STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

PEOPLE OF THE STATE OF MICHIGAN,    CASE NO. 05-017154-FC

     Plaintiff,                JUDGE: ARCHIE L. HAYMAN

vs.

OMAR RASHAD POUNCY,

     Defendant.

_____/

RECEIVED
FEB - 1 2007
SECOND DISTRICT
SANDRA SCHULTZ MENGEL
CHIEF CLERK

JURY TRIAL

BEFORE THE HONORABLE ARCHIE L. HAYMAN, CIRCUIT JUDGE

Flint, Michigan - Tuesday, January 24, 2006

APPEARANCES:

For the People:           CHRISTOPHER D. LAROBARDIERE (P-60954)
                      Assistant Prosecuting Attorney
                      900 South Saginaw Street, Suite 200
                      Flint, Michigan 48502
                      (810) 257-3210

For the Defendant:       OMAR RASHAD POUNCY
                      In Propria Persona
                      2617 Gibson Street
                      Flint, Michigan 48503

Advisor for Defendant:   MICHAEL J. BRECZINSKI (P-33705)
                      5005 Lapeer Road
                      Burton, Michigan 48509
                      (810) 743-2960

Digitally Recorded

Transcribed By:           Melissa K. Bellamy, CER-7386
                      Certified Electronic Recorder
                      900 South Saginaw Street
                      5th Floor East
                      Flint, Michigan 48502
                      (810) 424-4476

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

TABLE OF CONTENTS

|                                                                  | PAGE |
|------------------------------------------------------------------|------|
| MISCELLANEOUS ISSUES                                             | 4    |
| CHARGES READ – MINIMUM/MAXIMUM PENALTIES DISCUSSED              | 18   |
| PLEA OFFER DISCUSSED                                             | 21   |
| PLEA OFFER REJECTED BY DEFENDANT                                | 23   |
| MOTION IN LIMINE BY PROSECUTOR AS TO 404(B)                     | 23   |
| MOTION GRANTED                                                   | 29   |
| MOTION IN LIMINE BY PROSECUTOR AS TO TAPE RECORDING             | 29   |
| MOTION GRANTED                                                   | 34   |
| JURY SELECTION BEGINS                                            | 35   |
| JURY SWORN                                                       | 188  |
| INFORMATION READ TO THE JURY                                    | 192  |
| MR. POUNCY'S REQUEST TO DO HIS OWN OPENING STATEMENT           | 212  |

OPENING STATEMENTS:
    BY MR. LAROBARDIERE — 203
    BY MR. BRECZINSKI — 219

MR. POUNCY'S REQUEST TO REPRESENT HIMSELF — 232

WITNESSES:
  PEOPLE:
    JOSEPH SCOTT DAVIS
      DIRECT EXAM BY MR. LAROBARDIERE — 222
      CROSS-EXAM BY MR. POUNCY — 234
      RE-DIRECT EXAM BY MR. LAROBARDIERE — 268
    EARL BRADY
      DIRECT EXAM BY MR. LAROBARDIERE — 270
      CROSS-EXAM BY MR. POUNCY — 287
      RE-DIRECT EXAM BY MR. LAROBARDIERE — 308

EXHIBITS:

|                                          | INTRO | ADMIT |
|------------------------------------------|-------|-------|
| PX 1 CAMARO PHOTO                        | 223   | 224   |
| PX 2 PHOTO OF TRAILER                    |       | 272   |
| PX 3 '03 FORD PHOTO                      |       | 272   |
| PX 5 PHOTO OF HOUSE/KELLAR AVE           | 277   | 278   |
| PX 6 PHOTO OF 2ND HOUSE/KELLAR AVE       |       | 283   |
| PX 7 PHOTO OF BRUSH OFF OF KELLAR        |       | 285   |
| PX 8 PHOTO LINE-UP                       | 310   | 311   |

1     Flint, Michigan

2     Tuesday, January 24, 2006 at 9:40 a.m.

3           THE COURT:  We're on the record in the People

4     of the State of Michigan versus Omar Rashad Pouncy, case

5     number 05-17154-FC and Mr. Larobardiere would you state

6     your appearance please?

7           MR LAROBARDIERE:  Chris Larobardiere for the

8     People Judge.

9           THE COURT:  All right and Mr. Breczinski?

10          MR. BRECZINSKI:  Mike Breczinski on behalf of

11    defendant.

12          THE COURT:  All right Mr. Pouncy would you

13    state your name sir?

14          MR. POUNCY:  Omar Pouncy.

15          THE COURT:  All right this is the date set for

16    trial in this matter and first of all is there anything

17    that you need to bring to my attention Mr. Breczinski

18    before we get started here?

19          MR. POUNCY:  I do man, I mean-

20          THE COURT:  Just one second, I'll get to you in

21    just a second.  Anything that you have Mr. Breczinski?

22          MR. BRECZINSKI:  Your Honor I talked to my

23    investigator that is retained for this matter, Lennie

24    Acardo.  I don't have a written report but so far he has

25    been coming up with nothing on some of the leads that we

3

1    have as to possible alibi witnesses and such.  That's

2    what he's told me.  He's made numerous calls and seen

3    people and reviewing reports and everything else and

4    hasn't, and talked to my client I know several times.

5    Other than that I don't have a written report, any final

6    written report from him though.  Since I have no details

7    to say whether I'm ready for trial or not is problematic-

8           THE COURT:  Okay.

9           MR. BRECZINSKI:  just because I don't have that

10    full detailed report from him which I was expecting.

11           THE COURT:  All right then Mr. Larobardiere is

12    there anything you need to bring to my attention?

13           MR. LAROBARDIERE:  Well Judge just by way of

14    follow-up to that, it's my understanding that the

15    investigator did make attempts and made some contacts,

16    however was unsuccessful in furthering the defense's

17    theory or investigation.  That's my understanding.  Just

18    that he did take steps you know we're, we're not, it's my

19    understanding he didn't do anything.  We're not saying he

20    didn't do anything, that he did make attempts, those

21    attempts were fruitless and that's where we stand today.

22    That's my understanding.

23           THE COURT:  All right Mr. Pouncy do you want to

24    stand sir and what would you like to say sir?

25           MR. POUNCY:  What I would like to say, I really

1   don't think this, we, we ready to go on because um, well

2   I was about to say um first I really, my, me and my

3   attorney not, we really not, really not on the same page

4   to be honest. This, today our first time really talkin'

5   and me bein' able to really, you know what I'm sayin',

6   let him implicate the things that is, that I have

7   problems with in this report with the inconsistencies. I

8   have, I request for motions to be filed and no motions

9   was filed you know what I'm sayin'? My, my alibi um

10  motion that I, that's what I understand I'm not a um

11  Johnnie Cochran or nothin' you know what I'm sayin' but

12  you know what I'm sayin' I know that you have to file for

13  a alibi and I do have a alibi you know and, and I gave, I

14  did get with Mr. Acardo or whatever and I only gave him

15  one number. So it's only one number that he only asked

16  for, one number which was part of my alibi you know I

17  mean? Probably not got in contact with, with the person

18  but it's easy to get in contact with. You know I'm just

19  really, I wrote um what's, Barbara Menear, the Defender

20  Administrator and asked for um further, a, a different

21  counsel because I don't really feel satisfied with the

22  one I have and I been, I, I think I wrote you too and but

23  I didn't put that in there or whatever but it's just I

24  don't really feel comfortable with talkin' to him 'cause

25  every time we try to talk it's not like, you know what

1    I'm sayin', it's, I think it's like some kind of conflict

2    we don't get a chance to talk you know what I'm sayin'?

3    The longest we ever talked was today and me bein' able to

4    describe my um, my, my um discrepancies that I have

5    within this and the viewpoints that I seen in the, in the

6    um transcripts and the police report, I don't even have

7    the discovery, you know what I'm sayin', discovery packet

8    or what's tryin' to be used against me you know.  All I

9    have is a, a, a view of a size 11 shoe print, you know

10   what I'm sayin' that Mr. Acardo looked, measured my foot,

11   foot print and it was a size 13½.  You know I mean that's

12   the only thing I know that's really in my defense you

13   know what I'm sayin'?  That's the only thing I really

14   know, you know what I mean?  And a line-up wasn't done

15   and, and then um the, the State's the la, the lady um I

16   think her name was Mich, Mrs. Sandstrom or whatever, she

17   stated that she viewed the pictures on the 12th or

18   whatever, she viewed the pictures on the 12th, she viewed

19   the pictures on the 12th or, or what not, she say she

20   viewed the pictures on the 12th and the, the photo line-up

21   wasn't even conducted until the 13th, you know what I

22   mean?  If she stated that she only viewed one picture I

23   got, I wrote the Civil Rights Unit, they told me they

24   going to get the ACLU in 'cause I wasn't read no rights.

25   I don't have a copy of the statement that I made, you

1    know what I mean or none of that stuff.  I don't, I don't

2    even feel like I'm ready, it's not, I'm not ready

3    prepared.  If I had a further counsel and a better

4    understanding or if some motions would have been filed to

5    see if, even if they was denied or not but I, I really

6    feel you know what I'm sayin' that this, um, it's not

7    ready.  I'm not gettin' proper representation um

8    honestly.  I wrote who I thought I was supposed to write

9    you know what I mean I, I haven't got a response yet but

10    I really don't feel comfortable with, with the

11    representation that I have now.  I mean this, this the

12    longest I ever talked to him today, was today and that

13    was probably like ten, fifteen minutes and then you

14    called him in and that's the longest and you know what

15    I'm sayin'?  It's just I don't feel comfortable that's

16    all.

17          THE COURT:  I hear what you're saying.  You can

18    have a seat sir.  And you want to say anything about this

19    Mr. Breczinski at all?

20          MR. BRECZINSKI:  I've been over a number of

21    times.  Some of us have, we've had differences as to what

22    the, let's say-

23          THE COURT:  How many times do you think you've

24    been over to visit him since he's been over here in

25    Circuit Court?

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1          MR. BRECZINSKI: Maybe a half-dozen at least-

2          THE COURT: Okay.

3          MR. BRECZINSKI: something like that.

4          THE COURT: All right.

5          MR. BRECZINSKI: More than-

6          THE COURT: and you agree with that Mr. Pouncy?

7          MR. POUNCY: Yes right but we don't talk. He

8 come drop off a piece of paper, the paper, the

9 transcripts he drops it off. I don't get to talk to him.

10 I talk to the, I filed a um appeal. I talked to a appeal

11 attorney about this case, and he don't have nothin' to do

12 with it, longer than I done talked to my, the attorney

13 that supposed to represent me on it. I don't have no, no

14 motions. Man I asked that a motion be filed for my, for

15 the um-

16          THE COURT: Okay just one second if you don't

17 mind. Mr. Pouncy he's been over to see you a half-a-

18 dozen times. That's quite a few times for, for a lawyer

19 to go over and, and visit with their clients since they

20 arrived at Circuit Court. Mr. Breczinski has been doin'

21 this work probably as long as you've been livin' on this

22 planet. I don't know-

23          MR. POUNCY: But we haven't talked man.

24          THE COURT: how old are you. Just, I want you

25 to listen. I stood here and I, I listened to you and I

1    didn't interrupt you one bit-

2              MR. POUNCY:  Sorry about that.

3              THE COURT:  yeah so now how old are you Mr.

4    Pouncy?

5              MR. POUNCY:  Eighteen.

6              THE COURT:  He's been practicin' law longer

7    than you've been born okay?  If you go and take an

8    automobile to get the transmission rebuilt, you don't go

9    in there and ask the guy who's rebuildin' the

10   transmission every detail that he's doin'.  You bring the

11   car in, you drop it off and you come back and pick it up.

12   And the reason is is because you expect that this person

13   knows how to build a transmission and he doesn't have to

14   talk to you about buildin' this transmission you know

15   'cause he's built 'em before.  He's built a hundred

16   thousand of 'em probably by the time you show up with

17   yours.  And so you, when you talk about motions and you

18   talk about all these things that should have been done,

19   Mr. Breczinski is a lawyer who will file motions if it's

20   appropriate to file motions.  And if he didn't file a

21   motion, there's probably a good chance that there's not

22   a, a legal basis to file the motion.  Lawyers can't just

23   file motions to be filin' 'em.  They have to have a basis

24   in law and in fact to file a motion okay?  Now you might

25   think it's, it's wise to file the motion but you don't

1    know the law.  So there's no way for you to really judge

2    that.  Unfortunately, you're in a position where you

3    really just don't have a, a way of judging whether he's a

4    good lawyer or not.  And that's just the bottom line.

5    It's just like a doctor you know?  You don't know whether

6    a doctor is really good at what they do or not.  You, you

7    take people's word about the repu, his reputation or her

8    reputation but you have no idea because you don't know

9    anything about medicine and you don't know what's

10   involved in the surgery that you're goin' through.  So

11   you're not in a position to judge.  Now I know you're not

12   hearing what I'm saying but-

13          MR. POUNCY:  I am.

14          THE COURT:  and I'm not asking you to in, to

15   interrupt because I'm not finished okay?  Now I know

16   you're not really hearin' what I'm sayin' but you're not

17   in a position to judge whether Mr. Breczinski knows how

18   to do his job or not.  So at this point I'm not really in

19   a position to grant your request to have new counsel

20   because we're here on the day of trial, we got a jury

21   downstairs that's ready to go and we're gonna try this

22   case today Mr. Pouncy.  Mr. Breczinski you've indicated

23   here that you've had a private investigator that's been

24   hired at County expense that's gone out and has tried to

25   follow up on some of the leads that Mr. Pouncy has given

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1   and he's come up with nothin'.  I mean and-

2               MR. POUNCY:  (Inaudible).

3               THE COURT:  Mr. Pouncy I'm not talkin' to you

4   right now okay?  I'm gonna ask you to remain quiet until

5   I'm done.

6               MR. POUNCY:  All right.

7               THE COURT:  What it sounds like to me then is

8   that the investigator has filed, followed up with the

9   leads and he just hasn't been able to come up with

10  anything.  And maybe that's because there may or may not

11  be anything to come up with I don't know.  Has Mr. Pouncy

12  said anything to you about filing an alibi notice for

13  him?

14              MR. BRECZINSKI:  Your Honor we have discussed

15  that matter.  That's one of the reasons I got the

16  investigator so he could go out and-

17              THE COURT:  If he could find this alibi for

18  him?

19              MR. BRECZINSKI:  find the possible witnesses.

20  Obviously, if there are no other witnesses, he can get up

21  on the stand with or without a notice and say I wasn't

22  there.  Well you need an alibi notice if you've got other

23  proof witnesses or other material proof of that alibi-

24              THE COURT:  And you have put this investigator

25  in contact with Mr. Pouncy-

1    MR. BRECZINSKI:  Yes.

2    THE COURT:  and Mr. Pouncy has given him the

3    information that he had to locate this person or persons

4    that have the alibi is that correct?

5    MR. BRECZINSKI:  I have also given the

6    investigator copies of everything in my file, copies of

7    the transcripts also from the preliminary exam so he has

8    everything that I have also that he's reviewed.  I

9    understand that so he-

10    THE COURT:  I'll come back to you in a minute.

11    MR. BRECZINSKI:  might see things that I didn't

12    see.  He may have seen things that I overlooked because

13    there is a fair bit of material and it is a large bit and

14    there are discrepancies between what I consider sometimes

15    minor discrepancies between what different statements.

16    Um and then you know-

17    THE COURT:  That's, that's, that's, that's,

18    that's with every case I mean it's, you know people see

19    and hear things differently.  In fact the jury is

20    instructed to that effect during the trial.  You know two

21    people can look at the same event and you ask them to

22    describe and they're gonna give you a different

23    description.  That's not unusual.  But you say they're

24    minor I mean so it doesn't sound like anything glaring by

25    that, by those words that were used.  All right so at

1    least you've had a chance to look into the alibi issue

2    and you've had your investigator look into it?

3         MR. BRECZINSKI:  I've been having him look into

4    it yes.  That's why I got the investigator because there

5    were a number of leads which I quite frankly would have

6    been stretched too thin to do it so I needed somebody to

7    do it for me which is why I got an investigator.

8         THE COURT:  Yeah I understand.  All right Mr.

9    Pouncy what else did you want to say?  If you would stand

10   please?

11        MR. POUNCY:  I requested for it 'cause um, my

12   um stepbrother is the one that's implicated me into this

13   situation.  Falsely implicated me in this, I requested

14   for um a, a correct picture, may I approach you please?

15        THE COURT:  No if you have your lawyer hand it

16   up to me though.  Mr. Breczinski, Mr. Breczinski-

17        MR. POUNCY:  Man this, tryin' to railroad me

18   man.

19        THE COURT:  Mr. Breczinski if you would take

20   this item from him and bring it up to me I would

21   appreciate it.

22        MR. POUNCY:  You don't even have proper

23   procedures man that's my life on the line man.  And I,

24   that's somebody's that not, you know what I'm sayin' I

25   don't feel comfortable with from day one.

1    THE COURT:  Now why are you showin' me this

2    picture Mr. Pouncy?

3    MR. POUNCY:  Because I asked him to get a more

4    appropriate picture than from, than that picture you

5    know?

6    THE COURT:  More appropriate picture for what?

7    MR. POUNCY:  For, to be presented you know what

8    I'm, to be presented, to be presented in Court or what

9    not.

10    THE COURT:  Now who, who is gonna present your

11    picture in Court?

12    MR. POUNCY:  Who, whoever, whoever is

13    representin' or me or whatever, whatever.

14    MR. BRECZINSKI:  That is a picture of whom?

15    You're not explaining what-

16    MR. POUNCY:  Oh that's a picture of my, my

17    stepbrother best friend or whatever who be's with him all

18    the time and people mistakes me for him all the time man.

19    And, and that, you know what I'm sayin' I'm usin' that

20    because they found a size 11 shoe print at the scene of

21    the crime, the investigator (inaudible) my print up, they

22    don't even have that, what, I don't even have the

23    discovery what's all in my packet.  All I got was

24    (inaudible) and transcripts.

25    THE COURT:  Let me just ask, please.  You've

1    talked with him about this issue also I, I assume is that

2    correct?

3              MR. BRECZINSKI:  I've talked with him some.

4    Personally that picture looks like an eleven-year old, at

5    least to me-

6              THE COURT:  Yeah.

7              MR. BRECZINSKI:  and that has been shown to

8    Acardo who is supposed to look into this issue also.

9              MR. POUNCY:  But that is a twenty-three year

10   old.  That's just a younger picture you know when people

11   pass away-

12             THE COURT:  Mr. Pouncy I, I understand that but

13   let me say somethin' to you okay?

14             MR. POUNCY:  Man I refuse for me to go into

15   Court today Your Honor and I'm not tryin' to be

16   disrespectful-

17             THE COURT:  Mr. Pouncy I'm gonna tell you yes

18   you are.  You are bein' disrespectful right now and I'm

19   gonna tell you I'm not gonna tolerate you bein'

20   disrespectful in this Court.  Now you're gonna have a

21   choice.  You can either sit in that chair and act

22   civilized and go through this process in a civilized

23   manner or I'll have to make other choices.  One might be

24   to remove you from this courtroom and have your trial

25   without you even present.  The other might be to just tie

1    you up and gag you right there in the seat and have the

2    jurors to sit here and watch you with a gag in your mouth

3    during the entire trial.  But I'm not gonna have you

4    disrupting this Court, you understand that?

5              MR. POUNCY:  Yes.

6              THE COURT:  And the reason is is because number

7    one, you really don't know what you're talkin' about for

8    the most part okay, just to boil it right down.  You

9    think you do and that's part of your problem in my

10   opinion okay?  But you don't and you're not gonna come in

11   here and hijack this trial because you're runnin' some

12   game about us railroading you.  Nobody's gonna railroad

13   you in this courtroom.  There's gonna be witnesses who

14   are gonna have to come in here and get on the stand and

15   testify under oath.  So ain't nobody runnin' no monkey

16   type courtroom in this courthouse you understand that?

17   Are you hearin' what I'm sayin'?

18             MR. POUNCY:  Yes I'm hearing.

19             THE COURT:  All right so then I don't want to

20   hear anything about that 'cause nobody's gonna railroad

21   you okay?  Now please have a seat and I really don't

22   think I want to hear anything else from you at this point

23   okay so please have a seat and just be quiet.  All right

24   is there anything else we need to do Mr. Breczinski

25   before we get this jury down here?

1          MR. BRECZINSKI:  I, I would state Your Honor

2     that that picture and the name was given to Mr. Acardo as

3     the idea that it wasn't him, it was someone else that

4     looked like him-

5          THE COURT:  I understand.

6          MR. BBRECZINSKI:  and it's basically tied in

7     with the alibi so he was supposed to look into both

8     situations.  As far as I know without a written report of

9     everything he did, I don't know that but I assume because

10    of his reputation and past performance that he would have

11    'cause he's been known to be usually a fairly thorough

12    person.

13         THE COURT:  He is.  He's been around for years.

14         MR. BRECZINSKI:  So, you know and so that's

15    been looked into.  I haven't heard anything positive to

16    that.  That doesn't mean that this person's name can't be

17    brought up.  It doesn't mean that, for example, Mr.

18    Grimes can't be cross-examined as to whether it really

19    was this gentleman.

20         THE COURT:  Yes I understand that.  All right I

21    understand that.  Now, what I want to do at this point

22    before we get the jury down here is I want to discuss

23    what the plea offer is and what the guidelines are so at

24    least Mr. Pouncy understands what's goin' on there and he

25    can't say he didn't have that information before he goes

1      to trial.  So Mr. Larobardiere will you first tell us

2      what is the charges and what are the maximum penalties if

3      you would please?

4              MR. LAROBARDIERE:  Yes Judge.  Judge there are

5      eleven counts.  Count one carjacking, count two

6      carjacking, count three carjacking, count four armed

7      robbery, count five armed robbery, count six armed

8      robbery, count seven armed robbery, count eight felony

9      firearm, count nine felony firearm, count ten carjacking,

10     count eleven felony possession of a firearm.

11             THE COURT:  Okay.

12             MR. LAROBARDIERE:  Judge there is a plea offer.

13     He does have two prior felonies.

14             THE COURT:  What are the two priors for?

15             MR. LAROBARDIERE:  They are for-

16             MR. POUNCY:  (Inaudible) no search warrant or

17     nothin'.

18             THE COURT:  Mr. Pouncy I'm gonna ask you to be

19     quiet again okay?  Now if you can't be quiet I'm gonna

20     remove you from the courtroom and we're gonna have this

21     trial without you present and then you won't know exactly

22     what went went on in here.  So if you want to be here to

23     see what's happenin', then I suggest that you keep your

24     mouth shut.  Go right ahead Mr. Larobardiere.

25             MR. LAROBARDIERE:  Judge there are, I'm looking

1    for (inaudible) notice.  There are two priors.  One is

2    for carrying a concealed weapon and I believe delivery of

3    marijuana.

4           THE COURT:  Okay so he's, has the potential of

5    facing a habitual offender third is that what you're

6    tellin' me?

7           MR. LAROBARDIERE:  That's true.  And the other

8    is possession of cocaine Judge.

9           THE COURT:  All right so now if he were also

10   convicted of habitual offender third, the carjacking

11   carries life, in fact all of the carjacking offenses

12   carry life, armed robbery carries life of course, felony

13   firearm is two years consecutive and preceding any time

14   done on the underlying felonies and then he's got

15   carjacking which again is a life offense and then a felon

16   in possession which, if he were convicted of habitual

17   offender third, would make that offense not a five-year

18   max but a ten-year max is that correct?  It would double

19   the maximum is that correct?

20          MR. LAROBARDIERE:  Yes Judge.

21          THE COURT:  Now what are the guidelines on

22   these offenses, assuming he were convicted of these

23   offenses that are in the information, what would his

24   guidelines be?

25          MR. LAROBARDIERE:  Mr. Breczinski has that

1    Judge.

2          THE COURT:  Would you tell me what his

3    guidelines are Mr. Breczinski?

4          MR. BRECZINSKI:  You Honor we sat down to,

5    together, Chris and I did and were figuring the

6    guidelines and we figured with habitual third and this

7    was the armed robbery, carjacking alone-

8          THE COURT:  Yeah.

9          MR. BRECZINSKI:  since those are the most

10   serious ones I'd say, we're figuring with the habitual

11   third it's a hundred and thirty-five months to three

12   hundred and thirty-seven.

13         THE COURT:  Three hundred and thirty-seven?

14         MR. BRECZINSKI:  Yes.

15         THE COURT:  All right.  Hundred and thirty-five

16   months to three thirty-seven which is really somewhere in

17   the neighborhood of 11.5 years to what, three hundred

18   thirty-seven months is, that's twenty years plus another

19   hundred and thirty-seven months which is probably about

20   another nine years so that's somewhere around almost

21   thirty years isn't it?

22         MR. BRECZINSKI:  Closer to (inaudible) years.

23         THE COURT:  Three hundred and sixty would be

24   thirty years so it'd be about twenty, twenty-eight,

25   twenty-nine years I think.

1          MR. BRECZINSKI:  Around twenty-eight years.

2          THE COURT:  All right.  So somewhere between

3    eleven and-a-half to twenty-eight years, somewhere in

4    that area on the, on the guidelines and so, just so you

5    know Mr. Pouncy what that means is is that if you were

6    convicted of all of the offenses and if you were a

7    habitual offender third and you came in front of me for

8    sentencing, the guidelines say that I should give you a

9    sentence somewhere between eleven and-a-half to twenty-

10   eight, eight years, do you understand that?  All right

11   now let's talk about the offer that's bein' made.  What

12   is the offer?

13         MR. LAROBARDIERE:  Judge the offer is plea to

14   those eleven counts and no HO for sentencing.

15         THE COURT:  All right and so what would be the

16   guidelines without habitual offender third?  What would

17   be his guidelines?

18         MR. BRECZINSKI:  The bottom range is still a

19   hundred and thirty-five and the top it two twenty-five.

20         THE COURT:  Two twenty-five?

21         MR. BRECZINSKI:  That's what we figured them

22   out to be.

23         THE COURT:  All right so he's still lookin' at

24   about eleven and-a-half to almost twenty, almost twenty

25   years.

1       MR. BRECZINSKI:  Yes.

2       THE COURT:  Is that correct?

3       MR. BRECZINSKI:  Correct.

4       THE COURT:  All right and-

5       MR. BRECZINSKI:  Nineteen years approximately.

6       THE COURT:  All right and he's also got the

7  felony, are you asking to plea to the felony firearm as

8  part of the deal Mr. Larobardiere?

9       MR. LAROBARDIERE:  Yes Judge.

10      THE COURT:  On both, so he would also have that

11 two years on top?

12      MR. LAROBARDIERE:  Correct.

13      THE COURT:  All right.  So really I can see why

14 he might want to go to trial.  There's not much

15 difference in terms of the guidelines between the offer

16 and the original charges it sounds like to me.

17      MR. LAROBARDIERE:  Well Judge the co-defendant

18 did plead to armed robbery and felony firearm and I think

19 his guidelines are about eight or nine years.

20      THE COURT:  And are nine years.

21      MR. LAROBARDIERE:  So there's not a lot of

22 difference on them.

23      THE COURT:  Yeah it sounds like to me I mean

24 there's really not much difference in the guidelines here

25 at all.  Why don't you talk to your attorney Mr. Pouncy

1    and then he can tell me what you want to say.  And can

2    you check with Jackie see if our jurors are ready?

3               CLERK:  (Inaudible).

4               THE COURT:  Are they ready?

5               CLERK:  Yeah they're ready.

6               THE COURT:  Okay.  All right.  Okay Mr.

7    Breczinski is there anything else you need to bring to my

8    attention?

9               MR. BRECZINSKI:  No Your Honor.

10              THE COURT:  Okay and Mr. Pouncy it would be

11   correct that you're not interested in taking the

12   prosecutor's offer is that correct?

13              MR. POUNCY:  I will never take the plea to

14   nothin' I did 'cause I didn't do it.

15              THE COURT:  Okay then I think we should get

16   ready to have the jury brought down and Trish if you'll

17   go get the jury and we'll start jury selection.  I want

18   to ask those of you in the audience if you would step in

19   the hallway for now just until we get the jury selected

20   and then we'll go from there.

21              MR. LAROBARDIERE:  Judge I did have, I talked

22   to Mr. Breczinski, I do have a couple of preliminary

23   matters before we do that.

24              THE COURT:  What kind of preliminary matters?

25              MR. LAROBARDIERE:  A motion in limine regarding

1    404(b), if he filed a notice about that.  There is a

2    case, a separate case that is set for trial in March that

3    involves two witnesses.  It's a similar scheme of

4    conduct, similar statements made where another car was

5    carjacked by Mr. Pouncy and those witnesses have

6    identified him and would testify that it was done the

7    same manner, the same words were used similar to this.

8           THE COURT:  And what would be the purpose for

9    admitting, for having this evidence admitted?

10          MR. LAROBARDIERE:  Same, same course, scheme of

11   conduct.  It was done in the same way, the same words of

12   Kings Automotive or Kings Garage were used, the same

13   words used in this case.  It was done in a similar manner

14   and fashion so the purpose would be for the similar

15   course of conduct or schemed plan.

16          THE COURT:  And what's your comment on that Mr.

17   Breczinski?

18          MR. BRECZINSKI:  Your Honor, I understand that

19   it doesn't necessarily have to be things that they were

20   previously convicted on but in this case they're gonna

21   have a trial later on that, those issues.  I don't think

22   they need it and what they've got is they apparently

23   have, you know, a number of people that say this is him

24   for identity and I'm not sure that this is really gonna

25   add anything to the trial or really give, bolster their

1    (Judge Archie L. Hayman; 01-24-06; 10:04 a.m.)

2    case any.  This is when we had, before when we had the

3    other case and was arraigned and it was set for the 31st

4    we had discussions about instead of do, trying to do

5    something about this, combining them all.

6          THE COURT:  Well the thing is when you're

7    looking at this, at this issue, under 404(b), it's really

8    a uh, a rule of inclusion as opposed to exclusion which

9    means that normally if the prosecution is able to show a

10    legitimate basis for asking to have the evidence brought

11    forth, that the Court ought to allow it in.  The Court

12    has to balance it of course under 404, under 403 to

13    determine whether the probative value of the evidence is

14    substantially outweighed by its prejudicial effect and I

15    don't know enough of the details about this other

16    incident to determine whether or not it's similar enough

17    to this incident to allow it in so I think there's going

18    to have to be some offer of proof made before I would be

19    able to rule on this Mr. Larobardiere and what I would

20    suggest is that uh, uh, that uh, have you put this in

21    writing, this motion that you're discussing here?  All

22    right and it's in the file here?  And have you set forth

23    what similarities that you find between the two, between

24    the case that's comin' up the pike and this one here?

25          MR. LAROBARDIERE:  Just that it was done in the

1      same manner as the current offense Judge and-

2              THE COURT:  And when you say the same manner,

3      what exactly is the same about it?  I heard you say that

4      they, that, when you say this Automotive, what's, why is

5      that significant that that was brought up?

6              MR. LAROBARDIERE:  Offer a little more detail

7      Judge-

8              THE COURT:  Okay.

9              MR. LAROBARDIERE:  and that, in the 404(b)

10     offense, there was a vehicle for sale, 1972 Monte Carlo

11     and Mr. Pouncy came and looked at that vehicle more than

12     once.  On that last occasion looking at it, he took it

13     for a test drive and was in the passenger seat and

14     directed the driver to get out, pull over and, and get

15     out.  Before he did that at gunpoint, before he did that

16     he said I want you to take, I want, want to buy the

17     vehicle but I want to check out my mechanic at Kings

18     Automotive.  And that's the same M.O., the same steps and

19     circumstances that were done in the current offenses

20     that'll be tried here today.

21             THE COURT:  So these are cars that were taken

22     off a car lot you're tellin' me?

23             MR. LAROBARDIERE:  No these are private for

24     sale vehicles.

25             THE COURT:  Private for sale vehicles, I see

1    okay. So he goes to the private home is what you're

2    claiming-

3            MR. LAROBARDIERE: Right.

4            THE COURT: And asks to test drive the vehicle

5    and then does the carjacking when they, they're out in

6    sight, out ridin' in the vehicle-

7            MR. LAROBARDIERE: Exactly.

8            THE COURT: and makes the comment that he wants

9    to take it to his mechanic sometime during the discussion

10   at this automotive place?

11           MR. LAROBARDIERE: True. Now in the 404(b)

12   offense, let me back up. In the current offense before

13   the Court today for trial, the carjacking at, there's the

14   similar comments I want to take it to my mechanic and

15   that is actually done, they go to where he wants the

16   mechanic to look at it and that's where the carjacking

17   occurs. The difference in the 404(b) case is that that

18   same comment is made, however the driver, or possess, the

19   person in possession of the vehicle declines to do that.

20   So at that point he tells 'em, he pulls, pulls 'em over

21   at gunpoint wherever they're test driving. So that's the

22   only difference between the 404(b) case and the current

23   offense today.

24           THE COURT: All right anything else Mr.

25   Breczinski?

27

1      MR. BRECZINSKI:  Um no Your Honor it's, in

2   general broad strokes that is what their claim is.

3      THE COURT:  Well under a 404(b), the

4   prosecutor, when they're making this request, as long as

5   they show a legitimate reason for bringing in the

6   evidence it should be admitted assuming that it meets the

7   test under 403.  Here the prosecution is bringing it in

8   for the purpose of, of uh showing identification of the

9   defendant as the perpetrator and that is a legitimate

10  basis to, to utilize that evidence.  Under 404, under 403

11  the question is whether or not the probative value of the

12  evidence is substantially outweighed by its prejudicial

13  effect.  It certainly is prejudicial because certainly

14  there is a concern that the jury might feel that well if

15  he committed this crime, that's the one that's coming up

16  the pike, maybe he committed the one that's before us

17  right now.  But the probative value is also very

18  significant because it would tend to show that he is the

19  perpetrator and the probative value is significant and I

20  think it does substantially outweigh the prejudicial

21  effect because the jury will certainly be instructed that

22  they cannot assume that because he, he may have been

23  involved in something previously that really he hasn't

24  been convicted of, that he in fact committed this

25  offense.  So I think because of that I, I would find that

1   it is admissible under 404(b) and it is the type of, of

2   uh, of uh matter that ought to be allowed in to establish

3   the defendant's identity on behalf of the prosecution.

4   So I will grant your motion in limine Mr. Larobardiere

5   and you can prepare an order and make sure that that's in

6   the file that reflects that okay?

7           MR. LAROBARDIERE:  Yes sir.

8           THE COURT:  All right anything else Mr.

9   Larobardiere?

10          MR. LAROBARDIERE:  Yes Judge.  The other matter

11  is an evidentiary matter and I have is what is a, a tape

12  that I would be moving to admit into evidence and I've

13  let counsel hear this and what it is Judge is a tape

14  recording of a threat of Mr. Pouncy to one of the victims

15  after the actual carjacking and the victims recognized

16  the voice on here and the threats contain don't show up

17  to Court, don't say what I look like, say you don't know

18  me and threats to burn up or blow up their house or

19  something, damage their house in some way.

20          THE COURT:  Now how do you know that that's Mr.

21  Pouncy on the tape?

22          MR. LAROBARDIERE:  The victims first, through

23  these negotiations to, to come look at this vehicle,

24  obviously they talked to him via telephone so when they

25  hear this fairly lengthy message left on the machine,

1    they recognize his voice.  So that's how they would

2    identify or authenticate that tape and voice.

3            THE COURT:  So they're gonna be on the witness

4    stand and they're gonna have the opp, they're gonna be

5    able to identify and verify that that is in fact his

6    voice?

7            MR. LAROBARDIERE:  True from previous dealings

8    with him on the phone about negotiating this vehicle.

9            THE COURT:  All right.

10           MR. LAROBARDIERE:  And actually have a face to

11    face contact too of course again about the vehicle.

12           THE COURT:  All right Mr. Breczinski what's

13    your response to this sir?

14           MR. LAROBARDIERE:  Judge it, I just, I do have

15    one follow up.  I did do some research on this.  I've

16    shared this with Mr. Breczinski-

17           THE COURT:  Yes.

18           MR. LAROBARDIERE:  and what I found was a

19    Michigan Supreme Court case, People versus Scholl which

20    says that threats after a crime are generally admissible

21    to show consciousness of guilt and that is for the jury

22    to decide the significance of the threat when comparing

23    it to the other testimony in the record.

24           THE COURT:  Yes.

25           MR. LAROBARDIERE:  And I did find another

1    companion case, had followed up on that.  November of '05

2    a Court of Appeals case Judge that discusses that Scholl

3    case and it says that it's not prejudicial to admit

4    threats that are related to the offense.

5           THE COURT:  All right Mr. Breczinski what do

6    you want to say about this sir?

7           MR. BRECZINSKI:  Your Honor if it was just that

8    we'd be jumping up and down about it.  Unfortunately for

9    my client they've also, the, at least the, they've

10   informed me, at least through that that they apparently

11   have the call traced from the, these people, was it the

12   Sandstroms?

13          MR. LAROBARDIERE:  Yes sir.

14          MR. BRECZINSKI:  Sandstroms phone records where

15   it originated from and it apparently originated from the

16   holding room down at the Central District Court and a

17   time-

18          MR. LAROBARDIERE:  Judge that's, I just want to

19   correct him for the record.  That's, we did discuss that

20   possibility but we, we won't be offering any proof as to

21   that.  It will just be authenticating the voice on the

22   tape from the previous dealings with him.

23          THE COURT:  And what else did you want to say

24   Mr. Breczinski?

25          MR. BRECZINSKI:  Well I understood from them

1    they apparently traced it to the holding room at the

2    Central District Court.  Is that correct?  That's what

3    I've been informed by the detective.

4              MR. LAROBARDIERE:  We were investigating the

5    occurrence of the telephone call Judge and we did think

6    that it was happ, it happened while he was brought over

7    for District Court examination but after talking with the

8    victims and researching the actual date of the recording,

9    that, that's not, that didn't happen.  So we wouldn't be

10   offering any proof as to that.  Only authenticating it

11   from the victim's dealings with Mr. Pouncy.

12             THE COURT:  Well I'm not sure I'm understanding

13   this.  So you're tellin' me that the phone call was

14   traced to the holding room in the Cen, uh Central

15   District Court, is that what you're tellin' me?

16             MR. LAROBARDIERE:  No Judge.  We did initially

17   believe that that's where the telephone call was made and

18   however-

19             THE COURT:  Why did you initially believe that?

20             MR. LAROBARDIERE:  Because we believed because

21   he was in custody at the time.  But after speaking with

22   the victims and uh-

23             THE COURT:  Let me ask you when you say you

24   traced it, did you trace it by tracing, you know like a

25   trace that they do through a phone line is that what

1      we're talking about?

2            MR. LAROBARDIERE:  No there were no traces

3      done.

4            THE COURT:  All right so-

5            MR. LAROBARDIERE:  We were trying to

6      investigate that possibility.  That's what Mr.

7      Breczinski's talking about.

8            THE COURT:  So when you say trace, you didn't

9      trace it mechanically-

10           MR. LAROBARDIERE:  No.

11           THE COURT:  you're tellin' me that you

12     basically made some assumptions or tried to track back.

13           MR. LAROBARDIERE:  We were tryin' to track the

14     possibilities where it was placed at.

15           THE COURT:  Okay when you use the word tracing

16     I, I was thinking that someone had traced through a line

17     and said well that's where the call came from and that to

18     me seems to me would be significant and ought to be

19     brought before the Court if that was the case whether it-

20           MR. LAROBARDIERE:  That's why-

21           MR. BRECZINSKI:  I-

22           THE COURT:  whether it incriminates him or, or

23     does not incriminate him you know.

24           MR. BRECZINSKI:  From what I was told I was

25     under the impression they had contacted the phone company

1    to find out-

2            THE COURT:  Yeah that's what I was thinkin' for

3    a minute here but no what you're sayin' is that they

4    surmised somehow that it came from there but not through

5    an electronic trace.  And so the way you're gonna

6    establish it basically is by authentication of a person

7    on the witness stand sayin' that they checked the voice

8    is that right?

9            MR. LAROBARDIERE:  True Judge.

10           THE COURT:  Now is there, was there any way to

11   trace the phone call do you know?

12           MR. LAROBARDIERE:  No that's what we've, that's

13   what I was going to get into.  That's what we found out

14   that these phones are not, there are certain cell phones

15   used that are not traceable.  That's what was used in

16   this case-

17           THE COURT:  All right.

18           MR. LAROBARDIERE:  (Inaudible).

19           THE COURT:  All right anything else Mr.

20   Breczinski?

21           MR. BRECZINSKI:  No Your Honor.

22           THE COURT:  All right at this point I would

23   allow you to uh, to uh, to present the tape if you lay a

24   proper foundation for it and you authenticate it okay?

25   Is there anything else Mr. Larobardiere?

1          MR. LAROBARDIERE:  No sir.

2          THE COURT:  Mr. Breczinski anything you need to

3   bring to my attention at this time?  Is there anything

4   else Mr. Breczinski?  All right gentlemen you're, you're

5   havin' a con, side conversation and I just need to know

6   is there anything else on this issue Mr. Breczinski?

7          MR. BRECZINSKI:  No Your Honor.

8          THE COURT:  All right then I've made my ruling.

9   Trish go get the jury and let's get started.

10              (At 10:16 a.m., Court recessed)

11              (At 10:23 a.m., Court reconvened)

12          THE COURT:  We're on the record in the People

13   of the State of Michigan versus Omar Rashad Pouncy, case

14   number 05-17154-FC.  Ladies and gentlemen my name is

15   Archie Hayman.  I want to welcome you all here to the

16   Genesee County Circuit Court.  I will be the Judge

17   presiding over this matter.  I know that jury duty may be

18   a new experience for some of you.  Jury duty is one of

19   the most serious duties that members of a free society

20   are asked to perform.  Our system of self government

21   cannot exist without it.  The jury is an important part

22   of this Court.  The right to a jury trial is an ancient

23   tradition and part of our heritage.  The law says that

24   both a person who is accused of a crime and the

25   prosecution have the right to a trial, to have the right

1    to a trial not by one person but by a jury of twelve

2    impartial persons.  Jurors must be as free as humanly

3    possible from bias, prejudice or sympathy for either

4    side.  Each side in a trial is entitled to jurors who can

5    keep open minds until the time comes to decide the case.

6    A trial begins with jury selection.  The purpose of this

7    process is to obtain information about you that will help

8    us choose a fair and impartial jury to hear this case.

9    During jury selection the lawyers and I will ask you

10    questions.  The questions are meant to find out if you

11    know anything about the case.  Also we need to find out

12    if you have any opinions or personal experiences that

13    might influence you for or against the prosecution, the

14    defendant or any witnesses.  One or more of these things

15    could cause you to be excused in this particular case

16    even though you may otherwise be qualified to be a juror.

17    The questions may probe deeply into your attitudes,

18    beliefs and experiences.  They are not meant to be an

19    unreasonably prying into your private life.  The law

20    requires that we get this information so that an

21    impartial jury can be chosen.  If you do not hear or

22    understand the question you should say so.  If you do

23    understand, understand it, you should answer it

24    truthfully and completely.  Please do not hesitate to

25    speak freely about anything you believe we should know.

1    I would now ask all of the potential jurors to stand and

2    swear to answer truthfully, fully and honestly all the

3    questions that you'll be asked about your qualifications

4    to serve as a juror in this case.  If you have religious

5    beliefs against taking an oath, you may affirm that you

6    will answer all the questions truthfully, fully and

7    honestly.  You may proceed Mary Lee.

8         COURT CLERK:  Jurors please raise your right

9    hand.  Do you solemnly swear or affirm that you will

10   truthfully and completely answer all questions about the

11   qualifications to serve as jurors in this case?

12        JURY POOL MEMBERS:  I do.

13        THE COURT:  Please have a seat ladies and

14   gentlemen.  At this time ladies and gentlemen we're gonna

15   select fourteen individuals to come up and have a seat in

16   this jury box.  As we call the names we'll be sending you

17   guys that are hear back to take their seats.  And I think

18   we'll start with you guys in the front row will be the

19   first ones to, to go back as we call 'em up one at a

20   time.  Mary Lee you may proceed.

21        COURT CLERK:  Juror B63, Marvin Stanford.

22        THE COURT:  Okay Mr. Stanford if you'll come up

23   here to the front row and have a seat and if uh you sir

24   will step out and take his seat.  Now was that Stanford

25   or Stafford?

37

1          COURT CLERK:  Stanford.

2          THE COURT:  Okay thank you.  Okay thank you.

3     And actually you're gonna have to go back this way sir.

4     I know that doesn't, you're gonna have to go back out

5     this way and then walk up where that gentleman is and

6     come all the way up to this seat right here in the front

7     row.  And I apologize I think I did direct you to this

8     witness stand here.  My mistake and I apologize for that.

9     And welcome to the Genesee County Circuit Court sir.  You

10    may proceed Mary Lee.

11         COURT CLERK:  Juror H275, Diane Romano, R-o-m-

12    a-n-o.

13         THE COURT:  Okay and good morning Ms. Romano

14    and if you'll take her seat sir.  Thank you.  And we want

15    to welcome you also to the Genesee County Circuit Court.

16         COURT CLERK:  Juror H276, Kimberly Rudolph.

17         THE COURT:  Okay, oh Ms. Rudolph, all right.

18    If you'll come down and take the third seat there and we

19    also want to welcome you to the Genesee County Circuit

20    Court.

21         COURT CLERK:  Juror B68, Rose Wilder.

22         THE COURT:  Good morning Ms. Wilder.  If you'll

23    take the fourth seat there and we want to also welcome

24    you to the Genesee County Circuit Court.

25         COURT CLERK:  Juror B47, Donna Fox.

1      THE COURT:  Good morning Ms. Fox.

2      MS. FOX:  Morning.

3      THE COURT:  We want to welcome you also to the

4  Genesee County Circuit Court.

5      COURT CLERK:  Juror B55, Shirley Michael.

6      THE COURT:  And good morning Ms. Michael and if

7  you'll have a seat next to Ms. Fox and we also want to

8  welcome you to the Genesee County Circuit Court.

9      COURT CLERK:  Juror G214, Diane Banyas, B-a-n-

10  y-a-s.

11      MS. BANYAS:  Right here.

12      THE COURT:  Okay and you're gonna go right to

13  that seat Ms. Banyas, Banyas.  And good morning Ms.

14  Banyas and we want to welcome you also to the Genesee

15  County Circuit Court.

16      MS. BANYAS:  Thank you.

17      COURT CLERK:  Juror B58, William Nordstrom.

18      THE COURT:  And good morning Mr. Nordstrom and

19  we also want to welcome you the Circuit Court sir.  Yeah

20  it might be easier to let one, let those off the end

21  start goin' off first and then uh we'll come, yeah that

22  might be better.

23      COURT CLERK:  Juror B64, Mary Suski.

24      THE COURT:  And good morning Ms. Suski and if

25  you'll, yep you'll have to go up that way, up to the

1    second row and have a seat next to uh Mr. uh Nordstrom,

2    or excuse me - we need Ms. Suski, where is she?

3               COURT CLERK:  She's coming.

4               THE COURT:  Oh you're Ms. Suski okay thank you.

5    Yes.  All right we welcome you to the Genesee County

6    Circuit Court ma'am.

7               COURT CLERK:  Juror B70, Wayne Wright.

8               THE COURT:  And good morning Mr. Wright.

9               COURT CLERK:  Juror H270, Craig Morris.

10               THE COURT:  Good morning Mr. Morris.

11               MR. MORRIS:  Morning.

12               THE COURT:  And we also would welcome you to

13    the Circuit Court.

14               COURT CLERK:  Juror B51, Shelly Labean, L-a-b-

15    e-a-n.

16               THE COURT:  And good morning Ms. Labean.

17               MS. LABEAN:  Good morning.

18               THE COURT:  And we welcome you to the Circuit

19    Court also.

20               COURT CLERK:  Juror H254, Dawn Fox.

21               THE COURT:  All right and we'll have the lady

22    on the, on the floor here if you'll step up, that's seat

23    number 13.  Yeah um hm.  And what was her name again?

24               COURT CLERK:  Dawn Fox.

25               THE COURT:  Okay and good morning Ms. Fox and

1    welcome you also to the Genesee County Circuit Court.

2              COURT CLERK:  Juror B54, Kim McPherson.

3              THE COURT:  And good morning Ms. McPherson.  We

4    also want to welcome you to the Circuit Court.  Now that

5    we've got everyone in their right seats, again I want to

6    welcome you all to the Circuit Court.  I'm gonna ask

7    those of you that are in the audience to please pay

8    attention to what's going on up here because you may

9    yourself wind up here in the box and if you are brought

10   up I'm not gonna repeat all the questions that I and Mr.

11   Breczinski and Mr. Larobardiere are gonna ask you.  I'm

12   simply gonna ask you did you hear the questions that we

13   asked and would you have answered any of those questions

14   any differently and that way we'll hopefully speed the

15   process up a little bit.  I want to first start out by

16   telling all of you that are in the jury box that if

17   you'll notice there are cameras on the walls here.

18   They're used to record the proceedings in this courtroom.

19   And sometimes I think when jurors come and they see

20   cameras on the wall they wonder if they're being recorded

21   and I just want you to know that those cameras are not

22   recording you.  So at the end of this trial if you were

23   to watch this trial, your face will not be anywhere on

24   this tape so I just want you to know that.  The ledge

25   that's in front of the jury box has microphones on it and

1    that is for the purpose of recording your voices.  We do

2    record your voices as we speak with you so I just wanted

3    to make you aware of that and Ms. McPherson over there

4    we, we do know you're over there.  I know that you're

5    kinda in, in nowhere land right now but we do see you

6    over there okay?  I want to start out by asking how many

7    of you have served on a jury before?  If you've served on

8    a jury before raise your hands.  Okay we have a couple

9    hands.  Let's start with you Mr. Stanford.  How long ago

10   did you serve on a jury sir?

11           MR. STANFORD:  At least ten years.

12           THE COURT:  Was that in this courthouse?

13           MR. STANFORD:  No.

14           THE COURT:  Was it in the District Court?

15           MR. STANFORD:  Yes.

16           THE COURT:  Do you remember if it was in the

17   68th District Court or the 67th?  The one in the City of

18   Flint or, or in one of the townships?

19           MR. STANFORD:  City of Flint.

20           THE COURT:  All right.  And do you recall if

21   that was a civil case or a criminal case?

22           MR. STANFORD:  Criminal.

23           THE COURT:  Did you have a chance to deliberate

24   on that case and come back with a verdict?

25           MR. STANFORD:  Yes.

1        THE COURT: Do you recall what your verdict

2   was?

3        MR. STANFORD: Guilty.

4        THE COURT: Was there anything about that

5   experience, having had an opportunity to sit as a juror,

6   deliberate and come back with a verdict, anything about

7   that experience that would affect your ability to be

8   fair, either to the prosecution or to the defendant in

9   this case?

10       MR. STANFORD: No.

11       THE COURT: Anything about that experience that

12  would just make you feel you don't want to participate

13  here today?

14       MR. STANFORD: No.

15       THE COURT: Did the lawyers do anything to

16  offend you at all?

17       MR. STANFORD: No.

18       THE COURT: The Judge do anything to offend

19  you?

20       MR. STANFORD: No.

21       THE COURT: Okay and then I think Ms. Wilder

22  your hand was up is that correct?

23       MS. WILDER: Yeah it was up but I, you know I

24  went all the way but they canceled it. I was-

25       THE COURT: Okay so you had an opportunity to

1    sit-

2              MS. WILDER:  To sit-

3              THE COURT:  and to listen to the trial but you

4    didn't get an opportunity to deliberate because the case

5    was resolved before you deliberated is that what

6    happened?

7              MS. WILDER:  Right.

8              THE COURT:  All right do you recall if that was

9    a civil or criminal case?

10             MS. WILDER:  No I don't remember 'cause it's

11   been about fifteen to, fifteen to twenty years.

12             THE COURT:  Okay was there anything about that

13   experience that would affect your ability to be fair,

14   either to the prosecution or to the defendant in that,

15   this case?

16             MS. WILDER:  No.

17             THE COURT:  Anything about that experience that

18   sours you against the Court system and just would make

19   you feel you don't want to participate here today?

20             MS. WILDER:  No.

21             THE COURT:  Did the lawyers do anything to

22   offend you?

23             MS. WILDER:  No.

24             THE COURT:  The Judge offend you in any way?

25             MS. WILDER:  No.

1       THE COURT:  Anyone else ever serve on a jury

2    before?  If so raise your hand.  All right I believe Mr.

3    Morris your hand was up sir?

4       MR. MORRIS:  Yeah it never went all the way

5    either.  It's about, it's about six, seven years.

6       THE COURT:  All right so do you recall if it

7    was in this courthouse?

8       MR. MORRIS:  It was in Flint.

9       THE COURT:  Okay and do you recall if it was a

10   civil or criminal case?

11      MR. MORRIS:  Criminal.

12      THE COURT:  And you had an opportunity to hear

13   the case pretty much through to its entirety but you

14   didn't have an opportunity to deliberate is that correct?

15   Is there anything about that experience that would affect

16   your ability to be fair, either to the prosecution or to

17   the defendant in this case?  Anything about that

18   experience that sours you against the Court system and

19   would just make you feel you don't want to participate

20   here today?

21      MR. MORRIS:  No.

22      THE COURT:  Did the lawyers do anything to

23   offend you?  Did the Judge offend you in any way?  Anyone

24   else ever serve on a jury?  Anyone ever been a witness to

25   a, in a case, a lawsuit or a witness in a criminal case?

1    Anyone ever been a witness?  If so raise your hand.

2    Anyone else ever serve on a jury?  Anyone ever been a

3    witness to a, in a case, a lawsuit or a witness in a

4    criminal case?  Anyone ever been a witness?  If so raise

5    your hand.  Okay we have one hand up and that would be

6    Ms. McPherson.

7              MS. MCPHERSON:  Yes.

8              THE COURT:  And uh how-

9              MS. MCPHERSON:  I was a witness in a drug case.

10             THE COURT:  In a drug case.  And how long ago

11   would that have been ma'am?

12             MS. MCPHERSON:  About two years.

13             THE COURT:  All right and do you recall if you

14   testified for the defense or for the prosecution?

15             MS. MCPHERSON:  Defense.

16             THE COURT:  All right was there anything about

17   that experience that would affect your ability to be fair

18   in this trial to the prosecution or to the defendant?

19             MS. MCPHERSON:  No.

20             THE COURT:  Anything about that experience that

21   soured you against the Court system and would just make

22   you feel you don't want to participate here today?

23             MS. MCPHERSON:  No.

24             THE COURT:  Did the lawyers do anything to

25   offend you?

1        MS. MCPHERSON:  No.

2        THE COURT:  The Judge offend you in any way?

3        MS. MCPHERSON:  No.

4        THE COURT:  Can, did you find out what the

5   outcome of that case was?

6        MS. MCPHERSON:  Yes.

7        THE COURT:  All right um were you satisfied or

8   dissatisfied with the outcome?

9        MS. MCPHERSON:  Satisfied.

10       THE COURT:  All right.  Would that have any

11  affect whatsoever in how you would judge this case ma'am?

12       MS. MCPHERSON:  No.

13       THE COURT:  All right.  Anyone else ever been a

14  witness?  Okay Ms. Romano and how long ago would that

15  have been ma'am?

16       MS. ROMANO:  Almost ten years.

17       THE COURT:  All right and did you testify in a

18  civil case or a criminal case?

19       MS. ROMANO:  Civil.

20       THE COURT:  And did you testify for the

21  plaintiff or the defendant?

22       MS. ROMANO:  Defendant.

23       THE COURT:  Do you know what the outcome of

24  that case was?

25       MS. ROMANO:  Yes.

1        THE COURT:  Were you satisfied with the way in

2    which it was resolved?

3        MS. ROMANO:  Yes.

4        THE COURT:  Do you harbor any ill feelings one

5    way or the other towards anyone that participated in that

6    process?

7        MS. ROMANO:  No.

8        THE COURT:  Can you be fair to both the

9    prosecution and to the defendant in this case?

10       MS. ROMANO:  I think so.

11       THE COURT:  Would anything, would that

12   experience in any way, shape or form affect your judgment

13   in the case that you would decide here today?

14       MS. ROMANO:  No.

15       THE COURT:  All right.  Anyone else ever been a

16   witness?  Anyone ever, ever been a defendant in a, in a

17   case, anyone ever been a defendant?  All right Mr. Wright

18   is that correct?

19       MR. WRIGHT:  Yep.

20       THE COURT:  All right and how long ago would

21   you have been a defendant sir?

22       MR. WRIGHT:  About eleven years or so.

23       THE COURT:  Okay and was that in Circuit Court

24   or District Court?

25       MR. WRIGHT:  Uh 67th I believe.

48

1    THE COURT: All right so, and that would have

2 involved a misdemeanor case is that correct? Is that

3 correct? All right um did you have a trial in that

4 matter?

5    MR. WRIGHT: Not at the time but eventually

6 yes.

7    THE COURT: So eventually it went to trial?

8    MR. WRIGHT: Yes.

9    THE COURT: And did a jury decide that case?

10    MR. WRIGHT: No.

11    THE COURT: Did a Judge decide it?

12    MR. WRIGHT: Yes.

13    THE COURT: All right. Were you satisfied with

14 the outcome?

15    MR. WRIGHT: Yes.

16    THE COURT: Is there anything about that

17 experience that would affect your ability to be fair,

18 either to the prosecution or to the defendant in this

19 case?

20    MR. WRIGHT: No.

21    THE COURT: Anything about that, did the Judge,

22 did the lawyers do anything to offend you?

23    MR. WRIGHT: Lawyers did not offend me.

24    THE COURT: Judge offend you?

25    MR. WRIGHT: The Judge did offend me.

49

1        (Judge Archie L. Hayman; 01-24-06; 10:38 a.m.)

2            THE COURT:  Um hm and would that in any way

3    affect how you would judge this case here today?

4            MR. WRIGHT:  Not at all.

5            THE COURT:  Could you set that aside and decide

6    this case just on the evidence that you see here in this

7    courtroom?

8            MR. WRIGHT:  Of course I will.

9            THE COURT:  Okay anyone else ever been a

10   defendant?  Anyone ever been a plaintiff in a lawsuit?

11   Excuse me uh Ms. uh Suski?

12           MS. SUSKI:  Um, if I'm going through a divorce

13   right now, I'm the defendant, does that apply?

14           THE COURT:  That would qualify yes definitely.

15   Yeah all right and are you in, still in the process of

16   going through that right now?

17           MS. SUSKI:  Still in the process.

18           THE COURT:  All right um would that affect how

19   you would judge this case in any way, shape or form?

20           MS. SUSKI:  I don't think so.

21           THE COURT:  Okay would you tend to favor one

22   side or the other because you are, may be a plaintiff or

23   a defendant in a lawsuit?

24           MS. SUSKI:  No.

25           THE COURT:  In other words would you have a

1       tendency to favor either the defendant, the prosecution

2       or the defense because you yourself are a plaintiff or a

3       defendant.

4               MS. SUSKI:  Well I, I could identify with the

5       underdog (inaudible).

6               THE COURT:  Okay so you feel that you might

7       identify with the underdog because you feel that at least

8       in terms of what you're going through you feel you're

9       getting beat up in the system right now is that correct?

10      Is that a yes?

11              MS. SUSKI:  Yes it is.

12              THE COURT:  Okay now can you set aside the

13      concerns you have about what you're going through and

14      decide this case just on the evidence that you see in

15      here in this courtroom?

16              MS. SUSKI:  I can certainly try.

17              THE COURT:  Okay if you were to be selected as

18      a juror do you understand you would be obligated to do

19      that?

20              MS. SUSKI:  I understand.

21              THE COURT:  All right and that if you couldn't

22      do that you really shouldn't serve as a juror, do you

23      understand that?

24              MS. SUSKI:  I understand.

25              THE COURT:  Because what these, both sides are

1    looking for are fair jurors who can be fair to both

2    sides.

3              MS. SUSKI:  Well I'll do my best.  It may be

4    tough.

5              THE COURT:  Okay well um obviously you have

6    some feelings about what you're goin' through and that's

7    understandable.  If you were sitting here listening to

8    the trial, and let's assume that there was some aspect of

9    the trial that seemed to be similar to what you're goin'

10   through.  Okay let's put it that way.  I doubt that that

11   would be the case but just assume that were to happen.

12   Could you set aside your feelings about what you're going

13   through and just judge the case just on the evidence that

14   you see in here?

15             MS. SUSKI:  It would be hard-

16             THE COURT:  Okay would you uh, would you-

17             MS. SUSKI:  but I would try.

18             THE COURT:  you would try.  And you understand

19   that that's the fair thing to do?

20             MS. SUSKI:  Yes.

21             THE COURT:  Okay anyone else plaintiff or

22   defendant?  Ms. Banyas?

23             MS. BANYAS:  Yes about, it's been about twenty-

24   five years ago my boss was accused of mail fraud and

25   (inaudible) fraud embezzlement.  I had to testify against

1    him.  That was in Federal Court-

2             THE COURT:  Yes.

3             MS. BANYAS:  in Bay City.

4             THE COURT:  All right that was in Federal Court

5    and that experience did, did it sour you in any, in any

6    way towards the Court system?

7             MS. BANYAS:  No.

8             THE COURT:  Okay would you have a tendency to

9    side with one side or the other because you were a

10   witness yourself?  In other words would you have a

11   tendency to side with the prosecution or the defense

12   because you testified for one side or the other?

13            MS. BANYAS:  No I, I-

14            THE COURT:  And I'm assuming you testified for

15   the prosecution in that case-

16            MS. BANYAS:  Yes I did.

17            THE COURT:  is that correct?  Okay.  Would you

18   have a tendency to side then with the prosecution because

19   you testified?

20            MS. BANYAS:  No not necessarily.

21            THE COURT:  All right.  Can you judge this case

22   just on the evidence that you see in here in this

23   courtroom?

24            MS. BANYAS:  Yes.

25            THE COURT:  All right.  Were you satisfied with

1    the outcome of that case?

2              MS. BANYAS:  Yes.

3              THE COURT:  And I think Mr. Stanford your hand

4    was up sir?

5              MR. STANFORD:  Yes.  Sued an insurance company.

6              THE COURT:  All right and how long ago would

7    that have been?

8              MR. STANFFORD:  Two years.

9              THE COURT:  Okay were you satisfied with the

10   outcome?

11             MR. STANFORD:  Not really.

12             THE COURT:  All right do you, do you believe

13   that the fact that the outcome didn't come out as you had

14   hoped it would, did that have anything to do with either

15   the lawyer or the Judge or the Court system in your

16   opinion?

17             MR. STANFORD:  No it's just life.

18             THE COURT:  Just life okay.  All right would,

19   would that experience have any affect on your judgment in

20   this case at all?

21             MR. STANFORD:  No.

22             THE COURT:  So can you be fair to both the

23   prosecution and the defendant then?

24             MR. STANFORD:  Yes.

25             THE COURT:  Anyone else?  All right coming back

1    to Ms. McPherson.

2         MS. MCPHERSON:   I was a defendant in my divorce

3    case and a plaintiff in a case where someone owed me

4    money.

5         THE COURT:   All right were you satisfied with

6    the outcome in both of those cases?

7         MS. MCPHERSON:   Yes.

8         THE COURT:   All right.   Can you set aside

9    whatever feelings that you may have had in those cases

10   and decide this case just on the evidence that you see in

11   here?

12        MS. MCPHERSON:   Yes.

13        THE COURT:   All right.   This is a criminal case

14   and what that means is is that the prosecution has the

15   burden of proof.   The prosecution has to prove beyond a

16   reasonable doubt the elements to the charges that are

17   listed in the information, and I'll read the information

18   to you at some point.   Does everyone understand that this

19   is a criminal trial and that the burden of proof is

20   beyond a reasonable doubt?   Is there anyone that does not

21   understand that?   If so raise your hands.   No hands are

22   raised.   Does, is there anyone who disagrees, who

23   believes that the prosecution should not have the burden

24   of proof in this case and should not have to prove beyond

25   a reasonable doubt the charges that are being brought

1  against the defendant in this case, Mr. Pouncy?  If you

2  don't believe that is fair for the prosecution to

3  shoulder the burden of proof raise your hand.  Okay I see

4  no hands are raised.  Do you understand the difference

5  between proof beyond a reasonable doubt in a criminal

6  case and proof by a preponderance of evidence in a civil

7  case?  If you don't understand the difference between

8  those two please raise your hand.  Okay and I'm glad a

9  few people raised their hand, that's honest, very good.

10  In a civil case, and again, this is not a civil case, I

11  have, excuse me I have a little congestion in my sinuses.

12  In a civil case, the plaintiff has the burden of proof.

13  They have to prove by a preponderance of evidence the

14  claims that are being brought.  And I think you said you

15  sued an insurance company so in your lawsuit the burden

16  of proof was by a preponderance of evidence.  What that

17  means is, and I guess you know as guys we always like to

18  go to the sports as an illustration, but if you were on a

19  football field, the football field is a hundred yards.

20  If you get the football slightly beyond the fifty-yard

21  line, that is a preponderance and it doesn't matter how

22  far beyond the fifty-yard line, as long as the nose of

23  the football gets beyond the fifty-yard line you have

24  preponderated.  Or if you have the scales of justice if,

25  if the scales are evenly balance and you just slightly

1    tilt the scales in your favor, that is a preponderance of

2    evidence.  The reason for that is that in a civil case of

3    course there is not the possibility of your freedom being

4    taken away and so the burden of proof is lower.  In a

5    criminal case the burden of proof is beyond a reasonable

6    doubt and that means that you have to prove beyond a

7    reasonable doubt the claims.  And I'm gonna define for

8    you what that means in the instructions as we go along.

9    But what the instructions say basically a reasonable

10   doubt is just that.  A doubt that is reasonable after a

11   careful consideration of the facts and circumstances

12   involved in the case.  So when we talk about a reasonable

13   doubt, you have to decide do I have a reasonable doubt

14   and if I have a reasonable doubt is that, if I have, do

15   you have a doubt and if that, if I have a doubt is that

16   doubt reasonable?  That's really what you're deciding

17   okay?  And of course the prosecution has to prove beyond

18   a reasonable doubt.  That doesn't mean beyond all doubt

19   but it does mean beyond a reasonable doubt.  Does

20   everyone understand that concept now and, and the

21   difference between that and a civil case?  All right so

22   you're in a criminal case in this Court in this trial and

23   the proof is beyond a reasonable doubt.  There are gonna

24   be many witnesses that'll come before you.  Police

25   officers, experts, lay witnesses that may be people who

1    just happened to see something.  What I'm concerned about

2    here is that you judge all witnesses by the same

3    standard.  And what I mean is that just because somebody

4    has a title you don't say well okay you know that's a

5    police officer so I'm gonna believe him.  Or okay that's

6    a doctor so I'm just gonna automatically believe them.

7    But you're gonna look at the evidence, you're gonna look

8    at the testimony and you're gonna consider it in the

9    light of your common sense in deciding whether you

10   believe the witness.  Does everyone understand that?  In

11   my ri, ridiculous example, which I'll be honest with you,

12   people have asked me to change, I just haven't come up

13   with a better one, but my ridiculous example is this, if

14   the Pope were to walk inside the courtroom and take the

15   witness stand, of course you're gonna want to believe him

16   because he's the Pope.  But of course in a Court of law

17   you're gonna have to stop and say okay even though he's

18   the Pope, I've got to listen to his testimony, consider

19   it in the light of all the other evidence and then decide

20   whether I believe him or not.  I can't just believe him

21   because he's the Pope.  Does everyone understand that?

22   All right.  This trial I suspect will last probably about

23   four or five days.  And what that means is that you'll be

24   here until five o'clock today, you'll come back tomorrow

25   at eight thirty in the morning and we'll go 'til five

1    tomorrow.  You'll come back on Thursday at probably about

2    one o'clock and we'll go 'til five and then you'll come

3    back on Friday and eight thirty and we'll go to five.  I

4    suspect the case will be ended sometime by the end of

5    this week.  Knowing that that's the possible schedule,

6    and I will let you out at five by the way, you won't be

7    here beyond five o'clock just so you know, knowing that

8    that's the possible schedule, does it create a hardship

9    for any of you to serve on this jury?  If so raise your

10   hands.  Okay I've got a few hands up.  Let's take 'em one

11   at a time.  Mr. Stanford it would be a hardship for you

12   to serve sir?

13        MR. STANFORD:  My wife has breast cancer in her

14   lugs and I'm her primary care.  I've got somebody with

15   her today but I take care of her most of the time.

16        THE COURT:  Okay and there's no one else to

17   take care of her?

18        MR. STANFORD:  No.

19        THE COURT:  Okay.  All right well I'm gonna

20   excuse you then Mr. uh, um-

21        MR. STANFORD:  Stanford.

22        THE COURT:  Stanford and if you would go to the

23   second floor they'll let you know what you need to do and

24   I'll prey for you and for your wife sir.  All right you

25   may leave at this time.  And Trish, I mean Mary?

1          COURT CLERK:  Juror H258, Cheryl Hawkins.

2          THE COURT:  Good morning Ms. Hawkins.  And if

3   you'll come and take the seat that's been vacated by Mr.

4   Stanford.  And we welcome you also to the Genesee County

5   Circuit Court Ms. Hawkins.  You've heard the questions

6   that I've asked up to this point is that correct?  Would

7   you have answered any of those questions any differently

8   than the rest of the jury as a whole?

9          MS. HAWKINS:  No.

10          THE COURT:  Can you be here with us for the

11  time that I've indicated?

12          MS. HAWKINS:  Well I was supposed to go get my

13  daughter Friday from college but-

14          THE COURT:  Okay what time did you have to go

15  get her?

16          MS. HAWKINS:  About ten o'clock in the morning.

17          THE COURT:  Okay.  Is there anyone else that

18  can go get her?

19          MS. HAWKINS:  No.

20          THE COURT:  Okay is it possible to get her a

21  different time or a different day?

22          MS. HAWKINS:  Well now I guess I'll have to.

23          THE COURT:  Okay.  Is there any other reason

24  why you can't serve?

25          MS. HAWKINS:  No.

1          THE COURT:  I think that reason I would keep

2     you here unfortunately.  And I just want you to know

3     don't blame it on these parties, blame it on me okay?

4     'Cause I'm the one that's keepin' you okay?  Can you be

5     fair to both the prosecution in this case?

6          MS. HAWKINS:  Yes.

7          THE COURT:  Is there any reason you can think

8     of why you shouldn't serve ma'am?

9          MS. HAWKINS:  No.

10          THE COURT:  Okay I think I had another hand up

11     in the front row.  Okay let's go to you Ms. Wilder.

12          MS. WILDER:  It would be for today 'cause I

13     probably could get someone to pick up my children.  I'm a

14     foster parent-

15          THE COURT:  Okay.

16          MS. WILDER:  and I have children that I've got

17     to pick up from school.

18          THE COURT:  And what time do you have to pick

19     them up ma'am?

20          MS. WILDER:  Three thirty.

21          THE COURT:  At three thirty?  All right and

22     after that you would be available is what you're tellin'

23     me is that correct?  Okay I'm gonna hold on to you for

24     right now okay?

25          MS. WILDER:  All right.

1        THE COURT:  Anyone else?  Okay let's go over to

2    the back row.  Your hand is up Ms. Banyas?

3        MS. BANYAS:  I'm a contingency employee at

4    Genesys which means that if I don't work I don't get paid

5    so you know if I was, if I was here (inaudible).

6        THE COURT:  It would create a financial

7    hardship.

8        MS. BANYAS:  Well I mean I wouldn't, you know

9    not a huge hardship for anybody but-

10       THE COURT:  Now you're talking yourself out.

11   If that's the case I might keep you.  Now so are you

12   tellin' me it's not gonna cause a huge financial hardship

13   but it would be a, some hardship?

14       MS. BANYAS:  Right.

15       THE COURT:  Okay.  You would keep your job I

16   would assume-

17       MS. BANYAS:  Yes.

18       THE COURT:  because you're serving on the jury.

19       MS. BANYAS:  Yes.

20       THE COURT:  All right but they just don't pay

21   you is that what you're tellin' me?

22       MS. BANYAS:  Yes um hm.

23       THE COURT:  All right.  If I were to require

24   you to stay, would it, would it make a big disruption in

25   your life is what I guess I need to know?

1      MS. BANYAS:  Um no I guess not big.

2      THE COURT:  All right if I required you to stay

3    would you blame me, not the prosecution or the defendant

4    in this case?

5      MS. BANYAS:  Um I would probably blame you.

6      THE COURT:  Okay that's good and during the

7    trial would you be able to pay attention and keep, and,

8    and keep your attention on the trial even though you may

9    have some concerns about you know your, your job

10   situation?

11     MS. BANYAS:  Yes uh huh.

12     THE COURT:  Okay.  All right I may come back to

13   you just let me think about that for a second okay?

14   Anyone else that had their hand up?  Okay Mr. Wright is

15   that correct?

16     MR. MORRIS:  Morris.

17     THE COURT:  Uh Morris, excuse me.  Mr. Morris?

18     MR. MORRIS:  Today I uh, I got up yesterday at

19   about noon, I work third shift-

20     THE COURT:  Yes sir.

21     MR. MORRIS:  and I don't think I can make it to

22   five o'clock.

23     THE COURT:  All right that's understandable.

24   So you work third shift is what you're tellin' me and you

25   haven't had a chance to sleep?

63

1          MR. MORRIS:  No.

2          THE COURT:  Now um assuming that you were here

3    from the days forward, let's assume you knew you were

4    gonna be here from here on out, would you go to work

5    tonight?

6          MR. MORRIS:  No.

7          THE COURT:  Okay and does your employer pay you

8    for the time you're here?  Okay who do you work for?

9          MR. MORRIS:  GM.

10          THE COURT:  All right General Motors.  Okay.  I

11    think we're gonna hold on to you for right now.

12          MR. MORRIS:  Okay.

13          THE COURT:  I understand your sleep situation-

14          MR. MORRIS:  Just pick me up-

15          THE COURT:  yeah I understand-

16          MR. MORRIS:  if I fall out of the chair.

17          THE COURT:  yeah I understand.  All right and

18    anyone else's hand up?  Ms. McPherson?

19          MS. MCPHERSON:  Well I'm a teacher and I would

20    hate to be gone out of my classroom any longer.

21          THE COURT:  All right and what grade do you

22    teach ma'am?

23          MS. MCPHERSON:  First.

24          THE COURT:  Okay and do they have someone who

25    substitutes for you?

1          MS. MCPHERSON:  Yes.

2          THE COURT:  Okay I'm gonna hold on to you too

3     unfortunately.  I recognize it, it's, anytime anyone

4     serves there's always some inconvenience.  I recognize

5     that.  I'm concerned of the more, about the more serious

6     ones because I think everyone has an obligation to serve.

7     We even have Judges in this courthouse who have had to

8     serve and they've had to just stop whatever they were

9     doing and, and serve on a jury and let all their cases

10    pile up during that time so we all have to sacrifice to

11    some extent for this system to exist.  So now with

12    respect to you Ms. Wilder um, my thinkin' is is that I,

13    I'm probably gonna hold on to you although I probably

14    would have to let you go in time to go get your kids

15    today so it's possible it could affect whether we go all

16    day today.  Um so we'll see how things play out with that

17    okay?  I may change my mind later but right now I think

18    I'm gonna hold you okay?  Ms. Banyas I'm gonna let you go

19    because I'm concerned about the financial hardship.  I

20    know that you've indicated it may not be that difficult

21    but four days' pay is, in my opinion a lot of money, in

22    my opinion okay, and what I'm gonna suggest is that you

23    come back at a time when you can serve and when you might

24    be in a better position to serve okay?  So when you go to

25    the second floor let then know that now is not a good

1    time for you to serve but you can come back at another

2    time and maybe if you could let them know what that time

3    might be, they'll then have you come back then okay?

4              MS. BANYAS:  Okay.

5              THE COURT:  Thank you ma'am.

6              MS. BANYAS:  Thank you sir.

7              THE COURT:  You may go to the second floor.

8    Mary you can put someone in Ms. Banyas' seat.

9              COURT CLERK:  Juror B50, Carissa Klonowski?

10             MS. KLONOWSKI:  Yeah.

11             COURT CLERK:  K-l-o-n-o-w-s-k-i.

12             THE COURT:  Klonowski is that how you pronounce

13   it?

14             MS. KLONOWSKI:  Klonowski correct.

15             THE COURT:  All right good morning Ms.

16   Klonowski.  I didn't design that jury box and if I had I

17   probably would have made it wide enough to drive a car

18   through it because those rows are very tight.  Ms.

19   Klonowski I want to welcome you to the Genesee County

20   Circuit Court and you've heard the questions that I've

21   asked up to this point is that correct?

22             MS. KLONOWSKI:  I have.

23             THE COURT:  Can you be here with us for the

24   time that I've indicated?

25             MS. KLONOWSKI:  I cannot.

1        THE COURT:  All right and explain.

2        MS. KLONOWSKI:  I work for a place where

3    there's only three of us that work and so it would create

4    hardship financial wise for me to miss.

5        THE COURT:  Okay so they, they don't pay you

6    for the time that you're off ma'am?  Okay and you said

7    there's only three of you so they don't have substitutes

8    to cover for you?

9        MS. KLONOWSKI:  No.  Today they are.  The two

10   women that work have children so for them to cover my

11   shift it's really hard for them as well.

12       THE COURT:  All right and I'm gonna excuse you

13   Ms. Klonowski and if you'll let them know when you can

14   come back and serve 'cause you'll have to come back and

15   serve at some point but maybe there's a more convenient

16   time for you to be back here okay?

17       MS. KLONOWSKI:  Okay.

18       THE COURT:  Go right ahead uh Mary Lee.

19       UNIDENTIFIED PERSON:  (Inaudible).

20       THE COURT:  Yeah this is the hot seat I think

21   right now.

22       COURT CLERK:  Juror B71, Patricia Zak, Z-a-k.

23       THE COURT:  And good morning Ms. Zak.

24       MS. ZAK:  Good morning.

25       THE COURT:  And if you'll take the seat that's

1    been vacated by Ms. Klonowski.  And we want to welcome

2    you also Ms. Zak to the Genesee County Circuit Court.

3    You've heard the questions that I've asked up to this

4    point is that correct?  Would you have answered any of

5    those questions any differently than the rest of the jury

6    panel as a whole?

7            MS. ZAK:  Um hm.

8            THE COURT:  Can you be here with us for the

9    time I've indicated?

10           MS. ZAK:  We are leaving Sunday for five weeks.

11           THE COURT:  Okay that shouldn't be a problem.

12   If we don't have the case finished by Friday we'll always

13   have two extras so we could always still make sure that

14   you make that flight if it has, if it comes down to that

15   okay?

16           MS. ZAK:  Yes.

17           THE COURT:  And let me just ask counsel do

18   either of you expect the case to go beyond this week at

19   all?  I mean I don't expect it to.  Okay.

20           MR. BRECZINSKI:  No.

21           THE COURT:  So beyond Friday but if for some

22   reason unforeseen it does, you remind me and I will

23   excuse you okay?  All right.  So any other reason that

24   you can't serve?  Can you be fair ma'am to both the

25   prosecution and the defendant in this case?

1          MS. ZAK:  I think so.

2          THE COURT:  I'm sorry I didn't hear you?

3          MS. ZAK:  I think so.

4          THE COURT:  Okay.  Is there any reason you can

5     think of why you shouldn't serve?

6          MS. ZAK:  No because I-

7          THE COURT:  Okay, I'm sorry?

8          MS. ZAK:  have a, have family members in law

9     enforcement.

10          THE COURT:  Okay well we'll get to that.  All

11     right I'm glad you brought that up.  Let's ask that

12     question then.  Are there any members of the jury who

13     have family in law enforcement?  If so raise your hands.

14     Okay looks like just you Ms. Zak okay and who do you have

15     that's a family member that's a-

16          MS. ZAK:  My son.

17          THE COURT:  Your son?  And who does he work for

18     ma'am?

19          MS. ZAK:  Genesee County.

20          THE COURT:  Is it the Sheriff's Department?

21          MS. ZAK:  Yes.

22          THE COURT:  All right and uh you know I thought

23     I'd seen that name before.  And does he work here in the

24     courthouse or in the jail or on the road?

25          MS. ZAK:  Paramedic on the road.

1          THE COURT:  Paramedic on the road.  Okay um

2     does he talk to you about what he does ma'am?

3          MS. ZAK:  Oh sometimes.

4          THE COURT:  All right would that, what he talks

5     to you, the things that he talks to you about, would if

6     affect your ability to be fair in this case?

7          MS. ZAK:  I don't think so.

8          THE COURT:  Let's assume that you sat as a

9     juror in this case and you went through this entire trial

10    and you believe that the prosecution failed to prove

11    beyond a reasonable doubt Mr. Pouncy is guilty of the

12    offenses that are in the information here.  Can you come

13    back with a verdict of not guilty?

14         MS. ZAK:  I think so.

15         THE COURT:  All right and would you have any

16    concern that when you went on the road and, or, or went

17    and saw your son and he talked to you and you said well I

18    was on the Judge, a jury trial in Judge Hayman's Court

19    and I found the defendant not guilty.  Do you have any

20    concerns that he might have somethin' to say to you about

21    that?

22         MS. ZAK:  Oh probably.

23         THE COURT:  All right but do you have any

24    concern about that?

25         MS. ZAK:  No.

70

1        THE COURT:  I mean can you look him in the eye

2   and say hey I sat there and listened to the trial-

3        MS. ZAK:  Oh yeah definitely.

4        THE COURT:  and as far as I'm concerned the

5   prosecution didn't prove beyond a reasonable doubt Mr.

6   Pouncy is guilty and therefore I voted not guilty.  Can

7   you look him in the eye and tell him that?

8        MS. ZAK:  I think so.

9        THE COURT:  All right and let's assume that you

10  sit and listen to this trial and you felt the prosecution

11  proved beyond a reasonable doubt Mr. Pouncy was guilty.

12  Can you come back with a verdict that reflected that?

13       MS. ZAK:  Yes.

14       THE COURT:  All right and I'm, and I'm talkin'

15  to you but actually I'm talkin' to everybody.  So all

16  right anyone would disagree with the responses that Ms.

17  Zak gave?  Anyone that would disagree with that at all?

18  If so raise your hand.  Okay no hands are raised.  I want

19  to, at this time, ask you what each and everyone of you,

20  what's your highest level of education is and what your

21  occupation is.  And we'll start in the front row with you

22  Ms. Hawkins your highest level of education and

23  occupation please?

24       MS. HAWKINS:  Associates Degree from Baker and

25  a physical therapy assistant.

71

1      THE COURT:  All right and Ms. Romano?

2      MS. ROMANO:  I have a bachelor's degree and I'm

3  a substance abuse counselor.

4      THE COURT:  All right and what did you get your

5  bachelor's degree in ma'am?

6      MS. ROMANO:  Criminal justice.

7      THE COURT:  All right and Ms. Rudolph?

8      MS. ROMANO:  I've got a bachelor's degree in

9  liberal arts and I'm a camp director.

10      THE COURT:  I'm sorry.

11      MS. ROMANO:  I'm a camp director.

12      THE COURT:  Camp director all right thank you.

13  And Ms. Wilder?

14      MS. WILDER:  Twelfth grade graduate.  One year

15  of college.  Foster adoptive mom, retired.

16      THE COURT:  All right and what did you retire

17  from ma'am?

18      MS. WILDER:  General Motors.

19      THE COURT:  GM.  All right and what did you do

20  for GM?

21      MS. WILDER:  I was a stock chaser-

22      THE COURT:  Okay.

23      MS. WILDER:  and a job setter.

24      THE COURT:  All right and Ms. Fox?

25      MS. FOX:  I'm a medical assistant for a OBGYN

1    practice.

2              THE COURT:  And your highest level of

3    education?

4              MS. FOX:  High school and I did go to um, I

5    didn't mark it, I didn't know how to mark it on the slip,

6    it was considered a trade school so it's not really a, a

7    degree per se as far as a science degree or a bachelor's

8    degree-

9              THE COURT:  Okay.

10             MS. FOX:  for a medical assistant.

11             THE COURT:  So a medical school as a medical

12   assistant.

13             MS. FOX:  Medical, Ross Medical School.

14             THE COURT:  Ross Medical okay.

15             MS. FOX:  Yes sir.

16             THE COURT:  And Ms. Michael?

17             MS. MICHAEL:  I went to the eleventh grade and

18   I'm a retired drywall finisher.

19             THE COURT:  All right and we'll come back up

20   here to Ms. Zak.

21             MS. ZAK:  Um one year of college, I'm retired.

22             THE COURT:  And what are you retired from

23   ma'am?

24             MS. ZAK:  Um banking.

25             THE COURT:  Banking all right.  And Mr.

1  Nordstrom?

2        MR. NORDSTROM:  Bachelor's degree and I'm a

3  retired school teacher.

4        THE COURT:  And what did you teach in school

5  sir?

6        MR. NORDSTROM:  Business.

7        THE COURT:  Business all right.  And Ms. Suski?

8        MS. SUSKI:  I have a bachelor's in business

9  administration and I'm a self-employed freelance website.

10  designer.

11        THE COURT:  All right very good.  And Mr.

12  Wright?

13        MR. WRIGHT:  First year of college, unemployed

14  at the moment.

15        THE COURT:  All right and Mr. Morris?

16        MR. MORRIS:  Graduated from high school-

17        THE COURT:  All right and you're-

18        MR. MORRIS:  twelfth grade.

19        THE COURT:  and you're GM, I think you work at

20  GM is that correct?

21        MR. MORRIS:  Yes.

22        THE COURT:  All right and Mr. Wright I just

23  want to back up with you just for a second and what did

24  you study in college sir?

25        MR. WRIGHT:  General classes, computers mostly.

1          (Judge Archie L. Hayman; 01-24-06; 11:01 a.m.)

2              THE COURT:  Computers?  All right.

3              MR. WRIGHT:  Computer studies.

4              THE COURT:  All right and Ms. La, Labean?

5              MS. LABEAN:  High school diploma and I'm a

6    secretary in the automotive industry.

7              THE COURT:  All right and then coming down to

8    you Ms. Fox.

9              MS. FOX:  High school and I'm the inbound

10   operations assistant for Rite Aid in the receiving-

11             THE COURT:  Okay.

12             MS. FOX:  department.

13             THE COURT:  All right and Ms. McPherson?

14             MS. MCPHERSON:  I have a bachelor's degree in

15   education plus graduate hours.

16             THE COURT:  All right and you're a teacher is

17   that correct?

18             MS. MCPHERSON:  Yes.

19             THE COURT:  A first grade teacher?

20             MS. MCPHERSON:  Yes.

21             THE COURT:  All right thank you.  Um let's see

22   I think I'm just about done.  I wanna go over you with,

23   go over with you the list of potential witnesses and I

24   will first start by introducing you to the people who are

25   seat, seated here at counsel table.  And representing Mr.

75

1    Pouncy is defense attorney Michael Breczinski and Mr.

2    Breczinski if you would stand so the jurors can see who

3    you are sir?

4              MR. BRECZINSKI:  Good morning ladies and

5    gentlemen.

6              THE COURT:  And the accused in this case is Mr.

7    Omar Rashad Pouncy and Mr. Pouncy would you stand so the

8    jurors can see who you are sir?

9              MR. POUNCY:  Morning to you.

10             THE COURT:  And representing the People of the

11   State of Michigan is Christopher Larobardiere, Mr.

12   Larobardiere would you stand so they can see who you are?

13             MR. LAROBARDIERE:  Morning.

14             THE COURT:  And if you would introduce the

15   officer in charge with, with you sir?

16             MR. LAROBARDIERE:  Detective Jim Volardie.

17             MR. VOLARDIE:  Morning.

18             THE COURT:  Now do any of you recognize any of

19   the individuals seated here at counsel table?  If so

20   raise your hands.  Okay I see no hands are raised.  I

21   want to now go over the list of potential witnesses

22   that'll be called in this case and I want you to

23   understand, these are potential witnesses.  Not all these

24   witnesses will be called, but we just want to see if you

25   recognize any of the names.  Wayne Grimes, Thomas

1     Sandstrom, Patrick Wendell, Officer Jill Phillips,

2     Officer Edwards, Joseph Davis, Willie McKinley, Sergeant

3     David Dwyer, Lieutenant Kevin Shanilan, Sam Anderson,

4     Tiaqua Leondess, Terrell Pierce, Maria Sandstrom,

5     Detective Steve Warda, Officer Bob Farmer, Officer Chris

6     Watts, Alan Dietrich, Charles Smith, Jr., Willie Joyce,

7     Timothy Moore, Dan Haynes, Detective Jim Gagliardi, Earl

8     Brady, Officer Randy Yont, Officer James Williams,

9     Sergeant George Thomas, Jason Hickey, Agent Jeff Lowe,

10    Sergeant Meoachy Proby, Detective Shawn Duncanson,

11    Sergeant Sharon Dunbar.  Do any of those names sound

12    familiar to any of you and if they do please raise your

13    hand.  I see no hands are raised.  Let's see is there

14    anything else I need to cover?  Um one other thing.  As

15    jurors, it will be your responsibility to decide the

16    facts of this case, that's what jurors are here for.  It

17    is the Judge's responsibility to instruct you as to the

18    law and to run the case in a fair and efficient manner.

19    Your job is to decide the facts of this case.  You decide

20    whether they ran the red light or did not run the red

21    light.  Anything you decide about a fact is final.  Does

22    anyone here have any religious beliefs, personal beliefs

23    that would preclude them from making those kinds of

24    judgments?  If so raise your hand.  I see no hands are

25    raised.  With that then Mr. Larobardiere I'll allow you

1    to proceed sir.

2         MR. LAROBARDIERE:  Thank you Judge.  Morning

3    ladies and gentlemen and welcome.  Thank you again for

4    making time, I know everybody has a schedule, work and

5    family and foster kids and a lot of juggling goes into,

6    to coming here today and I appreciate you making those

7    arrangements.  My name is Chris Larobardiere, I'm an

8    assistant prosecutor assigned to try this case today and

9    Detective Jim Gagliardi of the Mt. Morris Township Police

10   Department.  I, we have your questionnaires and as the

11   Judge said they're not meant to be probative or

12   impersonal, it just gives us an idea of, of where you

13   come from.  We have truly a group of people from numerous

14   cross-sections of our community and that's what we want.

15   We use the questionnaires to, to ask you a few questions

16   in order to get an impartial jury to both sides okay?

17   And once that's done, those questionnaires are taken away

18   because some people wonder you know if I fill this out

19   and I'm puttin' personal stuff on here what happens to

20   it?  It's taken away by the clerks not to be seen again

21   so when we're done with this we're done with those

22   (inaudible).  I do have a few questions to follow up on

23   some of what the Judge said and I'll, I'll, the Judge

24   asked about law enforcement and I'll take it a step fur,

25   further on police contacts.  All of us have probably been

1    stopped by the police or know somebody who's stopped by

2    the police or arrested and things like, of that sort.

3    Some of you indicated you had some contact with the

4    police.  Does anyone have any strong feelings or

5    attitudes for whatever reason towards the police,

6    positive or negative?  No hands are raised and I don't

7    mean to single you out Mr. Wright but I'd ask you a

8    little more questions about, you indicated you did have a

9    case in District Court is that right?

10           MR. WRIGHT:  Yes sir.

11           MR. LAROBARDIERE:  Okay what was the charge?

12           MR. WRIGHT:  Zero, first person in Michigan

13   under the zero tolerance law.

14           MR. LAROBARDIERE:  Okay possession of alcohol?

15           MR. WRIGHT:  Yes for under, someone under

16   twenty-one.

17           MR. LAROBARDIERE:  Okay.  All right so you were

18   a juvenile, or you were under eighteen?

19           MR. WRIGHT:  No I was eighteen.

20           MR. LAROBARDIERE:  Eighteen.  All right.  Okay.

21   And that's a misdemeanor in a misdemeanor Court and I

22   think you heard you say you were okay with the way the

23   attorneys handled things but you were a little upset with

24   the Judge?

25           MR. WRIGHT:  Yeah.

1       MR. LAROBARDIERE:  Was that, did that have to

2   do with the punishment?

3       MR. WRIGHT:  No more personal attitude person.

4       MR. LAROBARDIERE:  Okay.  Did you feel the

5   Judge treated you unfairly then?

6       MR. WRIGHT:  I think she tried to make an

7   example.  Instead of following the law she (inaudible)

8   her own opinions into it.

9       MR. LAROBARDIERE:  All right.  Okay.

10      MR. WRIGHT:  I just pleaded no contest 'cause

11  that's how I thought I should have done it then.

12      MR. LAROBARDIERE:  Okay.  All right well as you

13  know you're in Circuit Court and this is gonna be a

14  felony case and it doesn't have anything to do with

15  alcohol okay?

16      MR. WRIGHT:  (Inaudible).

17      MR. LAROBARDIERE:  Knowing that, knowing your

18  experience is, that's done and in the past for you, um,

19  or do you harbor any hard feelings towards the police or

20  the Court system or the Judge?

21      MR. WRIGHT:  I wouldn't say that that

22  particular Judge is my favorite person in the world but I

23  don't think about her daily or anything-

24      MR. LAROBARDIERE:  All right.

25      MR. WRIGHT:  really.

1          MR. LAROBARDIERE:  From your experience would

2     you associate with either the prosecution's side or the

3     defense side for whatever reason?

4          MR. WRIGHT:  I couldn't answer that on what, it

5     depends on what circumstances you're talkin' about.

6          MR. LAROBARDIERE:  Well what I'm askin' is

7     would, would-

8          MR. WRIGHT:  I've also had traffic violations

9     before too so-

10         MR. LAROBARDIERE:  okay um it's along the same

11    line of questions then, would you tend to favor then the

12    prosecutor or favor the defense because of your

13    experience?

14         MR. WRIGHT:  I'd have to say it depends on the

15    evidence, the circumstances.  I'm unbiased to begin with.

16         MR. LAROBARDIERE:  All right let me take it a

17    step further then.

18         MR. WRIGHT:  Okay.

19         MR. LAROBARDIERE:  Because evidence will be

20    presented and you'll be the fact finder of the evidence

21    and what everybody's gonna do today is bring their common

22    sense through your many years of experience in our

23    community you're gonna bring that in and when you hear

24    that evidence you're gonna use that common sense and

25    evaluate the evidence.  Fair enough?

PENGAD • 1-800-631-6989 • www.pengad.com
LASER BOND FORM B

1          MR. WRIGHT:  Exactly.

2          MR. LAROBARDIERE:  So you don't leave your

3     common sense at the doorway is what I'm gettin' at there.

4          MR. WRIGHT:  Yeah.  I don't have no personal

5     vendetta or anything.

6          MR. LAROBARDIERE:  Okay um and after that

7     you're gonna hear evidence presented at the, the chair

8     okay?  What the attorneys say is not evidence but what

9     comes from the witness chair and it's gonna be both

10    direct evidence and circumstantial evidence and as long

11    as you hear enough evidence that is beyond a reasonable

12    doubt then would you have any trouble conducting, based

13    on your experiences in the Court system?

14         MR. WRIGHT:  Not at all.

15         MR. LAROBARDIERE:  All right.  Thank you.  I

16    didn't mean to single you out, I just had to ask a few

17    more questions here.  I'd like to follow up a little more

18    about religion and I don't mean to single out any

19    religion but the question as a follow up to Judge Hayman

20    is this.  You will be the fact finders in the case.  You

21    will hear the evidence and in the end you will have to

22    render a judgment.  Does anyone have any strong religious

23    beliefs that say I'm not really supposed to render a

24    judgment.  I'm not supposed to judge another man or

25    woman?  Does anyone feel that way?  Does everyone think

1    they can comply with their duty as a jury to render a

2    judgment after you hear all the evidence?  Okay I see

3    some heads shaking yes and none for don't.  Common sense

4    again and reasonable doubt.  Reasonable, reasonable doubt

5    is the burden that the prosecutor has to meet.  Now

6    reasonable doubt does not mean beyond any doubt, does

7    everyone understand that?  Okay?  Because if it was

8    beyond any doubt, we would have to have a video tape or,

9    or things of that sort of the crime.  Does everyone

10   understand that?  Okay?  But it's a, a doubt based on

11   common sense.  Something that violates common sense is

12   what I like to say.  Does anyone think that that's fair?

13   Does anything think that no it should be higher, it

14   should be, you know, it shouldn't be any doubts.  Does

15   anyone feel that way?  Raise your hand.  When you hear

16   the facts in evidence, you may develop some questions

17   along the way.  Now Judge Hayman doesn't let jurors ask

18   questions and that, for, that's a procedural reason.

19   You're the fact finders okay?  And the evidence will be

20   presented from the chair.  There will be testimonial

21   evidence and there will be documentary evidence okay?

22   Exhibits, things that you can take back with you okay?

23   Now a trial is not gonna answer all your questions here

24   today I'll tell you that.  That some of you, when you're

25   done and you're able to discuss a case you know you may

1    have some questions.  And a trial presumably was not

2    gonna answer all your questions.  Now if someone has a

3    question after hearing the evidence, is that gonna cause

4    you a problem?  Are you gonna say, you know what, this

5    wasn't covered and I have a question and because I have a

6    question, I cannot render judgment.  Does anyone feel

7    that way?  Raise your hand.  Let's talk a little bit

8    about bias and prejudice and sympathy.  Now you all

9    indicated you have various jobs and of course come from

10   various cross-sections of our community.  Bias, prejudice

11   and sympathy have got nothing to do with this case and

12   have no place in this courtroom okay?  Some of you, I

13   don't mean to single out, have what I'll call helping

14   professions.  You might be teachers, um is somebody a

15   guidance counselor?

16           MS. ROMANO:  No I was, I was um-

17           MR. LAROBARDIERE:  Camp Director?

18           MS. ROMANO:  yeah but I also was um a ther, a

19   therapist for (inaudible) with somebody.

20           MR. LAROBARDIERE:  Okay for delinquent

21   juveniles?

22           MS. ROMANO:  Um hm.

23           MR. LAROBARDIERE:  Okay um and Ms. Maron, Mar-

24           MS. ROMANO:  Romano.

25           MR. LAROBARDIERE:  Romano, sorry, and you deal

1    with substance abuse true?

2            MR. ROMANO:  Yes sir.

3            MR. LAROBARDIERE:  Okay so those inevitably

4    are, you're tryin' to help people correct some behavior

5    true?

6            MS. ROMANO:  True.

7            MR. LAROBARDIERE:  Okay uh and I thank you for

8    being in those professions, those are, those are very

9    necessary professions.  I'm in the responsibility

10   business okay?  And I'm, I want people to take

11   responsibility and that's why I'm the prosecutor okay so

12   I'm not saying we have differences of opinions but my

13   concern is if you're in a helping position, profession,

14   do you feel that you might have some sympathy or bias, or

15   not bias but sympathy or empathy for a person facing

16   trial?  All right you're shaking your head.  May I have

17   your name?

18           MS. RUDOLPH:  Pardon?

19           MR. LAROBARDIERE:  You're shaking your head so-

20           MS. RUDOLPH:  Yeah Ms. Rudolph.

21           MR. LAROBARDIERE:  Rudolph.  I'm sorry Ms.

22   Rudolph so you kind of would, would have an understanding

23   of their going through trial and facing some difficult

24   times true?  Um because of your training or your

25   experience within the system, do you think you would

1    develop a bias or sympathy towards the defense?

2              MS. RUDOLPH:  Yes.

3              MR. LAROBARDIERE:  Okay.  And that undoubtedly

4    would be difficult to overcome based on your, your

5    current profession and your previous dealings with, with

6    people with troubled behavior?

7              MS. RUDOLPH:  I think when you're talkin' about

8    facts.  It's not like I would be dependent upon facts.

9    And I guess when you said like the thing about asking

10   questions you know, it's just kind of like you want to

11   cover all the bases, it's the bein' thorough, I would

12   like to be thorough before.

13             MR. LAROBARDIERE:  All right.  Okay.  And what

14   we have to uh, what I have to do as a prosecutor is we

15   have elements of the crime and (inaudible) we, you all

16   the elements of the crime and as long as those elements

17   are met the jurors have a duty to render judgment okay?

18   So that's what you'd be evaluating so even though you may

19   have some questions, as long as the elements of the crime

20   that should be sufficient is what I, the prosecutor

21   argues okay?  Um but you, you do feel that based on your

22   uh, your training or your job in dealing with troubled

23   people uh you may develop some sympathy towards the

24   defense true enough?  Thank you for being candid.

25             THE COURT:  Have to have a verbal response

1    ma'am.

2            MS. RUDOLPH:  Yes.

3            THE COURT:  Thank you.

4            MR. LAROBARDIERE:  Thank you for being candid.

5            THE COURT:  And let me just follow up on that

6    just for a second.  First of all certainly you wouldn't

7    be human if you didn't have human feelings okay?  And we

8    understand that everybody brings feelings, and I guess

9    you, whether you call it prejudices, biases, sympathies,

10   everyone brings those with them I mean because that's,

11   that's who we are a lot of times.  But if you, as you, if

12   you act as a juror you understand it's your duty to

13   evaluate the facts of the case and decide what the facts

14   are and if the prosecution proved beyond a reasonable

15   doubt the defendant is guilty then you are obligated to

16   come back with a verdict of guilty, do you understand

17   that?  Is that a yes?

18           MS. RUDOLPH:  Yes.

19           THE COURT:  On the other hand, if the

20   prosecution fails to prove beyond a reasonable doubt that

21   the defendant is guilty then you are obligated to come

22   back with a verdict of not guilty, do you understand

23   that?

24           MS.  RUDOLPH:  Yes.

25           THE COURT:  And so even though you may have

1     sympathy, in order to function as a juror you have to set

2     that sympathy aside and decide the case just on the

3     evidence 'cause your function is only to decide the

4     facts.  Your function is not to impose penalty.  I just

5     want you to understand that.  When, when you go in the

6     jury room to deliberate, you're not gonna be going in

7     there deciding well what should the penalty be if you

8     were to find the defendant guilty.  Your only function is

9     to decide the facts and that's it.  Once you've done that

10    your job is done.  The system handles it from there, do

11    you understand that?

12            MS. RUDOLPH:  Yes.

13            THE COURT:  All right and you also understand

14    that if for some reason a decision were made that the

15    defendant is guilty, a Judge can't just do anything.  We

16    have guidelines that we have to follow do you understand

17    that?  And they're not for you to know about or to be

18    concerned about 'cause it's not your issue.  But the

19    system already has in place what guidelines the Judges

20    have to follow, do you understand that?

21            MS.  RUDOLPH:  Yes.

22            THE COURT:  All right now knowing that, let's

23    assume you sat through this trial and you were convinced

24    that the prosecution had proved beyond a reasonable doubt

25    Mr. Pouncy was guilty, would you say well I feel sorry

1       for Mr. Pouncy and so I'm gonna vote not guilty even

2       though the facts have convinced me beyond a reasonable

3       doubt he is guilty but because I feel sorry for him, I'm

4       gonna vote not guilty.  Would you do that?

5              MS. RUDOLPH:  No.

6              THE COURT:  Okay would you come back with a

7       verdict that's consistent with your duty then?  Even

8       though you still might feel sympathy for him?

9              MS. RUDOLPH:  Right.

10             THE COURT:  Is that correct?  All right.  All

11      right anything else Mr. Larobardiere?

12             MR. LAROBARDIERE:  May we approach Judge?

13             THE COURT:  Sure.  Let's go off the record for

14      one second Trish.  All right let's go back on and Mr.

15      Larobardiere any other questions?

16             MR. LAROBARDIERE:  Yes Judge a few more follow-

17      up on what the Judge has said ladies and gentlemen about

18      punishment.  This is a case about carjacking and armed

19      robbery and weapons possession okay?  Now, as the Judge

20      said, your job is to judge facts okay?  And punishment

21      does not figure into what you're doing.  Okay the Court

22      fixes punishment, the Judge does all right?  Does anyone

23      feel that they can't keep that out of the back of their

24      mind that, you know uh judging the facts may have some

25      impact on someone's life.  Does someone have any, any

1    hurdle, feel like they wouldn't be able to get over that

2    hurdle?  No hands are raised.  This also is a, gonna

3    involve a case about a aiding and abetting theory okay?

4    I'll talk a little bit about that.  Aiding and abetting

5    theory recognizes where some people act as a group at

6    times and offer encouragement or assistance to others in

7    committing a crime even though they may not directly be

8    committing the crime okay?  Does everyone understand the

9    difference?  Okay everyone's shaking their head.  Does

10   anyone have a problem with that theory?  That the law

11   allows someone to be held responsible when they're acting

12   or offering encouragement with another person?  Does

13   anyone have a problem with that, that theory of law?  No?

14   Okay.

15           THE COURT:  And if you don't mind I just want

16   to give an example because I want to make sure everyone

17   is clear, crystal clear on what we're talkin' about.  To

18   me the classic example of that is a situation where

19   someone for instance robs a store and maybe there's two

20   people involved.  One person is drivin' the car, the

21   other person is the passenger, they pull up in front of

22   the store, the passenger gets out and goes in with the

23   gun and actually commits the physical robbery.  Points

24   the gun, says give me your money, takes the money and

25   runs back to the car.  The guy who's drivin' the car

1    could be considered an aid and abettor because they are

2    assisting in the fact that they brought the person there

3    in the car and even though they didn't get out and go

4    into the store, they're driving and so to that extent may

5    be aiding, abetting or encouraging the uh, the crime.

6    And that's what we're talkin' about here that even though

7    that person didn't point the gun, they still could be

8    held responsible for the robbery, even though they were

9    just the driver.  All right go ahead Mr. Larobardiere.

10         MR. LAROBARDIERE:  Thank you Judge.  And once

11   again, does anyone have a problem with that theory of the

12   law?  And that's something you would decide after hearing

13   the facts, okay whether or not they fit into that theory

14   of law.  Are there any other reasons, for whatever

15   reason, raise your hand, that you feel that this week,

16   this day, and I anticipate two, to two to three days of

17   trial that I just cannot serve on this jury?  Raise your

18   hand.  Something that we haven't covered or haven't

19   asked, either the Judge or me that you feel, after

20   hearing everything and evaluating your personal situation

21   you feel you cannot serve?

22         UNIDENTIIFED JUROR:  I just have one question.

23   I have an autistic child and my husband works midnights.

24   I can try and make arrangements with my sister.  He's in

25   school during the day so there shouldn't be a problem.

1    It's only if an emergency came up that the school would

2    call me or if they can't reach my husband if he is

3    sleeping-

4            THE COURT:  Yeah I think if you give them the

5    jury board number, the jury board-

6            UNIDENTIFIED JUROR:  Okay.

7            THE COURT:  would certainly make you aware if

8    something came up.

9            UNIDENTIFIED JUROR:  Okay.

10           THE COURT:  Absolutely, yeah.  So just make

11   sure that you do that when you go downstairs.  Let them

12   know what the situation is and they'll take your name and

13   number and if that call comes, you know have them to call

14   the jury board if there's an issue and they will get the

15   message to you.

16           UNIDENTIFIED JUROR:  Okay.

17           THE COURT:  All right-

18           MR. LAROBARDIERE:  Now ma'am does that-

19           THE COURT:  just one second Mr. Larobardiere I

20   think we had a hand up here with Ms. Romano.

21           MR. LAROBARDIERE:  Okay Ms. Romano?

22           MS. ROMANO:  I just want to make sure it was

23   clear, I don't know many police officers or law

24   enforcement individuals but in my job I counsel people

25   with substance abuse problems, primarily on parole so I

1    just thought you guys should know that in case that's

2    somehow precludes me or-

3            THE COURT:  No it doesn't preclude you.  I'm, I

4    mean it's good that you let us know that that is a part

5    of your employment but it does not preclude you at all.

6            MS. ROMANO:  Okay.

7            THE COURT:  Yeah.  Any other questions Mr.

8    Larobardiere?

9            MR. LAROBARDIERE:  Uh just follow up as to your

10   thought.  Is there anything goin' on in the personal life

11   that's something that would be in the back of your head

12   where you wouldn't be able to focus on the trial?

13           UNIDENTIFIED JUROR:  Not that I can foresee,

14   no.

15           MR. LAROBARDIERE:  Okay.  As long as you can be

16   communicated with-

17           UNIDENTIFIED JUROR:  Right.

18           MR. LAROBARDIERE:  through the jury board?  And

19   also I'd like to ask Ms. Suski too, I know if you're,

20   you're going through Court proceedings, you know

21   sometimes your mind too could be caught up on what's

22   goin' on, you know with the attorneys or next week you

23   have a hearing, you know something like that.  I can

24   appreciate that so I want to ask you is there anything

25   that, would that be going on in the back of your mind

1    where you would have difficulty, in all honesty, hearing

2    the facts?

3         MS. SUSKI:  No.  I wouldn't be human if it

4    wasn't going on in the back of my mind.

5         MR. LAROBARDIERE:  True, true um but-

6         MS. SUSKI:  But it's not all consuming.

7         MR. LAROBARDIERE:  Okay.  All right fair

8    enough.  That's all I have Judge.

9         THE COURT:  So you would be able to set aside

10   and, and focus on this trial for the time that you would

11   be here?  Okay.  Thank you.  All right Mr. Breczinski any

12   questions you would have sir?

13        MR. BRECZINSKI:  Certainly.  You heard the

14   Judge talk about it, you heard the prosecutor talk about

15   it, that there's certain things, presumption of

16   innocence.  Right now Omar sits there and you have to

17   presume he's innocent, I mean have the attitude hey he's

18   innocent.  Got to be sort of like somebody from Missouri,

19   you know the show me state, that's what they call it, the

20   show me state.  Well it is, basically that's the

21   attitude.  Show me Mr. Prosecutor that he's guilty beyond

22   a reasonable doubt and if you can't, if I've got any kind

23   of a reasonable doubt then it's just like they, they

24   said.  Doubt based on reason, common sense.  If you do,

25   if I've got a reasonable doubt as if he's guilty, you

1    haven't proven your case and, which is a, comes to an

2    important point.  You may think somebody is guilty, you

3    may have a belief that he's guilty but there's reasonable

4    doubt as to his guilt.  Even if you think he might be

5    guilty the question is, but you've got that reasonable

6    doubt, can everybody, is there anybody here that wouldn't

7    be able to vote not proven guilty beyond a reasonable

8    doubt?  You understand this is not showing he's innocent

9    but that they haven't met their burden.  You may believe

10    he might be guilty but you've got a reasonable doubt.

11    Does anybody have a problem with that?  I mean there's

12    people that say well he might be guilty and I don't know,

13    we can't let somebody go that might be guilty but that's

14    exactly what this is about.  That if it's only a might be

15    rather than he's, well I know he's guilty beyond any

16    reason in common sense.  That if you got a reason or

17    common sense to believe that there's a, that there's a

18    doubt as to it that you have to acquit him.  That means

19    he's not proven guilty.  It doesn't mean he's innocent.

20    Doesn't mean you believe he's innocent okay?  Everybody

21    follow that even, even if that's what it's about?  Even

22    if you believe he might be but you got a reasonable

23    doubt?  I see no hands raised.

24            THE COURT:  One second Mr. Breczinski I just

25    want to chime in on your, when you start out with the

95

1    concept of the presumption of innocence-

2         MR. BRECZINSKI:   Right.

3         THE COURT:   So I just want to follow up on what

4    he says by that.   What that means is that as Mr. Pouncy

5    sits here in this chair right now, if I were to ask all

6    of you to stand up right now and say how do you find Mr.

7    Pouncy, guilty or innocent?   You would have to say

8    innocent and the reason is you haven't heard any evidence

9    at this point okay?   So as he sits there right now he is

10   innocent and just because he's charged, just because

11   there's an information that I'm gonna read to you at some

12   point, that is no evidence that he's guilty whatsoever.

13   All it is is a document that is gonna tell you what he's

14   charged with and you can't assume that because he's here

15   in Court, because he's charged that he's guilty.   And you

16   know some people say well hey you know he must have, if

17   he got arrested he must have done somethin' wrong.   You

18   can't make those kinds of assumptions.   What you have to

19   do is you have to look and say okay prosecutor what

20   evidence have you presented and if, and then you have to

21   look at the evidence and say well does that prove beyond

22   a reasonable doubt he's guilty?   And if you bring that

23   together, then you can come back with a verdict of

24   guilty.   But throughout the trial and until you have a

25   chance to go in that jury room and deliberate, Mr. Pouncy

1    is presumed innocent, does everyone understand that?  All

2    right go right ahead Mr. Breczinski?

3              MR. BRECZINSKI:  Now this case involves

4    somebody allegedly, actually a group of people allegedly

5    stealing cars.  Producing a gun and stealing cars.

6    Because there's a gun involved, some people have problems

7    with guns, some people are gun fanatics, some people have

8    had incidents where they're, they very idea of a gun gets

9    them upset, they're, get, some, they get excited, that

10   can prejudice them for or against something.  Is there

11   anything about the fact there, there's gonna be

12   allegations a gun was involved in these incidents that

13   would make you unable to sit and fairly judge this jury,

14   judge this man on this?  I see no hands raised.  These

15   are claims that cars were taken, there were other items

16   taken, they were armed robberies, they were carjackings.

17   Is there anything about that because of your past, maybe

18   you've been involved in something or you had friends or

19   relatives that were involved as victims of crimes or

20   perpetrators of such a thing that would make you unable

21   to sit and fairly just this because those are the type of

22   things involved?  I see no hands raised.  In this case

23   that we have, they're alleging that there were three

24   gentlemen that were involved, two or three gentlemen

25   involved in these incidents and they were all black which

1    comes down to another question, race.  There's a lot,

2    there has been a lot of things in the paper in the last

3    few years and even before that about the high incidents

4    of black males that are arrested or convicted or on

5    probation.  Is there anybody because it's a black male

6    that's being accused would tend to have a belief that

7    that's more likely that he's guilty just because of that

8    fact?  Is there anyone that has racial prejudices or

9    anything else that, because they couldn't sit unfair,

10   fairly on this?  A lot of people, because of the way they

11   were raised, have prejudices.  This is something that's

12   ingrained, sometimes they know it's wrong but they can't

13   get rid of it just because that's the way they were

14   brought up because of their background and such.  And

15   that's not anything to be necessarily ashamed of but is

16   there anyone who has those feelings or that background

17   that thinks that that might interfere with fairly judging

18   Mr. Pouncy?  There's gonna be an issue of, about

19   identification because quite frankly Mr. Pouncy's gonna

20   say it wasn't me, they're mistaken.  They all say it was

21   me but it wasn't me.  Can you listen to identification

22   testimony, can you listen to everything and judge that if

23   that's the issue?  Is there anyone that would have a

24   difficulty with the case with that sort of issue in it?

25   I see no hands.  There's, there is obviously the issue of

1    theft.  Has anybody have, had been like the victim of a

2    theft or anything else of the sort or has somebody else

3    that was involved in theft or good friends or relatives

4    where you just couldn't sit on a case because you, of

5    what happened to you or your friends or relatives?  I see

6    no hands.  Just a minute.  I have no further questions.

7            THE COURT:  Okay thank you Mr. Breczinski.

8    Challenge for cause Mr. Larobardiere?

9            MR. LAROBARDIERE:  No Your Honor.

10           THE COURT:  Challenge for cause Mr. Breczinski?

11           MR. BRECZINSKI:  No Your Honor.

12           THE COURT:  Preemptory challenge to you Mr.

13   Larboardiere?

14           MR. LAROBARDIERE:  People have decided to

15   excuse juror number 3 Judge, Ms. Rudolph.

16           THE COURT:  Okay Ms. Rudolph I want to thank

17   you for comin' down.  If you'll report to the second

18   floor, they'll let you know what you need to do and I

19   also would agree with Mr. Larobardiere that the work you

20   do is very important so please keep it up because it is

21   very helpful to society.  Thank you ma'am.  Go right

22   ahead Ms.-

23           COURT CLERK:  Juror B67, Bridget Walls.

24           THE COURT:  Okay Ms. Walls if you'll come on up

25   please?  And good morning Ms. Walls.

1          (Judge Archie L. Hayman; 01-24-06; 11:35 a.m.)

2               MS. WALLS:  Good morning.

3               THE COURT:  I want to welcome you to the

4     Genesee County Circuit Court.  You've heard the questions

5     that I asked, Mr. Larobardiere asked and Mr. Breczinski

6     asked is that correct?

7               MS. WALLS:  Yes.

8               THE COURT:  Would you have answered any of

9     those questions any differently than the rest of the jury

10    panel as a whole?

11              MS. WALLS:  No.

12              THE COURT:  Can you be here with us for the

13    time that I've indicated?

14              MS. WALLS:  Yes.

15              THE COURT:  Can you be fair to both the

16    prosecution and the defendant?

17              MS. WALLS:  I would try yes.

18              THE COURT:  Okay well you understand that if

19    you serve as a juror you will have an obligation to be

20    fair to both sides, do you understand that?

21              MS. WALLS:  I do understand that.

22              THE COURT:  You cannot serve unless you are

23    willing to be fair to both sides, do you understand that?

24              MS. WALLS:  Yes.

25              THE COURT:  In fact it would not be fair to

1    allow you to serve unless you were fair to both sides, do

2    you understand that?

3              MS. WALLS:   Yes.

4              THE COURT:   So can you make a, an honest effort

5    to be fair to both sides?

6              MS. WALLS:   Yes.

7              THE COURT:   As you sit there right now do you

8    have a, do you have a preference or do you prefer one

9    side or the other?

10             MS. WALLS:   No not really.   And I guess I say

11   that because my son havin' been in the system in trouble

12   also you know-

13             THE COURT:   Yes.

14             MS. WALLS:   but I know what my responsibility

15   would be as a juror.

16             THE COURT:   All right now your son was in the

17   system is what you said is that correct?

18             MS. WALLS:   Well actually still is because he

19   was just released from prison on January 4th and still has

20   a year-and-a-half probation.

21             THE COURT:   All right and did he come through

22   this courthouse when he was charged ma'am?

23             MS. WALLS:   I'm not sure.

24             THE COURT:   All right.   Did you come to Court

25   on his case?

1      MS. WALLS: I did-

2      THE COURT: All right.

3      MS. WALLS: I just can't remember if it was

4  this Court or the other Court.

5      THE COURT: Well I guess what I meant, this

6  courthouse is what I meant.

7      MS. WALLS: Right.

8      THE COURT: Was it in this courthouse?

9      MS. WALLS: No I know, I knew you didn't mean

10  this one particular right because it was a uh, his, was

11  it a felony?

12      THE COURT: Okay if it was in this courthouse I

13  would say so ma'am.

14      MS. WALLS: Right.

15      THE COURT: All right and um did you go to the,

16  to see the outcome and what happened in the case?

17      MS. WALLS: Yes.

18      THE COURT: Were you satisfied or dissatisfied

19  with the way in which it was handled and resolved?

20      MS. WALLS: Dissatisfied.

21      THE COURT: Okay and was your dissatisfaction

22  with the attorney, the prosecution, the police, the

23  Judge?

24      MS. WALLS: The Judge.

25      THE COURT: Or all above?

1          MS. WALLS:  Well basically the Judge.

2          THE COURT:  The Judge okay-

3          MS. WALLS:  The Judge.

4          THE COURT:  so you weren't happy with the way

5    the Judge handled it is that correct?

6          MS. WALLS:  Exactly.

7          THE COURT:  All right.  Can you set aside your

8    feelings about what the Judge did in that case involving

9    your son and decide this case just on the evidence that

10   you see in here?

11         MS. WALLS:  Yes.

12         THE COURT:  Okay.  If you were to hear this

13   case, and let's assume that after you heard the entire

14   case, if you were convinced that the prosecution had

15   proven beyond a reasonable doubt that Mr. Pouncy was

16   guilty, could you come back with a verdict of guilty?

17         MS. WALLS:  Yes.

18         THE COURT:  On the other hand if you felt that

19   the prosecution had failed to prove beyond a reasonable

20   doubt that Mr. Pouncy was guilty, could you come back

21   with a verdict of not guilty?

22         MS. WALLS:  Yes.

23         THE COURT:  As you sit there and you look at

24   Mr. Pouncy, are you gonna draw parallels between Mr.

25   Pouncy and your son?  In other words, would you have a

1    tendency to see your son sitting over there as opposed to

2    Mr. Pouncy I guess is my question?

3            MS. WALLS:  Probably.

4            THE COURT:  All right.  Would that affect your

5    judgment in deciding this case?

6            MS. WALLS:  No.

7            THE COURT:  So then you can set aside the fact

8    that Mr. Pouncy is an African American male, young male

9    probably just as your son, and you can decide this case

10   just on the evidence, is that what you're tellin' me?

11           MS. WALLS:  Yes.

12           THE COURT:  Okay.  Is there any reason you can

13   think of why you shouldn't serve on this jury ma'am?

14           MS. WALLS:  No.

15           THE COURT:  All right.  Do you have a desire

16   not to serve on this jury?

17           MS. WALLS:  Probably not.

18           THE COURT:  Okay can you tell me why?

19           MS. WALLS:  It's probably because of my son,

20   like I said, and I had a problem with the Judge, the uh,

21   her verdict basically.

22           THE COURT:  Oh it's another female Judge?  This

23   is the second time.  Okay so you weren't happy with her,

24   with her decision?

25           MS. WALLS:  I wasn't because the Judge that

104

1    initially, was supposed to have heard the case was out

2    ill.

3              THE COURT:  Okay.

4              MS. WALLS:  And it was given to another Judge.

5              THE COURT:  I see.  All right.  Let me just ask

6    this and I, let me just ask you this, do you believe that

7    your son had done anything wrong?

8              MS. WALLS:  I do.

9              THE COURT:  All right.  So you don't quarrel

10   with the fact that he was charged then is that correct?

11             MS. WALLS:  Correct.

12             THE COURT:  And you don't quarrel with the fact

13   that he was convicted is that correct?

14             MS. WALLS:  Correct.

15             THE COURT:  You just quarrel with the way in

16   which it was handled by the Judge?

17             MS. WALLS:  Exactly.

18             THE COURT:  All right um all right so I guess

19   I'm gonna ask you what I call my drop dead question.  And

20   that is if you were Mr. Pouncy seated in the defense

21   chair, would you be satisfied to have you serve as a jury

22   in this, juror in this case?  Knowing what you know about

23   yourself, would you be satisfied to have yourself sit on

24   this jury if you were in Mr. Pouncy's seat?

25             MS. WALLS:  Probably because he's probably

1    thinking that I'm going to say not guilty because my son

2    sat in that seat.

3            THE COURT:  All right but so you're sayin' that

4    if you're Mr. Pouncy you feel that he, that you, you

5    wouldn't have a problem with having you served is that

6    correct?

7            MS. WALLS:  That's correct.

8            THE COURT:  All right now let's, let's now go

9    on the other side of the table-

10           MS. WALLS:  Right.

11           THE COURT:  Let's assume you were the People of

12   the State of Michigan who are being represented here by

13   Mr. Larobardiere.  Knowing what you know, would you be

14   satisfied to have you serve as a juror?

15           MS. WALLS:  No he would say no I'm, sure.

16           THE COURT:  No I'm not asking what he would

17   say-

18           MS. WALLS:  Right.

19           THE COURT:  I'm asking-

20           MS. WALLS:  No.

21           THE COURT:  knowing what you know-

22           MS. WALLS:  No.

23           THE COURT:  would you be satisfied if you were

24   Mr. Larobardiere to have you serve as a juror?

25           MS. WALLS:  No.

1    THE COURT:  And why ma'am?

2    MS. WALLS:  Because that, knowing that, that I

3    would probably think that I would be unfair.  I would be

4    prejudiced toward the defendant as opposed to the

5    prosecutor.

6    THE COURT:  All right.  Now you're sayin'

7    that's what Mr. Larobardiere might think but no my

8    question is knowing you and knowing who you are, would

9    you is my question?

10   MS. WALLS:  No because I would say the same

11   thing.

12   THE COURT:  Okay you would say the same thing

13   and that same thing is what?

14   MS. WALLS:  No because I would be prejudice.

15   THE COURT:  All right so you don't believe you

16   could be fair to the prosecution is that what you're

17   tellin' me?

18   MS. WALLS:  As we go farther into the

19   questioning, probably not.

20   THE COURT:  Okay.  And that's because you have

21   some concerns about how your son was treated is that

22   correct?

23   MS. WALLS:  Exactly.

24   THE COURT:  All right and this might not be the

25   type of case for you to sit on because of what your

1    experience of what has happened with your son?

2              MS. WALLS:  Right.  Even though it's totally

3    different situations but-

4              THE COURT:  Yes.  Okay.  All right anyone want

5    to question her based on my questions?  Mr. Breczinski?

6              MR. BRECZINSKI:  No Your Honor.

7              THE COURT:  Mr. Larobardiere?

8              MR. LAROBARDIERE:  No Your Honor.

9              THE COURT:  I think I am gonna excuse you ma'am

10   and I, you know I really appreciate your honest answers.

11   You were totally honest and I really appreciate that

12   'cause you could have come up here and said anything

13   okay?  But you didn't and so I appreciate that and I'm

14   gonna pray for you and for your son okay?

15             MS. WALLS:  Thank you very much.

16             THE COURT:  And if I ever have an opportunity

17   to run into you outside of the courthouse I'll share with

18   you some of my thoughts about-

19             MS. WALLS:  You've actually done that.

20             THE COURT:  our, our young African American

21   males okay?  All right?

22             MS. WALLS:  I heard that.  Thank you.

23             THE COURT:  Okay ma'am thank you.

24             MR. POUNCY:  Thank you ma'am for bein' honest.

25             THE COURT:  Mr. Pouncy please.  That's okay but

1    thank you.  All right let's uh, Mary Lee?

2              COURT CLERK:  Juror H256, Deborah Gontarek.

3              THE COURT:  Spell that last name.

4              COURT CLERK:  G-o-n-t-a-r-e-k.

5              THE COURT:  All right good morning still.

6              MS. GONTAREK:  Good Morning.

7              THE COURT:  And I want to welcome you also to

8    the Genesee County Circuit Court.  And I'm gonna ask you

9    to pronounce your last name before I mess it all up.

10             MS. GONTAREK:  Gontarek.

11             THE COURT:  Gontarek?

12             MS. GONTAREK:  Um hm.

13             THE COURT:  All right Ms. Gontarek I want to

14   welcome you to the Court and you've heard the questions

15   that I asked, Mr. Larobardiere asked and Mr. Breczinski

16   asked is that correct?

17             MS. GONTAREK:  Um hm.

18             THE COURT:  Is that a yes?

19             MS. GONTAREK:  Yes.

20             THE COURT:  And would you have answered any of

21   those questions any differently than the rest of the jury

22   panel as a whole?

23             MS. GONTAREK:  No.

24             THE COURT:  Can you be here with us for the

25   time that I've indicated?

1       MS. GONTAREK: Yes.

2       THE COURT: Can you be fair to both the

3   prosecution and the defendant in this case?

4       MS. GONTAREK: Yes.

5       THE COURT: Is there any reason you can think

6   of why you shouldn't serve?

7       MS. GONTAREK: No.

8       THE COURT: Mr. Larobardiere any questions you

9   would have for this juror?

10      MR. LAROBARDIERE: Nothing further Judge.

11      THE COURT: Any questions you would have for

12  this juror Mr. Breczinski?

13      MR. BRECZINSKI: No Your Honor.

14      THE COURT: Okay any challenge for cause Mr.

15  Larobardiere?

16      MR. LAROBARDIERE: No Your Honor.

17      THE COURT: Challenge for cause Mr. Breczinski?

18  Challenge for cause?

19      MR. BRECZINSKI: No Your Honor.

20      THE COURT: Preemptory challenge to you Mr.

21  Breczinski.

22      MR. BRECZINSKI: We'll thank and excuse juror

23  in seat number 7, Patricia Zak.

24      THE COURT: All right Ms. Zak I want to thank

25  you for coming down ma'am. And thank you also for your

1    honest answers and if you'll report to the second floor

2    they'll let you know what you need to do ma'am.  Thank

3    you.

4              COURT CLERK:  Juror G213, Patricia Ayre, A-y-r-

5    e.

6              THE COURT:  Good morning Ms. Ayre.

7              MS. AYRE:  Morning.

8              THE COURT:  And did I say your name correctly?

9              MS. AYRE:  Ayre yes.

10             THE COURT:  Ayres?

11             MS. AYRE:  Ayre.  Okay thank you.  Ms. Ayre

12   you've had a chance to, well I want to welcome you to the

13   Circuit Court first and you've had a chance to hear my

14   questions, Mr. Larobardiere and Mr. Breczinski's

15   questions is that correct?

16             MS. AYRE:  Um hm.

17             THE COURT:  Is that a yes?

18             MS. AYRE:  Yes.

19             THE COURT:  Would you have answered any off

20   those questions any differently than the rest of the jury

21   panel has?

22             MS. AYRE:  No.

23             THE COURT:  Can you be here with us for the

24   time that I've indicated?

25             MS. AYRE:  Yes.

1    THE COURT:  Can you be fair to both the

2    prosecution and the defendant in this case?

3        MS. AYRE:  Yes.

4        THE COURT:  Is there any reason you can think

5    of why you shouldn't serve on this jury ma'am?

6        MS. AYRE:  No.

7        THE COURT:  All right Mr. Larobardiere any

8    questions?

9        MR. LAROBARDIERE:  No Your Honor.

10       THE COURT:  Mr. Breczinski?

11       MR. BRECZINSKI:  None Your Honor.

12       THE COURT:  Challenge for cause Mr.

13   Larobardiere?

14       MR. LAROBARDIERE:  No Your, no thank you Your

15   Honor.

16       THE COURT:  Challenge for cause Mr. Breczinski?

17       MR. BRECZINSKI:  None Your Honor.

18       THE COURT:  Preemptory challenge to you Mr.

19   Larobardiere.

20       MR. LAROBARDIERE:  Judge the People would like

21   to thank and excuse juror number 9, Ms. Suski.

22       THE COURT:  Okay Ms. Suski I want to thank you

23   for coming down ma'am and I am gonna be prayin' for you

24   also ma'am.  Thank you.  And if you'll report to the

25   second floor.  Mary Lee?

1    COURT CLERK:  Juror G232, Richard Lapland, L-a-

2  p-l-a-n-d.

3    THE COURT:  And good morning Mr. Lapland.

4    MR. LAPLAND:  Morning sir.

5    THE COURT:  And we want to welcome you also to

6  the Genesee County Circuit Court sir and you've heard the

7  questions that I asked and Mr. Larobardiere asked and Mr.

8  Breczinski asked is that correct?

9    MR. LAPLAND:  Yes I have.

10    THE COURT:  Would you have answered any of

11  those questions any differently than the rest of the jury

12  panel as a whole?

13    MR. LAPLAND:  No I haven't.

14    THE COURT:  Can you be here with us for the

15  time that I've indicated?

16    MR. LAPLAND:  Yes.

17    THE COURT:  Can you be fair to both the

18  prosecution and the defendant in this case?

19    MR. LAPLAND:  I believe so.

20    THE COURT:  Is there any reason you can think

21  of why you shouldn't serve on this jury sir?

22    MR. LAPLAND:  No but I would like to give you

23  some information.  Just the fact that I do have some

24  relatives that work for the Genesee County Police

25  Department.

1          THE COURT:  Okay and how many relatives do you

2    have?

3          MR. LAPLAND:  Two.

4          THE COURT:  And are they on road patrol, are

5    they in the offices?

6          MR. LAPLAND:  One worked in dispatch and the

7    other one works in the jail.

8          THE COURT:  In the jail?  So they work for the

9    Sheriff's Department.

10          MR. LAPLAND:  Yes I'm sorry.

11          THE COURT:  Okay.  Would that fact have any

12    affect on how you would judge this case sir?

13          MR. LAPLAND:  No.

14          THE COURT:  Would you be concerned after you

15    heard all the evidence if you came back with a verdict of

16    not guilty that your relatives might have somethin' to

17    say to you about that?

18          MR. LAPLAND:  No.

19          THE COURT:  Can you look them in the eye and

20    say hey I listened to the evidence and I made my own

21    judgment?

22          MR. LAPLAND:  Yes I can.

23          THE COURT:  Do you have any problem with making

24    judgments about facts sir?

25          MR. LAPLAND:  No.

1          THE COURT:  Is there any other reason you can

2    think of why you shouldn't serve?

3          MR. LAPLAND:  No.

4          THE COURT:  Okay.  Mr. Larobardiere any

5    questions?

6          MR. LAROBARDIERE:  No questions Judge.

7          THE COURT:  Mr. Breczinski?

8          MR. BRECZINSKI:  No Your Honor.

9          THE COURT:  Challenge for cause Mr.

10   Larobardiere?

11         MR. LAROBARDIERE:  No thank you Judge.

12         THE COURT:  Challenge for cause Mr. Breczinski?

13         MR. BRECZINSKI:  No Your Honor.

14         THE COURT:  Preemptory challenge to you Mr.

15   Breczinski.

16         MR. BRECZINSKI:  We'll thank and excuse juror

17   in seat number 9, Mr. Lapland.

18         THE COURT:  All right Mr. Lapland I want to

19   thank you sir for coming up and if you'll report to the

20   second floor they'll let you know what you need to do.

21   Thank you sir.

22         THE COURT:  Mary Lee?

23         COURT CLERK:  Juror D223, Julian Green.

24         THE COURT:  Is that G-r-e-e-e-n-

25         COURT CLERK:  Correct.

1          THE COURT:  or n-e?

2          THE COURT:  And I'm gonna ask everyone to be

3     patient 'cause it looks like we may go into the lunch

4     hour and I have either a choice.  I can either break at

5     lunch and have you all come back a two o'clock or I can

6     get this down now and then I can send you on your merry

7     way once we've got a jury so I assume most of you would

8     just rather stick around until we get this done.  All

9     right.  Okay Ms. Green I want to welcome you to the

10    Genesee County Circuit Court ma'am.  And you've heard the

11    questions that I asked, Mr. Larobardiere asked and Mr.

12    Breczinski asked is that correct?

13         MS. GREEN:  Yes.

14         THE COURT:  Would you have answered any of

15    those questions any differently than the rest of the jury

16    panel as a whole?

17         MS. GREEN:  I also have three members of my

18    family who are in law enforcement.

19         THE COURT:  Yes ma'am.

20         MS. GREEN:  I don't think I can be impartial.

21         THE COURT:  Okay.

22         MS. GREEN:  I, I would like to (inaudible).  I

23    just don't (inaudible).  And I've had a car stolen.

24         THE COURT:  You've had your automobile stolen?

25         MS. GREEN:  Yeah.

1               THE COURT:  And all of this so this type of

2    case may not be the kind of case you should sit on?

3             MS. GREEN:  This might not be a good idea.

4             THE COURT:  All right.  Based on that I'm gonna

5    excuse you ma'am and I want to thank you for coming and

6    bein' honest about it 'cause you could have just sat

7    there and said nothing.

8             MS. GREEN:  Well I wanted to serve-

9             THE COURT:  Yes.

10            MS. GREEN:  I really do but I don't, and I want

11   to be fair to the young man but I don't know.

12           THE COURT:  Well I do want you to know that I,

13   I certainly always have concerns when jurors are not able

14   to serve because you know we, we, like Mr. Larobardiere

15   pointed out earlier, it's good to have a good cross-

16   section of the community and especially in, when, in

17   terms of African Americans on the, the jury.  We

18   certainly like to try to keep as many as we can because

19   there's always a concern as to whether we're represented

20   in the jury and so I don't like to dismiss unless there's

21   a good reason to do so for that reason.  But you've given

22   me a, a very good reason to excuse you and I am going to

23   excuse you ma'am.  Thank you very much.  If you'll report

24   to the second floor and Mary Lee you may proceed.

25           COURT CLERK:  Juror B38, James Baldwin.

1       THE COURT:  I see some of you are puttin' your

2   coats on it's gettin' cold in here.  And I apologize for

3   that.  We've talked to maintenance but there is actually

4   cold air that blows into this courtroom and we'll see if

5   we can do somethin' about it after lunch so it won't be

6   so cold in here for you.  Okay Mr. Baldwin we want to

7   welcome you also to the Genesee County Circuit Court sir

8   and you've heard the questions that I asked, that Mr.

9   Larobardiere asked and Mr. Breczinski asked is that

10  correct?

11      MR. BALDWIN:  Yes sir.

12      THE COURT:  Would you have answered any of

13  those questions any differently than the rest of the jury

14  panel as a whole?

15      MR. BALDWIN:  No sir.

16      THE COURT:  Can you be here with us for the

17  time I have indicated?  Can you be fair to both the

18  prosecution and the defendant in this case?

19      MR. BALDWIN:  Yes sir.

20      THE COURT:  Is there anything you can think of

21  or is there any reason you can think of why you shouldn't

22  serve on this jury sir?

23      MR. BALDWIN:  No sir.

24      THE COURT:  Any questions you would have Mr.

25  Larobardiere?

1          MR. LAROBARDIERE:  (Inaudible) Judge.  Mr.

2    Baldwin do you have any strong feelings towards the

3    police, either positive or negative from your life

4    experiences?

5          MR. BALDWIN:  No sir.

6          MR. LAROBARDIERE:  Feel you can be impartial to

7    both sides and hear the evidence as it comes in?

8          MR. BALDWIN:  Yes sir.

9          MR. LAROBARDIERE:  And render a judgment?

10         MR. BALDWIN:  Yes sir.

11         MR. LAROBARDIERE:  No, nothing further Judge.

12         THE COURT:  All right Mr. Breczinski any

13    questions you would have sir?

14         MR. BRECZINSKI:  Were you listening to all the

15    questions that I was asking everybody else?

16         MR. BALDWIN:  Yes sir.

17         MR. BRECZINSKI:  And was there anything that

18    you would have answered differently than what everybody

19    else did?

20         MR. BALDWIN:  No sir.

21         MR. BRECZINSKI:  No prejudices or anything

22    else?

23         MR. BALDWIN:  I'm impartial (inaudible) so

24    (inaudible) too so (inaudible).

25         MR. BRECZINSKI:  Okay thank you.

1          THE COURT:  Okay then challenge for cause Mr.

2     Larobardiere?

3          MR. LAROBARDIERE:  No thank you Judge.

4          THE COURT:  Challenge for cause Mr. Breczinski?

5          MR. BRECZINSKI:  None Your Honor.

6          THE COURT:  Preemptory challenge to you Mr.

7     Larobardiere?

8          MR. LAROBARDIERE:  Judge I'd like to thank and

9     excuse juror number 14, Ms. McPherson.

10         THE COURT:  Okay Ms. McPherson I want to thank

11    you ma'am for coming down and looks like you're gonna get

12    to go and continue teachin' those kids and keep up the

13    good work.  You know I pray for teachers all the time so-

14         MS. MCPHERSON:  Thank you.

15         THE COURT:  yes ma'am.  Thank you.

16         COURT CLERK:  Juror H277, Jeffrey Searles-

17         MR. SEARLES:  Very good.

18         COURT CLERK:  S-e-a-r-l-e-s.

19         THE COURT:  Well I tell you I'm gonna have you

20    pronounce it before I pronounce it because I don't think

21    I'm as good as her at all.  What was, what's that last

22    name again now?

23         MR. SEARLES:  Pronounced Searles.

24         THE COURT:  Searles.

25         MR. SEARLES:  Yes.

1        THE COURT: All right Mr. Searles I want to

2    welcome you to the Genesee County Circuit Court and

3    you've heard the questions that I asked, Mr. Larobardiere

4    asked and Mr. Breczinski, Breczinski asked is that

5    correct?

6        MR. SEARLES: Yes I have.

7        THE COURT: Would you have answered any of

8    those questions any differently than the rest of the jury

9    panel as a whole?

10        MR. SEARLES: No I would not.

11        THE COURT: Can you be here with us for the

12    time that I've indicated?

13        MR. SEARLES: Yes I can.

14        THE COURT: Can you be fair to both the

15    prosecution and the defendant in this case?

16        MR. SEARLES: No sir.

17        THE COURT: Is there any reason you can think

18    of why you shouldn't serve on this jury sir?

19        MR. SEARLES: Not at all.

20        THE COURT: All right Mr. Larobardiere any

21    questions?

22        MR. LAROBARDIERE: No thank you Judge.

23        THE COURT: Questions Mr. Breczinski?

24        MR. BRECZINSKI: I have none.

25        THE COURT: Challenge for cause Mr.

1    Larobardiere?

2              MR. LAROBARDIERE:  No thank you Judge.

3              THE COURT:  Challenge for cause Mr. Breczinski?

4              MR. BRECZINSKI:  None Your Honor.

5              THE COURT:  Preemptory challenge Mr.

6    Breczinski?

7              MR. BRECZINSKI:  We would thank and excuse

8    juror in seat number 3, Deborah-

9              THE COURT:  Gontarek?

10             MR. BRECZINSKI:  Yes.

11             THE COURT:  All right thank you ma'am.  If

12   you'll report to the second floor they'll let you know

13   what you need to do.

14             COURT CLERK:  Juror B43, Terry Curtis.

15             THE COURT:  Good morning Mr. Curtis.

16             MR. CURTIS:  Good morning.

17             THE COURT:  We want to welcome you also to the

18   Genesee County Circuit Court.  You heard the questions

19   that I asked, Mr. Larobardiere asked and Mr. Breczinski

20   asked is that correct?

21             MR. CURTIS:  Yes.

22             THE COURT:  Would you have answered any of

23   those questions any differently than the rest of the jury

24   panel?

25             MR. CURTIS:  No.  They probably won't want me

1  on here.

2         THE COURT:  Well I, I, why do you say that sir?

3         MR. CURTIS:  My house was broke into a year

4  ago-

5         THE COURT:  Okay.

6         MR. CURTIS:  they stole guns, they stole hand

7  guns, they stole money and that's-

8         THE COURT:  So do you believe that that, the

9  fact that that happened, that that would affect your

10  judgment in this case?

11         MR. CURTIS:  It sure would.

12         THE COURT:  It would?

13         MR. CURTIS:  Yep.

14         THE COURT:  Well let, let me just ask you did

15  you find out who had done this?

16         MR. CURTIS:  Nope not yet.

17         THE COURT:  All right.  You don't have any

18  indication that anyone in this courtroom did it is that

19  correct?

20         MR. CURTIS:  Well that'd be just pointin'

21  fingers.

22         THE COURT:  Okay-

23         MR. CURTIS:  Not yet, no.

24         THE COURT:  all right.  That's what I'm, yeah,

25  that's my point.  I mean you, you don't have any

1    indication that anyone in this courtroom is responsible

2    for that is that correct?

3                MR. CURTIS:  No.

4                THE COURT:  All right uh then um, is it just

5    the fact that you were invaded and that is gonna have a-

6                MR. CURTIS:  Well I had a stepson that was shot

7    in the stomach too so-

8                THE COURT:  I'm sorry?

9                MR. CURTIS:  I had a stepson that was shot in

10   the stomach.

11               THE COURT:  During that incident?

12               MR. CURTIS:  Yes.

13               THE COURT:  Okay then I think based on that I

14   can understand and I will certainly excuse you.

15               MR. CURTIS:  Thank you.

16               THE COURT:  And is he okay?

17               MR. CURTIS:  Yes he is.

18               THE COURT:  All right very good.  All right if

19   you'll report to the second floor they'll let you know

20   what you need to do.

21               MR. CURTIS:  Thank you sir.

22               THE COURT:  Yes sir.

23               COURT CLERK:  Juror H267, Hugh Miller.

24               THE COURT:  And good morning still Mr. Miller.

25               MR. MILLER:  Morning.

1      (Judge Archie L. Hayman; 01-24-06; 11:56:33 a.m.)

2              THE COURT:  And we also want to welcome you to

3      the Circuit Court sir.  You heard the questions that I

4      asked, Mr. Larobardiere asked and Mr. Breczinski asked is

5      that correct?

6              MR. MILLER:  Yes.

7              THE COURT:  Would you have answered any of

8      those questions any differently than the rest of the jury

9      panel as a whole?

10             MR. MILLER:  No.

11             THE COURT:  Can you be here with us for the

12     time that I've indicated?

13             MR. MILLER:  Yes sir.

14             THE COURT:  Can you be fair to both the

15     prosecution and the defendant in this case?

16             MR. MILLER:  Yes.

17             THE COURT:  Is there any reason you can think

18     of why you shouldn't serve on this jury sir?

19             MR. MILLER:  No.

20             THE COURT:  Mr. Larobardiere any questions?

21             MR. LAROBARDIERE:  Yes Judge.  Mr. Miller I see

22     you're an engineer?

23             MR. MILLER:  Yes.

24             MR. LAROBARDIERE:  And one question I have for

25     engineers is that you're, you're probably detail oriented

1    is that fair to say?

2              MR. MILLER:  That's very fair.

3              MR. LAROBARDIERE:  Okay and I'll go back to my

4    original, some of my original questions is that at trial,

5    the evidence will come in by the testimony, documents to

6    create pictures okay?  And the prosecutor proves, or I

7    try to prove the elements that the Judge will give you

8    okay?  And you may have some questions being an engineer

9    is what I'm gettin' at about certain details that some

10   person who's not an engineer may, may not question that.

11   If you have such a question and it doesn't get answered

12   is that gonna be a problem for you as an engineer?

13             MR. MILLER:  No.

14             MR. LAROBARDIERE:  Do you understand, do you

15   follow what I'm saying?

16             MR. MILLER:  I'm following what your saying

17   yes.

18             MR. LAROBARDIERE:  This is not a technical

19   science-

20             MR. MILLER:  Right.  I don't have to prove it

21   to myself.  You, you have to prove it.

22             MR. LAROBARDIERE:  Right.  This is a, in other

23   words what I'm sayin' is your job deals with a, a, I

24   think a very technical science-

25             MR. MILLER:  Um hm.

1    MR. LAROBARDIERE:  whereas it gets into very

2    fine details and this, although we had to prove elements,

3    okay, certain things, the proofs doesn't have to be so

4    technical that it's beyond any doubt okay?

5            MR. MILLER:  Um hm.

6            MR. LAROBARDIERE:  Do you have a problem with

7    that concept?

8            MR. MILLER:  No I don't.

9            MR. LAROBARDIERE:  All right do you understand

10   what I'm, you follow what I'm saying?

11           MR. MILLER:  Yes I follow what you're saying.

12           MR. LAROBARDIERE:  Okay thank you nothing

13   further.

14           THE COURT:  Thank you.  Mr. Breczinski?

15           MR. BRECZINSKI:  Do you have any problem with

16   the concept that if you have a reasonable doubt, even if,

17   even if you think he might be guilty that you would have

18   to acquit?

19           MR. MILLER:  I don't have a problem with that,

20   no.

21           MR. BRECZINSKI:  You could do that?

22           MR. MILLER:  I could do that.

23           MR. BRECZINSKI:  I have nothing further.

24           THE COURT:  Challenge for cause Mr.

25   Larobardiere?

1           MR. LAROBARDIERE:  No thank you Judge.

2           THE COURT:  Challenge for cause Mr. Breczinski?

3           MR. BRECZINSKI:  None Your Honor.

4           THE COURT:  Preemptory challenge to you Mr.

5    Larobardiere.

6           MR. LAROBARDIERE:  No thank you Judge.

7           THE COURT:  Okay pass.  Mr. Breczinski

8    preemptory challenge to you sir.

9           MR. BRECZINSKI:  No thank you Judge.

10          THE COURT:  Okay pass.  Mr. Breczinski

11   preemptory challenge to you sir.

12          MR. BRECZINSKI:  We would thank and excuse

13   juror in seat number 6, Ms. Shirley-

14          THE COURT:  Ms. Michael?

15          MR. BRECZINSKI:  Michael yeah.

16          THE COURT:  All right Ms. Michael I want to

17   thank you for coming down.  If you'll report to the

18   second floor they'll let you know what you need to do

19   ma'am.

20          MR. BRECZINSKI:  No I said juror 6.

21          THE COURT:  Oh okay I'm sorry seat 6 yes okay

22   you're right that would be Ms. Michael yep.  You're Ms.

23   Morris I'm sorry.  Okay thank you and go right ahead Mary

24   Lee.

25          COURT CLERK:  Juror G222, Craig Cohoon-

1    THE COURT:  Craig-

2    COURT CLERK:  Craig C-o-h-o-o-n.

3    THE COURT:  Okay and good afternoon Mr. Cohoon.

4  And you've heard the questions that I've asked and Mr.

5  Larobardiere and Mr. Breczinski asked is that correct?

6    MR. COHOON:  Yes.

7    THE COURT:  Would you have answered any of

8  those questions any differently than the rest of the jury

9  panel?

10    MR. COHOON:  No.

11    THE COURT:  Can you be here for the time that

12  I've indicated?

13    MR. COHOON:  Yes sir.

14    THE COURT:  Can you be fair to both the

15  prosecution and the defendant in this case?

16    MR. COHOON:  I believe so.

17    THE COURT:  All right is there any reason you

18  can think of why you shouldn't serve?

19    MR. COHOON:  No sir.

20    THE COURT:  Mr. Larobardiere any questions?

21    MR. LAROBARDIERE:  No thank you.

22    THE COURT:  Questions Mr. Breczinski?

23    MR. BRECZINSKI:  None Your Honor.

24    THE COURT:  All right challenge for cause Mr.

25  Larobardiere?

1          MR. LAROBARDIERE:  None Your Honor.

2          THE COURT:  Challenge for cause Mr. Breczinski?

3          MR. BRECZINSKI:  None Your Honor.

4          THE COURT:  Preemptory challenge to you Mr.

5    Larobardiere.

6          MR. LAROBARDIERE:  Pass Judge.

7          THE COURT:  Peremptory challenge to you Mr.

8    Breczinski.

9          MR. BRECZINSKI:  We will thank and excuse juror

10   in seat number 1, Cheryl Hawkins.

11         THE COURT:  Okay Ms. Hawkins want to thank you

12   for comin' down ma'am.  If you'll report to the second

13   floor, they'll let you know what you need to do.

14         COURT CLERK:  Juror B66, Josephine Villarreal,

15   V-i-l-l-a-r-r-e-a-l.  B66 Josephine Villarreal.

16         THE COURT:  Good afternoon Ms. Villarreal.

17         MS. VILLARREAL:  Good afternoon.

18         THE COURT:  And Ms. Villarreal we want to

19   welcome you to the Genesee County Circuit Court.  You

20   heard the questions that I've asked, Mr. Larobardiere has

21   asked and Mr. Breczinski has asked is that correct?

22         MS. VILLARREAL:  Yes.

23         THE COURT:  Um is there, are there any

24   questions that you would have answered any differently

25   than the rest of the jury panel as a whole?

1            MS. VILLARREAL:  Right now I have four nephews

2      went to prison right now.

3            THE COURT:  Okay and would that affect your

4      ability to be fair in this case?

5            MS. VILLARREAL:  Yes.  Yes.

6            THE COURT:  Okay.  I'm gonna excuse ma'am.

7      Thank you for comin' down and thank you for bein' honest.

8            MS. VILLARREAL:  Thank you.

9            THE COURT:  Yes ma'am.

10           COURT CLERK:  Juror G233, Dawn Liquia, L-i-q-u-

11     i-a.

12           THE COURT:  Good afternoon ma'am.

13           MS. LIQUIA:  Good afternoon.

14           THE COURT:  And would you pronounce that last

15     name for me?

16           MS. LIQUIA:  Liquia.

17           THE COURT:   Liquia?

18           MS. LIQUIA:  Liquia.

19           THE COURT:  Okay I didn't want to even try that

20     one.

21           MS. LIQUIA:  I'm used to it.

22           THE COURT:  Okay thank you.  Thank you Ms.

23     Liquia and we want to welcome you to the Genesee County

24     Circuit Court.  You've heard the questions that I asked,

25     Mr. Larobardiere asked and Mr. Breczinski asked is that

1    correct?

2              MS. LIQUIA:  Yes.

3              THE COURT:  Would you have answered any of

4    those questions any differently than the rest of the jury

5    panel as a whole?

6              MS. LIQUIA:  No.

7              THE COURT:  Can you be here with us for the

8    time that I've indicated?

9              MS. LIQUIA:  Yes.

10             THE COURT:  Can you be fair to both the

11   prosecution and the defendant in this case?

12             MS. LIQUIA:  Yes.

13             THE COURT:  Is there any reason you can think

14   of why you shouldn't serve on this jury ma'am?

15             MS. LIQUIA:  No.

16             THE COURT:  Any questions you would have Mr.

17   Larobardiere?

18             MR. LAROBARDIERE:  None Your Honor.

19             THE COURT:  Any questions you would have Mr.

20   Breczinski?

21             MR. BRECZINSKI:  None Your Honor.

22             THE COURT:  Challenge for cause Mr.

23   Larobardiere?

24             MR. LAROBARDIERE:  No thank you Your Honor.

25             THE COURT:  Challenge for cause Mr. Breczinski?

1          MR. BRECZINSKI:  No thank you.

2          THE COURT:  Preemptory challenge to you Mr.

3    Larobardiere.

4          MR. LAROBARDIERE:  Pass.

5          THE COURT:  Pass.  Preemptory challenge to you

6    Mr. Larobardiere, I mean Mr. Breczinski, excuse me.

7          MR. BRECZINSKI:  We thank and excuse juror in

8    seat number 6, Craig Cohoon.

9          THE COURT:  Okay Mr. Cohoon we want to thank

10   you for comin' down sir.  If you'll report to the second

11   floor, thank you sir.

12         COURT CLERK:  Juror B65, Brian Valance-Jones.

13         THE COURT:  And good afternoon Mr. Jones.

14         MR. JONES:  Afternoon Your Honor.

15         THE COURT:  And sir we want to welcome you also

16   to the Genesee County Circuit Court.  You've heard the

17   questions that I asked, Mr. Larobardiere asked and Mr.

18   Breczinski asked is that correct?

19         MR. JONES:  Yes sir.

20         THE COURT:  Would you have answered any of

21   those questions any differently than the rest of the jury

22   panel as a whole?

23         MR. JONES:  No sir.

24         THE COURT:  Can you be here with us for the

25   time that I've indicated?

1          MR. JONES:  I do have a conflict sir.

2          THE COURT:  Okay tell me about it.

3          MR. JONES:  This Thursday I have a criminal

4  court case in 50th District Court.

5          THE COURT:  All right well believe it or not

6  you can be excused for that.  You just have to let them

7  know that you're here serving on the jury and they'll

8  have to excuse you okay?

9          MR. JONES:  Yes sir.

10          THE COURT:  Now is that matter a trial or what?

11          MR. JONES:  It's been adjourned several times-

12          THE COURT:  Okay.

13          MR. JONES:  I'm the officer in charge of the

14  case.

15          THE COURT:  So you're the officer in charge?

16          MR. JONES:  Yes sir.

17          THE COURT:  So you would have to be called as a

18  witness is that what is goin' on?

19          MR. JONES:  Yes sir.

20          THE COURT:  And is it scheduled for a trial is

21  that what you understand it to be or some other

22  proceeding?

23          MR. JONES:  I don't know Your Honor.  It's been

24  adjourned a couple of times.

25          THE COURT:  Okay.  Which police force do you

134

1   serve on?

2           MR. JONES: Oakland County Sheriff's office.

3           THE COURT: All right. Would the fact that you

4   are a police officer would that affect your ability to be

5   fair to this case, in this case towards the prosecution

6   and the defendant?

7           MR. JONES: No Your Honor.

8           THE COURT: Is there any reason you can think

9   of why you shouldn't serve?

10          MR. JONES: Other than I'm a police officer

11  sir.

12          THE COURT: All right. Would you have the

13  tendency at first, let's assume a police officer comes in

14  and takes the witness stand, would you have a tendency to

15  believe that witness simply because they're a police

16  officer?

17          MR. JONES: I would have to say yes sir.

18          THE COURT: Okay um would that be the final

19  word on it? Let's assume that the officer got on the

20  stand and said well the light was red and the defense

21  presented photographs that showed at the exact time that

22  we're talkin' about the light was green. Would you have

23  a tendency to believe the police officer or the evidence

24  that you see in front of you?

25          MR. JONES: The evidence sir.

1   THE COURT:  All right so if the evidence was

2   contrary to what the police officer testified to you

3   could come at a conclusion using your common sense that

4   the police officer was wrong is that correct?

5   MR. JONES:  Absolutely.

6   THE COURT:  All right but now let me ask you

7   this question and I guess I'm gettin' to my drop dead

8   question again, if you were Mr. Pouncy, would you be

9   satisfied knowing you, would you be satisfied to have you

10  serve as a juror in this case?

11  MR. JONES:  Absolutely not.

12  THE COURT:  Okay then on that note I'm gonna

13  excuse you then and thank you for bein' honest sir.

14  MR. JONES:  Yes sir.

15  THE COURT:  Yes sir.  Go right ahead Mary Lee.

16  COURT CLERK:  Juror G321, Rosie Lang.

17  THE COURT:  Is that L-a-n-g or L-a-i-n-g?

18  COURT CLERK:  Correct, L-a-n-g.

19  THE COURT:  Okay.  Good afternoon Ms. Lang.

20  MS. LANG:  Good afternoon.

21  THE COURT:  And if you'll come up and take the

22  seat that was vacated by Mr. Jones?  And we want to

23  welcome you also to the Genesee County Circuit Court.

24  Ms. Lang you've had a chance to hear my questions, Mr.

25  Larobardiere's questions and Mr. Breczinski's questions

1    is that correct?

2              MS. LANG:  Correct.

3              THE COURT:  Would you have answered any of

4    those questions any differently than the rest of the jury

5    panel as a whole?

6              MS. LANG:  No.

7              THE COURT:  Can you be here with us for the

8    time that I've indicated?

9              MS. LANG:  Yes.

10             THE COURT:  Can you be fair to both the

11   prosecution and the defendant in this case?

12             MS. LANG:  Yes.

13             THE COURT:  Is there any reason you can think

14   of why you shouldn't serve on this jury?

15             MS. LANG:  No.

16             THE COURT:  Okay Mr. Larobardiere any

17   questions?

18             MR. BRECZINSKI:  We'd like to approach Your

19   Honor.

20             THE COURT:  Okay sure please approach

21   gentlemen.  Let's go off the record for a second Trish.

22   So let's go back on the record Trish and Mr. Larobardiere

23   you have any questions for this juror?

24             MR. LAROBARDIERE:  Yes.  Ms. Lang I received

25   your questionnaire and it's blank so I had some questions

1   about that.  Did you fill out a questionnaire?

2           MS. LANG:  Yeah.

3           MR. LAROBARDIERE:  Okay uh, I don't know how

4   you want me to-

5           THE COURT:  Nope if there, if there is a

6   question on the questionnaire that you're concerned about

7   ask.

8           MR. LAROBARDIERE:  Okay.  The questionnaire

9   does ask about employment.  Are you employed ma'am?

10          MS. LANG:  I'm retired.

11          MR. LAROBARDIERE:  Retired from what type of

12  job?

13          MS. LANG:  Hurley.

14          MR. LAROBARDIERE:  Hurley Hospital?

15          MS. LANG:  Um hm.

16          MR. LAROBARDIERE:  And it asks about

17  convictions.  Do you yourself have any criminal

18  convictions?

19          MS. LANG:  No.

20          MR. LAROBARDIERE:  Okay do you have any family

21  members that do?

22          MS. LANG:  Yes.

23          MR. LAROBARDIERE:  And can you tell me about

24  that?

25          MS. LANG:  I have a son was convicted last

1    year.

2                MR. LAROBARDIERE:  Okay what type of offense?

3                MS. LANG:  Felony.

4                MR. LAROBARDIERE:  All right does that cause

5    you to have any strong feelings one way or another

6    towards the justice system?

7                MS. LANG:  No.

8                MR. LAROBARDIERE:  Were you satisfied with the

9    outcome of your son's case?

10               MS. LANG:  No.

11               MR. LAROBARDIERE:  Okay what were you

12   dissatisfied about?

13               MS. LANG:  The way the case was handled.

14               MR. LAROBARDIERE:  How the case was handled?

15               MS. LANG:  Yes.

16               MR. LAROBARDIERE:  By the attorneys or the,

17   we've had people talk about the Judges.  Which, which

18   part of the system?

19               MS. LANG:  Well the attorneys and the Judge.

20               MR. LAROBARDIERE:  All right um do you think

21   your involvement with your son's case would cause you

22   difficulty sitting here today being impartial in another

23   criminal case?

24               MS. LANG:  No.

25               MR. LAROBARDIERE:  That's all I have Judge.

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1           THE COURT:  Okay Mr. Breczinski?  And Mr.

2    Breczinski I think Mr. Pouncy may have a question for you

3    before you proceed here.

4           MR. BRECZINSKI:  Can we approach Your Honor?

5           THE COURT:  Yes.  Let's go off the record again

6    Trish.  Do you have any questions Mr. Breczinski?

7           MR. BRECZINSKI:  Are you married?

8           MS. LANG:  No.

9           MR. BRECZINSKI:  Divorced?

10          MS. LANG:  Yes.

11          MR. BRECZINSKI:  Okay.  Have you ever been

12   involved in a lawsuit?

13          MS. LANG:  No.

14          MR. BRECZINSKI:  Any um, have you ever been

15   involved in any criminal matters yourself?

16          MS. LANG:  No.

17          MR. BRECZINSKI:  Okay.  Do you have any

18   infirmities or hearing problems or sight problems that

19   would make it hard for you to sit as a juror?

20          MS. LANG:  No.

21          MR. BRECZINSKI:  I have nothing further of this

22   witness.

23          THE COURT:  All right challenge for cause Mr.

24   Larobardiere?

25          MR. LAROBARDIERE:  No thank you Judge.

1      THE COURT:  Challenge for cause Mr. Breczinski?

2          MR. BRECZINSKI:  None Your Honor.

3      THE COURT:  All right preemptory challenge to

4  you Mr. Larobardiere.

5          MR. LAROBARDIERE:  Judge we'd like to thank and

6  excuse juror number 6, Ms. Lang.

7      THE COURT:  All right Ms. Lang I want to thank

8  you for coming ma'am.  If you'll report to the second

9  floor they'll let you know what you need to do.

10         COURT CLERK:  Juror H247, Catherine Anderson.

11         THE COURT:  And good afternoon Ms. Anderson.

12         MS. ANDERSON:  Afternoon.

13         THE COURT:  I want to welcome you to the

14  Genesee County Circuit Court.  You've heard the questions

15  that I asked, Mr. Larobardiere asked and Mr. Breczinski

16  asked is that correct?

17         MS. ANDERSON:  Correct.

18         THE COURT:  Would you have answered any of

19  those questions any differently than the rest of the jury

20  panel as a whole?

21         MS. ANDERSON:  Well I was in, kind of involved

22  in a stolen car incident.

23         THE COURT:  Okay a, a lawsuit you say?

24         MS. ANDERSON:  Well it never really went to

25  Court-

1        THE COURT:  Okay.

2        MS. ANDERSON:  it, they pled on it and it was

3   stolen when I was on vacation.  It was back before I got

4   back so-

5        THE COURT:  All right so you recovered the

6   property-

7        MS. ANDERSON:  Um hm.

8        THE COURT:  and it was resolved without you

9   having to go to Court?

10       MS. ANDERSON:  Correct.

11       THE COURT:  Were you satisfied with the way in

12   which it was resolved?

13       MS. ANDERSON:  Yes.

14       THE COURT:  Do you, would, would the fact that

15   you've gone through that experience, would that have any

16   affect on your judgment in this case today?

17       MS. ANDERSON:  No 'cause I didn't really go

18   through it.

19       THE COURT:  All right.

20       MS. ANDERSON:  I mean I was just, I was

21   affected kind of over the phone but I never really had

22   any dealings with the courthouse.

23       THE COURT:  All right so it would not affect

24   how you would judge this case then-

25       MS. ANDERSON:  No.

1          THE COURT:  is that correct?  Can you be fair

2     to both the prosecution and the defendant in this case?

3          MS. ANDERSON:  Yes I can.

4          THE COURT:  Is there any reason you can think

5     of why you shouldn't serve?

6          MS. ANDERSON:  No.

7          THE COURT:  Can you be here for the time that

8     I've indicated?

9          MS. ANDERSON:  Yes.

10         THE COURT:  All right any questions you would

11    have Mr. Larobardiere?

12         MR. LAROBARDIERE:  No thank you Judge.

13         THE COURT:  Questions Mr. Breczinski?  Any

14    questions Mr. Breczinski?

15         MR. BRECZINSKI:  Um there's something about a

16    stolen car.  Were you a victim of (inaudible)?

17         MS. ANDERSON:  Well it was my car.  I had

18    loaned it to my nephew while I was on vacation and his

19    girlfriend took it from him and it was returned before I

20    got back home so-

21         MR. BRECZINSKI:  I have nothing further.

22         THE COURT:  All right challenge for cause Mr.

23    Larobardiere?

24         MR. LAROBARDIERE:  No thank you.

25         THE COURT:  Challenge for cause Mr. Breczinski?

1       MR. BRECZINSKI:  None Your Honor.

2       THE COURT:  Preemptory challenge to you Mr.

3  Breczinski.

4       MR. BRECZINSKI:  We'll thank and excuse juror

5  in seat number 6, Catherine Anderson.

6       THE COURT:  All right Ms. Anderson thank you

7  very much.  If you'll report to the second floor they'll

8  let you know what you need to do ma'am.  Thank you ma'am.

9       COURT CLERK:  Juror G228, William Hopee, Hopee?

10      MR. HOPEE:  Hopee.

11      COURT CLERK:  Hopee, H-o-p-e-e.

12      THE COURT:  And good afternoon Mr. Hopee.

13      MR. HOPEE:  Afternoon.

14      THE COURT:  And just so you know that's why I

15 have her pronounce the name first so that hopefully I'll

16 get it right.  Mr. Hopee we want to welcome you to the

17 Genesee County Circuit Court.  You've heard the questions

18 that I asked, Mr. Larobardiere asked and Mr. Breczinski

19 asked is that correct?  Would you have answered any of

20 those questions any differently than the rest of the jury

21 panel?

22      MR. HOPEE:  No.

23      THE COURT:  Can you be here with us for the

24 time that I've indicated?

25      MR. HOPEE:  Yes.

144

1          THE COURT:  Can you be fair to both the

2    prosecution and the defendant in this case?

3          MR. HOPEE:  Yes.

4          THE COURT:  Is there any reason you can think

5    of why you shouldn't serve?

6          MR. HOPEE:  Well my wife has chronic asthma and

7    she just had a stroke in May so if I could be notified if

8    something happens, that'd be the only reason.

9          THE COURT:  All right so I assume someone's

10   watching her while you're here?

11         MR. HOPEE:  No.

12         THE COURT:  Okay but she may be able to call is

13   what you're saying?

14         MR. HOPEE:  They've got a very good emergency

15   response team in Linden.

16         THE COURT:  Okay if you would give them the

17   Jury Board's number and make sure the Jury Board knows

18   that that call could be coming through they certainly

19   will get a hold of you here if that happens.  Knowing

20   that is there any other reason that you can think of why

21   you shouldn't serve?

22         MR. HOPEE:  No.

23         THE COURT:  All right Mr. Larobardiere any

24   questions?

25         MR. LAROBARDIERE:  No thank you.

1          THE COURT:  Mr. Breczinski?

2          MR. BRECZINSKI:  None Your Honor.

3          THE COURT:  Okay challenge for cause Mr.

4    Larobardiere?

5          MR. LAROBARDIERE:  No thank you Your Honor.

6          THE COURT:  Challenge for cause Mr. Breczinski?

7          MR. BRECZINSKI:  None Your Honor.

8          THE COURT:  Preemptory challenge to you Mr.

9    Larobardiere.

10          MR. LAROBARDIERE:  People pass.

11          THE COURT:  Peremptory challenge to you Mr.

12    Breczinski.

13          MR. BRECZINSKI:  We thank and excuse juror in

14    seat number 11, Craig Morris.

15          THE COURT:  All right Mr. Morris thank you very

16    much sir if you'll report to the second floor, they'll

17    let you know what you need to do.  And Mary Lee, yeah,

18    yeah.

19          COURT CLERK:  Juror G212, Amy Abdella.

20          THE COURT:  And good afternoon Ms. Abdella.

21          MS. ABDELLA:  Good afternoon.

22          THE COURT:  Want to welcome you also to the

23    Genesee County Circuit Court Ms. Abdella and you heard

24    the questions that I asked, Mr. Larobardiere asked and

25    Mr. Breczinski asked is that correct?

1          MS. ABDELLA:  Yes.

2          THE COURT:  Would you have answered any of

3    those questions any differently than the rest of the jury

4    panel as a whole?

5          MS. ABDELLA:  No.

6          THE COURT:  Can you be here with us for the

7    time that I've indicated?

8          MS. ABDELLA:  Yes.

9          THE COURT:  Can you be fair to both the

10   prosecution and the defendant in this case?

11         MS. ABDELLA:  Yes.

12         THE COURT:  Is there any reason you can think

13   of why you shouldn't serve?

14         MS. ABDELLA:  No.

15         THE COURT:  Any questions you would have Mr.

16   Larboardiere?

17         MR. LAROBARDIERE:  (Inaudible) is this

18   (inaudible)?

19         MS. ABDELLA:  Yes.

20         MR. LAROBARDIERE:  It's not gonna cause a

21   hardship to be away from your business?

22         MS. ABDELLA:  No (inaudible).

23         MR. LAROBARDIERE:  I don't anticipate going the

24   whole length the Judge mentioned but it's a possibility.

25         MS. ABDELLA:  (Inaudible).

1        MR. LAROBARDIERE:  Okay nothing further.

2        THE COURT:  Any challenge for, any questions

3  Mr. Breczinski?  Any questions Mr. Breczinski?

4        MR. BRECZINSKI:  Just one second Your Honor.

5  None Your Honor.

6        THE COURT:  Challenge for cause Mr.

7  Larobardiere?

8        MR. LAROBARDIERE:  No thanks Judge.

9        THE COURT:  Challenge for cause Mr. Breczinski?

10        MR. BRECZINSKI:  None Your Honor.

11        THE COURT:  Preemptory challenge to you Mr.

12  Larobardiere.

13        MR. LAROBARDIERE:  People pass.

14        THE COURT:  Peremptory challenge to you Mr.

15  Breczinski.

16        MR. BRECZINSKI:  We would excuse Jeff Searles,

17  seat number 14.

18        THE COURT:  Okay Mr. Searles I want to thank

19  you for coming down sir if you'll report to the second

20  floor they'll let you know what you need to do.

21        COURT CLERK:  Juror G220, Brian Buswell, B-u-s-

22  w-e-l-l.

23        THE COURT:  And good afternoon Mr. Buswell.

24        MR. BUSWELL:  Afternoon.

25        THE COURT:  We want to welcome you to the

1    Circuit Court and you've heard the questions that I

2    asked, Mr. Larobardiere asked and Mr. Breczinski asked is

3    that correct?

4         MR. BUSWELL:  Yes.

5         THE COURT:  Would you have answered any of

6    those questions any differently than the rest of the jury

7    panel as a whole?

8         MR. BUSWELL:  No.

9         THE COURT:  Can you be here with us for the

10   time that I've indicated?

11        MR. BUSWELL:  It will create a hardship.  I

12   work for a small company, there's only three employees

13   and ones actually out of town right now for the week.

14        THE COURT:  Are you paid while you're here?

15        MR. BUSWELL:  No.

16        THE COURT:  Okay and um, all right and you said

17   it would create a hardship.  Does it create a hardship

18   for the company or for you?

19        MR. BUSWELL:  Both.

20        THE COURT:  Okay, all right.  I'm gonna excuse

21   you.  I'm gonna ask that you report to the second floor.

22   Let them know when you can come back and serve because

23   everyone has an obligation to serve, maybe this just

24   isn't the best time for you okay?

25        MR. BUSWELL:  Um hm.

1          (Judge Archie L. Hayman; 01-24-06; 12:19 p.m.)

2               THE COURT:  Thank you sir.

3               MR. BUSWELL:  Um hm.

4               THE COURT:  Go right ahead Mary Lee.

5               MR. BUSWELL:  Thank you.

6               COURT CLERK:  Juror B72, Kristie Zamora, Z-a-m-

7     o-r-a.

8               THE COURT:  And how do you pronounce that

9     ma'am?

10              MS. ZAMORA:  Zamora.

11              THE COURT:  Zamora all right good afternoon Ms.

12    Zamora and I want to welcome you here to the Genesee

13    County Circuit Court.  You've heard the questions that I

14    asked, Mr. Larobardiere and Mr. Breczinski asked is that

15    correct?

16              MS. ZAMORA:  Yes.

17              THE COURT:  Would you have answered any of

18    those questions any differently than the rest of the jury

19    panel as a whole?

20              MS. ZAMORA:  No I wouldn't.

21              THE COURT:  Can you be here with us for the

22    time that I've indicated?

23              MS. ZAMORA:  Yes.

24              THE COURT:  Can you be fair to both the

25    prosecution and the defendant in this case?

1           MS. ZAMORA:  Yes.

2           THE COURT:  Is there any reason you can think

3    of why you shouldn't serve on this jury ma'am?

4           MS. ZAMORA:  I just want to share that my boss

5    is a former prosecutor and I have a couple of family

6    members that are in law enforcement.

7           THE COURT:  All right and who is your boss?

8           MS. ZAMORA:  Brooks Patterson.

9           THE COURT:  All right so that would be in

10   Oakland County?

11          MS. ZAMORA:  Oakland County correct.

12          THE COURT:  All right.  Would the fact that

13   your former boss, boss was a prosecutor affect your

14   ability to be fair in this case ma'am?

15          MS. ZAMORA:  No.

16          THE COURT:  And when he was your boss were you

17   in the prosecutor's office?

18          MS. ZAMORA:  No.

19          THE COURT:  All right where was this at then?

20          MS. ZAMORA:  He's the county executive.

21          THE COURT:  County executive-

22          MS. ZAMORA:  Yes (inaudible)-

23          THE COURT:  all right so you worked in the

24   county executive office?

25          MS. ZAMORA:  Correct.

1      THE COURT:  All right now you said you have

2  family members that are in law enforcement?

3      MS. ZAMORA:  Correct.

4      THE COURT:  Who would they be ma'am?

5      MS. ZAMORA:  My brother-in-law is a Flint

6  Police officer and I have a cousin who is with the

7  Genesee County Sheriff's Department and a former, a

8  cousin also that retired as a parole officer.

9      THE COURT:  All right.  Do they talk to you

10  about their work ma'am?

11      MS. ZAMORA:  No.

12      THE COURT:  Would, if you heard this case and

13  you were convinced that the prosecution had failed to

14  prove beyond a reasonable doubt Mr. Pouncy's guilt, could

15  you come back with a verdict of not guilty?

16      MS. ZAMORA:  Yes.

17      THE COURT:  Would you be concerned about what

18  your relatives might have to say to you about that ma'am?

19      MS. ZAMORA:  No.

20      THE COURT:  You could look them in the eye and

21  say I, this is my decision ma'am?

22      MS. ZAMORA:  Yes.

23      THE COURT:  All right um is there any other

24  reason you can think of why you shouldn't serve ma'am?

25      MS. ZAMORA:  No.

1    THE COURT:  And again I guess I'll just ask my

2    drop dead question, you've heard it already.  If you were

3    sittin' where Mr. Pouncy is seated, would you be

4    satisfied to have you as a juror knowing what you know

5    about yourself ma'am?

6         MS. ZAMORA:  Yes.

7         THE COURT:  And uh, and the same for Mr.

8    Larobardiere who represents the People of the State of

9    Michigan, would you be satisfied to have you serve ma'am?

10         MS. ZAMORA:  Yes.

11         THE COURT:  So you would intend to be fair to

12   both sides, is that what I'm hearing?

13         MS. ZAMORA:  Yes I would.

14         THE COURT:  Okay any questions Mr.

15   Larobardiere?

16         MR. LAROBARDIERE:  No (inaudible).

17         THE COURT:  Any questions Mr. Breczinski?

18         MR. BRECZINSKI:  None Your Honor.

19         THE COURT:  Challenge for cause Mr.

20   Larobardiere?

21         MR. LAROBARDIERE:  No thank you Judge.

22         THE COURT:  Challenge for cause Mr. Breczinski?

23         MR. BRECZINSKI:  None Your Honor.

24         THE COURT:  Preemptory challenge to you Mr.

25   Larobardiere.

1          MR. LAROBARDIERE: People pass.

2          THE COURT: Peremptory challenge to you Mr.

3     Breczinski.

4          MR. BRECZINSKI: We would thank and excuse

5     Kristie Zamora.

6          THE COURT: All right Ms. Zamora I want to

7     thank you. If you'll report to the second floor they'll

8     let you know what you need to do ma'am.

9          MS. ZAMORA: Thank you.

10         COURT CLERK: Juror B53, Tara McKee.

11         THE COURT: Spell that last name.

12         COURT CLERK: M-c-K-e-e.

13         THE COURT: Okay and good afternoon Ms. McKee.

14         MS. MCKEE: Hi.

15         THE COURT: And if you'll take the seat that's

16    vacated by Ms. Zamora. And we want to welcome you to the

17    Genesee County Circuit Court. You've heard the questions

18    that I asked, Mr. Larobardiere and Mr. Breczinski asked

19    is that correct?

20         MS. MCKEE: Yes.

21         THE COURT: Would you have answered any of

22    those questions any differently than the rest of the jury

23    panel as a whole?

24         MS. MCKEE: Yes.

25         THE COURT: And what question would you answer

1    differently ma'am?

2              MS. MCKEE:  Um I think my nephew might know

3    him.

4              THE COURT:  All right so you might know him

5    then?

6              MS. MCKEE:  I think my nephew might, not me.

7              THE COURT:  All right and what's your nephew's

8    name?

9              MS. MCKEE:  Michael Collins but, let me

10   explain, I'm just (inaudible) though 'cause the other

11   night I was talkin' to him, he said-

12             THE COURT:  Oh wait just one second ma'am

13   please.  I don't want you to talk about what he said okay

14   please no.  But let me just ask you, you say that you

15   believe that Michael Collins might know Mr. Pouncy?

16             MS. MCKEE:  Might, I'm not for sure though.

17             THE COURT:  You're not for sure.  All right-

18             MS. MCKEE:  You don't want me to tell you why I

19   think that?

20             THE COURT:  No I don't.  Now let me ask you

21   ma'am, now if, if, let's assume that you were to re,

22   remain as a juror on this case and you were to sit

23   through this trial, and let's assume that after you had

24   heard all of the evidence you go home and for some reason

25   you find out yep, in fact Mr. Collins does know Mr.

1    Pouncy, all right?  Let's assume that after you've heard

2    all the evidence you were convinced beyond a reasonable

3    doubt that Mr. Pouncy was guilty, would you still come

4    back with a verdict of guilty?

5         MS. MCKEE:  Yes but I don't want to be in a

6    situation like that-

7         THE COURT:  Well just one second ma'am I don't,

8    all right so, and let's assume you heard the evidence and

9    you felt the prosecutor did not prove beyond a reasonable

10   doubt Mr. Pouncy was guilty, could you come back with a

11   verdict of not guilty?

12        MS. MCKEE:  Yes.

13        THE COURT:  All right.  And you made a comment

14   that you don't want to be in that situation.  Are you

15   saying, and all I want is a yes or no, are you saying

16   that you don't want to have to make the decision or to

17   judge the facts in this case?

18        MS. MCKEE:  Yes.

19        THE COURT:  All right and is it because there,

20   because it involves Mr. Pouncy who is an African American

21   male or is it because you're concerned that Mr. Collins

22   might know Mr. Pouncy?

23        MS. MCKEE:  Well my nephew's done stuff too in

24   the past too so-

25        THE COURT:  And I, ma'am I don't want you to

1   talk about all that okay please?  Okay?  Really I don't

2   and my concern is is that I don't want you to in any way

3   poison this jury okay?

4            MS. MCKEE:  (Inaudible).

5            THE COURT:  All right?  That's my concern okay?

6   All right so now again, in answer to my question, is that

7   a yes or a no?

8            MS. MCKEE:  What's the question?

9            THE COURT:  All right.  The question is is

10  simply if uh, would you have any concern about, well I'm

11  not sure if I remember my question 'cause I asked that

12  question and you gave me the answer.

13           MS. MCKEE:  I'm sorry.

14           THE COURT:  That's okay.  Yes?  Yeah thank you.

15  See this is why I have her over here, to help me.  She's

16  got a much more better memory than I do.  Would you have

17  any problem judging this case simply because if you found

18  out later that Mr. Collins did know him would you, would

19  that create a problem for you judging this case?

20           MS. MCKEE:  No.

21           THE COURT:  Um ma'am you heard me make the

22  comment earlier that a lot of times there's a concern

23  about having African Americans serve on the jury, you

24  understand what I'm saying?

25           MS. MCKEE:  Um hm.

1        THE COURT:  And uh, and we don't like to remove

2    anyone really but and we have, certainly have a concern

3    about African Americans also.  We don't want to remove

4    people unless we have to, do you understand that?  All

5    right now I'm gonna ask you my drop dead question.  If

6    you were Mr. Pouncy, would you be satisfied to have you

7    sit as a juror in this case, knowing what you know ma'am?

8        MS. MCKEE:  Probably not.

9        THE COURT:  All right if you were Mr.

10   Larobardiere, would you be satisfied having you sit as a

11   juror in this case knowing what you know ma'am?

12       MS. MCKEE:  No.

13       THE COURT:  All right I'm gonna excuse you

14   ma'am.  Thank you for being honest okay?  Go right ahead

15   Mary.

16       MS. MCKEE:  Sorry.

17       THE COURT:  No that's okay ma'am, thank you for

18   being honest.

19       COURT CLERK:  Juror G226, Jill Harrison.

20       THE COURT:  And good afternoon Ms. Harrison.

21       MS. HARRISON:  Good afternoon.

22       THE COURT:  And that was quick, thank you, you

23   move very quickly.  Ms. Harrison I want to welcome you to

24   the Circuit Court and you've heard the questions I asked,

25   Mr. Larobardiere asked and Mr. Breczinski asked is that

1     correct?

2          MS. HARRISON:  Correct.

3          THE COURT:  Would you have answered any of

4     those questions any differently?

5          MS. HARRISON:  Yes.

6          THE COURT:  All right go right ahead.

7          MS. HARRISON:  I was a police dispatcher for

8     two years with all the officers from Mt. Morris Township

9     and could have possibly answered the 911 call from

10    (inaudible).

11         THE COURT:  On this case?

12         MS. HARRISON:  Yes.

13         THE COURT:  All right.

14         MS. HARRISON:  For Genesee County 911.

15         THE COURT:  Then I'm gonna excuse you.  Thank

16    you ma'am.

17         MS. HARRISON:  Yep.

18         THE COURT:  Okay Mary Lee.

19         COURT CLERK:  Juror H251, Sandra Duke.

20         THE COURT:  And good afternoon Ms. Duke.

21         MS. DUKE:  Afternoon.

22         THE COURT:  And Ms. Duke we want to welcome you

23    to the Circuit Court.  You've heard the questions that I

24    asked, Mr. Larobardiere asked and Mr. Breczinski asked is

25    that correct?

1           MS. DUKE:  Yes.

2           THE COURT:  Would you have answered any of

3    those questions any differently than the rest of the jury

4    panel as a whole?

5           MS. DUKE:  No.

6           THE COURT:  Can you be here with us for the

7    time I've indicated?

8           MS. DUKE:  Yes.

9           THE COURT:  Can you be fair to both the

10   prosecution and the defendant in this case?

11          MS. DUKE:  Yes.

12          THE COURT:  Is there any reason you can think

13   of why you shouldn't serve on this jury ma'am?

14          MS. DUKE:  No.

15          THE COURT:  Mr. Larobardiere any questions?

16          MR. LAROBARDIERE:  None Your Honor.

17          THE COURT:  Mr. Breczinski?

18          MR. BRECZINSKI:  None Your Honor.

19          THE COURT:  Preemptory challenge to you Mr.

20   Larobardiere.

21          MR. LAROBARDIERE:  People pass.

22          THE COURT:  Preemptory challenge to you Mr.

23   Breczinski.

24          MR. BRECZINSKI:  Thank and excuse juror in seat

25   number 5, Donna Fox.

1      THE COURT:  I'm sorry Mr. Breczinski?

2      MR. BRECZINSKI:  Ms. Fox.

3      THE COURT:  Okay Ms. Fox in seat number 5,

4  thank you very much and Ms. Fox thank you and if you'll

5  go to the second floor they'll let you know what you need

6  to do ma'am.

7      MS. FOX:  Okay thank you.

8      THE COURT:  Yes ma'am.  And ladies and

9  gentlemen we're getting close.  Just so, so you're

10  wondering, we're very close okay?  Thank you.

11      COURT CLERK:  B60, Robert Schmidt, S-c-h-m-i-d-

12  t.

13      THE COURT:  And good afternoon Mr. Schmidt.

14      MR. SCHMIDT:  Good afternoon Your Honor.

15      THE COURT:  And sir we welcome you also to the

16  Genesee County Circuit Court.  You heard the questions

17  that I asked, Mr. Larobardiere asked and Mr. Breczinski

18  asked is that correct?

19      MR. SCHMIDT:  Correct.

20      THE COURT:  Would you have answered any of

21  those questions any differently than the rest of the jury

22  panel as a whole?

23      MR. SCHMIDT:  No.

24      THE COURT:  Can you be here with us for the

25  time that I've indicated?

1          MR. SCHMIDT:  Yes.

2          THE COURT:  Can you be fair to both the

3     prosecution and the defendant in this case?

4          MR. SCHMIDT:  Yes.

5          THE COURT:  Is there any reason you can think

6     of why you shouldn't serve on this jury sir?

7          MR. SCHMIDT:  No.  I would have to point out to

8     the Court that I was a defendant in a case that went

9     before a Magistrate in Sturgeon Falls in December of

10    2003.

11         THE COURT:  Okay.  Were you satisfied with the

12    way that case was resolved?

13         MR. SCHMIDT:  Yes.

14         THE COURT:  Do you harbor any ill will towards

15    the prosecution, police, judges, attorneys?

16         MR. SCHMIDT:  No.

17         THE COURT:  Would you have a tendency to

18    identify more with the defense in this case because you

19    were a defendant sir?

20         MR. SCHMIDT:  No.

21         THE COURT:  Would you be fair to both sides?

22         MR. SCHMIDT:  Yes.

23         THE COURT:  In other words even handed on both

24    sides?

25         MR. SCHMIDT:  Yes.

1       THE COURT:  All right.  Mr. Larobardiere any

2  questions you would have?

3       MR. LAROBARDIERE:  Yes Judge.  What kind of

4  case was it Mr. Schmidt?

5       MR. SCHMIDT:  It was a violation of fishing

6  laws in Ontario.

7       MR. LAROBARDIERE:  Okay they take their fishing

8  pretty serious up there.  I think the Judge covered that

9  you don't harbor any feelings or strong emotions,

10  positive, negative, one way or the other from that

11  outcome?

12       MR. SCHMIDT:  No I don't.

13       MR. LAROBARDIERE:  Okay um I'll ask you my

14  engineer question, the same as I did the other gentleman.

15  I see you're a retired engineer from Chevrolet?

16       MR. SCHMIDT:  Yes I am.

17       MR. LAROBARDIERE:  Um and that plant's gone now

18  correct?

19       MR. SCHMIDT:  Yes it is.

20       MR. LAROBARDIERE:  You understand that your

21  employment, that very technical science is different than

22  the science or evidence and elements that'll be presented

23  here, do you understand that?

24       MR. SCHMIDT:  Correct.

25       MR. LAROBARDIERE:  Okay.  It's not the same

1    standard, it's not done of this, I'll say without, with

2    the same scientific detail you understand that?

3              MR. SCHMIDT:  Correct.

4              MR. LAROBARDIERE:  This is not, this is real

5    life, this is not what I'll call CSI where they have all

6    the forensic testing and what not.  This will not be a

7    case like that.  Do you have a problem with that?

8              MR. SCHMIDT:  No.

9              MR. LAROBARDIERE:  Bein', bein' an engineer

10   like yourself?

11             MR. SCHMIDT:  No, no I don't have any problem.

12             MR. LAROBARDIERE:  Okay appreciate it.  Thank

13   you.

14             THE COURT:  Mr. Breczinski any questions you

15   would have sir?

16             MR. BRECZINSKI:  I have no questions of this-

17             THE COURT:  Challenge for cause Mr.

18   Larobardiere?

19             MR. LAROBARDIERE:  No thank you Judge.

20             THE COURT:  Challenge for cause Mr. Breczinski?

21             MR. BRECZINSKI:  None Your Honor.

22             THE COURT:  Preemptory challenge to you Mr.

23   Larobardiere.

24             MR. LAROBARDIERE:  We pass.

25             THE COURT:  Preemptory challenge to you Mr.

1    Breczinski.

2              MR. BRECZINSKI: We'll thank and excuse juror

3    in seat number 14, Sandra Duke.

4              THE COURT: All right. Ms. Duke I want to

5    thank you for coming down ma'am and if you'll report to

6    the second floor they'll let you know what you need to do

7    ma'am.

8              MS. DUKE: Thank you.

9              THE COURT: Go right ahead Mary.

10             COURT CLERK: Juror G219, Ann Burnash, B-u-r-n-

11   a-s-h.

12             THE COURT: Good afternoon Ms. Burnash.

13             MS. BURNASH: Hello.

14             THE COURT: And if you'll take Ms. Duke's seat

15   and we want to welcome you to the Circuit Court ma'am.

16   And you've heard the questions that I asked, Mr.

17   Larobardiere asked and Mr. Breczinski asked is that

18   correct?

19             MS. BURNASH: Yes.

20             THE COURT: Would you have answered any of

21   those questions any differently than the rest of the jury

22   panel?

23             MS. BURNAHS: No.

24             THE COURT: Can you be here with us for the

25   time that I've indicated?

1           MS. BURNASH:  I don't think so.

2           THE COURT:  Okay and what problem do you think

3      might exist ma'am?

4           MS. BURNASH:  My, I work eight at night 'til

5      six in the morning-

6           THE COURT:  Whoa.

7           MS. BURNASH:  and I work Wednesday, Thursday,

8      Friday and Saturday so-

9           THE COURT:  Do you have to go to work when

10     you're serving on jury?

11          MS. BURNASH:  Yes.

12          THE COURT:  Okay do they pay you if you don't?

13          MS. BURNASH:  No.  I'm a waitress.

14          THE COURT:  All right.  All right-

15          MS. BURNASH:  I'm a single parent.

16          THE COURT:  would it create a hardship for you?

17     Okay.  Would it create a hardship for you then?

18          MS. BURNASH:  Very much financial burden.

19          THE COURT:  All right then I'm gonna excuse

20     ma'am but if you'll report to the second floor, let them

21     know when you can come back and serve because I think

22     everyone has an obligation to serve okay?

23          MS. BURNASH:  Thank you.

24          THE COURT:  All right ma'am thank you.

25          COURT CLERK:  Juror G245, Richard Webster.

1        THE COURT:  Okay and good afternoon Mr. Webster

2    and I want to welcome you to the Genesee County Circuit

3    Court.  You heard the questions that I asked, Mr.

4    Larobardiere asked and Mr. Breczinski asked?

5        MR. WEBSTER:  Yes sir.

6        THE COURT:  Would you have answered any of

7    those questions any differently than the rest of the jury

8    panel?

9        MR. WEBSTER:  No sir.

10        THE COURT:  Can you be here with us for the

11    time that I've indicated?

12        MR. WEBSTER:  Yes.

13        THE COURT:  Can you be fair to both the

14    prosecution and the defendant in this case?

15        MR. WEBSTER:  I was a defendant in a case also.

16        THE COURT:  Okay what kind of case was it sir?

17        MR. WEBSTER:  Criminal.

18        THE COURT:  All right and how long ago would

19    that have been?

20        MR. WEBSTER:  Eight months ago.

21        THE COURT:  All right.  Would that affect your

22    ability to be fair or would you tend to side with one

23    side or the other?

24        MR. WEBSTER:  I hope not.

25        THE COURT:  All right.  Were you satisfied with

1    the way in which it was handled?

2              MR. WEBSTER:  No.

3              THE COURT:  Okay and who did you, who do you

4    have disagreement with, the prosecution, police, Judge?

5              MR. WEBSTER:  Prosecutors.

6              THE COURT:  Prosecutors?  All right.  Would

7    that affect how you might judge this case sir?

8              MR. WEBSTER:  No.

9              THE COURT:  No?  All right.  Any questions Mr.

10   Larobardiere?

11             MR. LAROBARDIERE:  No Your Honor.

12             THE COURT:  Any questions Mr. Breczinski?

13             MR. BRECZINSKI:  No Your Honor.

14             THE COURT:  Challenge for cause Mr.

15   Larobardiere?

16             MR. LAROBARDIERE:  None Your Honor.

17             THE COURT:  Challenge for cause Mr. Breczinski?

18             MR. BRECZINSKI:  None Your Honor.

19             THE COURT:  Preemptory challenge to you Mr.

20   Larobardiere.

21             MR. LAROBARDIERE:  The People would like to

22   thank and excuse Mr. Webster Judge.

23             THE COURT:  All right thank you Mr. Webster and

24   if you'll report to the second floor they'll let you know

25   what you need to do and thanks for your honest answers

1    sir.

2              COURT CLERK:  Juror H257, Joshua Guerin, G-u-e-

3    r-i-n.

4              THE COURT:  And good afternoon, is it Mr.

5    Guerin?

6              MR. GUERIN:  Yep.

7              THE COURT:  All right.  We want to welcome you

8    to the Circuit Court Mr. Guerin.  You've heard the

9    questions that I asked, Mr. Larobardiere asked and Mr.

10   Breczinski asked is that correct?

11             MR. GUERIN:  Yes.

12             THE COURT:  Would you have answered any of

13   those questions any differently than the rest of the jury

14   panel?

15             MR. GUERIN:  Yes I was a plaintiff in a civil

16   case.

17             THE COURT:  And how long ago would that have

18   been?

19             MR. GUERIN:  In '97.

20             THE COURT:  Were you satisfied with the way in

21   which it was resolved?

22             MR. GUERIN:  No.

23             THE COURT:  Do you harbor any ill will towards

24   the Court system as a result of it?

25             MR. GUERIN:  No.

1          THE COURT:  Can you be fair to both the

2     prosecution and the defendant in this case?

3          MR. GUERIN:  Yes.

4          THE COURT:  Is there any reason you can think

5     of why you shouldn't serve in this case sir?

6          MR. GUERIN:  I'm no worse than anybody else?

7          THE COURT:  All right.  Can you be here with us

8     for the time I've indicated?

9          MR. GUERIN:  Yes.

10         THE COURT:  All right any questions you would

11    have Mr. Larobardiere?

12         MR. LAROBARDIERE:  No Your Honor.

13         THE COURT:  Mr. Breczinski?

14         MR. BRECZINSKI:  None Your Honor.

15         THE COURT:  Preemptory challenge, or challenge

16    for cause Mr. Larobardiere?

17         MR. LAROBARDIERE:  No thank you Your Honor.

18         THE COURT:  Challenge for cause Mr. Breczinski?

19         MR. BRECZINSKI:  None Your Honor.

20         THE COURT:  All right preemptory challenge to

21    you Mr. Larobardiere?

22         MR. LAROBARDIERE:  People pass.

23         THE COURT:  We have a jury.  I want to thank

24    all of you who are in the audience — I'm sorry?  Why

25    don't you come on up, both you and Mr. Larobardiere

1    please?  Go off the record for a second Trisha.  Actually

2    we got to continue on a little bit further ladies and

3    gentlemen.  Preemptory challenge to you Mr. Breczinski.

4         MR. BRECZINSKI:  Thank and excuse juror in seat

5    number 8, Mr. Nordstrom.

6         THE COURT:  Okay Mr. Nordstrom thank you very

7    much sir and if you'll report to the second floor they'll

8    let you know what you need to do.  Um hm.  Go right

9    ahead.

10        COURT CLERK:  Juror H272, Joanne Potts.

11        THE COURT:  And good afternoon Ms. Potts.  You

12   have to kind of weave through there.  I want to welcome

13   you to the Genesee County Circuit Court Ms. Potts and

14   you've heard the questions that I asked, Mr. Larobardiere

15   asked and Mr. Breczinski asked is that correct?

16        MS. POTTS:  Yes.

17        THE COURT:  Would you have answered any of

18   those questions any differently than the rest of the jury

19   panel as a whole?

20        MS. POTTS:  No.

21        THE COURT:  Can you be here with us for the

22   time that I've indicated?

23        MS. POTTS:  Yes.

24        THE COURT:  Can you be fair to both the

25   prosecution and the defendant in this case?

1          MS. POTTS:  I don't, I don't think so.

2          THE COURT:  Okay um would, and would it be the

3    prosecution or the defense?

4          MS. POTTS:  Um the defense.

5          THE COURT:  Okay have you had any experiences

6    that causes you to feel this way one way or the other?

7          MS. POTTS:  Yes.  We've lived in our

8    neighborhood about forty years and a year ago there was a

9    family moved in next door and the young son robbed our

10   place.

11         THE COURT:  All right so you were the victim of

12   a robbery recently?

13         MS. POTTS:  Yes.

14         THE COURT:  All right.  I'm gonna excuse you

15   ma'am.  You may report to the second floor.  Thank you

16   very much and thank you for bein' honest.  Go right ahead

17   Cindy.

18         COURT CLERK:  H271, Dwight Neisler, N-e-i-s-l-

19   e-r.

20         THE COURT:  All right good afternoon Mr. is it

21   Neisler or Neisler?

22         MR. NEISLER:  Neisler.

23         THE COURT:  Neisler all right.  Thank you sir.

24   And we welcome you to the Genesee - well let's see, you

25   got to come all the way down here Mr. Neisler.  I was

1    gettin' ready to say we're missin' a person.

2              MR. NEISLER:  I wasn't watchin' where

3    (inaudible).

4              THE COURT:  Oh that's okay.  We welcome you to

5    the Genesee County Circuit Court and you've heard the

6    questions that I asked, Mr. Larobardiere asked and Mr.

7    Breczinski asked is that correct?

8              MR. NEISLER:  Yes.

9              THE COURT:  Would you have answered any of

10   those questions any differently than the rest of the jury

11   panel?

12             MR. NEISLER:  No sir.

13             THE COURT:  Can you be here with us for the

14   time I've indicated?

15             MR. NEISLER:  It's a little bit difficult, I'm

16   a landlord and right now I have one house that I had

17   advertised in the paper-

18             THE COURT:  Yes sir.

19             MR. NEISLER:  and I have another, it's ready

20   and I have another that I'm tryin' to get cleaned out.

21             THE COURT:  Okay.  Sounds like I might keep you

22   here for that if that's the reason-

23             MR. NEISLER:  All right.

24             THE COURT:  just so you know.  Any other reason

25   you can think of sir?

1      MR. NEISLER:  I've been a plaintiff in numerous

2  civil-

3      THE COURT:  Yes I can imagine.  Would that

4  affect your ability to be fair?

5      MR. NEISLER:  No.

6      THE COURT:  Can you be fair to both the

7  prosecution and the defendant in this case?

8      MR. NEISLER:  I believe so.

9      THE COURT:  All right.  Is there any other

10  reason you can think of why you shouldn't serve?

11      MR. NEISLER:  Other than my time away from-

12      THE COURT:  Time away from work?

13      MR. NEISLER:  Yes.

14      THE COURT:  Okay.  Well I, all I can assure you

15  is that I will do everything I can to be as efficient as

16  possible to get you in and out so that you can get back

17  to your private life okay?  Mr. Larobardiere any

18  questions you would have?

19      MR. LAROBARDIERE:  I'll follow up with that and

20  say I will also try to be efficient and I don't

21  anticipate the case going through the end of the week but

22  it's a possibility.  Is that gonna, you gonna be able

23  accommodations with your business?

24      MR. NEISLER:  Well it's always, I mean it's

25  like this all the time.  I never know from one week to

1        (Judge Archie L. Hayman; 01-24-06; 12:39:21 p.m.)

2 the next what's, you know somebody can give me notice and

3 move out or not give me notice and move out or whatever.

4 Right now I, I do have one that is ready to be rented and

5 being here of course I can't answer phone calls.

6        THE COURT: Well one thing you're gonna know is

7 you've got at least Thursday morning so you will, 'cause

8 you won't have to be here until one o'clock on Thursday

9 and you will be out of here by five every day so at least

10 you'll know that at five o'clock you're out the door.

11        MR. LAROBARDIERE: Um thinkin' about your

12 business, is that gonna be in the back of your mind

13 outweighing, listening to the evidence comin' in?

14        MR. NEISLER: No I don't think so.

15        MR. LAROBARDIERE: Pardon?

16        MR. NEISLER: I don't think so.

17        MR. LAROBARDIERE: Okay fair enough. Thank

18 you.

19        THE COURT: Mr. Breczinski any questions?

20        MR. BRECZINSKI: No Your Honor.

21        THE COURT: Challenge for cause Mr.

22 Larobardiere?

23        MR. LAROBARDIERE: No thank you Judge.

24        THE COURT: Challenge for cause Mr. Breczinski?

25        MR. BRECZINSKI: No thank you.

1    THE COURT:  Preemptory challenge Mr.

2  Larobardiere?

3    MR. LAROBARDIERE:  Pass Judge.

4    THE COURT:  Preemptory challenge to Mr.

5  Breczinski.

6    MR. BRECZINSKI:  We thank and excuse juror in

7  seat number 8, Dwight Neisler.

8    THE COURT:  Okay Mr. Neisler thank you sir and

9  if you'll report to the second floor they'll let you know

10  what you need to do.

11    MR. NEISLER:  Thank you.

12    COURT CLERK:  B40, Jan Como, C-o-m-o.

13    THE COURT:  Okay and good afternoon Ms. Como.

14    MS. COMO:  Good afternoon.

15    THE COURT:  And if you'll come on up.  And we

16  want to welcome you to the Genesee County Circuit Court

17  ma'am.

18    MS. COMO:  Thank you.

19    THE COURT:  You've heard the questions that I

20  asked, Mr. Larobardiere asked and Mr. Breczinski asked is

21  that correct?

22    MS. COMO:  Yes.

23    THE COURT:  Would you have answered any of

24  those questions any differently than the rest of the jury

25  panel?

1          MS. COMO:  Can I just make a statement?

2          THE COURT:  I'm not sure ma'am I don't want you

3     to just make a statement-

4          MS. COMO:  Well-

5          THE COURT:  let me, just first of all answer

6     my, can, can you, first of all would you have answered

7     any question differently and if so which question would

8     that be?

9          MS. COMO:  It's about my work experience, I

10    worked in the County Probation office-

11         THE COURT:  Okay.

12         MS. COMO:  this was in the sixties-

13         THE COURT:  Sure.

14         MS. COMO:  County Probation office and also for

15    attorneys and at that time I got very, well I would say I

16    wasn't (inaudible) any more.  But that's a long time ago.

17    I'm hoping that that won't influence me.

18         THE COURT:  Well let me just ask you this.  Can

19    you judge and decide this case just on the evidence that

20    you see in here in this courtroom?

21         MS. COMO:  I hope so.  I, I've never had this

22    experience before so-

23         THE COURT:  Okay now you understand that if you

24    serve as a juror you have an obligation to decide this

25    case just on the evidence that you see and hear in this

1    courtroom and you can't bring any other experiences or

2    thoughts or anything into this case, do you understand

3    that?

4              MS. COMO:  Correct, um hm.

5              THE COURT:  And in fact I will even instruct

6    you that if you just happen to be ridin' by when the

7    incident occurred, you can't even talk about that, you

8    know, anything you may have even seen with your own two

9    eyes.  You understand what I'm sayin'?

10             MS. COMO:  Yes.

11             THE COURT:  You have to decide this case just

12   on the evidence as presented in this courtroom.

13             MS. COMO:  Yes.

14             THE COURT:  Would you make an honest effort to

15   do that ma'am?

16             MS. COMO:  Yes.

17             THE COURT:  Do you think it's just absolutely

18   impossible for you to do that?

19             MS. COMO:  No.

20             THE COURT:  Do you believe you can be fair to

21   both the prosecution and the defendant?

22             MS. COMO:  Well I've already formed an opinion

23   of one of the attorneys just by watching his actions.

24             THE COURT:  But the attorneys are not on-

25             MS. COMO:  I'm hoping that-

1          THE COURT:  but you understand the attorneys

2     are not on trial.

3          MS. COMO:  right but I'm hoping that won't

4     influence me so-

5          THE COURT:  Okay.  Okay but you understand the

6     attorneys are not on trial?

7          MS. COMO:  Right.

8          THE COURT:  Okay again, you're not gonna be

9     asked at the end of this trial what do you think about

10    the lawyers okay?  You're gonna be asked has the

11    prosecution proven beyond a reasonable doubt the guilt of

12    the defendant and, and I'm talkin' to you but actually

13    I'm talkin' to everybody, you understand that?  So do you

14    understand that ma'am?

15         MS. COMO:  So it's what the prosecution does to

16    prove it to me?

17         THE COURT:  Well the prosecution has the burden

18    of proof.

19         MS. COMO:  Right.

20         THE COURT:  They have to prove beyond a

21    reasonable doubt each of the elements of the crimes

22    that'll be outlined in the information.  And what you

23    have to do as a jury, your only responsibility is to

24    decide what the facts of the case are and once you, along

25    with your other jurors, decide what the facts are, does

1    that prove beyond a reasonable doubt the defendant's

2    guilt?  Are you understanding what I'm saying?

3                MS. COMO:  Yes.

4                THE COURT:  You have no responsibility about

5    penalty, you have no responsibility about the lawyers.

6    You've, you know the lawyers are only here to explain

7    their theories and their, and, and their side of the case

8    to you so that you'll be able to understand the evidence

9    that comes in.  Do you understand that?

10               MS. COMO:  Yes.

11               THE COURT:  Um all right so knowing that, does

12   that make you feel a little more comfortable about

13   hearing this case?

14               MS. COMO:  Yes.

15               THE COURT:  Now let me ask you this.  I'm going

16   to my drop dead question again.  Now if you were Mr.

17   Pouncy sitting over there knowing what you know, would

18   you be satisfied to have you as a juror?

19               MS. COMO:  Yes.

20               THE COURT:  If you were Mr. Larobardiere

21   knowing what you know would you be satisfied to have you

22   as a juror?

23               MS. COMO:  Yes.

24               THE COURT:  So you believe you can be fair to

25   both sides?

1    MS. COMO: All right. Is there any other, is

2    there any reason you can think of why you shouldn't

3    serve? Any other reason at all ma'am?

4    MS. COMO: No.

5    THE COURT: All right. Mr. Larobardiere any

6    questions you would have?

7    MR. LAROBARDIERE: No thank you Judge.

8    THE COURT: Mr. Breczinski?

9    MR. BRECZINSKI: None Your Honor.

10   THE COURT: All right peremp, challenge for

11   cause Mr. Larobardiere?

12   MR. LAROBARDIERE: No thank you Judge.

13   THE COURT: Challenge for cause Mr. Breczinski?

14   MR. BRECZINSKI: No thank you Your Honor.

15   THE COURT: Preemptory challenge to you Mr.

16   Breczinski.

17   MR. BRECZINSKI: Thank and excuse juror in seat

18   number 7, Patricia Ayre.

19   THE COURT: Okay Ms. Ayre we want to thank you

20   for coming down ma'am. If you'll report to the second

21   floor they'll let you know what you need to do and thank

22   you for your honest, thank you for coming down Ms. Ayre.

23   Mr., uh Cindy go right ahead.

24   COURT CLERK: H248, Anthony Benson.

25   THE COURT: Good afternoon Mr. Benson. I want

1    to welcome you to the Genesee County Circuit Court.  All

2    right sir you heard the questions that have been asked by

3    me and Mr. Larobardiere and Mr. Breczinski is that

4    correct?

5              MR. BENSON:  Yes.

6              THE COURT:  Would you have answered any of

7    those questions any differently?

8              MR. BENSON:  No.

9              THE COURT:  Can you be fair - yeah - can you be

10   fair to both the prosecution and the defendant in this

11   case?

12             MR. BENSON:  Yes.

13             THE COURT:  Is there any reason you can think

14   of why you shouldn't serve?

15             MR. BENSON:  No.

16             THE COURT:  Ask Trish to come up this way

17   please.  All right.  I'm gonna ask both counsel to

18   approach please.  Mr. Benson the prosecutor just

19   indicated to me that you and he went to high school

20   together, did, were you aware of that?

21             MR. BENSON:  Not until just now.

22             THE COURT:  Not until just now okay.  Does the

23   fact that you went to high school with him, would that in

24   any way affect your ability to be fair?

25             MR. BENSON:  No.

1          THE COURT:  If you, if you were to sit through

2     this trial and you were convinced beyond a reasonable

3     doubt, you were not convinced beyond a reasonable doubt

4     that Mr. Pouncy was guilty, would you be able to come

5     back with a verdict of not guilty?

6          MR. BENSON:  Yes.

7          THE COURT:  And of course if you found that the

8     prosecution had proved beyond a reasonable doubt his

9     guilt, you would come back with a verdict reflecting

10    that?

11         MR. BENSON:  Yes.

12         THE COURT:  Would you judgment in any way be

13    affected by the fact that Mr. Larobardiere went to the

14    same high school you went to?

15         MR. BENSON:  No.

16         THE COURT:  Would you have any concerns that if

17    you voted against him that he may have somethin' to say

18    to you?

19         MR. BENSON:  No.

20         THE COURT:  All right.  Any questions you would

21    have Mr. Larobardiere?

22         MR. LAROBARDIERE:  No Your Honor.

23         THE COURT:  Any questions you would have Mr.

24    Breczinski?

25         MR. BRECZINSKI:  No Your Honor.

1       THE COURT:  All right challenge for cause Mr.

2   Larobardiere?

3       MR. LAROBARDIERE:  No thank you.

4       THE COURT:  Challenge for cause Mr. Breczinski?

5       MR. BRECZINSKI:  None Your Honor.

6       THE COURT:  Preemptory challenge to you Mr.

7   Breczins, Mr. Larobardiere?

8       MR. LAROBARDIERE:  People pass.

9       THE COURT:  Preemptory challenge to you Mr.

10  Breczinski?

11      MR. BRECZINSKI:  Thank and excuse juror in seat

12  number 7, Anthony Benson.

13      THE COURT:  All right thank you Mr. Benson if

14  you'll report to the second floor they'll let you know

15  what you need to do.  Go right ahead Cindy.

16      COURT CLERK:  H268, Terry Miller.

17      THE COURT:  I thought we had a Terry Miller.

18  Let me see here, I guess not.  Good afternoon Mr. Miller.

19      MR. MILLER:  Good afternoon.

20      THE COURT:  I want to welcome you also to the

21  Genesee County Circuit Court, I want you to get a chance

22  to get a seat and-

23      MR. MILLER:  I guess.

24      THE COURT:  Yeah I apologize for that.  Sir we

25  want to welcome you to our Court and you've had a chance

1    to hear my questions, Mr. Larobardiere and Mr. Breczinski

2    is that correct?  Would you have answered any of those

3    questions any differently than the rest of the jury

4    panel?

5              MR. MILLER:  No.

6              THE COURT:  Can you be here with us for the

7    time I've indicated?

8              MR. MILLER:  Yes.

9              THE COURT:  Can you be fair to both the

10   prosecution and the defendant?

11             MR. MILLER:  I'm not sure.

12             THE COURT:  Okay.

13             MR. MILLER:  I, I've had my house broke into

14   twice and my car broke in, a hotel room broke into.

15             THE COURT:  All right I understand that.  Are

16   you able to separate what happened to you from this

17   particular case?

18             MR. MILLER:  (Inaudible).

19             THE COURT:  All right in other words you have

20   no indication that anybody in this courtroom did what,

21   those things to you is that correct?  Would you harbor

22   any ill will towards anyone here because of that sir?

23             MR. MILLER:  (Inaudible).

24             THE COURT:  After you listened to all the

25   evidence if you were convinced the prosecution had not

1    proven beyond a reasonable doubt Mr. Pouncy's guilty, can

2    you come back with a verdict that reflects that?

3              MR. MILLER:  Yes.

4              THE COURT:  Would, can you set aside what

5    happened to you and just decide this case based on the

6    evidence that you see here in this courtroom?

7              MR. MILLER:  (Inaudible).

8              THE COURT:  Now you understand as you serve as

9    a juror that you will be res, you will be required to do

10   that do you understand that?

11             MR. MILLER:  Yes.

12             THE COURT:  So would you follow my instructions

13   in that regard sir?

14             MR. MILLER:  Yes sir.

15             THE COURT:  All right any questions you would

16   have Mr. Larobardiere?

17             MR. LAROBARDIERE:  Just one.  I'll just ask you

18   my engineering question.  Do you remember me talking to

19   Mr. Miller and Schmidt as a, as an engineer yourself?

20   That that science is different than criminal science if

21   you will whereas the evidence comes in by testimony and

22   you as an engineer, you may have some more questions

23   that, what the other people with their backgrounds might

24   have.  And it may not get all answered.  Is that gonna be

25   a problem for you?

1          MR. MILLER:  No.

2          MR. LAROBARDIERE:  And you're willing to do

3     your duty and follow the, the law as the Judge gives it

4     to you and rule on the evidence as it comes in?

5          MR. MILLER:  Right.

6          MR. LAROBARDIERE:  Fair enough.  Thank you

7     Judge.

8          THE COURT:  All right Mr. Breczinski any

9     questions you would have?

10          MR. BRECZINSKI:  Yes Your Honor.  In this

11     matter I know you're saying you, you'd try to set this

12     aside, your past experiences but do you think it could

13     affect your judgment in this case?

14          MR. MILLER:  No.

15          MR. BRECZINSKI:  That it might make you less

16     (inaudible)?

17          MR. MILLER:  Not really.

18          MR. BRECZINSKI:  Not really?  I have nothing

19     further.

20          THE COURT:  Challenge for cause Mr.

21     Larobardiere?

22          MR. LAROBARDIERE:  No thank you.

23          THE COURT:  Challenge for cause Mr. Breczinski?

24     Peremptory challenge to you Mr. Larobardiere.

25          MR. LAROBARDIERE:  People pass.

1          THE COURT:  All right we do have a jury ladies

2     and gentlemen.  I want to thank those of you in the

3     audience, we're down to three I think, for bein' so

4     patient with us and I'm gonna excuse you.  You can go to

5     the second floor and thank you very much.  Those of you

6     that are in the box, I'm gonna have Cindy to swear you in

7     and then when you come back after lunch we're then gonna

8     uh, uh, I'm gonna give you some brief instructions and

9     we're gonna start with the opening statements in this

10    case.  I want to remind you we're gonna go up to five

11    o'clock.  At five o'clock I will be letting you go home

12    so if any of you have someone to come pick you up, you

13    tell 'em at five o'clock you'll be ready to go and you

14    will be out the door okay?  With that if you would all

15    stand please in the jury box and Cindy you may proceed.

16         COURT CLERK:  Please raise your right hand.  Do

17    you solemnly swear or affirm that in this action now

18    before the Court you will justly decide the questions

19    submitted to you that unless you are discharged by the

20    Court from further deliberation, you will render a true

21    verdict and that you will render your verdict only on the

22    evidence introduced and in accordance with the

23    instructions of the Court, so help you God?

24         JURY:  Yes.  I do.

25         THE COURT:  Okay ladies and gentlemen at this

1    time Trish is gonna escort you out.  Trisha, and I just

2    want to introduce you to, this is Trisha Macon, she is my

3    law clerk.  She's gonna be acting as the bailiff.  She is

4    an attorney already licensed to practice law.  She's

5    gonna take you out to lunch and buy you lunch and she's

6    gonna pay for it 'cause we pay our law clerks good money

7    so if you want dessert or whatever, Trisha's got you

8    covered.  If everyone would stand please?  And Trisha

9    where are they goin' to lunch, do you know?

10         LAW CLERK:  Masonic.

11         THE COURT:  Masonic, okay.  You can follow her

12   out and have a good lunch ladies and gentlemen.  Yeah you

13   may want to put in a request for tomorrow.  All right is

14   there anything else to take up at this time Mr.

15   Larobardiere?

16         MR. LAROBARDIERE:  Nothing (inaudible).

17         THE COURT:  Mr. Breczinski?  Anything to take

18   up Mr. Breczinski?

19         MR. BRECZINSKI:  Your Honor my client has

20   wanted me to try and get a more recent picture of this

21   gentleman and I don't know his-

22         THE COURT:  Say what now Mr. Breczinski?

23         MR. BRECZINSKI:  (Inaudible) Jamaar.  I don't

24   know if the Sheriff's Department has any pictures on

25   (inaudible) or booking or, or what.

1   THE COURT:  Um I, I really don't either uh

2   that's something that you'll probably have to check with

3   them and see if they, if they do have anything on this

4   person if they have a picture.  Is there anything else

5   you need to take up?

6   MR. BRECZINSKI:  No Your Honor.

7   THE COURT:  All right then we'll be recessed

8   until two o'clock.  We'll get started back at two.  I'm

9   gonna ask the deputies, we don't have to call down, just

10  bring him up at two o'clock and we're ready to go okay?

11  So we don't, so we don't have to call down just bring him

12  up at two and have him ready.  And we're off the record.

13  (At 12:55 p.m., Court recessed)

14  (At 2:14 p.m., Court reconvened)

15  THE COURT:  Okay we're on the record, Mr.

16  Larobardiere is there anything you need to take up before

17  we get the jury up here?

18  MR. LAROBARDIERE:  Judge I just think Mr.

19  Pouncy keeps making inappropriate comments to the officer

20  in charge so I just think you should know that.

21  THE COURT:  Okay Mr. Breczinski did you have

22  anything you want to bring to my attention?

23  MR. BRECZINSKI:  No Your Honor.

24  THE COURT:  All right.  I'm gonna ask that no

25  one make any comments to each other across the tables.

1   It's not appropriate and uh, so I'm gonna ask that that

2   not occur.  You understand that Mr. Pouncy?

3            MR. POUNCY:  Yes.  Can um that sign be taken

4   out 'cause I'm not guilty man.

5            THE COURT:  I'm sorry?

6            MR. POUNCY:  Can that sign be taken, this moved

7   'cause I'm not guilty.  It say if Omar Pouncy guilty.

8            THE COURT:  Mr. Pouncy this is the prosecutor's

9   side of the case.  You're not runnin' anything in here

10  okay?

11           MR. POUNCY:  I'm just askin' though-

12           THE COURT:  No, no.  He has the right to

13  present his side of the case, your lawyer will present

14  his side and if your lawyer believes there's somethin'

15  wrong goin' on he'll get up and say somethin'.  He

16  doesn't need you to jump in okay?  You're not a lawyer

17  okay?

18           MR. POUNCY:  Would I, don't I have the right to

19  represent myself though?  I'm just askin', I'm just

20  askin'.

21           THE COURT:  Mr. Pouncy if you decide that you

22  want to represent yourself then you're gonna represent

23  yourself in total.  The only thing Mr. Breczinski will be

24  doin' is sitting there okay?

25           MR. POUNCY:  Okay.

1        THE COURT:  And I can tell you right now that

2    if you represent yourself you really are a fool okay and

3    the reason is because you don't have a clue as to what

4    you're doin'.

5        MR. POUNCY:  I know I'm not guilty.

6        THE COURT:  Well Mr. Pouncy nobody's sittin'

7    here sayin' whether you're guilty or not.  That's what

8    the jury is here for to decide that.

9        MR. POUNCY:  (Inaudible).

10       THE COURT:  Sir please I'm not interested in

11   gettin' into a long diatribe with you okay?

12       MR. POUNCY:  All right.

13       THE COURT:  All right?  Okay let's get the jury

14   up here Trish.

15            (At 2:16 p.m., Court recessed)

16            (At 2:21 p.m., Court reconvened)

17       THE COURT:  Okay we are back on the record in

18   the People of the State of Michigan versus Omar Rashad

19   Pouncy, case number 05-017154-FC.  Ladies and gentlemen

20   we're ready to begin the trial in this matter.  I want to

21   start out by giving you some brief instructions.  Once

22   I've given you those instructions, we'll then begin with

23   the opening statements.  This is a criminal case.  The

24   paper used to charge the defendant with a crime is called

25   an information.  The information in this case charges the

1    defendant in this particular case with eleven counts.

2    The information reads as follows:  On or about September

3    29th of 2005 through October 11th of 2005, in Mt. Morris

4    Township in the County of Genesee, count 1, carjacking,

5    it's alleged that Omar Rashad Pouncy did in the course of

6    committing a larceny of a 2004 Corvette automobile, a

7    motor vehicle, use force or violence against Maria

8    Sandstrom, a person in lawful possession of the motor

9    vehicle, contrary to MCL 750.529(a).  Count 2,

10   carjacking.  It's alleged that Omar Rashad Pouncy, on or

11   about September 29th of '05 through October 11th of '05 in

12   Mt. Morris Township in the County of Genesee, did in the

13   course of committing a larceny of a 2003 Ford automobile,

14   a motor vehicle, use force or violence against, or used

15   the threat of force or violence against Earl Brady, a

16   person in lawful possession of the motor vehicle,

17   contrary to MCL 750.529(a).  Count 3, carjacking.  It is

18   alleged that on or about September 29th of '05 through

19   October 11th of '05 in Mt. Morris Township, the County of

20   Genesee, that Omar Rashad Pouncy did in the course of

21   committing a larceny of a 1973 Cadillac automobile, a

22   motor vehicle, use force or violence against Thomas

23   Sandstrom, a person in lawful possession of the motor

24   vehicle, contrary to MCL 750.529(a).  Count 4, armed

25   robbery.  It is alleged that on or about September 29th of

1    '05 on Oct uh through October 11th of '05 in Mt. Morris

2    Township in the County of Genesee, that Omar Rashad

3    Pouncy did in the course of committing a larceny of money

4    and/or purse, use force or violence against a person

5    present, Maria Sandstrom, and in the course of that

6    conduct possessed a gun, a dangerous weapon.  Count 5, it

7    is alleged that on or about September 29th of '05 through

8    October 11th of '05 in Mt. Morris Township in the County

9    of Genesee that Omar Rashad Pouncy did in the course of

10   committing a larceny of a cell phone, assault or put in

11   fear a person present, Earl Brady, and in the course of

12   that conduct possessed a gun, a dangerous weapon,

13   contrary to MCL 750.529.  Count 6, armed robbery.  It is

14   alleged that on or about September the 29th of '05 through

15   October 11th of '05 in Mt. Morris Township in the County

16   of Genesee that the defendant Omar Rashad Pouncy did in

17   the course of committing a larceny of money and or wallet

18   use force or violence against a person present, Thomas

19   Sandstrom, in the course of that conduct possessed a

20   pistol a dangerous weapon, contrary to MCL 750.529.

21   Count 7, armed robbery.  It is alleged that on or about

22   September 29th of '05 through October 11th of '05 in Mt.

23   Morris Township, the County of Genesee, that Omar Rashad

24   Pouncy did in the course of committing a larceny of a

25   cell phone assault or put in fear a person present,

1   Patrick Wendell, and in the course of that conduct

2   possessed a pistol, a dangerous weapon, contrary to MCL

3   750.529. Count 8 is felony firearm. It is alleged that

4   on or about September 29th of '05 through October 11th of

5   '05 in Mt. Morris Township in the County of Genesee that

6   Omar Rashad Pouncy did carry or have in his possession a

7   firearm to wit a pistol at the time he committed or

8   attempted to commit a felony. To wit carjacking and/or

9   armed robbery and/or felon in possession of a firearm.

10  Count 9, felony firearm. It is alleged that on or about

11  September 29th of '05 through October 11th of '05 in Mt.

12  Morris Township in the County of Genesee, that Omar

13  Rashad Pouncy did carry or have in his possession a

14  firearm to wit a pistol at the time he committed or

15  attempted to commit a felony to wit car jacking and/or

16  armed robbery and/or felon in possession of a firearm.

17  Count 10, carjacking. It is alleged that on or about

18  September 29th of '05 through October 11th of '05 in Mt.

19  Morris Township in the County of Genesee, that Omar

20  Rashad Pouncy, did in the course of committing a larceny

21  of a 1979 Chevrolet Camaro, a motor vehicle, use force or

22  violence against Earl Brady, a person in lawful

23  possession of the motor vehicle, contrary to MCL

24  750.529(a). Count 11, felon in possession of a firearm.

25  It is alleged that on or about September 29th of '05

1    through October 11th of '05 in Mt. Morris Township in the

2    County of Genesee, that Omar Rashad Pouncy did possess a

3    firearm when ineligible to do so because he had been

4    convicted of a specified felony and the requirements for

5    regaining eligibility had not been met, contrary to MCL

6    750.224(f).  The defendant has pled not guilty to these

7    charges.  You should clearly understand that the

8    information I have just read to you is not evidence.  An

9    information is read in every criminal trial so that the

10   defendant and jury can hear the charges.  You must not

11   think it is evidence of his guilt or that he must be

12   guilty because he has been charged.  A person accused of

13   a crime is presumed to be innocent.  This means that you

14   must start with the presumption that the defendant is

15   innocent.  This presumption continues throughout the

16   trial and entitles the defendant to a verdict of not

17   guilty unless you are satisfied beyond a reasonable doubt

18   that he is guilty.  Every crime is made up of parts

19   called elements.  The prosecutor must prove each element

20   of the crime beyond a reasonable doubt.  The defendant is

21   not required to prove his innocence or to do anything.

22   If you find that the prosecutor has not proven every

23   element beyond a reasonable doubt, then you must find the

24   defendant not guilty.  A reasonable doubt is a fair,

25   honest doubt growing out of the evidence or lack of

1    evidence.  It is not merely an imaginary or possible

2    doubt but a doubt based on reason and common sense.  A

3    reasonable doubt is just that.  A doubt that is

4    reasonable after a careful and considerate examination of

5    the facts and circumstances in this case.  Now I will

6    explain some of the legal principles you will need to

7    know and the procedure we will follow in this trial.  A

8    trial follows this procedure.  First the prosecutor makes

9    an opening statement where he gives his theories about

10   the case.  The defendant's lawyer does not have to make

11   an opening statement but he may make an opening statement

12   after the prosecutor makes his or he may wait until

13   later.  These statements are not evidence.  They are only

14   meant to help you understand how each side views the

15   case.  Next the prosecutor presents his evidence.  The

16   prosecutor may call witnesses to testify and may show you

17   exhibits like documents or objects.  The defendant's

18   lawyer has the right to cross-examine the prosecutor's

19   witnesses.  After the prosecutor has presented all his

20   evidence, the defendant's attorney may also offer

21   evidence but does not have to.  By law the defendant does

22   not have to prove his innocence or produce any evidence.

23   If the defense does call any witnesses, the prosecutor

24   has the right to cross-examine them.  The prosecutor may

25   also call witnesses to contradict the testimony of the

1    defense witnesses.  After all the evidence has been

2    presented, the prosecutor and the defendant's lawyer will

3    make their closing arguments.  Like the opening

4    statements these are not evidence.  They are only meant

5    to help you understand the evidence and the way each side

6    sees the case.  You must base your verdict only on the

7    evidence.  Let's talk about the function of the Court and

8    the jury.  My responsibilities as the Judge in this trial

9    are to make sure that the trial is run fairly and

10   efficiently.  To make decisions about evidence and to

11   instruct you about the law that applies to this case.

12   You must take the law as I give it to you.  Nothing I say

13   is meant to reflect my own opinions about the case.  As

14   jurors you are the ones who will decide this case.  Your

15   responsibilities as jurors is to decide what the facts of

16   the case are.  This is your job and no one else's.  You

17   must think about all the evidence and all the testimony

18   and then decide what each piece of evidence means and how

19   important you think it is.  This includes how much you

20   believe what each of the witnesses said.  What you decide

21   about any fact in this case is final.  When it is time

22   for you to decide the case, you are only allowed to

23   consider the evidence that was admitted in the case.

24   Evidence includes only the sworn testimony of witnesses,

25   the exhibits admitted into evidence and anything else I

1    tell you to consider as evidence.  Now this is somewhat

2    of a long instruction but after I get done with it I'll

3    only have a few more afterwards and we'll be done so bear

4    with me here.  It is your job to decide what the facts of

5    this case are.  You must decide which witnesses you

6    believe and how important you think their testimony is.

7    You do not have to accept or reject everything a witness

8    says.  You are free to believe all, none or part of any

9    persons testimony.  In deciding which testimony you

10   believe you should rely on your own common sense and

11   every day experience.  However, in deciding whether you

12   believe a witness's testimony, you must set aside any

13   bias or prejudice you have based on the race, gender or

14   national origin of the witness.  There is no fixed set of

15   rules for judging whether you believe a witness but it

16   may help you to think about these questions.  A) Was the

17   witness able to see or hear clearly?  How long was the

18   witness watching or listening?  Was anything else going

19   on that might have distracted the witness?  B) Does the

20   witness seem to have a good memory?  C) How does the

21   witness look and act while testifying?  Does the witness

22   seem to be making an honest effort to tell the truth, or

23   does the witness seem to evade the questions or argue

24   with the lawyers?  D) Does the witness's age or maturity

25   affect how you judge his or her testimony?  E) Does the

1    (Judge Archie L. Hayman; 01-24-06; 2:31 p.m.)

2    witness have any bias or prejudice or any personal

3    interest in how this case is decided?  F) Have there been

4    any promises, threats, suggestions or other influences

5    that affect how the witness testifies?  G) In general

6    does the witness have any special reason to tell the

7    truth or any special reason to lie?  H) All in all, how

8    reasonable does the witness's testimony seem when you

9    think about all the other evidence in the case?  The

10   questions the lawyers ask the witnesses are not evidence.

11   Only the answers are evidence.  You should not think that

12   something is true just because one of the lawyers asks

13   questions that assumes or suggests that it is.  This

14   instruction has to do with the Court asking questions, I

15   don't ask questions.  This one has to do with the jurors

16   asking questions.  I don't allow the jurors to ask

17   questions.  And just so you know the reason for that is I

18   don't want you to ask a question and then it may be a

19   question that one of the lawyers may have to object to

20   and I don't want to have him standing up objecting to

21   your question and then have you go back and deliberate on

22   the case.  So what I'm gonna ask you to do is to rely on

23   the lawyers to give you the information that you'll need

24   to make an intelligent decision about this case even

25   though maybe not every question you have is gonna be

1    answered in this case.  During the trial the lawyers may

2    object to certain questions or statements made by the

3    other lawyers or witnesses.  I will rule on these

4    objections according to the law.  My rulings for or

5    against one side or the other are not meant to reflect my

6    opinions about the facts of the case.  Sometimes the

7    lawyers and I will have discussions out of your hearing.

8    Also while you're in the jury room I may have to take

9    care of other matters that have nothing to do with this

10   case.  Pay no attention to these interruptions.  And I do

11   want you to know that I do respect your time and I don't

12   intend to have you sittin' around waiting for no reason.

13   When you get here we're gonna get you up here and get the

14   case submitted to you so you can get back to your private

15   lives so I just want you to know I do respect your time.

16   You must not discuss the case with anyone, including your

17   family or friends.  You must not even discuss it with

18   other jurors until the time comes for you to decide the

19   case.  When it is time for you to decide the case, I will

20   send you to the jury room for that purpose.  Then you

21   should discuss the case among yourselves but only in the

22   jury room and only when all the jurors are there.  When

23   the trial is over you may, if you wish, discuss the case

24   with anyone.  If I call for a recess during the trial

25   I'll either send you back to the jury room or allow you

1    to leave the courtroom on your own and go about your

2    business, but you must not discuss the case with anyone

3    or let anyone discuss it with you in or in your presence.

4    If someone tries to do that, tell him or her to stop,

5    explain that as a juror you're not allowed to discuss the

6    case.  If he or she continues, leave and report the

7    incident to me as soon as you return to Court.  You must

8    not talk to the defendant, the lawyers, the witnesses

9    about anything at all, even if it has nothing to do with

10   the case.  It is very important that you get only, that

11   you only get information about the case in Court when you

12   are acting as the jury and when the defendant, the

13   lawyers and I are all here.  So if you see any of the

14   parties here at the table, in the courthouse, outside the

15   courtroom or outside the courthouse and they don't speak

16   to you, don't think they're being rude.  They just don't

17   want to create the appearance of impropriety on their

18   part.  And I think that's really about all that's, if

19   anyone has any problem seeing what's going on please let

20   me know and if you have any physical issues that might

21   make it difficult for you to sit for periods of time

22   please let me know.  I don't have a problem with stopping

23   and giving you a break so don't sit there and suffer

24   unnecessarily.  If you feel uncomfortable let me know and

25   we'll let you take a break.  With that I, are you ready

1    to begin with your opening statement Mr. Larobardiere?

2              MR. LAROBARDIERE:  Yes Judge.

3              THE COURT:  Then you may proceed sir.

4              MR. LAROBARDIERE:  Thanks Judge.  Every day

5    thousands of people are-

6              THE COURT:  One second please Mr. Larobardiere.

7    I'm gonna ask that there be no talking period during the

8    opening statements please.  Go right ahead Mr.

9    Larobardiere.

10             MR. LAROBARDIERE:  Thanks Judge.  Every day

11   thousands of people advertise their vehicles for sale,

12   used or new vehicles for sale.  This is an example of one

13   of the vehicles that was carjacked and advertised for

14   sale as a result of it being advertised.  This man right

15   here is a seller's worst nightmare.  This man right here

16   went and met buyers advertising their vehicles for sale,

17   convinced them that he was interested in buying the

18   vehicles, convinced them that he wanted to take the

19   vehicle to be checked out by his mechanic, got 'em down

20   to a dead end street, carjacked 'em at gunpoint.  He and

21   his stepbrother.  When he got 'em to that dead end, he

22   robbed them of their vehicles, we're talkin' about a '79

23   Camaro, a '73 Cadillac, an '04 Corvette, an '03 truck and

24   trailer.  He took all those vehicles, he took the driver

25   of the Corvette's purse and money and everything in her

1    purse.  He robbed her husband's, of her, his wallet,

2    credit cards and money.  He took the owners of the truck,

3    the Camaro and the trailer, their cell phones.  To top it

4    off, made 'em run into the woods as they took off in

5    their vehicles.  This man took advantage of all these

6    sellers that advertised their vehicles and expect to meet

7    a person and in good faith hand of hand negotiation for a

8    vehicle.  He took advantage of these people's good faith

9    in a system set up to deal with these vehicles.  The

10   story starts out on September 29th of 2005.  Man in Flint

11   has a customized fabrication shop, a race shop.  He has

12   some friends down in Oakland County has a '79 Camaro for

13   sale.  He agrees to have it displayed at the shop for

14   people can see it, high traffic area.  And Mr. Pouncy

15   came and dealt with the owner of the shop, used a false

16   name when dealing with the owner, entered into a

17   negotiation about the vehicle.  Got the owners to come up

18   from Oakland County with a truck, a trailer, put the

19   vehicle on a, the Camaro the trailer.  He was with two

20   other people, one of them being his step brother.  His

21   name is Wayne Grimes.  Wayne Grimes is the driver of Mr.

22   Pouncy to these various locations where these vehicles

23   were displayed for sale.  He wants to buy a vehicle,

24   entered in negotiations.  First let me go have it checked

25   out by my mechanic.  Follow us.  They do.  On the way to

1    the location, which happens to be Kellar Avenue in Mt.

2    Morris Township, he talks to his driver, stepbrother,

3    Wayne Grimes.  He talks, they talk together, it's agreed

4    upon, Wayne Grimes is gonna carjack these people at this

5    man's assistance and encouragements.  Wayne Grimes will

6    describe the conversation they had in their vehicle on

7    the way to the, the dead end at Keller Avenue, will

8    describe on how all that took place.  Idea of that

9    carjacking was this Camaro is a race car he said.  It has

10   slicks on it, has a hopped up motor, they were gonna sell

11   the parts for quick cash.  That was the agreement.  Wayne

12   Grimes will tell you he did do that.  That he was given a

13   gun, he did carjack 'em, he ordered them to give up their

14   property.  They gave up their cell phones to this man,

15   Mr. Pouncy.  It was agreed upon in the car on the way to

16   Kellar Avenue that they should give up their cell phones

17   so they couldn't call for help.  Wayne Grimes ordered

18   them to do that, they did, they gave 'em to Mr. Pouncy.

19   And Mr. Pouncy got in, drove the vehicle away, the truck,

20   trailer and Camaro.  Wayne Grimes had his own vehicle, he

21   drove that away.  He'll admit to you that he robbed those

22   people and that he took responsibility for robbin' those

23   people and he's gonna go to prison for it.  After that

24   carjacking, October 11th, 2005, Wayne Grimes and Omar

25   Pouncy meet again, goin' through Flint Journal ads.  Find

1    this ad, '73 Eldorado convertible.  Mr. Pouncy enters

2    into negotiations, telephones the owner on several

3    occasions, that would be Mr. Thomas Sandstrom.  They

4    happen to live in the Fenton area, Mr. Pouncy telephones

5    him, gets directions numerous times on how to get there,

6    they arrive, same thing.  Mr. Pouncy and Mr. Sandstrom

7    have negotiations about the vehicle.  Yes I like it,

8    first I want to have it checked out by my mechanic at

9    Kings Automotive.  There's these terms used, Kings

10   Garage, Kings Automotive.  They had to take it there

11   first.  Mr. Pouncy gets in the Cadillac with Mr.

12   Sandstrom, he drives it to Kellar Avenue.  This time the

13   wife, Ms., Mrs. Sandstrom follows them in their '04

14   Corvette.  As they're getting close to Flint she suspects

15   that something's not right and her suspicions are right.

16   She jots down the license plate number of Mr. Grimes'

17   vehicle, the vehicle that they took out to Fenton to look

18   at the Cadillac.  When they get to Kellar Avenue again

19   it's the same set up.  They believe that there's gonna be

20   a mechanic to check out this Cadillac.  This time Mr.

21   Pouncy's got the gun in the face of Ms. Sandstrom and Mr.

22   Sandstrom taking their Cadillac, their Corvette.  Also

23   took their purse, her purse, his wallet.  Lucky for Ms.

24   Sandstrom's intuition, that license plate led the police

25   to track down Mr. Grimes' vehicle, Mr. Grimes arrest led

1     to the unfolding of this carjacking conspiracy.  The

2     Judge is going to address you on the jury instructions,

3     I'd like to touch on some of that because some of this,

4     as I said, Mr. Pouncy directly holds the gun, takes their

5     vehicles, takes their property as it relates to the

6     Sandstroms.  As it relates to Mr. Brady, is the owner of

7     the Camaro and the truck and the trailer, he aids and

8     abets in that crime.  He offers encouragement, he offers

9     assistance.  First, he's the one that got all that goin'.

10    He's the one that entered negotiations to begin with,

11    he's the one that took 'em to the location of the Camaro,

12    he's the one that told 'em we're gonna go have it checked

13    out by my mechanic.  One the way there, that's when they

14    had the discussion about well you should do it Mr.

15    Grimes, you should do this carjacking and he does.  By

16    his assistance, intentionally assisting someone else to

17    commit the crime, that's aiding and abetting.  That crime

18    was committed, we know that.  Their vehicles and property

19    were taken.  He did something to assist, I outlined that

20    for you.  He intended that carjacking to occur.  Armed

21    robbery, armed robbery is the taking of the people's

22    property.  The property would be the cell phones, the

23    purse, the wallet, the keys, that was at gunpoint.  It

24    was done by Mr. Pouncy or, once again, at his aid or

25    encouragement or assistance.  We do have a lot of counts

1   in this case, 11 counts the Judge read them to you.

2           THE COURT: If you don't mind Mr. Larobardiere

3   I do feel I have to correct one thing in what you're

4   saying there. You said that armed robbery was the taking

5   of property, but it's the taking of property by force or

6   violence and so that is an element that you didn't bring

7   up and I just want to make sure the jurors aren't

8   confused on that because I don't want them to think just

9   by taking property that's armed robbery so-

10          MR. LAROBARDIERE: That's true Judge. That's

11  true Judge-

12          THE COURT: all right you may proceed and Mr.

13  Pouncy please put your hands down sir. Just sir, shh,

14  please no comment please. Go right ahead Mr.

15  Larobardiere.

16          MR. LAROBARDIERE: As I, as I said, and the

17  Judge is right, he did that at gunpoint or aided and

18  assisted his stepbrother, Wayne Grimes, at gunpoint. To

19  do the armed robbery, they produced the gun, they put 'em

20  in fear. That is an element as the Judge said. Then in

21  the course committed a larceny, took their property,

22  their wallet, their purse, their vehicle. And possessing

23  the dangerous weapon, people describe a black and grey 9

24  millimeter pistol that was used by Mr. Pouncy or Mr.

25  Grimes. That vehicle, or that pistol was even fired by

1    Mr. Grimes when Mr. Brady and his friend, Mr. Wendell,

2    didn't want to give up their keys and cell phones so

3    quickly. Wasn't movin' fast enough so he fired a shot.

4    Because we have a lot of counts, I have this illustration

5    to kind of put it in perspective with the different

6    pieces of property and the victims so you can be thinking

7    about that as you hear the testimony come in. I'll offer

8    pictures of these various pieces of property also of the

9    vehicles. Carjacking under counts 1, 2, 3 and 10 at the

10   top of this slide is the carjacking of the Corvette. Ms.

11   Sandstrom was driving the Corvette as a follow-up vehicle

12   with the Cadillac when they're goin' to the supposed

13   mechanic's house. To the right of that slide is count

14   number 2, that is the Ford truck, that is Mr. Brady's

15   truck. He did have a trailer on that as well that he

16   trailered the '79 Camaro with. Below that slide on the

17   right is the white Cadillac. That is carjacking count

18   number 3, that was driven by Thomas Sandstrom. All the

19   way around clockwise up to about ten o'clock on the left,

20   from the rear view that's the '79 Camaro. Where it says

21   Earl Brady that's count number 10. These are the

22   carjacking counts, those are the vehicles and the people

23   that possessed them. Below that are the armed robbery

24   counts, 4, 5, 6 and 7. Top slide, that is the red

25   Corvette up there, it's not lighted very well but that's

1    what that is in that picture.  Number 4 is the money and

2    purse.  That was the contents of Ms. Sandstrom when she

3    was drivin' that Corvette.  That accounts for the armed

4    robbery count of number 4.  Next to that to the right

5    going clockwise is count 5, Earl Brady had a cell phone

6    he was made to give up at gunpoint, that this man

7    assisted in giving aid and encouragement, that's count

8    number 5, armed robbery.  Below that is the white

9    Cadillac picture again.  Number 6 money and wallet that

10   Mr. Sandstrom had on him he was made to give up at

11   gunpoint.  That accounts for the armed robbery count 6.

12   Count 7, the cell phone picture, six o'clock frame, Mr.

13   Wendell was made to give up his cell phone.  This man

14   aided and encouraged in that robbery.  That's count 7.

15   To the left of that you see a black gun.  Counts 8 and 9,

16   this man possessed a gun when he robbed those people of

17   their Cadillac and Corvette and of their wallet and their

18   purse.  He also aided and abetted his stepbrother Wayne

19   Grimes by making that gun available so he could complete

20   the robbery.  He offered other aid and encouragement and

21   assistance when Mr. Grimes robbed Mr. Brady and Wendell

22   at gunpoint as well.  That accounts for counts 8 and 9.

23   Count 11 is felon in possession of a firearm.  Count 11

24   there was a stipulation that this defendant could not

25   possess a gun because he's been convicted of a specified

1    felony.  These are all the counts ladies and gentlemen,

2    those are the, the testimony that will be preceding here,

3    starting today with.  After you hear that testimony keep

4    this slide in mind.  We're gonna go over it again at the

5    end but when you hear the testimony and plug it into this

6    slide, go back, find him guilty of all 11 counts for

7    taking advantage of these people when they're just tryin'

8    to sell their vehicle.  Thank you.

9            THE COURT:  Thank you Mr. Larobardiere.  Do you

10   wish to make an opening statement Mr. Breczinski?  And

11   Trisha when you get a chance will you approach?

12           MR. BRECZINSKI:  Can we approach the bench Your

13   Honor?

14           THE COURT:  I already know what you're gonna

15   ask, I think I heard so I, I'm gonna get Trisha to look

16   into it okay?

17           MR. BRECZINSKI:  Okay (inaudible) a record on

18   all this if we're going to.

19           THE COURT:  Maybe you better approach.  All

20   right ladies and gentlemen I'm going to ask you to stand

21   for a second please.  And Trisha would you take the

22   jurors back to this room here for a minute please and

23   we'll have you come right back out in just a few minutes

24   ladies and gentlemen.  Everyone please stand.  Mr.

25   Pouncy, Mr. Breczinski.  Thank you.  Please everyone have

1    a seat.  Mr. Breczinski what is it that you want to bring

2    to my attention at this time sir?  I'm gonna take this,

3    okay.

4           MR. BRECZINSKI:  My, my client just made a

5    statement he wants to make his own opening statement.  If

6    he's doing that obviously he'd be taking the stance that

7    he'd have to be representing himself.

8           THE COURT:  He wants to make his own opening

9    statement?

10          MR. BRECZINSKI:  That's what he just told me.

11          THE COURT:  Okay.

12          MR. BRECZINSKI:  And I had to-

13          THE COURT:  And is, what instruction should I

14    be reading with respect to that?  Is there any particular

15    instruction that deals with that issue?

16          MR. BRECZINSKI:  I'm not sure if there's one

17    about (inaudible)-

18          THE COURT:  I don't think so.

19          MR. BRECZINSKI:  representing himself or not.

20          THE COURT:  No I don't think so.  Um all right

21    then Mr. Pouncy why don't you stand sir.  Is it true that

22    you're asking to make your own opening statement?

23          MR. POUNCY:  Yes I'm, yes that is true but I

24    would ask that if there are any objections needed that

25    I'm not further, that I'm not known to do is properly

1    object if my attorney can do it because I, because like I

2    first stated to you earlier I haven't even had a

3    conversation, we seen each other-

4            THE COURT:  Mr. Pouncy one second.  Sir if you

5    make-

6            MR. POUNCY:  This my life man.

7            THE COURT:  sir if you make the opening

8    statement, you'll have to represent yourself through this

9    trial.  Now I'm not gonna have him doin' half the trial

10   and you doin' half.  Either one, one of you is gonna be

11   the lawyer and the other one isn't.  Now if you decide to

12   represent yourself, then he's gonna be sittin' back just

13   as an advisor and that'll be it and you'll be able to get

14   advice from him but you'll be callin' the shots through

15   the entire trial.  That includes objections and

16   everything else.  And if you don't know when and how to

17   make 'em then I guess, you know, that's, that's on you.

18   Now you say this is your life uh then I would caution you

19   to be very careful as to how you proceed right now-

20           MR. POUNCY:  (Inaudible).

21           THE COURT:  and uh sir, just one second okay

22   'cause you're, you're talkin', um there's no way if, if I

23   needed to have my transmission rebuilt that I would pull

24   my car into a place to have it rebuilt and say to them

25   look you guys step to the side I'm gonna rebuild this

1    transmission because I don't know anything about buildin'

2    transmissions.  I've never built one.  Are you hearin'

3    what I'm sayin'?

4              MR. POUNCY:  Yes Your Honor-

5              THE COURT:  All right.

6              MR. POUNCY:  but you're not hearin' me though.

7    I'm just, all I'm-

8              THE COURT:  I am hearin' you sir.  A lot better

9    than you think.

10             MR. POUNCY:  What, okay basically what I'm

11   sayin' is he, yes he have came to see me, well to drop

12   papers off you know what I'm sayin' about a dozen times.

13   I complained, I complained that I don't, listen, can I-

14             THE COURT:  Yeah I'm listenin'.

15             MR. POUNCY:  I complained that I don't feel

16   comfortable when I, I didn't talk to him, no alibi has

17   been formed, no alibi thing has been called for me man

18   just 'cause stuff happen.  If they, if they witnesses

19   didn't come they would postpone it.  If the prosecution,

20   hold on-

21             THE COURT:  No that's not true.

22             MR. POUNCY:  Okay.

23             THE COURT:  They wouldn't be postponin'

24   anything.  I decide what's postponed and I wouldn't be

25   allow (inaudible).

1      MR. POUNCY: Okay. Well anyway I haven't got

2  to talk to him about the cases, about, about the case you

3  know what I'm sayin'? I haven't, 'cause there ain't

4  nobody gonna take care more, no more than yourself you

5  know what I mean? And that's, that's all I'm gonna, got

6  to say man and I want to just give my opening statement.

7  I'm sittin' here gettin', gettin' blamed for somethin'

8  that I didn't do. It's a life you know what I'm sayin'?

9      THE COURT: Well I'm sorry that you don't like

10  the way that this procedure is set but this is a

11  procedure-

12      MR. POUNCY: You know what I'm sayin' it's not

13  that. It's just that he, he don't know no more than

14  what's, 'cause we didn't talk. He don't know no more

15  than what he done read 'cause we didn't talk. I didn't

16  (inaudible) on my situation just like the prosecutor

17  don't know more than what he done read or what they done

18  told him. (Inaudible).

19      THE COURT: Is that all that you want to say?

20  Is that it? Do you wish to represent yourself sir or are

21  you gonna let Mr. Breczinski represent you? And ma'am I

22  can't hear from you. I know you're his mom, I understand

23  that but I, I can't hear from you. So Mr. Pouncy, I'm

24  sorry, so which is it gonna be sir?

25      MR. POUNCY: So it's not an option for me to be

1    able to get, even though I complained earlier and don't

2    feel comfortable with the representation, for me to get

3    further (inaudible)?

4              THE COURT:  No sir if you want to, if you want

5    to decide who's gonna represent you then you get your

6    money together and you go hire the lawyer you want to

7    represent you.  Otherwise, you're gonna get the lawyer

8    that we appoint for you to represent you.

9              MR. POUNCY:  Well yeah I'm gonna hire a lawyer

10   then.

11             THE COURT:  Well I'm sorry sir it's late for

12   that.  It's trial day today.

13             MR. POUNCY:  It's too late?

14             THE COURT:  Yes sir.  If you were gonna hire

15   somebody-

16             MR. POUNCY:  (Inaudible).

17             THE COURT:  if you were gonna hire somebody you

18   should have did it a long time ago.  This is trial day

19   today.

20             MR. POUNCY:  Okay excuse me.

21             THE COURT:  The only issue now is is are you

22   gonna let Mr. Breczinski represent you or are you gonna

23   represent yourself, that's the only thing that's on the

24   table right now.

25             MR. POUNCY:  Well let me ask you this.  Would

1    you let somebody represent you that didn't come and see

2    you the day before your trial that didn't come and talk

3    to you, that you didn't discuss your case with?

4            THE COURT: Sir I would let Mr. Breczinski

5    represent me in a heartbeat before I would represent

6    myself with the knowledge that you have.

7            MR. POUNCY: So will I, I won't be able to talk

8    at all if he talk? I won't be able to say nothin' at

9    all?

10           THE COURT: No sir. He is gonna represent you.

11   That's what he does. You may get a chance-

12           MR. POUNCY: He don't listen man he wave me off

13   and all that-

14           THE COURT: well sir that's what you say,

15   that's what you say and he may be, maybe he ought to be

16   waving you off depending on what it is you're sayin' and

17   what you're doin'. I don't know what you're sayin' or

18   doin' but when I practiced law it was irritating to have

19   a defendant sittin' beside me runnin' his mouth while I'm

20   tryin' to listen to everything else that's goin' on in

21   here and make sure that his rights are bein' protected.

22           MR. POUNCY: How about when you, you know

23   defended one on one and you, and it still goes on. You

24   (inaudible)-

25           THE COURT: Mr. Pouncy I, I'm, sir stop. I'm

1    at the end of this conversation 'cause I see where this

2    is goin'.

3              MR. POUNCY:  (Inaudible) please Judge Hayman.

4              THE COURT:  Sir I am not gonna sit here and

5    argue with you.  Have a seat please.  And Mr. Breczinski

6    it looks like you'll be making the opening statement and

7    representing Mr. Pouncy-

8              MR. POUNCY:  (Inaudible).

9              THE COURT:  all right?  All right now so why

10   don't you come back over and Trish get the jury and let's

11   get started up.  I'm not gonna let you highjack this case

12   Mr. Pouncy and either you're gonna shut up or I'm gonna

13   have you hauled back upstairs and you'll be sittin' up

14   there watchin' it from upstairs or not watchin' it at all

15   and we're gonna continue to conduct this trial.  Or I'm

16   gonna have them tie you up and put a gag on your mouth

17   and have you sit here gagged if you don't shut up okay?

18   All right get the jury Trisha.

19             MR. BRECZINSKI:  Your Honor?

20             THE COURT:  Yes?

21             MR. BRECZINSKI:  I was wondering if we could

22   get some water out here.  I get parched and you used to

23   have pitcher in this courtroom-

24             THE COURT:  I know but we, we're concerned

25   about havin' water.  I may, I don't have a problem with

1    you gettin' a cup of water but right now I want to get

2    the jury in here okay?

3            MR. BRECZINSKI:  The reason I ask is because

4    when I was a teenager most of salivary glands were

5    removed and I (inaudible).

6            THE COURT:  You can get a cup of water I don't

7    have a problem with that.

8            MR. BRECZINSKI:  Okay.

9            THE COURT:  Yeah you can do that.  In fact

10   Trish will take care of that for you.  Mr. Pouncy be

11   quiet okay?  One more time and I'm gonna haul you

12   upstairs.  I kid you not.  All right get the jury Trish.

13   Everyone stand please.

14            (At 3:01 p.m., Jury enters courtroom)

15            THE COURT:  Please have a seat ladies and

16   gentlemen.  And we are back on the record and Mr.

17   Breczinski would you begin with your opening statement

18   sir?

19            MR. BRECZINSKI:  There is no doubt these cars

20   were carjacked and some armed robbery happened.  We're

21   not gonna say that this is all a lie, that these things

22   never happened or anything else of the sort.  There's no

23   doubt that these, the Sandstroms or the um, had their um

24   Cadillac and their Corvette taken from them.  There's no

25   doubt that these, these other uh, Camaro was taken from

219

1    Earl Brady and this truck also.  There's no doubt about

2    that, that these things were taken.  The issue is whether

3    or not Omar Pouncy did it.  Issue is whether he was the

4    person that did it.  We've got basically five people that

5    are sayin' I think that's the guy, four of which never

6    him before in their life, four of which are four white

7    people that are sayin' that hey this is the guy that did

8    it, we think it is.  They really hadn't met him much.

9    There wasn't repeated times coming there.  There wasn't

10   all sorts of things, it was a relatively short thing and

11   the other person we have it saying is this stepbrother

12   Wayne Grimes.  And you think well Wayne knows who this is

13   and why would he be mistaken about this but

14   unfortunately, Wayne Grimes and Omar had a little bit of

15   a history.  Wayne had a girlfriend and Omar, to put it

16   delicately, became intimate with Wayne's girlfriend and

17   there is a little bit of bad blood because of that

18   between them.  And he says hey he's got a reason to say

19   this and he's got a, a good friend, a (Inaudible) Tanner

20   who looks a lot like me.  I've, and that was his best

21   friend, I bet you that that's the person.  He's saying I

22   wasn't there, that's what Omar's saying, it wasn't me,

23   these people are mistaken.  That in a nutshell is what is

24   going on.  There is, we're gonna hear basically

25   identification.  We don't have fingerprints, we don't

1    have DNA, we don't have videotape, we don't have all

2    these wonderful things we can play there.  It's people

3    saying I think that's the person and well you're gonna

4    end up having to decide whether there's reasonable doubt

5    or not as to whether Omar was the person that did it or

6    whether or not they could be mistaken.  And if there's a

7    reasonable doubt as to it we'd be, we'll be asking you to

8    come back with a verdict of not guilty.  Thank you.

9         THE COURT:  Thank you Mr. Breczinski.  Mr.

10   Larobardiere are you ready to call your first witness?

11        MR. LAROBARDIERE:  Yes Judge.

12        THE COURT:  You may call your first witness.

13        MR. LAROBARDIERE:  Thank you.  We would call

14   Joseph Dale, Davis.

15        THE COURT:  And Mr. Larobardiere can you just

16   kind of slide that podium just slightly a little bit over

17   this way so that when people come through-

18        MR. LAROBARDIERE:  This way Judge?

19        THE COURT:  yes, slide it slightly to your

20   right as you're facin', yep, slightly over.  'Cause it,

21   when people come through I want 'em to be able to come

22   through there to here.  Thank you.  Good afternoon sir if

23   you'll come up this way please?  If you'll raise your

24   right hand.  Solemnly swear or affirm the testimony you

25   give today will be the truth so help you God?

1          MR. DAVIS:  I do.

2          THE COURT:  Please pull that door towards you

3     sir and you may step up and have a seat.  Mr.

4     Larobardiere when you're ready you may proceed.

5          MR. LAROBARDIERE:  Thank you Judge.

6               JOSEPH SCOTT DAVIS

7     called as a witness at 3:06 p.m., testified as follows:

8               DIRECT EXAMINATION

9  BY MR. LAROBARDIERE:

10 Q    Morning, afternoon Mr. Davis.  Could you please state

11 your name and spell it for the record?

12 A    Joseph Scott Davis, J-o-s-e-p-h S-c-o-t-t D-a-v-i-s.

13 Q    Thank you.  What's your, your, you have a business-

14 A    Yes sir.

15 Q    self-employed business is that right?

16 A    Yes sir.

17 Q    And what's the name of the business?

18 A    Mr. Davis Racing.

19 Q    Where's it located?

20 A    Richfield Road, 3614 Richfield Road.

21 Q    City of Flint or-?

22 A    Yes sir.

23 Q    Okay.  Uh you do work on vehicles there?

24 A    Yes.

25 Q    What type of work?

1    A    Uh mostly race car chassis fabrication.

2    Q    Fabrication means metal work?

3    A    Yes.

4    Q    Okay.  Do you recognize this vehicle on the screen?

5    A    Yes.

6    Q    Okay.  Do you recognize this vehicle on the screen?

7    A    Yes I do.

8              MR. LAROBARDIERE:  It's been marked as People's

9         proposed exhibit number 1.  Judge for the record I've

10        shown defense counsel this and uh, uh the uh subsequent

11        exhibits, all my exhibits.

12             (At 3:07 p.m., PX 1 introduced)

13   BY MR. LAROBARDIERE:

14   Q    Does this, how do you recognize this vehicle?

15   A    It belongs to Ed Brady.

16   Q    And how do you know Mr. Brady?

17   A    He's a drag racer.  We associate on uh, on uh different

18        race cars.

19   Q    Okay.  Has he brought work or vehicles-

20   A    Yes he-

21   Q    for, for-

22   A    yes, yes.

23   Q    work at your shop?

24   A    Yes he does.

25   Q    All right.  This picture ad, does this belong to Mr.

1          Brady did you say?

2    A    Yes that was his car.

3    Q    Does this ad accurately, this picture accurately

4         represent that Camaro owned by Mr. Brady?

5    A    Absolutely.

6              MR. LAROBARDIERE:  Judge I ask that People's

7         number 1 be admitted.

8              THE COURT:  Any objection to number 1 Mr.

9         Breczinski?

10             MR. BRECZINSKI:  No Your Honor.

11             THE COURT:  1 is in.

12             (At 3:08 p.m., PX 1 admitted).

13   BY MR. LAROBARDIERE:

14   Q    Tell us about your first contact with this car in the

15        month of October 2005.

16   A    Ed brought it up to me.  I was working on another one of

17        his vehicles.  He asked if I could set it out front and,

18        and try to sell it.  I have an open parking lot you know

19        pretty good visi-

20   Q    You're on Richfield, I'm sorry to interrupt-

21   A    yeah pretty good visibility.

22   Q    You have pretty, pretty good traffic flow through there?

23        A    Yes, yes absolutely.  And I would pull it out in the

24        mornings and put it in every night.  I have 4000 square

25        feet, you know my facility, and then I could pull it in

1              (Judge Archie L. Hayman; 01-24-06; 3:08 p.m.)

2      at night.

3  Q   All right.  Tell us about this vehicle, looks, looks like

4      it's pretty fast.

5  A   Roll cage, real nice rear end, suspension's excellent in

6      it, it had probably a 700 horse motor in it, nitrous

7      oxide, all kinds of goodies.  It really isn't a street

8      car, it's a drag car and uh-

9  Q   Sounds-

10 A   and it was basically used as that, as a drag car.

11 Q   Drag car?

12 A   Um hm.

13 Q   Sounds like it's worth some money-

14 A   Yes.

15 Q   the parts on it.

16 A   Absolutely.

17 Q   Okay.  Did you advertise this vehicle, did you have any

18 takers?

19 A   I had a dozen people stop over the, over the course of

20     the three weeks there probably fifteen different

21     customers.

22 Q   All right.  Sep, September 29th in that time frame, you

23     have anybody stop by seriously lookin' at it?

24 A   Yes I did.

25 Q   Do you see that person here today?

1   A    Yes I do.

2   Q    Point to where you see him and describe the clothing the

3        person's wearing please.

4   A    On that day?

5   Q    Yes. Well the person-

6   A    Or now?

7   Q    the person you recognize as being serious.

8   A    This fella right here with the white shirt on.

9   Q    Okay and when did you, I, I referred you to September 29th

10       but when did you first have contact with this gentleman?

11  A    I'm not really, exactly sure on the dates. I have a lot

12       of traffic, it is a business, but probably four days or

13       five days before the actual incident him and two other

14       fellas stopped by and looked at the car, seemed terribly

15       interested. You know the kind of deal where you almost

16       know you're gonna make a sale you know?

17  Q    Were you negotiatin' price or would you refer to Brady?

18  A    I was, that's, that's not my business. I, I gave 'em a

19  flat price. I, it's not my business to deal with somebody. I

20  don't sell cars. I was basically doin' it as a favor for Ed.

21  I don't, I don't have a license or do business as a car

22  salesman. And it takes too much of my time honestly, it's

23  outside you know?

24  Q    True. You'd rather be in the shop-

25  A    Absolutely.

1  Q    fabricating.

2  A    Yep.

3  Q    Say about four, five days prior to September 29th this

4  gentleman came by?

5  A    Yes.

6  Q    Okay.  Do you remember how he got there?

7  A    The first it was a car.  A little silver Chrysler.

8  Q    All right um you say he was with other people.  Between

9       this gentleman and Judge I will ask that the record

10      reflect witness has identified Mr. Pouncy.

11                  THE COURT:  Absent objection the record shall

12      reflect the identification of Mr. Pouncy.

13  BY MR. LAROBARDIERE:

14  Q    If Mr. Pouncy was there with two other gentlemen, out of

15       Mr. Pouncy and the two other gentlemen, who was doing all

16       the talking of interest in the Camaro with you?

17  A    This gentleman here.

18  Q    All right.  Is there a point where they, it got so

19  serious where you called Mr. Brady?

20  A    They came back a second time.  I believe on the second

21       time the, the two other fellas were different and then

22       the subsequent third time when they finally bought the

23       car or were making the attempt to purchase on the car,

24       they were you know two other fellas than the first time.

25       The first time I didn't see the other two guys after

227

```
 1         that.
 2    Q    Okay.  How many face-to-face encounters did you have with
 3         Mr. Pouncy about this vehicle?
 4    A    Three.
 5    Q    Three times?
 6    A    Three times.
 7    Q    How close in distance would you get to Mr. Pouncy during
 8         these three occasions?
 9    A    Probably less than two feet.
10    Q    Less than two feet?
11    A    Yeah we were under the hood, lookin' at the car, you know
12         inspecting everything.
13    Q    Did you ever, did he ever tell you his name?
14    A    Yes.
15    Q    What name did he give you?
16    A    Jacob.
17    Q    Okay and at some point negotiations get so serous you
18         call Mr. Brady?
19    A    On the third, on the third visit.  He had called me
20         earlier in the day askin' me about insurance, you know
21         how should he insure the car because it's a race car, you
22         know basically told me he was comin' with the money and
23         ready to do business.  So I called Ed on the phone and
24         said you need to get up here.  You know an hour from now
25         this guy's gonna be here and pretty much they showed up
```

```
 1         and Ed showed up and it was over within a few minutes.

 2         They were down the road.

 3    Q    Okay well how did you communicate with Mr. Pouncy about

 4         the vehicle, other than in person?  Was there any other

 5         ways?

 6    A    On the phone.  He called me one time on the phone.

 7         Actually I think he called me two times on the phone.

 8    Q    All right.  About the vehicle?

 9    A    About the vehicle both times.

10    Q    And that caused you to cause, call Mr. Brady?

11    A    Yes.

12    Q    And Mr. Brady came up with someone else?

13    A    His friend Pat, yes.

14    Q    Okay and what were they drivin' when they came up to your

15         shop?

16    A    Ed's Ford pick-up.

17    Q    Okay did they have anything with them other than the

18         pick-up?

19    A    Had the trailer that they would have to call the, haul

20         the car on.

21    Q    Okay.  The vehicle was not, you couldn't drive it down

22         the street at all?

23    A    Well it wasn't insured for that type of drivin'.  It was

24         you know more of a storage insurance and basically you

25         just don't drive that kind of car around you know.
```

229

```
 1   Q   Is it real loud to drive?

 2   A   Not real you know overly loud but it's, it's, it's for

 3       drag racing.  It doesn't drive real well other than going

 4       straight you know and it would've been a, a real handful.

 5

 6   Q   All right.  Ed Brady shows up with his truck and trailer

 7       and what happens from there?

 8   A   They discuss it a little bit, actually talk about price-

 9   Q   Let me, let me interrupt you.  When you, you say they,

10       who's talkin' to who?

11   A   Ed, Ed, Pat, uh-

12   Q   This man here?

13   A   Yes that I now know-

14   Q   Mr. Pouncy?

15   A   as Omar, they discussed price and I don't think Ed really

16       budged on the price whatsoever, I think they were pretty

17       firm there.  Then the question came up yeah I'm really

18       happy with the deal, I want to buy the car.  Can you take

19       it over to my mechanic at King Automotive.

20   Q   What was the name of the mechanic?

21   A   I, I don't know the mechanic's name, the, the shop is

22       King Automotive.

23   Q   King Automotive?

24   A   Yeah.

25   Q   Okay.  What happened at that point?
```

```
1   A   Ed kind of went with it and said yeah okay.  I felt
2       somewhat comfortable.  Did a fabulous job of convincing
3       me that he was gonna purchase this car.  I was-
4   Q   Now when you say that you're referring to Mr. Pouncy?
5   A   Yes.  Absolutely.
6   Q   All right.  You dealt with people interested in vehicles
7       before?
8   A   Absolutely.  I'm, you know I'm kind of in the business I
9       have to sell my jobs when I'm done and I have to sell the
10      job to 'em when it, you know so I'm a, I'm a people
11      person in that respect.
12  Q   All right so there's no doubt in your mind that this is-
13  A   This was a done deal you know it was, it was sold.  He
14      did a fabulous job of selling himself.
15  Q   All right.  So they agreed on price sounds like, they
16      agreed to, take it to the automotive?
17  A   Um hm.
18  Q   And what happened now?
19  A   They loaded the car up and twenty-five minutes later I
20      got a phone call from Ed sayin' that he didn't have his
21      car anymore.
22  Q   You say you had three face-to-face encounters within a
23      couple feet with Mr. Pouncy.
24  A   Yes.
25  Q   Any question as you sit here today that it was Mr. Pouncy
```

1    each time you saw him in person?

2  A    None whatsoever.

3          MR. LAROBARDIERE:  Nothing further Judge.

4          THE COURT:  Cross-examination Mr. Breczinski.

5          MR. BRECZINSKI:  Can we approach Your Honor?

6          THE COURT:  Sure.  Everyone please stand

7    please.  And please follow Trisha back to the jury room

8    again please.

9          (At 3:17 p.m., Jury excused)

10          THE COURT:  Please everyone have a seat and

11    we're on the record Mr. Breczinski.  What is it that you

12    want to say to me at this time?

13          MR. BRECZINSKI:  During the direct examination

14    of what is the first witness of this matter, Mr. Scott

15    Davis, my client wrote a note which he passed me that

16    says, and I quote, "I'm gonna represent myself from now

17    on so you can tell the Judge" and he apparently does

18    desire that he definitely wishes to represent himself.

19          THE COURT:  Okay Mr. Pouncy would you stand

20    sir?  Is that your desire at this time?  Please remain

21    standing sir.  Mr. Pouncy you understand you have the

22    right to an attorney and you have the right to Court

23    appointed counsel if you can't afford one, do you

24    understand that?

25          MR. POUNCY:  I don't have attorney right now.

1          THE COURT:  Sir I'm just asking you do you

2     understand your rights sir?

3          MR. POUNCY:  Oh yes I do understand.

4          THE COURT:  You understand that if you

5     represent yourself that I will have to treat you like any

6     other lawyer and if you don't comply with the Court rules

7     I'm gonna have to call you on it you understand that?

8          MR. POUNCY:  Yes sir.

9          THE COURT:  And you understand that Mr.

10    Breczinski will be here just simply to advise you from

11    this trial forth and if you stand up and start

12    representing yourself you're not gonna be able to change

13    horses in the middle of the stream.  You're gonna be

14    representing yourself from beginning to end sir.  Is that

15    what you really want to do?

16          MR. POUNCY:  Yes.  Yes.

17          THE COURT:  Mr. Pouncy I'm gonna tell you that

18    in my opinion you have no business representing yourself,

19    none whatsoever.

20          MR. POUNCY:  The fact that they found the

21    (inaudible) shoe-

22          THE COURT:  Sir I just, sir I just want you to

23    understand that uh-

24          MR. POUNCY:  All right I'm ready to go then.

25          THE COURT:  All right then Mr. Breczinski have

1      a seat and Mr. Pouncy have a seat sir.

2                    MR. POUNCY:  (Inaudible).

3                    THE COURT:  Yes sir.  And everyone stand.

4      Trish bring the jury back in.

5                    (At 3:20 p.m., Jury enters room)

6                    THE COURT:  Everyone stand yes.  Ladies and

7      gentlemen please have a seat.  We're on the record.

8      Ladies and gentlemen at this time I have to advise you

9      that Mr. Pouncy has decided to represent himself in this

10     trial and I want you to understand that if, since he's

11     decided to represent himself, that this Court has an

12     obligation to hold him to the same standard as I would

13     any other lawyer and so if for some reason I have to make

14     rulings, I don't want you to think that my rulings are

15     any indication of my opinion about this case.  My rulings

16     are gonna be simply based on what the law requires me to

17     do and in no way, shape or form reflects my opinion about

18     this case and I just want you to understand that.  With

19     that Mr. Pouncy do you wish to cross-examine the witness

20     sir?

21                    MR. POUNCY:  Yes.

22                    THE COURT:  Then step to the podium and begin.

23                         CROSS-EXAMINATION

24     BY MR. POUNCY:

25     Q    Um you said, can you state your name again please for me

| | | |
|---|---|---|
| 1 | | 'cause I didn't catch it. |
| 2 | A | Joseph Scott Davis. |
| 3 | Q | Joseph Scott Davis.  Did you ever, after this incident |
| 4 | | occurred, did you ever speak with a officer or anything, |
| 5 | | or a detective or anyone that come and questioned you |
| 6 | | about the situation, your awareness of it? |
| 7 | A | Yes the, the very next day. |
| 8 | Q | The very next day?  Which, what date, what was, date was |
| 9 | | that please? |
| 10 | A | I'm not real sure on the date. |
| 11 | Q | You can't remember that? |
| 12 | A | No I cannot. |
| 13 | Q | Okay.  Do you know- |
| 14 | A | Somewhere, somewhere in September, the end of the month. |
| 15 | Q | The end of the month? |
| 16 | A | Yes. |
| 17 | Q | Okay.  Were you shown any, asked to identify the suspect |
| 18 | | or the subject that- |
| 19 | A | Yes I was. |
| 20 | Q | Okay do you um remember, how did you identify this |
| 21 | | person? |
| 22 | A | They showed me a sheet with six, twelve I think or more |
| 23 | | pictures- |
| 24 | Q | Okay. |
| 25 | A | and I, I was able to pick you out and also another |

1       gentleman.

2    Q  Okay do you remember what the name you told this person

3       that you, that, that you knew this person of?

4    A  Jacob Woods.

5    Q  Jacob Woods?

6    A  Yes.

7    Q  Where did you say you knew this subject from?

8    A  Because I was told that he was another associate of

9       mine's, little brother.

10   Q  Okay did you recall, 'cause I have it right here in the

11      police report, that you stated you knew this person from,

12      you alls a part of the same racin' circuit, Jacob Wood or

13      Sam, Sammy Wood or whoever-

14   A  Yeah.

15   Q  this person is.  You remember that?

16   A  Yeah.

17   Q  So you, so you knew this person then right?

18   A  Excuse me for a second.

19           THE WITNESS:  Can I answer him like, I, I'm

20      tryin' to come up with a way of answering these

21      questions.

22           THE COURT:  Just answer it.  Give him your

23      answer.

24           THE WITNESS:  All right.  You, you came to me

25      as Jacob Woods and you said to me hi I'm Jacob, you

1     remember me, Sammy's little brother?

2   BY MR. POUNCY:

3   Q     Okay-

4   A     Now that's, that's what you told me and from that point

5         on because I know Sam, I felt comfortable dealing with

6         you.

7   Q     Okay so a person that looks like me, 'cause you know in

8         this world, do you know in this world there's more than a

9         person, there's more than one person that look like that-

10  A     Not, not in this neighborhood, I'm sorry.  I know, I know

11        who I'm speaking with right now.

12  Q     Okay.  Okay.  May I, may I approach the witness please?

13              THE COURT:  Yes you may sir.

14  BY MR. POUNCY:

15  Q     Um it state that you picked out number, the number 3 on

16        the, on the photo line-up-

17  A     (Inaudible) number 3 but-

18  Q     that's what it (inaudible)-

19              THE COURT:  And before you show that to him Mr.

20        Pouncy, make sure Mr. Larobardiere sees what you're

21        showing-

22              MR. POUNCY:  Okay.

23              THE COURT:  to make sure that it's, he

24        understands what it is you're showin' this witness.

25              MR. POUNCY:  Photo line-up that was presented,

1    that was produced on the 13th, October, October 13th.

2                THE COURT:  Go right ahead Mr. Pouncy.

3  BY MR. POUNCY:

4  Q    Okay.  Sorry about this.  I'm not Johnny Cochran or

5       nothin', I'm just representin' myself.  Sorry for any

6       delays.

7                THE COURT:  You don't have to say that sir.

8       You decided to represent yourself.  Go right ahead.

9  BY MR. POUNCY:

10 Q    Um this what the um, this what the police report states.

11      It says note that earlier in the, in the day I had made

12      contact with Joe Davis-

13               MR. LAROBARDIERE:  Object Judge to reading the

14      report.

15               THE COURT:  I would sustain the objection.

16      You're not allowed to read the police report Mr. Pouncy.

17               MR. POUNCY:  Okay I'm sorry.

18               THE COURT:  You can question this witness but

19      you can't read the report sir.

20 BY MR. POUNCY:

21 Q    So you did, okay, did you, it states that you um-

22               THE COURT:  Mr. Pouncy you're not allowed to

23      read that.

24               MR. POUNCY:  Okay.

25 BY MR. POUNCY:

```
 1    Q    Did you pick out, do you remember, recall this picture
 2         that you picked out of the, out of the line-up?
 3    A    Not out of the page, no I do not.
 4    Q    Not out of the page?
 5    A    I, I, if uh, it seems that it was the top right corner
 6         but I'm not a hundred percent sure.
 7    Q    I have, I'll show you.  I have this picture of the top
 8         right corner of the line-up.
 9              THE COURT:  And just so you know witness, don't
10         let the jurors see that if you would please 'cause that
11         hasn't been admitted.
12              THE WITNESS:  I actually, it wasn't the right
13    corner obviously.
14    BY MR. POUNCY:
15    Q    Which one was it please?
16    A    This one here.
17    Q    Which one?
18    A    This one here.
19    Q    Which one, can you state the number?
20    A    Four.
21    Q    Number four?  Okay.  May the record reflect that number
22         four-
23              MR. LAROBARDIERE:  Judge I would object to his
24         improper form of question.
25              THE COURT:  What's your legal objection Mr.
```

239

1    Larobardiere?

2              MR. LAROBARDIERE:  To the form of the question.

3    He was asking the record to reflect something about the,

4    the piece of paper.  It, it was not a proper question.

5              THE COURT:  And your response to that Mr.

6    Pouncy?

7              MR. POUNCY:  This was um, um it was stated that

8    um on the 13th of October that it was-

9              THE COURT:  I'd like for you to respond to his

10   legal objection.  It's as to the form of the question.

11   At this point-

12             MR. POUNCY: I don't know what none of that

13   stuff means.  I don't know.  I, I, I don't, I don't agree

14   with him.

15             THE COURT:  One second Mr. Pouncy.  I have to

16   hold you to the same standard if you decide to represent

17   yourself.  I can't really listen to that.  I'm gonna, at

18   this point I'm gonna overrule his objection.  I'm gonna

19   allow you to proceed.

20             MR. POUNCY:  Thank you I appreciate that.  May

21   the record reflect that he picked out number 4 or

22   whatever and number 4 um-

23             THE COURT:  Okay just one second.  The record

24   shall reflect that he picked out number 4.  Now you're

25   gonna have to question this witness.  You can't testify

1    right now 'cause you're not on the witness stand.

2          MR. POUNCY:  Okay.

3          THE COURT:  And when you're getting ready to

4    say somethin' else that would be testimony.  You can't do

5    that okay?  You can question this witness.  That's what

6    we're doin' right now.  Question this witness okay?

7          MR. POUNCY:  Okay um is it all right if I show

8    him this Mr. Larobardiere?  This the paper that refers to

9    that line-up, to that line-up?

10        MR. LAROBARDIERE:  Judge I have to object to

11    the admission on the uh, the names.  I think it's hearsay

12    as to the names contained on the list.

13        THE COURT:  I'll have to sustain the objection

14    as to hearsay Mr. Pouncy because there has to be a proper

15    foundation laid for the admission of that document.  So I

16    have to sustain his objection at this point.

17        MR. POUNCY:  Okay these records are come, came-

18        THE COURT:  You can't say that sir.  Right now

19    the only thing you can do is question this witness and

20    that's it.  You can't make statements, you can't talk to

21    me or to people around here unless you're raisin' an

22    objection.  You have to question this witness and that's

23    it.

24        MR. POUNCY:  Okay I object that, I object what

25    he did, what he said.

```
1              THE COURT:  Okay well that's not a, that's not

2       appropriate.  Right now just ask this witness what

3       questions you want to ask him please sir.

4              MR. POUNCY:  All right.

5              THE COURT:  And you can't, go right ahead, go

6       right ahead sir.

7  BY MR. POUNCY:

8  Q    Number 4, you picked out number 4.  Can you state the

9       name of the person, number 4 these, okay say for instance

10      number 1-

11             MR. LAROBARDIERE:  (Inaudible).

12             THE COURT:  I would have to sustain his

13      objection to that Mr. Pouncy.  You can't ask that

14      question.

15             MR. POUNCY:  I can't ask that question?

16             THE COURT:  No sir.

17             MR. POUNCY:  May I present this picture please

18      Your Honor?  I mean Mr. Larobardiere.

19             MR. LAROBARDIERE:  I have to object to

20      relevance Judge.

21             THE COURT:  Well I'm not sure what the picture

22      is but uh-

23             MR. POUNCY:  It's the same picture I showed,

24      presented earlier.

25             THE COURT:  Did you want to ask this witness a
```

1    question about the picture?

2              MR. POUNCY:  Yes that's-

3              THE COURT:  Go right ahead.  You can ask him a

4    question about the picture.

5  BY MR. POUNCY:

6  Q   Excuse me your name again sir?

7  A   Joseph Scott.

8  Q   Joseph Scott?

9  A   Yes.

10  Q   Mr. Scott um does this person look familiar to you bein'

11     the person that did all the talkin' and all that stuff?

12  A   I don't, I don't remember that fact.

13  Q   Okay.  How, how positive, oh so you picked out number 4

14     right?

15  A   You know that, that picture, maybe I made a, a hasty

16     judgment.  That's a pretty unclear picture.

17  Q   So you think you made a mistake?  (Inaudible).

18  A   I may have made a mistake there.

19  Q   Think this was, you made a mistake, mistaken

20     identification?

21  A   Well I didn't make a mistake.  I, I had a color photo the

22     first time.

23              MR. POUNCY:  Can I see the color photo please?

24     The color photo right there is right under there.  Not

25     this one, no that's not the one, no that's (inaudible)

1    the one that I presented to you.  Your Honor I believe I

2    have a color photo, color photo.  I'm sorry about that,

3    just a second please.

4              THE COURT:  Yes go right ahead sir?

5              MR. POUNCY:  You have color photos in here?

6              MR. BRECZINSKI:  (Inaudible).

7              THE COURT:  Do you have a color, colored photo,

8    photo of the one he's asking for Mr. Larobardiere?

9              MR. LAROBARDIERE:  I don't know Judge.  I don't

10   know which one he's-

11             MR. POUNCY:  It's this line-up right here.

12   That's it right there.  That's the one identified.  There

13   go a color photo right there.  Can I see it please?

14   Thank you.

15             MR. LAROBARDIERE:  Judge I'm gonna object.

16   He's shown numerous photo arrays which I think are

17   confusing the witness.

18             THE COURT:  Well I'm gonna allow him to

19   question the witness.  It's his cross-examination.

20   Proceed Mr. Pouncy.

21   BY MR. POUNCY:

22   Q    Okay there go the color photo, it's better, sorry about

23        that.  But is that-

24   A    You're not in this photo.

25   Q    Is that (inaudible) pictures?

1   A   You're not in this group of photos.

2   Q   Well why did you say number 4-

3   A   In that other picture it, it kind of looked like you but

4       it was a terrible picture.  It was black and white, had

5       been copied many times.

6   Q   Oh so you can, all right so it is possible for you to

7       mistaken identify someone is that a, is that correct?

8   A   Yes.

9   Q   Because we are human right?

10  A   Yes absolutely but if the, if the pictures were clear it

11      was pretty easy to judge.

12  Q   Okay well yeah that, yeah that, that number 4, I want to

13      reflect to number 4, that number 4 picture that you

14      picked out.  It wasn't me, it, that wasn't a photo of me.

15          THE COURT:  You don't have to testify about

16      that, you can't testify right now Mr. Pouncy.

17          MR. POUNCY:  Oh I'm, I'm not tryin' to testify.

18      Can I make the record reflect to the, can I speak to the

19      jury?  I can talk to the jury too right?

20          THE COURT:  Not, not really.

21          MR. POUNCY:  Not, not at this time?

22          THE COURT:  No.  Only thing you can do right

23      now, and I'm gonna make it clear again, the only thing

24      you can do right now is question this witness and that's

25      it.

1    BY MR. POUNCY:

2    Q    So is it a poss, is it a possibility that you could

3         mistaken identify anyone, not just singlin' out, not just

4         singlin' out the person that you seen, that you thought

5         you seen that day is anyone, have you ever seen someone

6         that look alike to you before?

7    A    Absolutely.  We all have.

8              MR. POUNCY:  All right thank you I um, I have

9         no further questions, oh so you don't remember the dates

10        that this stuff happened?

11             THE WITNESS:  Not exactly.  Somewhere near the

12   end of the month in September.

13   BY MR. POUNCY:

14   Q    Okay so-

15   A    I do, I do an awful lot of business and when I was there

16        I, I can't remember exact dates on things.

17   Q    'Cause it states, well, um, 'cause um, is, when you, when

18        you um talked, gave your statement to the detective was

19        it, could you um state the detective's name who you

20        talked to or officer that you talked to that day that you

21        gave a statement to please?

22   A    This officer right here.

23   Q    It was, it was the detective?

24   A    Detective right here.

25   Q    All right just a second please.  'Cause I, I'm not sure

```
1        if that was the officer that was in charge of this case

2        and the one that-

3               THE COURT:  You have to ask just questions Mr.

4        Pouncy.  That's all you can do is ask a question sir.

5   BY MR. POUNCY:

6   Q    Are you positive that this was, that this was the

7        officer?

8   A    He's the, he's the only detective that I've spoken to

9        about this case from beginning to end.

10  Q    From the beginning to the end?

11  A    Until now.

12  Q    That drove over and showed you the photos-

13  A    Yes.

14  Q    of the person that you stated name is Jacob Woods?

15  A    Yes.

16  Q    And his brother Sam Woods?

17  A    You said he was your brother.

18  Q    The person that you seen, the Jacob Woods character, you

19       stated that Sam Woods was his brother?

20  A    No I don't, I don't know him to be his brother.  You told

21       me your were Jacob Woods and you were Sam Woods' brother.

22  Q    Um but you state, is, is-

23  A    To be perfectly honest with you-

24  Q    excuse me, so it's not, so it's not true that you said

25       you know this person you know, when you know someone it's
```

1      not that you heard or hearsay right?  Right or wrong?

2    A  Absolutely.

3    Q  All right.  You stated, so didn't state that you know

4       this person from the racin', the racin' circuit 'cause

5       that's what my, from my research that's what I, that's

6       what I discovered.  That you said you known this person

7       and you known this person who came, this character that

8       came and seen you as Jacob Woods and his brother from a

9       racin' circuit.

10   A  I, I do, I have seen you two other occasions when Sammy

11      was there when the other people that, that we commonly

12      know were there.

13   Q  So you-

14   A  And I was introduced to you then I would think four

15      months or five months earlier, actually then as Sammy's

16      brother.

17   Q  As Jacob Woods.  So why would a person go around four

18      months before this-

19   A  I don't know.  Maybe-

20   Q  can you hold on a second please?  Hold on a second.  Why

21      would a person go four months before this, this um

22      alleged carjacking and armed robbery which is, which is a

23      total disgrace, which I'm total against, would, would

24      never do but why would a person go and tell you four

25      months before they even find out that you fix car, well

1      that, that this car's for sale, present you his name as

2      bein' Jacob Woods?

3  A   Are you asking me a question?

4  Q   Yes.  Why would a person-

5  A   The answer, the answer to that question is sometimes

6      people that commit crimes use aliases.

7  Q   Use aliases?  So, so you, so, so you not, so are you

8      positive, 'cause first, hold on let me retract.  So first

9      you said that the number 4, the number 4 character-

10  A   No, no, no, no.  We, we've gone past that.

11  Q   Hold on can you not interrupt me please?  I, I'm tryin'

12      to listen to you and be respectful sir.  First you stated

13      that the number 4 character in the line-up-

14  A   I said he-

15  Q   hold, hold on.  First-

16  A   I said he looked like you.

17  Q   Okay oh so-

18  A   I said he looked like you.

19  Q   it is people who look like-

20  A   I said, I said he looked like you.

21  Q   more than one person who looks like me?  It is, so you do

22      agree with that then right?  You do agree that there's

23      more than one person that looks like me?

24  A   But without a shadow of a doubt, as soon as I saw those

25      pictures in color, you were not one of the people on that

1        (Judge Archie L. Hayman; 01-24-06; 3:37 p.m.)

2    page.

3  Q   But black and white, all that, colors and all that,

4      colors, the color, the color of the picture it doesn't

5      matter you know 'cause we don't know, 'cause honestly, no

6      one's in this courtroom-

7              THE COURT:  Mr. Pouncy you're not allowed to

8      testify.

9              MR. POUNCY:  I'm not testifying.

10             THE COURT:  Yes you are sir.  You-

11             MR. POUNCY:  All right-

12             THE COURT:  have to ask, please one second, you

13     have to ask a question of the witness.

14             MR. POUNCY:  Ask a question.  All right I'm

15     sorry man, I'm sorry man.  It's my life man so I'm tryin'

16     to-

17 BY MR. POUNCY:

18 Q   Okay so, so you said, so you said, first you say, it

19     states from my discovery that you said it was a number

20     that it, it reflects if the, it reflects in the police

21     report that you said you, you, it states that you picked

22     out a number 3 character out the line up, out the photo

23     line-up.

24 A   I don't have that, I don't have that group of pictures in

25     front of me right now so I'm not sure.

1   Q   But didn't, but this is, but didn't this, did you do

2        that?  Did you pick out the number 3 character?

3   A   I, listen I, I work for a living-

4   Q   Me too.

5   A   and, and, and honestly, honestly I can't remember what

6        number I picked out of a line-up but if I had the paper

7        in front of me again with your picture on it or Jacob's

8        picture on it I'd, I'd hit it first shot.

9   Q   Thank you.  Thank you so if this-

10   A   (Inaudible).

11   Q   character Jacob, if this character Jacob was in the photo

12        line-up, you can identify him?

13   A   Yes.

14   Q   Okay so, so you not absolutely positive-

15   A   I'm positively sure beyond a shadow of a doubt.

16   Q   Positively sure that it's Jacob Woods?

17   A   That it's you.

18   Q   That it's Jacob?  'Cause-

19   A   That it's you.

20   Q   hold on first you said you positive that it's Jacob Woods

21        could or right or wrong?  First you just said it's Jacob

22        Woods-

23   A   You can spin this all afternoon Omar.  It's, Jacobs is

24        you.  You gave me Jacob's name.

25   Q   Why, why would a person, why, why would, I never seen,

```
1          well I can't testify, sorry about that.  Why would a
2          person give you a fake name-
3      A   Because they're about to do somethin' illegal.
4      Q   a fake name, hold on just a second please man please I
5          let you talk.
6                  THE COURT:  Witness, witness one second let him
7          finish his question.
8                  THE WITNESS:  Sorry.  I'm sorry sir.
9                  THE COURT:  Go right ahead Mr. Pouncy.
10     BY MR. POUNCY:
11     Q   Why, could you please, you, have you, do you go around
12         givin' people fake names?  Or aliases if that's the
13         proper word for it?
14     A   No sir.
15     Q   You don't?  What'd make you think that I was the person?
16         Just by appearance or what?  Just by my facial features
17         or what sir?
18     A   Just because I spoke to you on three occasions, you spoke
19         to me on the phone, we had a repertoire, we actually
20         talked to each other on three occasions.
21     Q   When was those three occasions please?
22     A   In September.
23     Q   September?  Oh so you only seen this person three times
24         'cause if, if it reflects you just said you seen this
25         person four months-
```

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1    A    I didn't-

2    Q    hold on, oh man could you hold on please?  You just said

3         it.  Right or, right or wrong you just said you seen this

4         person more, on more than three occasions.  Now you

5         statin' you seen this person three occasions.  Come on

6         man this, this, this somebody, this somebody life.  Could

7         you please be honest?  You remember you under oath.  You

8         know, are you aware of the penalties for perjury?

9    A    Absolutely.  Absolutely.

10   Q    So, so could you, okay could you please be honest.

11   A    I didn't speak to you on the other two occasions.

12   Q    Hold on-

13   A    You asked me if I spoke to you.

14   Q    okay you said you seen this person on three occasions and

15        I wrote it down when you said it, when you, when um you

16        said it.

17   A    I said I spoke to you on three occasions.  That's what I

18        just said.

19   Q    But you didn't, you just said you spoke to the person

20        that looks like me, which everybody has a look-a-like,

21        you know what I'm sayin' and plus in all and okay, okay.

22        Have you ever, do, you know what I'm sayin', okay damn

23        man what, let me see.  (Inaudible).  Okay can I use this

24        scenario right?  Okay say if you was to, say okay just

25        say if you were to, not bein' racist or anything like

1    that, please, please don't take it that way towards

2    anyone, say if you was to get robbed or, or let's see not

3    robbed let's see.  Yeah robbed.  Okay this what, this

4    what this case is-

5              MR. LAROBARDIERE:  Judge I would object to

6    improper hypothetical.

7              THE COURT:  Well I gotta hear what the

8    hypothetical is first before I know if it's improper or

9    not so proceed Mr. Pouncy.

10   BY MR. POUNCY:

11   Q    Thank you.  Say if you was to get robbed by a, let's see,

12        I don't want to be, I don't want to be racist or anything

13        but if I'm not, please don't take this offensive but an

14        Asian person, like Chinese, a Chinese person right and

15        somebody you really don't have a lot of dealings with

16        around or seen in person, you know what I'm sayin', a

17        lot, and this person was to rob you or whatever and you,

18        you don't have no type of proof to what this person, like

19        his fingerprints or anything like that or a shoe print or

20        where he lives, his, his name oh you, you have the person

21        name or whatever, Jacob Woods, I'm sorry about that.  But

22        um you was to get robbed by this person right, a Asian, a

23        Asian person, you and your wife right?  And so if you was

24        to call the po, the, the law enforcement to serve and

25        protect to help, help people out in a time of need in

1    cases like this when people break the law and, and rob

2    people which is, which isn't right, you know what I mean

3    but so then you call, I mean you call they come to you

4    and you give a description of this person right?  Of this

5    Asian person who allegedly robbed you right?  You, are

6    you followin' through with me?  I don't mean to lose you

7    at all sir.  And so you call, you don't have nothin', you

8    don't have nothin' to, you know what I'm sayin' say

9    nothin' but what you identification, how the person

10   looked right or wrong, how the person looked.  And then

11   you give your police report, the police report say we get

12   a line-up together or somethin' like that, could you

13   identify this person and what, what would your answer be?

14 A  If I could identify that person-

15 Q  Yes.

16 A  I would say I can identify this person.

17 Q  Okay.  Thank you.  Okay so then later on, the next day

18   you and your wife walkin' to, are you familiar with Clio

19   Road?  The Clio Road China Garden?  You know that's a

20   restaurant where Asian people work at in, produce food.

21   They cook, actually produce good food, I eat there or

22   whatever but you walk in the building right and you see

23   this person, you walk in, you see this young man 'bout

24   fit the description and the age that you said right?

25   That you, that you gave to the police officer and then

1   you call the police, you call the police, like you go in

2   a panic 'cause if I seen the person that robbed me or

3   carjacked me I'd go in panic too you know what I mean?

4   And you go in panic like you leave out the building, call

5   the po, call the law enforcement like 9111 I, I see the

6   person that carjacked me, that carjacked me or robbed me

7   or whatever and it comes, they come, they come to um, the

8   officers come to, to, 'cause you were complainin'.  You

9   were complainin' and it's gonna be checked out.  Probable

10  cause, you know that's probable cause so this, this young

11  man get arrested.  But little did you know or little does

12  your wife know that at the time during that you were,

13  that you were allegedly robbed and carjacked by this

14  Asian person that fit the description that worked at, at

15  this Chi, at this China Garden, you call the police this,

16  this young man get arrested right?  And then they go to

17  review, he gives his alibi or whatever and all that

18  stuff, he gives his alibi and then the cameras or

19  whatever show and his, or his boss or his time cards

20  reflect that he was at work at this time.  At the time of

21  the thing, at the time of the incident right?  Reason why

22  I'm usin' a different, different race because me and you

23  are different races and it's easily for one of us to get

24  each other mixed up and mistaken identified.  That's why,

25  you know what I'm sayin' and a Asian person-

1    THE COURT:  Mr. Pouncy I'm gonna ask you to ask

2    the question here because it sounds like to me you're,

3    you're doin' a lot of testifyin' right now-

4    MR. POUNCY:  I apologize, I apologize.  I'm not

5    used to this.

6    THE COURT:  and I, and we're not gettin' the

7    question so what is your question to this witness sir?

8  BY MR. POUNCY:

9  Q  Okay would, how would you feel if that, if that reflects,

10    that camera reflected that this person was actually

11    working and, and his timecard which, oh okay, his

12    timecard reflects that he was at work and, and you

13    mistakenly identified this person?  How would you feel

14    deep down inside sir, Mr. Davis?

15  A  I, I wouldn't make a, a, I wouldn't call the police

16    unless I knew I had it right.  I wouldn't make that

17    mistake.

18  Q  That scenario 'cause remember you, you are, you, you,

19    you, you admitted-

20  A  That, that scenario went on for half-an-hour and I, I

21    didn't really-

22  Q  oh you weren't done?  (Inaudible) you wasn't done I will

23    let you finish.  Excuse me sir if you wasn't done I can

24    let you finish but I thought you paused and you was done

25    you know.

```
1    A    All right Omar.

2    Q    But you can go ahead if you want to though.  How do you

3         know, how did you know that this person that sit,

4         standing in front of you now name is Omar?  At first

5         didn't you know this, didn't you say you knew this person

6         name was Jacob Woods?

7    A    No I said that you gave me the name Jacob Wood.

8    Q    The, the report states that you've known this person as

9         Jacob Woods.  You've known-

10   A    I had been-

11   Q    when you know a person-

12   A    listen, listen.  Look can I just say it so we can get it

13        over with?

14   Q    hold on.  Yeah go ahead no problem.

15             THE COURT:  Mr. Pouncy I'm gonna ask you to

16        stop.  Witness please give your answer.

17             BY THE WITNESS:  You said Jacob Woods to me at

18        my facility all right?  Before that on a Saturday night

19        near Gracelawn Cemetery I was pointed at you by another

20        guy that said that's Jacob, that's Sammie's brother.  Now

21        that part, that's the story, that's what you're goin',

22        there it is all right?

23   BY MR. POUNCY:

24   Q    Okay what time?  What time was this?

25   A    I don't have any idea?
```

1   Q   That's Saturday night?

2   A   It was, it was in May, it was in May or June of last year

3       and it was street rod nights on a Sunday, Saturday night,

4       right where you've been before-

5   Q   So you sayin' that I'm the person that street rod?

6   A   No, no, no you don't.  You just hang out with the crowd.

7   Q   I just hang out with the crowd?

8   A   I don't know how, other ways to answer you Omar and now I

9       know you as Omar so I, I can call you Omar from here

10      forward-

11  Q   So Omar wasn't the person that you know to, to do this

12      then right?  To, to, to, well you didn't, did, first of

13      all did you witness the carjacking and the armed robbery

14      take place sir?

15  A   No I did not.

16  Q   What actually did you witness?

17  A   I, I witnessed you come into my store, three occasions-

18  Q   Your store?  Where is the store located 'cause I don't

19      know.

20  A   Oh you never been there?

21  Q   No I never been there before.  I don't, no I never been

22      there before.  Can you reflect to me where it's located

23      at?

24  A   3614 Richfield Road.

25  Q   What, what, what city and state is that in and the

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1    county?

2  A   Flint, right, right on the east side of town.

3  Q   Okay you know what time did this Jacob Woods, person

4      known as Jacob Woods-

5  A   It was, it was late in the afternoon all three times,

6      four or five o'clock in the afternoon.

7  Q   Four or five o'clock in the afternoon all three times?

8  A   Um hm.

9  Q   Four or five o'clock in the afternoon, four or five,

10     sorry about that.  Four or five o'clock in the afternoon

11     'cause the report states that these, the, the um-

12          THE COURT:  Mr. Pouncy you can ask questions.

13     You can't talk about what somebody else states.

14  BY MR. POUNCY:

15  Q   Okay so when you, okay four or five o'clock in the

16     afternoon, okay I'm just, my memory, so you said this

17     person came to your, came to your station at four or five

18     o'clock in the afternoon and twenty-five minutes later

19     you got a call from your who?  Was it a male or a female

20     who called you?

21  A   My friend Ed Brady.

22  Q   Is that a male or a female?

23  A   It's a male.

24  Q   He called you (inaudible) so, okay what time did the

25     person leave?  Around what time, can you give me

1  approximate time please?

2 A  I, you know it was, it was, it was in the afternoon, I

3  wasn't closed yet.  So on that last day it could have

4  been earlier in the afternoon like three o'clock.  But-

5 Q  Hold on, hold on, hold on, excuse me.

6 A  but, but, but here's the deal.  The first two times you

7  came-

8 Q  Hold on, three o'clock?  Three o'clock.

9  THE COURT:  Just one second Mr. Pouncy please.

10  THE WITNESS:  he first two times you came I was

11  about to close up because I drove the car out back.

12  MR. POUNCY:  Um hm.

13  THE WITNESS:  The third time you, you came, I

14  was open for a few more hours so it was earlier in the

15  afternoon.

16  MR. POUNCY:  Is it-

17  THE WITNESS:  I, I will tell ya, I will tell ya

18  this much.  I, I didn't spend a lot of time tryin' to

19  figure all this out.

20 BY MR. POUNCY:

21 Q  So you, hold on.  So first you say between four and five

22  o'clock, now you changin' the time and which this time is

23  real significant in this case because the person that's

24  bein', do, hold on.  Do you agree that the time part is

25  significant in this case because the person that is the

261

1    defendant, if, if the defendant was at work at these

2    times wouldn't you believe that the time would be a

3    significant part?

4  A    Yes it would be significant.

5  Q    'Cause, 'cause now you're changin' up your story and

6    bein' contradictory.  First, first I'm gonna start, first

7    you, first it states-

8          THE COURT:  Mr. Pouncy you're here to ask

9    questions and if you don't-

10         MR. POUNCY:  Okay.

11         THE COURT:  sir I'm serious.  If you don't ask

12    questions I'm gonna make you sit down okay?  'Cause I'm

13    not gonna have this continued bantering back and forth.

14    The reason you're there is to ask a question.

15         MR. POUNCY:  All right.  I'm just tryin' to get

16    to the bottom of this mistaken identity.

17         THE COURT:  Sir if you're gonna get to the

18    bottom of it you need to ask questions okay?

19         MR. POUNCY:  Okay.

20         THE COURT:  And if you're not gonna ask

21    questions then I'm gonna have you sit down.

22  BY MR. POUNCY:

23  Q    Okay do you have, do you have any facts, any facts like

24    far as DNA, fingerprints or, or anything, shoeprints, to

25    identify the person that came besides his facial features

```
 1        which you already, which you already um-
 2                  THE COURT:  Mr. Pouncy-
 3                  MR. POUNCY:  I'm, I'm 'bout to ask the
 4        question.
 5                  THE COURT:  Well get to your question please.
 6                  MR. POUNCY:  Okay.
 7   BY MR. POUNCY:
 8   Q    Which you already made a statement that you had, that it
 9        is possible for mistaken identify right?
10                  THE COURT:  Well you're askin' two or three
11        questions in there.
12                  MR. POUNCY:  Okay yeah I am.
13                  THE COURT:  You need to ask one question.
14                  MR. POUNCY:  Okay.  Sorry, sorry.  Jury I'm
15        sorry about that you know what I'm sayin', everybody.
16   BY MR. POUNCY:
17   Q    But um do you have any DNA, fingerprints, footprints or
18        anything, flesh, blood to, to prove that this, the
19        person, to prove that the person that came to you on that
20        day is actually, is it all right if I refer to myself?
21                  THE COURT:  Sir I just want you to ask the
22        question.  I'll let you decide-
23   BY MR. POUNCY:
24   Q    Okay to actually prove that the person was me, Omar
25        Pouncy not Jacob Woods?
```

263

1   A   All I have is, is the description that I gave the officer

2       when he came to see me and the pictures that he showed me

3       when he came back.

4   Q   Okay.  Now let me ask you this question.  How would you

5       feel if you was the victim of a mistaken identity?

6               MR. LAROBARDIRE:  Object to relevance Judge.

7               THE COURT:  I would sustain the objection.  How

8       he feels is not relevant.

9               MR. POUNCY:  Okay.  Okay.  I need to ask a

10      question can you hold on a second?

11              THE COURT:  Yes go right ahead sir.

12              MR. POUNCY:  Can um, may I approach with this

13      article you know what I'm sayin'?  And you ain't got to

14      be real hard on me you know what I'm sayin', I'm not-

15              THE COURT:  Let Mr. Larobardiere take at least

16      a look at the article that you're proposing to present.

17              MR. POUNCY:  Yeah 'cause it's just stuff that I

18      got (inaudible).

19              THE COURT:  Please no comments Mr. Pouncy.

20      Just hand the article to Mr. Larobardiere.

21              MR. LAROBARDIERE:  I've seen that.

22              THE COURT:  You know what the article is?

23              MR. LAROBARDIERE:  Yes.

24              THE COURT:  All right then you may approach

25      then.  There's no objection so approach.

1    MR. LAROBARDIERE: Well I object.

2    THE COURT: I haven't heard you stand and

3    approach. If you're gonna, I mean object. If you're

4    gonna, just one second. Mr. Pouncy-

5    MR. POUNCY: Yes.

6    THE COURT: you're not to turn and say anything

7    to the jurors like that sir please.

8    MR. POUNCY: All right.

9    THE COURT: If you are objecting then stand so

10   I'll know you're objecting.

11   MR. LAROBARDIERE: I object to relevance Judge.

12   THE COURT: All right the objection is

13   relevance. What's your response to that Mr. Pouncy?

14   MR. POUNCY: Um my response is this, this is

15   just a report that proves-

16   THE COURT: Okay and I don't want you to tell

17   the jurors what that is. I want you to respond to his

18   legal objection as to relevancy sir.

19   MR. POUNCY: Oh this, oh this um Mr.

20   Larobardiere-

21   THE COURT: And sir you have to address the

22   Court.

23   MR. POUNCY: Oh the Court?

24   THE COURT: Yes. He's objected he's sayin'

25   it's not the, this article that you're tryin' to show is

1    not relevant meaning it does, it, it isn't of any value.

2    It doesn't help to determine a fact that's at issue in

3    this case.

4            MR. POUNCY:  Um I believe it, it does because

5    this, this article out the Flint Journal Newspaper

6    reflects that um, can I re, tell you what it says, the

7    relevance of it?

8            THE COURT:  Yeah you can tell me what you

9    believe is relevant about it sir.

10           MR. POUNCY:  Okay what I believe is relevant

11    about it because my defense is mistaken identification-

12           THE COURT:  Okay.

13           MR. POUNCY:  based on the reason why, based on

14    the, the, based on um them, people, well, well people

15    sayin' that I, I look like someone and this is a article

16    that proves that that is proven to be flawless in, in you

17    tryin' to convict, in tryin' to convict someone, someone

18    mistaken identification-

19           THE COURT:  I would have to agree with him.  I

20    would have to sustain his objection as to relevance

21    because you would have to have an expert here to make

22    that argument.  You can't just take a newspaper article

23    and use it-

24           MR. POUNCY:  Okay.

25           THE COURT:  because a newspaper article is not,

1    whoever wrote that article they're not under oath-

2            MR. POUNCY:  Yeah they've, okay.

3            THE COURT:  they don't have to be placed under

4    oath and so it's just not appropriate so I would sustain

5    his objection.

6            MR. POUNCY:  I'm sorry about that man.  I, I

7    concur.

8            THE COURT:  That's okay.  Now do you have any

9    other questions for this witness?

10   BY MR. POUNCY:

11  Q   Yes.  So, so do, you do agree with um mis, that mistaken

12     identity is real huh?

13  A   Yes it is real.

14  Q   Okay so with that and not tryin' to, you know what I'm

15     sayin', put you down for your vision or anything like

16     that, don't get me wrong, could, could it be a

17     possibility that you think, even though you know what I'm

18     saying, okay it, could it be a possibility that the

19     person come, due, due to this, that you picked out three

20     people, three different people off a photo?  Yeah three-

21  A   (Inaudible) three different people.

22  Q   Well let me, well first, okay, okay

23  A   I did make a mistake in the beginning with the black and

24     white photograph-

25  Q   Oh-

1   A    you, you have to forgive me that one.  That picture's

2        awful.

3   Q    Okay-

4   A    He, he looks somewhat like you and I thought you were

5        showin' me and not tryin' to back door me with a, with a

6        wrong photo group of pictures.

7   Q    Okay I forgive you, I forgive you even more-

8              THE COURT:  Mr. Pouncy I think I'm gonna end

9        this.  Please have a seat sir.

10             MR. POUNCY:  All right thank you.

11             THE COURT:  Any re-direct Mr. Larobardiere?

12             MR. LAROBARDIERE:  Yes Judge.

13                  RE-DIRECT EXAMINATION

14  BY MR. LAROBARDIERE:

15  Q    Mr. Davis-

16             MR. POUNCY:  Oh here are the pictures back.

17       Thanks I appreciate it.  Sorry about that.

18  BY MR. LAROBARDIERE:

19  Q    you uh, in, in meeting with Mr. Pouncy, did you also talk

20  to him, have verbal discussions?

21  A    Absolutely.

22  Q    We discussed you identifyin' him by sight but after he's

23       had a chance to question you did you recognize his voice

24       also?

25  A    Yes.  Yes most definitely.

1   Q    All right.  Any question in your mind, same person that

2        you talked to of those three occasions that you

3        (inaudible)?

4   A    None whatsoever.

5                  MR. LAROBARDIERE:  Nothing further Judge.

6                       THE COURT:  You may step down sir.  Thank

7        you very much.  Can this witness be excused Mr.

8        Larobardiere?

9                  MR. LAROBARDIERE:  Yes.

10                      THE COURT:  Mr. Pouncy this witness be

11       excused sir?

12                 MR. POUNCY:  I don't know what that mean.  Oh

13       yeah he can go yeah.

14                 (At 3:57 p.m., witness excused)

15                 THE COURT:  All right call your next witness

16       Mr. Larobardiere.

17                 MR. LAROBARDIERE:  Thank you Judge.  People

18       call Earl Brady.

19                 THE COURT:  All right.

20                 MR. POUNCY:  Thank you too Mr. Davis.  Thank

21       you.

22                 THE COURT:  Mr. Pouncy would you please keep

23       your voice down?  I don't want the jurors to hear what

24       you're talkin'-

25                 MR. POUNCY:  (Inaudible).

1          THE COURT:  Okay thank you sir.  Good afternoon

2     sir.

3          MR. BRADY:  Afternoon.

4          THE COURT:  If you'll raise your right hand

5     please?  Solemnly swear or affirm the testimony you give

6     today will be the truth so help you God?  Please pull

7     that door toward you sir, step on up and have a seat and

8     Mr. Larobardiere when you're ready you may proceed.

9                         EARL BRADY

10    Called as a witness at 3:58 p.m., testified as follows:

11                      DIRECT EXAMINATION

12    BY MR. LAROBARDIERE:

13    Q    Sir please state your name and spell your first and last

14         name for the record.

15    A    Earl E. Brady, E-a-r-l B-r-a-d-y.

16    Q    Thank you Mr. Brady.  I'd like to refer you to the events

17         occurring on or about September 29th 2005.  On that day,

18         on that time did you own this vehicle on the screen?

19    A    Yes.

20    Q    You make, enter into an arrangement to have it displayed

21         for sale at some place?

22    A    Yes.

23    Q    And where was that?

24    A    At Scott's Racing.

25    Q    Where is that located?

| | | |
|---|---|---|
| 1 | A | I think it's Flint but it's on Richfield Road. |
| 2 | Q | All right and at some point did you receive a call about |
| 3 | | an interested party about purchasing the car? |
| 4 | A | Yes Mr. Davis called me and said there was a, a person |
| 5 | | stopped by three times that was, looked at the car and |
| 6 | | was interested in purchasing it. |
| 7 | Q | And what did that cause you to do after hearing that? |
| 8 | A | He said if I would, if I was interested in sellin' to, if |
| 9 | | I would bring my truck and the trailer up, okay, that the |
| 10 | | person that was interested in purchasing it wanted to |
| 11 | | take it to their mechanic to have them, you know, review |
| 12 | | the car and so on like that and that particular kind of |
| 13 | | car is not streetable, it's a race car so it, you know |
| 14 | | it's typical to put on a trailer. |
| 15 | Q | Do you recognize this item on the screen? |
| 16 | A | Yes that's my trailer. |
| 17 | Q | And does this photo accurately represent the trailer- |
| 18 | A | Yes. |
| 19 | Q | that you owned?  This also be on September 29th 2005? |
| 20 | A | Right. |
| 21 | | MR. LAROBARDIERE:  Judge I ask that People's |
| 22 | | number 2 be admitted. |
| 23 | | THE COURT:  Any objection to number 2 Mr. |
| 24 | | Pouncy? |
| 25 | | MR. POUNCY:  That's, that- |

1       THE COURT:  Number 2 is in.

2            (At 3:59 p.m., PX 2 admitted)

3   BY MR. LAROBARDIERE:

4   Q    Recognize this item?  This is proposed People's exhibit

5        number 3.

6            (At 3:59 p.m., PX 3 introduced)

7   A    Yes that's my pick-up, '03 Ford pick-up-

8   Q    All right.

9   A    and that's the one the trailer and the car was hooked to.

10  Q    Okay.  So you hooked, Judge this picture, or first Mr.

11       Brady this accurately represents the '03 pick-up you

12       owned on September 29th?

13  A    Right.

14            MR. LAROBARDIERE:  I'll ask number 3 be

15       admitted Judge.

16            THE COURT:  Any objection to number 3 Mr.

17       Pouncy?

18            MR. POUNCY:  No (inaudible).

19            THE COURT:  All right 3 is in.

20            (At 4:00 p.m., PX 3 admitted)

21  BY MR. LAROBARDIERE:

22  Q    So you hooked up this truck, trailer and proceeded to the

23       Davis Race Shop?

24  A    Yes.

25  Q    Was anyone with you?

1   A   Yes.   Patrick Wendell.

2   Q   All right and how do you know Mr. Davis and Mr. Wendell?

3   A   Mr. Wendell lives in my neighborhood and so on like that,

4       I've known him for many years and we're just friends that

5       hang out together.  Mr. Davis has a speed shop.  I've

6       known him for probably four or five years, he's worked on

7       numerous vehicles of mine and actually the, the, well go

8       ahead.

9   Q   Okay you've known Mr. Davis for a while as well?

10  A   I'd say a good four to five years.

11  Q   Okay.  You and Mr. Wendell arrived at the race shop-

12  A   Yes.

13  Q   and this is on September 29th 2005.  What time?

14  A   I want to stay in the neighborhood of one thirty,

15      somewhere around in there, p.m.

16  Q   All right and what happened at that point?

17  A   The suspected buyer was supposed to meet us there

18      approximately about that time.  He was probably a half-

19      hour, forty-five minutes late.  They finally showed up,

20      there was three of them in a grey Intrepid.  We, we

21      talked to them, they, you know, we, said he was

22      interested in the car, wanted to know if I would take it

23      to his mechanic to look at it.  And we said okay and we

24      you know loaded the car up.  We talked to him, he asked

25      me if he could have my cell number so that if we go,

1    because I'm not familiar with Flint and so on like that

2    right?  If I was following him if he, you know had my

3    cell number you know if we got separated or whatever he

4    would call me and make sure we, you know, were goin' in

5    the right direction.

6  Q  Did you give him your phone, telephone number?

7  A  Yes I did.  I gave him my cell number.

8  Q  Okay do you recognize the person here today who that

9     approached you about buyin' your car?

10 A  Yes I do.

11 Q  Can you point to where you see him and describe the

12    clothing he's wearing.

13 A  Right there.

14 Q  Okay what clothing is he wearing?

15 A  What clothes was he wearing that day?

16 Q  What clothes is he wearing today?

17 A  Oh yeah the white shirt.

18         MR. LAROBARDIERE:  Okay Judge may the record

19 reflect the witness has identified Mr. Pouncy.

20         THE COURT:  Absent objection the record shall

21 reflect the identification of Mr. Pouncy.

22         MR. POUNCY:  Pardon me?

23         THE COURT:  I said absent objection the record

24 shall reflect your identification.

25         MR. POUNCY:  Oh no problem.

```
 1              (Judge Archie L. Hayman; 01-24-06; 4:02 p.m.)

 2                  THE COURT:  Go right ahead Mr. Larobardiere.

 3   BY MR. LAROBARDIERE:

 4   Q    You had a face-to-face discussion with Mr. Pouncy at the

 5        race shop before-

 6   A    Yes.

 7   Q    went anywhere?

 8   A    Correct.

 9   Q    How close were you to Mr. Pouncy when this took place?

10   A    Three feet, if that.  Two to three feet.

11   Q    All right.  How long did you talk to him at three feet's

12        distance?

13   A    We were probably there less than ten minutes, five to ten

14        minutes.

15   Q    All right.  You arrived in a, what kind of vehicle?

16   A    '03, '03 Ford pick-up.

17   Q    You, you arrived in that correct?

18   A    Yes.

19   Q    Did you see what kind of vehicle he arrived in?

20   A    Yes he was, yeah I don't know what year it was, it was a

21        grey Intrepid.

22   Q    You recognize this, this vehicle on the screen?

23   A    That looks familiar to me, yes.

24   Q    Okay how do you recognize it?

25   A    It looks, you know just a grey Intrepid, that's, you know
```

1    I don't know if that's the exact car but that's what it

2    looked like.

3  Q  All right you have a discussion about goin' to the

4    mechanic.  Did he use the uh, did he use a name for the

5    mechanic?

6  A  It was some shop or whatever and I, I don't recall what

7    it is right off, no okay.

8  Q  Did he tell you what street you're gonna go to?

9  A  No.

10 Q  Do you know what street you eventually ended up at?

11 A  Kellar.

12 Q  Okay.  Tell the Court what happens as you are driving

13   this Camaro on the truck and trailer on your way to

14   Kellar.

15 A  After we left Scott's speed shop, my phone rang, I

16   answered it and so on like that and he asked me on the

17   way there that when we got to where we was going if I

18   would back my truck and trailer into the driveway where

19   we were going so that if they decide to purchase it we

20   could just push the car off you know and leave it there

21   okay?

22 Q  Okay did you do that?

23 A  Yes we did.

24 Q  Do you recognize this house?

25 A  Yes, yes I do.

1   Q   Tell us how you recognize that.

2   A   That's the house they took us to where we backed the, the

3       vehicle into the driveway.

4   Q   Mark that as People's proposed exhibit number 5 and you

5       did in fact back the trailer-

6               (At 4:05 p.m., PX 5 introduced)

7   A   Yes I backed the truck trailer into the driveway, yes.

8   Q   All right it was this house?

9   A   Yes that house.

10  Q   All right.  Does this picture accurately represent the

11      house you backed up to?

12  A   Yes because I remember the van sittin' there and the

13      garage door open like that and you know sloped in the

14      middle and so on like that, yes that's, that's the house.

15              MR. LAROBARDIERE:  Judge I'll ask that People's

16      number 5 be admitted?

17              THE COURT:  Any objection to number 5 Mr.

18      Pouncy.

19              MR. POUNCY:  Yes I object.

20              THE COURT:  What's your basis for your

21      objection sir?

22              MR. POUNCY:  Um cause um, 'cause I don't think

23      that, it stated they were goin' to, I don't think that's

24      King Automotive 'cause King, what street is that located

25      on?

1       THE COURT:  I'm not sure sir but what is your

2   objection to the picture is my question.

3       MR. POUNCY:  I don't think that's King

4   Automotive.  That's where they said they went to.

5       THE COURT:  I would overrule the objection and

6   5 is admitted over objection.  You may proceed Mr.

7   Larobardiere.

8       (At 4:05 p.m., PX 5 admitted)

9       MR. LAROBARDIERE:  Thank you Judge.

10  BY MR. LAROBARDIRE:

11  Q   Tell the Court what happened once you arrived at this

12      address.

13  A   We were there and we were talking to him and he got on is

14      cell phone and said-

15  Q   Let me interrupt you-

16  A   Okay.

17  Q   When you say we're talkin' to him, who are you talkin'

18      about?

19  A   Who we were talking to?

20  Q   Are you talking, are you talking with the potential

21      buyer?

22  A   Yeah there was, there was three people there okay?

23  Q   All right so and you need to clarify who, who are you

24      talking to?

25  A   This gentleman here in the white shirt.

1   Q   Mr. Pouncy?

2   A   Yes okay? And he had two associates with him okay? And

3       once we backed the vehicle in the driveway and so on like

4       that, got out of the truck, they walked up, we started to

5       talk about the car, he walked off into the grass towards

6       the house, got on his cell phone, come back and said he

7       just got a hold of his mechanic and his mechanic was on

8       his way, it'd be just a matter of a few minutes, I said

9       which is fine. So on that particular car uh this you

10      know fiberglass hood which lifts off and so on like that

11      okay, so we took the hood off the car, put it on top of

12      the car, show him the functions of the car like you

13      normally would on a race car and so on like that, started

14      the car up, went through the, you know, the motions

15      inside the car, what it does, what works what so on and

16      so forth like that okay? And then-

17   Q   This car have a special way to start it?

18   A   Yes it's a, it doesn't have a regular key ignition and so

19      on like that, like I said it's a race car. It has

20      switches on it with a push button start and so on like

21      that okay?

22   Q   All right did a mechanic ever show up?

23   A   No.

24   Q   What happened at that point?

25   A   At that point one of his associates was standing there

1    with us listening to the conversation.  We walked around

2    the car a couple times looking at it so on like that and

3    he pulled out a handgun and pointed it at me.

4  Q  All right let me interrupt.

5  A  Okay.

6  Q  Mr. Pouncy with, with two other people?

7  A  Correct.

8  Q  And describe for me those two other people.

9  A  I would say they're both in the neighborhood, in their

10   early twenties, so on and so forth like that.  The one

11   guy, the, off to the right of me was a little smaller,

12   had a hood sweatshirt on, so on and so forth like that.

13   Looked, like I said, looked to be in his early twenties,

14   probably hundred and thirty, hundred and forty pounds

15   okay?  The other gentleman to, the one in the middle

16   there, actually at the time that the one in the middle,

17   Mr. Pouncy there was off to the left okay?  The one in

18   the middle's the one that pulled the gun.  He's probably,

19   I want to say 5'8", somewhere around in there, hundred

20   and fifty pounds so on like that.

21 Q  Okay I'd like a little more detail on the description of

22   the person who pulled the gun.

23 A  He had a, a special kind of hairdo, I don't know if they

24   call 'em corn rolls, dreadlocks, so on so forth like that

25   okay?

1   Q   All right is it fair to say his hair was longer or short?

2   A   No it was done up tight okay so the hair wasn't long.

3   Q   Okay.

4   A   Well I don't know what you consider long but I mean it

5       wasn't, you know it wasn't like a brush cut or anything

6       like that okay?  It was just rolled tight to his head.

7   Q   All right and he produced a, a weapon?

8   A   Correct.

9   Q   And describe that for us.

10  A   At that point it looked very large, it was black, little

11      bit silver, looked to be like an automatic weapon.

12  Q   All right what happened at that point?

13  A   Actually when he pulled the weapon and so on like that he

14      asked me for my keys and my cell phone and I, I refused

15      so on like that and he had a few choice words for me and

16      he asked me if I wanted to die and I said no and he said

17      well give me your keys and your cell phone and I refused

18      to.  And then he told me to get down on the ground, I

19      refused to.  You know I said hey you know put the thing

20      away, what's up?  I thought you wanted to buy a car okay?

21      And then after that point he shot one round off in the

22      air and pointed at my heart and he says now do you want

23      to die, the next one's in your heart, give me your keys

24      and your cell phone.

25  Q   Did you do it?

1    A    At that point yes I give him my keys and my cell phone.

2    Q    Were you in fear?

3    A    Yes.

4    Q    Who did you give your keys and cell phone to?

5    A    I don't know who his name is but was the smaller guy of

6         the, of the three.  He was standing off to the right.

7    Q    Okay and-

8    A    Actually I, the, the, the one that pulled the gun okay,

9         he asked for the keys and the cell phone and I went to

10        hand it to him to get to close to him and he wouldn't let

11        me get close to him.  He told me to hand it to the other

12        guy while he held the gun on me.

13   Q    Okay.  Where was Mr. Wendell at this point?

14   A    Mr. Wendell was off to my left okay?

15   Q    Now Mr. Davis was with you or at his race shop?

16   A    He never left the race shop with us no.

17   Q    All right so you gave up your cell phone and keys-

18   A    Correct.

19   Q    and did you see Mr. Wendell give up anything?

20   A    Yes he gived up his phone.

21   Q    His phone?

22   A    Um hm.

23   Q    Okay and what happened after that?

24   A    Actually after that they, they told us to walk across the

25        street into the woods or the vacant lot or whatever it

1       was and don't come back.  So we left, we went across the

2       street, heard the vehicle start and leave and next door

3       to the house that you have there, it'd be off to the

4       right looking at that picture, there was two guys

5       working, renovating a house.  We walked back to them,

6       asked them for help and they took us to the police

7       station.

8   Q   Do you recognize that picture?

9   A   That looks to be the house that was off to the right to

10      where the, the gentlemen were working on.

11                  MR. LAROBARDIERE:  Judge I'll ask that be

12      admitted as People's number 6.

13                  THE COURT:  Any objection to number 6 Mr.

14      Pouncy?

15                  MR. POUNCY:  No objection.

16                  THE COURT:  Six is in.

17          (At 4:11 p.m., PX 6 introduced and admitted)

18  BY MR. LAROBARDIERE:

19  Q   What happened once you arrived at this house?

20  A   We talked to the gentlemen there working and so on like

21      that and they said, you know we asked them if they heard

22      the shot or whatever and they said they seen us pull in

23      with the car on the trailer and so on like that and they

24      thought maybe just the car backfired or whatever so we

25      told 'em no that that was a gun discharge and so on like

```
 1        that and they said well let us pick up our tools, we

 2        don't want to work in this neighborhood anyway, and they

 3        loaded their tools in their vehicle and took us to the

 4        police station.

 5   Q    Okay so they stopped working and-

 6   A    Yes.

 7   Q    went with you to the police department?

 8   A    Yes.

 9   Q    You say you were told to run to the woods?

10   A    Yes.

11   Q    How far into the woods did you go?

12   A    At that point it, it's hard to say but probably a short

13        distance into the wooded area and hid behind the trees.

14   Q    Do you recognize this picture?

15   A    Yeah it looks like the brush we ran into yes.

16   Q    Why did you run to those woods?

17   A    Pardon me?

18   Q    Why did you run to those woods?

19   A    Because they were holdin' a gun on us and told us to run

20        to the woods and if we wanted to live.

21   Q    You did just that?

22   A    Exactly.

23   Q    How long did you stay in these woods?

24   A    We probably weren't in there less than five minutes or

25        whatever 'cause, you know my, my vehicle's a diesel so
```

1      it's real distinctive when it starts and leaves and so on

2      like that so once the vehicle left the premises we were

3      at we figured it was safe to go look for some help.

4              MR. LAROBARDIERE:  Judge I'll ask, I'll mark

5      and ask that this be admitted as People's number 7.

6              THE COURT:  Any objection to number 7 Mr.

7      Pouncy?

8              MR. POUNCY:  No problem.  That, that's the

9      woods on-

10             THE COURT:  I, I-

11             MR. POUNCY:  at the crime of the scene?  No

12     objection.  No objection.

13             THE COURT:  I don't want to make any comments.

14     All I'm gonna say is I, I will admit.  Proceed Mr.

15     Larobardiere.

16          (At 4:13 p.m., PX 7 introduced and admitted)

17             MR. LAROBARDIERE:  Thank you.

18  BY MR. LAROBARDIERE:

19  Q    When you went back to the house on Kellar, this house,

20       was your truck and trailer and Camaro there?

21  A    No.

22  Q    Did you see where they went at all?

23  A    No that particular, the house right there is on a dead

24       end street, it's the last house on the right and where it

25       went from there I have no idea.

1          MR. LAROBARDIERE:  One moment Judge.  Nothing

2     further Judge.

3          THE COURT:  Cross-examination Mr. Pouncy.

4          MR. POUNCY:  Just a second please.

5     (Inaudible).  Not those the um photo line-up and in color

6     please so we won't have no discrepancies.  Yeah that one

7     right there.  Thank you.  That's it right there.  This it

8     right here.

9          MR. LAROBARDIERE:  Judge I'm gonna have to

10    object.  He wants to approach a witness with various

11    photo line-ups.  I think it's an attempt to confuse the

12    witness.  That's my objection.

13         THE COURT:  Well he, if he's asked for that

14    photo line-up I'm gonna ask you to hand it to him.

15         MR. LAROBARDIERE:  All right.

16         MR. POUNCY:  That's what was-

17         THE COURT:  No I think he wanted the one that's

18    on the right.

19         MR. POUNCY:  Yeah was that the-

20         THE COURT:  Yes that, is that the one you asked

21    for Mr. Pouncy?

22         MR. POUNCY:  Yes please.

23         THE COURT:  All right hand that one to him

24    please.

25         MR. POUNCY:  Thank you.

```
 1                    THE COURT:  Proceed sir.

 2                    CROSS-EXAMINATION

 3   BY MR. POUNCY:

 4   Q    How you doin' today sir?

 5   A    Good.

 6   Q    Want to restate your name again 'cause I, I-

 7   A    Earl, Earl E. Brady, B-r-a-d-y.

 8   Q    Is it all right if I call you Mr. Brady?

 9   A    Fine.

10   Q    All right no problem.  Okay um, um, first of all did you,

11        if I recall you pointed to the person that was sittin' in

12        that chair right there right?  Where, where I was sittin'

13        at?

14   A    Which is you yes.

15   Q    Yes okay um you, what did you call that person, what was

16        his name?

17   A    Pardon me?

18   Q    What, what was that person's name that you called him?

19   A    When you were just sitting right there?

20   Q    Yes, well my name, what's my name?  'Cause you called me

21        somethin', a name over there.

22   A    Okay well I understand your name is Omar.

23   Q    Okay how did you get that understanding?

24   A    That's, I understand that's what your name is.

25   Q    How did you get that-
```

1    A    When, when I, when I met you at Scott's Race Shop okay

2         you introduced yourself as Jacob Woods-

3    Q    Um hm.

4    A    okay which apparently is an alias or whatever and so on

5         like, I don't-

6    Q    That's your, that's your theory?

7                   THE COURT:  And if you don't mind, just one

8         second please, I want you to answer his direct question.

9                   THE WITNESS:  Okay.

10                  THE COURT:  His question was how did you know

11        his name is Omar, that's the question.

12                  THE WITNESS:  After I picked it up out of the

13        line-up.

14   BY MR. POUNCY:

15   Q    After you pick, when, when, when did you pick me up out

16        of a line-up or a person that looks like me out of a

17        line-up?

18   A    I don't remember exactly what date it was but the Mt.

19        Morris Police Department called me up and asked me to

20        look at a line-up.

21   Q    'Cause I don't have a record of that-

22                  THE COURT:  Mr. Pouncy please no testifying.

23        If you want to ask this witness a question, you ask a

24        question.  If you don't ask questions I'm going to make

25        you sit down.

1    MR. POUNCY: All right, all right I'm sorry but

2    all right. Can I ask him a question?

3    THE COURT: No sir.

4    MR. POUNCY: Oh okay.

5    THE COURT: You can only ask this man a

6    question.

7  BY MR. POUNCY:

8  Q    So you don't know what date that you looked at this line-

9       up?

10 A    It was after the date that my vehicle was taken, yes

11      okay?

12 Q    Which was-

13 A    My vehicle was taken September 29th.

14 Q    September 29th. What kind of vehicle did you have?

15 A    The ones that was in the photo there. I was drivin' an

16      '03 Ford pick-up on a trailer and a '79 Camaro.

17 Q    '04-

18 A    '03 Ford pick-up-

19 Q    and a what again?

20 A    '79 Camaro was hooked to the, on the trailer.

21 Q    Or there's a trailer involved too?

22 A    Trailer was hooked to the truck and the Camaro was on top

23      of the trailer.

24 Q    Okay. So how did you come about meetin' this guy that

25      you known as Jacob Woods?

289

| | | |
|---|---|---|
| 1 | A | At Scott's Race Shop. |
| 2 | Q | Scott's Race Shop, where is that, oh I think on- |
| 3 | A | It's in Richfield in Flint. |
| 4 | Q | Yeah I heard that earlier. |
| 5 | A | Well I think it's Flint Township, I'm not positive but |
| 6 | | right there. |
| 7 | Q | So you're not sure what city it's in, township or |
| 8 | | anything? |
| 9 | A | I'll just say Flint. |
| 10 | Q | So can you be, please be positive and- |
| 11 | A | Positive it's Flint. |
| 12 | Q | 'Cause this is, you know this is a trial right and- |
| 13 | A | It's Flint. |
| 14 | Q | It's Flint?  What makes you think Flint after you just |
| 15 | | said you, you think you know?  What makes you- |
| 16 | A | 'Cause I remember seein' the signs when I come in there, |
| 17 | | here in Flint. |
| 18 | Q | Why did you, didn't say, why wasn't you positive before? |
| 19 | A | Because I'm not from the area so I'm not a hundred |
| 20 | | percent sure okay of what the- |
| 21 | Q | Oh so, so you still not a hundred percent sure? |
| 22 | A | Yes I am. |
| 23 | Q | But you just told me you're not a hundred percent sure. |
| 24 | A | I just told you yes I am. |
| 25 | Q | If a person was to say somethin' to you and then say |

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1     somethin' else, what would you take that as?

2     Contradictory statements?

3  A  My ans, my answer is yes it's in Flint.

4           MR. LAROBARDIERE:  Judge I object to

5     hypothetical proposal by him.

6           THE COURT:  Well I would sustain on the basis

7     that the question is uh, is ambiguous.

8           MR. POUNCY:  All right.

9           THE COURT:  And so I'm gonna ask you to ask a

10    more clear question Mr. Pouncy.

11          MR. POUNCY:  Okay a clearer question.  Sorry

12    about that.

13 BY MR. POUNCY:

14 Q  If, if a person was to state, okay if you was to state,

15    if you was to state, if a person sayin' somethin' to you

16    right?  Talkin' to you, a person talkin' to you was to

17    say one thing this minute and then refer, and then turn

18    around and say a total different thing, what would you

19    take that as?

20 A  Well if somebody was tryin' to trick me with a question

21    and so on like that okay, uh-

22 Q  Hold on could you, no, could you ask that question, what,

23    answer the question I just asked you.  What would you

24    take that as?

25          THE COURT:  Mr. Pouncy Mr. Larobardiere hasn't

```
 1      stood up and objected but that is not an appropriate
 2      question okay?
 3              MR. POUNCY:  Okay.
 4              THE COURT:  What this gentleman thinks is not
 5      relevant okay?  All right-
 6              MR. POUNCY:  Okay so what he think doesn't,
 7      okay.
 8              THE COURT:  okay sir so please ask a question
 9      that's relevant or I'm gonna have you sit down.
10              MR. POUNCY:  All right.
11  BY MR. POUNCY:
12  Q   So, so you, so what day, you, what day was your vehicle,
13      um, you said Ford truck right?
14  A   Correct.
15  Q   And a trailer and a Chevy-
16  A   Camaro.
17  Q   Camaro okay, I didn't know that.  What day was it tooken
18      from you?
19  A   Didn't you just write it down?  September 29th.
20              THE COURT:  Well and that, that question's been
21      asked so I'm gonna ask you to move on.
22  BY MR. POUNCY:
23  Q   September 29th.  You know um around about what time?  Or
24      what, what time please specific time.
25  A   What time what was now?
```

1  Q   That it was tooken from you?

2  A   Uh well it was probably somewhere in the neighborhood of

3      two fifteen, somethin' like that. Two fifteen, two

4      thirty.

5  Q   Two fifteen. Just a second please. Two fifteen, two

6      thirty okay so you, if I recall, when I asked you said

7      you known that person as Jacob Wood, Wood or Woods,

8      whatever you said?

9  A   When you showed up at Scott's Race Shop, yes that's how

10     you were introduced.

11 Q   Okay. What, who, who, can I ask you who showed you a

12     photo line-up 'cause it's, it's not on record and what

13     day?

14 A   I don't know what day exactly. It was the Mt. Morris

15     Police Department.

16 Q   May I ask you which officer, the name of the officer

17     please?

18 A   That one right there.

19 Q   Okay so you, you not, you don't remember which day right?

20 A   They called me, you know a few days after the, the

21     incident happened. I don't recall exactly what day it

22     was no.

23 Q   Okay so you say a few days after, there's only like

24     thirty days in, in September.

25 A   No less than thirty days. Less-

1    Q    No, no, let me finish.  No I'm not sayin' thirty days-

2    A    Okay.

3    Q    less than thirty days.  I'm sayin' there's only thirty

4         days in September right?

5    A    Pardon me?

6    Q    There's only thirty days in the month of September right?

7    A    Yes.

8    Q    Okay so would it be few, a few days would be either, we

9         start with two, the, October 1st, around October 1st or

10        when?  October 1st or October 2nd, 3rd, 4th?

11   A    Well like I, I just told you, I don't remember exactly

12        what day it was.  I said a few days after the incident

13        happened okay?  Within a week okay?

14   Q    Within a week.  So that would be, within a week the, the

15        space would be October 6th then.  October 6th?

16   A    Somewhere in that neighborhood yes.

17   Q    Between October, okay between September 29th and October

18        6th right?

19   A    Somewhere in that neighborhood correct.

20   Q    Okay.  Um you said you met this person that you known as

21        Jacob, once again, you said you know him as Jacob Woods-

22   A    That's how you were introduced to me in the beginning

23        correct.

24   Q    That's how the person that had my features and produced

25        this name to you?

1    A    No that was you, not some person like you.

2    Q    Okay, okay let me get to this then.  What, what makes you

3         so sure that it's, this, the person that's standing right

4         here was the person who was at Davison Race Shop?

5    A    Because when somebody robs you you seem to pay attention

6         to what's goin' on.

7    Q    Okay so, so um you didn't um, you didn't state that the

8         person with dreadlocks robbed you?  I mean with the hair-

9    A    Well there was three people.

10   Q    Three people okay so what makes you remember, okay, no

11        sorry about that.  Is, have you ever heard of mistaken

12        identity?

13   A    I have heard the word, the term yes.

14   Q    Does that exist in you, in, to you?

15   A    No.

16   Q    It don't, mistaken identity don't exist to you?

17   A    It does exist but not in this case.

18   Q    Not in this case huh?  So let me, we'll use this scenario

19        all right?  If you was to get, get um robbed by a Asian,

20        group, a Asian person, okay in this predicament you said

21        it was three people right?

22   A    Correct.

23   Q    Um a Asian person right, you was to get robbed by three

24        Asian people 'cause, how many, what color was the people

25        that robbed you again?

1    A    They were black.

2    Q    Black?  African-American okay um okay, this scenario I'm

3         gonna use, I used it earlier.  Is it all right Mr.

4         Larobardiere or the Court?

5              THE COURT:  Mr. Pouncy please proceed with your

6         question.

7              MR. POUNCY:  Okay thank you.  Okay you was-

8              THE COURT:  And if Mr. Larobardiere thinks

9         you're doin' somethin' wrong, he'll stand up and object.

10             MR. POUNCY:  Okay no problem.

11   BY MR. POUNCY:

12   Q    Okay if you was um, you was robbed and what else?

13        Carjacked, some cars was tooken from you right?

14   A    Right.

15   Q    Okay if you was robbed and carjacked by a group of Asian,

16        a group of Asian peers, three Asian peers right, human

17        beings or whatever, and you was to call, you was to call

18        um the police, the law enforcement which is you know made

19        to serve and protect us bein' the citizens, as citizens

20        right?

21   A    Correct.

22   Q    And you give a report or whatever what, what, what would

23        you, your report be to those people?

24   A    Whatever-

25   Q    To the, to the officer?

| | | |
|---|---|---|
| 1 | A | What, you know whatever I remembered in my mind.  What I |
| 2 | | seen. |
| 3 | Q | What you remembered right? |
| 4 | A | Um hm. |
| 5 | Q | Okay and what would you remember?  Three Asian people, |
| 6 | | three Asian males or females? |
| 7 | A | Depends on what features they had, their size. |
| 8 | Q | If it was Asian people though? |
| 9 | A | Well the Asian people are people okay? |
| 10 | Q | I'm talkin' about race because me and you are of |
| 11 | | different race- |
| 12 | A | I'm not talkin' about race though. |
| 13 | Q | not to be, not to be racist or anything, I'm just tryin' |
| 14 | | to ask some questions and get to the bottom of this |
| 15 | | that's all.  Me and you are different race right? |
| 16 | A | Pardon me? |
| 17 | Q | Me and you are of a different race right? |
| 18 | A | I assume so yes. |
| 19 | Q | Okay if a Asian person, is that a different, you not |
| 20 | | Asian right? |
| 21 | A | You look and see. |
| 22 | Q | Pardon me? |
| 23 | A | You look. |
| 24 | Q | I don't want to guess or anything 'cause this- |
| 25 | A | Well I'm just- |

1    Q    this already a guessing game, I don't want to guess.

2    A    No I'm not Asian.

3    Q    All right. You think that remark you used was

4        appropriate?

5                THE COURT: Mr. Pouncy-

6                MR. POUNCY: I'm just askin'-

7                THE COURT: sir I just want you to ask direct

8        questions okay?

9                MR. POUNCY: All right.

10                THE COURT: I'm gonna have you have a seat here

11        in a minute 'cause I, I'm really gettin' at the end of my

12        rope with this. Ask your question so you can sit down.

13                MR. POUNCY: Okay.

14   BY MR. POUNCY:

15    Q    Okay if you was robbed by this Asian group of people

16        right you would explain to the officer that the people

17        was Asian right?

18                THE COURT: And you've covered that. Please

19        ask your question sir.

20   BY MR. POUNCY:

21    Q    Okay and then you give a description of 'em and then you,

22        you don't have, that's the only thing, the only

23        information that you have to provide for the police

24        officer is the description of the people, how they look.

25        So then it goes on the next day or whatever, you and your

1      partner, you said you was with your partner right?

2  A   A friend of mine correct.

3  Q   A friend of mine. You was with a friend of mine. You

4      and your friend of yours, you all walkin' down, you all

5      goin' to a basketball game, a, a high school basketball

6      game right? And you all see, you see some, you see like,

7      it's like a, no I'm not use that I'm sorry. Well you

8      goin' to a restaurant right? I'm gonna use this one.

9      You goin' to a restaurant and you see three Asian people

10     back there cookin' up, which would be males right, three

11     Asian males. And then you and your partner walk in the

12     store and you see these people that resemble to people

13     that committed these offenses against you which is

14     terrible, you know what I mean? And then you would call,

15     and you would panic or what not and call the, call the

16     police and be like oh I see the people, I, I see 'em, the

17     people that did this to me right? And go to find out

18     that after everything is broken apart that this person

19     was at work at the time, these three people was at work

20     at the time that you claim you, you complained about

21     these three people taken ob, ob, items from you which is

22     a car, cell phone and-

23            THE COURT: Doesn't seem like I'm gonna get you

24     to get to your question Mr. Pouncy.

25            MR. POUNCY: That's okay, what would you, okay

| | |
|---|---|
| 1 | (Judge Archie L. Hayman; 01-24-06; 4:27 p.m.) |
| 2 | I'm sorry. |
| 3 | BY MR. POUNCY: |
| 4 | Q   What would you, what would you um, how would you feel, |
| 5 |     what, just a second please.  I'm, I'm gonna leave that |
| 6 |     alone then.  So you don't have, do you have anything |
| 7 |     besides a person lookin' like a person to, to identify me |
| 8 |     as bein' the person who committed this crime against you? |
| 9 |     Far as like anything like DNA, fingerprints, shoe prints |
| 10 |    or anything like that?  Blood or anything? |
| 11 | A   Do I have any of that? |
| 12 | Q   Yes. |
| 13 | A   Of course not. |
| 14 | Q   Pardon me? |
| 15 | A   No. |
| 16 | Q   You don't?  Okay.  So is it a possible, okay so is it, |
| 17 |    all right.  So obviously would you think that it'd be a |
| 18 |    possibility that you could be mistaken, mistaken identify |
| 19 |    someone? |
| 20 | A   In, in this particular case no. |
| 21 | Q   Not in this particular case.  I'm just askin' if any, if |
| 22 |    any time is it possible that you can mistaken identify |
| 23 |    someone? |
| 24 | A   Any, anybody can make a mistake in anything okay? |
| 25 | Q   Okay thank you.  Okay.  So how many times did you see |

1     this person in, in your whole entire life?

2  A  The first time I met him was at Scott's Race Shop okay?

3  Q  What day was that please?

4  A  Pardon me?

5  Q  What date was that?

6  A  What date?

7  Q  Yes.

8  A  It all happened all on the same day, September 29th.

9  Q  Okay.  The second time you met this gentleman, these

10    three gentleman?

11  A  When we backed into this driveway on Kellar Street when

12    they got out of their vehicle and approached my vehicle.

13  Q  Oh so this is what, this is another day?

14  A  Same day.

15  Q  Same day okay so you only met this person one time right?

16  A  Twice in the same day.

17  Q  Twice in the same day.  Okay how long did you see, see

18    this person like?

19  A  The first time?

20  Q  Yes.

21  A  Less then ten minutes.

22  Q  Less than ten minutes?  While you was, while you was,

23    okay while you was lookin' at this person was it on your

24    mind like oh I got to remember these, these people, I got

25    to remember these people before any of the alleged

1    carjacking and stuff took on.  Do, was it in your mind

2    like oh I'm gonna remember this person, this person, was

3    that in your mind?

4  A  Well I, I paid attention to who I was talking to yes.

5  Q  You did?

6  A  Um hm.

7  Q  Okay so who was the person who, to, you said a gun was

8    pointed at you right?  You alleged that.

9  A  Right.

10  Q  Who was the person that pointed the gun at you?

11  A  The person that was with you.

12  Q  That was with me?  Who, who, okay I'm gonna leave that

13    alone.  Okay the person that looks like the person that

14    was with me?

15  A  You, you can word it any way you like but yes.

16  Q  Okay thank you um so um, um, excuse me a second.  So um

17    you, so you remember the, reviewin' the photo line-up

18    right?  You remember the per, pardon me?

19  A  Yes.

20  Q  You remember which number 'cause you know it's six people

21    on a page and what not?

22  A  No I don't remember which number no.

23  Q  If-

24  A  I didn't think it was appropriate and I'd have to re, you

25    know remember the numbers.

1    Q    Well do you remember where that person was located on

2         that page?  'Cause it's only, it's only six positions on

3         the page of the-

4    A    No I don't remember okay exactly what spot that person

5         was on that page no.

6    Q    Okay but you was showed this line-up on, if I'm correct,

7         between September 29th and October 6th right?

8    A    I don't know which line-up you're referring to no.

9    Q    Okay well can I-

10   A    I did, I did see some pictures yes.

11   Q    Between those date, between those dates?

12   A    Somewhere in that vicinity yes.

13                    MR. POUNCY:  Okay may I approach please?

14                    THE COURT:  Sure you may approach.

15   BY MR. POUNCY:

16   Q    This is the line-up that was in, in my file by the people

17        that was-

18                    THE COURT:  Mr. Pouncy just show it to him and

19        ask your question sir.

20                    MR. POUNCY:  Okay.

21   BY MR. POUNCY:

22   Q    Which person was it on there?

23   A    Okay you're lookin' for the, which person am I looking

24        for?

25   Q    The people that was involved.

1  A   This here's one of 'em.

2          THE COURT:  Okay just one second.  You're gonna

3     have to be a little more specific if you will.

4  BY MR. POUNCY:

5  Q   Okay well, well the person that, that was sittin', that

6     was sittin' in that chair that you identified earlier.

7  A   The person that looks like you?

8  Q   Yes.

9  A   Okay.  I'd say the bottom right hand corner.

10  Q   Bottom right hand corner?

11          THE COURT:  May the record reflect that that's

12     not me in the bottom right hand corner please?

13          MR. LAROBARDIERE:  Object to his testifying

14     Judge.

15          THE COURT:  Sorry?

16          MR. LAROBARDIERE:  Objection.  He's testifying.

17          THE COURT:  The objection is that you're

18     testifying-

19          MR. POUNCY:  Okay sorry about that.

20          THE COURT:  and I would sustain as to the

21     objection as to testifying.

22          MR. POUNCY:  May the record reflect that he,

23     Mr., what's your name again?

24          THE WITNESS:  Brady.

25          MR. POUNCY:  Mr. Brady, sorry about that.  Mr.

1    Brady um pointed to number six on this, on this line-up

2    sayin', lookin' like me.

3         THE COURT:  Okay any objection to that Mr.

4    Larobardiere?

5         MR. LAROBARDIERE:  I object Judge that that's

6    confusing the witness.  He's shown him a, numerous

7    different photo arrays-

8         MR. POUNCY:  I showed him one.

9         MR. LAROBARDIERE:  and there's a way to clarify

10   this which I do (inaudible).

11        THE COURT:  Record shall reflect that the

12   witness identified number 6.  Go right ahead Mr. Pouncy.

13        MR. POUNCY:  Thank you I appreciate that.

14   BY MR. POUNCY:

15   Q   Okay so you said, okay where was this, your understanding

16       of you and, there was three people you said right?

17       Three?

18   A   Correct.

19   Q   Where was, what was your understanding of where you all

20       was supposed to go?

21   A   Actually I didn't say anything okay?  They were tellin'

22       me where they were gonna go okay?.

23   Q   Oh the, the people who was there?

24   A   Yeah.  The, the original agreement was that we were gonna

25       go to your mechanics to look at the vehicle okay?  All

1    right?  Earlier you, they asked me where, you know where,

2    the name of the place on, at that time I didn't recall

3    you know where we were supposed to be going okay?  But

4    when you were sitting over there at the table you brought

5    up Kings Automotives okay and that's where you told me we

6    were supposed to go?

7  Q  Pardon me?  When I was sittin' where?

8  A  When you were sitting at the bench over there earlier.

9    You brought up Kings Automotive.  I didn't, I didn't say

10   anything about Kings Automotive you did.

11 Q  Okay so yeah I did say that 'cause I thought that was

12   the, the picture that they as referrin' to as King

13   Automotive.

14          THE COURT:  Mr. Pouncy questions please.

15          MR. POUNCY:  Okay.

16 BY MR. POUNCY:

17 Q  So, so that picture, that picture that was on the, on

18   the, what's, the, that's not a projector, well we call it

19   a projector, some (inaudible) like projector, um isn't

20   King Automotive where the plan, that, where you all

21   planned to go?

22 A  No.  I don't know where we, you know I, my plan was to

23   follow you where we were supposed to be going okay?  And-

24 Q  Follow the person that looks like me you mean?

25 A  I will state the person you, okay, following you to where

```
 1      we were supposed to be going okay?  You had mentioned

 2      Kings Automotives but we apparently didn't go to Kings

 3      Automotives.

 4   Q  Okay so um if, if you, this,, this person that was

 5      supposed to go to Kings Automotive, what, what make, why

 6      would you end, end up on a dead end if, if that's not

 7      King Automotive?

 8   A  Because we were following you to your mechanics.

 9              MR. POUNCY:  Just a second please Your Honor, I

10      mean Court.  Excuse me Court may I have this marked as

11      proposed defense number 1, is that correct Mr.

12      Breczinski?  Number 1 please the, this photo that he

13      picked out which isn't me?

14              THE COURT:  Any objection to number 1 Mr.-

15              MR. LAROBARDIERE:  No objection.

16              THE COURT:  Number 1 is in Mr. Pouncy.

17              (At 4:35 p.m., DX 1 admitted)

18              MR. POUNCY:  Thank you.  Where, where do I set

19      that at?  Do I give it to anyone?

20              THE COURT:  It's up to you.  I'll leave that to

21      you sir.

22              MR. POUNCY:  Do I give it to anyone?

23              THE COURT:  That's up to you sir what you want

24      to do with it.

25              MR. POUNCY:  And for the, for the record um
```

1  'cause number four was picked out on the last one can I-

2     THE COURT: Sir you're testifying. You can't

3  testify.

4     MR. POUNCY: Oh I'm sorry.

5     THE COURT: Do you have any other questions for

6  this witness?

7 BY MR. POUNCY:

8 Q Um so, so um you said you have no other way to identify

9  me as bein' the person besides my fea, my physical

10  features right now right?

11 A Standing here this close to you and so on like that, yes

12  my memory shows it's you.

13     MR. POUNCY: All right thank you. I have no

14  further questions of this witness.

15     THE COURT: Thank you Mr. Pouncy. Any re-

16  direct Mr. Larobardiere?

17     MR. LAROBARDIERE: Yes Judge.

18      RE-DIRECT EXAMINATION

19 BY MR. LAROBARDIERE:

20 Q Mr. Brady you remember meeting with Detective Gagliardi

21  about tryin' to figure out the identity of these people?

22 A Yes.

23 Q Do you remember being shown various photo arrays?

24 A Yes.

25 Q Do you remember, you, you did say that you identified Mr.

1        Pouncy in one of those photo arrays?

2    A   Yes.

3    Q   And do you remember that that being recorded somehow on

4        the actual photo array-

5    A   I-

6    Q   do you remember, do you remember some writing being

7        memorialized on the-

8    A   Right.

9    Q   photo array after you were positive about that?

10   A   Right.

11            MR. LAROBARDIERE:  Um Judge uh for the record

12       I'll ask this be marked as People's number 8 if I may

13       approach the witness?

14            THE COURT:  You may approach the witness.

15            MR. LAROBARDIERE:  May I approach the witness

16       Judge?

17            THE COURT:  Approach.

18            MR. POUNCY:  Um I object.

19            THE COURT:  You may approach.

20            MR. POUNCY:  Not with the copy-

21            THE COURT:  Mr. Pouncy.

22   BY MR. LAROBARDIERE:

23   Q   When you met with Detective Gagliardi, did you look at

24       color or black and white photos or both?

25   A   I believe it was just black and white.

1   Q   All right.  And you indicated that you were, were, you

2       did positively identify some of the carjackers?

3   A   Correct.

4   Q   And at that time there was some writing put on the photo

5       array?

6   A   Yes.

7   Q   All right I'm showing you People's number 8, do you

8       recognize this photo array?

9                    (At 4:39 p.m., PX 8 introduced)

10  A   Can I look at it?

11  Q   Yes.

12  A   Yes.

13  Q   All right.

14  A   Upper right hand corner.  All right-

15  Q   What's significant to you about the upper right hand

16      corner?

17  A   This is the person that I identified okay?  And it looks

18      different in the, in the black and white okay?  Then is

19      this the colored that I looked at?  I don't know if it

20      is, this is the one I looked at.

21  Q   There's also some writing on that if you look at the

22      bottom and the, and the uh, the top right.

23  A   Um hm.

24  Q   Do you remember when you were meeting with the detective

25      that that writing was placed on that photo array?

1    A    I don't recall that no.

2    Q    All right.

3              MR. LAROBARDIERE:  Judge I'll ask that People's

4    number 8 be admitted at this time.

5              THE COURT:  Any objection to number 8 Mr.

6    Pouncy?

7              MR. POUNCY:  Yes I, um, no no objections.

8              THE COURT:  All right 8 is in.  Mr.

9    Larobardiere any other questions sir?

10             (At 4:40 p.m., PX 8 admitted)

11             MR. LAROBARDIERE:  No further questions.

12             THE COURT:  You may step down sir.  Thank you

13   very much.

14             (At 4:40 p.m., witness excused)

15             THE COURT:  At this time Trish I'm gonna let,

16   we're gonna excuse the jurors for the day.  Ladies and

17   gentleman we've gone as far as we're gonna go today.  I'm

18   gonna ask you to come back tomorrow at one o'clock in the

19   afternoon okay?  We're gonna go from one to five

20   tomorrow.  We'll go from one to five Thursday, we're

21   gonna go from eight thirty, hopefully have it finished by

22   Friday if not earlier okay?  I want to impress upon you

23   that you're not to discuss this case with anyone okay?

24   The only thing you're about to hear about this case

25   should come in this courtroom.  With that have a good

1    afternoon and I'll see you tomorrow afternoon at one and

2    report to the second floor, don't come up here.  Go right

3    to the jury board room and we'll come get you from there

4    okay?  And Trish you may escort them out.  Everyone stand

5    please.

6              (At 4:41 p.m., jury excused)

7              THE COURT:  All right is there anything to take

8    up at this time Mr. Larobardiere?

9              MR. LAROBARDIERE:  No Your Honor.

10             THE COURT:  Mr. Pouncy?

11             MR. POUNCY:  Yes can I remember, um, can a

12   request be made for that photo to be (inaudible) for

13   tomorrow?

14             THE COURT:  Yeah I think I've made the request

15   to the deputies.  Just remind me tomorrow and we'll see

16   if we can find, if they have it see if we can get it

17   okay?

18             MR. POUNCY:  I didn't mean no disrespect today

19   at all so-

20             THE COURT:  Mr. Pouncy uh, you know uh as I

21   said already I think you're makin' a big mistake.  You

22   are headstrong as I've told you, and I've told you before

23   from that thing over here.  You're hard headed and this

24   is a perfect example of it okay?  I don't know how this

25   is gonna turn out but the thing that bothers me the most

1    is that you seem to be a young man who has a lot of

2    intelligence and I wish that you would focus that

3    intelligence on gettin' an education and tryin' to better

4    yourself instead of bein' in this courtroom 'cause you

5    really don't belong here, and I'm not sayin' because you

6    didn't do anything wrong. I'm sayin' you don't belong

7    here because you have the ability to do better and I'm

8    just shocked I'll be honest with you. It's, it's a

9    waste. But we'll see how this case turns out and then

10    we'll get back to it. Anything else Mr. Breczinski?

11          MR. BRECZINSKI: You said what time?

12          THE COURT: At one o'clock.

13          MR. BRECZINSKI: Okay so you're, you've got

14    other things in the morning?

15          THE COURT: Yes I do. I have to go speak to a

16    group of students at Central High School tomorrow. I

17    promised to speak at Central and that's where I'm goin'

18    tomorrow okay?

19          MR. BRECZINSKI: All right.

20          THE COURT: All right. See you guys in the

21    morning. Thank you.

22          UNIDENTIFIED PERSON: One o'clock tomorrow?

23          THE COURT: Yes one o'clock ma'am. And again,

24    I'm still prayin' for you ma'am also.

25          UNIDENTIFIED PERSON: (Inaudible).

MR. POUNCY:  Love you granny.

THE COURT:  Yes ma'am.

(At 4:42 p.m., proceeding concluded)


STATE OF MICHIGAN)
                 ) ss
COUNTY OF GENESEE)

     I certify that this transcript, consisting of 314 pages,
is a true and accurate transcription to the best of my ability
of the digitally recorded proceeding in this case before
Honorable Archie L. Hayman, on January 24, 2006, as recorded
by the Law Clerk for the Honorable Archie L. Hayman.


Dated:  June 27, 2006

*Melissa K. Bellamy*

Melissa K. Bellamy (CER 7385)
900 South Saginaw Street
5th Floor East
Flint, Michigan 48502
(810) 424-4476