STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

PEOPLE OF THE STATE
OF MICHIGAN,

    Plaintiff,

vs

OMAR RASHAD POUNCY,

    Defendant.

_____/



File No. 05-017154-FB

HONORABLE ARCHIE L. HAYMAN

David S. Leyton (P-35086)
Prosecuting Attorney
900 South Saginaw Street
Flint, Michigan 48502
(810) 257-3232
_____

Omar Rashad Pouncy (P-23554)
MDOC#.: 571990
Carson City Corr. Fac.
P.O. Box 5000
Carson City, MI 48811

BRIEF IN SUPPORT OF
MOTION FOR RELIEF FROM JUDGMENT

BY: Omar Rashad Pouncy
MDOC#.: 571990
Carson City Corr. Fac.
P.O. Box 5000
Carson City, MI 48811

## TABLE OF CONTENTS

Index of Authorities .................................................................vi

Statement of Questions Presented for Review ...........................................xx

Statement of Facts.................................................................. 1

Arguments

I.  DEFENDANT POUNCY'S WAIVER OF COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR A NUMBER
    OF DIFFERENT REASONS.................................................................6

                        a). SINCE  DEFENDANT  POUNCY  WAS  FORCED  TO
                        CHOOSE  BETWEEN  SELF  ADMITTED  UNPREPARED
                        COUNSEL  OR  NO  COUNSEL  AT  ALL  DEFENDANT
                        POUNCY'S WAIVER OF COUNSEL WAS NOT A PRODUCT
                        OF A FREE AND MEANINGFUL CHOICE............18

                        b). DUE TO DEFENDANT POUNCY BEING ERRONEOUSLY
                        MISLED BY THE TRIAL COURT, THE PROSECUTING
                        ATTORNEY, AND TRIAL COUNSEL CONCERNING THE
                        SENTENCING GUIDELINES RANGE DEFENDANT POUNCY
                        WAS SUBJECT TO IF CONVICTED, RENDERS DEFEDANT
                        POUNCY'S    WAIVER    UNKNOWINGLY    AND
                        UNINTELLIGENTLY MADE...................... 24

                        c). DUE TO THE TRIAL COURT'S FAILURE TO
                        ENSURE THAT DEFENDANT POUNCY UNDERSTOOD THE
                        CHARGES AND THEIR ASSOCIATED PENALTIES AT THE
                        TIME OF THE WAIVER OF COUNSEL RENDERS THE
                        WAIVER   OF   COUNSEL   UNKNOWINGLY   AND
                        UNINTELLIGENTLY MADE...................... 27

                        d). DUE TO THE TRIAL COURT FAILING TO INFORM
                        DEFENDANT POUNCY OF THE STATUTORY 2 YEAR
                        MINIMUM SENTENCE ASSOCIATED WITH THE ARMED
                        ROBBERY OFFENSES RENDERS DEFENDANT POUNCY'S
                        WAIVER   OF   COUNSEL   UNKNOWINGLY   AND
                        UNINTELLIGENTLY MADE...................... 29

                        e). DUE TO THE TRIAL COURT'S FAILURE TO
                        ADVISE DEFENDANT POUNCY OF THE POTENTIAL
                        PROBLEMS THAT AN INCARCERATED DEFENDANT MIGHT
                        ENCOUNTER IN OBTAINING EVIDENCE AND LOCATING
                        AND QUESTIONING WITNESSES BEFORE ALLOWING HIM
                        TO REPRESENT HIMSELF, RENDERS THE WAIVER OF
                        COUNSEL   UNKNOWINGLY   AND   UNINTELLIGENTLY
                        MADE......................................30

                        f). DUE TO THE TRIAL COURT FAILING TO MAKE AN
                        INQUIRY INTO THE VOLUNTARINESS OF DEFENDANT
                        POUNCY'S WAIVER OF COUNSEL ON THE RECORD,
                        VOLUNTARINESS CAN NOT BE PRESUMED FROM THE
                        SILENT RECORD AND DEFENDANT POUNCY'S WAIVER
                        OF COUNSEL MUST BE ASSUMED TO BE INVOLUNTARY
                        ..........................................31

II. DEFENDANT POUNCY IS ENTITLED TO A NEW TRIAL DUE TO THE PROSECUTION MISLEADING THE DEFENSE, TRIAL COURT, AND JURY INTO BELIEVING THAT THE COMPLAINANT'S PHONE RECORDS WERE OF NO VALUE TO DEFENDANT POUNCY'S DEFENSE, WHEN THE PROSECUTION ERRONEOUSLY MISINFORMED THAT THE PHONE CALLS FROM THE PERPETRATOR TO THE COMPLAINANTS WEREN'T CAPABLE OF BEING TRACED, WHEN THE PHONE CALLS WERE INDEED CAPABLE OF BEING TRACED TO SOMEONE OTHER THAN DEFENDANT POUNCY, AND THEREBY EFFECTIVELY PREVENTED DEFENDANT POUNCY FROM DISCOVERING AND PRESENTING EXCULPATORY EVIDENCE......................38

III. THE PROSECUTOR'S UNPROVED ALLEGATIONS DURING OPENING STATEMENT THAT DEFENDANT POUNCY HIMSELF CARJACKED THE '79 CAMARO, AND '03 TRUCK, THAT DEFENDANT POUNCY ROBBED THE COMPLAINANTS OF THEIR CELL PHONES, THAT WAYNE GRIMES GAVE DEFENDANT POUNCY THE CELL PHONE AFTER THE ROBBERY, THAT IT WAS AGREED UPON IN THE CAR THAT THEY WERE GOING TO ROB THE COMPLAINANTS OF THEIR CELL PHONES, THAT WAYNE GRIMES ORDERED THE COMPLAINANTS TO GIVE THEIR CELL PHONES UP TO DEFENDANT POUNCY, THAT DEFENDANT POUNCY DROVE THE VEHICLES AWAY FROM THE SCENE OF THE CRIME, AND THAT DEFENDANT POUNCY MADE THE GUN USED DURING THE SEPTEMBER 29, 2005 CARJACKING AVAILABLE SO THAT WAYNE GRIMES COULD COMPLETE THE ROBBERY WERE SO PREJUDICIAL AND ULTIMATELY DEPRIVED DEFENDANT POUNCY OF HIS RIGHT TO A FAIR AND IMPARTIAL TRIAL..58

IV. DEFENDANT POUNCY'S SIXTH AMENDMENT RIGHT TO CONFRONTATION WAS VIOLATED WHEN THE PROSECUTION PLACED A POLICE REPORT ON THE JURY PANEL LEDGE WHICH WAS NEVER ADMITTED INTO EVIDENCE AND ONLY PRESENTED THE PROSECUTION"S THEORY OF THE CASE AND STATEMENTS FROM NON-TESTIFYING WITNESSES.........................................65

V. DEFENDANT POUNCY WAS DENIED HIS RIGHT TO DISCOVERY, WHEN THE PROSECUTION FAILED TO PROVIDE THE DEFENSE WITH THE WRITTEN STATEMENT OF ITS COMPLAINANT THOMAS SANDSTROM AND REVERSAL IS REQUIRED............................................................69

VI. DEFENDANT POUNCY WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS DUE TO THE PROSECUTION'S FAILURE TO CORRECT THE FALSE TESTIMONY OF ITS "STAR WITNESS", WAYNE GRIMES.......75

VII. WHEN THE PROSECUTOR ARGUED THAT DEFENDANT POUNCY CREATED A LOT OF DUST, THREW UP A LOT OF SMOKE, THREW UP A LOT OF MIRRORS, WAS A SMOOTH TALKER, USED A SALEMAN'S PITCH IN REPRESENTING HIMSELF, WAS TRYING TO TALK HIS WAY OUT OF THE CHARGES, AND WAS VERY SCHEMING THIS CONSTITUTES IMPERMISSIBLE AND INFLAMMATORY PROSECUTORIAL MISCONDUCT WHICH ATTACKED DEFENDANT POUNCY IN THE CAPACITY OF BEING HIS OWN COUNSEL AND ULTIMATELY DEPRIVED HIM OF A FAIR TRIAL AND CONSTITUTES A FAILURE TO RESPECT DEFENDANT POUNCY'S RIGHT TO SELF-REPRESENTATION, WHICH REQUIRES AUTOMATIC REVERSAL.................................................................83

VIII. DUE TO THE NEWLY DISCOVERED EVIDENCE OF THE COMPLAINING WITNESS, THOMAS SANDSTROM, IDENTIFYING WAYNE GRIMES, AS THE PERPETRATOR AFTER TRIAL, INSTEAD OF DEFENDANT POUNCY, A NEW TRIAL IS REQUIRED....................................................90

IX. THE IMPERMISSIBLE PROSECUTORIAL MISCONDUCT DEPRIVED DEFENDANT POUNCY OF HIS RIGHT TO A FAIR TRIAL.....................................................................97

  a). THE PROSECUTOR'S DISPLAYING OF A SIGN ON THE COURTROOM'S OVERHEAD PROJECTOR WHICH SAID "OMAR POUNCY IS GUILTY", BOTH DURING OPENING STATEMENT AND CLOSING ARGUMENTS, EFFECTIVELY COMMUNICATED TO THE JURY THAT THE PROSECUTOR PERSONALLY BELIEVED THAT DEFENDANT POUNCY OF HIS RIGHT TO A FAIR TRIAL.................105

ii

b). THE PROSECUTOR'S INFLAMMATORY CHARACTERI-
ZATIONS OF DEFENDANT POUNCY, AS "A SELLER'S
WORST NIGHTMARE" DEPRIVED DEFENDANT POUNCY OF
HIS RIGHT TO A FAIR TRIAL.................108

c). THE PROSECUTOR'S IMPROPER VOUCHING FOR
ITS STAR WITNESS, CONCERNING THE VERACITY OF
HIS TESTIMONY, DEPRIVED DEFENDANT POUNCY OF
HIS RIGHT TO A FAIR TRIAL.................107

X.  STAND-BY COUNSEL HAD NO AUTHORITY TO STIPULATE THAT DEFENDANT POUNCY'S RIGHT TO
POSSESS A FIREARM HAD NOT BEEN RESTORED PURSUANT TO MICHIGAN LAW, THEREBY
STIPULATING THAT DEFENDANT POUNCY WAS A CONVICTED FELON. THIS INTERFERENCE BY
STAND-BY COUNSEL BLATANTLY FAILED TO RESPECT DEFENDANT POUNCY'S RIGHT TO SELF-
REPRESENTATION AND CONSTITUTES A DENIAL OF HIS RIGHT TO SELF-REPRESENTATION AND ITS
DENIAL IS NOT AMENDABLE TO HARMLESS ERROR ANALYSIS...........................111

XI. DEFENDANT POUNCY WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL
AND WAS THEREBY PREJUDICED.......................................................115

a). COUNSEL WAS INEFFECTIVE FOR FAILING TO
OBJECT TO THE TRIAL COURT'S UNCONSTITUTIONAL
PRACTICE OF CLOSING THE COURTROOM TO THE
GENERAL PUBLIC DURING JURY SELECTION, WHEN
THE TRIAL COURT TOLD THE AUDIENCE TO GO IN
THE HALLWAY DURING JURY VOIR DIRE AND CERTAIN
MOTION HEARINGS, THEREBY ALLOWING DEFENDANT
POUNCY TO BE DEPRIVED OF HIS ABSOLUTE RIGHT
TO A PUBLIC TRIAL........................131

b). COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE
WHEN HE FAILED TO MOVE TO HAVE THE
PROSECUTION'S STAR WITNESS BARRED FROM
TESTIFYING, WHEN A VALID LEGAL BASIS EXISTED
TO DO SO, WHEN WAYNE GRIMES WAS PRESENT
DURING THE ENTIRE PRELIMINARY EXAMINATION,
AND THEREBY WAS IN VIOLATION OF THE
SUBQUESTRATION ORDER ISSUED BY THE DISTRICT
COURT JUDGE...............................133

c). COUNSEL WAS INEFFECTIVE FOR FAILING TO
MOVE FOR A CONTINUANCE TO PROPERLY PREPARE
FOR TRIAL ONCE HE LEARNED ON THE DAY OF TRIAL
THAT THE PROSECUTION WOULD BE PERMITTED TO
INTRODUCE EVIDENCE OF CRIMES HE KNEW NOTHING
ABOUT, TO WIT: THE MRE 404 (B) CARJACKING
INCIDENT, WHEN MR. BRECZENSKI DID NOT
REPRESENT DEFENDANT AT THE PRELIMINARY
REGARDING THE MRE 404 (B) CARJACKING, NOR DID
HE HAVE THE TRANSCRIPTS FROM THE PRELIMINARY
EXAMINATION REGARDING THE MRE 404 (B)
CARJACKING. MR. BRECZENSKI WAS NOT CAPABLE OF
DEFENDING AGAINST THE MRE 404 (B) EVIDENCE...
.........................................136

d). COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE WHEN HE FAILED TO OBJECT TO THE PROSECUTOR DISPLAYING A SIGN REPRESENTING THE PROSECUTOR'S PERSONSAL BELIEF IN DEFENDANT POUNCY'S GUILT DURING OPENING STATEMENT, WHICH SAID "OMAR POUNCY IS GUILTY"........141

e). COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE WHEN HE FAILED TO INTERVIEW EXCULPATORY WITNESSES AND WITNESSES WHO THE PROSECUTION HAD ENDORSED AS WITNESSES THEY INTENDED TO PRODUCE AT TRIAL, THEREBY FAILING TO INVESTIGATE.............................145

XII. DEFENDANT POUNCY'S COUNSEL'S INCOMPETENT ADVICE, CONCERNING HIS GUIDELINE RANGE, WHICH RESULTED IN DEFENDANT POUNCY'S REJECTION OF THE PLEA OFFER CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL. BASED ON THE INACCURATE INFORMATION PROVIDED TO DEFENDANT POUNCY, CONCERNING THE SENTENCING GUIDELINE RANGE HE FACED, BY THE TRIAL COURT, THE PROSECUTOR, AND TRIAL COUNSEL THE PLEA AGREEMENT WHICH WAS OFFERED MUST BE REINSTATED.....................................................................154

XIII. COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR FAILING TO FILE A MOTION FOR SEVERANCE WHEN THE RIGHT EXISTED BECAUSE THE JOINDER OF TWO SEPARATE CARJACKING/ARMED ROBBERY INCIDENTS ARISING OUT OF TWO SEPARATE TRANSACTIONS EMBARRASSED AND CONFOUNDED DEFENDANT POUNCY IN MAKING HIS DEFENSE, WHERE DEFENDANT POUNCY, AGAINST HIS WISHES, TESTIFIED CONCERNING BOTH TRANSACTIONS, WHEN HE HAD ONLY WISHED TO TESTIFY CONCERNING ONE OF THE CARJACKING/ARMED ROBBERY TRANSACTIONS AND WISHED TO REMAIN SILENT ON THE OTHER AND THE JOINDER WAS PREJUDICIAL BECAUSE IT COMPROMISED HIS RIGHT TO REMAIN SILENT......................................162

XIV. TRIAL COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR FAILING TO HAVE THE PROSECUTION SPECIFY THE TIME (DATES) OF THE ALLEGED OFFENSES, WHERE TIME WAS OF AN ESSENCE AND WAS NECESSARY IN ORDER FOR DEFENDANT POUNCY TO PUT FORTH AN EFFECTIVE DEFENSE, THE 13 DAY TIME PERIOD (SEPTEMBER 29, 2005 THROUGH OCTOBER 11, 2005) IN WHICH THE JURY HAD TO CONCLUDE THE OFFENSES OCCURRED ON WAS TOO BROAD, AND MADE IT POSSIBLE THAT SOME JURORS MAY HAVE FOUND THAT THE OFFENSES OCCURRED ON SEPTEMBER 29, 2005, WHILE OTHERS MAY HAVE FOUND THE OFFENSES OCCURRED OCTOBER 11, 2005 AND OTHER JURORS WERE PERMITTED TO CONCLUDE THAT THE OFFENSES OCCURRED ON ANY OTHER DATE ALL WITHIN THE (SEPTEMBER 29, 2005 THROUGH OCTOBER 11, 2005) TIME PERIOD. IT WAS THEREFORE IMPOSSIBLE FOR DEFENDANT TO EFFECTIVELY DEFEND AGAINST THE CHARGES DUE TO THE WIDE TIME PERIOD IN WHICH THE JURY WAS PERMITTED TO FIND THAT THE OFFENSES OCCURRED ON.............................................................................170

XV. TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO INVESTIGATE AND HAVE THE SHOE PRINT IMPRESSION FROM THE SCENE OF THE CRIME EXAMINED BY A DEFENSE EXPERT TO DETERMINE THE SHOE SIZE, TO SHOW TO THE JURY THAT THE SHOE PRINT IMPRESSION DID NOT BELONG TO DEFENDANT POUNCY, IN SUPPORT OF THE DEFENSE THEORY THAT DEFENDANT POUNCY WAS NOT PRESENT AT THE SCENE OF THE CRIME...............................178

XVI. DEFENDANT POUNCY IS ENTITLED TO A NEW TRIAL BASED ON THE NEWLY DISCOVERED EVIDENCE, AN AFFIDAVIT SIGNED BY ONE OF HIS CODEFENDANTS WHO WAS UNAVAILABLE AT THE TIME OF TRIAL WHO IS GOING TO OFFER EXCULPATORY TESTIMONY IN DEFENDANT POUNCY'S FAVOR AND THEREBY TESTIFY THAT DEFENDANT POUNCY DID NOT COMMIT THE OFFENSES AND WAS NOT INVOLVED............................................186

XVII.   THE TRIAL COURT ARBITRARILY DEPRIVED DEFENDANT POUNCY OF HIS RIGHT TO PRESENT A
        DEFENSE WHEN IT BARRED DEFENDANT POUNCY FROM CALLING WAYNE GRIMES DURING THE
        DEFENSE SIDE OF THE CASE "TO GET DOWN TO THE TRUTH"..........................197

XVIII.  THE TRIAL COURT'S INSTRUCTION WHICH TOLD THE JURY THAT AS A MATTER OF LAW THE
        COMPLAINANTS WERE INDEED ACTUALLY "VICTIMS", TOOK AWAY ESSENTIAL ELEMENTS AWAY
        FROM THE OFFENSES, OVEREMPHASIZED THE PROSECUTION'S THEORY, AND ULTIMATELY
        INVADED THE PROVINCE OF THE JURY.........................................208

XIX.    THE TRIAL COURT INTERFERED WITH DEFENDANT POUNCY'S STATE AND FEDERAL
        CONSTITUTIONAL RIGHTS TO A FAIR JURY TRIAL WHEN HE REFUSED TO HOLD AN
        EVIDENTIARY HEARING ON THE QUESTION OF WHETHER JURORS WERE PREJUDICED OR BIASED
        DUE TO ANY "EXTRANEOUS INFLUENCES" WHEN ONE JUROR REPORTED TO THE COURT THAT HE
        RECEIVED A PHONE CALL FROM THE GENESEE COUNTY JAIL DURING A WEEKEND RECESS AND
        HE BELIEVED DEFENDANT POUNCY WAS THE INDIVIDUAL WHO CALLED HIM...............220

XX.     THE TRIAL COURT VIOLATED DEFENDANT POUNCY'S RIGHT TO DUE PROCESS BY FAILING TO
        RECUSE ITSELF SUA SPONTE, KNOWING THAT IT HAD DEEP SEATED ANTAGONISM AGAINST
        DEFENDANT POUNCY AND DUE TO THE TRIAL COURT'S PRECONCEIVED NOTION OF GUILT...230

XXI.    DEFENDANT POUNCY WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL DUE TO THE CUMULATIVE
        EFFECT OF ERRORS THAT RIDDLED HIS TRIAL....................................242

XXII.   APPELLATE COUNSEL'S FAILURE TO TIMELY FILE THE MOTION FOR PERMISSION TO FILE
        BRIEF IN EXCESS OF 50 PAGES CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL AND
        DEFENDANT POUNCY WAS THEREBY PREJUDICED BECAUSE THIS ERROR PREVENTED HIM FROM
        HAVING THE ISSUES, RAISED HEREIN ON THE MOTION FOR RELIEF FROM JUDGMENT, RAISED
        ON HIS DIRECT APPEAL OF RIGHT. HAD THE ISSUES RAISED HEREIN BEEN RAISED ON HIS
        DIRECT APPEAL OF RIGHT IT'S A REASONABLE PROBABILITY THAT THE OUTCOME OF HIS
        DIRECT APPEAL WOULD HAVE BEEN DIFFERENT....................................243

XXIII.  THE GOOD CAUSE REQUIREMENT IS SATISFIED IN THIS CASE, BECAUSE APPELLATE
        COUNSEL'S INEFFECTIVENESS ON DIRECT APPEAL OF RIGHT PREVENTED DEFENDANT POUNCY,
        RAISING THE ISSUES WHICH ARE BEING RAISED HEREIN, ON THE MOTION FOR RELIEF FROM
        JUDGMENT, DURING HIS DIRECT APPEAL OF RIGHT. THE ONLY RECOURSE AVAILABLE IS TO
        RAISE THE REMAINING ISSUES THAT COULD NOT BE CONTAINED IN THE INITIAL BRIEF ON
        DIRECT APPEAL IS TO RAISE THEM AT THE MOTION FOR RELIEF FROM JUDGMENT STAGE..251

XXIV.   THE ACTUAL PREJUDICE REQUIREMENT IS ALSO SATISFIED IN THE CASE AT BAR, BECAUSE
        BUT FOR SOME OF THE ISSUES RAISED HEREIN DEFENDANT WOULD HAVE HAD A REASONABLE
        LIKELY CHANCE OF ACQUITTAL, AND SOME OF THE IRREGULARITIES WERE SO OFFENSIVE TO
        THE MAINTENANCE OF A SOUND JUDICIAL PROCESS THAT THE CONVICTIONS SHOULD NOT BE
        ALLOWED TO STAND REGARDLESS OF ITS EFFECT ON THE OUTCOME OF THE CASE.........253

# INDEX OF AUTHORITY

## Cases

Adams v State, 192 So2d 762 (Fla, 1966)...............................................85

Adams v U.S. ex rel. McCann, 317 US 269, 279 (1993)..........................18, 211

Adamson v People of State of California, 332 US 46, 57 (1947)......................167

Allen v Woodford, 395 F.3d 979, 1016 (9th Cir. 2005)...............................109

Alley v Bell, 307 F.3d 380, 386 (6th Cir. 2002)....................................233

Arizona v Fulminante, 499 US 279, 307-10 (1991)....................................78

Arizona v Youngblood, 488 US 51 (1988).............................................72

Arrieta-Agressat v U.S, 3 F.3d 525, 527 (1st 1993)................................109

Baldayaque v US, 338 F.3d 145, 152 (2d Cir. 2003).................................245

Banks v Reynolds, 54 F.3d 1508, 1515-16 (10th Cir. 1995).........................246

Barry v Brower, 864 F.2d 294, 300-01 (1988).......................................249

Bates v Bell, 402 F.3d 635, 647 (6th Cir. 2005)................................88, 103

Beckam v Wainwright, 639 F.2d 262 (5th Cir. 1981).................................158

Berger v U.S., 295 US 78, 84 (1935)..................................63, 64, 100, 103

Blackburn v Foltz, 828 F.2d 1177 (CA 6, 1987)..........22, 52, 80, 136, 137, 169, 253

Boatright v U.S., 105 F.2d 737, 740 (8th Cir.)....................................212

Bowling v Parker, 344 F.3d 487 (6th Cir. 2003)....................................109

Bracy v Gramley, 520 US 899, 904-05 (1997)........................................232

Brady v Maryland, 373 US 83 (1963)..............................................45, 71

Brewer v Williams, 430 US 387, 404 (1977)......................................24, 27

Brookhart v Janis, 384 US 1, 3 (1967)..........................................67, 68

Brooks v US, 240 F.2d 905 (5th Cir. 1957).........................................213

Brown v Myers, 137 F.3d 1154 (9th Cir. 1998)......................................152

Bruna v US, 308 US 287, 292 (1939)................................................168

Bryant v Scott, 28 F.3d 1411, 1418-1419 (5th Cir. 1994).................. 146, 148, 152

Buhl v Cooksey, 233 F.3d 783, 789 (3d Cir. 2000)........................ 18, 19, 20, 21

Cain v Department of Corrections, 451 Mich 470 (1996)............................. 238

Carothers v US, 161 F.2d 718 (5th Cir. 1947)..................................... 212

Carriger v Stewart, 132 F.3d 463, 479 (9th Cir. 1997)............................ 52

Carter v Bowersox, 265 F.3d 705, 715-16 (8th Cir. 2001)......................... 246

Claudia v Scully, 982 F.2d 798, 806 (2d Cir. 1992)................................ 249

Clinkscale v Carter, 375 F.3d 430, 445 (6th Cir. 2004)....................... 53, 80

Chambers v Mississippi, 410 US 284, 300-02 (1973)........................... 138, 203

Chapman v California, 386 US 18, 24...................................... 73, 233, 241

Christoffel v US, 338 US 84, 89 (1826)............................................ 212

Commonwealth v Long, 258 Pa Super 312 (1978)...................................... 86

Crampton v Department of State, 395 Mich 347, 351 (1975).......................... 239

Crisp v Duckworth, 743 F.2d 580, 584 (7th Cir. 1984)............................ 147

Cross v US, 335 F.2d 987 (1964)................................................... 166

Darden v Wainwright, 477 US 168, 181 (1986).................................. 107, 108

Delgado v Lewis, 223 F.3d 976, 980-82 (9th Cir. 2000).......................... 246

District of Columbia v Clawans, 300 US 617 (1937)................................ 218

Donnelly v DeChristoforo, 416 US 637, 646 (1974).............................. 63, 107

Drew v US, 118 US App DC 11, 331 F.2d 85,........................................ 166

Duckett v Godinez, 67 F.3d 734, 740 (9th Cir. 1995)............................ 233

Dunaway v US, 205 F.2d 23, 24 (1953)............................................. 166

Duncan v Louisiana, 391 US 145, 148-49 (1968).................................... 131

Eagle v Linahan, 279 F.3d 926, 943 (11th Cir. 2001)............................ 246

Evitts v Lucey, 469 US 387, 396-397 (1985)............................. 244, 248, 251

Fagan v Washington, 942 F.2d 1155, 1156 (7th Cir 1991).......................... 249

Faretta v California, 422 US 806 (1975).............................. 18, 19, 22, 113

Fowler v Collins, 253 F.3d 244 (6th Cir. 2001)................................. 33, 36

French v Jones, 332 F.3d 430 (CA 6, 2003)........................................ 114

Gaines v Hopper, 575 F.2d 1147, 1149 (5th Cir. 1978)............................ 146

Gall v Park, 231 F.3d 265, 312 (6th Cir. 2000)................................. 109

Gannett Co. v DePasquale, 443 US 368, 380 (1979)................................ 131

Gideon v Wainwright, 372 US 335 (1963)........................................ 17, 18

Giglio v US, 405 US 150, 154 (1972),............................................. 78

Grady v Artuz, 931 F.Supp 1048, 1053-54 (S.D.N.Y. 1996).......................... 249

Gravely v Mills, 87 F.3d 779, 785-86 (6th Cir. 1996)....................... 143, 246

Gray v Lucus, 677 F.2d 1086, 1093 n. 5 (5th Cir. 1982)......................... 146

Grooms v Salem, 923 F.2d 88, 90 (8th Cir. 1991)............................... 146

Guilmette v Howes, 577 F.Supp.2d 904 (2008 E.D. Mich)........................... 184

Harris v Stovall, 212 F.3d 940 (6th Cir. 2000)............................. 234, 241

Harris v US, 402 F.2d 656 (1958)................................................ 105

Hederson v Sargeant, 926 F.2d 706, 711 (8th Cir. 1991)........................ 147

Hence v Smith, 49 F.Supp.2d 547, 549 (E.D. Mich 1999).......................... 233

Herbert v Louisiana, 272 US 312, 316 (1926).................................... 242

Hodge v hurley, 426 F.3d 1380, 1389 (6th Cir. 1996)................. 103, 104, 107

Hoffman v Monroe Public Schools, 96 Mich App 256, 261 (1980)................... 223

Holsomback v White, 133 F.3d 1382 (CA 11, 1998)................................ 183

House v Bell, 311 F.3d 767 (CA 6, 2002).................................. 55, 95, 195

Hughes v Borg, 898 F.2d 695, 700 (CA 9, 1990).................................... 68

Hughes v Hopper, 629 F.2d 1036, 1039 (5th Cir. 1980).......................... 50

Hunt v Mitchell, 261 F.3d 575, 582 (CA 6, 2001)................................. 17

In re Bay Prosecutor, 109 Mich App 476 (1981)................................... 73

In re Beverly Hills Fire Litigation, 695 F.2d 207, 213 (CA 6, 1982)...... 225, 226, 227

In re Forfeiture of 1, 159, 420, 194 Mich App 134, 151 (1992).................. 236

viii

In re Haurley, 238 Mich App 509, 511 (1999)....................................... 203

In re Murchison, 349 US 133, 136 (1995)............................................ 233

In Oliver, 33 US 257, 272 (1948)................................................... 133

Jackson v State, 41 So2d 15 (Fla App, 1982)........................................ 85

Jenkins v Artuz, 294 F.3d 284, 296 n.2 (2d Cir. 2002).............................. 78

Jihns v Perini, 462 F.2d 1308 (6th Cir. 1977).................................... 152

Johnson v Duckworth, 793 F.2d 989 (7th Cir.), cert denied, 479 US 937, 107 S.Ct 416, 93
L.Ed.2d 367 (1986)................................................................. 158

Johnson v Gibson, 169 F.3d 1239, 1250 (10th Cir. 1999).......................... 88

Johnson v Sherry, 586 F.3d 439 (6th Cir. 2009)............................. 132, 133

Johnson v Zerbst, 304 US 458, 467 (1938)......................... 18, 19, 29, 35

Kemp v Leggatti, 635 F.2d 453, 454 (5th Cir. 1981).............................. 146

Kidwell v US, 38 App DC 566, 570 (1912)........................................... 166

Kimmelman v Morrison, 477 US 365 (1986)........................................... 161

Konda v US, 166 F. 91 (7th Cir.)............................................ 212, 214

Laffosse v Walters, 585 F.Supp 1209, 1214 (S.DN.Y. 1984).......................... 249

Lawrence v Armontrout, 900 F.2d 127, 130 (8th Cir. 1990)........................ 147

Lindstadt v Keane, 239 F.3d 191 (CA 2, 2001)...................................... 183

Liteky v US, 510 US 540, 555-56 (1994)............................................ 233

Lockhart v Fretwell, 506 US 364, 369 (1993)....................................... 159

Loyd v Whitley, 977 F.2d 149 (5th Cir. 1992).................................... 148

Mabry  v Johnson, 467 US 504, 510 n.11 (1984)..................................... 161

Maine v Moulton, 474 US 159, 170 (1985)........................................... 17

Malicoat v Mullins, 426 F.3d 1240, 1256 (10th Cir. 2005)........................ 109

Marino v Vasquez, 812 F. 2d 499 (CA 9, 1987).................................. 226, 227

Martin v Parker, 11 F.3d 613, 616-17 (6th Cir. 1993).................... 106, 107, 255

Martin v Rose, 744 F.2d 1245, 1250 (6th Cir. 1984).............................. 141

Mason v Hanks, 97 F.3d 887, 894 (7th Cir. 1996)....................................... 246

Mathis v Berghuis, ___ F.3d ___ (CA ₵, # 02-01665, 1-27-04)................. 55, 95, 195

Matice v Wainwright, 811 F.2d 1430, 1439 (11th Cir. 1987)........................ 249

Maurino v Johnson, 210 F.3d 638, 645 (6th Cir. 2000)........................ 234, 241

May v Henderson, 13 F.3d 528, 537 (2d Cir.), cert. denied, ___ US ___, 115 S.Ct 81, 130
L.Ed.2d 35 (1994)...................................................................... 249

McBee v Grant, 763 F.2d 811, 818 (6th Cir. 1985)............................... 233

McElroy v US, 164 US 76, 78 (1896)............................................... 166

McFarland v Yukins, 356 F.3d 688, 710 (6th Cir. 2004)......................... 246

McKaskle v Wiggins, 465 US 168, 177 n. 8 (1984).... 24, 27, 29, 30, 31, 36, 37, 89, 113

Mooney v Holohan, 294 US 103, 112 (1935)......................................... 78

Moore v State, 324 SE3d 760 (GA App 1984)....................................... 228

Murray v Carrier, 477 US 478, 488 (1986)........................................ 245

Napue v Illinois, 360 US 264 (1959).............................................. 95

Nealy v Cabana, 764 F.2d 1173, 1177 (5th Cir. 1985).......................... 146

Neder v US, 527 US 1, 8 (1999).................................................. 113

Northrop v Trippett, 265 F.3d 372, 378 (CA 6, 2001)........................ 135, 165

Osborn v Shillinger, 861 F.2d 612, 627 (10th Cir. 1988)...................... 147

Overbee v Van Waters and Rogers, 706 F.2d 768, 770-771 (CA 6)........... 183, 225, 226

Owens v US, 483 F.3d 48, 64 (1st Cir. 2007)................................... 132

Patton v US, 281 US 276 (1930).................................................. 210

Pavel v Hollins, 261 F.3d 210, 223 (CA 2, 2007)................................ 183

Pazden v Maurer, 424 F.3d 303 (3rd Cir. 2005)............................. 21, 23

People v Adkins (After Remand), 452 Mich 702, 720 (1996).................... 98, 172

People v Alexander, 76 Mich 76, 78 (1977)....................................... 234

People v Anderson, 398 Mich 361, 366 (1976)................................. 18, 113

people v Bahoda, 448 Mich 261 (1995).................... 44, 61, 71, 77, 85, 99

x

People v Bairefoot, 117 Mich App 225, 230 (1982)................................. 85, 242

People v Barclay, 208 Mich App 670, 672 (1995)........................... 131, 165, 172

People v Bell, 74 Mich App 270 (1977)......................................... 92, 192

People v Barcato, 17 Mich App 277, 304 (1969)..................................... 89

People Bradshaw, 165 Mich App 562, 567 (1988)............................. 51, 91, 191

People v Carrick, 220 Mich App 17 (1996)................................... 135, 166

People v Charles O. Williams, 386 Mich 565 (1972)............................... 136

People v Cornett, 685 P2d 224 (Colo App 1984)............................. 226, 227

People v Coward, 32  Mich App 274, 276 (1971)................................... 62

People v Cress, 468 Mich 678, 692 (2003)....................................... 92

People v Dalessandro, 165 Mich App 569 (1988).................................. 86

People v Dellahando, 265 Mich 486 (1933)....................................... 69

People v Denny, 445 Mich 412, 427 (1994)....................................... 18

People v Dickerson, 62 Mich App 457 (1975).................................... 133

People v Dixson, 403 Mich 106, 109 (1978)..................................... 240

People v Ecarius, 124 Mich 616, 621 (1900)..................................... 62

People v Florinchi, 84 Mich App 128 (1978)................................... 46, 73

People v Fowler, 104 Mich 449,452 (1895)....................................... 62

People v Grames, 8 Mich App 375 (1967)....................................... 242

People v Grant, 470 Mich 477 (2004)......................................... 152

People v Grayton, 81 Mich App 390, 397 (1978)................................. 227

People v Gruhom, 84 Mich App 663, 666 (1978)................................. 225

People v Hale, 72 Mich App 484 (1976)....................................... 234

People v Hall, 249 Mich App 262, 269 (2002)................................. 216

People v Hill, 258 Mich 79, 88 (1932)......................................... 85

People v Hurd, 102 Mich App 424, 427 (1986)................................... 62

People v Jackson, 91 Mich App 636, 638 (1979)............................. 56, 195

People v Johnson, 183 Mich App 305 (1990)....................................56, 96, 195

People v Johnson, 103 Mich App 825, 829 (1981)...................................... 227

People v Johnson, 187 Mich App 621, 626 (1991)...................................... 62

People v Johnson, 356 Mich 619 (1959)................................................ 69

People v Joshua, 32 Mich App 581, 586 (1971)......................................... 62

People v Koss, 86 Mich App 557, 560 (1978)........................................... 234

People v Legone, 205 Mich App 77 (1994)......................... 44, 61, 71, 77, 85, 99

People v Leo, 188 Mich App 417 (1991)................................................ 73

People v Lewis Wilson, 445 Mich 925 (1994)........................................... 227

People v Lobsinger, 64 Mich 284 (1975)........................................ 234, 235

People v Martin, 392 Mich 553 (1974)................................................. 218

People v McAllister, 16 Mich App 217 (1969)......................................... 192

People v McPherson, 263 Mich App 124 (2004)............................... 66, 232, 242

People v Mechura, 205 Mich App 480, 484, lv den 447 Mich 984 (1994)........ 92, 95, 192

People v Moore, 184 Mich 315 (1991).................................................. 86

People v Naugle, 152 Mich App 227 (1886)............................................ 176

People v Pace, 102 Mich App 522 (1980).......................................... 46, 73

People v Pennington, 113 Mich App 688, 694 (1982).................................... 62

People v Pickens, 446 Mich 298 (1994)..................... 131, 158, 165, 172, 180, 244

People v Pike, unpublished opinion of 3-30-95 (Court of Appeals # 127780, MLW # 19539)
.........................................................................................92

People v Ramsey, 385 Mich 221, 224-225 (1971)........................................ 68

People v Reed, 49 Mich app 308, 328 (1874)........................................... 218

People v Reed, 393 Mich 342, 351 (1975)......................................... 218, 219

People v Reed, 449 Mich 375, 378 (1995)......................................... 245, 251

People v Richard Allen Green, unpublished opinion, (#242832, January 27, 2004). 56, 195

People v Rosales, 160 Mich App 304 (1987)............................................ 242

People v Russell, 471 Mich 182, 190-191 (2004).............................. 17, 29, 114

People v Sabin, 223 Mich App 530 (1997)........................................... 173

People v Simon, 189 Mich App 565, 568 (1991)....................................... 67

People v Skowronski, 61 Mich App 71 (1975)........................................ 242

People v smith, 158 Mich App 220 (1987)........................................... 242

People v Solak, 146 Mich App 659, 676 (1985)....................................... 62

People v Spencer, 130 Mich App 527 (1983)......................................... 242

People v Stanley, 71 Mich App 56 (1976)........................................... 134

People v Swift, 172 Mich 473, 483 (1912)........................................... 62

People v Taylor, 185 Mich App 1 (1990)............................................ 173

People v Terry Burton, 74 Mich App 215 (1977)............................. 51, 56, 191

People v Thornton, 80 Mich App 746 (1978)......................................... 218

People v Turner, 120 Mich App 23 (1982)............................................ 69

People v Ullah, 216 Mich App 669, 684-686 (1996)............................. 135, 166

People v Van Dorston, 441 mich 540, 545 (1993)..................... 45, 61, 77, 85, 99

People v Washington, 43 Mich App 150 (1972)....................................... 176

People v Whitney, 228 Mich app 230, 252 (1998).................................... 210

People v Williams, 470 Mich 634, 641 (2004)..................................... 17, 18

People v Wise, 134 Mich App 82, 101-102 (1984)..................................... 86

People v Wolverton, 227 Mich App 72 (1997)......................................... 63

People v Wright, 78 Mich App 246 (1977)........................................... 218

Pointer v Texas, 380 US 400, 403, 13 L.Ed.2d 923 (1965)............................ 67

Pointer v US, 151 US 396, 403 (1894)............................................. 166

Press-Enterprise  Co  v  Superior  Court  (Press-Enterprise  I),  464  US  501,  510-511
(1984)........................................................................... 133

Rachel v Bordenkircker, 590 F.2d 200, 204 (6th Cir. 1978)..................... 143, 246

Raffel v US, 271 US 494, 497 (1926)............................................... 167

Remmer v US, 347 US 227 (1954)............................................... 223, 226

Roe v US, 287 F.2d 435, 440 (5th Cir. 1961)........................................ 211

Santobello v New York, 404 US 257, 263 (1971)...................................... 161

Sanchez v Mondragon, 858 F.2d 1462, 1465 (10th Cir. 1988).......................... 23

Schwachter v US, 237 F.2d 640 (6th Cir. 1956)................................. 211, 213

Seals v Henry Ford Hospital, 123 Mich App 329 (1983).............................. 113

Sims v Livesay, 970 F.2d 1575, 1580 (6th Cir. 1992)...................... 181, 182, 183

Sitz v Department of State Police, 443 Mich 744 (1993)............... 91, 113, 191, 224

Siverson v O'Leary, 764 F.2d 1208, 1214 (CA 7, 1985)......................... 114, 141

Smith v Illinois, 390 US 129, 131 (1968)........................................ 67, 68

Smith v Phillips, 455 US 109 (1982)............................................. 46, 72

State v Johnson, 524 SW2d 97, 101 (Mo, 1975)....................................... 69

Stewart v US, 336 US 1 (1961)..................................................... 168

Stumph v Mitchell, 367 F.3d 594 (6th Cir. 2004)............................... 92, 93

Strickland v Washington, 466 US 668 (1984)..................................... Passim

Sullivan v US, 85 US App DC 409................................................... 212

Tanner v US, 483 US 107, 117 (1987)............................................... 225

Taylor v Illinois, 484 US 400, 408-09 (1988)...................................... 203

Thomas v Lockhart, 738 F.2d 304, 308 (8th Cir. 1989)............................. 147

Tinsley v Millian, 394 F.3d 769, 802 (6th Cir. 2005)....................... 133, 169

Tucker v Prelensnik, 181 F.3d 747, 754 (6th Cir. 1999)......................... 176

Tumey v State of Ohio, 273 US 510, 523 (1927).................................... 234

Turner v Louisiana, 379 US 466, 471-472 (1965)................................... 224

Turner v Tennessee, 858 F.2d 1201 (6th Cir. 1988)............................... 158

United Brotherhood of Carpenters and Joiners of America v US, 330 US 395, 410 (1946)
..............................................................................211, 212

US v Agurs, 427 US 97 (1976)......................................... 45, 72, 78, 82

US v Almonte, 956 F.2d 27, 30 (2d Cir. 1992)...................................... 204

US v Arlt, 41 F.3d 516, 519.................................................... 24, 27

US v Ash, 413 US 300, 308 (1973)..................................................... 18

US v Bagaric, 706 F.2d 42, 58-61 (CA 2, 1983)................................ 100, 142

US v Bagley, 473 US 667 (1986).................................................. 45, 72

US v Beach, 296 F.2d 153, 160 (CA 4, 1961).................................. 225, 227

US v Beasley, 545 F.2d 403 (CA 5, 1977)........................................ 46, 73

US v Bess, 593 F.2d 749, 757 n. 10 (6th Cir. 1979)...................... 103, 104, 107

US v Blakey, 14 F.3d 1557, 1559-60 (11th Cir. 1994)............................... 109

US v Blaylock, 20 F.3d 1458, 1469 (9th Cir. 1994)........................... 161, 248

US v Boldt, 929 F.2d 35, 41 (1st Cir. 1991)........................................ 106

US v Brockington, 849 F.2d 872, 875 (4th Cir. 1988)............................... 61

US v Bryan, 868 F.2d 1032 (CA 9, 1989).......................................... 46, 73

US v Campagnuolo, 592 F.2d 852, 854 (CA 5, 1971)................................. 46, 73

US v Carrado, 227 F.3d 528 (6th Cir. 2000)....................................... 227

US v Carroll, 26 F.3d 1380, 1389 (6th Cir. 1994)....................... 103, 104, 107

US v Carter, 410 F.3d 1017, 1026 (8th Cir. 2005)................................. 109

US v Cronic, 446 US 648 (1984)............................................... 114, 141

US v Davis, 177 F.3d 552 (6th Cir. 1999)......................................... 228

US v Debango, 780 F.2d 81, 85 (DC Cir. 1986)...................................... 147

US v DI Pasquale, 740 F.2d 1282, 1296 (CA 3, 1984).......................... 100, 142

US ex rel Caruso v Zelinsky, 684 F.2d 435 (3rd Cir. 1982)....................... 158

US ex rel Cosey v Wolff, 727 F.2d 656, 658 n. 3 (3rd Cir. 1984)................... 147

US ex rel Martinez, 526 F.2d 750, 755-6 (2d Cir. 1975) .....................20, 21, 23

US v Erskine, 335 F.3d 1161 (9th Cir. 2004)................................ 25, 26, 28

US v Farrester, 60 F.3d 52, 64-65 (2d Cir. 1995)................................... 207

US v Feliciano, 223 F.3d 102, 111 (2d Cir. 2000)................................... 78

US v Ford, 872 F.2d 1231, 1236-1237 (6th Cir. 1989)................................ 176

US v Friedman 909 F.2d 705, 708 (2d Cir. 1990)................................... 88

US v Gallin, 166 F.2d 123, 126 (3 Cir.)........................................ 212

US v Garcia-Guiza, 160 F.3d 511, 520 (9th Cir. 1998)........................... 104

US v Garza, 608 F.2d 659, 665-666 (CA 5, 1979)........................... 100, 142

US v Gatto, 763 F.2d 1040 (CA 9, 1985)...................................... 46, 73

US v Gonzalez Vargas, 558 F.2d 631 (1st Cir. 1977)............................ 107

US v Green, 305 F.3d 422 (CA 6, 2002)........................................ 134

US v Griffin, 659 F.2d 932 (CA 9, 1981)...................................... 46, 72

US v Harison, 716 F.2d 1050, 1051 (CA 4, 1983)........................... 100, 142

US v Harris, 683 F.2d 322 (9th Cir. 1982)...................................... 28

US v Herndon, 156 F.3d 629 (6th Cir. 1998)................................... 228

US v Holmes, 413 F.3d 770, 775 (8th Cir. 2005)................................ 88

US v Irizarry, 341 F.3d 273, 308 (3d Cir. 2003)............................... 109

US v Kerr, 981 F.2d 1050, 1054 (9th Cir. 1992)........................... 104, 107

US v Kimmel, 672 F.2d 720 (9th Cir. 1982)..................................... 28

US v Kerbs, 788 F.2d 1166, 1176-77 (6th Cir. 1986).......................... 104

US v Leeds, 457 F.2d 857, 861 (2d Cir. 1972)................................. 105

US v Littlefield, 752 F.2d 1429 (CA 9, 1985)................................. 226

US V Love, 534 F.2d 87 (CA 6, 1976).......................................... 242

US v Lowe, 106 F.3d 1498, 1504 (10th Cir. 1997).............................. 233

US v Maccini, 721 F.2d 840, 846 (CA 1, 1983)........................... 100, 142

US v Malina, 934 F.2d 1440, 1444 (9th Cir. 1991)............................. 104

US v Mannino, 212 F.3d 835, 845 (3d Cir. 2000).............................. 245

US v Manuszak, 234 F.2d 421 (3d Cir. 1956).................................. 214

US v Martinez-Medina, 279 F.3d 105, 119 (1st Cir. 2002)................. 108, 109

US v Marx, 485 F.2d 1179, 1184 (CA 10, 1973)................................ 226

US v McDowell, 814 F.2d 245, 252 (6th Cir. 1987)............................ 35

US v McKenzie, 301 F.2d 880 (6th Cir. 1962).................................. 213

US v McLain, 823 F.2d 1457, 1462 (11th Cir. 1987).......................... 88

US v Mohawks, 20 F.3d 1480, 1484 (9th Cir. 1994)...................... 24, 27

US v Morris, 568 F.2d 396, 402 (5th Cir. 1978)............................. 103

US v Morrison, 449 US 361, 364 (1981)...................................... 160

US v Newton, 369 F.3d 659, 681 (2 Cir. 2004)............................... 109

US v Padrone, 406 F.2d 560 (CA 2, 1969)..................................... 73

US v Peppers, 302 F.3d 120, 130-31 (3d Cir. 2002)...................... 20, 30

US v Peruz, 144 F.3d 204, 210 (2d Cir. 1998)................................ 110

US v Procopio, 88 F.3d 26, 32 (1st Cir. 1996)............................. 88

US v Robarts, 618 F.2d 530, 533 (9th Cir. 1980).......................... 104

US v Rodriguez, 929 F.2d 747 (1st Cir. 1991)............................. 158

US v Rodriques, 159 F.3d 439, 452 (9th Cir. 1998)........................ 88

US v Rudberg, 122 F.3d 1199, 1200 (9th Cir. 1997)....................... 104

US v Salema, 61 F.3d 214, 222 (3d Cir. 1995)................................ 20

US v Scheffer, 523 US 303, 308 (1998)....................................... 203

US v Schwartz, 877 F.2d 655 (CA 9, 1988)................................ 46, 73

US v Shaffer, 789 F.2d 682 (9th Cir. 1986)................................ 47

US v Shareef, 196 F.3d 77, 78 (2d Cir. 1999)............................... 110

US v Smith, 74 F.3d 1276, 1283 (DC Cir), cert denied, ___ US ___, 116 S.Ct 1867, 134 L.Ed.2d 965 (1996)............................................. 61

US v Smith, 411 F.2d 733, 736 (CA 6, 1969)................................. 114

US v Smith, 982 F.2d 681 (1st Cir. 1993)................................ 106

US v Stubbs, 281 F.3d 109, 117 (3d Cir. 2002)............................... 20

US v Taylor, 113 F.3d 1136, 1140 (10th 1997)............................. 19

US v Taylor, 933 F.2d 307, 313 (CA 5, 1991)............................... 114

US v Thomas, 463 F.2d 1061, 1062-1063 (CA 7, 1972)............................ 225, 227

US v Timothy Willis Jr., 257 F.3d 636 (CA 6, 2001)............................ 56, 95

US v Tussa, 816 F.2d 58, 67 (2d Cir. 1987).................................... 207

US v Valenzuela-Bernal, 458 US 858, 867 (1982)............................... 203

US v Wallach, 935 F.2d 445, 456 (2d Cir. 1991)............................... 78

US v Watson, 866 F.2d 381 (11th Cir. 1989).................................. 89

US v Welty, 674 F.2d 185, 189 (3d Cir. 1982)................................ 20

US v West, 680 F.2d 652, 655-656 (CA 9, 1982).............................. 100, 142

US v Williamson, 183 F.3d 458, 463-64 (5th Cir. 1999)...................... 246

US v Young, 470 US 1, 13 (1985)................. 45, 61, 71, 77, 89, 99, 102, 106, 143

Von Moltke v Gillies, 332 US 708, 724 (1948)......................... 20, 22, 24, 32

Waller v Georgia, 467 US 39, 46 (1984)..................................... 131

Ward v US, 995 F.2d 1317, 1321 (6th Cir. 1993)............................. 144, 153

Washington v Hofbauer, 228 F.2d 689 (6th Cir. 2000)..................... 143, 175, 246

Washington v Texas, 388 US 14, 19 (1967).................................. 139, 203

Wayne County Prosecutor v Doefler, 14 Mich App 428, 440 (1968)............ 235

Wiggins v Corcoran, 165 F.Supp.2d 538, 558 (2001)......................... 149

Wiggins v smith, 534 US 510 (2003)........................................ 149

Wilks v Israel, 627 F.2d 32, 35 (7th Cir. 1980)........................... 19, 23

Williams v Taylor, 529 US 362, 395 (2000)................................. 145

Wilson v Cowan, 578 F.2d 166 (6th 1978)................................... 52, 136

Wiser v People, 732 P2d 1139, 1142 (Colo, 1987).......................... 225, 226

Withrow v Larkin, 421 US 35, 46 (1975).................................... 234, 239

Wolf v US, 36 F.2d 450, 451 (7 Cir.)...................................... 212

Womble v J.C. Penney Company. Inc., 431 F.2d 985, 989 (CA 6, 1970)........ 225

Workman v Tate, 957 F.2d 1339, 1345 (6th Cir. 1992)....................... 148

Yarborough v Keane, 101 F.3d 894, 897 (2d Cir. 1996)...................... 78

## United States And Michigan Constitutions

Const 1963, art 1, §13................................................ 18, 19, 32, 113

Const 1963, art 1, §17..................................................... 224, 238

Const 1963, art 1, §20................................................. 68, 131, 224

US Const Am V............................................................... 203

US Const Am VI........................................................... Passim

US Const Am XIV.......................................................... Passim

## Michigan Court Rulues

MCR 2.003 (B)(2).......................................................... 236

MCR 2.611 (a)(1)(f)..................................................... 56, 195

MCR 6.005 (D)............................................................. 29

MCR 6.112................................................................ 172

MCR 6.120 (C)............................................................ 165

MCR 6.410................................................................ 176

MCR 6.431 (B)......................................................... 56, 195

MCR 6.508 (b)(i)......................................................... 254

MCR 6.508 (b)(iii)....................................................... 254

MCR 6.508 (D)(3)......................................................... 248

MCR 6.508 (D)(3)(A)...................................................... 252

MCR 7.212 (A)...................................................... 245, 246, 251

## Michigan And Federal Rules Of Evidence

MRE 404 (B)............................................................ Passim

FRE 606................................................................. 227

## Statutes

18 U.S.C. §3481......................................................... 168

MCL 600.1420............................................................ 133

MCL 750.529............................................................. 30

MCL 763.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

MCL 766.45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

MCL 767.51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

MCL 767.55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

## Jury Instructions

CJI2d 18.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

## Miscellaneous

1 ABA Standards For Criminal Justice, Standard 4-4.1, at 4-53 (2d ed. Supp 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .145, 182

2 Gillespie, Michigan Criminal Law and Procedure (2d ed), §630, p.285 . . . . . . . . . . . . . 67

ABA Model Code of Professional Responsibility DR 7-106 (C) (1980) . . . . . . . . . . . . 100, 141

ABA Model Rules of Professional Conduct, Rule 3.4 (e) (1984) . . . . . . . . . . . . . . . . 100, 142

ABA Standards For Criminal Justice 3-5, Commentary at 100 (3ed. 1993) . . . . . . . . . . . . . . 62

ABA Standards For Criminal Justice 3-5.8 (b) (2d ed. 1980) . . . . . . . . . . . . . . . . . . . . 101, 142

Ballentine's Law Dictionary, Legal Assistant Edition, by Jack G. Handler, J.D. Pgs. 92 & 578 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

Guidelines For District Judges From 1 Bench Book For United States District Judges 1.02-2 to 5 (3d ed 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

H. Drinker, Legal Ethincs, 147 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

## STATEMENT OF QUESTIONS PRESENTED

1. Was Defendant Pouncy's waiver of counsel constitutionally ineffective for a number of different reasons?

Defendant says "yes."

2. Is Defendant Pouncy entitled to a new trial due to the prosecution misleading the defense, trial court, and jury into believing that the complainant's phone records were of no value to Defendant Pouncy's defense, when the prosecution erroneously misinformed that the the phone calls from the prepetrator to the complainants weren't

capable of being traced, when the phone calls were indeed capable of being traced to someone other than Defendant Pouncy, and thereby effectively prevented Defendant Pouncy from discovering and presenting exculpatory evidence?

Defendany say "yes."

3. Were the prosecutor's unproved allegations during opening statement that Defendant Pouncy himself carjacked the '79 Camaro, and '03 truck, that Defendant Pouncy robbed the complaints of their cell phones, that Wayne Grimes gave Defendant Pouncy the cell phone after the robbery, that it was agreed upon in the car that they were going to rob the complainants of their cell phones, that Wayne Grimes ordered the complainants to give their cell phones up to Defendant Pouncy, that Defendant Pouncy drove the vehicles away from the scene of the crime, and that Defendant Pouncy made the gun used during the September 29, 2005 carjacking available so that Wayne Grimes could complete the robbery so prejudicial and ultimately deprived Defendant Pouncy of his right to a fair and impartial trial?

Defendant says "yes."

4. Was Defendant Pouncy's sixth amendment right to confrontation violated when the prosecution placed a police report on the jury panel ledge which was never admitted into evidence and only presented the prosecution's theory of the case and statements from non-testifying witnesses?

Defendant says "yes."

5. Was Defendant Pouncy denied his right to discovery, when the prosecution failed to provide the defense with the written statement of its complainant Thomas Sandstrom and reversal is required?

Defendant says "yes."

6. Was Defendant Pouncy deprived of his right to due process due to the prosecution's failure to correct the false testimony of its "Star Witness", Wayne Grime?

Defendant says "yes."

7. When the prosecutor argued that Defendant Pouncy created a lot of dust, threw up a lot of smoke, threw up a lot of mirrors, was a smooth talker, used a saleman's pitch in representing himself, was trying to talk his way out of the charges, and was very scheming does this constitute impermissible and inflammatory prosecutorial misconduct which attacked Defendant Pouncy in the capacity of being his own counsel and ultimately deprive him of a fair trial and constitutes a failure to respect Defendant Pouncy's right to self-representation, which requires automatic reversal?

Defendant says "yes."

8. Due to the newly discovered evidence of the complaining witness, Thomas Sandstrom, identifying Way Grimes, as the perpetrator after trial, instead of Defendant Pouncy, is a new trial required?

Defendant says "yes."

9. Did the impermissible prosecutorial misconduct deprive Defendant Pouncy of his right to a fair trial?

Defendant says "yes."

10. When stand-by counsel had no authority to stipulate that Defendant Pouncy's right to possess a firearm had not been restored pursuant to Michigan law, thereby stipulating that Defendant Pouncy was a convicted felon. Did this interference by stand-by counsel blatantly fail to respect Defendant Pouncy's right to self-representation and constitutes a denial of his right to self-representation and is its denial not amendable to harmless error analysis?

Defendant says "yes."

11. Was Defendant Pouncy deprived of his right to the effective assistance of counsel and thereby prejudiced?

Defendant says "yes."

12. Did Defendant Pouncy's counsel's incompetent advice, concerning his guideline range, which resulted in Defendant Pouncy's rejection of the plea offer constitute

ineffective assistance of counsel? And based on the inaccurate information provided to Defendant Pouncy, concerning the sentencing guideline range he faced, by the trial court, the prosecutor, and trial counsel must the plea agreement which was offered be reinstated?

Defendant says "yes."

13. Was counsel constitutionally ineffective for failing to file a motion for severance when the right existed because the joinder of two separate carjacking/armed robbery incidents arising out of two separate transactions embarrassed and confounded Defendant Pouncy in making his defense, where Defendant Pouncy, against his wishes, testified concerning both transactions, when he had only wished to testify concerning one of the carjacking/armed robbery transactions and wished to remain silent on the other and was the joinder prejudicial because it compromised his right to remain silent?

Defendant says "yes."

14. Was trial counsel constitutionally ineffective for failing to have the prosecution specify the time (dates) of the alleged offenses, where time was of an essence and was necessary in order for Defendant Pouncy to put forth an effective defense, the 13 day time period (september 29, 2005 through october 11, 2005) in which the jury had to conclude the offenses occurred on was too broad, and made it possible that some jurors may have found that the offenses occurred on september 29, 2005, while others may have found the offenses occurred on october 11, 2005 and other jurors were permitted to conclude that the offenses occurred on any other date all within the (september 29, 2005 through october 11, 2005) time period. Since it was therefore impossible for Defendant to effectively defend against the charges due to the wide time period in which the jury was permitted to find that the offenses occurred on?

Defendant says "yes."

15. Did trial counsel provide ineffective assistance by failing to investigate and

## STATEMENT OF FACTS

Defendant Omar Rashad Pouncy was charged with eleven felony counts arising out of two separate carjacking incidents which occurred on different dates, September 29, 2005, and October 11, 2005. One of the incidents involved the Sandstroms and the other involved Mr. Brady. At the preliminary examination, counsel for Mr. Pouncy objected to two cases being tried together. (PET 106). The district court granted the prosecutor's motion for bindover as charged. (PET 112-113).

Defendant Pouncy expressed dissatisfaction with his appointed attorney and explained to the trial court that counsel had not visited him to discuss the case, had not filed necessary pretrial motions, and had not filed his alibi notice. (T 1-24-06, pp. 4-18). Mr. Pouncy requested other counsel. (7). The trial court merely informed Defendant Pouncy that counsel was an experienced attorney, that Mr. Pouncy was not a trained lawyer and would not know whether his appointed counsel was representing him properly or not. (T 1-24-06, p. 10).

Mr. Pouncy was tried for two out of three alleged carjackings at the same trial, and the prosecutor sought to introduce a third carjacking as a "similar act" under MRE 404 (B) to prove identity and common schem, however, he didn't move to have this evidence introduced into the trial until the very first day of trial. The trial court stated that MRE 404 (B) was a rule of inclusion, and granted the request to introduce the "similar act" on the issue of identity. (29).

The trial court for some unknown reason closed the courtroom to the general public and Defendant Pouncy's family and friends during jury voir dire and certain motion hearings, without counsel objecting. (T 1-24-06, 23).

After the jury was selected, Mr. Pouncy requested permission to give his own opening statement, again expressing dissatisfaction with his attorney, including the fact that no alibi defense had been brought forward. (T 1-24-06, 213-216). The trial court told Mr. Pouncy he would have to either represent himself or have Mr. Breczinski

1

represent him. Defendant requested substitute counsel, both appointed and retained. (T 1-24-06, 215-217). The court told defense counsel that he would be giving the opening statement. Afterward, Mr. Pouncy expressed the desire to represent himself and Mr. Breczinski was ordered to remain as stand-by counsel.

Mr. Davis testified that Ed Brady brought a vehicle (a Camaro racing car) to his shop to put up for sale, and that on September 29, 2005, prospective buyer Jacob Woods came to look at the car. The witness identified Woods as Defendant Pouncy. (T 1-24-06, 226). On cross-examination, Defendant showed Mr. Davis some photographs, and the witness selected the wrong photograph as Mr. Pouncy. (243-245).

Earl Brady testified that he was trying to sell the 1979 Camaro. On September 29, 2005, he left Mr. Davis' shop with Jacob Woods, whom he identified as Defendant Pouncy, sitting at counsel table. (T 1-24-06, 274). Earl Brady was accompanied by Mr. Wendell, and there were two people with the buyer. (273). Mr. Brady drove the truck trailing the Camaro, Mr. Wendell drove a pick-up truck, and the buyer rode in a grey Intrepid, heading to the Mechanic's shop. The buyer called on his cell phone and asked Mr. Brady to back the truck and trailer into a driveway. (276) As they were standing around discussing the Camaro, one of Mr. Pouncy's associates pulled a black and silver gun and demanded Mr. Brady's keys and cell phone. Mr. Pouncy was "off to the left." (280). When the witness refused, the associate fired the gun up into the air and Mr. Brady complied. (281-282). "They told Mr. Wendell and Mr. Brady to walk across the street and into the woods. Mr. Brady was shown a lineup by the police. On cross examination, Mr. Brady identified Mr. pouncy in a photograph that was someone else, not Defendant Pouncy. (T 1-24-06, 302-305, 307-308).

Mr. Wendell identified Mr. Pouncy, sitting at counsel table, as the prospective buyer. (T 1-25-06, 11). Mr. Wendell was unable to identify Mr. Pouncy in a lineup, but he identified him at the oreliminary examination, wearing the jail-issued orange jumpsuit. (31).

2

Thomas Sandstrom testified that on October 11, 2005, a man came to his home to see a Cadillac that Mr. Sandstrom had advertised in the newspaper. (T 1-26-06, 66). Mr. Sandstrom made an in-court identification of Mr. Pouncy. He arrived in a metallic Intrepid at 5:45 pm. (69). Mr. Pouncy wanted to take the car to Kings Automotive. He and Mr. Sandstrom drove the Cadillac, another individual drove the Intrepid, and Mrs. Sandstrom followed in her car. (71). They all stopped at a gas station, where the Intrepid driver bought gas, and proceeded to a dirt road where Mr. Pouncy rang the doorbell of the last house on the road. (73). Someone came to the door. Mr. Pouncy asked Mr. Sandstrom for the title and they went to Mrs. Sandstrom's car. Mr. Sandstrom felt a gun in his side and Mr. Pouncy told his wife to get out of the car. (74). Mr. Sandstrom was asked for his wallet, then the Sandstroms were told to go into the woods. (75).

Mrs. Sandstrom identified Defendant, at counsel table, as the man who came to her home on October 11, 2005, inquiring about the Cadillac. (T 1-25-06, 141). She described driving to the dirt road and being told to go into the woods. (T 1-26-06, 10). Ms. Sandstrom memorized the license plate number of the Intrepid and gave it to the police. (15). Ms. Sandstrom viewed a photo lineup with her husband, simultaneousl. (42, 74). Ms. Sandstrom was unable to identify a picture displayed to her by Defendant Pouncy. (56).

Wayne Grimes was the prosecutor's star witness. He testified that he and Defendant Pouncy committed the crimes charged against Defendant. Mr. Grimes' father was married to Mr. Pouncy's mother. (T 1-26-06, 105). According to Mr. Grimes, Mr. Pouncy, his friend Tiaqua, and he went to the race shop. The owner of the car and another man followed the three of them to "his engineer." (108). They stopped at a gas station on the way. (109). When they stopped on Kellar Street, they all got out, Defendant nodded his head, and Mr. Grimes pulled out a gun and demanded cell phones and car keys, then ordered the two men into the woods. (112). Mr, Grimes claimed that he did not know what

happened to the cars. (113). Mr. Grimes pled guilty to armed robbery and felony firearm. (115).

Mr. Grimes testified that on October 11, 2005, he went with Mr. Pouncy to the Sandstrom house to look at another car. He followed Defendant and the owner of the Cadillac, stopping at a BP gas station on the way, to the same street as before, where Tiaqua got out. Grimes saw Mr. Pouncy by the door of the car driven by Ms. Sandstrom, and he heard screaming. Mr. Grimes claimed that he covered his license plate with a bag and drove away. (T 1-26-06, 121).

Dan Haynes and Samuel Anderson were allowed to testify regarding the 404 (B) case. Mr. Haynes testified that his brother was selling a car, which was located at Samuel Anderson's house. On October 21, 2005, a potential buyer, who Mr. Haynes identified in court as Defendant Pouncy, came to look at it and wanted to take it for a ride. (T 1-27-06, 108).

Samuel Anderson testified that on September 24, 2005, he showed Ralph Haynes' car to an individual he identified as Mr. Pouncy. (T 1-27-06, 171). Someone in a gray van dropped him off. (176). Mr. Pouncy, accompanied by Mr. Anderson, took it for a test drive and as they got to the ramp to 69, Defendant pulled a gun and said, "I own this car now." Mr. anderson was interviewed by the police and told them that "it was hard for me to tell black people apart from one another." (179). Mr. Pouncy requested the preliminary examination transcript to use to impeach Mr. Anderson's testimony and the trial court refused and said "it's really not part of this case." (193).

Detective Gagliardi testified that the photo lineup was put together on October 14, 2005. There was no lineup with Mr. Grimes. (T 1-27-06, 209). The police could not conduct a photo lineup with Mr. Grimes' photo because he was in custody. (211). Mr. and Mrs. sandstrom were allowed to view the lineup together. (214). Mr. Pouncy requested the reports that the detective had promised to provide at the time of the preliminary examination, but the trial court determined that the prosecution had given him everything they had. (106).

4

Mr. Pouncy testified on his own behalf. He was at work on September 29, 2005, on work release. Mr. Pouncy was employed by Tim's Remodeling and Paint, and he was working by himself, finishing the basement and bathroom areas of a house on Piper Street. (T 1-31-06, 164). He was there working on October 11, 2005, as well. (164). He called his mother to bring him lunch, and she brought it to him at 6:30 pm. (165). He waars a size $13\frac{1}{2}$ shoe and does not own a beige coat. (166). Mr. Pouncy did not do any of what the witnesses claimed that he did. (167). There was bad blood between Mr. Grimes and Defendant because of a girl and because Mr. Grimes had pulled a gun on him. (170). Mr. Pouncy would not have associated with Mr. Grimes.

Mrs. Marquetta Shahid Grimes, Defendant's mother, verfied that Mr. Pouncy called her on October 11, 2005, requesting lunch, and that she took him some food from Burger King to his job site at 6:30 pm. (T 1-31-06, 214-215).

Although Mr. Pouncy represented himself at trial, the trial court entrusted the selection of jury instructions to his stand-by counsel. The court asked the prosecutor and counsel whether they had looked at the instructions. The attorneys discussed the instruction list and then the prosecutor and Mr. Pouncy gave closing arguments.

On appeal of right Defendant Pouncy was represented by Ms. Chari K. Grove.

All other pertinent facts will be referenced throughout the brief.

5

I.   DEFENDANT POUNCY'S WAIVER OF COUNSEL WAS CON-
STITUTIONALLY INEFFECTIVE FOR A NUMBER OF DIF-
FERENT REASONS.

a). SINCE DEFENDANT POUNCY WAS FORCED TO CHOOSE BETWEEN SELF
ADMITTED UNPREPARED COUNSEL OR NO COUNSEL AT ALL DEFENDANT
POUNCY'S WAIVER OF COUNSEL WAS NOT A PRODUCT OF A FREE AND
MEANINGFUL CHOICE.

b). DUE TO DEFENDANT POUNCY BEING ERRONEOUSLY MISLED BY THE
TRIAL COURT, THE PROSECUTING ATTORNEY, AND TRIAL COUNSEL CON-
CERNING THE SENTENCING GUIDELINES RANGE DEFENDANT POUNCY WAS
SUBJECT TO IF CONVICTED, RENDERS DEFENDANT POUNCY'S WAIVER UN-
KNOWINGLY AND UNINTELLIGENTLY MADE.

c). DUE TO THE TRIAL COURT'S FAILURE TO ENSURE THAT DEFENDANT
POUNCY UNDERSTOOD THE CHARGES AND THEIR ASSOCIATED PENALTIES AT
THE TIME OF THE WAIVER OF COUNSEL RENDERS THE WAIVER OF COUNSEL
UNKNOWINGLY AND UNINTELLIGENTLY MADE.

d). DUE TO THE TRIAL COURT FAILING TO INFORM DEFENDANT POUNCY
OF THE STATUTORY 2 YEAR MINIMUM SENTENCE ASSOCIATED WITH THE
ARMED ROBBERY OFFENSES RENDERS DEFENDANT POUNCY'S WAIVER OF
COUNSEL UNKNOWINGLY AND UNINTELLIGENTLY MADE.

e). DUE TO THE TRIAL COURT'S FAILURE TO ADVISE DEFENDANT POUNCY
OF THE POTENTIAL PROBLEMS THAT AN INCARCERATED DEFENDANT MIGHT
ENCOUNTER IN OBTAINING EVIDENCE AND LOCATING AND QUESTIONING
WITNESSES BEFORE ALLOWING HIM TO REPRESENT HIMSELF, RENDERS
THE WAIVER OF COUNSEL UNKNOWNINGLY AND UNINTELLIGENTLY MADE.

f). DUE TO THE TRIAL COURT FAILING TO MAKE AN INQUIRY INTO THE
VOLUNTARINESS OF DEFENDANT POUNCY'S WAIVER OF COUNSEL ON THE
RECORD, VOLUNTARINESS CAN NOT BE PRESUMED FROM THE SILENT
RECORD AND DEFENDANT POUNCY'S WAIVER OF COUNSEL MUST BE ASSUMED
TO BE INVOLUNTARY.

At the very beginning of Defendant Pouncy's trial, counsel openly admitted to

the trial court that he was indeed not prepared for trial and exbited his confusion

as to his ability to effectively represent Defendant Pouncy at that particular time,

since he had not been provided with the investigative report from the private

investigator which was needed to make an informed decision as how to proceed at

trial, strategy wise. The following occurred in its pertinent parts:

Mr. Breczinski: [Defense Counsel] Your Honor I talked to my in-

vestigator that is retained for this matter, Lennie Acardo. I

don't have a written report but so far he has been coming up
with noting on some of the leads that we have as to possible
alibi witnesses and such. That's what he's told me. He's made
numerous calls and seen people and reviewing reports and every-
thing else and hasn't, and talked to my client I know several
times. Other than that I don't have a written report, any final
written report from him though. Since I have no details to say
whether  I'm ready for trial or not is problematic-

The Court: Okay.

Mr. Brezinski: just because I don't have that full detailed re-
port from him which I was expecting. (T 1-24-06, 3-4).

The record then clearly shows that the trial court ignored Defense counsel's
apparent dilemma in not having "the full detailed report" and counsel's obvious
request for a continuance to prepare for trial and represent Defendant Pouncy
effectively. The trial court moved on to the prosecution's concerns, without
addressing what counsel brought to his attention. (T 1-24-06, 4). Without this report
counsel could not make an informed decision on how to proceed at trial.

Once Defendant Pouncy learned that his trial court counsel was unprepared for
trial he took it upon himself to clearly inform the trial court that "I really don't
think this, we, we ready to go on... (T 1-24-06, 4-6). Again after counsel admitted
that he was unprepared for trial, Defendant Pouncy, asked the trial court to postpone
the trial so counsel could properly prepare for trial. However, his request was
denied by the trial court in an attempt to expedite the process. (T 1-24-06, 214).
Counsel said he would have to make assumptions without the written report. (T 1-24-
06, 17).

Only after the trial court wouldn't grant a continuance to allow Defendant
Pouncy's trial court counsel to prepare for trial after trial court counsel admitted
that he was not prepared and displayed confusion and disbelief in himself as to

whether he could effectively represent Defendant Pouncy, Defendant Pouncy was then forced to choose between unprepared counsel and no counsel at all, thereby forcing self-representation, and Defendant Pouncy involuntarily chose the lesser of the two evils. (T 1-24-06, 232-234).

Prior to the commencement of trial, the trial court, the prosecutor, and defense counsel misled Defendant Pouncy, by erroneously misadvising him of the sentencing guidelines he faced if he was convicted. All three, the trial court, the prosecutor, and defense counsel misinformed Defendant Pouncy that if he was convicted he would be subject to 135 months (11 years, 3 months) to 337 months (28 years, 11 months). However, Defendant Pouncy, was actually subjected to far more higher sentencing guidelines if convicted. Defendant Pouncy, was really subjected to 225 months (18 years, 9 months) to 562 months (46 years, 10 months) in prison if convicted, which is a significant increase compared to the sentencing guidelines the trial court, prosecutor, and defense counsel misadvised Defendant Pouncy of. The Following occurred in its pertinent parts:

> The Court: Now what are the guidelines on these offenses, assuming he were convicted of these offenses that are in the information, what would his guidelines be?
>
> Mr. Larobardiere: [Prosecutor] Mr. Brezinski has that judge.
> The Court: Would you tell me what his guidelines are Mr. Brezinski?
> Mr. Brezinski: Your Honor we sat down to, together, Chris, and I did and were figuring the guidelines and we figured with habitual third and the armed robbery, carjacking alone-
> The Court: Yeah.
> Mr. Brezinski: since those are the most serious ones I'd say, we're figuring with the habitual third it's a hundred and thirty-five months to three hundred and thirty-seven.
> The Court: Three hundred and thirty-seven?
> Mr. Brezinski: Yes.

The Court: All right. Hundred and thirty-five months to three
thirty-seven which is really somewhere in the neighborhood of
11.5 years to what, three hundred thirty-seven months is, ... š ... /
that's twenty years plus another hundred and thirty-seven months
which is probably about another nine years so that's somewhere
around almost thirty years isn't it?

Mr. Brezinski: Closer to (inaudible) years.

The Court: Three hundred and sixty would be thirty years so it'd
be about twenty, twenty-eight, twenty-nine years I think.

Mr. Brezinski: Around twenty-eight years.

The Court: All right So somewhere between eleven and-a-half to
twenty-eight years,6 somewhere in that area on the, on the
guidelines and so, just so you know Mr. Pouncy what that means
is that if you were convicted of all of the offenses and if you
were a habitual offender third and you came in front of me for
sentencing, the guidelines say that I should give you a sentence
somewhere between eleven and-a-half to twenty-eight, eight
years, do you understand that? All right now let's talk about
offer that's bein' made, what is the offer? (T 1-24-06, 19-21)

Although the trial court, the prosecutor, and defense counsel misadvised
Defendant Pouncy that if he was convicted and sentenced he was subject to sentencing
guidelines of 135 months (11 years, 3 months) to 337 months (28 years, 11 months) in
prison, however, his sentencing guidelines were actually 225 months (18 years, 9
months) to 562 months (46 years, 10 months) in prison, (See Presentence Investigation
Report), and the trial court imposed a sentenced based on the 225 months (18 years, 9
months) to 562 (46 years, 10 months) sentencing guidelines. The following occurred in
its pertinent part during sentencing:

The Court: All right, It looks like the guideline range would
still be E-6, which would mean the minimum is twenty-five-two ...
hundred twenty-five months to five hundred sixty-two months on
the carjacking affense as well as the armed robbery offense; and
I would make these corrections as to both sentencing information

9

reports. (ST 2-1-06, 34)

**************

Defendant Pouncy was indeed sentenced based on the 225 months (18 years, 9 months) to 562 (46 years, 10 months) advanced sentencing guidelines and not the initially erroneous misadvised sentencing guidelines of 135 months (11 years, 3 months) to 337 months (28 years, 11 months). This is the judgment of sentence of the trial court:

<u>JUDGMENT OF SENTENCE</u>

So it'll be the sentence of the Court as follows: On Count I, Carjacking, Habitual Offender Third, which carries up to life in prison, you're not entitled to any jail credit on that offense. <u>I'm gonna sentence you to serve a minimum of five hundred and sixty-two months, a maximum of eight hundred months.</u>
On Count II, Carjacking, Habitual Offender Third, <u>I'm gonna sentence you to serve a minimum of five hundred and sixty-two months, a maximum of eight hundred months.</u>
On Count III, Carjacking, Habitual Offender Third, I'm <u>gonna sentence you to serve a minimum of five hundred and sixty-two months, a maximum of eight hundred months.</u>
On the charge of Armed Robbery, the <u>guidelines on that is two twenty five to five sixty two.</u> I'm gonna order that you serve <u>a minimum of five hundred and sixty-two months, a maximum of eight hundred months.</u>
Count V, Armed Robbery, I'm gonna order you to serve a minimum of <u>five hundred and sixty-two months, a maximum of eight hundred months.</u>
On Count VI, Armed Robbery, I'm gonna order that you serve <u>a minimum of five hundred and sixty-two months, a maximum of eight hundred months.</u>

On the charge of Armed Robbery, Count Number VII, Habitual Offender Third, I'm gonna order that you serve <u>a minimum of five hundred and sixty-two months, a maximum of eight hundred months.</u>

On the offense, Count VIII, Felony Firearm, I'm gonna order that
you serve two years flat; that is to be served consecutive to
all of the other offenses except for the other Felony Firearm
charge; and I'm gonna give you a hundred forty-seven days of
jail credit against that offense.

On Count IX, Felony Firearm, I'm gonna order that you serve two
years flat on that offense; that is to be consecutive to all of
the other offenses except for Felony Firearm offense under VIII.
I'll give you a hundred and forty-seven days of jail credit
against that offense.

Carjacking, Count X, Habitual Offender Third, I'm gonna order
that you <u>serve five hundred and sixty-two days or sixty-two
months in the-in prison, eight hundred on the maximum.</u>
On the charge of Felon in Possession of a Firearm, Count XI,
that carries up to ten years in prison; and I'm not sure what
the guidelines are on that, but I'm gonna sentence you to serve
a minimum of twenty-four months, a maximum of a hundred and
twenty months; and that offense is to run consecutive to Counts
VIII and IX, but concurrent with Counts I, II, III, IV, V, VI,
VII and X  (ST 2-1-06, 81-83).

At the time Defenfant Pouncy made his waiver of counsel he was under the false
impression given to him by the trial court, the prosecutor, and defense counsel that
he was only going to be subject to a sentencing guideline range of 135 Months (11
years, 3 months) to 337 months (28 years, 11 months) and not the actual extremely
higher sentencing guideline range of 225 months (18 years, 9 months) to 562 months
(46 years, 10 months) in prison. Due to Defendant Pouncy being erroneously misadvised
by the trial court, prosecutor, and defense counsel of the sentencing guideline range
and consequently not being aware of the actual extremely higher sentencing guideline
range at the time of his waiver of counsel, renders Defendant Pouncy's waiver of
counsel unknowingly and unintelligently made. Defendant Pouncy should have been made
aware of the actual extremely higher sentencing guideline range of 225 months (18

years, 9 months) to (562 months (46 years, 10 months) in prison, before being allowed to represent himself. Had he been made aware of the actual sentencing guideline range he would not have took the risk of self-representation.

Also prior to the commencement of trial the trial court made an <u>unsuccessful</u> attempt to ensure that Defendant Pouncy understood the charges and their associated penalties, however, the trial court failed to receive any kind of response from Defendant Pouncy as to whether or not he understood the charges and their associated penalties. Defendant Pouncy never said that he understood either the charges or their associated penalties. The following occurred in its pertinent part:

> **The Court:** Yes I understand that. All right I understand that. Now, what I want to do at this point before we get the jury down here is I want to discuss what the plea offer is and what the guidelines are so at least Mr. Pouncy understands what's goin on there and he can't say he didn't have that information before he goes to trial. So Mr. Larobardiere will you first tell us what is the charges and what are the maximum penalties if you would please?
>
> **Mr. Larobardiere:** Yes Judge. Judge there are eleven counts. Count one carjacking, count two carjacking, count three carjacking, count four armed robbery, count five armed robbery, count six armed robbery, count seven armed robbery, count eight felony firearm, count nine felony firearm, count ten carjacking, count eleven felony possession of a firearm.
>
> **The Court:** Okay.
>
> **Mr. Larobardiere:** Judge there is a plea offer. He does have two prior felonies.
>
> **The Court:** What are the two priors for?
>
> **Mr. Larobardiere:** They are for—
>
> **Mr. Pouncy:** (Inaudible) no search warrant or nothin'
>
> **The Court:** <u>Mr. Pouncy I'm gonna ask you to be quiet again okay?</u> <u>Now if you can't be quiet I'm gonna remove you from the court-room and we're gonna have this trial without you present and</u>

then you won't know exactly what went on in here. So if you want
to be here to see what's happenin, then I suggest that you keep
your mouth shut. Go right ahead Mr. Larobardiere.

Mr. Larobardiere: Judge there are, I'm looking for (inaudible)
notice. There are two priors. One is for carrying a concealed
weapon and I believe delivery of marijuana.

The Court: Okay so he's, has the potential of facing a habitual
offender third is that what you're tellin' me?

Mr. Larobardiere: That's true. And the other is possession of
cocaine Judge.

The Court: All right so now if he were also convicted of habit-
ual offender third, the carjacking carries life, in fact all of
the carjacking offenses carry life, armed robbery carries life
of course, felony firearm is two years consecutive and preceding
any time done on the underlying felonies and then he's got car-
jacking which again is a life offense and then a felon in
possession which, if he were convicted of habitual offender
third, would make that offense not a five-year max but a ten
-year max is that correct? It would double the maximum is that
correct?

Mr. Larobardiere: Yes Judge

The Court: Now what are the guidelines on these offenses, assum-
ing he were convicted of these offenses that are in the informa-
tion, what would his guidelines be?

Mr. Larobardiere: Mr. Breczinski has that Jugde.

The Court: Would you tell me what his guidelines are Mr. Brec-
zinski?

Mr. Breczinski: Your Honor we sat down to, together, Chris and I
did and were figuring the guidelines and we figured with habit-
ual third and this was the armed robbery, carjacking alone-

The Court: Yeah

Mr. Breczinski: since those are the most serious ones I'd say,
we're figuring with the habitual third it's a hundred and thirty
-five months to three hundred and thirty-seven.

The Court: Three hundred and thirty-seven?

Mr. Breczinski: Yes.

The Court: All right. Hundred and thirty-five months to three thirty-seven which is really somewhere in the neighborhood of 11.5 years to what, three hundred thirty-seven months is, that's twenty years plus another hundred and thirty-seven months which is probably about another nine years so that's somewhere around almost thirty years isn't it?

Mr. Breczinski: Closer to (inaudible) years.

The Court: Three hundred and sixty would be thirty years so it'd be about twenty, twenty-eight, twenty-nine years I think.

Mr. Breczinski: Around twenty-eight years.

The Court: All right. So somewhere between eleven and-a-half to twenty-eight years, somewhere in that area on the, on the guide-lines and so, just so you know Mr. Pouncy what that means is is that if you were convicted of all of the offenses and if you were a habitual offender third and you came in front of me for sentencing, the guidelines say that I should give you a sentence somewhere between eleven and-a-half to twenty-eight, eight years , **do you understand that?** All right now let's talk about the offer that's bein' made. What is the offer. (T 1-24-06, 18-21).

As the record clearly demonstrates, the trial court tried to ascertain whether Defendant Pouncy, understood the charges and their associated penalties, but fail short when the trial court failed to receive a response from Defendant Pouncy, as to whether or not he understood the charges and their associated penalties , when Defendant Pouncy did not produce a positive or negative response. The trial court's failure to ensure that Defendant Pouncy understood the charges and their associated penalties, by failing to receive a direct response from him, prior to allowing him to represent himself, renders the waiver of counsel ineffective as being unknowingly and unintelligently made.

Moreover, prior to the commencement of trial the trial court stated all of the charges and **some** of their associated penalties. When going over the charges and their

associated penalties the trial court **failed** to advise Defendant Pouncy of **all** of the
associated penalties, specifically regarding the armed robbery charges. The trial
court failed to advise Defendant Pouncy of the mandatory 2 year sentence associated
with the armed robbery offenses  The following occurred in its pertinent part:

> **The Court:** All right so now if he were also convicted of habit-
> ual offender third, the carjacking carries life, in fact all of
> the carjacking offenses carry life, **armed robbery carries life**
> **of course,** felony firearm is two years consecutive and preceding
> any time done on the underlying felonies and then he's got car-
> jacking which again is a life offense and then a felon in poss-
> ession which, if he were convicted of habitual offender third,
> would make that offense not a five-year max but a ten-year max
> is that correct? It would double the maximum is that correct?
> (T 1-24-06, 19).

The trial court merely stated that "armed robbery carries life of course", when
it also carries a mandatory 2 year minimum. Due to the trial court's failure to
advise Defendant Pouncy of the mandatory 2 year minimum sentence associated with the
armed robbery offenses, his waiver of counsel is rendered ineffective as being
unknowingly and unintelligently made.

Prior to allowing Defendant Pouncy to represent himself the trial court advised
him of **some** of the dangers and disadvantages associated with self-representation,
however, the trial court **failed** to advise him of one of the most important
disadvantages associated with self-representation. The trial court failed to advise
Defendant Pouncy of the potential problems that an incarcerated defendant might
encounter in obtaining evidence and locating and questioning witnesses prior to
allowing him to represent himself. This failure renders the waiver of counsel
ineffective as unknowingly and unintelligently made.

Furthermore, after Defendant Pouncy made his **involuntary** request to represent
himself the trial court **failed** to make the prerequisite inquiry into the

15

voluntariness of the choice to waive counsel prior to allowing Defendant Pouncy to represent himself. The following occurred in its pertinent part:

> The Court: Please everyone have a seat and we're on the record Mr. Breczinski. What is it that you want to say to me at this time?
>
> Mr. Breczinski: During the direct examination of what is the first witness of this matter, Mr. Scoot Davis, my client wrote a note which he passed me that says, and I quote, "I'm gonna represent myself from now on so you can tell the Judge" and he apparently does desire that he definitely wishes to represent himself.
>
> The Court: Okay Mr. Pouncy would you stand sir? Is that your desire at this time? Please remain standing sir. Mr. Pouncy you understand you have the right to an attorney and you have the right to Court appointed counsel if you can't afford one, do you understand that?
>
> Mr. Pouncy: <u>I don't have an attorney right now.</u>
>
> The Court: Sir I'm just asking you do you understand your rights sir?
>
> Mr. Pouncy: Oh yes I do understand.
>
> The Court: You understand that if you represent yourself that I will have to treat you like any other lawyer and if you don't comply with the Court rules I'm gonna have to call you on it you understand that?
>
> Mr. Pouncy: Yes sir.
>
> The Court: And you understand that Mr. Breczinski will he here just simply to advise you from this trial forth and if you stand up and start representing yourself you're not gonna be able to change horses in the middle of the stream. You're gonna be representing yourself from beginning to end sir. Is that what you really want to do?
>
> Mr. Pouncy: Yes. Yes.
>
> The Court: Mr. Pouncy I'm gonna tell you that in my opinion you have no business representing yourself, none whatsoever.

Mr. Pouncy: The fact that they found the (inaudible) shoe--

The Court: Sir I just, sir I just want you to understand that uh--

Mr. Pouncy: All right I'm ready to go then. (T 1-24-06, 232-232).

At that point the trial court allowed Defendant Pouncy to proceed to represent himself **without** advising him of the potential problems that an incarcerated defendant might encounter in obtaining evidence and locating and questioning witnesses. Moreover, the record clearly shows that the trial court failed to make the prerequisite inquiry as to the voluntariness of the waiver of counsel prior to allowing Defendant Pouncy to represent himself. The failure to inquire about the voluntariness of the waiver of counsel renders the waiver ineffective because voluntariness of the waiver can **not** be presumed.

Due to the ineffectiveness of the waiver of counsel Defendant Pouncy's convictions must be reversed, because an ineffective waiver of counsel renders the entire proceeding and resulting convictions unreliable.

STANDARD OF REVIEW:

The Court reviews the record de novo to determine whether the waiver of the right to counsel was constitutionall adequate. People v Russel, 471 Mich 182, 187, 684 NW2d 745 (2004). No objection is required to preserve this issue for review. Hunt v Mitchel, 261 F.3d 575, 582 (CA 6, 2001).

DISCUSSION:

Defendant's who face incarceration are guaranteed the right to counsel at all critical stages of the criminal process by the Sixth Amendment, People v Williams, 470 Mich 634, 641; 683 NW2d 597 (2004), citing Maine v Moulton, 474 US 159, 170; 106 S.Ct. 477; 88 L.Ed.2d 481 (1985), which applies to the states through the Due Process Clause of the Fourteenth Amendment. Williams, supra at 641, citing Gideon v Wainwright, 372 U.S. 335; 83 S.Ct. 792; 9 L.Ed.2d 799 (1963). Both federal and state

law also guarantee a defendant the right of self-representation, People v Adkins (After Remand), 452 Mich 702, 720; 551 NW2d 108 (1996), overruled in part on other grounds by Williams, supra at 641 n. 7; Faretta v California, 422 U.S. 806; 95 S.Ct. 2525; 45 L.Ed.2d 562 (1975). See also Const 1963, art 1, § 13; Mcl 763.1., although this right is subject to the trial court's discretion. People v Denney, 445 Mich 412, 427; 519 NW2d 128 (1994); People v Anderson, 398 Mich 361, 366; 247 NW2d 857 (1976).

Defendant Pouncy's waiver of counsel was ineffective for the following reasons:
## FORCED TO CHOOSE BETWEEN SELF ADMITTED UNPREPARED COUNSEL OR NO COUNSEL AT ALL (SELF-REPRESENTATION), RENDERS WAIVER INVOLUNTARY.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right...to have Assistance of Counsel for his defense " U.S. Const. Amend. VI. Moreover, the Supreme Court has proclaimed that "the guiding hand of counsel "must be made available in criminal trials to those that can not afford to hire an attorney on their own. United States v Ash, 413 U.S, 300, 308, 93 S Ct, 2568, 37 L.Ed.2d 619 (1973); Gideon v Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). "Compliance with this constitutional mandate is an essential jurisdictional prerequisite to a...court's authority to deprive an accused of his life or liberty." Johnson v Zerbst, 304 U.S. 458, 467, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

The Sixth Amendment is unique, however, because it not only guarantees a substantial right-the right to counsel-it also guarantees the converse right to proceed without counsel at trial. [T]he Constitution does not force a lawyer upon a defendant." Faretta v California, 422 U.S. 806, 814-15, 95 S.Ct. 2525, 45 L.Ed.2d. 562 (1975), (quoting Adams v United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1943)). The Sixth Amendment thus embodies two competing rights because exercising the right to self-representation necessarily means waiving the right to counsel, Buhl v Cooksey, 233 F.3d 783, 789 (3d Cir. 2000). Concomitantly, proceeding to trial represented by counsel as guaranteed under the Sixth Amendment means that a defendant has not articulated a desire to waive that

18

right and exercise his/her right to proceed pro se.

"A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege" and must be the product of a free and meaningful choice. Johnson, 304 U.S. at 464, 58 S.Ct. 1019. "[C]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights." Id. In order to protect the right to counsel, the Constitution requires that any waiver of that right be the product of the voluntary exercise of free will. Faretta, 422 U.S. at 835, 95 S.Ct. 2525.

> It is axiomatic that a criminal defendant's waiver of a consti-
> tutional right must be voluntary, knowing, and intelligent.
> Therefore, the constitutional right of self-representation in a
> criminal case is conditional upon voluntary, knowing and intell-
> igent waiver of the right to be represented by counsel.

Buhl, 233 F.3d at 789.

A clear choice between two alternative courses of action does not always permit a petitioner to make a voluntary decision. If a choice presented to a petitioner is constitutionally offensive, then the choice cannot be voluntary. A defendant may not be forced to proceed with incompetent counsel; a choice between proceeding with incompetent counsel or no counsel is in essence no choice at all. The permissibility of the choice presented to the [defendant]...depends on whether the alternative to self-representation offered operated to deprive him of a fair trial. Wilks v Israel, 627 F.2d 32, 35 (7th Cir. 1980) (internal citations omitted).

Therefore, a reviewing court must be "confident the defendant is not found to make a choice between incompetent counsel or appearing pro se." United States v Taylor, 113 F.3d 1136, 1140 (10th Cir. 1997). (In referring to defense counsel here as "incompetent" Defendant in no way intend to suggest anything about his ability or professionally, for not having an opportunity to review the critical investigative report, but remain adamant about his incompetence regarding the issues outlined in

19

the ineffective assistance of counsel claims. Rather, regarding this particular issue at bar, Defendant is only referring to the fact that the circumstances here (not having access to the critical investigative report prior to trial and thereby not having the opportunity to make informed decisions), put counsel in a position where he could not competently proceed to represent Defendant Pouncy at trial absent more time to adequately prepare. The "court [must] decide whether the defendant was bowing to the inevitable or voluntarily and affirmatively waiving his right to counsel." United States v Salemo, 61 F.3d 214, 222 (3d Cir. 1995) (quotations omitted); see also United States ex rel. Martinez, 526 F.2d 750, 755-6 (2d Cir 1975) ("appellant was given no freedom of choice to decide whether he wished to defend himself. His choice, if choice it can be called, was based entirely on his bowing to the inevitable.").

This imposes on the trial court, "the weighty responsibility of conducting a sufficiently penetrating inquiry to satisfy itself that the defendant's waiver of counsel is knowing and understanding as well as voluntary." United States v Peppers, 302 F.3d 120, 130-31 (3d Cir. 2002). "A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is rendered." Von Moltke v Gillies, 332 U.S. 708, 724, 68 S.Ct. 316, 92 L.Ed. 309 (1948). In conducting this examination a court can evaluate the motives behind defendant's dismissal of counsel and decision to proceed pro se. United States v Stubbs, 281 F.3d 109, 117 (3d Cir. 2002). Moreover, although the record here does not suggest that Defendant Pouncy's request for a continuace was manipulative, we have cautioned that "even well-founded suspicions of intentional delay and manipulative tactics can provide no substitute for the inquiries necessary to protect a defendant's constitutional rights." United States v Welty, 674 F.2d 185, 189 (3d Cir 1982); see also Buhl, 233 F.3d at 796. Although, a trial court ruling on a request

for a continuance may certainly consider such factors as "the importance of the efficient administration of justice," Buhl, 233 F.3d at 797, the court cautioned that "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an emptry formality." Martinez, 526 F.2d at 755.

Here, in the case at bar, the facts are identical to the facts in Pazden v Maurer, 424 F.3d 303 (3rd Cir. 2005). In Pazden, supra, the petitioner "merely bowed to the inevitable" when he opted to represent himself at trial [on a] complex, 133-count indictment," because he was confronted with "the unconstitutional dilemma of either representing himself or proceeding to trial with assigned counsel who admitted being unpreapred and unfamiliar with the record. "Therefore,...his [Pazden's] decision to waive counsel and represent himself was not "voluntary in the constitutional sense." Pazden, 424 F.3d 315.

In the case at bar, just like Pazden, supra, prior to the commencement of trial Defendant Pouncy's trial court attorney openly admitted that he was unprepared for trial and expressed unequivocal disbelief and confusion regarding his ability to cometently represent Defendant Pouncy at trial competently represent Defendant Pouncy at that particular time, due to him not having access and the ability to review the full details of the critical investigative report. Counsel said it was **"problematic"** to say if he was ready for trial or not, without the details of the report.

In the case at bar, Defendant Pouncy only involuntarily chose "the lesser of two evils", by opting to represent himself Pazden, 424 F.3d 317, only after hearing that his counsel was unprepared for trial, his counsel expressed disbelief and confusion in his ability to competently represent Defendant Pouncy at trial if it was to proceed at that time, after the trial court denied the defense's request for a continuance to allow his counsel to prepare for trial, and after the court gave Defendant Pouncy an unconstitutional choice of choosing between self-admitted

21

unprepared counsel and self-representation. The following is the unconstitutional choice Defendant Pouncy was faced with:

> The Court: The only issue now is is are you gonna let Mr. Brec-
> zinski represent you or are you gonna represent yourself, that's
> the only thing that's on the table right now. (T 1-24-06, 216).

A sound trial strategy is one that is developed in concert with an investigation that is adequately supported by reasonable professional judgments. Counsel must make "an independent examination of the facts, circumstances, pleadings and laws involved ...Von Moltke v Gillies, 332 U.S. 708, 721, 68 S.Ct. 316, 92 L.Ed. 309 (1948). This includes pursuing "all leads relevant to the merits of the case." Blackburn v Foltz, 828 F.2d 1177, 1183 (CA 6, 1987).

In the case at bar, without having the opportunity to examine the facts developed from the investigation conducted by the defense's private investigator, which was contained in the investigative report, Defendant Pouncy's counsel was unable develop a sound trial strategy, because without having the opportunity to review the full detailed report, any decision would have been uninformed. Thus cousel was indeed unprepared and incapable of competently representing Defendant Pouncy, under the circumstances.

Clearly, under Faretta, Defendant Pouncy had the right to waive counsel and proceed to trial pro se. However, Defendant Pouncy could only have done so if he was "voluntarily exercising his informed free will." See Faretta, 422 U.S. at 835, 95 S.Ct 2525. "[T]here can be no doubt that [those who wrote the Bill of Rights] understood the inestimable worth of free choice." Id. at 833, 95 S.Ct. 2525. Here, Defendant Pouncy was not exercising his free will, but was instead compelled to proceed pro se only because his attorney had not been given enough time to obtain and review the full detailed investigative report, so he could make informed decisions. The record here supports Defendant Pouncy's contention that his decision to proceed

pro se was not an exercise of free will, rather it was the result of him "bowing to the inevitable". This record is replete with statements and submissions by Defendant Pouncy's attorney explaining that he was unprepared to proceed to trial, as well as statements by Defendant Pouncy explaining the dilemma he was placed in by counsel's inability to competenly represent him.

Here, the court's denial of the defense's request for a continuance to prepare for trial, specifically to allow counsel to obtain and review the full details of the investigative report, so he could make informed decisions, forced Defendant Pouncy to choose between the "lesser of two evils", effectively leaving him with "no choice in th[e] matter at all". This hardly constitutes a voluntary choice to waive one's Sixth Amendment right to counsel under Faretta, and it is inconsistent with teachings of Johnson  Pazden, 424 F.3d at 316-17

Similarly, in Sanchez v Mondragon, 858 F.2d 1462, 1465 (10th Cir. 1988), reversed on other grounds, the court explained, "[a] choice between incompetent or unprepared counsel and appearing pro se is a dilemma of constitutional magnitude. The choice to proceed pro se cannot be voluntary in the constitutional sense when such a dilemma exists." See also Wilks, 627 F.2d at 36 ("A clear choice between two alternative courses of action does not always permit a petitioner to make a voluntary decision. If a choice presented to a petitioner is constitutionally offensive, then the choice cannot be voluntary...The permissibility of the choice presented to the petitioner...depends on whether the alternative to self-representation offered operated to deprive him of a fair trial.") Maynard, 545 F.2d at 278 ("[A] criminal defendant may [not] be asked...to choose between waiver and another course of action [if] the choice presented to him is...constitutionally offensive."); United States ex rel. Martinez, 526 F.2d at 756 (appellant's choice, "if choice it can be called, was based entirely on his bowing to the inevitable.").

Defendant Pouncy's waiver of counsel was involuntarily made because he was

forced to chose the lesser of two evils when the trial court gave him the unconstitutional options of choosing between admittedly unprepared counsel or self-representation. Reversal is required because an ineffective waiver of counsel constitutes per se prejudicial error, and harmless error standard is inapplicable. McKaskle v Wiggins, 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984).

WAIVER UNKNOWINGLY AND UNINTELLIGENTLY MADE DUE TO THE COURT, THE PROSECUTOR, AND THE TRIAL COURT PROVIDING DEFENDANT POUNCY WITH ERRONEOUS MISLEADING INFORMATION CONCERNING THE SENTENCING GUIDELINE RANGE HE FACED IF CONVICTED

A defendant's decision to forgo counsel and instead to defend himself-known as a "Faretta waiver"-is valid if the request is timely, not for the purposes of delay, unequivocal, **and knowing and intelligent.** U.S. v Arlt, 41 F.3d 516, 519. In order to deem a defendant's Faretta waiver knowing and intelligent, the court must insure that he understands 1) the nature of the charges against him, 2) **the possible penalties**, and 3) the "dangers and disadvantages of self-representation." Balough, 820 F.2d at 1487. On appeal the [prosecution] carries the burden of establishing the legality of the waiver. United States v Mohawk, 20 F.3d 1480, 1484 (9th Cir. 1994), and the court must evaluate the question with great care, indulging "every reasonable presumption against waiver." Arlt, 41 F.3d at 520 (quoting Brewer v Williams, 430 U.S. 387, 404, 97 S.Ct 1232, 51 L.Ed.2d 424 (1977)).

To ensure that a defendant's waiver is made with eyes wide open, a judge must thoroughly investigate the circumstances under which the waiver is made. See Von Moltke v Gillies, 332 U.S. 708, 724, 68 S.Ct. 316, 92 L.Ed. 309 (1948) (plurality). The Supreme Court gave guidelines for courts to consider when excepting a waiver of counsel.

> To be valid such waiver must be made with an apprehension of the
> nature of the charges, the statutory offenses included within
> them, the range of allowable punishment thereunder, possible de-
> fenses to the charges and circumstances in mitigation thereof,

and all other facts essential to a broad understanding of the
whole matter. Id. at 724, 68 S.Ct. 316.

In U.S. v Erskine, 355 F.3d 1161 (9th Cir. 2004), the Court held that the
Petitioners waiver of counsel was ineffective to the extent that it was unknowingly
and unintelligently made when the court advised him of **incorrect** sentence he faced in
the event of coviction.

In the case at bar, prior to allowing Defendant Pouncy to waive his right to
counsel, the trial court, prosecutor, and trial court counsel all provided Defendant
Pouncy with erroneous information concerning the sentencing guideline range he was
subject to in the event of conviction. The trial court, prosecutor, and trial court
counsel erroneously informed Defendant Pouncy that his sentencing guideline range was
135 months (11 years, 3 months) to 337 months (28 years, 11 months). However,
Defendant Pouncy's actual sentencing guideline range was far more higher than what
the trial court, prosecutor, and trial court counsel initially informed him of. On
the minimum end of the sentencing guideline range the actual sentencing guideline
range was **7 years and 6 months higher** than the initially informed erroneous
sentencing guideline range, which made the actual minimum sentencing guideline range
**225 months (18 years, 9 months)**, which is a significant increase, that Defendant
Pouncy should have been made aware of prior to being able to waive his right to
counsel, so that his waiver could have been made knowingly and intelligently. On the
maximum end of the sentencing guideline range the actual sentencing guideline range
was **17 years and 9 months higher** than the initially informed erroneous sentencing
guideline range, which made the actual maximum sentencing guideline range **562 months
(46 years, 10 months),** which is also a significant increase, that Defendant Pouncy
should have been made aware of prior to being able to waive his right to counsel so
that his waiver could have been made knowingly and intelligently.

Moreover, Defendant Pouncy was indeed sentenced based on the uninformed

sentencing guideline range of 225 months (18 years, 9 months) to 562 months (46 years, 10 months). The trial court sentenced Defendant Pouncy to 562 months (46 years, 10 months), the maximum end of the uninformed sentencing guideline range, to 800 months (66 years, 8 months). The trial court's failure to inform Defendant Pouncy of the **correct** sentening guideline range renders his waiver of counsel ineffective to the extent that it was not knowingly and intelligently made. He did not know that he faced a sentening guideline range would have allowed him to be sentenced to serve a minimum prison term of 46 years and 10 months.

As the Court held in Erskine, 335 F.3d 1161 (9th Cir. 2004):

> It is the court's failure to inform the defendant of the correct [sentencing guideline range] that affects the decision, which, in turn, gives rise to the harm and to the per se prejudice. See Arlt, 41 F.3d at 524. Erskine, 355 F.3d at 1170 n. 12.

It was further held:

> Where, as here, the district court provides erroneous advice to the defendant at the time of the Faretta hearing, any prior knowledge or understanding the defendant may have had becomes void **because a reasonable defendant would rely on the court's instruction and would weigh the decision to forgo or retain counsel on the basis of the information (faulty or not) provided by the court. Id. at 1171 n. 13.**

When Defendant Pouncy opted, although, involuntarily to represent himself, at the time of the waiver of counsel, due to the trial court's, the prosecutor's, and trial court counsel's erroneous misleading information he was under the false impression that his sentencing guideline range was only 135 months (11 years, 3 months) to 337 months (28 years, 11 months) and not the actual sentencing guideline range of 225 months (18 years, 9 months) to 562 months (46 years, 10 months) in prison. Consequently since he was not aware of the actual sentencing guideline range, which was significantly higher than the initially erroneous informed sentencing

guideline range, his waiver of counsel was unknowingly and unintelligently made. Reversal is required because an ineffective waiver of counsel constitutes per se prejudicial error, and harmless error standard is inapplicable. Mckaskle v Wiggins, 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.ed 2d 122 (1984).

## WAIVER INEFFECTIVE DUE TO TRIAL COURT FAILING TO ENSURE THAT DEFENDANT POUNCY UNDERSTOOD CHARGES AND ASSOCIATED PENALTIES PRIOR TO PERMITTING SELF REPRESENTATION.

A defendant's decision to forgo counsel and instead to himself-known as a "Faretta waiver"-is valid if the request is timely, not for the purposes of delay, unequivocal, and knowing and intelligent. Arlt, 41 F.3d at 519. In order to deem a defendant's Faretta waiver knowing and intelligent, the [trial] court **must ensure that he understands** 1) the nature of the charges against him, 2) the possible penalties....Balough, 820 F.2d at 1487. On appeal, the prosecutor carries the burden of establishing the legality of the waiver. United States v Mohawk, 20 F.3d 1480, 1484 (9th Cir. 1994), and this Court evaluates the question with great care, indulging "every reasonable presumption against waiver." Arlt, 41 F.3d at 520 (quoting Brewer v Williams, 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)).

It is an undisputable fact that a defendant seeking self-representation must expressly state that he understands the charges against him and their associated penalties, prior to being allowed to represent himself. Here, in the case at bar, althouhg the trial court advised Defendant Pouncy of the charges and associated penalties he faced, the trial court failed to ascertain whether or not Defendant Pouncy understood the charges and associated penalties. Although the trial court asked Defendant Pouncy, if he understood the charges and their associated penalties, the record clearly shows that the trial court did **not** receive a response to the negative or the positive. Moreover at the time the trial court was explaining the charges and their associated penalties, the record clearly shows that Defendant Pouncy was not even paying attention and was being disruptive to the extent that the

27

trial court had to threaten to gag and remove him from the courtroom, so that's probably why Defendant Pouncy didn't answer whether he understood or not because he probably was not paying any attention.

As held in Erskine, 355 F.3d 1161 (9th Cir. 2004):

> The "appropriate inquiry [on appeal] **is what the defendant un-derstood-not what the court said** or understood," see, e.g., Balough, 820 F.2d at 1487-88; United States v Harris, 683 F.2d 322, 325 (9th Cir. 1982); United States v Kimmel, 672 F.2d 720, 722 (9th Cir. 1982).

In the case at bar, the record fails to show that Defendant Pouncy understood the charges and their associated penalties **at the time he sought to represent himself.** The question is not, broadly, what the record reveals about Defendant Pouncy's understanding of the charges and associated penalties throughout the different stages of the proceedings-pretrial, trial, and sentencing- but specifically what the defendant understood at the particular stage of the proceedings at which he purportedly waived his right to counsel. See U.S. v Erskine, 355 F.3d 1161 (9th Cir. 2004); Balough, 820 F.2d at 1489 (reviewing the record and formulating the operative inquiry as whether the evidence "show[ed] that Balough understood the dangers and disadvantages of self-representation at the time he sought to waive his right to counsel.

Defendant Pouncy failed to respond either to the positive or the negative when the trial court asked if he understood the charges and their associated penalties, so the trial court erred in allowing him to waive his right to counsel prior to ensuring that he understood the charges and their associated penalties  In light of the trial court failing to ascertain an expressed statement from Defendant Pouncy as to whether he understood, at the time of his waiver of counsel, the charges and their associated penalties the waiver must be deemed ineffective to the extent that it was unknowingly and unintelligently made. This court must "[19]indulge every reasonable presumption

against waiver of fundamental constitutional rights."[1] Johnson v Zerbst, 304 U.S. 458, 464; 58 S.Ct. 1019; 82 L.Ed. 1461 (1938).

The trial court's failure to ensure that Defendant Pouncy understood the charges and their associated penalties at the time he sought to waive his right to counsel constitutes per se prejudicial error, and harmless error standard is inapplicable. McKaskle v Wiggins, 456 U.S. 168, 177 n.8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984).

Waiver unknowingly and unintelligently made due to the trial court failing to inform Defendant Pouncy of the mandatory 2 year minimum sentence associated with the armed robbery offense prior to allowing him to represent himself

A trial court must satisfy the requirements of MCR 6.005 (D), which prohibits the trial court from allowing the defendant to make an initial waiver of the right to counsel without first:

> (1) advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation. See also People v Russell, 471 Mich 182, 190-191, 684 NW2d 745 (2004).

In Michigan, Armed Robbery carries up to life in prison, however, it also carries a mandatory 2 year minimum sentence of imprisonment. MCL 750.529 holds:

> A person who engages in conduct proscribed under section 530 and who in the course of engaging in that conduct, possesses a dangerous weapon or an article used or fashioned in a manner to lead any person present to reasonably believe the article is a dangerous weapon, or who represents orally or otherwise that he or she is in possession of a dangerous weapon, is guilty of a felony punishable by imprisonment for life or any term of years. In an aggravated assault or serious injury is inflicted by any person while violating this section, the person shall be sentenced to a minimum term of imprisonment of not less than 2 years.

As explained in United States v Peppers, 302 F.3d 120 (3rd Cir. 2002), [a] Court's inquiry must establish that the defendant understands **"all** risks and **consequences** associated with his decision for self-representation," and "even [if] the colloquy skips just **one** of the [relevant] factors," it fails to establish that the waiver is knowing, intelligent, and voluntary. 302 F.3d at 135.

In the case at bar, the trial court informed Defendant Pouncy that the armed robbery offenses (Defendant Pouncy was charged with a total of four armed robbery offenses), carried up to life in prison, however, the trial court **failed** to inform Defendant Pouncy that the armed robbery offenses also carried a mandatory 2 year sentence, which renders Defendant Pouncy's waiver of counsel ineffective to the extent that it was unknowingly and unintelligently made because at the time of the waiver of counsel, he did not know that if he was convicted of the armed robbery offenses he was subject to a mandatory 2 year sentence on each count. The court's failure to advise Defendant Pouncy of the mandatory 2 year sentence prior to allowing self-representation constitutes per se prejudicial error, and harmless error standard is inapplicable. McKaskle v Wiggins, 465 U.S. 168, 177 n.8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). Reversal is required

WAIVER OF COUNSEL UNKNOWINGLY AND UNINTELLIGENTLY MADE DUE TO TRIAL COURT'S FAILURE TO ADVISE DEFENDANT POUNCY OF THE POTENTIAL PROBLEM THAT AN INCARCERATED DEFENDANT MIGHT ENCOUNTER IN OBTAINING EVIDENCE AND LOCATING AND QUESTIONING WITNESSES, PRIOR TO ALLOWING HIM TO WAIVE HIS RIGHT TO COUNSEL.

In order to deem a defendant's Faretta waiver knowing and intelligent, the trial court must ensure that he understands...the "dangers and disadvantages of self-representation." Balough, 820 F.2d at 1487.

In the case at bar, the trial court did advise and ensured that Defendant Pouncy understood **some** of the dangers and disadvantages of self-representation, however advising him of some is constitutionally inadequate. As explained in Peppers, the trial court's inquiry must establish that the defendant understands **"all risks** and

consequences associated with his decision for self-representation," and "even [if] the colloquy skips just one of the [relevany] factors," it fails to establish that the waiver is knowing, intelligent, and voluntary. 302 F.3d at 135. Here, the trial court failed to establish that the waiver was knowing, intelligent, and voluntary because during the cursory colloquy between Defendant Pouncy and the trial court failed to advise Defendant Pouncy of the potential problems that an incarcerated defendant might encounter in obtaining evidence and locating and questioning witnesses, prior to allowing him to waive his right to counsel. Defendant Pouncy was an incarcerated defendant and did not know that he would be hampered by his incarceration, in his pursuit of obtaining evidence and locating and questioning witnesses at the time he sought self-representation. The failure on the behalf of the trial court to advise Defendant Pouncy of this "danger and disadvantage", prior to allowing him to waive his right to counsel, renders the resulting waiver unknowingly and unintelligently made, which constitutes per se prejudicial error, and harmless error standard is inapplicable. McKaskle v Wiggins, 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984).

Defendant Pouncy indeed encountered problems obtaining evidence and locating and questioning witnesses while representing himself. Obtaining gun (T 1-26-06, 147); locating alibi witnesses  (T 1-27-06, 5); having opportunity to review evidence in prosecution's possession (T 1-27-06, 7); obtaining the exculpatory video surveillance from the BP Gas station (T 1-27-06, 300); obtaining exculpatory video surveillance from Northern High School (T 1-27-06, 301); obtaining reports surrounding recoveries of the vehicles (T 1-27-06, 301); interviewing witnesses (T 1-31-06, 158); and interviewing other incarcerated witnesses such as Wayne Grimes Jr. Reversal is required.

WAIVER OF COUNSEL INEFFECTIVE DUE TO TRIAL COURT'S COMPLETE FAILURE TO MAKE INQUIRY INTO VOLUNTARINESS OF WAIVER

The Supreme Court reiterated in Faretta v California, 422 U.S. 806, 807, 95 S.Ct 2525, 45 L.Ed.2d 562 (1975), that the Sixth and Fourteenth Amendments of the U.S. Constitution guarantee every defendant a right of self-representation. Id. at 821, 95 S.Ct. 2525. When a defendant chooses to effectuate the right of self-reprtesentation, he forgoes, as a factual matter, the benefits associated with representation by legal counsel. Id. at 834, 95 S.Ct. 2525. These benefits are of the utmost importance in a criminal proceeding, because a person's very freedom is at stake. In consideration of the gravity of such circumstances, the Supreme Court mandated that an individual who wishes to represent himself must waive the right to counsel "knowingly and intelligently" **on the record.** Id.

In this regard, the court serves a protective function. This function is accompanied by a responsibility to a defendant to ensure that a waiver of counsel is appropriate in consideration of this mandate. The Faretta Court articulated this duty to a defendant who wishes to waive his right to counsel, "he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes wide open.'" Id. (citations omitted).

To ensure that a defendant's waiver is made with eyes wide open, a judge must thoroughly investigate the circumstances under which the waiver is made. See Von Moltke v Gillies, 332 U.S. 708, 724, 68 S.Ct. 316; 92 L.Ed. 309 (1948) (plurality). The Supreme Court gave guidelines for courts to consider when excepting a waiver of counsel:

> To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowed punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.

Id, at 724, 68 S.CT. 316. While the extent to which a court must probe into these elements i order to render a waiver of counsel proper varies from case to case, the court's obligation to maintain the integrity of the Sixth Amendment remains constant. A defendant's waiver of his right to counsel must be made on the record knowingly, intelligently, and voluntarily. Fowler v Collins, 253 F.3d 244 (6th Cir. 2001).

Guidelines For District Judges from 1 bench Book for United States District Judges 1.02-2 to 5 (3d ed 1986):

When a defendant states that he wishes to represent himself, you should...ask questions similar to the following:

a) Have you ever studied law?

b) Have you ever represented yourself or any other defendant in a criminal action?

c) You realize, do you not, that you are charged with these crimes. (Here state the crimes with which the defendant is charged.)

d) You realize, do you not, that if you are found guilty of the crime charged in Count I the court must impose an assessment of at least $50.00 ($25.00 if a misdemeanor) and could sentence you to as much as _____ years in prison and fine you as much as $_____ ?

e) You realize, do you not, that if you are found guilty of more than one of those crimes this court can order that the sentence be served consecutively that is, one after another?

f) You realize, do you not, that if you represent yourself, you are on your own? I cannot tell you how you should try your case or even advise you as to how to try your case?

g) Are you familiar with the Federal Rules of Evidence?

h) You realize, do you not, that the Federal Rules of Evidence govern what evidence may or may not be introduced at trial and in representing yourself, you must abide by those rules.

i) Are you familiar with Federal Rules of Criminal Procedure?

33

j) You realize, do you not, that those rules govern the way in which a criminal action is tried in federal court?

k) You realize, do you not, that if you decide to take the witness stand, you must present your testimony by asking questions of yourself? You cannot just take the stand and tell your story. You must proceed question by question through your testimony.

l) (Then say to the defendant something to this effect): I must advise you that in my opinion you would be far better defended by a trained lawyer than you can be by yourself. You are not familiar with the law. You are not familiar with court procedure. You are not familiar with the rules of evidence. I would strongly urge you not to try to represent yourself.

m) Now, in light of the penalty that you might suffer if you are found guilty and in light of all of the difficulties of representing yourself, is it still your desire to waive your right to be represented by a lawyer?

This is the most important and rudimentary question which should have been asked.

n) Is your decision entirely voluntary on your part?

o) If the answers to the two preciding questions are in the affirmative, [and in your opinion the waiver of counsel is knowing and voluntary,] you should then say something to the following effect:

> "I find that the defendant has knowingly and voluntarily waived his right to counsel. I will therefore permit him to represent himself."

p) You should consider the appointment of standby counsel to assist the defendant and to replace him if the Court should determine during trial that the defendant can no longer be permitted to represent himself.

The point is, of course, that the more searching the inquiry at this stage the more likely it is that any decision on the part of the defendant is going to be truly voluntary and equally important that he will not be able to raise that issue

34

later if he does then decide to represent himself. It is simply a question of taking enough time at the moment to make a meaningful record and thus to avoid the very real dangers of reversal should the defendant not prove himself up to the task of his own self-defense. U.S. v McDowell, 814 F.2d 245, 252 (6th Cir. 1987).

In the case at bar, the trial court completely failed to even inquiry into the voluntariness of Defendant Pouncy's waiver of counsel. Voluntariness of a defendant's waiver of the right to counsel can not be assummed. Johnson v Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Neither can a trial court conclude that a defendant's decision to waive his right to counsel is voluntary, simply by looking at him, but only can determine the voluntariness of a waiver of the right to counsel by the defendant's own admission of voluntariness. Here, the trial court did not ask, so Defendant Pouncy, did not have the opportunity to explain  to the trial court that he was forced to waive his right to counsel and that his choice to waive his fundamental right to counsel was not of his free choice and was indeed involuntarily made.

Moreover, the trial court even failed to place its determination as to the propriety of the waiver on the record. A trial court's determination as to the propriety of a waiver should appear on the record. See Johnson v Zerbst, 304 U.S. 458, 465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). In absence of such an expressed on the record determination of the propriety of a waiver, the court must indulge every reasonable presumption against waiver of an individual's fundamental constitutional rights. Id. at 464, 58 S.Ct. 1019. In other words since Defendant Pouncy never informed the court that his waiver of counsel was of his free choice and voluntarily made and in the absence of the trial court's on the record determination that the waiver was voluntarily made (which the trial court could not have possibly determined since Defendant Pouncy never informed the court that his waiver was of his free choice and voluntarily made) this court must presume that the waiver was indeed not of Defendant Pouncy's free choice and involuntarily made.

The record in the case at bar, fail to demonstrate that the presumption against waiver was overcome. The trial court did not satisfy its duty to ascertain whether or not Defendant Pouncy's waiver of counsel was of his free choice and voluntarily made. The trial court conducted a cursory investigation of whrther Defendant Pouncy's waiver met the high standard set by the Supreme Court in Faretta. "The fact that an accussed may tell [the judge] that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility." Von Moltke, 332 U.S. at 724, 68 S.Ct. 316.

In Fowler v Collins, 253 F.3d 244 (6th Cir. 2001), the Court held that since the court failed to inquire into the voluntariness of the defendant's waiver of counsel prior to allowing him to represent himself, the waiver of counsel is presumed to be involuntarily made and reversal is required. Id. at 250.

In the case at bar, since the trial court completely failed to inquire into the voluntariness of the waiver of counsel and the record fails to show that Defendant Pouncy waived his fundamental right to counsel voluntarily the waiver must be deemed ineffective to the extent that it was involuntarily made and this constitutes per se prejudicial err, and harmless error standard is inapplicable. McKaskle v Wiggins, 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984).

Here's a brief recap as to why Defendant Pouncy's waiver of counsel is ineffective and the resulting convictions are unreliable:

> •Defendant Poincy was forced to choose between self-represen-
> tation or self-admitted unprepared counsel.
>
> • Defendant Pouncy did not know that the actual sentencing
> guideline range he was subject to prior to making his waiver of
> counsel due to the trial court's, the prosecutor's, and trial
> court counsel's erroneous information concerning the sentencing
> guideline range.
>
> • The trial court failed to ensure that Defendant pouncy under-

stood the charges and their associated penalties, prior to per-
tting self-representation.

• Defendant Pouncy did not know that the armed robbery offenses
carried a mandatory two year sentence, due to the trial court's
failure to inform him of such prior to allowing him to repre-
sent himself

• Prior to waiving his right to counsel Defendant Pouncy did not
know that he would encounter problems obtaining evidence and
locating and interviewing witnesses while representing himself
while incarcerated, due to the trial court failing to inform him
of this disadvantage.

• Defendant Pouncy's waiver of counsel is presumed involuntarily
made in the absence of on the record evidence that the waiver
was a product of free choice and due to the trial court's
failure to inquire about the voluntariness of the waiver.

Reversal is required. McKaskle v Wiggins, 465 U.S. 168, 177 n. 8, 104 S.Ct. 944,
79 L.Ed.2d 122 (1984).

II. DEFENDANT POUNCY IS ENTITLED TO A NEW TRIAL DUE TO THE PROSECUTION MISLEADING THE DEFENSE, TRIAL COURT, AND JURY INTO BELIEVING THAT THE COMPLAINANT'S PHONE RECORDS WERE OF NO VALUE TO DEFENDANT POUNCY'S DEFENSE, WHEN THE PROSECUTION ERRONEOUSLY MISINFORMED THAT THE PHONE CALLS FROM THE PERPETRATOR TO THE COMPLAINANTS WEREN'T CAPABLE OF BEING TRACED, WHEN THE PHONE CALLS WERE INDEED CAPABLE OF BEING TRACED TO SOMEONE OTHER THAN DEFENDANT POUNCY, AND THEREBY EFFECTIVELY PREVENTED DEFENDANT POUNCY FROM DISCOVERING AND PRESENTING EXCUL- PATORY EVIDENCE.

Prior to the perpetrator meeting the complainants in person and carrying out the carjackings the perpetrator would contact each complainant by placing a phone call to them. Joseph Scott Davis, testified that the perpetrator [allegedly Defendant Pouncy], called him two times on the phone about the vehicle. (T 1-24-06, 229). Earl Brady, testified that the perpetrator [allegedly Defendant Pouncy], called him after they left the speed shop to tell him to back his truck and trailer into the driveway of the home on Kellar Rd. (T 1-24-06, 276). Thomas Sandstorm, testified that the perpetrator [allegedly Defendant Pouncy], called him to schedule a test drive of the vehicle he had advertised in the newspaper. (T 1-25-06, 66). Maria Sandstorm, testified that she got a phone call from the perpetrator [allegedly Defendant Pouncy], stating that he was in the area and wanted to see the car. (T 1-25-06, 140). Wayne Grimes, testified that Defendant Pouncy called one of the complainants on their cell phone to tell him to back into the driveway. (T 1-26-06, 11). Wayne Grimes, also testified that Defendant Pouncy called the Sandstorms from his own cell phone prior to the execution of the carjacking. (T 1-26-06, 116). Dan Haynes, testified that his brother received a phone call from the perpetrator [allegedly Defendant Pouncy], who wanted to look at his car. (T 1-27-06, 106). Even after the carjacking the perpetrator [allegedly Defendant Pouncy], called the Sandstorms and left a threatening messages on their answering machine. (T 1-25-06, 84).

Relying on the lead of the perpetrator contacting the complainants by phone prior to the actual carjackings the prosecution investigated this lead in an attempt

to identify the incoming phone number that the perpetrator was calling the complainants from and ultimately to identify the perpetrator of the carjackings. The prosecution obtained the complainants phone records and based on the information provided by the complainants they focused on two particular phone calls which came from the perpetrator into the complainants at both 10:26:16 a.m. and at 11:45:52 a.m. (See attached subpoena requesting phone records as Appendix J). According to the phone records the relevant information related to the 11:45:52 a.m., phone call was all contained in row 14 of the phone records. (See page one of two of the phone records attached as Appendix K). Then according to the phone records the relevant information related to the 10:26:16 a.m., phone call was all contained in row 18 of the phone records. (See Page one of two of the phone records attached).

Along with the phone records the phone company (Verizon Wireless) supplied an **"Explanation Form"** which explains exactly how to investigate the phone records. It tells the investigator exactly what type of information is contained in each column. It specifically explains what column you go to to locate the incoming party's phone number. If you go to column A (the Switch column) you can determine the switch that the call was hitting of of. If you go to column B (the Date column) you can determine the date of the call. If you go to column C (the Time column) you can determine the start time of the call. If you go to column D (the Dir column) you can determine if the call was an outbound call; you will see MO, if the call was an incoming call; you will see MT, if the call was an incoming call to voicemail or in rare cases it could be mobile forwarding, you will see MF, if the call was a mobile call; you will see MM. If you go to column E (the MDN column) you can determine the target #. (The target # is the subscriber's number, in this case the complainant's phone number.) If you go to column F (the Called # column), if the call was an outgoing call then you can determine the outgoing # that the target dialed, but if the call was an incoming call then you will find the target's #. Then if you go to column G (the CPN column),

you can determine the calling part's #, if the call was an outgoing call then the target's # will be in this column, **if the call was an incoming call then the incoming # to the target will appear in this column,** (the CPN column). Then if you go to column H (the Szr column), you can determine the duration of the call in seconds. (See the Verizon Wireless "Explanation Form" attached as Appendix L).

Here is an exact copy of the relevant portion of the phone records investigated by the prosecution:

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| | Switch | Date | Time | Dir | MDN | Called # | CPN | Szr |
| 14 | Det 8 | 9/24/05 | 11:45:52am | MT | (810) 348-9846 | (313) 402-2922 | (810) 836-5074 | 22 |
| 15 | Det 8 | 9/24/05 | 11:05:51am | MO | (810) 348-9846 | 513-0886 | (810) 348-9846 | 80 |
| 16 | Det 8 | 9/24/05 | 10:56:52am | MT | (810) 348-9846 | (313) 402-2918 | (810) 742-8725 | 65 |
| 17 | Det 8 | 9/24/05 | 10:52:46am | MO | (810) 348-9846 | 742-8725 | (810) 348-9846 | 70 |
| 18 | Det 8 | 9/24/05 | 10:26:16am | MT | (810) 348-9846 | (313) 402-2933 | (810) 836-5074 | 72 |

So if the instructions from the Verizon Wireless Explanation Form were properly applied to the two phone calls in rows 14 & 18 that the prosecution focused their investigation on, they would have easily determined that the two phone calls from the perpetrator to the complainant came from an (810) 836-5074 phone number not the two (313) 402-2922 and (313) 402-2933 routing numbers they erroneously investigated.

When the prosecution investigated the phone records, although they focused on the incoming phone calls in both rows 14 & 18, they focused their investigation on the wrong column. The prosecution erroneously investigated these two numbers (313) 402-2922 [row 14] & (313) 402-2933 [row 18], which merely was routing numbers and was found in column F (the Called column). (See attached investigative subpoenas from the prosecution requesting "Any and all subscriber information, including but not limited

to, name(s) and address(es)," regarding both (313) 402-2922 & (313) 402-2933, as
Appendix M);

The note portion of the Verizon Wireless Explanation Form clearly holds the
following in its pertinent part:

### NOTES:

When the #'s in the MDN column, Called # column and the CPN #
column are all different you are looking at a routing #. The
Routing # will appear in the Called # column.

(All three numbers are different)

(See attached Verizon Wireless Explanation Form)

The note portion of the Verizon Wireless Explanation Form clearly explains
that if the # in the MDN column, Called # column, and the CPN column are all
different then the Routing # will appear in the Called # column. Then in column D
(the Dir column) of the Verizon Wireless Explanation Form in the last row it clearly
says that any routing information is not related to the investigation. Despite,
having this information the prosecution erroneously surrounded their investigation on
the routing numbers (3130 402-2922 & (313) 402-2933 located in the Called # column
and once the phone company received the prosecution's subpoenas requesting "any and
all subscribers information, including but not limited to, name(s) and address(es)"
regarding these two numbers. Verizon Wireless responded via fax and indicated that
those two numbers (313) 402-2922 and (313) 402-2933 were routing numbers and that no
information was found. (See attached Faxed response from Verizon Wireless Dated 10-28-
05) as Appendix N).

After the prosecution received the fax back from Verizon Wireless indicating
that they investigated both (313) 402-2922 and (313) 402-2933 numbers and they
discovered that those two numbers were routing numbers and that no subscriber
information was found, the prosecution erroneously concluded that the phone calls
from the perpetrator to the complainants were not capable of being traced. Upon read-

reaching this erroneous conclusion the prosecution misled Defendant Pouncy into believing that the phone calls from the perpetrator to the complainants were not capable of being traced, by informing Defendant Pouncy that the complainant's phone records was of no value to defense, because the phone calls from the perpetrator to the complainants were untraceable, when the phone calls from the perpetrator to the complainants were indeed actually traceable and specifically trtaceable to a (810) 036-5074 phone number which is subscribed to a Mr. Quilla D. Strong. (See attached affidavit from Mr. Quilla D. Strong, stating that he's the subscriber of the (810) 036-5074 phone number, the phone in which the perpetrator was calling the complainants from.

    Prior to the commencement of trial, the prosecutor also misinformed and misled the trial court into believing that the complainant's phone records were of no value to Defendant Pouncy's defense, because the prosecution erroneously concluded that the phone calls from the perpetrator to the complainants were not capable of being traced. The following occurred in its pertinent part:

        The Court: Now is there, was there any way to trace the phone call do you know?

        Mr. Larobardiere: [Prosecutor] No that's what we've, that's what I was going to get into. <u>That's what we found out that these phones are not, there are certain cell phone used that are not traceable. That's what was used in this case.</u> (T 1-24-06, 34).

Then the lead Detective James Gagliardi also misinformed the jury that the phone calls from the perpetrator to the complainants were untraceable. The following occurred during direct examination of Det. James Gagliardi, in its pertinent part:

        Q: Mr. Larobardiere: There was some talk about the communication by cell phone to the victims. Were you able to trace any of these calls from the victims' phone numbers to any particular cell phone numbers?

        A: Det. Gagliardi: <u>No. The phone records that we were able to trace back from the victims' phone went back to they're a type</u>

of calling card that there's no information recorded to that.
(T 1-27-06, 226).

* * * * * *

By Mr. Larobardiere:

> Q: Were you about to say a calling card or something of that
> sort?
>
> A: They were attempted to be traced back and, again, they came
> back to-when these cards are purchased by a business, they're
> produced by the thousands, so there was no way to say that the
> phone calls came from this person or that person. (T 1-27-06,
> 227).

The prosecution would have been able to determine the phone number in which the
perpetrator was calling the complainants from, had it correctly followed the
instructions provided by the Verizon Wireless Explanation Form and ultimately would
have been able to trace that phone number to the subscriber Quilla B. Strong.
However, the prosecution investigated the wrong numbers, specifically routing numbers
(313) 402-2922 and (313) 402-2933, which were located in column F (the Called #
column), despite the Verizon Wireless Explanation Form clearly stating that the
numbers in column F (the Called # column) was routing numbers. The prosection was
supposed to have investigated the numbers in column G (the CPN column) and they could
have easily determined that the incoming number that the perpetrator was calling from
was (810) 836-5074 and not (313) 402-2922 or (313) 402-2933 and that the (810) 836-
5074 phone number was subscribed to someone other than Defendant Pouncy and could not
be linked to Defendant pouncy, which was exculpatory evidence that could have played
a major part in exonerating Defendant pouncy or at least created a reasonable doubt
as to Defendant Pouncy being the perpetrator of the crimes since the phone record
evidence pointed to another individual

Absent the prosecution's misleading advice concerning the phone records,
Defendant Pouncy would have conducted an independent investigation surrounding the

43

complainant's phone records and correctly applied the instructions from the Verizon Wireless Explanation Form and would have thereby discovered that the complainant's phone records were indeed exculpatory evidence since the phone number (810) 836-5074, in which the perpetrator was calling the complainants from was not subscribed to Defendant Pouncy and could not be linked to Defendant Pouncy and this exculpatory evidence ultimately could have been presented to the jury and it's a reasonable probability that the outcome of Defendant Pouncy's trial would have been different.

When the prosecution misinformed and misadvised Defendant Pouncy that the phone calls from the perpetrator to the complainants were not capable of being traced and thereby misled Defendant Pouncy into believing that the phone records were of no value to his defense, based on this information, albeit erroneous, Defendant Pouncy reasonably concluded that an independent investigation of the phone records by the defense would have been absolutely frivolous. Defendant Pouncy, trusted that the prosecution's information was correct when they informed the defense that the phone calls from the perpetrator to the complainants were untraceable. It is undisputable that the phone calls could indeed actually be traced and specifically be traced to an (810) 836-5074 phone number which was subscribed to someone other than Defendant Pouncy and could not be linked to him either. Due to the prosecution misleading Defendant Pouncy into believing that the phone calls from the perpetrator to the complainants were not capable of being traced and that the phone records was of no value to the defense, Defendant Pouncy was prevented from discovering and presenting exculpatory or at least favorable evidence to the jury. A new trial is required based on this newly discovered evidence.

## STANDARD OF REVIEW:

Due to this error being created by the prosecution's misleading information this error constitutes prosecutorial misconduct and must be reviewed "de novo". People v Bahoda, 448 Mich 261 (1995); People v Legone, 205 Mich App 77 (1994). Whether done

intentionally or inadvertently the prosecution's tactic also "undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice". United States v Young, 470 US 1, 13 (1985); People v Van Dorston, 441 Mich 540, 545 (1993).

DISCUSSION:

First thing first, in Brady v Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court discussed the withholding or suppression of evidence by the prosecution. The Supreme Court held, "the suppression by the prosecution of evidence favorable to an accussed upon request violation due process where the evidence is material either to guilt or to punishment, **irrespective of the good faith or bad faith of the prosecution.**" 373 U.S. at 87.

In United States v Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court dealt with the withholding of potentially exculpatory evidence where there had been no defense request for it or just a general request. Some evidence has such obviously substantial value to the defense that the prosecution must disclose it, even without a specific request. 427 U.S. at 110. "[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure." Id., at 108. The Agurs Court held that, if there is no request or if the request is not specific, the applicable standard of materiality of the evidence was whether the non-disclosure was harmless under the traditional harmless-error standard. 427 U.S. at 111-112. Even in the absence of a specific or general discovery request, it is the obligation of the prosecution to turn over exculpatory material to the defense.

In Arizona v Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the Supreme Court confirmed the Brady standard concerning the withholding of evidence: due process "makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence." 109 S.Ct. at 337.

In United States v Bagley, 473 U.S. 667 (1986), the Court held that suppression

of both exculpatory and impeachment material amounts to a constitutional violation if it deprives the defendant of a fair trial; a constitutional violation occurs if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial. The Court reversed Bagley's conviction due to the Brady violation.

Brady imposes an affirmative duty on the government to produce the specifically requested evidence that is material to the accused regardless of whether it constitutes direct or impeaching evidence. The duties imposed upon the prosecutor under Brady have been interpreted as minimum prosecutorial obligations. Smith v Phillips, 455 U.S. 109 (1982); United States v Griffin, 659 F.2d 932 (Ca 9, 1981), cert denied, 456 U.S. 949 (1982); United States v Campagnuolo, 592 F.2d 852, 859 (Ca 5, 1971); United States v Beasley, 545 F.2d 403 (Ca 5, 1977).

Lack of knowledge is no excuse. In United States v Bryan, 868 F.2d 1032 (Ca 9, 1989), the Court held that the prosecutor will be deemed to have knowledge of and access to anything in the possession, custody or control of any governmental agency participating in the same investigation of the defendant. Cf United States v Gatto, 763 F.2d 1040 (CA 9, 1985); United States v Schwartz, 857 F.2d 655 (Ca 9, 1988).

Similarly, under Michigan law, acts of suppression by the prosecution will result in **reversal, dismissal, or other remedies.** Where a prosecutor has violated a discovery order, even if inadvertently in good faith, the resulting conviction will be reversed on appeal, unless it is clear that failure to divulge was harmless beyond a reasonable doubt  People v Pace, 102 Mich App 522 (1980); People v Florinchi, 84 Mich App 128, 269 NW2d 500 (1978), lv den, 405 Mich 828 (1979).

In the case at bar, the prosecution provided Defendant Pouncy with the, unbeknownst at the time, exculpatory phone records, however, prior to the defense conducting its own independent investigation surrounding the phone records the prosecution misinformed the defense that it had already investigated the

46

complainant's phone records and determine that the phone calls from the perpetrator to the complainants were not capable of being traced. The reason why the prosecution erroneously concluded that the phone calls from the perpetrator to the complainants were not capable of being traced was due to their erroneous investigation  The prosecution focused their investigation on routing numbers (313) 402-2922 and (313) 402-2933 instead of the incoming party number (810) 836-5074, which could have easily been discovered had the prosecution correctly applied the instructions from the Verizon Wireless Explanation Form. At the conclusion of the prosecution's erroneous investigation they ultimately misled Defendant Pouncy into believing that the phone calls from the perpetrator to the complainants were not capable of being traced and that the phone records was of no value to his defense. The phone calls from the perpetrator to the complainants were indeed actually traceable to an (810) 836-5074 phone number and was exculpatory or at least favorable to Defendant Pouncy since the (810) 836-5074 phone number was not subscribed to him and could not be linked to him. So despite the prosecution's initial disclosure of the phone records, when the prosecution later misled Defendant Pouncy into believing that the phone calls from the perpetrator to the complainants were not capable of being traced and that the phone records were of no value to Defendant pouncy's defense, effectively negated any disclosure previously made.

In a case factually similar to the case at bar, in United States v Shaffer, 789 F.2d 682 (9th Cir. 1986), Shaffer was charged with and convicted of several narcotics and income tax violations, he then moved for a new trial on the grounds of newly discovered evidence based on the Government misleading him into believing that evidence was not favorable and was of no value to his defense when the evidence was indeed actually favorable and was valueable to his defense. Specifically in Shaffer, he was indicted along with three other defendants. The government's case against Shaffer rested in large part on the testimony of Robert Durand, an unindicted co-

47

conspirator in the cocaine operation who in exchange for immunity from prosecution, agreed to cooperate with the government in an investigation into the cocaine operation conducted by Shaffer and the other three defendants. However, during the cocaine investigation involving Shaffer, one of Shaffer's indicted co-conspirators, James Hoffman, contacted Durand about a **separate** herion operation that Hoffman wanted to conduct. Shaffer was not involved in the new narcotics operation. With the aid of Durand, the government conducted a supplemental investigation into Hoffman's herion operation from approximately September 1980 to May 1981. During the Hoffman investigation, the government compensated Durand for expenses incurred in meeting with Hoffman. Durand also received money that he paid to Hoffman and another subject for their expenses in setting up the smuggling venture. Therefore, while Durand was testifying in the Shaffer grand jury proceedings, he was also operating as a paid informant in the Hoffman investigation.

Before his trial, Shaffer made specific discovery requests, inter alia, he requested that the Government provide him with any internal government memoranda regarding Durand's cooperation. Shaffer also made a general request for all material in the government's possession that was favorable and material to his defense. In response, the government provided Shaffer with, inter alia, a tape that detailed Durand's involvement with the separate investigation in which he was assisting in. However, prior to the defense having the opportunity to independently review the contents of the tapes, the government told Shaffer's counsel that the tapes would be of no value to Shaffer's defense. So based on the information provided by the government Shaffer's counsel did not see a need to review the tapes since the prosecutor informed him that the tapes would be of no value to Shaffer's defense.

After Shaffer's convictions and during the appellate process he discovered that the tapes which the government said was of no value to his defense, was indeed actually valuable to his defense because the tapes detailed the prosecution's star

48

witness's involvement in a separate drug operation. The Court in Shaffer, held that despite the initial disclosure of the tapes that detailed Durand's involvement in a separate drug operation, the disclosure was inadequate because of the later statement by the government that the tapes would be of no value to Shaffer's defense, when the tapes was actually valuable to his defense, effectively negated any previous disclosure. The Court held as follows:

> "Second, the district court was correct in holding that, while
> the government did apprise Shaffer's counsel of tapes that de-
> tailed Durand's involvement, such disclosure was inadequate be-
> cause the government also told Shaffer's counsel that these
> tapes would be of no value to Shaffer's defense. This later
> statement by the government negates any disclosure made in the
> earlier statement. At 709 F.2d 690.

Just as in Shaffer, supra, in the case at bar, the prosecution provided Defendant Pouncy with the phone records, but later came and misled Defendant Pouncy into believing that the phone calls from the perpetrator to the complainants were not capable of being traced, and that the phone records was of no value to his defense. When the prosecutor misled Defendant Pouncy into believing that the phone calls from the perpetrator to the complainants were not capable of being traced and that the phone record was of no value to his defense, when the phone calls were indeed actually capable of being traced to an (810) 836-5074 phone number and was favorable to Defendant Pouncy's defense because the (810) 836-5074 phone number was not subscribed to Defendant Pouncy nor could it be linked to him either. So when the prosecutor came and misled Defendant Pouncy into believing that the phone calls from the perpetrator to the complainant was not capable of being traced and that the phone records were of no value to the defense, when they were indeed actually traceable and favorable to the defense, Defendant Pouncy's knowledge of the phone records was effectively nullified. See Hughes v Hopper, 629 F.2d 1036, 1039 (5th Cir. 1980), cert

49

denied, 450 U.S. 933, 101 S.Ct. 1396, 67 L.Ed.2d 363 (1981) (holding "defense counsel's knowledge of the [evidence is] effectively nullified...when a prosecutor misleads the defense into believing the evidence will not be favorable to the defendant").

Due to the prosecution misleading Defendant Pouncy into believing that the phone calls weren't capable of being traced and that the phone records were not favorable to the defense, when the phone calls were indeed actually capable of being trace and the phone records were indeed actually favorable to the defense, the fact that the evidence is favorable warrants a new trial. Since it was discovered after trial that the phone records were actually favorable to Defendant Pouncy's defense, due to no fault of his own but due to the prosecution misleading him into believing that the phone records were of no value to his defense, the favorableness of the phone records must be treated as newly discovered evidence and Defendant Pouncy is entitled to a new trial because absent the prosecution misleading Defendant Pouncy into believing that the phone calls from the perpetrator to the complainants were not capable of being traced and that the phone records were of no value to his defense, Defendant Pouncy would have investigated the phone records and correctly applied the instructions from the Verizon Wireless Expanation Form and thereby discovered that the phone calls from the perpetrator to the complainants could indeed actually be traced to an (810) 836-5074 a phone number which was not subscribed to Defendant Pouncy or could not be linked to him either. This could have exculpated Defendant Pouncy because the jury could have reasonably concluded that the subscriber of the phone number in which the perpetrator was calling the complainants from was the perpetrator of the offenses. Or the fact that the phone number was traced to a subscriber other than Defendant Pouncy and could not be linked to him could have created a reasonable doubt in the mind of at least one juror that Defendant Pouncy was not the perpetrator of the offenses since the phone record evidence pointed at

someone else.

The standard for granting a new trial on the basis of newly discovered evidence was stated in People v Bradshaw, 165 Mich App 562, 567 (1988):

> "For a new trial to be granted on the basis of newly
> discovered evidence, it must be shown that: (1) the
> evidence itself, not merely its materiality, was newly
> discovered; (2) the newly discovered evidence was not
> cumulative; (3) including the new evidence upon retrial
> would probably cause a different result; (4) the party
> could not, using reasonable diligence, have discovered
> and produced the evidence at trial." See also People v
> cress, 468 Mich 678, 692 (2003).

In people v Terry Burton, 74 Mich App 215 (1977), the defendant was convicted of felony murder for the killing of a gas station attendant during a robbery which was allegedly planned and executed by a political group named the Republic of New Africa. The defendant denied any involvement. After the trial, two of his sisters testified at the hearing that they were involved in the planning and that the defendant was not involved. The codefendant also testified that the defendant was not involved in the offense. The Court of Appeals in Burton, held that this evidence was newly discovered, and could not have been discovered with reasonable diligence, because the sisters had deliberately withheld it from the defense to avoid risk to themselves, because they assumed the defendant would be acquitted, and because the co-defendant could have invoked the right to remain silent if called to testify at the trial. The Court also held that the new evidence was obviously not cumulative to any of the trial testimony. Finally, the Court found that a new trial was necessary given that the newly discovered evidence could have significant impact on a second jury by creating a reasonable doubt as to the defendant's guilt. Id. at 223.

In People v Mechura, supra, the Court of Appeals held that the trial court abused its discretion in denying a defendant's motion for a new trial in a first

degree murder case. The defendant had unsuccessfully claimed self-defense. A witness subsequently testified at the hearing on the motion for new trial that the decedent's girlfriend had confessed to giving perjured trial testimony that the decedent was unarmed.

In the instant case, the newly discovered evidence is exculpatory, non-cumulative, would produce a different result because the evidence against Defendant Pouncy was insubstantial at best, eyewitnesses' testimony, and using reasonable diligence Defendant Pouncy could not have discovered and produced the evidence at trial because he reasonably trusted the prosecution when it informed him that the phone calls from the perpetrator to the complainants were not capable of being traced and that the phone records were of no value to Defendant Pouncy's defense he reasonably concluded that conducting an independent investigation of the phone records would have been frivolous since the prosecution claimed they already conducted an investigation and concluded that the phone calls were not capable of being traced. Defendant Pouncy also reasonably trusted that the prosecution's investigation surrounding the phone records was properly conducted.

In the case at bar, there was no physical evidence tying Defendant Pouncy to the crimes, the evidence produced at trial was insubstantial at best. First there was Wayne Grimes whose testimony was highly suspect because he only agreed to testify on the prosecution's behalf after the prosecution offered to drop 8 capital offenses against him and give him a very light sentence. See Carriger v Stewart, 132 F.3d 463, 479 (9th Cir. 1997) (holding "We have...recognized that criminals who are rewarded by the government for their testimony are inherently untrustworthy.) Then there was the complainants who did not know the perpetrator prior to the dates in question who were merely eyewitnesses and there is "grave reservations concerning the reliability of eyewitness testimony," Blackburn v Foltz, 828 F.2d 1177, 1186 (citing Wilson v Cowan, 578 F.2d 166, 168 (6th Cir. 1978)), the accuracy of the complainant's identification

is highly suspect. Clinkscale v Carter, 375 F.3d 430, 445 (6th Cir. 2004).

The newly discovered evidence in the case at bar, is definitely exculpatory because the dispositive factor was identification of the perpetrator. The fact that the phone number in which the perpetrator called the complainants from was not subscribed to Defendant Pouncy and could not be linked to him this could have exonerated Defendant Pouncy or at the very least the evidence was so favorable it's a reasonable probability it could have at the very minimum created a reasonable doubt as to Defendant Pouncy being the perpetrator of the offenses in the mind of at least one juror which could have changed the outcome of Defendant Pouncy's trial. During trial and closing argument by the prosecutor he tried his best to convice the jury that Defendant Pouncy was the one who owned the phone in which the perpetrator was calling the complainants from. The prosecutor present Thomas Sandstorm to testify that he recognized Defendant Pouncy's voice on the recording in which someone was making threats to kill them and blow their home up if they pressed charges and came to identify anyone. (T 1-25-06, 85). Then during closing argument the prosecutor constantly insinuated that Defendant Pouncy was the one making the phone calls to the complainants and that Defendant Pouncy was indeed the owner of the phone which the calls were coming from. The following occurred in its pertinent part:

By Mr. Larobardiere [Prosecutor]:

> The next person we heard from, Thomas Sanddtrom Mr. Sandstrom advertised his vehicle for sale in "The Fkint Journal", a '73 Cadillac. The, uh, sale was a muti-day ad; and towards the end of the ad, <u>he said I got one call, Mr.Pouncy</u>. Now he talked to him numerous times on the phone....<u>Called another time</u>....<u>Called him on the phone, directed him to the house, met Mr. Pouncy</u>. (T 2-1-06, 15).

*   *   *   *   *   *

> Remember Mr. Grimes testifying when he talked about the robbery that he committed, while driving in his vehicle, while talking about how it was planned on he was gonna actually carry out the robbery, that he, <u>phoned the driver of the truck on his</u>

[Defendant Pouncy's] cell phone and had him drive in, the cell phone that he says he doesn't have. (T 2-1-06, 72).

\* \* \* \* \* \*

Mr. Pouncy is the one who said he hasn't talked to his step-brother, he doesn't have a phone, he doesn't know how to get a hold of him, they don't talk and his-his two-way is in Mr. Grimes' phone. (T 2-1-06, 73).

As you can clearly see the prosecutor persistently tried to convince the jury that Defendant Pouncy owned a cell phone and that he was calling the complainants from his cell phone, so had the prosecutor had not misled Defendant Pouncy into believing that the phone calls from the perpetrator to the complainants were not capable of being traced and that the phone records were of no value to his defense, it would have been discovered that the calls were traceable and indeed traceable to someone other than Defendant Pouncy this exculpatory and at the very least favorable evidence could have been presented to the jury and the outcome of his trial could have been different. Absent the prosecution's misleading information the exculpatory evidence would have been discovered and presented to the jury and this evidence could have countered and disproved the complainant's testimony that Defendant Pouncy was the person calling them since the phone number (810) 836-5074 which was calling them was not subscribed to Defendant Pouncy or it could not have been linked to him. Moreover, the prosecutor would not be able to argue that Defendant Pouncy owned the phone that the incoming calls from the perpetrator was coming from to the complainants. This case was already weak because it merely relied on idenification and the fact that the phone record evidence pointed to another individual could have definitely changed the outcome of Defendant Pouncy's trial. The jury was entitled to know that the phone calls could be traced and traced to someone other than Defendant Pouncy.

It's obvious that this exculpatory newly discovered evidence could not have been discovered and presented at trial even using reasonable diligence because the

prosecution misled Defendant Pouncy into believing that the evidence was of no value to his defense. The fact that the phone calls could actually be traced and that the phone records were indeed actually favorable to Defendant Pouncy's defense, was not discovered until after trial, during routine investigation and preparation for the appellate process when the defense was going over all relevant transcripts and documents. So this exculpatory evidence could not have been discovered and produced at trial with reasonable diligence, because after the prosecution misled Defendant Pouncy into believing that the phone calls could not be traced and that the phone records was of no value to his defense, he trusted the prosecution's word and reasonably concluded that any independent investigation of the phone calls and the phone records would have been frivolous since they said the evidence was of no value to his defense.

The newly discovered evidence is not cumulative, clearly because no party produced witnesses that testified that the phone calls could be traced and that the subscriber of the phone number in which was calling the complainants was someone other than Defendant Pouncy. On the other hand the prosecution misled the jury into believing that the phone calls could not be traced and that the phone records was of no value to Defendant Pouncy's defense.

In the recent case of Mathis v Berghuis, ___ F.3d ___ (CA 6, # 02-1665, 1-27-04), the Sixth Circuit Court of Appeals held that the defendant was entitled to a new trial based on newly discovered impeachment evidence. The Court found that there was a reasonable probability that the result of the proceeding would have been different, and that the defendant was not obligated to demonstrate that the admission of the newly discovered evidence would have resulted in a different trial, or to prove that the complainant's prior allegations were false. The Sixth Circuit concluded that the Michigan court's decision that suppression of the impeachment evidence was not grounds for a new trial was contrary to clearly established federal law. See also House v Bell, 311 F.3d 767 (CA 6, 2002). In United States v Timothy Millis Jr., 257

F.3d 636 (CA 6, 2001), the Sixth Circuit found that in light of the suspicious circumstances surrounding the recanting prosecution witness's testimony at trial, including threats to prosecute him if he refused to testify, the district court did not abuse its discretion in finding that that testimony was false and granting a new trial based on the recanting testimony.

Defendant Pouncy is entitled to an evidentiary heareing on this issue so the court can properly assess the issue. Where non-record evidence forms the basis for a claim of newly discovered evidence, an evidentiary hearing must be held. People v Jackson, 91 Mich App 636, 639 (1979); People v Terry Burton, supra. The Court of Appeals in People v Richard Allen Green, unpublished opinion (# 242632, January 27, 2004), held that the trial court abused its discretion in failing to hold an evidentiary hearing on the defendant's claim of newly discovered evidence.

At the evidentiary hearing Defendant Pouncyn will produce a Verizon Wireless Representative who will testify that the phone calls from the perpetrator to the complainants were indeed actually traceable and they were specifically traceable to an (810) 836-5074 phone number which was subscribed to a Quilla B. Strong. Then Defendant Pouncy will then produce the subscriber of the phone number in which the perpetrator was calling the complainants from Quilla B. Strong, who will testify that he did not know Defendant Pouncy and that he had the cell phone activated for an individual named Jacob Woods and not Defendant Pouncy. (See Affidavit from Quilla B. Strong attached as Appendix N).

In light of the newly discovered evidence, a new trial is necessary to prevent a miscarriage of justice and to ensure Defendant Pouncy's right to due process and to present a defense. MCR 2.611 (A)(1)(f); MCR 6 431 (B); People v Jehnson, 183 Mich App 305 (1990); US Const Am VI, XVI. The jury is entitled to know that the phone calls were indeed actually traceable and as a matter of fact traceable to someone other than Defendant Pouncy this newly discovered evidence could really have a significant

56

impact on a second jury by creating a reasonable doubt as to Defendant Pouncy's guilt because it will undermine the dispositive factor, identity.

III.   THE PROSECUTOR'S UNPROVED ALLEGATIONS DURING OPENING STATEMENT THAT DEFENDANT POUNCY HIMSELF CARJACKED THE '79 CAMARO, AND '03 TRUCK, THAT DEFENDANT POUNCY ROBBED THE COMPLAINANTS OF THEIR CELL PHONES, THAT WAYNE GRIMES GAVE DEFENDANT POUNCY THE CELL PHONE AFTER THE ROBBERY, THAT IT WAS AGREED UPON IN THE CAR THAT THEY WERE GOING TO ROB THE COMPLAINANTS OF THEIR CELL PHONES, THAT WAYNE GRIMES ORDERED THE COMPLAINANTS TO GIVE THEIR CELL PHONES UP TO DEFENDANT POUNCY, THAT DEFENDANT POUNCY DROVE THE VEHICLES AWAY FROM THE SCENE OF THE CRIME, AND THAT DEFENDANT POUNCY MADE THE GUN USED DURING THE SEPTEMBER 29, 2005 CARJACKING AVAILABLE SO THAT WAYNE GRIMES COULD COMPLETE THE ROBBERY WERE SO PREJUDICIAL AND ULTIMATELY DEPRIVED DEFENDANT POUNCY OF HIS RIGHT TO A FAIR AND IMPARTIAL TRIAL.

Defendant Pouncy was charged with eleven different counts, ranging from carjacking, armed robbery, felony firearm, and felon in possession of a firearm. In the counts concerning the carjackings and armed robberies Defendant Pouncy was charged as being an aider and abettor in relation to the carjacking and armed robberies occurring on September 29, 2005 involving the carjacking of the '79 Camaro and '03 Ford truck, and the armed robberies involving the cell phones. (T 2-1-06, 90-91).

During the prosecutor's opening statement he first made allegations that Defendant Pouncy himself carjacked the complainants of their '79 Camaro and '03 truck and trailer. The prosecutor went further and alleged that Defendant Pouncy himself took the compleinant's cell phones. The following occurred in its pertinent part:

> By Mr. Larobardiere:
>
> When he got 'em to that dead end, he robbed them of their vehicles, we're talkin' about a **'79 Camaro,** a '73 Cadillac, an '04 Corvette, **an '03 truck and trailer. He took all those vehicles,** he took the driver of the Corvette's purse and money and everything in her purse. He robbed her husband's, of her, his wallet, credit cards and money. **He took the owner of the truck, the Camaro and the trailer, their cell phones.** (T 1-24-06, 203-204).

58

A short while later during opening statement the prosecutor made some more allegations, alleging that after Wayne Grimes ordered the complainants to give up their cell phones the complainants handed over their cell phones to **Defendant Pouncy**. The prosecutor alleged that prior to the commission of the crimes on September 29, 2005 Wayne Grimes and Defendant Pouncy planned and agreed to rob the complainants of their cell phones also, so they could not call for help. Furthermore, the prosecutor alleged that Defendant Pouncy drove the truck, trailer and Camaro away from the scene of the crime. The following occurred in its pertinent part:

> **By Mr. Larobardiere:**
> Wayne Grimes will tell you he did do that. That he was given a gun, he did carjack 'em, he ordered them to give up their property. **They gave up their cell phones to this man, Mr. Pouncy. It was agreed upon in the car on the way to Kellar Avenue that they should give up their cell phones so they couldn't call for help.** Wayne Grimes ordered them to do that, they did, **they gave 'em to Mr. Pouncy. And Mr. Pouncy got in, drove the vehicle away, the truck, trailer and Camaro.** (T 1-24-06, 205).

Furthermore, during opening statement the prosecutor made allegations that Defendant Pouncy aided and abetted Wayne Grimes by making the gun that he used available so Wayne Grimes could complete the robbery. The following occurred in its pertinent part:

> **By Mr. Larobardiere:**
> He [DEFENDANT POUNCY] also aided and abetted his stepbrother Wayne Grimes **by making that gun available so he could complete the robbery.** (T 1-24-06, 210).

In all the outlined allegations above, the prosecutor **utterly failed** to produce evidence during the trial to support these highly prejudicial assertions he made during

59

opening statement which consequently deprived Defendant Pouncy of his right to a fair and impartial trial.

In the case at bar, the prosecutor **failed** to produce any evidence to support his assertion made during opening statement that Defendant Pouncy himself carjacked the complainants of their '79 Camaro and '03 truck and trailer and **failed** to produce any evidence to support his assertion made during opening statement that Defendant Pouncy himself took the complainants' cell phones. Wayne Grimes, the prosecution's star witness, testified during direct examination that he himself and **not** Defendant Pouncy was the person who carjacked the complainants of their '79 Camaro and '03 truck and trailer and he testified that he himself and **not** Defendant Pouncy was the person who robbed the complainants of their cell phones. (T 1-26-06, 112).

Moreover, in the case at bar, the prosecutor **failed** to produce any evidence to support his assertions made during opening statement that the complainants gave their cell phones to Defendant Pouncy, that Defendant Pouncy and Wayne Grimes agreed in the car on their way to Kellar Avenue that they were going to rob the complainants of their cell phones so they could not call for help, and that Defendant Pouncy drove the vehicle, the truck, trailer and Camaro away from the scene of the crime. Wayne Grimes, the prosecution's star witness, testified during direct examination that he ordered the complainants to hand their cell phones over to the third individual allegedly with them Tiaqua. (T 1-26--06, 112). He did **not** testify that the complainants gave their cell phone over to Defendant Pouncy, as the prosecutor alleged in his opening statement. Wayne Grimes only testified that they **only** discussed the taking of the cars, (T 1-26-06, 110), **not** the complainants call phones as the prosecutor alleged during his opening statement. Moreover, Wayne Grimes, testified that after he ordered the complainants in the woods he pulled off and he did **not** see who drove the truck, with the trailer and Camaro attached to it away from the scene of the crime. (T 1-26-06, 113). No one testified that Defendant Pouncy got in and drove the truck, trailer, and Camaro away from the scene of the crime as the prosecutor alleged.

Furthermore, Wayne Grimes, **never** testified that Defendant Pouncy aided and abetted him by making the gun that he used to commit the robbery available to him[Wayne Grimes] , as the prosecutor alleged. Wayne Grimes, testified that Tiaqua gave him the gun and **not Defendant Pouncy.** (T 1-11-06, 111).

The prosecutor's unproved allegations opening statement were prejudicial and ultimately deprived Defendant Pouncy of his right to a fair and impartial trial.

**Standard Of Review:**

The standard of review of prosecutorial misconduct is "de novo", without deference to the ruling of the court below. People v Bahoda, 448 Mich 261 (1995); People v Legone, 205 Mich app 77 (1994). The prosecutor's tactic[s] also "undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice." United States v Young, 470 US 1, 13 (1985); People v Van Dorston, 441 Mich 540, 545 (1993).

**Discussion:**

The purpose of an opening statement is to "provide background on objective facts while avoiding prejudicial references...." United States v Smith, 74 F.3d 1276, 1283 (D.C. Cir.), cert denied, __ US __, 116 S.Ct 1867, 134 L.Ed.2d 965 (1996). In Small, the court quoted with approval the Fourth Circuit's statement in United States v Brockington, 849 F.2d 872, 875 (4th Cir. 1988) that "[t]he prosecutor's opening statement should be an objective summary of the evidence reasonably expected to be produced, and the prosecutor should not use the opening statement as an opportunity to 'poison the jury's mind against the defendant' or 'to recite items of highly questionable evidence.'" 74 F.3d at 1283 (citations omitted). In other words, "[t]he prosecutor's opening statement should be confined to a statement of the issues in the case and the evidence the prosecutor intends to offer which the prosecutor believes in good faith will be available and admissible[,]" "scrupulously avoid[ing] any utterance the [the prosecutor] believes cannot and will not later actually be supported with

[competent and reliable] evidence." Id. (quoting ABA Standards for Criminal Justice 3-5.5, commentary at 100 (3d ed. 1993)). Consequently, where the prosecutor informs the jury that the government will produce certain evidence to show a defendant's guilt and then, without good cause, fails to do so, the prosecutor fails to give a proper opening statement to the jury. Otherwise, the risk to the defendant is that the jury's mindset will be tainted, resulting in an unfair trial. See Williams-Davis, 90 F.3d at 506. The risk to the government is that it may have to retry the case.

On several occasions, the Court of Appeals has held that when a prosecutor states that evidence will be submitted to the jury, and the evidence is not presented, reversal is not warranted if the prosecutor did so acting in good faith. See People v Johnson, 187 Mich App 621, 626, 468 NW2d 307 (1991); People v Solak, 146 Mich App 659, 676, 382 NW2d 495 (1985); People v Pennington, 113 Mich App 688, 694, 318 NW2d 542 (1982); People v Hurd, 102 Mich App 424, 427, 301 NW2d 881 (1980); People v Joshua, 32 Mich App 581, 586, 189 NW2d 105 (1971). However, a panel of the Court of Appeals, has stated the rule somewhat differently, holding that when a prosecutor fails to prove allegations made during his opening statement, reversal is not required in the absence of bad faith or prejudice to the defendant. See People c Coward, 32 Mich app 274, 276, 188 NW2d 182 (1971).

When the Michigan Supreme Court first addressed the issue, it reasoned that a prosecutor's unsupported allegation did not, in itself, warrant reversal where the prosecutor was in good faith, because "the jury must be presumed to have based their verdict upon the evidence, and not upon the statement of counsel." People v Fowler, 104 Mich 449, 452, 62 NW 572 (1895); see also People v Ecarius, 124 Mich 616, 621, 83 NW 628 (1900). Applying the same rule, the Court, in People v Swift, 172 Mich 473, 483, 138 NW 662 (1912), further reasoned that failure by the prosecutor to prove allegations made during opening statement is at least as prejudicial to the prosecution as to the defense, because it opens the door to "caustic argument" on the part of defense counsel.

However, more recently the Court of Appeals in People v Wolverton, 227 Mich App 72, 574 NW2d 703, 705 (1997), has held **"in the early cases, then, the Court apparently ignored the possibility that a defendant could be unfairly prejudiced by unproved allegations made in good faith."** The Court of Appeals in Wolverton, further held **"[t]herefore, because the ultimate concern is whether the defendant received a fair and impartial trial, the Court of Appeals cases that have framed the issue solely in terms of the prosecutor's good faith are misleading."** Wolverton, supra at 574 NW2d 705. In other word the prosecution's good faith or bad faith is constitutionally irrelevant and prejudice is followed by a prosecutor's unproved allegations during his opening statement.

Misrepresenting facts in evidence can amount to substantial error because doing so **"may profoundly impress a jury and may have significant impact on the jury's deliberations."** Donnelly v DeChristoforo, 416 US 637, 646, 94 S.Ct 1868, 40 L.Ed.2d 431 (1974). For similar reasons, asserting facts that were never admitted into evidence may mislead a jury in a prejudicial way. See Berger v United States, 295 US 78, 84, 55 S.Ct 629, 79 L.Ed 1314 (1935). This is particularly true when a prosecutor misrepresents evidence because a jury generally has confidence that a prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty. See id. at 88, 55 S.Ct. 629.

Given this precedent, and the fact that this case essentially presented a credibilty contest between the prosecution and the defense relative witnesses, the prosecutor's damning and subsequently unproven allegations that Defendant Pouncy himself carjacked the '79 Camaro and '03 truck, unproven allegations that Defendant Pouncy himself robbed the complainants of their cell phones, unproven allegations that Wayne Grimes gave Defendant Pouncy the cell phones, unproven allegations that Defendant Pouncy and the other alleged participants planned and agreed to rob the complainants of their cell phones while in the car, unproven allegations that Wayne Grimes ordered the

complainants to give their cell phones up to Defendant Pouncy, unproven allegations that Defendant Pouncy drove the stolen truck, trailer, and Camaro away from the scene of the crime, and the most demning and unfairly prejudicial unproven allegation that Defendant pouncy made the gun used by Wayne Grimes available so that he could complete the robbery were so prejudicial and ultimately deprived Defendant Pouncy of his right to a fair trial.

The prosecutor was suppposed to be familiar with what he would be able to prove through admissible evidence at trial before he made the damning unproven allegations during his opening statement. When the prosecutor made the allegations during his opening statement, especially the allegation of Defendant Pouncy being the one who aided and abetted Wayne Grimes by making the gun used during the robbery evaileble, he must have been aware that he was required to prove this at trial through admisaible evidence. he took a risk that his prediction of his allegations would not be vindicated. As a result of his gamble, the jury was exposed to highly persuasive unproven allegations, which ultimately was intended to support and prove the prosecution's theory that Defendant Pouncy aided and abetted Wayne Grimes. Defendant Pouncy aided and abetted Wayne Grimes. Defendant Pouncy is entitled to a new trial based on the prejudicial effect of the unproven damning and unfairly prejudicial allegations.

as it was held in Berger v United States, 295 US 78, 88, 55 S.Ct 624, 79 L.ed 1314 (1935(, assserting facts that were never admitted into evidence may mislead a jury in a prejudicial way. In the case at bar, when the prosecutor allaged and subsequently failed to prove that Defendant Pouncy made the gun used by Wayne Grimes in the robbery available this misled the jury, because a jury generally has confidence that a prosecuting attorney is faithfully observing his obligations as a representative of a sovereignty. See id. at 88, 55 S.Ct 629. Reversal is required.

IV.   **DEFENDANT POUNCY'S SIXTH AMENDMENT RIGHT TO CONFRONTATION WAS VIOLATED WHEN THE PROSECUTION PLACED A POLICE REPORT ON THE JURY PANEL LEDGE WHICH WAS NEVER ADMITTED INTO EVIDENCE AND ONLY PRESENTED THE PROSECUTION'S THEORY OF THE CASE AND STATEMENTS FROM NON-TESTIFYING WITNESSES.**

During trial, specifically during the lead detective's direct examination, while Det. James Gagliardi was testifying for the prosecution he placed a prosecution produced, Mt. Morris Township Police Defendant Standard Report next to him on the ledge of the jury panel, which not only enabled him to impermissibly refresh his recollection with the police report, **without** permission from the court, but moreover it also enabled the jurors to see and read the report which was never admitted into evidence, only presented the prosecution's theory of the case, and statements from non-testifying witnesses. The following occurred in its pertinent part:

> **Mr. Pouncy:** I have an objection.
>
> **The Court:** That's the way to proceed.
>
> **Mr. Pouncy:** I ask that that report be removed from away from his vision because he is continuing to look at it before he answers the question.
>
> **The Court:** Well, I think I am going to ask you to take the report off the ledge because the jurors can see it certainly. And, all right, proceed, Mr. Larobardiere. (T 1-27-06, 228).

The trial court immediately recognized that jurors were indeed able to and were reading the contents contained in the prosecution produced police report. The Mt. Morris Township Police Department Standard Incident Report whic the jury was exposed to included the following:

> • **Unconfronted statements from the Prosecutor all throughout the report.**
>
> • **Unconfronted statements from Wayne Grimes which referenced other carjackings. Page 22.**

- Unconfronted statements from Det. Gagliardi, which referenced the attempted larceny of another vehicle for which Defendant Pouncy was never charged with. Page 22.

• Unconfronted statements from Wayne Grimes referencing Defendant Pouncy getting his money from illegal drug sells. Page 16.

• Unconfronted statements from Wayne Grimes referencing Defendant Pouncy being involved in three fights while in the Genese County jail. Page 19.

• Unconfronted statements from Wayne Grimes concerning Defendant Pouncy's last case (Assault with the intent to do great bodily harm less then murder). Page 19.

• Unconfronted statements from Wayne Grimes concerning Defendant Pouncy having unjustifiable large sums of money on him at any given time. Page 16. (See Mt. Morris Township Police Department Standard Incident Report from January 10, 2006 attached as Appendix T).

The fact that the jurors were exposed to this extaneous evidence, which was prepared and produced solely by the prosecution and only emphasized its theory and contained unconfronted and extemely prejudicial evidence, deprived Defendant Pouncy of his Sixth Amendment right to confront all witnesses against him and to get all the evidence on the record. Reversal is required.

**Standard Of Review:**

A claim of constitutional error is reviewed de novo. People v McPherson, 263 Mich App 124 (2004). The denial of the right to confrontation is a violation of the Sixth Amendment. US Const, Am VI.

**Discussion:**

In Pointer v Texas, 380 US 400, 403, 13 L.Ed.2d 923 (1965), the United States Supreme Court held that the Sixth Amendment right of an accused to confront the witnesses against him is a "fundamental right...made obligatory on the States by the Fourteenth Amendment." As the Court said in Pointer, "It cannot seriously be doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him." 380 US at 404, 13 L.ed.2d at 926. The denial of the right of effective cross-examination "'would be constitutional error of the first magnitude and no amount of showing of prejudice would cure it.'" Brookhart v Janis, 384 US 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314. Smith v Illinois, 390 US 129, 131, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968).

In the case at bar, there's no doubt that the fact finders did indeed have the opportunity to view and use evidence from the police report which was never admitted into evidence or placed on the record and which included some very damaging and prejudicial and unconfronted evidence. The jury was exposed to the prejudicial statements made by the prosecutor in the police report, the extremely prejudicial references to uncharged crimes in the police report, the extremely prejudicial comments made by Wayne Grimes in the police report referring to Defendant Pouncy carrying unexplained large sums of money and being involved in illegal drug transactions, the extrememly prejudicial statements by Wayne Grimes in the police report that referred to Defendant Pouncy being involved in three fights while in the Genesee County jail, however, since this extraneous evidence was not placed on the record Defendant Pouncy was denied his constitutional right to confront all witnesses against him and to get all the evidence used against him on the record.

The triers of facts may not go outside the record in determining guilt. 2 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 630, p. 285.

The Court in People v Simon, 189 Mich App 565, 568 (1991); held:

> "When the factfinders relies on extraneous
> evidence, the defendant is denied his

constitutional right to confront all the witnesses against him and to get all the evidence on the record. People v Ramsey, 385 Mich 221, 224-225; 187 NW2d 887 (1971); US Const, Am VI; Const 1963, art 1, § 20; see also Hughea v Borg, 898 F.2d 695, 700 (CA 9, 1990).

In the case at bar, it cannot be said beyond a reasobale doubt that the jury did not convict Defendant Pouncy based on the extraneous prejudicial evidence it received from the unadmitted police report which was solely prepared by the prosecution and emphasized the prosecution's theory of the case. The unadmitted police report, in effect, served as evidence against Defendant Pouncy, thus deprivimg him of his right to confrontation and cross-examination and to get all evidence used against him on the record. See Ramsey, supra; Hughes, supra. This requires automatic reversal. See Brookhart, 1384 US at 3, 86 S.Ct. 1246 and Smith, 340 US at 131, 88 S.Ct. at 750.

V.   DEFENDANT POUNCY WAS DENIED HIS RIGHT TO
DISCOVERY, WHEN THE PROSECUTION FAILED TO
PROVIDE THE DEFENSE WITH THE WRITTEN
STATEMENT OF ITS WITNESS COMPLAINANT THOMAS
SANDSTROM, AND REVERSAL IS REQUIRED.

The importance of pre-trial discovery in criminal cases cannot be overstated. The
Court in People v Walton, stressed the need for full discovery in preparation for
trial:

> "First, fairness to the defendant and an
> adequate opportunity to prepare a defense,
> including preparation for cross-examination
> of witnesses, requires that the defendant be
> given access to all relevent information. It
> has been held that statements made by the
> defendant to the police are discoverable for
> that reason. People v Johnson, 356 Mich 619,
> 97 NW2d 739 (1959). Statements by the police
> officers have also been made available.
> [People v Dellabonda, 265 Mich 486, 251 NW
> 594 (1933).] It goes without saying that
> statements made by other witnesses are
> equally important for trial preparation. This
> is particularly true, as in the case at bar,
> where the question of credibility may be
> preeminent....**Also, without an examination of
> the requested information, it is impossible
> to see if such information, would be relevant
> and whether its suppression would lead to a
> failure of justice.**

The Court in People v Turner, 120 Mich App 23 (1982) stated:

> "Discovery exists to allow the defendant a
> decent opportunity to prepare and to extend
> to him the fundamental fairness with the
> adversary system seeks to provide. State v
> Johnson, 524 SW2d 97, 101 (MO, 1975).
> Furthermore: [A] principal purpose of

> discovery is to advise defense counsel of
> what the defendant faces in standing trial;
> it permits a more accurate evaluation of the
> factors to be weighed in considering a
> disposition of the charges without trial."

In the instant case, Defendant Pouncy was deprived of his right to pre-trial discovery by failure of the police and prosecutor to provide him with the written statement that the complainant Thomas Sandstrom made. During the trial at bar, Defendant Pouncy never received as a part of the discovery, a written statement made by complainant Thomas Sandstrom concerning his version of events regarding the carjacking in which he claimed was committed against him. It was brought out that complainant Thomas Sandstrom made a written statement to the Mt. Morris Police, for the first time during Defendant Pouncy's second trial in which Thomas Sandstrom testified at as a MRE 404(B) witness. (See Case No.: Circuit Court No. 05-17448-FC/Court of Appeals No. 270604). The following occurred while Thomas Sandstrom was under cross-examination:

> **By Mr. Pouncy:**
> **Q:** You didn't see those? Uhm-did you make a--
> any type of written statement to the Mt.
> Morriss--**I mean did you write out a statement**
> **with the Mt. Morris Police Department?**
> **A:**[Witness Thomas Sandstrom] **Yes I did.**
> **Mr. Pouncy:** Oh--may we uhm--have that because
> **that wasn't even included in the last case**
> **sither?** [**The case at bar**]. Is there any way
> we can get that because I believe it was
> inconsistencies? that's proper impeachment. **I**
> **wasn't provided with that in the last matter**
> **either.** [**The case at bar**].
> **The Court:** Well I don't think this officer
> would have that. That would be something that
> was in the other case. So we just don't have
> it available here. Uh--so I at this point I

> don't see how we are going to have it because
> it's just not a part of this case. (Case
> Nos.: Circuit Court No. 05-17448-FC/Court of
> Appeals No. 270604, T 4-5-06, pages 145-146).

The above shows that it was brought out for the first time ever during a trial unrelated to the trial at bar, that prosecution's witness complainant Thomas Sandstrom made a written statement to the Mt. Morris Police, outlining his version of events concerning the alleged carjacking on October 11, 2005. The above also shows Defendant Pouncy making the trial court judge and prosecutor Mr. Larobardiere aware that he never received a copy of the written statement made by complainant Thomas Sandstrom and that he was not even aware that Thomas Sandstrom made a written statement to the Mt. Morris Police Department.

The prosecution's failure to provide Defendant Pouncy with a copy of the written statement made by complainant Thomas sandstrom deprived Defendant Pouncy of his right to pre-trial discovery. Reversal is required because the failure to provide Defendant Pouncy with the written statement hampered his defense and denied him a fair trial.

**Standard Of Review:**

The standard of review of prosecutorial misconduct is "de novo", without deference to the ruling of the court below. People v Bahoda, 448 Mich 261 (1995); People v Legone, 205 Mich App 77 (1994). The prosecutor's tactic also "undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice." United States v Young, 470 US 1, 13 (1985); People v Van Dorston, 441 Mich 540, 545 (1993).

**Discussion:**

In Brady v Maryland, 373 US 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court discussed the withholding or suppression of evidence by the prosecution. The Supreme Court held, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is

material either to guilt or the punishment, irrespective of the good faith or bad faith of the prosecution." 373 US at 87.

In United States v Agurs, 427 US 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court dealt with the withholding of potentially exculpatory evidence where there had been no defense request for it or just a general request. Some evidence has such obviously substantial value to the defense that the prosecution must disclose it, even without a specific request. 427 US at 110. "[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure." Id., at 108. The Agurs Court held that, if there is no request or if the request is not specific, the applicable standard of materiality of the evidence was whether the non-disclosure was harmless under the traditional harmless-error standard. 427 US at 111-112. Even in the absence of a specific or general discovery request, it is the obligation of the prosecution to turn over exculpatory material to the defense.

In Arizona v Youngblood, 488 US 51, 109 S.Ct 333, 102 L.Ed.2d 281 (1988), the Supreme Court confirmed the Brady standard concerning the withholding of evidence: due process "makes the good or bad faith of the State irrelevant when the State feils to disclose to the defendant material exculpatory evidence." 109 S.Ct. at 337.

In United States v Bagley, 473 US 667 (1986), the Court held that suppression of both exculpatory and impeachment material amounts to a constitutional violation if it deprives the defendant of a fair trial: a constitutional violation occurs if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial. The Court reversed Bagley's conviction due to the Brady violation.

Brady imposes an affirmative duty on the government to produce the specifically requested evidence that is material to the accused regardless of whether it constitutes direct or impeaching evidence. The duties imposed upon the prosecutor under Brady have been interpreted as minimum prosecutorial obligations. Smith v Phillips, 455 US 109 (1982); United States v Griffin, 659 F.2d 932 (CA 9, 1981), cert denied, 456 US 949

(1982); United States c Campagnuola, 592 F.2d 852, 859 (CA 5, 1971); United States v Beasly, 545 F.2d 403 (CA 5, 1977).

Lack of knowledge is no excuse. In United States v Bryan, 868 F.2d 1032 (CA 9, 1989), the Court held that the prosecutor will be deemed to have knowledge of and access to anything in the possession, custody or control of any government agency participating in the same investigation of the defendant. Cf. United States v Gatto, 763 F.2d 1040 (CA 9, 1985); United States v Schwartz, 857 F.2d 655 (CA 9, 1988).

Similarly, under Michigan law acts of suppression by the prosecution will result in reversal, dismissal, or other remedies. Where a prosecutor has violated a discovery order, even if inadvertently in good faith, the resulting conviction will be reversed on appeal, unless it is clear that failure to divulge was harmless beyond a reasonable doubt. People v Pace, 102 Mich App 522 (1980); People v Florinchi, 84 Mich App 128; 269 NW2d 500 (1978), lv den 405 Mich 828 (1979). In In re Bay Prosecutor, 109 Mich App 476 (1981), lv den 413 Mich 852 (1982), the Court of Appeals held that a prosecutor's refusal to provide a copy of police reports to defendants **before the preliminary** examination is an inexcusable obstruction of justice and an abuse of prosecutorial power. Where the prosecution obstructs the defense, a trial court may dismiss the charges against the defendant. See United States v Padrone, 406 F.2d 560 (CA 2, 1969); People v Leo, 188 Mich App 417; 470 NW2d 423 (1991).

The Court in People v Pace, supra, held that, even if the late discovery was not the fault of the prosecution, the error must be harmless beyond a reasonable doubt. Chapman v California, 386 US 18, 24, 87 S.Ct 824, 17 L.Ed.2d 705. The dispositive factor in the case at bar, was the relative credibilities of each witness. The written statement made by Thomas Sandstrom reflecting his version of events while the incident was still fresh in his head could vary well have been used at trial to either exonerate Defendant Pouncy or to at least impeach Thomas Sandstroms' credibility.

As the Court held in People v Walton, supra, "Also, without an examination of the requested information, it is impossible to see if such information would be relevant

and whether its suppression would lead to a failure of justice." Defendant Pouncy asl that he be provided with a copy of the written statement of Thomas Sandstrom since it was never provided and that due to the pre-trial discovery violation that his convictions be reversed. The written statement could contain inconsistent versions of events contrary to Thomas Sandstroms' trial testimony which could change the outcome of a new trial or completely exonerate Defendant Pouncy.

VI.     DEFENDANT POUNCY WAS DEPRIVED OF HIS RIGHT TO
        DUE PROCESS DUE TO THE PROSECUTION'S FAILURE
        TO CORRECT THE FALSE TESTIMONY OF ITS "STAR
        WITNESS", WAYNE GRIMES.

The criminal charges against Defendant Pouncy arose out of an alleged series of carjackings which allegedly occurred on two separate occasions first on September 29, 2005 and then on October 11, 2005. **There was absolutely no physical evidence connecting Defendant Pouncy to the crimes.** Defendant Pouncy did not even become the focus of the prosecution's investigation until Wayne Grimes, the prosecution's star witness inculpatated him. The prosecution openly admitted that Wayne Grimes was the center of all its information. The following occurred in its pertinent part:

> By Mr. Larobardiere:
> You're talking October 11th. The detective gets the case. **They track down Mr. Grimes, on his-they stop him on his way to college, Baker College. It unfolds from there. Suspects are identified from there.** (T 2-1-06, 18).

Without the prosecution's star witness Wayne Grimes, ever inculpating Defendant Pouncy by identifying him and saying he was involved with Wayne Grimes' criminal activities, Defendant Pouncy would have never been the focus of the prosecution's investigation and charges would have never been brought against his.

During the prosecution's star witness's testimony, in an attempt to prevent his credibility and believability from being diminished regarding his conflicting and inconsistent statements he gave, Wayne Grimes blatantly lied and said that when he was arrested for the crimes in question, it was his first time ever being arrested. Wayne Grimes lied to the jury by telling them that it was his first time ever being arrested in an attempt to give the jury a false impression, that he was inexperienced when it came down to dealing with law enforcement and interrogations, to justify why he only gave them "half of what happened", during the initial interrogation. Here's what took

place in its pertinent part:

> **Wayne Grimes:** They interviewed me. **I was**
> **scared.** They had a whole lot of charges-**I was**
> **scared**-that they said that I was being
> charged with. **So I was scared. I gave them**
> **half of what happened. This is the first time**
> **I got arrested. I gave them half of what**
> **happened.** (T 1-27-06, 22).

Wayne Grimes, blatantly lied while under oath and thereby committed perjury, when he lied and testified that "this is the first time I got arrested." The transcript from Wayne Grimes' sentencing proceeding indeed reveals that Wayne Grimes had indeed been arrested prior to him being arrested in connection with the case at bar. He was arrested in the City of Clio on May 14, 2005 and lodged in the Genesee County jail on the charge of "Felony Weapons-Carry Concealed", then eventually released on bond, thereafter, he pled to a reduced charge of reckless carrying of a weapon. (See Wayne Grimes' Presentence Investigation Report). The following was revealed during Wayne Grimes' sentencing proceeding:

> **The Court:** You have no prior felonies, **one**
> **misdemeanor,** no juvenile record, a year in
> college. (Case # 05-17155-FC, Sentencing
> Transcript 2-2-06, 21).

Wayne Grimes', transcripts and his Presentence Investigation Report, clearly reveals that he had indeed been arrested and had previously been in contact with law enforcement, which is contrary to his trial testimony. Despite, the perjurious testimony the prosecutor failed to correct its star witness' false testimony. The prosecutor's failure to correct the false testimony deprived Defendant Pouncy of his right to due process and this error is unquestionably prejudicial, because it's undisputable that Wayne Grimes was the prosecution's star witness and the case relied merely on the credibility of each relative witness and the perjurious testimony unfairly bolstered his credibility and believability in the eyes of the jury.

Credibilty of each sides witnesses was indeed material.

Moreover, during closing argument the prosecutor unfairly bolstered Wayne Grimes', credibility and believability by arguing that Wayne Grimes "testified honestly" and was "straightforward", and thereby urged the jury to believe Wayne Grimes over Defendant Pouncy. The following occurred in its pertinent part:

> **By Mr. Larobardiere:**
> He [Wayne Grimes] easily could have said-put that gun in his hands and said-you know, put that issue at rest, he's the one, he did it. Mr. Grimes didn't do that. **He testified honestly.** He-he got up there and said, **straightforwerd** to you, I didn't see who had the gun. (T 2-1-06, 73).

Wayne Grimes', testimony was so important and cruciel to the prosecution's case, the prosecutor engaged in blatant prosecutorial misconduct by interjecting his personal belief in the truthfulness of his star witness's testimony, which in and of itself warrants reversal. The prosecutor was obligated to correct its star witness's false testimony.

**Standard Of Review:**

The standard of review of prosecutorial misconduct is "de novo", without deference to the ruling of the court below. People v Bahoda, 448 Mich 261 (1995); Paople v Legone, 205 Mich App 77 (1994). The prosecutor's tactic[s] also "undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice." United States v Young, 470 US 1, 13 (1985); People v Van Dorston, 44 Mich 540, 545 (1993).

**Discussion:**

Since at least 1935, it has been the established law of the United States that a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution. See Mooney v Holohan, 294 US 103, 112, 55 S.Ct 340, 79 L.Ed 791

(1935). This is so because, in order to reduce the danger of false convictions, we rely on the prosecutor not to9 be simply a party in litigation whose sole object is the conviction of the defendant before him. The prosecutor is an officer of the court whose duty is to present a forceful and **truthful** case to the jury, not to win at any cost. See, e.g., Jenkins v artuz, 294 F.3d 284, 296 n. 2 (2d Cir. 2002)(noting the duty of prosecutors under New York law "to seek justice, not merely to convict").

Despite the fundamental nature of the injury to the justice system caused by knowing use of perjured testimony by the state, the Supreme Court has not deemed such errors to be "structural" in the sense that they "affect[] the framework within the trial proceeds." United States v Feliciano, 223 F.3d 102, 111 (2d Cir. 2000)(quoting Arizona v Fulminante, 499 US 279, 307-10, 111 S.Ct 1246, 113 L.Ed.2d 302 (1991)(brackets in original)). Structural errors are those that "'so fundamentally undermines the fairness or the validity of the trial that they require voiding [the] result [of the trial] regardless of identifiable prejudice.'" Id. (quoting Yarborough v Keane, 101 F.3d 894, 897 (2d Cir. 1996)). Instead, even when a prosecutor elicits testimony he or she knows or should know to be false, or allows such testimony to go uncorrected, a showing of prejudice is required. But the Supreme Court made clear that prejudice is readily shown in such case, and the conviction must be set aside unless there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v Agurs, 427 US 97, 103, 96 S.Ct 2392, 49 L.Ed.2d 342 (1976); Giglio v United States, 405 US 150, 154, 92 S.Ct 763, 31 L.Ed.2d 104 (1972); see also United States v Wallach, 935 F.2d 445, 456 (2d Cir. 1991)(citing Agurs and adding that the Supreme Court cases means that "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic" (quotation marks omitted)). A court must ask: (1) whether false testimony was introduced, (2) whether that testimony either was or should have been known to the prosecution to be false, (3) whether the testimony went uncorrected and (4) whether the false testimony was prejudicial in the sense defined by the Supreme

Court in Agurs.

In the case at bar, all four prongs of the Agurs, standards are easily satisfied. There's no question that false testimony was introduced. Wayne Grimes' testimony at trial clearly shows that he testified that when he got arrested in connection with the case at bar, it was his first time ever being arrested, according to him, however, undisputable court documents reveal that he had indeed been arrested prior to being arrested in connection with the case at bar. Both Wayne Grimes' Presentence Investigation Report and his sentencing transcripts reveal that he indeed had been previously arrested for carrying a concealed weapon charge and pled to a lesser offense a misdemeanor. So the first prong of the Agurs standard is satisfied, it can not be gainsaid that the testimony was false.

Now to the second prong, whether the false testimony either was or should have been known to the prosecution to be false. Wayne Grimes was the prosection's star witness and prior to him being apprehended in connection to the case at bar, he was the initial and single suspect so in an attempt to locate and apprehend him the lead detective James Gagliardi ran his name through the Law Enforcement Information Network (LEIN)(T 1-27-06, 202) and discovered all of his information in relation to his background (T 1-27-06, 204), so it's inconceivable to conclude that the prosecution did not know that its star witness had indeed been previously arrested when he testified to the contrary. So the second prong of the Agurs standard is satisfied, it cannot be gainseid that the prosecution did know or should have known that its star witness had been previously arrested for a carrying a concealed weapon charge.

Now to the third prong, whether the false testimony went uncorrected, it is very obvious from the record that the prosecutor failed to correct this false testimony and thereby allowed its star witness to bolster its credibility and believability with false testimony. So the third prong of the Agurs standard is satisfied.

Now to the fourth and final prong, whether the false testimony was prejudicial in the sense defined by the Supreme Court in Agurs. The Supreme Court in Agurs, clearly

79

held "that prejudice is readily shown in such cases," and the conviction must be set aside unless there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury." Id. 427 US at. 103. In the case at bar, it can not be said that there is no reasonable likelihood that the false testimony could have affected the judgment of the jury. As the prosecution openly admitted the dispositive factor in this case was "eyes witness testimony" and nothing else. The prosecution admitted this during the following pertinent part of his argument:

> **By Mr. Larobardiere:**
> I told you this was not gonna be a case of
> DNA, with fingerprints and all that technical
> evidence; and you all agreed that that was
> okay, nobody had a problem with it. What we
> did hear is what I said, is eye witness
> testimony from eight people; and you can
> convict solely on the eye witness testimony.
> (T 2-1-06, 9).

The prosecution's case rested solely on eye witnesses' testimony which is inherently suspect and unreliable. See Clinkscale v Carter, 375 F.3d 430, 445 (citing Blackburn v Foltz, 828 F.2d 1177, 1186)(holding that there are "grave reservations concerning the reliability of eyewitness testimony," so "the accuracy of [eye witness's] identification is highly suspect"). Besides the inherently unreliable eye witness testimony, there was absolutely no evidence against Defendant Pouncy, so the evidence against Defendant Pouncy was far from overwhelming and it goes without being said that there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury" Agurs, 427 US at 103, 96 S.Ct 763.

The false testimony of Wayne Grimes definitely affected the judgment of the jury. Wayne Grimes' false testimony made him appear more credible and believable, because his false testimony led the jury to be under a false impression that this was his first time being in trouble with the law and that he did not have a criminal record prior to

his involvement in the crimes at bar. This false testimony made Wayne Grimes appear to be more credible and believable than Defendant Pouncy, because while Wayne Grimes' false testimony had the jury under the false impression that he was a first time offender and had not never previously been arrested, there was a stipulation on the record that Defendant Pouncy had already previously been convicted of other crimes. (T 2-1-06, 81). since the jury was under the false impression that Wayne Grimes had not never previously been in contact with law enforcement or arrested and was a first time offender and they knew that Defendant Pouncy had already previously been convicted of other crimes, they could have used the false testimony to determine that the prosecution's star witness Wayne Grimes, was more credible and believable then Defendant Pouncy, since the false testimony went uncorrected by the prosecutor.

Moreover, since the prosecutor failed to correct this false testimony the jury could have used the false testimony to justify and excuse Wayne Grimes' inconsistent and conflicting statements and justify him only reporting "half of what happened". The jury could have concluded based on the false testimony that since Wayne Grimes had never been in contact with or interrogated by law enforcement. his inexperience in this area justified his inconsistent and conflicking statements, which effectively rendered all of Defendant Pouncy's efforts to impeach this witness with his inconsistent and conflicting statements, useless and thereby leaving Wayne Grimes' testimony uncountered all because of the prosecutor's failure to correct the false testimony.

Furthermore, there's no question the false testimony affected the judgment of the jury because this false testimony made the prosecution's star witness appear more credible and believable than Defendant Pouncy and during closing argument the prosecutor, although erroneously, argued that due to Wayne Grimes' "honesty" and "straightforwardness", they should believe him over Defendant Pouncy. However, in reality Wayne Grimes was not being honest and straightforward and had the jury known this it's a reasonable likelihood that at least one juror would have found Wayne Grimes' testimony unreliable and thereby disbelieved and ultimately disregarded his testimony and in light of the remaining insubstantial at best evidence, voted to

acquit, leaving a reasonable likelihood that the outcome of Defendant Pouncy's trial would have been different had the prosecutor exposed its star witness's in court perjury, by merely correcting it.

In the case at bar, this court must reverse Defendant Pouncy's convictions, if this court apply directly the test given to it by the Supreme Court, which has told courts that convictions in cases of this sort **must be reversed unless the evidence was so overwhelming that there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury."** Agurs, 427 US at 103, 96 S.Ct. 2392.

VII.    WHEN THE PROSECUTOR ARGUED THAT DEFENDANT
POUNCY CREATED A LOT OF DUST, THREW UP A LOT
OF SMOKE, THREW UP A LOT OF MIRRORS, WAS A
SMOOTH TALKER, USED A SALEMAN'S PITCH IN
REPRESENTING HIMSELF, WAS TRYING TO TALK HIS
WAY OUT OF THE CHARGES, AND WAS VERY SCHEMING
THIS      CONSTITUTES      IMPERMISSIBLE      AND
INFLAMMATORY PROSECUTORIAL MISCONDUCT WHICH
ATTACKED DEFENDANT POUNCY IN THE CAPACITY OF
BEING   HIS   OWN   COUNSEL   AND   ULITIMATELY
DEPRIVED HIM OF A FAIR TRIAL AND CONSTITUTES
A FAILURE TO RESPECT DEFENDANT POUNCY'S RIGHT
TO    SELF-REPRESENTATION,    WHICH    REQUIRES
AUTOMACTIC REVERSAL.

At the beginning of the trial Defendant Pouncy weived his right to counsel, although the waiver was ineffective, and acted in the capacity of his own ettorney. (T 1-24-06, 232-233). Throughout the trial Defendant Pouncy assumed the advocacy role just as any other attorney would. Defendant Pouncy cross-examined witnesses, raised objectiona occaaionally, called witneaaes in his behalf, and conducted his own closing arguments. However, for assuming the role as his own counsel the prosecutot Mr. Christopher D. Larobardiere, made Defendant Pouncy pey a huge price. Mr. Larobardiere utterly disrespected Defendant Pouncy's role as his own counsel and argued to the jury that Defendant Pouncy was creating a lot of dust while in tha capacity as his own counsel, that Defendant Pouncy threw up a lot of smoke while in the capacity of his own counsel, that Defendant Pouncy threw up a lot of mirrora while in the capacity of his own counsel, that Defendant Pouncy used a lot of smooth talk while in the capacity of his own counsel, that Defendant Pouncy used a saleman's pitch to try to trick the jury while in the capacity of his own counsel, that Defendant Pouncy was just trying to talk his way out of the charges while in the capacity of hie own counsel, that Defendant Pouncy wes very schaming while in the capacity of hia own counsel, and that Defendant Pouncy waa just trying to sell the jury something while in the capacity of his own counsel. The following took place during the prosecutor's closing argument:

By Mr. Larobardiere:

You saw Mr. Pouncy create a lot of dust throughout the trial, throw up a lot of smoke, throw up a lot of mirrors. When all that dust settled, just like the dust that

was created on Kellar Avenue, that dirt road, what are we left with on Mr. Pouncy's part? **A lot of smooth talk, a lot of semantics, a lot of play on words, a lot of play on time.** (T 2-1-06, 8).

\* \* \* \* \*

**Don't listen to the smooth talk, the saleman's pitch like these victim'c got tricked into.** When the dust clears....(T 2-1-06, 23).

Then Mr. Larobardiere resumed his attack on Defendant Pouncy in the capacity of his own counsel during rebuttal closing argument. The following occurred in its pertinent parts:

**By Mr. Larobardiere:**

Talked about the possibility of evidence, the gas station video, fingerprints, uh-if you remember, he did produce a witness very quickly, a certified investigator. What did that certified investigator produce? A foot scale, measured his foot, testified briefly about the foot scale doesn't really correspond to the-to an inches measurement; that's it. You could have the investigator go track down all these things he's talking about, produced anything. None of that was produced. It wasn't produced because it doesn't exist. **More smoke and mirrors. More dust he's trying to create.** (T 2-1-06, 74).

\* \* \*

You folks bring common sense with you into the courtroom today; and common sense-**you could see that he's a smooth talker, trying to talk his way out of this...** (T 2-1-06, 74).

\* \* \*

He is by no means a dumb individual here; he's very smart, **very scheming.** (T 2-1-06, 74).

* * *

> **This is how this man works. He's scheming**
> from the police department to the jail,
> **trying to create a cloud of smoke.** He's
> already-the wheels are already turning. **He's**
> **already thinking about how he's gonna try to**
> **get out of this and create a smoke cloud,**
> **create issues...** (T 2-1-06, 77).

* * *

> **Don't buy what he's selling. Stop the smooth**
> **talk right now. It ends with you.** (T 2-1-06,
> 77).

The above attacks on Defendant Pouncy in the capacity as his own counsel deprived him of his righted to a fair trial and also chilled his right to self-representation. The prosecutor's attacks were utterly offensive and prejudiced Defendant Pouncy. Reversal is required.

**Standard Of Review:**

The standard of review of prosecutorial misconduct is "de novo", without deference to the ruling of the court below. People v Bahoda, 448 Mich 261 (1995); People v Legone, 205 Mich App 77 (1994). The prosecutor's tactic[s] also "undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice." United States v Young, 470 US 1, 13 (1985); People v Van Dorston, 441 Mich 540, 545 (1993).

**Discussion:**

A prosecutor may not question defense counsel's veracity. People v Bairefoot, 117 Mich App 225, 230; 323 NW2d 302 (1982); Adams v State, 192 So2d 762 (Fla, 1966); Jackson v State, 41 So 2d 15 (Fla App, 1982). See also People v Hill, 258 Mich 79, 88; 241 NW 873 (1932). When the prosecutor argues that defense counsel himself is intentionally trying to mislead the jury, he is in effect stating that dafense counsel does not believe his own client. This argument undermines the defendant's presumption

of innocence. Commonwealth v Long, 258 Pa Super 312; 392 A 2d 810 (1978). Such an argument impermissibly shifts the focus from the evidence to the defense counsel's personality.

In People v Wise, 134 Mich App 82, 101-102, 351 NW2d 255 (1984), lv den 422 Mich 852 (1985), the Court held:

> The prosecutor may not question defense counsel's veracity....When the prosecutor argues that the defense counsel himself is intentionally trying to mislead the jury, he is in effect stating that defense counsel does not believe his own client. This argument undermines the defendant's presumption of innocence...Such an argument impermissibly shifts the focus from the evidence itself to the defense counsel's personality.

In People v Moore, 189 Mich App 315 (1991), the Court held:

> The prosecutor's arguments deprived defendant of his right to a fair trial by attempting to portray defense counsel as a sharp conniving attorney who was intentionally trying to mislead the jury. It is improper for the prosecutor to engage in arguments which undermines the defendant's presumption of innocence and impermissibly shift the jury's focus from the evidence itself to defense counsel's personality. People v Dalessandro, 165 Mich app 569, 580; 419 NW2d 609 (1988); People v Wise, 134 Mich App 82, 101-102; 351 NW2d 255 (1984).

In People v Dalessandro, 165 Mich App 569 (1988), the prosecutor attacked defense counsel's veracity by arguing that the defense put forth by counsel was a sham meant to

mislead the jury. The Court of appeals reversed Dalessandro's convictions due to the prosecutor's misconduct. The following occurred at the trial in its pertinent part:

**During the prosecutor's closing argument, the prosecutor made the following comments:**

This is a sham This evidence presented by the Defense is a sham meant to mislead you. It's a bunch of lies, just like the testimony that Gene Dalessandro had nothing to do with the injuries to the child. It's disreputable really to come in front of you thirteen people and sit on that witness stand and say, "Yes, I swear to tell the truth, the whole truth and nothing but the truth", and "Yes, these albums are albums I put together in December of 83' before William went to the hopital, and they show our loving, warm relationship."

They're Defense exhibits meant to convey an impression for you thirteen of this man, proffered by the Defense and brought before you and said, "here's our fects; look at how wonderful we are."

But you see what they did with them? They're lies. Thay're damnable lies. They're demonstrative lies. They're fabrications of evidence. That's the way this whole thing has been run.

**During rebuttal closing arguments, the prosecutor made the following comments:**

The Defense brings lies.

The exhibit, Mr. Perrotta [defense counsel] holds it up for you, "This is en exhibit; this was found in the house right efter they were arrested." Yeah, like this photograph elbum? Was it found then, or wes it written

> last week? Does it have the same evidentiary
> value as the album they put in? Does it have
> the same truth? Does it have the same meaning
> to deceive you? He talks about re herrings,
> he's brought a whole boat load of them in
> this case. He's thrown them out here in
> brushel baskets.

In U.S. v Procopio, 88 F.3d 21, 32 (1st Cir. 1996)(the court held: prosecutor's references to defense aruments as "smoke screen" and statement, "I've got news for the defense consel, this trial isn't a game," were improper because excessively disparaging).

In U.S. v Friedman, 909 F.2d 705, 708 (2d Cir. 1990)(the Court held: prosecutor's statements that defense counsel would "make any argument he can to get that guy off" and that "while some people...prosecute drug dealers...there are others who...try to get them off, perhaps even for high fees" was improper).

In Bates v Bell, 402 F.3d 635, 647 (6th Cir. 2005)(the Court held: prosecutor's response of "[i]t's just getting too close for you" and subsequent responses to defense counsel's objections were improper because they criticized defense counsel for protecting client and aimed at prejudicing defendant's right to object).

In U.S. v Holmes, 413 F.3d 770, 775 (8th Cir., 2005)(the Court held: prosecutor's statements during rebuttal that defense counsel presented "red herring" arguments and that he and defendant needed to "get their stories straight" were improper and prejudicial).

In U.S. v Rodriques, 159 F.3d 439, 452 (9th Cir. 1998)(the Court held: prosecutor's statement that defense counsel had "tried to deceive [jury] from the start" was improper), amended by 170 F.3d 881 (9th Cir. 1999).

In Johnson v Gibson, 169 F.3d 1239, 1250 (10th Cir. 1999)(the Court held: prosecutor's disparaging remarks about defense counsel were improper).

In U.S. v McLain, 823 F.2d 147, 1462 (11th Cir. 1987)(the Court held: prosecutor's

repeated accusations that defense counsel intentionally misled jury were improper),
overruled on other grounds by U.S. v Watson, 866 F.2d 381 (11th Cir. 1989).

In the case at bar, Defendant Pouncy assumed the role as his own counsel and
carried out the necessary duties of representing himself. Just as any other attorney
would have done, he put forth a defense to defend against the charges against him. Due
to Defendant Pouncy putting up a defense ,the prosecutor Mr. Larobardiere, attacked him
in the capacity of his own counsel and consistently argued that while Defendant Pouncy
wss in the capacity of his own counsel he tried to throw up smoke screens, throw up
dust, throw up mirrors, use a saleman's pitch to trick the jury, smooth talk the jury,
and was just trying to talk his way out of the charges. The prosecutor's tactics were
highly improper and prejudicial. Defendant Pouncy deserved the exact ssme respect while
in the capacity as his own counsel as any other counsel deserves while representing a
client. However, due to the prosecutor's improper and prejudicial attacks on Defendant
Pouncy in the capacity of his own counsel he did not receive the respect deserved nor
did he raceive a fair trial.

As held in McKaskle v Wiggins, 465 US 168, 178 n. 8; 104 S.Ct 944; 79 L.Ed.2d 122
(1984):

> "Since the right of self-representation is a
> right that when exercised usually increases
> the likelihood of a trial outcome unfavorable
> to the defendant, itd denial is not amendable
> to 'harmless error' ananlysis. The right is
> either respected or denied; its deprivation
> cannot be harmless."

In sum, the prosecutor's demeanor at trial "blutantly transgressed the rules of
conduct imposed on him aa a public officer." People v Bracato, 17 Mich App 277, 304;
164 NW2d 483 (1969). A prosecutor may not suggest that defense counsel is intentionelly
attempting to mislead the jury. Dalessandro, supra at 580. Here, the prosecutor's
comments did suggest that dafense counsel (Defendant Pouncy in the capacity as his own
counsel) was trying to distract the jury from the truth. Reversal is required.

VIII.  DUE TO THE NEWLY DISCOVERED EVIDENCE OF THE
       COMPLAINING   WITNESS,   THOMAS   SANDSTROM,
       IDENTIFYING WAYNE GRIMES, AS THE PERPETRATOR
       AFTER TRIAL, INSTEAD OF DEFENDANT POUNCY, A
       NEW TRIAL IS REQUIRED.

Throughout the entire trial Sandstrom consistently testified and maintained that he was only capable of identifying merely **one person** and that was the person who carjacked him and his wife on October 11, 2005. The **only** person he claimed he was capable of identifying was the person who rode within 3 feet of him in his Cadillac for approximately twenty-five to thirty miles who he was conversating with during the drive. He alleged that the only person he could identify was Defendant Pouncy. The following occurred during trial in its pertinent part:

BY DEFENDANT POUNCY:

Q: Starting to get dark. So that would create a more harder time for you to identify someone, right, or correct?

A: The only person I can identify is the person that was within three feet of me. I drove up in the car on the expressway for approximately twenty-five-thirty miles.

Q: Pardon me?

A: The person I can identify drove in the car three feet away from me for approximately twenty-five miles and I made some small talk all the time we were driving up to our final destination. (T 1-25-06, 113-114).

Although during trial Thomas Sandstrom adamantly maintained that he was only capable of identifying one person and alleged that that one person was Defendant Pouncy, he unequivocally changed his identification of the perpetrator after Defendant Pouncy was convicted. During Wayne Grimes' sentencing proceeding, which had nothing to do with Defendant Pouncy and during a proceeding in which Defendant Pouncy was **not** even present at, Thomas Sandstrom, unequivocally changed his identification of the perpetrator and unequivocally identified Wayne Grimes as the perpetrator and blamed

Wayne Grimes, for charging $4,000.00 to his stolen credit cards after they were stolen from him. Thomas Sandstrom, changed his identification and identified Wayne Grimes, during the following in its pertinent part:

> **Mr. Sandstrom:** Well basically it's just to go through it again. We've been forced to leave our house. We've had to change all the locks on our door. **Uh, our credit cards were stolen and he [Wayne Grimes] charged $4,000.00 that evening.** (See Wayne Grimes' Sentencing Transcripts Circuit Court # 05-17155-FC, Febraury 2, 2006, pages 12-13).

Due to Thomas Sandstroms' unequivocal change in his identification of the perpetrator to Wayne Grimes, Defendant Pouncy is entitled to a new trial based on this newly discovered evidence. The fact that Thomas Sandstrom, who was a complainung witness, changed his identification of the perpetrator to someone other than Defendant Pouncy, **after trial**, could definitely reasonably have an impact on a second jury, and create a reasonable doubt as to Defendant Pouncy being the perpetrator, since the dispositive factor in the case at bar, was identification. Based on this newly discovered evidence Defendant Pouncy is entitled to a new trial and therefore reversal is required.

**Standard Of Review:**

Since the issue of a complaining witness wrongfully identifying a defendant and then correctly identifying the true perpetrator caused the conviction of an innocent man this issue must be reviewed de novo. Constitutional errors are reviewed de novo. Sitz v Department of State Police, 443 Mich 744; 506 NW2d 209 (1993).

**Discussion:**

The standard for granting a new trial on the basis of newly discovered evidence was stated in People v Bradshaw, 165 Mich App 562, 567 (1988):

> "For a new trial to be granted on the basis

91

of newly discovered evidence, it must be
shown that: (1) the evidence itself, not
merely its materiality, was new discovered;
(2) the newly discovered evidence was not
cumulative; (3) including the new evidence
upon retrial would probably cause a different
result; (4) the party could not, using
reasonable diligence, have discovered and
produced the evidence at trial." See also
People v Cress, 468 Mich 678, 692 (2003).

In People v Pike, unpublished opinion of 3-30-95 (Court of Appeals # 127780, MLW #
19539), a witness to a shooting testified at Defendant Pike's trial that he was
positive that Pike had shot the victim; the witness later testified at the
codefendant's trial that he was not sure whether defendant or the codefendant had shot
the victim, and had not been sure at the time of Pike's trial. As it was clear that
Pike's conviction had been obtained through the use of the perjured testimony, the
Court of Appeals held that reversal was mandated.

In People v Bell, 74 Mich App 270 (1977), the Court ruled that the newly discovered
evidence of the arresting officer's perjury would render a different result probable at
a retrial.

In People v Mechura, 205 Mich App 480, 484, lv den 447 Mich 984 (1994), the Court
of Appeals held that the trial court abused its discretion in denying a defendant's
motion for a new trial in a first degree murder case. The defendant had unsuccessfully
claimed self-defense. A witness subsequently testified at the hearing on the motin for
a new trial that the decedent's girlfriend had confessed to giving perjured trial
testimony that the decedent was unarmed. In addition, the results of a polygraph test
supported the testimony of the witness at the motion hearing.

Further, in Stumph v Mitchell 367 F.3d 594 (6th Cir. 2004) the Court's ruling has
clearly established that the use of inconsistent, irreconcilable theories by the

prosecutor, constitute a violation of fundamental fairness, it constitutes a due process violation because it renders a conviction unreliable. The Michigan Court of Appeals characterized and reviewed the issue for "plain error", the Court in Stumpf v Mitchell, supra, held that this was "structural error". Structural error is an error affecting the framework within which the trial precedes, rather than simply an error in the trial process itself. The distinction between "structural error" and "plain error" is an important one because it determines how review should proceed. Structural error renders an entire trial inherently unfair because prejudice is incapable of measure and therefore warrants automatic reversal. The court has established in its decision in Stumpf v Mitchell, that inconsistency in the prosecutor's theories is a due process violation because it renders the conviction uncertain, this is akin to structural error as well because the prejudice is incapable of measure. "Under the peculiar facts of this case the actions by the prosecutor violates the fundamental fairness essential to the very concept of justice, the state cannot divide and conquer in this manner, such actions reduce criminal trials to mere gamesmanship and rob them of their supposed seach for the truth.

In Stumpf v Mitchell, 367 F.3d 594 (6th Cir. 2004), the Court held:

> "On this issue of first impression in this court we join our sister circuits in finding that the use of inconsistent, irreconcilable theories to convict two defendants for the same crime is a due process violation. ID at 611.

In the instant case, the facts are very similar to People v Pike, supra, Thomas Sandstrom adamantly maintained during trial that he was only capable of identifying one person and that person was the perpetrator who he drove from Fenton, MI to Flint, MI with. Thomas Sandstrom, claimed that the only person he could identify as that perpetrator was Defendant Pouncy and no one else, this was his position during trial. However, after the conclusion of Defendant Pouncy's trial, which ended on February 1, 2006 Thomas Sandstrom, changed his position concerning the identification of the

perpetrator and unequivocally identified Wayne Grimes, as the perpetrator during Wayne Grimes' sentencing proceeding which was held on February 2, 2006 a day after the conclusion of Defendant Pouncy's trial. Thomas Sandstrom, unequivocally identified Wayne Grimes as as the perpetrator and blamed Wayne Grimes for robbing him of his credit cards and charging $4,000.00 to them at a jewlery store.

The fact that Thomas Sandstrom, a complaining witness, identified someone other than Defendant Pouncy as the perpetrator after the conclusion of Defendant Pouncy's trial constitutes newly discovered evidence. The newly discovered evidence of Thomas Sandstrom identifying someone else other than Defendant Pouncy as the perpetrator is indeed exculpatory, because the dispositive  factor at trial was identification. The evidence is not cumulative because throughout the entire trial Thomas Sandstrom, adamantly maintained that he could only identify one person as the perpetrator and no one else, he claimed that the perpetrator was Defendant Pouncy, then changed his identification during Wayne Grimes' separate sentencing proceeding, in which Defendant Pouncy was not even present at.

Moreover, the fact that Thomas Sandstrom, unequivocally identified someone else other than Defendant Pouncy, as the perpetrator and changed his identification testimony and blamed Wayne Grimes for carjacking him and charging $4,000.00 to his credit cerds, could definitely produce a different result et a new trial because besides witnesses' testimony thera was absolutaly **no** evidence linking Defendant Pouncy to the crimes. If a new jury was to hear that Thomas Sandstrom has changed his idantification of the perpetrator to somaone other than Dafendant Pouncy, there's definitely a reaaonable probabilty that tha outcome of his trial would be different.

Furthermore, it was impossible to have had produced this evidence during the first trial because Thomas Sandstrom, did not identify Wayne Grimes as the perpetrator until a day after tha conclusion of Defendant Pouncy's trial, during Wayne Grimes' separate eentencing proceeding on February 2, 2006.

94

In the recent case of Mathis v Berghuis, ___ F.3d ___ (CA 6, # 02-1665, 1-27-04), the Sixth Circuit Court of Appeals held that the defendant was entitled to a new trial based on newly discovered impeachment evidence. The Court found that there was a reasonable probability that the result of the proceeding would have been different, and that the defendant was not obligated to demonstrate that the admission of the newly discovered evidence would have resulted in a different trial, or to prove that the complainant's prior allegations were false. The Sixth Circuit concluded that the Michigan Court's decision that suppression of the impeachment evidence was not grounds for a new trial was contrary to clearly established federal law. See also House v Bell, 311 F.3d 767 (CA 6, 2002). In United States v Timothy Willis Jr., 257 F.3d 636 (CA 6, 2001), the Sixth Circuit found that, in light of the suspicious circumstances surrounding the recanting prosecution witness's testimony at trial, including threats to prosecute him if he refused to testify, the district court did not abuse its discretion in finding that that testimony was false and granting a new trial based on the recanting testimony.

Thomas Sandstroms' change in his identification of the perpetrator to someone other than Defendant Pouncy during Defendant Pouncy's ex-codefendant's separate sentencing proceeding indicates that Thomas Sandstrom either realized that Defendant Pouncy was **not** the perpetrator when he seen Wayne Grimes, or he sincerely believed Wayne Grimes was Defendant Pouncy, in any event Defendant Pouncy's convictions were based on perjured testimony. The government's use of perjured testimony to obtain a criminal conviction violates the due process clause of US Const, AM XIV. Napue v Illinois, 360 US 264; 79 S.Ct 1173; 3 L.ED.2d 1217 (1959). In Barbara, the Supreme Court explained that "the discovery that test imony introduced at trial was perjured may be grounds for ordering a new trial." Barbara, 400 Mich at 363. In Mechura, the Court again recognized that the "discovery that testimony introduced at trial was perjured may be grounds for a new trial." Mechura, 205 Mich App 483.

Thus, Barbara and Mechura do not require that the person who testified at trial

even necessarily admit the perjury. All that is required is that the newly discovered evidence indicate that the newly discovered evidence indicate that the witness committed perjury. Thomas Sandstroms', statements at Wayne Grimes sentencing proceeding, in which he recanted his trial testimony and identified someone else as the perpetrator of the carjacking other than Defendant Pouncy, and specifically identified Wayne Grimes and blamed him for charging $4,000.00 to his credit cards, meets this test. Under the unusual circumstances of this case, where a complaining witness changed his identification testimony after one person was convicted and then identified another person during a separate proceeding, it cannot be said with confidence where the truth lies. The only ones capable of determining where the truth lies is a new jury, so they can be presented with and can weigh the newly discovered evidence.

In light of the newly discovered evidence, a new trial is nessary to prevent a miscarriage of justice and to ensure Defendant Pouncy's right to due process and to present a defense. MCR 6.431(B); People v Johnson, 183 Mich App 305 (1990); US Const Am VI and XIV.

IX. THE IMPERMISSIBLE PROSECUTORIAL MISCONDUCT DEPRIVED
DEFENDANT POUNCY OF HIS RIGHT TO FAIR TRIAL.

a) The prosecutor's displaying of a sign on the
courtroom's overhead projector which said "OMAR POUNCY
IS Guilty", both during opening statement and closing
arguments, effectively communicated to the jury that the
prosecutor personally believed that Defendant Pouncy was
guilty, and ultimately deprived Defendant Pouncy of his
right to a fair trial.

b) The prosecutor's inflammatory characterizations of
Defendant Pouncy, as "A seller's worst nightmare"
deprived Defendant Pouncy of his right to a fair trial.

c) The prosecutor's improper vouching for its Star
Witness, concerning the veracity of his testimony,
deprived Defendant Pouncy of his right to a fair trial.

Prior to the commencement of the trial, in preparation for opening statements,
the prosecutor displayed a sign he specifically designed that boldly communicated to
the jury, the prosecutor's personal belief in Defendant Pouncy's guilt. The sign
plainly said "OMAR POUNCY IS GUILTY." Upon seeing the sign and its prejudicial intent
Defendant Pouncy, stood and objected. The following occurred in its pertinent part:

Mr. Pouncy: Yes, Can um that sign be taken out 'cause
I'm not guilty.
The Court: I'm sorry?
Mr. Pouncy: Can that sign be taken, this moved 'cause
I'm not guilty. It say if (sic) Omar Pouncy guilty.
The Court: Mr. Pouncy this the prosecutor's side of the
case. You're not runnin' anything in here okay?
Mr. Pouncy: I'm just askin' though—
The Court: No, no. He has the right to present his side
of the case, your lawyer will present his side and if
your lawyer believes there's somthin' wrong goin' on
he'll get up and say somethin'. He doesn't need you to
jump in okay? You're not a lawyer okay? (T 1-24-06, 191).

Despite Defendant Pouncy's objection to the displaying of the impermissible
prejudicial sign, the trial court basically told Defendant Pouncy that it was the

prosecution's side of the case and was basically able to present his case by any means necessary, even if the methods infringed upon Defendant Pouncy's right to a fair trial. The prosecutor was thereby then permitted to display the sign that communicated to the jury his personal belief in Defendant Pouncy's guilt, that said **"OMAR POUNCY IS GUILTY", throughout both his entire opening statement and closing argument.** What's even more egregious and prejudicial, at the conclusion of the prosecution's opening statement, the prosecutor specifically told the jury to keep the sign which said **"OMAR POUNCY IS GUILTY",** in their minds during delieration. The following occurred in its pertinent part.

By Mr. Larobardiere:

> After yoy here that testimony **keep this slide [the sign] in mind.** We're gonna go over it again at the end but when you hear the testimony and play it into **this slide,** go back, **find him guilty of all 11 counts** for taking advantage of these people when they're just tryin' to sell their vehicle. Thank you. (T 1-24-06, 211).

Moreover, during both opening statement and closing argument, the prosecutor used highly improper and prejudicial arguments by characterizing Defendant Pouncy as **"A seller's worst nightmare".** The following occurred in its pertinent parts during opening statement:

By Mr. Larobardiere:

> Thanks Judge. Everyday thousands of people advertise their vehicles for sale, used or new vehicles for sale. This is an example of one of the vehicles that was car-jacked and advertised for sale as a result of it being advertised. **This man right here is a seller's worst nightmare.** (T 1-24-06, 203).

Then during closing argument the prosecutor continued with his improper and prejudicial characterization of Defendant Pouncy as being a nightmare. The following occurred in its pertinent part.

By Mr. Larobardiere:

> Eight people that meet Mr. Pouncy, who they believe
> they've got their vehicle sold to, and he takes them
> down to that dead end on Keller Avenue. A seller's worst
> nightmare. (T 2-1-06, 9).

The prosecutor's improper and prejudicial argument characterizing Defendant Pouncy as "A seller's worst nightmare", appealed to the jury's emotions and role as the conscience of the community, and ultimately deprived Defendant Pouncy of his right to a fair trial.

Furthermore, during closing arguments the prosecutor impermissibly and unfairly used its personal opinion to bolster his "Star Witness's" testimony, by arguing that Wayne Grimes testified truthfully and straightforwardly. The following occurred in its pertinent part:

> Mr. Larobardiere: He easily could have said-put that gun
> in his hands and said-you know, put that issue at rest,
> he's the one, he did it. Mr. Grimes didn't do that. He
> testified honestly. He-he got up there and said,
> straightforward to you, I didn't see who had the gun...
> That's why you believe Mr. Grimes over Mr. Pouncy. ( T
> 2-1-06, 73).

STANDARD OF REVIEW:

The standard of review of prosecutorial misconduct is "de novo", without deference to the ruling of the court below People v Bahoda, 448 Mich 261 (1995); People v Legone, 205 Mich App 77 (1994). The prosecutor's tactic[s] also "undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice." United States v Young, 470 U.S. 1, 13 (1985); People v Van Dorston, 441 Mich 540, 545 (1993).

Discussion:

Over 70 years ago the United States Supreme Court counselled prosecutors "to

refrain from improper methods calculated to produce a wrongful conviction...." Berger
v United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 74 L.Ed.2d 1314 (1935). The
Court made clear, however, that the adversary system permits the prosecutor to
"prosecute with earnestness and vigor." Ibid. In other words, "while he may strike
hard blows, he is not at liberty to strike foul ones." Ibid.

The line separating acceptable from improper advocacy is not easily drawn; there
is often a gray zone. Prosecutors sometimes breach their duty to refrainn from
overzealous conduct by commenting on the defendant's guilt and offering unsolicted
personal views on the evidence. Accordingly, the legal profession, through its Codes
of Professional Responsibility, which holds:

> ABA Model Code of Professional Responsibility DR7-106
> (C) (1980), which provides in its pertinent part:
>
> "In appearing in his professional capacity before a
> tribunal, a lawyer shall not:
> "(3) Absent his personal knowledge of the facts in issue
> , except when testifying as a witness."
>
> "(4) Absent his personal opinion as to the justness of a
> cause, to the credibility of a witness, as to the culp-
> ability of a civil litigant, or as to the guilt or inno-
> cence of an accused; but he may argue, on his analysis
> analysis of the evidence, for any possible or conclusion
> with respect to maters stated herein."
> See also ABA Model Rules of Professional Conduct, Rule
> 3.4 (e) (1984)

Also see, United States v Di Pasquale, 740 F.2d 1282, 1296 (CA 3, 1984); United
States v Maccini, 721 F.2d 840, 846 (CA 1, 1983); United States v Harison, 716 F.2d
1050, 1051 (CA 4, 1983); United States v Bagaric, 706 F.2d 42, 58-61 (CA 2, 1983);
United States v West, 680 F.2d 652, 655-656 (CA 9, 1982); United States v Garza, 608
F.2d 659, 665-666 (CA 5, 1979), the American Bar Association's Standing Committee on
Standards for Criminal Justice has promulgated useful guidelines, one of which states
that:

"[i]t is unprofesional conduct for the prosecutor to ex-
press his or her **personal belief or opinion as to the
truth or falsity of any testimony or evidence or the
guilt of the defendant."** ABA Standards for Criminal
Justice 3-5 8 (6) (2d ed. 1980).

The remaining text of ABA Standards for Criminal Justice 3-5.8 (2d ed. 1980)

provide:

"(a) The prosecutor may argue all reasonable inferences
from evidence in the record. It is unprofessional con-
duct for the prosecutor intentionally to misstate the
the evidence or mislead the jury as to the inferences it
may draw

"(c) **The prosecutor should not use arguments calculated
to inflame the passions or prejudices of the jury.**
"(d) **The prosecutor should refrain from argument which
would divert the jury from its duty to decide the case
on the evidence,** by injecting issues broader than the
guilt or innocence of the accused under controlling law,

or by making predictions of the consequences of the
jury's verdict.

"(e) It is the responsibility of the court to ensure
that final argument to the jury is kept within proper,
accepted bounds."

The accompanying commentary succinctly explains one of the critical policies

underlying these proscriptions:

**"Expressions of personal opinion by the prosecutor are
form of unsworn, unchecked testimony and tend to exploit
the influence of the prosecution's office and undermine
the objective detachment that should separate a lawyer
from the cause being argued."** Id , at 3.89.

As the Supreme Court has held, when a prosecutor expresses his personal opinion

concerning the guilt of the accused, he creates two risks:

101

> Such comments can convey the impression that evidence
> not presented to the jury, but known to the prosecutor,
> supports the charges against the defendant and can thus
> jeopardize the defendant's right to be tried solely on
> the basis of the evidence presented to the jury; and the
> prosecutor's opinion carries with it the imprimatur of
> the Government and may induce the jury to trust the
> Government's judgment rather than its own view of the
> evidence. United States v Young, 470 U.S. at 18-19, 105
> S.Ct. at 1048.

Furthermore, as the Supreme Court has emphasized, the tremendous power a prosecutor may wield is accompanied by a special responsibility to exercise that power fairly:

> [A prosecutor] is the representative not of an ordinary
> party to a controversy, but of a sovereignty whose obli-
> gation to govern impartially is as compelling as its
> obligation to govern at all; and whose interest, there-
> fore, in a criminal prosecution is not that it shall win
> a case, but that justice shall be done. As such, he is
> in a peculiar and very definite sense the servant of the
> law, the twofold aim of which is that guilt shall not
> escape or innocence suffer. He may prosecute with
> earnestness and vigor--indeed, he should do so. But,
> while he may strike hard blows, he is not at liberty to
> strike foul ones. It is as much his duty to refrain from
> improper methods calculated to produce a wrongful con-
> viction as it is to use every legitimate means to bring
> about a just one.
>
> It is fair to say that the average jury, in greater or
> less degree, has confidence that these obligations, which
> so plainly rest upon the prosecuting attorney, will be
> faithfully observed. Consequently, improper suggestions,
> insinuations, and, especially, assertions of personal
> knowledge are apt to carry much weight against the

102

accused when they should properly carry none. Berger v

United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.ED. 1314 (1935).

It is patently improper for a prosecutor either to comment on the credibility of

a witness or to express a personal belief that a particular witness is lying. United

States v Young, 470 U.S. 1, 17-19, 105 S.Ct 1038, 84 L.Ed.2d 1 (1985); Berger, 295

U.S at 86-88, 55 S.Ct. 629 (citing prosecutor's statement suggesting that he had

personal knowledge that a witness was not being truthful as one example of egregious

prosecutorial misconduct); see also Bates v Bell, 402 F.3d 635, 646 (6th Cir. 2005)

("To be certain, prosecutors can argue the record, highlight the inconsistencies or

inadequacies of the defense, and forcefully assert reasonable inferences from the

evidence. But, they can not put forth their opinions as to credibility of a witness,

guilt of a defendant, or appropriateness of capital punishment.") United States v

Carroll, 26 F.3d 1380, 1389 (6th Cir. 1994) ("We cannot overstate the extent to which

we disapprove of this sort of improper vouching by prosecution").

In Hodge v Hurley, 426 F 3d 368, 378 (6th Cir. 2005), the Court held:

> "We have previously indicated that it is not necessary
> for the prosecutor actually to use the words "I
> believe", or any similar phrase, for a statement to
> constitute improper comment on the credibility of
> witnesses  See .g., United States v Dess, 593 F.2d 749,
> 757 n. 10 (6th Cir. 1979) (quoting with approval United
> States v Morris, 568 F 2d 396, 402 (5th Cir. 1978)
> (noting that an attorney "may not state, "The
> prosecution's witnesses are telling the truth, 'or 'I
> believe the prosecution's witness are telling the
> truth'")) We have also noted that even the use of the
> words "I want to suggest" would not be sufficient to
> prevent a statement from constituting improper comment
> on waitness credibility when that statement is coupled
> with a statement that the witness in question was "is
> basically telling the truth ...because she had no reason
> to lie". United States v Krebs, 788 F 2d 1166, 1176-77

(6th Cir. 1986); see also United States v Carroll, 26
F.3d 1380, 1387, 1389 (6th Cir. 1994) (discussing Krebs)
note 2.

In U.S. v Garcia-Guiza, 160 F.3d 511, 520 (9th Cir. 1998), the Court held:

> "As we have frequently observed, "the government may not
> vouch for the credibility of its witnesses, either by
> putting its own prestige behind the witness, or by
> indicating that extrinsic information not presented in
> court suports the witness' testimony." United States v
> Rudberg, 122 F.3d 1199, 1200 (9th Cir. 1997) (citing
> United States v Roberts, 618 F 2d 530, 533 (9th Cir.
> 1980)). Neither may a prosecutor "express his opinion of
> the defendant's guilt". United States v Malina, 934 F.2d
> 1440, 1444 (9th Cir. 1991). <u>Vouching is especially
> problematic in cases where the case against the
> defendant is close.</u> United States v Kerr, 981 F.2d 1050,
> 1054 (9th Cir. 1992).

Implicit in an assertion of personal belief that a defendant is guilty, is an
implied statement that the prosecutor, by virtue of his experience knowledge and
intellect, has concluded that the jury must convict. The devastating impact of such
"testimony" should be apparent. Equally apparent should be the serious infringement
upon a defendant's due process rights. Such statements infringe upon the role of the
jury as fact finder and determiner of guilt or innocence. They amount to inadmissible
and highly prejudicial evidence. United States v Ness, 593 F.2d 749, 755 (6th Cir.
1979).

Additional reasons for the rule were advanced in H. Drinker, Legal Ethics 147
(1953):

> There are several reasons for the rule, long
> established, that a lawyer may not properly state his
> personal belief either to the court or to the jury in
> the soundness of his case. In the first place, his
> personal belief has no real bearing on the issue; no
> witness would be permitted so to testify, even under
> oath, and subject to cross-examination, much less the
> lawyer without either. Also, if expression of personal

> belief were permitted, it would give an improper
> advantage to the older and better known lawyer, whose
> opinion would carry more weight, and also with the jury
> at least, an undue advantage to an unscrupulous one.
> Furthermore, if such were permitted, for counsel to omit
> to make such a positive assertion might be taken as an
> admission that he did not believe in his case.

Given the above-stated sound reasons for the rule, it should be apparent that expressions of personal belief of the innocence or guilt of an accused are error regardless whether such expressions are phrased in such a way as to suggest knowledge of outside evidence not before the jury. Many expressions of personal belief carry with them the clear impact that counsel knows something which the jury doesn't and this is an additional reason to condemn them. Even without this, however, statements of personal belief before the jury should not take place. Bess, supra.

Bess, supra, futher held:

> "Personal belief arguments were improper,even when it
> was clear that they were based solely on the testimony
> advanced at trial. In light of our discussion above, we
> are persuaded that Henderson's approval of certain
> statements of personal belief was unsound and join the
> courts which have unequivocally condemned such conduct
> United States v Gonzalez Vargas, 558 F.2d 631 (1st Cir.
> 1977); United States v Leeds, 457 F.2d 857, 861 (2d Cir.
> 1972); Harris v United States, 131 U.S. App. D.C. 105,
>  402 F.2d 656 (1968) (Burger, J ).

In the case at bar, the prosecutor violated <u>three (3)</u> of the most cardinal rules. The prosecutor communicated to the jury his personal belief in Defendant Pouncy's guilt. The prosecutor used arguments calculated to inflame the passions and prejudices of the jury  Finally, the prosecutor placed the prestige of its office behind Wayne Grimes, the prosecutor's "Star Witness", when the prosecutor told the

jury his personal belief that Wayne Grimes testified "honestly" and was "straightforward".

In the case at bar, when the prosecutor displayed the prejudicial sign that stated "OMAR POUNCY IS GUILTY", verged on the exclusive province of the jury to determine guilt. This is especially true since the prosecutor not only displayed the prejudicial sign which conveyed its personal belief in Defendant Pouncy's guilt, but also made sure he told the jury to "keep this slide in mind". The prosecutor's conveyance to the jury of its personal belief in Defendant Pouncy's guilt, infringed upon the fact finding function reserved to the jury. U.S. v Smith, 982 F.2d 681 (1st Cir. 1993). The presentation of the prejudicial sign was "so egregious that it 'seriously affect[ed] the fairness, integrity and public reputation of judicial proceedings. United States v Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, n.4 84 L.Ed.2d 1 (1985).

There's no conceivable way to conclude that the impermissible and prejudicial conveyance to the jury, the prosecution's personal belief in Defendant Pouncy's guilt was harmless. The strength of the case against the defendant often is the most significant factor to be balanced against the prosecutorial misconduct. United States v Boldt, 929 F.2d 35, 41 (1st Cir. 1991). In the case at bar, there was no physical evidence against Defendant Pouncy at all. The prosecution's case was insubstantial at best, it turned on the relative credibilities of Defendant Pouncy and the prosecuting witnesses. Because this case turned on the relative credibilities of the defendant and the prosecution's witnesses, however, a strick adherence to the rules of evidence and appropriate prosecutorial conduct is required to ensure a fair trial. Martin v parker, 11 F.3d 613, 616-17 (6th Cir. 1993). The prejudicial following the prosecutor communicating its personal belief in Defendant Pouncy's guilt, was allowed to go unimpacted, because the trial court failed to honor Defendant Pouncy's objection and thereby did not give an immediate curative jury instruction. Once the prosecutor seen

that the trial court was going to allow him to express his personal belief in

Defendant Pouncy's guilt, the prosecutor took advantage of that and further

aggravated the prejudice by, at the conclusion of its opening statement, instructing

the jury to remember the sign that said "OMAR POUNCY IS GUILTY", when making their

decision concerning Defendant Pouncy's guilt or innocence, so the error definitely

was not isolated. The prosecutor had the sign which said "OMAR POUNCY IS GUILTY",

displayed on the courtroom's overhead projector throughout the entire course of both

his opening statement and closing argument. Reversal is required because this error

"so infected the trial with unfairness as to make the conviction a denial of due

process." Darden v Wainwright, 477 U.S. 168, 181, 106 S.Ct 2464, 91 L.Ed.2d 144

(1986). See also Donnelly v De Christoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40

L.Ed.2d 431 (1974). In the absence of this error there's a reasonable probability

that the outcome of Defendant Pouncy's trial could have been different.

Moreover, when the prosecutor placed the prestige of its office behind its "Star

Witness", Wayne Grimes, by telling the jury that Wayne Grimes was "honest" and

"straightforward", this also deprived Defendant Pouncy of his right to a fair trial.

United States v Bess, 593 F.2d 749, 757 n. 10 (6th Cir. 1979). Prosecutors can not

put forth their opinions as to credibility of a witness...United States v Carroll, 26

F.3d 1380, 1304 (6th Cir. 1994). In the case at bar, the prosecutor acted contrary to

well established rules of conduct and ultimately infringed upon Defendant Pouncy's

right to have the jury decide the credibilities of witnesses uninfluenced by the

superior statute of a seasoned prosecutor, when he told the jury his personal opinion

as to how "honest" and "straightforward", its "Star Witness's" testimony was.

Here, the transgression of the prosecutor was egregious. The devastating impact

from the prosecutor placing its prestige behind Wayne Grimes, when he told the jury

that he was "honest" and "straightforward", cannot be down played or ignored.

Vouching is especially problematic in case where the case against the defendant is

close, United States v Kerr, 981 F.2d 1050, 1054 (9th Cir. 1992). In the case at bar, Wayne Grimes, was the prosecutor's star witness. He was the individual who initially inculpated Defendant Pouncy. He was the only witness who testified that he knew Defendant Pouncy, prior to the dates in question because he was Defendant Pouncy's step-brother. This witness's credibility was the most crucial, because without his testimony being believed, there's a reasonable probability that the outcome of Defendant Pouncy's trial would have been different, however, the prosecutor's impermissible and prejudicial enhancement tactic prevented the jury from analyzing Wayne Grimes', testimony free from the influence of the superior prestige of the prosecutor. Further, to blink at what the prosecutor did here is to allow the prosecutor "with impunity [to] import his personal vouching into his argument at almost any point." United States v Gonzalez Vargas, 558 F.2d 631, 633 (1st Cir. 1977). Since this case turned on the relative credibilities of the defendant and the prosecutor's witnesses, a strict adherence to the rules of evidence and appropriate conduct is required to ensure a fair trial. Martin v Parker, 11 F.3d 613, 616-17 (6th Cir. 1993). The prosecutor's tactic of placing the prestige of his office behind his star witness, constitutes error and the error "so infected the trial with unfairness as to make the resulting conviction a denial of due process. Darden v Wainwright, 477 U.S. 168, 181, 106 S Ct. 2464, 91 L.Ed.2d. 144 (1986).

Finally, when the prosecutor impermissibly argued both during his **opening statement** and **closing argument**, that Defendant Pouncy was "a seller's worst nightmare", this further served to deprive Defendant Pouncy of his right to a fair trial. By the prosecutor telling the jury that Defendant Pouncy was a **"WORST NIGHTMARE", effectively served to inflame the passions of the jury and distracted them from the merits of the case.** U.S. v Martinez-Medina, 279 F.3d 105, 119 (1st Cir. 2002). Calling Defendant Pouncy, "a seller's worst nightmare", was plainly improper appeals to the jury's emotions and role as the conscience of the community. See

108

Arrieta-Agressat v United States, 3 F 3d 525, 527 (1st 1993). In light of the prosecutor's characterization of Defendant Pouncy, as "a seller's worst nightmare", it is reasonable to conclude that the jury probably convicted Defendant Pouncy, after giving consideration to the prosecutor's impermissible and prejudicial arguments of Defendant Pouncy being "a seller's worst nightmare", out of fear that if Defendant Pouncy was acquitted, he would be released and would carjack every person selling a vehicle.

The firmly established rule that a prosecutor must avoid making unfair and improper remarks about a defendant has been consistently upheld as improper. See U.S. Martinez-Medin, 279 F.3d 105, 119 (1st Cir. 2002) (prosecutor's reference to defendants as "hunting each other like animals" and killing one another "with no mercy" were "especially inflammatory and improper"); U.S v Newton, 369 F.3d 659, 681 (2d Cir. 2004) (prosecutor's closing statement asking if jury would trust defendant with children was improper); U.S v Irizarry, 341 F.3d 273, 308 (3d Cir. 2003) (prosecutor's attempts during questioning to associate defendant with reputed organized crime boss were improper); Gall v Park, 231 F.3d 265, 312 (6th Cir 2000) (prosecutor's statement that he was "not convinced that [defendant] isn't just a mean, shrewd, criminal" was improper), overruled on other grounds by Bowling v Parker, 344 F.3d 487 (6th Cir. 2003); U.S. v Carter, 410 F.3d 1017, 1026 (8th Cir. 2005) (prosecutor's comments calling defendant "con man" and "deviate [sic]" were improper); Allen v Woodford, 395 F.3d 979, 1016 (9th Cir. 2005) (prosecutor's comparison of defendant to Adolf Hitler was improper); Malicoat v Mullin, 426 F 3d 124, 1256 (10th Cir. 2005) (prosecutor's comments of calling defendant "evil" and "a monster" was improper); U.S v Blakey, 14 F 3d 1557, 1559-60 (11th Cir. 1994) (prosecutor's statement that defendant was a "professional criminal", when contrary facts existed, was improper).

The characterization of Defendant Pouncy as **"a seller's worst nightmare"**, was so egregious that, when viewed in the context of the entire trial, it substantially prejudiced Defendant Pouncy. United States v Shareef, 190 F.3d 71, 78 (2d Cir. 1999); United States v Perwz, 144 F 3d 204, 210 (2d Cir. 1998). There was no physical evidence against Defendant Pouncy and the dispositive factor was credibility of witnesses, and had the jury adopted the prosecutor's improper and prejudicial characterization of Defendant Pouncy as **"a seller's worst nightmare",** this definitely affected the outcome of the trial. Moreover, since the dispositive factor was credibility of the witnesses, any improper consideration would have prejudiced Defendant Pouncy. Reversal is required.

X.   STAND-BY  COUNSEL  HAD  NO  AUTHORITY  TO
STIPULATE  THAT  DEFENDANT  POUNCY'S  RIGHT  TO
POSSESS  A  FIREARM  HAD  NOT  BEEN  RESTORED
PURSUANT TO MICHIGAN LAW, THEREBY STIPULATING
THAT DEFENDANT POUNCY WAS A CONVICTED FELON.
THIS   INTERFERENCE   BY   STAND-BY   COUNSEL
BLATANTLY   FAILED   TO   RESPECT   DEFENDANT
POUNCY'S  RIGHT  TO  SELF-REPRESENTATION  AND
CONSTITUTES A DENIAL OF HIS RIGHT TO SELF-
REPRESENTATION   AND   IT'S   DENIAL   IS   NOT
AMENDABLE TO HARMLESS ERROR ANALYSIS.

Although, Defendant Pouncy assumed the role of self-representation involuntarily,

unknowningly, and unintelligently he was indeed acting as his own counsel. He cross-

examined witnesses, called witnesses, and raised objections when he was allowed to.

Once Defendant Pouncy assumed the role of his own counsel, the trial court assigned Mr.

Micheal J. Breczenski as his stand-by counsel, sua sponte.

Throughout the trial stand-by counsel, Mr. Breczenski, substantially interfered

with Defendant Pouncy's right to self-representation on several occasions, without

solicitation or consent from Defendant Pouncy.

During the prosecution's closing argument, Defendant Pouncy attempted to raise an

objection, however, stand-by counsel interfered and informed Defendant Pouncy that he

was not permitted to raise objections (argue). The following occurred in its pertinent

part:

By Mr. Larobardiere:

He  wants  to  try  to  further  his  mistaken
identity theory and say he was working. The
only person that can place him at work is his
mother; and—
The Defendant: Okay Jalon-Jalon and my mom.
Mr. Breczenski: You can't argue.
(T 2-1-06, 20).

Later  on  during  the  jury  instruction  stage,  Judge  Hayman,  was  not  sure  as  to

whether Defendant Pouncy had stipulated that he was a convicted felon at the time of

111

the offenses, so Judge Hayman, asked Mr. Breczenski, instead of Defendant Pouncy wheter or not there was a stipulation that Defendant Pouncy was previously convicted of a specified felony. Without authorization or consent from Defendant Pouncy, syand-by counsel, Mr. Breczenski agreed to the stipulation, thereby substantially interfering with Defendant Pouncy's right to self-representation. The following occurred in its pertinent part:

> **Mr. Larobardiere:** May we approach, Judge?
> **The Court:** Do I need to read that? That's not part of-
> **Mr. Larobardiere:** No, Judge.
> **The Court:** Okay. Then I would exclude that. Fourth, that the - third, that the Defendant's right to possess a firearm has not been restored pursuant to Michigan Law.
> **Mr. Breczenski:** You can - yeah, read-
> **The Court:** Have you stipulated to that?
> **Mr. Larobardiere:** Uh, that one and two should be read on that.
> **The Court:** Okay. Just one and two?
> **Mr. Larobardiere:** Yes.
> **Mr. Breczenski:** Yes.
> **The Court:** All right, thank you. Let me go back, because I've really messed this one up and do it over. The Defendant is charged with having possessed a firearm in this state after having been convicted of a specified felony. To prove this charge, the Prosecutor must prove each of the following elements beyond a reasonable doubt. First, that the Defendant possessed a firearm in this state. Second, that the Defendant was convicted of a specified felony. The second element has already been stipulated to, so really it's only one element in this particular charge that has to be shown. (T 2-106, 92-93).

Defendant Pouncy, never stipulated and never would have stipulated, that he was a convicted felon at the time of the offenses. He never expressly told the court this nor did he tell his stand-by counsel, Mr. Breczenski, to make the tactical decision to stipulate and tell the jury that he was a previously convicted felon. Stand-by counsel had no authority to make tactical decisions on behalf of Defendant Pouncy and interfere with his right to self-representation. The interference by stand-by counsel when a defendant is in propria persona constitutes a denial of the right to self representation and structual error resulte and automatic reversal is required.

## Standard Of Review:

The failure of stand-by counsel to respect a propria persona defendant's right to self-representation amounts to constitutional error and should be reviewed de novo. Sitz v Dept. of State Police, 443 Mich 744, 506 NW2d 209 (1993); Seals v Henry Ford Hospital, 123 Mich App 329, 333 NW2d 272 (1983).

## Discussion:

Defendant Pouncy submits that his stand-by counsel had no authority to make the tactical decision to stipulate that he was previously convicted of a specified felony, thereby eliminating the prosecution's burden of proof. Once a defendant, waives counsel, his right to represent himself must be honored. Faretta v California, 422 US 806, 95 S.ct 2525, 45 L.Ed.2d 562 (1975). The right to self-representation is also specifically guerenteed by the Michigan Constitution, Const 1963, art 1, §13; People v Anderson, 398 Mich 361, 366 (1976). Failure to honor that right et a critical stage of the prosecution is automatically raversible and requires a new trial. Neder v United States, 527 US 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); McKaskle v Wiggins, 465 US 168, 178 n.8; 104 S.Ct. 944; 79 L.Ed.2d 122 (1984). ("Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amendable to harmless error analysis. The right is either respected or denied; its deprivation cannot be

harmless.")

The Court of Appeals in United States v Taylor, 933 F.2d 307, 313 (CA 5, 1991), made it clear that stand-by counsel may not speak on behalf of self-represented defendants on any matter of importance: "The defendant preserves actual control over the case he presents to the jury; stand-by counsel cannot substantially interfere with any significant tactical decisions, cannot control the questioning of witnesses, and **cannot speak in place of the defendant on any matter of importance.**"

Where denial of the right to counsel is concerned, matters surrounding stipulating to facts and instructing the jury that a defendant is a convicted felon are clearly critical stages of the trial. French v Jones, 332 F.3d 430 (CA 6, 2003), cert denied ___ US ___; 124 S.Ct 581; 157 L.Ed.2d 432 (2003), Siverson v O'Leary, 764 F.2d 1208, 1214 (CA 7, 1985); United States v Smith, 411 F.2d 733, 736 (CA 6, 1969). There is no principled reason to think that a jury instruction is a critical stage for purposes of the right to counsel, but not when one is representing oneself. The right to self-representation is not just about assuring a fair trial, but about the individual's dignity and free choice. Faretta, 834; People v Russel, 471 Mich 182, 190 n.21. The right of self-representation is either respected or it is not. Here, it was not, and a new trial is required. United States v Cronic, 446 US 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Reversal is required.

XI.     DEFENDANT POUNCY WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND WAS THEREBY PREJUDICED.

a). COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE TRIAL COURT'S UNCONSTITUTIONAL PRACTICE OF CLOSING THE COURTROOM TO THE GENERAL PUBLIC DURING JURY SELECTION, WHEN THE TRIAL COURT TOLD THE AUDIENCE TO GO IN THE HALLWAY DURING JURY VOIR DIRE AND CERTAIN MOTION HEARINGS, THEREBY ALLOWING DEFENDANT POUNCY TO BE DEPRIVED OF HIS ABSOLUTE RIGHT TO A PUBLIC TRIAL.

b). COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE WHEN HE FAILED TO MOVE TO HAVE THE PROSECUTION'S STAR WITNESS BARRED FROM TESTIFYING, WHEN A VALID LEGAL BASIS EXISTED TO DO SO, WHEN WAYNE GRIMES WAS PRESENT DURING THE ENTIRE PRELIMINARY EXAMINATION, AND THEREBY WAS IN VOILATION OF THE SUBQUESTRATION ORDER ISSUED BY THE DISTRICT COURT JUDGE.

c). COUNSEL WAS INEFFECTIVE FOR FAILING TO MOVE FOR A CONTINUANCE TO PROPERLY PREPARE FOR TRIAL ONCE HE LEARNED ON THE DAY OF TRIAL THAT THE PROSECUTION WOULD BE PERMITTED TO INTRODUCE EVIDENCE OF CRIMES HE KNEW NOTHING ABOUT, TO WIT: THE MRE 404(B) CARJACKING INCIDENT, WHEN MR. BRECEZENSKI DID NOT REPRESENT DEFENDANT AT THE PRELIMINARY EXAMINATION REGARDING THE MRE 404(B) CARJACKING, NOR DID HE HAVE THE TRANSCRIPTS FROM THE PRELIMINARY EXAMINATION REGARDING THE MRE 404(B) CARJACKING. MR. BRECZENSKI WAS NOT CAPABLE OG DEFENDING AGAINST THE MRE 404(B) EVIDENCE.

d). COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE WHEN HE FAILED TO OBJECT TO THE PROSECUTOR

DISPLAYING A SIGN REPRESENTING
THE PROSECUTOR'S PERSONAL BELIEF
IN DEFENDANT POUNCY'S GUILT
DURING OPENING STATEMENT, WHICH
SAID OMAR POUNCY IS GUILTY".

e). COUNSEL WAS CONSTITUTIONALLY
INEFFECTIVE WHEN HE FAILED TO
INTERVIEW EXCULPATORY WITNESSES
AND WITNESSES WHO THE
PROSECUTION HAD ENDORSED AS
WITNESSES THEY INTENDED TO
PRODUCE AT TRIAL, THEREBY
FAILING TO INVESTIGATE.

Prior to the commencement of trial the trial court arbitrarily deprived Defendant Pouncy of his right to a public trial, when the trial court implemented an unconstitutional practice and closed the courtroom to the general public and ordered the audience to evacuate the courtroom during the duration of jury voir dire and some motion hearings. The following occurred in its pertinent part:

The Court: Okay then I think we should get ready to have the jury brought down and trish if you'll go get the jury and we'll start jury selection. I want to ask those of you in the audience if you would step in the hallway for now just until we get the jury selected and then we'll go from there. (T 1-24-06, 23).

Notwithstanding, the fact that the trial court patently arbitrarily deprived Defendant Pouncy of his right to a public trial, counsel failed to object to the impermissible closure of the courtroom. Counsel's ineffectiveness did prejudice Defendant Pouncy, because absent counsel's ineffectiveness for failing to object Defendant Pouncy would have been able to have jury voir dire and motion hearings, which were conducted during the closure, conducted in a courtroom that was open to the general public and his family and friends. The violation of the constitutional right to a public trial warrants the presumption of prejudice.

116

Prior to the commencement of the preliminary examination in the case at bar, which was conducted on November 2, 2005, Defendant Pouncy's counsel moved the district court judge to sequester all witnesses or potential witnesses. (PT 11-2-05, 3). The district court judge granted the request and gave specific orders and thereby said that witnesses for the Prosecution and the Defense needed to leave the courtroom and anyone who was present at the preliminary examination would **never** be called as a witness either at the preliminary examination or the trial. The following occurred in its pertinent part:

> **Mr. Tosto:** Yes, Judge. I'd ask that all witnesses be sequestered, please.
>
> **The Court:** And they already have?
>
> **Ms. Hanson:** as far as I know, Your Honor I don't - - the officer in charge doesn't recognize anybody in the courtroom at this time.
>
> **The Court:** Very good. Mr. Breczinski, you make the similar request the, correct?
>
> **Mr. Breczinski: Yes, Your Honor.**
>
> **The Court:** Okay. If there are any witnesses here for the People or the Defendants, they need to leave the courtroom at this time. Otherwise, we'll **presume that you'll never be called as a witness either today or if it goes to trial, at the trial,** so having said that, please call your first witness. (PT 11-2-05, 3-4).

The above demonstrates upon counsel's request that the distict court judge exercised his discretion and unequivocally ruled that if any witness or potential witness was present during the preliminary examination they would be barred from ever testifying in regard to this matter.

Wayne Grimes Jr., who turned into the prosecution's **"Star Witness"** after the

preliminary examination, was present during the entire preliminar examination. (PT 11-2-05, 3).

Notwithstanding, the fact that counsel was accurately aware of the strict sequestration order, which was implemented to prevent witnesses or potential witnesses from coloring their testimony to match other witnesses' testimony, counsel failed to move to have Wayne Grimes Jr., barred from testifying on the prosecution's behalf, once Wayne Grimes Jr., turned State's evidence, and engaged into an agreement with the prosecution to testify against Defendant Pouncy in exchange for leniency. Counsel's failure to move to have this witness barred from testifying, when there was a legal basis to do so constitutes ineffective assistance of counsel. Defendant Pouncy was thereby prejudiced.

Absent counsel's ineffectiveness, for failing to move to have the prosecution's "star witness" barred from testifying after being in violation of the sequestration order, which explicity held that **any** violator will be forever barred from testifying in regards to this matter, there is a very high reasonable probabilty that the outcome of Defendant Pouncy's trial would have been different. Wayne Grimes Jr., was the prosecution's "best evidence" as held by the lead detective, James Gagliardi. (T 1-27-06, 227-228). Wayne Grimes Jr. was the only witness who actually knew Defendant Pouncy, they were step-brothers, (T 1-26-06, 104), which made his inculpatory allegations inherently more believable in the eyes of the jury. There's no disputing the fact that Wayne Grimes Jr., was the most damaging evidence against Defendant Pouncy, and any competent attorney would have moved to have him barred from testifying in the face of a legitimate legal basis to do so. As the record clearly reflects, there was no physical evidence that linked Defendant Pouncy to the case. Absent Counsel's ineffectiveness, there's a reasonable probabilty that Defendant Pouncy's trial would have been different, considering the fact that the case came down to a credibility contest, and the insubstantial at best, eyewitness testimony. Wayne Grimes was indeed able to color

his testimony, because as the record reflects he initially denied any knowledge of the crime. (T 1-26-06, 137). Wayne Grimes admitted that he was only able to concoct half of a story at the time he initially confessed, which was before he had the chance to color his testimony by listening to other witnesses' testimony. (T 1-27-06, 49).

During the entire duration of the prosecution's opening statement, the prosecutor deliberately had a sign displayed on the courtroom's overhead projrctor for the view of the jury, which clearly read "OMAR POUNCY IS GUILTY", thereby effectively conveying to the jury its personal belief in Defendant Pouncy's guilt. Notwithstanding this fact counsel sat there and said absolutely nothing, failing to objact and thereby rendering ineffective assistance of counsel. (T 1-24-06, 191). Counsel even failed to object to the unfairly prejudicial sign, even after Defendant Pouncy took it upon himself and stood to object. The following occurred in its pertinent part:

> Mr. Pouncy: Yes. Can um that sign be taken out cause I'm not guilty man.
> The Court: I'm Sorry?
> Mr. Pouncy: Can that sign be taken, this be moved 'cause I'm not guily. It say "OMAR POUNCY IS GUILTY".
> The Court: Mr. Pouncy this is the prosecutor's side of the case. You're not runnin' anything in here okay?
> Mr. Pouncy: I'm just askin' though-
> The Court: No, no. He has the right to present his side of the case, your lawyer will present his side and if your lawyer believes there's something wrong goin' on he'll get up and say somethin'. He doesn't need you to jump in okay? (T 1-24-06, 191).

Counsel's failure to object to the prosecutor's display of a sign saying "OMAR POUNCY IS GUILTY", utterly constitutes ineffectiveness. Any competent attorney would not have allowed a prosecutor to communicate its personal opinion of a defendant's

guilt. Counsel should've objected immediately and moved to have the trial to issue a curative instruction.

Defendant Pouncy was prejudiced by counsel's failure to object to the prosecutor communicating to the jury his personal belief in Defendant Pouncy's guilt. Absent counsel's ineffectiveness for failing to object and move for a curative instruction there's a reasonable probability that the outcome of Defendant Pouncy's trial would have been different. By counsel failing to object and thereby allowing the prosecutor to communicate its personal belief in Defendant Pouncy's guilt to the jury, this allowed the highly prejudicial and improper tactic to deprice Defendant Pouncy of his right to have the jury decide his guilt or innocence uninfluenced by the prosecutor's personal opinion and belief. The prosecutor's tactic of displaying a sign to the jury saying "OMAR POUNCY IS GUILTY", may well have led the jury to suspend its own powers of critical analysis and judgment in deference to the experience and prestige of the prosecutor and ultimately used the prosecutor's personal belief in Defendant Pouncy's guilt to eliminate any existing reasonable doubt the jury had concerning Defendant Pouncy's guilt. However, had counsel objected and requested a curative instruction, the instruction could've countered the impact and eliminated the prejudice of such impermissible tactic.

The evidence against Defendant Pouncy was insubstantial at best. There was **no physical evidence at all.** The dispositive factor at trial was credibility of witnesses, therefore its a reasonable probability, in the absence of counsel's ineffectiveness that the out of Defendant Pouncy's trial would've been different.

On the first day of trial the trial court granted leave to the prosecution to introduce its MRE 404 (B) evidence of a third carjacking, which Defendant Pouncy was awaiting trial for in a separate matter. (T 1-24-06, 23-29). Despite, counsel not being equipped to defend against the prosecution's MRE 404 (B) evidence he failed to move for a continuance to properly prepare to defend against this evidence. (T 1-24-06, 29).

The prosecutor's MRE 404 (B) evidence was of a separate carjacking in which Dafendant Pouncy had also been charged with and was still pending at the time of the trial, in the case at bar. In the MRE 404 (B) carjacking, Defendant Pouncy had just had a preliminary examination in that case on December 27, 2005, just merely 28 days prior to this trial, in which the complainant Samuel L. Anderson testified. Moreover Defendant Pouncy, **was not represented by the attorney who represented him in the case at bar, Mr. Breczinski.** Defendant Pouncy was represented by attorney Bruce E. Doll. (See Preliminary Examination transcript from District Court # FYO 05-001256, Circuit Court # 05-017448-FC, Attached as Appendix A).

The above is said to show that Defendant Pouncy's counsel Micheal J. Breczinski, was not even familiar with the facts surrounding the prosecution's MRE 404 (B) evidence and it was impossible for counsel to have had been familiar with the facts because he was not the attorney who represented Defendant Pouncy at the preliminary examination concerning the MRE 404 (B) case and the preliminary examination transcript had not even been prepared prior to the commencement of the trial at bar. The preliminary examination transcripts for the MRE 404 (B) case, was not prepared until after the commencement of the trial in the case at bar, which began on January 24, 2006 and the transcript from the MRE 404 (B) case was not prepared until January 29, 2006. (Sea Preliminary Examination transcript from District Court # FYO 05-001256, Circuit Court # 05-017448-FC). (PLEASE NOTE THAT THERE IS A TYPOGRAPHICAL ERROR REGARDING THE DATE THE PROCEEDING WAS TRANSCRIBED, SPECIFICALLY THE YEAR, THE TRANSCRIPT SHOWS ON PAGE 33 THAT THE ORDER TO TRANSCRIBE THE CASE WAS NOT RECEIVED UNTIL 1/24/06, HOWEVER, THE PROBLEM IS WITH THE DATE IT STATES THAT THE TRANSCRIPT WAS COMPLETED ON, WHICH SAY JANUARY 29, 2005. THE DATE IN REGARD TO THE YEAR IS INCORRECT, IT SUPPOSED TO SAY 2006, BECAUSE THE PRELIMINARY EXAMINATION WAS NOT EVEN CONDUCTED UNTIL DECEMBER 27, 2005 WHICH MAKES IT IMPOSSIBLE FOR THE TRANSCRIPT TO HAVE HAD BEEN TRANSCRIBED BEFORE THE PRELIMINARY EXAMINATION).

This standing alone shows that Defendant Pouncy's attorney should have made a request for a continuance to adequately prepare to defend against the MRE 404 (B) evidence in which he wasn't equipped to defend against since he wasn't familiar with the facts of that case. Despite, counsel not being equipped to properly defend against the MRE 404 (B) evidence, counsel failed to move for a continuance to properly defend against the MRE 404 (B) evidence. Counsel was ineffective for failing to move for a continuance to properly prepare to defend agaist this evidence, which he wasn't aware that it was going to be introduced in the trial at bar, until the day of trial when the trial court ruled it admissible.

Defendant Pouncy was prejudiced by counsel's failure to move for a continuance to properly prepare against the MRE 404 (B) evidence. Absent counsel's ineffectiveness for failing to move for a continuance, there's a reasonable probability that the outcome of Defendant Pouncy's trial would have been different. Counsel should have moved for a continuance to porperly defend against the MRE 404 (B) evidence and to allow Defendant Pouncy the opportunity to defend against the MRE 404 (B) evidence, which wasn't ruled admissible into the case at bar, until the first day of trial, by presenting an alibi regarding the MRE 404 (B) evidence carjacking. Defendant Pouncy would have produced Carrice Byrom, who would have testified that on September 24, 2005 (the date of the MRE 404 (B) carjacking), he was asked by Wayne Grimes if he wanted to buy a green 1972 Monte Carlo (the carjacked vehicle) which he had just stolen, and that Wayne Grimes showed him a silver and black handgun (the gun used in the MRE 404 (B) carjacking. (See affidavit attached as Appendix B). Had Carrice Byrom, testified his testimony could have changed the outcome of Defendant Pouncy's trial. His testimony would have showed that Wayne Grimes and **not** Defendant Pouncy was the perpetrator of the MRE 404 (B) carjacking.

Defendant Pouncy also would have produced Ms. Helen Carr, who would have testified that she received some collect phone calls from Defendant Pouncy from the Genesee County jail, on September 24, 2005 (the date of the MRE 404 (B) carjacking), at 11:00

am., 12:30 pm., and 5:45 pm. (See attached affidavit as Appendix C). Had Ms. Helen Carr, testified her testimony could have changed the outcome of Defendant Pouncy's trial. Her testimony would have established, a perfect defense (alibi) as to the MRE 404 (B) carjacking or et least created a reasonable doubt as to Defendant Pouncy's presence at the scene of the crime, because the complainant in the MRE 404 (B) carjacking, Samuel L. Anderson, testified that the carjacking occurred between 12:00 noon and 1:00 p.m., on September 24, 2005. (T 1-27-06, 173). Ms. Helen Carr's testimony would have proved that it was impossible for the perpetrator to have had been Defendant Pouncy, because she was receiving collect phone calls from the Genesee County jail from Defendant Pouncy on the date and around the time of the MRE 404 (B) carjacking. This testimony would have allowed the jury to conclude that Defendant Pouncy, was in the Genesee County jail on the date and at the time of the MRE 404 (B) carjacking and therefore the jury could have disbelieved and ultimately disregarded the utterly prejudicial MRE 404 (B) evidence, which reasonably could have changed the outcome of Defendant Pouncy's trial. The remaining evidence was insubstantial at best. No physical evidence and the dispositive factor was witnesses' credibility, whether the jury believed the prosecution or the defense.

Moreover, Defendant Pouncy would have produced Mr. Robricus Lee Kelly, who would have testified that on September 24, 2005 (the date of the MRE 404 (B) carjacking) he was in the Genesee County jail with Defendant Pouncy and that Defendant Pouncy did not leave on work release that day until 6:00 pm., or no earlier than 5:00 pm. Had Mr. Robricus Lee Kelly testified, his testimony could have changed the outcome of Defendant Pouncy's trial. The complainant from the MRE 404 (B) carjacking, Samuel L. Anderson, testified that the carjacking occurred in-between 12:00 noon and 1:00 pm., on September 24, 2005. Mr. Robricus Lee Kelly's teatimony would have proved that it was impossible for Defendant Pouncy, to have been the perpetrator of the MRE 404 (B) carjacking, because as his affidavit outlines, him and Defendant Pouncy was in the Genesee County jail together on the date and at the time of the MRE 404 (B) carjacking, and that

123

Defendant Pouncy, did not leave the Genesee County jail that day until 6:00 pm., but no earlier than 5:00 pm., far after the occurrence of the MRE 404 (B) carjacking. This testimony would have allowed the jury to conclude that Defendant Pouncy, was in the Genesee County jail on the date and at the time the MRE 404 (B) carjacking and therefore the jury could have disbelieved and ultimately disregarded the utterly prejudicial MRE 404 (B) evidence, which reasonably could have changed the outcome of Defendant Pouncy's trial. The remaining evidence was insubstantial at best. No physical evidence and the dispositive factor was witnesses' credibility, whether the prosecutor believed the prosecution or the defense. (See affidavit attached as Appendix D).

Furthermore, Defendant Pouncy would have produced Sergeant Meoshy Proby and Depuy Eligio, officials from the Genesee County jail work release program. Both of these witnesses would have testified that on September 18, 2005 (the date that the MRE 404 (B) witness claimed he first met the perpetrator of the carjacking), Defendant Pouncy, never left the Genesee County jail that day. Sergeant Meoshy Proby, would have testified that on Sunday September 18, 2005 that Defendant Pouncy did not and was not allowed to leave the Genesee County jail, because his work schedule was only from 10:00 am., to 9:00 pm., monday through saturday. (See, excerpt of trial testimony from the actual trial regarding the MRE 404 (B) carjacking case, (T 4-5-06, 224)). Deputy Eligio Soto, would have also testified that on Sunday, Septemner 18, 2005, Defendant Pouncy was not allowed to leave the jail on that day and did not leave. (See attached excerpt of trial testimony from the actual trial regarding the MRE 404 (B) evidence case, T 4-6-06, 33, attached as Appendix E).

During the trial in the case at bar, Samuel Anderson, the MRE 404 (B) witness, testified that Sunday, September 18, 2005 was the first time he met the perpetrator of the MRE 404 (B) carjacking. (T 1-27-06, 170). Had Sergeant Meoshy Proby and Deputy Eligio Soto testified, their testimony could have allowed the jury to conclude that Defendant Pouncy, was in the Genesee County jail on Sunday, September 18, 2005 the day Samuel Anderson claimed he first met the perpetrator, and thereby the jury could have

reasonably concluded that Defendant Pouncy was not the perpetrator, and furthermore, disbelieved and ultimately disregarded the utterly prejudicial MRE 404 (B) evidence, which reasonably could have changed the outcome of Defendant Pouncy's trial. The remaining evidence was insubstantial at best. No physical evidence and the dispositive factor was witnesses' credibility, whether the jury believed the prosecution or the defense.

Defendant Pouncy, was further prejudiced by counsel's failure to move for a continuance upon becoming aware that the prosecutor would be permitted to introduce the MRE 404 (B) evidence, to properly prepare to defend against this evidence, because during the trial at bar, Samuel Anderson's testimony was utterly inconsistent with his preliminary examination testimony. Absent counsel's ineffectiveness, Defendant Pouncy, would have been prepared to defend against this evidence and thereby, would have had the preliminary examination transcripts of his testimony from the actual case involving the MRE 404 (B) carjacking, and thereby would have been able to expose this witness's significant testimonial inconsistencies and there's a reasonable probability that Defendant Pouncy's trial outcome could have been different.

The abundant amount of significant testimonial inconsistencies between Samuel Anderson's preliminary examination testimony and his trial testimony in the case at bar, are as follows:

> a). On December 27, 2005, he testified that the perpetrator's van was **both silver and red.** (PET 12-27-05, 20).
>
> aa). Then on January 27, 2006, at trial he changeed his testimony and said that the van was just **a solid grayish color.** (T 1-27-06, 176).
>
> b). On December 27, 2005, he testified that the perpetrator's van was **an old Ford window van.** (PET 12-27-05, 20).
>
> bb). Then on January 27, 2006, at trial he changed his testimony and said that the

perpetrator's van was **an old Dodge van.** (T 1-27-06, 10).

**c).** On December 27, 2005, he testified that the handgun used was **"dark just black."** (PET 12-27-05, 13).

**cc).** Then on January 27, 2006 at trial he changed his testimony and said that the gun was **"both chrome and black".** (T 1-27-06, 174).

**d).** On December 27, 2005 he testified that he was not sure of what the perpetrator said to him while in the process of the carjacking. (PET 12-27-05, 16).

**dd).** Then on January 27, 2006 at trial he changed his testimony and said that he knew exactly what the perpetrator said to him while in the process of the carjacking. (T 1-27-06, 174-175).

**e).** On December 27, 2005 he testified that he never discussed the price of the vehicle with the perpetrator. (PET 12-27-05, 25).

**ee).** Then on January 27, 2006 at trial he changed his testimony and said that he did discuss the price of the vehicle with the perpetrator. (T 1-27-06, 173).

**f).** On December 27, 2005 he testified that he selected two different people out of a photo lineup that he thought was the single perpetrator, and one was **NOT Defendant Pouncy.** (PET 12-27-05, 26).

**ff).** Then on January 27, 2006 at trial he changed his testimony and said that he didn't select a second individual out of the photo lineup as who he thought was the single perpetrator. (T 1-27-06, 191-194).

Defendant Pouncy, made the request for the preliminary examination transcripts, in the middle of cross-examination, at trial for impeachment purposes, because he was never provided with them. However, it was denied. (T 1-27-06, 192-195). The prosecutor admitted that the transcripts had not been typed up yet. (T 1-27-06, 192).

In absence of consel's ineffectiveness, for failing to move for a continuance, to properly prepare to defend against the MRE 404 (B) evidence, Defendant Pouncy would have had the preliminary examination transcripts to expose and impeach this witness's testimony based on his testimonial inconsistencies. There's a reasonable probability that in light of the inconsistencies, that the jury would have disbelieved and ultimately disregarded this witness's utterly prejudicial MRE 404 (B) testimony as unreliable, which reasonably could have changed the outcome of Defendant Pouncy's trial. The remaining evidence was insubstantial at best. No physical evidence and the dispositive factor was witnesses' credibility, whether the jury believed the prosecution or the defense.

Due to counsel's ineffectiveness for failing to move for a continuance to properly prepare to defend against the unfairly prejudicial MRE 404 (B) evidence Defendant Pouncy had no way to counter the MRE 404 (B) evidence, due to counsel's ineffectiveness this prejudicial evidence went unrebutted. In the absence of counsel's ineffectiveness it's definitely a reasonable probability that the outcome of Defendant Pouncy's trial could have been different. Reversal is required.

At the initiation of the investigation conducted by the Mt. Morris police department, concerning the carjackings involving the Sandstroms, they learned that when Thomas Sandstrom and the perpetrator arrived on Kellar Rd, they pulled into the driveway of 5349 Kellar Rd. At that point the perpetrator got out and walked up to the front door of the home of 5349 Kellar Rd. The perpetrator knocked on door. Mr. Sandstrom could not tell if the perpetrator was talking to anyone at the front door, but he did observe the perpetrator then go to the open garage when the perpetrator

127

begin speaking to an individual from inside of the house.

Mr. Sandstrom, then told the Mt. Morris police department that after the perpetrator came back from talking to the individual inside of 5349 Kellar Rd, and shortly after, the carjackings occurred. (See attached Mt. Morris Township Police Department Standard Incident Report, at page 3, as Appendix F).

Later on in the investigation, the Mt. Morris Police Department further investigated the lead and went to 5349 Kellar Rd. They made contact with a man in the home. He was identified as Charles Smith Jr., date of birth 1-20-50. Mr. Smith stated that his friend Willie Jiyce, was the registered owner of the home. Mr. Smith stated that he was indeed at the home on October 11, 2005 (the date of the carjackings) and he observered a white in color Cadillac sitting at the end of the driveway at approximately 5:45 pm, to 6:00 pm. Mr. Smith stated that he immediately advised Mr. Joyce that someone had parked in his driveway. He stated that a short time latter that an unkown black male came up to the door and spoke with Mr. Joyce. Mr. Smith then stated that he did not see this black male at anytime and did not talk to him and did not know what he looked like. Mr. Smith, stated that he **did not** see any other vehicles than the Cadillac. He stated that the black male asked Mr. Joyce if he wanted his yard mowed. Mr. Joyce, stated that he did not. (See attached Mt. Morris Township Police Department Standard Incident Report, page 5).

Upon learning about the above, the prosecution classified both Mr. Charles Smith and Willie Joyce as witnesses. (See attached Mt. Morris Township Police Department Standard Incident Report, pages 1-2). Moreover, the prosecution went to the extent of endorsing both of these witnesses as witnesses it intended to produce at trial. (See attached Felony Information containing witness list, Appendix G).

Defendant Pouncy's counsel had possession of the Mt. Morris Township Police Department Standard Incident Report and the prosecution's witness list. Therefore, counsel was aware of the existence of Mr. Charles Smith and Mr. Willie Joyce Mckiney,

and moreover, counsel was aware of how highly important these two witnesses were to the case. Defendant Pouncy, consistently maintained his innocence and told counsel that he was not involved with the carjackings at all. (T 1-31-06, 163-232). Defendant Pouncy, told his attorney that if he interviewed Willie Joyce Mckinley, Mr. Mckinley would have been an exculpatory witness, because he had the chance to see the actual perpetrator on the day in question, and that Mr. Willie Joyce Mckinley, would had not identified him as the individual who got out of the white Cadillac and came up to speak with him on October 11, 2005. Defendant Pouncy also told counsel that he wanted Mr. Willie Joyce Mckinley and Mr. Charles Smith produced at his trial. Defendant Pouncy, wanted Mr. Charles Smith, interviewed and produced at his trial because Mr. Charles Smith's testimony would have undermined the complainant's testimony that there was a total of three vehicles present in front of the house on 5349 Kellar Rd, since Mr. Charles Smith, stated that he only seen <u>one</u> vehicle on October 11, 2005, to wit: a white Cadillac.

Despite, counsel being equipped with the <u>**invaluable**</u> lead and information that Mr. Willie Joyce Mckinley, was an exculpatory witness, because he would not be able to identify Defendant Pouncy, as the individual he seen get out of the white Cadillac and subsequently came to speak with him, on the date of the carjacking, counsel still failed to conduct a reasonable investigation surrounding this lead when there was no reason to believe that an investigation would have been fruitless. Counsel's failure to investigate constitutes ineffective assistance of counsel.

Counsel's ineffectiveness for failing to investigate and interview an exculpatory witness, Mr. Willie Joyce Mckinley, did indeed prejudice Defendant Pouncy. In the absence of counsel's ineffectiveness for failing to interview an exculpatory witness, Mr. Willie Joyce Mckinley, it's a reasonable probability that the outcome of Defendant Pouncy's trial could have been different. Had counsel interviewed Mr. Willie Joyce Mckinley, this witness would have informed counsel that Defendant Pouncy, was not the

individual who he seen get out of the white Cadillac and subsequently spoke with on October 11, 2005 at approximately 5:45 pm, to 6:00 pm. Had counsel investigated and interviewed this witness, Defendant Pouncy, would have had this witness's presence secured at trial and produced his exculpatory testimony. Defendant Pouncy, did not know how to locate this witness due to counsel's failure to investigate prior to trial. Once this witness was produced and provided exculpatory evidence on the behalf of Defendant Pouncy, the jury could have concluded that since Mr. Willie Joyce Mckinley, was a witness who was unique because he had no interest in the outcome of the trial and thereby was unbiased, and positively testified that Defendant Pouncy, **was not** the individual who got out of the white Cadillac and spoke with him on October 11, 2005, there's a reasonable probability that the jury would have believed this unique unbiased witness because he was the only witness who was not connected to the prosecution or the defense, so his testimony reasonably could have seemed more credible than any other witness and the outcome of Defendant Pouncy's trial could have reasonably been different. The dispositive factor was the credibilities' of the witnesses, whether the jury believed the prosecution or the defense.

Also at the initiation of the investigation concerning the Sandstrom's carjacking, the Mt. Morris Township Police detectives gleaned information from the Sandstroms, inter alia, that both of their credit cards were taken during the carjackings. Mr. Sandstrom, reported that "in his wallet was a master card credit card, State Bank of Fenton debit card, American Express credit card, and his operators license," Mrs. Sandstrom, reported that she had a black knitted purse and in it was "her operators license, a Master card credit card, American Express credit card, Marshall Fields credit card, and a Fenton State Bank debit card. (See Mt. Morris Township Police Department Standard Incident Report, page 4, attached).

During trial the Standstroms, also testified that their credit cards were stolen, maintaing their initial position. (T 1-26-06, 12). During the proceeding of Wayne

Grimes, at his sentencing allocution, Mr. Sandstrom, informed the court that after the theft of their credit cards, the perpetrator "charged $4,000.00 that evening. Our cards were stolen, four thousand-in a jewlry store". (See Grimes' sentencing transcripts Circuit Court # 05-17155-FC, February 2, 2006, page 12-13).

Despite, counsel being equipped with this invaluable lead, counsel completely failed to investigate the complainants' credit cards transactions. Defendant Pouncy, relentlessly maintained that he was not involved with any of the offenses and was completely innocent. The position that Defendant Pouncy, had triggered counsel's duty to investigate the complainant's credit cards transactions in an attempt to identify the real perpetrator of the carjackings.

**Standard Of Review:**

Claims of ineffective assistance of counsel are reviewed de novo. People v Pickens, 446 Mich 298, 521 NW2d 797 (1994). The de novo standard of review applies to the existing record. See, e.g., People v Barclay, 208 Mich App 670, 672 (1995).

**Discussion:**

The state and federal constitutions guarantee a criminal defendant the right to the effective assistance of counsel. US Const amends VI, XIV; Const 1963, art 1, §20. The following are examples of how Defendant Pouncy's trial attorney denied him a fair trial.

## FAILURE TO OBJECT TO THE CLOSURE OF THE COURTROOM

The Sixth Amendment guarantees that, "[i] ell criminal prosecutions, the accused shall enjoy the right to a speedy and **public trial.**" U.S. Const. amend. VI. The right is applicable to the states through the Fourteenth Amendment. Duncan v Louisiana, 391 US 145, 148-49, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

"The centrel aim of a criminal proceeding must be to try the accused fairly." Waller v Georgia, 467 US 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). The public trial guarantee was created to further that aim. Id, citing Gannett Co. v De Pasquale, 443 US 368, 380, 99 S.Ct 2898, 61 L.Ed.2d 608 (1979). A public trial helps to ensure that the

judge and prosecutor carry out their duties responsibly, encourages witnesses to come forward, and discourages perjury. Id. **The violation of the constitutional right to a public trial is structual error, not subject to the harmless error analysis. Id. at 49-50, n.9, 104 S.Ct. 2210.**

A closure does not violate the Sixth Amendment where: (1) the party seeking to close the courtroom advances an overriding interest that is likely to be prejudiced by an open courtroom; (2) the party seeking closure demonstrates that the closure is no broader than necessary to protect that interest; (3) the trial court considers reasonable alternatives to closing the proceeding; and (4) the trial court makes findings adequate to support the closure. Id. at 48, 104 S.Ct. 2210.

In the case at bar, it is an undisputable fact that the trial court's closure of the courtroom was arbitrary and that no overriding interest existed to justify closure, and that Defendant Pouncy's trial attorney failed to object, thereby failing to protect and ensure his client's guaranteed and fundamental right to a public trial. Counsel was ineffective for failing to protect and ensure that Defendant Pouncy's guaranteed and fundamental right to public trial, by failing to object. When counsel failed to object to protect Defendant Pouncy's guaranteed and fundamental right to a public trial, counsel's performance fell below an objective standard of reasonableness. There was no conceivable strategic reason for not objecting to protect his client's fundamental right to a public trial. See Owens v United States, 483 F.3d 48, 64 (1st Cir. 2007)(**holding that counsel's failure to object to the courtroom closure for a day of jury selection deprived defendant of a substantial fair trial right.**) And in a even more recent case, the Court in William Johnson v Jeri Ann Sherry, 586 F.3d 439 (6th Cir. 2009), **unequivocally held that counsel's failure to object to the closure of the courtroom to the general public and defendant's family constituted deficient performance.**

In Press-Enterprise Co. v Superior Court (Press-Enterprise I),464 US 501, 510-11

(1984), the Supreme Court held that the Sixth amendment right to a public trial requires voir dire and trial proceedings to be open to both the press and public. In In re Oliver, 333 US 257, 272, 68 S.Ct 499, 92 L.Ed. 682 (1948), the Supreme Court explained that a defendant has a particular compelling interest in having his family present at his trial. In the case at bar, due to counsel's failure to object to the closure of the courtroom during jury voir dire and certain motion hearings Defendant Pouncy's mother, sisters, brothers, step-father, girlfriend, cousins, and grandmother were prevented from attending the voir dire and motion hearings. Had counsel objected to the impermissible closure his Sixth Amendment right would have had to been respected, because there was no "overriding interest" to permit the proceedings to be closed.

Defendant Pouncy, was indeed prejudiced by his trial attorney's ineffectiveness. Counsel's ineffectiveness rendered Defendant Pouncy's trial fundamentally unreliable and reversal is required. Tinsley v Millian, 399 F.3d 769, 802 (6th Cir. 2005). When a defendant's right to a public trial had been violated the entire proceeding and results are fundamentally unreliable and prejudice is automatically attached. Waller, supra, 467 US at 49-50, n. 9, 104 S.Ct 2210. See also William Johnson v Jeri Ann Sherry, 586 F.3d 439 (6th Cir. 2009). Reversal is required.

## FAILURE TO MOVE TO HAVE WAYNE GRIMES' TESTIMONY BARRED

In Michigan, a court, has discretion to exclude witnesses from the courtroom, while they are not testifying and they are not testifying and thereby implement a sequestration order. MCL 600.1420.

The decision to exclude witnesses in a criminal case is within the judge's discretion. Where an order to sequester witnesses has been made and a witness has violated such order, it is within the judge's discretion to refuse to permit the witness to testify on the grounds that it is counsel's responsibility to keep his or her witnesses out of the courtroom. People v Dickerson, 62 Mich App 457 (1975).

One of the purposes for the sequestration of a witness is to prevent the witness

from coloring his or her testimony to conform with the testimony of another. People v Stanley, 71 Mich App 56 (1976).

In the case at bar, prior to the commencement of the preliminary examination for both Defendant Pouncy and his ex-codefendant, turned prosecution's "Star Witness", Wayne Grimes, the judge implemented a strick and unequivocal sequestration order, pursuant to counsel's request. The court further held that **anyone who was present during the preliminary examination proceeding, would not be permitted to testify either at the preliminary examination or at the trial, if the case was bound over.** Notwithstanding, the fact that counsel was fully aware of this order, counsel failed to move to have the the prosecution's "Star Witness" barred from testifying, when there was a viabli legitimate legal basis to have Wayne Grimes barred from testifying.

A court's sequestration order can only be overturned in the showing of an abuse of discretion. United States v Green, 305 F.3d 422 (CA 6, 2002). Since the District Court Judge clearly did not abuse his discretion, and exercised his sound discretion, when he held that any person present during the preliminary examination would be **forever** barred from testifying either at the exam or at the trial, had counsel moved to have Wayne Grimes barred from testifying, the trial court would have been obligated to bar this violator's testimony, because the sound ruling of the District Court Judge was binding in the absence of an abuse of discretion. Counsel is obligated to advocate his client's cause. Strickland, supra, at 466 U.S 688.

In the case at bar, the violator Wayne Grimes, was the prosecution's "Star Witness", he's the individual who falsely implicated Defendant Pouncy, in the carjackings, he claimed that Defendant Pouncy was the mastermind. To say the least, he was by far the most damaging witness against Defendant Pouncy. He was Defendant Pouncy's, step-brother and was the only witness who said they knew Defendant Pouncy, before the dates in question. So his testimony was probably the most persuasive.

Counsel was obligated, in the interest of his client, Defendant Pouncy, to move to

have this witness barred from testifying in the prosecutor's behalf. Any reasonable attorney definitely would have moved to have this witness's testimony barred, in the face of such a legitimate legal basis, and thereby would have prevented the jury from hearing the prosecution's most prejudicial evidence against Defendant Pouncy. Counsel's failure to have this witness's testimony barred constitutes ineffective assistance of counsel. See, Northrop v Trippett, 265 F.3d 372, 378 (CA 6, 2001); People v Ullah, 216 Mich App 669, 684-686 (1996)(failure to move for suppression of inadmissible similar acts evidence); People v Carrick, 220 Mich App 17 (1996)(Attorneys always have a duty to make outcome-determinative motions). Had counsel advocated Defendant Pouncy's cause by moving to have this witness barred from testifying, since the District Court's ruling was binding, it's a reasonable probability that the trial court would have barred the violator's testimony. Counsel's failure to move to have this witness barred from testifying, constitutes negligence, not strategy, and was "unreasonable under prevailing professional norms". Kimmelmen, 106 S.Ct. at 2588; Strickland, 466 US at 688-89, 104 S.Ct at 2065. There's no conceivable nor reasonable trial strategy about counsel failing to move to have this witness barred from testifying, in the face of a legitimate legal basis to have such testimony barred.

Defendant Pouncy, was indeed prejudiced by counsel's ineffectiveness, for failing to move to have the prosecution's star witness barred from testifying when a legitimate legal basis existed. Absent counsel's ineffectiveness it's a reasonable probability that the outcome of Defendant Pouncy's trial would have been different. as it is undisputed, Wayne Grimes was the Prosecution's Star Witness, and provided for them damaging testimony against Defendant Pouncy. He testified that all of the carjackings were executed at Defendant Pouncy's behest. He testified that he didn't wasnt to participate, but only participated due to Defendant Pouncy's coercion. He was the only witness who knew Defendant Pouncy prior to the execution of the carjackings. (T 1-26-06, 104-144; 1-27-06, 11-90). Once counsel would have moved to have had this violator's

135

testimony barred, it would have been excluded and therefore the jury would not have heard the prosecution's, by far, most prejudicial evidence. In the absence of this evidence it's a reasonable probability that the outcome of Defendant Pouncy's trial would have been different. Strickland, at 694, 104 S.Ct 2052.

Without Wayne Grimes', damaging testimony, the prosecution's case would not have just been paralyzed, but their case would have been annihilated. The importance of Wayne Grimes', testimony to the jury in reaching its decision cannot be gainsaid. There was no physical evidence at all. Defendant Pouncy, was convicted chiefly on witnesses' testimony, alleged eyewitnesses. The remaining evidence was insubstantial at best. As recognized by the Federal Courts, there are "grave reservations concerning the reliability of eyewitness testimony". Blackburn v Foltz, 828 F.2d 1179, 1186 (6th Cir. 1987)(citing Wilson v Cowan, 578 F.2d 166, 168 (6th 1978). Since none of these witnesses knew Defendant Pouncy, and the identification involved cross-racial identification, it's a reasonable probability that the jury would have found there testimony unreliable, thereby leaving reasonable doubt as to Defendant Pouncy's guilt. In the absence of Wayne Grimes' testimony, there's a reasonable probability that the outcome of Defendant Pouncy's trial would have been different. Strictland, at 466 US 687. Reversal is required.

## COUNSEL'S FAILURE TO MOVE FOR A CONTINUANCE TO PROPERLY PREPARE TO DEFEND AGAINST THE PROSECUTION'S MRE 404 (B) EVIDENCE

The necesity of granting a continuance is judge by a three part test: (1) whether defendant is asserting a constitutional right; (2) whether defendant has a legitimate reason for asserting the right; (3) whether the defendant is guilty of negligence in failing to assert the previous; and (4) whether defendant was responsible for any prior adjounments. People v Charles O. Williams, 386 Mich 565 (1972).

Due to the fact that the trial court didn't grant leave to the prosecution to introduce the MRE 404 (B) evidence, until the first day of trial combined with the fact that Mr. Breczinski, was not familiar with the facts of the MRE 404 (B) case to the

point where he could adequately and effectively defend against the MRE 404 (B) carjacking evidence, the trial court would have been bound to allow the defense an adequate continuance so the defense could properly prepare to defend against and counter the evidence, since counsel was not the attorney who represented Defendant Pouncy at the preliminary examination stage regarding the MRE 404 (B) case and did not have the transcripts from that exam to be able to familiarize himself with the facts sounding that evidence and to be able to use those transcripts for impeachment purposes.

Despite, the prosecution gaining permission to introduce the highly prejudicial MRE 404 (B) evidence on the very first day of trial, which the Defense was not aware of until the exact day of trial, counsel failed to move for a continuance to obtain the preliminary examination transcript into to allow himself to become acquainted with the facts of the MRE 404 (B) evidence and for impeachment purposes of the prosecution's MRE 404 (B) carjacking witness, Samuel Anderson, when counsel did not have a clue as to what took place at the preliminary examination because he did not represent Defendant Pouncy at the preliminary examination, regarding the MRE 404 (B) carjacking, and counsel also failed to move for a continuance to allow Defendant Pouncy to present witnesses who would have provided clear and convincing exculpatory evidence (alibi defense) for the MRE 404 (B) carjacking, which rendered counsel's performance utterly "defeicient", involving "errors so serious that counsel was not functioning as the 'counsel' guaranteed to Defendant Pouncy by the Sixth Amendment". Id. at 687, 104 S.Ct. 2052. Counsel's conduct definitely "fell below an objective standard of reasonableness", Tucker, 181 F.3d at 754, and furthermore counsel's "identified acts and omissions were outside the wide range of professionally competent assistance". Strickland, 466 US 690, 144 S.Ct 2052.

In Blackburn v Foltz, supra, supra at, 1183-86, the Court found that counsel's failure to obtain the transcript of a witness's prior testimony for impeachment purposes constituted ineffective assistance of counsel. Counsel's failure to request a

137

continuance to obtain the transcript of Samuel Anderson's prior testimony for impeachment purposes, in the case at bar, was even more unreasonable because did not have any other way to impeach this witness. Counsel did not represent Defendant Pouncy, at the preliminary examination, and therefore it's impossible to conclude that this witness's prior testimony was a part of counsel's recollection. Counsel failed to take any meaningful step to impeach and diminish the identification testimony of the MRE 404 (B) carjacking complainant, Samuel Anderson. Weakening the MRE 404 (B) witness's testimony was one of the only plausible ways of persuading the jury to disbelieve and ultimately disregard the prejudicial MRE 404 (B) carjacking testimony. When no other defense was available in counsel's view, the failure to prepare for effective impeachment, was "unreasonable under prevailing professional norms and ... was not sound strategy." Kimmelman, 106 S.Ct at 2588; Strickland, 466 US at 688-89, 104 S.Ct at 2065. Counsel's performance was definitely "deficient", Blackburn, supra, at 1184.

Furthermore, counsel's failure to move for a continuance to allow Defendant Pouncy, to defend against and counter the prejudicial MRE 404 (B) carjacking evidence, constitutes ineffective assistance. Counsel was aware that Defendant Pouncy, had completely denied any involvement in the MRE 404 (B) carjacking case and that he had alibi witnesses to support his defense concerning the MRE 404 (B) carjacking. Despite, counsel being fully aware that Defendant Pouncy had alibi witnesses to defend against and counter the MRE 404 (B) carjacking evidence, counsel failed to move for a continuance, after the prosecution for the first time ever, moved to get permission to introduce its prejudicial MRE 404 (B) evidence of a third carjacking. Defendant Pouncy could have produced his witnesses to defend and counter the MRE 404 (B) carjacking evidence, had counsel moved for a continuance. Counsel's failure to request a continuance so Defendant Pouncy, could exercise his right to present a defense, Chambers v Mississippi, 410 US 284, 300-02 (1973), which would have countered the MRE 404 (B) carjacking evidence, renders counsel's performance "deficient", involving

errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment". Id. at 687, 104 S.Ct. 2052. Counsel's conduct thereby "fell below an objective standard of reasonableness", Tucker, 181 F.3d at 754, and counsel's "identified acts and omissions were outside the range of professionally competent assistance", Strickland, 466 US at 690, 104 S.Ct 2052. Any reasonable competent attorney would have requested for a continuance immediately after learning that the trial court granted leave to the prosecution to introduce the MRE 404 (B) evidence, so his client could have presented evidence to defend against and counter the prejudicial MRE 404 (B) carjacking evidence, thereby exercising his right to produce favorable witnesses as guaranteed by the U.S. Const. Amend. VI. The Sixth Amendment provides that [i]n all criminal prosecutions, the accused shall enjoy the right...to have compulsory process for obtaining witnesses in his favor." U.S. Const. Amend. VI. This right is held applicable to the states through the Fourteenth Amendment in Washington v Texas, 388 US 14, 19 (1967).

Defendant Pouncy, was definitely prejudiced by counsel's failure to request a continuance to properly prepare to defend against and counter against the prejudicial MRE 404 (B) carjacking evidence. Strickland, 466 U.S. at 692, 104 S.Ct. 2052. Absent counsel's ineffectiveness there "is a reasonable probabilty that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct 2052.

In the case at bar, without recourse to the preliminary transcript, Defendant pouncy was forced to let Samuel Anderson's testimony stand and was unable to put before the jury jis prior testimonial inconsistencies. Defendant Pouncy, was not fully aware of the inconsistencies without the aid of the prior testimony within the preliminary examination transcript. Clearly, the lack of the prior transcript hampered, if not precluded, effective cross-examination of the MRE 404 (B) carjacking witness, Samuel Anderson. Blackburn, 828 F.2d at 1185-96. Had Defendant Pouncy, had the preliminary examination transcript, he would have placed significant testimonial inconsistencies before the jury and there's a reasonable probability that the outcome of Defendant

Pouncy's trial would have been different. Strickland, 466 US at 694, 104 S.Ct 2052.

Moreover, in the absence of counsel's ineffectiveness for failing to request a continuance to prepare to defend against and counter the prejudicial MRE 404 (B) carjacking evidence there is a reasonable probability that the outcome of Defendant Pouncy's trial would have been different. Id. at 694,104 S.Ct. 2052. Had counsel requested a continuance to prepare to defend against and counter the prejudicial MRE 404 (B) evidence, Defendant Pouncy would have presented witnesses in his favor who would have established his alibi defense concerning the MRE 404 (B) carjacking. Defendant Pouncy, would have produced Carrice Byrom, who would have testified that on September 24, 2005 (the date of the MRE 404 (B) carjacking), he was asked by Wayne Grimes if he wanted to buy a green 1972 Monte Carlo (the carjacked vehicle) which was stolen, and that Wayne Grimes showed him a silver and black handgun (the gun used in the MRE 404 (B) carjacking). Defendant Pouncy, would have presented Ms. Helen Carr, who would have testified that she received collect phone calls from Defendant pouncy from the Genesee County jail, on September 24, 2005 (the date of the MRE 404 (B) carjacking), at 11:00 am., 12:30 pm., and at 5:45 pm. Defendant Pouncy would have presented Mr. Robricus Lee Kell, who would have testified that on September 24, 2005 (the date of the MRE 404 (B) carjacking), he was in the Genesee County jail with Defendant Pouncy and that Defendant Pouncy did not leave on work release that day until 6:00 pm., or no earlier than 5:00 pm. Defendant Pouncy would have also produced Deputy Eligio Soto who would have testified that on September 18, 2005 (the date that Samuel Anderson claimed he first seen the perpetrator), Defendant Pouncy was not allowed to leave the jail and did not leave on that day.

The importance of Samuel Anderson's and Dan Haynes' (the MRE 404 (B) carjacking witness) testimony to the jury in reaching its decision to convict cannot be gainsaid. There was absolutely no physical evidence against Defendant Pouncy at all. The remaining evidence was insubstantial at best. Counsel's deficient perfomance further foreclosed the jury from hearing valuable countervailing evidence, alibi testimony

and Samuel Anderson's prior inconsistent testimony. Due to counsel's error, Defendant Pouncy, was unable to subject the prosecution's case (relating to the MRE 404 (B) carjacking evidence) to "'the crucible of meaningful adversarial testing'-the essence of the right to effective assistance of counsel." Martin v Rose, 744 F.2d 1245, 1250 (6th Cir. 1984) (citing United States v Cronic, 466 U.S. 648,656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984)). The errors rendered the adversarial process and resulting conviction unreliable. See Strickland, 466 U.S. at 700, 104 S.Ct. at 207 and Blackburn, 828 F.2d at 1186. Reversal is required.

## COUNSEL'S FAILURE TO OBJECT TO THE PROSECUTION'S CLEAR AND PREJUDICIAL COMMUNICATION TO THE JURY ITS OWN PERSONAL BELIEF IN DEFENDANT POUNCY'S GUILT VIA A SIGN

Over 70 years ago the United States Supreme Court counselled prosecutors "to refrain from improper methods calculated to produce a wrongful conviction....." Berger v United States, 295 U.S. 78, 88, 55 S.Ct 629, 633, 74 L.Ed.2d 1314 (1935). The Court made clear, however, that the adversary system permits the prosecutor to "prosecute with earnestness and vigor." Ibid. In other words," while he may strike hard blows, he is not at liberty to strike foul ones." Ibid.

The line searating acceptable from improper advocacy is not easily drawn; there is often gray zones. Prosecutors sometimes breach their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence. Accordingly, the legal profession, through its Codes Of Professional Responsibility, which holds:

> ABA Modle Code of Professional Responsibility DR 7-106 (C) (1980), which provides in its pertinent part:
>
> "In appearing in his professional capacity before a tribunal, a lawyer shall not:
> "(3) Assert his personal knowledge of the facts in issue, except when testifying as a witness.
>
> "(4) Assert his personal opinion as to justness

of a cause to the credibility of a witness, as to
the culpability of a civil litigant, or **as to the guilt
or innocence of an accused**; but he may argue, on
his  analysis of the evidence, for any position
or conclusion with respect to matters stated
herein".

See Also ABA Model Rules of Professional Conduct,
Rule 3.4(e) (1984).

and the federal courts, See, e.g., United States v Di Pasquale, 740 F.2d 1282, 1296
(CA 3, 1984); United States v Maccini, 721 F.2d 840, 846 (CA 1, 1983); United States v
Harrison, 716F.2d 1050, 1051 (CA 4, 1983); United States v Bagaric, 706 F 2d 42, 58-61
(CA 2, 1983); United States v West, 680 F.2d 652, 655-656 (CA 9, 1982); United States
v Garza, 608 F.2d 659,665-666 (CA 5, 1979), the American Bar Association's Standing
Committee on Standards for Criminal Justice has promulgated useful guidelines, one of
which states that:

"[i]t is unprofessional conduct for the prosecu-
tor to express his or her personal belief or
opinion as to the truth or falsity of any testi-
mony or evidence or **the guilt of the defendant."**
ABA Standards for Criminal justice 3-5.8(b)(2d
ed. 1980).

In the case at bar, prior to the prosecutor commencing his opening statement, the
prosecutor placed a sign on the courtroom's overhead projector for the jury to see,
which plainly and clearly stated **"OMAR POUNCY IS GUILTY".** Upon seeing the sign
Defendant Pouncy, took it upon himself to object to the diplaying of the sign, which
communicated the prosecutor's own personal opinion in Defendant Pouncy's guilt. The
trial court responded to Defendant Pouncy's objection and said that, he was not able
to object and if an objection needed to be Defendant Pouncy's attorney would needed to
object  Despite, Defendant Pouncy's counsel being able to observe the clearly
prejudicial sign on the overehead by the prosecut, which communicated the prosecu-

142

tion's own personal belief in Defendant Pouncy's guilt, and being put on notice of the prejudicial nature of the prosecutor's tactic of displaying such sign communicating his own personal belief in Defendant Pouncy's guilt, by Defendant Pouncy's own objection, counsel still failed to object to the clear prosecutorial misconduct Counsel's performance was "deficient", involving "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at. 687, 104 S.Ct. 2052. Counsel's failure to object fell below an objective standard of reasonableness," Tucker, 181 F.3d at 754, and counsel's "identified acts and omissions were outside the wide range of professionally competent assistance," Strickland, 466 U.S. at 690, 104 S.Ct. 2052. There isn't any disputing the fact that the prosecutor via a prejudicial sign displayed in the courtroom's overhead projector communicated its own personal belief in Defendant Pouncy's guilt, and this constitutes impermissible prosecutorial misconduct. United States v Young, 470 U.S. 1, 105 S.Ct. 1038 (1985). It has long been held that counsel's failure to object to prosecutorial misconduct constitutes defective performance when that failure is due to clear inexperience or lack of knowledge of controlling law, rather than reasonable trial strategy. See ,e.g., Washington v Hofbauer, 228 F.3d 689 (6th Cir. 2000). Gravely v Mills, 87 F.3d 779, 785-86 (6th Cir. 1996); Rachel v Bordenkircker, 590 F.2d 200, 204 (6th Cir. 1978). counsel's failure to object in the case at bar, definitely was not reasonable trial strategy. A reasonable trial strategy can never conceivably consist of allowing a prosecutor to express its own person belief in Defendant's guilt.

Defendant Pouncy was definitely prejudiced by counsel's ineffectiveness.

Counsel's deficiencies did prejudice the defense. See Strickland, 466 U.S. at 692, 104 S.Ct 2052. Absent counsel's ineffectiveness there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052. The

essential question is "whether better lawyering would have produced a different result." McQueen, 99 F.3d at 1311 (quoting Ward v United States, 995 F.2d 1317, 1321 (6th Cir. 1993)). The prosecutor displaying the sign that effectively communicated to the jury its own personal belief in Defendant Pouncy's guilt was highly prejudicial and improper because it's a reasonable probability the jury may well have led the jury to suspend its own powers of critical analysis and judgment in deference to the experience and prestige of the prosecutor. People v Humphreys, 24 Mich App 411 (1970). Counsel's failure to object allowed the prejudicial effect to go uncountered, had counsel objected and requested a curative instruction, it's a reasonable probability that the instruction would have countered the impact and eliminated the prejudiced which flowed from the prosecution's tactic of effectively communicating to the jury its own personal belief in Defendant Pouncy's guilt, by displaying a sign that read "OMAR POUNCY IS GUILTY, throughout the course of its opening statement and closing argument. In the absence of the prejudice following from this error, there is a reasonable probability that the outcome of Defendant Pouncy's trial would have been different. The evidence in the case at bar, was iinsubstantial at best. There was a total absence of any physical evidence linking Defendant Pouncy to any of the carjackings. The remaing evidence was only testimony of a witness who had many motivations to concoct his testimony, that was basically bought by the prosecution. Then there was the alleged eyewitnesses whose testimony is inherently suspect. Clinkscale, 375 F.3d at 445 (citing Blackburn, 828 F.2d at 1186) (holding there are "grave reservations concerning the reliability of eyewitness testimony"). Counsel's ineffective assistance prejudiced Defendant Pouncy to the extent that it undermines the confidence in the outcome of his trial. Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. Reversal is required.

COUNSEL"S FAILURE TO INVESTIGATE BY FAILING TO INTERVIEW PROMISING EXCULPATORY
WITNESSES

I Williams v Taylor, 529 U.S. 362 at 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000),
the United States Supreme Court affirmed the holding of Strickland, (noting that the
trial court correctly applied both components of the Strickland standard to
petitioner's claim and proceeding to discuss counsel's failure to investigate as a
violation of Strickland's performance prong). In highlighting counsel's duty to
investigate, and in refferring to the ABA Standards for Criminal Justice as guides,
they applied the same "clearly established precedent of Strickland. Cf. 466 U.S.,
at 690-691, 104 S.Ct. 2052 (establishing that "thorough investigations" are "virtually
unchallengeable" and underscoring that "counsel has a duty to make reasonable
investigations"); see also id, at 688-689, 104 S.Ct. 2052 ("Prevailing norms of
practice as refelected in American Bar Association standards and the like...are guides
to determining what is reasonable.").

1 ABA Standards for Criminal Justice, Standard 4-4.1, at 4-53 (2d ed. Supp 1986),
entitled Duty to investigate holds:

It is the duty of the lawyer to conduct a prompt investigation of the
circumstances of the case and **to explore all avenues leading to facts relevant to the**
**merits of the case** and the penalty in the event of conviction. The investigation
should always include efforts to secure information in the possession of the
prosecution and law enforcement authorities. The duty to investigate exists regardless
of the accused's admissions or statements to the lawyer of facts constituting guilt or
the accused; stated desire to plead guilty.

The reasonableness of an attorney's investigation may critically depend on the
information forwarded by the defendant and the defendant's own strategic decisions
about his representation. Strickland, supra, (stating that "when a defendant has given
counsel reason to believe that pursuing certain investigations would be fruitless or

even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable"). However, an attorney must engage in a reasonable amount of pretrial investigation and "at a minimum...interview potential witnesses and...make an independent investigation of the facts and circumstances in the case." Nealy v Cabana, 764 F.2d 1173, 1177 (5th Cir, 1985). The failure to interview eyewitnesses to a crime may strongly support a claim of ineffective assistance of counsel, see Gray v Lucus, 677 F.2d 1086, 1093 n.5 (5th Cir, 1982) (noting that attorney's failure to investigate crucial witnesses may constitute inadequate performance), cert denied, 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983) and when [exculpatory] witnesses are involved, it is unreasonable for counsel not to try to contact the witnesses and "ascertain whether their testimony would aid the defense." Grooms v Salem, 923 F.2d 88, 90 (8th Cir, 1991), cert denied, 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815.

In Bryant v Scott, 28 F.3d 1411, 1418-1419 (5th Cir. 1994), holding counsel was constitutionally deficient for failing to interview eyewitness. The Court held:

> "Moore [defense counsel] should have interviewed
> the eyewitnesses. Because there was no physical
> evidence connecting Bryant with the crime, the
> eyewitness identification of Bryant at the crime
> was the conerstone of the state's case in chief.
> Consequently, information relevant to Bryant's
> defense might have been obtained through better
> pretrial investigation of the eyewitnesses' test-
> imony. See Kemp v Leggetti, 635 F.2d 453, 454
> (5th Cir. 1981) (granting habeas relief where
> counsel failed to interview single eyewitness or
> character witnesses); Gaines v Hopper, 575 F 2d
> 1174, 1149 (5th Cir, 1978) (affirming habeas re-
> lief where, inter alia, counsel failed to inter-
> view eyewitnesses).

Furthermore, the Court held:

> Given the importance of eyewitness identification
> of Bryant's case, Moore did not perform as a rea-

sonable attorney practicing under prevailing pro-
fessional norms. See Hederson v Sargent, 926 F.2d
F.2d 706, 711 (8th Cir. 1991) (stating that
"[c]ounsel has 'a duty...to investigate all wit-
nesses who allegedly possessed knowledge concern-
ing [the defendant's] guilt or innocence.'"
(quoting Lawrence v Armontrout, 900 F.2d 127, 130
(8th Cir. 1990), modified on other grounds, 939
F.2d 586 (8th Cir.), cert denied, ___ U.S. ___,
112 S.Ct. 915, 116 L.Ed.2d 815 (1992).

Where counsel fails to investigate and interview promising witnesses, and
therefore "ha[s] no reason to believe they would not be valuable in securing
[defendant's] release," counsel's inaction constitutes negligence, not trial strategy.
United States ex rel. Cosey v Wolff, 727 F.2d 656, 658 n.3 (3th Cir. 1984); see also
osborn v Shillinger, 861 F.2d 612, 627 (10th Cir. 1988); United States v Debango, 780
F.2d 81, 85 (D.C. Cir. 1986); Crisp v Duckworth, 743 F.2d 580, 584 (7th Cir. 1984),
cert. denied, 469 U.S. 1226 (1985); Thomas v Lockhart, 738 F.2d 304, 308 (8th Cir.
1984).

In the case at bar, from day one counsel was aware that two promising witnesses
existed. Counsel was aware of the existence of both Charles Smith Jr. and Willie Joyce
McKinley. Counsel was aware that Charles Smith Jr's, statement was favorable to the
defense, because his statement tended to show that the carjackings concerning the
Sandstrom's did not even occur. Charles Smith Jr, only seen one car, not three and he
did not see any crime occur or hear the alleged victim Maria Sandstrom scream. (T 1-26-
06, 121). Counsel still failed to investigate by failing to interview this promising
witness. Moreover, this witness was on the prosecuton's witness list as a witness it
intended to produce at trial, yet counsel still failed to interview this witness.

Moreover, Defendant Pouncy's unwavering position was that he was not the
individual who was driving the white Cadillac and subsequently drove Thomas Sandstorm

to 5349 Kellar Rd to Willie Joyce McKinley's house. Defenfant Pouncy also maintained that he was not the individual who got out of the white Cadillac and went to ask Mr. Willie Joyce McKinley to cut his lawn on October 11, 2005 (the day of the Sandstorm carjacking). Despite, Defendant's unwavering position which was that Mr. Willie Joyce McKinley, would **not** have identified him as the perpetrator who got out of the white Cadillac to ask him to cut his lawn on October 11, 2005, counsel failed to investigate this oh so promising witness by failing to interview this witness. Furthermore, despite the prosecution having Mr. Willie Joyce McKinley, endorsed as a witness it intended to call at trial, counsel still failed to interview this witness, thereby not being prepared to deal with this witness at trial if he was produced.

Counsel need not have been Clairvoyant to uncover the fact that these witnesses were promising to the defense; nor would more than reasonable prudence have been required for counsel to recognoze that their testimony was critical to Defendant Pouncy's defense. Workman v Tate, 957 F.2d 1339, 1345 (6th Cir. 1992).

Counsel abdicated his responsibility of investigating potential witnesses. Bryant, 28 F.3d. at 1417  It is at least incumbent to try to contact these witnesses. ibid.

Given the seriousness of the offenses and the gravity of the punishment, counsel should have tried to investigate the potential witnesses. Cf. Loyd v Whitley, 977 F.2d 149, 157 (5th Cir. 1992) (stating that "defense counsel's failure to pursue a crucial line of investigation in a capital murder case was not pfofessionally reasonable"), cert denied ____ U.S. ____, 113 S.Ct. 2343, 124 L.Ed.2d 253 (1993).

In the case at bar, Defendant Pouncy was charged with a total af eleven (11) counts, eight (8) of those counts were capital offenses, where he was subject to life in prison. (See Felony Information, attached as Appendix I).

Counsel's failure constitutes ineffective assistance of counsel. Any reasonable competent attorney would have realized that pursuing such leads was necessary in making

148

an informed choice among possible defenses, particularly since the dispositive factor was credibility of witnesses. Wiggins v Smith, 534 U.S. 510 (2003). Indeed, Defendant Pouncy gave counsel no reason to believe nor did counsel discover any evidence to suggest that those witnesses' testimony would have been damaging or that further investigation would have been fruitless.

The record underscores the unreasonableness of counsel's failure to investigate throughly stemmed from inattention, not strategic judgment. Due to the absence of physical evidence and Defendant Pouncy's unwavering position prior to and during trial of not being the perpetrator counsel had every reason to develop the most powerful mistaken identity defense, and thereby should have investigated the exculpatory eyewitnesses who would not have identified Defendant Pouncy. Counsel was ineffective Counsel must make a fully informed and deliberate decision. Wiggins v Corcoran, 164 F.Supp. 2d 538, 558 (2001). Moreover, the knowledge of the existence of these exculpatory witnesses, trigged an obligation to look further. Id, at 559. Counsel's performance was "deficient", involving "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Counsel's conduct "fell below an objective standard of reasonableness." Tucker, 181 F.3d at 754, and counsel's "identified acts and omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S.Ct. 2052.

Defendant Pouncy, was definitely prejudiced by counsel's deficiencies. Strickland, 466 U.S. at 692, 104 S.Ct. 2052. Absent counsel's ineffectiveness there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedind would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id, at 694, 104 S.Ct. 2052. The essential question is "whether better lawyering would have produced a different result." McQueen, 99 F.3d at 1311 (quoting Ward v United States, 995 F.2d 1317, 1321

149

(6th Cir. 1993)).

There's no question that better lawyering would have produced a different result, in the case at bar. Had Defendant Pouncy had reasonably competent counsel, his attorney would have at the very minimum interviewed Mr. Charles Smith Jr. and Mr. Willie Joyce McKinley. Counsel would have learned from his interviewing of these promising witnesses, that for one Mr. Charles Smith Jr., would have offered testimony that would have supported a defense that would have tended to show that no crime occurred at all, Mr Charles Smith Jr., would have testified that he only seen one vehicle and that was the white Cadillac and did not see a Corvette (the other alleged carjacked vehicle) or a Dodge Intrepid (allegedly the other suspect's vehicle). Mr. Charles Smith Jr. would have also testified that he seen no crime and that he was indeed aware of his surroundings. Moreover, he would have testified that he did not hear anyone scream. Mr. Charles Smith Jr's testimony would have reasonably changed the outcome of Defendant Pouncy's trial. Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Mr. Charles Jr. would have been an unbiased witness, who had no interest in the outcome of the trial, unlike the other witnesses, whose testimony if believed would have left a reasonable doubt as to the actual occurrence of the carjackings relating to the Sandstorms. Mr. Charles Smith Jr., was a "res gestae witness" who was present at the scene of the alleged crime, at the time of the alleged crime, and had occasion to observe his surroungins, and seen no crime. His testimony could have changed the outcome of Defendant Pouncy's trial and he should have been interviewed. Had he been interviewed Defendant Pouncy would have produced him at trial.

Moreover, counsel would have learned had he interviewed Mr. Willie Joyce McKinley, that Mr. Willie Joyce McKinley, was indeed an exculpatory witness whose testimony could have played a major role in exonerating Defendant Pouncy. Mr. Willie Joyce McKinley, would have been able to testify that Defendant Pouncy, was not the individual who he seen get out of the white Cadillac and subsequently approached him

to make an inquiry as to whether he wanted his lawn cut on October 11, 2005 at approximately 5:45 p.m. to 6:00 p.m. Mr. Willie Joyce McKinley, was also a unique witness, because he was unbiased, and had no interest in the outcome of the trial. His testimony could have carried a substantial amount of weight with the jury. Mr. Willie Joyce McKinley's testimony would have established a complete defense for Defendant Pouncy, in regards to the Sandstorm's carjacking. His testimony would have showed that Defendant Pouncy was not the perpetrator of the Sandstorm's carjackings, because his testimony would have established that Defendant Pouncy was not the individual who he seen on October 11, 2005 (the day of the Sandstorm's carjacking) get out of the white Cadillac, that was parked in his drive way. Then eventually came to speak with him at approximately 5:45 p.m. to 6:00 p.m.

Had the jury believed this testimony, the jury could have reasonably concluded that Defendant Pouncy was not the perpetrator and that the prosecution's witnesses were indeed misidentifying Defendant Pouncy, because both Maria and Thomas Sandstorm testified that the perpetrator got out of the white Cadillac and went to speak with someone at the address on Kellar Rd, before carjacking them, and Mr. Willie Joyce McKinley would have testified that Defendant Pouncy was not that individual.

Absent counsel's ineffective assistance this exculpatory witness would have been presented to the triers of facts and there is a reasonable probability that the outcome of Defendant Pouncy's trial would have been different. There was absolutely no physical evidence connecting Defendant Pouncy to these crimes. The dispositive factor was witnesses' credibility. This witness's testimony was indeed credible and could have tipped the scales in the favor of acquittal by at least creating reasonable doubt in the mind of one juror. Counsel's deficient performance foreclosed the jury from hearing valuable exculpatory. Blackburn, 828 F.2d, at 1186. Counsel's errors rendered the adversarrial process and resulting convictions unreliable. Strickland, 466 U.S. at

700, 104 S Ct at 2071. Reversal is required.

Furthermore, counsel was ineffective for failing to investigate the complainant's credit card transactions. Where Defendant Pouncy gave counsel no reason to believe that investigating the credit card transactions would be fruitless or prejudicial, counsel had every duty and reason in the world to investigate this lead to exonerate Defendant Pouncy, because the identity of the true perpetrator could have been revealed. Strickland, 466 U S. at 690-91, 104 S.Ct. at 2066.

Counsel's complete failure to investigate the complainant's credit cards transactions rendered counsel's performance "deficient" and involved "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixt Amendment." Strickland, 466 U S. at 687, 104 S.Ct. 2052. Counsel's conduct "fell below an objective standard of reasonableness," Tucker, 181 F 3d at 754, and Counsel's "identified acts and omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S.Ct. 2052.

Counsel's failure to investigate has constantly been found to be ineffective assistance of counsel in violation of the Sixth Amendment. See, People v Grant, 470 Mich 477, 684 N.W.2d 686 (2004); Blackburn v Foltz, 828 F.2d 1177 (6th Cir. 1987); Jihns v Perini, 462 F.2d 1308 (6th Cir. 1972) (Applying pre-Strickland standard) ; Brown v Myers, 137 F 3d 1154 (9th Cir. 1998); Bryant v Scott, 28 F.3d 1411 (5th Cir. 1994). No reasonable competent attorney would have failed to investigate a viable lead which would have exonerated his client.

Counsel's ineffectiveness for failing to investigate the complainant's credit cards transactions prejudiced Defendant Pouncy. In the absence of counsel's ineffectiveness there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability suficient to undermine confidence in the outcome". Strickland, 466 U.S. at 694, 104 S.CT. 2052. The essential question is

"whether better lawyering "whether better lawyering would have produced a different result." McQueen, 99 F.3d at 1311 (quoting Ward v United States, 995 F.2d 1317, 1321 (6th Cir. 1993)).

There is no doubt that bettering lawyering would have produced a different result. Had counsel investigated the complainant's credit cards transactions for the time period after the alleged carjackings, counsel would have easily discovered that after the perpetrator robbed the Sandstorms of their vehicles and credit cards, the perpetrator went to a jewelry store and purchased $4,000.00 in merchandise. Upon discovering what jewelry store the purchase was made at, counsel could have interviewed the employee who made the $4,000.00 sale to the perpetrator and counsel would have discovered that the employee would not have identified Defendant Pouncy as the individual who he/she said sold the $4,000.00 worth of merchandise to. Upon discovering that this employee excluded Defendant Pouncy, as the individual who was in possession of the credit cards and made a $4,000.00 purchase, the defense could have had him/her as an exculpatory witness. Had the jury been aware that this witness positively excluded Defendant Pouncy as the individual in possession of the complainants' credit cards and who made a $4,000.00 purchase with the complainants' credit cards, it's a reasonable probability that this would have created doubt as to whether Defendant Pouncy was the perpetrator or not of these carjackings. Thereby it's a reasonable probability that the outcome of Defendant Pouncy trial could have been different and reversal is required. Defendant Pouncy's counsel prejudiced him to the extent that it undermines confidence in the outcome of his trial. Strickland, 466 U.S. at 694, 104 S.Ct. 2068.

XII.     **DEFENDANT POUNCY'S COUNSEL'S INCOMPETENT ADVICE, CONCERNING HIS SENTENCING GUIDELINE RANGE, WHICH RESULTED IN DEFENDANT POUNCY'S REJECTION OF THE PLEA OFFER CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL. BASED ON THE INACCURATE INFORMATION PROVIDED TO DEFENDANT POUNCY, CONCERNING THE SENTENCING GUIDELINE RANGE HE FACED, BY THE TRIAL COURT, THE PROSECUTOR, AND TRIAL COUNSEL THE PLEA AGREEMENT WHICH WAS OFFERED MUST BE REINSTATED.**

Prior to the commencement of trial, the trial court, the prosecutor, and defense counsel misled Defendant Pouncy by erroneously misadvising him of the sentencing guideline range he faced if he was convicted by trial. All three the trial court, the prosecutor, and defense counsel misinformed Defendant Pouncy that if he was convicted he would be subjected to 135 months (11 years, 3 months) to 337 months (28 years, 11 months), in prison. However, Defendant Pouncy, was actually subjected to far more higher sentencing guidelines if convicted. Defendant Pouncy, was really subjected to 225 months (18 years, 9 months) to 562 months (46 years, 10 months) in prison if convicted, which is a significant increase compared to the sentencing guideline range the trial court, prosecutor, and defense counsel misadvised Defendant Pouncy of. The following occurred in its pertinent parts:

**The Court:** _Now what are the guidelines on these offenses, assuming he were convicted of these offenses that are in the information, what would his guidelines be?_

**Mr. Larobardiere:** Mr. Breczenski has that judge.

**The Court:** Would you tell me what his guidelines are Mr. Breczenski?

**Mr. Breczenski:** Your Honor we sat down to, together, Chris, and I did and were figuring the guidelines and we figured with habitual third and the armed robbery, carjacking alone—

**The Court:** Yeah.

**Mr. Breczenski:** since those are the most

154

serious ones I'd say, we're figuring with the
habitual third it's a hundred and thirty-five
months to three hundred and thirty-seven.

The Court: Three hundred and thirty-seven?

Mr. Breczenski: Yes.

The Court: All right. Hundred and thirty-five
months to three thirty-seven which is really
somewhere in the neighborhood of 11.5 years
to what, three hundred thirty-seven months
is, that's twenty years plus another hundred
and thirty-seven months which is probably
about another nine years so that's somewhere
around almost thirty years isn't it?

Mr. Breczenski: Closer to (inaudible) years.

The Court: Three hundred and sixty would be
thirty years so it'd be about twenty, twenty-
eight, twenty-nine years I think.

Mr. Breczenski: Around twenty-eight years.

The Court: All right. So somewhere between
eleven and-a-half to twenty-eight years,
somewhere in that area on the, on the
guidelines and so, just so you know Mr.
Pouncy what that means is that if you were
convicted of all of the offenses and if you
were a habitual offender third and you came
in front of me for sentencing, the guidelines
say that I should give you a sentence
somewhere between eleven and-a-half to
twenty-eight, eight years, do you understand
that? All right let's talk about the offer
that's bein' made, what is the offer?

Mr. Lerobardiere: Judge the offer is plea to
those eleven counts and no HO for sentencing.

The Court: All right and so what would be the
guidelines without habitual offender third?
What would be his guidelines?

> Mr. Breczenski: The bottom range is still a
> hundred and thirty-five and the top is
> twenty-five.
> The Court: Two twenty-five?
> Mr. Breczenski: That's what we figured them
> out to be.
> The Court: All right so he's still lookin' at
> about eleven and-a-half to almost twenty,
> almost twenty years.
> Mr. Breczenski: Yes. (T 1-24-06, 19-22).

Since there wasn't a big significance in the original sentencing guideline range, if Defendant Pouncy would've went to trial, and the sentencing guideline range, if Defendant Pouncy would have accepted the plea bargain, Defendant Pouncy rejected the plea bargain. (T 1-24-06, 23).

Although the trial court, the prosecutor, and defense counsel misadvised Defendant Pouncy that if he was convicted and sentenced he was subject to a sentencing guideline range of 135 months (11 years, 3 months) to 337 months (28 years, 11 months) in prison, however, his sentencing guideline range was actually 225 months (18 years, 9 months) to 562 months (46 years, 10 monts) in prison, (See Presentence Investigation Report), and the trial court imposed a sentence based on the 225 months (18 years, 9 months) to 562 months (46 years, 10 months) sentencing guideline range. The following occurred in its pertinent part during sentencing:

> The Court: All right. It looks like the
> guideline range would still be E-6, which
> would mean the minimum is twenty-five-two
> hundred twenty-five months to five hundred
> sixty-two months on the carjacking offense as
> well as the armed robbery offense; and I
> would make these corrections as to both
> sentencing information reports. (ST 2-1-06,
> 34).

Defendant Pouncy was indeed sentenced based on the 225 months (18 years, 9 months) to 562 months (46 years, 10 months) advanced sentencing guideline range, which he was never advised of, and not the initially erroneous misadvised sentencing guideline range of 135 months (11 years, 3 months) to 337 months (28 years, 11 months). He was sentenced to serve a minimum of 562 months (46, years, 10 months) to 800 months (66 years, 8 months). (ST 2-1-06, 81-83).

At the time Defendant Pouncy rejected the prosecutor's plea offer of 135 months (11 years, 3 months) to 225 months (18 years, 9 months) he was under the false impression given to him by the trial court, the prosecutor, and defense counsel that he was only going to be subject to a sentencing guideline range of 135 months (11 years, 3 months) to 337 months (28 years, 11 months) and not the actual extremely higher sentencing guideline range of 225 months (18 years, 9 months) to 562 months (46 years, 10 months) in prison.

Counsel was constitutionally ineffective for providing Defendant Pouncy with incompetent and erroneous information concerning his sentencing guideline range if convicted and sentenced. Counsel's ineffectiveness prejudiced Defendant Pouncy because it caused him to reject the plea offer. Had Defendant Pouncy known that he was actually facing a sentencing guideline range of 225 months (18 years, 9 months) to 562 months (46 years, 10 months) instead of 135 months (11 years, 3 months) to 337 months (28 years, 11 months) he would have accepted the offered plea bargain of 135 months (11 years, 3 months) to 225 months (18 years, 9 months). Absent counsel's ineffectiveness the results would have been different because he would have accepted the plea bargain and would have been subjected to far less severe sentencing guidelines. Reversal is required.

**Standard Of Review:**

On the ground of ineffective assistance of counsel, Defendant must first demonstrate errors so serious that counsel was not functioning as the counsel

guaranteed by the Sixth Amendment. Second, the defendant must show that there is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different. Strickland v Washington, 466 US 668, 104 S.Ct 2052, 80 L.Ed.2d 674 (1984); People v Pickens, 446 Mich 298 (1994).

**Discussion:**

In United States ex rel. Caruso v Zelinsky, 689 F.2d 435 (3RD Cir. 1982), the defendant alleged that his counsel had failed to communicate to him a plea offer. The Caruso court held that "[t]he decision to reject a plea bargain offer...is a decision for the accused to make...a failure of counsel to advise his client of a plea bargain...constitute[s] a gross deviation from accepted professional standards." Id. at 438 (citations omitted). In United States v Rodriguez, 929 F.2d 747 (1st Cir. 1991), the First Circuit held that "there is authority which suggests that a failure by defense counsel to inform defendant of a plea offer can constitute ineffective assistance of counsel on grounds of incompetence alone, even absent any allegations of conflict of interest." Id. at 753 (citations omitted). The Seventh Circuit, in Johnson v Duckworth, 793 F.2d 898 (7th Cir.), cert. denied, 479 US 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986), held that "in the ordinary case criminal defense attorneys have a duty to inform their clients of plea agreements proffered by the prosecution, and that failure to do so constitutes ineffective assistance of counsel under the sixth and fourteenth amendments." Id. at 902. The Fifth Circuit, in Beckam v Weinwright, 639 F.2d 262 (5th Cir. 1981), held that although an attorney need not "obtain defendant's consent to every trial decision," where the issue is whether to advise the client to plead or not "the attorney has the duty to advise the defendant of the available options and possible consequences" and failure to do so constitutes ineffective assistance of counsel. Id. at 267.

Finally, in a case factually similar to the case at bar, the Sixth Circuit, in Turner v Tennessee, 858 F.2d 1201 (6th Cir. 1988), vacated on other grounds, 492 US

902, 109 S.Ct. 3208, 106 L.Ed.2d 559 (1989), reinstated, 726 F.Supp. 1113 (M.D. Ten. 1989), aff'd, 940 F.2d 1000 (6th Cir. 1991), cert. denied, __ US __, 112 S.Ct. 915, 116 L.Ed.2d 815 (1992), **held that an attorney's incompetent advice resulting in the defendant's rejection of a plea offer constituted ineffective assistance of counsel.** Id. at 1205. If an attorney's incompetent advice regarding a plea bargain falls below reasonable standard of professional conduct, a fortiori, failure even to inform defendant of the plea offer does so as well.

Based on the above authority, it is clear that counsel's incompetent and inaccurate advice concerning the sentencing guideline range Defendant Pouncy faced had he went to trial and been convicted of the most serious offenses, which ultimately counsel Defendant Pouncy to reject the offered plea bargain constitutes unreasonable conduct under prevailing professional standards. Therefore, based on counsel's incompetent and inaccurate advice concerning the sentencing guideline range in the event of conviction by trial, Defendant Pouncy has met the first part of the Strickland test.

To meet the second part of the Strickland test, Defendant Pouncy must show that there is a reasonable probability that "but for counsel's unprofessional errors, the result would have been different." Strickland, 466 US at 694, 104 S.Ct. at 2068. See also, Lockhart v Fratwell, __ US __, __, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993) (holding that under Strickland, petitioner must show that "counsel's deficient performance renders the results of the trial unreliable or the proceeding fundamentally unfair").

Here, in the case at bar, at the time Defendant Pouncy rejected the plea bargain of 135 months (11 years, 3 months) to 225 months (18 years, 9 months) based on the trial court's, prosecution's, and trial counsel's incompetent and inaccurate information concerning the sentencing guideline range he was subject to in the event of conviction by trial he was under the false impression that he would only be subject to a sentencing guideline range of 135 months (11 years, 3 months) to 337 months (28 years,

11 months). However, unbeknownst to Defendant Pouncy, he was actually subject to and sentenced based on a sentencing guideline range of 225 months (18 years, 9 months) to 562 months (46 years, 10 months).

In the absence of counsel's ineffectiveness for providing Defendant Pouncy with incompetent and inaccurate information concerning the sentencing guideline range he was subject to in the event of conviction by trial, he would have known that he was actually subject to a sentencing guideline range of 225 months (18 years, 9 months) to 562 months (46 years, 10 months), which are extremely higher then the inaccurate sentencing guideline range that counsel initially informed Defendant Pouncy of, at the time he was offered the plea bargain of 135 months (11 years, 3 months) to 225 months (18 years, 9 months). Absent counsel's ineffectiveness, Defendant Pouncy, would have accepted the plea bargain of 135 months (11 years, 3 months) to 225 months (18 years, 9 months) instead of going to trial and taking the chance of subjecting himself to a sentencing guideline range whic was 7 years, 6 months higher on the minimum end and 28 years, 1 month higher on the maximum end. Absent counsel's ineffectiveness, Defendant Pouncy would have definitely benefited from the plea bargain.

Had Defendant Pouncy accepted the plea bargain, his sentence would certainly have been much less severe, he would not have been sentenced to a prison term of 562 months (46 years, 10 months) to 800 months (66 years, 8 months), because the sentencing guideline range would not have permitted such a severe sentence. Therefore, there is a reasonable probability that "but for counsel's unprofessional errors, the results would have been different." Strickland, 466 US at 644, 104 S.Ct at 2068. Reversal is required.

The Court must fashion a remedy that is "tailored to the injury suffered and [does] not unnecessarily infringe on competing interests." United States v Morrison, 449 US 361, 364, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981). Since the remedy for counsel's ineffective assistance should put the defendant back in the position he would have been

in if the Sixth Amendment violation had not occurred. Several issues have re....

Requiring the government to reinstate its original plea offer is constitutionally permissible. See Mabry v Johnson, 467 US 504, 510 n. 11, 104 S.Ct. 2543, 2548 n. 11, 81 L.Ed.2d 437 (1984); Santobello v New York, 404 US 257, 263, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971). See also, Partida-Parra, 859 F.2d at 633 (noting that in certain circumstances "it may be appropriate for the court to order 'specific performance' of the [plea] bargain"). Thus, where, as here, the defendant was deprived of the opportunity to accept a plea offer, putting him in the position he was in prior to the Sixth Amendment violation ordinarily will involve reinstating the original offer.

Requiring the government to reinstate its original offer would also accommodate the policy articulated by the Supreme Court in Kimmelman v Morrison, 477 US 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), where the Court held that "[t]he Constitution contrains our ability to allocate as we see fit the cost of ineffective assistance. The Sixth Amendment mandates that the State [or the government] bears the risk of constitutionally deficient assistance of counsel." Id. at 379, 106 S.Ct. at 2585. Under Kimmel man, even if one might perceive that the government's competing interest might be infringed by requiring that the original offer be reinstated, a contrary result would impermissibly shift the risk of ineffective assistance of counsel from the government to Defendant Pouncy. United States v Blaylock, 20 F.3d 1458; 1469 (9th Cir. 1994).

Therefore, reversal is required, and the Court must ensure that the government reinstate its original plea offer. Defendant Pouncy should have the choice between going forward with a new trial or accepting the government's original plea offer. Blaylock, supra 20 F.3d at 1469.

XIII.    COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR
         FAILING TO FILE A MOTION FOR SEVERANCE WHEN
         THE RIGHT TO SEVERANCE EXISTED BECAUSE THE
         JOINDER OF TWO SEPARATE CARJACKING/ARMED
         ROBBERY INCIDENTS ARISING OUT OF TWO SEPARATE
         TRANSACTIONS EMBARRASSED AND CONFOUNDED
         DEFENDANT POUNCY IN MAKING HIS DEFENSE, WHERE
         DEFENDANT POUNCY, AGAINST HIS WISHES,
         TESTIFIED CONCERNING BOTH TRANSACTIONS, WHEN
         HE HAD ONLY WISHED TO TESTIFY CONCERNING ONE
         OF THE CARJACKING/ARMED ROBBERY TRANSACTIONS
         AND WISHED TO REMAIN SILENT ON THE OTHER AND
         THE JOINDER WAS PREJUDICIAL BECAUSE IT
         COMPROMISED HIS RIGHT TO REMAIN SILENT.

The prosecution filed an information against Defendant Pouncy, that charged him with multiple offenses. The information charged a total of eleven separate felonies, however, the eleven felonies arose out of two separate transaction. The two carjacking/armed robbery incidents occurred on different days, September 29, 2005 and October 11, 2005, they involved different complainants, and they were not related. The Court of Appeals, in its opinion issued December 27, 2007, clearly held that the two carjacking/armed robbery transactions were not related within the meaning of MCR 6.120 and that Defendant Pouncy had a right to severance. The Court of Appeals, held as follows in its pertinent part:

> "Therefore, as stated, the record is lacking in evidence to support that the carjackings were committed as part of a single scheme or plan. Accordingly, because the only basis for joining the charges from the two carjackings in a single trial was that they were executed in a similar fashion, the offenses were not related within the meaning of MCR 6.120 and defendant had a right to severance. See Tobey, supra at 145, 151, 153-154." (Court of Appeals opinion, unpublished, December 27, 2007, 2007, at pages 14-15).

The issue at bar, isn't whether Defendant Pouncy, had a right to severance of the

162

two separate carjacking/armed robbery incidents, because that is the obvious. The crux of this claim, is that counsel was ineffective for failing to move to have the separate additional unrelated charges severed, and that prejudice resulted.

Due to counsel's ineffectiveness for failing to take advantage of Defendant Pouncy's right to severance, Defendant Pouncy's right in making his defense was utterly embarrassed and confounded, where the joinder of the two separate carjacking/armed robbery incidents forced Defendant Pouncy to testify against his wishes concerning both carjacking/armed robbery incidents, when he only wished to testify concerning one of the carjacking/armed robbery incidents and wished to remain silent on the other.

Although, the evidence against Defendant Pouncy relating to both of the carjacking/armed robbery incidents were weak, and insubstantial at best, because there was absolutely no physical evidence linking him to either of the transactions and the trial court judge held the dispositive factor was identity:

> **The Court:** This case is gonna really be decided on whether the jurors believe the identifications that these people are making about you. (T 1-31-06, 109).

The theories in the joined cases were substantially different. The theory in the Brady carjacking/armed robbery, which allegedly occurred on September 29, 2005, was that he was an aider and abettor (T 2-1-06, 22) and the theory in the Sandstrom carjacking/armed robbery, which allegedly occurred on October 11, 2005, was that he was the principle perpetrator. (T 2-1-06, 15-18).

Concerning his defense for the Sandstrom carjacking/armed robbery incident, Defendant Pouncy planned instead of he himself testifying he would remain silent and produce Ms. Marquetta Shahid-Grimes, Defendant's mother, to verify that he called her on October 11, 2005 requesting lunch, and that she took him some food from Burger King to his job site at 6:30 pm, during the time of the alleged offense. (T 1-31-06, 214-215). Then since his trial court counsel failed to investigate and interview his alibi

163

witnesses which would have provided a defense for the Brady carjacking/armed robbery, he planned to only testify on his behalf concerning those charges (Brady charges). However, due to counsel's failure to take advantage of Defendant Pouncy's right to severance of the unrelated charges, when Defendant Pouncy took the witness stand in his behalf, he was coerced into testifying and getting crossed-examined on the Sandstrom charges (T 1-31-06, 116-212), which had he only testified on the Brady charges and remained silent on the Sandstrom charges he feared an adverse influence upon the jury would have followed his silence on the Sandstrom charges and his express denial of the Brady charges.

Absent counsel's utter ineffectiveness for failing to move for severance of the unrelated carjacking/armed robbery charges, first and foremost since Defendant Pouncy had the absolute right to severance, **upon request**, the jury would not have heard the damaging testimony both the Sandstrom and Brady carjacking/armed robbery counts, it would have been either or. The Sandstrom carjacking/armed robbery would have been tried separately and the jury would not have heard about the separate unrelated Brady carjacking/armed robbery charges and vise versus. Moreover, absent counsel's ineffectiveness Defendant Pouncy would not have been forced to testify about the Sandstorm carjacking/armed robbery charges, the prosecutor would not have been able to cross-examine him about the Sandstrom carjacking/armed robbery charges, and thereby the jury would not have been able to draw an adverse inference from his demeanor during his testimony concerning the Sandstrom carjacking/armed robbery charges.

Due to counsel's ineffectiveness for failing to move for severance Defendant Pouncy was stuck between a rock and a hard place. Based on the joinder Defendant Pouncy was placed in a compromising position because he was faced with the unconstitutional choices of completely involuntarily abandoning his absolute right to testify in his defense concerning the Brady carjacking/armed robbery charges, to prevent cross-examination by the prosecutor concerning the Sandstrom carjacking/armed robbery charges and to protect himself from the possible adverse effects on the jury based on his

demeanor while under examination for the Sandstrom carjacking/armed robbery charges and to prevent inpeachment concerning the Sandstrom carjacking/armed robbery charges. Or he had the other unconstitutional choice of exercising his right to testify in his behalf concerning the Brady carjacking/armed robbery incidents and remaining silent regarding the Sandstrom carjacking/armed robbery charges and thereby suffer the adverse consequences of the jury drawing negative conclusions concerning the Sandstrom charges since he exercised his right to remain silent on those charges and expressly denied the Brady charges. And the other unconstitutional choice was to testify about both incidents, involuntarily and run the risk of being cross-examined, and impeached concerning the Sandstrom charges, which he wished to remain silent on. Defendant Pouncy was definitely prejudiced by counsel's ineffectiveness and reversal is required.

**Standard Of Review:**

Claims of ineffective assistance of counsel are reviewed de novo. People v Pickens, 446 Mich 298, 521 NW2d 797 (1994). The de novo standard of review applies to the existing record. See, e.g., People v Barclay, 208 Mich App 670, 672 (1995).

**Discussion:**

Although, MCR 6.120 (C), requires a trial court to sever unrelated offenses for separate trial and it's clear the offenses were not related within the meaning of MCR 6.120 and Defendant Pouncy had a right to severance, **a defendant motion triggers the obligation for the court to sever unrelated offenses**, counsel failed to do so.

Counsel was obligated, in the interest of his client, Defendant Pouncy, to move to have the unrelated offenses severed. Since Defendant Pouncy had the right to severance under MCR 6.120, any reasonable competent attorney definitely would have moved to have had the unrelated charges severed, if not just to prevent the unfair prejudice stemming from the joinder of unrelated charges, but also to honor and protect his right to remain silent and to prevent the process of making his defense from being embarrassed and confounded. Counsel's failure to have the unrelated charges severed constitutes insffective assistance of counsel. See Northrop v Trippett, 265 F.3d 372, 378 (CA 6,

2001); People v Ulleh, 216 Mich App 669, 684-686 (1996)(failure to move for suppression of inadmissible similar acts evidence); People v Carrick, 220 Mich App 17 (1996)(Attornrys always have a duty to make outcome determinative motions). Had counsel advocated Defendant Pouncy's cause by moving to have the unrelated charges severed, they would have been severed, counsel's performance was "outside the wide range of professionally competent assistance." Id. at 689, 104 S.Ct 2052. Counsel's error was so serious that counsel was not functioning as "counsel guaranteed by the Sixth Amendment." Id. at 687, 104 S.Ct. 2052.

Defendant Pouncy was indeed prejudiced by counsel's ineffectiveness for failing to have the unrelated charges severed. Cross v United States, 335 F.2d 987 (1964) holds, "[An] accused is prejudiced when joinder of offenses for trial embarrasses or confounds accused in making his defense." The Court in Cross, further held, "[An] accused is prejudiced if he is coerced into testifying on count[s] upon which he wished to remain silent as result of joinder of offenses for trial."

"Therefore, if because of the....[Joinder] prejudice developed and was not cured by requiring an election or by other relief, material error afflicted the trial. Prejudice has consistently been held to occur when....[joinder] embarrasses or confounds an accused in making his defense. Pointer v United States, 151 US 396, 403 [14 S.Ct. 410, 38 L.Ed 208] (1894); Kidwell v United States, 38 App D.C. 566, 570 (1912). See, also, McElroy v United States, 164 US 76, 78 [17 S.CT 31, 41 L.Ed 355] (1896)." Dunaway v United States, 92 US App. D.C. 299, 300-01, 20-5 F.2d 23, 24 (1953). See also Drew v United States, 118 US App D.C. 11, 331 F.2d 85.

Prejudice may develop when an accused wishes to testify on one but not the other of two joined offenses which are clearly distint in time, place, and evidence. His decision whether to testify will reflect a balancing of several factors with respect to each count: the evidence against him, the availability of defense evidence other then his testimony, the plausibility and substantiability of his testimony, the possible

effects of demeanor, impeachment, and cross-examination. "When he takes the stand in his own behalf, he does so as any other witness, and within the limits of the appropriate rules he may be cross-examined as to the facts in issue. He may be examined for the purpose of impeaching his credibility. His failure to deny or explain evidence of incriminating circumstances of which he may have knowledge may be the basis of adverse inference, and the jury may be so instructed. His waiver is not partial; having once cast aside the cloak of immunity, he may not resume it at will, whenever cross-examination may be inconvenient or embarrassing." Raffel v United States, 271 US 494, 497, 46 S.Ct 566, 568, 70 L.Ed 1054 (1926)(citations omitted).

But if the two charges are joined for trial, it is not possible for him to weigh these factors separately as to each count.

> "The safeguards against self-incrimination are for the benefit of those who do not wish to become witnesses in their own behalf and not for those who do." Raffel v United States, supra note 3, 271 U.S. at 499, 46 S.Ct at 568, 70 L.Ed 1054. But joinder may place the defendant in both caregories at once.

If he testifies on one count, he runs the risk that any adverse effects will influence the jury's consideration of the other count. Thus he bears the risk on both counts, although he may benefit on only one. Moreover, a defendant's silence on one count would be damaging in the face of his express denial of the other. Thus he may be coerced into testifying on the count upon which he wished to remain silent.

The Supreme Court said in Adamson v People of State of California, 332 US 46, 57, 67 S.ct. 1672, 1678, 91 L.Ed 1903 (1947):

> "When evidence is before a jury that threatens conviction, it does not seem unfair to require him to choose between leaving the adverse evidence unexplained and subjecting himself to impeachment through disclosures of

former crimes."

However, a defendant tried for two offenses faces a much more difficult situation: (1) his silence on one count does not prevent impeachment; (2) an inference from his silence on one count is encouraged by his lack of silence on the other. And of course every effort must be made to enforce the rule that "the jury...must not permit [a defendant's failure to testify]...to weigh in the slightest degree against any such defendant..." Bruno v United States, 308 US 287, 292, 60 S.Ct. 198, 199, 84 L.Ed 257 (1939). See 18 U.S.C. §3481; Stewart v United States, 366 US. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961).

In the case at bar, the joinder invaded Defendant Pouncy's constitutional right to remain silent. This right would not have been invaded absent counsel's failure to move to have the unrelated charges severed. Had counsel moved to have the unrelated charges severed the prosecution's case would have been paralyzed, because the jury would not have heard about the unrelated charges and Defendant Pouncy would not have been coerced into testifying concerning the charges he wished to exercise his right to remain silent about. The substantial prejudice is obvious. Absent counsel's ineffectiveness, the jury would not have heard about all three separate carjacking/armed robbery incidents allegedly committed at the hands of Defendant Pouncy. (The jury heard about the Sandstrom carjacking/armed robbery incident, the Brady carjacking/armed robbery incident, and the Haynes carjacking/armed robbery incident as "similar acts" MRE 404 (b) evidence). Once the unrelated charges would've been severed the jury would've only heard about two alleged carjacking/armed robbery incidents instead of three, again the unfair prejudice from counsel's failure to have the unrelated charges severed is obvious because the third unrelated carjacking/armed

robbery incident could've played a major role in the jury's decision to convict. Moreover, no reasonably competent attorney would have allowed a sigle jury to hear about a total of three different carjacking/armed robbery incidents when there was an avenue which would've prevented the jury from hearing about all three incidents.

There's a reasonable probability that the outcome of Defendant Pouncy's trial could've been different had the jury not heard about a third unrelated separate carjacking/armed robbery incident. The significant role that the third unrelated carjacking/armed robbery incident played in the jury reaching its decision to convict cannot be gainsaid. There was no physical evidence at all linking Defendant Pouncy to the offenses. Defendant Pouncy, was convicted chiefly on witnesses' testimony, alleged eyewitnesses, which is insubstantial evidence at best. As recognized by the Federal Courts, there are "grave reservations concerning the reliability of eyewitness testimony." Blackburn v Foltz, 828 F,2d 1177, 1186 (6th Cir. 1987)(Citing Wilson v Cowan, 578 F.2d 166, 168 (6th Cir. 1978). There's a reasonable probability that, but for counsel's unrelated charges severed to protect his client's, Defendant Pouncy's, right to remain silent on the Sandstrom charges), the results of the proceeding would have been different. Since because of counsel's ineffectiveness, the unrelated charges were joined, and this ultimately invaded Defendant Pouncy's constitutional right to remain silent because he was coerced into testifying concerning charges he wished to remain silent about, the results of the trial are "fundamentally unfair and unreliable." Tinsley v Millian, 399 F.3d 769, 802 (6th Cir. 2005), quoting Lockhart v Fretwell, 506 US 364, 369, 113 S.Ct 838, 122 L.Ed.2d 180 (1993). As held since the joinder embarrassed and confounded Defendant Pouncy in making his defense, the joinder was prejudicial. Cross v United States, supra at 335 F.2d 991. Reversal is required.

XIV.   THE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE
FOR FAILING TO HAVE THE PROSECUTION SPECIFY
THE TIME (DATES) OF THE ALLEGED OFFENSES,
WHERE TIME WAS OF AN ESSENCE AND WAS NESSARY
IN ORDER FOR DEFENDANT POUNCY TO PUT FORTH AN
EFFECTIVE DEFENSE, THE 13 DAY TIME PERIOD
(SEPTEMBER 29, 2005 THROUGH OCTOBER 11, 2005)
IN WHICH THE JURY HAD TO CONCLUDE THE
OFFENSES OCCURRED ON WAS TOO BROAD, AND MADE
IT POSSIBLE THAT SOME JURORS MAY HAVE FOUND
THAT THE OFFENSES OCCURRED ON SEPTEMBER 29,
2005, WHILE OTHERS MAY HAVE FOUND THE
OFFENSES OCCURRED OCTOBER 11, 2005 AND OTHER
JURORS WERE PERMITTED TO CONCLUDE THAT THE
OFFENSES OCCURRED ON ANY OTHER DATE ALL
WITHIN THE (SEPTEMBER 29, 2005 THROUGH
OCTOBER 11, 2005) TIME PERIOD. IT WAS
THEREFORE IMPOSSIBLE FOR DEFENDANT TO
EFFECTIVELY DEFEND AGAINST THE CHARGES DUE TO
THE WIDE TIME PERIOD IN WHICH THE JURY WAS
PERMITTED TO FIND THAT THE OFFENSES OCCURRED
ON.

The prosecution filed an information against Defendant Pouncy charging a total of eleven offenses arising out of two separate unrelated transactions. In the information the prosecution alleged that the two unrelated transactions occurred somewhere between the time period of September 29, 2005 through October 11, 2005. (See Felony Information).

During the preliminary examination the complainants were indeed able to pin point the alleged two dates of the offenses. Sandstrom offenses allegedly occurred on October 11, 2005. (PET 10-2-05, 5). Brady offenses allegedly occurred on September 29, 2005. (PET 10-2-05, 33-34). Despite the complainant's ability to unequivocally pin point the exact dates of the alleged offenses, counsel failed to require the prosecution to specify and reflect those exact dates in the felony information so that Defendant Pouncy could put forth an effective defense to defend against just those two dates, September 29, 2005 and October 11, 2005, instead defend against a total of thirteen dates, September 29, September 30, October 1, October 2, October 3, October 4, October 5, October 6, October 7, October 8, October 9, October 10, and October 11, 2005).

Due to counsel's ineffectiveness for failing to require the prosecution to specify

and reflect the exact two dates, September 29, 2005 and October 11, 2005, of the alleged offenses in the felony information the jury was instructed as follows:

> The prosecutor must also prove beyond a reasonable doubt that the crime occurred on or about September 29[th] of 2005 **through** October 11[th] of 2005 within Mt. Morris Township, Genesee County. (T 2-1-06, 86).

The 13 day time period in which the jury had to conclude that the offenses occurred on effectively rendered Defendant Pouncy's alibi defense ineffective, because his alibi defense only covered two dates Septmber 29, 2005 (T 1-31-06, 163-212) and October 11, 2005 (T 1-31-06, 163-212; 213-232). The 13 day time period prejudiced Defendant Pouncy in preparing and presenting a defense because the jury was permitted to find thet the offenses occurred on any of the 13 dates within the, September 29, 2005 **through** October 11, 2005, time span. The jury was permitted to conclude that the offenses occurred on September 30, October 1, October 2, October 3, October 4, October 5, October 6, October 7, October 8, October 9, or October 10, 2005 all dates in which an alibi wasn't provided for. The 13 day time period in which the jury had to conclude that the offenses occurred on also permitted the jury to return a non-unanimous verdict because some of the jurors may have found that the offenses occurred on September 29, 2005, while others may have found the offenses occurred on October 11, 2005 and others may have found that the offenses occurred on another date all within the, September 29, 2005 Through October 11, 2005, time period. It is impossible to conclude that the guilty verdicts returned were unanimous as required.

Absent counsel's ineffectiveness for failing to move to have the prosecution specify and reflect the two detes of the alleged offenses, September 29, 2005 and October 11, 2005, in the felony information Defendant Pouncy would not have been prejudiced in preparing and presenting his defense and the jury would not have been permitted to return a non-unanimous verdict. Absent counsel's ineffectiveness there's a

reasonable probability that the outcome of Defendant Pouncy's trial would have been different. Had the felony information strickly reflected the two dates September 29, 2005 and October 11, 2005 the jury would have been limited to only finding that the offenses occurred on either September 29, 2005 or October 11, 2005, instead of on September 29, September 30, October 1, October 2, October 3, October 4, October 5, October 7, October 8, October 9, October 10, and October 11, 2005, thereby even had they concluded the offenses occurred, there's a reasonable probability that they would have gave Defendant Pouncy's alibi defense which covered the two dates, September 29, 2005 and October 11, 2005, more weight and there's a reasonable probability that the alibi defense could have created a reasonable doubt as to Defendant Pouncy being the perpetrator or provided a complete defense for him. But since the jury was permitted to conclude that the offensee occurred on any of the following dates September 29, 30, October 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11 of 2005 the alibi defense was of no use if the jury found that the offenses occurred on September 30, October 1, 2, 3, 4, 5, 6, 7, 8, 9, or 10th of 2005 all dates in which the alibi defense didn't cover.

Absent counsel's ineffectiveness there's a reasonable probability that the outcome of Defendant Pouncy's trial would have been different. Reversal is required.

**Standard Of Review:**

Claims of ineffective assistance of counsel are reviewed de novo. People v Pickens, 446 Mich 298, 521 NW2d 797 (1994). The de novo standard review applies to the existing record. See, e.g., People v Barcley, 208 Mich App 670, 672 (1995).

**Discussion:**

MCR 6.112 The Information or Indictment hold es follows in its pertinent parts:

> (D) Information; Nature and Contents. The information must sat forth the substance of the accusation against the defendant and the name, statutory citation, and penalty of the offensa allegedly committed. If epplicable, the information must also set forth the

notice required by MCL 766.55, and the defendant's Michigan driver license number. **To the extent possible, the information should specify the time and place of the alleged offense.**...

(E) Bill of Particulars. The court, on motion, may order the prosecutor to provide the defendant a bill of particulars describing the essential facts of the alleged offense.

It is clear from the above authority that when possible, the prosecution is obligated to pinpoint in an information the time (date) of an alleged offense, however, the obligation is only triggered on a defendant's motion. In the case at bar, counsel failed to move to have the prosecution specify and reflect the exact dates of the two alleged unrelated offenses in the felony information, so that Defendant Pouncy wouldn't be prejudiced in preparing and presenting his defense, thereby rendering ineffective assistance of counsel.

Failure to pinpoint in an information the time of an alleged offense is fatal when time is of the essence of the offense. MCL 767.45; MCL 767.51. An information must contain the time of the offense, but a varianve as to time is not fatal unless time is of the essence of the offense. People v Taylor, 185 Mich App 1 (1990); People v Sabin, 223 Mich App 530 (1997), remanded on other grds 459 Mich 920 (1998). In the case at bar, time was of the essence of the offenses. Defendant Pouncy was charged with eleven counts of various offenses ranging from carjacking, armed robbery, and weapon offenses. There was no physical evidence linking Defendant to the offenses. Defendant Pouncy maintained that he was innocent and he put forth an alibi defense which placed him somewhere else other than the scene of the crime on the two dates the complainant's alleged that the crimes occurred on at the preliminary examination, September 29, 2005 and October 11, 2005. Based on the complainants' testimony at the preliminary

examination that the offenses occurred on only two dates, September 29, 2005 and October 11, 2005, Defendant Pouncy prepared a defense which covered those two dates. However, due to counsel's ineffectiveness for failing to require the prosecution to specify and reflect the exact two dates that the complainants' alleged the offenses occurred on, in the felony information when the prosecution was capable of doing so, Defendant Pouncy was prejudiced in preparing and presenting his defense because since the jury was permitted to conclude that the offenses occurred on eleven other dates, September 30, October 1, 2, 3, 4, 5, 6, 7, 8, 9, or 10th of 2005, other than the two dates Defendant Pouncy prepared to defend against (September 29, 2005 and October 11, 2005) his alibi defense covering just two out of the thirteen (13) days the jury was permitted to conclude that the offenses occurred on effectively rendered Defendant Pouncy's alibi defense ineffective.

If the jury concluded that the offenses occurred on September 30, 2005; Defendant Pouncy's alibi defense for September 29, 2005 and October 11, 2005 was of no use. If the jury concluded that the offenses occurred on October 1, 2005; Defendant Pouncy's alibi defense for September 29, 2005 and October 11, 2005 was of no use. If the jury concluded that the offenses occurred on October 2, 2005; Defendant Pouncy's alibi defense for September 29, 2005 and October 11, 2005 was of no use. If the jury concluded that the offenses occurred on October 3, 2005; Defendant Pouncy's alibi defense for September 29, 2005 and October 11, 2005 was of no use. If the jury concluded that the offenses occurred on October 4, 2005; Defendant Pouncy's alibi defense for September 29, 2005 and October 11, 2005 was of no use. If the jury concluded that the offenses occurred on October 5, 2005; Defendant Pouncy's alibi defense for September 29, 2005 and October 11, 2005 was of no use. If the jury concluded that the offenses occurred on October 6, 2005; Defendant Pouncy's alibi defense was of no use. If the jury concluded that the offenses occurred on October 7, 2005; Defendant Pouncy's alibi defense was of no use. If the jury concluded that the

174

offenses occurred on October 8, 2005; Defendant Pouncy's alibi defense was of no use. If the jury concluded that the offenses occurred on October 9, 2005; Defendant Pouncy's alibi defense was of no use. If the jury concluded that the offenses occurred on October 10, 2005; Defendant Pouncy's alibi defense was of no use.

Since Defendant Pouncy's defense was alibi, time was indeed of the essence of the offense. The prosecutor was indeed capable of specifying and reflecting the exact two dates in which the offenses allegedly occurred on, September 29, 2005 and October 11, 2005, in the felony information based on the complainants' testimony from the preliminary examination, instead of claiming that they occurred over a 13 day time period. Counsel was constitutionally ineffective for failing to have the prosecution pinpoint the exact two dates of the alleged offenses to prevent his client's right to prepare and present a defense from being prejudiced.

Any reasonably competent attorney, who was trying to advocate his client's cause, Strickland, supra at 466 US 688, would have moved to have the prosecution specify and reflect the two dates, pinpointed by the complainants, in the felony information. Any reasonably competent attorney would have foreseen that since the felony information alleged that the offenses occurred over a 13 day time period, September 29, 2005 **through** October 11, 2005, that in order for his client to present a viable and plausible defense his client would have had to offer an alibi for a total of 13 days for September 29, 30, October 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11th of 2005 which was a huge unnecessary burden, which could have been eliminated had counsel requied the prosecution to specify and reflect the two dates, September 29, 2005 and October 11, 2005, pinpointed by the complainants in the felony information. Counsel's failure clearly constitutes deficient performance...rather than reasonable trial strategy. Washington v Hofbauer, 228 F.3d 689, 702. Counsel's complete failure to have the unnecessary alleged dates eliminated from the felony information, was to the defense's detriment, because the 13 day time period in which the jury had to conclude the offenses occurred on effectively rendered Defendant Pouncy's alibi defense ineffective.

Counsel's failure, constitues performance that was "deficient", involving "errors so serious that counsel was not functioning as 'counsel' guarnteed to the defendant by the Sixth Amendment." Id. at 687, 104 S.Ct 2052. Thereby, counsel's conduct "fell below an objective standard of reasonableness," Tucker v Prelensnik, 181 F.3d 747, 754 (6th Cir. 1999), and counsel's "identified acts and omissions were outside the wide range of professionally competent assistance." Strickland, 466 US at 690, 104 S.Ct. 2052.

Defendant Pouncy, was indeed prejudiced by counsel's ineffectiveness because due to counsel's ineffectiveness the jury was permitted to conclude that the offenses occured on dates other than the two dates Defendant Pouncy's alibi defense covered. In the absence of counsel's ineffectiveness the jury would've been limited to only conclude that the offenses occurred on either September 29, 2005 or October 11, 2005 and there's a reasonable probability that since his alibi defense covered these two dates in which the jury was limited to concluding that the offenses occurred on, the alibi defense could've been of use in the jury's decision making process and there's a reasonable probability that the alibi defense could've at least created a reasonable doubt in the mind of at least one of the jurors and ultimately the outcome of his trial would've been different.

The Court in People v Naugle, 152 Mich App 227 (1086), recognized that a defendant can be prejudiced in preparing a defense when time is of an assence of the offense and the prosecution fails to pinpoint the date of the alleged offense. In the case at bar, the 13 day time period in which the jury had to conclude that the offenses occurred on also permitted some jurors to find that the offenses occurred on different dates, thereby there's no way to be certain that the guilty verdicts were unanimous as required. See e.g., People v Washington, 43 Mich App 150 (1972); MCR 6.410. In United States v Ford, 872 F.2d 1231, 1236-1237 (6th Cir. 1989), the Court held, that when a jury is permitted to find that offenses were committed during a time period, rather than on exact dates this permits a jury to reach mix conclusions concerning the date of

the offense. "It is therefore uncertain whether the guilty verdict returned...was unanimous as required by [Michigan Court Rule 6.410]." U.S. v Ford, supra at 872 F.2d 1236-1237. As held in U.S. v Ford, supra, there's no way to be certain that one juror didn't find that the offenses occurred on September 30, 2005, while others found that the offenses occurred on October 2, 2005, while others found that the offenses occurred on October 4, 2005, and while others found that the offenses occurred on October 6, 2005, all dates within the time period stated in the trial court's instruction, which constitutes a non-unanimous verdict.

Defendant Pouncy was prejudiced and "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." Id. at 694, 104 S.Ct 2052. Due to the resulting prejudice the result of the trial was "fundamentally unfair and unreliable." Tinsley v Millian, 399 F.3d 769, 802 (6th Cir. 2005), quoting Lockhart v Fretwell, 506 US 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Reversal is required.

XV.    TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE
BY FAILING TO INVESTIGATE AND HAVE THE
SHOE PRINT IMPRESSION FROM THE SCENE OF THE
CRIME EXAMINED BY A DEFENSE EXPERT TO
DETERMINE THE SHOE SIZE, TO SHOW TO THE JURY
THAT THE SHOEPRINT IMPRESSION DID NOT BELONG
TO DEFENDANT POUNCY, IN SUPPORT OF THE
DEFENSE THEORY THAT DEFENDANT POUNCY WAS NOT
PRESENT AT THE SCENE OF THE CRIME.

During the investigation stage of the case at bar, the Mt. Morris Township discovered a shoe print impression at the reported scene of the crime and photographed it to preserve it for its potential evidentiary value. The prosecution subsequently provided the defense, Defendant Pouncy's attorney Michael J. Breczenski, with the photograph of the shoe print impression. Defendant Pouncy, repeatedly asked his trial court counsel to have the shoe print impression analyzed to determine the size of the impression to demonstrate the size difference of the impression compared to his shoe print size to eventually present the exculpatory results to the jury in an attempt to persuade the jury that he was not at the scene of the crime and thereby could not have been the perpetrator of the offenses, since there was a total lack of any physical evidence linking Defendant Pouncy to the scene of the crime and since the dispositive factor at trial was the identity of the perpetrator.

Despite the potential exculpatory nature of the shoe print impression and Defendant Pouncy's request to counsel to have the shoe print impression analyzed, counsel failed to move the trial court for the appointment of an expert in the area of forensic shoe print impressions, to have the shoe print impression analyzed by the expert. Instead of having a qualified expert properly analyze the shoe print impression, counsel tried to have a private investigator, __who was not qualified as an expert in this area,__ play the role of a forensic shoe print impression expert, but the private investigator, Leonard Accardo, himself openly admitted that he had no clue what size the shoe print impression was. The following occurred in its pertinent part:

By Mr. Lerobardiere:

Q: Mr. Accardo, this piece of evidence this footprint of a foot with the shoe on, correct?

178

A: Yes, it is.

Q: And the measurement taken of this shoe print with the shoe on was a ruler in inches, correct?

A: Yes, sir.

Q: And the shoe size too is-measures in shoe sizes, it's not inches, correct?

A: Correct.

**Mr. Larobardiere:** Thank you.

The Court: Well, while you left it begging the question. And Mr. Larobardiere, what, then is, **Mr. Accardo, if you can tell us, what would be the difference in scale between the inches on the ruler and what's on the shoe sizer?**

**Witness: To be very honest with you your Honor, I'm not sure.**

The Court: You have no idea?

The Court: I have no idea.

The Court: All right. So you can't say whether-how they compare with each other then, the ruler versus the soe scaler. Is that correct?

**Witness: I Cannot.**

The Court: All right. Thank you, sir. (T 1-27-06, 102-103).

Now, while the record shows that Defendant Pouncy wears a size thirteen-and-a-half (13½), (T 1-27-06, 96), the record fails to show what the size of the shoe print impression was, which ultimately left the jury free to speculate and assume that the size of the shoe print impression, from the scene of the crime, was a thirteen-and-a-half (13½), the exact same size as Defendant Pouncy's shoe size which reasonably could have prejudiced Defendant Pouncy because this could have easily played a part of the jury's decision to convic. But had counsel had the shoeprint impression analyzed by a

forensic shoe print impression expert, the record would have showed by clear and convincing evidence that the size of the impression was substantially different than Defendant Pouncy's shoe size, and in light of this fact there's a reasonable probability that at least one of the jurors would have been convinced that since the size of the impression was substantially different from Defendant Pouncy's shoe size, he was not present at the scene of the crime and ultimately concluded that he was not the perpetrator and voted to acquit Defendant Pouncy.

Counsel was constitutionally ineffective for failing to investigate and have the shoe print impression from the scene of the crime analyzed by a defense expert to detremine the shoe size, to show to the jury that the shoe print impression did not belong to Defendant Pouncy, in support of the defense's theory that Defendant Pouncy was not present at the scene of the crime. Reversal is required.

**Standard Of Review:**

Ineffective assistance of counsel is reviewed de novo. People v Pickens, 446 Mich 298 (1994).

**Discussion:**

"[T]he proper standard for attorney performance is that of reasonably effective assistance." Strickland, 466 US at 687, 104 S.Ct. at 2064. In evaluating counsel's performance, "all the circumstances" must be considered. Id. at 688,104 S.Ct. at 2065.

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tectical decisions.

Id. at 688-89, 104 S.Ct at 2065.

The Supreme Court recognized that in the context of ineffective assistance claims based on counsel's "failure to investigate," the temptation to rely on hindsight is particularly strong. Consequent, the Court made clear that "strategic choices made after thorough investigation of law and facts relevant to the plausible options are virtually unchallengeable...." Id. at 690, 104 S.Ct at 2066. However, "strategic choices made after less than complete investigations are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 690-91, 104 S.Ct at 2066 (emphasis added).

In the case at bar, Defendant Pouncy told counsel about the shoe print impression and told counsel that he was not the perpetrator and was not at the scene of the crime and that the shoe print impression should be analyzed by an expert and the exculpatory results presented to the jury to prove that he was not at the scene of the crime. Also prior to trial counsel had in his possession the Mt. Morris Township Police Department Standard Incident Report, (See Photo o Of Shoe Print Impression, Appendix U), which contained a photograph of the shoe print impression recovered from the scene of the crime, "that should have alerted him to the significance of the [shoe print impression] for the defense." Sims v Livesay, 970 F.2d 1575, 1580 (6th Cir. 1992).

Such potentially exculpatory evidence cannot be ignored. In the case at bar, due to the utter lack of any physical evidence to link Defendant Pouncy to the offenses or the scene of the crime, identification of the perpetrator was the dispositive factor. Counsel was aware that due to the utter lack of physical evidence linking Defendant Pouncy to the offenses or the scene of the crime, the prosecution was going to attempt to connect Defendant Pouncy to the offenses and the scene of the crime by using alleged eyewitness testimony and **nothing else.** The photograph of the shoe print impression from the scene of the crime disclosed facts that clearly showed that the states' theory and its witnesses' contentions that Defendant Pouncy was at the scene of the crime and was

the perpetrator, were easily refuteable. The states' theory and its witnesses' contentions were aasily refuteable because had counsel had the shoe print impression analyzed by an expert and retrieved the results, that would have showed by clear and convicing evidence that the size of the impression was substantially different from Defendant Pouncy's shoe size, it's a very reasonable probability that based on the complete lack of any physical evidence and the fact that the sizes were substantially different, the outcome of the proceeding would have been different because at least one of the jurors would have easily concluded that the physical evidence that the prosecution ,did have (shoe print impression), pointed to another person besides Defendant Pouncy.

Counsel's failure to investigate and have the shoe print impression from the scene of the crime, analyzed by a defense expert to determine the shoe size, to show to the jury that the shoe print impression did not belong to Dafendant Pouncy, in support of the defense's theory that Defendent Pouncy was not present at the scene of the crime, cannot be characterized as a reasonable exercise of professional judgment. From eny view it can clearly br sean that, "counsel did not make a reasonable decision that further investigation of the physical evidence was unneccsary." Sims v Livesey, supra 970 F.2d at 1580. counsel made no "independent investigation" of the exculpatory shoe print impression at all and cannot offer any explanation for why he did not take advantage of the exculpatory evidence.

> Cf. 1 ABA Standards For Criminal Justice,
> Standard 4-4,1, at 4-53 (2ed. Supp. 1986),
> entitled Duty to investigate:
> It is the duty of the lawyer to conduct a
> prompt investigation of the circumstances of
> the case and to explore all avenues leading
> to facts relevant to the merits of the case
> and penalty in the event of conviction. the
> investigation should always include effeorts

to secure information in the possession of
the prosecution and law enforcement
authorities. The duty to investigate exists
regardless of the accused's admissions or
statements to the lawyer of facts
constituting guilt or the accused's stated
desire to plead guilty.

Commentary to Standard 4-4.1 notes that
"[f]acts form the basis of effective
representation....Adequate investigation may
avert the need for courtroom confrontation.
**The resources of scientific laboratories may
be required to evaluate certain kinds of
evidence:
Neglect of....these steps may preclude the
presentetion of an effective defense."** Id. at
4-54.

There was no strategy in counsel's failure to investigate the role of the shoe print
impression, it was only negligence. Sims v Livesay, supra 970 F.2d at 1581. Therefore,
counsel's failure to investigate key evidence may not be excused. Defendant Pouncy, in
short, did not receive reasonably effective assistance of counsel.

A decision not to have an expert analyze the exculpatory shoe print impression
based on less than adequate investigation or evaluation is not based on strategic
considerations, and is subject to review under Strickland. See pavel v Hollins, 261
F.3d 210, 223 (CA 2, 2001)(Counsel ineffective in a child sexual abuse case where his
failure to call a medical expert was based on an insufficient investigation); Lindstadt
v Keane, 239 F.3d 191 (CA 2, 2001)(counsel's ineffectiveness included failing to
consult or call an expert in a child CSC case); Holsomback v white, 133 F.3d 1382 (CA
11, 1998)(same).

In a case more factually similar to the case at bar, the Court in Sims v Livesay,
970 F.2d 1575 (6th Cir. 1992) held that "trial counsel provided ineffective assistance
in failing to investigate and present evidence that, consistent with claim that

shooting was accidental and at close range, there was gun powder residue on the quilt with bullet holes.

From any view, it is clear to see that Counsel's conduct had a clear negative impact on the results of the trial. See Rice v Marshall, 816 F.2d 1126, 1131-32 (6th Cir. 1987). Counsel's ineffectiveness prejudiced Defendant pouncy because since an expert did not analyze the shoe print impression to determine the size, to show that the size of the impression was substantially different from Defendant Pouncy's shoe size, the jury was free to speculate ans assume that the size of the impression from the scene of the crime was the exact same size as Defendant Pouncy's thirteen-and-a-half (13$\frac{1}{2}$) shoe size, when the sizes were really substantially different. this was deterimental to Defendant Pouncy and ultimately played a mayor role in the jury's decision to convict.

Moreover, counsel's ineffectivaness also prevented Defendant pouncy from discovering and presenting the exculpatory nature of the shoe print impression to the jury, there is a reasonable probability thet the exculpatory nature of the shoe print impression would have changed the outcome of the proceedings. "This is not a case where the evidence of the [defendant's] guilt was so massive or multilayered as to render harmless defense counsel's errors." Sims v Livesay, supra 978 F.2d at 1581. To the contrary, the state relied heavily and solely upon the testimony of witnesses' testimony, alleged eyewitnesses. which is insubstantial evidence at best. As recognized by the Federal Courtd, there are "grave reservations concerning the reliability of eyewitness testimony." Blackburn v Foltz, 828 F.2d 1177, 1186 (6th Cir. 1987)(citing Wilson v Cowan, 578 F.2d 166, 168 (6th Cir. 1078). Therefore, in light of the exculpatory nature of the ahoe print impression, the verdict against the defendant is "more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 US at 696, 104 S.Ct at 2069.

Even more recently in Guilmette v Howes, 577 F.Supp.2d 904 (2008 E.D. Mich), the

Court held that counsel provided constitutionally ineffective assistance of counsel for doing the exact same thing that Defendant Pouncy's counsel failed to do, have an expert analyze a shoe print recovereed from the scene of the crime, and reversed Guilemette's convictions on this basis.

In the case at bar, the defendant's burden, while substantial, does not require that he establish his his innocence or even demonstrate "that counsel's deficient conduct more like than not altered the outcome of the case." Strickland, 466 US at 693, 104 S.Ct at 2068. In order to establish prejudice, the defendant need only show that had the soe print impression, along with its exculpatory results been presented to the jury, there is a reasonable probability that the jury's verdict would have been different. Strickland, 466 US at 694, 104 S.Ct at 2068. Defendant Pouncy has met this burden. Counsel's errors undermines confidence in the outcome of the trial.

Furthermore, since due to counsel's ineffectiveness an expert never analyzed the shoe print impression, and discovered its exculpatory nature, it is necessary, that Defendant Pouncy be appointed an expert, at this stage, due to him being indigent, to analyze the shoe print impression to determine the size and once the results show that the sizes are indeed substantially different, a new trial must be granted so that a jury can be informed of the exculpatory evidence. The jury had a right to know that this exculpatory evidence existed and was indeed capable of excluding Defendant Pouncy as being the perpetrator. The jury's lack of knowledge of the exculpatory nature of the impression is why the confidence in the outcome of the trial is undermined, because had the jury known there's a reasonable probability that the outcome of Defendant Pouncy's trial would have been different. Reversal is required.

XVI.     DEFENDANT POUNCY IS ENTITLED TO A NEW TRIAL BASED ON THE
         NEWLY DISCOVERED EVIDENCE, AN AFFIDAVIT SIGNED BY ONE OF
         HIS CODEFENDANTS WHO WAS UNAVAILABLE AT THE TIME OF
         TRIAL WHO IS GOING TO OFFER EXCULPATORY TESTIMONY IN
         DEFENDANT POUNCY'S FAVOR AND THEREBY TESTIFY THAT
         DEFENDANT POUNCY DID NOT COMMIT THE OFFENSES AND WAS NOT
         INVOLVED.

Defendant Pouncy was inculpated in the offenses and ultimately convicted on the

basis of bargained-for-testimony from Wayne Grimes, who claimed that he, Defendant

Pouncy, and another individual by the name of Tiakawa Leondis-Terrel Pierce were

apart of schemes to carjack people. Wayne Grimes, testified that he, Defendant

Pouncy, and Tiakawa Leondis-Terrel Pierce got together on September 29, 2005 with the

intentions to take Defendant Pouncy to purchase a vehicle. He testified that once all

three of them arrived at the destination on Richfield Rd, Defendant Pouncy did all of

the talking and they eventually left with two white males trailing them in a Ford

pickup truck with a trialer carrying a Camaro attached. Wayne Grimes, testified that

they headed north down Dort Hwy., and eventually stopped at a Sunoco gas station at

the corners of Dort Hwy., and Carpenter Rd. Wayne Grimes testified that while they

were at the gas station this is when Mr. Pierce and Defendant Pouncy began to

pressure him into taking the vehicles and he thereby made the decision to carry out

the carjackings due to Defendant Pouncy's and Mr. Pierce's encouragement.

Wayne Grimes, continued to testify that they departed from the Sunoco gas

station and headed to Kellar Rd., out in Mt. Morris, Mi, where based on the pressure

and encouragement of Mr. Pierce and Defendant Pouncy, he followed their requests and

carjacked and robbed Earl Brady and Patrick Wendell of their cell phones and

vehicles.

Then Wayne Grimes, went on to testify that again on October 11th, 2005 he, Mr.

Pierce, and Defendant Pouncy got together again between 7:00 am and 12:00 pm. Wayne

Grimes testified that once they got together they all stayed together the entire time

and never spilt up. Wayne Grimes testified that while they were together they drove

around the City of Flint, Mi aimlessly looking at a newspaper plotting to carjack

people. Wayne Grimes testified that while looking at the newspaper Defendant Pouncy called someone about purchasing a car and eventually told him to take him out to Fenton, Michigan. Wayne Grimes then testified that during that entire day they only stopped at a gas station to get gas one or two times, but they did not stop anywhere else. Wayne Grimes testified that the only other stop was at the Sandstroms' house out in Fenton, Mi where Defendant Pouncy exited the vehicle to speak with the Sandstroms. Wayne Grimes testified that a short time after their arrival and after Defendant Pouncy spoke with the Sandstroms, he approached him and Mr. Pierce and told them to follow him back to Flint, Mi. Wayne Grimes testified that he observed Defendant Pouncy enter a white Cadillac with a white male passenger as Defendant Pouncy drove the white Cadillac back to Flint, Mi leading the three car caravan because the white male's wife was trailing Wayne Grimes in a red Corvette. Wayne Grimes testified that once they made it back to Flint, Mi they entered Mt. Morris Township and stopped at a BP gas station on the corners of Clio and Coldwater Rds. Wayne Grimes testified that after they were done at the gas station the three car caravan headed back to the same location on Kellar Rd, once there, he testified that Defendant Pouncy exited the white Cadillac and went to speak with someone inside of the home on Kellar Rd. Wayne Grimes, testified that this incident went real quick, like less than thirty seconds, he said he was in his vehicle listening to music then heard a loud scream and he looked up and seen Defendant Pouncy standing next to the car. So his first instinct was to cover up his license plate and leave. He testified that he left and spoke with Defendant Pouncy the Next morning and was arrested about two hours later. (T 1-26-06, 104-143; 1-27-06, 11-90).

Although Defendant Pouncy, Wayne Grimes, and Tiakawa Leondis-Terrel Pierce were all charged with offenses related to the September 29, 2005 and October 11, 2005 carjackings and armed robberies, however, at the time of Defendant Pouncy's trial only he and Wayne Grimes had been apprehended and in custody at that time. Defendant

Pouncy's codefendant Mr. Pierce was still at large at the time of his trial and was not apprehended until after Defendant Pouncy was convicted and sentence. Codefendant Pierce was interviewed by the defense after he was apprehended and it was discovered that he possessed personal knowledge concerning the carjackings and armed robberies which occurred on September 29, 2005 and October 11, 2005.

Codefendant Pierce, possesses information about the September 29, 2005 and October 11, 2005 carjackings and armed robberies which is favorable to Defendant Pouncy and is ultimately exculpatory. Codefendant Pierce, admits that he was with Wayne Grimes, both on September 29, 2005 and October 11, 2005. Codefendant Pierce, know who the third party was who was with him and Wayne Grimes on both September 29, 2005 and October 11, 2005 Codefendant Pierce is willing to come forward and testified that on September 29, 2005 he was walking down the street at approximately 10:00 am and he noticed a friend's car riding down the street. As the car stopped he approached the car and he seen that his friend Wayne Grimes, was in the car. He got up to the car and Wayne Grimes, asked him if he had anything to do and he told him "no". At that time Wayne Grimes asked him if he could drive his car because he was about to go purchase another car. Mr. Pierce, asked Wayne Grimes what kind of car he was about to buy and he said an "oldschool Camaro". So Mr. Pierce asked Wayne Grimes, why did he need him to drive since he had had their other friend Jacob Woods in the car with him. Mr. Pierce said that he was going to be getting an oldschool Camaro and a truck, so he needed him to drive his beige colored Dodge Intrepid, while he drive the truck and Jacob Woods drive the Camaro. So he agreed and rode along. Mr. Pierce said they stopped at a fabricating race car shop on Richfield Rd. and met two white men who was driving a Ford pickup truck with a trailer that was carrying a Camaro attached to it. When they arrived Jacob Woods got out and discussed the sale of the cars with the two white men. After Jacob Woods got done talking, Mr. Pierce, Wayne Grimes, and Jacob Woods got back into Wayne Grimes, car and started driving north

down Dort Hwy until they came to a stop at a gas station at the corners of Dort Hwy and Carpenter Rd   Jacob Woods got out and paid for the gas while Wayne Grimes, pumped the gas. After Wayne Grimes, got done pumping the gas all three of them was now in the car again and Jacob Woods started talking about stealing the Camaro and the truck from the two white men and Wayne Grimes, agreed and said that him and Jacob Woods would take the cars on Kellar Rd., out in Mt. Morris, Mi. So they proceeded to Kellar Rd., out in Mt. Morris, Mi. Once they got there Wayne Grimes and Jacob Woods got out of the car and Wayne Grimes told me [Mr. Pierce] to meet him at his house. So I [Mr. Pierce] left and went to his [Wayne Grimes'] house on Kermit Street, then Wayne Grimes and Jacob Woods pulled up about 15 minutes later in the pick up truck with the Camaro attached. Wayne Grimes parked the truck in his garage and then they all left and Wayne Grimes and Jacob Woods dropped me [Mr. Pierce] off.

Codefendant Pierce then said again on October 11, 2005 he, Wayne Grimes, and Jacob Woods got together between 8:00 am and 8:30 am. He said they started out the day just riding around listening to some music. After riding around they stopped at a gas station to get some gas then Jacob Woods came out with a  newspaper and said that he had an appointment with some people in Fenton, Michigan concerning a Cadillac. Jacob Woods, said that he had forgotten the peoples' who he was supposed to be meeting, phone number so he looked it up in the newspaper and called them while they were in the car. The people gave Jacob Woods direction on how to get to their home, they got on the highway between 2:50 pm and 3:10 pm, but they got lost several times so Jacob Woods kept calling for more and more directions. They was traveling for about 2 and a half hours before they arrived at a house in a gated community in Fenton, Michigan. They got there and Jacob Woods got out of the car and spoke with a white male and female for about 10 minutes and then he came over to the car and told Mr. Pierce and Wayne Grimes, to follow him back to Flint, Michigan. Jacob Woods, got into a white Cadillac with a white Cadillac with a white male and they followed him

while a red Corvette trailed them, which was being driven by a white female. This time they didn't get lost so it did not take long to make it back to Flint, Mi. They came back to Flint, Michigan and eventually entered Mt. Morris, Mi and stopped at a BP gas station at the corners of Coldwater and Clio Rds. After they left the gas station they all went on Kellar Rd,, in Mt. Morris, Michigan again and Jacob Woods pulled into a house's driveway and walked up to the door and spoke with someone inside of the house. After Jacob Woods finished talking him and the white male approached the red Corvette and then the lady stepped out then Mr. Pierce seen Wayne Grimes, got out of his car and before Wayne Grimes, got to where Jacob Woods was at with the white male and female, Mr. Pierce then heard a scream and he seen the people run in some woods, then Wayne Grimes jumped in the red Corvette and pulled off fast down Kellar Rd. Mr. Pierce said he left and went to Wayne Grimes' house and left his car there. Mr. pierce said he spoke with Jacob Woods and Wayne Grimes the next day.

Codefendant Pierce outlined all of the above in a signed affidavit and he further said that he knows both Jacob Woods and Omar Rashad Pouncy and that they are two different people. He unequivocally stated that Jacob Woods was the person who was with him and Wayne Grimes on both September 29, 2005 and October 11, 2005. He clearly stated that Defendant Pouncy was not with him and Wayne Grimes and Jacob Woods and that Defendant Pouncy had absolutely nothing at all to do with the carjackings and armed robberies.

Codefendant Pierce further stated that he is willing to testify to what is contained in the affidavit at any hearing or trial, at the time of Defendant Pouncy's trial he was out of touch and he did not know that there was a warrant out for his arrest nor did he know that Defendant Pouncy was being accused for carjackings and armed robberies that Wayne Grimes and Jacob Woods commited and Defendant Pouncy had nothing to do with. Mr. Pierce said in his affidavit that had he known that Defendant Pouncy was being accused for the carjackings and armed robberies that Wayne Grimes

and Jacob Woods did he would have came forward with the information in his affidavit earlier. (See Signed Affidavit of Tiakawaw Leondis-Terrel Pierce attached) Appendix R).

Based on the newly discovered affidavit of Mr. Tiakawaw Leondis-Terrel Pierce, which clearly exculpates Defendant Pouncy, and reveal the true perpetrator's identity (Jacob Woods), Defendant Pouncy is entitled to a new trial because the testimony of Mr. Pierce could definitely have had cast doubt in the minds of the jurors as to Defendant Pouncy being the perpetrator of the carjackings and armed robberies which means there's a reasonable probability that the outcome of Defendant Pouncy's trial would be different if a new jury would hear Mr. Pierce's exculpatory testimony.

## STANDARD OF REVIEW:

Since the newly discovered affidavit of Mr. Pierce provides exculpatory information which indicates that Defendant Pouncy is actually innocent this issue must be reviewed De Novo. Sitz v Department of State Police, 443 Mich 744; 506 NW2d 209 (1993).

## DISCUSSION:

The standard for granting a new trial on the basis of newly discovered evidence was stated in People v Bradshaw, 165 Mich App 562, 567 (1988):

> "For a new trial to be granted on the basis of newly
> discovered evidence, it must be shown that: (1) the evi-
> dence itself, not merely its materiality, was newly dis-
> covered; (2) the newly discovered evidence was not cum-
> mulative; (3) including the new evidence upon retrial
> would probably cause a different result; (4) the party
> could not, using reasonable diligence, have discovered
> and produced the evidence at trial." See also People v
> Cress, 468 Mich 678, 692 (2003).

In People v Terry Burton, 74 Mich App 215 (1977), the defendant was convicted of felony murder for the killing of a gas station attendant during a robbery which was allegedly planned and executed by a political group named the Republic of New Africa.

191

The defendant denied any involvement. After the trial, two of his sisters testified at the hearing that they were involved in the planning and that the defendant was not involved. The codefendant also testified that the defendant was not involved in the offense. The Court of Appeals in Burton held that this evidence was newly discovered, and could not have been discovered with reasonable diligence, because the sisters had deliberately withheld it from the defense to avoid risk to themselves, because they assumed the defendant would be acquitted, and because the co-defendant could have invoked the right to remain silent if called to testify at the trial. The Court also held that the new evidence was obviously not cummulative to any of the trial testimony. Finally, the Court found that a new trial was necessary given that the newly discovered evidence could have significant impact on a second jury by creating a reasonable doubt as to the defendant's guilt. Id. at 223.

A similar result was reached in People v Bell, 74 Mich App 270 (1977), the Court ruled that the newly discover evidence of the arresting officer's perjury would render a different result probable at a retrial.

In People v Mechura, supra, the Court of Appeals held that the trial court abused its discretion in denying a defendant's motion for a new trial in a first degree murder case. The defendant had unsucessfully claimed self-defense. A witness subsequently testified at the hearing on the motion for new trial that the decedent's girlfriend had confessed to giving perjured trial testimony that the decedent was unarmed. In addition, the results of a polygraph test supported the testimony of the witness at the motion hearing.

In People v Mc Allister, 16 Mich App 217, 167 NW2d 600 (1969), the Court held "on motion for new trial on grounds of newly discovered evidence, affidavit of another that he and accomplice committed the crime and that defendant did not participate was newly discovered, was not cumulative, and went to the heart of defendant's defense that he did not commit the crimes, and new trial should have been

granted on that basis.

In the instant case, the newly discovered evidence is exculpatory, non-cumulative, and would produce a different result because Mr. Pierce's affidavit undermines the prosecution's theory that Defendant Pouncy was involved in the September 29, 2005 carjackings and armed robberies and it also undermines the prosecution's theory that he was the perpetrator of the October 11, 2005 carjackings and armed robberies. There was no physical evidence tying Defendant Pouncy to the crimes, and the prosecution's case was insubstantial at best because the dispositive factor was eyewitness identification. Mr. Pierce's affidavit just does not exculpate Defendant Pouncy, but the affidavit also reveals the true perpetrator's identity. Mr. Pierce says that Defendant Pouncy was not the third person who was with him and Wayne Grimes on September 29, 2005 and October 11, 2005, but it was an individual by the name of Jacob Woods. This is very believable because the prosecution's witness initially initially identified the perpetrator as Jacob Woods. On cross-examination the prosecution's witness Joseph Scott Davis testified that he knew the person (perpetrator) name to be <u>Jacob Woods</u>. The following occurred in its pertinent part:

By Defendant Pouncy:

> Q: Okay do you remember what the name you told this person that you, that, that you knew this person of?
>
> A: <u>Jacob Woods.</u>
>
> Q: Jacob Woods?
>
> A: Yes.
>
> Q: Where did you say you knew this subject from?
>
> A: <u>Because I was told that he was another associate of mines, little brother.</u>
>
> Q: Okay did you recall, 'cause I have it here in the police report, that you stated you knew this person from you alls a part of the same racin' circuit, <u>Jacob Woods</u> or Sammy Wood or whoever—
>
> A: Yeah.

Q: this is. You remember that?

A: Yeah.

Q: So you, so you knew this person then right?

A: Excuse me for a second.

> The Witness: Can I answer him like, I'm tryin'
> to come up with a way of answering these ques-
> tions.

> The Court: Just answer it. Give him your answer.

> The Witness: All right. You, you came to me as
> Jacob Woods and you said to me hi I'm Jacob, you
> remember me, Sammy's little brother? (T 1-24-06,
> 236-237).

The prosecution's witness testified that the person who came to his place of business making inquiries about the Camaro on September 29, 2005 and left with Earl Brady and Patrich Wendell introduced himself as Jacob woods associates Jacob Woods Joesph Scott Davis' associates' little brother. Combined with the testimony of Joesph Scott Davis indicating that the perpetrator introduced himself as Jacob Woods and the unequivocal testimony of codefendant Pierce that Jacob Woods and **not** Defendant Pouncy was the individual who came up with the plan to carjack the people and encouraged Wayne Grimes to carjack the people on September 29, 2005 it's a reasonable probability that Mr. Pierce's testimony which is newly discovered would have sigif- icant impact on a second jury by creating a reasonable doubt as to Defendant Pouncy's guilt.

Moreover, Mr. Pierce's affidavit also exculpates Defendant Pouncy concerning the carjackings and armed robberies which occurred on October 11, 2005, because his affidavit also unequivocally indicates that Jacob Woods and **not** Defendant Pouncy committed the carjackings and armed robberies on October 11, 2005. Mr. Pierce's affidavit unequivocally states that it was Jacob Woods who was with him and Wayne Grimes. Mr. Pierce's affidavit unequivocally state that on October 11, 2005 him, Wayne Grimes, and the third party Jacob Woods all got together between 0:00 am and

8:30 am. This aspect of the affidavit is also exculpatory to Defendant Pouncy because Defendant Pouncy's tether report indicates that he did not leave home until 09:16 (9:16 am), which is after the time that Jacob Woods, Mr. Pierce, and Wayne Grimes got together. (See attached tether report attached as Appendix S). Mr. Pierce's affidavit unequivocally states that on October 11, 2005 they all got on the highway headed to Fenton, Michigan between 2:50 pm and 3:10 pm. This aspect of the affidavit is also exculpatory because Defendant Pouncy's tether records also shows that while Mr. pierce, Wayne Grimes, and Jacob Woods were on the highway during their hour and a half hour drive after between 2:50 pm and 3:10 pm that he was in and out of his home. If Mr. Pierce, Wayne Grimes, and Jacob Woods got on the highway between 2:50 pm and 3:10 pm and they traveled for about 2 and a half hours that means that they were on the highway headed to Fenton, Michigan at 14:49 (2:49 pm), 14:50 (2:50 pm), 16:36 (4:36 pm), and 16:40 (4:40 pm) which are the times when Defendant Pouncy was in and out of his home not riding around heading to Fenton, Mi with Mr. Pierce, Wayne Grimes, and Jacob Woods. So it's definitely a reasonable probability that the newly discovered evidence of Mr. Pierce's exculpatory affidavit could have a significant impact on a second jury by creating a reasonable doubt as to Defendant Pouncy's guilt. The defense obviously could not have produced Tiakawaw Leondis-Terrel Pierce at the time of trial due to him still being at large at the time of Defendant Pouncy's trial, which means that the defense could not interview him to discover what he knew about the incidents. The police could not even track him down despite having a warrant out for his arrest. Had the defense been able to locate him during the time of trial he would have been produced at trial and his testimony would have exculpated Defendant Pouncy.

In the recent case of Mathis v Berghuis, ____ F.3d ____ (CA 6, # 02-1665, 1-27-04), the Sixth Circuit Court of Appeals held that the defendant was entitled to a new trial based on newly discovered impeachment evidence. The Court found that there was

a reasonable probability that the result of the proceeding would have been different, and that the defendant was not obligated to demonstrate that the admission of the newly discovered evidence would have resulted in a different trial, or to prove that the complainant's prior allegations were false. The Sixth Circuit concluded that the Michigan court's decision that suppression of the impeachment evidence was not grounds for a new trial was contrary to clearly established federal law. See also House v Bell, 371 F.3d 767 (CA 6, 2002).

The trial court must conduct an evidentiary hearing for this issue. Where non-record evidence forms the basis for a claim of newly discovered evidence, an evidentiary hearing must be held. People v Jackson, 91 Mich App 636, 639 (1979); People v Terry Burton, supra. The Court of Appeals in People v Richard Allen Green, unpublished opinion (# 242832, January 27, 2004) held that the trial court abused its discretion in failing to hold an evidentiary hearing on the defendant's claim of newly discovered evidence.

In light of the newly discovered evidence, a new trial is necessary to prevent a miscarriage of justice and to ensure Defendant Pouncy's right to due process and to present a defense. MCR 2.611 (A)(1)(f); MCR 6.431 (B); People v Johnson, 183 Mich App 305 (1990); US Const Am VI. XIV.

XVII.    THE TRIAL COURT ARBITRARILY DEPRIVED
         DEFENDANT POUNCY OF HIS RIGHT TO PRESENT A
         DEFENSE WHEN IT BARRED DEFENDANT POUNCY FROM
         CALLING WAYNE GRIMES DURING THE DEFENSE SIDE
         OF THE CASE "TO GET DOWN TO THE TRUTH".

During trial defendant pouncy relied on more than one defense to counter each witnesses' allegations. Defendant Pouncy relied on a mistaken identification and alibi defense to defend against the allegations made by the complainants, because they did not know Defendant Pouncy. However, when it came down to defending against the prosecution's star witness's testimony Wayne Grimes, Defendant Pouncy's defense was that he was fabricating his story and falsely implicating Defendant Pouncy.

During trial Wayne Grimes, the prosecution's star witness alleged that on October 11, 2005 (the date the Sandstroms' carjacking allegedly occurred on), him and Defendant got together between 7:00 am and 12:00 pm, that day. Wayne Grimes, testified that on October 11, 2005 once him and Defendant Pouncy got together that day, they stayed together the entire day and did not separate from each other. He testified that while they were together they drove around the City of Flint aimlessly, looking at a Flint Journal newspaper searching for people to carjack. He testified that before they made it to the complainants' home in Fenton, Michigan they never separated and the only stop they made was at a local gas station to get gas and nowhere else. (T 1-27-06, 78-80). So in other words Wayne Grimes testified that on October 11, 2005 him and Defendant Pouncy was together riding around Flint, Michigan aimlessly all that day and they only stopped at a gas station and nowhere else.

After learning of Wayne Grimes' allegations that him and Defendant Pouncy was together all day riding around Flint, Michigan aimlessly plotting to carjack people, Defendant Pouncy attempted to defend against the allegations and prove that Wayne Grimes was fabricating his story and falsely implicating Defendant Pouncy in the crime charged, by confronting him with Defendant Pouncy's BI Incorporated Daily Summary Tether Report from October 11, 2005.

197

The tether report showed that Defendant Pouncy was in and out of his home during the time Wayne Grimes alleged that they were together out riding around Flint, MI aimlessly plotting to carjack people. The report showed that on October 11, 2005 Defendant Pouncy left his home at 09:16 and then returned at 14:49 (2:49 pm) which was after Wayne Grimes claimed they got together and during the time he claimed they were out riding around Flint, MI aimlessly plotting to carjack people and making only one stop at a gas station. The tether report also showed that Defendant Pouncy then left his home at 14:50 (2:50 pm) and then he returned home at 16:36 (4:36 pm) which was also during the time Wayne Grimes claimed that him and Defendant Pouncy was together driving around Flint, MI aimlessly plotting to carjack people. Furthermore, the tether report showed that Defendant Pouncy left home at 16:40 (4:40 pm) and then finally returned at 21:51 (9:51 pm). (T 1-31-06, 127-130). The tether report clearly showed that Defendant Pouncy was in and out of his home during the time Wayne Grimes placed Defendant Pouncy with him out riding around Flint, MI aimlessly plotting to carjack people. (BI Incorporated Daily Summary Tether Report, Attached as Appendix S). However, when Defendant Pouncy attempted to prove that Wayne Grimes was fabricating his story and falsely implicating him in the crimes charged, by using the exculpatory tether report, the prosecutor objected and the trial court sustained the objection and ruled that Defendant Pouncy would first need to lay a foundation for the report and have it authenticated before it could be used. The following occurred in its pertinent part:

> Q: [DEFENDANT POUNCY] So you and these people
> was together that whole day, right? No
> splitting up, right?
> A: [WAYNE GRIMES] Yes.
> Q: Just riding around, now your first stop
> was where? During that day was it in Fenton,
> Michigan?
> A: I don't remember our first stop. I just
> know we was riding around. Probably stopped

and get some more gas.

Q: So you stopped - okay. Are you aware that I was on tether at that time? On October 11?

A: Yes.

Q: Are you aware that tether tracks where you're at?

A: Yes.

Mr. Larobardiere: Object.

The Court: Sustain I would sustain the objection. I would strike the question and the answer because you have to lay a foundation for his knowledge of the tether system. It hasn't been done yet.

By Mr. Pouncy:

Q: Okay. What makes you know that I was on tether at this - on October 11?

A: Because you always said you had to be in the house at 9:00.

Q: I had to be in the house at 9:00?

A: 9:00 or 10:00.

Q: Oh, you're not sure? Yes? Does - do you know what this is? The Daily Summary Report of the-

Mr. Larobardiere: Object, Judge. It calls for hearsay and lack of foundation for this witness.

Q: --Michigan Department of Corrections.

The Court: Just one second. I'll have to sustain as to lack of foundation at this point. So, would you please remove that off the screen for right now, Mr. Pouncy?

Mr. Pouncy: Yes.

The Court: And let Mr. Brezenski explain to you what's going on here.

By Mr. Pouncy:

Q: Okay. So you do state that I was riding

around with you all day that day, right?

A: Yes.

Mr. Pouncy: I have no further questions of
this liar. (T 1-27-06, 80-81).

As the record clearly shows Defendant Pouncy attempted to use his exculpatory tether report to show that Wayne Grimes had fabricated his story and was falsely implicating Defendant Pouncy in the crimes charged, because the tether report would have showed that Defendant Pouncy was in and out of his home at the time Wayne Grimes claimed that him and Defendant Pouncy was together out riding around Flint, MI aimlessly plotting to carjack people, but the prosecutor objected on the basis of hearsay and the lack of a foundation being laid for the tether report because no one had testified that the report was an authentic document to the extent of it being true and accurate, so the trial court sustained the objection and ordered Defendant Pouncy to remove the tether report from the overhead projector and to follow up with his stand-by counsel as how to proceed concerning how to use the exculpatory tether report document to show that Wayne Grimes had fabricated his story and was falsely implicating Defendant Pouncy in the crime charged.

Defendant Pouncy accepted the trial court's ruling and his advice to let Mr. Breczenski (stand-by counsel) explain how to proceed. Mr. Breczenski, explained that in order to use the tether report he would first have to have the officer in charge of the tether department, Ms. Meoashy Proby, verify that the tether report document was true and accurate, thereby having it authenticated and admitted into evidence. Mr. Brezenski, further advised Defendant Pouncy that once the tether report document was authenticated and admitted into evidence he would then have to call Wayne Grimes, to the stand during the defense side of the case.

After Mr. Breczenski, finished explaining to Defendant Pouncy, how to proceed concerning how he would have to go about using the tether report document to prove that Wayne Grimes was fabricating his story and falsely implicating defendant Pouncy in the

charged crimes, Defendant Pouncy discontinued his cross-examination of Wayne Grimes, without having the opportunity to use the tether report to prove that he was fabricating his story and falsely implicating Defendant Pouncy in the crimes charged. (T 1-27-06, 81).

Following Mr. Breczenski's advice on how to authenticate and have the tether report admitted into evidence so he could use it to prove that Wayne Grimes was fabricating his story and falsely implicating him in the charged crimes, Defendant Pouncy called the officer in charge of the tether division to the stand. Sergeant Meaoshy Proby testified that the tether report was true and accurate, thereby authenticating and laying the required foundation needed to use the tether report to prove that Wayne Grimes was fabricating his story and falsely implicating Defendant Pouncy in the charged crimes, and the trial court accepted and admitted the tether report into evidence. (T 1-31-06, 115-137).

After the tether report was properly admitted into evidence and a foundation was laid Defendant Pouncy, sought to call Wayne Grimes to the stand since it was the defense side of the case, to present his defense via the tether report and thereby prove that Wayne Grimes was fabricating his story and falsely implicating Defendant Pouncy in the charged crimes, because the tether report clearly showed that Defendant Pouncy was indeed in and out of his home at the time Wayne Grimes alleged he was out riding aroung Flint, MI aimlessly plotting to carjack people. However, once Defendant Pouncy sought to call Wayne Grimes to the stand the trial court prevented him from calling this witness to the stand, **"to get down to the truth",** the court ruled that Defendant Pouncy had already had an adequate opportunity to question him about everything, which was not true. The following occurred in its pertinent part:

> **The Court:** Please have a seat everyone. We're
> still on the record. Now I want to take up
> first of all the issue about Wayne Grimes.
> You had indicated that you wanted to recall
> Mr. Grimes is that correct?
> **Mr. Pouncy:** Yes.

**The Court:** And what did you want to recall him about?

**Mr. Pouncy:** About just really gettin' more down to the truth of this situation you know. It's just a couple questions I haven't asked him. I wasn't gonna be nowhere near as long as I was last time. I know I was a long time.

**The Court:** Yeah I'm afraid you've had your opportunity to question him and everyone else and this Court's been very patient. I've sat and allowed you to go on-

**Mr. Pouncy:** (Inaudible).

**The Court:** Just one second please. I've been very patient with you. I've allowed you to go on and on with every witness about every detail and about everything that either was relevant or not relevant in this case to give you an opportunity to present your case. And taken into account that you're not a lawyer, even though I advised you that you, if you proceeded to represent yourself I was gonna have to hold you to the same standard as a lawyer. I really haven't done that because I've given you a lot of leeway throughout this entire trial that I certainly would not have given to a lawyer. And I've allowed your mom to testify as an alibi while she sat in court through the entire trial and generally that is somethin' that you know you have to give a notice to the Prosecutor way in advance for. I've given you an opportunity to question every witness that's came in here and basically let you question 'em until pretty much there's just nothing else to question 'em about, including Mr. Grimes. So I just don't see any basis to uh, to have us

202

> to continue the same litany all over again.
> Now is there anything you need to bring to my
> attention Mr. Breczenski? (T 1-31-06, 268-
> 270).

As the record reflects the trial court arbitrarily deprived Defendant Pouncy of his right to present a defense when it prevented Defendant Pouncy from calling Wayne Grimes during the defense side of the case so Defendant Pouncy could use the then properly admitted exculpatory tether report to prove that Wayne Grimes was fabricating his story and falsely implicating Defendant Pouncy in the charged crimes.

**Standard Of Review:**

In In re Hourley, 238 Mich App 509, 511; 639 NW2d 50 (1999), the Court explained that the constitutional question whether defendant was denied his right to present a defense is reviewed de novo.

**Discussion:**

Criminal defendants have a fundamental right to present the testimony of witnesses in their defense, a right grounded in the fifth and sixth amendments. See Taylor v Illinois, 484 US 400, 408-09, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); Washington v Texas, 388 U.S. 14, 18-19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). A defendant cannot establish a "violation" of this right to offer testimony merely by showing that the court deprived him of that testimony; rather, he must "at least make some plausible showing of how [the] testimony would have been both material and favorable to his defense." United States v Valenzuela-Bernal, 458 US 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). Arbitrarily excluding proffered testimony can violate the right to present a defense where there is no claim of a discovery violation against a defendant proffering a witness's testimony and that testimony is otherwise admissible under the rules of evidence. While "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," United States v Scheffer, 523 US 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998); see also Chambers

v Mississippi, 410 US 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Defendant Pouncy contends here that the trial court did not properly rely on any cognizable evidentiary rule in excluding his proffered evidence, when he prevented Defendant Pouncy from calling Wayne Grimes to the stand during the defense side of the case to use the then properly admitted tether report to prove that Wayne Grimes was fabricating his story and falsely implicating Defendant Pouncy in the charged crimes.

Whether rooted in the Due Process Clause of the Fifth Amendment or in the Compulsory Process Clause of the Sixth Amendment, the Constitution guarantees criminal defendants the right to present a defense. See United States v Almonte, 956 F.2d 27, 30 (2d Cir. 1992); see also Chambers, 410 US at 302, 93 S.Ct 1049. ("Few rights are more fundamental than that of an accused to present witnesses in his own defense.")

In the case at bar, the trial court erroneously relied on facts which did not even exist to prevent Wayne Grimes from being called to the stand during the defense side of the case, so that Defendant Pouncy could use his tether report to prove that Wayne Grimes was fabricating his story and falsely implicating Defendant Pouncy in the charged crimes. The trial court first held that, Defendant Pouncy had the opportunity to question **"every witness about every detail and about everything that either was relevant or not relevant in this case to give you an opportunity to present your case."** First, the trial court must have, obviously, forgotten that Defendant Pouncy **did not** have the opportunity to question Wayne Grimes about the tether report to prove that he was fabricating his story and falsely implicating Defendant Pouncy in the charged crimes while he was on the stand, which was during the prosecution's side of the case not during the defense's side of the case. While Wayne Grimes was on the stand during the prosecution's side of the case, Defendant Pouncy did not have the opportunity to question Wayne Grimes using the tether report to prove that he was fabricating his story and falsely implicating Defendant Pouncy in the charged crimes, because the trial court sustained the prosecutor's objection due to there being a lack of foundation laid for the tether report to use it at that time.

After Wayne Grimes was off the stand, after the prosecution rested its case, and during the defense side of the case Defendant Pouncy called the officer in charge of the tether division Sergeant Proby, to authenticate and lay a proper foundation for the tether report so he could use it to question Wayne Grimes to prove that he was fabricating his story and falsely implicating him in the charged crimes. But when Defendant Pouncy, sought to call Wayne Grimes during the **defense's side of the case** to use the **then properly admitted** tether report, in his defense, to prove that he was falsely implicating Defendant Pouncy in the charged crimes, by showing wayne Grimes that he had evidence (the tether report) on his side to show that it was **impossible** for Defendant Pouncy to have had been with him riding around Flint, Michigan aimlessly on October 11, 2005 planning to carjack people all day as Wayne Grimes claimed, because the tether report showed that he was in and out of his home, **not** out riding around Flint, MI simlessly with Wayne Grimes during the time he claimed, the trial court deprived Defendant Pouncy of his right to call witnesses during his side of the case, which ultimately prevented Defendant Pouncy from attacking the core of the prosecution's case.

Wayne Grimes, was the prosecution's star witness and he was the first person to implicate Defendant Pouncy in the charged crimes. The need to prove that this witness was fabricating his story and falsely implicating Defendant Pouncy in the charged crimes was imperative to Defendant Pouncy's defense concerning Wayne Grimes' testimony. In relation to Wayne Grimes' testimony, Defendant Pouncy's defense was that he was lying, period. Had the trial court not prevented Defendant Pouncy, from calling Wayne Grimes to the stand during the defense's side of the case, Defendant Pouncy would've been able to prove that he was indeed lying, by using the then properly admitted tether report to do so, The tether report was **clear and convincing exculpatory evidence,** because it showed that Defendant Pouncy was **not** out riding around Flint, MI aimlessly on October 11, 2005 planning to carjack people as wayne Grimes claimed, however the

tether report actually placed Defendant Pouncy elsewhere and not with Wayne Grimes, it showed that Defendant Pouncy was in and out of his home and not riding around with Wayne Grimes.

Had Defendant Pouncy been permitted to call Wayne Grimes during the defense's side of the case, Defendant Pouncy would have been able to use the tether report to prove that he was fabricating his story and falsely implicating Defendant Pouncy in the charged crimes. It is not inconceivable to conclude, but is very plausible and reasonable to conclude that once Wayne Grimes seen that Defendant Pouncy's tether report which placed him elsewhere (in and out of his home), and not riding around with him as he claimed planning to carjack people, Wayne Grimes would have came clean and openly confessed ,in open court, in front of the jury that Defendant Pouncy was not with him and did not commit the carjackings. Or at the very least it isn't inconceivable, but very plausible and reasonable to conclude that once Wayne Grimes would've seen that the tether report placed Defendant Pouncy elsewhere, (in end out of his home), and not with him as he claimed, Wayne Grimes would have changed his story and tried to form another story which would have contradicted his first story which would have possibly caused the jury to disbelieve his testimony and ultimately caused the jury to disregard his testimony as untrustworthy in light of the exculpatory tether report which placed Defendant Pouncy elsewhere. In either case, whether it been that Wayne Grimes came clean and confessed that Defendant Pouncy had nothing to do with the charged crimes after seeing the tether report or it been he changed his story after seeing the tether report, in the face of the exculpatory tether report that placed Defendant Pouncy elsewhere, Wayne Grimes' testimony would have been contradicted by clear, convincing, end undisputable evidence favorable to Defendant Pouncy's defense. Defendant Pouncy was definitely prejudiced by the trial court's arbitrary decision to prevent Wayne Grimes from being called to the stand by the defense during the defense's side of the case to allow Defendant Pouncy to use the then admitted tether reports to

prove that Wayne Grimes was fabricating his story and falsely implicating Defendant Pouncy in the charged crimes.

There was no significance in having the tether report authenticated and properly admitted through the officer in charge of the tether division, if the trial court was not going to allow Defendant Pouncy to use it for its initial intended purpose, which was to show that Wayne Grimes was falsely implicating him in the charged crimes, because the tether report placed Defendant Pouncy elsewhere.

The defense of proving that Wayne Grimes was lying thereby falsely implicating Defendant Pouncy in the charged crimes, would have attacked the core of the prosecution's case, and the trial court's prevention of Wayne Grimes being called by the defense during the defense's side of the case to prove that Wayne Grimes was indeed falsely implicating Defendant Pouncy cannot be viewed as harmless error. See United States v Ferrester, 60 F.3d 52, 64-65 (2d Cir. 1995) ("Error going 'to the heart' of a critical issue is less likely to be harmless.") (Citing United States v Tussa, 816 F.2d 58, 67 (2d Cir. 1987)). Reversal is required.

XVIII.  THE TRIAL COURT'S INSTRUCTION WHICH TOLD THE JURY THAT
AS A MATTER OF LAW THE COMPLAINANTS WERE INDEED ACTUALLY
"VICTIMS", TOOK AWAY ESSENTIAL ELEMENTS AWAY FROM THE
OFFENSES, OVEREMPHASIZED THE PROSECUTION'S THEORY, AND
ULTIMATELY INVADED THE PROVINCE OF THE JURY.

Defendant Pouncy was charged with a total of eleven counts, ranging from carjacking, armed robbery, and weapon charges. The evidence against Defendant Pouncy was merely the testimony of the prosecution's witnesses. The evidence was far from overwhelming, indeed, the Court of Appeals held that the evidence was simply "considerable", and not overwhelming. (See Court of Appeals Opinion, on Reconsideration, March 25, 2008, pg. 10).

Despite, an essential element of the prosecution's burden of proof and the offenses being whether or not a crime had actually occurred and whether or not they had committed against the **complainants**, the trial court effectively deprived the jury of its duty to determine whether or not a crime had actually occurred and whether the complainants were actually the individuals who the crimes were committed against, when it instructed the jury that the complainants, were indeed **"VICTIMS".** The following occurred in its pertinent part:

By the trial court:

> Members of the jury, the evidence and arguments in this case are finished. I'LL now instruct you on the law; that is I'll explain the law that applies to this case.
>
> Remember that you have taken an oath to return a true and just verdict, based only on the evidence and my instructions on the law...
>
> It is my duty to instruct you on the law. You must take the law as I give it to you.... At various times, I've already given you some instructions about the law. You must take all my instructions together as the law you are to follow. You should not pay attention to some instructions and ignore others.

> To sum up, it is your job to decide what the facts of
> the case are, to apply the law as I give it to you and,
> in that way, to decide the case. (T 2-1-06, 77-78).

The above clearly shows that the trial court informed the jury that anything he
told them during the instruction stage would only have been the have been the law of
the case. The above clearly shows that the trial court informed the jury that they
must take the law as it was given to them. The above also shows that the trial court
informed the jury that they must follow all of the instructions and not to ignore
any. Then the trial court went on to instruct the jury that as a matter of law the
complainants were actually victims. The following occurred in its pertinent part:

> I'm gonna now give you the elements of the offense of
> Armed Robbery. The Defendant is charged with the crime
> of Armed Robbery. To prove this charge, the prosecutor
> must prove each of the elements beyond a reasonable
> doubt. First, the Defendant used forced or violence
> against the complainants that have been named in the in-
> formation. Second, the Defendant did so while he was in
> the course of committing a larceny. A "larceny" is the
> taking and movement of someone else's property or money
> with the intent to take it away from that person per-
> manently. "In the course of committing a larceny" includes
> acts that occur in an attempt to commit the larceny or
> during the commission of a larceny, or in flight or
> attempted flight after the commission of the larceny, or
> in an attempt to retain possession of the property or
> money.
> Third, the "victims" were present while Defendant was in
> the course of committing the larceny. (T 2-1-06, 93-94).

When the trial court characterized the mere complainants as actual victims, this
characterization effectively informed the jury that as a matter of law Maria
Sandstrom, Thomas Sandstrom, Earl Brady, and Patrick Wendell had indeed had crimes
committed against them and thereby were victims. This took away essential elements

away from the charged offenses, overemphasized the prosecution's theory, and ultimately invaded the province of the jury. Moreover this limited the jury's consideration to a question of identification of the perpetrator of the crime, since when the trial court instructed that the complainants had indeed had crimes committed against them when he instructed as a matter of law they were victims, left considering whether the charged crimes were actually committed unnecessary. Reversal is required.

## STANDARD OF REVIEW:

The de novo standard of review applies to claims of instructional error. People v Hall, 249 Mich App 262, 269 (2002), under a test that requires the reviewing court to review the jury instructions in their entirety to determine if error requiring reversal occurred. People v Whitney, 228 Mich App 230, 252 (1998).

## DISCUSSION:

In the criminal prosecution of one charged with the commission of a felony, the defendant has an absolute right to a jury determination upon all essential elements of the offense, This right emanating from the criminal defendant's constitutional right to trial by jury. (On the meaning of trial by jury, See Patton v United States, 281 U S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930). Art III, § 2, cl. 3, of the United States Constitution provides that "The Trial of all Crimes, except in Cases of Impeachment, shall be by jury ***." On this sec, e g., District of Columbia v Clawans, 300 U S. 617, 57 S.CT. 660, 81 L.Ed. 843 (1937)), is neither depleted nor diminished by what otherwise might be considered the conclusive or compelling nature of the evidence against him. This right is personal to the defendant, and, like his right to a jury trial, is one which he, and he alone, may waive, (where the accused intelligent and competent he may, with the approval of the court, waive a jury trial

even though without the advice of counsel. Adams v United States ex rel. McCann, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed 268 (1943)), furthermore, in a situation wherein an understandingly tendered waiver is not forthcoming from the defendant, under no circumstances may the trial court usurp this right by ruling as a matter of law on an essential element of the crime charged.

A plea of not guilty by an accused to an indictment or information charging a criminal violation places "in issues" all essential averments contained therein. Once the defendant has entered a plea of not guilty, everything material to a finding of his guilt is "in controversy". Thus under the system of jurisprudence, it is technically possible for a criminal defendant to enter a plea of not guilty, introduce little or no evidence in his own defense, and rely exclusively on his presumption of innocence and the possible inability of the prosecution to prove his guilt beyond a reasonable doubt. Thereupon, "guilt is determined by the jury, not the court." United Brotherhood of Carpenters and Joiners of America v United States, 330 U.S. 395, 410, 67 S.Ct 775, 783, 91 L.Ed. 973 (1946). As was said in Roe v United States, 287 F 2d 435, 440 (5th Cir. 1961):

> "* * * (N)o fact, not even an undisputed fact, may be determined by the Judge. The plea of not guilty puts all all in issue, even the most patent truths. In our federal system, the Trial Court may never instruct a verdict either in whole or in part."

Schwachter v United States, 237 F.2d 640 (6th Cir. 1956), was a prosecution for selling a stolen automobile moving in interstate commerce, knowing the same to have been stolen. The trial judge, apparently of the opinion that the Government had proved that the automobile in question was in interstate commerce at the time it was sold, ruled as a matter of law as to the fact, the same being an essential element of the crime charged. Reversing on this issue, the court said:

> "The rule is settled that in a criminal case the judge

211

may not direct a verdict of guilty no matter how
conclusive the evidence. United Brotherhood of
Carpenters and Joiner of America v United States, 330
U.S. 395, 408, 67 S.Ct. 775, 91 L.Ed. 973. **It is
necessary that the Government prove to the jury beyond a
reasonable doubt every essential element of the offense
charged.** Christoffel v United States, 338 U.S. 84, 89,
69 S.Ct. 1447 93 L.Ed. 1826; Boatright v United States,
8 Cir., 105 F.2d 737, 740. This includes the fact in
this case that the car was a part of interstate commerce
when the defendant sold it. Wolf v United States, 7
Cir., 36 F.2d 450, 451. The trial judge may not direct
the jury to find a controverted material fact against
the defendant. Konda v United States, 7 Cir., 166 F. 91.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"But the general rule is settled that the trial judge in
criminal case can not weigh the evidence or judge the
credibility of the witnesses and take from the jury a
controverted question of material fact, no matter how
strongly he may be of the opinion that the evidence has
established that fact beyond a reasonable doubt. United
States v Gallin, supra, 3 Cir., 166 F.2d 123, 126,
certiorari denied 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed.
1151; Sullivan v United States, 85 U.S. App. D.C. 409,
178 F.2d 723, 725; Konda v United States, supra, 7 Cir.,
166 F. 91, 93; United Brotherhood of Carpenter and
Joiners of America v United States, supra, 330 U.S. 395,
408, 67 S.Ct. 775, 91 L.Ed. 973. See Smith v United
States, 6 Cir., 230 F.2d 935, 939" (At 644 of 237 F.2d)

In Carothers v United States, 161 F.2d 718 (5th Cir. 1947), defendants were
charged in 26 counts with violations of the Emergency Price Control Act of 1942 for
willfully selling a particular service at a price in excess of the designated
ceiling. On appeal, the conviction gained at the trial was reversed, the court
holding that the trial judge erred in ruling as a matter of law on an essential
element of the offense charged, the value of the maximum price. The court said:

212

"This assumption, that the price had been established as
matter of law at less than the price the indictment
charged defendant with receiving, put the judge in the
position of deciding a fact issue material to
defendant's conviction, instead of submitting it to the
jury for its determination, and thus depriving the
defendant of his constitutional right of trial by jury.

\* \* \* \* \* \*

"This being a criminal case, if, as the United States
claims, the evidence had clearly and beyond question
established what the maximum price was, this would not
render the error harmless, for in such a case the court
may not direct a verdict as to any fact." (At 722.)

Prosecution for possession of non-taxpaid whiskey was involved in United States
v McKenzie, 301 F.2d 880 (6th Cir. 1962). At the trial, the judge had ruled as a
matter of law that the fact of possession existed, and stated that the only issue
remaining was the identity of the persons who had such possession. Holding that it
was necessary that the Government prove to the jury beyond a reasonable doubt every
essential element of the offense charged, the Sixth Circuit reversed, saying:

"\* \* \* It was necessary in this case that the Government
prove not only that appellant was driving the car, but
also prove that the circumstances were such as to con-
stitute possession by the appellant of the contents of
cardboard carton and that the carton contained non-tax-
paid whiskey. Schwachter v United States, 237 F.2d 640,
C.A. 6[th]. No matter how conclusive the evidence may be
in a criminal case on a controverted material fact, the
the trial judge cannot make the finding or withdraw the
issue from the jury." (At 882 of 301 F.2d).

Brooks v United States, 240 F.2d 905 (5th Cir. 1957), was an appeal from a
conviction of perjury. The trial court had instructed the jury correctly that an
essential element of the offense charged was whether the special agent of the

Internal Revenue Service who administered oaths to the defendants had authority to administer such oaths. However, the trial judge thereafter instructed the jury as a matter of law that the requisite authority existed. The defendants thereupon assigned the giving of this instruction as reversible error, to which the reviewing court replied:

> "We agree for the all-sufficient reason that it deprived
> the jury of its function of determining whether or not,
> under the evidence and as exclusive judges of the facts
> and of the credibility of the witness, they believed
> beyond a reasonable doubt that Perry was an officer
> authorized to administer oaths in 1955 and thus violated
> appellant's constitutional right to a trial by jury as
> guaranteed by the Sixth Amendment. Heinous as the crime
> of perjury is under our law, it is entitled to no
> relaxation of the constitutional guaranty of the citizen
> in order to punish it." (At 906.)

In United States v Manuszak, 234 F.2d 421 (3d Cir. 1956), defendant was convicted for theft of goods from an interstate shipment of freight, for interstate transportation of stolen goods, and for conspiracy. At the trial, the court in effect instructed the jury as a matter of law that the "goods that were stolen were part of an interstate shipment", an essential ingredient of the offense. The Third Circuit Court of Appeals reversed on this issue, and said:

> "The defense never agreed or stipulated that a theft had
> occurred. The presumption of innocence to which
> appellant was entitled demanded that all factual
> elements of the government's case be submitted to the
> jury. It is immaterial that the government's evidence as
> to the actual theft was uncontradicted. The acceptance
> of such evidence and the credibility of witnesses is for
> the jury, even though to the court the only possible
> reasonable result is the acceptance and belief of the
> government's evidence. A partial direction of the
> verdict occurs when the court determines an essential

214

fact, and this denies the appellant trial by jury." (At 424-425).

In Konda v United States, 166 F. 91 (7th Cir. 1908), defendant was convicted below of sending an obscene pamphlet through the mail in violation of law. one of the essential elements of the crime, which the Government had the burden of proving beyond a reasonable doubt, was that the material mailed was actually obscene. The trial court, however, ruled as a matter of law in favor of the prosecution on this issue, and withdrew it from the jury's consideration. Reversing, this court said and quoted at length:

> "In our judgment, however, a defendant in a criminal
> case has the absolute right to require that the jury
> decide whether or not the evidence sustains each and
> every material allegation of the indictment. Material
> allegations are allegations of fact. And each, as much
> as any other, enters into a verdict of guilty. If the
> judge may decide that one or another material allegation
> is proven, he may decide that all are proven, and so
> direct a verdict of guilty. In a civil case, the judge
> may exercise the power of directing a verdict for the
> plaintiff when there is no conflict in the evidence and
> the only inference that can be drawn by reasonable minds
> as to the ultimate facts in issue favors the plaintiff.
> This power, we opine, grew out of the practical
> administration of the fundamental power to review, on a
> motion for a new trial, the findings of the jury. In the
> civil case above supposed, if the jury should return a
> verdict for the defendant, the judge would set it aside;
> and he would continue to set aside verdicts in that case
> until one should be returned that was in accord with the
> undisputed facts. So he cuts off the possibility of
> useless verdicts by directing in the first instance the
> jury to return the only verdict he will let stand. But
> in a criminal case, if the jury returns a verdict for
> the defendant, the judge no matter how contrary to the

evidence he may think the verdict is, cannot set it aside and order a new trial. Therefore, since the judge is without power to review and overturn a verdict of not guilty, there is no basis on which to claim the power to direct a verdict of guilty. Our conclusion is that an accused person has the same right to have 12 laymen pronounce upon the truth or falsity of each material averment in the indictment, if the evidence against him is clear and uncontradicted, as he unquestionably would have if it were doubtful and conflicting. Inasmuch as jurors are rightly trusted, close and difficult cases to maintain the peace and dignity of organized society, surely they may be relied on in the plain and simple ones." (At 93.)

In the case at bar, during the jury instruction portion of the proceeding, specifically during the Armed Robbery (CJI2d 18.1) instruction the trial court went out of its way to instruct the jury as a matter of law that the mere complainants were actually victims. Even in the actual Armed Robbery instruction, the specificall designed neutral language, refer to the complainants just as they are complainants not victims. The instruction reads as follows in it's pertinent part:

### CJI2d 18.1

### ARMED ROBBERY

(1) The defendant is charged with the crime of armed robbery. To prove this charge, the prosecutor must prove "each" of the following elements beyond a reasonable doubt.:

(2) First, the defendant [used force of violence against/ assaulted/ put in fear] [state "complainant's" name].

(3) Second, the defendant did so while [he/she] was in the course of committing a larceny. A "larceny" is the taking and movement of someone else's property or money with the intent to take it away from that person

216

permanently.

"In the course of committing a larceny" includes acts
that occur in an attempt to commit the larceny, or
during the commission of the larceny, or in flight or
attempted flight after the commission of the larceny, or
in an attempt to retain possession of the property or
money

(4) Third, [state **complainant's** name] was present while
defendant was in the course of committing the larceny.

It's very clear from the above instruction that before the complainants could be
classified as a matter of law to have been actual victims, the prosecutor would first
be required to prove that force or violence were used against Maria Sandstrom, Thomas
Sandstrom, Earl Brady, and Patrick Wendell or that they were assaulted or put in
fear, during the course of being subjected to the larceny of their property or money.

The definition to the relevant terms, **complainant** and **victim** are as follows:

(1) **Complainant**-[Kon 'play. nent] 1. The plaintiff in a
lawsuit. 2. **A person who files a formal accusation of a**
**crime.** 3. A person who makes any formal complaint. 4.
The prosecuting witness in a criminal proceeding. (See
Ballentine's Law Dictionary, Legal Assistant Edition, by
Jack G. Handler, J.D. pg. 92)

(2) **Victim**-[vik-tem] A person against whom a crime, tort
, or other wrong has been commited. (See Ballentine's
Law Dictionary Legal Assistant Edition, by Jack G.
Handler, J.D. pg 578)

As the above definitions shows a **complainant** is merely a person who files a
formal accusation of a crime. In other words a complainant is someone who alleges
that a crime has been committed against them. However, a **victim** is someone who has
conclusively been deemed as a matter of fact and law to have had a crime committed
against them. In other words a victim is someone who has been found to have been
subjected to a crime or crimes as a matter of fact and law.

217

In the case at bar, when the trial court gave the constitutionally erron Armed Robbery instruction it elevated and re-classified Maria Sandstrom, Thomas Sandstrom, Earl Brady and Patrick Wendell from being merely complainants, people who were simply making allegations, to actual victims, people who had indeed been subjected to a crime or crimes as a matter of fact and law. This deprived Defendant Pouncy of his right to have the jury determine all elements of the charged offenses, and this right is so fundamental its violation can not be subject to the harmless error anaylsis, since the judge invaded the province of the jury. People v Reed, 393 Mich 342, 351, 224 NW2d 867, 871 (1975).

When the trial court instructed the jury that Maria Sandstrom, Thomas Sandstrom, Earl Brady, and Patrick Wendell, were victims as a matter of law, this clearly and effectively told the jury that Maria Sandstrom, Thomas Sandstrom, Earl Brady, and Patrick were all indeed subjected to a crime or crimes, and made in unnecessary for the jury to consider whether or not a crime was actually committed, because the trial court told them as a matter of law crimes were indeed committed against them. The courts instruction, in violation of Defendant Pouncy's absolute right to a jury determination upon all essential elements of the charged offense, "limited the jury's consideration to a question of identification of the perpetrator of the crime". People v Reed, 49 Mich App 308, 328, 212 NW2d 41,51 (1974). In other words the jury was only left to decide whether Defendant Pouncy was the individual who committed the crimes against Maria Sandstrom, Thomas Sandstrom, Earl Brady, and Patrick Wendell, the victims according to the law the trial court gave the jury.

Moreover, telling the jury that Maria Sandstrom, Thomas Sandstrom, Earl Brady, and Patrick Wendell, were actual victims, the trial court overemphasized the prosecution's theory and created presumptions in favor of the prosection, which constituted reversible error. See People v Martin, 392 Mich 553; 221 NW2d 336 (1974), People v Wright, 78 Mich App 246; 259 NW2d 443 (1977), and People v Thornton, 80 Mich

App 746 (1978).

If the trial court is going to be permitted to invade the province of the jury by ruling as a matter of law that complainants are actual victims, then the trial court will equally be permitted to refer to  defendants as perpetrators and rule as a matter of law that the defendant is indeed the perpetrator. However, neither is permitted and requires automatic reversal when the province of the jury is invaded. People v Reed, supra at 393 Mich 351. Reversal is required.

XIX.   THE TRIAL COURT INTERFERED WITH DEFENDANT
POUNCY'S STATE AND CONSTITUTIONAL RIGHTS TO A
FAIR JURY TRIAL WHEN HE REFUSED TO HOLD AN
EVIDENTIARY HEARING ON THE QUESTION OF
WHETHER JURORS WERE PREJUDICED OR BIASED DUE
TO ANY "EXTRANEOUS INFLUENCES" WHEN ONE JUROR
REPORTED TO THE COURT THAT HE RECEIVED A
PHONE CALL FROM THE GENESEE COUNTY JAIL
DURING A WEEKEND RECESS AND HE BELIEVED
DEFENDANT POUNCY WAS THE INDIVIDUAL WHO
CALLED HIM.

On Friday, January 27, 2006 the trial court ended that day of the proceeding and ordered the jurors to return three days later on Tuesday, January 31, 2006 at 10:00 am. (T 1-27-06, 293). At the conclusion of that day Defendant Pouncy was escorted back to the Genesee County jail where he was detained at during trial.

On Tuesday, January 31, 2006 three days later the proceeding reconvened. The trial court immediately announced that over the weekend recess at least one juror was contacted by phone from the Genesee County jail on Friday night January 27, 2006 and that the juror was unable to continue to sit as an impartial jury member due to the extraneous influence. The following occurred in its pertinent part:

> **The Court:** Before we get this jury up here to continue with the trial, we've got a matter that we're gonna have to take care, take up. We've got one juror whose apparently been contacted by phone from the Genesee County jail over this past weekend, I think it was Friday night and I want to have the juror brought in because we need to determine whether or not this juror is able to continue on with this trial based on that contact. And so at this time Trish if you would go get the juror and bring him in I would appreciate it. If everyone would stand please.

> (At 9:48 am., Juror enters courtroom)

> **The Court:** Good morning sir. Please everyone

220

have a seat. We are on the record in the
People of the State of Michigan versus Omar
Rashad Pouncy, 05-17154-FC. I want to say
good morning sir and uh it's unfortunate
what's brought you here this morning.
Obviously the reason that I brought you in is
I wanted to ask you that based on what has
occurred since this past Friday do you
believe that you can set aside what has
occurred and still judge this case just on
the evidence that you see in here in this
courtroom?

**Juror:** (Inaudible).

**The Court:** Okay do you believe that that
interaction would certainly affect your
judgment in this case?

**Juror:** Yes I do.

**The Court:** All right and do you wish to then
be excused from serving in this case sir?

**Juror:** Yes I do.

(T 1-31-06, 4).

After the trial court learned that at least one of the jurors was contacted over
the weekend recess by someone calling from the Genesee County jail and the juror said
that he was not able to judge the case just on the evidence introduced at trial, the
trial court took the incident and allegation so serious that it dismissed the juror who
came forth without any hesitation and promised the juror that they would get to the
bottom of the situation. The following occurred in its pertinent part:

**The Court:** I want to say first of all I'm
gonna excuse you sir and I want to certainly
aapologize to you for what has happened. I'm
not sure at this point exactly how it
happened but I can assure you that we will
look into this and we will get to the bottom

221

of it and when we do we will certainly make
you aware of what has happened okay?
**Juror:** yes sir.
**The Court:** All right sir thank you very much.
Everyone stand please. And Trish you can
escort the juror out and sir the only thing I
would ask is just don't discuss this with any
of the other jurors.
**Juror:** Right.
**The Court:** Thank you sir.

     (At 9:50 am., Juror excused)

      (T 1-31-06, 4-5).

   After the trial court dismissed the juror, for the first time ever the trial court
then decided to instruct the juror not to discuss anything concerning the phone contact
from the Genesee County jail after the juror had already had the opportunity to taint
and influence the remaining jurors before the trial court decided to excuse the juror.
Before the juror who came forth about the weekend phone contact from the Genesee County
jail, was called in by the trial court the juror was free to congregate and communicate
with the other jury members about the phone call he received from the Genesee County
jail over the weekend. Defendant Pouncy determined that the trial court's investigation
of the extraneous influence was cursory at best and ask the trial court to further
investigate to ensure that the other jurors, for one wasn't also contacted from the
Genesee County jail over the weekend recess and to ensure that the other juror who came
forth with the phone contact from the Genesee County jail situation did not communicate
to the other jurors about what took place with him over the weekend recess, however the
trial court failed to investigate past the one juror. The following occurred in its
pertinent part:

     **Mr. Pouncy: <u>Yes. I have a concern because I</u>**
     **<u>don't know if this guy done talked to, to the</u>**
     **<u>other jurors or, or anything about the</u>**
     **<u>incident and that could have a emph, you know</u>**
     **<u>what I'm sayin', emphasis on, on them lookin'</u>**

**at me in a bad way you know what I mean?**
**Honestly this is my life.**
**The Court:** No this juror has not had contact
with the other jurors since this incident.
**Mr. Pouncy:** He hasn't?
**The Court:** No sir he has not.
**Mr. Pouncy:** I hope not you know what I'm
sayin? (T 1-31-06, 12).

Defendant Pouncy tried to get the trial court to investigate and protect his right
to a fair jury trial. The trial court impermissibly assumed that the juror didn't
communicate anything to the other jurors about the weekend recess phone contact
incident prior to coming into the courtroom. When this juror was in the jury room with
the other jurors nothing was preventing him from communicating with the other jurors
about this incident, the trial court did not instruct the juror to not communicate with
the other jurors until **after** he had already had had the opportunity to communicate with
the other jurors.

The trial court interfered with Defendant Pouncy's constitutional right to a fair
trial by failing to conduct a **Remmer** hearing (Remmer v UNited States, 347 US 227; 74
S.Ct 450; 98 L.Ed. 654 (1954). A Remmer hearing should have been conducted to first see
if any of the other jurors were contacted by someone from the Genesee County jail
during the 3 day weekend recess and to at the very least a Remmer hearing should have
been conducted to ensure that the juror who came forward, did not discuss the incident
with the other jurors prior to the trial court dismissing him. Either way whether the
other jurors were contacted from the Genesee County jail or found out that the other
juror was contacted from the Genesee County jail in relation to the case at bar, they
were impermissibly influenced by non-record extraneous evidence, which violates
Defendant Pouncy's right to a fair jury trial.

**Standard Of Review:**

Because this error implicates Defendant Pouncy's state and federal Constitutional

223

Rights to a fair trial by an impartial jury, this Court should use a de novo standard of review. Sitz v Department of State Police, 443 Mich 744; 506 NW2d 204 (1993).

**Discussion:**

Criminal defendants possess a state and federal constitutional right to trial by an impartial jury and the failure to afford the accused a fair trial in a fair tribunal violates even minimum standards of due process. US Const Am VI, XIV; Mich Const 1963, art 1, §§ 17, 20, Turner v Louisiana, 379 US 466, 471-472; 85 S.Ct 546; 13 L.Ed.2d 424 (1965). Because only the jury can strip a man of his liberty, jurors must be indifferent and must base their verdicts only upon the evidence developed at trial. Turner, supra at 472. The requirement that a jury's verdict must be based upon the evidence developed at trial "goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury" and this principle governs the trial "regardless of the heinous of the crime charged, the apparent guilt of the offendar or the station in life which he occupies." Id. As the united States Supreme Court explained:

> "In the Constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation of cross-examination, and of counsel." Turner v Louisiana, 379 US at 472-473.

Thus, in Turner, the Court presumed prejudice from the continuous three-day contact between jurors and two deputy sheriffs who testified for the prosecution. The deputies drove jurors to a restaurant for each meal and their lodging each night. They ate with jurors, conversed with them and did errands for them. Although there was no direct evidence that the deputies discussed the case with jurors, the Supreme Court reversed

224

Turner's murder conviction.

Although the general rule precludes jurors from impeaching their verdicts, that rule does not preclude inquiry into any extraneous influences brought to bear upon the jury in order to show what the influences were and whether they were prejudicial. Tanner v United States, 483 US 107, 117; 107 S.Ct. 2739; 97 L.Ed.2d 90, 104 (1987). Womble v J.C. Penney Company, Inc., 431 F.2d 985, 989 (CA 6, 1970), In re Beverly Hills Fire Litigation, 695 F.2d 207, 213 (CA 6, 1982), Hoffman v Monroe Public Schools, 96 Mich App 256, 261; 292 NW2dd 542 (1980). This exception is nessary to assure that the parties receive a fair trial and that the integrity of the system itself is maintained. In re Beverly Hills Fire Litigation, supra. Inquiry into "extraneous influences" on jurors is permiasible since it does not relate directly to the thought process or inner workings of jurors. Hoffman, sopra at 259, 261. For this reason, affidavits and oral testimony by jurors may be received on the issue of an "extraneous" or "outside" influence. Tanner, supra at 117, Hoffman, supra at 261, People v Gruhom, 84 Mich App 663, 666; 270 NW2d 673 (1978), Wiser v People, 732 P2d 1139, 1142 (Colo, 1987). Affidavits by the defense attorney and other non-jurors which contain information suggesting that jurors were exposed to extraneous information may be sufficient to require an inquiry into the allegation of juror misconduct. Overbee v Van Waters & Rogers, 706 F.2d 768, 770-771 (CA 6, 1983), United States v Thomas, 463 F.2d 1061, 1062-1063 (CA 7, 1972), Wiser v People, 732 P2d 1139, 1140 (Colo, 1987). See also, United States v Beach, 296 F.2d 153, 160 (CA 4, 1961)(Defense attorney's mere belief that jurors engaged in improper experiment was sufficient to require remand for evidentiary hearing).

Trial courts confronted with allegations that jurors were subjected to extraneous influence in the course of their deliberations should hold a hearing to determine whether the misconduct affected the jury's verdict. United States v Beach, 296 F.2d 152, 160 (CA 4, 1961), Wiser v People, 732 P2d 1139 (Colo, 1987). The Sixth Circuit has

held that an evidentiary hearing is required. Overbee v Van Waters & Rogers, 706 F.2d 768, 771 (CA 6, 1983).

Courts throughout the country have adopted three varied approaches for determining whether a defendant has been reversibly prejudiced by the jury's exposure to extraneous influences or information. Some courts have held that a presumption of prejudice arises and the prosecutor bears the burden of establishing that the extraneous information was harmless. In re Beverly Hills Fire Litigation, 695 F.2d at 215, Overbee v Van Waters & Rogers, 706 F.2d 768, 771 (CA 6, 1983), United States v Littlefield, 752 F.2d 1429 (CA 9, 1985) Citing Remmer v United States, 347 US 227; 74 S.Ct 450; 98 L.Ed 645 (1954), People v Cornett, 685 P2d 224 (Colo App 1984), Moore v State, 324 S.E.2d at 762. Others have suggested that reversal is required where there is the "slightest possibility" that a typical juror would have been affected. United States v Marx, 485 F.2d 1179, 1184 (CA 10, 1973), cert den, 416 US 986; 94 S.Ct 2391; 40 L.Ed.2d 764 (1974). Still other courts require reversal where there is a "reasonable possibility" that the extraneous contact or influence affected the verdict to the detriment of the defendant. Marino v Vasquez, 812 F.2d 499 (CA 9, 1987), Wiser v People, 732 P2d 1139, 1142 (Colo 1987). According to the Ninth Circuit, the proper standard for the "reasonable possibility" test is "whether it can be concluded beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict." Marino, supra at 504. The prosecutor bears the burden of proving beyond a reasonable doubt that the error was harmless. Id.

The Sixth Circuit has repeatedly held that juror receipt of extraneous information "can rarely be viewed as harmless." In re Beverly Hills Fire Litigation, 695 F.2d at 215, Overbee v Van Water & Rogers, 706 F.2d 768, 771 (CA 6, 1983). Such an error "requires that the verdict be set aside, unless entirely devoid of any proven influence or the probability of such influence upon the jury's deliberations or verdict." In re Beverly Hills Fire Litigation, supra, Overbee, supra. Influence on a single juror may be enough

to require reversal, but where several jurors are exposed to extraneous information, "controlling law permits no alternative to reversal." In re Beverly Hills Fire Litigation, supra. Michigan case law permits a verdict to be set aside where jurors consider extraneous information in reaching their verdict.

People v Grayton, 81 Mich App 390, 397; 265 NW2d 344 (1978).

The Federal Rules of Evidence explicitly allow jurors to testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. FRE 606 (b).

At least one Michigan court has recognized the importance of safeguarding the defendant's right to a fair trial before an impartial juror. People v Johnson, 103 Mich App 825, 829; 303 NW2d 908 (1981). Declaration of a mistrial may be appropriate where one or more jurors may be biased, prejudiced or otherwise demonstrate a state of mind which will prevent him from rendering a just verdict. Johnson, supra. In People v Lewis Wilson, 445 Mich 925; 521 NW2d 13 (1994), the Court ordered a remand for an evidentiary hearing where an affidavit suggested that jurors were provided with extraneous information.

Courts on other jurisdictions have found error where jurors were exposed to improper "extraneous influences". United States v Thomas, 463 F.2d 1061 (CA 7, 1972)(reversible error occurred where jurors read newspaper article about case and considered it in the course of their deliberation). In re Beverly Hills Fire Litigation, 695 F.2d 207 (CA 6, 1982)(juror conducted experiment which led to findings contrary to plaintiff's version of litigation, than communicated his findings to fellow jurors), United States v Littlefield, 752 F.2d 1429 (CA 9, 1985)(jurors improperly reversibly read a Time magazine article on offenses similar to that with which defendant was charged), Marinao v Vasquez, 812 F.2d 499 (CA 9, 1987)(jurors referred to dictionary to define intent element of offense and conducted experiment which pertained to self-defense), People v Cornett, 685 P2d 224 (Colo App 1984)(juror consideration of newspaper article), U.S. v Carrado, 227 F.3d 528 (6th Cir. 2000)(evidentiary hearing

required to assess allegation of jury tampering), U.S. v Davis, 177 F.3d 552 (6th Cir. 1999)(evidentiary hearing required to assess issue of prejudicial extraneous information), U.S. v Herndon, 156 F.3d 629 (6th Cir. 1998)(evidentiary hearing required to assess allegation of extraneous influence on juror), Moore v State, 324 SE3d 760 (Ga App 1984)(juror's independent legal research). The Georgia Court of Appeals held:

> "The intentional gathering of extra judicial evidence, highly prejudicial to the accused, by members of the jury and the communication of that information to the other jurors in the closed jury room is inimical to our present jury trial system." Moore, supra at 845-856.

In the case at bar, an evidentiary hearing is required. It's very clear that jury tampering occurred and the trial court took the issue so serious that he went to the extent of dismissing a juror, the only one who was interviewed, and the trial court even placed Defendant Pouncy on lock down, no phone calls, visits, or mail and placed him in segregation because he believed the jury tampering allegations. The trial court implemented these restrictions against Defendant Pouncy without any evidence that he was involved or had anything to do with the phone contact to the jury. The following occurred in its pertinent part:

> **The Court:** just one second sir. **As I sit here right now, I don't have any proof that you did anything okay?...But I am gonna order the deputies here at least during the time that this trial is goin' on not to allow you to have access to the phone, not to allow you to be just out in general population because I want to make sure that there's no opportunity for this to happen from your end okay because if someone else is doin' it then we need to fin**

**find out who that person is and bring them to justice over this.** If you're doin' it then we need to bring you to justice over this. But I'll let that play itself out okay?

**Mr. Pouncy:** If, if there was investigation done or even just questions asked, it would show that I was in my room on lock down. (T 1-31-06, 7-8).

In the case at bar, it's an undiputeable fact that jury tampering occurred with at least one juror. It also can not be gainsaid that this juror had the opportunity to communicate with the other jury members about the phone contact he received from the Genesee County jail, before he was dismissed. Moreover, it cannot be gainsaid that it isn't possible that the individual who contacted the one juror could not have contacted the other jurors, but they just failed to come forward out of fear. In any event this extraneous influence from this phone contact if considered by the jury did definitely prejudice Defendant Pouncy because the extraneous influence of jury tampering regarding contacting jurors from jail would definitely prejudice any defendant because the jury is automatically going to assume that Defendant Pouncy was involved, with or without evidence and this will ultimately prejudice their decisions concerning the true offenses and questions of facts. In other words, it gave the jurors a non-evidentiery basis for convicting Defendant Pouncy.

The only way to be sure that the remaining jurors' decisions were not based on any extraneous influences involving the juror phone contact from the Genesee County jail is to conduct a **Remmer** hearing. The aforementioned authority makes it clear that Defendant Pouncy is entitled to an evidentiary hearing to ensure that his right to a fair jury trial was not violated by any extraneous influences on a deliberating juror from the jury tampering phone contact.

**XX.** THE TRIAL COURT VIOLATED DEFENDANT POUNCY'S RIGHT TO DUE PROCESS BY FAILING TO RECUSE ITSELF SUA SPONTE, KNOWING THAT IT HAD DEEP SEATED ANTAGONISM AGAINST DEFENDANT POUNCY AND DUE TO THE TRIAL COURT'S PRECONCEIVED NOTION OF GUILT.

Prior to Defendant Pouncy coming before Judge Archie L. Hayman, to be tried Defendant Pounct's ex-codefendant, Wayne Grimes, turned State's evidence, and accepted a plea bargain in front of Judge Hayman, to offer so called truthful testimony against Defendant Pouncy. (See Plea transcripts from Wayne Grimes' plea proceeding Docket # 05-17155-FC, January 10, 2006, attached as Appendix P). Wayne Grimes and Defendant Pouncy were both charged with the exact same charges arising out of the same alleged incidents. However, Defendant Pouncy was also charged with five (5) additional charges, which were pending at the time of the trial in the case at bar, stemming from a separate alleged carjacking incident involving a Monte Carlo which was admitted into the trial of the case at bar, under MRE 404 (b) evidence. (T 1-24-06, 29).

During Wayne Grimes's separate plea proceedings which occurred prior to the commencement of the trial in the case at bar, and prior to the trial court allowing admission of the prosecution's MRE 404 (b) evidence carjacking involving the "Monte Carlo", Judge Hayman formed a deep seated prejudice against Defendant Pouncy and also formed a preconceived notion of guilt at least regarding the MRE 404 (b) evidence carjacking involving the "Monte Carlo", which was admitted in the trial of the case at bar and was unadjudicated (pending) at the time of the case at bar. The trial court thought Defendant Pouncy was so reprehensible that no one needed to hand around him, the trial court thought that Defendant Pouncy's character reeked criminality, and the Defendant Pouncy's criminality influenced Wayne Grimes and caused his involvement. Before Defendant Pouncy was even tried for the carjacking stemming from the MRE 404 (b) evidence carjacking involving the "Monte Carlo", the trial court

unequivocally formed and displayed its preconceived notion of guilt towards Defendant
Pouncy, concerning the "Monte Carlo" carjacking. The following occurred in its
pertinent parts:

> The Court: And you know, you made comments about wanting
> to fit in, well, you know, you see what you get when you
> try to fit in. Well, you know, you see what you get when
> you try to fit in, because you know, he was trying to
> put all the blame on you, because he felt you were
> putting all the blame on him; and quite frankly, from my
> point of view, I think you're both responsible. I think
> you're responsible because you knew what type of person
> Mr. Pouncy was. You knew it before the day it happened,
> because I'm sure you've seen something else that he had
> done, in his character. I mean, I've watched Mr. Pouncy.
> There's no question, I-I can tell who Mr. Pouncy is. He's
> bright, but "he's got issues, unfortunately", and you
> have no business hanging around with him; and I'm sure
> your mother told you that before it even happened. I bet
> she told you, didn't she?
>
> The Defendant: [Wayne Grimes] Yes, sir.
>
> The Court: Yeah, I bet she told you a long time ago,
> don't hang out with Mr. Pouncy, because she knew what
> would happen. So what I'm going to say to you, it
> appears-and i could be wrong, you may be snowing me, but
> it appears that you are a decent guy and probably
> wouldn't have done this if you hadn't have been with Mr.
> Pouncy; that's my impression, but I could be
> wrong.....Uh, you know, Ms. Sandstrom had her Corvette
> taken from her, you know; and I don't know how many
> years it took her to get that Corvette, but I'm sure
> when she got it she was proud to have it; and Mr.
> Sandstrom had '73 Cadillac that looked like he kept in
> prestine condition. And then the gentleman [Dan Haynes],
> back here whose brother, who was disabled, had the Monte
> Carlo [the vehicle from the MRE 404 (b) carjacking]. His

brother's car, can you imagine how that must feel to
him? So these people have been harmed, seriously. (See
Wayne Grimes', sentencing transcript Docket # 05-17155-
FC 2-2-06, pgs 25-27, attached as Appendix Q)

Defendant Pouncy, wasn't even present at the proceeding when the above took
place, and the trial court took advantage of this opportunity to express and display
its deep seated personal prejudice against Defendant Pouncy and to express the
preconceived notion of guilt it had concerning a pending case where the evidence had
not even been presented yet, yet the trial court unequivocally believed that
Defendant Pouncy was guilty of the pending "Monte Carlo" carjacking which he later
ruled admissible at the trial in the case at bar under the MRE 404 (b). The trial
court's deep seated personal prejudice against Defendant Pouncy and its preconceived
notion that Defendant Pouncy was guilty of a pending carjacking which he ruled
admissible in the trial of the case at bar, under MRE 404 (b) and its failure to
recuse himself sua sponte from presiding over the case at bar, deprived Defendant
Pouncy of his right to Due Process.

## STANDARD OF REVIEW:

A trial court's failure to disqualify itself when it cannot impartially hear a
case is a violation of Due Due Process, and is reviewed de novo. A claim of
constitutional error is reviewed de novo. People v Mcpherson, 263 Mich App 124
(2004).

## DISCUSSION:

The Due Process Clause of the Fourteenth Amendment requires a fair trial in a
fair tribunal before a judge with no actual bias against the defendant or interest in
the outcome of the case. See Bracy v Gramley, 520 U.S, 899, 904-05, 117 S.Ct. 1793,
138 L Ed.2d 97 (1997). Judicial misconduct claims impugning the impartiality of the
judge can involve two types of cases. One group addresses charges of "judicial bias"
stemming from a trial judge's "personal interest" in the outcome of a case, usually

232

derived from some extrajudicial association with the cause or with one of the parties. See In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). The second group concerns charges of "judicial misconduct" in which the trial judge is accused of conducting the proceedings in a manner that strongly suggests to the jury that the judge disbelieves the defendant's case or otherwise favors the prosecution. See Liteky v United States, 510 U.S. 540, 555-56, 114 S.Ct 1147, 127 L.Ed.2d 474 (1994); see also Alley v Bell, 307 F.3d 380, 386 (6th Cir. 2002), cert den 540 U.S. 839, 124 S.Ct. 99, 157 L.Ed.2d 72 (2003).

To state a claim that a judge improperly favors the prosecution, a petitioner must show either actual bias or the appearance of bias creating a conclusive presumption of actual bias. See United States v Lowe, 106 F.3d 1498, 1504 (10th Cir. 1997). Adverse rulings are not themselves sufficient to establish bias or prejudice that will disqualify a judge. See, e.g., Hence v Smith, 49 F.Supp.2d 547, 549 (E.D. Mich. 1999). To violate a petitioner's right to a fair trial, a trial judge's intervention in the conduct of a criminal trial must be significant and must be adverse to the petitioner to a substantial degree. See, McBee v Grant, 763 F.2d 811, 818 (6th Cir. 1985); see also Duckett v Godinez, 67 F.3d 734, 740 (9th Cir. 1995) (stating that a state trial judge's behavior must render the trial fundamentally unfair to warrant habeas relief).

Once the trial judge pierces the veil of judicial impartiality, bias infects the proceedings and the Due Process Clause is offended.

The Supreme Court has held that judicial bias is a structural error that can never be found to be harmless. Chapman v California, 386 U.S. 18, 23 & n. 8, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (stating that the right to an impartial judge is a constitutional right "so basic to a fair trial that [its] infraction can never be treated as harmless error"). The Sixth Circuit has stated:

> Because judicial bias infects the entire trial process

it is not subject to harmless error review....Instead,
the court is required to assess whether the actions of
the judge rose to the level of judicial bias. If the
court determines that the actions resulted in a consti-
tutional violation, then the court is required to over-
turn the state court decision.

Maurino v Johnson, 210 F.3d 638, 645 (6th Cir. 2000), abrogated on other grounds by
Harris v Stovall, 212 F.3d 940 (6th Cir. 2000) (citation omitted).

The floor established by the Due Process Clause clearly requires a "fair trial
in a fair tribunal," Withrow v Larkin, 421 U.S. 35, 46, 95 S.Ct. 1456, 43 L.Ed.2d 712
(1975), before a judge with no actual bias against the defendant or interest in the
outcome of his particular case. See, e.g., Aetna, supra, at 821-822, 106 S.Ct., at
1585-1586; Tumey v State of Ohio, 273 U.S. 510, 523, 47 S.Ct 437, 441 (1927).

Generally, disqualification of a trial judge is required where the record
discloses actual bias on the part of the judge or where the judge expresses a
preconceived notion as to defendant's guilt or innocence. People v Koss, 86 Mich App
557, 560; 272 NW2d 724 (1978), People v Alexander, 76 Mich App 71, 78; 255 NW2d 774
(1977). Disqualification for bias has been held to warrant disqualification when the
trial judge admitted some degree of personal animus toward the defendant, People v
Lobsinger, 64 Mich App 284, 235 NW2d 761 (1975), when the judge was made aware of
inadmissible polygraph test results, People v Hale, 72 Mich App 484, 250 NW2d 103
(1976).

In the case at bar, there's no question that Judge Hayman indeed admitted some
degree of personal animus toward Defendant Pouncy. Judge Hayman developed this
personal prejudice toward Defendant Pouncy during Defendant Pouncy's ex-codefendant's
pleas proceeding which occurred on January 10, 2006, which was prior to the
commencement of the January 24, 2006 trial at bar. Judge Hayman's personal prejudice
came out and is clearly seen when he expressed himself, he said that it's

234

"unfortunate that he's [Defendant Pouncy] got issues," his personal prejudice is clear from when he blamed everything on Defendant Pouncy and said if it wasn't for Defendant Pouncy he believes that Wayne Grimes would not have committed the crimes, because he believed Defendant Pouncy forced and influenced Wayne Grimes to commit the crimes.

It's clear that at least a degree of personal prejudice did, in fact, exist and Judge Hayman was thereby required to recuse himself sua sponte.

In People v Lobsinger, supra, the Court held that since the trial court judge had some degree of animus against the defendant. The Court held:

> "A judge is not expected to bring with him to the bench a
> blank mind and personality, as he becomes, by necessity,
> a composition of the general experiences of his life,
> refined and honest by his legal training and legal
> experience so that the desired judicial temperament will
> hopefully emerge. To require a blank mind is
> unreasonable, but to demand an impartial and clear
> appraisal of each new case is not. A judge may well be
> subconsciously prejudiced in one way towards the evidence
> or the parties in a case before him  It is his duty not
> to permit these prejudices to override his
> responsibilities in providing a fair forum for the
> determination of controversy. This duty should ideally
> motivate the judge to request reassignment of the case if
> he is aware of any prejudices which he holds which would
> interfere with his impartiality. If the judge refuses to
> do so, and the appellate court finds from the record that
> the judge was apparently prejudiced, then reversal is
> often the only remedy." People v Lobsinger, supra, at 289-
> 290 (citing Wayne County Prosecutor v Doerfler, 14 Mich
> App 428, 440; 165 NW2d 648 (1968).

In the case at bar, it's clear from what was expressed during Wayne Grimes' proceedings that Judge Hayman was personally prejudiced against Defendant Pouncy.

235

Judge Hayman, clearly disliked something about Defendant Pouncy and this dislike was so personal Judge Hayman expressed himself out of the presence of Defendant Pouncy and said "unfortunately Defendant Pouncy has issues". It's not apparent what kind of issues that Judge Hayman was talking about but they were not good because he said they were "**unfortunate** issues" This personal prejudice prevented Defendant Pouncy from having an impartial judge preside over his case. Moreover, this personal prejudice against Defendant Pouncy could have caused Judge Hayman to abuse his discretion on close evidentiary calls and ruled against Defendant Pouncy, jusy because Defendant Pouncy has "unfortunate issues"

Judge Hayman was required to disqualify himself from presiding over the trial at bar, due to the personal prejudice against Defendant Pouncy. Disqualification is appropriate when a judge cannot impartially hear a case, including when the judge is personally biased or prejudiced for or against a party or attorney. MCR 2.003 (B)(2); In re Forfeiture of 1,159,420,194 Mich App 134, 151, 406 NW2d 326 (1992).

Furthermore, Judge Hayman was disqualified because he prejudged the case, because before Defendant Pouncy was even tried for the separate MRE 404 (b) evidence carjacking, which was admitted into the case at bar, Judge Hayman had already believed that the separate MRE 404 (b) evidence carjacking had indeed occurred and that Defendant Pouncy was responsible.

Defendant Pouncy was charged with three different carjackings, one of them involved a truck and a Camaro, one of them involved a Corvette and a Cadillac, and the last one which was tried separately at a different trial after the case at bar, which involved a 1972 Monte Carlo. Although the carjacking involving the 1972 Monte Carlo was not tried at the same time as the other two carjackings the prosecutor moved the trial court to grant leave to admit the 1972 Monte Carlo carjacking into the case at bar, under MRE 404 (b) evidence and the trial court granted leave to introduce the 1972 Monte Carlo carjacking into the trial at bar, under MRE 404 (b).

The following occurred in its pertinent part:

>Mr. Larobardiere: and that, in the 404 (b) offense,
>there was a vehicle for sale, 1972 Monte Carlo and Mr.
>Pouncy came and looked at that vehicle more than once.
>On that last occasion looking at it, he took it for a
>test drive and was in the passenger seat and directed
>the driver to get out, pull over, and, and get out.
>Before he did that at gunpoint, before he did that he
>said I want you to take, I want, want to buy the vehicle
>but I want to check out my mechanic at Kings Automotive.
>And that's the same M.O., the same steps and
>circumstances that were done in the current offenses
>that'll be tried here today. (T 1-24-06, 26).
>
>                    * * * * *
>
>The Court: ...So I think because of that I, I would find
>that it is admissible under 404 (b) and it is the type
>of, of uh, of uh matter that ought to be allowed in to
>establish the defendant's identity on behalf of the
>prosecution. So I will grant your motion in limine Mr.
>Larobardiere and you can prepare an order and and make
>sure that that's in the file that reflects that okay? (T
>1-24-06, 29).

   The trial court granted leave to introduce the 1972 Monte Carlo MRE 404 (b)
carjacking in the case at bar, however, prior to granting leave to introduce this
evidence into the trial at bar, Judge Hayman had already prejudged the 1972 Monte
Carlo MRE 404 (b) carjacking case before it had even been tried and before he allowed
the prosecutor to introduce it in the case at bar. On January 10, 2006, Wayne Grimes,
who is Defendant Pouncy's, ex-codefendant and was charged with the same offenses
,accepted a plea bargain in exchange for favorable testimony against Defendant
Pouncy. During Wayne Grimes' separate plea proceeding and prior to ruling that the
MRE 404 (b) evidence was admissible in the case at bar, Judge Hayman had prejudged
the untried 1972 Monte Carlo MRE 404 (b) carjacking and concluded that the carjacking
involving the 1972 Monte Carlo did indeed occur and that Defendant pouncy was
responsible. Judge Hayman expressed his preconceived notion of guilt during Wayne

Grimes' proceeding. The following occurred in its pertinent part:

> **The Court:** ...And then the gentleman back here [Dan
> Haynes MRE 404 (b) witness] who's brother who disabled,
> had this Monte Carlo [the 1972 Monte Carlo from the MRE
> 404 (b) carjacking]. His brother's dead now, but to have
> that happen to that brother's car [the 1972 Monte Carlo]
> ,can you imagine how that must feel to him? So these
> people have been hard, seriously... (See Case Number
> Circuit Court No. 05-17155-FC, Wayne Grimes' Sentencing
> Transcripts 2-1-06, page 27).

Defendant Pouncy was not tried for the carjacking involving the 1972 Monte Carlo
until April 4, 2006 (See Case Number Circuit Court No. 05-17448-FC, Court of Appeals
No. 270604), but Judge Hayman personally prejudged the 1972 Monte Carlo carjacking on
January 10, 2006 and concluded that the offense had indeed occurred and that
Defendant Pouncy was responsible and this was before Judge Hayman ruled on the
Prosecutor's motion to introduce the 1972 Monte Carlo carjacking into the case at
bar, pursuant to MRE 404 (b). Due to Judge Hayman's personal preconceived notion of
guilt he was required to disqualify himself from presiding over the case at bar,
because the case at bar involved the 1972 Monte Carlo carjacking via MRE 404 (b),
which Judge Hayman had already prejudged.

A judge may be disqualified from presiding over a case in Michigan under either
court rule or the state and federal constitutions. The applicable court rule provides
that judges must be impartial, supplying a none exhaustive list of grounds for
disqualification, such as personal bias or personal knowledge of disputed facts, MRE
2.003 (B).

Unlike MCR 2.003 (B), the Due Process Clause may require a judge's
disqualification even where there is no showing of actual bias. U.S. Const Am XIV;
Const 1963; art 1, § 17; Cain v Department of Corrections, 451 Mich 470 (1996). Both
the United States and Michigan Supreme Courts have found it appropriate to

disqualify judges where "experience teaches that the **probability** of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." Withrow v Larkin, 421 U.S. 35, 46-7, 95 S.Ct. 1456; 43 L.Ed.2d 712 (1975); Cain, 451 Mich at 498; Crampton v Department of State, 395 Mich 347, 351 (1975) (emphasis added) The Michigan Supreme Court recently re-affirmed its prior holding in Crampton, citing a nonexclusive list of situations which posed a constitutionally unacceptable risk of bias, namely when the judge or decisionmaker:

> (1)"has a pecuniary interest in the outcome".
> (2) "has been the target of personal abuse or criticism from the party before him",
> (3) is "emeshed in [other] matters involving petitioner ..." or
> (4) might have prejudged the case because of prior participation as an accuser, investigator, fact finder, or initial decisionmaker.

Cain, 451 Mich at 498 (quoting Crampton v Department of State, 395 Mich 347, 351) (emphasis added).

An actual showing of prejudice is required before a trial judge will be disqualified. An exception to this rule requiring a showing of "actual" prejudice occurs when the trial judge or decisionmaker might have prejudged the case because of a prior participation as an accuser, investigator, factfinder, or initial decisionmaker. Crampton v Dept of State, 395 Mich 347, 351; 235 NW2d 352 (1975).

In the case at bar, since Judge Hayman had prejudged the 1972 Monte Carlo carjacking case, he was absolutely required to disqualify himself from presiding over the case at bar, because the 1972 Monte Carlo carjacking was apart of the case at bar, it was admitted in the case at bar via MRE 404(b). Judge Hayman clearly was convinced beyond a reasonable doubt, before the commencement of the trial at bar, that the 1972 Monte Carlo carjacking had indeed been committed, he was further

239

convinced beyond a reasonable doubt that the complainant in the 1972 Monte Carlo MRE 404 (b) carjacking ""ha[d] been harmed, seriously...". Moreover, Judge Hayman was convinced beyond a reasonable doubt that Defendant Pouncy was responsible for the carjacking of the 1972 Monte Carlo. Judge Hayman's prejudgment of the case should have prompted him to disqualify himself sua sponte because his preconceived notion of guilt concerning the 1972 Monte Carlo carjacking prevented him from being an impartial decisionmaker. judge Hayman's preconceived notion of guilt could very well have been the reason why he ruled that the 1972 Monte Carlo carjacking was admissible in the trial at bar. Judge Hayman, was mandated to disqualify himself sua sponte.

In some circumstances, a trial judge is required to raise the issue of disqualification on his own motion. See People v Dixson, 403 Mich 106, 109; 267 NW2d 423 (1978). The bias and preconceived notion of guilt against Defendant Pouncy which Judge Hayman retained is apparent only to one who had attended the proceedings of Wayne Grimes or one who had read a transcript thereof. Defendant Pouncy was not present at Wayne Grimes' separate proceedings and was not aware of Judge Hayman's ill prejudicial and impermissible unfavorable personal position against Defendant Pouncy or Judge Hayman's preconceived notion of guilt. Under these circumstances Judge Hayman was under an affirmative duty to raise the issue of bias sua sponte.

Judge Hayman's statement at Wayne Grimes' proceedings expressing his personal prejudice against Defendant Pouncy's "unfortunate issues," and his belief that the 1972 Monte Carlo carjacking had indeed been committed and the Defendant Pouncy was responsible, required Judge Hayman to disqualify himself from subsequently hearing Defendant Pouncy's case. The statements, amounted to a prejudgment of Defendant Pouncy's case.

It is the trial judge's prejudgment, rather than an exercise of his judgment, which requires disqualification in the present case. People v Gibson, (On Remand), supra at 797 n. 2.

Because of the separate proceedings against Wayne Grimes and Defendant pouncy, Judge Hayman was required to make findings of fact in order to accept Wayne Grimes guilty plea, but this did not require Judgde Hayman to form personal prejudice against Defendant Pouncy or prejudge an untried case which would have been admitted into the trial at bar. This, the "prejudgment" was not necessary because Wayne Grimes was not even charged with the 1972 Monte Carlo carjacking. such statements do amount to a prejudgment of the case of a yet-toObe-tried defendant, the trial judge should have disqualified himself from consideration of such a defendant's case. Id, at 797-798.

Once the trial judge pierces the veil of judicial impartiality, bias infects the proceedings and the Due Process Clause is offended.

The Supreme Court has held that judicial bias is a structural error that can never be found to be harmless. Chapman v California, 386 U.S. 18, 23 & n. 8, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (stating that the right to an impartial judge is a constitutional right "so basic to a fair trial that [its] infraction can never be treated as harmless error").

The Sixth Circuit had stated:

> Because judicial bias infects the entire trial process
> it is not subject to harmless error review....Instead,
> the court is required to assess whether the actions of
> the judge rose to the level of judicial bias. If the
> court determines that the actions resulted in a consti-
> tutional violation, then the court is required to over-
> turn the state court decision.

Maurino v Johnson, 210 F.3d 638, 645 (6th Cir. 2000), abrogated on other grounds by Harris v Stovall, 212 F.3d 940 (6th Cir. 2000) (Citation omitted). Reversal is required and a new trial must be held before an impartial judge.

XXI.    DEFENDANT POUNCY WAS DEPRIVED OF HIS RIGHT TO
A FAIR TRIAL DUE TO THE CUMULATIVE EFFECT OF
THE ERRORS THAT RIDDLED HIS TRIAL.

Due to all of the errors, raised herein, on the motion for relief from judgment, taken together that riddled Defendant Pouncy's trial he was deprived of his right to a fair trial. If not standing alone the cumulative effect of the errors deprived Defendant Pouncy of a fair trial.

**Standard Of Review:**

A claim of constitutional error is reviewed de novo. People v McPherson, 263 Mich App 124 (2004).

**Discussion:**

Due process does not require perfect trials, but it does mandate fair ones. United States v Love, 534 F.2d 87 (CA 6, 1976).

Minor irregularities in a trial usually do not amount to reversible error, due process is not violated unless the weight of the irregularities makes the trial inconsistent "with the fundamental principles of liberty and justice which lie at the base of all our civil and political instructions." Hebert v Louisiana, 272 US 312, 316; 47 S.Ct 103, 104; 71 L.Ed 270, 273; 48 ALR 1102, 1106 (1926).[People v Grames, 8 Mich App 375; 154 NW2d 548 (1967), lv den 380 Mich 756 (1968) Emphasis added].

In the present case, the record discloses errors at the trial level, the total weight which caused the trial to cross the line from being merely an imperfect trial to a trial violative of due process and inconsistent with fairness. When the cumulative effect of errors deny a defendant a fair trial reversal is required. People v Smith, 158 Mich App 220 (1987); People v Rosales, 160 Mich App 304 (1987); People v Skowronski, 61 Mich App 71 (1975); People v Bairefoot, 117 Mich App 225 (1982); People v spencer, 130 Mich App 527 (1983). Reversal is required.

XXII.    APPELLATE COUNSEL'S FAILURE TO TIMELY FILE
THE MOTION FOR PERMISSION TO FILE BRIEF IN
EXCESS OF 50 PAGES CONSTITUTES INEFFECTIVE
ASSISTANCE OF COUNSEL AND DEFENDANT POUNCY
WAS THEREBY PREJUDICED BECAUSE THIS ERROR
PREVENTED HIM FROM HAVING THE ISSUES, RAISED
HEREIN ON THE MOTION FOR RELIEF FROM
JUDGMENT, RAISED ON HIS DIRECT APPEAL OF
RIGHT. HAD THE ISSUES RAISED HEREIN BEEN
RAISED ON HIS DIRECT APPEAL OF RIGHT IT'S A
REASONABLE PROBABILITY THAT THE OUTCOME OF
HIS DIRECT APPEAL WOULD HAVE BEEN DIFFERENT.

During direct appeal, Defendant Pouncy was represented by the State Appellate

Defender Office. Ms. Chari K. Grove, assistant defander, handled Defendant Pouncy's

case. After reviewing the transcripts, relevant documents, and assessing Defendant

Pouncy's post-conviction remedies, Ms. Grove determined that im order to effectively

represent Defendant Pouncy it was necessary to have the Michigan Court of Appeals **grant**

**a "motion for permission to file brief in excess of 50 pages",** due to the length of the

transcripts (more than 200 pages), the number of pretrial motins, and the number and

complexity of the issues she deemed neceesary to raise due to their merit.

On November 16, 2006 Ms. Grove filed both the Appellant Brief and the **Motion For**

**Permission To File Brief In Excess Of 50 Pages,** simultaneously. However, on November

20, 2006 the Michigan Court of Appeals **"returned motion for brief in excess of 50**

**pages-untimely per MCR 7.212 (B).** See MIchigan Court of Appeals Dockect Entries,

attached as appendix (Appendix V). The Michigan Court of Appeals Docket Entries read

as follows in its pertinent part:

> 11/20/2006 25 Pleadind Returned
>
> Date: 11/20/2006
>
> For Party: 2 Pouncy Omar Rashad
> DF-AT
>
> Attorney: 25B12-Grove Chari K
>
> Comments: returned motion for
> brief in excess of 50 pages-un-
> timely per MCR 7.212(B)
>
> (Michigan Court of Appeals
> Docket Entries-Page 4 of 7).

Due to appellate counsel's failure to timely file the motion for permission to file brief in excess of 50 pages, counsel was not able to raise all of the issues she deemed necessary to raise in Defendant Pouncy's appellate brief on his direct aapeal of right, and was thereby forced to abandon the significant and obvious issues raised herein, on the motion for relief from judgment, during the direct appeal of right. Appellate counsel's failure to timely file the motion for permission to file brief in excess of 50 pages constitutes ineffective assistance.

Counsel's ineffectiveness did indeed prejudice Defendant Pouncy because had the motion for permission to file brief in excess of 50 pages been timely filed there's a reasonable probability that the Michigan Court of Appeals would have granted a page extention which would have permitted counsel to raise the issues that are currently being raised, in the motion for relief from judgment, on direct appeal and due to the constitutional violations which the issues that are currently being raised present there's a reasonable probability that Defendant Pouncy's results from the direct appeal of right would've been favorable. In other words, absent counsel's ineffectiveness there is a reasonable probability that Defendant Pouncy would have succeeded on appeal.

Appellate counsel's ineffectiveness satisfies the "good cause" requirement.

**Standard Of Review:**

The **Strickland** standard applies equally on appeal: the defendant must demonstrate that appellate counsel's performance was deficient and that the deficient performance prejudiced the appeal. Strickland v Washingto, 466 US 668, 687; 104 S.Ct 2052; 80 L.Ed.2d 674 (1984). The standard of review is de novo. People v Pickens, 446 Mich 298 (1994).

**Discussion:**

The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel on the first appeal by right. Evitts v Lucey, 469 US 387, 396-397, 105 S.Ct 830, 83 L.Ed.2d 821 (1985). Counstitutionally ineffective assistance of counsel is "cause" for a state procedural default, see Murray v Carrier, 477 US 478, 488, 106 S.Ct

2639, 91 L.Ed.2d 397 (1986), including in the 6.500 motion context. People v Reed, 449 Mich 375, 378 (1995).

MCR 7.212 (B), requires a party who is seeking to file an appellate brief in excess of 50 pages to file a motion for leave to file the appellate brief in excess of 50 pages 10 days prior to the actual filing of the appellate brief.

In the case at bar, appellate counsel failed to comply with the applicable court rule, which consequently caused the Court of Appeals to return the motion to file brief in excess of 50 pages, **without ruling on it due to its untimeliness,** this ultimately forced appellate counsel to involuntarily abandon and omit significant and obvious meritorious claims that she indeed necessary to raise during the direct appeal right. Counsel's failure to comply with the applicable court rule, MCR 7.212 (B), constitutes deficient performance. It's clear based on appellate counsel's professional judgment that she was convinced that the issues raised herein, on the motion for relief from judgment, needed to be raised on direct appeal of right and in order to raise those issues she would have to file a motion for a page extention, so that the issues raised herein could be raised in the direct appeal appellate brief, however, due to counsel's serious error in failing to timely file the motion for permission to file brief in excess of 50 pages, counsel could not raise the issues raised herein, on the motion for relief from judgment, on direct appeal and was forced to abandon and omit the issues she wished to raise because due to her own serious error of failing to comply with MCR 7.212 (B) the number of pages was limited to 50 pages.

Counsel's non-compliance with MCR 7.212(B) constitutes ineffective assistance of counsel. See, e.g., Baldayaque v US, 338 F.3d 145, 152 (2d Cir. 2003)(counsel's failure to file post-conviction motion to vacate despite being directed to by defendant "violated a basic duty of an attorney"); US v Mannino, 212 F.3d 835, 845 (3d Cir. 2000)(counsel's failure to renew objection on appeal to court's methodology in determining amount of heroin attributable to defendants at sentencing was ineffective

assistance because, had issue been raised, court of appeals would have vacated sentences and remanded for proper analysis); US v Williamson, 183 F.3d 458, 463-64 (5th Cir. 1999)(counsel's failure to cite directly controlling precedent was ineffective assistance because it was objectively unreasonable and resulted in prejudice to defendant); McFarland v Yukins, 356 F.3d 688, 710 (6th Cir. 2004)(appellate counsel's failure to claim ineffective assistance resulting in prejudicial result at the trial level was ineffective assistance because defendant would have likely prevailed had issue been raised); Mason v Hanks, 97 F.3d 887, 894 (7th Cir. 1996)(counsel's failure to raise obvious and significant issues was ineffective assistance because it was without legitimate strategic purpose); Carter v Bowersox, 265 F.3d 705, 715-16 (8th Cir. 2001)(appellate counsel's failure to discover instructional error and raise due process claim on appeal was ineffective assistance because at least 1 juror was uncertain about defendant's guilt); Delgado v Lewis, 223 F.3d 976, 980-82 (9th Cir. 2000)(counsel's failure to raise any arguable issues in appellate brief was ineffective assistance); Banks v Reynolds, 54 F.3d 1508, 1515-16 (10th Cir. 1995)(counsel's failure to raise issues of trial counsel's conflict of interest and prosecution's failure to provide exculpatory material was ineffective assistance because claims were "clearly meritorious" and defendant prejudiced by counsel's error); Eagle v Linahan, 279 f.3d 926, 943 (11th Cir. 2001)(appellate counsel's failure to argue that prosecutor violated Batson rule by exercising preemptory strike on basis of juror's race was ineffective assistance because clear claim would have succeeded on appeal).

Counsel's ineffectiveness in the case at bar, for failing to comply with MCR 7.212 (B) and timely filing the motion for permission to file brief in excess of 50 pages was due to clear inexperience or **lack of knowledge of controlling law, rather than reasonable [appellate] strategy."** See Washington v Hofbauer, 228 F.3d 689, 702 (6th Cir. 2000); Gravley v Mills, 87 F.3d 779, 785-86(6th Cir. 1996); Rachel v Bordenkircher, 590 F.2d 200, 204 (6th Cir. 1978).

Moreover, appellate counsel's ineffectiveness indeed prejudiced Defendant Pouncy. Had counsel timely filed the motion for permission to file brief in excess of 50 pages there's a reasonable probability that the Court of appeals would have granted leave to file a brief in excess of 50 pages, based on the length of the transcripts (more than 2000 pages), the number of pretrial motions, the number and complexity of the issues, and the sub issues, and appellate counsel's deliberate appellate strategy of raising **all of the constitutional violations,** specifically the issues raised herein, on the motion for relief from judgment, which counsel was forced to omit and abandon, which she deemed meritorious. So had counsel timely filed the motion for permission to file brief in excess of 50 pages, and the Court of Appeals granted leave to file a brief in excess of 50 pages, the issues that are currently being raised would have been raised on direct appeal and due to them being clearly meritorious and warranting reversal, there's a very reasonable probability that they would have succeeded on appeal. Therefore, there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at Strickland, 466 US at 694, 104 S,Ct 2052.

This is not a case where appellate counsel was not aware of the omitted and abandoned issues or deliberately decided not to raise the issues. But quite contrarily, appellate counsel did base her appellate strategy on raising the issues currently raised herein on the motion for relief from judgment, on direct appeal, but her "serious error" in not timely filing the motion for permission to file brief in excess of 50 pages, caused her to render ineffective assistance to Defendant Pouncy. In other words, Ms. Grove, based her appellate strategy on raising the issues that are contained in the motion for relief from judgment along with the issues that were raised on direct appeal of right, but due to her "deficient performance" in failing to timelt file the motion for permission to file brief in excess of 50 pages, she was forced to involuntarily omit and abandon the significant, obvious, and meritorious issues which

Case 2:13-cv-14695-MFL-LJM ECF No. 8-22, PageID.2390 Filed 05/20/14 Page 272 of 279

are now currently being raised on the motion for relief from judgment.

The remedy for counsel's ineffective assistance should put defendant back in position he would have been in if Sixth Amendment violation had not occurred. See United States v Blaylock, 20 F.3d 1458, 1468 (9th Cir. 1994). The remedy in the case at bar, is to either reinstate Defendant Pouncy's right to appeal and provide him with effective appellate counsel who is aware of the controlling law which governs "motions for permission to file brief in excess of 50 pages", or to excuse the "cause" requirement set forth in MCR 6.508 (D)(3), because appellate counsel's ineffectiveness on direct appeal of right is the "good cause" why Defendant Pouncy was prevented from raising the issues currently being raised, in this motion for relief from judgment, on his direct appeal of right. Once again, appellate counsel recognized that the issues raised herein on the motion for relief from judgment, should have been raised on direct appeal of right along with the other issues presented, but her error in failing to comply with MCR 7.212 (B), prevented her from doing so. Defendant Pouncy is entitled to be "put back in the position he would have been in if Sixth Amendment violation had not occurred." Blaylock, supra at 1468.

The Sixth Amendment, made applicable to the States by was of the Due Process Clause of the Fourteenth Amendment (see Gideon v Wainwright, 372 US 335, 83 S.Ct 792, 9 L.Ed.2d 799 (1963)), entitles a criminal defendant to the effective assistance of counsel not only at trial, but during his first appeal as of right. Evitts v Lucey, 469 US 387, 105 S.Ct 830, 830 L.Ed.2d 821 (1985). As the Court explained in Evitts:

> In bring an appeal as of right from his conviction, a criminal defendant is attempting to demonstrate that the conviction, with its consequent drastic loss of liberty, is unlawful. To prosecute the appeal, a criminal appellant must face an adversary proceeding that-like a trial-is governed by intricate rules that to a

layperson would be hopefully forbidding. An
unrepresented appellent-like an unrepresented
defendant at trial-is unable to protect the
vital interests at stake. To be sure,
respondent did have nominal representation
when he brought this appeal. But nominal
representation on an appeal of right-like
nominal representation at trial-does not
suffice to render the proceedings
constitutionally adequate; a party whose
counsel is unable to provide effective
representation is in no better position than
one who has no counsel at all.

469 US at 396, 105 S.Ct at 836. A defendant whose lawyer does not provide him with
effective assistance on direct appeal and who is prejudiced by the deprivation is thus
entitled to a new appeal. See, e.g., May v Henderson, 13 F.3d 528, 537 (2d Cir.), cert.
denied, ___ US ___, 115 S.Ct 81, 130 L.Ed.2d 35 (1994); Claudio v Scully, 982 F.2d 798,
806 (2d Cir. 1992), cert denied, 508 US 912, 113 S.Ct. 2347, 124 L.Ed.2d 256 (1993);
Fagan v Washington, 942 F.2d 1155, 1156 (7th Cir. 1991); Berry v Brower, 864 F.2d 294,
300-01 (ed Cir. 1988); Matice v Wainwright, 811 F.2d 1430, 1439 (11th Cir. 1987); Grady
v Artuz, 931 F.Supp. 1048, 1053-54 (S.D.N.Y. 1996); Laffosse v Walters, 585 F.Supp
1209, 1214 (S.D.N.Y. 1984).

In this case, counsel's failure to timely file the motion for permission to file
brief in excess of 50 pages, limited the brief on appeal to only 50 pages, which were
ell used up, without being able to include all of the issues deemed necessary to raise.
Since both briefs, Ms. Grove's primary appellate brief and Defendant Pouncy's
supplemental brief, used up all 50 pages end they could not contain any more issues so
the issues raised herein weren't able to be presented to the Court of Appeals on the
appeal of right because the briefs were limited to only 50 pages which weren't enough to
raise the issues, this is why appellate counsel filed the motion to file brief in excess
of 50 pages so she would have enough pages to raise the issues but due to her own error

both briefs the primary brief and the supplemental brief by Defendant Pouncy was limited to only 50 pages which caused counsel to have to involuntarily omit viable constitutional violation based issues.

XXIII. THE GOOD CAUSE REQUIREMENT IS SATISFIED IN THIS CASE, BECAUSE APPELLATE COUNSEL'S INEFFECTIVENESS ON DERECT APPEAL OF RIGHT PREVENTED DEFENDANT POUNCY, FROM RAISING THE ISSUES WHICH ARE BEING RAISED HEREIN, ON THE MOTION FOR RELIEF FROM JUDGMENT, DURING HIS DIRECT APPEAL OF RIGHT. THE ONLY RECOURSE AVAILABLE IS TO RAISE THE REMAINING ISSUES THAT COULD NOT BE CONTAINED IN THE INITIAL BRIEF ON DIRECT APPEAL IS TO RAISE THEM AT THE MOTION FOR RELIEF FROM JUDGMENT STAGE.

On direct appeal, as set forth in detail in the ineffective assistance of appellate counsel issue, Defendant Pouncy's appellate attorney, Ms. Chari K. Grove, recognized a substantial amount of significant, obvious, and meritorious appealable issues and deemed it necessary to present all of the viable issues on the direct appeal of right. Ms. Grove, submitted a motion to extend the pages of the brief beyond the 50 page limit, however, she failed to comply with MCR 7.212 (B) and file the motion 10 days prior to filing the appellate brief end it was returned without being ruled on by the Court of appeals, as untimely. Therefore, counsel was forced to omit and abandone significant, obvious, and meritorious issues, on direct appeal of right and now the issues which were abandoned and omitted are being raised at this stage.

Defendant Pouncy, submits that due to counsel's ineffectiveness for feiling to timely file the motion for permission to file brief in excess of 50 pages, satisfies the "good cause" requirement, because had counsel filed the motion timely there's a reasonable probability that the Court of Appeals would have granted leeve to file a brief in excess of 50 pages and the issues which are currently being raised, in the motion for relief from judgment, would have been raised on the direct appeal of right. Constitutionally ineffective assistance of counsel is "good cause" for a state procedural default, see Murray v Carrier, 477 US 478, 488, 106 S.Ct 2639, 91 L.Ed.2d 397 (1986), including in the 6.500 motion context. People v Reed, 449 Mich 375, 378 (1995).

The only reasonable and conceivable avenue available to Defendant Pouncy after appellate counsel was forced to omit and abandon significant, obvious, and meritorious

issues from the direct appeal of right, is to present the issues that appellate counsel was forced to omit and abandon, at this stage in a motion for relief from judgment.

Moreover, some of the issues that are currently being raised herein, weren't capable of being raised during the direct appeal stage, because they weren't discovered until after the conclusion of the direct appeal of right and are newly discovered evidence issues. Therefore, the good cause requirement concerning the issues raised herein are satiated. MCR 6.508(D)(3)(A).

XXIV.  THE ACTUAL PREJUDICE REQUIREMENT IS ALSO
SATISFIED IN THE CASE AT BAR, BECAUSE BUT FOR
SOME OF THE ISSUES RAISED HEREIN DEFENDANT
WOULD HAVE HAD A REASONABLE LIKELY CHANCE OF
ACQUITTAL, AND SOME OF THE IRREGULARITIES
WERE SO OFFENSIVE TO THE MAINTENANCE OF A
SOUND JUDICIAL PROCESS THAT THE CONVICTIONS
SHOULD NOT BE ALLOWED TO STAND REGARDLESS OF
ITS EFFECT ON THE OUTCOME OF THE CASE.

In the case at bar, there was a complete absence of physical evidence to connect Defendant Pouncy to the offenses or the scene of the crime. The prosecution's case rested chiefly and solely upon the testimony of witnesses' testimont, alleged eyewitnesses, which is insubstantial evidence at best. as recognized by the Federal Courts, there are "grave reservations concerning the reliability of eyewitness testimony." Blackburn v Foltz, 828 F .2d 1177, 1186 (6th Cir. 1987)(citing Wilson v Cowan, 578 F.2d 166, 168 (6th Cir. 1978). When a case turns on the relative credibilies of the defendant and the prosecution's witnesses, a strick adherence to the rulers of evidence and appropriate prosecutorial conduct is required to ensure a fair trial. Martin v Parker, 11 F.3d 613, 616-17 (6th Cir. 1993). In other words, in cases as the one at bar, any irregularity could affect the defendant's right to a fair trial, because of the lack of physical evidence the errors cannot be considered harmless. But for some of the irregularities raised herein, Defendant pouncy would have had a reasonably likely chance of acquittal.

Moreover, some of the irregularities raised herein are so offensive to the maintenance of a sound judicial process that the convictions should not be allowed to stand regardless of its effect on the outcome of the case. In other words, some of the issues raised herein are structural errors, and are not subject to any harmless error analysis. Arizona v Fulimante, 499 US 279, 307-09 (1991). Structural errors affect "the framework within which the trial proceeds" and involve "basic protections, [without which], a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." Id. at 307-09 (quoting Rose v Clark, 478 US 570, 577-78 (1986)).

253

Defendant Pouncy has satisfied the "actual prejudice" requirement. MCR 6.508(b)(i) and (iii). See each individual issues raised herein to see the demonstrated prejudice that resulted from each individual irregularity. Reversal is required.

## RELIEF REQUESTED

For the above reasons, Defendant prays that this Honorable Court set aside the convictions in the above case.

## ORAL ARGUMENT REQUESTED

Resolution of the issues raised herein will require that this court have an accurate understanding of the arguments presented. Oral arguments are necessary to resolve any questions the Court may have regarding the complex facts and issues in this case, and to allow the Defendant to apply any new intervening case-law to its situation , the Court should grant oral argument or minimally provide some mechanism for resolving factual and legal questions which may arise during the pendency of the instant appeal. The permissive language of MCR 6.508 (B) allows the Court to afford parties an opportunity for oral arguments.

Dated: January 10, 2010

Respectfully submitted,

*Omar Rashad Pouncy*
Omar Rashad Pouncy
MDOC# 571990
Carson City Corr. Fac.
P.O. Box 5000
Carson City, MI 48811

255