CFJ-287 Rev. 7/05

## DEFENDANT'S VERSION OF THE OFFENSE

In your own words, write out your version of this offense.

1) How did you become involved in this offense?

It is your opportunity to present your version of:

- -what happened;
- who you were with;
- when it occurred and,
- why.

2) Briefly describe how you were apprehended and when. Your version will be included in the report as written; however, please be as brief as possible. If your version is unduly long, it may be paraphrased. The victim (if any) will also be given the opportunity to present their version. Use back if additional pages are needed.

I drove away a car during a robbery, with weapon Crimes, and other poverty the year of 2005, around October.

Signature: _[signature]_

Date 2.22.06

* No corresponding field in OMNI, use for PSI information only

```
DDDC FYO05C1034                    FELONY CRIMINAL                              Page  01  of 05
                                   Docket Changes
Original Defendants 01        Judge/Magistrate # 31   Name CHRISTOPH     ODETTE
Case Number FYO05C1034           Circuit Judge # 40   Name GEOFFREY  L   NEITHERCUT
P/STATE OF MICHIGAN          ,                    _____
A/P35086 LEYTON              ,DAVID    S
                      VS                       ┌─────────────────────────────────────────┐
                                               │        Defendant Information            │
D/PIERCE           ,TIAKAWA    LEONDIS TE       │ CTN# 250500343801  SID# 2415683T        │
A/P23157 RAGNONE       ,SAMUEL A                │ Def DOB 19870905  Tckt# ____            │
                                               │ TCN# L807012103X   ENF/Unit ____        │
                                               │ OCA# 05-4219                            │
                                               └─────────────────────────────────────────┘
```

| Date     | Fee    | CD  | Register of Actions 1                2          |
|----------|--------|-----|--------------------------------------------------|
| 20051015 | 000.00 | CW  | COMPLAINT SWORN - WARRANT AUTHORIZED             |
| 20051015 | 000.00 | ORI | ORIGINATING AGENCY             MI2584500         |
| 20051015 | 000.00 | FEL | FELONY                         CT I-CARJACKING/750.529A    |
| 20051015 | 000.00 | FEL | FELONY                         CT II-CARJACKING/750.529A   |
| 20051015 | 000.00 | FEL | FELONY                         CT III-CARJACKING/750.529A  |
| 20051015 | 000.00 | FEL | FELONY                         CT IV-ROBBERY-ARMED/750.529 |
| 20051015 | 000.00 | FEL | FELONY                         CT V-ROBBERY-ARMED/750.529  |
| 20051015 | 000.00 | FEL | FELONY                         CT VI-ROBBERY-ARMED/750.529 |
| 20051015 | 000.00 | FEL | FELONY                         CT VII-ROBBERY-ARMED/750.529 |
| 20051015 | 000.00 | FEL | FELONY                         CT VIII-WEAPONS-FELONY-      |

Push F1 for next page or enter page desired

GCDC FYO05C1034

FELONY CRIMINAL

Docket Changes

Original Defendants 01    Judge/Magistrate # 31    Name CHRISTOPH . ODETTE

Case Number FYO05C1034    Circuit Judge # 40    Name GEOFFREY L NEITHERCUT

P/STATE OF MICHIGAN ,

A/P35086 LEYTON ,DAVID S

VS

D/PIERCE ,TIAKAWA LEONDIS TE

A/P23157 RAGNONE ,SAMUEL A

```
Defendant Information
CTN# 250500343801   SID# 2415683T
Def DOB 19870905    Tckt#
TCN# L807012103X    ENF/Unit
OCA# 05-4219
```

| Date | Fee | CD | Register of Actions 1 | 2 |
|------|-----|-----|----------------------|---|
| 20051015 | 000.00 | CON | FIRARM/750.227B-A | |
| 20051015 | 000.00 | FEL | FELONY | CT IX-WEAPONS-FELONY- |
| 20051015 | 000.00 | CON | FIREARM/750.227B-A | |
| 20051015 | 000.00 | IOD | INVESTIGATING OFFICER-DEPT | DET GAGLIARDI/MT MORRIS TWP |
| 20051015 | 000.00 | CN | COMPLAINT NUMBER | 05-4219 |
| 20051015 | 000.00 | DLN | DRIVERS LICENSE NUMBER | P620793507691 MI |
| 20051015 | 000.00 | RS | RACE/SEX | B,M |
| 20051015 | 000.00 | POO | PLACE OF OCCURRENCE | MT MORRIS TWP |
| 20051015 | 000.00 | DOO | DATE OF OFFENSE | 10-11-05 |
| 20051015 | 000.00 | ET | ENTRY TYPE | 03 |

Push F1 for next page or enter page desired

DDC FYO05C1034

FELONY CRIMINAL

Docket Changes

Original Defendants 01     Judge/Magistrate # 31   Name CHRISTOPH  ODETTE
Case Number FYO05C1034     Circuit Judge # 40      Name GEOFFREY L NEITHERCUT

P/STATE OF MICHIGAN       ,
A/P35086 LEYTON           ,DAVID   S

                    VS

D/PIERCE                  ,TIAKAWA    LEONDIS TE
A/P23157 RAGNONE          ,SAMUEL A

```
┌─────────────────────────────────────────────────────┐
│            Defendant Information                      │
│ CTN# 250500343801     SID# 2415683T                  │
│ Def DOB 19870905      Tckt# ___                      │
│ TCN# L807012103X      ENF/Unit ___                   │
│ OCA# 05-4219                                          │
└─────────────────────────────────────────────────────┘
```

| Date | Fee | CD | Register of Actions 1 | 2 |
|------|-----|----|----|---|
| 20051015 | 000.00 | WC | WARRANT CHARGE | 2499 |
| 20051015 | 000.00 | CSW | CASE SENT TO WARRANT DIVISION | |
| 20051017 | 000.00 | CRL | CASE RECEIVED LEIN | |
| 20051017 | 000.00 | LE | LEIN ENTRY | NORMAN/ORIG |
| 20070330 | 000.00 | LC | LEIN CANCELLED | LODGED/NORMAN/15090381 |
| 20070330 | 000.00 | CS | CASE SENT TO | HOLDING/RULE |
| 20070330 | 000.00 | SCR | SECRETARY/COURT RECORDER | TAMMY EWKA   CER 5727 |
| 20070330 | 000.00 | ARJ | ARRAIGNED BY JUDGE | HUGHES |
| 20070330 | 000.00 | PT | PRE-TRIAL | 04 05 2007 01 00 9 COUNTS |
| 20070330 | 000.00 | PEX | PRELIMINARY EXAM | 04 10 2007 08 30 9 COUNTS |

Push F1 for next page or enter page desired

DDC FYO05C1034

FELONY DOCKET INFO

Docket Changes

Original Defendants 01    Judge/Magistrate # 31    Name CHRISTOPH    ODETTE
Case Number FYO05C1034    Circuit Judge # 40    Name GEOFFREY   L   NEITHERCUT

P/STATE OF MICHIGAN _____ , _____
A/P35086 LEYTON _____ ,DAVID    S _____
                    VS
D/PIERCE _____ ,TIAKAWA    LEONDIS TE
A/P23157 RAGNONE _____ ,SAMUEL A _____

```
┌─────────────────────────────────────────────┐
│          Defendant Information                │
│ CTN# 250500343801      SID# 2415683T          │
│ Def DOB 19870905     Tckt# _____           │
│ TCN# L807012103X      ENF/Unit ____           │
│ OCA# 05-4219 _____                          │
└─────────────────────────────────────────────┘
```

| Date | Fee | CD | Register of Actions 1 | 2 |
|------|-----|-----|----------------------|---|
| 20070330 | 000.00 | BSA | BOND SET | C/S,$25000,C/S,$25000 |
| 20070330 | 000.00 | CON | C/S,$25000 | |
| 20070330 | 000.00 | CON | C/S,$25000 | |
| 20070330 | 000.00 | CON | C/S,$25000 | |
| 20070330 | 000.00 | CON | C/S,$25000 | |
| 20070330 | 000.00 | CON | C/S,$25000 | |
| 20070330 | 000.00 | CON | C/S,$25000 | |
| 20070330 | 000.00 | CON | C/S,$25000 | |
| 20070330 | 000.00 | NCV | NO CONTACT WITH VICTIM | |
| 20070330 | 000.00 | CON | NOT TO POSSESS DANGEROUS WEAPONS | |

Push F1 for next page or enter page desired

DDDC FYO05C1034                    Docket Changes
                                                    Name  CHRISTOPH   ODETTE
Original Defendants 01    Judge/Magistrate # 31      Name  GEOFFREY  L  NEITHERCUT
Case Number FYO05C1034   Circuit Judge # 40

P/STATE OF MICHIGAN        ,
A/P35086 LEYTON            ,DAVID    S
                    VS
D/PIERCE                   ,TIAKAWA    LEONDIS TE
A/P23157 RAGNONE           ,SAMUEL A

```
+---------------------------------------------------+
|             Defendant Information                 |
| CTN# 250500343801    SID# 2415683T                |
| Def DOB 19870905     Tckt#                        |
| TCN# L807012103X     ENF/Unit                     |
| OCA# 05-4219                                       |
+---------------------------------------------------+
```

| Date | Fee | CD | Register of Actions 1                       2 |
|------|-----|-----|--------------------------------------------|
| 20070330 | 000.00 | JOF | JUDGE ORDERED FINGERPRINTS        MT MORRIS TWP PD |
| 20070330 | 000.00 | AA | APPOINT ATTORNEY REQUESTED |
| 20070402 | 000.00 | TCN | TRANSACTION CONTROL NO.     L807012103X |
| 20070409 | 000.00 | AF | APPEARANCE FILED            D1/RAGNONE      ,SAMUEL A |
| 20070411 | 000.00 | MN | MOTION SCHEDULED            04 12 2007 08 30 ------ |
| 20070412 | 000.00 | MF | MOTION FILED                FOR REDUCTION OF BOND |
| 20070412 | 000.00 | MH | MOTION HEARD                DENIED |
| 20070412 | 000.00 | REV | REVIEW HEARING             06-05-2007 @  8:30 |
| 20070425 | 000.00 | MF | MOTION FILED                ALLOW ATTY TO WITHDRAW |
| 20070425 | 000.00 | MN | MOTION SCHEDULED            05 01 2007 01 00 ------- |

Push F1 for next page or enter page desired

DDC FYO05C1034

Docket Changes

Original Defendants 01   Judge/Magistrate # 31   Name CHRISTOPH  ODETTE
Case Number FYO05C1034   Circuit Judge # 40   Name GEOFFREY  L  NEITHERCUT

P/STATE OF MICHIGAN      ,
A/P35086 LEYTON          ,DAVID    S

                    VS

D/PIERCE                 ,TIAKAWA     LEONDIS TE
A/P23157 RAGNONE         ,SAMUEL A

```
Defendant Information
CTN# 250500343801   SID# 2415683T
Def DOB 19870905    Tckt# _____
TCN# L807012103X    ENF/Unit ____
OCA# 05-4219
```

| Date | Fee | CD | Register of Actions 1 | 2 |
|------|-----|-----|----------------------|---|
| 20070417 | 000.00 | RFE | REFERRAL/FORENSIC EVALUATION | |
| 20070604 | 000.00 | MIS | JUDGE NEEDS TO SIGN ORDERS FOR FORENSIC | |
| 20070605 | 000.00 | MIS | ORDERS SIGNED AND FAXED TO FORENSIC CENTER | |
| 20070605 | 000.00 | REV | REVIEW HEARING | 07-10-2007 @ 8:30 |
| 20070706 | 000.00 | FC | FOUND COMPETENT | |
| 20070712 | 000.00 | PEX | PRELIMINARY EXAM | 07-24-2007 @ 8:30 |
| 20070720 | 000.00 | WF | WRIT FILED | HABEAS CORPUS |
| 20070720 | 000.00 | LOE | LEAVE ON EXAM | 07 24 2007 08 30 CARJACKING |
| 20070725 | 000.00 | WF | WRIT FILED | HABEAS CORPUS |
| 20070725 | 000.00 | PEX | PRELIMINARY EXAM | 08-07-2007 @ 8:30 |

Push F1 for next page or enter page desired

```
ODC  FYO05C1034          PRIORITY DOCUMENT          Docket Changes
Original Defendants 01    Judge/Magistrate # 31   Name CHRISTOPE  ODETTE
Case Number FYO05C1034      Circuit Judge # 40     Name GEOFFREY  L  NEITHERCUT
P/STATE OF MICHIGAN      ,
A/P35086 LEYTON          ,DAVID    S          ┌─────────────────────────────────────┐
                 VS                          │      Defendant Information          │
D/PIERCE        ,TIAKAWA    LEONDIS TE       │ CTN# 250500343801   SID# 2415683T   │
A/P23157 RAGNONE         ,SAMUEL A           │ Def DOB 19870905    Tckt#           │
                                             │ TCN# L807012103X    ENF/Unit        │
                                             │ OCA# 05-4219                        │
                                             └─────────────────────────────────────┘
```

| Date | Fee | CD | Register of Actions 1 | 2 |
|------|-----|----|----|----|
| 20070802 | 000.00 | LOE | LEAVE ON EXAM | 08 07 2007 08 30 9 COUNTS |
| 20070806 | 000.00 | IF | INFORMATION FILED | REQUEST FOR PRETRIAL |
| 20070806 | 000.00 | CON | DEMAND FOR DOCUMENTS | |
| 20070808 | 000.00 | LOE | LEAVE ON EXAM | 08 14 2007 08 30 CARJACKING |
| 20070808 | 000.00 | PEX | PRELIMINARY EXAM | 08-14-2007 @ 8:30 |
| 20070814 | 000.00 | WF | WRIT FILED | HABEAS CORPUS-WITNESS |
| 20070814 | 000.00 | WF | WRIT FILED | HABEAS CORPUS-WITNESS |
| 20070817 | 000.00 | PEX | PRELIMINARY EXAM | 08-28-2007 @ 8:30 |
| 20070824 | 000.00 | LOE | LEAVE ON EXAM | 08 28 2007 08 30 CARJACKING |
| 20070828 | 000.00 | MIS | FILE SENT TO JUDGE FOR SIGNATURE | |

Push F1 for next page or enter page desired

MDDC FYO05C1034          FELONY CRIMINAL
                         Docket Changes
Original Defendants 01    Judge/Magistrate # 31   Name CHRISTOPH . ODETTE
Case Number FYO05C1034    Circuit Judge # 40       Name GEOFFREY L NEITHERCUT
P/STATE OF MICHIGAN        ,
A/P35086 LEYTON           ,DAVID    S

                  VS                    ┌─────────────────────────────────────┐
                                        │       Defendant Information          │
D/PIERCE          ,TIAKAWA    LEONDIS TE│ CTN# 250500343801   SID# 2415683T    │
A/P23157 RAGNONE          ,SAMUEL A     │ Def DOB 19870905   Tckt#             │
                                        │ TCN# L807012103X    ENF/Unit         │
                                        │ OCA# 05-4219                         │
                                        └─────────────────────────────────────┘

Date        Fee      CD    Register of Actions 1           2
20070828   000.00   MIS   ADDED COUNT X- CARRYING
20070828   000.00   CON   CONCEALED WEAPON
20070828   000.00   EXH   EXAM HELD              BOUND OVER CIRCUIT COURT FOR
20070828   000.00   CON   09-10-07 01:30PM NEITHERCUT AS CHARGED PLUS ADDED CT X
20070828   000.00   BC    BOND CONTINUED              C/S,$25000,C/S,$25000
20070828   000.00   CON   C/S,$25000,C/S,$25000
20070828   000.00   CON   C/S,$25000,C/S,$25000
20070828   000.00   CON   C/S,$25000,C/S,$25000
20070828   000.00   CON   C/S,$25000,C/S,$25000
20070828   000.00   BOC   BOUND OVER TO CIRCUIT COURT CT I,II,III,IV THRU X
Push F1 for next page or enter page desired

DDDC FYO05C1034          TESTIMONY DOCTRINAL
                            Docket Changes

Original Defendants 01    Judge/Magistrate # 31   Name CHRISTOPH . ODETTE
Case Number FYO05C1034     Circuit Judge # 40      Name GEOFFREY L NEITHERCUT
P/STATE OF MICHIGAN        ,
A/P35086 LEYTON           ,DAVID    S

                    VS                          ┌─────────────────────────────────────┐
                                                │        Defendant Information        │
                                                │ CTN# 250500343801   SID# 2415683T   │
D/PIERCE                  ,TIAKAWA    LEONDIS TE │ Def DOB 19870905  Tckt#             │
A/P23157 RAGNONE          ,SAMUEL A             │ TCN# L807012103X   ENF/Unit         │
                                                │ OCA# 05-4219                        │
                                                └─────────────────────────────────────┘

  Date        Fee      CD    Register of Actions 1        2
20070830    000.00    DTL    DISPOSITION TO LANSING       CT I
20070912    000.00    DTL    DISPOSITION TO LANSING       CT I
20070904    000.00    CSC    CASE SENT TO CIRCUIT CT..    07-21200-FC

Push F1 for next page or enter page desired

**Exhibit N**

# Mt. Morris Township Police Department
## Standard Incident Report

| | |
|---|---|
| **Incident No:** | 05-004219 |
| **Status:** | Inactive |

**Date Reported:** 10/11/2005    **Time Reported:** 19:05

**Officer:** Phillips

**Classification:** ROBBERY -- (1200-0)

**Location:** Kellar, 5349          **Section:** 23          **Nbh:**

**Description:** Carjacking          **Clerk:** DP

---

**Complainant / Victim:**
Sandstrom, Maria
22 Chateau DuLac
Fenton, MI 48430
**DOB:** 11/23/1948
**Phone:** (810) ~~730-9321~~

**Race:** White    **Sex:** Female

**Complainant / Victim:**
Sandstrom, Thomas Charles
22 Chateau DuLac
Fenton, MI 48430
**DOB:** 05/30/1948
**Phone:** (810) ~~730-9021~~

**Race:** White    **Sex:** Male
**Notes:** Alt #: 248-857-0405

**Suspect:**
Grimes, Wayne Demetrius Jr
5206 Kermit St
Flint, MI 48505
**DOB:** 10/06/1987

**Suspect:**
Pierce, Tiakawa Leondis-Terrel
6118 Flowerday
Mt Morris, MI 48458
**DOB:** 09/05/1987
**Phone:** (810) ~~616-5796~~
**Ops:** P 620 793 507 691 / MI

**Race:** Black    **Sex:** Male    **Hair:** Black    **Eyes:** Brown    **Ethnicity:**
**Height:** 5'06"    **Weight:** 130 lbs.    **Build:**    **Complex:**    **Resident:**

**Suspect:**
Pouncy, Omar Rashad
2617 Gibson St.
Flint, MI 48503
**DOB:** 05/03/1987
**Phone:** (810) ~~618-9821~~
**Soc. Sec.:** 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
**Ops:** P520 661 730 339 / MI

**Race:** Black    **Sex:** Male    **Hair:** Black    **Eyes:** Brown    **Ethnicity:**
**Height:** 5'06"    **Weight:** 160 lbs.    **Build:**    **Complex:**    **Resident:**

**Witness:**
Gagliardi, James
5447 Bicentennial Parkway
MT. MORRIS, MI 48458
**Phone:** (810) 785-1311

**Race:** White    **Sex:** Male
**Notes:** POLICE OFFICER

**Witness:**
McKinley, Willie Joyce
5349 Kellar
Flint, MI 48505
**DOB:** 06/21/1953
**Phone:** (810) 785-1064

**Race:** Black    **Sex:** Male

---

| **Signed:** | **Reviewed By:** | **Date Printed:** 10/14/2005 |
|---|---|---|

# Mt. Morris Township Police Department
## Standard Incident Report

| | |
|---|---|
| Incident No: 05-004034 | |
| Status: **Open** | |

| | |
|---|---|
| Date Reported: **09/29/2005** | Time Reported: **14:50** |
| Officer: **Farmer** | |
| Classification: **ROBBERY -- (1200-0)** | |
| Location: **Kellar** | Section / Nbh: **23** |
| Description: **CAR JACKING** | Clerk: **CC** |

**Complainant / Victim:**
**Brady, Earl Edward**
**3423 Duffield Rd.**
**White Lake, MI 48383**
DOB: **09/30/1950**
Phone: **(248) 889-4139 (Main)**
Race: **White**   Sex: **Male**
Notes: **248-505-8565**

**Complainant / Victim:**
**Wendell, Patrick Alan**
**1900 Ormond Rd.**
**White Lake, MI 48383**
DOB: **01/27/1944**
Phone: **(248) 887-4625 (Main)**
Race: **White**   Sex: **Male**
Notes: **248-909-0713**

**Suspect:**
**Grimes, Wayne Demetrius Jr**
**5206 Kermit St**
**Flint, MI 48505**
DOB: **10/06/1987**

**Suspect:**
**Pierce, Tiakawa Leondis-Terrel**
**6118 Flowerday**
**Mt Morris, MI 48458**
Ops: **P 620 793 507 691 / MI**
Race: **Black**   Sex: **Male**   Hair: **Black**   Eyes: **Brown**   Ethnicity:
Height: **5'06"**   Weight: **130 lbs.**   Build:   Complex:   Resident:

**Suspect:**
**Pouncy, Omar Rashad**
**2617 Gibson St.**
**Flint, MI 48503**
DOB: **05/03/1987**
Soc. Sec.: **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**
Ops: **P520 661 730 339 / MI**
Race: **Black**   Sex: **Male**   Hair: **Black**   Eyes: **Brown**   Ethnicity:
Height: **5'06"**   Weight: **160 lbs.**   Build:   Complex:   Resident:
Notes:

**Witness:**
**Davis, Joseph Scott**
**4415 Meadow Brook**
**Flint, MI 48506**
DOB: **05/31/1962**
Phone: **(810) 736-8826 (Main)**
Notes: **810-458-0500**

| Signed: | Reviewed By: | Date Printed: **06/09/2010** |
|---|---|---|

Copyright (c) 1988-2010 by DDP Police Services, Inc.

**Exhibit O**

**Mt. Morris Township Police Department**
**Standard Incident Report**

| Incident No: 05-004219 |
| Page No: 5 |

Original Narrative (continued):

stopped in front of her. She was at the back of the Intrepid. She stated she observed that the unknown B/M approached the house and it appeared that he spoke with the homeowner at that house. She stated that the suspect came back from the house and was speaking with her husband. She stated that Mr SANDSTROM came to her and asked her for the title. While she was trying to retrieve the title for Mr SANDSTROM she observed that the unknown B/M had a gun on her husband and did advise her to "get the fuck out of the car". Once they got out of the car, the unknown B/M then advised Mr SANDSTROM to give him his wallet and advised both of them to start walking into the woods. Ms SANDSTROM stated that a short time later the suspects drove away in their Corvette and white Eldorado. At this time they walked back to Coldwater Road where they did observe police.

I asked Mrs SANDSTROM what the suspect with the gun looked like. She stated he was a dark skinned B/M with a beige coat with blue jeans, approximately 5'10", 180 lbs and that he had a black pistol. Ms SANDSTROM stated that there were two other people involved and she didn't get a good look at the suspects. She stated she got a look at one of the suspects but couldn't tell if it was a man or a woman. She stated that they were medium build and had a ponytail. She could not get a good description on the other two suspects other than that. I asked Mr and Mrs SANDSTROM if they had ever seen these suspects before. They stated that they had not. I asked them if they had caller I.D. at the home when the suspects called. They stated no. I advised them to retrieve their phone records for that day of 10/10/05 and 10/11/05 and have that information forwarded to our detective bureau for further information.

At this time I had already let them contact a family member to come and pick them up. They did leave a contact number for this officer.

Myself and officer WILLIAMS and Sgt TOMALIA did go over to 5349 Kellar at approximately 8:28 p.m. where Mr SANDSTROM stated the robbery had occurred. We did make contact with the man in the home. He was identified as CHARLES SMITH JR, 1/20/50. I asked Mr SMITH if he is the homeowner. He stated that he is not, that his friend, WILLIE JOYCE is the registered owner of the home. I asked him if he had talked to someone at approximately 5:45 to 6:00. He stated that he did not but he did look outside where he observed a white in color Cadillac sitting at the end of the driveway. Mr SMITH stated that he immediately advise Mr JOYCE that someone had parked in the driveway. He stated that a short time later that an unknown B/M came up to the door and spoke with Mr JOYCE. Mr SMITH stated that he did not see this B/M at any time and did not talk to him and does not know what he looked like. I asked him if he observed any other vehicles in the street or in the area. He stated that he did not see any other vehicle other than the Cadillac. I asked him when the B/M came to the door if he knew what he talked to Mr JOYCE about. Mr SMITH stated that JOYCE advised him that the B/M wanted to know if he wanted him to mow his yard. Mr JOYCE stated that he did not. I asked him when Mr JOYCE was to be home. He stated that he does not know. I advised him when Mr JOYCE comes home to call 911 to speak with this officer.

Myself and officer WILLIAMS then went to the house at 6093 Penwood to see if the beige Intrepid was in the driveway. We did stationary patrol for a period of time at 6093 Penwood but no beige Intrepid ever came to the house.

At approximately 9:30 p.m. myself and officer WILLIAMS did go back over to 5349 Kellar and tried to make contact with the homeowner Mr JOYCE. I did go and knocked on the door where I was met by Mr JOYCE. I asked him at approximately 5:45 to 6:00 p.m. if he had a conversation with a man in the

**Mt. Morris Township Police Department**
**Standard Incident Report**

| | |
|---|---|
| Incident No: | 05-004219 |
| Page No: | 6 |

Original Narrative (continued):

driveway. He stated at about that time he was advised by his roommate Mr SMITH that someone had pulled into the driveway in a white Cadillac. He stated that he heard a knock on the door where he was approached by a dark skinned B/M wearing a beige or tan in color hooded coat who asked him if he wanted him to mow his yard for some money. Mr JOYCE stated that he found this suspicious and told him no. I asked Mr JOYCE what the male looked like. He stated that he was a dark skinned B/M wearing a beige or tan hooded coat wearing blue jeans, approximately 5'10", 185-190 lbs. Mr JOYCE stated that he observed a red in color vehicle in the roadway but couldn't get a good look at it. I asked Mr JOYCE if he saw any other people outside at any time. He stated that he did not. He stated that after the suspect left his door he did not look outside any longer to see what was going on. At this time I then cleared the scene.

I had Mr and Mrs SANDSTROM write out a written statement as to what occurred. This information will be attached to this report for further review. This information will be forwarded to the detective bureau. Nothing further.

Respectfully Submitted
Joseph Phillips #58
Mt Morris Township Police Department

Transcribed: D Pierce

Supplement/Gagliardi, dated 10/14/05, by Officer Gagliardi:

Sir:

On Tuesday, October 4, 2005, R/t. GAGLIARDI was given complainant #4034-05 regarding a carjacking for follow up investigation. Upon receiving the complainant, I did discover that on September 29, 2005, Officer ROBERT FARMER of the Mt Morris Township PD had taken a car jacking complaint from EARL EDWARD BRADY, w/m, 9/30/50 and his friend PATRICK ALAN WENDELL, w/m, 1/27/44.

Upon receiving this information, I did make contact with the victim, EARL BRADY via tx at his residence. Upon speaking to Mr. BRADY he advised that he had a 1979 Chevy Camaro that was customized and built for racing that he was trying to sell. BRADY stated that he had attempted to sell this vehicle down in the White Lake area, which is where Mr. BRADY resides, however, there wasn't much of a market for this type of vehicle in that area. BRADY stated that he has a friend, JOSEPH SCOTT DAVIS who owns, Mr. Davis Racing located at 3614 Richfield Dr. in Flint. BRADY states that he spoke to DAVIS and asked him if it would be possible to park his camaro out in front of his business in an attempt to sell the vehicle. BRADY states that he had transported his vehicle up to Davis Racing and parked the 79 Camaro in front of the business in hopes of making a sale. BRADY states that he was contacted by his friend, DAVIS who advised him that he had an individual who was interested in purchasing the Camaro and asked if it would be possible for BRADY to meet this individual at Davis Racing. BRADY states that he agreed and he and his friend, PATRICK WENDLE got into their 2003 Ford pick up and headed towards Flint in order to meet up with the potential buyer.

BRADY states that when he arrived at Davis Racing, there were three black males waiting for him along side of a late model Dodge Intrepid that was gray in color. BRADY states that he and his friend, PATRICK WENDLE got out of the truck and began to speak with these subjects about the vehicle. BRADY describes the subjects as subject #1, who he states did all the talking about purchasing the

**Exhibit P**

# Mt. Morris Township Police Department
## Standard Incident Report

| Incident No: 05-004219 |
|---|
| Page No:      , |

Supplement/Gagliardi, dated 10/14/2005, by Officer Gagliardi, completed 10/14/2005 (continued):

no.  I asked GRIMES if he had been threatened or made any promises or intimated in any way and again he stated no.  At that point, I did advise WAYNE GRIMES why he had been arrested and asked him what it was that he knew about this incident.  At first GRIMES stated that he had nothing to do with this and that he wasn't involved.  I then advised GRIMES that we had an eye witness who had obtained his license plate number from the vehicle during the second car jacking.

At that time, GRIMES leaned forward and put his head down into his hands and stated, alright man, I'm gonna tell ya just what happened.  At that point, I asked GRIMES who the two other subjects were that were with him on the prior evening.  At this time, GRIMES stated that he was with OMAR POUNCY and another subject by the name of T.  When I asked GRIMES who T was, he stated that his name was TIAKAWA and that he stayed up on, he thought, Flowerday.  At that point, I asked GRIMES if OMAR and TIAKAWA were involved in the first car jacking and GRIMES stated yes that all three of them committed both robberies.  At that time, I asked GRIMES how it was that he was familiar with OMAR POUNCY and TIAKAWA.  He stated that he has know both of these subjects from the neighborhood and that they hang out in the North end together.  At that time, I asked GRIMES to go back to the first robbery and describe what it was that had taken place on that date.  At that time, GRIMES stated that on 9/29/05 he received a call from OMAR stating that he needed a ride over to Davis Racing somewhere over on Richfield Rd.  GRIMES stated that he asked OMAR POUNCY why he needed a ride.  At which time, OMAR stated that he wanted to check out a car.  I asked GRIMES where it was that he picked up OMAR to which he stated that he picked OMAR and TIAKAWA both up on the street corner at Martin Luther King and Pasadena down in the City.  GRIMES states that once he picked up OMAR and TIAKAWA, OMAR gave him directions on how to get to Davis Racing out on Richfield Rd.

GRIMES states that when they got to Davis Racing, OMAR got out of the car and began to talk with 2 white males who had showed up driving a black Ford pick up and towing a long trailer behind the pick up.  GRIMES states that OMAR POUNCY did all of the talking with the two white males.  GRIMES states that after being at Davis Racing for about 15 minutes, OMAR got back into the car and said let's go.  GRIMES then stated that he needed gas in the vehicle so they drove to the Sunoco gas station at Dort and Carpenter.  GRIMES states that when they got to the Sunoco, they put a few doors worth of gas in the vehicle.  At which time, they left the Sunoco and started heading towards Kellar Rd.  At that time, I asked GRIMES who it was that he got to Kellar Rd to which he stated that he wasn't sure of the way and OMAR gave him the directions.  GRIMES states that when they got to Kellar he turned South and then proceeded down to the dead end.  At that point, I asked GRIMES if he knew what was going to go on when then got to the dead end to which he stated that he knew something was up and that he thought that something was going to happen but, he didn't know exactly what.  GRIMES states that before getting to the dead end of Kellar, OMAR called the victim on his cell phone and asked the victim to back the truck up into the driveway of the last house.  GRIMES states that as they proceeded down to the dead end of Kellar, the victims turned the vehicle around and backed into the driveway.

GRIMES stated that at point, the two white males got out of the truck and he along with OMAR and T got out of their vehicle.  GRIMES states that OMAR proceeded over to the owner of the Camaro and began talking with him.  GRIMES states that OMAR was the one that did all of the talking with the victim.  GRIMES states that while OMAR was dealing with the owner, he and T had lifted the hood on the Camaro and were looking at the engine.  GRIMES states at that point, TIAKAWA walked away and started to walk over towards the two white males, that being EARL BRADY and PATRICK WENDELL.  GRIMES states at that point, he started to walk back over towards his car.  GRIMES states that the next thing he knows, he sees the two white males running East towards the woods from Kellar and that

Copyright (c) 1988-2010 by DDP Police Services, Inc.

JAN-13-2006(FRI) 10:47    Mt. Morris Twp. Police Dept.    (FAX)810 785 7730    P.002/024    5-778

# Mt. Morris Township Police Department
## Standard Incident Report

| | |
|---|---|
| | **Incident No:** 05-004219 |
| | **Status:** Inactive |

**Date Reported:** 10/11/2005    **Time Reported:** 19:05

**Officer:** Phillips

**Classification:** ROBBERY – (1200-0)    **Section:** 23    **Nbh:**

**Location:** Kellar, 5349    **Clerk:** DP

**Description:** Carjacking

Interview w/Wayne Demorius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi:

JG:  Tuesday January 10, 2006, ah this is Det GAGLIARDI of the Mt Morris Township Police Department. I'm taking a statement from WAYNE DEMETRIUS GRIMES JR. Ah present in the room with myself is Mr GRIMES, ah his attorney, JOHN TOSTOS and CHRIS LAROBARDIERE from Genesee County Prosecutors Office. WAYNE I'm gonna take you back to 29th okay September involved ah Mr BRADY and Mr WENDALL, um, they had the black Ford pick up truck, the yellow 79 Chevy Camaro and then the trailer okay. Tell me about what took place.

WG:  We started out the day, earlier (inaudible) I was at home and then OMAR called me. He came over my house. (inaudible) I went to go pick him up. He was with a man named TIAKAWA. I don't know TIAKAWA like that, it's his friend. I don't know him. I don't even know his last name but it was him and TIAKAWA. He said that he was going to buy a car. And I asked him where. He told me at some racing place. I didn't know how to get there. He showed me how to get there. When we got there we went up to the door and knocked and somebody came out and talked to him and then two more men came out and then they showed him the car. They started it up, they took the hood off so he could see the engine. When we was there I got back in the car while he was outside. Then he got back in the car and he told me, he said we're gonna

JG:  Who's he

WG:  OMAR. OMAR got back in the car and he told me he said we about to take to my engineer. I said where's that. He said ah I don't even know the street. But I know it was in Beecher though. I can't remember the street. He said some street and when we went, we was on our way there. We stopped by the gas station and then we was at the gas station pumping gas, got in the car. He was telling me how to get to the street. When we got to the street he said I'm gonna take it, I'm gonna take it. I said what you mean you gonna take it. He like I'm about to just take, I'm gonna take it, we can take it and sell it on the street. Sell it for what. He said we can take the motor out and sell it to, try and sell it to anybody man, it's it's real quick, real quick, quick money, quick money. So, so when we got down to the street he said man I need you to do it, I need you to do it. I'm like what you mean you need me to do it. He like man look dog he said you ain't gotta do nothing man, we we do everything else. Just take the gun, point it point it at them, tell them to give you the phone so they can't call nobody. So I said man I'm alright, I'm alright. They said aw man, come on you a punk man, you a punk. I'm telling everybody, I'm telling everybody. That ain't like you WAYNE, that ain't like you WAYNE. Quit acting like that, man, you acting scary right now. I'm like man, fine I'll do it. So we drive to the end of the road. We drive to the end of the road and park my car and get out. He go knock on the door and then he comes back. Well he went up to the house and then he comes back and this man started the car up again, took the ah hood off the car and when he took the hood off he put the hood in the back of the truck and he was showing us around and he gave me the signal, he nodded his head.

JG:  Who's he

| | | |
|---|---|---|
| Signed: | Reviewed By: | **Date Printed:** 01/13/2006 |

Jan-13-2006 02:01pm From-PROS DAVID S LEYTON 2:13-cv-14695-MFL-LJM Doc # 9-4 Filed 06/09/14 810 785 7730 Pg 20 of 160 T-620 P.003/024 Pg ID 2678 F-738 P.003/024

JAN-13-2006(FRI) 10:47   Mt. Morris Twp. Police Dept.     (FAX)810 785 7730     P.003/024

# Mt. Morris Township Police Department
## Standard Incident Report

Interview w/Wayn i Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

WG:  OMAR. Pulled out the gun, I pulled out the gun, I ordered the chubby dude to give his phone to TIAK. He gave his phone to TIAK. Then I told them to go in the woods. They went in the woods. No wait in between there he said what, in between there, I can't remember exactly what he said but he kept saying something and I shot the gun. I did shoot the gun. I shot the gun in the air back towards, back towards the apartments in the air. Again, he said, alright, alright, alright, then he gave TIAK TIAK the phone. Then I told him to go in the woods and they went in the woods. When they went in the woods I gave the gun to TIAK and then I left in my car and pulled up. That was the first.

JG:  Okay TIAKAWA and OMAR

WG:  TIAK

JG:  Then  hey get in the truck, take the truck and trailer and Camaro.

WG:  Yes, I left

JG:  They never off load the Camaro. That stayed on the back of the trailer.

WG:  They off loaded the Camaro when they got to wherever they, they got to.

JG:  Okay when they finally got to their final destination.

WG:  Yeah, they just pulled the whole truck through

JG:  Now you guys said, you said you guys stopped at the gas station. Is that the Sunoco and Dort and Carpenter.

WG:  Dort and Carpenter no, Dort and Carpenter, it's across the street from the ah the corner store, by the railroad tracks.

CL:  There's railroad tracks right near there.

WG:  It was a junk yard too on the other corner. It's like Sunoco on this corner and store across the street and there's a junk yard and I think it's a bar or something. Like there's railroad tracks and then you

JG:  So that's

WG:  cross the railroad tracks and then you're going towards the highway.

JG:  So you're down towards Richfield Road then. Because the Sunoco at Dort and Carpenter you got the Sunoco on the SE side, you got the ah topless bar on the SW side, you got Parkers Propane on the N, NW side

CL:  Why don't you tell him the route you took, if you came down Richfield Road

Jan-13-2006 02:01pm From-PROS DAVID S LEYTON    2:13-cv-14695-MFL-LJM    Doc # 9-4    Filed 06/09/14    664 Pg 21 of 160    P-004/024    F-578
P. 004/024

JAN-13-2006(FRI) 10:47    Mt. Morris Twp. Police Dept.    (FAX)810 785 7730    P. 004/024

# Mt. Morris Township Police Department
## Standard Incident Report

Interview w/Wayn.: Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/05, by Officer Gagliardi (continued):

WG: Richfield Road is where the racing car is.

JG: (inaudible)

WG: Yeah, came down that way, you turn right on Dort Highway. Well yeah that is there, we kept going all the way straight, straight, straight all the way down Dort Highway then under the bridge, we passed a car, RPM, passed that, kept going straight. Then on the corner of Dort Highway and Carpenter Road.

JG: Okay.

CL: Cause it does sound like Dort and Carpenter then.

WG: Yeah

CL: Okay

JG: So you guys get gas there, you leave um did OMAR talk to anybody at the house do you know, when he got to the dead end of Kermit er ah Kellar.

WG: No I don't think nobody came to the door. Nobody came outside. I don't even know if he knocked on the door for sure. I know he went up to the house but it was like the side door, which is inside the garage and the garage was open.

JG: How did we come up with the dead end of Kellar.

WG: What you mean

JG: For for the place to rob the people.

WG: That's where he told me to go.

JG: That's where he told you to go.

WG: I didn't even know the name of the street. He just told me how to get there.

JG: Did you guys talk about how you went about picking out your victims. How you went about picking out people that had the cars for sale.

WG: No

JG: OMAR do that.

WG: I didn't, he told me how to get there and where to go. He told me he was buying a car. I didn't know that we was taking the car til we got to the gas station. And he just said he gonna take it.

JG: Now you said you picked OMAR and ah TIAK down on Dartmouth at his grandma's.

Jan-13-2006 03:012 4695 om PROS DAVID'S LAYTON # 9-4   Filed 06/02/14 76 Pg 22 of 160 021 Pg 005/024 276-778

JAN-13-2006(FRI) 10:48   Mt. Morris Twp. Police Dept.   (FAX)810 785 7730   P. 005/024

## Mt. Morris Township Police Department
## Standard Incident Report

Interview w/Wayne Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/08, by Officer Gagliardi (continued):

WG:  Wisner

JG:  Wisner and Dartmouth there, right there at the corner where his grandma stays.  So it it wasn't at Pasadena and (inaudible) like they originally said.  Okay, that's fine.  Um, did OMAR call ah one of the victims on a cell phone on the way to Kellar asking him to turn the truck around and back it up in the driveway.

WG:  Yes, back it up for us.

JG:  Okay.  Now the two victims, they get out of the truck.  You three guys, you get out of your car.  OMAR goes up to the house, he comes back, speak to the owner of the Camaro, Mr BRADY

WG:  Yes

JG:  They're talking.

WG:  Yes

JG:  You and TIAKAWA are up on, looking at the looking at the Camaro with Mr WENDALL, at this point.

WG:  Yes

JG:  Okay  Do you guys get down off the trailer, come back towards where Mr BRADY and OMAR are.

WG:  We never was on the trailer, we just looking, he was showing us some, underneath the car.

JG:  Okay

WG:  And we was looking underneath the car and then it was like, we was on the, we was on the side towards the house, not the other house or whatever, but the house, when you back it in, so we all on this side, we all on the same side like, like we is now in this group.

JG:  Okay so then you got down off the trailer, OMAR gives you the nod, the signal.

WG:  Yeah

JG:  Where did ya where did ya get the gun from again.

WG:  TIAK

JG:  TIAKAWA had the gun

WG:  (inaudible)

Jan-13-2006 02:02pm From-PROS-DAVID S LEYTON 4695 MFLs JJM's L Doc # 9-4    Filed 06/09/14 765 Pg 23 of 160 921 Pg ID 032277-778

JAN-13-2006(FRI) 10:48    Mt. Morris Twp. Police Dept.    (FAX)810 785 7730    P. 006/024

## Mt. Morris Township Police Department
### Standard Incident Report

| Incident No: 05-004219 |
| Page No:    5 |

Interview w/Wayne Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

JG: He gives you the gun. Okay. You fire the shot. The victims give up their cell phone and their keys. You give the gun back to TIAKAWA

WG: Yes

JG: Do you know where the gun went after that

WG: No

JG: Do you know where the gun is today

WG: Over to somebody, he probably still has it or could be at his house, at home.

JG: Where would be a good spot for me to be looking for TIAKAWA because it seems like everywhere I look I'm a day late and a dollar short.

WG: I don't know him but back like where he live, I remember picking him up though from the (inaudible) and it was, I don't even know, I don't know my Beecher Street but it like, like you on Detroit Street, you turn right on Coldwater, first street you turn left

JG: Cypress

WG: And like two or three streets you turn right and then you turn left and his house somewhere right, on the right side.

JG: Orange Blossom, McClellan, Flowerday

WG: Yeah (inaudible)

JG: Do you, do you know anybody named MCGRUDER, any MCGRUDER'S.

WG: No

JG: None of them. Okay. Now you take off, you head back home after you guys are done at Kellar with with the victims.

WG: Yes

JG: Okay. Do you know where OMAR and TIAKAWA go. Did you have any other contact that day with them.

WG: Yes later on that night. We talked about it. Said it was crazy.

JG: Who did you talk with.

WG: I talked to OMAR

Jan-13-2006 02:02pm From-PROS DAVID S LEYTON 2:13-cv-14695-MFL-LJM Doc # 9-4 Filed 06/09/14 810 785 7730 Pg 24 of 160 T-602 P.007/024 F-778

JAN-13-2006(FRI) 10:48    Mt. Morris Twp. Police Dept.    (FAX)810 785 7730    P.007/024

# Mt. Morris Township Police Department
## Standard Incident Report

Interview w/Wayne Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

JG:  To OMAR that night. Okay. He said it was crazy.

WG:  He said that was crazy.

JG:  Anything else.

WG:  That was about it.

JG:  Did you ask him where the cars were.

WG:  Yeah, I did ask him where the cars were. And he didn't really tell me where the cars were. He just said they was out in the city.

JG:  Okay. Did he ever say anything about stripping the car, taking the engine out of the Camaro.

WG:  No, I thought that's what he was going to do but he said he was going to sell it. He told me, when we was at the gas station he could sell it and get quick money. And far as I know he didn't ever sell it like he say.

JG:  Okay well I got it sold. I know that. Do you know a guy named SAM WOODS.

WG:  SAM WOODS

JG:  Yep

WG:  SAM WOODS. Sounds familiar, I can't think of him, but it sounds familiar, SAM WOODS. I don't know, I don't know him but his name sound familiar like he was in a line up I could pick him out probably.

JG:  Okay. So you, do you know anything about a chop shop.

WG:  No I don't nothing about no chop shop.

JG:  Nothing like that. Okay.

WG:  A chop shop is where you take the parts off cars right.

JG:  Yeah they take cars into ah the garages, the guys chop the parts out of them and resell them on the street. And that's what happened to the Camaro. Um,

CL:  WAYNE you said engineers, you talked about engineer that ah OMAR said, engineer or did he say if he wanted a mechanic to look at it.

WG:  Mechanic

CL:  Okay  And did he mention a particular garage, did he ever mention the King's garage.

Jan-13-2006 02:02pm From-PROS DAVID S LEYTON 2:13-cv-14695-MFL-LJM Doc # 9-4 Filed 06/09/14 810 785 7730 Pg 25 of 160 T-091 Pg ID 252 P.008/024 F-978

JAN-13-2006(FRI) 10:49    Mt. Morris Twp. Police Dept.    (FAX)810 785 7730    P.008/024

## Mt. Morris Township Police Department
## Standard Incident Report

Incident No: 05-004219

Page No: 7

Interview w/Wayn Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

JG: King Automotive

WG: Yeah

JG: It's on Saginaw.

WG: He said we was taking it to King Automotive.

CL: Is that what he told the guys at the race shop

WG: I don't know what he told them at the race shop. I was in the car. But when he got in the car, he stopped at the gas station. I mean when he got in the car we was at the ah race shop he told me we was going to get it checked it out by a mechanic. And I said where and he said King Automotive so.

CL: Okay at this point it sounds like it's still ah purchase, you know he's gonna purchase the vehicle. Is that what you understood.

WG: Yes until we got to

CL: Alright

WG: the gas station he told me he was gonna take it on Kellar Street and told me I was gonna do it.

CL: Alright. That's what I wanted to know about ah, tell me a little more detail about how this turns from a purchase this Camaro to stealing it, the talking between you and OMAR and where are you.

WG: I wasn't really talking, OMAR and TIAKAWA was talking to each other and then he told me at the gas station, like hey man, we gonna take it. They gonna take it. I'm like what you mean take it. Then he tell me like, man we about to just take the car. We can sell, we can sell the parts on it on the street for quick money. Quick cash. That's what they was just telling me.

CL: Okay when you said he, you're talking about OMAR

WG: Yes

CL: Alright. And is this in the car or at the gas station.

WG: This in the car at the gas station.

CL: Okay Is this the same, is this the gas station where you and ah OMAR go inside the gas station.
WG: Yes

CL: Alright. What happened when you go in there.

WG: I go in there and purchase some gas

CL: Okay for your car.

## Mt. Morris Township Police Department
## Standard Incident Report

| | |
|---|---|
| Incident No: | 05-004219 |
| Page No: | 8 |

Interview w/Wayne Demarius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

WG:  Yes

CL:  And you guys didn't talk about taking the car

WG:  Not in the gas

CL:  (inaudible)

WG:  While I'm pumping the gas, he bring it up then when I get in the car we get to talking about it. He tell me what gonna happen and all this.

CL:  Alright.  Tell me a little more about that. Is he talking about taking it, it's easy money, did he say what the plan was.

WG:  He didn't really say like a plan laid out. He said like we gonna take, here's what we gonna do man, he said we about to take the car. I'm like what you talking about man. He like man if we get that car we can get out in the street, we can take the car sell, we can sell it for quick cash. The motor worth this and the nitro worth this, the car so old it worth this, we can do this, we can do that. So they tell me what it's worth. He was describing it, like how we gonna take it and he's just tell me what's it worth. Tell me what it's worth and then you know we started out driving. They started like following us and then he started telling me like go go on this street and this street and then I finally get there, he told me how to get there. And then while we was getting there that's when it came up about me doing it.

CL:  Alright.  So when you actually get to the dead end of Kellar, then, there's discussion between you and OMAR about how you're gonna actually ah take the theft of it.

WG:  Yes

CL:  Alright. And you're in the car still.

WG:  Yes

CL:  You're in your car. Alright. And TIAKAWA is in the back of your car. Where's he at.

WG:  TIAKAWA I think he's in the front seat and OMAR'S in the back, I can't remember.

CL:  But all you guys are in the car.

WG:  TIAKAWA'S in the back seat, OMAR'S in the front

CL:  Alright. Um, so when you arrive at the dead end of Kellar, you guys are still in the car and then OMAR is telling you that you should do it or you're a punk or something like that.

WG:  Yeah

CL:  Alright.  ANd he was telling you how to do it.

Jan-13-2006 03:03pm from PRESS DAVID G LETON Doc # 9-4  Filed 06/00/814 766 Pg 27 of 160 1  Pg 1 292 281 778

JAN-13-2006(FRI) 10:49    Mt. Morris Twp. Police Dept.       (FAX)810 785 7730                    P. 010/024

## Mt. Morris Township Police Department
## Standard Incident Report

Interview w/Wayne Demetrius Grimes Jr w/Det (Gagliardi), dated 01/11/06, by Officer Gagliardi (continued):

WG:  He was telling me just to point the gun out and make sure you get their cell phone so they can't call nobody and that's what I did and then I gave the gun back to TIAK and got in my car and left.

CL:  Alright. You ah, TIAKAWA'S in the car at this point, you're talking to him alright.

WG:  Yes

CL:  And you actually got the gun from TIAKAWA

WG:  Yes

CL:  Okay. So what did TIAKAWA say during this, you know, when OMAR is telling you get their cell phone and point the gun and all that. What is TIAKAWA doing, is he is he offering help too on how to do it or what is he doing.

WG:  Really, just give me the gun

CL:  Does he say here take this, this will help or did OMAR just say give it to him.

WG:  Give it to me and I was like man alright and then (inaudible) anything and I took it and got out and took the cell phone out to the car (inaudible) and they went wherever they went.

CL:  When ah you guys are in the car talking about ah when OMAR'S talking about how this car's worth so much money and the parts are worth so much money, ah is TIAKAWA agreeing or he doing anything. Is he like

WG:  Yeah, he goes yeah

CL:  He was agreeing with what OMAR is saying

WG:  Yes

CL:  Alright. And when you actually ah pull the gun on the victims ah TIAKAWA receives what.

WG:  What you mean by receives

CL:  Well you ordered, actually you robbed the guys with the gun, did TIAKAWA receive, you said he received the cell phone and keys

WG:  Yes

CL:  Alright. Alright. And when you say he was saying something, you didn't really know what, are you talking about the victim, the guy with the keys and cell phone, was saying something.

WG:  Yes

Jan-13-2006 02:03pm From-1469S-PROS DAVISON LEYTON Doc # 9-4   Filed 06/09/14 7664 Pg 28 of 160 P 011/024

JAN-13-2006(FRI) 10:50   Mt. Morris Twp. Police Dept.    (FAX)810 785 7730        P. 011/024

## Mt. Morris Township Police Department
### Standard Incident Report

| | |
|---|---|
| Incident No: | 05-004219 |
| Page No: | 10 |

Interview w/Wayne Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

CL:  Alright. Before you shot the gun

WG:  Yes i was like an argument kinda like I'm not giving you my cell phone.

CL;  Alright. Ah then who drives what vehicle from from the dead end there. You got your vehicle.

WG:  Yes I'm driving my vehicle. I pull off first. I don't know who is actually driving the car but they didn't come back with me.

CL:  You didn't look in your mirror and see who was driving the truck.

WG:  I was scared. I gave (inaudible) hopped in my car and (inaudible)

CL:  And where did you go.

WG:  I went home.

CL:  And then you talked to OMAR later.

WG:  Yeah later

CL:  How were you talking to OMAR and ah you know to get the ride to go look at this vehicle, how do you talk to him, by cell phone.

WG:  Yes

CL:  Alright. There were some cell phones found in your vehicle when you were arrested. Are those the cell phones you were using.

WG:  I only had one cell phone.

JG:  I think I got 2-3 cell phones out of your car.

CL;  What kind

WG:  In the arm rest, it in the arm rest

JG:  Yeah

WG:  That my girl's cell phone

JG:  Girl, okay

CL.:  It's a Cricket

WG:  Cricket (inaudible)

Jan-13-2006 02:03pm   From-PROS DAVID S LEYTON

JAN-13-20 06(FRI) 10:50   Mt. Morris Twp. Police Dept   (FAX)810 785 7730   P. 012/024

## Mt. Morris Township Police Department
## Standard Incident Report

| | |
|---|---|
| Incident No: 05-004219 | |
| Page No: | 11 |

Interview w/Wayne Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

JG: Okay.

CL: Are those the phones that you were using or OMAR was using or what.

WG: No I had a Nextel, my phone was on me when I got arrested and the phone that was in there was TOYIA S.

CL: Your girlfriend

WG: Yeah, I think it was one (inaudible)

CL: Alright. OMAR what ah, he was calling you on cell phone though right, to to go look at the Camaro.

WG: Yeah

CL: And what ah cell phone number did he use.

WG: I can't really say the cell phone number, it's in my phone because I don't call the phone number I just got down to OMAR and press call so I don't know the number by heart.

CL: What kind of phone did he give you do you remember.

WG: They both had Nextel's (inaudible)

CL: Is that a pre-paid deal where you go um buy a block of minutes

WG: Who me or him

CL: Ah either one of you

WG: I don't know what his was, mine was in my friend granny name

CL: Okay on a monthly bill

WG: Yeah (inaudible)

CL: Okay You don't know what he was doing, OMAR

WG: I would assume it was probably a contract, I would assume that.

CL: What makes you say that.

WG: Because the phones that's pre-paid they Boose Mobile, that's Nextel, (inaudible) Boose Mobile and he has a Nextel but you still it's illegal or it ain't (inaudible) but you can still take the chip out of a Boose Mobile and put it into a Nextel.

Jan-13-2008 03:06pm 469 From-PRESS DAVIS LEXICONC # 9-4    Filed 06/09/14 766 g 30 of 160 21  P.010/024 284-778

JAN-13-2008(FRI) 10:50    Mt. Morris Twp. Police Dept.    (FAX)810 785 7730    P. 013/024

## Mt. Morris Township Police Department

### Standard Incident Report

Interview w/Wayne Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

CL:  Ah, in your car was found a few items, the gun box, is that to the gun that you used.

WG:  No I don't think so.

CL:  Okay what is that to

WG:  That, I have a CCW before in my car

CL:  What do you mean you had a CCW, a charge

WG:  Yeah (inaudible) been charged with CCW and on probation for that

CL:  Okay and so what does that what does that mean again.

WG:  I think that's the the box for that gun, I don't even know what kind of gun I had.

CL:  The cops have the gun then ah right

WG:  Yeah

CL:  When when you got arrested for that

WG:  In Mt Morris

CL:  In Mt Morris Twp

WG:  (inaudible)

CL:  Um what else was in the car there ah

JG:  The plastic bag, the black plastic bag. Is that what you used to cover up your license plate with.

WG:  No

JG:  What's that to.

WG:  Um probably shoes, I believe I had some shoes in there. I believe I had some shoes in there, some shoes when you all arrested me.

JG:  Just the ones you had on your feet the Nikes.

WG:  I had a brand new pair because them tennis shoe purple and pink size six.

JG:  Those don't ring a bell to me. This looked like...this looked like a plastic a ah plastic bag that was specifically cut, because it fits absolutely perfect over your license plate. You said you covered up your plate when you did the second one.

## Mt. Morris Township Police Department
## Standard Incident Report

| | |
|---|---|
| Incident No: 05-004219 | |
| Page No: 13 | |

Interview w/Wayne Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

**WG:** Yeah, that was, it was a white bag though

**JG:** A white bag. Okay

**WG:** I didn't keep it it just flew off when I drove away

**JG:** Okay

**WG:** Because when I got home it was gone but the bag, if there was a bag

**JG:** Uh huh

**WG:** cause I remember I was going to take some shoes back to Courtland Center. So if there was a bag it would be that bag, a Finish Line bag.

**CL:** You say you ordered them to the woods. Ah where did you come up with that. Is that something that you and OMAR talked about to make them run to the woods.

**WG:** No really. It, I told them to go to the woods, bring them to the woods.

**CL:** Um when you were demanding the cell phone and keys, you were demanding that he take that and get (inaudible)

**WG:** Yes

**CL:** And what, during that time you were doing that, was TIAKAWA yelling at him too, saying give it up or anything like that.

**WG:** Yes because he wouldn't give it up and he was putting up an argument. He said that, I'm not, I'm not giving you my keys and he was like give me your keys. I'm like give him the keys and the gun shoots and then he give him the keys. So

**CL:** Alright. So TIAKAWA also was telling him, him to give it to him.

**WG:** Yes

**CL:** Alright. What was OMAR doing at that, you know, you and TIAKAWA are are um robbing these guys (inaudible) key, what was OMAR doing.

**WG:** He asked the other guy before we even started to use the phone. He said can I use your phone.

**CL:** The other guy, the other victim who didn't argue with you.

**WG:** No, he didn't argue with me, he was the ah chubby dude.

**CL:** Okay there was one guy that was was bigger than the other guy.

Jan-13-2006 10:04pm From-PROS-DAVID S CLAYTON 14695 RM-PLUM Doc # 9-4 Filed 06/09/14 664 Pg 32 of 160 P 016/024 878

JAN-13-2006(FRI) 10:51    Mt. Morris Twp. Police Dept.    (FAX)810 785 7730    P.015/024

## Mt. Morris Township Police Department
### Standard Incident Report

Interview w/Wayne Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

WG:  Yeah

CL:  Chubbier than the other guy so which guy were you robbing. The chubbier guy or the other guy.

WG:  The chubby guy.

CL:  Alright. So OMAR was doing what again. He was, he asked the other guy who was with the chubby guy to use the phone.

WG:  Yes

CL:  Alright.

WG:  Before any of it started he asked him to use the phone. I don't know why (inaudible) using it before but  know he was (inaudible) ask him to use the phone.

CL:  Okay

WG:  Cause he used the phone and walked off.

CL:  Did he, let me ask you this, did he actually use the phone or did he think he was playing. Did he think he was you know faking using it. Or do you know.

WG:  I would assume faking it because when he got off the phone, like two seconds later he did like this. Nodded to me and then (inaudible) the other phone so I would assume he was faking it.

CL:  Okay  Ah, you said he nodded to you to like go ahead or or, okay like to say go ahead and start with your guy (inaudible) Okay. That's all I have. Ah let me ask you this ah WAYNE, did ah you ever hear OMAR go by the name of JACOB WOODS. Use that as an alias. You know a fake name, JACOB WOODS.

WG:  Not that (inaudible) familiar to SAM WOODS.

CL:  Okay. Alright.

JG:  Okay. Um let's jump forward now to the following week, the second one, the one that was down in Fenton.

WG:  Where's Fenton

JG:  That's were the Cadillac and Corvette come from.

WG:  Ah

JG:  Up 23

CL:  It's that one.

Jan-13-2006 02:04pm From-PROS DAVID S LEYTON 2:13-cv-14695-MFL-LJM Doc # 9-4 Filed 06/09/14 810 785 7778 Pg 33 of 160 Pg ID 528 P. 018/024

JAN-13-2006(FRI) 10:51   Mt. Morris Twp. Police Dept.   (FAX)810 785 7730   P. 018/024

# Mt. Morris Township Police Department
## Standard Incident Report

| | |
|---|---|
| Incident No: 05-004219 | |
| Page No:   15 | |

Interview w/Wayne Demetrius Grimos Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

WG:  Naw that ain't it.

CL:  That's not the car

WG:  No, it wasn't a Corvette, it was

CL:  Yeah this one too.

JG:  Yeah the top was (inaudible)

CL:  The top was

WG:  Yeah that had to be the top was down, the top was down when we went there.

JG:  Okay. Okay go ahead and tell me what took place with that.

WG:  Um I can barely remember how we got together at the beginning of that one.  I, I don't, I can barely remember how we got together at the beginning of that one.

CL:  (inaudible)

JG:  What you said regarding that was you were at home, OMAR gave you a call, said he wanted a ride to check out another car. Ah you said that you picked him up at the corner of Dartmouth and Wisner for that and that you guys took off down Saginaw Street towards the City.  You said you got down to about Saginaw and Fifth here by the Ralley's and he said let's go pick up "T".

WG:  That police report right there, um that wasn't true.

JG:  (inaudible)

CL:  He offered you $20 to give him a ride.

WG:  Yeah

CL:  Okay go ahead and tell us how how (inaudible)

WG:  I can not remember exactly how we got together like

JG:  Let me stop you for a second.  Try and speak up a little bit louder so we can make sure we got all this here.

WG:  Okay. I can not remember exactly like how we got together but I remember we was together, looking at a paper and then he was going through the ads.  When he was going through the ads we found the name or the car whatever, somehow picked it out.  He called the number on on his phone and he said we would like to purchase the car.  And this time I'm really thinking you know we about to purchase the car.  So

## Mt. Morris Township Police Department
### Standard Incident Report

| | |
|---|---|
| Incident No: | 05-004219 |
| Page No: | 16 |

Interview w/Wayne Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

CL: Why do you think that, does he have money or something.

WG: Yes he does.

CL: OMAR.

WG: Yeah

CL: From dealing drugs, from what.

WG: Like I thought he had a job. Cause he was in here, he was out on work release and he told me he was working for the painting company or something but I never even seen him go to work or never seen a check or anything. I don't know exactly if that's it or trucks or I don't know exactly how he get his money but every time he go somewhere he has a lot of money.

CL: Okay

WG: Like like you seen what I was arrested with, he has more than that. Like three times or two times that amount.

JG: Oh I know how much, I've dealt with OMAR many a times over so.

WG: Yeah like $4,000 - $5,000 in his pocket, just walking around with it. So I I wouldn't doubt that he was about to buy the car cause he loves cars.

CL: You're talking about, looking through the paper is this, looking through the Flint Journal want ads

WG: Yeah the Flint Journal.

CL: Does that sound right.

WG: Yeah, Flint Journal ads. Then he called the number. I guess they scheduled it and everything. Tell him where to come so he tell me where to come. Talk to him on the phone, he telling me where to go, where to go. We get there, I don't get out the car. I stay in the car, did TIAKAWA get out, I don't remember if TIAKAWA got out. I know OMAR got out, talked to the dude. He looked at the car, got inside the car and then came back to the car. He said I'm, I need you all to follow me. We're gonna ah, I'm gonna buy it. That's what he said, I'm gonna buy it. He said you gotta follow me I'm gonna buy it and his wife is gonna follow him, cause she gonna bring him back home when I'm gonna buy it. So, he hopped in the car. He said I'm gonna drive it, driving it back, went back the same way, all the way to all the way to, what highway did we get off of. I think Pierson Road. All the way to Pierson Road I think on the highway. We got off the highway went down Pierson, then we went to the gas station and that's the same thing, from that point on what happened. We went in the gas station.

JG: Did you buy gloves in the gas station

WG: No I didn't buy no gloves. I bought some gas. And then he told me what happened or what's

Jan-13-2006 02:04pm From-PROS_DAVISON LEVISON # 9-4  Filed 06/00/814 7660 Pg 35 of 160  P-018/024  F-778

JAN-13-2006(FRI) 10:52    Mt. Morris Twp. Police Dept.    (FAX)810 785 7730           P. 018/024

# Mt. Morris Township Police Department
## Standard Incident Report

Interview w/Wayne Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

gonna happen. We got there, he pulled up the street. At this point I could have just you know backed out or left or did anything but he said he needed TIAKAWA to take the car. So, I I drove down Kellar Street, went to the end of it, I parked. This time it was less than like, like 10 or 15 seconds, less than 10 or 15 seconds. I hear a lady screaming so I open my car door. I get out. I put a bag around my license plate.

JG:  What color was that.

WG:  It was white

JG:  That was the white one

WG:  I put a bag around my license plate and I get back in my car. Then I speed off. TIAKAWA not in the car with me. OMAR not in the car with me.

JG:  Now you said, I'm sorry

WG:  (inaudible)

JG:  Okay. You you said originally when you and I first talked that ah (end of side A)

CL:  You're not doing  (inaudible)

WG:  No, I mean he was getting in the car I didn't look at him but I was looking out the left side and I seen OMAR walking that way (inaudible)

CL:  Ah you take off first out of there. You drive off first.

WG:  Yes

CL:  Did you look back and see both vehicles coming after you

WG:  I did but

CL:  (inaudible)

WG:  I had tint on my window and it was just a speed (inaudible) because I was speeding off so I (inaudible)

CL:  Alright and you go where.

WG:  That's I went home.

CL:  You went home. Did you talk to either OMAR and TIAKAWA after that.

WG:  I talked to him the next morning and he told me that was crazy, like that was crazy.

## Mt. Morris Township Police Department
### Standard Incident Report

Interview w/Wayne Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

JG:  Who's that, OMAR or TIAKAWA

WG:  OMAR. He was telling me that's crazy. And I said what's crazy. He said what just happened man, we had to do it, we had to do it.

CL:  Did he say anything, when you had to do it, what's he talking about. Did you ask him more about that or did he elaborate on that.

WG:  Yeah he said he had to do it because they needed it or he said they had to do it because he needed it. I don't know if they was talking about the money or the car. But they said, he said he had to do it because he needed it.

CL:  Did he say where the cars went or ended up.

WG:  I didn't ask him about the cars, I didn't see him, that night I went to JB's with my friend TONY and then I went home. I woke up in the morning. I talked to him on the phone and I talk to him on the phone and said that I was going to um college to school and I got arrested around 11:00 12:00.

CL:  Ah the property that was taken, there was a wallet, a credit card, some purses, you had money. Did you get or see any of that stuff.

WG:  I didn't see no no personal belongings. I didn't take it. I didn't see (inaudible)

CL:  How about after the fact though you know, when you talked to them, did OMAR mention you know what he did with the property or did he promise you any of it or stuff like that.

WG:  Yes

CL:  Tell me about that.

WG:  He had mentioned what he did with the property, is mention what he had took but he promises to give me something (inaudible). He said I'm gonna give you something man for doing it, I'm gonna give you something.

CL:  The plan was to sell those vehicles. Is that what is was believe, you know to what he was going to do with them.

WG:  That's what I, sell the vehicles or stripe them and take them apart

CL:  Sell the parts

WG:  Yes

CL:  On the street

WG:  Either way, sell something off the cars

Jan-13-2006 10:05 146635-PROF-DAVID M LEYTON Doc # 9-4 Filed 06/09/14 Pg 37 of 160 Pg ID 2525

JAN-13-2006(FRI) 10:52    Mt. Morris Twp. Police Dept.    (FAX)810 785 7730                P. 020/024

## Mt. Morris Township Police Department
## Standard Incident Report

| | |
|---|---|
| Incident No: 05-004219 | |
| Page No: 19 | |

Interview w/Wayne Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

**CL:** Has he got, does he have you know a garage or does he have skills do you know to take this stuff off the vehicles or would he have somebody do it.

**WG:** No, I wouldn't say he had skills and the the garage part, I'm not saying he don't, but I think it's possible he could have cause he would have to hide the car somewhere but I don't know where he hide em. I don't know if it TIAKAWA house or out in Beecher or if his granny house on Dort and Wisner or if he got another friend or a person that know how to take the parts off. I don't know none, how he, how he could get it off. I don't think he do it himself, I think he got somebody else to do it.

**CL:** Okay

**WG:** It takes times to take the stuff off I guess. (inaudible)

**CL:** Um there was some there were some phone calls made to the SANDSTROMS. Do you know anything about that. Did OMAR tell you he called them and threatened them.

**JG:** After he was in jail.

**CL:** To hope that you know things would be okay for you guys. You guys were never housed together right.

**WG:** My and OMAR.

**CL:** Yeah

**WG:** No. He ah, I been on 5B since I been here but he's been on every floor. He's been on 5A, in the hole, 3A, medical floor, (inaudible)

**JG:** What got him put in the hole

**WG:** Ah he had got in three fights I've heard, four fights from two of his ah (inaudible) friends on the last case he was with.

**CL:** (inaudible)

**WG:** (inaudible) co-defendent he was fighting that day. And then the other days on the floors was his co-defendants friend, they was jumping him. And I don't know the other time he was in the hole.

**CL:** Ah has he written you any letters or communicated with you in any way about the case.

**WG:** Yes

**CL:** Tell us about that.

**WG:** I have a letter, I can't remember what it say but he wrote it when he was in the hole it say JOHN WHEELER and it say why you, why you tell on me, why you give a report and you know that ain't me, you know ah, I know you mad cause I mess with your girl (inaudible). It was like it was writing it like

Jan-13-2006 12:03am 14685-PROS DAVID M LEYTON Doc # 9-4   Filed 06/09/14 Pg 38 of 160   P.021/024

JAN-13-2006(FRI) 10:53    Mt. Morris Twp. Police Dept.    (FAX)810 785 7730    P. 021/024

## Mt. Morris Township Police Department
### Standard Incident Report

Interview w/Wayne Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):
like in case I turn it in. I still have it though. And it's from, it say JOHN WHEELER on it though.

CL:  (inaudible) from JOHN WHEELER

WG:  Yeah

CL:  Who is that, is that his alias.

WG:  I don't know who that is but and then at the bottom it say Geezie is getting down with us, don't mention my name.

CL:  (inaudible) Geezie

WG:  Yeah, no Geezie is a raper, he sing that, he rap that song and that's what he's saying on the bottom is get down, don't be mentioning my name.

JG:  So you have no idea where "T" hanging.

WG:  No I don't

JG:  Nobody that he runs with

WG:  OMAR

JG:  Just OMAR.

WG:  That's the only person I ever seen him with. I never seen him in the streets nowhere.

JG:  Okay

WG:  The only time I ever seen him was with OMAR and I know where he live cause that's where he live at on that street, I don't know the name of the street, but it's in Beecher.

JG:  Yeah I know the street, I know the family

WG:  I know that where he live at cause OMAR told me.

CL:  Last time you talked about the gun coming from the waist band of ah TIAKAWA and entered his coat before they got out of the car, about the white or white Cadillac and red Corvette. Before you cover your plate, that's what you said last time, you saw TIAKAWA ah had a gun in his waist and he was putting in his coat as he was getting out. Do you remember saying that.

WG:  Yes

CL:  Well you didn't say that today so (inaudible)

WG:  I told ah I said today I'm telling the truth of everything that happened, what I know, how it

**Mt. Morris Township Police Department**

**Standard Incident Report**

| | |
|---|---|
| Incident No: 05-004219 | |
| Page No: | 21 |

Interview w/Wayne Demetrius Grimos Jr w/Dot Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

happened, how it was done.

JG:  So the only time you put a gun in TIAKAWA'S hand is when he gives the gun to you at the first one with the Camaro, right. That's the only time you put a gun in "T" hand. What happened with SANDSTROMS on the second one, that never happened.

WG:  No that never happened.

JG:  Okay. Um

WG:  But think about it it gotta be his gun

JG:  Okay um no idea where I can find that Cadillac at.

WG:  (inaudible)

JG:  Yep the white Caddi

WG:  No I didn't have a discussion about that car. I didn't talk to him, that's the second one right.

JG:  Yes

WG:  Yeah I never talked to him about that car. I know he had a black Monte Carlo though like a, looked like gray trim on the inside but that was parked right there on the street in front of Wisner and Dartmouth at his house. And he had that about to the end of August then he (inaudible)

JG:  Who had that OMAR

WG:  Yes

JG:  Okay

CL:  What kind of vehicle

WG:  I think it's a Monte Carlo, all black. It has "T" tops.

JG:  That's TIAKAWA'S car

WG:  (inaudible)

CL:  Alright ah and this other case of the Monte Carlo on Lapeer Road, you don't know anything about that one.

WG:  Where's Lapeer Road.

CL:  That's in Burton on ah the east side ah I'm not sure what the cross road would be. Lapeer and ah I don't know if it's Center or ah east of that. Out kinda by Courtland Mall out that way.

Jan-13-2006 02:06pm From-PROS DAVID S LEYTON 2:13-cv-14695-MFL-LJM Doc # 9-4 Filed 06/09/14 810 784 7664 Pg 40 of 160 P.023/024 Pg ID 5292 P. 023/024

JAN-13-2006(FRI) 10:53    Mt. Morris Twp. Police Dept.    (FAX)810 785 7730    P. 023/024

# Mt. Morris Township Police Department
## Standard Incident Report

Incident No: 05-004219
Page No:   22

Interview w/Wayne Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

**WG:** (inaudible)

**CL:** You're not involved in that.

**WG:** Not involved

**CL:** That uh again was September 17 about, around about September 17. Um, did OMAR ever mention that he was looking at a Monte Carlo, or did you ever seen him with a Monte Carlo

**WG:** Yes he black one, the one you talking about is like navy blue right

**JG:** Uh huh

**WG:** That not that one. I know which one he talking about. But it's a black Monte Carlo, it's a black Monte Carlo

**CL:** Let me (inaudible)

**WG:** There's a black Monte Carlo. I don't know if he took it from him, but I know he had one and I believe he still has it now. If he has it, you know, probably in the garage on Wisner Street or on the street on Wisner Street. It's a black car, it's gray and black on the inside. It don't even have a radio in it. But I believe that's his car, far as I know. I don't know where he got it from.

**JG:** You know anything about, now this is on Kellar, when you first coming down Kellar off of Coldwater Road

**WG:** The first time.

**JG:** Yep, on the east side of the road, there was a guy there, second house in, had a souped up car for sale out in front of his house, they called the tow truck, G & W Towing to come over to load it up. The driver loaded it up, delivered it down, what the hell is the street, um, the street OMAR'S girl lives on, what is that Proctor, Piper. She stays on Piper. He went to off load it, the three guys and a goldish beige Dodge Intrepid, but nobody would produce I.D. so he refused to unload it and took it back. You don't know nothing about that one.

**WG:** Don't know nothing about that one. I don't know nothing about that one

**JG:** Okay

**CL:** This is a ah, it says here a pea green 72 Monte Carlo two door

**WG:** Pea, it's green, no I didn't see no green one. I seen a black one, not a green one.

**CL:** Did you see the black one before ah you guys carjacked the ah Camaro

**WG:** Yes

Jan-13-2008 12:06pm 1-468m-MMS LDALLING LEYDIGC # 9-4   Filed 06/20/03447664Pg 41 of 160   P.028/026529378

JAN-13-2008(FRI) 10:54   Mt. Morris Twp. Police Dept.   (FAX)810 785 7730   P.024/024

## Mt. Morris Township Police Department
## Standard Incident Report

Incident No: 05-004219

Page No: 23

Interview w/Wayne Demetrius Grimes Jr w/Det Gagliardi, dated 01/11/06, by Officer Gagliardi (continued):

CL: And then the Cadillac

WG: About the end or beginning of ah, end of August, beginning of September, around there. That's the first time I seen it.

CL: Okay but he was driving it as a daily vehicle or

WG: Daily vehicle, he was driving that and he was driving a van. The van (inaudible)

CL: Driving a van

WG: Right. Sometime he would be in a ah gray Caprice which is his girl that stay on Piper.

CL: Alright. Ah

JG: But OMAR was gonna gonna give you something for your troubles.

WG: Yes

JG: He was gonna pay you someway size shape or form

WG: He said man I got you, don't worry about it, I got you

JG: Don't worry about it, I got you

WG: (inaudible)

CL: Do you have anything else. You guys gotta type this and let him look at it before the trial.

JG: This will be the end of the interview.

Respectfully Submitted
Det James Gagliardi
Mt Morris Township Police Department

Transcribed: D Pierce

Exhibit Q

Oct.14. 2005 10:33AM   EC MONITORING CENTER                No.0433   P. 1

10/14/2005  10:34 am

## BI Incorporated
## Daily Summary
### 10/11/2005 00:00 TUE  thru  10/13/2005 23:59 THU

Client  382089364

EM Equipment ID  7104288 / 9300863
AM Equipment ID

Name  Pouncy, Omar Rashad
Address  113 E PIPER

City  FLINT, MI 48505
Home  810.785.6591
Alt

Officer Name  PROBY, MEOASHY
Officer Fax

Agency Name  SFL-GENESEE CO. SHERIFF
Agency Fax  810.766.8060

Permanent Schedule effective Oct 06 2005, Thursday

| May Leave | MON | 09:00 | MON | 22:00 |
|-----------|-----|-------|-----|-------|
| May Leave | TUE | 09:00 | TUE | 22:00 |
| May Leave | WED | 09:00 | WED | 22:00 |
| May Leave | THU | 09:00 | THU | 22:00 |
| May Leave | FRI | 08:00 | FRI | 22:00 |
| May Leave | SAT | 09:00 | SAT | 22:00 |

| Equip# | Date/Day | Description / Action | | Event | Received |
|--------|----------|---------------------|--|-------|----------|
| 7104288 | 10/11/2005 TUE | Hello | | 01:09 | 01:09 |
| | | Authorized Leave | | 09:16 | 09:22 |
| | | Authorized Return | | 14:49 | 14:50 |
| | | Authorized Leave | | 14:50 | 14:57 |
| | | Authorized Return | | 16:36 | 16:36 |
| | | Authorized Leave | | 16:40 | 16:46 |
| | | Authorized Return | | 21:51 | 21:51 |
| | 10/12/2005 WED | Hello | | 01:24 | 01:24 |
| | | * Power Fail AC | Alert | 08:46 | 09:01 |
| | | Telephone Fail | | 08:47 | 09:01 |
| | | * Need Location Verify | Alert | 08:47 | 09:01 |
| | | * Power Restore AC | Alert | 08:59 | 09:01 |
| | | * Telephone Restore | Alert | 09:00 | 09:01 |
| | | Location Verify Initiated | | 09:01 | 09:01 |
| | | Location Verify Initiated | | 09:01 | 09:01 |
| | | Location Verify Complete | | 09:01 | 09:01 |
| | | Authorized Leave | | 09:07 | 09:14 |
| | | Authorized Return | | 10:05 | 10:05 |
| | | Authorized Leave | | 10:30 | 10:36 |
| | | Link Lost Error | | 15:23 | 18:54 |
| | | Authorized Return | | 19:03 | 19:03 |
| | | Authorized Leave | | 19:27 | 19:34 |
| | | Authorized Return | | 19:53 | 19:53 |
| | | Authorized Leave | | 21:00 | 21:07 |
| | | Authorized Return | | 22:00 | 22:03 |
| | | Host Busy Signal | | 22:00 | 22:03 |
| | 10/13/2005 THU | Hello | | 01:08 | 01:08 |
| | | Authorized Leave | | 09:38 | 09:45 |
| | | Authorized Return | | 10:28 | 10:28 |
| | | Authorized Leave | | 10:37 | 10:43 |
| | | Authorized Return | | 11:42 | 11:43 |
| | | Authorized Leave | | 11:59 | 12:06 |
| | | Link Lost Error | | 13:29 | 15:05 |
| | | Authorized Return | | 15:04 | 15:05 |

**EXHIBIT**

5

Report list.rpt

Oct. 14. 2005 10:33AM    LEC MONITORING CENTER                    No. 0433   P. 2

10/14/2005 10:34 am

## BI Incorporated
### Daily Summary
10/11/2005 00:00 TUE   thru   10/13/2005 23:59 THU

| Equip# | Date/Day | Description / Action | Event | Received |
|--------|----------|---------------------|-------|----------|
| 7104288 | 10/13/2005 THU | Authorized Leave | 15:05 | 15:11 |
| | | Authorized Return | 20:21 | 20:21 |
| | | Authorized Leave | 20:23 | 20:29 |
| | | Authorized Return | 21:48 | 21:49 |

**Exhibit R**

| Mt. Morris Township Police Department | Incident No: 05-004219 |
|---|---|
| **Standard Incident Report** | Page No:    21 |

Supplement / Det Gagliardi (Tape From Sandstorms), dated 10/26/2005, by Officer Gagliardi, completed 10/26/2005 (continued):

This tape is from her home answering machine and has a male caller stating that they would be killed if they testified in court.
I did PR this tape and currently have it with the case file.


Respectfully:
Det Gagliardi

---

Phone Message, dated 11/01/2005, by Officer Gagliardi, completed 11/01/2005:

Come down to this mother fucking police station and county jail and identify me we're gonna have some mother fucking problems.  I don't give a fuck.  The police ain't gonna be able to stop the shit.  You hear me.  And then ah you better not press no mother fucking charges on nothing.  I'm not playing no  mother fucking games with you.  I'm already in the mother fucking county. You got me fucked up.  I'm telling you, you press charges on me I'm gonna fucking kill you.  Blow that fucking house up.  I know where you fucking live.  Get your fucking mind right.  Take it like a man.  Got me in the fucking county.  I can get some people right after you.  Don't mother fucking press charges on nothing.  Don't you identify me, say you don't know what the fuck I look like.  You think I'm playing.  I'm having somebody watching your mother fucking house I know where the fuck it's at.

9:42 p.m. Thursday


Transcribed: D Pierce

**Exhibit S**

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE COUNTY
7th CIRCUIT COURT

PEOPLE OF THE STATE OF MICHIGAN                    CIRCUIT COURT
                   Plaintiff,                    No. 05-017154-FC

vs.                                                                Hayman
                               JUDGE: ~~FULLERTON~~

OMAR RASHAD POUNCY,
                   Defendant,                    VERDICT FORM

WE, THE JURY, FIND THE DEFENDANT:

(Select One)

**Count I:  CARJACKING (Victim-Maria Sandstorm) (Property-2004 Corvette)**
[   ]  Not Guilty
    or
[X]  Guilty of  Carjacking

**Count II:  CARJACKING (Victim-Earl Brady) (Property-2003 Ford)**
[   ]  Not Guilty
    or
[X]  Guilty of  Carjacking

**Count III:  CARJACKING (Victim-Thomas Sandstorm) (Property-1973 Cadillac)**
[   ]  Not Guilty
    or
[X]  Guilty of  Carjacking

**Count IV:  ROBBERY-ARMED (Victim-Maria Sandstorm)(Property-money/purse)**
[   ]  Not Guilty
    or
[X]  Guilty of Robbery-Armed

**Count V:  ROBBERY-ARMED (Victim- Earl Brady) (Property-cellphone)**
[   ]  Not Guilty
    or
[X]  Guilty of Robbery-Armed



A TRUE COPY
Genesee County Clerk

**Count VI: ROBBERY-ARMED (Victim-Thomas Sandstorm)** (Property-money/wallet)
[  ] Not Guilty
    or
[X] Guilty of Robbery-Armed

**Count VII: ROBBERY-ARMED (Victim- Patrick Wendell)(Property-Cellphone)**
[  ] Not Guilty
    or
[X] Guilty of Robbery-Armed

**Count VIII: WEAPONS-FELONY FIREARM**
[  ] Not Guilty
    or
[X] Guilty of Weapons-Felony Firearm

**Count IV: WEAPONS-FELONY FIREARM**
[  ] Not Guilty
    or
[X] Guilty of Weapons-Felony Firearm

**Count X: CARJACKING (Victim-Earl Brady) (Property-1979 Chevrolet Camero)**
[  ] Not Guilty
    or
[X] Guilty of Carjacking

**Count XI: WEAPONS-FIREARMS-POSSESSION BY FELON**
[  ] Not Guilty
    or
[X] Guilty of Weapons-Firearms-Possession by Felon

Dated: _2-1-05_

_____
Foreperson

**Exhibit T**

This exhibit is temporarily unavailable for reason of misplacement resulting from Petitioner's transfer from facility to facility and/or change in privileges relating to access to his legal materials. Where otherwise  unavailable in Rule 5 material compilation, this item will be submitted at its earliest availability.

**Exhibit U**

## CITY OF CLIO POLICE DEPARTMENT
## CIRCUIT COURT RECORD AND APPLICATION FOR WARRANT

CASE NO.                                           COMPL. No:  277-05
OFFICER IN CHARGE:                                 FILE CLASS: 5200-1
                                                   DATE: 05/14/2005

D/Sgt. Ronald N. Steinhorst - Clio Police Department

Name of
Defendant                    Aliases:                      Address:

1. Wayne Demetrius Grimes Jr. b/m 10/06/1987 of: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2.
3.
4.

Date of Arrest: 05/14/05              Arresting Officer(s): Sgt. Gerald Driggett
                                                            Ofc. Casey Tafoya

Offense Charged: **Carrying a Concealed Weapon in a Motor Vehicle**

Evidence: (Articles Held)
1. Stoeger Arms Llama .380 8-Shoit Semi-Auto Pistol, SN# 531230
2. One .380 8-Shot Gun Magazine with eight (8) live rounds
3. One (1) Box of Winchester 380 ammo containing 16 live rounds of Ammo
4. One (1) 5" straight edged knife
5. One (1) JVC Radio/Cassette Player box
6. Statement(s) from Tytionne Barber and Faranda Rawls

## HISTORY OF CASE

Sir:

On Saturday 05-14-05 at approximaely 9:32 p.m. Sgt. Gerald Driggett while working a

second shift Patrol Assignment in the City of Clio, Genesee County, Michigan, was monitoring the

flow of traffic (Selective Enforcement) in the 300 block of S. Mill St. when he observed a car

traveling Northbound on S. Mill St in the curb lane at a high rate of speed.  As the car entered the

operational "Zone of Influence" of his radar unit, it was clocked at 43 miles per hour in a

1

posted 25 mile per hour zone. Sgt. Driggett then pulled in directly behind the car, never losing sight of the vehicle. The motorist was stopped in the 100 block of E. Vienna St. and pulled into the Rite-Aid Store parking lot at 100 E. Vienna St. in the City of Clio. The vehicle was described as a 1999 Dodge Intrepid, bearing MI/REG: ABQ-7336. The windows were tinted so dark that Sgt. Driggett could not see how many occupants were in the vehicle. Sgt. Driggett then got out of his patrol car and approached the driver's side of the vehicle where he found a young male black subject behind the wheel. Sgt. Driggett asked the subject for his Operator's License, Vehicle Registration and Proof of Insurnace. The driver stated that he did not have an Operator's License on him. Sgt. Driggett had the driver step out of the vehicle and after patting him down, he placed him in the rear seat of his patrol car. Ofc. Caey Tafoya (#45-16) arrived on the scene and was directed to check the other occupants of the vehicle. Sgt. Driggett then asked the driver for his name, date of birth, and address.

The driver identified himself as Wayne Demetrius Grimes Jr. Dob: 10-006-1987, of ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓. Sgt. Driggett then ran a Operator's Status Check through LEIN/SOS and Grimes was shown to have no Operator's License on computer. Grimes then told Sgt. Driggett that he could call his mother, and she could verify his operator's license number . A telephone call was placed to a Mrs. Valentine, but she did not know what his license number was, but she did state that Grimes had a valid Operator's license to her knowledge. Ofc. Tafoya then found some paperwork with an Operator's License number on it and this information was ran through LEIN/SOS, it came back to a Wayne Demetrius Grimes, at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓, the father to Wayne Demetrius Grimes Jr. Ofc. Tafoya then returned to the vehicle. Grimes then asked Sgt. Driggett to resubmit his name and while confirming the spelling on his full name, he looked up and oberved Ofc. Tafoya put a knife on the roof of the car. Ofc. Tafoya was then joined by Deputy Cronkright of the Genesee County Sheriff's Department who then took all

2

three of the passengers out of the vehicle. Sgt. Driggett observed the knife to have a black handle and a long silver colored blade. While resubmitting Grimes name into LEIN/SOS, Ofc. Tafoya yelled to Sgt. Driggett's to handcuff Grimes because he had found a gun in the car. Ofc. Tafoya then pulled out a JVC AM/FM Radio Cassette Player box and set it on the roof of the car. Tafoya stated that he had found the knife in the pocket of the driver's side door in plain view and the gun was located inside of a JVC AM/FM Radio/Cassette Player box in the back seat in plain view. Grimes was then removed from the rear seat of Sgt. Driggett's Patrol and he was handcuffed and placed under arrest for Carryng a Concealed Weapon. Sgt. Driggett then assisted Ofc. Tafoya and Deputy Cronkright in placing the other three occupants in custody.

Sgt. Driggett then took photographs of the gun still in the box and the knife. Ofc. Tafoya and Deputy Cronkright then transported the other three subjects to the Clio Police Station. Sgt. Driggett then inventoried the car and turned the same over to Wrecker Driver Theodore Wright of the Roadside Assistance Towing Company.

Upon arrival to the station, Sgt. Driggett secured the gun, ammo and knife in his office. After securing the necessary paperwork from Ofc. Tafoya, Sgt. Driggett met with Passenger, Tytionna Barber. Due to Barber's age, her grandmother, was contacted to come to the Clio Police Station.

At 10:53 p.m. Sgt. Driggett advised Ms. Faranda Rawls b/f 10/01/1987 her rights (Miranda) and she initialed each question and then signed a waiver of her rights. Ms. Rawls agreed to talk with Sgt. Driggett. Rawls stated on 05-14-05 at approximately 8:00 p.m. she was picked up by Wayne Grimes and Eugene Roriex at her grandmother's house on ▓▓▓▓▓▓▓▓▓▓ in Flint, Michigan. Grimes was driving and Eugene was in the right front passenger seat. From there, the three of them went to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, where they picked up Tytionna Barber around

3

9:00 p.m. From the LaBeau street address, the four of them were heading to the Clio Cinema for a movie (House of Wax) when they were pulled over. Before the officer came up to the driver's side door of the car, Grimes told everyone that there was a gun in the car. Rawls said she didn't know there was a gun in the car until Grimes told them. Rawls stated that after the officer took Grimes back to his car, Roriex took the gun out of the glove box to hide it. Roriex threw the gun in the backseat for the girls (Barber and Rawls) to hide. Rawls said she put the gun in the box. Rawls stated that was the only time she had touched the gun when she went to hide it in the box. Rawls made a written statement and signed it. This interview was concluded at 11:15 p.m.

At 11:20 p.m. Sgt. Driggett met with Grimes and Roriex and advised both of them their rights (Miranda). Both stated that they understood their rights, but declined to make any statement concerning the gun.

At 11:50 p.m. a Ms. Rosie Richmond of ▬▬▬▬▬▬▬▬▬▬▬ arrived at the Police Station. Ms. Richmond is the grandmother of Tytionna Barber. Ms. Richmond was informed of the investigtion that was being conducted regarding the Carrying of a Concealed Weapon and because of her grandaughter being 16 years of age, it was necessary for her to be here before he could question her about the incident. Richmond stated that she understood everything.

At 11:57 p.m. Sgt. Driggett advised Tytionna Barber her rights in the presence of her grandmother, Rosie Richmond. Ms. Barber stated that she understood each of her rights and initialed and signed a waiver to that effect. Barber stated that she was picked up around 9:10 p.m. by Grimes, Roriex and Rawls. Grimes was driving the car, Roriex was seated in the right front seat and Rawls was in the backseat behind the driver, and she was seated in the backseat behind the right front passenger. Barber stated that they were on there way to the Clio Cinema to see a movie when they got stopped by the police. Barber stated that Grimes pulled into the parking lot of the

4

Rite-Aid Store. As they were pulling into the parking lot, Grimes told everyone that there was a gun in the glove box. When Grimes was taken out of the car by the Officer, Roriex (Eugene) took the gun out of the box and threw it in the back seat between Barber and Rawls. Barber stated that she and Rawls both told Roriex that they did not want the gun and she pushed it away with her tennis shoes on the back seat. Barber stated that Roriex told them to hide the gun and Rawls picked up the gun and put it in the box. The box was already in the rear seat. Barber made a written statement and signed it and the notes that Sgt. Driggett made during the interview were signed and are attached to the report. The interview with Ms. Barber was concluded at 12:25 a.m. Roriex, Rawls and Barber were then released to their parents.

At 12:30 a.m. Sgt. Driggett compled the booking card and Grimes was transported to the Genesee County Jail where he was lodged for Carrying a Concealed Weapon.

Upon return to the station Sgt. Driggett photographed the gun, the Magazine with the seven (7) live rounds of ammo still in it, the ammo box with the sixteen (16) live rounds and the knife. All items were marked and the property was logged on PR#277 and the items were secured into evidence locker #9.

On Monday 05-16-05 at 9:00 a.m. Sgt. Steinhorst opened Locker #9 and received the evidence and logged it into the Property Room in Bin # 202.

On Tuesday 05-24-05 at 9:30 a.m. items #1 and #2 were removed from the property room Bin #202 and were transported to the Michigan State Police Forensic Laboratory located at 6296 Dixie Highway in Bridgeport, Michigan 48772-0608 for analysis and testing.

On May 25, 2005 at 10:24 a.m. a FAX was received by the Clio Police Department from the Michigan State Police Bridgeport Crime Lab listing the following results:

The weapon was examined by D/Tpr. Ryan M. Larrison. Test shots taken from the submitted

5

firearm are not indentifiable with any open shooting cases currently on file at this Michigan State

Police Forensic Laboratory.  The submitted firearm functioned during the examination.  Test shots

from the submitted firearm were entered into IBIS (Intergrated Ballistics Identification

System).

   Grimes does not have any prior Criminal Record.  According to the Michigan State Police

Central Records Division, Gun File Subunit, the weapon was last registered on 09/27/83 to a Tom

Ester w/m dob: 04/17/53 of ▬▬▬▬▬▬▬▬▬▬▬▬.  The weapon has not been

reported stolen.

####

**Exhibit V**

# Clio City Police Department -- (810) 686-5010
## 505 W. Vienna St., Clio. MI 48420

| | |
|---|---|
| Incident No: | 05-000277 |
| Status: | Open |

| | | | | |
|---|---|---|---|---|
| Date Reported: **05/14/2005** | Time Reported: **21:32** | | | |
| Dispatch Time: **21:32** | Arrival Time: **21:32** | Clear Time: **02:30** | | |
| Officers: **Driggett** | **TAFOYA** | | Detective: | **STEINHORST** |
| Classification: **WEAPONS OFFENSE - CONCEALED -- (5200-1)** | | | | |
| Location: **VIENNA ST., E. 100 BLOCK** | | | Section / Nbh: **[02]** | |
| Description: **CARRY CONCEALED WEAPON** | | | | Clerk: **GGD** |

**Complainant:**
DRIGGETT, GERALD SGT.
505 W. VIENNA ST.
CLIO, MI. 48420      Phone: **(810) 686-5010 (Main)**

Race: **White**    Sex: **Male**

**Suspect / Arrested:**
GRIMES JR., WAYNE DEMETRIUS    DOB: **10/06/1987**    Soc. Sec.: ▓▓▓▓
~~▓▓▓▓▓▓▓~~    Phone: ▓▓▓▓▓▓▓

Race: **Black**    Sex: **Male**    Hair: **Black**    Eyes: **Brown**    Ethnicity:
Height: **5'09"**    Weight: **205 lbs.**    Build: **Medium**    Complex:    Resident: **In County**
Notes: **277-05**

**Witness:**
BARBER, TYTIONNA LEEAISHIA    DOB: **03/09/1989**    Phone: ▓▓▓▓▓▓
~~▓▓▓▓▓▓▓~~

Race: **Black**    Sex: **Female**    Hair: **Black**    Eyes: **Brown**    Ethnicity:
Notes: **277-05**

**Witness:**
CRONKRIGHT, DEP. (GCSD)
1002 S. SAGINAW ST
FLINT, MI 48502

Race: **White**    Sex: **Male**    Hair: **Brown**    Eyes: **Brown**    Ethnicity:
Notes: **368-06**

**Witness:**
GROHOSKI, MICHAEL OFC.
505 W. VIENNA ST.
CLIO, MI 48420      Phone: **(810) 686-5010 (Main)**

**Witness:**
RAWLS, FARANDA CHRISTINA    DOB: **10/01/1987**    Phone: ▓▓▓▓▓▓
~~▓▓▓▓▓▓~~

Race: **Black**    Sex: **Female**    Hair: **Black**    Eyes: **Brown**    Ethnicity:
Notes: **277-05**

**Witness:**
RICHMOND, ROSIE MARIE    DOB: **06/23/1948**    Phone: ▓▓▓▓▓▓
~~▓▓▓▓▓▓▓▓~~

Race: **Black**    Sex: **Female**
Notes: **277-05**

| Signed: | Reviewed By: | Date Printed: **06/08/2010** |
|---|---|---|

Copyright (c) 1988-2010 by DDP Police Services, Inc.

**Clio City Police Department -- (810) 686-5010**
**505 W. Vienna St., Clio. MI 48420**

| | |
|---|---|
| Incident No: | 05-000277 |
| Page No: | 2 |

---

**Witness:**
RORIEX, EUGENE DELON

DOB: 04/17/1987
Phone: ~~(810)~~ ▓▓▓▓▓▓

| | | | | | | |
|---|---|---|---|---|---|---|
| Race: | Black | Sex: | Male | Hair: | Black | Eyes: | Brown | Ethnicity: |

Notes: 277-05

**Witness:**
TAFOYA, CASEY CLINTON

DOB: 10/21/1974

| | | | |
|---|---|---|---|
| Race: | White | Sex: | Male |

Notes: 864-95,

---

**Vehicles:**

GRAY 1999 DODGE INTREPID 4DR

Registered To: WAYNE DEMETRIUS GRIMES

Tag: ABQ7336 / MI
VIN: 2B3HD46R4XH620166

---

**Property:**

**1) STOEGER ARMS LLAMA 380 CAL HANDGUN**
Item No: 05-000277-001    Class: **Firearms / Guns**
Tracking:    Loss Type: **Seized**    Recovered: 05/14/2005

Type: **Firearms/Guns**
Serial No: 531230

**2) MAGIZINE CONTAINING 8 LIVE RDS OF 380 CAL AMMO**
Item No: 05-000277-002    Class: **Other**
Tracking:    Loss Type: **Seized**    Recovered: 05/14/2005

Type: **General Property**

**3) ONE BOX WINCHESTER 380 AMMO CONTAINING 16 LIVE ROUNDS**
Item No: 05-000277-003    Class: **Other**
Tracking:    Loss Type: **Seized**    Recovered: 05/14/2005

Type: **General Property**

**4) KNIFE/ 5" BLADE**
Item No: 05-000277-004    Class: **Other**
Tracking:    Loss Type: **Seized**    Recovered: 05/14/2005

Type: **General Property**

**5) JVC BOX**
Item No: 05-000277-005    Class: **Other**
Tracking:    Loss Type: **Seized**    Recovered: 05/14/2005

Type: **General Property**

Copyright (c) 1988-2010 by DDP Police Services, Inc.

**Clio City Police Department -- (810) 686-5010**
**505 W. Vienna St., Clio, MI 48420**

| | |
|---|---|
| Incident No: | 05-000277 |
| Page No: | 3 |

Evidence:

**1) FIREARM: Stoeger Arms Llama 380 Cal Semi-Auto Handgun**

| Tag No: | **100290** | Category: | **Evidence** | Submitted on: | **05/16/2005** |
|---|---|---|---|---|---|
| Tracking: | **277** | Loss Type: | **Seized** | Submitted by: | **STEINHORS** |

| Type: | **Firearms/Guns** | | | |
|---|---|---|---|---|
| Make: | **Stoeger Arms** | Type: | | |
| Model: | **Llama** | Caliber: | Barrel Length: | Shots: |
| Serial No: | **531230** | | | |

Notes:   05-16-05 - Property was removed from Locker # 9 by Sgt. Steinhorst and placed into Property Room in Bin #202.
05-23-05 - Property was removed from Bin #202 by Sgt. Steinhorst and transported to the MSP Crime Lab in Bridgeport for Testing.
06-14-05 - Property was picked up by Sgt. Steinhorst at the MSP Crime lab and returned to the Property Room Bin # 202.

**2) GUN MAGAZINE: Loaded with (8) live rounds of 380 ammo**

| Tag No: | **100291** | Category: | **Evidence** | Submitted on: | **05/16/2005** |
|---|---|---|---|---|---|
| Tracking: | **277** | Loss Type: | **Seized** | Submitted by: | **STEINHORS** |

| Type: | **Firearms/Guns** | | | |
|---|---|---|---|---|
| Make: | **Unknown** | Type: | | |
| Model: | **Unknown** | Caliber: | Barrel Length: | Shots: |
| Serial No: | **NONE** | | | |

Notes:   05-16-05 - Property was removed from locker #9 by Sgt. Steinhorst and placed into property room in Bin #202.
05-23-05 - Property was removed from Bin #202 by Sgt. Steinhorst and transferred to the MSP Crime Lab in Bridgeport, MI for Testing.
06-14-05 - Property was picked up by Sgt. Steinhorst at the MSP Crime lab and returned to Property room Bin#202.

**3) AMMO: 16 Live rounds of Winchester .380 ammo**

| Tag No: | **100292** | Category: | **Evidence** | Submitted on: | **05/16/2005** |
|---|---|---|---|---|---|
| Tracking: | **277** | Loss Type: | **Seized** | Submitted by: | **STEINHORS** |

| Type: | **General Property** |
|---|---|
| Make: | **Winchester** |
| Model: | **None** |
| Serial No: | **NONE** |

Notes:   05-16-05 - Property was removed from locker #9 by Sgt. Steinhorst and placed into property room in bin # 202.

**4) KITCHEN KNIFE: Unknown Brand wooden handled Kitchen knife**

| Tag No: | **100293** | Category: | **Evidence** | Submitted on: | **05/16/2005** |
|---|---|---|---|---|---|
| Tracking: | **277** | Loss Type: | **Seized** | Submitted by: | **STEINHORS** |

| Type: | **General Property** |
|---|---|
| Make: | **Unknown** |
| Model: | **Unknown** |
| Serial No: | **NONE** |

Notes:   05-16-05 - Property was removed from locker #9 by Sgt. Steinhorst and placed into the property room in Bin #202.

**5) CARDBOARD BOX: JVC Am/Fm Radio/CD/Player box**

| Tag No: | **100294** | Category: | **Evidence** | Submitted on: | **05/16/2005** |
|---|---|---|---|---|---|
| Tracking: | **277** | Loss Type: | **Seized** | Submitted by: | **STEINHORS** |

| Type: | **General Property** |
|---|---|
| Make: | **JVC** |
| Model: | **None** |
| Serial No: | **NONE** |

Notes:   05-16-05 - Property was removed from locker # 9 by Sgt. Steinhorst and placed into the property room in Bin# 202.

Original Narrative, completed 05/14/2005:

SIR:

On Saturday 5-14-05 at approximately 9:32pm, while working D# 45-13 in the City of Clio, I was monitoring traffic flow in the 300 block of S. Mill St. I observed a car northbound on S. Mill St., in the curb lane, at a high rate of speed. As this car entered the operational area of my radar, I clocked this car

Copyright (c) 1988-2010 by DDP Police Services, Inc.

**Clio City Police Department -- (810) 686-5010**
**505 W. Vienna St., Clio. MI 48420**

| | |
|---|---|
| Incident No: | 05-000277 |
| Page No: | 4 |

Original Narrative, completed 05/14/2005 (continued):

at 43mph.  This area of. S. Mill St. is a posted 25mph zone.  I pulled out directly behind this car, never losing sight, and stopped the car in the parking lot of Rite Aid in the 100 block of E. Vienna St.  The car was a 1999 Dodge Intrepid license ABQ7336.  The window were tinted so dark I could not see how many occupants were in the car.  At this time I got out and approached the drivers door of the car.  Sitting in the drivers seat was a young male black.

I asked the driver for his license, registration and proof of insurance.  The driver handed me the registration and proof of insurance.  The driver then said he didn't have his license on him.  I had the driver step out of the car and go back to mine.  I patted the driver down for weapons and asked if he had any weapons on him or in the car and the driver said no.  I had the driver sit in my car.  Ofc. Tafoya, D# 45-16, arrived at this time.  I had Ofc. Tafoya check the front seat passenger for his license.  I talked to the driver.  The driver identified himself as Wayne Demetrius Grimes Jr. of ██████████████, with a DOB of 10-6-87.  I ran Mr. Grimes Jr. through L.E.I.N./S.O.S.  Mr. Grimes Jr. was shown to have no drivers license, No record on Computer.  Mr. Grimes Jr. said he left his license in his other coat.  His mother would know his license number.  I talked to Mrs. Valentine on the phone and she stated that her son Wayne Grimes Jr. has a license but she didn't know the number.  At this time I went to talk to the passengers in the car.  All the passengers in the car identified the driver as Wayne Grimes Jr.  I went back to my car to talk to Mr. Grimes Jr.  Dep. Cronkright, GCSD, arrived on scene to assist.  I ran the drivers license number that was on the registration and it came back to Wayne Demetrius Grimes of ██████████████, the dad to Wayne Grimes Jr.  Ofc. Tafoya then left my window and returned to the car to talk to the passengers again.

Mr. Grimes Jr. asked me to run his name a second time to double check for his license.  I was confirming the spelling on his name, when I looked up as saw Ofc. Tafoya put a knife on the roof of the car.  Ofc. Tafoya and Dep. Cronkright took all three remaining occupants out of the car.  I observed the knife in Ofc. Tafoya's hand to have a black handle and a long silver blade.  While I was typing the new spelling of the middle name of Demetrius into the computer, Ofc. Tafoya yelled back hand cuff him, meaning Mr. Grimes Jr., because there was a gun in the car.  Ofc. Tafoya then pulled out a JVC box and set it on the roof of the car.  I got out and handcuffed Mr. Grimes Jr. and placed him under arrest for Caring a Concealed Weapon.  I then went and assisted Ofc. Tafoya and Dep. Cronkright in placing the other three subjects in custody.

At this time I took photographs of the gun still in the box and the knife.  Ofc. Tafoya and Dep. Cronkright transported Mr. Grimes Jr. and the three occupants of the car to the Station.  I remained on location and impounded the 1999 Dodge, license ABQ7336 to Roadside towing.  After the impound I returned to the station.

Upon arrival at the station, I secured the gun, ammo, knife in my office.  I met with Ofc. Tafoya.  I received needed paper work and information from Ofc. Tafoya.  I then met with a passenger in the car identified as Tytionna Barber.  I confirmed her information as far as her address, date of birth and name.  Tytionna Barber was 16 year old and her grandmother was contacted to come to the Clio Police Dept.  I then met with Faranda Rawls.

At 10:53pm I read Faranda Rawls her Miranda rights.  Ms. Rawls stated out loud yes to all the rights.  I then had her sign and date the Miranda rights form and initial after each right that she stated yes.  Ms. Rawls stated the on 5-14-05 at approximately 8:00pm she was picked up by Wayne and Eugene at her grandfathers house on ██████████████.  Wayne was driving and Eugene was the front

Copyright (c) 1988-2010 by DDP Police Services, Inc.

**Clio City Police Department -- (810) 686-5010**

**505 W. Vienna St., Clio, MI 48420**

| | |
|---|---|
| Incident No: | 05-000277 |
| Page No: | 5 |

Original Narrative, completed 05/14/2005 (continued):

seat passenger. From there the three of them went to ▉▉▉▉▉and picked up Tytionna. This was around 9:00pm. From ▉▉▉▉▉ the four of them were going to the movies in Clio. They were going to see the House of Wax. Before getting there they were pulled over. Ms. Rawls stated before the Officer came up to the car, Wayne told them there was a gun in the car. Ms. Rawls said she didn't know there was a gun until Wayne told them. Ms. Rawls stated after the Officer took wayne out of the car, Eugene took the gun out of the glove box to hide it. Eugene threw the gun in the back seat for the girls to hide. Ms. Rawls said she put the gun in the box. Ms. Rawls said thats the only time she touched the gun is when she hid it. Ms. Rawls made a written statement and signed it. This interview was concluded at 11:15pm.

While I was interviewing Ms. Rawls, Ofc. Tafoya was interviewing Mr. Grimes Jr. and Mr. Roriex. Ofc.Grohoski had arrived for duty. I gave Ofc. Grohoski the information on the gun. He contacted Central 911 dispatch to check the gun. Per Becky at Central dispatch the L.E.I.N. showed the gun would have to be looked up manually. No information would come back on the gun.

I then met with Ofc. Tafoya. Ofc. Tafoya stated that Mr. Grimes Jr. and Mr. Roriex were advised of their Miranda rights and neither would make a statement.

At approximately 11:50pm Ms. Rosie Richmond of▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉arrived at the station. Ms. Richmond is the grand mother of Tytionna Barber. I informed Ms. Richmond that I needed her presence to interview Ms. Barber because she was 16 years old. At this time Myself, Tytionna and Ms. Richmond went to my office. At 11:57pm I read Ms. Barber her Miranda rights and she stated out loud yes to these rights. The grandmother also stated out loud yes to these rights. I then had Ms. Barber sign and date the Miranda rights form and initial by each right that she stated yes.I then had the grandmother initial after each right that Tytionna stated yes. Ms. Barber stated that she was picked up on▉▉▉▉▉▉at approximately 9:10pm. Wayne, Eugene and Faranda was in the car. Wayne was driving, Eugene was the front seat passenger and Faranda was in the backseat behind the driver. She got in the back seat behind the passenger. Ms. Barber stated they were going to the movies in Clio to see the House of Wax. Then on the way they got pulled over. Ms. Barber stated Wayne pulled into Right Aid parking lot. When Wayne pulled into the parking lot , Wayne said there was a gun in the glove box. When Wayne was out of the car, Eugene took the gun out of the glove box and threw it in the back seat between her and Faranda. Ms. Barber said both her and Faranda stated they didn't want the gun. Ms. Barber stated she pushed the gun away from her by the tennis shoes on the back seat. Ms. Barber said Eugene told them to hide it and Faranda put the gun in the box. The box was all ready in the back seat. Ms. Barber made a written statement, signed and dated the statement. I then had Ms. Richmond read the written statement and the notes I made from the interview. She signed and dated the written statement and my notes.

Ms. Rawls, Ms. Barber and Mr. Roriex were released to parents. I completed the booking of Mr. Grimes Jr. Mr. Grimes Jr. was then transported to the Genesee County Jail and Lodged for CCW.

I returned to the office photographed the gun, magazine with the 8 rounds of ammo still in it, the ammo box with the live rounds, and the knife. I marked the box the gun was in and secured all the evidence into locker number 9. The knife had a five inch blade. Ofc. Tafoya found the knife in the drivers door pocket and the gun was on the back seat floor board in the box.

yright (c) 1988-2010 by DDP Police Services, Inc.

**Clio City Police Department -- (810) 686-5010**
**505 W. Vienna St., Clio, MI 48420**

Incident No: 05-000277

Page No:    6

Supplemental Report No. 1, dated 05/18/2005, by Officer TAFOYA, completed 05/18/2005:

Sir;

On 5-14-05 at approximately 10:00pm Ofc. Tafoya pulled on scene of the Rite Aid parking lot at Vienna St and Mill St to assist 45-13 on a traffic stop.  While 45-13 had the driver in custody for no operators license in possession Ofc. Tafoya approached the vehicle to make contact with the remaining occupants.  After making contact with the occupants they  were removed from the vehicle and identified for further investigation.  Occupants of the vehicle stated that there were no weapons or anything of an illegal nature in the vehicle and gave Ofc. Tafoya permission to search them as well as the vehicle. Upon searching the vehicle Ofc. Tafoya observed a small box  behind the drivers seat which was partially open. Upon opening the box a small black handgun was found.  At the time of discovery the gun was accessible to all occupants of the vehicle.  At that time all occupants of the vehicle were searched again and cuffed.  Upon searching the vehicle further a knife with approximately six inch blade and a black handle was found in the pocket of the drivers side door.   Ammunition to the gun was also found in the glove box of the vehicle.  Gun was later found to be a .380 caliber which matched the ammunition found in the glove box.  All occupants of the vehicle were transport to Clio Police station for follow up nvestigation.









**Exhibit W**

2005003440 NF
12/16/2005

| | Information - Circuit Court | Bind over/Transfer - Circuit/Juvenile Court |
| | Original Complaint - Court | Complaint copy - Prosecutor |
| | Warrant - Court | Complaint copy - Defendant/Attorney |

| STATE OF MICHIGAN<br>67 JUDICIAL DISTRICT<br>7th JUDICIAL CIRCUIT | AMENDED<br>INFORMATION<br>FELONY | JUDGE:ARCHIE HAYMAN<br>DISTRICT: FYO05B1034<br>CIRCUIT:  05-017154-FC |
| District Court ORI- MI- MI250095J<br>630 S. SAGINAW ST. FLINT, MI 48502  810-257-3170 | Circuit Court ORI- MI- MI250015J<br>900 S. Saginaw St. FLINT, MI, 48502 | |

| THE PEOPLE OF THE<br>STATE OF MICHIGAN | V | Defendant's name and address<br>OMAR RASHAD POUNCY B/M<br>2617 GIBSON ST<br>FLINT, MI, 48503 | Victim or complainant<br>DET. JIM GAGLIARDI<br>Complaining Witness<br>DET. JIM GAGLIARDI |

| Co-defendant(s)<br>WAYNE GRIMES, TIAKAWA LEONDIS-TERREL PIERCE | | | Date: On or about<br>09/29/05-10/11/05 |
| City/Twp./Village<br>MT MORRIS TOWNSHIP | County in Michigan<br>Genesee | Defendant CTN<br>25-05003440-01 | Defendant SID<br>2487773M | Defendant DOB<br>05/03/1987 |
| Police agency report no.<br>05-4219 | Charge<br>See below | [ ] Oper./Chauf.<br>[ ] CDL | Vehicle Type | Defendant DLN<br>P520661730339MI |

Witnesses

| WAYNE GRIMES | TIAKAWA LEONDIS-TERREL PIERCE | * DET. JIM GAGLIARDI |
| * THOMAS SANDSTORM | * MARIA SANDSTORM | * EARL BRADY |
| * PATRICK WENDELL | * DET. STEVE WARDA | * OFC. RANDY YOUNT |
| * OFC. JOE PHILLIPS | * OFC. BOB FARMER | * OFC JAMES WILLIAMS |
| * OFC EDWARDS | * OFC CHRIS WATTS | * SGT GEORGE THOMAS |
| * JOSEPH DAVIS | * ALAN DIEDIRCH | * JASON HICKEY |
| * WILLIE MCKINLEY | * CHARLES SMITH JR | * AGENT JEFF LOWE |
| * SGT DAVID DWYRE | * WILLIE JOYCE | * SGT M PROBY |
| * LT KEVIN SHANILAN | * TIMOTHY MOORE | * DET SHAWN DUNCANSON |
| * SAM ANDERSON | * DAN HAYNES | * SGT SHARON DUNBAR |

STATE OF MICHIGAN, COUNTY OF GENESEE
IN THE NAME OF THE PEOPLE OF THE STATE OF MICHIGAN: The prosecuting attorney for this county appears before the court and informs the court that on the date and at the location described above, the defendant:

COUNT: 1  CARJACKING
did, in the course of committing a larceny of a 2004 Corvette Automobile, a motor vehicle, use force or violence against Maria Sandstorm, a person in lawful possession of the motor vehicle; contrary to MCL 750.529a. [750.529A]
FELONY:  Life or any term of years; may be consecutive to sentence for other crimes arising out of same transaction

COUNT: 2  CARJACKING
did, in the course of committing a larceny of a 2003 Ford automobile, a motor vehicle, use force or violence against, or use the threat of force or violence against Earl Brady, a person in lawful possession of the motor vehicle; contrary to MCL 750.529a. [750.529A]
FELONY:  Life or any term of years; may be consecutive to sentence for other crimes arising out of same transaction

COUNT: 3  CARJACKING
did, in the course of committing a larceny of 1973 Cadillac automobile, a motor vehicle, use force or violence against Thomas Sandstorm, a person in lawful possession of the motor vehicle; contrary to MCL 750.529a. [750.529A]
FELONY:  Life or any term of years; may be consecutive to sentence for other crimes arising out of same transaction

COUNT: 4  ROBBERY - ARMED
did, in the course of committing a larceny of money and/or purse, use force or violence against a person present, Maria Sandstorm, and in the course of that conduct possessed a gun, a dangerous weapon; contrary to MCL 750.529. [750.529]
FELONY:  Life or any term of years, unless aggravated assault or serious injury involved, then not less than 2 Years

**COUNT: 5  ROBBERY - ARMED**

did, in the course of committing a larceny of a cellphone, assault or put in fear a person present, Earl Brady, and in the course of that conduct possessed a gun, a dangerous weapon; contrary to MCL 750.529.  [750.529]

FELONY:  Life or any term of years, unless aggravated assault or serious injury involved, then not less than 2 Years

**COUNT: 6  ROBBERY - ARMED**

did, in the course of committing a larceny of money and/or wallet, use force or violence against a person present, Thomas Sandstorm, and in the course of that conduct possessed a pistol, a dangerous weapon; contrary to MCL 750.529.  [750.529]

FELONY:  Life or any term of years, unless aggravated assault or serious injury involved, then not less than 2 Years

**COUNT: 7  ROBBERY - ARMED**

did, in the course of committing a larceny of a cellphone, assault or put in fear a person present, Patrick Wendell, and in the course of that conduct possessed a pistol, a dangerous weapon; contrary to MCL 750.529.  [750.529]

FELONY:  Life or any term of years, unless aggravated assault or serious injury involved, then not less than 2 Years

**COUNT: 8  WEAPONS - FELONY FIREARM**

did carry or have in his/her possession a firearm, to-wit: a pistol, at the time he/she committed or attempted to commit a felony, to-wit: Carjacking and/or Armed Robbery and/or Felon in Possession of a Firearm; contrary to MCL 750.227b.  [750.227B-A]

FELONY:  2 Years consecutively with <u>and</u> preceding any term of imprisonment imposed for the felony or attempted felony conviction

**COUNT: 9  WEAPONS - FELONY FIREARM**

did carry or have in his/her possession a firearm, to-wit: a pistol, at the time he/she committed or attempted to commit a felony, to-wit: Carjacking and/or Armed Robbery and/or Felon in Possession of a Firearm; contrary to MCL 750.227b.  [750.227B-A]

FELONY:  2 Years consecutively with <u>and</u> preceding any term of imprisonment imposed for the felony or attempted felony conviction

**COUNT: 10  CARJACKING**

did, in the course of committing a larceny of a 1979 Chevrolet Camero, a motor vehicle, use force or violence against Earl Brady, a person in lawful possession of the motor vehicle; contrary to MCL 750.529a.  [750.529A]

FELONY:  Life or any term of years; may be consecutive to sentence for other crimes arising out of same transaction

**COUNT: 11  WEAPONS - FIREARMS - POSSESSION BY FELON**

did possess  a firearm when ineligible to do so because he or she had been convicted of Possession of Cocaine less than 25 Grams and/or Carrying Concealed Weapon, a specified felony, and the requirements for regaining eligibility had not been met; contrary to MCL 750.224f.  [750.224F]

FELONY:  5 Years and/or $5,000.00

Upon conviction of a felony or an attempted felony court shall order law enforcement to collect DNA identification profiling samples.

(* Witnesses the People intend to produce at trial; MCL 767.409(a)(3)

and against the peace and dignity of the State of Michigan.

_12/16/05_
Date

Prosecuting Attorney  (FOR DAVID S. LEYTON)

By: _C. _____

**Exhibit X**

STATE OF MICHIGAN
IN THE SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

Supreme Court  No.  145994
Court of Appeals File No. 276454
LCN No. 06-10096-FH;

v.

OMAR RASHAD POUNCY,

Defendant-Appellant.
                                                                                              /

GENESEE COUNTY PROSECUTORS'S OFFICE
Attorney for Plaintiff-Appellee

LAW OFFICES OF DAVID L. MOFFITT & ASSOCIATES
By:    David L. Moffitt (P30716)
Attorneys for Defendant-Appellant Omar Rashad Pouncy
                                                                                              /

LAW OFFICES OF DAVID L. MOFFITT & ASSOCIATES
THE BINGHAM CENTER
30600 TELEGRAPH ROAD SUITE 2185
BINGHAM FARMS, MICHIGAN 48025
[v] 248-644-0880 [f] 248-307-9545  [e] DLMOFFITTASSOC@AMERITECH.NET  [web] DAVIDLMOFFITT.COM

## AFFIDAVIT OF DEFENDANT-APPELLANT
## OMAR RASHAD POUNCY

OMAR RASHAD POUNCY, being first duly sworn, deposes and says that the facts set forth are true to the best of my knowledge, that he is not disqualified from being a witness, that if called to testify could do so competently and from personal knowledge, except where same may be stated to be based upon information and belief, and as to those matters, he believes them to be true, says:

1.    That Affiant is the defendant-appellant in the above-captioned cause.

2.    Although I am absolutely innocent of the offenses that I was convicted of and currently incarcerated for, had I known that I was subjecting myself to a minimum penalty of 225 months (18 years, nine months to 562 months (46 years, 10 months) in prison I would have definitely been alarmed by this fact and considered the plea negotiations.

3.    Since I am innocent I would've explored taking an Alf ordered plea, purse went to *North Carolina v Alford*, 400 US 25; 91 Supreme Court 160; 20 7LEd2d 162 (1970);

4.     When the judge, prosecutor and my attorney, at the time, informed me that I was only facing a minimum sentencing range of 135 months (11 years, 3 months) to 337 months (28 years, 11 months) if I proceeded to trial and lost, somehow, I figured the worst case scenario was that I would be able to come home at the age of 29 , if I received the lower end of that range;

5.     This was the exact same amount of time offered to me on the minimum end of the guidelines associated with the extended plea, which were 135 months (11 years, three months) to 225 months (18 years, nine months), so I felt like if I could get a minimum sentence of 135 months (11 years, 3 months) if I went to trial and the exact same amount if I took the plea offer, the plea you really was not a plea.

6.     I was not made aware that the actual minimum range of my potential sentence was 225 months (18 years, nine months) to 562 months (46 years, 10 months), until the date of sentencing, far after the plea of 135 months (11 years, 3 months) to 225 months (18 years, 9 months) was offered to me.

7.     Knowing that I was actually facing up to 562 months (46 years, 10 months), at the time of the extended plea offer would've made the offer look much more appealing.

8.     Moreover, had I known that I was actually facing up to 562 months (46 years, 10 months) in prison, I would have urged my attorney to negotiate for a lesser plea offer, like my co-defendants' attorneys did, which would have potentially allowed me to be up for parole soon, instead of being sentenced to a death sentence, for a crime I did not commit.

9.     One of my co-defendants  Tiakawa Pierce has been released already and Wayne Grimes Jr. will be up for parole in less than two years.

10.    Although a would've been hard excepting a plead to something that I did not do were had absolutely nothing to do with, I hate to even admit at this point, but had I known that I was facing up to 562 months (46 years, 10 months) in prison, I would've jumped on the plea offer and hope and pray that one day my innocence would have been proven.

11.    In order to avoid the type of sentence I have now, I would have  accepted

some type of plea deal, had I known at the time of the plea negotiations that the actual minimum spanned all the way up to 562 months (46 years, 10 months) in prison.

12. Not only did the prosecutor and my attorney, at the time, mislead me in this regard, but the judge also did too.

13. If able to negotiate a plea deal now or even accept the offer that was extended to me previously I would accept it now like I would have then, especially now that I know the actual potential sentence range up to 562 months (46 years, 10 months).

15. I'm willing to verify any of the above during any judicial proceeding.

Further Affiant Sayeth Not.

_____
Affiant

STATE OF MICHIGAN          )
                           )SS
COUNTY OF _____)

Subscribed and sworn to before me
on this ____ day of _____, 2013.

_____
Notary Public

**Exhibit Y**

MICHIGAN COURT OF APPEALS

COA Case Number: 269298
SCt Case Number: 136202
PEOPLE OF MI V OMAR RASHAD POUNCY

------------------------------------------------------------------------

1  PEOPLE OF MI
  Oral Argument: N  Timely: N
  PL-AE   PRS
  (16282) KUEBLER DONALD A
900 S SAGINAW STREET
COURTHOUSE RM 100
FLINT  MI 48502-1514
810-257-3854

2  POUNCY OMAR RASHAD
  Oral Argument: Y  Timely: Y
  DF-AT   APP
  (25812) GROVE CHARI K
645 GRISWOLD
3300 PENOBSCOT BUILDING
DETROIT  MI 48226
313-256-9833

------------------------------------------------------------------------

Status: Case Concluded; File Archived    SCT Status: CLOSE

------------------------------------------------------------------------

Consolidations:
270604 PEOPLE OF MI V OMAR RASHAD POUNCY (Case Concluded; File Archived)

------------------------------------------------------------------------

03/28/2006 1 Claim of Appeal - Criminal
  Proof Of Service Date: 3/24/2006
Register of Actions: Y
Fee Code: I
Attorney:38166 - ARCHER WILLIAM H

03/09/2006 2 Order Appealed From
  From: GENESEE COUNTY CIRCUIT COURT
  Case Number: 05-017154-FC
  Trial Court Judge: 37516 HAYMAN ARCHIE L
  Nature of Case:
      Carjacking 4 COUNTS
      Robbery Armed 4 COUNTS
      Felony Firearm 2 COUNTS
      Felon in Possession of a Firearm
      Habitual Offender 2nd

03/28/2006 5 Transcript Ordered by Trial Court
  Date: 3/23/2006 Timely: Y
  Reporter: 4272 - BOLT JACQUELINE J
  Hearings:
      11/14/2005
      12/19/2005
      1/9/2006
      1/24/2006 Hearing
      1/24/2006
      1/25/2006
      1/26/2006
      1/27/2006
      1/31/2006
      2/1/2006
      3/9/2006

04/03/2006 6 Steno Certificate - Tr Request Received
  Date: 3/24/2006 Timely: Y
  Reporter: 4272 - BOLT JACQUELINE J
  Hearings:
      11/14/2005
      12/19/2005
      1/9/2006
      1/24/2006 Hearing
      1/24/2006
      1/25/2006
      1/27/2006
      1/31/2006
      2/1/2006
      3/9/2006

04/27/2006 7 Invol Dismissal Warning - No Steno Cert
  Attorney: 38166 - ARCHER WILLIAM H

Due Date: 5/18/2006
Comments: No steno cert from Rptr Bolt for 1/26/06 only from event 5

05/02/2006 8 Correspondence Received
Date: 5/1/2006
For Party: 2 POUNCY OMAR RASHAD DF-AT
Attorney: 38166 - ARCHER WILLIAM H
Comments: Ltr Atty Archer to Rptr Bolt-please file an amended steno cert

05/04/2006 9 Steno Certificate - Tr Request Received
Date: 3/24/2006 Timely: Y
Reporter: 4272 - BOLT JACQUELINE J
Hearings:
    1/26/2006
Comments: amended to include this hearing date

06/26/2006 10 Transcript Overdue - Notice to Reporter
Mail Date: 6/27/2006
Reporter: 4272 - BOLT JACQUELINE J
Comments: transcripts from evts 6 & 9 are overdue from Rptr Bolt

06/29/2006 11 Notice of Filing Transcript
Date: 6/29/2006 Timely: Y
Reporter: 4272 - BOLT JACQUELINE J
Hearings:
    11/14/2005
    12/19/2005
    1/9/2006
    1/24/2006 Hearing
    1/24/2006
    1/25/2006
    1/26/2006
    1/27/2006
    1/31/2006
    2/1/2006
    3/9/2006

06/30/2006 12 Notice of Filing Transcript
Date: 6/29/2006 Timely: Y
Reporter: 4272 - BOLT JACQUELINE J
Hearings:
    11/14/2005
    12/19/2005
    1/9/2006
    1/24/2006 Hearing

1/24/2006
1/25/2006
1/26/2006
1/27/2006
1/31/2006
2/1/2006
3/9/2006

07/31/2006 13 LCt Order - Appoint AT Atty
 Date: 7/27/2006
For Party: 2 POUNCY OMAR RASHAD DF-AT
Attorney: 1284 - STATE APPELLATE DEFENDER
Comments: SADO substitutes for Atty Archer-sent sub cnsl letter and printout

09/06/2006 15 Stips: Extend Time - AT Brief
 Extend Until: 10/19/2006
Filed By Attorney: 1284 - STATE APPELLATE DEFENDER
For Party: 2 POUNCY OMAR RASHAD DF-AT

09/28/2006 16 Motion: Extend Time - Appellant
 Proof Of Service Date: 9/28/2006
Filed By Attorney: 25812 - GROVE CHARI K
For Party: 2 POUNCY OMAR RASHAD DF-AT
Fee Code: I
Requested Extension: 11/16/2006
Answer Due: 10/5/2006

10/10/2006 17 Submitted On Administrative Motion Docket
 Event: 16 Extend Time - Appellant
District: T

10/11/2006 18 Order: Extend Time - Appellant Brief - Grant
 Click here to view document in PDF format.

 Event: 16 Extend Time - Appellant
Panel: PMD
Attorney: 25812 - GROVE CHARI K
Extension Date: 11/16/2006

11/08/2006 19 Transcript Requested by Atty or Party
 Date: 11/8/2006 Timely: N
Reporter: 4272 - BOLT JACQUELINE J
Filed By Attorney: 1284 - STATE APPELLATE DEFENDER
Hearings:
    1/10/2006

2/2/2006
Comments: transcripts of co-defendant in 05-17155-FC-sent late order transcript letter

11/16/2006 20 Brief: Appellant
 Proof Of Service Date: 11/16/2006
Oral Argument Requested: Y  Timely Filed: Y
Filed By Attorney: 25812 - GROVE CHARI K
For Party: 2 POUNCY OMAR RASHAD DF-AT
Comments: timely by order-see event 18

11/16/2006 22 Presentence Investigation Report - Confidential
 Date: 11/16/2006
For Party: 2 POUNCY OMAR RASHAD DF-AT
Attorney: 25812 - GROVE CHARI K

11/16/2006 23 Motion: Remand
 Proof Of Service Date: 11/16/2006
Filed By Attorney: 25812 - GROVE CHARI K
For Party: 2 POUNCY OMAR RASHAD DF-AT
Fee Code: I
Answer Due: 12/7/2006

11/20/2006 21 Defective Filing Letter
Event: 20
    Other - Cured

11/20/2006 25 Pleadings Returned
 Date: 11/20/2006
For Party: 2 POUNCY OMAR RASHAD DF-AT
Attorney: 25812 - GROVE CHARI K
Comments: returned motion for brief in excess of 50 pages-untimely per MCR 7.212(B)

11/28/2006 26 Pleadings Returned
 Date: 11/28/2006
For Party: 2 POUNCY OMAR RASHAD DF-AT
Attorney: 25812 - GROVE CHARI K
Comments: returned amended motion to remand-need motion to amend

12/04/2006 27 Brief: Amended - Appellant
 Proof Of Service Date: 12/4/2006
Oral Argument Requested: Y  Timely Filed: Y
Filed By Attorney: 25812 - GROVE CHARI K
For Party: 2 POUNCY OMAR RASHAD DF-AT
Comments: amended brief filed to cure defect-see event 21

12/04/2006 28 Defect Cured
Event: 20
P/S Date: 12/4/2006
   Other - Cured

12/12/2006 29 Motion: Motion
Proof Of Service Date: 12/12/2006
Filed By Attorney: 25812 - GROVE CHARI K
For Party: 2 POUNCY OMAR RASHAD DF-AT
Fee Code: I
Answer Due: 12/19/2006
Comments: motion to amend motion to remand

12/19/2006 30 Submitted On Administrative Motion Docket
Event: 29 Motion
District: T

12/20/2006 31 Order: Grant - Generic
Click here to view document in PDF format.

Event: 29 Motion
Panel: PMD
Attorney: 25812 - GROVE CHARI K
Comments: motion to amend mtn to remand granted-clerk's office to include affidavits attached
to mtn to amend

01/23/2007 33 Submitted On Motion Docket
Event: 23 Remand
District: T Item #: 8

01/25/2007 34 Order: Remand - Motion - Deny
Click here to view document in PDF format.

Event: 23 Remand
Panel: HWS,KJ,PMD
Attorney: 25812 - GROVE CHARI K

01/25/2007 35 Noticed
Record: REQST Mail Date: 1/26/2007

01/29/2007 36 Brief: Appellee
Proof Of Service Date: 1/25/2007
Oral Argument Requested: N  Timely Filed: N
Filed By Attorney: 16282 - KUEBLER DONALD A
For Party: 1 PEOPLE OF MI PL-AE

01/29/2007 37 Defective Filing Letter
Event: 36
   Proof of Service - Cured

01/29/2007 38 Pleadings Returned
Date: 1/29/2007
For Party: 2 POUNCY OMAR RASHAD DF-AT
Attorney: 25812 - GROVE CHARI K
Comments: returned 2nd motion to amend motion to remand-mtn remand decided on 1/25/07

02/01/2007 40 Material Received by Record Room
Comments: BX(1):LCF;11 TRS-GENESEE CO. (MISSING 1/24/06 HEARING)

02/06/2007 39 Defect Cured
Event: 36
   Proof of Service - Cured

02/09/2007 41 Telephone Contact
For Party: 2 POUNCY OMAR RASHAD DF-AT
Attorney: 25812 - GROVE CHARI K
Comments: Contacted Atty:C.Grove/assist:Virginia req clarification on 2 trs for 1/24/06(missing hearing tr).

02/12/2007 42 Motion: Remand
Proof Of Service Date: 2/12/2007
Filed By Attorney: 25812 - GROVE CHARI K
For Party: 2 POUNCY OMAR RASHAD DF-AT
Fee Code: I
Answer Due: 3/5/2007

02/16/2007 48 Motion: Extend Time - Standard 4 - Appt'd Atty
Proof Of Service Date: 2/16/2007
Filed By Attorney: 25812 - GROVE CHARI K
For Party: 2 POUNCY OMAR RASHAD DF-AT
Fee Code: I
Requested Extension: 5/2/2007
Answer Due: 2/23/2007

02/20/2007 44 Record Request
Mail Date: 2/20/2007
Agency: GENESEE COUNTY CIRCUIT COURT

02/20/2007 45 Transcript Cancelled
Date: 2/15/2007

Reporter: 4272 - BOLT JACQUELINE J
Filed By Attorney: 25812 - GROVE CHARI K
Hearings:
    1/24/2006 Hearing
Comments: Atty Grove indicates that motion and jury trial from 1/24/06 contained in one
transcript

02/20/2007 46 Record Filed
  Comments: (EVT #45)MAKES REC COMP:BX(1):LCF;11 TRS.

02/27/2007 49 Submitted On Administrative Motion Docket
  Event: 48 Extend Time - Standard 4 - Appt'd Atty
District: T

02/27/2007 50 Order: Extend Time - Standard 4 - Grant
  Click here to view document in PDF format.

  Event: 48 Extend Time - Standard 4 - Appt'd Atty
Panel: PMD
Attorney: 25812 - GROVE CHARI K
Extension Date: 3/19/2007
Comments: extend time Standard 4 brief but only until 3/19/07

02/28/2007 52 Brief: Standard 4
 Proof Of Service Date: 2/28/2007
Oral Argument Requested:   Timely Filed: Y
Filed By Attorney: 25812 - GROVE CHARI K
For Party: 2 POUNCY OMAR RASHAD DF-AT
Comments: timely by order-see event 50

03/02/2007 53 Pleadings Returned
 Date: 3/2/2007
For Party: 2 POUNCY OMAR RASHAD DF-AT
Attorney: 25812 - GROVE CHARI K
Comments: returned motion to extend time to file Std 4 brief-Std 4 brief w/mtn is timely-see evt
50 & 52

03/13/2007 55 Submitted On Motion Docket
 Event: 42 Remand
District: T Item #: 8

03/16/2007 56 Order: Remand - Motion - Deny
 Click here to view document in PDF format.

  Event: 42 Remand

Panel: KJ,JRC,PMD
Attorney: 25812 - GROVE CHARI K
Comments: without predjudice to filing motion to expand record to include trs attached to mtn

04/02/2007 59 Motion: Supplemental Brief
 Proof Of Service Date: 4/2/2007
Filed By Attorney: 25812 - GROVE CHARI K
For Party: 2 POUNCY OMAR RASHAD DF-AT
Fee Code: I
Answer Due: 4/9/2007
Comments: supplemental brief filed with motion

04/02/2007 60 Motion: Motion
 Proof Of Service Date: 4/2/2007
Filed By Attorney: 25812 - GROVE CHARI K
For Party: 2 POUNCY OMAR RASHAD DF-AT
Fee Code: I
Answer Due: 4/9/2007
Comments: motion to expand record

04/05/2007 61 Pleadings Returned
 Date: 4/5/2007
For Party: 2 POUNCY OMAR RASHAD DF-AT
Comments: returned supplemental motion to remand-Std 4 pleadings already filed-see event 52

04/10/2007 62 Submitted On Administrative Motion Docket
 Event: 59 Supplemental Brief
District: T

04/12/2007 63 Order: Supplemental Brief - Deny
 Click here to view document in PDF format.

 Event: 59 Supplemental Brief
Panel: PMD
Comments: supplemental brief returned with order-order VACATED-see event 68

04/17/2007 64 Submitted On Motion Docket
 Event: 60 Motion
District: T Item #: 8

04/23/2007 65 Order: Grant - Generic
 Click here to view document in PDF format.

 Event: 60 Motion
Panel: DAS,ETF,JRC

Attorney: 25812 - GROVE CHARI K
Comments: motion to expand the record is granted

04/23/2007 66 Motion: Reconsideration of Order
 Proof Of Service Date: 4/23/2007
Filed By Attorney: 25812 - GROVE CHARI K
For Party: 2 POUNCY OMAR RASHAD DF-AT
Fee Code: I
Answer Due: 5/7/2007
Comments: motion for reconsideration of order denying mtn to file supplemental brief

05/09/2007 67 Submitted On Special Motion Docket
 Event: 66 Reconsideration of Order
District: T Item #: 1

05/09/2007 68 Order: Reconsideration - Grant - Appeal Remains Open
 Click here to view document in PDF format.

 Event: 66 Reconsideration of Order
Panel: PMD
Comments: 4/12 order VACATED-AT mtn for supp brf GRANT-AT may re-file supp brf
returned w/ 4/12 order by 5/23

05/15/2007 69 Brief: Supplemental Brief - AT
 Proof Of Service Date: 5/15/2007
Oral Argument Requested:   Timely Filed: Y
Filed By Attorney: 25812 - GROVE CHARI K
For Party: 2 POUNCY OMAR RASHAD DF-AT
Comments: brief allowed by order-see event 68

09/11/2007 72 Submitted on Case Call
 District: D Item #: 2
Panel: MRS,WCW,KFK

10/31/2007 78 Order: Consolidate - Administrative
 Click here to view document in PDF format.

 Panel: MRS,WCW,KFK
Comments: Consl: ▓▓▓▓▓70604

12/27/2007 85 Opinion - Per Curiam - Unpublished
 Click here to view document in PDF format.

 Pages: 36
Panel: MRS,WCW,KFK

Result: Affirm in Part, Reverse in Part, Remanded
Comments: Affirm on #269298; Reverse and remand on #270604

01/11/2008 86 Motion: Reconsideration of Opinion
 Proof Of Service Date: 1/18/2008
Filed by Pro Per
For Party: 2 POUNCY OMAR RASHAD DF-AT
Answer Due: 2/1/2008

01/16/2008 87 Defective Filing Letter
 Event: 86
   PROOF OF SERVICE - Cured

01/17/2008 88 Motion: Reconsideration of Opinion
 Proof Of Service Date: 1/17/2008
Filed By Attorney: 25812 - GROVE CHARI K
For Party: 2 POUNCY OMAR RASHAD DF-AT
Answer Due: 1/31/2008

01/23/2008 89 Defect Cured
 Event: 86
P/S Date: 1/18/2008
   PROOF OF SERVICE - Cured

02/05/2008 90 Submitted On Reconsideration Docket
 Event: 86 Reconsideration of Opinion
Event: 88 Reconsideration of Opinion
District: C Item #: 1

02/25/2008 93 Late Application Rejected
 Proof Of Service Date: 2/25/2008
Filed By Pro Per
Comments: APPL received 022208; too late to file from 012708 opinion

03/25/2008 96 Opinion - On Reconsideration - Per Curiam - Unpublished
 Click here to view document in PDF format.

 Pages: 38
Panel: MRS,WCW,KFK
Result: L/Ct Judgment/Order Affirmed

03/25/2008 97 Order: Reconsideration - Grant - Vacate Opinion
 Click here to view document in PDF format.

 Event: 88 Reconsideration of Opinion

Event: 86 Reconsideration of Opinion
Panel: MRS,WCW,KFK
Attorney: 25812 - GROVE CHARI K
Comments: Opinion vacated as to ~~#269203~~ only; #270604 opinion of 12-27-2007 is retained; a new opin is attachd

04/11/2008 99 SCt: Application for Leave to SCt
~~Supreme Court Nos 136202~~
Notice Date: 5/6/2008
Fee: State   Check No.:
For Party: 2
Attorney: 25812 - GROVE CHARI K  .

04/14/2008 100 Supreme Court - File & Record Sent To
File Location: Z
Comments: SC#136202 LCF;11 TR

04/15/2008 101 SCt: COA and TCt Received
11 tr; 1 files
07/29/2008 102 SCt Order: Deny Application/Complaint
Click here to view document in PDF format.


07/29/2008 103 Supreme Court - File Ret`d By - Close Out
File Location: F


------------------------------------------------------------------------------
Case Listing Complete

**EXHIBIT Z**

# STATE APPELLATE DEFENDER OFFICE

SUITE 3300 PENOBSCOT • 645 GRISWOLD • DETROIT, MICHIGAN 48226-4281
Phone: 313.256.9833 • Fax: 313.965.0372
CLIENT CALLS 313.256.9822

JAMES R. NEUHARD
DIRECTOR

NORRIS J. THOMAS, JR.
CHIEF DEPUTY DIRECTOR

DAWN VAN HOEK
DEPUTY DIRECTOR



LANSING OFFICE
101 NORTH WASHINGTON
14TH FLOOR
LANSING, MICHIGAN 48913-0001
Phone: 517.334.6069 · Fax: 517.334.6987

website: www.sado.org

November 27, 2006

Mr. Omar Rashad Pouncy
No. 571990
Earnest C. Brooks Correctional Facility
2500 Sheridan
Muskegon Heights, MI 49444

Dear Mr. Pouncy:

I have been ordered to reduce the length of the brief to 50 pages, so I will have to re-file it. Also, I need a few things: the addresses and phone numbers of all of the people who signed the affidavits (I can't call them to testify unless I talk to them); a copy of the Grimes plea transcript, if you have it; copies of the photo identification line-ups.

Sincerely,

Chari Grove
Assistant Defender

cg

cc:    File

**EXHIBIT AA**

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

OMAR RASHAD POUNCY,

        Defendant-Appellant.

UNPUBLISHED
March 25, 2008

No.  269298
Genesee Circuit Court
LC No.  05-017154-FC

ON RECONSIDERATION

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

OMAR RASHAD POUNCY,

        Defendant-Appellant.

No.  270604
Genesee Circuit Court
LC No.  05-017448-FC

Before:  Smolenski, P.J., Whitbeck, C.J., and Kelly, J.

PER CURIAM.

In these consolidated appeals, defendant Omar Pouncy appeals as of right from two separate trials.  In Docket No. 269298, defendant appeals his convictions from the Brady and Sandstrom jury trial (Brady trial).  In Docket No. 270604, defendant appeals his convictions from the Haynes bench trial (Haynes trial).  Both cases arise out of defendant's involvement in carjackings during which defendant posed as a potential buyer of vehicles advertised for sale.  In each incident, after arranging to take the vehicle for a drive, defendant would allegedly pull a gun on the seller and steal the vehicle.

In Docket No. 269298, the Brady trial, defendant appeals his jury conviction of four counts of carjacking, MCL 750.529a, four counts of armed robbery, MCL 750.529, two counts of carrying a firearm during commission of a felony (felony firearm), MCL 750.227b, and one count of being a felon in possession of a firearm (felon in possession), MCL 750.224f.  The trial court sentenced defendant as a third offense habitual offender, see MCL 769.11, to concurrent sentences of 2 years each for the felony firearm counts, followed by concurrent sentences of 562 months to 800 months' imprisonment for each of the four counts of carjacking, to 562 months to

800 months' imprisonment for each of the four counts of armed robbery, and two to 10 years' imprisonment for felon in possession. On appeal, defendant presents numerous claims of error. Because we conclude that there were no errors warranting relief, we affirm defendant's convictions and sentences in Docket No. 269298.

In Docket No. 270604, the Haynes trial, defendant appeals his bench conviction of one count each of carjacking, armed robbery, felony firearm, felon in possession, and carrying a concealed weapon, MCL 750.227. The trial court sentenced defendant as a fourth offense habitual offender, see MCL 769.12, to 2 years in prison for felony firearm and to 450 to 900 months' imprisonment for each of the remaining counts. The trial court determined that the first 24 months of the concealed weapon sentence should run concurrent with the felony firearm sentence. After defendant serves the felony firearm sentence, the armed robbery, felon in possession, and the remainder of the concealed weapon charge would run concurrently. Finally, the carjacking sentence would be served last, consecutive to all other counts. In his appeal, defendant again presents numerous claims of error, but we find only one dispositive. We conclude that defendant experienced a total deprivation of counsel during a critical stage of the proceedings because he did not unequivocally waive his right to counsel during the pretrial proceedings. For this reason, we reverse defendant's convictions in Docket No. 270604 and remand for further proceedings consistent with this opinion.

## I. Facts and Procedural History

### A. The Haynes Carjacking

In September 2005, Ralph Haynes had a Monte Carlo on display for sale in the front yard of Samuel Anderson's home. Ralph was selling the car to pay for anticipated funeral expenses associated with his impending death from cancer. Anderson explained that on Saturday, September 24, 2005, a person came to look at Ralph's car. At trial, Anderson identified defendant as the prospective buyer. Anderson testified that defendant had looked at the car on three or four previous occasions. Anderson explained that during defendant's first visit, which was probably on the Sunday or Monday before the 24th, defendant inquired about the price, stated that "[m]oney is no object," and then left. On defendant's second visit, probably on Tuesday, he asked to drive the car, but Anderson refused. Sometime during his Tuesday visit, defendant mentioned to Anderson his desire to take the vehicle to his mechanic. Defendant arranged to come over again on Wednesday, but Anderson did not meet with him. Instead, Ralph and his brother Dan Haynes remained at Anderson's house in order to meet with defendant and defendant's mechanic.

Dan testified that he went to Anderson's house with Ralph on Wednesday, September 21, 2005, in order to meet some people who were interested in purchasing the Monte Carlo. At trial, Dan identified defendant as the prospective buyer. After briefly discussing the car, defendant asked to take it for a test drive, but, because the car did not have a license plate, Dan offered to take defendant for a ride instead. Defendant agreed, but during the ride he told Dan that he really wanted to take the car to his mechanic. Dan refused, but told defendant that he would ask Ralph about it, and then took defendant back to Anderson's house. Ralph refused to let defendant take the car to his mechanic, so Dan offered to let defendant go get his mechanic and bring him back to Anderson's house. Dan stated that defendant then left and came back shortly thereafter with his mechanic. After defendant and his mechanic looked at the car, defendant asked whether he

needed to leave a deposit, but Dan declined, promising that the car would still be there the next day. Defendant agreed to come back the next day at 12:30 p.m., but he never showed up. According to Dan, defendant called Ralph on Friday, apologized for not showing up, and asked to see the car again.

On September 24th, defendant arrived at Anderson's house and asked to take the car for a test drive. Anderson agreed to accompany defendant on the test. Anderson informed defendant that the car was not insured and instructed defendant on a specific route for the test drive. Anderson testified that part of the instructed route included getting on the expressway, but as they approached the expressway ramp, Anderson realized that defendant was in the wrong lane. When Anderson advised defendant that he needed to change lanes, defendant replied, "No, the car is mine now[,]" pulled out a gun, and pointed it at Anderson. Anderson told defendant he could have the car and asked to be let out. Defendant stopped at a red light and told Anderson, "All right when that light turns green you better be out the door or I will blow you through the door." Anderson got out.

### B. The Brady Carjacking

Joseph Davis testified that Earl Brady brought a Camaro drag-racing car to his racecar chassis fabrication shop to display it for sale. Approximately four or five days before September 29, 2005, three men came to look at the Camaro; one of them identified himself as "Jacob Woods." At trial, Davis identified defendant as "Jacob Woods" and noted that he had been the one doing most of the talking. Defendant came back a second time and then a third time on the 29th. On September 29th, defendant called Davis and indicated that he was ready to make a deal, so Davis called Brady and told him to come over. Brady arrived in his truck with his friend Patrick Wendell. Defendant and two other men showed up later in a grey Intrepid. During negotiations, defendant told Davis that he wanted to take the Camaro to his mechanic at King Automotive. Brady agreed, loaded the Camaro onto a trailer attached to his truck, and they all left.

At trial, both Brady and Wendell identified the prospective buyer of the Camaro as defendant. The group arrived at a house where defendant said they would meet the mechanic and defendant asked Brady to back the truck into the driveway. Defendant and Brady were discussing the Camaro, when one of defendant's associates pulled out a gun and demanded Brady's keys and cell phone. When Brady refused, the associate fired the gun up into the air; Brady then complied. The men also took Wendell's cell phone. The men told Wendell and Brady to walk across the street and into the woods. While in the woods, Brady and Wendell heard the vehicles drive away. Brady and Wendell walked to a nearby house and called the police.

Wayne Grimes, defendant's stepbrother, testified that he helped defendant commit the Brady carjacking. Grimes testified that he owned an Intrepid, in which he drove defendant and defendant's friend, Tiaqua, to Davis's race shop on September 29, 2005. After defendant spoke to some men about a car, defendant directed Grimes to drive to defendant's "engineer." On the way, defendant told Grimes that he planned to "take" the cars and sell them, and Tiaqua handed Grimes a gun. Grimes testified that they arrived at a house, and, after Grimes gave him the signal, he pointed the gun at one of the men and took his keys and cell phone. He testified that he shot the gun in the air when the man first refused. He also testified that he ordered the men to

walk into the woods. According to Grimes, after the men walked into the woods, he got in his car and left defendant and Tiaqua. Grimes testified that he had pleaded guilty to armed robbery and felony firearm.

### C. The Sandstrom Carjacking

Thomas Sandstrom testified that on October 11, 2005, a man, who had already called the previous day, came to his home in a metallic Intrepid to see a Cadillac that Sandstrom had advertised for sale. At trial, both Thomas and his wife Maria Sandstrom identified defendant as the prospective buyer. Defendant asked to take the car to his mechanic at King Automotive and Thomas agreed. Thomas rode in the Cadillac with defendant, defendant's associate drove the Intrepid, and Maria followed in her Corvette. They ended up at the last house on a dead end dirt road. Defendant asked Thomas for the title and they went to the Corvette to retrieve it from Maria. Thomas then felt defendant stick a gun in his side and defendant told Maria to get out of the Corvette. Thomas was asked for his wallet, and both the Sandstroms were ordered into the woods. Thomas heard the cars drive away, so he and Maria walked back to the road and flagged down a passing police car. Maria had memorized the license plate of the Intrepid and gave it to the police.

Grimes testified that he also helped defendant commit the Sandstrom carjacking. He testified that he, Tiaqua, and defendant were driving around, and defendant was looking at automotive sales ads in the newspaper. At some point, defendant called about an ad and then directed Grimes to drive to the seller's house. After defendant spoke to a man about a car, defendant told Grimes that he was going to take the car for a test drive. On the way, Grimes "[f]ound out that . . . it's about to happen again"—that defendant planned to steal the cars. Grimes testified that just after they arrived at the house, he heard the women screaming and he got out of his car, covered his license plate, and then drove away, leaving defendant and Tiaqua behind. Grimes admitted that, when he was first arrested, he denied any involvement in the carjackings.

### D. The Arrest and Trials

Detective James Gagliardi testified that he was assigned to investigate the Brady carjacking, but his investigation hit a dead-end. However, on October 12, 2005, he received notice of the Sandstrom carjacking and, after investigating the Intrepid lead, he was able to locate Grimes. Grimes was arrested and, during interrogation, he identified defendant as one of his accomplices. Gagliardi testified that he put together a photo showup of defendant, and that Davis, Brady, and the Sandstroms all immediately identified defendant. Sometime around October 13, 2005, Anderson and Dan Haynes viewed a photo showup, and both men identified defendant as the carjacker. Gagliardi testified that defendant was taken into custody on Friday, October 14, 2005.

In late January and early February 2006, the trial court held the Brady trial. The trial lasted six days and included all the charges stemming from both the Brady and the Sandstrom carjackings. The jury convicted defendant as charged of four counts of carjacking, four counts of armed robbery, two counts of felony firearm, and one count of being a felon in possession of a firearm.

The Haynes trial lasted four days in April 2006. After the close of proofs, the trial court convicted defendant of one count each of armed robbery, carjacking, being a felon in possession of a firearm, carrying a concealed weapon, and felony firearm.

Defendant now appeals his convictions from both trials.

## II. Docket No. 269298: Appeal from the Brady Trial

### A. Waiver of Right to Counsel

Defendant first argues that he did not knowingly, intelligently and voluntarily waive his right to have counsel represent him at trial. Specifically, defendant contends that his waiver was contingent on the appointment of standby counsel and that he was not properly informed of the risks inherent in self-representation. As a result, defendant further argues, his convictions must be reversed. We disagree.

### 1. Standard of Review

When reviewing whether a defendant validly waived the right to counsel, this Court reviews de novo the entire record to determine whether the trial court's factual findings regarding the waiver were clearly erroneous. *People v Williams*, 470 Mich 634, 640; 683 NW2d 597 (2004). In conducting this review, this Court must respect the trial court's special "role in determining factual issues and issues of credibility." *Id.* at 641. However, the meaning of "knowing and intelligent" is a question of law, which this Court reviews de novo. *Id.* at 640. A trial court's ultimate decision to permit a defendant to represent himself is reviewed for an abuse of discretion. *People v Hicks*, 259 Mich App 518, 521; 675 NW2d 599 (2003).

### 2. The Right to Counsel

Both the United States and Michigan constitutions guarantee the right to counsel during all critical stages of the criminal process for an accused who faces incarceration. US Const, Am VI; Const 1963, art 1, § 20; *Williams, supra* at 641-642. The United States Constitution also implicitly guarantees a criminal defendant's right to represent himself, *People v Russell*, 471 Mich 182, 188-190; 684 NW2d 745 (2004), while the same right is explicitly guaranteed under Michigan's constitution and by statute. See Const 1963, art 1, § 13; MCL 763.1; *Williams, supra* at 641-642. Under Michigan law,

> a trial court must make three findings before granting a defendant's waiver request. First, the waiver request must be unequivocal. Second, the trial court must be satisfied that the waiver is knowingly, intelligently, and voluntarily made. To this end, the trial court should inform the defendant of potential risks. Third, the trial court must be satisfied that the defendant will not disrupt, unduly inconvenience, and burden the court or the administration of court business. [*Williams, supra* at 642.]

Additionally, under MCR 6.005(D),

> The court may not permit the defendant to make an initial waiver of the right to be represented by a lawyer without first
>
> (1) advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation, and
>
> (2) offering the defendant the opportunity to consult with a retained lawyer or, if the defendant is indigent, the opportunity to consult with an appointed lawyer.

Failure to substantially comply with the above requirements renders the defendant's waiver of counsel ineffective. *Russell*, *supra* at 191-192.

> When determining whether the requirements were met, [this Court] indulge[s] every reasonable presumption against waiver of fundamental constitutional rights. Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver. [*People v Willing*, 267 Mich App 208, 220; 704 NW2d 472 (2005) (internal quotations and citations omitted).]

### 3. Defendant's Initial Waiver

At the beginning of trial, defendant expressed dissatisfaction with his appointed attorney. Defendant claimed that he and his attorney Michael Breczinski were "really not on the same page." Defendant indicated that he was not comfortable with Breczinski's representation because Breczinski had not filed some requested motions or an alibi notice and the longest contact he had had with Breczinski was a 15-minute conversation on the day of trial. Defendant requested replacement counsel. The trial court explained that Breczinski could not file legal documents without a proper basis and that defendant did not have the knowledge or experience to know whether the requested motions were proper. The trial court also assured defendant that Breczinski was a very experienced attorney. The trial court denied defendant's request for new counsel, noting that "we're here on the day of trial, we got a jury downstairs that's ready to go and we're gonna try this case today[.]" Although the trial court denied defendant's request, it still inquired about the efforts Breczinski had taken with regard to defendant's alibi and other matters. Breczinski explained that he had taken steps to investigate defendant's alibi and address the other issues raised by defendant.

After jury selection, defendant proffered an objection.

*Mr. Pouncy:*   Can that sign be taken, this moved 'cause I'm not guilty. It say if Omar Pouncy guilty.

*The Court:*   Mr. Pouncy this is the prosecutor's side of the case. You're not runnin' anything in here, okay?

*Mr. Pouncy:*   I'm just askin' though—

*The Court:*   No, no.   He has the right to present his side of the case, your lawyer will present his side and if your lawyer believes there's somethin' wrong goin' on he'll get up and say somethin'.   He doesn't need you to jump in okay?   You're not a lawyer okay?

*Mr. Pouncy:*   Would I, don't I have the right to represent myself though?   I'm just askin', I'm just askin'.

*The Court:*   Mr. Pouncy if you decide that you want to represent yourself then you're gonna represent yourself in total.   The only thing Mr. Breczinski will be doin' is sitting there okay?

*Mr. Pouncy:*   Okay.

*The Court:*   And I can tell you right now that if you represent yourself you really are a fool okay and the reason is because you don't have a clue as to what you're doin'.

After the prosecution's opening statement, defendant requested permission to give his own opening statement.

*The Court:*   . . . Is it true that you're asking to make your own opening statement?

*Mr. Pouncy:*   Yes I'm, yes that is true but I would ask that if there are any objections needed that I'm not further, that I'm not known to do is properly object if my attorney can do it . . . because like I first stated to you earlier I haven't even had a conversation, we seen each other—

\* \* \*

*The Court:*   [S]ir if you make the opening statement, you'll have to represent yourself through this trial.   Now I'm not gonna have him doin' half the trial and you doin' half.   Either one, one of you is gonna be the lawyer and the other one isn't.   Now if you decide to represent yourself, then he's gonna be sittin' back just as an advisor and that'll be it and you'll be able to get advice from him but you'll be callin' the shots through the entire trial.   That includes objections and everything else.   And if you don't know when and how to make 'em then I guess, you know, that's . . . on you.   Now you say this is your life . . . then I would caution you to be very careful as to how you proceed right now—

\* \* \*

[T]here's no way if, if I needed to have my transmission rebuilt that I would pull my car into a place to have it rebuilt and say to them look you guys step to the side I'm gonna rebuild this transmission because I don't know anything about buildin' transmissions.   I've never built one.   Are you hearin' what I'm sayin'?

After this, defendant again expressed dissatisfaction with how Breczinski was handling his case and indicated that he could do a better job. The trial court reiterated that Breczinski was doing what he was supposed to do and asked defendant whether he would let Breczinski represent him.

>*Mr. Pouncy:*    So it's not an option for me to be able to get, even though I complained earlier and don't feel comfortable with the representation, for me to get further (inaudible)?

>*The Court:*    No sir if you want to, if you want to decide who's gonna represent you then you get your money together and you go hire the lawyer you want to represent you. Otherwise, you're gonna get the lawyer that we appoint for you to represent you.

>*Mr. Pouncy:*    Well yeah I'm gonna hire a lawyer then.

>*The Court:*    Well I'm sorry sir it's late for that. It's trial day today.

>*Mr. Pouncy:*    It's too late?

>                              * * *

>*The Court:*    The only issue now is . . . are you gonna let Mr. Breczinski represent you or are you gonna represent yourself, that's the only thing that's on the table right now.

>*Mr. Pouncy:*    Well let me ask you this. Would you let somebody represent you that didn't come and see you the day before your trial that didn't come and talk to you, that you didn't discuss your case with?

>*The Court:*    Sir I would let Mr. Breczinski represent me in a heartbeat before I would represent myself with the knowledge that you have.

>*Mr. Pouncy:*    So will I, I won't be able to talk at all if he talk? I won't be able to say nothin' at all?

>*The Court:*    No sir. He is gonna represent you. That's what he does. . . .

The trial court then determined that Breczinski should continue representing defendant and make the opening statement.

Just before Breczinski was about to cross-examine the first trial witness, Breczinski told the court that defendant had passed him a note during the direct examination that stated, "I'm gonna represent myself from now on so you can tell the Judge."

>*The Court:*    Mr. Pouncy you understand you have the right to an attorney and you have the right to Court appointed counsel if you can't afford one, do you understand that?

-8-

*Mr. Pouncy:*    I don't have attorney right now.

*The Court:*    Sir I'm just asking you do you understand your rights sir?

*Mr. Pouncy:*    Oh yes I do understand.

*The Court:*    You understand that if you represent yourself that I will have to treat you like any other lawyer and if you don't comply with the Court rules I'm gonna have to call you on it you understand that?

*Mr. Pouncy:*    Yes sir.

*The Court:*    And you understand that Mr. Breczinski will be here just simply to advise you from this trial forth and if you stand up and start representing yourself you're not gonna be able to change horses in the middle of the stream. You're gonna be representing yourself from beginning to end sir. Is that what you really want to do?

*Mr. Pouncy:*    Yes. Yes.

*The Court:*    Mr. Pouncy I'm gonna tell you that in my opinion you have no business representing yourself, none whatsoever.

*Mr. Pouncy:*    The fact that they found the (inaudible) shoe—

*The Court:*    [S]ir I just want you to understand that . . . .

*Mr. Pouncy:*    All right I'm ready to go then.

*The Court:*    All right then . . . .

As can be seen from these exchanges, this is not a case where defendant "steadfastly rejected the option of proceeding to trial without the assistance of counsel," by repeatedly insisting on the appointment of substitute counsel. *Russell, supra* at 192. Rather, defendant repeatedly raised the issue of self-representation. After defendant's initial inquiry about his entitlement to represent himself, several exchanges transpired between defendant and the trial court regarding whether he actually wished to represent himself. But after each exchange the trial court erred on the side of ruling against waiver. During the last exchange, defendant confirmed that he understood the risks associated with self-representation and ultimately indicated that he was ready to proceed. Only then did the trial court permit defendant to represent himself.

Nevertheless, relying on *People v Dennany*, 445 Mich 412; 519 NW2d 128 (1994), defendant argues that his simultaneous request for standby counsel rendered his waiver equivocal. However, this Court in *People v Hicks* noted that the plurality opinion of *Dennany* was not binding authority and held that "a request for self-representation can be accompanied by a request for standby counsel and maintain its unequivocal nature." *Hicks, supra* at 528. The Court explained that, "[i]nherent in the trial court's ability to evaluate a waiver of counsel is the ability to determine whether the defendant is vacillating in his choice or merely requesting that

which ... will likely be granted to the defendant anyway." *Id.* at 529. Deferring to the trial court's superior ability to judge credibility, see *Williams, supra* at 640-641, we conclude that defendant's reference to having standby counsel did not invalidate his otherwise unequivocal waiver of counsel.

Defendant also argues that his waiver was not knowing and intelligent because the trial court failed to adequately advise him of the risks of self-representation. We do not agree.

The existence of a knowing and intelligent waiver of counsel depends on the particular facts and circumstances of a case. *People v Riley*, 156 Mich App 396, 399; 401 NW2d 875 (1986), overruled in part on other grounds *People v Lane*, 453 Mich 132; 551 NW2d 382 (1996). An explanation of the risks of self-representation requires more than informing the defendant that he waives counsel at his own peril. *People v Blunt*, 189 Mich App 643, 649-650; 473 NW2d 792 (1991). A defendant must be specifically and rigorously warned of the hazards ahead. *Russell, supra* at 193 n 27, citing *Iowa v Tovar*, 541 US 77, 88-89; 124 S Ct 1379; 158 L Ed 2d 209 (2004). An explanation of the risks of self-representation should include, for example, a warning that exercising the right to self-representation is usually an unwise decision and the defendant may be acting to his own detriment, and a warning that the defendant will not be afforded any special treatment and will be held to abide by the special skills and training required of any professional attorney. *Blunt, supra* at 649-650.

In the present case, the record demonstrates that the trial court properly advised defendant of the risks of self-representation. The trial court told defendant that he would be a "fool" to represent himself and warned him that the court would treat him "like any other lawyer." Indeed, the trial court explained that defendant would be bound to comply with the court rules, which included making "objections and everything else." After defendant effectively asserted his right to represent himself, the trial court was not required to repeatedly pressure defendant into relinquishing that right. *People v Morton*, 175 Mich App 1, 7; 437 NW2d 284 (1989). Based on the totality of the exchanges, we conclude that the trial court properly apprised defendant of the risks associated with self-representation.[1]

Moreover, the record reflects that the trial court repeatedly advised defendant of the charges against him, including the minimum and maximum prison sentences associated with the various charges, both at the beginning of trial and at every subsequent proceeding. See MCR 6.005(D).[2] Additionally, the record reflects that throughout the entire proceeding, Breczinski

---

[1] Contrary to defendant's assertion, the trial court was not required to advise him "of the manner in which to make objections or explain the manner of decorum to be followed in the courtroom." Regardless, the record demonstrates that the trial court repeatedly, as necessary, advised defendant with respect to proper procedure, including, for example, introducing evidence and making objections.

[2] We reject defendant's argument that the trial court's failure to specifically advise him of the charges against him at the February 1, 2006 hearing warrants reversal of his convictions. Notice of the charges against the defendant is only required during the initial waiver. MCR 6.005(D). MCR 6.005(E) does not require that that the trial court re-advise the defendant of the charges against him at every subsequent proceeding. See *Lane, supra* at 137. Moreover, during his
(continued...)

was available to advise defendant as standby counsel and actively participated in the trial by performing voir dire and questioning witnesses. See MCR 6.005(D)(2).

### 4. Defendant's Waiver at Subsequent Proceedings

MCR 6.005(E) provides, in pertinent part, as follows:

If a defendant has waived the assistance of a lawyer, the record of each subsequent proceeding (e.g., preliminary examination, arraignment, proceedings leading to possible revocation of youthful trainee status, hearings, trial or sentencing) need show only that the court advised the defendant of the continuing right to a lawyer's assistance (at public expense if the defendant is indigent) and that the defendant waived that right. Before the court begins such proceedings,

(1) the defendant must reaffirm that a lawyer's assistance is not wanted; or

(2) if the defendant requests a lawyer and is financially unable to retain one, the court must appoint one; or

(3) if the defendant wants to retain a lawyer and has the financial ability to do so, the court must allow the defendant a reasonable opportunity to retain one.

Defendant argues that the trial court's failure to specifically advise him of his right to counsel or reconfirm his waiver of counsel at the February 1, 2006 hearing warrants reversal of his convictions. We disagree.

In dealing with this precise issue—whether the trial court's failure to properly advise the defendant under MCR 6.005(E) requires reversal—the Michigan Supreme advised that "failure to strictly adhere to the court rules in and of itself does not mandate reversal." *Lane, supra* at 139. Notably, unlike as for the initial waiver, neither the Michigan nor United States Constitutions require the waiver at subsequent proceedings. *Id.* Therefore, "failure to comply with MCR 6.005(E) is to be treated as any other trial error." *Id.* at 140. To avoid forfeiture under the plain error rule, which is applicable to claims of unpreserved, nonconstitutional error, the defendant bears the burden to show that the plain error prejudiced the defendant's substantial rights, i.e., that the error affected the outcome of the lower court proceedings. *Id.*; *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

The trial court's failure to properly advise defendant under MCR 6.005(E) at the February 1, 2006 hearing was not outcome determinative. Although the trial court did not go through the rote process of specifically advising defendant that he had the right to counsel and

---

(...continued)

closing argument, the prosecutor advised the jury of all of the charges against defendant, and during jury instructions, the trial court advised the jury of all the charges against defendant. Defendant was present throughout both recitations of the charges against him. Therefore, defendant was clearly, albeit indirectly, re-advised of the charges against him during that proceeding.

specifically reconfirming that defendant was waiving that right, the record unequivocally evidences that defendant was aware that he had the right to counsel and that he nevertheless chose to waive that right.

First, the record reflects that the trial court advised defendant of his right to counsel and re-confirmed that he waived that right on every other trial date. Indeed, on January 31, 2006, the trial court specifically advised defendant of his right to counsel and reconfirmed his waiver of counsel, *twice*. And at the end of that proceeding, the trial court asked who would be conducting closing argument on behalf of defendant, to which defendant responded, "I am." Second, the very next day, the sixth and final day of trial, February 1, 2006, the trial court began by asking for counsels' appearances. The trial court took the appearance of the prosecutor, then stand-by counsel, and then the trial court took defendant's appearance. Specifically, Mr. Breczinski identified himself as "of counsel for Omar Pouncy," and then the trial court asked defendant, "All right, Mr. Pouncy, would you state your appearance, also, sir?" and defendant responded by stating his name. Third, before the jury was brought in, defendant again expressed his intent to present closing argument himself. Fourth, after the trial court greeted the jury, it asked defendant whether he was ready to proceed, and he answered affirmatively. Finally, and most notably, during jury instructions, the trial court advised the jury that defendant's decision to represent himself should not affect their verdict. Specifically, the trial court stated as follows:

> In this case, the Defendant, Omar Rashad Pouncy, is representing himself. This fact should not affect your decision in any way. The Defendant has the right to represent himself and has chosen to exercise that right. A lawyer, Michael Breczinski, is present if the Defendant wishes to consult with him and has been throughout the entire trial.

In light of the foregoing, there is no indication on the record that defendant would have availed himself of his right to counsel even if the trial court had properly advised him. Thus, the trial court's error in failing to strictly apply with MCR 6.005(E) on the last day of trial was harmless.

### 5. Conclusion

The trial court did not clearly err when it determined that defendant knowingly, intelligently and voluntarily waived his right to counsel. Therefore, the trial court did not err when it permitted defendant to represent himself.

### B. Continuance to Obtain Substitute Counsel

Defendant argues that the trial court erred when it failed to order a continuance of the trial in order to give defendant time to obtain alternate counsel after he expressed dissatisfaction with his current counsel. We disagree.

To the extent that defendant claims that the trial court erred by denying him substitute *appointed* counsel, his claim is without merit. Criminal defendants are not entitled to appointed counsel of their choice. *Russell*, *supra* at 192 n 25. The decision to permit substitute counsel is within the trial court's discretion. *Id.* A defendant may be granted replacement counsel upon a showing of good cause and a finding that substitution of counsel will not unreasonably disrupt

the judicial process. *People v Meyers* (*On Remand*), 124 Mich App 148, 165; 335 NW2d 189 (1983). Here, defendant's expression of dissatisfaction with how Breczinski was handling the case did not adequately demonstrate a breakdown in the attorney-client relationship to warrant substitution of counsel. Moreover, as will be discussed below, good cause was not supported by defendant's allegations that Breczinski was ineffective.

Turning to defendant's ability to obtain *retained* counsel, the constitutional right to counsel encompasses the right of a defendant to choose his own retained counsel. *US v Gonzalez-Lopez*, 548 US ___, ___; 126 S Ct 2557; 165 L Ed 2d 409 (2006). However, the right is not absolute; a court must balance the defendant's right to choice of counsel against the public's interest in the prompt and efficient administration of justice. *People v Akins*, 259 Mich App 545, 557; 675 NW2d 863 (2003).

> "When reviewing a trial court's decision to deny a defense attorney's motion to withdraw and a defendant's motion for a continuance to obtain another attorney, we consider the following factors: (1) whether the defendant is asserting a constitutional right, (2) whether the defendant has a legitimate reason for asserting the right, such as a bona fide dispute with his attorney, (3) whether the defendant was negligent in asserting his right, (4) whether the defendant was merely attempting to delay trial, and (5) whether the defendant demonstrated prejudice resulting from the trial court's decision." [*Id.*, quoting *People v Echavarria*, 233 Mich App 356, 369; 592 NW2d 737 (1999).]

Although defendant did briefly express a desire to retain counsel, he did not make a formal motion for a continuance to do so. The trial court cannot be faulted for failing to grant a continuance that was never requested. Further, even if we were to conclude that this statement were a request for a continuance, we would conclude that the trial court did not abuse its discretion in denying the request. Defendant failed to demonstrate that his appointed counsel was not providing him with effective assistance and the purported request did not come until trial was already underway and after he had already expressed a desire to represent himself.

The trial court did not err when it permitted the trial to proceed without a continuance.

## C. Severance of Charges

Defendant next argues that the charges stemming from the Brady carjacking should not have been joined together in a single trial with the charges stemming from the Sandstrom carjacking because the two incidents were not related within the meaning of MCR 6.120(B)(1). Defendant argues that Breczinski's objection to the joinder of the trials at defendant's preliminary examination hearing preserved this joinder challenge. But, when read in context, it appears that Breczinski did not object to the joint trial of the Brady and Sandstrom charges. Rather, he expressed concern over the potential confusion regarding the consecutive versus concurrent nature of the sentences for the various charges. Therefore, defendant's challenge to the joinder of the Brady and Sandstrom trials is unpreserved. We review unpreserved claims of error for plain error. *Carines, supra* at 763.

-13-

### 1. MCR 6.120

MCR 6.120 governs joinder and severance of charges against a single defendant. MCR 6.120 provides:

(A) Charging Joinder. The prosecuting attorney may file an information or indictment that charges a single defendant with any two or more offenses. Each offense must be stated in a separate count. Two or more informations or indictments against a single defendant may be consolidated for a single trial.

(B) Postcharging Permissive Joinder or Severance. On its own initiative, the motion of a party, or the stipulation of all parties, except as provided in subrule (C), the court may join offenses charged in two or more informations or indictments against a single defendant, or sever offenses charged in a single information or indictment against a single defendant, when appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence of each offense.

(1) Joinder is appropriate if the offenses are related. For purposes of this rule, offenses are related if they are based on

(a) the same conduct or transaction, or

(b) a series of connected acts, or

(c) a series of acts constituting parts of a single scheme or plan.

(2) Other relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial.

(3) If the court acts on its own initiative, it must provide the parties an opportunity to be heard.

(C) Right of Severance; Unrelated Offenses. On the defendant's motion, the court must sever for separate trials offenses that are not related as defined in subrule (B)(1).[3]

Under MCR 6.120(A), it is clear that the prosecutor could properly file an information that charged defendant with multiple offenses. The crux of this claim, therefore, is whether this case warranted a *postcharging* severance of the charges.

---

[3] The current version of MCR 6.120, which was adopted on July 13, 2005, and became effective January 1, 2006, is applicable to defendant's trial, which commenced on January 24, 2006.

-14-

The prosecution points out that joinder of charges against a single defendant is appropriate when the offenses are related, i.e., when the offenses are based on a series of acts constituting parts of a single scheme or plan. MCR 6.120(B)(1)(c). Accordingly, the prosecution argues that it is clear from the record that the Brady and Sandstrom carjackings were parts in a series of acts constituting parts of a single carjacking scheme or plan. Defendant and his accomplices devised an elaborate plan to groom sellers into thinking that defendant wanted to purchase the sellers' vehicles. In both instances, defendant contacted the sellers by phone before arranging to come to look at the vehicles. Once he arrived, defendant would indicate that he was interested in purchasing the vehicle, but condition the purchase on having his mechanic inspect the vehicle. Defendant would then lead the sellers to a remote location where the sellers were threatened at gunpoint, their personal belonging were taken, they were ordered into the woods, and then their vehicles were stolen. Thus, the prosecution argues, based on the systematic manner of both carjackings, it was appropriate for the trial court to try all the charges for these two related criminal acts together.

Based on the language of the court rule alone, the prosecution's argument appears to have merit. However, case law interpreting the language of the court rule leads us to conclude that the offenses here were not related because they were *not* in fact based on a series of acts constituting parts of a *single* scheme or plan.

MCR 6.120 is a codification of the Michigan Supreme Court's decision in *People v Tobey*, 401 Mich 141; 257 NW2d 537 (1977). See *People v Daughenbaugh*, 193 Mich App 506, 509; 484 NW2d 690 (1992). In *Tobey*, the Court held that the defendant was entitled to separate trials on charges related to two heroin sales, made to the same undercover police agent 12 days apart. *Tobey, supra* at 144, 145. In reaching this decision, the Court recited several examples taken from the commentary to the ABA Standards Relating to Joinder and Severance:

> "[S]ame conduct" refers to multiple offenses "as where a defendant causes more than one death by reckless operation of a vehicle." "A series of acts connected together" refers to multiple offenses committed "to aid in accomplishing another, as with burglary and larceny or kidnapping and robbery." "A series of acts . . . constituting parts of a single scheme or plan" refers to a situation "where a cashier made a series of false entries and reports to the commissioner of banking, all of which were designed to conceal his thefts of money from the bank[.]" [*Id.* at 151-152.]

The *Tobey* Court concluded that the two heroin sales, although "substantially similar conduct," were not the "same conduct" because they transpired on two different dates. *Id.* at 152. The Court also concluded that the sales were not "connected" because, although they involved the same seller and buyer, they did not occur out of substantially the same transaction where proof of the acts committed was essential to a conviction on each of the counts, or out of a series of connected events committed to aid in accomplishing another. *Id.* at 152. Finally, the Court concluded that the sales were not part of a single scheme or plan because, again, although the sales involved the same seller and buyer, there was no evidence of any single scheme or plan for the seller to make continuing sales to that buyer. *Id.* at 153. Accordingly, because the only basis for joining the two offenses was that they were merely of the same or similar character, the Court concluded that the defendant had a right to severance. *Id.* at 153. Because the charges were not severed, the Court reversed the convictions. *Id.* at 154.

-15-

In a case more factually similar to this case, the Court in *Daughenbaugh* held that the defendant was entitled to separate trials on four separate armed robberies, which involved three different victims. *Daughenbaugh, supra* at 508, 511. Three of the robberies occurred on various dates in July 1988, and one occurred in September 1988. *Id.* at 508. Although the defendant was dubbed the "Blue Bandit" because he allegedly wore a blue hooded sweatshirt and blue jeans when committing the robberies, *id.*, the *Daughenbaugh* Court stated that "[t]he acts here are even less closely related than were those in *Tobey*[,]" noting that the robberies involved different victims on different dates, and pointed out that there was "no indication that one robbery was committed to facilitate another." *Id.* at 510. This Court has also recognized that "the relationship among [common plan] offenses . . . is dependent upon the existence of a plan that ties the offenses together and demonstrates that the objective of each offense was to contribute to the achievement of a goal not attainable by the commission of any of the individual offenses." *People v McCune*, 125 Mich App 100, 103; 336 NW2d 11 (1983) (internal quotation marks and citation omitted).

Following the *Tobey* and *Daughenbaugh* interpretations, we conclude that the Brady and Sandstrom carjackings were not related for *purposes of joinder*. The two carjackings, although very similar, were not the "same conduct" because they took place several days apart and involved different victims. Nor were the carjackings "connected," because proof of one of the carjackings was not essential to a conviction on the other; that is, the two incidents were not part of a series of connected events committed to aid in accomplishing another.

Moreover, although the two carjacking incidents were of the same character and involved similar conduct, there is no evidence that the carjackings were part of a single scheme or plan. There was no evidence of a single plan that tied the offenses together or that demonstrated that the objective of each separate offense was to contribute to the achievement of a single goal not attainable by the independent commission of either of the individual offenses. Stated differently, there was "no indication that one [carjacking] was committed to facilitate another." *Daughenbaugh, supra* at 510. Defendant denied any involvement in either of the carjackings, and Grimes testified that he had no idea either carjacking was going to take place until moments before each event transpired. Therefore, as stated, the record is lacking in evidence to support that the carjackings were committed as part of a single scheme or plan. Accordingly, because the only basis for joining the charges from the two carjackings in a single trial was that they were executed in a similar fashion, the offenses were not related within the meaning of MCR 6.120 and defendant had a right to severance. See *Tobey, supra* at 145, 151, 153-154.

Although MCR 6.120(C) requires a trial court to sever unrelated offenses for separate trials, a defendant's motion triggers that obligation. But defendant never moved for severance of the charges. Consequently, the trial court was not required to sever the charges.

Under MCR 6.120(B), the trial court is afforded discretion, on its own initiative, to sever offenses charged in a single information against a single defendant "when appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence of each offense." Factors relevant to the fairness of severance include: the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial. MCR 6.120(B)(2). Here, the potential prejudice to defendant from trying the cases together did not necessarily outweigh the interests of judicial

economy. Thus, we cannot conclude that trial court abused its discretion by failing to sua sponte sever the charges.

## 2. Ineffective Assistance Of Counsel

Defendant alternatively argues that Breczinski was ineffective for failing to bring a motion for severance. We disagree.

Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and law. "A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews the factual findings for clear error and the constitutional question de novo. *Id.* However, because there was no hearing pursuant to *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973), our review is limited to mistakes apparent on the record. *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003).

A defendant has a constitutionally protected right to the effective assistance of counsel. *Strickland v Washington*, 466 US 668, 684-686; 104 S Ct 2052; 80 L Ed 2d 674 (1984); see also *People v Pickens*, 446 Mich 298, 303; 521 NW2d 797 (1994). A defendant does not receive adequate assistance of counsel when a defendant's trial counsel's conduct so undermines "the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland, supra* at 686. In order to demonstrate that counsel's assistance was so defective as to require reversal of a conviction, the defendant must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Id.* at 687. Defendant has met neither requirement.

A counsel's performance is deficient if it falls below an objective standard of reasonableness under prevailing professional norms. *Id.* at 688. As we already noted, defendant clearly had a right to severance of the charges against him. Therefore, had Breczinski moved to sever the trials for the two unrelated carjackings, the trial court would have been required to grant the motion under MCR 6.120(C). But this alone does not constitute proof that Breczinski's decision not to request severance fell below an objective standard of reasonableness. There are "countless ways to provide effective assistance in any given case" and "[e]ven the best criminal attorneys would not defend a particular client in the same way." *Strickland, supra* at 689. The decision to request a severance is a matter committed to the professional judgment of trial counsel. And this decision is entitled to considerable deference. Indeed, counsel "is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. As the Court in *Strickland* aptly explained:

It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong

-17-

presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [ *Id.* at 689 (citations omitted).]

Under some circumstances, a defendant's trial counsel might reasonably conclude that it would best serve the client's interests to defend against charges, which could otherwise be severed under MCR 6.120(C), at a single trial. In the present case, defendant's trial counsel may very well have determined, among other things, that defendant had a better chance of obtaining an acquittal of some or all of the charges in a trial before a single jury. The fact that this decision proved to be wrong does not transform an otherwise reasonably competent decision into one that falls below an objective standard of reasonableness. See *People v Mitchell*, 454 Mich 145, 171; 560 NW2d 600 (1997) ("[T]he Sixth Amendment guarantees a range of reasonably competent advice and a reliable result. It does not guarantee infallible counsel."). Because defendant failed to overcome the strong presumption that his trial counsel's decision not to request a severance was sound trial strategy, he is not entitled to a new trial on the basis of ineffective assistance of counsel for failing to request a severance.

Even if the decision not to request a severance fell outside the range of reasonable professional conduct, it "does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland, supra* at 691. In order to warrant a new trial, the defendant must "affirmatively prove prejudice." *Id.* at 693. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* But neither must the defendant show that "counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* Instead, the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Accordingly, in order to warrant a new trial, defendant must show that, but for his trial counsel's decision not to request a severance, there is a reasonable probability that he would not have been convicted of the charged offenses.

At trial, there was considerable evidence that defendant committed the charged offenses, including the testimony of defendant's coconspirator in the carjackings. Further, the most significant testimony would have been available to the prosecution even if the charges had been tried in separate trials. Indeed, because the prosecution can meet the requirements of MRE 404(b), even with the trials severed, the prosecution would be able to present testimony concerning each of the carjackings at the separate trials. This significantly mitigates any prejudice that may have occurred as a result of the joined trials.[4] After examining the totality of

---

[4] We agree that there is a qualitative difference between charging a defendant with a crime and merely presenting evidence of a similar criminal act through MRE 404(b). See *Daughenbaugh, supra* at 511. However, the difference is not necessarily a prejudicial difference. Instead, the nature of the charges and the evidence that could be presented through MRE 404(b) must be analyzed and compared on a case-by-case basis to determine whether the failure to sever resulted in prejudice.

the evidence before the jury and considering the limited nature of the prejudice caused by joining the charges in a single trial, we cannot conclude that, but for the decision not to request a severance, there is a reasonable probability that defendant would not have been convicted of one or more of the charges against him. See *Strickland, supra* at 695 (noting that a court hearing an ineffectiveness claim must consider the totality of the evidence and determine whether "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.").

Therefore, defendant is not entitled to relief on this basis.

### 3. Conclusion

In sum, the charges stemming from the Brady carjacking and the Sandstrom carjacking were not related within the meaning of MCR 6.120. But the trial court did not err by not severing the unrelated charges given that defendant failed to specifically request severance of the charges. Further, the trial court did not abuse its discretion by not severing the charges sua sponte. Finally, defendant failed to overcome the presumption that his trial counsel's decision not to request a severance was anything other than trial strategy and has failed to demonstrate prejudice. Consequently, his trial counsel was not constitutionally deficient.

### D. Pretrial Identification Procedures

Defendant next argues that there were several errors based on suggestive identifications, which he claims warrant relief. Because defendant failed to preserve any of these claims of error, we shall review them for plain error affecting defendant's substantial rights. *Carines, supra* at 763.

First, defendant claims that the trial court erred when it failed to grant his request for a corporeal lineup. However, defendant states that he "may" have requested a corporeal lineup and otherwise fails to identify record evidence that he did in fact request a corporeal lineup. Therefore, defendant has abandoned any claim of error on this basis. *People v Martin*, 271 Mich App 280, 315; 721 NW2d 815 (2006).

Next, defendant argues that the police purposefully delayed his arrest so that they could hold a photo showup rather than a corporeal lineup, which would have been required if he been in custody. See *People v Kurylczyk*, 443 Mich 289, 298 (Griffin, J.), 318 (Boyle, J.); 505 NW2d 528 (1993). However, defendant fails to demonstrate that Grimes' statement to police was sufficient to warrant his arrest. Indeed, as the prosecution points out, Grimes' flip-flopping—first denying knowledge of the incidents and then confessing to participating while implicating other parties—raised concerns about his credibility. It was a reasonable tactic for the police to verify and corroborate Grimes' accusation by seeking to have the witnesses identify defendant in a photo showup before attempting to arrest him. Moreover, "there would be numerous problems with a rule requiring police officers to arrest a suspect as soon as probable cause is established simply because they wanted to obtain some sort of identification." *Id.* at 298 n 8 (Griffin, J.).

We also find no merit to defendant's claim that the police unfairly conducted the Sandstroms' photo showup because the Sandstroms were allowed to view the showup simultaneously. A photographic identification procedure can be so suggestive as to deprive the

-19-

defendant of due process. *People v Gray*, 457 Mich 107, 111; 577 NW2d 92 (1998). The fairness of an identification procedure is evaluated in light of the total circumstances. *People v Lee*, 391 Mich 618, 626; 218 NW2d 655 (1974). The test is whether the procedure was so impermissibly suggestive as to have led to a substantial likelihood of misidentification. *Kurylczyk, supra* at 306 (Griffin, J.), 318 (Boyle, J.). Factors to consider include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Id.* If a pretrial procedure was impermissibly suggestive, testimony regarding that identification is inadmissible at trial. *Id.* at 303.

Detective Gagliardi testified that he put together a photo showup for defendant. Gagliardi testified that he took both Thomas and Maria Sandstrom into the same conference room and presented them with the photo showup. Gagliardi indicated that the Sandstroms "looked at the picture for a brief second" and then both picked defendant. Thomas and Maria confirmed that they viewed the photographic showup together. But Maria explained that when she and her husband were presented with the photos, they agreed not to choose a photograph until they both independently knew which picture they were going to choose. Although she waited for her husband to indicate that he was ready to choose, Maria stated that "in [her] mind [she] picked out the picture almost immediately." According to Maria, after they were both ready, they both immediately chose defendant's picture.

The simultaneous presentation of the photo showup to both the Sandstroms may not have been a prudent decision on Gagliardi's part. However, looking at the total circumstances, there is no indication that this procedure was so impermissibly suggestive as to have led to a substantial likelihood of misidentification. Maria's testimony revealed that she and her husband took care to make sure they were not influenced by one another when they chose the picture. The trial testimony revealed that they both had ample opportunity to view defendant at the time of the crime because they both had direct conversations with him while in close physical proximity. Further, both Thomas and Maria almost immediately chose defendant from the photo showup and they both expressed unwavering certainty during trial that defendant was the man who carjacked them at gunpoint.

Further, according to Gagliardi, Davis "almost immediately" pointed out defendant as the man who claimed to be "Jacob Woods." Similarly, Brady immediately picked out defendant. Therefore, to the extent that defendant challenges their photo identifications, his argument is without merit. We find no clear error in the trial court's admission of their identifications into evidence. Accordingly, we conclude that the police use of a photo showup rather than a corporeal lineup did not prejudice defendant and that the photographic identification procedure was not so suggestive as to deprive defendant of due process.

Finally, defendant argues that the identifications at trial were tainted by the suggestive nature of the confrontation at the preliminary examination. However, on the record before this Court, there is no indication that the identifications at the preliminary examination were unduly suggestive. Therefore, there was no need to establish an independent basis for the identifications at trial. *People v McElhaney*, 215 Mich App 269, 287-288; 545 NW2d 18 (1996). There were no plain errors warranting relief.

### E. Instructional Error

Defendant next argues that the trial court erred when it failed to properly instruct the jury. Specifically, defendant argues that the trial court should have given instructions on alibi, accomplice credibility and mere presence. The failure to give these instructions, defendant contends, constitutes error warranting relief. We disagree.

Although defendant claims that the trial court entrusted the selection of jury instructions to Breczinski, the record demonstrates that defendant took an active role in deciding which instructions the court should give. Further, the trial court specifically asked both Breczinski and defendant if they were satisfied with the reading of the instructions and both expressed satisfaction with the reading. By expressly approving the instructions, defendant waived any claim of error. *People v Lueth*, 253 Mich App 670, 688; 660 NW2d 322 (2002).

Defendant also argues that Breczinski, although serving only as standby counsel, was ineffective for failing to request instructions on the defense of alibi, accomplice credibility, and mere presence. However, a defendant who asserts his right to self-representation has no entitlement to the effective assistance of advisory counsel. *People v Kevorkian*, 248 Mich App 373, 425-426; 639 NW2d 291 (2001).

Accordingly, there were no instructional errors warranting relief.

### F. Ineffective Assistance of Counsel

Although defendant ultimately elected to represent himself during his trial, defendant argues that his trial counsel nevertheless rendered ineffective assistance that affected the outcome of his trial and, therefore, warrants reversal of his convictions. We do not agree.

#### 1. Failure to Present Alibi Defense

Defendant argues that Breczinski was aware of the existence of potential alibi witnesses "well before trial" and yet he failed to file a timely notice of alibi, which failure this Court has held falls below the professional norm. See *Pickens*, *supra* at 327.

During defendant's arraignment, Breczinski moved to adjourn trial on the ground that he had not yet been able to investigate numerous witnesses allegedly related to defendant's defense. The trial court granted the motion and rescheduled the trial for later that same month. The morning of trial, defendant complained that Breczinski had not prepared an alibi defense. However, the record shows that Breczinski hired an investigator for the specific purpose of tracking down and interviewing potential alibi witnesses. The investigator met with defendant to collect the names of potential witnesses. Defendant conceded that he only gave the investigator the name and number for one potential witness. The investigation apparently revealed no legitimate potential for an alibi defense. Therefore, Breczinski was not ineffective for failing to raise a futile defense. *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998).

Moreover, despite the lack of alibi notice, the trial court allowed defendant to present his mother as a witness. She testified that at approximately 6:00 p.m. on October 11, 2005, defendant called her and asked that she bring "lunch" to him at his job site. Therefore, even

assuming that Breczinski's failure to file an alibi notice fell below an objective standard of reasonableness, the failure did not deprive defendant of a substantial defense. *People v Wilson*, 159 Mich App 345, 354; 406 NW2d 294 (1987).[5]

## 2. Failure to Obtain Identification Expert

Defendant next argues that Breczinski was ineffective for failing to obtain an expert to testify on the reliability of eyewitness identifications.

> Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy. Further, "a defendant must overcome a strong presumption that the assistance of his counsel was sound trial strategy, and he must show that, but for counsel's error, the outcome of the trial would have been different." [*People v Davis*, 250 Mich App 357, 368-369; 649 NW2d 94 (2002) (citations omitted).]

Defendant has failed to overcome the presumption that his counsel's decision not to obtain an identification expert was a matter of trial strategy. *Strickland, supra* at 690.

## 3. Failure to Move for a Corporeal Lineup

Defendant also argues that Breczinski was ineffective for failing to request a corporeal lineup. This Court has held that a defendant has no constitutional right to a pretrial lineup. *People v Farley*, 75 Mich App 236, 238; 254 NW2d 853 (1977). "[T]he granting of a pretrial lineup is a matter which is addressed solely to the examining magistrate's discretion." *Id.* at 238-239. Further, defendant fails to explain how presentation of a corporeal lineup rather than the photo showup would have affected the witnesses' identification. Indeed, given that the witnesses repeatedly identified defendant both in the photo showup and during various court proceedings, defendant has failed to show how the absence of a corporeal lineup prejudiced his substantial rights. Therefore, Breczinski was not ineffective for failing to move for a corporeal lineup.

## 4. Failure to Object to Suggestive Identification Procedures

Defendant argues that Breczinski was also ineffective for failing to object to the allegedly suggestive photo showup procedures. Because defendant represented himself at the time that the prosecution sought to introduce evidence of the witnesses' photo showup identifications, he had no entitlement to the effective assistance of counsel from Breczinski. See *Kevorkian, supra* at 425-426. Regardless, as we already noted, the photographic identification procedure was not so suggestive as to deprive defendant of due process. Thus, even if defendant had been entitled to

---

[5] Defendant also appears to contend that the trial court erred by denying him a continuance to present his additional alibi witnesses. However, because this issue was not properly set forth in the statement of questions presented, we need not address it. *People v Brown*, 239 Mich App 735, 748; 610 NW2d 234 (2000). Nevertheless, we conclude that this issue is without merit because defendant never requested a continuance related to the presentation of alibi witnesses.

Breczinski's effective assistance, Breczinski had no obligation to present a frivolous objection. *Fike, supra* at 182.

### 5. Failure to Request Severance of the Charges and Jury Instructions

Finally, defendant argues that Breczinski was ineffective for failing to request a separate trial for the charges arising from the Brady and Sandstrom carjackings and for failing to request jury instructions on alibi, accomplice witness credibility and mere presence. However, for the reasons already discussed, we conclude that these claims of error are without merit.

Defendant was not deprived of the effective assistance of counsel.

### G. Other Acts Evidence

Defendant was tried on the charges arising from the Sandstrom and Brady carjackings at the same trial, but the prosecutor also sought to introduce evidence of the Haynes carjacking as a "similar act" under MRE 404(b) to prove similar scheme and conduct. Defendant argues that the trial court committed reversible error because the MRE 404(b) evidence of the Haynes carjacking was both unduly prejudicial and confusing to the jury. We disagree.

Before delving into our analysis of this issue, it is important to note that, here, our review of whether the Haynes evidence was properly admissible in the Brady trial differs significantly from the analysis that we employed in reviewing the joinder of the Brady and Sandstrom charges in a single trial. In the joinder analysis above, we needed to determine whether the Brady and Sandstrom carjackings constituted parts of a *single, continuing plan* to commit carjackings. Here, under a MRE 404(b) analysis, we determine whether the Haynes carjacking was of the *same character or involved similar conduct* as the Brady and Sandstrom carjackings.

### 1. Standard of Review

This Court reviews for an abuse of discretion the trial court's decision to admit other acts evidence. *People v Crawford*, 458 Mich 376, 383; 582 NW2d 785 (1998). Even when properly preserved, the defendant bears the burden of establishing that, more probably than not, a miscarriage of justice occurred. *People v Knapp*, 244 Mich App 361, 378; 624 NW2d 227 (2001). Reversal is not required unless it affirmatively appears that it is more probable than not that the error was outcome determinative. *Id.*

### 2. MRE 404(b)

The prosecutor argued that the Haynes carjacking was "done in a similar manner and fashion" because of the fact that the perpetrator there stated the need to take the car to "King's Automotive," the same mechanic mentioned in Sandstrom and Brady carjackings. Breczinski simply argued that the evidence did not serve to bolster the prosecution's case in light of the existing evidence. The trial court stated that MRE 404(b) was a rule of inclusion but requested more information about the circumstances of the Haynes carjacking before ruling. The prosecution then related the facts that, like the Brady and Sandstrom carjackings, defendant expressed interest in purchasing Haynes' car, took the car for a test drive, and then stole the car at gunpoint. The prosecution explained that the only difference between the carjackings was

-23-

that, in the Haynes carjacking, Anderson refused to drive to the mechanic, so defendant simply ordered him to pull over during the test drive. The trial court acknowledged that the evidence was prejudicial but found that the probative value of the evidence outweighed the prejudice, noting that the trial court would instruct the jury on use of the evidence. Accordingly, the trial court granted the prosecution's request to introduce evidence of the Haynes carjacking "to establish the defendant's identity[.]"

> MRE 404(b)(1) governs the admissibility of other bad acts evidence and provides:
>
>> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

To be admissible under MRE 404(b), other acts evidence generally must satisfy three requirements: (1) it must be offered for a proper purpose, (2) it must be relevant, and (3) its probative value must not be substantially outweighed by its potential for unfair prejudice. *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004). A proper purpose is one other than establishing the defendant's character to show his propensity to commit the offense. *People v VanderVliet*, 444 Mich 52, 74; 508 NW2d 114 (1993). The prosecutor bears the burden of establishing relevance. *Knox, supra* at 509. The proffered evidence would be unfairly prejudicial if it presents a danger that the jury will give undue or preemptive weight to marginally probative evidence. *People v Ortiz*, 249 Mich App 297, 306; 642 NW2d 417 (2001).

> [E]vidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system. Further, logical relevance is based on the system, as shown through the similarities between the charged and uncharged acts, rather than on defendant's character, as shown by the uncharged act. *Also, relevant similar acts are not limited to circumstances in which the charged and uncharged acts are part of a single continuing conception or plot. . . .* [T]he evidence of other acts must indicate the existence of a plan rather than a series of similar spontaneous acts, but unlike evidence of other acts used to prove identity, the plan need not be unusual or distinctive; *it need only exist to support the inference that the defendant employed that plan in committing the charged offense.* [*People v Ackerman*, 257 Mich App 434, 440-441; 669 NW2d 818 (2003) (internal quotations and citations omitted; emphasis added).]

We conclude that the evidence of other acts—the Haynes carjacking—had significant probative value in establishing a scheme, plan, or system for committing the charged offenses— the Brady and Sandstrom carjackings. The other acts evidence showed that defendant had engaged in repeated conduct where he would lure away persons selling vehicles and then steal their vehicles at gunpoint. The charged offenses here were consistent with the 404(b) conduct. Thus, the trial court properly admitted evidence under MRE 404(b) when, in each of the three

instances, defendant employed a preconceived and distinct plan to steal cars at gunpoint by pretending to be interested in purchasing the vehicle.

We note that when ruling on the prosecution's motion the trial court stated that "the prosecution is bringing it in for the purpose of . . . showing identification of the defendant as the perpetrator[.]"    However, the trial court misunderstood the prosecution's argument.    The prosecution actually sought to introduce the evidence to show a similar scheme, plan, or system in doing an act.    The significance of this distinction is that the requirements for reviewing evidence introduced to show identity are more stringent than those required when simply showing similar scheme, plan, or system.

If the bad acts evidence is offered to establish identification through a system in doing an act, (1) there must be substantial evidence that the defendant committed the bad act, (2) there must be some special quality or circumstance of the act tending to prove the defendant's identity or system, (3) it must be material to the defendant's guilt of the charged offense, and (4) the danger of unfair prejudice must not substantially outweigh the probative value of the evidence. *People v Golochowicz*, 413 Mich 298, 309; 319 NW2d 518 (1982).    "'The [commonality of circumstances] must be so unusual and distinctive as to be like a signature.'"    *Id.* at 310-311, quoting McCormick, Evidence (2d ed), § 190, p 449.

> It is because of the combined value of . . . the unique and uncommonly distinctive style employed by the defendant in committing the "substantially proved" uncharged similar offense, and the same distinctive *modus operandi* employed in the charged offense, that the jury is permitted to infer, if it believes the evidence, that both crimes were the handiwork of the same person, the defendant.    [*Id.* at 311.]

Here, the circumstances of the Haynes, Brady, and Sandstrom carjackings were of such distinctive character as to justify an ordinarily reasonable juror to infer that all were the handiwork of the same person.    In all three carjackings, defendant was able or attempted to lure the victim to an alleged mechanic, and then steal the vehicle at gunpoint.    Because we conclude that the Haynes carjacking met the more stringent standard required to establish identification, the trial court did not abuse its discretion in admitting the evidence for that purpose.

The trial court did not abuse its discretion by admitting evidence of the Haynes carjacking during the Brady trial.

## H.  Bolstering Witness Credibility

Defendant next argues that the trial court erred when it permitted Grimes to bolster his own credibility by testifying about his own religious conversion.    We do not agree.    All of the allegedly inappropriate responses were directly and fairly in response to questions posed by defendant.    Because defendant solicited the allegedly prejudicial comments, he has waived any claim of error.    See *People v Jones*, 468 Mich 345, 352 n 6; 662 NW2d 376 (2003) ("[W]hen a party invites the error, he waives his right to seek appellate review . . . .").

I. Tape Recording

Defendant next argues that the trial court erred when it permitted the admission and playing of a recording that was so inaudible as to be untrustworthy without proper authentication. We disagree.

Generally, the decision whether to admit evidence is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *People v Katt*, 468 Mich 272, 278; 662 NW2d 12 (2003). An abuse of discretion exists if the results are outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). Because this issue is unpreserved, we shall review it for plain error affecting defendant's substantial rights. *Carines, supra* at 763.

The prosecutor requested leave to introduce a tape recording of a message allegedly left on the Sandstroms' answering machine on Thursday, October 11, 2005, claiming that it was defendant's voice on the recording. The prosecutor alleged that the complainants recognized the voice based on "previous dealings" with defendant. The trial court ruled that the tape recording would be admissible, provided that the prosecution laid a proper foundation and authenticated it.

During trial, the prosecution questioned Thomas Sandstrom about the phone message. Thomas testified that he recognized the voice as belonging to the individual that came to look at the car. And, after the trial court pointed out that the witness had not named the specific individual to whom the voice on the recording belonged, Thomas stated that he recognized the voice on the recording as that of defendant. The prosecution then admitted the tape without objection, and it was played for the jury. Because it was difficult to hear, the tape was stopped, moved closer to a microphone, and then played again. The tape was then moved closer to the jury box and played two more times. The recording played as follows:

> *Tape:* (inaudible)—call the police station or county jail and identify me. (inaudible) Do you hear me? And you better not press no fucking charges or nothing. (inaudible) I'm telling you. You press charges on me I'll fucking kill you. (inaudible)—because I fucking know where you live (inaudible) Take it like a man—(inaudible) in this fucking county. I'll send some people after you. I fucking don't want you to press charges or nothing. Don't you identify me so you live with—(inaudible) Do you think I'm playing? I'm already have someone watching your fucking house. And they know where it's at.

Defendant argues that the prosecution failed to lay a proper foundation for the tape's admission into evidence. MRE 901, which sets forth the requirements for authentication of evidence, provides, in pertinent part:

> (a) *General provision.* The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

> (b) *Illustrations.* By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

\* \* \*

(5) *Voice identification.* Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

The prosecution properly authenticated the recording for admission into evidence by having Thomas state that, based on his previous dealings with defendant, it was his opinion that the voice heard on the recording belonged to defendant. "[A] tape ordinarily may be authenticated by having a knowledgeable witness identify the voices on the tape. MRE 901 requires no more." *People v Berkey*, 437 Mich 40, 50; 467 NW2d 6 (1991).

Defendant also argues that the tape was inaudible. However, the jury heard the recording repeatedly, and the jurors were in the best position to evaluate and decipher the recording for themselves and then assess the weight to be accorded it. *People v Drohan*, 264 Mich App 77, 88; 689 NW2d 750 (2004).

The trial court did not abuse its discretion in allowing the admission of the recording.

## J. Prosecutorial Misconduct

Defendant next argues that the prosecution denied him a fair trial by failing to reveal the full extent of the promises of leniency to Grimes, which defendant could have used to impeach Grimes' credibility. More specifically, defendant argues that the prosecution denied him a fair trial by failing to disclose that Grimes received a significant sentence reduction in return for his testimony. Although framed as a Confrontation Clause challenge, defendant's argument regarding the prosecution's alleged failure to disclose "the full extent of the promises of leniency" to Grimes is more aptly framed as a due process prosecutorial misconduct challenge.

Generally, this Court reviews de novo a claim of prosecutorial misconduct based on a failure to disclose evidence. *People v Ackerman*, 257 Mich App 434, 448; 669 NW2d 818 (2003). However, because defendant failed to object below, this issue is not preserved. Unpreserved claims of prosecutorial misconduct are reviewed for plain error. *People v Aldrich*, 246 Mich App 101, 110; 631 NW2d 67 (2001).

"Where an accomplice or co-conspirator has been granted immunity or other leniency to secure his testimony, it is incumbent upon the prosecutor . . . to disclose such fact to the jury upon request of defense counsel." *People v Atkins*, 397 Mich 163, 173-174; 243 NW2d 292 (1976). MCR 6.201(B)(5) requires the prosecutor to disclose upon request "any plea agreement, grant of immunity, or other agreement for testimony in connection with the case."

Due to the undeniable relevance of evidence of a witness' motivation for testifying, the prosecutor must, upon request of defense counsel, disclose to the jury "the fact that immunity or a plea to a reduced charge has been granted to the testifying accomplice [or coconspirator]." Defendant is "entitled to have the jury consider *any fact* which might have influenced an informant's testimony." The disclosure requirement may be considered satisfied where the "jury [is] made well

aware" of such facts "by means of . . . *thorough and probing cross-examination by defense counsel.*" [*People v Mumford*, 183 Mich App 149, 152-153; 455 NW2d 51 (1990) (emphasis in original; internal citations omitted).]

On direct examination the prosecution asked Grimes whether he had been charged with crimes related to the carjackings and Grimes admitted that he pleaded guilty to armed robbery and felony firearm. On cross-examination defendant questioned Grimes regarding the total number of charges that were originally filed against him. The cross-examination established that Grimes was originally charged with significantly more crimes than those to which he eventually pleaded. Hence, any duty of disclosure was satisfied because, through defendant's cross-examination, the jury was informed of Grimes' possible motivations for changing his account of the carjacking events to police. See *id.* at 152-153. Defendant presented to the jury the possibility that the prosecution's leniency—dropping numerous charges against Grimes—served as the potential motivation for Grimes' alteration of his account of the events to include defendant. Moreover, the prosecutor did not mislead the jury or elicit false testimony.

Accordingly, defendant has failed to show plain error affecting his substantial rights with regard to the prosecution's alleged failure to disclose "the full extent" of the prosecution's plea agreement with Grimes.

## K. Verdict Form

Defendant next argues that the verdict form used in this case constituted a substantial departure from the ABA standard 3.24 verdict form and was "coercively worded" because it did not allow for the possibility of the jury not being able to reach a decision on one or more counts. The standard jury verdict form, as established by the ABA and adopted by CJI2d 3.24 states:

POSSIBLE VERDICTS:

You may return only one verdict on this charge. Mark only one box on this sheet.

___    Not Guilty

___    Guilty of _____

According to defendant, the term "*POSSIBLE* VERDICTS" and use of the word "may" leaves open the possibility of no verdict. Here, the verdict form, stated as follows:

WE, THE JURY, FIND THE DEFENDANT:

(Select One)

[Listing of various charges, with Guilty or Not Guilty option for each.]

Defendant also notes that the verdict form designated the Sandstroms, Earl Brady, and Patrick Wendell as "victims"; thereby purportedly precluding the jury from deciding that those witnesses were not actually victims.

A trial court is not required to strictly adhere to the standard criminal jury instructions because they are not binding authority. *People v Petrella*, 424 Mich 221, 277; 380 NW2d 11 (1985). Moreover, MCR 769.26 provides:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, *on the ground of misdirection of the jury*, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in *a miscarriage of justice*. [Emphasis added.]

Even assuming that the jury form constituted "misdirection of the jury" for failure to indicate that they could choose not to render a verdict on one or more of the counts, there is no indication in the record that the jury would have chosen that option even had it been offered. The trial court polled each member of the jury to ask him or her if he or she agreed with the verdict and each responded affirmatively. Accordingly, there was no plain error affecting defendant's substantial rights. *Carines, supra* at 763.

## L. Sentencing Errors

This Court reviews de novo issues concerning the proper application of the statutory sentencing provisions. *People v Hegwood*, 465 Mich 432, 436; 636 NW2d 127 (2001). "This Court reviews a sentencing court's scoring decision to determine whether the trial court properly exercised its discretion and whether the record evidence adequately supports a particular score." *People v McLaughlin*, 258 Mich App 635, 671; 672 NW2d 860 (2003).

Breczinski represented defendant at sentencing. Defendant states that Breczinski objected to the scoring of the sentencing guidelines. While Breczinski did in fact object to the scoring of numerous offense variables, he did not specifically object to the scoring of OV 12. "An objection based on one ground is usually considered insufficient to preserve an appellate attack based on a different ground." *People v Kimble*, 470 Mich 305, 309; 684 NW2d 669 (2004). "A party shall not raise on appeal an issue challenging the scoring of the sentencing guidelines or challenging the accuracy of information relied upon in determining a sentence that is within the appropriate guidelines sentence range unless the party has raised the issue at sentencing, in a proper motion for resentencing, or in a proper motion to remand filed in the court of appeals." MCL 769.34(10). Moreover, an erroneous scoring of the guidelines range does not require resentencing if the trial court would have imposed the same sentence regardless of the error. *People v Mutchie*, 468 Mich 50, 51-52; 658 NW2d 154 (2003).

Here, defendant's crime class was A, and his overall OV score was 165, placing him well within OV level VI, which includes any point total above 100. MCL 777.62. The trial court scored 25 points for OV 12. MCL 777.42(1)(a). Thus, even if the trial court had not scored any points for OV 12, defendant would still have been well within OV level VI. Accordingly, defendant has failed to demonstrate plain error affecting his substantial rights and resentencing is not required. Finally, we decline to consider defendant's challenge to the extent that he is challenging the trial court's scoring of OV 7, because it was not properly set forth in the statement of questions presented. *People v Brown*, 239 Mich App 735, 748; 610 NW2d 234 (2000).

### M. Issues Raised in Defendant's Standard 4 Brief

In his Standard 4 brief, defendant raises numerous additional claims of error, which he contends warrant relief. Specifically, defendant argues that he was deprived of a fair trial by the delay in his arrest, by the trial court's deprivation of defendant's right to have the public present during certain motion hearings and voir dire, by the trial court's exercise of its discretion to limit cross-examination, by permitting defendant to represent himself without making an effective waiver of the right to counsel, by the suppression of exculpatory and impeaching evidence by the prosecution, by the trial court's failure to allow defendant to represent himself during the pretrial stages or allow defendant to retain counsel, by the prosecution's improper closing arguments, and by the cumulative effect of the errors. We have carefully examined these claims of error and conclude that none of them have merit.

### IV. Docket No. 270604: Appeal from the Haynes Trial

### A. Sixth Amendment Right To Counsel

#### 1. Standard of Review

Defendant argues that he suffered a total deprivation of counsel during pretrial proceedings, beginning on the date of his second motion hearing held on February 27, 2006. He contends that Breczinski was acting merely as stand-by counsel when the trial court and Breczinski were under the mistaken impression that defendant was representing himself at the pretrial hearings. Defendant asserts that he did not actually waive his right to counsel until the first day of trial in the Haynes trial on April 4, 2006.

This Court reviews for clear error a trial court's factual findings surrounding a defendant's knowing and intelligent waiver of the assistance of counsel. *Williams, supra* at 640. However, the meaning of "knowing and intelligent" is a question of law, which this Court reviews de novo. *Id.* "Credibility is crucial in determining a defendant's level of comprehension, and the trial judge is in the best position to make this assessment." *Id.* at 640 (citations omitted).

#### 2. Relevant Facts

Breczinski represented defendant at his January 9, 2006 arraignment and at the first pretrial motion hearing, held on February 6, 2006. However, the following exchange transpired during the second pretrial motion hearing on February 27, 2006:

*The Court:*     . . . Mr. Breczinski if you would state your appearance please.

*Breczinski:*    Michael Breczinski appearing I guess of counsel? I'm not sure.

*The Court:*     Uh—I'm not sure either. I thought—I am not sure on this one. I guess we'll see.

\* \* \*

> *The Court:*     . . . Mr. Breczinski what did you want to say about whether you are representing Mr. Pouncy or whether he is representing himself?
>
> *Breczinski:*     Your Honor I'm not sure about that . . . ."

During that same hearing, defendant made a request for a court-appointed memory expert. The trial court expressed its concern regarding defendant's apparent choice to represent himself, stating as follows:

> Yeah this is part of the concern that I have any time you know certainly people ought to be allowed to represent themselves, but to me this just shows part of the problem with that whole process. You're coming up with things that may or may not really have any real value in the trial.

When, later during that same hearing, defendant requested the witnesses' medical records in an effort to discover any vision problems, the following exchange transpired:

> *The Court:*     . . . again you know I think because you're not a lawyer you're focusing on these things and I understand that. But they're really not the real issue in this—
>
> *Mr. Pouncy:*   I don't even really have a lawyer you know what I'm saying?
>
> *The Court:*     Well you got a lawyer right there. Well you're shaking your head.
>
> *Mr. Pouncy:*   He ain't came to talk to me about nothing you know what I'm saying?
>
> *The Court:*     Well he should be talking to you.
>
> *Mr. Pouncy:*   He ain't—he ain't—
>
> *The Court:*     But he's not your babysitter either. I want you to understand that.
>
> *Mr. Pouncy:*   He ain't been there. You asked for him to come.
>
>                                  * * *
>
> . . . He ain't even been there man. This is my first time seeing him since the last time we was in court. . . . I'm really asking—
>
>                                  * * *
>
> . . . I'm really asking can I get another lawyer?

Upon the trial court's questioning, Breczinski admitted that he had not seen defendant since February 1, 2006, the date of defendant's conviction in the Brady trial. The trial court admonished Breczinski, stating that he should have been seeing defendant "at least every two

weeks." Breczinski then agreed to visit defendant later that week. Turning its attention back to defendant, the trial court stated:

> *The Court:*    . . . [S]o you do have a lawyer. He knows what he is doing whether you think so or not. To be honest with you lawyers don't win cases by spending their time with you in jail all day long either. . . .
>
> *Mr. Pouncy:*   But at least go over the case with me.
>
> *The Court:*    Well I agree. . . .

The trial court ordered that the trial be adjourned, so that Breczinski could spend time with defendant to help him prepare his case. The trial court stressed that Breczinski make sure he worked closely with defendant so that he would understand everything that was going on.

At a March 20, 2006 motion hearing, when asked for his appearance, Breczinski stated: "Michael Breczinski appearing *I guess* of counsel for the Defendant." (Emphasis added.) Later during that same hearing, in response to defendant's request for access to the court's law library, the trial court stated: "Mr. Breczinski is your counsel. You're going to have to rely on him for the law. That's what he's here for to give you that advice. . . . I will suggest . . . that you . . . make your suggestions known to your . . . legal counsel here and let him find the material for you. Mr. Breczinski is very good at . . . research. Well you say no, but you know I've seen things that he has written and put together." In response to defendant's assertion that Breczinski had refused to help him, the trial court instructed defendant to be more specific in his requests to Breczinski, noting that Breczinski was not going to give defendant the "whole defender trial booklet."

At March 27 and March 28, 2006 motion hearings, Breczinski unequivocally told the trial court that he was appearing as stand-by counsel.

### 3. The Law

As already noted above, under Michigan law,

> a trial court must make three findings before granting a defendant's waiver request. First, the waiver request must be unequivocal. Second, the trial court must be satisfied that the waiver is knowingly, intelligently, and voluntarily made. To this end, the trial court should inform the defendant of potential risks. Third, the trial court must be satisfied that the defendant will not disrupt, unduly inconvenience, and burden the court or the administration of court business. [*Williams, supra* at 642.]

Additionally, under MCR 6.005(D),

> The court may not permit the defendant to make an initial waiver of the right to be represented by a lawyer without first:

(1) advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation, and

(2) offering the defendant the opportunity to consult with a retained lawyer or, if the defendant is indigent, the opportunity to consult with an appointed lawyer.

Failure to substantially comply with the above requirements renders the defendant's waiver of counsel ineffective. *Russell, supra* at 191-192.

### 4. Analysis

#### (a) No Waiver

The record reveals that during the pretrial proceedings of the Haynes trial, Breczinski repeatedly stated that he was not sure whether he was representing defendant. Despite this ambiguity regarding defendant's representation, the trial court never directly asked defendant, nor did he directly state, whether he wished to represent himself. Indeed, contrary to a finding of waiver, defendant complained that he felt like he did not have an attorney, and, at one point, he actually requested replacement counsel. Further, the trial court never once attempted to comply with the MCR 6.005(D) requirements during the pretrial proceedings. Thus, under the circumstances, we conclude that defendant did not unequivocally waive his right to counsel during the pretrial proceedings.

#### (b) Total Deprivation Of Counsel

Invalidly permitted self-representation that results in a complete deprivation of the right to counsel at a critical stage of the proceeding is structural error that requires reversal. But a limited deprivation can be harmless error. *Willing, supra* at 224. Thus, we must determine whether defendant's ineffective or equivocal waiver resulted in a total or complete deprivation of his right to counsel, whether this total deprivation occurred during a critical stage of the proceeding, and whether the effect of the deprivation pervaded the entire proceeding. *Id.*

This Court has held that the provision of standby counsel is not the provision of counsel that can negate the total deprivation of the right to counsel. *Id.* at 227-228. We conclude that defendant never unequivocally waived his right to counsel during the pretrial proceedings. We therefore conclude that defendant experienced a total deprivation of counsel despite the fact that standby counsel was present to assist him.

Further, the total deprivation of counsel occurred during a critical stage of the proceedings. "The phrase 'critical stage' refers to 'a step of a criminal proceeding . . . that [holds] significant consequences for the accused.'" *Id.* at 228. In this case, with the exception of the arraignment and first motion hearing, defendant was left unrepresented during the pretrial proceedings. During these proceedings, he made several motions, including a critical motion to quash the information. Further, the hearings took place after defendant had been formally charged. Thus, there can be little doubt that the hearings constituted a critical stage of the proceedings, and his deprivation of counsel during this critical stage affected the entire proceeding.

(c) Failure To Comply with MCR 6.005 Requirements At Trial

Although defendant unequivocally waived his right to counsel on the first day of the Haynes trial, the trial court again never even attempted to comply with the MCR 6.005(D) requirements. And on the third day of trial, the trial court completely failed to advise defendant of his rights or reconfirm his waiver of counsel as required: once a defendant has waived his right to counsel, the record must at each subsequent proceeding affirmatively show that the court advised the defendant of his continuing right to counsel and that the defendant waived that right. MCR 6.005(E); *Lane, supra* at 137; *Dennany, supra* at 433 n 13 (Griffin, J). Thus, even assuming defendant did not suffer a total deprivation of counsel during the pretrial proceedings, the trial court's subsequent failure to substantially comply with the MCR 6.005 requirements at trial rendered defendant's waiver of counsel ineffective. *Russell, supra* at 191-192.

(d) Effect Of Prior Waiver Made During Brady Trial

We disagree with the prosecution's assertion that the trial court's compliance with MCR 6.005(D) in the Brady trial was sufficient to constitute compliance with MCR 6.005(D) in the Haynes trial.

The following timeline is helpful here:

- January 9, 2006 - Defendant is arraigned in the Haynes trial proceedings. Breczinski represents defendant during this proceeding.

- January 24, 2006 - The Brady trial begins, and defendant knowingly, voluntarily, and unequivocally waives his right to counsel *in that case*.

- February 1, 2006 - The Brady trial ends.

- February 6, 2006 - Pretrial motion hearings begin in the Haynes trial proceedings. Breczinski represents defendant during this proceeding.

- February 27, 2006 - Pretrial motion hearings continue in the Haynes trial proceedings, and Breczinski first indicates that he is not sure whether he is representing defendant in the Haynes trial proceedings.

- March 9, 2006 - The trial court sentences defendant in the Brady trial. Breczinski represents defendant during this proceeding.

- March 20, 27, and 28, 2006 - Pretrial hearings in the Haynes trial continue.

- April 4, 2006 - The Haynes trial begins.

Given the overlapping nature of the proceedings, it is understandable that the trial court might have confused the two cases and simply assumed that defendant intended to represent himself in the Haynes trial, just as he had done in the Brady trial. Indeed, it is arguable that requiring the trial court to rehash the waiver procedures in the Haynes trial when the court had just gone through them with defendant approximately one month earlier in the Brady trial would

unnecessarily elevate form over substance. In other words, it could reasonably be assumed that defendant was still aware of and capable of knowingly exercising his rights in the Haynes trial when he knowingly, voluntarily, and unequivocally waived his right to counsel in the Brady trial. However, the fact that the trial court's error was *understandable* does not make it constitutionally *acceptable*.

> When determining whether the requirements were met, [this Court] indulge[s] every reasonable presumption against waiver of fundamental constitutional rights. Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver. [*Willing, supra* at 220 (internal quotations omitted.).]

We conclude that defendant's unequivocal decision to represent himself in the Brady trial can have no effect on his choice of representation in the Haynes trial. The fact that a trial court follows procedure with a certain defendant in one trial does not alleviate the trial court's obligation to adhere to proper procedure during a different and independent proceeding. A defendant's repeated presence before the court does not make him any less worthy of the court's adherence to proper procedure and constitutional safeguards. Therefore, the trial court erred by presuming defendant's waiver of counsel in the Haynes trial proceedings.

### (e) Conclusion

We conclude that defendant experienced a total deprivation of counsel during a critical stage of the proceedings. Because the effects of that deprivation pervaded the entire proceeding, and because the trial court failed to comply with the MCR 6.005(D) requirements, we must reverse his convictions in the Haynes trial. As we find this issue dispositive of the appeal brought under Docket No. 270604, we need not address several of defendant's remaining claims of error. However, because several issues are likely to recur on remand, in the interest of the efficient administration of justice, we will address those issues below.

### B. Pretrial Identification Procedures

Defendant requested a corporeal lineup during his preliminary examination and during the pretrial proceedings. Further, defendant repeatedly challenged the identifications made during the preliminary examination during subsequent pretrial and trial proceedings. Therefore, he preserved these issues, *Davis, supra* at 547, and we will review them for clear error. *Gray, supra* at 115; *Kurylczyk, supra* at 303 (Griffin, J.), 318 (Boyle, J.).

Defendant argues that the trial court erred in denying him a corporeal lineup. However, this Court has held that a defendant has no constitutional or statutory right to a corporeal lineup. *Farley, supra* at 238. "[T]he granting of a [corporeal] lineup is a matter which is addressed solely to the examining magistrate's discretion." *Id.* at 238-239. In the present case, before the preliminary examination hearing began, defense counsel moved for a corporeal lineup. The district court questioned whether a corporeal lineup was necessary when the prosecution was required to establish witness identification of the defendant during the preliminary examination. Defense counsel responded that defendant was concerned about being identified solely because he would be the only person sitting at the defense table in a jail jumpsuit. The district court

opined that was not a legitimate legal basis on which to grant a corporeal lineup. The district court noted that, if it were a legitimate legal basis, a corporeal lineup would have to be held in every case. The prosecution agreed with the court and noted that Anderson had already immediately picked defendant out of a photo showup. The district court then stated that the "bottomline" was that the victim was bound to testify truthfully under oath regarding the identity of the defendant. We find no abuse of discretion in the district court's decision.

We also reject defendant's argument that he was denied due process because Anderson was allowed to identify defendant while he was singled out as the defendant at the preliminary examination.[6]

An identification procedure can be so suggestive and conducive to irreparable misidentification that it denies an accused due process of law. *People v Kevin Dale Williams*, 244 Mich App 533, 542; 624 NW2d 575 (2001). To establish that an identification denied him due process, a defendant must show that the pretrial identification procedure was so suggestive under the totality of the circumstances that it led to a substantial likelihood of misidentification. *Id.* Appropriate factors to consider when determining whether the in-court identification would result from a sufficiently independent basis include: (1) the witness's prior knowledge of the defendant; (2) the witness's opportunity to observe the criminal during the crime; (3) the length of time between the crime and the disputed identification; (4) the witness's level of certainty at the prior identification; (5) discrepancies between the pretrial identification description and the defendant's actual appearance; (6) any prior proper identification of the defendant or failure to identify the defendant; (7) any prior identification of another as the culprit; (8) the mental state of the witness at the time of the crime; and (9) any special features of the defendant. *Gray, supra* at 116; *People v Kachar*, 400 Mich 78, 95-96; 252 NW2d 807 (1977).

Here, during the preliminary examination, Samuel Anderson testified that on September 24, 2005, defendant came to his house to look at the Monte Carlo that he was selling for Ralph Haynes. Anderson testified that defendant "came to the house looking at the car several times." Anderson agreed to accompany defendant on a test drive. Anderson testified that his encounter with defendant on the 24th occurred during daylight hours and, although he stated that he wore glasses, he confirmed that nothing obstructed his vision. Anderson further testified that he was only about "two foot or a foot and-a-half" away from defendant while they were in the car. Moreover, the prosecution specifically asked Anderson: "Other than the fact that he's present in the courtroom, would you recognize [Defendant]?" Anderson answered affirmatively and explained·that "his face is embedded in my mind over this." Anderson confirmed that he had previously identified defendant in a photo showup.

We conclude that Anderson demonstrated a sufficiently independent basis for identification. Therefore, the fact that defendant was the only defendant in the courtroom during his preliminary examination was not so suggestive as to lead to a substantial likelihood of

---

[6] We note that defendant does not challenge Anderson's identification of him during the photographic showup.

misidentification. Anderson had ample opportunity to observe defendant during the crime, only three months had passed between the crime and the preliminary examination, and Anderson previously identified defendant during the photo showup. Accordingly, the identification procedures used in this case did not deprive defendant of due process.

## C. MRE 404(b) Evidence

Defendant also argues that the trial court erred when it permitted evidence of the Sandstrom carjacking to be admitted under MRE 404(b) even though the Sandstrom carjacking was not sufficiently similar to prove identity and was unduly prejudicial.

We reiterate that in our review of the joinder of the Brady and Sandstrom carjackings we needed to determine whether those two carjackings constituted parts of a *single, continuing plan* to commit carjackings. Here, under a MRE 404(b) analysis, we need determine whether the Sandstrom carjacking was of the *same character or involved similar conduct* as the Haynes carjacking.

At the first motion hearing, the prosecution moved to introduce evidence of the Sandstrom carjacking as a "similar act" under MRE 404(b) to prove similar conduct and identification. The prosecution noted that Thomas Sandstrom "spent a significant amount of time with Mr. Pouncy driving with him in a vehicle." The trial court sought clarification of the prosecution's argument, asking, "So you want to introduce this information for the purpose of identification is that what you're saying?" The prosecution responded, "Yes it is. Exactly." The trial court found that the evidence's prejudicial effect did not outweigh the probative value of the evidence "to identify who may or may not have been the perpetrator in this case." Accordingly, the trial court granted the prosecution's request to introduce evidence of the Sandstrom carjacking and granted the prosecution's motion to add Thomas Sandstrom to its witness list as a 404(b) witness.

We conclude that the circumstances of the Sandstrom and Haynes carjackings were of such distinctive character as to justify an ordinarily reasonable juror to infer that both were the handiwork of the same person. In both carjackings, defendant was able to or attempted to lure the victim to an alleged mechanic. Moreover, the evidence of the Sandstrom carjacking had significant probative value in establishing a scheme, plan, or system for committing the Haynes carjacking. Here, the other acts evidence showed that defendant had engaged in repeated conduct where he would lure away persons selling vehicles and then steal their vehicles at gunpoint. The charged offenses here were consistent with the 404(b) conduct. Thus, the trial court properly admitted evidence under MRE 404(b) to show that in each instance defendant employed a distinctive *modus operandi* to steal cars at gunpoint by pretending to be interested in purchasing the vehicle. *Golochowicz, supra* at 310-311.

Accordingly, we conclude that the trial court properly admitted under MRE 404(b) Thomas Sandstrom's testimony during the Haynes trial for the purposes of establishing identity.

-37-

### D.  Prejudicial Arrest Delay

Defendant argues that the delay in his arrest prejudiced his rights because he was not able to obtain and preserve exculpatory evidence in the form of surveillance footage from the Genesee County Jail.

Defendant did not raise this issue below, but because a pre-arrest delay challenge implicates constitutional due process rights, the failure to raise the issue before the trial court does not preclude appellate consideration of the issue. *People v Crear*, 242 Mich App 158, 166; 618 NW2d 91 (2000).  We generally review constitutional errors de novo. *People v Cain*, 238 Mich App 95, 111; 605 NW2d 28 (1999).  However, we review unpreserved constitutional claims for plain error affecting the defendant's substantial rights. *Carines, supra* at 774.

Here, defendant claims that he was prejudiced because he was not able to obtain and preserve the surveillance footage from the Genesee County Jail.  He argues that this footage would have proved that he was in jail on September 24, 2005, when the Haynes carjacking occurred.  However, defendant has not demonstrated the requisite actual and substantial prejudice necessary to shift the burden of persuasion to the prosecution to show the reasonableness of the delay.  See *People v Adams*, 232 Mich App 128, 134-135; 591 NW2d 44 (1998).  Indeed, the officer in charge of defendant's work release program, testified that defendant signed in to jail at 12:50 a.m. on the morning of September 24, 2005, signed back out at 6:00 a.m., and then signed back in on the evening of September 24th at 11:50 p.m.  Therefore, defendant has offered nothing more than mere speculation concerning the exculpatory nature of the evidence of which he claims he was deprived.

Accordingly, we conclude that defendant's due process rights were not violated.

### V.  Conclusion

Because we conclude that there were no errors warranting relief, in Docket No. 269298 we affirm defendant's convictions and sentences.  In Docket No. 270604, because Defendant suffered a total deprivation of counsel during a critical stage of the proceedings, we reverse and remand for further proceedings consistent with this opinion.  We do not retain jurisdiction in either case.

/s/ Michael R. Smolenski
/s/ William C. Whitbeck
/s/ Kirsten Frank Kelly

**EXHIBIT BB**

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE
7TH JUDICIAL CIRCUIT

PEOPLE OF THE STATE OF MICHIGAN
      Plaintiff,

CASE NO.: 05-14154-FC

v

OMAR RASHAD POUNCY,
      Defendant.

JUDGE: ARCHIE L. HAYMAN

ORDER DENYING DEFENDANT'S
MOTION FOR RELIEF FROM
JUDGMENT

*A TRUE COPY — William J. Carr, Clerk*

---

DAVID S. LEYTON (P-35086)
Prosecuting Attorney
DALE A. DEGARMO (P-36501)
Assistant Prosecuting Attorney
100 Courthouse
Genesee County
Flint, Michigan 48502
(810) 257-3248

DANIEL D BREMER (P23554)
Attorney for Defendant
1133 East Bristol Rd.
Burton, MI 48529
(810) 232-6231

OMAR POUNCY
Inmate No: 571990
St. Louis Correctional Facility
8585 N. Croswell Rd.
St. Louis, MI 48880

---

## ORDER DENYING DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT

At a session of said Court
on this ___ day of November, 2010.

PRESENT: The Honorable Archie L. Hayman

    This case is before the Court on Defendant's Motion for Relief from Judgment. It should be noted that in addition to the current Motion for Relief from Judgment and its supplements, Defendant has filed several in pro per motions[1] with this Court; however, due to the disposition of Defendant's Motion for Relief from Judgment, each of Defendant's pro per motions are moot and are THEREFORE **DENIED**.

---

[1] Filed July 22, 2009: Motion for Expansion of the Record; Motion for a *Ginther* Hearing; Motion for Discovery; Motion for Appointment of Forensic Shoeprint Impression Expert Witness; and Motion for *Remmer* Hearing.

- 1 -

The factual background of this case was proficiently spelled out by the Court of Appeals[2] and is as follows:

**FACTS**

The Haynes Carjacking

In September 2005, Ralph Haynes had a Monte Carlo on display for sale in the front yard of Samuel Anderson's home. Ralph was selling the car to pay for anticipated funeral expenses associated with his impending death from cancer. Anderson explained that on Saturday, September 24, 2005, a person came to look at Ralph's car. At trial, Anderson identified defendant as the prospective buyer. Anderson testified that defendant had looked at the car on three or four previous occasions. Anderson explained that during defendant's first visit, which was probably on the Sunday or Monday before the 24th, defendant inquired about the price, stated that "[m]oney is no object," and then left. On defendant's second visit, probably on Tuesday, he asked to drive the car, but Anderson refused. Sometime during his Tuesday visit, defendant mentioned to Anderson his desire to take the vehicle to his mechanic. Defendant arranged to come over again on Wednesday, but Anderson did not meet with him. Instead, Ralph and his brother Dan Haynes remained at Anderson's house in order to meet with defendant and defendant's mechanic.

Dan testified that he went to Anderson's house with Ralph on Wednesday, September 21, 2005, in order to meet some people who were interested in purchasing the Monte Carlo. At trial, Dan identified defendant as the prospective buyer. After briefly discussing the car, defendant asked to take it for a test drive, but, because the car did not have a license plate, Dan offered to take defendant for a ride instead. Defendant agreed, but during the ride he told Dan that he really wanted to take the car to his mechanic. Dan refused, but told defendant that he would ask Ralph about it, and then took defendant back to Anderson's house. Ralph refused to let defendant take the car to his mechanic, so Dan offered to let defendant go get his mechanic and bring him back to Anderson's house. Dan stated that defendant then left and came back shortly thereafter with his mechanic. After defendant and his mechanic looked at the car, defendant asked whether he needed to leave a deposit, but Dan declined, promising that the car would still be there the next day. Defendant agreed to come back the next day at 12:30 p.m., but he never showed up. According to Dan, defendant called Ralph on Friday, apologized for not showing up, and asked to see the car again.

On September 24th, defendant arrived at Anderson's house and asked to take the car for a test drive. Anderson agreed to accompany defendant on the test. Anderson informed defendant that the car was not insured and instructed defendant on a specific route for the test drive. Anderson testified that part of the instructed route included getting on the expressway, but as they approached the expressway ramp, Anderson realized that defendant was in the wrong lane. When Anderson advised defendant that he needed to change lanes, defendant replied, "No, the car is mine now[,]" pulled out a gun, and pointed it at Anderson. Anderson told defendant he could have the car and asked to be let out. Defendant stopped at a red light and told Anderson,

---

[2] *People v Omar Rashad Pouncy*, (*on Reconsideration*) unpublished opinion per curiam of the Court of Appeals, issued March 25, 2008 (Docket Nos. 269298 & 270604).

"All right when that light turns green you better be out the door or I will blow you through the door." Anderson got out.

### The Brady Carjacking

Joseph Davis testified that Earl Brady brought a Camaro drag-racing car to his racecar chassis fabrication shop to display it for sale. Approximately four or five days before September 29, 2005, three men came to look at the Camaro; one of them identified himself as "Jacob Woods." At trial, Davis identified defendant as "Jacob Woods" and noted that he had been the one doing most of the talking. Defendant came back a second time and then a third time on the 29th. On September 29th, defendant called Davis and indicated that he was ready to make a deal, so Davis called Brady and told him to come over. Brady arrived in his truck with his friend Patrick Wendell. Defendant and two other men showed up later in a grey Intrepid. During negotiations, defendant told Davis that he wanted to take the Camaro to his mechanic at King Automotive. Brady agreed, loaded the Camaro onto a trailer attached to his truck, and they all left.

At trial, both Brady and Wendell identified the prospective buyer of the Camaro as defendant. The group arrived at a house where defendant said they would meet the mechanic and defendant asked Brady to back the truck into the driveway. Defendant and Brady were discussing the Camaro, when one of the defendant's associates pulled out a gun and demanded Brady's keys and cell phone. When Brady refused, the associate fired the gun up into the air; Brady then complied. The men also took Wendell's cell phone. The men told Wendell and Brady to walk across the street and into the woods. While in the woods, Brady and Wendell heard the vehicles drive away. Brady and Wendell walked to a nearby house and called the police.

Wayne Grimes, defendant's stepbrother, testified that he helped defendant commit the Brady carjacking. Grimes testified that he owned an Intrepid, in which he drove defendant and defendant's friend, Tiaqua, to Davis's race shop on September 29, 2005. After defendant spoke to some men about a car, defendant directed Grimes to drive to defendant's "engineer." On the way, defendant told Grimes that he planned to "take" the cars and sell them, and Tiaqua handed Grimes a gun. Grimes testified that they arrived at a house, and, after Grimes gave him the signal, he pointed the gun at one of the men and took his keys and cell phone. He testified that he shot the gun in the air when the man first refused. He also testified that he ordered the men to walk into the woods. According to Grimes, after the men walked into the woods, he got in his car and left defendant and Tiaqua. Grimes testified that he had pleaded guilty to armed robbery and felony firearm.

### The Sandstrom Carjacking

Thomas Sandstrom testified that on October 11, 2005, a man, who had already called the previous day, came to his home in a metallic Intrepid to see a Cadillac that Sandstrom had advertised for sale. At trial, both Thomas and his wife Maria Sandstrom identified defendant as the prospective buyer. Defendant asked to take the car to his mechanic at King Automotive and Thomas agreed. Thomas rode in the Cadillac with defendant, defendant's associate drove the

- 3 -

Intrepid, and Maria followed in her Corvette. They ended up at the last house on a dead end dirt road. Defendant asked Thomas for the title and they went to the Corvette to retrieve it from Maria. Thomas then felt defendant stick a gun in his side and defendant told Maria to get out of the Corvette. Thomas was asked for his wallet, and both the Sandstroms were ordered into the woods. Thomas heard the cars drive away, so he and Maria walked back to the road and flagged down a passing police car. Maria had memorized the license plate of the Intrepid and gave it to the police.

Grimes testified that he also helped defendant commit the Sandstrom carjacking. He testified that he, Tiaqua, and the defendant were driving around, and defendant was looking at automotive sales ads in the newspaper. At some point, defendant called about an ad and then directed Grimes to drive to the seller's house. After defendant spoke to a man about a car, defendant told Grimes that he was going to take the car for a test drive. On the way, Grimes "[f]ound out that . . . it's about to happen again" – that defendant planned to steal the cars. Grimes testified that just after they arrived at the house, he heard the women screaming, and he got out of his car, covered his license plate, and then drove away, leaving defendant and Tiaqua behind. Grimes admitted that, when he was first arrested, he denied any involvement in the carjackings.

## THE ARREST AND TRIALS

Detective James Gagliardi testified that he was assigned to investigate the Brady carjacking, but his investigation hit a dead-end. However, on October 12, 2005, he received notice of the Sandstrom carjacking and, after investigating the Intrepid lead, he was able to locate Grimes. Grimes was arrested, and, during interrogation, he identified defendant as one of his accomplices. Gagliardi testified that he put together a photo showup of defendant, and that Davis, Brady, and the Sandstroms all immediately identified defendant as the carjacker. Gagliardi testified that defendant was taken into custody on Friday, October 14, 2005.

In late January and early February 2006, the trial court held the Brady trial. The trial lasted six days and included all charges stemming from both the Brady and the Sandstrom carjackings. The jury convicted defendant as charged of four counts of carjacking, four counts of armed robbery, two counts of felony firearm, and one count of being a felon in possession of a firearm.

The Haynes trial lasted four days in April 2006. After the close of proofs, the trial court convicted defendant of one count each of armed robbery, carjacking, being a felon in possession of a firearm, carrying a concealed weapon, and felony firearm.[3]

Thereafter, Defendant, while represented by SADO, appealed his convictions in the Brady/Sandstrom carjackings to the Michigan Court of Appeals. Defendant also filed an in pro per supplemental brief. The issues raised on direct appeal include:

---

[3] End of the recitation of facts as established by the Michigan Court of Appeals.

I. Defendant's wavier of counsel was not voluntary or unequivocal and his conviction must be reversed;

II. Defendant was denied his right to effective assistance of counsel; the Court erred by refusing to grant a continuance for Defendant to obtain substitute counsel;

III. Defendant Pouncy was denied due process of law by the impermissible joinder of eleven charges based on two entirely separate incidents;

IV. Defendant was denied due process of law by the use of suggestive photo identification procedures and the denial of a corporeal lineup;

V. The trial court denied Defendant a fair trial, his right to present a defense, and a properly instructed jury by failing to instruct on the principal defense of alibi, on accomplice witness credibility, and on mere presence; Defendant was denied effective assistance of counsel by the lack of requests for those instructions;

VI. Defendant was denied a fair trial by the introduction of other criminal acts that were not sufficiently similar to prove identity and that were unduly prejudicial;

VII. The trial court denied Defendant a fair trial by allowing the star prosecution witness to testify, over objection, that he was telling the truth because of his religious beliefs;

VIII. The trial court denied Defendant a fair trial by admitting a highly inflammatory tape recording that was not sufficiently authenticated and that was so inaudible to be untrustworthy;

IX. Defendant was sentenced on the basis of inaccurate information where OV 12 was misscored, and he is entitled to resentencing.

A supplemental brief was then filed by defendant's attorney raising two additional issues:

I. The Prosecutor's failure to disclose the full extent of the promises of leniency given to the star prosecution witness in return for his testimony against defendant denied defendant his right to confrontation and his right to due process of law;

II. The substantial departure from the verdict form was coercive and Defendant's convictions must be reversed.

Defendant then filed an in pro per supplemental brief raising the following issues:

I. Defendant was deprived of a fair trial due to the substantial prejudice he suffered from the unnecessary, intentional, and prejudicial delay in his arrest, and his convictions must be reversed and charges dismissed;

II. Defendant was deprived of his right to a public trial and reversal is required without the showing of actual prejudice;

III. Defendant was impermissibly deprived of his right to confront witnesses as guaranteed by the Sixth Amendment, which is made obligatory on the states by the Fourteenth Amendment. Reversal is required without the showing of prejudice;

IV. Defendant's waiver of counsel was ineffective due to the trial court's failure to advise him of the "accurate" maximum possible sentence. Failure to advise Defendant of the mandatory minimum sentence required by law of the charge of armed robbery and felony firearm at the time of the waiver, failure to advise him of all of the disadvantages involved in self-representation, failure to reaffirm the wavier at subsequent proceedings, and for

- 5 -

allowing Defendant to represent himself after he clearly told the trial court that he was not prepared for trial;

V. Defendant was denied his right to due process due to the suppression of exculpatory and impeaching evidence by the prosecution notwithstanding his constant request; .

VI. Defendant was impermissibly deprived of his right to represent himself at the pretrial stages and his right to counsel of his choice (retained), due to the trial court's failure to appraise his request;

VII. Defendant Pouncy was denied a fair trial due to the prosecution's improper burden shifting arguments during closing argument concerning Defendant's alibi defense;

VIII. The cumulative amount of errors that reddled [sic] Defendant's trial wether [sic] deemed preserved or unpreserved deprived him of a fair trial.

The Court of Appeals, in an opinion addressing both trials, affirmed the conviction and sentencing in the case currently before this Court (the Brady/Sandstrom carjacking) but reversed the conviction in the Haynes bench trial. Defendant, while represented by SADO, appealed the same issues (including those presented in pro per) to the Michigan Supreme Court. The Supreme Court denied the application for leave to appeal.

## Motion for Relief from Judgment

Thereafter and on December 1, 2008, Defendant requested this Court appoint counsel for purposes of pursuing post-appellate relief in the form of a Motion for Relief from Judgment. Because MCR 6.505(A) gives this Court the discretion to appoint counsel for the Defendant at any time during the proceedings under the subchapter, Defendant's request was granted. Thereafter, several attorneys were appointed on the case and each were allowed to withdraw. Subsequently, on May 21, 2009, the above named counsel, Daniel Bremer, was appointed to represent Defendant in his post-appellate relief. On July 22, 2009, a Motion for Relief from Judgment was filed by Attorney Bremer. After several proceedings were heard in this matter regarding in pro per motions, a Brief in Support of the Motion for Relief from Judgment was filed by post appellate counsel on December 21, 2009. On January 12, 2010, the Prosecution filed their Answer in Opposition to Defendant's Motion for Relief from Judgment. Thereafter, this Court received the following documents from the Defendant, in pro per: a letter of January 5, 2010 indicating the Defendant's discontent with Attorney Bremer, a Motion filed on January 25, 2010 requesting substitute appellate counsel and requesting the Brief in Support of the Motion for Relief from Judgment filed by Attorney Bremer be withdrawn and stricken, and a letter dated February 11, 2010 requesting that this Court allow Defendant, in pro per, to file his own Brief in Support of Motion for Relief from Judgment and requesting the ability to exceed the limit of 50 pages. On February 26, 2010, this Court denied Defendant's Motion for Substitution of Appellate Counsel and to have the Brief in Support of the Motion for Relief from Judgment withdrawn, but granted Defendant's request to supplement his brief in pro per. This Court allowed Defendant to file such supplement by April 14, 2010. On March 2, 2010, Defendant filed his substantial supplement[4] to his Motion for Relief from Judgment and on May 11, 2010, filed a response to the People's Answer in Opposition to Defendant's Motion for Relief from

---

[4] Defendant's in pro per supplemental brief totaled 255 pages.

Judgment.[5]  On April 20, 2010, this Court allowed the Prosecution to respond to Defendant's in pro per supplement.  Additionally, and on May 19, 2010, post appellate counsel filed a Supplemental Brief and Supplementation of Authority based on a Retroactive Change in the Law.  On July 29, 2010, the Prosecution filed their response to Defendant's in pro per supplement. Defendant, also in pro per, and on October 15, 2010, filed his 258 page Response to People's Answer in Opposition to Defendant's pro per Supplemental Motion for Relief from Judgment as well as his 42 page Response to the People's Answer in Opposition to Defendant's Supplemental Issue Based on Retroactive Change in Law.  Each of these documents has been considered in this Court's Order.

## MOTION FOR RELIEF FROM JUDGMENT FILED BY DEFENSE COUNSEL

Entitlement to relief in this case is governed by MCR 6.508(D), which provides in pertinent part that the court may not grant relief to the defendant if the motion:

(2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceedings under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;

(3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates:

(a) good cause for failure to raise such grounds on appeal or in a prior motion, and

(b) actual prejudice from the alleged irregularities that support the claim for relief.  As used in this subrule, "actual prejudice" means that,

(i) in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal

It is under this standard that each of the defendant's arguments will be addressed beginning with the arguments presented by post appellate counsel:

**I. The Defendant received ineffective assistance of appellate counsel and for this reason he has good cause for failing to raise the various issues set forth below to the extent that they are not based on newly discovered evidence.**

Post-appellate counsel first argues that Defendant received ineffective assistance of appellate counsel as though an appellate attorney can winnow out weaker issues, the issues argued by the appellate attorney are markedly weaker than those presented in the current motion. This argument is without merit.

---

[5] Defendant's in pro per response to People's Answer in Opposition to Defendant's Motion for Relief from Judgment totaled 147 pages.

As stated within *People v Uphaus*, 278 Mich App 174; 748 NW2d 899 (2008):

> the test for ineffective assistance of appellate counsel is the same as that applicable to a claim of ineffective assistance of trial counsel. *People v Pratt*, 254 Mich App 425, 430; 656 NW2d 866 (2002). .... Appellate counsel may legitimately winnow out weaker arguments in order to focus on those arguments that are more likely to prevail. *People v Reed*, 449 Mich 375, 391; 535 NW2d 496 (1995).

Under *Strickland v Washington*, 466 US 668, 687-690; 104 S Ct 2052; 80 L Ed 2d 674 (1984), a criminal defendant must first show that his attorney's performance was deficient meaning that the attorney made errors so serious that his attorney was not performing as the counsel guaranteed by the Sixth Amendment. Furthermore, Defendant must rebut the presumption that his attorney's performance was the result of a sound trial strategy and that the defendant must also show that the deficient performance was prejudicial. Prejudice is established where there is a reasonable probability that, but for counsel's error, the result of the trial would have been different.

In this regard, given the multitude of arguments presented by appellate counsel on Defendant's direct appeal, and given the evidence of defendant's guilt, it is clear that Defendant's appellate counsel represented Defendant effectively and presented to the Court of Appeals valid and strong arguments on Defendant's behalf. Additionally, Defendant filed his own, in pro per Standard 4 brief to the Court of Appeal addressing claims he believed applicable. The Court of Appeals ruled on such in pro per arguments and still upheld the jury conviction in the case currently before the Court. Defendant cannot meet the heavy burden of proving that his appellate counsel was not performing as the counsel guaranteed by the Sixth Amendment. This argument is without merit.

## II. The prosecutor denied the Defendant due process of law by failing to correct false testimony of Wayne Grimes, a key witness.

Defendant next argues that due process was denied to Defendant when the Prosecution witness, Wayne Grimes, falsely testified that he had not previously been arrested. It is Defendant's contention that due process was denied when the prosecutor failed to correct the testimony of a witness which he knew to be false. *See Napue v Illinois*, 360 US 264, 269; 79 S Ct 1173 (1959). Defendant claims that the docket entries of the 67th District Court show that Wayne Grimes was charged with carrying a concealed weapon on May 16, 2005 and though he technically may not have been arrested, his answer to the jury that he was never arrested was misleading. However, Defendant has presented absolutely no evidence that Wayne Grimes testimony was false and, because this Court is not required to search for authority to sustain or reject a party's position, Defendant's arguments are without merit. *People v Watson*, 245 Mich App 572, 629 NW2d 411 (2001). Additionally, because Defendant's argument as to ineffective assistance of appellate counsel has failed, Defendant cannot establish good cause for failure to raise such grounds on appeal or in a prior motion, nor can he establish actual prejudice stemming from the alleged irregularities as required under MCR 6.508(D)(3).

III. **The prosecutor denied the Defendant due process of law by allowing a police officer to place a police report containing inadmissible evidence on the ledge of the juror box where it was visible to the jury.**

Defendant next argues that while Detective James Gagliardi was on the witness stand, he placed a Mt. Morris Township police report near him on the ledge of the jury box, within view of the jury. According to Defendant, this constitutes improper extrinsic influence on a jury. Pursuant to *People v Budzyn*, 456 Mich 77, 88-90; 566 NW2d 229 (1997), "where the jury considers extraneous facts not introduced in evidence, this deprives a defendant of his rights of confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment." According to *Budzyn*:

> In order to establish that the extrinsic influence was error requiring reversal, the defendant must initially prove two points. First, the defendant must prove that the jury was exposed to extraneous influences. See *Marino v Vasquest*, 812 F2d 499, 504 (C.A.9, 1987). See also *United States v Caro-Quintero*, 769 FSupp 1564, 1573 (CD Cal., 1991). Second the defendant must establish that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict. See *Hughes*, supra at 700. Generally in proving this second point, the defendant will demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict.

In this regard, Defendant has offered no evidence that the jury was exposed to any extraneous influences. Though the police report may have been placed in a position where a juror could have seen *a* page of the document, there is no evidence or indication that any individual juror saw a document page nor that a juror read any of the contents of that page or even what the contents of such page was. In fact, during the testimony, Defendant did not object to the fact that the jurors may have possibly seen the police report but rather objected that the testifying witness was looking at the report before he answered questions. In sum, there is no evidence that a juror saw the police report and if a juror did see the police report, there is no evidence that it constituted an "extraneous influence," or could have affected the jury's verdict. Defendant's argument is without merit. Additionally, because Defendant's argument as to ineffective assistance of appellate counsel has failed, Defendant cannot establish good cause for failure to raise such grounds on appeal or in a prior motion, or actual prejudice stemming from the alleged irregularities as required under MCR 6.508(D)(3).

IV. **The Defendant was denied due process of law because the prosecutor failed to disclose potentially exculpatory evidence in the form of a written statement of one of the complainants, Thomas Sandstrom, before Mr. Sandstrom testified.**

The next argument presented concerns the failure of the prosecution to disclose the written statement of Thomas Sandstrom prior to trial. Defendant claims that the contents of his

statement may be favorable to Defendant and the prosecution, therefore, had an obligation to produce the statement. Unfortunately, Defendant cannot rely on mere conjecture and speculation as to what may be contained in a statement when the evidence presented to the jury was substantial and included the sworn testimony of Thomas Sandstrom. This argument presented by Defendant is, again, without merit. Additionally, because Defendant's argument as to ineffective assistance of appellate counsel has failed, Defendant cannot establish good cause for failure to raise such grounds on appeal or in a prior motion, or actual prejudice stemming from the alleged irregularities as required under MCR 6.508(D)(3).

**V. There was a possible extraneous influence on the jury in the form of either discussion of a telephone call from the Genesee County Jail received by one juror, or telephone calls to other jurors that required a hearing, but no hearing was conducted.**

On Tuesday, January 31, 2006, during the trial in this case, a juror reported to the Court that he had received a telephone call from the Genesee County jail. Such juror was dismissed from the case and was informed not to speak to the other seated jurors. Defendant claims, however, that because no hearing was held pursuant to *Remmer v United States*, 347 US 227, 230; 74 S Ct 450 (1954) to determine whether possible extraneous information was prejudicial to the defendant, a new trial is warranted. Again, Defendant has no evidence that the removed juror informed the rest of the jury of the alleged contact from the County Jail. In fact, the record reflects that this Court stated that the juror did not have any contact with other jurors since the incident. As stated previously, because Defendant's argument as to ineffective assistance of appellate counsel has failed, Defendant cannot establish good cause for failure to raise such grounds on appeal or in a prior motion, or actual prejudice stemming from the alleged irregularities as required under MCR 6.508(D)(3) as Defendant cannot present mere conjecture and speculation as a showing of "actual prejudice."

**VI. The prosecutor denied the Defendant due process of law by making disparaging remarks about the Defendant in his capacity as his own attorney.**

Defendant next cites *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008) for the proposition that the prosecution made inappropriate statements at closing arguments and, therefore, Defendant's guaranteed right to Due Process of law under the Fourteenth Amendment was deprived.

As stated in *Unger*:

> "Review of alleged prosecutorial misconduct is precluded unless the defendant timely and specifically objects, except when an objection could not have cured the error, or a failure to review the issue would result in a miscarriage of justice." *People v Callon*, 256 Mich App 312, 329, 662 NW2d 501 (2003). Because the challenged prosecutorial statements in this case were not preserved by contemporaneous objections and requests for curative instructions, appellate review is for outcome-determinative, plain error. *Id.* "Reversal is warranted only when plain error resulted in

the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Callon, supra* at 329, 662 NW2d 501.

Defendant's argument that a prosecutor may not question a defense counsel's veracity is correct. However, Defendant did not object to the alleged disparaging statements during trial and, therefore, the issue is not preserved. Furthermore, Defendant argues that the disparagement of a defendant, "who did not testify, was effectively the disparagement of an attorney and created prejudicial, reversible error." However, review of the trial transcripts evidences that Defendant was sworn as a witness on January 31, 2006 and testified in his own defense. (Trial Transcripts, 01/31/06, pp. 162-212). In this regard, "a prosecutor is not required to state his arguments in the blandest possible terms and may argue that a defendant's story is unworthy of belief as long as such argument is based on the evidence rater than on matters not of record or the prestige of the prosecutor's office." *People v Pawelczak*, 125 Mich App 231, 238; 336 NW2d 453 (1983). In this case, the Prosecution attacked Defendant's testimony as a "salesman's pitch" and further stated that defendant is a very smart individual. (Trial Transcripts 2/1/06 pp. 23 & 74). There is nothing within the arguments cited by Defendant that would constitute prosecutorial misconduct or would affect "the fairness, integrity, or public reputation of judicial proceedings." *Callon, supra*.

Additionally, and most importantly, Defendant's claim was already decided by the Michigan Court of Appeals. Specifically the Court of Appeals stated:

> In his Standard 4 brief, defendant raises numerous additional claims of error, which he contends warrant relief. Specifically, defendant argues that he was deprived of a fair trial . . . by the prosecution's improper closing arguments . . . We have carefully examined these claims of error and conclude that none of them have merit.

MCR 6.508(D)(2) provides that the court may not grant relief to the defendant if the motion: "alleges grounds for relief which were decided against the defendant in a prior appeal or proceedings under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision." Defendant has made no such allegations. As a result, Defendant's arguments are without merit.

## VII. The court denied the Defendant due process of law and the right to present a defense by preventing the Defendant from calling Wayne Grimes in his case in chief.

The next argument presented by post-appellate counsel states that because Defendant was precluded by the Court from calling his co-defendant, Wayne Grimes, during Defendant's case in chief he was denied due process of law constituting reversible error. In support, Defendant cites *Washington v Texas*, 388 US 14; 87 S Ct 1920; 18 L Ed 2d 1019 (1967) as well as *People v Yost*, 278 Mich App 341; 749 NW2d 753 (2008) wherein the Defendants in the respective cases were precluded from calling certain witnesses. In *Washington, supra*, the court held that the denial of Defendant's right to call his co-defendant based on a Texas statute was a denial of his

- 11 -

right to have compulsory process for obtaining witnesses in his favor. In *Yost, supra* the Michigan Appeals Court held that the sanction of witness preclusion for failure to comply with the trial court's previous order was reversible error. In either case, however, the Defendant was precluded from calling witnesses altogether. Both fact patterns, however, are entirely distinguishable from the case at bar as Mr. Grimes did take the stand and, further, was subjected to a lengthy cross examination by Defendant. In addition, Defendant stated to the Court that the reason he wanted to recall Mr. Grimes was because he was "[a]bout just really getting more down to the truth of this situation you know." Defendant gave no specific reason to the Court as to why Mr. Grimes should be recalled. Again, Defendant's claims have no merit. Additionally, because Defendant's argument as to ineffective assistance of appellate counsel has failed, Defendant cannot establish good cause for failure to raise such grounds on appeal or in a prior motion, or actual prejudice stemming from the alleged irregularities as required under MCR 6.508(D)(3).

## VIII.  The Defendant's trial attorney was ineffective in failing to have competent evidence to show the shoe size of the shoe print impression left at the alleged crime scene.

Defendant's next argument relates to ineffective assistance of trial counsel. Specifically, Defendant argues that the Mt. Morris Township police photographed a shoe print impression at the crime scene and that, prior to trial Defendant requested his attorney to have the shoe print impression analyzed. Defendant's attorney failed to hire a shoe print impression expert and Defendant claims that this constitutes ineffective assistance of counsel.

Under *Strickland v Washington*, 466 US 668, 687-690; 104 S Ct 2052; 80 L Ed 2d 674 (1984), a criminal defendant must first show that his attorney's performance was deficient meaning that the attorney made errors so serious that his attorney was not performing as the counsel guaranteed by the Sixth Amendment. The Michigan Court of Appeals, in Defendant's appeal of right, stated:

> [i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* But neither must the defendant show that "counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* Instead, the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Accordingly, in order to warrant a new trial, defendant must show that, but for his trial counsel's decision . . . there is a reasonable probability that he would not have been convicted of the charged offenses.

Additionally, as stated by the Court of Appeals in denying Defendant's motion in a similar argument:

Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy. Further, "a defendant must overcome a strong presumption that the assistance of his counsel was sound trial strategy, and he must show that, but for counsel's error, the outcome of the trial would have been different." [*People v Davis*, 250 Mich App 357, 368-369; 649 NW2d 94 (2002)(citations omitted).]

As applicable to his direct appeal and to this collateral attack, Defendant has failed to overcome this presumption. In this regard, Defendant has presented no evidence, whether prior to trial and while being represented by Attorney Breczinski or during trial while self represented, that Defendant had an expert to testify which would contradict the Prosecution's evidence or who would have testified regarding the size of the shoe print. Defendant has also offered no evidence that he currently has an expert who will testify that the shoe print impression left at the alleged crime scene was not, in fact, a shoe print of Defendant Pouncy. Because of this, there is no way for this Court to determine that any expert witness on the subject of a shoe print would have changed the outcome of this case, especially given the "considerable evidence that defendant committed the charged offenses, including the testimony of defendant's coconspirator in the carjackings." *People v Pouncy*, *supra* pp 19. Additionally, because Defendant's argument as to ineffective assistance of appellate counsel has failed, Defendant cannot establish good cause for failure to raise such grounds on appeal or in a prior motion, nor can he establish actual prejudice stemming from the alleged irregularities as required under MCR 6.508(D)(3).

## IX. Standby Counsel had no authority to stipulate that the Defendant had been convicted of an unspecified felony.

The next argument presented claims that Attorney Breczinski, as standby counsel, had no authority to stipulate that Defendant had been convicted previously of an unspecified felony for purposes of the felon in possession instruction. Defendant claims that as the Court was reading the instructions to the jury, the Prosecutor asked to approach the bench and both the Prosecutor and standby counsel approached with the Defendant remaining seated, though Defendant was representing himself at the time. Defendant claims that such stipulation infringed on Defendant's right to represent himself. In this regard, Defendant argues that denying a criminal defendant his right to represent himself or to be represented by the attorney of his choice is a structural error requiring automatic reversal pursuant to *United States v Gonzalez-Lopez*, 548 US 140, 150; 126 S Ct 2557; 165 L Ed 2d 409 (2006). However, during the trial, Defendant was, in no way, denied his right to represent himself. A stipulation as to whether Defendant had been previously convicted of an unspecified felony so that the Prosecution was not required to prove or place into the record the nature and type of offense Defendant was previously convicted of in no way denied Defendant's right of self-representation. Defendant's argument in this regard is without merit. Additionally, because Defendant's argument as to ineffective assistance of appellate counsel has failed, Defendant cannot establish good cause for failure to raise such grounds on appeal or in a prior motion, nor can he establish actual prejudice stemming from the alleged irregularities as required under MCR 6.508(D)(3).

- 13 -

X.   There is newly discovered evidence in the form of an affidavit from Tiakawa Pierce who was unavailable at the time of the trial.

The next argument presented is that newly discovered evidence warrants a new trial on behalf of Defendant. The newly discovered evidence presented is an affidavit from Tiakawa Leondis-Terrel Pierce signed November 1, 2008 which states that he was a former codefendant of Defendant and claims that Defendant was not involved in the crimes that were committed in this case but rather it was Mr. Pierce, Wayne Grimes Jr. and a Jacob Woods that were involved. Mr. Pierce further states that at the time of Defendant's trial he was "out of touch," did not know there was a warrant out for his arrest, nor did he know that Defendant was being accused for something he had nothing to do with. However, this affidavit cannot be given any credence. It is true that Mr. Pierce was charged as a codefendant with Defendant for carjacking and armed robbery of the Sandstroms and Brady. However, when Mr. Pierce pled guilty before this Court on February 14, 2010 to the crime of accessory after the fact to carjacking, Mr. Pierce stated, also under oath, that on October 11, 2005 he was with Defendant and Wayne Grimes when the crimes occurred and, specifically, that Defendant Pouncy engaged in the crime of carjacking.

Pursuant to *People v Cress*, 468 Mich 678, 692, 664 NW2d 174 (2003):

> For a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: (1) 'the evidence itself, not merely its materiality, was newly discovered'; (2) 'the newly discovered evidence was not cumulative'; (3) 'the party could not, using reasonable diligence, have discovered and produced the evidence at trial'; and (4) the new evidence makes a different result probable on retrial.

(*citing People v Johnson*, 451 Mich 115, 118 n. 6; 545 NW2d 637 (1996)). "However, where newly discovered evidence takes the form of recantation testimony, it is traditionally regarded as suspect and untrustworthy." *People v Canter*, 197 Mich App 550, 559; 496 NW2d 336 (1992). Because it is not necessary to delve much further into the topic suffice it to say that such contradictory evidence could not make a different result probable on retrial. Further, should Defendant know where Mr. Pierce is currently located and assuming that Mr. Pierce would be ready to testify at a retrial held for Defendant, it should be noted that Mr. Pierce is currently an absconder from probation in the Genesee County Circuit Court under case number 07-21200-FC and an outstanding bench warrant exists for his arrest. Further, because Defendant testified at trial that he did not engage in the alleged criminal activity, the testimony of Mr. Pierce, should Mr. Pierce decide to testify in the county where a bench warrant exists for his arrest, such testimony would be cumulative. Again, Defendant's claims are without merit.

XI.   There is newly discovered evidence in the form of an affidavit from Quillie B. Strong that shows that the telephone number used by the person who called one of the complainants on September 24, 2005, was traceable to a person other than the Defendant, contrary to the representations made by the prosecutor during the trial.

- 14 -

The next argument presented by Defendant is that the telephone number (810-836-5074) used on September 24, 2005 to call Ralph Haynes, the complainant in the Haynes bench trial case 05-17448-FC was not Defendant's cell phone but the cell phone of a "Jacob Joe Woods." To support this contention, Defendant provides the affidavit of Quillie B. Strong dated November 1, 2008, which states that he is the cell phone subscriber of 810-836-5074 and that he had the account set up for Jacob Joe Woods given that Mr. Woods was under 18. It should be noted that during the trial currently under collateral attack, Earl Brady testified that Defendant identified himself as Jacob Woods.

To begin, Defendant's conviction in the Haynes trial was overturned and Defendant is not currently incarcerated on such charges. Additionally, the affidavit of Quillie B. Strong uses the date of September 24, 2005 but does, in no way, indicate or have any bearing on whether defendant committed the crimes on September 29, 2005 and October 11, 2005. The alleged newly discovered evidence in the form of the affidavit of Quille B. Strong is, therefore, irrelevant. Additionally, because Defendant himself testified that he was not involved in the crimes, the alleged newly discovered evidence would be considered cumulative and, therefore, does not warrant a new trial. Again applying the elements in *Cress, supra*, Defendant's arguments are without merit.

**XII. There was prosecutorial misconduct when the prosecutor produced a power point slide during his opening statement and closing argument that proclaimed "Omar Pouncy is guilty". Also, the prosecutor produced a slide during his closing argument referring to Mr. Pouncy as "a seller's worst nightmare." The prosecutor vouched for the credibility of Wayne Grimes. Alternatively, Defendant's attorney was constitutionally ineffective in failing to object to this misconduct.**

The next argument presented by post-appellate counsel again makes a claim of prosecutorial misconduct during opening and closing arguments. Yet again, Defendant states that because Defendant did not testify, the statements made against Defendant by the prosecution were an attack on Defendant in his capacity as an attorney. Such argument was address previously under subsection VI and because Defendant did, in fact, testify at trial, Defendant's arguments are without merit. The jury was instructed by the Court that the lawyer's statements and arguments are not evidence. "It is well established that jurors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Additionally, because Defendant's argument as to ineffective assistance of appellate counsel has failed, Defendant cannot establish good cause for failure to raise such grounds on appeal or in a prior motion, nor can he establish actual prejudice stemming from the alleged irregularities as required under MCR 6.508(D)(3).

**XIII. The armed robbery instruction denied the Defendant due process of law by referring to the complainants as "victims".**

Defendant next argues that he was denied due process of law as the Court, within the armed robbery instruction, referred to the complainants as "victims." Defendant did not object to this instruction during the trial. As argued by defense counsel, the use of the term "victims" by the Court during jury instructions forecloses the jury's consideration of whether in fact the

complainants had been victims of a crime. According to Defendant, and pursuant to *People v Petrella*, 424 Mich 221, 227; 380 NW2d 11 (1985), it is error to give an erroneous or misleading jury instruction on an essential element of the offense and when the Court used the term "victim" rather than the name of the complainant, this implied that the judge instructed the jury that the offense actually took place. However, this Court did not err or give a misleading instruction on an essential element of the offense. The jury was in no way precluded from determining whether the crime was actually committed by the simple use of the term "victim" during one instruction. In fact, the Court of Appeals, while ruling on a similar issue involving the use of the term "victim" on the verdict form, stated:

> Even assuming that the jury form constituted "misdirection of the jury" for failure to indicate that they could choose not to render a verdict on one or more of the counts, there is no indication in the record that the jury would have chosen that option even had it been offered. The trial court polled each member of the jury to ask him or her if he or she agreed with the verdict and each responded affirmatively.

*People v Pouncy, supra*, pp 29. No substantial right of the defendant was infringed upon to warrant a new trial as required by *People v Bauder*, 269 Mich App 174, 180; 712 NW2d 506 (2005) and as cited by Defendant. Furthermore, such issue was argued in Defendant's direct appeal to the Michigan Court of Appeals which held that:

> Although defendant claims that the trial court entrusted the selection of jury instructions to Breczinski, the record demonstrates that defendant took an active role in deciding which instructions the court should give. Further, the trial court specifically asked both Breczinski and defendant if they were satisfied with the reading of the instructions and both expressed satisfaction with the reading. By expressly approving the instructions, defendant waived any claim of error. *People v Lueth*, 253 Mich App 670, 688; 660 NW2d 322 (2002).

*People v Pouncy, supra*, pp 21. MCR 6.508(D)(2) provides that the court may not grant relief to the defendant if the motion: "alleges grounds for relief which were decided against the defendant in a prior appeal or proceedings under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision." Defendant has made no such allegations. As a result, Defendant's arguments are without merit.

**XIV. Trial counsel was constitutional ineffective in failing to produce at trial three exculpatory witnesses, Charles Smith, Willie Joyce McKinley and Carrice Byrom, two alibi witnesses, Carrice Byrom and Helen Carr, as well as Sheriff Deputies in charge of the work release program, and in failing to investigate possible credit card transactions with credit cards alleged stolen from the complaining witnesses.**

The next argument presented also attacks Defendant's trial counsel and states Mr. Breczinski was constitutionally ineffective for failing to produce several witnesses at trial. However, during the actual trial in this case, Defendant asserted his right of self representation. In this regard, a defendant who asserts his right to self-representation has no entitlement to the effective assistance of advisory counsel. *People v Kevorkian*, 248 Mich App 373, 425-426; 639 NW2d 291 (2001). Because Defendant wished to represent himself during the pendency of his trial, it was his obligation to procure those witnesses that he deemed necessary for his defense. Defendant's argument is without merit. Additionally, because Defendant's argument as to ineffective assistance of appellate counsel has failed, Defendant cannot establish good cause for failure to raise such grounds on appeal or in a prior motion, nor can he establish actual prejudice stemming from the alleged irregularities as required under MCR 6.508(D)(3).

## XV. The cumulative effect of the errors and absence during the trial of the newly discovered evidence set forth above deprived the defendant of due process guaranteed under the United States and Michigan Constitutions.

Finally, post-appellate counsel states that the cumulative effect of the aforementioned arguments deprived the Defendant of due process of law. However, given the aforementioned disposition of Defendant's claims, and based on the denial of all Defendant's alleged errors, Defendant's Motion for Relief from Judgment in this regard must be **DENIED**.

## DEFENDANT POUNCY'S IN PRO PER SUPPLEMENT

In addition to the numerous aforestated arguments, Defendant, in pro per, has also presented 255 pages in supplement. Defendant's in pro per arguments will also be addressed in turn. With regard to Defendant's Response to the People's Answer in Opposition to Defendant's Motion for Relief from Judgment as well as Defendant's Response to People's Answer in Opposition to Defendant's Pro Per Supplemental Motion for Relief from Judgment, all arguments have been addressed and considered in this Court's Order and no further analysis is required in this regard.

## I. Defendant's wavier of counsel was constitutionally ineffective

Defendant, in pro per, first argues that his court appointed counsel, Mr. Breczinski, was constitutionally ineffective and that his waiver of counsel was constitutionally ineffective for the following reasons:

1. Since Defendant Pouncy was forced to choose between self admitted unprepared counsel or no counsel at all Defendant Pouncy's waiver of counsel was not a product of a free and meaningful choice;
2. Due to Defendant Pouncy being erroneously misled by the trial court, the prosecuting attorney, and trial counsel concerning the sentencing guidelines range Defendant Pouncy was subject to if convicted, renders Defendant Pouncy's waiver unknowingly and unintelligently made;

- 17 -

3. Due to the trial court's failure to ensure that Defendant Pouncy understood the charges and their associated penalties at the time of the waiver of counsel renders the waiver of counsel unknowingly and unintelligently made;

4. Due to the trial court failing to inform Defendant Pouncy of the statutory 2 year minimum sentence associated with the armed robbery offenses renders Defendant Pouncy's waiver of counsel unknowingly and unintelligently made;

5. Due to the trial court's failure to advise Defendant Pouncy of the potential problems that an incarcerated Defendant might encounter in obtaining evidence and locating and questioning witnesses before allowing him to represent himself, renders the waiver of counsel unknowingly and unintelligently made;

6. Due to the trial court failing to make an inquiry into the voluntariness of Defendant Pouncy's waiver of counsel on the record, voluntariness can not be presumed from the silent record and Defendant Pouncy's waiver of counsel must be assumed to be involuntary.

Despite these numerous arguments regarding Defendant's waiver of counsel within this motion, such issues were already decided against him in his prior appeal. As applicable to this issue and as stated by the Court of Appeals:

> In the present case, the record demonstrates that the trial court properly advised defendant of the risks of self-representation. The trial court told defendant that he would be a "fool" to represent himself and warned him that the court would treat him "like any other lawyer." Indeed, the trial court explained that defendant would be bound to comply with the court rules, which included making "objections and everything else." After defendant effectively asserted his right to represent himself, the trial court was not required to repeatedly pressure defendant into relinquishing that right. *People v Morton*, 175 Mich App 1, 7; 437 NW2d 284 (1989). Based on the totality of the exchanges, we conclude that the trial court properly apprised defendant of the risks associated with self-representation. . . . Moreover, the record reflects that the trial court repeatedly advised defendant of the charges against him, including the minimum and maximum prison sentences associated with the various charges, both at the beginning of trial and at every subsequent proceeding. See MCR 6.005(D). Additionally, the record reflects that throughout the entire proceedings, Breczinski was available to advise defendant as standby counsel and actively participated in the trial by performing voir dire and questioning witnesses. See MCR 6.005(D)(2).

*People v Pouncy, supra*, pp. 10. Pursuant to MCR 6.508(D), this Court "may not grant relief to the defendant if the motion: (2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceedings under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision." Defendant has not argued a retroactive change in the law applicable to such waiver. Defendant's in pro per arguments are without merit.

It should be noted that Defendant Pouncy argues at length that his choice between incompetent counsel and self representation is no choice at all. His arguments regarding the incompetence of counsel include failure to be prepared for trial and failure to hire an investigator. However, the Court of Appeals also decided this issue against Defendant Pouncy in his prior appeal. The Court looked to the multiple arguments of ineffective assistance of counsel presented by Defendant and ultimately held that Mr. Breczinski was not ineffective.

Additionally, within Defendant's in pro per Response to People's Answer in Opposition to Defendant's pro per Supplemental Motion for Relief from Judgment, Defendant cites at length the case of *Massaro v United States*, 538 US 500; 123 S Ct 1690 (2003) for the proposition that, whether argued specifically before the Court of Appeals or newly within this motion for relief from judgment, the claims of ineffective assistance of counsel claims are best brought before the trial court on collateral review and are not required to be presented on direct appeal. However, in *Massaro*, the Supreme Court was ruling under 28 USCA §2255. No argument has been raised making this holding applicable to a motion under MCR 6.500 *et al*. Defendant's arguments in this regard are without merit.

II. **Defendant Pouncy is entitled to a new trial due to the prosecution misleading the defense, trial court, and jury into believing that the complainant's phone records were of no value to defendant Pouncy's defense, when the prosecution erroneously misinformed that the phone calls from the perpetrator to the complainants weren't capable of being traced, when the phone calls were indeed capable of being traced to someone other than defendant Pouncy, and thereby effectively prevented defendant Pouncy from discovering and presenting exculpatory evidence.**

The next argument presented by Defendant in pro per relates to the alleged misconduct on the part of the prosecution to misinform the Defendant and the Court that the alleged phone calls from the perpetrator were incapable of being traced. Such argument was made by post-appellate counsel under section XI as well as in Defendant's in pro per Response to the People's Answer in Opposition to Defendant's Motion for Relief from Judgment and likewise at this juncture requires denial as Defendant's arguments are without merit.

III. **The Prosecutor's unproved allegations during opening statement that defendant Pouncy himself carjacked the '79 Camaro, and '03 truck, that defendant Pouncy robbed the complainants of their cell phones, that Wayne Grimes gave defendant Pouncy the cell phone after the robbery, that it was agreed upon in the car that they were going to rob the complainants of their cell phones, that Wayne Grimes ordered the complainants to give their cell phones up to defendant Pouncy, that defendant Pouncy drove the vehicles away from the scene of the crime, and that defendant Pouncy made the gun used during the Sept. 29, 2005 carjacking available so that Wayne Grimes could complete the robbery were so prejudicial and ultimately deprived defendant of his right to a fair trial.**

Defendant next argues prosecutorial misconduct during opening statements and further that the allegations asserted by the Prosecution were not substantiated during trial and were, therefore, highly prejudicial and deprived Defendant of his right to a fair and impartial trial.

Specifically, Defendant takes issue with the Prosecution's statements that Defendant carjacked the 1979 Camaro and the 2003 truck, that Defendant stole the victim's cell phone, that it was agreed prior to the commission of the crimes that the cell phones should be taken and, finally that Defendant make a gun available to Wayne Grimes to be used in the robbery.

As cited by the parties, "[t]he general rule is that when a prosecutor states that evidence will be submitted to the jury, which subsequently is not presented, reversal is not warranted if the prosecutor acted in good faith." *People v Pennington*, 113 Mich App 688, 694-695; 318 NW2d 542 (1982). In this regard, and during trial, the prosecution presented evidence through the testimony of Co-Defendant Wayne Grimes as to how the crimes were committed as well as Defendant's culpability therein. In addition, and as stated in post-appellate counsel's previous argument regarding prosecutorial misconduct during opening and closing statements, the jury was instructed by the Court that the lawyer's statements and arguments are not evidence. It is well established that jurors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Furthermore, because Defendant's argument as to ineffective assistance of appellate counsel has failed, Defendant cannot establish good cause for failure to raise such grounds on appeal or in a prior motion, nor can he establish actual prejudice stemming from the alleged irregularities as required under MCR 6.508(D)(3).

**IV. Defendant Pouncy's Sixth Amendment right to confrontation was violated when the prosecution placed a police report on the ledge which was ever admitted into evidence and only presented the prosecution's theory of the case and statements from non-testifying witnesses.**

The next argument presented again deals with prosecutorial misconduct and the placement of a police report in a location where jurors potentially could see the document. This argument was addressed previously by post-appellate counsel under subsection III as well as in Defendant's in pro per Response to the People's Answer in Opposition to Defendant's Motion for Relief from Judgment and is again, without merit for the aforestated reasons. The jurors were instructed that they could only consider evidence which was properly admitted and the jury is presumed to follow the instructions as given. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

**V. Defendant Pouncy was denied his right to discovery, when the prosecution failed to provide the defense with the written statement of its complainant, Thomas Sandstrom, and reversal is required.**

Defendant next argues, in pro per, that he was denied a written copy of the statement of Thomas Sandstrom requiring reversal. This argument was addressed previously in subsection IV of post-appellate counsel's motion as well as in Defendant's in pro per Response to the People's Answer in Opposition to Defendant's Motion for Relief from Judgment and similarly without merit for the aforestated reasons.

**VI. Defendant Pouncy was deprived of his right to due process due to the prosecution's failure to correct the false testimony of its "star witness", Wayne Grimes.**

Yet again, Defendant's in pro per argument regarding the false testimony of Wayne Grimes was addressed previously post-appellate counsel in subsection II as well as in Defendant's in pro per Response to the People's Answer in Opposition to Defendant's Motion for Relief from Judgment and remains without merit for the aforestated reasons. However, it should be noted that Defendant does offer the City of Clio Police Report regarding the arrest of Wayne Demetrius Grimes Jr. on May 14, 2005 on the charge of carrying a concealed weapon in a motor vehicle. In this regard, "a conviction will be reversed and a new trial will be ordered . . . only if the tainted evidence is material to the defendant's guilt or punishment." *Smith v Phillips*, 455 US 209, 219; 102 S Ct 940; 71 L Ed 2d 78 (1982); *Giglio v United States*, 405 US 150, 154-155; 92 S Ct 763; 31 Led 2d 104 (1972). There is no merit to Defendant's argument that the testimony concerning the arrest of Wayne Grimes was in any way material to Defendant's guilt or punishment. Additionally, Defendant had full and ample opportunity to cross examine Mr. Grimes during the trial. Furthermore, because Defendant's argument as to ineffective assistance of appellate counsel has failed, Defendant cannot establish good cause for failure to raise such grounds on appeal or in a prior motion, nor can he establish actual prejudice stemming from the alleged irregularities as required under MCR 6.508(D)(3).

**VII. When the prosecutor argued that defendant Pouncy created a lot of dust, threw up a lot of smoke, threw up a lot of mirrors, was a smooth talker, used a salesman's pitch in representing himself, was trying to talk his way out of the charges, and was very scheming this constitutes impermissible and inflammatory prosecutorial misconduct which attached defendant Pouncy in the capacity of being his own counsel and ultimately deprived him of a fair trial and constitutes a failure to respect defendant Pouncy's right to self-representation, which requires automatic reversal.**

Again, the argument of prosecutorial misconduct in the form of disparaging remarks aimed at Defendant in his capacity as his own attorney was addressed in the Motion for Relief from Judgment submitted by post-appellate counsel under subsection V as well as in Defendant's Response to the People's Answer in Opposition to Defendant's Motion for Relief from Judgment and for the aforestated reasons, is without merit.

**VIII. Due to the newly discovered evidence of the complaining witness, Thomas Sandstrom, identifying Wayne Grimes, as the perpetrator after trial, instead of defendant Pouncy, a new trial is required.**

Defendant's next in pro per argument claims that after Defendant's conviction, the complaining witness, Thomas Sandstrom, recanted his previous testimony and identification of Defendant as the perpetrator of the convicted crimes and, instead, identified Wayne Grimes as the perpetrator. In support of this, Defendant cites to the allocution of Mr. Sandstrom during the sentencing of Mr. Grimes that: " We've had to change all the locks on our door, Uh, our credit cards were stolen and he charged $4,000.00 that evening." (*People v Wayne Grimes*, 05-17155-FC, Sentencing Tr 02-02-06, pp. 12-13). Defendant contends that by Mr. Sandstrom's use of the word "he," Mr. Sandstrom unequivocally changed his identification of the perpetrator from Defendant to Wayne Grimes. Mr. Sandstrom gave no indication that he was changing his identification of the perpetrator. The statement of Mr. Sandstrom while at Mr. Grimes' sentencing is not evidence, was not under oath, and in no way contradicts Mr. Sandstron's

previous sworn identification of Defendant. This argument as well is wholly without merit. Furthermore, because Defendant's argument as to ineffective assistance of appellate counsel has failed, Defendant cannot establish good cause for failure to raise such grounds on appeal or in a prior motion, nor can he establish actual prejudice stemming from the alleged irregularities as required under MCR 6.508(D)(3).

**IX. The impermissible prosecutorial misconduct deprived defendant Pouncy of his right to a fair trial.**

Within the in pro per brief, Defendant argues he was denied his right to a fair trial based on the prosecutor's inflammatory statements during opening and closing arguments. Specifically, Defendant takes exception to the following:

1. The prosecutors display of a sign on the courtroom's overhead projector which said "Omar Pouncy is Guilty" both during opening statements and closing arguments, which effectively communicated to the jury that the prosecutor personally believed that Defendant Pouncy was guilty, and ultimately deprived Defendant Pouncy of his right to a fair trial;
2. The prosecutor's inflammatory characterizations of Defendant Pouncy as "A seller's worst nightmare" which deprived Defendant Pouncy of his right to a fair trial;
3. The prosecutor's improper vouching for its Star Witness, concerning the veracity of his testimony, deprived Defendant Pouncy of his right to a fair trial.

Again, these arguments were specifically addressed within the Motion for Relief from Judgment filed by post-appellate counsel in section XII as well as in to Defendant's in pro per Response to the People's Answer in Opposition to Defendant's Motion for Relief from Judgment. For the aforestated reasons, Defendant's arguments are without merit.

**X. Stand-by Counsel had no authority to stipulate that defendant Pouncy's right to possess a firearm had not been restored pursuant to Michigan law, thereby stipulating that defendant Pouncy was a convicted felon. This interference by stand-by counsel blatantly failed to respect defendant Pouncy's right to self-representation and constitutes a denial of his right to self-representation and its denial is not amendable to harmless error analysis.**

The next argument presented by Defendant in pro per and also previously addressed concerns stand by counsel Breczinski's stipulation that Defendant Pouncy was a convicted felon for purposes of the felon in possession charge brought against Defendant. Such arguments were presented in subsection IX of Defendant's Motion for Relief from Judgment filed by post-appellate counsel as well as in Defendant's in pro per Response to the People's Answer in Opposition to Defendant's Motion for Relief from Judgment and are without merit for the aforementioned reasons.

**XI. Defendant Pouncy was deprived of his right to the effective assistance of counsel and was thereby prejudiced.**

- 22 -

Defendant's next in pro per argument relates to alleged ineffective assistance of counsel of Attorney Breczinski. Defendant specifically argues the following:

1. Counsel was ineffective for failing to object to the trial court's unconstitutional practice of closing the courtroom to the general public during jury selection, when the trial court told the audience to go in the hallway during jury voir dire and certain motion hearings, thereby allowing Defendant Pouncy to be deprived of his absolute right to a fair public trial;

2. Counsel was constitutionally ineffective when he failed to move to have the prosecution's star witness barred from testifying, when a valid legal basis existed to do so, when Wayne Grimes was present during the entire preliminary examination, and thereby was in violation of the sequestration order issued by the district court Judge;

3. Counsel was ineffective for failing to move for a continuance to properly prepare for trial once he learned on the day of trial that the prosecution would be permitted to introduce evidence of crimes he knew nothing about;

4. Counsel was constitutionally ineffective when he failed to object to the prosecutor displaying a sign representing the prosecutor's personal belief in Defendant Pouncy's guilt during opening statements;

5. Counsel was constitutionally ineffective when he failed to interview exculpatory witnesses and witnesses who the prosecution had endorsed as witnesses they intended to produce at trial, thereby failing to investigate.

Though Defendant attempts to argue that trial counsel Breczinski was ineffective, the Michigan Court of Appeals specifically held otherwise and stated succinctly "Defendant was not deprived of the effective assistance of counsel." *People v Pouncy, supra,* pg 23. Though several of the distinct issues presented herein may have not specifically been argued and ruled upon by the Court of Appeals, "[i]neffective assistance of counsel is a single ground for relief no matter how many failings a lawyer may have displayed." *People v US,* 403 F3d 844, 894 (CA 7, 2007). "It is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief." *Id.* Given that the Court of Appeals has previously decided this issue against Defendant, this Court may not grant relief pursuant to MCR 6.508(D).

**XII. Defendant Pouncy's counsel's incompetent advice concerning his guideline range, which resulted in defendant Pouncy's rejection of the plea offer constitutes ineffective assistance of counsel. Based on the inaccurate information provided to defendant Pouncy, concerning the sentencing guideline range he faced, by the trial court, the prosecutor, and trial counsel the plea agreement which was offered must be reinstated.**

Again, Defendant argues ineffective assistance of trial counsel. Whether regarding Mr. Breczinski as standby counsel or Defendant Pouncy in his capacity as his own attorney, based on

the foregoing analysis and the Court of Appeals prior ruling, Defendant's arguments are without merit pursuant to MCR 6.508(D).

XIII. **Counsel was constitutionally ineffective for failing to file a motion for severance when the right existed because the joinder of two separate carjacking/armed robbery incidents arising out of two separate transactions embarrassed and confounded defendant Pouncy in making his defense, where defendant Pouncy, against his wishes, testified concerning both transactions, when he had only wished to testify concerning one of the carjacking/armed robbery transactions and wished to remain silent on the other and the joinder was prejudicial because it compromised his right to remain silent.**

Again, Defendant argues ineffective assistance of counsel for failure to file a motion for severance, an issue that was specifically brought before the Court of Appeals and denied. In *People v Pouncy, supra*, pp. 17 the Court of Appeals stated:

> Under some circumstances, a defendant's trial counsel might reasonably conclude that it would best serve the client's interests to defend against charges, which could otherwise by severed under MCR 6.120(C), at a single trial. In the present case, defendant's trial counsel may very well have determined, among other things, that defendant had a better chance of obtaining an acquittal of some or all of the charges in a trial before a single jury. The fact that this decision proved to be wrong does not transform an otherwise reasonably competent decision into one that falls below an objective standard of reasonableness. See *People v Mitchell*, 454 Mich 145, 171; 560 NW2d 600 (1997) ("[T]he Sixth Amendment guarantees a range of reasonably competent advice and a reliable result. It does not guarantee infallible counsel."). Because defendant failed to overcome the strong presumption that his trial counsel's decision not to request a severance was sound trial strategy, he is not entitled to a new trial on the basis of ineffective assistance of counsel for failing to request a severance.

Pursuant to MCR 6.508(D), this Court "may not grant relief to the defendant if the motion: (2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceedings under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision." Defendant has not argued a retroactive change in the law applicable and, therefore, Defendant's in pro per arguments are without merit.

XIV. **Trial counsel was constitutionally ineffective for failing to have the prosecution specify with time (dates) of the alleged offenses, where time was of an essence and was necessary in order for defendant Pouncy to put forth an effective defense, the 13 day time period (September 29, 2005 through October 11, 2005) in which the jury had to conclude the offenses occurred on was too broad, and made it possible that some jurors may have found that the offenses occurred on September 29, 2005, while others**

- 24 -

may have found the offenses occurred October 11, 2005 and other jurors were permitted to conclude that the offenses occurred on any other date all within the (September 29, 2005 through October 11, 2005) time period. It was therefore impossible for defendant to effectively defend against the charges due to the wide time period in which the jury was permitted to find that the offenses occurred on.

Again, Defendant argues ineffective assistance of counsel. Whether applicable to Mr. Breczinski as standby counsel or Defendant Pouncy in his capacity as his own attorney, based on the foregoing analysis and the Court of Appeals prior ruling, Defendant's arguments are without merit pursuant to MCR 6.508(D).

**XV. Trial counsel provided ineffective assistance by failing to investigate and have the shoe print impression from the scene of the crime examined by a defense expert to determine the shoe size, to show to the jury that the shoe print impression did not belong to defendant Pouncy, in support of the defense theory that defendant Pouncy was not present a the scene of the crime.**

Defendant's fifteenth argument also claims ineffective assistance of counsel. As stated previously, whether applicable to Mr. Breczinski as standby counsel or Defendant Pouncy in his capacity as his own attorney, based on the Court of Appeals prior ruling and the disposition of post-appellate counsel's argument in subsection VIII of Defendant's Motion for Relief from Judgment, Defendant's arguments are without merit pursuant to MCR 6.508(D).

**XVI. Defendant Pouncy is entitled to a new trial based on the newly discovered evidence, an affidavit signed by one of his codefendants who was unavailable at the time of trial who is going to offer exculpatory testimony in defendant Pouncy's favor and thereby testify that defendant Pouncy did not commit the offenses and was not involved.**

Defendant brings his next in pro per argument based on the alleged newly discovered evidence in the form of an affidavit of co-defendant Tiakawa Leondis-Terrel Pierce. This is the same argument presented by post-appellate counsel in subsection X and for the same reasons addressed above, Defendant's argument is without merit.

**XVII. The trial court arbitrarily deprived defendant Pouncy of his right to present a defense when it barred defendant Pouncy from calling Wayne Grimes during the defense side of the case "to get down to the truth."**

Defendant, in pro per, argues yet again that he was denied his right to present a defense as he was unable to call Wayne Grimes during his case in chief. This argument was presented in subsection VII of Defendant's Motion for Relief from Judgment filed by post-appellate counsel as well as in Defendant's in pro per Response to the People's Answer in Opposition to Defendant's Motion for Relief from Judgment and is without merit for the aforementioned reasons.

**XVIII. The trial court's instruction which told the jury that as a matter of law the complainants were indeed actually "victims," took away essential elements away [sic]**

from the offenses, overemphasized the prosecution's theory, and ultimately invaded the province of the jury.

Defendant's eighteenth argument again addresses this Court's instruction by referring to the complainants as victims. This argument was addressed previously in subsection XIII of post-appellate counsel's motion as well as in Defendant's in pro per Response to the People's Answer in Opposition to Defendant's Motion for Relief from Judgment and is without merit for the aforestated reasons.

**XIX. The trial court interfered with defendant Pouncy's stated and federal constitutional rights to a fair jury trial when he refused to hold an evidentiary hearing on the question of whether jurors were prejudiced or biased due to any "extraneous influences" when one juror reported to the court that he received a phone call from the Genesee County Jail during a weekend recess and he believed defendant Pouncy was the individual who called him.**

Defendant next addresses the issue of extraneous influence on the jury. This argument was addressed previously in subsection IV of post-appellate counsel's motion as well as in to Defendant's in pro per Response to the People's Answer in Opposition to Defendant's Motion for Relief from Judgment and is without merit for the aforestated reasons.

**XX. The trial court violated defendant Pouncy's right to due process by failing to recuse itself sua sponte, knowing that it had deep seated antagonism against defendant Pouncy and due to the trial court's preconceived notion of guilt.**

Defendant next argues that this Court violated his right to due process by failing to recuse itself due to an alleged deep seated antagonism and preconceived notion of guilt. Under MCR 2.003(C)(1)(a) (formerly MCR 2.113(B)(1)) disqualification of a judge is warranted if "[t]he judge is biased or prejudiced for or against a party or attorney. Pursuant to *Cain v Michigan Department of Corrections*, 451 Mich 470, 500; 548 NW2d 210 (1996):

> Simply stated, a showing of "personal" bias must usually be met before disqualification is proper. This requirement has been interpreted to mean that disqualification is not warranted unless the bias or prejudice is both personal and extrajudicial. Thus, the challenged bias must have its origin in events or sources of information gleaned outside the judicial proceeding.

In this regard, Defendant cites to statements made by the Court on February 2, 2006 at the sentencing of a co-defendant which occurred after a six day trial between January 24, 2006 and February 1, 2006. Specifically, Defendant refers to this Court's following statement referring to Defendant: "he's got issues, unfortunately." Defendant cites no law or makes no argument that such statements were personal or extrajudicial nor is there any indication that the origin of such statements came from information gleaned outside the judicial proceeding. As previously stated, this court had just finished a six day trial wherein Defendant was jury convicted. Again, Defendant's arguments are without merit.

**XXI. Defendant Pouncy was deprived of his right to a fair trial due to the cumulative effect of errors that riddled his trial.**

Defendant next argues that he was deprived of his right to a fair trial based on the cumulative effect of the above argued "errors." However, "[b]ecause no errors were found with regard to any of the above issues, a cumulative effect of errors is incapable of being found." *People v Mayhew*, 236 Mich App 112, 128; 600 NW2d 370 (1999).

**XXII. Appellate counsel's failure to timely file the motion for permission to file brief in excess of 50 page constitutes ineffective assistance of counsel and defendant Pouncy was thereby prejudiced because this error prevented him from having the issues, raised herein on the motion for relief from judgment, raised on his direct appeal of right. Had the issues raised herein been raised on his direct appeal of right it's a reasonable probability that the outcome of his direct appeal would have been different.**

Defendant next argues that appellate counsel's failure to timely file a motion for permission to file a brief in excess of 50 pages in the Court of Appeals was ineffective assistance of counsel because all the arguments currently presented to the Court were not presented to the Court of Appeals in Defendant's direct appeal. Such argument was addressed previously under subsection I of post-appellate counsel's Motion for Relief from Judgment and as stated above, Defendant was not deprived of effective assistance of appellate counsel.

**XXIII. The good cause requirement is satisfied in this case, because appellate counsel's ineffectiveness on direct appeal of right prevented defendant Pouncy, raising the issues which are being raised herein, on the motion for relief from judgment during his direct appeal of right. The only recourse available is to raise the remaining issues that could not be contained in the initial brief on direct appeal is to raise them at the motion for relief form judgment stage.**

Argument twenty-three relates directly to appellate counsel's alleged ineffectiveness. Again, such arguments are without merit and Defendant has failed to establish good cause for his failure to raise these issues in his prior appeals of right.

**XXIV. The actual prejudice requirement is also satisfied in the case at bar, because but for some of the issues raised herein defendant would have had a reasonable likely chance of acquittal, and some of the irregularities were so offensive to the maintenance of a sound judicial process that the convictions should not be allowed to stand regardless of its effect on the outcome of the case.**

Defendant's final argument within his Supplemental Motion for Relief from Judgment is that he has satisfied the actual prejudice requirement of MCR 6.508(D)(3). However, Defendant has not established actual prejudice. Again, the multitude of arguments presented by Defendant within this supplemental motion are meritless and absolutely no showing has been made under the law that "but for the alleged error, the defendant would have had a reasonably likely chance

of acquittal." As stated by the Court of Appeals "[a]t trial, there was considerable evidence that defendant committed the charged offenses, including the testimony of defendant's coconspirator in the carjackings." *People v Pouncy, supra*, pp. 19. Based on the foregoing analyses of both Defendant's Motion for Relief from Judgment as well as Defendant's in pro per Supplemental Motion for Relief from Judgment as well as each additional supplement and response filed by Defendant in pro per, as a whole, Defendant's Motion for Relief from Judgment must be **DENIED.**

## RETROACTIVE CHANGE IN LAW

Finally, and within a separate supplement filed by post-appellate counsel on May 19, 2010, Defendant argues that he is entitled to a new trial based on *Presley v Georgia*, 558 US ___; 130 S Ct 721; ___ : ___ L Ed 2d ___ (2010). Within *Presley*, the United States Supreme Court held that the defendant's Sixth Amendment right to a public trial was violated when the trial court excluded the public from the voir dire of prospective jurors. From this, defendant argues that a new trial should be ordered in this case. This same argument was presented to the Michigan Court of Appeals (though admittedly before the Supreme Court's decision in *Presley*) and specifically the Court of Appeals held:

> In his Standard 4 brief, defendant raises numerous additional claims of error, which he contends warrant relief. Specifically, defendant argues that he was deprived of a fair trial . . . by the trial court's deprivation of the defendant's right to have the public present during certain motion hearings and voir dire. . . We have carefully examined these claims of error and conclude that none of them have merit.

*People v Pouncy, supra*, pp. 31. MCR 6.508(D)(2) provides in pertinent part that the court may not grant relief to the defendant if the motion: "alleges grounds for relief which were decided against the defendant in a prior appeal or proceedings under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision"

In this regard, Defendant contends that *Presley, supra*, established such a retroactive change in the law that undermined the prior decision. However, the United States Supreme Court in *Presley* did not announce a new right nor was it a change in the law. The *Presley* Supreme Court relied heavily on their prior precedent and stated, citing *Gannett Co v DePasquale*, 443 US 368, 380; 99 S Ct 2898; 61 L Ed 2d 608 (1979): "Our cases have uniformly recognized the public-trial guarantee . . ." The highest Court gave no indication within *Presley* that it was either establishing a new right or law or that such new right or law was to be retroactive. Therefore, and pursuant to MCR 6.508(D)(2), this Court is unable to provide relief to Defendant Pouncy in this regard.

WHEREFORE, Defendant's Motion for Relief from Judgment in its entirety and including and an all supplements is hereby **DENIED**. Any further documents filed or submitted by Defendant will be addressed pursuant to the Court Rules and pursuant to MCR 6.502(G).

**IT IS SO ORDERED.**

Dated: 11/3/10

Honorable Archie L. Hayman
Circuit Court Judge (P37516)