UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OMAR RASHAD POUNCY,

      Petitioner,                                Case No. 13-cv-14695
                                                    Hon. Matthew F. Leitman

v.

CARMEN D. PALMER,

      Respondent.

_____/

## OPINION AND ORDER CONDITIONALLY GRANTING WRIT OF HABEAS CORPUS

In *Faretta v. California*, 422 U.S. 806 (1975), the United States Supreme Court held that a criminal defendant has a constitutional right to represent himself at trial. But the Supreme Court stressed that a defendant's waiver of his right to counsel (and decision to defend himself) is valid only if it is truly voluntary – a free "choice" made with "eyes wide open." *Id*. at 835.

In this case, Petitioner Omar Rashad Pouncy ("Pouncy") waived his right to counsel and represented himself at his criminal trial, but he did not make a free "choice" to do so. He chose to represent himself only because his attorney was admittedly and obviously unprepared for trial. Under these circumstances, Pouncy's decision to forego his right to counsel was "no choice at all." *James v. Brigano*, 470 F.3d 636, 644 (6th Cir. 2006). Pouncy's waiver of counsel thus

1

clearly failed to comply with *Faretta*. The Michigan Court of Appeals nonetheless held that the waiver was constitutionally sufficient. That was an unreasonable application of *Faretta*. Pouncy is therefore entitled to habeas relief.

## I.

In 2005, the Saginaw County Prosecutor charged Pouncy with four counts of carjacking, four counts of armed robbery, two counts of felony firearm, and one count of felony possession of a firearm. (*See* 1-24-2006 Trial Tr., ECF #8-7 at 18, Pg. ID 473.) The prosecutor alleged that Pouncy and an accomplice contacted individuals who had advertised a vehicle for sale, lured those individuals to an isolated area, and then carjacked them at gunpoint. (*See id.* at 203-04, Pg. ID 659-60.)

Pouncy, who was eighteen years old at the time of trial, did not have the resources to post bond and was held in custody from the time he was first charged up through (and including) his trial. Nor could Pouncy afford an attorney. The state court therefore appointed defense attorney Michael Breczinski ("Breczinski") to represent Pouncy. Pouncy told Breczinski that his primary defense to the charges was that he had an alibi and that the prosecution had the wrong man. (*See, e.g.*, *id.* at 5, 14, Pg. ID 460, 469.)

Pouncy was arraigned in the state trial court on November 14, 2005. (*See* Register of Actions, ECF #8-42 at 2, Pg. ID 3204.) That court scheduled Pouncy's

2

trial to begin just eight weeks later, on January 10, 2006. (*See id*.) Breczinski did not file a single substantive motion on Pouncy's behalf between the arraignment and the scheduled trial date. His only motion requested a modest two-week adjournment of the trial, which the court granted. (*See id.* at 3, Pg. ID 3205.) But Breczinski did not use the extra time to file any other motions of any kind. (*See id.*)

Pouncy's trial began on January 24, 2006, a mere ten weeks after his arraignment. (*See id*.) As soon as the presiding judge called the case on the record that morning, Breczinski expressed concern about whether he was sufficiently prepared to begin trial. (*See* 1-24-2006 Trial Tr., ECF #8-7 at 3-4, Pg. ID 458-59.) Breczinski told the judge that that there was a large volume of materials to review and "a number of leads" to pursue; that he "would have been stretched too thin" to do all of the necessary work himself; and that he therefore hired a private investigator to conduct a substantial portion of the investigation into Pouncy's defenses. (*Id.* 12-13, Pg. ID 467-68.) Breczinski said that he put the investigator in contact with Pouncy and that he gave the investigator access to his complete file. (*See id.* at 11-12, Pg. ID 466-67.) Breczinski then explained that the investigator had provided an initial oral report stating, at that time, that he had found "nothing on some of the leads that we have as to possible alibi witnesses and such." (*Id.* at 3-4, Pg. ID 461-62.) Breczinski stressed, however, that he had not yet received the

3

investigator's "final written report," and that he thus could not be certain that he was prepared for trial. (*Id.*)

Breczinski told the judge that "[w]ithout [the] written report," he could only "assume," based on the investigator's "reputation and past performance," that the investigator had done a thorough review of the case (*id.* at 17, Pg. ID 472); Breczinski candidly admitted that he did not "know" whether the investigator had, in fact, conducted a complete review. (*See id.*) Breczinski also acknowledged that he was unable to assess his own level of preparation "because [he did not] have that full detailed report from [the investigator] which [he] was expecting." (*Id.* at 4, Pg. ID 459.) In Breczinski's words: "[s]ince I have *no* details[,] to say whether I'm ready for trial or not is *problematic*…." (*Id.*; emphasis added.)[1]  Simply put, Breczinski could not assure the court, or Pouncy, that he (or his investigator) had completed the investigation into Pouncy's intended primary defenses at trial – Pouncy's claimed alibi and the mistaken identification by the prosecution's witnesses.

Despite Breczinski's insistence that he did not know if the investigator had completed his work, the trial court concluded that the investigator *had* completed

---

[1] In response to Breczinski's concerns, the assistant prosecutor assigned to the case expressed his "understanding" that the investigator had made attempts to develop support for Pouncy's alibi and mistaken identification defenses but "was unsuccessful in furthering the defense's theory or investigation." (1-24-2006 Trial Tr., ECF #8-7 at 4, Pg. ID 461.) But the prosecutor did not explain the basis for his "understanding."

4

his review of Pouncy's possible defenses and found *nothing*. The judge said "[w]hat it sounds like to me then is that the investigator has filed, followed up with the leads and he just hasn't been able to come up with anything." (*Id.* at 11, Pg. ID 466.)

Pouncy also raised concerns about Breczinski's lack of preparation at the very beginning of the proceedings. Pouncy told the trial judge that Breczinski had failed to communicate with him (*see, e.g.*, *id.* at 5-7, Pg. ID 460-62) and that "today" (i.e., the morning of the first day of trial) was "our first time really talkin[g]." (*Id.* at 5, Pg. ID 460). Breczinski explained that he had visited Pouncy in jail roughly six times, but Pouncy asserted that Breczinski had not stayed longer than ten or fifteen minutes during any of these meetings. (*See id.* at 7-8, Pg. ID 462-63.) Pouncy insisted that during these short visits, Breczinski simply "drop[ped] off [] piece[s] of paper" like a transcript and did not "talk" to him. (*Id.* at 8, Pg. ID 463.) Pouncy further told the judge that he had not yet received any discovery materials. (*See id.* at 6, Pg. ID 461.) Notably, Breczinski never disputed Pouncy's description of their interactions nor did Breczinski claim to have delivered any discovery materials to Pouncy. Pouncy finally complained that he was "not getting proper representation" from Breczinski; said that he did not "feel comfortable" proceeding to trial with such unprepared counsel; and he asked the judge to appoint him a new lawyer. (*Id.* at 6-7, Pg. ID 461-62.)

5

In response, the trial judge told Pouncy that he (Pouncy) was "not in a position to judge whether Mr. Breczinski" was providing him proper representation, and the judge assured Pouncy that Breczinski was an experienced and competent attorney. (*Id.* at 9-11, Pg. ID 464-66.) And when Pouncy continued to express his concerns about proceeding to trial with unprepared counsel, the trial judge told Pouncy that the trial was going to begin that morning because "we got a jury downstairs that's ready to go…." (*Id.* at 10, Pg. ID 465.) The judge added that if Pouncy wished to remain present for his trial that he needed to "keep [his] mouth shut" (*Id.* at 18, Pg. ID 473), and that to prevent interruptions he would "gag [Pouncy] right there in the seat and have the jurors to [sic] sit [there] and watch [him] with a gag in [his] mouth during the entire trial." (*Id.* at 16, Pg. ID 471.)

Before bringing the prospective jurors into the courtroom, the trial judge asked counsel to compare the prosecution's final plea offer to Pouncy's sentencing exposure in the event of a conviction following a trial. In the context of that discussion, the judge noted that the armed robbery charge "carrie[d] [a possible] life" sentence, and he then asked Breczinski to "tell me what [Pouncy's sentencing] guidelines" would be in the event Pouncy was convicted on all counts. (*Id.* at 19-20, Pg. ID 474-75.) Breczinski responded that the guidelines range was 135 to 337 months in prison – roughly eleven and one-half to twenty-eight years.

6

(*See id.* at 20-21, Pg. ID 475-76.)  Based upon Breczinski's calculations, the judge explained to Pouncy that "the guidelines say I should give you a sentence somewhere between eleven and-a-half to twenty-eight, eight years" if Pouncy was convicted on all the charges brought against him.  (*Id.* at 21, Pg. ID 476.)

It turns out that Breczinski – whose experience and abilities the trial judge had touted to Pouncy – had materially miscalculated the guidelines range (which the trial court then incorrectly accepted and repeated to Pouncy).  The true range was 225 months to 562 months (*see* Sentencing Tr., ECF #8-16 at 34, Pg. ID 1936), but that range was not discovered until after Pouncy was convicted.

Before summoning the jury pool to the courtroom, the trial judge also heard arguments on two motions in limine made by the prosecution.  In one of the motions, the prosecutor sought to admit a purported tape recording of Pouncy threatening a witness.  The prosecutor explained that the allegedly-threatened witness could lay the required foundation for the recording by identifying Pouncy's voice, and the prosecutor argued that the recording was admissible "to show consciousness of guilt." (1-24-2006 Trial Tr., ECF #8-7 at 30-31, Pg. ID 485-86.) As support for admission of the recording, the prosecutor cited authority from both the Michigan Supreme Court and the Michigan Court of Appeals.  (*See id.*)

Breczinski's primary response to this motion was two jumbled sentences: "Your Honor, if it was just that we'd be jumping up and down about it.

7

Unfortunately, for my client they've also, the, at least the, they've informed me, at least through that they apparently have the call traced from the, these people, was it the Sandstroms?" (*Id.* at 31, Pg. ID 486.)   But the prosecutor quickly corrected Breczinski and clarified that the recorded call had *not* been traced back to Pouncy. (*See id.* at 31-32, Pg. ID 486-87.)   And even though Breczinski said that if the call had not been traced, he would be "jumping up and down" to oppose admission of the recording, he then offered no objection at all to its admission. (*See id.* at 34, Pg. ID 489.)   Moreover, Breczinski did not even acknowledge, much less attempt to distinguish, the case law cited by the prosecutor.

In the second motion in limine, the prosecution sought to introduce alleged prior bad acts evidence against Pouncy under Michigan Rule of Evidence 404(b). (*See id.* at 24-25, Pg. ID 479-80.)   Breczinki offered only token opposition – three spoken sentences – to that motion. (*See id.*)

Breczinski's handling of the motions in limine appears to have heightened Pouncy's concerns about proceeding to trial with Breczinski as his lawyer.   Just before opening statements, Pouncy asked the trial judge if he had "the right to represent [himself]." (*Id.* at 191, Pg. ID 647.)   The judge responded that if Pouncy chose to represent himself, then he would have to do so "in total," with Breczinski merely "sitting there." (*Id.*)   The judge then told Pouncy that if he chose to represent himself that he would "really [be] a fool" because Pouncy did not "have

8

a clue as to what [he would be] doin'." (*Id.* at 192, Pg. ID 648.)  Pouncy responded that he knew he was "not guilty" and, for the time being, dropped his request to represent himself.  (*Id.*)

Pouncy's anxiety about proceeding with Breczinski as his counsel arose again during the prosecutor's opening statement.  When the prosecutor finished addressing the jury, Pouncy asked the trial judge if he (Pouncy) could give his own opening statement and if Breczinski could from that point forward assist him in making objections. (*See id.* at 212-13, Pg. ID 668-69.)  Pouncy again complained to the judge that Breczinski never meaningfully "talk[ed] to him" about the case and that Breczinski's knowledge was thus limited to the facts described by the police in the discovery materials. (*Id.* at 214-18, Pg. ID 670-74.)  The trial judge told Pouncy that he would have to choose between representing himself and having Breczinski serve as trial counsel; the judge would allow only one of them to "be the lawyer." (*Id.* at 213, Pg. ID 669.)  And the judge strongly advised Pouncy to be "very careful" before deciding to represent himself because Pouncy was not familiar with the applicable laws and rules of procedure. (*Id.*)  The judge told Pouncy that if he (the judge) was in Pouncy's position, he "would let Mr. Breczinski represent me in a heartbeat before I would represent myself with the knowledge you have." (*Id.* at 216-17, Pg. ID 672-73.)

Pouncy then asked the trial judge if it was "an option" for him "get" new counsel to replace Breczinski.  (*Id.* at 215-16, Pg. ID 671-72.)  The judge replied: "if you want to decide who's going to represent you then you get your money together and you go hire the lawyer you want to represent.  Otherwise, you're gonna get the lawyer that we appoint for you to represent you" (i.e., Breczinski). (*Id.* at 216, Pg. ID 672.)  Pouncy then told the judge that he would, indeed, proceed to hire his own lawyer, but the judge told him that it was too "late for that" because it was "trial day."  (*Id.*)  The judge finally declared that they were "at the end of this conversation," and he told Breczinski that "it looks like you'll be making the opening statement." (*Id.* at 217-18, Pg. ID 673-74.)  Breczinski then did so.

Breczinski's opening statement was brief – taking up just two transcript pages. (*See id.* at 219-21, Pg. ID 675-77.)   Breczinski first conceded that the complaining witnesses were robbed and told the jury that the only "issue is whether or not Omar Pouncy did it." (*Id.* at 219-20, Pg. ID 675-76.)  Breczinski then said the complaining witnesses "really hadn't met [Pouncy] much;" that the robberies were "relatively short thing[s];" that the alleged accomplice who would be testifying against Pouncy had a motive to frame him; and that the prosecution did not have any DNA evidence or fingerprints. (*Id.* at 219-21, Pg. ID 675-77.) But Breczinski did *not* tell jurors that they *would* have a reasonable doubt after hearing all of the evidence.  Instead, Breczinski told the jurors that "*if* there's a

10

reasonable doubt as to [whether Pouncy was involved in the carjackings]," then "we'll be asking you to come back with a verdict of not guilty." (*Id.* at 221, Pg. ID 677; emphasis added.)

Breczinski's opening statement was apparently the "last straw" for Pouncy. He took over his own defense beginning with the cross-examination of the prosecution's first witness.   Before he began representing himself, Pouncy had the following exchange with the trial judge:

> MR. BRECZINSKI: During the direct examination of what is the first witness of this matter, Mr. Scott Davis, my client wrote a note which he passed me that says, and I quote, "I'm gonna represent myself from now on so you can tell the Judge" and he apparently does desire that he definitely wishes to represent himself.
>
> THE COURT: Okay Mr. Pouncy would you stand sir? Is that your desire at this time? Please remain standing sir. Mr. Pouncy you understand you have the right to an attorney and you have the right to Court appointed counsel if you can't afford one, do you understand that?
>
> MR. POUNCY: *I don't have attorney right now*.
>
> THE COURT: Sir I'm just asking you do you understand your rights sir?
>
> MR. POUNCY: Oh yes I do understand.
>
> THE COURT: You understand that if you represent yourself that I will have to treat you like any other lawyer and if you don't comply with the Court rules I'm gonna have to call you on it you understand that?
>
> MR. POUNCY: Yes sir.

THE COURT: And you understand that Mr. Breczinski will be here just simply to advise you from this trial forth and if you stand up and start representing yourself you're not gonna be able to change horses in the middle of the stream. You're gonna be representing yourself from beginning to end sir. Is that what you really want to do?

MR. POUNCY: Yes. Yes.

THE COURT: Mr. Pouncy I'm gonna tell you that in my opinion you have no business representing yourself, none whatsoever.

MR. POUNCY: The fact that they found the (inaudible) shoe –

THE COURT: Sir I just, sir I just want you to understand that uh –

MR. POUNCY: All right I'm ready to go then.

THE COURT: All right then Mr. Breczinski have a seat and Mr. Pouncy have a seat sir.

MR. POUNCY: (Inaudible)

THE COURT: Yes sir. And everyone stand. Trish bring the jury back in.

(At 3:20 p.m., Jury enters room)

THE COURT: Everyone stand yes. Ladies and gentlemen please have a seat. We're on the record. Ladies and gentlemen at this time I have to advise you that Mr. Pouncy has decided to represent himself in this trial and I want you to understand that if, since he's decided to represent himself, that this Court has an obligation to hold him to the same standard as I would any other lawyer and so if for some reason I have to make rulings, I don't want

12

you to think that my rulings are any indication of my opinion about this case. My rulings are gonna be simply based on what the law requires me to do and in no way, shape or form reflects my opinion about this case and I just want you to understand that. With that Mr. Pouncy do you wish to cross-examine the witness sir?

MR. POUNCY: Yes.

(*Id.* at 232-34, Pg. ID 688-90; emphasis added.)

From that point forward, Pouncy represented himself. As the trial moved forward, the judge confirmed Pouncy's continuing desire to represent himself through a number of exchanges like the following:

THE COURT: All right Mr. Pouncy if you would stand sir? Again I want to advise you that you have the right to an attorney, you have the right to Court appointed counsel if you cannot afford an attorney. This Court has appointed an attorney to represent you and you've made it clear that you want to represent yourself. Again, I, I would caution you against representing yourself because of the procedural aspects and your unfamiliarity with the procedures. However, if you choose to represent yourself then I have to allow you to but I would again advise you not to represent yourself in this matter. So what do you choose to do at this time sir?

MR. POUNCY: Continue with the same decision if that's okay?

THE COURT: And you would continue, choose to continue representing yourself?

MR. POUNCY: Yes.

(1-26-2006 Trial Tr., ECF #8-10 at 5-6, Pg. ID 985-86.)

13

The jury ultimately found Pouncy guilty on all of the charges brought against him.  When Pouncy appeared for sentencing, the trial judge confirmed that the sentencing guidelines range was much higher than Breczinski had calculated and that the Court had previously told Pouncy.  The actual range was 225-562 months.  (*See* Sentencing Tr., ECF #8-16 at 34, Pg. ID 1936).)  The trial court sentenced Pouncy to a term of 562-800 months in custody.  (*See id.* at 81, Pg. ID 1983.)  The minimum term of this sentence was 225 months longer than the *highest* end of the guidelines calculated by Breczinski (and adopted by the trial court) before trial.

## II.

Pouncy appealed his conviction to the Michigan Court of Appeals, and that court affirmed. *See People v. Pouncy*, 2008 WL 9869818 (Mich. Ct. App. Mar. 25, 2008).  The state appellate court rejected Pouncy's claim "that he did not knowingly, intelligently, and voluntarily waive his right to have counsel represent him at trial." *Id.* at *4.  The appellate court first explained that a trial court must make three findings before accepting a waiver of counsel: (1) that the request for self-representation is unequivocal; (2) that the waiver of counsel is knowingly, intelligently, and voluntarily made; and (3) that the defendant will not disrupt the proceedings. *See id.* at *5.  The appellate court also recognized its obligation to

14

"indulge every reasonable presumption against waiver" and to refrain from presuming a waiver from a silent record. *Id.*

After quoting at length from the exchanges between Pouncy and the trial judge (described above), the appellate court offered the following analysis:

> As can be seen from these exchanges, this is not a case where defendant "steadfastly rejected the option of proceeding to trial without the assistance of counsel," by repeatedly insisting on the appointment of substitute counsel. *Russell, supra* at 192.    Rather, defendant repeatedly raised the issue of self-representation. After defendant's initial inquiry about his entitlement to represent himself, several exchanges transpired between defendant and the trial court regarding whether he actually wished to represent himself. But after each exchange the trial court erred on the side of ruling against waiver. During the last exchange, defendant confirmed that he understood the risks associated with self-representation and ultimately indicated that he was ready to proceed. Only then did the trial court permit defendant to represent himself.
>
> \*\*\*
>
> Defendant also argues that his waiver was not knowing and intelligent because the trial court failed to adequately advise him of the risks of self-representation. We do not agree.
>
> The existence of a knowing and intelligent waiver of counsel depends on the particular facts and circumstances of a case. *People v. Riley,* 156 Mich. App. 396, 399; 401 N.W.2d 875 (1986), overruled in part on other grounds *People v. Lane,* 453 Mich. 132; 551 N.W.2d 382 (1996). An explanation of the risks of self-representation requires more than informing the defendant that he waives counsel at his own peril. *People v. Blunt,* 189 Mich. App.

643, 649–650; 473 N.W.2d 792 (1991). A defendant must be specifically and rigorously warned of the hazards ahead. *Russell, supra* at 193 n. 27, citing *Iowa v. Tovar,* 541 U.S. 77, 88–89; 124 S. Ct. 1379; 158 L. Ed. 2d 209 (2004). An explanation of the risks of self-representation should include, for example, a warning that exercising the right to self-representation is usually an unwise decision and the defendant may be acting to his own detriment, and a warning that the defendant will not be afforded any special treatment and will be held to abide by the special skills and training required of any professional attorney. *Blunt, supra* at 649–650.

In the present case, the record demonstrates that the trial court properly advised defendant of the risks of self-representation. The trial court told defendant that he would be a "fool" to represent himself and warned him that the court would treat him "like any other lawyer." Indeed, the trial court explained that defendant would be bound to comply with the court rules, which included making "objections and everything else." After defendant effectively asserted his right to represent himself, the trial court was not required to repeatedly pressure defendant into relinquishing that right. *People v. Morton,* 175 Mich. App. 1, 7; 437 N.W.2d 284 (1989). Based on the totality of the exchanges, we conclude that the trial court properly apprised defendant of the risks associated with self-representation.

Moreover, the record reflects that the trial court repeatedly advised defendant of the charges against him, including the minimum and maximum prison sentences associated with the various charges, both at the beginning of trial and at every subsequent proceeding. See MCR 6.005(D). Additionally, the record reflects that throughout the entire proceeding, Breczinski was available to advise defendant as standby counsel and actively participated in the trial by performing voir dire and questioning witnesses. See MCR 6.005(D)(2).

16

*Pouncy*, 2008 WL 9869818, at *8-9.

The state appellate court did not directly address whether the trial court impermissibly forced Pouncy to choose between unprepared appointed counsel and self-representation. But the appellate court did touch on the level of Breczinski's preparation when it rejected Pouncy's argument that Breczinski was ineffective for failing to present an alibi defense. The appellate court said:

> During defendant's arraignment, Breczinski moved to adjourn trial on the ground that he had not yet been able to investigate numerous witnesses allegedly related to defendant's defense. The trial court granted the motion and rescheduled the trial for later that same month. The morning of trial, defendant complained that Breczinski had not prepared an alibi defense. However, the record shows that Breczinski hired an investigator for the specific purpose of tracking down and interviewing potential alibi witnesses. The investigator met with defendant to collect the names of potential witnesses. Defendant conceded that he only gave the investigator the name and number for one potential witness. The investigation apparently revealed no legitimate potential for an alibi defense. Therefore, Breczinski was not ineffective for failing to raise a futile defense.

*Id.* at *17.

The Michigan Supreme Court declined to hear Pouncy's appeal. *See People v. Pouncy*, 753 N.W.2d 187 (Mich. 2008).

At the conclusion of his direct appeal, Pouncy filed a motion for relief from judgment with the trial court, and in that motion he again argued that his waiver of counsel was ineffective. The trial court ruled that Pouncy was not entitled to relief

17

on his ineffective-waiver argument because the Michigan Court of Appeals had decided that issue against him on direct appeal. (*See* Opinion, ECF #8-37 at 17-19, Pg. ID 3153-55.) With respect to Pouncy's specific argument that his waiver of counsel was involuntary because the choice between self-representation and representation by Breczinski was "no choice at all," the trial court said:

> It should be noted that Defendant Pouncy argues at length that his choice between incompetent counsel and self representation [sic] is no choice at all. His arguments regarding the incompetence of counsel include failure to be prepared for trial and failure to hire an investigator. However, the Court of Appeals also decided this issue against Defendant Pouncy in his prior appeal. The Court looked to the multiple arguments of ineffective assistance of counsel presented by Defendant and ultimately held that Mr. Breczinski was not ineffective.

(*Id.* at 19, Pg. ID 3155.)

The Michigan Court of Appeals and the Michigan Supreme Court thereafter each denied leave to appeal from the trial court's denial of Pouncy's motion for relief from judgment.

On November 12, 2013, Pouncy filed a Petition for a Writ of Habeas Corpus in this Court (the "Petition"). (*See* ECF #1; *see also* ECF #2, 3.) Pouncy asserted five main claims (a number of which consisted of multiple sub-claims), including his claim that the state courts erred when they held that his waiver of counsel was constitutionally sufficient.

18

III.

The Court will apply 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") to Pouncy's waiver of counsel claim.[2]  In relevant part, AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of

---

[2] Pouncy argues that AEDPA deference under § 2254(d) does not apply because no state court addressed the specific arguments that he presents here in support of his invalid-waiver-of-counsel claim.  Pouncy says that he did not raise these arguments on direct appeal and that the Michigan Court of Appeals thus did not address them; that he first presented these arguments in his post-conviction motion for relief from judgment filed with the state trial court; and that the trial court declined to address these arguments after concluding (wrongly, in Pouncy's view) that the Michigan Court of Appeals had already rejected the arguments.  Pouncy insists that *de novo* review thus applies.  However, it does appear that the Michigan Court of Appeals sought to determine whether Pouncy's waiver of counsel was voluntary.  That court understood Pouncy's argument – at least in a general sense – to be that he "did not knowingly, intelligently, and voluntarily waive his right to have counsel represent him at trial." *Pouncy*, 2008 WL 9869818, at *4.  And that court purported to apply the *Faretta* standard to Pouncy's waiver and to determine whether Pouncy had, in fact, waived his right to counsel. (*See* footnote 4, *infra*.)  Thus, this Court will apply AEDPA deference to Pouncy's invalid-waiver-of-counsel claim.  Needless to say, the Court would grant relief under *de novo* review.

19

the evidence presented in the State court
proceeding.

28 U.S.C. § 2254(d).

"The 'contrary to' and 'unreasonable application' clauses of § 2254(d)(1)
have independent meaning." *Loza v. Mitchell*, 766 F.3d 466, 473 (6th Cir. 2014)
(citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).  A decision of a state court
is "contrary to" clearly established federal law if the state court "arrives at a
conclusion opposite to that reached by th[e Supreme] Court on a question of law or
if the state court decides a case differently than th[e Supreme] Court has on a set of
materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).
A decision of a state court involves an "unreasonable application of" clearly
established federal law if the state court "identifies the correct governing legal
principal from th[e Supreme] Court's decisions but unreasonably applies that
principal to the facts of the prisoner's case." *Id.*

AEDPA "imposes a 'highly deferential standard for evaluating state-court
rulings,' and 'demands that state-court decisions be given the benefit of the
doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521
U.S. 320, 333, n.7 (1997)).  Accordingly, a federal court may not "issue [a] writ
simply because that court concludes in its independent judgment that the relevant
state-court decision applied clearly established federal law erroneously or
incorrectly." *Id.*  "[A] state court's determination that a claim lacks merit precludes

20

federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted).   Indeed, habeas relief "is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03.  Thus, in order to obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.  "[I]f this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

For the purposes of § 2254(d)(1), "[c]learly established Federal law … includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).  A habeas court must not construe Supreme Court holdings at "a high level of generality." *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014).  Indeed, "clearly established Federal law" is limited to the "*specific question[s]*" decided by the Supreme Court.  *Id.* (emphasis added.) Thus, it is not contrary to, nor an unreasonable application of, clearly established federal law "for a state court to decline to apply a *specific* legal rule that has not been *squarely* established by th[e Supreme] Court." *Harrington*, 562 U.S. at 101 (emphasis added).

21

IV.

In *Faretta*, the United States Supreme Court held that a criminal defendant has a Sixth Amendment right to represent himself. *Faretta*, 422 U.S. at 819-20. The Supreme Court stressed that the notion of free choice is inherent the structure and history of the Sixth Amendment's right-to-counsel provision:

> The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a *willing* defendant – not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, *against his considered wish*, thus violates the logic of the Amendment.

*Id.* at 820 (emphasis added). The Supreme Court further highlighted that while "those who wrote the Bill of Rights" certainly appreciated "the value of state-appointed counsel," there is "no doubt" that they likewise "understood the inestimable worth of *free choice*." *Id.* at 833-34 (emphasis added). The Supreme Court vacated the defendant's conviction in *Faretta* because the state court had compelled the defendant to accept counsel even though the record reflected that he had "voluntarily exercise[d] his informed free will" when he asked to represent himself. *Id.* at 835.

But the Supreme Court in *Faretta* also recognized that a defendant assumes serious risks when he chooses to represent himself. Indeed, when a criminal defendant exercises his right to represent himself, "he relinquishes, as a purely

22

factual matter, many of the traditional benefits associated with the right to counsel." *Id.* at 835.   "For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits." *Id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938)).   A criminal defendant must "be made aware of the dangers and disadvantages of self-representation so that the record will establish that he 'knows what he is doing and his choice is made with eyes wide open.'" *Id.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).   *Faretta* thus "set" a "high standard" for a waiver of counsel, *Fowler v. Collins*, 253 F.3d 244, 250 (6th Cir. 2001) – a standard that is satisfied only when a defendant's decision to represent himself is truly free and informed.[3]

---

[3]   *Faretta* involved a defendant who was compelled to accept counsel, not a defendant who was challenging the validity of his waiver of counsel. But both the Supreme Court and the Sixth Circuit have recognized that *Faretta* sets forth the standard against which a claimed waiver of the right to counsel at trial must be measured. *See, e.g.*, *Martinez v. Court of Appeal*, 528 U.S. 152, 161-62 (2000) (citing *Faretta* for the proposition that a defendant's decision to represent himself must be "voluntarily and intelligently" made and may be made only after a defendant is warned about the dangers of self-representation); *Fowler*, 253 F.3d at 250 (*Faretta* "set" a "high standard" for waiver); *Wilson v. Hurt*, 29 Fed. App'x 324, 329 (6th Cir. 2002) (citing *Faretta* to support the proposition that "the Supreme Court has repeatedly held that the waiver of the right to counsel must be 'knowing an intelligent' in order to be valid."). *Faretta* expressly adopted its waiver test, in part, from *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938), and thus some courts outside of the Sixth Circuit have tested a defendant's waiver of the right to counsel against *Johnson* rather than *Faretta*. *See, e.g.*, *Pazden v. Maurer*, 424 F.3d 303, 318-20 (3d Cir. 2005).   But the federal courts uniformly agree that Supreme Court precedent clearly establishes that a waiver of counsel must be truly voluntary.   Because the Sixth Circuit has concluded that *Faretta* "set" the standard with respect to waivers of the right trial counsel, *see Fowler, supra*, this Court has

V.

Pouncy's waiver of his right to counsel was involuntary – and thus did not satisfy *Faretta* – because the state trial court forced Pouncy to choose between unprepared counsel and representing himself.  That amounted to "no choice at all." *Brigano*, 470 F.3d at 644.

The record contains compelling evidence that Pouncy's trial counsel, Breczinski, was woefully unprepared; that Pouncy did not want to represent himself; that the trial judge denied Pouncy the opportunity to hire an attorney at his own expense; and that Pouncy chose to represent himself because Breczinski was so unprepared and the trial Court left him with no other viable alternative.

Breczinski did not try to hide his lack of preparation.  On the contrary, as described in detail above, he candidly told the trial judge that he could *not* attest that was prepared because he did not have the final written report of the investigator whom he had hired on Pouncy's behalf.  Breczinski acknowledged that he simply did not know whether his investigator had completed his review of (and follow-up on) the large volume of material and the "number of leads" that Breczinski had provided to him.  Critically, the unfinished investigation did not

---

analyzed the waiver issue here through the lens of *Faretta* and has evaluated the Michigan Court of Appeals' decision against *Faretta*.   The result would be precisely the same if the Court viewed the waiver through the *Johnson* lens and evaluated the Michigan Court of Appeals' decision against *Johnson*.

relate to some tangential matter; it related to the primary defenses that Pouncy wished to raise at trial: alibi and mistaken identity.

Breczinski's serious lack of preparation is likewise apparent from other aspects of the record. Consider Breczinski's response to the prosecution's motions in limine. When the prosecution moved to admit a recording of the alleged telephone threat by Pouncy against a witness, Breczinski offered no opposition. (*See* 1-24-2006 Trial Tr., ECF #8-7 at 34, Pg. ID 489.) Breczinski had nothing to say because he wrongly assumed that the prosecution had "apparently traced" the call to Pouncy. (*Id* at 31-32, Pg. ID 486-87.) But even after the prosecutor explained that "there were no traces done," Breczinski still failed to offer any objection to the recording's admission. (*Id.* at 33-34, Pg. ID 488-89.) Had Breczinski taken the time before trial to directly ask the prosecutor about whether the allegedly-threatening call had been traced, he would have discovered that there had been no trace and could have positioned himself to "jump up and down" in opposition to admission of the recording (as he told the trial court he would have done). Instead, Breczinski did nothing. Similarly, Breczinksi offered essentially no opposition to the prosecution's motion to admit other acts evidence under MRE 404(b).

Moreover, Breczinski never disputed Pouncy's repeated assertions that Breczinski never spent more than fifteen minutes speaking with him until the

25

morning of trial.  That omission is significant because the trial judge specifically asked Breczinski to respond to Pouncy's claimed lack of communication. (*See id.* at 7, Pg. ID 462.)  Breczinski said only that he had visited Pouncy a number of times – a point Pouncy acknowledged – and that during these visits, Pouncy had mentioned a possible alibi defense. (*See id.* at 7-11, Pg. ID 462-66.)  Breczinski gave no indication that he spent the necessary time with Pouncy to carefully explore the facts of the case, anticipated witness testimony, and/or important strategic issues and decisions.[4]

Simply put, there can be no serious dispute on this record that Breczinski was entirely unprepared for trial.  Indeed, during the most recent hearing in this case, the Court pressed counsel for Respondent to identify evidence in the record that Breczinski *was* prepared for trial, and counsel could say no more than that Breczsinski "was there" and "making arguments." (11-12-2015 Tr., ECF #73 at 24, 28-29, Pg. ID 6720, 6724-25.)  Counsel for Respondent could not say that Breczinski's arguments evidenced any real preparation; in fact, they did not.  Moreover, being prepared requires far more than just being present and speaking.  As the Supreme Court has explained:

---

[4] Breczinski's gross miscalculation of Pouncy's sentencing guidelines range further bespeaks his lack of preparation.  While a pre-trial guidelines calculation is necessarily something of an estimate (because the final calculations depend, in part, upon the evidence presented at trial), that Breczinski's calculations were so far off suggests a lack of familiarity with the relevant sentencing facts.

> That a person who happens to be a lawyer is present at trial alongside the accused . . . is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.

*Strickland*, 466 U.S. at 685.

The bottom line is this: on the morning of trial, Pouncy had every reason to believe that Breczinski was not prepared to defend against the very serious charges Pouncy was facing. Pouncy had heard Breczinski admit that he did not have the results of the critical investigation into Pouncy's primary defenses; Pouncy had seen Breczinski misunderstand, and otherwise offer no real opposition to, motions in limine that had serious adverse consequences for Pouncy; and Breczinski had not meaningfully communicated with Pouncy prior to the start of trial. Under these circumstances, Pouncy fairly concluded that proceeding with Breczinski as his counsel was not a reasonable course of action.

Despite Pouncy's concerns about Breczinski, Pouncy did not want to represent himself. He repeatedly asked the trial judge to appoint new counsel for him, and he even offered to retain counsel at his own expense. And he backed away from his first few requests to take over his own defense. He reluctantly began representing himself only after (1) he heard Breczinski confess to being

27

unprepared and saw the manifestation of Breczinski's unpreparedness and (2) the trial court blocked his efforts to obtain a new lawyer.  In Pouncy's words, he chose to present his own defense only because "I don't have an attorney right now." (1-24-2006 Trial Tr., ECF #8-7 at 232, Pg. ID 688.)

Under all of these circumstances, Pouncy's waiver of his right to be represented by counsel at trial was plainly not voluntary.  Indeed, the Sixth Circuit and many other federal courts have held that a waiver of the right to trial counsel is involuntary where, as here, the defendant was forced to choose between unprepared counsel and representing himself. *See, e.g.*, *Brigano*, 470 F.3d at 644[5]*; Pazden*, 424 F.3d at 316-20.[6]  Because Pouncy's waiver was involuntary, it plainly did not satisfy *Faretta*.

---

[5] The Sixth Circuit in *Brigano* also noted that the state trial court had failed to explain the dangers of self-representation to the petitioner in that case.  Here, in contrast, the state trial judge did make some statements to Pouncy about the danger of self-representation. But *Brigano* remains highly relevant notwithstanding this distinction.  *Brigano* underscores that forcing a criminal defendant to choose between unprepared counsel and self-representation is a clear and independent violation of *Faretta* warranting habeas relief.

[6] In addition to the Third and Sixth Circuits, the United States Court of Appeals for the Seventh Circuit has also explained:

> A clear choice between two alternative courses of action does not always permit a petitioner to make a voluntary decision. If a choice presented to a petitioner is constitutionally offensive, then the choice cannot be voluntary. A defendant may not be forced to proceed with incompetent counsel; a choice between proceeding

The Michigan Court of Appeals decision upholding Pouncy's waiver was an unreasonable application of *Faretta*.[7]  That court offered the following explanation as to why it found Pouncy's waiver sufficient:

> As can be seen [from the colloquies between Pouncy and the trial judge], this is not a case where defendant 'steadfastly rejected the option of proceeding to trial without the assistance of counsel,' *Russell, supra* at 192, by repeatedly insisting upon the appointment of counsel. *Rather, defendant repeatedly raised the issue of self-representation*.  After defendant's initial inquiry about his entitlement to represent himself, several exchanges transpired between defendant and the trial court regarding whether he actually wished to represent himself.  But after each exchange, the trial court erred on the side of ruling against waiver.  During the last exchange, defendant confirmed that he understood the risks associated with self-representation and ultimately

---

> with incompetent counsel or no counsel is in essence no choice at all. The permissibility of the choice presented to the petitioner . . . depends on whether the alternative to self-representation offered operated to deprive him of a fair trial.

*Wilks v. Israel*, 627 F.2d 32, 35 (7th Cir. 1980) (internal citations omitted).

[7] The Michigan Court of Appeals did not cite *Faretta*, but it did purport to be applying the federal constitutional standard to Pouncy's waiver of counsel claim. The Michigan Court of Appeals found the federal standard in the Michigan Supreme Court's decision in *People v. Russell*, 684 N.W.2d 745 (Mich. 2004). *See Pouncy*, 2008 WL 9869818, at *5. In *Russell*, the Michigan Supreme Court cited its earlier decision in *People v. Anderson*, 247 N.W.2d 857 (Mich. 1976), as the model for Michigan's application of the federal waiver standard, *see Russell*, 684 N.W.2d at 750-51, and *Anderson* cites *Faretta* as supplying the federal test for waiver of trial counsel. *See Anderson*, 247 N.W.2d at 859-60.  Thus, the Michigan Court of Appeals effectively judged Pouncy's waiver against the *Faretta* standard.

> indicated that he was ready to proceed.  Only then did the
> trial court permit defendant to represent himself.

*Pouncy*, 2008 WL 9869818, at \*8 (emphasis added).  This analysis entirely fails to account for the *context* in which Pouncy "raised the issue of self-representation" – when confronted with the prospect of proceeding to trial on several life-maximum offenses with admittedly and obviously unprepared counsel.   Likewise, the analysis ignores that Pouncy did, indeed, ask the trial court repeatedly to appoint substitute counsel for him and/or to allow him to retain counsel.  In short, when conducting a *Faretta* analysis, "context matters," *Jones v. Bell*, 801 F.3d 556, 565 (6th Cir. 2015), and because the Michigan Court of Appeals did not account for the Hobson's choice that Pouncy faced when he decided to represent himself, its holding that Pouncy voluntarily waived his right to counsel is an unreasonable application of *Faretta*. *See Brigano*, 470 F.3d at 644.

The Michigan Court of Appeals also noted that Pouncy reaffirmed his waiver at "every subsequent proceeding" following his initial waiver, and the court appeared to suggest that these restatements of the waiver enhanced its validity. *Pouncy*, 2008 WL 9869818, at \*9.  But every time Pouncy restated his waiver, he was facing the very same impossible choice between representing himself and proceeding with Breczinski.  Thus, Pouncy's restatement of the waiver does not cure the involuntariness problem.

30

In one other section of its Opinion – one not dealing with the *Faretta* issue – the Michigan Court of Appeals arguably suggested that (1) Breczinski had completed his preparation with respect to investigating Pouncy's primary defenses and (2) his preparation was sufficient. The appellate court noted that "Breczinski hired a private investigator for the specific purpose of tracking down and interviewing potential alibi witnesses" and that "[t]he investigation apparently revealed no legitimate potential for an alibi defense." *Pouncy*, 2008 WL 9869818, at *19. But the state appellate court's conclusion concerning the results of the investigation cannot be squared with the record as it existed when Pouncy decided to represent himself. At that time, Breczinski reported that *he did not know the final results of the investigation*; he knew only from the investigator's initial oral report that the investigator had come up with "nothing" on "*some*" of the leads that he was pursuing. (1-24-2006 Trial Tr., ECF #8-7 at 3-4, Pg. ID 458-59; emphasis added). *That is precisely why Breczinski could not, and did not, assure the trial court that he was prepared to proceed to trial.* (*See id*.) Thus, if the Michigan Court of Appeals concluded that Pouncy did not face a Hobson's choice because Breczinski was sufficiently prepared with respect to Pouncy's primary defenses, that conclusion was contrary to the record and was unreasonable.

Pouncy is entitled to habeas relief. *See Brigano,* 470 F.3d at 644 (affirming grant of habeas relief on ground that waiver did not comply with *Faretta* where

petitioner "was attempting to deal with appointed counsel that had stated he was unprepared to go to trial and a trial court judge intent on going forward with trial regardless of appointed counsel's preparedness"); *Pazden*, 424 F.3d at 319 (remanding for entry of habeas relief where defendant was forced to choose between representing himself and proceeding with unprepared counsel).[8]

## VI.

Pouncy raised a number of other claims for relief in his Petition and his Memorandum of Law in Support of the Petition (*see* ECF #9-1), and he also moved to amend the Petition to include an additional claim for ineffective assistance of trial counsel. (ECF #60 at 32-33, Pg. ID 6451-52.) Given the Court's decision to grant habeas relief on the ground addressed above, the Court sees no need to address Pouncy's remaining claims.

---

[8] The *Faretta* waiver error in this case is not subject to harmless error analysis. The Sixth Circuit in *Brigano*, 470 F.3d at 644, and in *Fowler*, 253 F.3d at 250, granted habeas relief in the face of such an error without conducting a harmlessness review. *See also United States v. Forrester*, 512 F.3d 500, 508 (9th Cir. 2007) (quoting *United States v. Erskine*, 355 F.3d 1161, 1167 (9th Cir. 2004) ("[T]he failure to meet the requirements for a valid *Faretta* waiver constitutes per se prejudicial error, and the harmless error standard is inapplicable.")); *United States v. Allen*, 895 F.2d 1577, 1580 (10th Cir. 1990) (concluding that harmless error analysis does not apply to waiver of counsel cases).

VII.

**IT IS HEREBY ORDERED** that a writ of habeas corpus is **CONDITIONALLY GRANTED** to Pouncy.  Unless the State takes action to afford Pouncy a new trial within ninety (90) days of the date of this Opinion and Order, the State of Michigan shall release Pouncy unconditionally from custody.

**IT IS SO ORDERED.**


                                          s/Matthew F. Leitman
                                          MATTHEW F. LEITMAN
                                          UNITED STATES DISTRICT JUDGE

Dated:  January 8, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 8, 2016, by electronic means and/or ordinary mail.

                                          s/Holly A. Monda
                                          Case Manager
                                          (313) 234-5113

33