UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OMAR RASHAD POUNCY, 571990,

     Petitioner,

                             No. 2:13-cv-14695

v

                             HON. MATTHEW F. LEITMAN

CARMEN D. PALMER,

     Respondent.

_____/

**RESPONDENT'S POST-HEARING BRIEF**

                             Bill Schuette
                             Attorney General

                             David Porter
                             Assistant Attorney General
                             Attorney for Respondent
                             Criminal Appellate Division
                             P.O. Box 30217
                             Lansing, MI 48909
                             (517) 373-4875
                             porterd@michigan.gov
                             P76785

Dated:  November 1, 2018

# TABLE OF CONTENTS

Page

Table of Contents..........................................................................i

Index of Authorities................................................................. iii

Introduction ............................................................................1

Summary of Argument............................................................5

Argument ................................................................................6

I.     *Schlup*'s actual innocence standard requires something that Pouncy has not provided: reliable evidence. ....................6

II.    McGruder lied about committing the Sandstrom carjacking..........7

III.   McGruder lied about threatening Grimes into implicating an innocent person. ...............................................12

IV.   The rest of McGruder's testimony raised a series of red flags that further demonstrate he is an incredible witness. ..................15

       A.    McGruder's account of the Haynes and Brady carjackings was not believable. ..............................17

       B.    McGruder is an admitted perjurer. .......................18

       C.    McGruder's implausible testimony regarding his wardrobe in 2005 raises questions about why McGruder would provide such oddly specific testimony about an issue so important to Pouncy's theory of innocence. ................................19

       D.    McGruder's evasive and contradictory answers about his 2016 affidavit provide more reason to question his credibility...........................................................21

       E.    Evidence obtained from Pouncy's public Facebook account reveals additional cause for concern. ......................23

V.    This Court should reject Pouncy's actual innocence claim because it relies on contradictory statements from three liars and nothing at the evidentiary hearing disturbed the victims' steadfast identifications of Pouncy, not McGruder .......... 29

    A.    Pouncy's actual-innocence claim depends on this Court believing a trio of established liars. ...................................... 31

    B.    Pouncy's actual-innocence claim consists of internally contradictory evidence offered by Pouncy's own witnesses. ............................................................................. 32

    C.    Pouncy's actual innocence claim conflicts with the most important part of the record: the victims' identifications, none of which were undermined at the evidentiary hearing. .............................................................. 42

VI.   This Court should deny McGruder's premature and unfounded request for immediate habeas relief. ........................... 47

Conclusion and Relief Requested............................................................. 49

Certificate of Service ............................................................................. 50

ii

# INDEX OF AUTHORITIES

<u>Page</u>

**Cases**

*Bousley v. United States,*
   523 U.S. 614 (1998) .......................................................................... 7, 42

*Dretke v. Haley,*
   541 U.S. 386 (2004) ................................................................................ 6

*Schlup v. Delo,*
   513 U.S. 298 (1995) ...................................................................... passim

# INTRODUCTION

In the fall of 2005, three men committed a trio of carjackings in the Flint area.  Two of the men—Wayne Grimes and Tiakawa Pierce—have admitted under oath that they were involved in all three crimes.  One of them (Grimes) has consistently said that the third accomplice in all three was Omar Pouncy.  So have all the victims, each of whom picked Pouncy out of a line-up and steadfastly identified him in court.

But Pouncy insists he is innocent.  His claim of actual innocence consists of a hodgepodge of evidence, some of which has been already been litigated in state court.  But three pieces of evidence have not.  In April 2016, Jaakawa McGruder signed a sworn affidavit stating that he—not Pouncy—was the man who committed all three carjackings with Pierce and Grimes.  And in early 2018, Pierce stated in a sworn affidavit that McGruder—not Pouncy—was the third perpetrator who was involved in all three carjackings.  Around that same time, Willie Joyce, the resident of the home where the second and third carjackings took place, signed an affidavit saying that he saw, and even spoke to, McGruder on his doorstep moments before the third carjacking.

Taken at face value, this evidence would appear to make a promising case of innocence, at least on paper.  So, on May 22, 2018, this Court placed Jaakawa McGruder under oath to see and hear for itself whether there was something to his claims.  Sure enough, McGruder's testimony captured the highlights of each carjacking.

Take, for instance, McGruder's testimony regarding the third carjacking involving Tom and Maria Sandstrom.  McGruder testified that on the afternoon of October 11, 2005, he, Grimes, and Pierce contacted the seller of a White Cadillac and arranged to come see the car, which was in the Fenton area.  (5/22/18 Hrg. Tr., R. 190, ID 9646.)  After having difficulty initially finding the place, McGruder arrived with Pierce and Grimes and persuaded the seller to let him drive it to his "mechanic" in Mt. Morris.  (*Id*. at 9647–50.)  McGruder drove the Cadillac to Kellar Street, followed by Grimes and Pierce in the Intrepid and Maria in her Corvette.  (*Id*. at 9650–52.)  When they arrived at Kellar Street, McGruder saw that the house he intended to use as his "mechanic's house" looked occupied, so he walked up and knocked on the front door.  (*Id*. at 9652–53.)  Someone answered and, as a ruse, McGruder asked the person whether he would like his lawn mowed.

2

(*Id*. at 9653.)  After the person declined and went back inside, McGruder walked back to the Sandstroms, pulled out a gun, demanded the title and keys, and ordered them off into the woods.  (*Id*. at 9654, 9656–58.)  He, Grimes, and Pierce then sped away in the three cars. (*Id*. at 9660.)  Later that evening, he was arrested by Westland Police on an unrelated matter and taken to the Genesee County Jail where he ran into Grimes and threatened him into snitching on someone else. (*Id*. at 9661–65.)

This testimony, we are told, is convincing because it largely tracked the testimony at trial and Willie Joyce's affidavit, and it also provided a plausible explanation for why Grimes would wrongly accuse Pouncy.  (Pet's Post-Hrg. Br., R. 197, ID 9905–16.)  As a result, Pouncy says, it is compelling proof that McGruder was the perpetrator and that he is totally innocent.

There is just one small problem.

Jaakawa McGruder was sitting in the Genesee County Jail during the Sandstrom carjacking.  Three days before that, on October 8, 2005, McGruder was arrested by Westland police and held at the Westland Police Station until October 11th, when deputies from the Genesee

County Sheriff picked him up and booked him to the Genesee County Jail at 4:22 p.m.—hours before he supposedly carjacked the Sandstroms.  (*See* Attachment A, Westland PD Arrest & Booking Records; Attachment B, Genesee County Jail Booking Records.)

McGruder didn't drive with Grimes and Pierce to Fenton on October 11th to look at a White Cadillac like he said.  He didn't meet the seller in his driveway and inspect the trunk for speaker space like he said.  He didn't drive the Cadillac to Kellar Street like he said.  He didn't walk up to the house and speak with the resident of 5349 Kellar Street like he (and Willie Joyce) said.  He didn't stick a gun in the seller's side and drive off in his Cadillac like he said.  And he wasn't arrested by Westland police later that same night like he said.  He didn't do any of it like he said because he was sitting in jail.

All of it, it turns out, was a lie.  And the same person who is willing to lie under oath about his involvement in one of the carjackings is certainly willing to lie under oath about the other two.  For these and many other reasons explained below, this Court should find McGruder is an unbelievable and unreliable witness, that Pouncy is not actually innocent, and that he is not entitled to relief on his new *Brady* claim.

4

## SUMMARY OF ARGUMENT

There are a lot of reasons why this Court shouldn't believe McGruder when he says he committed the carjackings.  First and foremost, arrest and booking records establish that McGruder could not possibly have committed the Sandstrom carjacking on October 11, 2005.  He was in police custody that entire day.  Second, undisputed record evidence refutes McGruder's explanation for how Pouncy was wrongly implicated instead of him.  Third, and aside from these two decisive lies, McGruder's testimony regarding the first two carjackings and other key issues in the case raise serious questions about his credibility.

That McGruder (and Joyce) were not credible witnesses is reason enough to find that Pouncy is not actually innocent.  But, there is more.  A closer look at the evidence shows that Pouncy's entire claim rests on a bed of lies, and the critical facts he asked this Court to accept based solely on affidavits turned out to be untrue, refuted by his own people.  For these reasons, too, Pouncy has fallen far short of what is required to prove actual innocence.  This Court should deny Pouncy's motion and rule on the rest of his claims using the normal procedural-default and AEDPA-deference rules that govern non-actual-innocence cases.

## ARGUMENT

I.  ***Schlup*'s actual innocence standard requires something that Pouncy has not provided: reliable evidence.**

Before diving into the factual morass, it's helpful to first locate the legal lodestar: *Schlup*'s actual innocence standard. The purpose of the hearing and this briefing, after all, is to determine whether Pouncy has satisfied the "gateway" actual-innocence standard, which would allow this Court to consider Pouncy's procedurally defaulted claims.

It is an "extremely rare" case that meets *Schlup*'s actual innocence standard. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). The standard requires the prisoner to show that, in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327. And not just any new evidence will do. For an actual innocence claim to be credible, the new evidence must be "reliable," *id.* at 324, and in cases like this involving witnesses and other affiants, reliability is a product their timing and credibility, *id.* 332 ("[T]he court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence."). Moreover, just as Pouncy may (indeed, must) present new evidence to prove his innocence, so too may the State

6

to prove the opposite.  *See Bousley v. United States*, 523 U.S. 614, 624 (1998) ("[T]he Government is not limited to the existing record to rebut any showing that petitioner might make.").  When it does, evidence that otherwise would have been inadmissible against Pouncy at his criminal trial is now fair game.  *Schlup*, 513 U.S. at 327.

With these legal principles in mind, let us turn to the evidence Pouncy presented in support of his claim.

## II.    McGruder lied about committing the Sandstrom carjacking.

Pouncy, understandably, spends a good portion of his brief arguing why this Court should find McGruder credible.  He starts by recounting McGruder's testimony regarding each carjacking, comparing it to the facts elicited at Pouncy's trial.  For instance, at pages 10 through 14 of his brief, Pouncy lays out in painstaking detail the similarities between McGruder's testimony and the facts of the Sandstrom carjacking established at trial.  The identified similarities, Pouncy says, make McGruder a credible witness.

But Pouncy doesn't stop there.  He says that McGruder is *especially* credible because "[he] provided unique, compelling first-

person details about each carjacking, and provided personal insights and motivations that enhance his credibility." (Pet's Post-Hrg. Br., R. 197, ID 9912 (capitalization omitted).) For instance, Pouncy contends that McGruder "provided insight into some seemingly unusual choices he made during the carjackings," including his decision to inspect the Sandstroms' trunk (a fact that corresponded with Mr. Sandstrom's trial testimony). (*Id*. at ID 9913.) Pouncy also notes that "McGruder was able to explain in detail the thoughts and concerns that led him to make the unusual choice of knocking on Joyce's door during the Sandstrom carjacking and the details of their interaction"—details that Pouncy suggests "all ring true as coming from the perspective of the carjacker[.]" (*Id*. at ID 9913–14.)

But Pouncy doesn't stop there, either. He adds that, "[a]long with these detailed anecdotes and explanations of his strategic choices and mistakes, McGruder's testimony also included specific, sensory and emotional details that confirm his involvement in the carjackings." (*Id*. at 9915.) For instance, Pouncy points out how "McGruder explained the complications raised by Sandstrom's location in a suburb credibly and compellingly, from the perspective of the carjacker." (*Id*.) "Simply put,"

8

Pouncy says, "only the carjacker could have recalled the details recounted by McGruder on the stand." (*Id*. at ID 9916.)

But there is a fly in the ointment: McGruder was locked up on October 11th.

Arrest records show that at 11:30 p.m. on October 8, 2005, McGruder was stopped by Westland police while riding a bicycle.[1]  (See Attachment A, Westland PD Arrest & Booking Records.)  He initially identified himself as "Jaclay Williams," but after continued questioning he revealed his real name was Jaakawa McGruder.  (*Id*.)  McGruder, officers discovered, had a bench warrant out for his arrest from Genesee County, so they took him into custody.  (*Id*.)  As both the summary of the offense and booking records show, the Westland police held him without bond until he could be transported to Genesee County.  (*Id*.)

---

[1] These records were first requested and received by the State on October 26, 2018, as part of its investigation of the claims McGruder made at the evidentiary hearing.  Before the hearing, the State had no reason to believe McGruder was arrested by Westland police in October 2005 and thus had no reason to search that Department's records for disproof of McGruder's claim.  The same goes for the other attached documents obtained following the evidentiary hearing.

Booking records from the Genesee County Jail show that McGruder remained in custody at the Westland Police Department until 3:15 p.m. on October 11, 2005, when deputies from the Genesee County Sheriff's Office came and retrieved him.  (Attachment B, Genesee County Jail Booking Records.)  He was booked in the Genesee County Jail at 4:22 p.m. (roughly two hours before the Sandstrom carjacking occurred).  (*Id.*; *cf.* 1/25/06 Trial Tr. [Trial Tr. II], R. 8-8, ID 839; 883–84.)  He remained there until the next morning, when he appeared before Genesee Circuit Court Judge Archie Hayman, who ordered that he continue to be held without bond.  (Attachment C, *McGruder* Register of Actions, No. 05-016366-FH, Event 22.)

If arrest and booking records weren't enough, McGruder's own words refute the story he told at the evidentiary hearing.  According to his probation officer's notes from a conversation he had with McGruder on October 25, 2005 (the day he was released from jail), he "reported being arrest[ed] by Westland PD on 10/8/05 for a traffic violation then lying about his ID."  (Attachment D, McGruder Probation Records.)[2]

---

[2] Again, the rules governing the admissibility of evidence are inapplicable in this context.  *Schlup*, 513 U.S. at 327.

10

Obviously, McGruder could not possibly have committed the Sandstrom carjacking. To borrow Pouncy's own words from his defense at trial, "[C]an't be two places at one time. Not at all." (1/31/16 Trial Tr., R. 8-14, ID 1699.) Not at all, indeed. That means that McGruder's sworn testimony stating that he was the one with Grimes and Pierce in Mt. Morris carjacking the Sandstroms is false. That also means that Joyce cannot be right when he said that he saw McGruder at his doorstep on October 11th. McGruder was locked away in a jail cell then.

What's more, that means that all the reasons Pouncy gave for why McGruder is worthy of belief actually prove quite the opposite: that he is a cunning manipulator and deceiver, capable to spinning a yarn chock full of seemingly believable fictions. All the "compelling first-person details," all the "personal insights," all the "detailed anecdotes and explanations of his strategic choices," and all the "specific, sensory and emotional details," we now know, show only that McGruder is a proficient and committed liar. They show only that McGruder is unworthy of this Court's trust.

That McGruder was able to provide details of a carjacking that he did not commit, details that he swore under oath he did not learn

11

anywhere else (something we now know cannot be true), raises a host of questions about how he was able to recite the details of a decade-old carjacking that took place while he was sitting in the Genesee County Jail. Those questions must wait because, unfortunately, it wasn't McGruder's only verifiable lie.

## III.   McGruder lied about threatening Grimes into implicating an innocent person.

According to Pouncy, McGruder's testimony was particularly powerful evidence of his actual innocence because McGruder also provided an explanation for why Grimes would wrongfully implicate Pouncy in the first place.

Pouncy observes that, according to McGruder, Grimes implicated Pouncy only because McGruder confronted him in the Genesee County Jail on the night of the final carjacking—October 11th—and threatened to kill Grimes's family if he implicated him. (Pet's Post-Hrg. Br., R. 197, ID 9941.) Pouncy adds that McGruder "went on to describe the plan he developed with Grimes" that night to "implicate someone who had nothing to do with the crime." (*Id*.) This evidence, Pouncy argues, "confirm[ed] that Grimes had a clear motivation to provide false

information [and] would have raised reasonable doubt in the jurors' minds as to the trustworthiness of Grimes's statements implicating Pouncy." *Id.*

But this story cannot be true, either. That's because Grimes was not arrested and taken into custody until October 12, 2005—the day *after* McGruder supposedly had the threatening bullpen conversation with Grimes. (*See* Attachment E, Mt. Morris PD Incident Report No. 05-004219 Part 1, at 8–9.)

Pouncy might reply that the date of the encounter doesn't matter and that McGruder was likely just off by one day, which doesn't mean it didn't happen. The record shows otherwise. At the hearing, McGruder quite specifically tied the bullpen meeting to the night of the last carjacking. Asked whether "that day [October 11, 2005] [was] particularly significant to [him]," McGruder said it was because he was pulled over, arrested, and transported to the Genesee County Jail. (5/22/18 Hrg. Tr., R. 190, ID 9661–63.) Asked specifically whether he was taken to Genesee County Jail *that night*, McGrurder said yes. (*Id.* at ID 9663.) And when McGruder was asked, "Who if any of your friends did you run into the bullpen *that evening*?" McGruder said

13

Grimes, specifically agreeing that he had just committed a carjacking

with him "earlier that day." (*Id*. at ID 9664 (emphasis added).)  Later,

Pouncy's counsel revisited the subject of timing just to confirm:

> Q.  So -- and you would agree, that [the bullpen meeting]
> was the night of the last carjacking.
>
> A.  Yes.
>
> Q.  The night of the last carjacking, October 11, 2015 -- or
> 2005.  Sound right?
>
> A.  Yes.

(*Id*. at ID 9796–97.)  Given the lengths to which Pouncy's attorney went

to nail down the date of the bullpen meeting, it is unlikely McGruder

was simply mistaken about the date.

But let's indulge the assumption that he was mistaken about the

date for a moment.  Even then, we still know McGruder's testimony

cannot be true because Grimes had already implicated Pouncy *before he*

*ever stepped foot in the county jail*.  Police reports show that, after he

was arrested, Grimes was "transported back to the Mt. Morris

Township PD for questioning," where he implicated "Omar Pouncy and

another subject by the name of T." (Attachment E, Mt. Morris PD

Incident Report No. 05-004219 Part 1, at 9–10.)  It was only after

14

completing his statement that Grimes was "transported to the Genesee County Jail." (*Id.* at 13.)

These indisputable facts show that McGruder could not possibly have threatened Wayne Grimes into implicating someone else like he said. That means that McGruder told not one, but two, pivotal lies at the hearing, and Pouncy's theory for why Grimes would wrongly identify him rests entirely on one of them. Unfortunately, McGruder's credibility problems don't stop there.

## IV. The rest of McGruder's testimony raised a series of red flags that further demonstrate he is an incredible witness.

At this point, Pouncy might try to salvage the ship by asking this Court to cordon off McGruder's false testimony regarding the Sandstrom carjacking and still believe McGruder when he says he committed the Haynes and Brady carjackings. This Court should pass.

First, believing McGruder committed only *some* of the carjackings is entirely at odds with Pouncy's position throughout this entire case. Pouncy has insisted time and again, whoever committed the carjackings committed them all. (*See, e.g.*, Pet's Bond Motion Reply Br., R. 176, ID 8545 ("Once [Petitioner] proves that he did not commit one of the

carjackings this necessarily proves that he was not involved in any of them").)  On Pouncy's own theory, this Court cannot believe McGruder committed the first two carjackings because he could not have committed the third.

But Pouncy's logic aside, the fact that McGruder would lie so extensively about his involvement in the third carjacking raises grave questions about whether he is telling the truth about the first and second incidents.  The answer is obvious: if McGruder lied about one of the carjackings, there is no reason to believe it isn't lying about the others.

In the end, the State need not definitively prove that McGruder is lying about his involvement in the first and second carjackings because, based on what we know of the Sandstrom carjacking, McGruder is not a reliable witness.  And reliable evidence is what is required to make out a credible claim of actual innocence under *Schlup*.  *Schlup*, 513 U.S. at 324.  Simply put, the fact that McGruder lied about committing one of the carjackings scuttles Pouncy's entire actual innocence claim.

But even if this Court indulges Pouncy by closing its eyes to the third carjacking and evaluating the rest of McGruder's testimony, it is

evident from his testimony regarding the first two carjackings that he was not telling the truth.  On top of that, there are a host of other issues with his testimony that make McGruder unreliable: he admitted to committing perjury; he made unusually confident and specific claims about facts that he *knew* were critical to Pouncy's case; and he gave evasive and conflicting testimony about how he came to confess to Pouncy's crimes, answers that look all the more fishy in light of his close relationship with Pouncy and the timing of his admitted meet-up with Pouncy not long before he "confessed" to the crimes.

### A.    McGruder's account of the Haynes and Brady carjackings was not believable.

At this point, it is unnecessary to cover in detail McGruder's testimony regarding the Haynes and Brady carjackings.  But it helpful to point out some of the more basic, but important facts that McGruder got wrong, as it provides additional support for the conclusion that he was lying about Haynes and Brady carjackings just like he was lying about the Sandstrom one:

17

| McGruder's Testimony | Record Evidence |
|---|---|
| McGruder said he saw Haynes' car outside a "car shop." (5/22/18 Hrg. Tr., R. 190, ID 9615–17.) | Haynes' car was staged on Sam Anderson's front lawn. (1/27/06 Trial Tr. [Trial Tr. IV], R. 8-11, ID 1299.) |
| McGruder said met with a "black male" who was advertising Haynes' car for someone else. (*Id*.) | Anderson was not a black male. (*See* Pet's Post-Hrg. Br., R. 197, ID 9930.) |
| Regarding the culminating event of the Haynes carjacking, McGruder said, "[W]e came up on a red light – and I don't know, something just told me to just, you know, take the car. I remember telling him – I remember pulling the gun out." (*Id*. at ID 9627.) | Sam Anderson testified that the perpetrator brandished the gun long before the red light, driving around with the gun pointed at him while he demanded the title en route to his appointed drop-off location at a local college. (Trial Tr. IV, R. 8-11, ID 1303–04.) |
| Regarding the Brady carjacking, McGruder said that Grimes took the lead and acted as the interested buyer. (*Id*. at 6934.) | Joe Davis testified that he said that he interacted with "Jacob Woods" (whom he identified as Pouncy and whom Pouncy contends was actually McGruder). (1/24/06 Trial Tr. [Trial Tr. I], R. 8-7, ID 683–84.) |

## B. McGruder is an admitted perjurer.

McGruder is particularly unworthy of belief if for no other reason than he admitted to lying under oath on multiple occasions. At Pierce's preliminary examination, McGruder testified that he and Grimes had a conversation in jail in which he asked Grimes why authorities were looking for Pierce, to which Grimes replied he "had no idea" because

"[Pierce] had nothing to do with it."  (8/28/07 Pierce Prelim. Tr., R. 184-4, ID 9453.)  That, he now admits, was a lie meant to help Pierce avoid criminal charges.  (5/22/18 Hrg. Tr., R. 190, ID 9709–10.)  And not only did McGruder lie, he was unrepentant about it: "[A]t that point, no, I did not feel that was wrong."  (*Id.* at 9802.)

In addition, McGruder also testified at Pierce's preliminary examination that Grimes and Pouncy did not have any relationship problems and that they got long like friends, even brothers.  (8/28/07 Pierce Prelim. Tr., R. 184-4, ID 9459–60.)  That proved irreconcilable with McGruder's testimony at the hearing (and affidavit averments) that Grimes and Pouncy had bad blood and would not have associated in the fall of 2005.  (5/22/18 Hrg. Tr., R. 190, ID 9766.)

**C.    McGruder's implausible testimony regarding his wardrobe in 2005 raises questions about why McGruder would provide such oddly specific testimony about an issue so important to Pouncy's theory of innocence.**

At the hearing, McGruder was asked what his wardrobe was like back in 2005.  He began with a generic answer, saying he "probably mostly" wore things like jeans and t-shirts.  (5/22/18 Hrg. Tr., R. 190, ID 9625.)  But then McGruder became oddly specific.  He testified that he

wore a white coat that season, and more than that, he wore *only* white coats.  (*Id.*)  And even more than that, McGruder narrowed it down to a specific make and model: his puffy Dope Boy or his leather Pelle Pelle. (*Id.* at ID 9626.)  He also said that he had an affinity for shoes, and not just any shoes: Pumas.  (*Id.* at ID 9625, 9815.)  He had as many as 30 pairs of them and knew the pattern of each one.  (*Id.* at ID 9765, 9815.)

The State, naturally, cannot refute such strangely specific and unverifiable claims.  But the question arises: how can someone who said his memory of the carjackings he supposedly committed was "hazy" (*id.* at ID 9617–18), and who failed to recall what he reviewed just a day earlier (*id.* at ID 9698), say this under oath:

> *I know exactly what shoes I was wearing and what type of ridges they had on the bottom of it.*

(*Id.* at ID 9765 (emphasis added).)

It was a curiously confident statement.  And not one that was innocuous like some of McGruder's other implausible hyperbole (like his claim that he "literally attempted [suicide] every night" or that his belief in aliens prevented him from putting phones in his name).  (*Id.* at ID 9671, 9741.)  This fact is important because it strikes at the heart of the State's case against Pouncy: the identification of the culprit.  That is

20

something to keep in mind when considering just how McGruder—after years of heavy drinking, drug use, countless suicide attempts, depression, and PTSD—can remember with certainty the pattern on the bottom of his shoe or the exact name of one of his six winter jackets from thirteen years ago.  Did he say that because he truthfully remembered or because he somehow knew that these facts were critical to Pouncy's claim?  (*See* Section V.B., p. 40, for a possible answer).

D.  **McGruder's evasive and contradictory answers about his 2016 affidavit provide more reason to question his credibility.**

In sharp contrast to his definitive answers about his wardrobe, McGruder was noticeably evasive about another, equally important aspect of the case: how he came to execute an affidavit for Pouncy claiming responsibility for the carjackings.

McGruder's testimony regarding the 2016 affidavit was riddled with inconsistencies and contradictions.  Take his story about who initially reached out to him.  McGruder first said it was Pierce but later said that attorney David Moffitt contacted him.  (*Id.* at ID 9690, 9747.) Even later still, McGruder revealed that he was actually first contacted

by Pouncy's cousin, Rashad Shahid, who was reaching out at Pouncy's request. (*Id*. at ID 9784–86.)

When it came to the all-important issue of statute of limitations, McGruder was all over the board. First, McGruder denied ever hearing about the statute of limitations issue. (*Id*. at ID 9692.) In fact, he denied even consulting an attorney. (*Id*.) But that turned out to be false when, on cross-examination, McGruder admitted that he not only spoke to Pierce's attorney, he discussed the subject of statute of limitations with him. (*Id*. at ID 9807.)

And when pressed about the content of that discussion, McGruder gave an interesting answer: he said that no attorney (including Pierce's) ever told him that he could not be charged because the statute of limitations had expired; he was, however, told by Pierce's attorney that the statute of limitations may not have run because he had been residing out of state. (*Id*.) In other words, the only advice McGruder admitted to receiving was based on a set of facts (him residing out of state) that he would have known was false. Either McGruder failed to convey accurate information to Pierce's attorney about his whereabouts, or he lied about what he learned regarding the statute of limitations.

22

Finally, McGruder also testified that he was the one who decided what information would be included in the second affidavit.  (*Id*. at ID 9693.)  But, as will be discussed in more detail below, that was not entirely true.  Two of the most strategically important claims in McGruder's affidavit were included by Pouncy's attorney using facts that the attorney conveyed to McGruder.  (*See* Section V.B., pp. 39–41.)

## E.   Evidence obtained from Pouncy's public Facebook account reveals additional cause for concern.

Evidence from Pouncy's Facebook profile raise further questions about McGruder's testimony regarding his 2016 affidavit and about how McGruder came to know the extensive details about the carjackings, one of which we know he could not have committed.

Recall that McGruder initially denied ever visiting Pouncy after he was released from prison in March 2016.  Asked whether he visited Pouncy after his release, McGruder answered, "No. I've seen Mr. Pouncy once at Mr. Moffitt's office and came in as a surprise."  (*Id*. at ID 9748.)  Asked again, McGruder admitted he saw Pouncy at his grandmother's house for dinner but said it was after he executed his second affidavit.  (*Id*. at ID 9749.)  He specifically denied having "any

23

contact with anybody in person before [he] executed that affidavit." (*Id.* at ID 9756.)  But McGruder contradicted that when he later admitted that the dinner happened *before* he signed the second affidavit, though even then he continued to downplay the incident.  (*Id.* at ID 9759.)

Also recall that McGruder initially denied ever having contact with Pouncy on Facebook: "No.  I'm not sure if Mr. Pouncy even has a Facebook," he said.  (*Id.* at ID 9749.)  When he was confronted with screenshots of him commenting on Pouncy's Facebook posts, McGruder stood firm, saying that he did not believe it was Pouncy who was posting from the "Omar Pouncy" account.  (*Id.* at ID 9752.)  McGruder shrugged away a slew of comments he left on Pouncy's Facebook wall, saying he was merely "[c]ommenting to a status" that could have been posted by other people using Pouncy's account, like his girlfriend or attorney.  (*Id.* at ID 9755; *see also id.* at ID 9752, 9813-14.)

Evidence publicly available from Pouncy's Facebook account raises serious questions about whether McGruder was forthright about seeing Pouncy in person and communicating with him on Facebook.

First, after this Court granted Pouncy habeas relief in 2016, Pouncy posted an article about the decision from his Facebook account.

(*See* Attachment H, 2/15/16 Pouncy-McGruder Facebook Contact (Redacted).)[3]  Pouncy commented on his own post "tagging" McGruder in a comment and here is how McGruder responded:



(*See id.*)  This comment, written to Pouncy in the first person, cannot be explained away as merely "replying to a status" posted by someone else. McGruder is speaking directly to Pouncy.

Second, photos on Pouncy's Facebook account show McGruder and Pouncy met in person on April 11, 2016, just a week before McGruder executed his second affidavit.  (*See* Attachment I, 4/11/16 Pouncy-McGruder Photo Post and Photos (Redacted).)  Assuming those photos are from the dinner event McGruder testified about,[4] the photos put McGruder's testimony in a new light.  To hear McGruder tell it, he

---

[3] All attached printouts from Facebook have been redacted to protect the account-holder's privacy.

[4] Of course, if these photos depict Pouncy and McGruder at *another* gathering, then McGruder lied about seeing Pouncy only once before he signed his second affidavit.

attended a family dinner and was surprised to find that Pouncy was also in attendance.  (5/22/18 Hrg. Tr., R. 190, ID 9749, 9759.)  Starting with a phrase that implied that he didn't know Pouncy would be there, McGruder said, "Once I seen he was there" an aunt gathered everyone for photos and he joined in before leaving.  (*Id.* at ID 9759.)  But the photos seem to tell a different story, one in which McGruder visited Pouncy and reconnected with him during a photo shoot:



(Attachment I.)  This version of events finds support in a comment Pouncy's mother made on one of the photos:



(*See id.*)

26

Pouncy's Facebook posts also reveal that McGruder wasn't the only person connected to the case whom Pouncy was meeting with during this time.  Days after being released from prison, on April 5, 2016 (just days before he met McGruder), Pouncy met with Tiakawa Pierce.  (Attachment J, 4/5/16 Pouncy-Pierce Photo Post (Redacted).)  And months later, Pouncy posted a photo of him communicating with Pierce and another co-defendant (presumably from another case) along with a comment saying, "They know I ain't never told on shit and never will."  (Attachment K, 8/13/16 Pouncy-Pierce Post.)

This Facebook evidence creates a timeline of known interactions between Pouncy and the cast of characters involved in this case.  As noted above, Pouncy posted an article regarding his release on February 15, 2016, in which he tagged McGruder and to which McGruder replied, "Like I always said you will be home.  Say no more."  (Attachment H (capitalization omitted).)  A week later, on February 22, 2016, Pouncy's cousin, Rashad Shahid, Jr., contacted McGruder telling him that "Omar was trying to get a hold of [him] and he could not" and that Pouncy's attorney asked Rashad to reach out to McGruder.  (5/22/18 Hrg. Tr., R. 190, ID 9732, 9782–86.)

27

Furthermore, the photos of Pouncy and Pierce meeting on April 5, 2016, align with McGruder's testimony that Pierce contacted him in April 2016, after which Pouncy's attorney contacted him and they scheduled a meeting to sign the affidavit.  (*Id.* at ID 9690.)  Photos confirm that six days after Pouncy met with Pierce, he met with McGruder on April 11, 2016.  A week later, McGruder sat down with Pouncy and his attorney to sign an affidavit taking responsibility for carjackings—one of which we know he did not commit.

Of course, Pouncy's public Facebook activity does not, standing alone, prove that Pouncy conspired with Pierce and McGruder (or others).  But it does reveal a connection between him and the key witnesses he presented to this Court at a crucial time during which Pouncy developed his factual case of alleged innocence.  One of those witnesses, McGruder, not only falsely confessed to at least one of Pouncy's carjackings, he downplayed the interactions he had with Pouncy shortly before that.  He also lied under oath about never reviewing anything relating to Pouncy's criminal trial (which we know is false since he could not have been present for the Sandstrom carjacking).  If, as Pouncy says, "only the carjacker could have recalled

28

the details recounted by McGruder on the stand," this timing of events provides a possible answer to the question of how McGruder testified to details of a carjacking he could not have committed. Regardless, all of it casts a pall on the credibility of not just McGruder, but Pouncy's entire claim. *See Schlup*, 513 U.S. at 332 ("[T]he court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.").

## V.    This Court should reject Pouncy's actual innocence claim because it relies on contradictory statements from three liars and nothing at the evidentiary hearing disturbed the victims' steadfast identifications of Pouncy, not McGruder.

Thus far, the discussion has focused on McGruder and his credibility (or lack thereof). Although his severe credibility deficit is reason enough to reject Pouncy's claim, if we take a step back and remember how we got here, it provides valuable perspective on just how weak Pouncy's claim of actual innocence is.

Pouncy, you will recall, asked this Court to find him actually innocent based on three pieces of evidence—affidavits from Pierce, McGruder, and Joyce—which he claimed were reliable, definitive proof that McGruder was the perpetrator of the three carjackings for which

29

he was convicted.  (12/01/17 Motion for Bond, R. 158, ID 8295–97, 8343–50.)  These papers, his counsel assured this Court, were "more than sufficient" to find him innocent.  (2/23/18 Hrg Tr, R. 185, ID 9551; *see also id.* at ID 9546 ("I think you've got plenty already with what you've got to make this determination without a hearing.").)

Despite these assurances, the evidentiary hearing proved that Pouncy's paper narrative was nothing more than a paper tiger.  For one, it turns out that Pouncy's premier witnesses, Pierce and McGruder, as well as Pouncy himself, are all liars who have vouched for someone else in connection with the carjackings.  And two, the facts revealed at the evidentiary hearing have refuted or undermined the most valuable aspects of each affidavit.  What looked so promising on paper turned out to be a bed of lies, offered by those who are no stranger to the art of deception.  Contrast Pouncy's Potemkin case of innocence with all six victims' reliable and repeated identifications of Pouncy (none of which were undone at the evidentiary hearing), and the result here is clear: Pouncy cannot show, in light of all the evidence, that it is more likely than not that no reasonable juror would convict Pouncy.

30

### A.   Pouncy's actual-innocence claim depends on this Court believing a trio of established liars.

Pouncy's claim of innocence relies primarily on two witnesses, Tiakawa Pierce and Jaakawa McGruder, both of whom filed affidavits saying that Pouncy did not commit the carjackings. It also, to a certain extent, relies on Pouncy himself, since he has protested his innocence going all the way back to his criminal trial. None of these individuals are worthy of belief because, in addition to McGruder having committed perjury, Pierce and Pouncy have lied under oath too.

First, Pierce stated under oath at his plea hearing that Pouncy was a perpetrator of the carjackings and that he (Pierce) was just an accessory after the fact. (2/14/08 Pierce Plea Tr., R. 189-1, ID 9577–83.) Both of those assertions cannot be squared with Pierce's other statements, also under oath, that Pouncy was not involved in the carjackings and that he (Pierce) participated in them. (1/4/18 Pierce Affidavit, R. 173-3, ID 8522, ¶¶ 1–3.)

Second, Pouncy has also lied under oath. At his criminal trial, Pouncy testified that he stopped associating with Grimes in late 2004, early 2005 after an alleged incident over a girl. (1/31/06 Trial Tr. [Trial Tr. V], R. 8-14, ID 1682.) But at Pierce's preliminary exam, he testified

31

that he was with Grimes on multiple occasions in September 2005 helping him acquire the gun used in the carjackings. (8/28/07 Pierce Prelim. Tr., R. 184-4, ID 9436–43.) Both, of course, cannot be true, making one of them false testimony.

This abysmal track record calls to mind a question Pouncy himself asked of a witness at his trial: "[S]o if somebody gives . . . two different stories . . . , would you consider that person a credible person?" (1/26/06 Trial Tr. [Trial Tr. III], R. 8-10, ID 1120.) The answer Pouncy was looking for is the right one: they're not. Pouncy asks this Court to believe that, for once, he, Grimes, and Pierce are not lying in connection with this case. But all three are bona fide fabricators who have lied for each other when asked. So far, no juror or judge has found their stories believable. Neither should this Court.

**B.    Pouncy's actual-innocence claim consists of internally contradictory evidence offered by Pouncy's own witnesses.**

If Pouncy didn't already have enough credibility problems on his hands, the evidentiary hearing—which featured Pouncy's two premier witnesses—made matters worse by refuting or undermining the major facets of each affiant's story. This Court is familiar with all three

affidavits, but it is important to recall the major areas of Pouncy's innocence claim that each affidavit purported to establish.

In his affidavit, Pierce attested that he was involved in all three carjackings and that McGruder—not Pouncy—was the third accomplice in each of them. (1/4/18 Pierce Affidavit, R. 173-3, ID 8522, ¶¶ 1–3.) Pierce also provided a seemingly compelling narrative of how he and McGruder were able to evade detection and how years later he was able to convince a reluctant McGruder into coming forward. (*Id.* at ID 8522–25.) And throughout his affidavit, Pierce stressed that McGruder was absent from the state since the carjackings. (*Id.*)

In his 2016 affidavit, McGruder not only confessed to all three carjackings, but he purported to establish two other major pillars of Pouncy's case: (1) that the shoe print found at the scene was, in fact, McGruder's size 9 Puma shoe print; and (2) that Pouncy couldn't be guilty because, having known Pouncy and Grimes for a "long" time and well aware of the animosity between them, he knew they would never have worked together like Grimes claimed. (4/18/16 McGruder Affidavit, R. 173-4, ID 8528–29, ¶¶ 7–10.)

33

Finally, Willie Joyce, a "neutral" witness who lived at the home where the carjackings took place, signed an affidavit describing in detail the events of October 11, 2005. (*See* 10/29/10 Joyce Affidavit, R. 9-3, ID 5166.) He recalled the time of day, the appearance and attire of the man who came to his door, and the subject of their brief conversation. (*Id*. at ¶ 2.) Years later, Joyce executed another affidavit positively identifying McGruder as the man who visited him, and he further stated that he identified McGruder out of a line-up days after the incident. (2/12/18 Joyce Affidavit, R. 182, ID 9278–79, ¶¶ 4–7.)

As promising as this innocence narrative may have sounded on paper, it failed to live up to expectations at the evidentiary hearing.

Let's start with Joyce. Of course, we now know that everything in Joyce's affidavit is wrong because McGruder was in the Genesee County Jail on the day that Joyce says he saw and spoke to McGruder. (*See* Attachments A and B.) But setting that aside, there is a stark difference between what Pouncy provided this Court in Joyce's affidavit and what Joyce was able to testify to on the stand.

Joyce's affidavit was filled with specifics, down to the 15-minute window of time he supposedly met McGruder. But on the stand, the

34

best Joyce could recall was that in "fall of 2005" "[a] young man came up to – best of my ability, come up to ask me if I wanted my lawn mowed." 9824.)  (5/22/18 Hrg. Tr., R. 190, ID 9824.)  Beyond that, he couldn't give details.  To the contrary, Joyce expressly disclaimed knowledge of many of the details stated in his affidavit: he didn't know the date he viewed the photo line-up, the name of the officer who showed him it, the location of McGruder's photo in the line-up, or the date he went to the courthouse or who he spoke to there.  (Id. at ID 9833–35.)  And the details that Joyce didn't disclaim he merely affirmed after Pouncy's counsel recited the words of his affidavit and asked him the answer-begging question, "is that correct?"  (Id. at ID 9832–35.)

The disparity was not lost on the Court.  (Id. at ID 9840–41.)  And in response to this Court's inquiries, Joyce admitted to signing the affidavit despite being unable able to personally attest to the specific details in it.  (Id. at ID 9841.)  For that reason, and the fact that it is impossible for Joyce to have seen McGruder on October 11th, this Court should disregard his affidavits entirely.

Next, Pierce.  Pierce's affidavit failed to live up to scrutiny in several major ways.  First, Pierce claimed that he and McGruder "got

rid of" the vehicles *after* Grimes was arrested and began calling McGruder from jail.  (1/4/18 Pierce Affidavit, R. 173-3, ID 8523, ¶ 8.) This cannot be true because authorities recovered Brady's truck on October 2, 2005—ten days *before* Grimes was arrested.  (Attachment G, Mt. Morris PD Incident Report No. 05-004034, at 5.)  Authorities also recovered a second vehicle (the Corvette) on or before October 24, 2005. (*See* Attachment F, Mt. Morris PD Incident Report No. 05-004219 Part 2, at 20.)  And according to McGruder's court records that Pouncy presented at the evidentiary hearing, McGruder was still in jail on that day and had been there the entire time Grimes was.  (Attachment C, *McGruder* Register of Actions, No. 05-016366-FH, Events 22–31.)  Thus, Pierce's assertion that McGruder disposed of the cars after Grimes called him from jail—an apparent attempt to show McGruder's consciousness of guilt—is indisputably false.

Also refuted at the hearing was Pierce's assertion that he and McGruder went "on the run" somewhere out of state after Grimes called McGruder from jail and let on that he was implicating him.  (1/4/18 Pierce Affidavit, R. 173-3, ID 8523, ¶¶ 8–9.)  The evidentiary hearing debunked this claim in two ways.  First, McGruder insisted at the

evidentiary hearing that the last time he spoke to Grimes was in the bullpen on October 11th. (5/22/18 Hrg. Tr., R. 190, ID 9703.) Thus, McGruder himself contradicted Pierce's contention that McGruder spoke with Grimes while he (McGruder) was out of jail.

Moreover, the court records Pouncy provided and McGruder's testimony show that McGruder did not—indeed, could not—flee the state shortly after the carjackings. McGruder's court records show that he was detained until October 24th or 25th, when he pleaded no contest to fleeing and eluding charges and was granted bond while awaiting sentencing. (Attachment C, *McGruder* Register of Actions, No. 05-016366-FH, Events 22–31.) He did not flee then, as he was present for his sentencing on December 8, 2005, when he received probation and boot camp. (*Id*. at Event 39.) According to McGruder, he participated in boot camp (which is a 90-day program), before being released to a halfway house in spring of 2006.[5] (5/22/18 Hrg. Tr., R. 190, ID 9667.) Thus, Pierce's contention that McGruder fled the state before Pouncy

---

[5] McGruder's probation records confirm that he finished the 90-day boot camp on April 25, 2006. (Attachment D, McGruder Probation Records.)

was convicted—yet another attempt to show McGruder's consciousness of guilt—is patently false.

So is Pierce's grander claim regarding McGruder's whereabouts in the years since the carjackings. No less than six times, Pierce made it a point to tell this Court that McGruder was residing out of state virtually the entire time since the carjackings. (1/4/18 Pierce Affidavit, R. 173-3, ID 8523–24, ¶¶ 8, 13, 14, 15, 21, 24.) None of it, it turns out, is true. McGruder's testimony refuted all of it when he testified that he resided continuously in Michigan until July 2017, when he moved to Arizona. (5/22/18 Hrg. Tr., R. 190, ID 9599, 9683, 9690, 9806.) The one feature of McGruder's story that Pouncy said made it "extremely significant and exculpatory"—the notion that he is still subject to prosecution—turned out to militate *against* McGruder's credibility. (*Compare* Pet's Bond Motion Reply Br., R. 176, ID 8551, *with* 2/23/18 Hrg. Tr., R. 185, ID 9488, 9527 (this Court stating that the "bias argument would make sense if McGruder was offering testimony that didn't put his own rear end in serious jeopardy").)[6]

---

[6] The State has no reason to believe that McGruder was not residing in Michigan up until 2017. Thus, this Court should accept for purposes of Pouncy's argument that McGruder is not subject to prosecution for the

Finally, McGruder.  As exhaustively discussed above, there are a litany of things wrong with McGruder's story that he committed the carjackings, but for now let's focus on those aspects of his testimony that undermined critical features of the narrative presented in McGruder's affidavit.

Take, for instance, McGruder's contention that, because he was a "long acquaintance" of both Grimes and Pouncy and aware of the deep animosity between the two, he knew Grimes and Pouncy could not have worked together like Grimes claimed.  (4/18/16 McGruder Affidavit, R. 173-4, ID 8528–29, ¶ 10.)

McGruder testified several times that he had not spoken to Grimes since seeing him in the Genesee County Jail bullpen on October 11, 2005.  (5/22/18 Hrg. Tr., R. 190, ID 9703, 9769.)  Noting the apparent contradiction between that testimony and his affidavit, this Court pressed McGruder on how he knew what "Grimes claimed"?  (*Id.* at ID 9768.)  McGruder struggled to answer until he finally relented:

_____

crimes he now—years after the statute of limitations has run—says he committed.

David Moffitt told him the substance of Grimes's allegations. (*Id*. at ID 9769–70.)

Moffitt, it turns out, was the supplier of another key assertion in McGruder's affidavit. McGruder's affidavit also stated unequivocally that "the Puma brand shoe print found at the scene of the crime is my shoe print." (4/18/16 McGruder Affidavit, R. 173-4, ID 8528, ¶ 7.) On the stand, McGruder conceded that he had no personal knowledge of the shoe print evidence and that it was Moffitt's decision to include this fact in the affidavit. (5/22/18 Hrg. Tr., R. 190, ID 9763–64.) Indeed, McGruder admitted that he first learned about the shoe print "[w]hen [he] came in to [Moffitt's] office" (after the affidavit was drafted) and that "somebody else told [him] that th[e] shoe print was relevant to the case[.]" (*Id*. at ID 9815, 9765.)

In effect, McGruder admitted that one of the key allegations in his affidavit was factually baseless and misleading. That admission, in turn, casts his sure-fire testimony about his 2005 wardrobe in a whole new light. (*See* Section IV.C., pp. 19–21.)

These are just two of the most glaring and currently verifiable misrepresentations in McGruder's affidavit revealed at the evidentiary

hearing (not counting the fact that McGruder could not have committed the Sandstrom carjacking). If two of the most important factual assertions were supplied from Pouncy's attorney, what else was supplied to McGruder? And by whom?

Those are questions for a later date.[7] For now, the important point is that Pouncy initially asked this Court to rely solely on sworn statements to find he is actually innocent, and the important points of those statements were refuted or severely undermined by his very own witnesses. That Pouncy has presented contradictory evidence should make this Court skeptical of his entire claim.

_____

[7] They are also much more pressing now that we know that McGruder could not have committed the Sandstrom carjacking. How did McGruder learn all the details he provided under oath? How does this new fact square with McGruder's repeated denials of reviewing *anything* in preparation for the hearing? (*Cf.* 5/22/18 Hrg. Tr., R. 190, ID 9610, 9614–15, 9630–31, 9687, 9698, 9792–93.) And why did he lie about his involvement in the carjacking? (*Cf. id.* at ID 9689–90, 9697, 9810–12 (McGruder stating he was promised nothing).)

### C.    Pouncy's actual innocence claim conflicts with the most important part of the record: the victims' identifications, none of which were undermined at the evidentiary hearing.

Thus far, the focus of the discussion has been on the "Pouncy" side of the ledger.  But keep in mind, actual innocence claims are not one-sided affairs.  *Bousley*, 523 U.S. at 624.  This Court must consider *all* the evidence, including the strength of the evidence admitted against the prisoner at his trial.  In this case, that means considering the victims, all of whom identified Pouncy—not McGruder—as their attacker.

Each of the victims first identified Pouncy in a photo line-up shortly after the incidents.  (Attachment G, Mt. Morris PD Standard Incident Report No. 05-004034, at 14–15; Attachment N, 10/13/05 Earl Brady Photo Line-up.)  They did so after spending extended periods of time with him in close quarters both before and during the event.  Thus, the identifications in this case are not the kind of one-time, fleeting glimpses typically involved in reports of "unreliable identification."  (*See* 2/23/18 Hrg Tr, R. 185, ID 9481–82 (this Court noting the same).)

Moreover, each victim steadfastly identified Pouncy in court.  Maria Sandstrom said that she "believe[d] with all [her] heart" that her

attacker was Pouncy.  (Trial Tr. III, R. 8-10, ID 1038.)  When Pouncy

pressed her to explain why, she was ready with an answer: "Your eyes,

your nose, . . . [y]our lips . . . , [and] a brow that has a line in it"—"you're

the only one I know that has that combination of those features."  (*Id*. at

ID 1008–09.)

Dan Haynes provided a similar answer.  Asked the same question,

Haynes said, "Your face, facial features, I remember all that. . . .  I

remember you."  (Trial Tr. IV, R. 8-11, ID 1263.)  "I'm not good with

names, but I'm good with things.  His face—I know his face.  There's no

doubt in my mind at all about that."  (*Id*. at ID 1245.)

For his part, Tom Sandstrom explained, "An individual person

that you sat three feet away from for approximately an hour I can—I

would remember that face."  (Trial Tr. II, R. 8-8, ID 886.)  And when Joe

Davis was asked whether he had any question about his identification

of Pouncy, he answered flatly, "None whatsoever."  (Trial Tr. I, R. 8-7,

ID 687–88.)  Sam Anderson didn't mince words, either: "It was you," he

said straight to Pouncy's face. "There's no doubt in my mind."  (Trial Tr.

IV, R. 8-11, ID 1324.)

If these positive statements weren't enough, many of the victims pushed back emphatically when Pouncy insisted that their perpetrator was someone who only *looked like* him. "No," Earl Brady said reoslutely, "that was you, not some person like you." (Trial Tr. I, R. 8-7, ID 751.) Dan Haynes likewise replied, "No. I don't mean the person that looks like you. You." (Trial Tr. IV, R. 8-11, ID 1248.) Sam Anderson also corrected Pouncy: "[N]ot someone that looks like you. I drove it with you." (Trial Tr. IV, R. 8-11, ID 1307.) And when Pouncy insisted to Tom Sandstrom that his attacker had facial features that resembled Pouncy's, Tom pushed back, "Oh it is your face." (Trial Tr. II, R. 8-8, ID 886–87.)

And there was more to the victims' identification than simply Pouncy's physical appearance. Two of the victims (the Sandstroms) received a threatening voicemail days after the carjacking, and at trial Tom testified that it was Pouncy: "Definitely the same voice," he said. (*Id.* at 8, ID 861.) The comparison didn't stop there, either. Tom went on to explain how the tone of voice on the voicemail was exactly like Pouncy's tone of voice when he demanded his keys at gunpoint: "Just like it sounds on the tape. That's the type of voice he used." (*Id.*)

44

Keep in mind that all of these in-court identifications were made as Pouncy represented himself. He was not sitting, silent and still, at the defense table as a represented party might. He was up and down, walking around the courtroom, talking to the witnesses. The witnesses could see his gait, hear his voice, and study his inflection, just as many of them had done when he set up and carried out the carjackings. All in all, six different people positively and repeatedly identified Pouncy by both his appearance and his voice. Nothing McGruder said changed these stubborn facts. Nor could it, as each victim was already given the opportunity to pick McGruder out of a photo line-up, and none of them did so.[8]

* * *

Let's recap. Pouncy argues that reasonable jurors would have doubted his guilt after they heard the chorus from Pierce, McGruder, and Joyce that McGruder—not Pouncy—was the culprit. As Pouncy's

---

[8] Pouncy has argued that one of the victims—Joe Davis—identified McGruder at trial, but the record shows that Davis quickly retracted that statement because the photo shown to him was blurry. (Trial Tr. I, R. 8-7, ID 699–701.) He adamantly identified Pouncy as the culprit. (*Id*. at ID 683–88.)

counsel put it, "they would have known that there was another person."
(2/23/18 Hrg Tr, R. 185, ID 9486.)

But Pouncy's case is no chorus; it's a cacophony.  Pierce would
have told them McGruder ran away and remained out of state (thereby
making him credible confessor).  McGruder would have said the
opposite.  And McGruder would have said he knew important details
about the case, but he would have had to admit Pouncy's team fed him
that info.

Were that not enough, the jurors also would have known that the
story they told is a sham.  McGruder didn't commit the Sandstrom
carjacking, and Joyce didn't see McGruder on October 11th.  McGruder
was locked up in the Genesee County Jail then.  And McGruder didn't
pressure Grimes into falsely implicating Pouncy because Grimes wasn't
in jail (where McGruder says he was) on October 11th and, in any
event, Grimes implicated Pouncy before he even went to jail.  Any
reasonable juror who heard all *that* would have written off McGruder
and Joyce as incredible (or in the case of Joyce, badly mistaken)
witnesses who exposed Pouncy's innocence defense as a farce.

46

And against all that, the jurors would have watched six victims confidently identify Pouncy as the man who robbed them of their prized possessions.  Under these circumstances, it cannot be said that *no* reasonable juror would convict Pouncy, let alone that such a result is more likely than not.  Pouncy has fallen woefully short of the exceedingly high threshold required by *Schlup*.  This Court should therefore find that Pouncy has not established his actual innocence.

## VI.   This Court should deny McGruder's premature and unfounded request for immediate habeas relief.

Not content with arguing actual innocence, Pouncy goes a step further and asks this Court to grant him habeas relief based on the testimony elicited at the evidentiary hearing.  (Pet's Post-Hrg. Br., R. 197, ID 9931–36.) Pouncy is over his skis.

For starters, Pouncy's argument is outside the scope of the present briefing.  As this Court indicated, "[T]he evidentiary hearing will proceed in increments."  (2/23/18 Hrg. Tr., R. 185, ID 9557.)  The first step of that incremental approach is determining whether Pouncy has satisfied the actual innocence standard.  Then, and only then, does it make sense to brief the consequences of that finding.  (*See id.*)  What's

47

more, the *Brady* claim he asserts is not even alleged in his petition, as he acknowledges in footnote 29 of his brief.[9]  In this circumstance, the proper course is to file a motion to add a new claim.

In any event, Pouncy has not come close to establishing a *Brady* claim involving a photo line-up sheet that Willie Joyce supposedly filled out.  (*Cf.* Pet's Post-Hrg. Br., R. 197, ID 9932–35.)  For starters, the sole basis for Pouncy's claim that such a lineup ever existed is Joyce's affidavit stating that he filled one out.  (*Id.* at ID 9932.)  But that same Joyce also stated under oath that he saw and spoke to McGruder, and we know that cannot be true.  But even overlooking that, the line-up is not favorable to Pouncy because McGruder could not possibly have been the culprit.  And for the same reason, any such evidence would not have been material.  The fact that an eyewitness picked someone out of a photo lineup who could not possibly have committed the crime would not have made a wit of difference to the jurors' deliberation of Pouncy's guilt.

---

[9] At times, Pouncy discusses his *Brady* claim involving phone records, which *was* asserted in his petition. (*See* R. 9, ID 4906.)  But, again, that claim is far beyond the purview of the present briefing.  The merits of his constitutional claims are an entirely separate issue.

## CONCLUSION AND RELIEF REQUESTED

This Court should find that Pouncy has failed to establish actual-innocence under *Schlup* and proceed to rule on the rest of his claims using the normal procedural-default and AEDPA-deference rules that govern non-actual-innocence cases.

Respectfully submitted,

Bill Schuette
Attorney General

John Pallas (P42512)
Christopher Allen (P75329)
Assistant Attorney General
Attorneys for Respondent
Criminal Appellate Division
P.O. Box 30217
Lansing, MI 48909
(517) 373-4875

/s/ David Porter

Assistant Attorney General
Attorney for Respondent
Criminal Appellate Division
P.O. Box 30217
Lansing, MI 48909
(517) 373-4875
porterd@michigan.gov
P76785

Dated: November 1, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2018, I electronically filed the

above document with the Clerk of the Court using the ECF System,

which will provide electronic copies to counsel of record.

JUDGE MATTHEW F. LEITMAN
JOHN J. BURSCH, ATTORNEY FOR PETITIONER
BRIAN P. LENNON, ATTORNEY FOR PETITIONER
DANIEL MERON, ATTORNEY FOR PETITIONER
TIMILIN K. SANDERS, ATTORNEY FOR PETITIONER
DAVID L. MOFFITT, ATTORNEY FOR PETITIONER


/s/ David Porter

Assistant Attorney General
Attorney for Respondent
Criminal Appellate Division
P.O. Box 30217
Lansing, MI 48909
(517) 373-4875
porterd@michigan.gov
P76785