UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OMAR RASHAD POUNCY,

     Petitioner,

                                 No. 13-cv-14695

v.

                                 HON. MATTHEW F. LEITMAN

CARMEN D. PALMER,

     Respondent.

_____/

**RESPONDENT WARDEN'S
MOTION TO DISMISS WITH PREJUDICE**

Respondent, Warden Matthew Macauley, through undersigned counsel, respectfully moves this Court to dismiss the petition for habeas corpus, and in support says:

1.     On November 20, 2013, petitioner Omar Pouncy filed a petition for a writ of habeas corpus, claiming (among other things) that he was actually innocent of the crimes for which he was convicted and sentenced to prison.

2.     In support of that claim, Pouncy filed an affidavit from Jaawkawa McGruder in which McGruder claims that he, not Pouncy, committed the crimes for which Pouncy was convicted.

3.     Based on McGruder's sworn representations, on May 22, 2018, this Court held an evidentiary hearing.  During his lengthy testimony, McGruder confirmed the statements in his affidavit and provided "unique, compelling first-person details" about the three carjackings that he, not Pouncy, supposedly committed.

4.     Recently uncovered evidence from cell phones that Pouncy used before and after the hearing establish that McGruder's testimony was entirely false, that Pouncy provided McGruder with the

information necessary to testify, and that Pouncy paid McGruder $10,000 to take responsibility for crimes that he (Pouncy) committed.

5.     This Court has the inherent authority "to fashion an appropriate sanction for conduct [that] abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991).

6.     That inherent authority includes the power to dismiss an action in which the plaintiff has perpetrated a fraud on the court by manufacturing evidence and suborning perjury.  *See Plastech Holding Corp. v. WM Greentech Auto. Corp.*, 257 F. Supp. 3d 867, 878 (E.D. Mich. 2017) (GOLDSMITH, J.); *Vargas v. Peltz*, 901 F. Supp. 1572, 1581 (S.D. Fla. 1995) ("The federal case law is well established that dismissal is the appropriate sanction where a party manufactures evidence which purports to corroborate its substantive claims.").

7.     For the reasons detailed in the accompanying brief in support, the State respectfully requests that this Court impose that sanction in this case.

8.     Under Local Rule 7.1(a), counsel for the State requested concurrence in this motion by email to lead counsel on May 30, 2019,

explaining the nature of the motion and its legal basis.  Petitioner's

counsel respectfully declined to concur.

Respectfully submitted,

Dana Nessel
Attorney General

/s/ David Porter

Assistant Attorney General
Criminal Appellate Division
P.O. Box 30217
Lansing, MI  48909
(517) 335-7650
porterd@michigan.gov
P76785

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OMAR RASHAD POUNCY,

     Petitioner,

                            No. 13-cv-14695

v.

                            HON. MATTHEW F. LEITMAN

CARMEN D. PALMER,

     Respondent.

_____/

**BRIEF IN SUPPORT OF RESPONDENT WARDEN'S
MOTION TO DISMISS WITH PREJUDICE**

## INTRODUCTION

On May 22, 2018, Jaawkawa McGruder testified under oath that he committed the three carjackings for which Pouncy was convicted and that Pouncy was innocent.  Months later, the State found evidence proving that McGruder couldn't possibly have committed one of the carjackings.  Recognizing that this new evidence raised questions not just about McGruder's involvement in the other carjackings, but about the circumstances surrounding how and why he came to testify, we asked:

1. How did McGruder learn all the details he provided under oath?

2. How does this new fact [that he didn't commit one of the crimes] square with McGruder's repeated denials of reviewing *anything* in preparation for the hearing?

3. And why did he lie about his involvement in the carjacking?

(R. 203, ID 10021 n.7.)  With enough to know that McGruder wasn't telling the truth about one of the carjackings, but not enough to prove how or why he lied, the State left those questions for another day.  (*Id.*)

Now that day has come.  Recently uncovered evidence shows that Pouncy orchestrated a scheme involving witness bribery and subornation of perjury from prison using a cell phone.

Most damning of all are the text messages between Pouncy and McGruder in which the two agree that McGruder would falsely testify that he, not Pouncy, committed the three carjackings, and in return Pouncy would pay him $10,000. (*See* Ex. 1.)  Pouncy's texts show that he did, in fact, pay McGruder. (*Id.*)

Records also show that Pouncy had help from several people on the outside, including India Countryman, who facilitated part of McGruder's payment; Rashad Shahid, who facilitated another part of the payment and who was involved in covering up the bribery after the hearing; and Tiakawa Pierce, Pouncy's co-defendant, who helped convince McGruder to commit perjury and whom Pouncy asked to provide *more* false evidence. (*See* Exs. 1–6.)

There is only one phrase that captures what Pouncy has done: fraud on the court.  And there is only one way to respond: dismissal with prejudice.  A litigant who so flagrantly abuses the justice system shouldn't be allowed to call on that system to vindicate his claims.  As numerous courts have done when confronted with this kind of conduct, this Court should dismiss the case.

3

# FACTS

In June 2018, just weeks after this Court held an evidentiary hearing regarding Omar Pouncy's actual innocence, authorities at Carson City Correctional Facility recovered two contraband cell phones that belonged to Pouncy.[1]  (*See* Silke Harmon Affidavit (Ex. 11), ¶¶ 3–4; 6/5/18 Misconduct Hr'g Report (Ex. 13); 6/8/18 Misconduct Hr'g Report (Ex. 14).)  Months later, an intelligence analyst with the Michigan Department of Corrections performed a cell phone extraction on the two phones.  (Ex. 11, ¶¶ 5–7; Matthew Miller Affidavit (Ex. 12), ¶¶ 7–9.)  The extraction showed that in the months, weeks, days, and even hours before his hearing, Pouncy was busy fabricating his case of actual innocence.

## Pouncy finds a "great witness"

The saga begins on April 2, 2018, when Pouncy received texts from India Countryman and his cousin, Rashad Shahid, providing

---

[1] One of the phones was found in the possession of another inmate, but prison officials believed that it belonged to Pouncy.  (Silke Harmon Affidavit (Ex. 11), ¶ 3.)  Later analysis confirmed that it was used by Pouncy.  (*Id*. at ¶¶ 10–23, 25; *see also* Ex. 8, p. # 1 (Pouncy texting Rashad that he lost the first phone when someone else got caught with it).)

4

McGruder's cell phone number.  They said, simply, "+1 (248) 571-6674."

(Ex. 4, p. 1, # 7;[2] Ex. 7, p. 1, # 2 & 4; Silke Harmon Affidavit (Ex. 11),

¶ 13.)

Minutes later, Pouncy texted that number.   During the first set of

exchanges, Pouncy asked McGruder, "Cuz if i take care of my part do I

have ur guarantee?"  (Ex. 1, p. 1, #6.)  Several days later, on April 4th,

the two texted again.  McGruder told Pouncy that he needed help going

through all the "Paperwork" because he was missing key details:

| McGruder: | What's The Deal |
|---|---|
| McGruder: | Just come threw in time so U can Go over All the Paperwork only need to know what kind gun, And Cars |
| Pouncy: | Bout 2 call |

(*Id*. at 1–2, # 17–19.)

After McGruder spotted information in the paperwork, their

conversation turned to payment:

| McGruder: | Witch I see cars in some paper work |
|---|---|
| Pouncy: | The checks should be cleared 2morrow no later than Friday. We need 2 chop it up tho |
| McGruder: | My phn tripping try call now |

---

[2] "#" refers to the numbered row in the exhibited report.

| | |
|---|---|
| McGruder: | I really Don't Like Talkin around my Girl About this Shit, She Ask To much |
| Pouncy: | Ok. Let me know a good time to call |
| McGruder: | Anytime 5pm 10pm your time |
| McGruder: | O get off work my time 2pm witch is 5 there |
| Pouncy: | I'll hit u @ 10 tomorrow. But if that cash clear lil cuz will PayPal u before then |
| McGruder: | No PayPal, shit take too long |
| McGruder: | Walmart to Walmart |
| Pouncy: | Alrite tell lil cuz |

(*Id.* at 2, # 21–31.)

Several days later, on April 7th, McGruder texted Pouncy asking him to call:

| | |
|---|---|
| McGruder: | Call me like 530 |
| Pouncy: | Alrite cuz. Dont let them know we're talkn |
| Pouncy: | To each other |
| McGruder: | I know |

(*Id.* at 3, # 43–46.)

The "them" in Pouncy's text was an apparent reference to his attorneys because just two days later, on April 9th, Pouncy texted McGruder telling him that his attorneys thought McGruder would make a "great witness":

6

> Pouncy:  Cuz I talked 2 the lawyers they said "you would make a great witness."

(*Id*. at 4, # 65.)  He then asked McGruder to contact his attorneys and make up a reason to testify sooner than May 22nd:

> Pouncy:  Can u contact them and tell them if they can try to have u testify this month someyimes bcuz you may b tied up next month. They tryn 2 set the date 4 May 22nd. I know we both tryn 2 resolve this sooner than later. Cuz thanks too, i know u got ur own way 2 get them m's but i swear we going 2 get them m's off of this. But yeah tell them u and your girl r going on a trip next month for the last two weeks and you're ready 2 get this over with and behind u. Ask them if they can make arrangements for this month sometime.
>
> McGruder:  Already Tried, They Gone Push Date Back Or Video,
>
> Pouncy:  Ok
>
> McGruder:  And I can't Fly now where June or July
>
> Pouncy:  So we stick 2 May. Damn im ready 2 go

(*Id*. at p. 4, # 66–70.)

## McGruder gets "thirsty"

McGruder and Pouncy did not text for the next month.  Then, on May 13, 2018, at 2:30 p.m., McGruder sent a series of texts to Pouncy threatening to "flip the script" if he was not paid immediately after

testifying and saying that he would not testify at all unless he received the "rest of [the] money":

> McGruder: You too much of a Risk for me cuz Either have rest of money to me before I fly out, Or I'm Not flying out, You risk your own life and them Niggas around you for what?  IDK but I'm not openly letting you play with mine,
>
> McGruder: and Talk to cuz He Said you got it when You saying he got it.
>
> McGruder: Cuz You know I will Flip the whole damn scrip, if I walk out that place and my shot ain't where it pose to be.
>
> McGruder: But To Get Rid of that Thought, Have It Sent On 19th no later and my Flight leave the 20th
>
> McGruder: No 19th, no 20th

(*Id.* at 4–5, # 76–80.)

Thirty minutes later, at 3:02 p.m., Pouncy texted Tiakawa Pierce (the same Pierce who was Pouncy's co-defendant and who signed an affidavit in support of his innocence).  (Ex. 2, p. 1, # 2.)  Pouncy said, "That nigga got me hot i done gave this nigga 5k and he tryn 2 renege." (*Id.* at 1, # 3.)  Pierce asked for McGruder's number and told Pouncy, "Just give me the rest I'm gonna hold it into it's over."  (*Id.* at 1, # 5.)

Minutes later, Pouncy texted India, asking, "Bestie do u have that money in the safe or the bank."  (Ex. 4, p. 57, # 867.)  India replied,

"Smdh in the bank and you can't trust to give him the whole thang as much as he flip flop what's gone make him come through after that ?" (*Id*. at 57, # 868.)  After learning where the money was, Pouncy instructed India, "Screen shot ur account balance so I can show him we got the money."  (*Id*. at 57, # 869; *see also* Ex. 10.)

Pouncy then responded to McGruder, promising to provide the second half of McGruder's $10,000 payment on the day of the hearing; if McGruder wasn't comfortable with that, Pouncy asked McGruder to return the $5,000 deposit:

> Pouncy:    If u reneging just give me that 5k I already gave u. Nigga u playn it foul. U doing wat u do aint got shit 2 wit wat I'm doing i aint give u 5k for no reason. We need 2 stick 2 the plan lil cuz going 2 showu the $ the day of court and smash it on u rite wen u get off the stand. Nigga I'm not giving up no 10k for nothing. I hope u aint on no hoe shit. We doing business i aint gettn extorted. At the end of the day I'm coming home regardless I'm just tryn 2 set this shit up 4 my lawsuit. But if u reneging just let me know so i can email my attorneys asap so i can get a closer date and so they won't have 2 pay for that flight

> Pouncy:    I'll have the money given 2 u at the court house I'm not comin off no more money b4 then

> Pouncy:    Or I'll have it sent to a lawyer down there with the agreement dat they dont turn it over til i confirm u testified

9

Pouncy:        And i gave u that 5k as a down payment 4 testifying u talkn 2 my lawyers aint goin 2 get me home tahk testifying 4 free. I'll give the $ 2 him 2 give 2 u or 2 auntie angel

Pouncy:        Now u dont want 2 answer just send me my 5k back asap. I hope we dont fall out over u gettn on no hoe shit. Business is handle with niggas stickn 2 the plan i can kill myself 2day nigga u still obligated 2 stick 2 the plan I KNEW U WAS GOING 2 GET ON SUM THIRSTY SHIT LIKE THIS.

(Ex. 1, p. 5, # 81–85.)

During this same time, Pierce and McGruder were also texting. As Pierce later showed Pouncy through screen shots of his conversation, McGruder said that "if I did the sh[i]t and got caught, . . . I'd seat my ass down humbled."  (Ex. 3, p. 1 # 6 & p. 3 IMG_5061 (capitalization removed).)  He told Pierce, "I went in on your case cuz I rather me do more time then you do it."  (*Id.* (capitalization removed).)  McGruder continued, referring to Pouncy, "But all that came from his stupid ass fuck ups, my job was to protect you, never him, but I see niggas already had paper work on me signed to go."  (*Id.* (capitalization removed).)

Later that afternoon, tensions had apparently subsided.  At 4 p.m., Pouncy texted Pierce, saying, "He say he was just playn and he going 2 do it so good look cuz this nigga play 2 fuckn much."  (Ex. 2, p.

1, # 6.)  Pierce replied, advising Pouncy not to "play" McGruder.  (*Id.* at

1, # 7.)  Pouncy assured Pierce that he wasn't: "Cuz on my granny I'm

not that shot aint shit i already gave him 5k."  (*Id.* at 1, # 8.)

A week later, on May 20th, McGruder texted Pouncy notifying him

that he was in town:

> McGruder:    Holiday Inn Flint - Grand Blanc Area 5353 Gateway
>              Centre Flint, MI

(Ex. 1, p. 5, # 86.)

Minutes later, Pouncy relayed McGruder's location to India.  (Ex.

4, p. 64, # 977.)  India responded, "Do I suppose to be taking him any or

just showing him ?"  (*Id.* at 65, # 987.)

**Pouncy "coaches" McGruder to the end**

The next day, McGruder met with Pouncy's legal team to prepare

for the hearing.  Throughout the afternoon, McGruder and Pouncy

texted about an email that Pouncy had prepared on McGruder's behalf

regarding the gun used during the crimes.  (Ex. 1, p. 5, # 87–92.)

According to McGruder, when he showed the email to Pouncy's

attorneys, they said that it looked like someone else had prepared the

email.  (*Id.* at 5, # 93.)  They expressed concern that Pouncy was

"coaching" McGruder:

McGruder:    You stupid

Pouncy:    How

McGruder:    You stupid

McGruder:    That Email you Sent Me To Send to Them About the Gun, They Know You Sent It

Pouncy:    Dead that shit

Pouncy:    The gun shit was me doing a lil overreacting but we still good

McGruder:    The Had Some One read It, He Said I write like his Mom With Bullet points, See How I Cap my Shit,

McGruder:    So Now They Feel like You Coaching me, And Once they Check your FB and See you got A Lead Out, You FUCKKKKKJ

McGruder:    He Just Told Me, If Not For Me, YOU FUCKED

(*Id*. at 5–6, # 87–95.)  McGruder then told Pouncy that he was considering backing out because the attorneys were asking him things he did not know.  (*Id*. at 6, # 96–98.)  He insisted on talking with Pouncy to go over things again:

McGruder:    THEY giving Me A Break To Go Back And Go over things,

McGruder:    Man This Shot Just Got More Stressful, And I knew it would If You ask Keep trying to play director

McGruder:    Man This Shot Just Got More Stressful, And I knew it would If You ask Keep trying to play director

12

| McGruder: | I'm ready To Wash My Hands With This Shot, Cuz You Just Made It So I Can Be Charged With This Shot, You Up'd my risk, Trying to delegate shit, |
| --- | --- |
| McGruder: | We need to talk about all this Shit set by set on what happen, shit they asking I don't know |
| McGruder: | Cuz |
| McGruder: | We need talk |
| McGruder: | Now |
| McGruder: | Shit I don't know and remember |

(*Id*. at 6, # 96–103.)  Minutes later, Pouncy texted back, assuring

McGruder that it was just part of the process:

| Pouncy: | They r just preping u for cross examination |
| --- | --- |

(*Id*. at 6, # 108.)

Early the next morning, the day of the evidentiary hearing,

McGruder texted Pouncy saying that he still had things he needed to

know about the offenses, and he wanted assurances that he would be

paid because he was facing criminal charges by testifying:

| McGruder: | Yes call me like 8am refresh of everything |
| --- | --- |
| Pouncy: | If i can these co's lurkn ill call at 635 |
| McGruder: | I'm in bed I'll be up 740 |
| Pouncy: | It depends how thess 1st shift co's moving its still 3rd shift now until 7 so b4 then will b best. Cuz we got this. I need u bad at |
| McGruder: | Endia gone be here on time right |

13

| Pouncy: | Yes she got u. |
|---|---|
| McGruder: | I hope so I got more shit to clear up here |
| McGruder: | I could get arrested, I need money asap |
| McGruder: | It court |
| Pouncy: | The Attorney General's office GUARANTEED the Federal judge that they will NOT arrest u. So India will b their and have the $ ass soon as u get done testifying. Cuz we sticking 2 da stricpt or wat |
| McGruder: | I hope so |

(*Id*. at p. 7, # 118–128.)

Twenty minutes later, just hours before McGruder was set to testify, Pouncy and McGruder exchanged one last flurry of texts. Pouncy supplied the details of each carjacking (the very same "unique, compelling first-person details" that Pouncy would later tell this Court that only the person who committed the carjackings would know):

| Pouncy: | Yeah the 1st carjacking happened in Burton it involved the Green older Monte Carlo. You test drove tge car two different times with 2 differnt guys and the 2nd time u carjacked him at gun point. They only saw u but Wayne and Tahk was in the car waitn on u |
|---|---|
| Pouncy: | The 2nd one involved the goldish Camaro. Y'all were out riding You Wayne and Tahk on Richfield rd and saw a souped up race Camaro 4 sale outside of a racecar fabrication shop u got out that nite and approached the place of business where it was setup 4 sale at and u realized that it was sum1 u knew from being at the race tracks with Sam Wood. The |

guys name was Joseph Scott and he said u looked familiar 2 him that's when u told him ur name was Jacob Wood Sam Wood's lil brother. From there he told u that u could come back the next day to test drive the car and have ur mechanic look at it. Y'all u wayne and Tahk left came back the next day and two more guys were there along with Scott Davis the guy u know from the race track. Yall left, stopped at a gas station on carpenter and dort hwy then yall headed over to Keller Rd at the deadend. It were sum ppl outside next door working on the house. Yall got out the car wayne pulled the gun out told the ppl (it was only 2 of them Scott davis did NOT cum with yall) to give him the keys and the title the two ppl refused Wayne shot the gun by surprise it was so close to u ur ears rang and then he forced them into the woods. You hopped in the truck and Wayne and Tahk left in Wayne's car.

Pouncy:    The 3rd one involved the White Cadillac and Red Corvete. Y'all seen a car advertised 4sell in the newspaper y'all called 2 schedule a test drive. The owners said come the next day. The next day you called them back to set up the test drive. Y'all drove all the way to Fenton to the ppls house. Yall got lost several times so you kept calling them back 4 directions. Yall finally arrived. You got out met the husband and wife u got in the car with the husband. You were in the driver seat. The husband was in the passenger seat. Wayne and Tahk stayed in Wayne's car. The wife got into a red corvette. Yall traveled to Mt. Morris. Y'all stopped at a gas station on the corner of Clio and Coldwater then yall headed 2 the same deadend road at the last house on the right. This time someone was home, 2 ensure that u would not alarm them inside the home u went up 2 the door

15

and 1st one black male came to the door. U asked to mow the lawn, he said wait so he could get the owner then another older black male came 2 the door u asked him if u could cut the grass. He declined ur offer. You left went back out to the car pulled the gun out told the white male to get out the car and to give u the title. You walked hom to the road where his wife was told hee to get out the car. She got out you tooj the keys and told them to get in the woods. They walked in the woods. Wayne got out of his car jumped in the corvette and sped off Tahk left in Wayne's car and u jumped back in the Cadillac and left.

(*Id.* at 7–8, # 129–131.)  Just to be sure, he sent the same three texts to India.  (Ex. 4, pp. 65–67, #999–1002.)

Later that morning, McGruder spent over five hours falsely confessing to crimes that Pouncy committed, in an attempt to convince this Court that Pouncy is actually innocent.  (R. 190.)  If Pouncy held to his word, McGruder left the courthouse with $5,000 of Pouncy's money.

**Pouncy cleans up a loose end**

A week later, Pouncy was cleaning up a loose end from the hearing.  It appears Pouncy was concerned about a phone call between him and Rashad that the State asked McGruder about during the hearing.  (*See* R. 190, ID 9782–83.)  During the call there was a discussion of "trust" and coded language about "[t]wo payments of ten."

16

(*Id*. at ID 9783.)  This Court asked McGruder whether he was offered any money to testify.  (*Id*. at ID 9788.)  He lied and said no.  (*Id*.)

With that exchange in mind, Pouncy ghost wrote an email on behalf of Rashad, addressed to Dan Meron, and sent it to Rashad on May 30th.  (Ex. 6.)  In it, Rashad (i.e., Pouncy) crafted a narrative in which Rashad suggested offering to pay McGruder money as part of a scheme to keep the proceeds for himself.  (*Id*.)  Rashad (i.e., Pouncy) recited all the work he had done on the case, including tracking down witnesses and persuading them to sign affidavits and collecting evidence.  (*Id*.)  He said he would sign an affidavit or testify.  (*Id*.)

**"Lawyer's don't know nothing bout a play"**

Pouncy's machinations didn't end there.  Shortly after the hearing, the State filed Pierce's plea hearing transcript in which he stated under oath that *Pouncy* committed the carjackings.  (*See* R. 184.)  The same day, Pouncy texted Pierce to check his email "asap."  (Ex. 2, p. 1, # 11.)  Moments earlier Pouncy had emailed Pierce with the subject line: "Tiakawa Transcript.pdf".  (Ex. 5.)  In the body, Pouncy wrote: "Cuz they just gave us this and tryn 2 use it against me we got tp clean this up.  My name is all thru this shit."  (*Id*.)

After Pierce read the email, he texted back, asking, "[W]hat you need me to do." (Ex. 2, p. 1, # 14.) Pouncy hatched a "play":

| | |
|---|---|
| Pouncy: | We have to have u sign affidavit sayn u only implemented me bcuz the prosecutor forced u 2 say my name even if u read it it shows the prosrcutor forcing u tonsay my name. You have 2 say u were willing 2 do whatever they wanted u 2 do in order to get that plea deal |
| Pierce: | Exactly thts because Sam told me tht couldn't be use and just say yes cuz my intentions wasn't to do tht I wanted to go all the way tht cop came from me because |
| Pierce: | I knew they ain't have shit but they kept shooting my motions down |
| Pouncy: | Cuz i aint trippin u aint testify against me. We just need 2 clean it Up |
| Pierce: | Let's get it but I wanna do a sit down with the judge prosecutor and lawyers just a seal testimony from pubic dnt need everybody knowing me by tht name |
| Pouncy: | Ok |
| Pierce: | Cuz Rs it ain't no rat in my blood they had to slick me to get me to say guilty with all them damn questions on top telling me in order for them to accept the |
| Pierce: | plea I gotta tell them what I did |
| Pouncy: | Cuz say no more |
| Pouncy: | Lawyers don't know nothing bout a play |

(*Id.* at p. 2, ID 15–24.)

**ARGUMENT**

This was subornation of perjury, witness bribery, and attempted subornation of perjury in black and white.  And it was all done in an effort to dupe this Court into releasing Pouncy from prison.  This Court has the power—indeed, the duty—to sanction Pouncy for his deplorable conduct.

**This Court has the inherent power to sanction misconduct**

Federal courts have several ways to deal with litigation misconduct.  The most potent stems from its inherent authority.  The Article III power, the Supreme Court has said, comes with "[c]ertain implied powers" that "necessarily" inhere in "our Courts of justice from the nature of their institution."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–44 (1991).  That inherent authority includes the power "to fashion an appropriate sanction for conduct [that] abuses the judicial process," *id*. at 44-45, including presenting false or fabricated evidence, *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 250 (1944).

There is, of course, authority in the Federal Rules of Civil Procedure to sanction various kinds of litigation misconduct, *see* Fed. R. Civ. P. 11, 37, 41, 60(b), but those sources do not diminish or displace

19

this Court's inherent authority, *see React Presents, Inc. v. Eagle Theater Entm't, LLC*, No. 16-cv-13288, 2018 WL 1535414, at \*5 (E.D. Mich. Mar. 29, 2018).  Because the kind of misconduct at issue here doesn't fall squarely within the scope of any of the pertinent rules, this Court's inherent authority provides the most appropriate source of authority to impose sanctions.  *See* Jonathan M. Stern, *Untangling a Tangled Web Without Trial: Using the Court's Inherent Powers and Rules to Deny A Perjuring Litigant His Day in Court*, 66 J. AIR L. & COM. 1251, 1269 (2001) (observing that courts invoke their inherent authority to dismiss fraud practiced on the court "because there is not a tight fit between the rules of civil procedure and situations in which litigants repeatedly lie under oath, fabricate evidence to support their claims, or destroy evidence").

There is no question this Court has power and duty to sanction bad-faith, fraudulent litigation conduct like the kind at issue here.  *See First Bank of Marietta v. Hartford Underwriters Ins.,* 307 F.3d 501, 511 (6th Cir. 2002) ("[T]he inherent authority of the Court is an independent basis for sanctioning bad faith conduct in litigation."); *See also Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011).

The only question is how.  In answering that question, courts generally consider the egregiousness of the misconduct, the prejudice to the opposing party and the judicial process, and whether the severity of the requested sanction is proportionate to the misconduct.  *See Plastech Holding Corp. v. WM Greentech Auto. Corp.*, 257 F. Supp. 3d 867, 878 (E.D. Mich. 2017); *see also Graham v. Schomaker*, 215 F.3d 1329 (7th Cir. 2000) ("Before imposing such a sanction, the district court should consider whether the other party has been prejudiced . . . , whether the sanction is proportionate to the transgression, and whether the misconduct is abusive to the judicial process."); *Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 394 (1st Cir. 1990) ("The appropriateness of a particular sanction is primarily a function of two variables: the facts presented and the court's purpose in penalizing the errant party.").

These considerations can point to only one response here: dismissal with prejudice.  That sanction, the State acknowledges, is one that courts do not impose lightly, *Chambers*, 501 U.S. at 44–45, but it is within the court's discretion to impose it in the appropriate case, *id.*

Given the egregiousness of Pouncy's conduct, the pivotal nature of the fraud, its permeating effect on the rest of the case, not to mention

the compelling interests in protecting the integrity of the courts and deterring this kind of malfeasance in our justice system, this Court should do the same.

## Pouncy perpetrated a fraud on this Court

Pouncy's conduct is as contumacious as it comes.  Text messages between Pouncy and McGruder show that Pouncy paid McGruder $10,000 to falsely testify that he was the perpetrator and that Pouncy was innocent.  Pouncy provided McGruder with the information necessary to pull off the stunt, sending him "paper work" to review and giving him a detailed, play-by-play refresher of each carjacking right before the hearing.  He also sent McGruder a fabricated email for McGruder to use (an email that his attorneys believed was written by someone else and that led them to believe that Pouncy was coaching McGruder).

Pouncy also facilitated the payment of $10,000 to McGruder.  He enlisted his cousin, Rashad, to wire a portion of the money to McGruder several weeks before the hearing.  And when McGruder got cold feet, he had India take a screen shot of this bank account balance to assure McGruder that he had the money to pay him.  He also enlisted India to

give McGruder the remainder of the money in cash right after he left the stand.

Later, after the State disclosed recordings involving Rashad hinting that McGruder was offered money for his testimony, Pouncy drafted an email on Rashad's behalf in an attempt to cover up his bribery scheme.  He also requested Pierce to sign another affidavit after the State presented evidence that Pierce had previously inculpated Pouncy under oath.

This conduct—bribing a witness to provide false testimony—"is among the most grave abuses of the judicial process." *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 782 (7th Cir. 2016).  The central truth-seeking function of adversary proceedings operates on the premise that witnesses who swear an oath are providing *truthful* information as best they know it.  Perjurious schemes like Pouncy's, which treat the oath as an empty incantation, represent a "flagrant affront" to the judicial system, *A.B.F. Freight System, Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994), "undermine[ing] [its] most basic foundations," *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015).

McGruder, of course, is the one who falsely testified, but he was merely an actor in Pouncy's play. It was Pouncy who read McGruder his lines—quite literally, hours before he went on the stand. It was Pouncy who funded McGruder's performance to the tune of $10,000. It was Pouncy who worked to keep his bribery scheme under wraps by ghost writing emails. And it was Pouncy who fabricated other aspects of his actual innocence claim. Pouncy was, as McGruder put it, the "director," (Ex. 1, p. 6, # 97), "set[ting] in motion [an] unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing [this Court]," *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) (describing a fraud on the court).

When it comes to "individuals who engage in fraud upon the court," courts have a "compelling" interesting in "dismiss[ing] [the] case and protect[ing] the sanctity of the judicial process. *Plastech*, 257 F. Supp. 3d at 878. The reason is self-evident: a litigant who "defile[s]" the "very temple of justice" does not deserve its continued hospitality. *Universal Oil Prod. Co. v. Root Ref. Co.*, 328 U.S. 575, 580 (1946); *see*

*also ABF Freight System,* 510 U.S. at 323 (stating that perjury is "intolerable" and "should be severely sanctioned in appropriate cases").

For this reason, many courts have dismissed a case when it was discovered the plaintiff had practiced a fraud on the court by fabricating evidence or committing perjury. *See, e.g.*, *Plastech*, 257 F. Supp. 3d at 878 ("[C]ase law is replete with instances where a district court dismissed an action with prejudice upon finding that a party fabricated evidence and presented that evidence to the court in support of its claims."); *Vargas v. Peltz*, 901 F. Supp. 1572, 1581 (S.D. Fla. 1995) ("The federal case law is well established that dismissal is the appropriate sanction where a party manufactures evidence which purports to corroborate its substantive claims."); *Murray v. City of Columbus, Ohio*, 534 F. App'x 479, 484 (6th Cir. 2013) (stating that in "situations where fraud has been practiced upon the court," "an appropriate sanction might be dismissal of the suit"); *see also* 27 C.J.S. Dismissal & Nonsuit § 61 (collecting cases); 24 Am. Jur. 2d Dismissal § 56 (same).

That includes habeas cases. *See Oliver v. Gramley*, 200 F.3d 465, 466 (7th Cir. 1999) (affirming dismissal of habeas petition for fraudulent litigation conduct); *Mitchell v. Daniels*, No. 3:06-cv-00624,

25

2014 WL 1246735, at *8 (S.D. Ill. Mar. 24, 2014) ("Pursuant to the Court's inherent authority, a dismissal with prejudice of a habeas petition is a permissible sanction for fraud upon the Court."). Thus, the fact that there are liberty interests at stake makes no difference. Courts have never shied away from dismissing a criminal defendant's case when he escapes from the restraints placed upon him by the very conviction he is challenging in court. *See Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970); *Ortega-Rodriguez v. United States*, 507 U.S. 234, 242 (1993). The same rationale applies in the habeas context.

**Pouncy's fraud goes to the heart of the case**

Courts have held that dismissal is a particularly "suitable penalty" when the fraudulent conduct relates to "*the* pivotal issue in this case." *Nichols v. Klein Tools, Inc.*, 949 F.2d 1047, 1049 (8th Cir. 1991). Here, Pouncy's scheme was centered on the pivotal issue in the case: his actual innocence.

A little context is important. This Court will recall that it previously granted Pouncy habeas relief on his "Hobson's Choice" *Faretta* claim, ruling that the state court's decision was an unreasonable application of clearly established federal law. *See Pouncy*

26

*v. Palmer*, 165 F. Supp. 3d 615 (E.D. Mich. 2016). The Sixth Circuit reversed that decision because, while this Court's analysis may have sufficed under *de novo* review, Pouncy was not entitled to relief under AEDPA's deferential standard. *Pouncy v. Palmer*, 846 F.3d 144, 163 (6th Cir. 2017).

When the proceedings in this Court resumed, Pouncy mounted a case for actual innocence. (*See* R. 158, 173.) At the heart of that case was McGruder's confession to committing the crimes for which Pouncy was convicted. (R. 173, ID 8506–08.) Pouncy argued that a successful showing of actual innocence through McGruder's testimony would not only excuse any procedural defaults, it would permit this Court to re-examine his Hobson's Choice claim under *de novo* review. (R. 185, ID 9547–51.) In other words, success for Pouncy was only one short step away, if only he could persuade this Court that he was actually innocent.

It was in this litigation posture that Pouncy paid McGruder $10,000 to falsely testify before this Court that he (not Pouncy) was the perpetrator of the carjackings.

27

Afterwards, Pouncy filed multiple briefs with this Court extolling McGruder's testimony.  In his post-hearing brief, Pouncy spent dozens of pages describing how "undoubtedly credible" McGruder's testimony was.  (R. 197, ID 9898.)  Leveraging this Court's statements from the hearing, he asked this Court to disbelieve his victims in light of McGruder's testimony.  (*Id.* at ID 9938 n.31 ("As this Court observed at the February 2018 hearing, 'if Sandstrom got it wrong, the guy that sat in the car with him for 45 minutes of small talk 2 feet away, then it seems to me it could have been all of them, especially if they look alike.'" (quoting R. 185, ID 9529)).)  He even asked this Court to grant him *immediate release* based on McGruder's testimony—knowing full well that the basis for the request was a farce.  (*Id.* at ID 9897.)

In later filings, after the State uncovered evidence that McGruder could not possibly have committed one of the carjackings, Pouncy doubled down.  Despite knowing that McGruder's entire account was false, Pouncy explicitly denied that "[he] or his 'team' turned to Jaakawa McGruder to become a false fall guy."  (R. 211, ID 10169.)  Pouncy also responded to the State's revelation by questioning whether

its evidence was fabricated or doctored.  (*Id.* at ID 10170.)  The irony of this insinuation is not lost on the State.

Finally, in his latest filing, Pouncy renewed his calls for *de novo* review of all his claims, including his previously adjudicated *Faretta* claim, based on McGruder's testimony.  (R. 233, ID 10634–41.)

In short, this was no white lie.  It was a deliberate, full-scale falsehood about the most important issue in Pouncy's case: whether he was convicted for crimes he didn't commit.  From Pouncy's perspective, the answer to the actual innocence question was the answer to the rest of the case.  If only he could convince this Court that someone else was responsible for his crimes, he could persuade this Court to release him from custody based on its earlier rulings.[3]  (*See* R. 185, ID 9547–51.)

---

[3] And with that favorable judgment, Pouncy had plans to further defraud the State of Michigan by filing a claim under a monetary compensation statute for wrongfully incarcerated persons whose convictions have been overturned based on new evidence of innocence. (Ex. 9.)  He promised McGruder that he would share the proceeds, which he estimated at $650,000, saying, "U know I'm going 2 break ⬚." (*Id.*)

**Pouncy's fraud has tainted the rest of the proceedings**

That the State was fortunate enough to discover Pouncy's fraud before it was too late doesn't mean it's any less deserving of a harsh sanction. There are the "unjust burdens" that the State and this Court has already endured as a result of Pouncy's perjurious scheme. *Secrease*, 800 F.3d at 402 ("unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly" justified dismissal). For well over a year, the State and this Court (and its staff) have toiled away on the question of Pouncy's innocence and his entitlement to habeas relief, entertaining the premise that Pouncy was asserting a bona fide claim. The entire time, Pouncy knew it was a sham.

As distressing as that is, the State is more interested in the future. Looking forward, Pouncy's conduct has irreparably tainted the rest of these proceedings.

For starters, this Court simply cannot trust any evidence or witnesses that Pouncy has presented. *Cf. Brady v. United States*, 877 F. Supp. 444, 453 (C.D. Ill. 1994) (dismissing a case and citing the fact that the perjurious plaintiff "does not take [his] oath to tell the truth

seriously and . . . will say anything at any time in order to prevail in this litigation"). The revelations regarding McGruder's rather detailed testimony puts Willie Joyce's lackluster testimony into a whole new light. This is especially true when you consider that Pouncy's cousin, Rashad, was Pouncy's conduit to Joyce. In fact, *every* piece of the evidence obtained by Rashad and every witness he solicited (including Joyce) is now tainted with the fetor of someone who conspired with Pouncy to cover up his bribery scheme. This Court cannot rely on anything Rashad—or anyone else—has contributed to this case.[4]

Moreover, texts between Pouncy and Pierce show that Pierce's affidavit—evidence that Pouncy has used to bolster McGruder's testimony—is entirely unreliable, if not actually false. After the State submitted evidence that Pierce previously implicated Pouncy under oath (something that contradicted his own sworn affidavit), Pouncy quickly wrote to Pierce telling him he need "clean this up" and

---

[4] Case in point: the cell phone records at the center of Pouncy's Brady claim. He claims that those records tie McGruder to the crimes and that the State suppressed and lied about that information. But, as explained in its final merits brief, the State has independently verified that the phone number in question belongs to Pouncy—*it's listed as his number on his PSIR.* That evidence and the claim are a farce, too. Pouncy, it seems, has the Madoff touch.

instructing him on what to say in a second affidavit. (Ex. 5; Ex. 2, p. 2, # 15.) Pouncy was unable to convince Pierce to file a second affidavit, but his attempts were enough. Pouncy and Pierce's willingness to craft a false narrative about his sworn testimony demonstrates that this Court cannot rely on Pierce's original affidavit. (*See* R. 173-3.) Even without the follow-up affidavit, Pouncy has continued to rely on Pierce's unreliable affidavit to bolster McGruder's credibility. (R. 211, ID 10178, 10182–83.)

In the context of a typical civil case, the Sixth Circuit has stated that dismissal is "particularly appropriate" when a party's fraudulent behavior "adversely impacts the entire litigation." *First Bank of Marietta,* 307 F.3d at 516. That consideration is especially powerful in the federal habeas context, which is already fraught with sensitive comity and federalism considerations. Federal courts with the power to intrude into a state's sovereignty should be vigilant that its power is not invoked through fraudulent means.

**Only dismissal will stop this from recurring**

Dismissing the petition will also serve important deterrence principles. *See Plastech*, 257 F. Supp. 3d at 878 ("Sanctions for

"violations of the judicial process" serve not only to "remedy prejudice to a party" and "reprimand the offender," but also to "deter future parties from trampling upon the integrity of the court."). Permitting Pouncy's case to proceed under these circumstances will send a message to all other habeas litigants that there is nothing to lose by submitting false evidence. As another district court put it in dismissing a case because of fraudulent conduct:

> [T]he dismissal of this case will also send a strong message to other litigants who plan to destroy and alter relevant evidence, abuse the discovery process, and then perjure themselves in open court in a continued attempt to slant the facts in their favor. This Court will not condone such behavior by imposing any lesser sanction than dismissal.

*Brady*, 877 F. Supp. at 453. This Court should make clear that the power of the federal courts will not be pressed into service through fraud and deceit. *See Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) ("[T]he most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases . . . to deter those who might be tempted to such conduct in the absence of such a deterrent.").

It does not matter whether Pouncy's remaining claims have possible merit, *see Ramirez*, 845 F.3d at 782 ("The court considered the

possibility—indeed, it expressly assumed—that Ramirez may have had a meritorious case of employment discrimination, and that dismissal would foreclose Ramirez from pursuing relief for that injury."); *see also Brady*, 877 F. Supp. at 454, though the decision to fabricate evidence sends a clear signal about Pouncy's belief in his own case, *see* 2 J. Wigmore, Evidence § 278, at 133 (Chadbourn ed. 1979) ("It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's falsehood or other fraud in the preparation and presentation of his cause . . . is receivable against him as an indication of his consciousness that his case is a weak or unfounded one."). But ignoring the tell for the moment, parties who come to court with plausible claims lose the right to have their rights vindicated by the very same judicial process that they corrupt. *See United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993) (dismissal is proper "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process"); *see also Molinaro*, 396 U.S. at 366 (prison escape "disentitles the defendant to call upon the resources of the Court for determination of his claims").

34

**No other sanction fits the bill**

This Court does have at its disposal other sanctions like monetary fines and attorney fees, but none of them are up to the task. *See Universal Oil*, 328 U.S. at 580–81. Pouncy is indigent, so an award of attorney's fees will not recompense the harm done thus far. *See Nichols*, 949 F.2d at 1049 ("Nichols' resources appear to be limited, so taxing costs against him would not benefit Klein Tools."); *Secrease*, 800 F.3d at 402 (concluding that monetary sanction ineffective because "the threat of a monetary sanction would probably not influence . . . behavior" of party proceeding *in forma pauperis*).

More important, monetary sanctions won't capture the essence of why Pouncy's conduct is so egregious. Pouncy's conduct is worthy of sanction not just because it required counsel for the State to litigate this case much longer than it otherwise would have, but because it tainted the proceedings going forward in a way that deprives the State and the victims of any assurance that the Court came to a fair and just outcome if it eventually grants Pouncy relief.

The same goes for the option of excising the actual innocence claim. Like the monetary sanctions, dismissing only the actual

innocence claim would not be proportionate to the severity of Pouncy's conduct.  For one, the State has already shown that McGruder's testimony does not establish Pouncy's actual innocence, even without evidence that it was fraudulent obtained.  (*See* R. 203.)  Dismissing a claim that would have been rejected anyways is tantamount to imposing no sanction at all.  And two, Pouncy's fraudulent conduct has tainted the rest of his substantive claims.  Under these circumstances, dismissing only the actual innocence claim would be like amputating the limb after the disease has already spread.

## CONCLUSION

What Pouncy has done—tampering with the administration of justice — "is a wrong against the institutions set up to protect and safeguard the public." *Chambers*, 501 U.S. at 43. The only way to right that wrong is to dismiss his petition with prejudice.

Respectfully submitted,

Dana Nessel
Attorney General

/s/ David Porter

Assistant Attorney General
Attorney for Respondent
Criminal Appellate Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-7650
porterd@michigan.gov
P76785

Dated:  May 31, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2019, I electronically filed the

above document with the Clerk of the Court using the ECF System,

which will provide electronic copies to counsel of record.

JUDGE MATTHEW F. LEITMAN
JOHN J. BURSCH, ATTORNEY FOR PETITIONER
BRIAN P. LENNON, ATTORNEY FOR PETITIONER
DANIEL MERON, ATTORNEY FOR PETITIONER
TIMILIN K. SANDERS, ATTORNEY FOR PETITIONER
DAVID L. MOFFITT, ATTORNEY FOR PETITIONER

/s/ David Porter

Assistant Attorney General
Attorney for Respondent
Criminal Appellate Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-7650
porterd@michigan.gov
P76785