# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

OMAR RASHAD POUNCY,   )
                      )
        Petitioner,   )   Case No. 2:13-cv-14695
                      )
v.                    )   Hon. Matthew F. Leitman
                      )
CARMEN D. PALMER,     )
                      )
        Respondent    )

## PETITIONER OMAR POUNCY'S OPENING BRIEF IN SUPPORT OF HIS REMAINING UNRESOLVED HABEAS CLAIMS

Aaron M. Katz
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
Telephone:  (617) 951-7000
Fax:  (617) 951-7050
Aaron.Katz@ropesgray.com

## TABLE OF CONTENTS

ISSUES PRESENTED ...................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ...................................................4

I.      Pouncy's Carjacking Trial ...................................................................................4

II.     Pouncy's Direct and Post-Conviction Appeals ..................................................8

STANDARD OF REVIEW ..........................................................................................11

SUMMARY OF THE ARGUMENT............................................................................12

ARGUMENT................................................................................................................13

I.      The Michigan Court of Appeals's Decision Denying Pouncy's Gonzalez-Lopez Claim Was Contrary to and Unreasonable Application of Clearly Established Supreme Court Precedent, as Well as Based on an Unreasonable Determination of the Relevant Facts...15

      A.     Pouncy Has Satisfied § 2254(d)(1) and § 2254(d)(2)..........................15

      B.     Reviewing Pouncy's Gonzalez-Lopez Claim De Novo, Pouncy Clearly Is Entitled to Relief. ..........................................................................................20

II.     The Michigan Court of Appeals's Denial of Pouncy's Faretta Claim Was Based on an Unreasonable Determination of the Facts and Contrary to Clearly Established Supreme Court Precedent...........................................................................................26

      A.     The Michigan Court of Appeals's Decision Was Contrary to Supreme Court Precedent That an Appellate Court May Not Presume a Knowing, Intelligent, and Voluntary Waiver From a "Silent Record." ........................................27

      B.     The Michigan Court of Appeals's Decision Affirming the Adequacy of the Trial Court's Faretta Warning Was an Unreasonable Application of and Contrary to Supreme Court Precedent, as Well as Based on an Unreasonable Determination of the Relevant Facts...............................................................................29

      C.     Because Pouncy Has Satisfied § 2254(d)(1) and (d)(2) for the Reasons Stated Above, the Court May Also Revisit the "Hobson's Choice" Theory of Involuntariness Using a De Novo Standard. ......................................35

III.    Pouncy Is Entitled to Relief on His Lafler Claim. ..........................................37

      A.     Court-Appointed Counsel's Failure to Engage in Competent Plea Negotiations, and His "Staggering" Miscalculation of Pouncy's Sentencing Exposure at Trial, Was Deficient Performance...................................................................39

      B.     Court-Appointed Counsel's Deficient Performance at the Plea Bargaining Stage Presumptively Prejudiced Pouncy. ...................................................43

      C.     The Court Should Order the State to Release Pouncy Immediately....................46

IV.    The Prosecution's Failure to Correct Testimony That It Knew Was False, and Its Failure to Disclose Material Exculpatory and Impeachment Information, Violated Napue, Brady, and Giglio..........................................................................................................48

i

    A.    The Prosecution Violated Napue, Giglio, and Brady With Respect to the Traceability of the Perpetrator's Phone Calls to the Victims. .............................50

    B.    The Prosecution Violated Napue and Giglio by Failing to Correct and Suppressing Information That Would Have Impeached Grimes's False Explanation for His Prior Inconsistent Statements to Law Enforcement Regarding the Carjackings. ...............................................................................................58

    C.    The Prosecution's Suppression of Willie Joyce's Exculpatory Identification of Someone Other Than Pouncy Is Properly Before This Court and Entitles Pouncy to a New Trial. ...............................................................................................64

V.    Court-Appointed Counsel's Complete Failure to Investigate the Facts, Consult Meaningfully With Pouncy, or Contest the State's Case Prior to Trial Amounted to a Constructive Denial of Pouncy's Sixth Amendment Right to Counsel During a Critical Stage in the Proceedings. ................................................................................68

    A.    Supreme Court Precedent Makes Clear That the Pre-Trial Investigatory Phase Is a "Critical Stage" of the Proceedings.....................................................................69

    B.    Pouncy's Cronic Claim Is Reviewed De Novo, Because No State Court Addressed the Claim on the Merits.....................................................................70

    C.    Court-Appointed Counsel's Extraordinary Failure to Investigate the Facts, Meaningfully Consult With Pouncy, or Contest the State's Case Prior to Trial Satisfies Cronic. ...............................................................................................71

**CONCLUSION** ..............................................................................................74

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Akins v. Easterling*,
  648 F.3d 380 (6th Cir. 2011) .............................................................31

*Alleyne v. United States*,
  570 U.S. 99 (2013) .............................................................................34

*Amos v. Renico*,
  683 F.3d 720 (6th Cir. 2012) ........................................................70, 71

*Brady v. Maryland*,
  373 U.S. 83 (1963) .....................................................................*passim*

*Byrd v. Skipper*,
  940 F.3d 248 (6th Cir. 2019) ................................................ 38, 45, 47

*Carlson v. Jess*,
  526 F.3d 1018 (7th Cir. 2008) ............................................. 20, 23, 25

*Carnley v. Cochran*,
  369 U.S. 506 (1962) ...........................................................................27

*Cone v. Bell*,
  556 U.S. 449 (2009) ...........................................................................53

*Couch v. Booker*,
  650 F. Supp. 2d 683 (E.D. Mich. 2009) ...................................... 16, 21

*Dennis v. Sec'y, Pa. Dep't of Corrections*,
  834 F.3d 263 (3d Cir. 2016) ..............................................................26

*Douglas v. Workman*,
  560 F.3d 1156 (10th Cir. 2009).........................................................67

*Fowler v. Collins*,
  253 F.3d 244 (6th Cir. 2001) .............................................................27

*Gideon v. Wainwright*,
  372 U.S. 335 (1963) ...........................................................................69

*Giglio v. United States*,
  405 U.S. 150 (1972) ...................................................................*passim*

*Griffin v. United States,*
    330 F.3d 733 (6th Cir. 2003) ............................................................. 38, 45

*Guilmette v. Howes,*
    624 F.3d 286 (6th Cir. 2010) (*en banc*) ............................................... 71

*Gumm v. Mitchell,*
    775 F.3d 345 (6th Cir. 2014) ....................................................................... 53

*Henness v. Bagley,*
    644 F.3d 308 (6th Cir. 2011) ....................................................................... 21

*Hill v. Curtin,*
    792 F.3d 670 (6th Cir. 2015) (*en banc*) ................................................. 28

*Holland v. Florida,*
    560 U.S. 631 (2010) ..................................................................................... 67

*Iowa v. Tovar,*
    541 U.S. 77 (2004) ................................................................................. 30, 31

*Jackson v. Brown,*
    513 F.3d 1057 (9th Cir. 2008) ..................................................................... 50

*James v. Brigano,*
    470 F.3d 636 (6th Cir. 2006) ....................................................................... 28

*Kimmelman v. Morrison,*
    477 U.S. 364 (1986) ..................................................................................... 73

*Kyles v. Whitley,*
    514 U.S. 419 ......................................................................................... 50, 68

*Lafler v. Cooper,*
    566 U.S. 156 (2012) ............................................................................ *passim*

*Lewandowski v. Makel,*
    949 F.2d 884 (6th Cir. 1991) ................................................................. 46, 47

*Linton v. Perini,*
    656 F.2d 207 (6th Cir. 1981) ....................................................................... 13

*Luis v. United States,*
    136 S. ct. 1083 (2016) ................................................................................. 22

*Magana v. Hofbauer,*
    263 F.3d 542 (6th Cir. 2001) ....................................................................... 42

*Martel v. Clair*,
    565 U.S. 648 (2012) ...........................................................................................22

*Matthews v. Ishee*,
    486 F.3d 883 (6th Cir. 2007) ...........................................................................15

*McKaskle v. Wiggins*,
    465 U.S. 168 .....................................................................................................30

*Missouri v. Frye*,
    566 U.S. 134 (2012) ...........................................................................................38

*Mitchell v. Mason*,
    325 F.3d 732 (6th Cir. 2003) ..............................................................69, 70, 73

*Napue v. Illinois*,
    360 U.S. 264 (1959) ...................................................................................*passim*

*Panetti v. Quarterman*,
    551 U.S. 930 (2007) ...........................................................................................20

*Patterson v. Illinois*,
    487 U.S. 285 (1988) .....................................................................................30, 31

*People v. Cress*,
    468 Mich. 678 (2003) ........................................................................................54

*Phillips v. White*,
    851 F. 3d 567 (6th Cir. 2017) ...........................................................................71

*Pouncy v. Palmer*,
    165 F. Supp. 3d 615 (E.D. Mich. 2016) ....................................................*passim*

*Pouncy v. Palmer*,
    2008 WL 9869818 (Mich. Ct. App. Mar. 25, 2008) ....................................*passim*

*Pouncy v. Palmer*,
    846 F.3d 144 (6th Cir. 2017) ..............................................................31, 36, 65

*Powell v. Alabama*,
    287 U.S. 45 (1932) .......................................................................................13, 69

*Rice v. White*,
    660 F.3d 242 (6th Cir. 2011) .............................................................................20

*Richey v. Bradshaw*,
    498 F.3d 344 (6th Cir. 2007) .............................................................................72

v

*Robinson v. Howes*,
    663 F.3d 819 (6th Cr. 2011) ............................................................68

*Rosencrantz v. Lafler*,
    568 F.3d 577 (6th Cir. 2009) ...........................................................54

*Rothgery v. Gillespie Cnty.*,
    554 U.S. 191 (2008) ..........................................................................69

*Sawaf v. United States*,
    570 F. App'x 544 (6th Cir. 2014) .........................................42, 43, 44

*Schledwitz v. United States*,
    169 F.3d 1003 (6th Cir. 1999) .........................................................50

*Smith v. Cain*,
    565 U.S. 73 (2012) ...........................................................................43

*Smith v. Sec'y of N.M. Dep't of Corrections*,
    50 F.3d 801 (10th Cir. 1995) ...........................................................52

*Smith v. United States*,
    348 F.3d 545 (6th Cir. 2003) ...........................................................52

*Strickland v. Washington*,
    466 U.S. 688 (1984) ..........................................................................38

*United States v. Butler*,
    223 F.3d 368 (6th Cir. 2000) ...........................................................60

*United States v. Cronic*,
    466 U.S. 648 (1984) .................................................................*passim*

*United States v. Curtis*,
    488 F. App'x 948 (6th 2012) ..............................................................2

*United States v. Garner*,
    507 F.3d 399 (6th Cir. 2007) ......................................................57, 58

*United States v. Gonzalez-Lopez*,
    548 U.S. 140 (2006) .................................................................*passim*

*United States v. Morris*,
    470 F.3d 596 (6th Cir. 2006) ......................................................38, 43, 44

*United States v. Powell*,
    847 F.3d 760 (6th Cir. 2017) ...........................................................23

*United States v. Tavera*,
    719 F.3d 705 (6th Cir. 2013) ............................................................54

*United States v. Utrera*,
    259 F. App'x 724 (6th Cir. 2008) ....................................................30

*United States v. White*,
    492 F.3d 380 (6th Cir. 2007) ............................................................61

*Von Moltke v. Gillies*,
    332 U.S. 708 (1948) ..........................................................................31

*Williams v. Taylor*,
    529 U.S. 362 (2000) ...................................................................11, 17

**Statutes**

28 U.S.C. § 2254 ..................................................................................*passim*

M.C.L. § 791.234 ......................................................................................33

## ISSUES PRESENTED

Omar Pouncy was 18 years old when he was convicted of carjacking offenses and sentenced to 562-824 months' imprisonment.  As this Court already has recognized (*see* ECF No. 73 at 25-26, PageID.6721-6722), Pouncy's criminal proceeding was infected with extreme, shocking, and disturbing violations of numerous constitutional protections that are fundamental to the fair and proper functioning of the criminal justice system.  To answer the pointed question the Court previously put to counsel for the state, it is not possible to examine what occurred in Pouncy's criminal proceeding and determine that it was "okay."  *See id.*  Unless Pouncy receives federal habeas corpus relief, he will not be released from prison until 2055 at the earliest.   Pouncy's habeas petition presents the following unresolved issues, some of which are subject to the Anti-Terrorism and Effective Death Penalty Act's standard of review and some of which are not:

**(1)**    Whether the trial court violated Pouncy's Sixth Amendment choice-of-counsel right, where, despite clear evidence that Pouncy's attorney-client relationship with his court-appointed counsel was either nonexistent or completely dysfunctional, the trial court reflexively refused Pouncy's request for an opportunity to retain replacement counsel of his choosing because a venire was "downstairs" and "ready to go."

**(2)**    Whether Pouncy's decision to waive his right to counsel can be found knowing, intelligent, and voluntary, where (i) the trial court never made an on-the-record finding that Pouncy's waiver was knowing, intelligent, and voluntary, and the trial court record is thus "silent" as to whether those requirements were met; (ii) the trial court never warned Pouncy, and nothing in the record indicates that Pouncy understood, that a conviction would result in any mandatory minimum sentence, that the mandatory minimum was 225 months' imprisonment, that the trial court would have the discretion to impose as many as 562 months' imprisonment as the minimum sentence, and that the trial court could impose as many months' imprisonment as it wished as the maximum sentence; and (iii) Pouncy elected to waive counsel only because his court-appointed counsel was incredibly ill-prepared and had failed to consult meaningfully with Pouncy about the case.

**(3)**    Whether Pouncy was denied his Sixth Amendment right to effective assistance of counsel during plea negotiations, where his court-appointed counsel failed to engage in well-prepared plea negotiations and then, after the prosecution extended a plea offer anyways, incorrectly indicated to Pouncy that his prison sentence if he were convicted at trial would "not be much different" than the prison sentence he would receive if he accepted the prosecution's plea offer.

**(4)**    Whether the prosecution violated *Napue v. Illinois*, *Brady v. Maryland*, and *Giglio v. United States*, where the prosecution (i) failed to correct false testimony

2

provided by the lead detective, James Gagliardi, and its star cooperating witness, Wayne Grimes; (ii) failed to disclose phone records in its possession that disproved Detective Gagliardi's testimony that phone calls the perpetrator placed to the victims were only traceable back to anonymous "calling cards," and which would have enabled Pouncy to prove that the calls in fact were traceable to a standard-issue Sprint phone number for which a man named Quillie Strong was the subscriber; (iii) failed to disclose arrest record information in its possession that proved Grimes on cross-examination provided the jury a blatantly false explanation for the significant inconsistent statements he had made to law enforcement regarding the carjackings; and (iv) failed to disclose that law enforcement had shown a photo array to an African-American man named Willie Joyce, an eyewitness to the October 11, 2005 carjacking, and that Joyce picked someone other than Pouncy as the perpetrator.

(5)    Whether Pouncy was constructively denied counsel during the critical pre-trial stage of his criminal proceeding, which is presumptively prejudicial under the Supreme Court's decision in *United States v. Cronic*, where his court-appointed counsel completely failed to conduct a pre-trial factual investigation, to communicate with the private investigator to whom he completely delegated his investigatory obligations, and to consult meaningfully with Pouncy prior to trial.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Pouncy's Carjacking Trial

Pouncy was 18 years old when he was charged with carjacking offenses that carried a mandatory minimum sentence of 225 months' imprisonment, a "guidelines range" of 225-562 months' imprisonment, and a maximum sentence of life.[1]

The trial court set trial to commence on January 24, 2006, which was only ten weeks after arraignment.  On the morning of trial, prior to the venire being called up for jury selection, the trial court informed Pouncy that, if he were convicted at trial, "the [sentencing] guidelines say that [the court] should give [him] a sentence somewhere between eleven and-a-half to twenty-eight [years]."  ECF No. 8-7 at 21:8-10, PageID.476.  This was the first time the trial court had said anything to Pouncy about the issue of punishment.  The trial court's statement to Pouncy was staggeringly incorrect with respect to both the bottom and the top of the guidelines range that would apply if Pouncy were convicted.  Furthermore, the trial court's statement that the guidelines represented the sentence "that [the court] *should* give" Pouncy completely failed to apprise Pouncy that the bottom of the guidelines range

---

[1] Under Michigan sentencing law, a defendant's sentencing guidelines range represented the range of *minimum* sentences that the court had discretion to impose. In other words, the bottom of the range represented the defendant's *mandatory minimum*, and the top of the guidelines represented the *highest minimum* sentence (or, "maximum minimum") that the trial court could impose.  The guidelines did not constrain the maximum sentence that the trial court could impose.

in fact represented the mandatory minimum that the trial court would *be required* to impose on him. It also failed to apprise Pouncy that the top of the guidelines range represented the *highest minimum* sentence that the trial court would have the discretion to impose on him. Finally, the trial court's statement failed to apprise Pouncy that, because the trial court would have unlimited discretion to impose *as many months' imprisonment as it wished* as Pouncy's maximum sentence, Pouncy might remain in prison until he died of old age if convicted at trial. To make matters worse, the trial court then incorrectly told Pouncy that the sentence he would receive if convicted at trial would "not [be] much differen[t]" than the one he would receive if he were to accept the prosecution's plea offer. *See id.* at 22:13-15, PageID.477. With Pouncy standing next to him, court-appointed counsel signaled agreement with the trial court's incorrect and incomplete statements regarding punishment.

Under the circumstances, Pouncy would not have understood the risks of proceeding to trial. He also would have been under the misimpression that he had nothing to lose by rejecting the prosecution's plea offer and taking his chances with the jury. Not surprisingly, Pouncy did not accept the prosecution's plea offer.

At trial, the state's case relied on cross-racial identifications that the carjacking victims had made with the prompting of potentially suggestive photo arrays, as well as the testimony of a cooperating witness who both held a grudge against Pouncy and had several motives to lie. In addition to a mistaken identity

defense, Pouncy had an alibi.   Unfortunately for Pouncy, however, his court-appointed counsel's trial preparations were atrocious—indeed, what court-appointed counsel did before trial cannot really be described as "trial preparation" at all.

By the morning of jury selection, Pouncy had become gravely concerned about his court-appointed counsel's readiness for trial and lack of meaningful consultation with him.  If the attorney-client relationship had not completely broken down, it was only because there had never really been an attorney-client relationship at all.  Pouncy told the trial court that he was "not gettin' proper representation . . . honestly" and did not "feel comfortable . . . with the representation that [he had]." ECF No. 8-7 7:7-16, PageID.462.  He told the trial court that the longest he had ever spoken with his court-appointed counsel was for "ten, fifteen minutes" that morning. *Id*. at 7:11-16.  Pouncy asked the trial court for the opportunity to retain replacement counsel.  The trial court excoriated Pouncy, stating that court-appointed counsel had been "practicin' law longer than [Pouncy had] been born" and that Pouncy was "not in a position to judge" court-appointed counsel's work.   *Id.* at 9:6–10:12, PageID.464-465.  The trial court concluded, "I'm not really in a position to grant your request to have new counsel because . . . we got a [venire] downstairs that's ready to go and we're gonna try this case today . . . ." *Id.* at 10:18-22, PageID.465.

And so trial began later that day, over Pouncy's objections and despite court-appointed counsel's acknowledgment that it was "problematic" to say whether he

6

was ready for trial.  ECF No. 8-7 at 4, PageID.459.  After court-appointed counsel gave a woeful opening statement that probably hurt Pouncy more than it helped him, *see id.* at 220:19–222:8, PageID.675-677, Pouncy wrote a note to counsel stating that he wished to represent himself for the remainder of trial.  Counsel informed the trial court of Pouncy's request to proceed *pro se*.  *Id.* at 233:13-18, PageID.688.  The trial court granted Pouncy's request, though without providing Pouncy any warning that, if he were convicted, (i) he would be subject to a mandatory minimum sentence; (ii) the mandatory minimum sentence would be 225 months' imprisonment; (iii) the court would have the discretion to impose a minimum sentence of as high as 562 months; and (iv) the court could impose as many months' imprisonment as it wished as the maximum sentence, meaning that Pouncy might remain in prison until he died of old age.  Instead, the trial court merely told Pouncy that he "[had] no business representing [himself]," and that he would have to "comply with Court rules" just "like any other lawyer."  *See* ECF No. 8-7 at 233:4-19, PageID.689.

Having been constructively denied counsel during the pre-trial phase, denied his request to retain replacement counsel, and now proceeding *pro se*, there were several additional constitutional violations still to come.  Specifically, the prosecution failed to: (1) correct significant false testimony that its lead law enforcement witness, Detective James Gagliardi, and its star cooperating witness, Wayne Grimes, provided to the jury; and (2) disclose to Pouncy several items of

7

exculpatory and impeachment information in the state's possession that (i) would have undermined Detective Gagliardi's honesty and credibility and cast doubt on the thoroughness and reliability of law enforcement's investigation, (ii) Pouncy could have used to connect someone else to the carjackings in support of his mistaken identity defense, and (iii) would have demonstrated that Grimes had lied on the stand in an attempt to explain away significant inconsistent prior statements he made to law enforcement about the carjackings.

With the deck unconstitutionally stacked against him in several ways, the jury found Pouncy guilty on all charges.  The trial court sentenced Pouncy to a minimum of 562 months' imprisonment and a maximum of 824 months' imprisonment.

## II.     Pouncy's Direct and Post-Conviction Appeals

On direct appeal, Pouncy claimed that the trial court violated his Sixth Amendment right to counsel-of-choice by refusing to grant a continuance so that he could retain counsel to replace his court-appointed counsel (**"*Gonzalez-Lopez* claim"**).  Pouncy also claimed that his decision shortly after opening statements to waive his right to counsel and to proceed *pro se* for the remainder of trial was not knowing, intelligent, and voluntary as the Sixth Amendment requires (**"*Faretta* claim"**).  The Michigan Court of Appeals denied each of these claims on the merits.

On state post-conviction appeal, Pouncy claimed that he had been denied effective assistance of counsel during the plea-bargaining stage because his court-

appointed counsel had grossly misinformed him of the additional sentencing risk to which he would be exposed if he rejected the prosecution's plea offer ("*Lafler* **claim**"). The trial court denied the *Lafler* claim in a single unexplained and incoherent sentence that did not actually address the claim at all.

Pouncy also claimed on post-conviction appeal that the prosecution failed to correct multiple pieces of false testimony that Detective Gagliardi and Wayne Grimes provided to the jury, as well as suppressed multiple pieces of exculpatory and impeachment information, all in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972) ("***Napue-Brady-Giglio* claims"**). First, the prosecution had failed to correct Detective Gagliardi's false testimony about the traceability of the perpetrator's phone calls and Grimes's false explanation for why he made prior inconsistent statements to law enforcement regarding the carjackings—both of which the prosecution knew to be false. Second, it suppressed Verizon phone records that would have enabled Pouncy to show that the perpetrator's phone calls to the victims were traceable to a standard-issue Sprint phone number for which a man named Quillie Strong was the subscriber, contrary to Detective Gagliardi's false testimony that the calls were made with anonymous "calling cards." Third, it suppressed information that Grimes had been handcuffed, arrested, and processed on a gun charge in the City of Clio on May 14, 2005. Grimes's May 14, 2005 arrest

was not a collateral issue, because Grimes told the jury on cross-examination that the reason the statements he made to law enforcement on October 13, 2005 regarding the carjackings were inconsistent with subsequent statements he made to law enforcement after agreeing to cooperate against Pouncy was because he had never previously been arrested and was "scared."  The trial court refused to grant Pouncy relief for these *Napue-Brady-Giglio* violations, employing bizarre reasoning that seemed to misunderstand the claims, the relevant legal principles, or both.

Finally, in a *pro per* "Standard 4" brief submitted to the Michigan Court of Appeals, Pouncy claimed that his court-appointed counsel's complete failure to investigate the facts and consult meaningfully with Pouncy prior to trial was so egregious that it amounted to a constructive denial of counsel during the critical pre-trial phase, which is structural error under *United States v. Cronic*, 466 U.S. 648 (1984) ("***Cronic* claim**").  Pouncy's counsel also included this *Cronic* claim in an application for leave to appeal subsequently submitted to the Michigan Supreme Court.  The Michigan Supreme Court denied Pouncy's motion for leave in a single-sentence form denial, stating merely that "the defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  ECF No. 8-49 at PageID.4440.

## STANDARD OF REVIEW

With respect to claims that the state court adjudicated on the merits, a habeas petitioner must show that the state court's decision either (i) constituted an unreasonable application of, or was contrary to, clearly established Supreme Court precedent,[2] or (ii) was based on an unreasonable determination of facts in light of the evidence presented in the state court proceeding.  *See* Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d).  If a petitioner satisfies § 2254(d) by making either showing, the federal habeas court must review the petitioner's claim *de novo*.  If the state courts failed to adjudicate the merits of a petitioner's claim, AEDPA's standard of review does not apply at all, and the federal habeas court must review the claim *de novo* in the first instance.  On *de novo* review of a habeas petitioner's claim, circuit precedent "is no longer merely persuasive or suggestive of an appropriate rule of law," but rather is "binding on [the district court]."  *Ray v. Bauman*, 326 F. Supp. 3d 445, 462 (E.D. Mich. 2018).

---

[2] A state court's decision is "contrary to" clearly established Supreme Court precedent where it reaches a conclusion opposite to that reached by the Supreme Court on the question presented, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  This includes applying the wrong legal rule, or imposing on the petitioner a burden higher than that dictated by applicable Supreme Court precedent.  *See id.*  A state court decision is an "unreasonable application of" Supreme Court precedent if the "state court identifies the correct governing legal rule from [the Supreme Court] but unreasonably applies it to the facts of the [petitioner's] case," or "unreasonably refuses to extend [a clearly established legal] principle to a new context where it should apply."  *Id.* at 407.

## SUMMARY OF THE ARGUMENT

It is impossible to reconcile Pouncy's criminal proceeding with the requirements of the Constitution. Simply put, what occurred in Pouncy's case was not "okay." Pouncy presented numerous meritorious constitutional claims in his state court appeals. AEDPA is no impediment to this Court's ability to remedy the constitutional violations that infected Pouncy's criminal proceeding. The state courts variously (i) failed to adjudicate Pouncy's claims using the correct constitutional rules and standards, (ii) unreasonably applied the constitutional rules and standards that they did correctly identify, (iii) unreasonably determined the facts relevant to the claims, and (iv) failed to adjudicate certain claims on the merits. For all those claims to which AEDPA applies, Pouncy has satisfied 28 U.S.C. § 2254(d), meaning the Court must now review those claims *de novo*. For those claims that the state courts failed to adjudicate on the merits, the Court must review the claims *de novo* because § 2254(d) does not apply at all.

Reviewing Pouncy's constitutional claims with the fresh eyes that AEDPA permits and that the Constitution requires, the Court can come to only one conclusion: Pouncy's trial was not "okay," his conviction and sentence are unconstitutional, and he must be ordered released from custody unconditionally.

# ARGUMENT

I. **The Michigan Court of Appeals's Decision Denying Pouncy's *Gonzalez-Lopez* Claim Was Contrary to, and an Unreasonable Application of, Clearly Established Supreme Court Precedent, as Well as Based on an Unreasonable Determination of the Relevant Facts.**

The Sixth Amendment's right to counsel includes "the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)). Denial of this right is a structural error that does not require any additional showing of prejudice. *Id.* at 146-148. Although "the right to counsel of choice may not be used to unreasonably delay trial," *Linton v. Perini*, 656 F.2d 207, 209 (6th Cir. 1981), the Sixth Amendment otherwise "guarantees a defendant the right to be represented by [a] qualified attorney" of his choice "whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *Gonzalez-Lopez*, 548 U.S. at 144 (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25 (1989)). "It is hardly necessary to say that . . . a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53 (1932).

After being charged, the court assigned a court-appointed counsel to Pouncy. Pouncy reasonably expected and hoped that this court-appointed counsel would provide reasonably competent, zealous representation and would meaningfully consult with him prior to trial. Unfortunately, by the morning of jury selection, it

was clear to Pouncy that his court-appointed counsel was not prepared for trial and was not invested in zealously advocating for him.  Pouncy implored the trial court that he was did not "feel comfortable" that court-appointed counsel was providing "proper representation" and that he wished to retain replacement counsel.  *See, e.g.*, ECF No. 8-7 at 5-7, PageID.460-462.  Only ten weeks had passed since Pouncy's arraignment.  A continuance to allow Pouncy to retain replacement counsel of his choice would not have posed any significant administrative burden.  Moreover, because Pouncy was in pre-trial custody, he had no incentive to delay trial merely for the sake of delay.  Nevertheless, the trial court denied Pouncy's request because a venire was "downstairs" and "ready to go."[3]  *Id.* at 10:18-22, PageID.465.

On direct appeal, Pouncy argued that the trial court's denial of his request to retain replacement counsel violated the Sixth Amendment.  The Michigan Court of Appeals denied Pouncy's claim for five purported reasons: (1) Pouncy had "failed to demonstrate that his appointed counsel was not providing him with effective assistance," *Pouncy v. Palmer*, 2008 WL 986818, at *30-31 (Mich. Ct. App. Mar. 25, 2008); (2) Pouncy's "expression of dissatisfaction with how [court-appointed counsel] was handling the case did not adequately demonstrate a breakdown in the attorney-client relationship to warrant substitution of counsel," *id.* at *29; (3) "trial

---

[3] There was not a special venire for Pouncy's case.  The trial court's observation that a venire was "downstairs" and "ready to go" was simply an observation that citizens had shown up to the courthouse that morning in response to their jury service notices.

14

was already underway," *id.* at 31; (4) Pouncy "had already expressed a desire to represent himself," *id.*; and (5) Pouncy did not "make a formal motion for a continuance," *id.* at *30.

Even when viewed through AEDPA's deferential lens, none of these reasons withstands scrutiny. As this Court already has stated, "[t]he record contains compelling evidence . . . that the trial judge denied Pouncy the opportunity to hire an attorney at his own expense," *Pouncy v. Palmer*, 165 F. Supp. 3d 615, 627 (E.D. Mich. 2016), and that the "the trial court *blocked* [Pouncy's] efforts to obtain a new lawyer," *id.* at 629 (emphasis added). This Court was precisely right.

## A. Pouncy Has Satisfied § 2254(d)(1) and § 2254(d)(2).

The Michigan Court of Appeals's first purported reason was contrary to the Supreme Court's decision in *Gonzalez-Lopez* itself, which right off the bat means Pouncy has satisfied § 2254(d)(1) with respect to his *Gonzalez-Lopez* claim. Moreover, the Michigan Court of Appeals's second, third, and fourth purported reasons are factual findings that cannot reasonably be squared with the trial court record, which means they are "unreasonable determination[s] of the facts" for purposes of § 2254(d)(2). *See Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (holding that "a state court decision involves 'an unreasonable determination of the facts'" if the state court's factual findings "are rebutted by 'clear and convincing evidence' and do not have support in the record"). This is another, independent

reason why the Court may now review the claim *de novo*. Finally, the Michigan Court of Appeals's fifth purported reason was an objectively unreasonable basis on which to affirm the trial court's denial of Pouncy's request to retain replacement counsel, and thus constitutes an unreasonable application of *Gonzalez-Lopez* for purposes of § 2254(d)(1). This is a third reason why *de novo* review is now required.

*Purported Reason #1 ("Trial Counsel Was Not Constitutionally Ineffective")*—*Gonzalez-Lopez*'s principal holding is that the "right to counsel of choice . . . is the right to a particular lawyer regardless of comparative effectiveness," and that a defendant deprived of that right is entitled to a new trial regardless of whether the counsel the court appointed to him was providing "effective assistance." *Gonzalez-Lopez*, 548 U.S. at 148; *see also Couch v. Booker*, 650 F. Supp. 2d 683, 692 (E.D. Mich. 2009) ("Because petitioner's right to retain counsel of his choice was wrongly denied, it is unnecessary for this court to conduct an ineffectiveness or prejudice inquiry in order for petitioner to obtain habeas relief." (citing *Gonzalez-Lopez*, 548 U.S. at 148)). *Gonzalez-Lopez* thus forecloses any argument that a defendant's entitlement to retain replacement counsel of his choice is conditioned on his ability to show that his current, court-appointed counsel is providing ineffective assistance. Thus, it directly contradicted *Gonzalez-Lopez* for the

Michigan Court of Appeals to impose such a condition on Poucy.[4]  *See Williams*, 529 U.S. at 405-406 (holding that a state court decision is "contrary to" Supreme Court precedent for purposes of § 2254(d)(1) if it imposes on the petitioner a burden of proof higher than that which the Supreme Court's precedent sets forth); *Dennis v. Sec'y, Pa. Dep't of Corrections*, 834 F.3d 263, 280-281 (3d Cir. 2016) ("Interpreting Supreme Court precedent in a manner that adds an additional element to the legal standard for proving a constitutional violation is 'contrary to' clearly established federal law" (citing *Williams*, 529 U.S. at 393-394)).

**Purported Reason #2 ("No Complete Breakdown of the Attorney-Client Relationship")**—If Poucy's repeated expressions of dissatisfaction with his court-appointed counsel demonstrated anything, it was that there was a total breakdown in the attorney-client relationship.  In fact, the only fair reading of the trial court record is that there had never been a properly functioning attorney-client relationship *at all*. Poucy stated to the court, prior to the venire even being brought upstairs to the courtroom for jury selection, that he and court-appointed counsel were "really not on the same page," that "today [the morning of jury selection is] our first time really talkin[g]," that he had written to the public defender "ask[ing] for . . . a different

---

[4] Nevertheless, this Court previously recognized that court-appointed counsel "gave no indication that he spent the necessary time with Poucy to carefully explore the facts of the case, anticipated witness testimony, and/or important strategic issues and decisions."  *Poucy*, 165 F. Supp. 3d at 628.

counsel because I don't really feel satisfied with the one I have," that he was not "getting[g] proper representation," that he "really don't feel comfortable with . . . the representation that I have now," that "we don't talk," and that his counsel was "somebody that . . . I don't feel comfortable with from day one." *See* ECF No. 8-7 at 4-7, PageID.459-463.  Pouncy told the trial court that "ten, fifteen minutes" that morning was the longest that court-appointed counsel had ever spoken to Pouncy about the case.  *See id.* at 7:11-15, PageID.462.  The trial judge's colloquy with Pouncy did not reveal an adequately functioning attorney-client relationship.  The trial court lectured Pouncy that he was "not in a position to judge whether [court-appointed counsel] knows how to do his job or not," *id.* at 10:10-11, PageID.465, and admonished Pouncy to "have a seat and just be quiet," *id.* at 16:16, PageID.471.

**Purported Reason #3 ("Trial Already Had Started")**—Contrary to what the Michigan Court of Appeals found, at the time the trial court denied Pouncy's request to retain replacement counsel, the trial had not started.  In fact, *jury selection* had not even begun.  As the trial record makes clear, a venire of prospective jurors was merely "downstairs" waiting to be called up to any number of courtrooms.  *See* ECF No. 8-7 at 10:10-11, PageID.465.

**Purported Reason #4 ("Expression of Desire to Proceed Pro Se")**—The trial record makes clear that the first time Pouncy mentioned *anything* about proceeding *pro se* was on the afternoon of January 24, 2006, after the jury had been sworn.  *See*

18

ECF No. 8-7 at 192-193, PageID.644-647.   The violation of Pouncy's Sixth Amendment choice-of-counsel right, however, occurred several hours earlier that day, prior to the beginning of jury selection.   At the time the trial court categorically refused to continue the trial so that Pouncy could retain replacement counsel, Pouncy had not expressed any desire to proceed *pro se*.   To the contrary, the trial record makes clear that Pouncy was *begging* for counsel.   *See Pouncy*, 165 F. Supp. 3d at 630 (holding that the Michigan Court of Appeals's analysis "ignores that Pouncy did, indeed, ask the trial court repeatedly . . . to allow him to retain counsel").

*Purported Reason #5 ("No Formal Motion for a Continuance Was Filed")*—The trial court clearly understood that providing Pouncy with a fair opportunity to retain replacement counsel would require a continuance, and thus that Pouncy's request to retain replacement counsel necessarily was a request for a continuance as well.   By telling Pouncy that his request to retain replacement counsel was denied because "we're gonna try this case today," ECF No. 8-7 at 10:20-22, PageID.465, the trial court preemptively denied any formal continuance motion that Pouncy might have lodged.   It is an objectively unreasonable application of *Gonzalez-Lopez* for a court of appeals to hold that the trial court properly denied the petitioner's request to retain replacement counsel because the petitioner failed to file a formal continuance motion that the trial court already made clear would be futile.

**B.     Reviewing Pouncy's *Gonzalez-Lopez* Claim *De Novo*, Pouncy Clearly Is Entitled to Relief.**

Because Pouncy has satisfied § 2254(d) for several independent reasons, the Court must review the *Gonzalez-Lopez* claim *de novo*.   *See, e.g.*, *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (holding that if "the requirement set forth in § 2254(d)(1) is satisfied," the "federal court must then resolve the claim without the deference AEDPA otherwise requires"); *Rice v. White*, 660 F.3d 242, 257 (6th Cir. 2011) ("Because the state court decision was premised on a plainly erroneous reading of the record, deference is not given to that decision, and the Court may review the claim *de novo*."); *Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008) (holding that because the state trial court denied the petitioner's *Gonzalez-Lopez* claim based "on an unreasonable factual determination," the substantive merits of [the petitioner's] claim are analyzed . . . *de novo*").  Applying *de novo* review, this Court should conclude that the trial court's refusal to allow Pouncy a fair opportunity to retain replacement counsel of his choice was arbitrary and, therefore, a violation of Pouncy's Sixth Amendment rights.

The Sixth Circuit has identified four factors to determine whether the trial court's "denial of a motion to substitute counsel" was arbitrary: "(1) the timeliness of the motion; (2) the adequacy of the court's inquiry into the matter; (3) the extent of the conflict between the attorney and client and whether it resulted in a total lack of communication preventing an adequate defense; and (4) the balancing of these

factors with the public's interest in the prompt and efficient administration of justice." *Henness v. Bagley*, 644 F.3d 308, 321 (6th Cir. 2011). All four *Henness* factors strongly point in Pouncy's favor here.

First, Pouncy made his request prior to the start of jury selection on January 24, 2006, which was his first opportunity to address the trial court in person since the January 9, 2006 pre-trial conference. Pouncy was in custody, and the morning of jury selection is when his grave concerns with his court-appointed counsel's preparedness for trial and lack of meaningful consultation with him had crystallized. *Cf. Couch*, 650 F. Supp. 2d at 691-692 (holding that the trial court acted arbitrarily in denying defendant's motion, filed the day before trial, for a continuance to retain counsel to replace his court-appointed counsel, because the defendant "only discovered the day before trial that the counsel of his choice was unable to represent him at trial"). Particularly given that only ten weeks had passed since arraignment, Pouncy's request cannot fairly be deemed untimely for Sixth Amendment purposes. As this Court has stated: "The bottom line is this: on the morning of trial, Pouncy had every reason to believe that Breczinski was not prepared to defend against the very serious charges Pouncy was facing. . . . Under these circumstances, Pouncy fairly concluded that proceeding with Breczinski as his counsel was not a reasonable course of action." *Pouncy*, 165 F. Supp. 3d at 629.

Second, the trial court's inquiry into Pouncy's concerns with his counsel was a hollow, infantilizing exercise.  The trial court lectured Pouncy that he was too young and too uneducated to question his court-appointed counsel's work or participate in his defense. *See* ECF No. 8-7 at 9-10, PageID.464-465.  This colloquy was not remotely the "probing" inquiry the Sixth Amendment requires.  *See Martel v. Clair*, 565 U.S. 648, 664 (2012).  The trial court's colloquy with Pouncy's court-appointed counsel was similarly shallow and arguably betrayed the trial court's assumption that Pouncy was guilty and simply did not have any valid defense for counsel to discover or present.  *See* ECF No. 8-7 at 7, 10-12, PageID.462, 465-467.

Third, the record reflects a dysfunctional relationship *at best* between Pouncy and court-appointed counsel and that court-appointed counsel had never had meaningfully consulted with Pouncy regarding the case.  *See, e.g.*, *id.* at 8, PageID.463.  The Supreme Court has held that "[g]iven the necessarily close working relationship between a lawyer and client, the need for confidence, and the critical importance of trust," it is not "surprising that the court has held that the Sixth Amendment grants a defendant 'a fair opportunity to secure counsel of his own choice." *Luis v. United States*, 136 S. ct. 1083, 1089 (2016).  Pouncy's justifiable lack of trust and confidence in his court-appointed counsel by the morning of trial practically jumps off the pages of the trial record.

22

Fourth, the record does not reflect that continuing the trial so that Pouncy could retain replacement counsel of his choice would interfere with the public's interest in any way. To the contrary, at a pre-trial hearing on January 9, 2006, the trial court indicated that it was open to continuing the trial date to at least March 2006, and the prosecution expressed agreement that such a continuance made sense. ECF No. 8-6 at 8:5−10:21, PageID.452-454. Pouncy remained in pre-trial custody, and the record does not support an argument that the public's interest would have been impaired by a continuance sufficient for Pouncy to retain replacement counsel and to get that replacement counsel up to speed. That a venire was "downstairs" was clearly not a reasonable basis to deny Pouncy's request. "[A] trial court may not arbitrarily and unreasonably interfere with a defendant's right to counsel of choice in the name of calendar control." *United States v. Powell*, 847 F.3d 760, 779 (6th Cir. 2017) (citing *Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir. 1985)).

The Seventh Circuit's decision in *Carlson v. Jess* is on point. The petitioner in *Carlson* had been indicted on sexual assault charges and retained attorney Randall Kaiser to represent him. *Carlson*, 526 F.3d at 1020. "The parties agreed that the trial would take, at most, two days to complete. [The petitioner] remained in jail from the time of his arrest until his eventual trial." *Id.* In the weeks leading up to the trial date, the petitioner "lost confidence in Kaiser's ability to represent him." *Id.* Ten days before the scheduled trial date, the petitioner notified Kaiser that he

23

had retained another lawyer, Robin Shellow, to replace him. *Id.* Six days after that, the petitioner formally "moved to substitute Shellow for Kaiser as his counsel, conditioned upon an adjournment [of the trial date] so that Shellow could prepare for trial." *Id.* The trial court held a hearing on the petitioner's substitution motion the day before trial was scheduled to begin. *Id.* at 1021. The trial court asked Shellow "if she was prepared to try the case tomorrow. When Shellow replied that she was not, the court [denied the motion and stated that the] case is staying on the calendar." *Id.* at 1022. The defendant was thus handcuffed into proceeding to trial with Kaiser and was convicted. *Id.* at 1023. On appeal, the state court denied the petitioner's *Gonzalez-Lopez* claim, based on its factual determination that the petitioner's "motion for substitution was based on 'differing views of how the case is approached' and 'strategic decision[s].'" *Id.* at 1024 (alteration in original).

The district court held that the state appellate court had unreasonably determined the facts relevant to the constitutional analysis. *See id.* The petitioner having satisfied § 2254(d), the district court held that on *de novo* review the petitioner was entitled to relief. *See id.* The Seventh Circuit affirmed. The Seventh Circuit agreed that the petitioner had satisfied § 2254(d)(2) and that the trial court's denial of the petitioner's "motion for substitution of counsel and a continuance [was] arbitrary." *Id.* at 1025. The Seventh Circuit agreed that there had been a complete breakdown in the attorney-client relationship between the petitioner and Kaiser and

stated that the state's "argument that [the petitioner] was not entitled to a continuance because of the timing of his request [was] far from compelling." *Id.* at 1025. "Even the inconvenience of pushing the trial back a month or so," the Seventh Circuit explained, "would be easily outweighed by [the petitioner's] interest in having his counsel of choice properly prepared to defend him against such serious charges." *Id.* at 1026. The petitioner had been "in jail from the time of his arrest," and thus "had nothing to gain by needlessly delaying the trial." *Id.* Moreover, he "had never requested to substitute counsel previously and had no history of 'gaming' the system." *Id.* The Seventh Circuit concluded: "Apparently, *any* delay [in the trial date] would have been unacceptable to the trial judge. That sort of rigidity can only be characterized as arbitrary." *Id.* (citing *Linton*, 656 F.2d at 212).

So too here. The only difference between the facts in *Carlson* and the facts in Pouncy's case is that the petitioner in *Carlson* recently had retained a specific replacement counsel, albeit one whom could not be prepared for trial unless a continuance were granted. But this a difference without a distinction. The fact that Pouncy had not yet retained a replacement counsel is not why the trial court denied Pouncy's request. The trial court denied Pouncy's request because, like the trial court in *Carlson*, it was hell bent on proceeding to trial that day. There is no shortage of affordable criminal defense lawyers in the Genesee County area who would have been qualified and willing to take Pouncy's case. The trial court could not have had

any good reason to believe that it would take Pouncy long to retain a replacement counsel who could be ready to try the case reasonably soon.  Thus, for all practical purposes, Pouncy was identically situated to the petitioner in *Carlson*, and the Court should reach the same result in Pouncy's case.

## II.    The Michigan Court of Appeals's Denial of Pouncy's *Faretta* Claim Was Based on an Unreasonable Determination of the Facts and Contrary to Clearly Established Supreme Court Precedent.

Pouncy's frustration with his court-appointed counsel was clearly boiling over from the moment court began the morning of jury selection.  After sitting through court-appointed counsel's pathetic opening statement, Pouncy was in a full-blown panic.  At that point, he wrote a note to his court-appointed counsel that he wanted to proceed *pro se* for the remainder of trial; trial counsel informed the trial court of the note.  *See* ECF No. 8-7 at 232:13-18, PageID.688.  The trial court then engaged Pouncy in a brief colloquy that omitted critical, essential information regarding the risks that Pouncy faced proceeding *pro so*, including his range of punishments if convicted.  *Id.* at 233-234, PageID.688-689.  The centerpiece of the colloquy was the trial court's admonition to Pouncy that he had "no business representing yourself, none whatsoever." *Id.* at 233:17-19, PageID.689.  The trial court accepted Pouncy's waiver without making a specific, on-the-record finding that Pouncy's waiver was knowing, intelligent, and voluntary.

On direct appeal, Pouncy argued that his waiver of counsel was not knowing, intelligent, and voluntary, rendering his waiver constitutionally invalid—structural error requiring automatic reversal of Pouncy's conviction. The Michigan Court of Appeals denied Pouncy's claim on the merits.

### A. The Michigan Court of Appeals's Decision Was Contrary to Supreme Court Precedent That an Appellate Court May Not Presume a Knowing, Intelligent, and Voluntary Waiver From a "Silent Record."

The Michigan Court of Appeals's decision was contrary to clearly established Supreme Court precedent because it presumed in the face of a "silent record" that Pouncy's waiver was knowing, intelligent, and voluntary, which the Supreme Court in *Carnley v. Cochran*, 369 U.S. 506 (1962), held is "impermissible," *id.* at 512.

In *Johnson v. Zerbst*, the Supreme Court held that "'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights." 304 U.S. 458, 464 (1938) (citations omitted). Thus, the *Zerbst* Court explained, "[w]hile an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record." *Id.* at 465. The Sixth Circuit highlighted *Zerbst*'s rule in *Fowler v. Collins*, 253 F.3d 244, 249-250 (6th Cir. 2001), affirming that "[a] trial court's determination as to the propriety of a waiver

should appear on the record."[5]  Similarly, in *James v. Brigano*, 470 F.3d 636 (6th Cir. 2006), the Sixth Circuit held that the state court should have granted the habeas petitioner's *Faretta* claim because "at no time did the state trial judge make an explicit finding that [the petitioner's] waiver was knowing and intelligent."  *Id.* at 643; *see also United States v. Curtis*, 488 F. App'x 948, 954 (6th 2012) ("Upon completion of [the *Faretta*] inquiry, the court must then make an express finding that the defendant knowingly and voluntarily waived his right to counsel.").

Like the trial court in *Brigano*, the trial court in Pouncy's case did not make an express, on-the-record finding that Pouncy's waiver was knowing, intelligent, and voluntary waiver, as *Zerbst* required it to do.  Instead, after asking Pouncy three questions to which Pouncy answered "yes," the trial court told court-appointed counsel to "take a seat," brought the jury back in, and informed the jury that "Mr. Pouncy has decided to represent himself in this trial."  ECF No. 8-7 at 233-235, PageID.688-690; *see also* ECF No. 73 at 8:19-20, PageID.6704 ("THE COURT: And to put it politely, it looked like in some respects Judge Hayman steamrolled an 18 year old with respect to this waiver question.").  The Michigan Court of Appeals, in deciding that Pouncy's waiver of counsel was knowing, intelligent, and voluntary as the Sixth Amendment requires, thus did exactly what the Supreme Court's

---

[5] In *Hill v. Curtin*, 792 F.3d 670 (6th Cir. 2015) (*en banc*), the Sixth Circuit quoted *Zerbst*'s record-finding requirement in the midst of discussing what the Supreme Court's *Faretta* precedents mandate.  *Id.* at 678.

decision in *Carnley* does not permit—it presumed a valid waiver from a "silent record."  Pouncy satisfies § 2254(d)(1) for this reason alone, and thus the Court must review the claim *de novo*.

On *de novo* review, the Court should hold that, under *Zerbst* and *Carnley*, the record does not permit the Court to hold on the basis of the silent trial court record that Pouncy's waiver of his right to counsel was knowing, intelligent, and voluntary.

**B.    The Michigan Court of Appeals's Decision Affirming the Adequacy of the Trial Court's *Faretta* Warning Was an Unreasonable Application of and Contrary to Supreme Court Precedent, as Well as Based on an Unreasonable Determination of the Relevant Facts.**

For a defendant's waiver of his right to counsel to be constitutionally valid, a trial court must provide constitutionally adequate warnings to the defendant.  With respect to the warnings the trial court provided Pouncy, the Michigan Court of Appeals found that "the trial court properly advised [Pouncy] of the risks of self-representation."  *Pouncy*, 2008 WL 9869818, at *22.  The Michigan Court of Appeals specifically pointed to the trial court's admonishment that Pouncy "would be a 'fool' to represent himself," and that "the court would treat him like 'any other lawyer'" and require him to "comply with the court rules."  *Id.*  But it is "contrary to" and "an unreasonable application of" Supreme Court precedent to say that this warning adequately warned Pouncy of the dangers of self-representation in his case.[6]

---

[6] Telling a defendant he would be a "fool" to represent himself is, of course, different than telling him that proceeding *pro se* "usually increases the likelihood of a trial

29

28 U.S.C. § 2254(d).  The Michigan Court of Appeals also asserted that "the record reflects that the trial court repeatedly advised defendant of the charges against him, including the minimum and maximum prison sentences associated with the various charges."  *Pouncy*, 2008 WL 9869818, at *23.  These were "unreasonable determinations" of fact in light of the trial court record.  28 U.S.C. § 2254(d)(2).

In *Faretta*, the Supreme Court held that a defendant's waiver of his right to counsel is valid under the Sixth Amendment only if the court has made him "aware of the dangers and disadvantages of the self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'"  *Faretta*, 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).  There are no exceptions to this rule.  To the contrary, the Supreme Court has made clear that *Faretta* warnings must always be "'rigorous[ly]' conveyed."  *Iowa v. Tovar*, 541 U.S. 77, 89 (2004) (quoting *Patterson v. Illinois*, 487 U.S. 285, 298 (1988)).

To satisfy *Faretta*, a trial court must ensure that the defendant's "[w]aiver of the right to counsel" is a "knowing, intelligent ac[t] done with sufficient awareness

---

outcome unfavorable to the defendant."  *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (2012).  In determining whether *Faretta* warnings were adequate, the Sixth Circuit has looked to whether the defendant was specifically provided such a warning.  *See, e.g.*, *United States v. Utrera*, 259 F. App'x 724, 728 (6th Cir. 2008) (noting that the trial court "repeatedly . . . explained that by choosing to represent himself, [the defendant] would likely increase his risk of conviction").

of the relevant circumstances." *Tovar*, 541 U.S. at 81 (second alteration in original) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)); *see also Pouncy v. Palmer*, 846 F.3d 144, 160 (6th Cir. 2017) (holding that a trial court must "loo[k] at all of the circumstances surrounding waiver of counsel to ensure that such waiver was knowing and intelligent" (quoting *Brigano*, 470 F.3d at 644)). Accordingly, "the information a defendant must have to waive counsel intelligently will 'depend, in each case, upon the particular facts and circumstances surrounding that case.'" *Tovar*, 541 U.S. at 92 (quoting *Zerbst*, 304 U.S. at 464). It is clear, however, that "[b]efore [validly] waiving the right to counsel, the defendant must understand 'the range of allowable punishments.'" *Akins v. Easterling*, 648 F.3d 380, 399 (6th Cir. 2011) (quoting *Von Moltke v. Gillies*, 332 U.S. 708, 724 (1948)); *see also Von Moltke*, 332 U.S. at 724 (holding that "[t]o be valid," the defendant's waiver of his right to counsel "must be made with an apprehension of . . . the range of allowable punishments [for the charged offenses]").[7] Indeed, in a prior brief to this Court, the state agreed that, for a waiver of counsel to be valid under the Sixth Amendment, "the defendant must be told . . . the statutory maximum punishment and any mandatory minimums." ECF No. 239 at 53, PageID.11374.

---

[7] In *Patterson*, the Supreme Court cited this portion of *Von Moltke* in the midst of discussing "the procedures that must be observed[ ] before permitting [a defendant] to waive his right to counsel at trial." 487 U.S. at 298.

There is a simple, common-sense reason why the defendant must be informed of—and *understand*—the range of punishments associated with the charges, including the mandatory minima, in order for his waiver of counsel to be knowing and intelligent.  The prison time that will automatically result, as well as the prison time that may result, from a conviction will always be a principal consideration in a defendant's decision whether to risk proceeding to trial without a lawyer.  Accordingly, the trial court's warnings to Pouncy, which demonstrably did not include any information regarding the range of punishments associated with the charged offenses, were patently inadequate.  Any state court decision reaching the opposite conclusion would be either "contrary to" or an "unreasonable application" of clearly established Supreme Court precedent under § 2254(d)(1).

To be sure, the Michigan Court of Appeals did find that the trial court "repeatedly advised" Pouncy of the "minimum and maximum prison sentences associated with the various charges against him."  *Pouncy*, 2008 WL 9869818, at *23.  But this factual finding is just flat out wrong.  The trial court record leaves no doubt on this point.  The Michigan Court of Appeals's decision was therefore based on an "unreasonable determination of the facts" for purposes of § 2254(d)(2).

At Pouncy's arraignment on November 14, 2005, the trial court did not advise Pouncy regarding the issue of punishment.  On the morning of January 24, 2006, just prior to jury selection, the trial court had a colloquy with the prosecutor (not

with Pouncy) regarding the "maximum sentences" for the charged offenses, during which the trial court stated that "all of the carjacking offenses carry life, [and] armed robbery carries life of course."[8]  ECF No. 8-7 at 19:11-12, PageID.474.  The record does not reflect whether Pouncy was listening to the Court's colloquy with the prosecutor, let alone understood the import of the conversation.  In any event, the Court's reference to "life" was immediately followed by a discussion of "what are [Pouncy's] guidelines."  *See id.* at 19:21–21:1, PageID.474-476.  The trial court told Pouncy that "what [the guidelines range] means is that if you were convicted of all the offenses . . . the guidelines say that I should give you a sentence somewhere between eleven and-a-half to twenty-eight [years]."  *Id.* at 21:5-10, PageID.476.

As an initial matter, the trial court's statement regarding Pouncy's guidelines egregiously understated the bottom and top of the guidelines range that in fact would apply if Pouncy were convicted at trial.[9]  Thus, Pouncy could not possibly have had a correct understanding of the mandatory minimum punishments associated with the charges against him.  And if he did not correctly understand the mandatory minimum punishments, then by definition he did not correctly understand the "range of

---

[8] Undersigned counsel notes that, under Michigan law, a defendant given a life sentence is parole eligible after 15 years.  *See* M.C.L. § 791.234.

[9] The charged offenses in fact carried a guidelines range of 225-562 months' imprisonment, staggeringly higher than the 135-337 month range the trial court conveyed to Pouncy.  *See Pouncy*, 165 F. Supp. 3d at 619.

allowable punishments" associated with the charged offenses. *Cf. Alleyne v. United States*, 570 U.S. 99, 108 (2013) (explaining that the "range of sentences to which a defendant is exposed" is defined by the mandatory minimum and the *Apprendi* maximum); *id.* at 113 ("Elevating the low-end of a sentencing range heightens the loss of liberty associated with the crime . . . .").

Equally important for *Faretta* purposes, telling Pouncy that "the guidelines say" what sentence the trial court "should give" would not have provided Pouncy any understanding that under Michigan law the bottom end of a defendant's guidelines range represents the *minimum* sentence that the trial court *must impose* (*i.e.*, a "mandatory minimum"). Nor would it have provided Pouncy any understanding that the top end of a defendant's guidelines range represents the *minimum* sentence that the trial court *may impose* in its discretion (*i.e.*, a "maximum minimum"), rather than the longest amount of time that the defendant may be imprisoned. Nor would it have provided Pouncy any understanding that the trial court would have the discretion to impose a maximum sentence that could result in Pouncy remaining in prison until he died of old age. The Supreme Court's *Faretta* precedents do not allow a reviewing court to simply assume, in the face of a silent record, that Pouncy somehow understood all of these critical pieces of information regarding the range of punishments associated with the charged offenses. And, indeed, the trial record reflects that on the morning of trial Pouncy complained to

34

the trial court that, because of his court-appointed counsel's failure to meaningfully consult with him, Pouncy still needed a "better understanding" of everything associated with his case.  *See* ECF No. 8-7 at 7:3-4, PageID.462.

The Michigan Court of Appeals, in holding that the trial court's warning satisfied the requirements of *Faretta* and its progeny, either unreasonably applied clearly established Supreme Court precedent, made its decision based on an unreasonable determination of the facts, or both.  *De novo* review therefore now applies.  Applying *de novo* review, it is clear that Pouncy is entitled to relief. Without being clearly advised that, if convicted, his "range of allowable punishments" *started at a minimum* of 225 months' imprisonment and topped out at however many months the trial court wanted to give him, Pouncy's waiver of his right to counsel was not knowing and intelligent.

**C.    Because Pouncy Has Satisfied § 2254(d)(1) and (d)(2) for the Reasons Stated Above, the Court May Also Revisit the "Hobson's Choice" Theory of Involuntariness Using a *De Novo* Standard.**

As the Sixth Circuit held on appeal, Pouncy's *Faretta* claim is a single claim that is based on several discrete arguments.  Thus, insofar as Pouncy has satisfied § 2254(d) with respect to his *Faretta* claim for the multiple reasons stated above, this Court may now also revisit, using a *de novo* standard, Pouncy's "Hobson's choice theory" for why his waiver of counsel also was involuntary.

At the outset of his colloquy with the trial court regarding his waiver of counsel, Pouncy solemnly stated, "I don't have an attorney right now."  ECF No. 8-7 at 232:25, PageID.688.  Against this backdrop, the only fair conclusion on *de novo* review is that Pouncy's decision to waive counsel was involuntary.  The Sixth Circuit has already signaled that Pouncy should prevail on his Hobson's choice theory under a *de novo* standard.  *See Pouncy*, 846 F.3d at 161 ("Were we to evaluate Pouncy's claim *de novo*, we might very well apply a different standard in this case.").  This Court has stated the same: "Needless to say, the Court would grant relief under *de novo* review."  *See Pouncy*, 165 F. Supp. 3d at 625 n.2.  For all the reasons the Court stated in its January 11, 2016 order, *see id.* at 627-631, the Court should hold on *de novo* review that Pouncy's waiver was involuntary because his alternative to proceeding *pro se* was to proceed to trial with court-appointed counsel who had utterly failed to prepare for trial and was not invested in advocating for Pouncy.[10]

_____

[10] Undersigned counsel is mindful of the Sixth Circuit's assertion that the direct appeal record in Pouncy's case "can reasonably be squared with the Michigan Court of Appeals' conclusion that [court-appointed counsel] was adequately prepared for trial."  *Pouncy*, 846 F.3d at 162.  Because the Court must review the *Faretta* claim *de novo* for the reasons stated above, however, AEDPA deference no longer applies to any aspect of the state court's adjudication of the *Faretta* claim, including any predicate ineffective assistance of counsel analysis.  Moreover, with respect to underlying state court factual findings, Pouncy can satisfy § 2254(e)(1)'s "clear and convincing evidence" standard.  The Michigan Court of Appeals found that Pouncy "conceded that he gave [Accardo] *the name and number* for one potential witness," *Pouncy*, 2008 WL 9869818, at *19.  But Pouncy told the trial court merely that he "gave [Accardo] one *number*" to call.  ECF No. 8-7 at 5:14-15, PageID.460.  The direct appeal record makes crystal clear that Pouncy provided court-appointed

### III.   Pouncy Is Entitled to Relief on His *Lafler* Claim.

There is no evidence that court-appointed counsel made any effort to negotiate a plea, but the prosecution nevertheless offered to allow Pouncy to plead guilty to the eleven substantive counts with which he was charged, but without a habitual offender enhancement.  Had Pouncy taken that deal, the trial court's sentencing discretion would have been significantly constrained, and Pouncy could have been released from prison in as few as 135 months.  Court-appointed counsel, however, failed to correctly advise Pouncy of the sentencing benefits that the plea offer provided, relative to going to trial.  Court-appointed counsel instead incorrectly informed Pouncy that the guidelines that would apply if Pouncy were convicted at trial were essentially identical to those that would apply under the plea offer, and he also allowed Pouncy to proceed under the impression that his sentence if convicted at trial would be "not much different" than the sentence he would receive if he accepted the plea offer.  *See* ECF No. 8-7 at 19-23, PageID.474-477.

A criminal defendant's Sixth Amendment right to effective assistance of counsel "extends to the plea-bargaining process." *Lafler v. Cooper*, 566 U.S. 156,

---

counsel and Accardo the *names* of *several witnesses* to investigate in support of his alibi defense.  Court-appointed counsel acknowledged this at the January 9, 2006 pre-trial conference.  *See* ECF No. 8-6 at 8-9, PageID.454-455 (referring to "looking into *all the witnesses*" that Pouncy provided to them and that "[t]here's quite a number of them that we have to look at").  Accardo's trial testimony further confirms that Pouncy provided multiple "names" of "possible witnesses."  *See* ECF No. 8-11 at 93-94, PageID.1222-1223.

162 (2012).  "[A] criminal defendant is [therefore] entitled to competent advice of counsel at the plea stage . . . ."  *United States v. Morris*, 470 F.3d 596, 600 (6th Cir. 2006).  "Claims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test set forth in [*Strickland v. Washington*, 466 U.S. 688 (1984)]."  *Missouri v. Frye*, 566 U.S. 134, 140 (2012) (citing *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)).  A petitioner's *Lafler* claim satisfies *Strickland* if the petitioner demonstrates (i) that his counsel's performance during the plea bargaining process fell below an objective standard of reasonableness, and (ii) a reasonable probability that, but for the deficient representation, he would have accepted the prosecution's plea offer, *see Frye*, 566 U.S. at 147, or "would have bargained for [and accepted] a better deal," *Byrd v. Skipper*, 940 F.3d 248, 256 (6th Cir. 2019).  In determining prejudice, the Sixth Circuit gives "special weight" to whether there were "significant disparities between the penalties offered in [the rejected] plea" and the potential penalties at trial.  *Morris*, 470 F.3d at 602.  A "substantial disparity between the penalty offered by the prosecution and the punishment called for by the indictment is sufficient to establish a reasonable probability that a properly informed and advised defendant would have accepted the prosecution's offer."  *Griffin v. United States*, 330 F.3d 733, 737 (6th Cir. 2003).

On post-conviction appeal, Pouncy argued that his court-appointed counsel's deficient performance at the plea bargaining stage—highlighted by his egregiously

incorrect advice regarding Pouncy's sentencing guidelines exposure at trial—entitled him to relief under *Lafler*. The state court addressed and denied this *Lafler* claim in a single unadorned sentence: "[B]ased on the foregoing analysis and the Court of Appeals [sic] prior ruling, Defendant's arguments are without merit pursuant to MCR 6.508(D)." ECF No. 8-37 at 23-24, PageID.3159-3160. It appears that the trial court erroneously treated Pouncy's *Lafler* claim as identical to Pouncy's claim that court-appointed counsel had been constitutionally ineffective at other critical stages of the proceeding, a claim that the trial court had disposed of in the immediately preceding section of its decision. *See id.* at 22-23, PageID.3158–3159. Accordingly, the trial court simply did not adjudicate Pouncy's separate and distinct *Lafler* claim. This means that AEDPA does not apply to the *Lafler* claim, and the Court must address the claim *de novo*.

### A. Court-Appointed Counsel's Failure to Engage in Competent Plea Negotiations, and His "Staggering" Miscalculation of Pouncy's Sentencing Exposure at Trial, Was Deficient Performance.

Pouncy's court-appointed counsel provided deficient representation during the plea bargaining process in at least two key respects. First, court-appointed counsel's lack of pre-trial investigation left him unequipped to engage in competent plea negotiations with the prosecutor, which prevented him from negotiating an even more favorable plea deal in the weeks and days leading up to trial. Second, Pouncy's court-appointed counsel indisputably misinformed Pouncy of the sentencing range

that he faced if he proceeded to trial, leading Pouncy to believe incorrectly that the prosecution's plea offer did not provide any meaningful benefits relative to taking his chances at trial.

With respect to the plea bargaining process, court-appointed counsel essentially admitted to the trial court on the morning of jury selection that he had failed to investigate the facts of the case.[11]  It is a basic tenet of plea bargaining, however, that pointing out the weaknesses in the prosecution's case increases the likelihood that the prosecutor will extend a better deal.  Thus, by definition, Pouncy's court-appointed counsel ignored a basic preparatory component to plea bargaining and, therefore, was unable to engage in competent representation during the plea bargaining process.  Indeed, the trial record does not reflect that court-appointed

---

[11] Six weeks before trial, court-appointed counsel acknowledged that "there are a lot of witnesses that we have to look into in this case, a lot of different details."  ECF No. 8-4 at 4:17-18, PageID.287.   Court-appointed counsel hired a private investigator, Leonard Accardo, "because there were a number of leads which [he] quite frankly would have been stretched too thin to [look into himself]."  ECF No. 8-7 at 13:4-7, PageID.468.  Two weeks before trial, court-appointed counsel told the court that, because Accardo had been "sick for ten days in bed," he was not prepared to go to trial.  *See* ECF No. 8-6 at 8:9-15, PageID.454.  On the morning of jury selection, court-appointed counsel told the trial court that he had not heard back from Accardo one way or the other about any of Accardo's investigatory efforts. Accordingly, court-appointed counsel acknowledged that he did not "know" anything about the quantity, quality, or results of Accardo's investigation; instead, he simply "assume[d]" based on Accardo's "reputation and past performance" that Accardo had competently performed all necessary work and had found nothing.  *See id.* at 17:6-12, PageID.472.

counsel engaged in any actual plea bargaining at all, but rather took to Pouncy the first offer that the prosecution provided.

With respect to the guidelines miscalculation, it is undisputed that court-appointed counsel egregiously misadvised Pouncy regarding the sentencing guidelines range that would apply if he were convicted at trial.[12]   Without any equivocation or suggestion that their guidelines calculation was a preliminary one, the prosecutor and court-appointed counsel, with Pouncy standing right there, stated to the trial court that Pouncy's guidelines range if he were convicted at trial would be 135-337 months.  Court-appointed counsel indicated his agreement when the trial court responded that this was "not much differen[t]" than the guidelines that would apply if Pouncy accepted the prosecution's plea.  *See* ECF No. 8-7 at 22:24, PageID.477.  As this Court previously found, "[t]he magnitude of [court-appointed counsel's] guidelines miscalculation here was *staggering*."  *Pouncy,* 168 F. Supp. 3d at 963 (emphasis added).  Court-appointed counsel understated the bottom of Pouncy's guidelines range if he were convicted at trial by nearly 8 years and the top by nearly 19 years.  As this Court already has concluded, this "gross miscalculation . . . bespeaks [counsel's] lack of preparation" and "lack of familiarity with the

---

[12] Competent counsel also would have advised Pouncy that, by resolving the case with a plea, the trial court would be more likely to impose a sentence at the low end of his guidelines range.  There is no evidence that court-appointed counsel so advised Pouncy.  This further prejudiced Pouncy's ability to conduct an informed cost-benefit analysis of the prosecution's plea offer.

relevant sentencing facts," *Pouncy*, 165 F. Supp. 3d at 628 n.4, as well as with the applicable law.  In a sworn affidavit submitted as part of these habeas proceedings, court-appointed counsel acknowledged that his egregious guidelines miscalculation adversely impacted his representation of Pouncy.  *See* ECF No. 71 at 2-3, PageID.6650-6651.

The Sixth Circuit has recognized that the "right to counsel during the plea-bargaining process include the right to be informed by counsel as to the range of penalties under the applicable guidelines," because a defendant's "understanding" of the "discrepancy between the punishment resulting from a plea agreement and that which would result from a trial conviction is an important factor that the defendant is entitled to consider in his decision-making process." *Sawaf v. United States*, 570 F. App'x 544, 548-549 (6th Cir. 2014).  Court-appointed counsel's inexplicable miscalculation of Pouncy's sentencing exposure if he proceeded to trial completely prevented Pouncy from accurately and intelligently weighing the benefits of the prosecution's plea offer.  Indeed, court-appointed counsel's miscalculation essentially *guaranteed* that Pouncy would reject the prosecution's offer, because the miscalculation suggested to Pouncy that he would have "nothing to lose" by going to trial. *Magana v. Hofbauer*, 263 F.3d 542, 550 (6th Cir. 2001) (holding that counsel's "gross misadvice to his client regarding the client's potential prison sentence [if he went to trial], certainly fell below an objective standard of

reasonableness under prevailing professional norms"); *see also Morris*, 470 F.3d at 603 (holding that trial counsel's "erroneous estimate" of the defendant's guidelines range "fell below an objective standard of reasonableness" (quoting *Griffin v. United States*, 330 F.3d 733, 738 (6th Cir. 2003)).

### B.   Court-Appointed Counsel's Deficient Performance at the Plea Bargaining Stage Presumptively Prejudiced Pouncy.

Under Sixth Circuit law, the prejudice prong on a *Lafler* claim is "presumptively satisfied if the difference between the length of the sentence proposed in the [prosecution's] plea offer and the sentence imposed after a trial conviction was substantial." *Sawaf*, 570 F. App'x at 547; *Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003) ("Other panels in this and other circuits have pointed to the disparity between the plea offer and the potential sentence exposure as strong evidence of a reasonable probability that a properly advised defendant would have accepted a guilty plea offer, despite earlier protestations of innocence."). That presumption of prejudice properly applies in Pouncy's case.   The Sixth Circuit's decision in *Morris* is instructive.

In *Morris*, the defendant's sentencing range would have been 90-97 months' imprisonment under the prosecution's plea offer, compared to a then-mandatory sentencing guidelines range of 101-111 months' imprisonment if he were convicted at trial.  470 F.3d at 599.  The defendant's counsel, however, incorrectly advised him that his sentencing range if convicted at trial would only be 62-68 months'

43

imprisonment. *Id.* at 602. The Sixth Circuit held that this incorrect guidelines advice prejudice the defendant because his "'ability to make an intelligent decision regarding [the] plea offer [was] severely undermined.'" *Id.* at 603 (quoting *Griffin*, 330 F.3d at 737) (second alteration in original)). The Sixth Circuit further held that "factoring in [the defendant's] assertion of his innocence," as a grounds to find a lack of prejudice, "would inappropriately punish him for exercising his Fifth Amendment right against self-incrimination" and be "at odds with this Court's precedents." *Id.* (citing *Griffin*, 330 F.3d at 738).

In Pouncy's case, the disparity between Pouncy's guidelines range under the prosecution's plea offer and Pouncy's actual (as opposed to miscalculated) guidelines range if he were convicted at trial was far greater than the disparity in *Morris*. Compared to the sentencing range that Pouncy faced if convicted after trial, the prosecution's plea offer provided a substantially lower mandatory minimum (135 months versus 225 months) and a dramatically lower "maximum minimum" (225 months versus 562 months). The presumption of prejudice thus properly applies.

That Pouncy asserted his innocence in open court is not a valid reason for finding a lack of prejudice under *Lafler*. In *Sawaf*, the district court had declined to "credit [the defendant] with the applicable presumption of prejudice" due to the defendant's "continued insistence that he was innocent . . . ." 570 F. App'x at 548. The Sixth Circuit reversed, holding that circuit precedent "compelled" it "to

44

conclude that [the defendant's] continued insistence as to his innocence does not foreclose the possibility that he would have been willing to enter a guilty plea" had he been properly informed about its benefits in comparison to risking trial. *Id.* at 549. As the Sixth Circuit explained in *Griffin*, it "does not make sense to say that a defendant's protestations of innocence belie his later claim that he would have accepted a guilty plea" had he been correctly advised of the plea offer's benefits. 330 F.3d at 738.

This Court should also conclude that court-appointed counsel's lack of trial preparations prejudiced Pouncy's ability to negotiate a more favorable plea deal than the one the prosecution offered. Last year, the Sixth Circuit in *Byrd* held that, where "counsel's deficient performance deprives a defendant of a fair opportunity in plea negotiations," the petitioner is entitled to show that "absent counsel's errors, [he] would have bargained for a better plea." 940 F.3d at 256. During pre-trial proceedings, court-appointed counsel repeatedly told the trial court that he was not prepared to test the prosecution's evidence or put on a defense case. Just as a matter of common sense, the fact that the prosecution offered Pouncy a plea deal under those circumstances suggests a reasonable probability that it would have offered Pouncy a *better deal* if it believed court-appointed counsel would be a worthy trial adversary. That the prosecution offered more favorable plea deals to Pouncy's alleged co-conspirators—Tiakawa Pierce and Wayne Grimes (who had confessed to

law enforcement almost immediately after being arrested)—further indicates that court-appointed counsel's utter lack of trial preparation prejudiced Pouncy's plea bargaining leverage. *Cf. id.* at 258 ("[Petitioner] also has demonstrated, by pointing to the bargain [a co-conspirator] reached as a comparator, that an available plea would have provided favorable terms . . . .").

### C.      The Court Should Order the State to Release Pouncy Immediately.

Pouncy already has served more time in prison than he might have served had he accepted the plea deal that the prosecutor had extended. Pouncy is thus similarly situated to the petitioner in *Lewandowski v. Makel*, 949 F.2d 884 (6th Cir. 1991), who had been convicted of first degree murder and was issued an immediate release as a remedy to his counsel's deficient advice with respect to a plea to a lesser charge.

In *Lewandowski*, the petitioner was charged with first degree murder and pled *nolo contendre* to second-degree murder. The defendant then had a change of heart and moved to withdraw his *nolo* plea. The trial court denied the motion and imposed a sentence of 15-25 years' imprisonment. *Id.* at 885-886. The petitioner subsequently retained new counsel who, "without discussing [with the petitioner] the legal ramifications of a successful appeal," appealed the trial court's denial of the motion to withdraw the plea. *Id.* at 886. The appeal succeeded, and the state took the petitioner to trial on the original first degree murder charge. *Id.* at 887. The jury convicted the petitioner, and the petitioner received a mandatory life sentence.

46

*Id.* On habeas review, the Sixth Circuit held that the petitioner's counsel had rendered ineffective assistance by failing to correctly inform him of "the risks that he faced should his appeal be successful." *Id.* The district court "determined that the appropriate remedy was specific performance of the original plea agreement, including the sentence which the judge imposed under the agreement. Under the original sentence [petitioner] would have been eligible for parole on May 2, 1989 at the latest. Accordingly, the district court ordered [the petitioner] released from custody." *Id.* On appeal, the state argued that "the district court erred in releasing [the petitioner]." *Id.* at 889. The Sixth Circuit disagreed and affirmed. *Id.*

Had Pouncy accepted the prosecution's plea offer, he could have received a sentence under which he would have been parole eligible after a little over 11 years in prison. Pouncy already has spent over 13 years in prison, and so ordering his immediate release is an analogous to the remedy ordered in *Lewandowski*. Furthermore, if the Court agrees that Pouncy's court-appointed counsel was ineffective in failing to negotiate an even better plea deal than the one the prosecution offered, the proper remedy under the Sixth Circuit's decision in *Byrd* is to order that Pouncy's conviction be unconditionally vacated. *See Byrd*, 940 F.3d at 260-261 (vacating petitioner's trial conviction as a *Lafler* remedy where "competent counsel . . . would have successfully negotiated a favorable plea").

**IV.    The Prosecution's Failure to Correct Testimony That It Knew Was False, and Its Failure to Disclose Material Exculpatory and Impeachment Information, Violated *Napue*, *Brady*, and *Giglio*.**

The Supreme Court's holdings in *Napue v. Illinois*, 360 U.S. 264 (1959), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), establish three fundamental rules under the Fifth and Fourteenth Amendment's Due Process Clause.  First, if the prosecution knows that a witness has provided false testimony to the jury, the state violates a defendant's due process rights if it "allows [the false testimony] to go uncorrected," and there is "any reasonable likelihood" that the false testimony affected the jury's judgment.  *See Napue*, 360 U.S. at 269.  Second, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.  Third, "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting [that witness's] credibility" requires a new trial.  *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 269).  Each of these species of prosecutorial misconduct infected Pouncy's trial, in violation of Pouncy's due process rights:

**1.**  The prosecution's lead law enforcement witness, Detective James Gagliardi, told the jury that phone calls placed by the perpetrator to the carjacking victims were only traceable back to "calling cards" (*i.e.*, placed from burner phones),

when in fact they were traceable to a standard-issue Sprint phone number for which a man named Qullie Strong (not Pouncy) was the subscriber. The circumstances demonstrate that Detective Gagliardi must have known his testimony was false (a *Napue* violation), and the prosecution had suppressed Verizon phone records in its possession at the time of trial that would have allowed Pouncy both to prove that the testimony was false (a *Giglio* violation) and connect another person to the carjackings in support of his mistaken identity defense (a *Brady* violation).

**2.** Moreover, the prosecution's star cooperating witness, alleged accomplice Wayne Grimes, in attempting to explain why his testimony on direct examination was materially inconsistent with statements he gave to law enforcement the day he was arrested on carjacking charges, told the jury that he was "scared" because it was the "first time" that he "got arrested." This was a bald-faced lie—City of Clio arrest records show that Grimes had been handcuffed, arrested, and processed on gun charges on May 14, 2005. The prosecutor and/or Detective Gagliardi (who was sitting at counsel table throughout trial) must have known Grimes's testimony was false. Yet, they allowed the false testimony to go uncorrected (a *Napue* violation), and the prosecution also suppressed arrest records in its possession that would have enabled Pouncy to prove that Grimes had just lied to the jury (a *Giglio* violation).

**3.** A man named Willie Joyce, an eyewitness to the October 11, 2005 carjacking, picked someone other than Pouncy from a photo array that law

enforcement presented to him shortly after the carjacking.  This evidence would have cast significant doubt on the reliability of the cross-racial identifications of Pouncy that the prosecution's testifying eyewitnesses made, therefore bolstering Pouncy's mistaken identity defense.  But the prosecution suppressed it (a *Brady* violation).

Under any standard of review, any one of these due process violations would be sufficient to require that Pouncy's conviction be reversed.  Collectively, these *Napue-Brady-Giglio* violations are shocking and disturbing.[13]  All of the violations are properly before this Court, and AEDPA provides no bar to Pouncy's entitlement to relief for these constitutional violations, for the reasons discussed below.

### A.   The Prosecution Violated *Napue*, *Giglio*, and *Brady* With Respect to the Traceability of the Perpetrator's Phone Calls to the Victims.

The state believed Pouncy committed a September 24, 2005 carjacking for which Pouncy was being tried in a separate proceeding.  At Pouncy's trial, the state introduced evidence of the September 24 carjacking under Rule of Evidence 404(b), because it shared the same *modus operandi* as the September 29 and October 11,

---

[13] Where the prosecution suppressed multiple items of *Brady* or *Giglio* information favorable to the accused, "*Kyles* mandates" that the reviewing court "consider the collective exculpatory effect of the nondisclosed evidence" in determining materiality.  *Schledwitz v. United States*, 169 F.3d 1003, 1013 (6th Cir. 1999); *see also Kyles v. Whitley*, 514 U.S. 419, 436-37 n.10 ("We evaluate [the suppressed favorable evidence's] cumulative effect for purposes of materiality . . . .").  Where the state violated *Napue* in addition to *Brady* and *Giglio*, the court also must consider the *Napue* violations collectively.  *See Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008) (explaining the two-step analytical framework to use).

2005 carjackings that are the subject of this habeas proceeding.  *See* ECF No. 8-7, PageID.478-479.   The *modus operandi* of all three carjackings involved the perpetrator first placing a phone call to the victim in response to a used-car advertisement that the victim had placed in the newspaper.  At trial, the lead law enforcement investigator, Detective James Gagliardi, testified that all of the calls from the perpetrator "went back to . . . a type of calling card that there's no information recorded to that," ECF No. 8-11, PageID.1355, at 223:23-24, and "so there was no way to say that the phone calls came from this person or that person" or "to trace any of those calls . . . to any particular cell phone," *id.*, PageID.1356, at 227:22-23.

Detective Gagliardi's testimony was false.  Verizon phone records in the possession of the prosecution at the time of trial, but that the prosecution suppressed, conspicuously showed that phone calls that the perpetrator placed to the victim of the September 24, 2005 carjacking were placed from the phone number (810) 836-5074.  *See* ECF No. 9-3, PageID.5149–5156.  That number was not associated with anonymous "calling cards," as Detective Gagliardi claimed to the jury.  It was a standard-issue Sprint phone number that was traceable to a specific subscriber, a man named Quillie Strong.  *Id.*, PageID.5147.  Phone records from Sprint prove this.

Undersigned counsel takes no pleasure in making an allegation of perjury against a member of the prosecution team, but the facts here are highly disturbing.

It seems exceedingly unlikely that Detective Gagliardi simply made an honest mistake with respect to the traceability of the phone calls. Detective Gagliardi was a veteran member of the prosecution team who served as the lead case agent. It strains credulity that he was such an inept investigator that he would have determined that (810) 836-5074 traced back to an anonymous "calling card," when in fact it traced back to a standard-issue Sprint number for which a specific person was the subscriber. Under the circumstances, Detective Gagliardi's "calling card" explanation looks like fabricated testimony designed to provide a convenient, pro-prosecution answer to the critical question of whether the phone calls traced back to someone other than Pouncy. To the extent Detective Gagliardi knowingly provided false testimony on this issue, it was precisely because he knew that the traceability of the perpetrator's phone calls would be material to the prosecution's ability to obtain a conviction of Pouncy. *Napue* makes clear that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269; *see also Smith v. Sec'y of N.M. Dep't of Corrections*, 50 F.3d 801, 826 n.38 and 831 (10th Cir. 1995) (holding that, under the Supreme Court's decision in *Bagley*, the prosecution's fabrication of evidence is "presumptively material").

The prosecution's suppression of the Verizon phone records also violated both *Giglio* and *Brady*, irrespective of whether the prosecutor's suppression was in bad

faith and irrespective of whether Detective Gagliardi knowingly committed perjury. If the prosecution had disclosed the Verizon phone records to Pouncy, Pouncy could have instantly impeached Detective Gagliardi's testimony that it was not possible to trace the perpetrator's phone calls back to any particular person. This would have impeached the all-important honesty and credibility of Detective Gagliardi, as well as undermined the thoroughness of his department's underlying investigation of the carjackings. Furthermore, by enabling Pouncy to tie the perpetrator's phone calls back to a phone number for which a person other than Pouncy was the subscriber, the Verizon phone records would have bolstered Pouncy's mistaken identity defense.[14]

The manner in which the trial court disposed of these issues on post-convicton appeal both failed to employ the correct legal standards under *Napue*, *Brady*, and *Giglio*, and irrationally characterized the Verizon phone records as irrelevant to Pouncy's mistaken identity defense. "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556

---

[14] Had the prosecution disclosed the Verizon records showing the calls from the (810) 836-5074 number, this would have led Pouncy to discover the Sprint records showing Quillie Strong as the number's subscriber. *See Gumm v. Mitchell*, 775 F.3d 345, 369-370 (6th Cir. 2014) (holding that the prosecution violates *Brady* where the suppressed evidence would have led the defendant to discover of other exculpatory evidence). The Sprint records show that calls from Quillie Strong's number were also placed to the victims of the September 29 and October 11, 2005 carjackings.

U.S. 449, 469-70 (2009). A "reasonable probability" does not mean "more likely than not," but rather means a "likelihood . . . great enough to 'undermine[ ] confidence in the outcome of the trial.'" *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Kyles*, 514 U.S. at 434) (alteration in original). To be entitled to relief either for a *Napue* violation or a *Giglio* violation that, as here, prevented the defendant from exposing false trial testimony, the "standard is [even] 'lower,' 'more favorable to the defendant,' and 'hostile to the prosecution.'" *Rosencrantz v. Lafler*, 568 F.3d 577, 587 (6th Cir. 2009) (internal citations and quotation marks omitted).

The trial court, however, held Pouncy to a different, higher standard of materiality. The trial court denied Pouncy's *Brady* claim by referring back to the portion of its opinion denying Pouncy's state-law claim that the Quillie Strong phone number evidence was newly discovered evidence that warranted a new trial under *People v. Cress*, 468 Mich. 678 (2003). *See* ECF No. 8-37 at 14-15, 19, PageID.3150-3151, 3155. *Cress*, however, requires precisely what *Napue*, *Brady*, and *Giglio* do not. First, *Cress* requires the defendant to show that "the new evidence makes a different result *probable* on retrial." *Cress*, 468 Mich. at 692 (emphasis added). The Supreme Court has made clear that a petitioner's burden under *Brady*'s materiality standard is significantly lighter. *See, e.g.*, *Kyles*, 514 U.S. at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence . . . ."). Second, *Cress* includes a "diligence"

requirement.  *See Cress*, 468 at 692.  "[T]he Supreme Court," however, "[has] rebuked the Court of Appeals for relying on such a due diligence requirement to undermine the *Brady* rule."  *United States v. Tavera*, 719 F.3d 705, 711 (6th Cir. 2013).

By using the *Cress* standard to adjudicate Pouncy's *Napue* and *Brady* claims relating to the phone records, the trial court therefore applied the wrong legal standard.  The trial court's decision was thus "contrary to" clearly established Supreme Court precedent for purposes of § 2254(d)(1).  *Cf. Lafler*, 566 U.S. at 173 (holding that the state court's decision was "contrary to clearly established federal law" because it "failed to apply" the correct legal test to the petitioner's claim).  This Court must therefore review Pouncy's claims *de novo*.

Even assuming for the sake of argument, however, that the trial court's decision could be read as applying the correct legal standards *sub silentio* (which it cannot), its application of those legal standards would have been wholly unreasonable.  The trial court asserted that, because the Verizon phone records relate to a phone call placed in connection with the September 24, 2005 carjacking, they do not "indicate or have any bearing on whether the defendant committed the crimes on September 29, 2005 and October 11, 2005."  ECF No. 8-37 at 15, PageID.3151. The trial court also asserted that "because Defendant himself testified that he was

not involved in the crimes," Strong's would-be trial testimony would have been "considered cumulative." *Id.* This reasoning is objectively unreasonable.

First, the trial court completely ignored that, given Detective Gagliardi's central role in the investigation—which included examining shoe print evidence and facilitating the photo arrays that led the victim eyewitnesses to identify Pouncy as the perpetrator—the jury's belief in Detective Gagliardi's honesty and competence would have been critical to its assessment of the prosecution's case. If the jury had doubts about Detective Gagliardi's honesty, it may have, for example, discounted the victims' photo array identifications as simply being the unreliable result of improper suggestiveness (or worse) on Detective Gagliardi's part. Or the jury could have inferred that Detective Gagliardi also lied when he testified that he had not obtained during the court of his investigation videotapes from the BP gas station that the perpetrator visited after one of the carjackings—and that he lied because the videotapes showed someone other than Pouncy. *See* ECF No. 8-11 at 223, PageID.1395.

Second, the prosecution's theory was that the same person committed the September 24, September 29, and October 11, 2005 carjackings. Circumstantial evidence that another African-American male (and not Pouncy) was the perpetrator of the September 24, 2005 carjacking would, therefore, undermine the prosecution's case that Pouncy committed the September 29 and October 11, 2005 carjackings.

56

Even the state previously agreed with this point.  *See* ECF No. 239, PageID.11346
(agreeing that evidence suggesting Pouncy did not commit one of the carjackings
would make the jury "more likely to believe that he didn't commit the other ones
too").  The phone records that the prosecution suppressed is thus classic exculpatory
information.  The Sixth Circuit's decision in *United States v. Garner*, 507 F.3d 399
(6th Cir. 2007), where the prosecution suppressed similar phone records in a
carjacking case involving a mistaken identity defense, is directly on point.[15]

Third, if the prosecution would have provided the Verizon phone records to
Pouncy, it would have led him to discover the Sprint phone records for the (810)
836-5074 telephone number.  Those Sprint phone records would have tied the
Quillie Strong phone number to the calls that the perpetrator placed to the victims of
the September 29 and October 11, 2005 carjackings.  Thus, it was not accurate for
the trial court to say that the suppression of the Verizon phone records did not have

---

[15] In *Garner*, the carjacking defendant asserted a mistaken identity defense.  *Id.* at
401.  The perpetrator of the carjacking also had stolen the victim's cell phone.  *Id.*
at 402.  Phone records in the prosecution's possession showed that several calls were
placed to and from the victim's phone shortly after it was stolen.  *Id.* 404.  The
prosecution failed to disclose the phone records to the defendant "within a time
frame that would allow [his] counsel to investigate [the records]."  *Id.* at 406.  The
Sixth Circuit held that the prosecution's untimely disclosure violated *Brady* because
the records included information that the defendant could have used to tie the calls
to two other men, corroborating his mistaken identity defense.  *Id.*  The Sixth Circuit
stated that the defendant was constitutionally "entitled to conduct his own
investigation into the records and should not [have been] forced to rely solely on the
government's one-side investigation."  *Id.*  So too in Pouncy's case.

any relationship to the charged September 29 and October 11, 2005 carjackings. They most certainly did.

Fourth, while phone records connecting someone other than Pouncy to the carjackings would have *corroborated* Pouncy's own trial testimony denying his involvement in any carjacking, that does not make the evidence *cumulative* for purposes of *Brady*. To the contrary, the power to corroborate Pouncy's testimony and bolster his mistaken identity defense is what makes the phone records so compellingly exculpatory. Under the trial court's twisted logic, if the defendant takes the stand to deny involvement in the charged crime—which, of course, is the only rational reason for a defendant to take the stand—any other exculpatory evidence is automatically cumulative and can be suppressed by the prosecution. That is not the law, and it is not a reasonable application of *Brady*.

### B. The Prosecution Violated *Napue* and *Giglio* by Failing to Correct and Suppressing Information That Would Have Impeached Grimes's False Explanation for His Prior Inconsistent Statements to Law Enforcement Regarding the Carjackings.

Pouncy's lack of distinguishing physical features (such as a scar or tattoo) raised a significant possibility that the victim eyewitnesses' cross-racial identifications were mistaken. To shore up this weakness in its case, the prosecution relied on Pouncy's alleged co-conspirator, cooperating witness Wayne Grimes.

Law enforcement had arrested Grimes on October 12, 2005 on probable cause that he was connected at least to the October 11, 2005 carjacking. ECF No. 203-6

at PageID.10061.  Detective Gagliardi interrogated Grimes at the police station.  *Id.*

Grimes initially denied any involvement in any carjackings but then flip-flopped,

admitting that he had participated in multiple carjackings, and also fingering Pouncy

as one of his two accomplices.  *Id.* at PageID.10061-10065.  Having confessed to

the carjackings, Grimes ultimately agreed to enter a guilty plea and, obviously

hoping to obtain a more lenient sentence, cooperate against Pouncy.  Two weeks

prior to Pouncy's trial, Grimes provided a new, tape-recorded statement to Detective

Gagliardi.  *See* ECF No. 9-4 at PageID.5273–5295.  This statement was far more

colorful than his October 12, 2005 statement and conflicted with his earlier statement

in multiple ways, including detailing Pouncy's supposed role in the offense,

Pouncy's supposed whereabouts on the morning of October 11, 2005, Pouncy's

supposed conduct in the moments leading up to the October 11, 2005 carjacking,

and statements Pouncy supposedly made shortly after the carjacking.  *Compare* ECF

No. 203-6 at PageID.10061-10065*, with* ECF No. 9-4 at PageID.5273-5295.

At trial, Pouncy confronted Grimes with the various conflicts and

inconsistencies between Grimes's first and second statements to Detective Gagliardi.

*See, e.g.*, ECF No. 8-10 at 1120-22, PageID.1117-1119; ECF No. 8-11 at 11-22, 45,

PageID.1140-1151, 1174.  Grimes's explanation to the jury for these conflicts and

inconsistencies was that, during his October 12, 2005 interrogation, he gave

Detective Gagliardi "half of what happened" because it was "the first time [he had]

got[ten] arrested" and he "was scared." ECF No. 8-11 at 22:12-16, PageID.1151. This explanation was a flat out lie. City of Clio arrest records show that Grimes was arrested and processed on May 14, 2005 for carrying a concealed weapon in a motor vehicle. *See* ECF No. 9-4 at PageID.5307-5312. The prosecution, however, both failed to correct this false testimony and suppressed the arrest records.

It strains credulity that both the prosecutor and Detective Gagliardi (who was sitting at counsel table with the prosecutor throughout the trial) were unaware that Grimes's testimony was false. Detective Gagliardi was responsible for the investigation of Grimes's role in the carjackings, which included running Grimes's name through the Law Enforcement Information Network ("LEIN") system. *See* ECF No. 203-6 at PageID.10060. As Detective Gagliardi testified at trial, running a LEIN report on someone pulls up the person's entire arrest history. ECF No. 8-11 at 202:17-21, PageID.1331; *see also, e.g.*, *United States v. Butler*, 223 F.3d 368, 371 (6th Cir. 2000) (discussing the LEIN system). The prosecutor had cut a plea deal with Grimes prior to Pouncy's trial, and the Pre-Sentence Investigation Report ("PSIR") for Grimes would have included his prior arrests. *See* ECF No. 8-5 at 3:6– 6:3, PageID.374-377. The prosecutor presumably read Grimes's PSIR prior to the conclusion of Pouncy's trial. Moreover, checking the criminal history of a star cooperating witness is basic preparation that any prosecutor worth his salt undertakes before putting his witness on the stand.

But even *assuming* that both the prosecutor and Detective Gagliardi were subjectively unaware that Grimes's explanation for his prior inconsistent statements about the carjackings was false, the suppression of Grimes's arrest records—which clearly were in possession of the prosecution team—was still a violation of *Giglio*. *See, e.g.*, *Giglio*, 405 U.S. at 154 (holding that non-disclosure of the impeachment information violated due process even if the prosecutor himself did not know that the information existed); *United States v. White*, 492 F.3d 380, 409 (6th Cir. 2007) (holding that, under *Giglio*, "[i]t matters little whether the government suppresses the evidence out of oversight or guile"). The arrest records impeached Grimes's trial testimony on a critical, non-collateral issue—namely, the reason for his prior inconsistent statements regarding Pouncy's role in the carjackings. If Grimes was willing to lie to the jury about his prior arrest record in order to explain away his prior inconsistent statements about the carjacking, the jury easily could have concluded that Grimes was willing to lie about the details of Pouncy's involvement in the carjackings as well. As the trial judge instructed the jury at the conclusion of the evidence, in "judging whether you believe a witness, . . . it may help you to think about" whether "the witness seem[ed] to be making an honest effort to tell the truth" rather than "evad[ing] the questions." *See* ECF No. 8-15 at 85:6-15, PageID.1873; *see also id.* at 86:10-13, PageID.1874 ("[If] you . . . conclude that a witness

deliberately lied about something . . . , you may choose not to accept anything the witness said.").

In rejecting Pouncy's *Napue* and *Giglio* claims regarding Grimes's false testimony, the trial court acknowledged that Pouncy had submitted as part of the post-conviction record the City of Clio police report "regarding the arrest of" Grimes on May 14, 2005 "on the charge of carrying a concealed weapon in a motor vehicle." ECF No. 8-37 at 21, PageID.3157.   Moreover, the court did not disagree that the prosecution was in possession of the information regarding Grimes's prior arrest history and failed to disclose it to Pouncy.   The trial court nevertheless denied Pouncy's claims because, in its view, "[t]here is no merit to Defendant's argument that the testimony concerning the arrest of Wayne Grimes was in any way material to Defendant's guilt or punishment."   *Id.*   This reasoning misses the point entirely.

Any evidence that "further diminishe[s]" the credibility of a cooperating witness implicates *Giglio*.   *Wearry*, 136 S. Ct. 1006; *cf. Napue*, 360 U.S. at 269-270 ("It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon the defendant's guilt.").   Under *Giglio*, the first question that the trial court needed to ask was whether the information regarding Grimes's arrest history tended to impeach Grimes's credibility, in light of the indisputable fact that Grimes *flat out lied* to the jury about his arrest history in order to explain away his prior inconsistent statements regarding the carjackings.   The question virtually

answers itself.  Because Grimes expressly invoked his *lack of arrest history* as the reason for his prior inconsistent statements to law enforcement regarding the carjackings, Grimes's *actual* arrest history was no longer some collateral issue.  Instead, it became critical to judging the honest of his trial testimony.  The second question that the trial court needed to ask under *Giglio* was whether information showing Grimes's perjury have had any reasonable likelihood of affecting the jury's judgment.  That question also virtually answers itself.  Grimes was critical the prosecution's case, which otherwise relied on cross-racial identifications that were subject to doubt (including one victim witness who picked someone other than Pouncy from the photo array that law enforcement showed to her).  The prosecutor's closing argument extensively discussed Grimes's testimony, and his rebuttal argument was substantially dedicated to Grimes's testimony.  The prosecutor in his rebuttal told the jury that Grimes "testified honestly," indicating the prosecutor's understanding that bolstering Grimes was critical to securing a conviction.  *See* ECF No. 8-15 at 73:10, PageID.1861.  As a cooperator, Grimes's credibility already was under the microscope; evidence that he lied about one thing on the stand surely would have cast doubt on the credibility of *everything* that he said on the stand.

By failing to ask the questions that *Giglio* requires, the trial court's decision effectively failed to apply *Giglio* at all, or at least did not apply it in any reasonable way.  Its decision was thus "contrary to" or an "unreasonable application of" *Napue*

and *Giglio*.  Because Pouncy, therefore, has satisfied § 2254(d), the Court reviews the *Napue*/*Giglio* claims related to Grimes *de novo*.  Pouncy also satisfies § 2254(d) because the trial court failed to address the Grimes *Napue/Giglio* violation collectively with the Verizon phone records *Napue*/*Brady* violation.

On *de novo* review, the state has no plausible argument that the prosecution's misconduct was not a violation of *Napue, Giglio*, or both.  The state, however, apparently is prepared to argue that Pouncy's *Napue* and *Giglio* claims are not even properly before this Court, because they are not pled in his habeas corpus petition.  *See* ECF No. 290 at 4-5, PageID.12220-12221.  The state's position is perplexing in the extreme.  The claims are contained within section XI of the amended habeas petition Pouncy filed on November 20, 2013.  *See* ECF No. 3 at 7, PageID.29.  The claims are pled in precisely the same way that they were pled and argued in Pouncy's post-conviction proceeding.[16]  The claims are properly before the Court.

### C.     The Prosecution's Suppression of Willie Joyce's Exculpatory Photo Array Identification Is Properly Before This Court.

The prosecution had no physical evidence connecting Pouncy to any of the carjackings, and its star cooperating witness (Grimes) had major credibility issues and multiple reasons to falsely point his finger at Pouncy.  To convict Pouncy, the prosecution therefore needed to hit a home run with the testimony of the

---

[16] In the post-conviction proceedings before the trial court, Pouncy clearly invoked *Napue* and *Giglio*.  *See* ECF No. 8-21 at 6-8, PageID.2088–2090.

eyewitnesses to the carjackings. At trial, the prosecution presented multiple eyewitnesses who had variously identified Pouncy as the perpetrator of the three carjackings. All of these eyewitnesses were white. But these were not the only eyewitnesses that law enforcement interviewed as part of its investigation into the carjackings. Law enforcement also interviewed an African-American man named Willie Joyce; this is undisputed and documented in the police records. ECF No. 203-6 at PageID.10057-10058. As documented in law enforcement's memorandum of interview, Joyce had a face-to-face confrontation with the perpetrator of the October 11, 2005 carjacking moments before the crime occurred. *Id*. The perpetrator that Joyce encountered was an African-American male wearing a beige jacket; this was the same description that multiple white witnesses had provided to law enforcement of the perpetrator. *See, e.g.*, ECF No. 203-6 at PageID.10053-10058. From photo arrays that Detective Gagliardi showed to them, the white witnesses had identified Pouncy as the man in the beige jacket that they had seen. *See id.*; *see also Pouncy*, 846 F.3d at 154. The prosecution called these white witnesses to testify at trial. But the prosecution *did not* call Joyce. Now we know why.

The evidence before this Court, in the form of Joyce's sworn in-court testimony, is that law enforcement at some point showed Joyce a photo array, just as it had with all of the other eyewitnesses it interviewed. Joyce recalled that he

identified one of the photos in the array as the perpetrator, circled the photo, and initialed the paper.  *See* ECF No. 190 at 238, PageID.9827.  Being interviewed by law enforcement as an eyewitness to a carjacking is the type of event that would tend to stick in one's mind for many years, and Joyce's ability to recall that he was shown a photo array and that he identified the perpetrator from the array is both unsurprising and credible.  Insofar as Joyce's recollection on these two basic points is accurate, one of two things *must* be true: either Joyce identified Pouncy as the perpetrator, or he identified someone other than Pouncy.  The latter is exceedingly more likely than the former.  If Joyce had identified Pouncy from the photo array, one would have expected the prosecution to have called Joyce as a trial witness.  At a minimum, one would have expected the prosecution's files to contain a record that Joyce identified Pouncy from a photo array.  But the prosecution did not call Joyce as a witness, and its files apparently lack any evidence that Joyce was shown any photo array at all. The logical inference from all this is that Joyce identified somebody other than Pouncy as the perpetrator and law enforcement suppressed the information.

Evidence that Joyce—the only African-American who had gotten a good look at the perpetrator—picked someone other than Pouncy from the photo array would have been devastating to the prosecution's case.  It is the type of screamingly exculpatory evidence that no reasonable law enforcement officer, prosecutor, or jurist could deem other than core *Brady* material.  Through no fault of his own,

66

however, Pouncy did not discover the suppression until 2018.  Pouncy brought it to this Court's attention promptly.  *See* ECF No. 182.

Joyce does not have any motive to lie, and his testimony is sufficient proof that *someone* on the prosecution team—either Detective Gagliardi or the prosecutors—committed a flagrant, disturbing *Brady* violation.  The state's cynical response is to argue that this Court can do nothing to remedy this *Brady* violation because it was not pled in the habeas petition that Pouncy filed in 2013 and cannot be added to an amended petition now because the AEDPA statute of limitations has run.  *See* ECF No. 290 at 4-5, PageID.12220-12221.  The law is not so obtuse or unfair.  The state has been on notice of this *Brady* violation since at least March 12, 2018, and Pouncy has been pursuing it as a ground for relief for the past two years.  We are not aware of any law requiring that, under these circumstances, Pouncy also had to amend his 2013 petition to add this shocking instance of prosecutorial misconduct.

In any event, if the Court believes its hands are tied unless Pouncy adds the Joyce *Brady* violation to his habeas petition, the AEDPA statute of limitations should not serve as any bar.  First, the Court could allow Pouncy to add the Joyce suppression allegations as a "supplement" to the *Brady* claims contained in his pending habeas petition.  *See Douglas v. Workman*, 560 F.3d 1156, 1187 (10th Cir. 2009) (endorsing that procedure).  Second, habeas petitions are "subject to equitable

tolling in appropriate cases." *Holland v. Florida*, 560 U.S. 631, 645 (2010). Where Pouncy only discovered the *Brady* violation in 2018 and has been vigorously pursuing the *Brady* violation in this Court ever since, and where the state had never previously argued that Pouncy should be required to add the *Brady* violation to his habeas petition itself, equitable tolling should apply.

If the Court agrees that it may consider the Joyce *Brady* violation, this is a separate reason why it must apply *de novo* review to all of the several *Napue/Brady/Giglio* violations that Pouncy alleges. Materiality for purposes of *Brady* is assessed "collectively, not item-by-item." *Kyles*, 514 U.S. at 436. If the Court agrees it can consider the suppression of Joyce's exculpatory photo array identification, this means that the Court necessarily will be addressing a different *Brady* claim than the one the state courts adjudicated, and so AEDPA will not apply. *See, e.g.*, *Robinson v. Howes*, 663 F.3d 819, 823 (6th Cr. 2011) (holding that "[c]laims that were not 'adjudicated on the merits in State court proceedings' receive the pre-AEDPA standard of review").

## V.   Court-Appointed Counsel's Complete Failure to Investigate the Facts, Consult Meaningfully With Pouncy, or Contest the State's Case Prior to Trial Amounted to a Constructive Denial of Pouncy's Sixth Amendment Right to Counsel During a Critical Stage in the Proceedings.

"[A] criminal defendant's initial appearance before a judicial officer . . . marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." *Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 213

(2008).  Once that right attaches, the defendant is entitled to counsel at every "critical stage" of the proceedings.  *Id.* at 212.  A denial of a defendant's Sixth Amendment right to counsel at a critical stage of the proceeding is structural error, entitling the defendant to a reversal of his conviction without the need for any additional showing of prejudice.  *See, e.g.*, *Gideon v. Wainwright*, 372 U.S. 335 (1963).

## A.  Supreme Court Precedent Makes Clear That the Pre-Trial Investigatory Phase Is a "Critical Stage" of the Proceedings.

The Supreme Court has made clear that, because a "thorough-going investigation and preparation [are] vitally important" in a criminal case, the pretrial period is "perhaps the most critical period of the proceedings."  *Powell v. Alabama*, 287 U.S. 45, 57 (1932).  As the Sixth Circuit held in *Mitchell v. Mason*, "Supreme Court precedent" establishes that "the pre-trial period [is] 'critical' for purposes of the Sixth Amendment."  325 F.3d 732, 748 (6th Cir. 2003).

If a defendant were completely prohibited from having counsel until the morning of trial, it is obvious that this would violate the defendant's Sixth Amendment right to counsel and require automatic reversal of his conviction.  *See id.* at 742 ("[T]he pre-trial period is indeed a critical stage, the denial of counsel during which supports a *Cronic* analysis.").  But a defendant need not show an *actual* denial of counsel during the pre-trial stage in order to prevail on a claim that his Sixth Amendment right to counsel actually was denied.  The Supreme Court held in *Cronic* that a defendant has been *constructively* denied his Sixth Amendment right

to counsel if his court-appointed counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing" at any "critical stage." *Cronic*, 466 U.S. at 659. In *Mitchell*, the Sixth Circuit held that *Cronic* "guarantees more than a pro forma encounter between the accused and his counsel [prior to trial], and six minutes of consultations spread over three meetings do not satisfy its requirements." *Mitchell*, 325 F.3d at 744. "When counsel is appointed but never consults with his client . . . and the court acquiesces in this constructive denial of counsel by ignoring the defendant's repeated requests for assistance, *Cronic* governs." *Id.*

## B.    Pouncy's *Cronic* Claim Is Reviewed *De Novo*, Because No State Court Addressed the Claim on the Merits.

Pouncy did not assert his *Cronic* claim on direct appeal. Nor did he present the claim to the trial court on post-conviction appeal. He asserted the claim for the first time in a *pro per* "Standard 4" brief that he submitted to the Michigan Court of Appeals. *See* ECF No. 233-4. The *Cronic* claim was then also included in the brief his counsel submitted to the Michigan Supreme Court in support of Pouncy's motion for leave to appeal the trial court's denial of his post-conviction claims. *See* ECF No. 8-49 at 36-38, PageID.4490–4492. The Michigan Supreme Court ultimately denied Pouncy's motion in one sentence form denial stating that "the defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *Id.* at PageID.4440. Because such form denials do not indicate whether the court disposed of the petitioner's claim on the merits or on a state procedural ground, the

Sixth Circuit has held that they cannot be treated as having done either.  *See, e.g.*, *Amos v. Renico*, 683 F.3d 720, 727 (6th Cir. 2012) ("[B]rief orders citing generally MCR 6.508(D) are no longer a sufficient basis for a finding of procedural default." (citing *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (*en banc*))); *Guillmette*, 624 F.3d at 291 (holding that "form orders" citing Rule 6.508(D) are "unexplained" orders).  Instead, the federal habeas court "must look 'to the last reasoned state court opinion to determine the basis for the state court's rejection of [the] claim.'"  *Amos*, 683 F.3d at 726 (citing *Guilmette*, 624 F.3d at 291).

Here, however, there *is no* reasoned state court decision with respect to the *Cronic* claim.  The Court thus reviews the claim *de novo*.  *See Phillips v. White*, 851 F. 3d 567, 571 (6th Cir. 2017) (holding that "AEDPA's deferential standard is inapplicable to Phillips's [*Cronic*] claim because no state court ever decided it").  In reviewing the *Cronic* claim, the Court is not restricted to the direct appeal record, but rather can consider the Accardo affidavits submitted to the trial court as part of Pouncy's post-conviction appeals, as well as the affidavit from court-appointed counsel that Pouncy submitted to this Court as part of his habeas corpus pleadings.

### C. Court-Appointed Counsel's Extraordinary Failure to Investigate the Facts, Meaningfully Consult With Pouncy, or Contest the State's Case Prior to Trial Satisfies *Cronic*.

As the post-conviction record makes clear, court-appointed counsel's failure in the pre-trial period was extraordinary, total, and complete.  Court-appointed

counsel "did not file a single substantive motion on Pouncy's behalf between the arraignment and the scheduled trial date." *Pouncy*, 165 F. Supp. 3d at 618. He met with Pouncy in pre-trial detention a handful of times, but never for "longer than ten or fifteen minutes." *Id.* at 619. He never provided Pouncy "any discovery materials," thus depriving Pouncy of any meaningful opportunity to participate in his own defense.[17] *Id.* at 619. He failed to meaningfully contest the prosecution's two important motions *in limine*. *Id.* at 620. For no reason other than total neglect, he failed to retain an expert to examine shoe-print evidence that would have substantially exculpated Pouncy. *See* ECF No. 71 at 2, PageID.6550. He simply took the prosecutor's word for it on critical issues, such as the traceability of phone calls, thus dispensing with any effort at additional discovery. Most glaringly of all, he turned all of pre-trial investigatory duties over to a private investigator, Leonard Accardo, but then failed to follow up with the Accardo in any meaningful way. *Pouncy*, 165 F. Supp. 3d at 618-619. Court-appointed counsel was thus (i) totally unaware of what Accardo did and did not do; (ii) totally ignorant of what Accardo found and did not find; and (iii) totally unaware that the Accardo's investigatory missteps included using a wrong phone number when trying to connect with Pouncy's mother and failing to contact Pouncy's employer; (iv) and totally unable

---

[17] Incredibly, the trial court saw no problem with court-appointed counsel's lack of meaningful consultation with Pouncy. ECF No. 8-7 at 9-10, PageID.464-465.

to intelligently direct Accardo about what additional investigation to undertake. Practically speaking, court-appointed counsel was in the same position he would have been in had he not hired an investigator at all.  *Cf. Richey v. Bradshaw*, 498 F.3d 344, 362-363 (6th Cir. 2007) (holding that counsel's retention of an expert was worthless because he was "in the dark about what that expert [was] doing").  All of this is laid bare in the court-appointed counsel's affidavit:

> 4.     I did not personally interview any of the prosecution or defense witnesses before trial because I relied exclusively upon Mr. Accardo's assistance in this area;

> 5.     Since I was not personally involved in investigating or interviewing witnesses, I depended entirely upon Mr. Accardo to develop and provide me with a written investigative report prior to trial that would enable me to make informed strategic decisions before and in trial;

> 6.     Without knowing the extent of Mr. Accardo's investigations and without any details in this regard, I confirm as I expressed on-the-record on January 24, 2006 that I was unprepared to proceed to trial without the investigative report.

ECF No. 71 at 2, PageID.6650.   In *Kimmelman v. Morrison*, 477 U.S. 364 (1986), the Supreme Court recognized that the adversarial "testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case . . . ."  *Id.* at 385.  Court-appointed counsel's affidavit makes clear that this is what occurred in Pouncy's case.

The facts relevant to Pouncy's *Cronic* claim are even more egregious than those in *Mitchell*, where the Sixth Circuit agreed that, even applying AEDPA's

deferential standard of review, the petitioner had been constructively denied counsel during the pre-trial stage in violation of *Cronic*.  In *Mitchell*, the petitioner's counsel had consulted with him for only six minutes during the pre-trial stage.  325 F.3d at 743-744.  The Sixth Circuit held that this failure *standing alone* was sufficient to satisfy *Cronic*, even when viewed through the lens of AEDPA.  *Id.* at 744 ("If counsel does not meet with his client for more than two minutes at a time, the defendant is unable to confide truthfully in his lawyer and counsel will not know, for example, which investigative leads to pursue, whether there are witnesses for the defense, or what kind of alibi the defendant may have.").

In Pouncy's case, not only were court-appointed counsel's pre-trial consultations with Pouncy effectively nil (and certainly not meaningful), but court-appointed counsel also had no knowledge of the quality, quantity, or results of the investigation performed by the *in communicado* investigator to whom he had completely delegated his pre-trial investigatory obligations.  In this Court words: "Simply put, there can be no serious dispute on this record that Breczinski was entirely unprepared for trial."  *Pouncy*, 165 F. Supp. 3d at 628.  If this does not constitute constructive denial of Pouncy's right to counsel at the pre-trial stage, what would?

## CONCLUSION

For the foregoing reasons, Pouncy's habeas petition should be granted, and the Court should order the state to release Pouncy from custody immediately.

Respectfully submitted,

/s/ Aaron M. Katz

Aaron M. Katz
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
Telephone:  (617) 951-7000
Fax:  (617) 951-7050
Aaron.Katz@ropesgray.com

May 11, 2020

## CERTIFICATE OF SERVICE

I, Aaron M. Katz, hereby certify that on May 11, 2020, I electronically filed

the foregoing papers with the Clerk of the Court using the ECF system which will

send notification of such filing to the following:

> Linus Banghart-Linn
> Assistant Attorney General
> Attorney for Respondent
> Criminal Appellate Division
> P.O. Box 30217
> Lansing, MI 48909

Respectfully submitted,

/s/Aaron M. Katz
Aaron M. Katz
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
Telephone:  (617) 951-7000
Fax:  (617) 951-7050
Aaron.Katz@ropesgray.com