UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OMAR RASHAD POUNCY,

      Petitioner,

                           No. 2:13-cv-14695

v

                           HON. MATTHEW F. LEITMAN

CARMEN D. PALMER,

      Respondent.

_____/

**RESPONDENT'S BRIEF IN RESPONSE TO PETITIONER OMAR POUNCY'S OPENING BRIEF IN SUPPORT OF HIS REMAINING UNRESOLVED HABEAS CLAIMS**

Dana Nessel
Attorney General

John S. Pallas
Assistant Attorney General
Attorney for Respondent
Criminal Trials and Appeals
Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-7650
pallasj@michigan.gov
P42512

Dated:  June 11, 2020

1

# TABLE OF CONTENTS

<u>Page</u>

Table of Contents ..................................................................................i

Argument...............................................................................................1

I.    The Michigan Court of Appeals did not unreasonably reject
      Pouncy's right to retained counsel of choice claim .........................2

      A.    The Michigan Court of Appeals' decision ...............................3

      B.    Clearly established federal law concerning the right to
            retain counsel of choice/continuances....................................3

      C.    Analysis ........................................................................5

            1.    *United States v. Gonzalez-Lopez* is inapplicable to
                  this case........................................................................5

            2.    The Michigan Court of Appeals' rejection of
                  Pouncy's right to retained counsel of choice claim
                  is not objectively unreasonable....................................7

            3.    Even on de novo review, Pouncy cannot prevail ........17

            4.    Conclusion ................................................................26

II.   The state appellate court's conclusion that Pouncy properly
      waived his right to counsel was not an unreasonable
      application of the *Faretta* standard ..............................................26

      A.    The Michigan Court of Appeals' decision ............................26

      B.    Clearly established federal law on waiving the right to
            counsel...............................................................................27

      C.    Analysis .........................................................................29

            1.    The facts ................................................................29

2.      The Michigan Court of Appeals reasonably concluded that Pouncy had knowingly, intelligently, and voluntarily waived his right to counsel and that the state trial court adequately informed Pouncy of the dangers of self-representation ............................................................ 34

III.    Pouncy is not entitled to habeas relief pursuant to the Supreme Court's decision in *Lafler v. Cooper* ............................... 46

    A.      Counsel's guidelines range estimation was not objectively unreasonable ....................................................... 49

    B.      Pouncy cannot establish that he was prejudiced as a result of counsel's guidelines prediction .............................. 55

        1.      Pouncy has not shown that he would have accepted the plea but for counsel's guidelines prediction ........................................................ 56

        2.      Pouncy has not shown that his sentence under the plea would be lower than the sentence he received ......................................................... 60

        3.      The remedy problem .................................................. 61

IV.     Pouncy is not entitled to habeas relief on any of three parts of his *Brady/Giglio/Napue* claim .................................................. 67

    A.      Pouncy's claim based on the cell phone records fails because the State didn't suppress any records, the records don't prove that the officer-in-charge lied and, most important, *the number in question belongs to Pouncy* ................................................................ 70

    B.      The state trial court's adjudication of Pouncy's claim relating to Wayne Grimes' arrest history was not objectively unreasonable ....................................................... 80

C.    Pouncy is not entitled to any relief pursuant to
*Brady/Giglio/Napue* for the purported suppression of
information concerning witness Willie Joyce ...................... 89

1.    This part of Pouncy's *Brady* claim is barred by
AEDPA's statute of limitations.................................... 90

2.    This part of Pouncy's *Brady* claim is unexhausted ..... 94

3.    This part of Pouncy's *Brady* claim is without
merit ........................................................... 96

V.    Pouncy's claim that he is entitled to habeas relief for his
*Cronic* claim is unexhausted and thus procedurally
defaulted.  In any event, the claim does not merit habeas
relief .............................................................. 98

A.    Pouncy procedurally defaulted his *Cronic* claim by
failing to present it to the state trial court and the
Michigan Court of Appeals on collateral review ............... 100

1.    The evolution of Pouncy's *Cronic* claim in state
court collateral proceedings ....................................... 100

2.    Pouncy's *Cronic* claim is unexhausted,
inexhaustible, and thus procedurally defaulted ....... 103

B.    Even ignoring Pouncy's exhaustion problem, he is not
entitled to *Cronic* relief because he doesn't state a
*Cronic* claim ..................................................... 106

1.    Pouncy fails to state a *Cronic* claim .......................... 108

2.    Pouncy's claims do not pass muster under
*Strickland* .................................................. 118

Conclusion and Relief Requested ........................................... 124

Certificate of Service .......................................................... 125

iii

# ARGUMENT

The path of this case has not always run smooth, but what's left is well-paved terrain:  five claims that Pouncy says entitle him to habeas relief.  Five claims that fail, either because the state court's adjudication was reasonable, or because the claim fails to persuade even without AEDPA deference.

In the end, Pouncy received a fair trial.  He was "entitled to a fair trial but not a perfect one."  *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986); *see also United States v. Hasting*, 461 U.S. 499, 508–09 (1983) ("[T]here can be no such thing as an error-free, perfect trial" and the Constitution "does not guarantee such a trial.")

The entitlement to a fair—but not a perfect—trial is just a part of the story.  This case is being reviewed in the context of 28 U.S.C. § 2254.  It was a part of a larger overhaul of habeas proceedings under the Antiterrorism and Effective Death Penalty Act (AEDPA) that began in 1996 and, invoking principles of federalism and comity, was meant to ensure that federal courts in habeas actions only interfered in the convictions of state prisoners in the most egregious of situations.

1

This case does not present one of those egregious situations.  Not only are the state court's decisions on Pouncy's remaining habeas claims reasonable, they are correct.  And those subject to de novo review similarly lead nowhere for Pouncy.

In 2005, the victims in the underlying state criminal case were carjacked.  They have had to live with the terror created by these crimes ever since.  It is now fifteen years later.  It is time for finality in this matter.  And that finality should manifest itself in the denial of habeas relief on all of Pouncy's remaining claims.[1]

## I.  The Michigan Court of Appeals did not unreasonably reject Pouncy's right to retained counsel of choice claim

Pouncy first argues that the state trial court unconstitutionally deprived him of his right to retained counsel of choice.  (R. 300, ID 12281.)  But, the state court's adjudication of this claim was not contrary to, or an objectively unreasonable application of, Supreme Court precedent.  Habeas relief should be denied.

---

[1] Undersigned counsel gratefully acknowledges—and is very appreciative of—the significant and careful work done on this case by former Assistant Attorney General David A. Porter during his tenure with the Department of the Michigan Attorney General.

2

### A.   The Michigan Court of Appeals' decision

The Michigan Court of Appeals adjudicated Pouncy's right to

retained counsel of choice claim on the merits. *People v. Pouncy*, Nos.

269298, 2008 WL 9869818, at *10–11 (Mich. Ct. App. Mar. 25, 2008).

### B.   Clearly established federal law concerning the right to retain counsel of choice/continuances

According to the Supreme Court, the Sixth Amendment right to

counsel "guarantees a defendant the right to be represented by an

otherwise qualified attorney whom that defendant can afford to hire, or

who is willing to represent the defendant even though he is without

funds." *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617,

624–25 (1989).

But the right to counsel of choice is not unqualified.  It is, as the

Supreme Court has put it, "circumscribed in several important

respects." *Wheat v. United States,* 486 U.S. 153, 159 (1988).  For

example, in *Wheat*, the district court refused the defendant the option of

substituting his codefendant's attorney for his own attorney when that

representation would give rise to a potential conflict of interest.  *Id.* at

156–57.  The Supreme Court upheld the district court's decision,

observing that, "[i]n the circumstances of this case, with the motion for

3

substitution of counsel made so close to the time of trial, the District Court relied on instinct and judgment based on experience in making its decision." *Id*. at 163.

As *Wheat* illustrates, when the right is asserted in the context of a requested continuance, trial courts retain "a great deal of latitude in scheduling trials" and ruling "on matters of continuances." *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983). The multiple demands placed on trial courts "counsel[ ] against continuances except for compelling reasons." *Id*. at 11. "Only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Id*. at 11–12 (1983) (quoting *Ungar v. Sarafite,* 376 U.S. 575, 589 (1964)).

Outside of these few pronouncements, the Supreme Court has not defined more precisely the contours of the right to counsel of choice in the context of a request for continuance. *See Graham v. Pfister*, 614 F. App'x 847, 850–51 (7th Cir. 2015) ("[T]he Supreme Court has rarely had occasion to comment on the scope of the right."). Lower courts have filled in jurisprudential void with various multi-factor tests, including one from the Sixth Circuit that Pouncy asks this Court to apply using

4

de novo review.  But these lower court decisions are irrelevant for

AEDPA purposes.  *See Williams v. Taylor*, 529 U.S. 362, 381 (2000)

("[T]he lower federal courts cannot themselves establish such a

principle with clarity sufficient to satisfy the AEDPA bar.").

## C.   Analysis

### 1.   *United States v. Gonzalez-Lopez* is inapplicable to this case

Pouncy relies heavily on *United States v. Gonzalez-Lopez*, 548 U.S.

140 (2006).  That reliance is misplaced.

*Gonzalez-Lopez* has nothing to do with determining whether the

state trial court *violated* Pouncy's Sixth Amendment right to retain his

counsel of choice.  In *Gonzalez-Lopez*, "the Government … conceded that

the District Court … erred when it denied [Gonzalez-Lopez] his choice

of counsel."  *Id.* at 152.  The Supreme Court "accept[ed] that premise"

and then went on to hold that, *once a violation of the right is

established*, the error is structural in nature such that no showing of

ineffectiveness or prejudice/harm is required.  *Id.* at 146, 148, 152.  The

Court made this even more clear when it stated the following:

> Nothing we have said today casts any doubt or places any
> qualification upon our previous holdings that limit the right

5

to counsel of choice and recognize the authority of trial courts ….  We have recognized a trial court's wide latitude in balancing the right to counsel against the needs of fairness, and against the needs of fairness, and against the demands of its calendar….This is not a case about a court's power to enforce rules or adhere to practices that determine which attorneys may appear before it or to make scheduling and other decisions that effectively exclude a defendant's first choice of counsel.

*Id.* at 151–152 (internal citations omitted).

As such, Pouncy's reliance on *Gonzalez-Lopez* is, at best, premature.  This is because, as demonstrated above, the Supreme Court in *Gonzalez-Lopez* did not address *how* a court should determine if violation of the Sixth Amendment right to retain counsel of choice occurs, but only what happens once such a violation is established under its prior decisions, such as *Wheat* and *Morris*, or as in the case before it, conceded by the government.[2]  In other words, Pouncy has things backwards.  He cannot use *Gonzalez-Lopez* to determine whether a violation of his right to retain counsel of choice in fact occurred as that would be putting the proverbial cart before the horse.  This Court need only concern itself with *Gonzalez-Lopez* once it has climbed the steep

---

[2] No such concession has occurred or is forthcoming in this case.

6

hill of finding that the Michigan Court of Appeals unreasonably applied Supreme Court precedent in rejecting Pouncy's right to retained counsel of choice claim.[3]  And for the reasons discussed below, this Court cannot even come close to reaching the summit of that hill given the protection afforded the State court's decision in this case under AEDPA.

> ## 2.   The Michigan Court of Appeals' rejection of Pouncy's right to retained counsel of choice claim is not objectively unreasonable

The state court's adjudication of Pouncy's claim did not run afoul of the exceedingly generous parameters set by the Supreme Court precedent on this issue.  That precedent holds that, even in the face of requests for retained counsel, trial courts retain "a great deal of latitude in scheduling trials" and ruling "on matters of continuances." *Morris*, 461 U.S. at 11–12.  The multiple demands placed on trial courts

---

[3] From a habeas prospective, the inapplicability of *Gonzalez-Lopez* is even clearer.  This is because not just any Supreme Court decision will do under § 2254(d)(1).  "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta," of the Supreme Court's decisions. *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (internal quotations and citations omitted).

"counsel[ ] against continuances except for compelling reasons." *Id.* at 11.  Only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.  *Id.* at 11–12 (quoting *Ungar v. Sarafite,* 376 U.S. 575, 589 (1964)).

Applicable Supreme Court precedent requires an accused provide "compelling reasons" to warrant a last-minute continuance to obtain counsel.  *Morris*, 461 U.S. at 11.  Pouncy offered no such reason.  The gist of his request was his displeasure with his appointed defense counsel.  But the Sixth Amendment does not guarantee a "meaningful relationship" with his counsel, only the effective assistance of one.  *Id.*, at 14.  And the specific reasons cited by Pouncy—counsel's decision not to file motions and inability to craft an alibi defense—are not the kind of compelling reasons that justify a last-minute continuance to retain a new attorney.  The motions at issue were meritless, and the lack of a viable alibi defense was not for lack of effort to build one by counsel and his investigator.

The Supreme Court has also emphasized that a trial court's interest in the timely and efficient administration of justice is still a

8

valid consideration when evaluating a request for a continuance. That interest is no greater than at trial, when significant resources have been brought to bear to bring finality to criminal charges. If courts retain "a great deal of latitude in scheduling trials," then deference to the trial court's decision-making is greatest when trial is underway. *Morris*, 461 U.S. at 11–12. Here, Pouncy's request came after trial had already begun,[4] the epitome of a last-minute request.

Under these circumstances, the state court's decision to deny Pouncy's request was not an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Slappy*, 461 U.S. at 11–12 (internal quotations omitted). At the very least, the state court's decision affirming the trial court's exercise of discretion was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

---

[4] Pouncy's claim that trial had not begun at the point at which he purports to have asked for a continuance to retain counsel of his own choice is unpersuasive. *See* discussion, *infra*.

9

Pouncy's arguments to the contrary, some of which are based on the inapplicable *Gonzalez-Lopez* decision, are unpersuasive.  The state appellate court's decision on this claim is neither an objectively unreasonable application of Supreme Court precedent nor an unreasonable determination of the facts.

Pouncy's first reason for claiming that the Michigan Court of Appeals' decision on this claim is unreasonable is an argument based on his mistaken belief that *Gonzalez-Lopez* is controlling authority with respect to determining whether the right to retained counsel has been violated.  Specifically, Pouncy states that the Michigan Court of Appeals' decision is contrary to Supreme Court authority (specifically *Gonzalez-Lopez*) because it required Pouncy to make a showing that "[t]rial counsel was not constitutionally ineffective." (R. 300, ID 12284.)

Pouncy's protestations to the contrary, no Supreme Court precedent precludes a trial court from using the competence of existing counsel as a factor in denying a last-minute request for a continuance so that the defendant can retain new counsel.  In fact, in *Morris*, the Supreme Court engaged in such an analysis of counsel's competence in determining whether the trial court abused its discretion in denying the

10

requested continuance. *Morris*, 461 U.S. at 12. Moreover, in *Wheat,* 486 U.S. at 159, the Supreme Court stated that "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."

As noted *supra*, pursuant to *Gonzalez-Lopez*, it is only *after* a court finds that the right to retain counsel of choice is violated is consideration of the competence of existing counsel barred. And the reason it is barred is because *Gonzalez-Lopez* teaches us that such an error, once found, is structural in nature. But the question of existing counsel's competence *does* relate to whether an error occurred in the first instance. As such, the Michigan Court of Appeals' use of its finding that Pouncy's existing counsel was not ineffective to determine in the first instance whether the trial court abused its discretion in denying any motion for continuance was not contrary to, or an unreasonable application of, Supreme Court precedent.

Pouncy next contends that the Michigan Court of Appeals erred in finding that he had not demonstrated a complete breakdown of the attorney-client relationship at the time he stated that he wanted to retain new counsel.  (R. 300, ID 12285.)  In other words, Pouncy appears to be arguing that the court's finding that he had failed to demonstrate such a breakdown was an objectively unreasonable factual finding.[5]

The state appellate court's finding that there had not been a complete breakdown in the attorney-client relationship is not objectively unreasonable.  As noted above, the Sixth Amendment does not guarantee a defendant a "meaningful relationship" with his counsel, only the effective assistance of one.  To be sure, Pouncy complained about his appointed defense counsel, but a close examination of his complaints—counsel's decisions not to file motions, the inability to craft

---

[5] The State notes that the discussion by the Michigan Court of Appeals of whether a breakdown in the attorney-client relationship occurred in the context of a discussion of whether the state trial court denied any implied request for substitute *appointed* counsel, not whether Pouncy's right to obtain substitute *retained* counsel had been abridged.  *See Pouncy*, 2008 WL 9869818, at *11.  As Pouncy does not appear now to be arguing that substitute *appointed* counsel should have been appointed (a claim for which a much stricter standard applies), any error by the state appellate court in findings made in the context of that claim are irrelevant.

12

an alibi defense, the amount of time that counsel had spent meeting with Pouncy, and generally not being "comfortable" with him—while likely reflective of some strife between him and counsel, certainly do not indicate a *complete* breakdown of the attorney-client relationship. Pouncy's inflated expectations of what appointed defense counsel would do for him in the course of representing him cannot—and should not— be the basis for finding the Michigan Court of Appeals' finding to be unreasonable.  In other words, Pouncy should not be able to use strife that *he* generated—and would likely have generated with any replacement counsel—as the basis for overruling the finding of a state appellate court.  Put even another way, there was no *bona-fide* dispute between Pouncy and his appointed defense counsel.

Pouncy next claims that the Michigan Court of Appeals erred when it said that "the purported request [to hire or retain new counsel] did not come until trial was already underway …."  (R. 300, ID 12286.) Pouncy is wrong as the record clearly supports the Michigan Court of Appeals' statement.  While Pouncy began complaining about his appointed defense counsel before the jury venire was brought into the courtroom and indicated that the defense team was "not ready to go", it

13

was indeed not until well into the trial proceedings—after the prosecutor's opening statement—that Pouncy first said that he wanted to hire or retain his own attorney.  (R. 8-7, ID 672.)  As such, it was not a mistake—and certainly not unreasonable—for the Michigan Court of Appeals to say that "trial was already underway" when Pouncy began asking to hire or retain his own attorney.

Admittedly, Pouncy could arguably have been asking for new *appointed* counsel when he stated *before* the jury venire was brought in (in other words, prior to jury selection) that he wrote the "Defender Administrator" about obtaining new (or what he calls "further") counsel. (R. 8-7, ID 460.)  But, as already noted, this does not constitute a request *to hire or retain* his own attorney.

In any event, the State asserts that the moment the parties went on the record in the courtroom on the date and time set for the trial, trial was effectively underway.  And it would not be unreasonable for a state appellate court to so find.

 Next, Pouncy claims that the Michigan Court of Appeals mistakenly said that Pouncy did not ask to hire or retain new counsel until after he had already expressed a desire to represent himself.  (R.

300, ID 12286-87.)  But the Michigan Court of Appeals' statement is correct and supported by the record.  Indeed, Pouncy's first request for time to hire or retain an attorney of his own followed his expressed desire to represent himself just as the Michigan Court of Appeals said it did.  Specifically, Pouncy first expressed a desire to represent himself after jury selection had occurred, but before initial instructions to the newly seated jury and opening statements.  (R. 8-7, ID 647-48.)  He next expressed a desire to represent himself just after the prosecutor's opening statement but before the defense opening statement (R. 8-7, ID 668-71) which was quickly followed by a request to hire or retain his own attorney.  (R. 8-7, ID 672.)  There was certainly no explicit request for a continuance *to hire or retain* a new attorney up until that point in the proceedings, only complaints about not being ready to proceed with trial and a *possible* request for new *appointed* counsel (see discussion, *supra*).  As such, Pouncy's claim that a violation of his Sixth Amendment right to hire or retain to his own attorney "occurred several hours earlier that day, prior to the beginning of jury selection" (R. 300,

ID 12287) is simply untrue.[6]  Again, even if the Michigan Court of Appeals' statement is incorrect (it is not), it was certainly not unreasonable for the state appellate court to make this finding especially considering that such a statement has support in the record.

Finally, Pouncy claims that the Michigan Court of Appeals unreasonably applied *Gonzalez-Lopez*, when it said "[a]lthough defendant did briefly expressly a desire to retain counsel, he did not make a formal motion for a continuance to do so."  (R. 300, ID 12287.) Momentarily setting aside the question of whether *Gonzalez-Lopez* even applies to this case noted *supra*, Pouncy misconstrues what the state appellate court said.  Pouncy indeed never *explicitly* asked for a continuance.  Again, it is certainly not an objectively unreasonable interpretation of the record to make such a finding.  In any event, Pouncy ignores the language in the Michigan Court of Appeals' opinion which states that, "even if we were to conclude that this statement were

_____

[6] It bears repeating Pouncy appears to be conflating what, at best, might could be interpreted as a request for new *appointed* counsel (R. 8-7, ID 460, 462) with a request to hire or retain his own counsel. This specific request for new *appointed* counsel did indeed occur before jury selection began (but not a request to retain or hire his own counsel). Again, it's not what this Court deems to be correct that matters.  It's what the Michigan Court of Appeals could have *reasonably* found.

a request for a continuance, we would conclude that the trial court did not abuse its discretion in denying the request." *Pouncy*, 2008 WL 9869818, at *11. So whatever point he is trying to make about this statement by the Michigan Court of Appeals, it is a point that gains no traction.

In sum, none of the reasons cited by Pouncy for finding the Michigan Court of Appeals' decision on his Sixth Amendment right to retain counsel of choice claim objectively unreasonable—either legally or factually—are meritorious. Rather, his complaints are the very kind of nitpicking (some of them inaccurate) that AEDPA says should not be done on habeas review. AEDPA deference thus continues to apply to the Michigan Court of Appeals' decision on this claim and, for the reasons stated above, the state appellate court's rejection of that claim was not objectively unreasonable.

### 3.    Even on de novo review, Pouncy cannot prevail

Assuming that AEDPA is inapplicable for some reason and de novo review applies, Pouncy is still not entitled to habeas relief.

17

Pouncy relies on the four-part test discussed in *Henness v. Bagley*, 644 F.3d 308, 321 (6th Cir. 2011),[7] among others cases, for determining whether a trial court properly denied a motion to allow a defendant to hire or retain his own counsel, which considers:

> (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.

*See also Cobb v. Warden, Chillicothe Corr. Inst.*, 466 F. App'x 456, 460 (6th Cir. 2012); *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007); *United States v. Vasquez*, 560 F.3d 461, 466 (6th Cir. 2009)

---

[7] As an aside, *Henness* was a §2254 habeas case which makes its reliance on circuit precedent puzzling.  Perhaps for this reason, it was not long before the Sixth Circuit disavowed the four-part test championed by *Henness* and other cases, holding that the "good cause" test—a synonym for the four-factor test applied in *Henness* and other cases—was not required by clearly established federal law.  *Brooks v. Lafler*, 454 F. App'x 449, 452 (6th Cir. 2012) ("For the purposes of AEDPA, however, the clearly established law does not indicate that the trial court had a duty to conduct a good cause inquiry before determining whether to grant or deny Brooks's request for new counsel.").  *Henness* is nonetheless illustrative of how a panel reviewing such a claim de novo might do so.

18

Here, the first time anything said by Pouncy could even be possibly construed as a request for a continuance for the purpose of hiring or retaining his own counsel was after trial started on the first day of trial.  (R. 8-7, ID 672.)  In another pleading filed in this Court, Pouncy asserted that prior to trial he "wrote ... the trial court itself" requesting a continuance to retain counsel.  (R. 233, ID 10671.)  But that assertion is belied by the record.  (R. 8-7, ID 460 (Pouncy told the court, "I think I wrote you too and but *I didn't put that in there*").)  Pouncy also claimed that he wrote the "Defender Administrator" at some unspecified time before trial asking for new counsel.  As noted earlier, however, any such request must have been made in the context of seeking substitute *appointed* counsel.  In any event, it is not clear from the record *when* Pouncy sent either the purported letter to the Deputy Administrator or the purported letter to the Court.  And if Pouncy did send such letters out, they reveal that Pouncy, if dissatisfied with counsel's performance, could have tried to do something about it much sooner than the morning of trial, a point that does not help Pouncy.

19

These same facts serve to distinguish a case relied upon by Pouncy in his latest filing—*Couch v. Booker*, 650 F. Supp. 2d 683, 691-92 (6th Cir. 2009) (finding that it was not untimely for the prisoner to seek a continuance for the first time the day before trial was scheduled to begin because he "only discovered the day before trial that the counsel of his choice was unable to represent him at trial.")  But the facts of *Couch* do not mesh well with the facts of this case.  It is simply not believable, especially since Pouncy claims to have sent out letters about his appointed defense counsel's purported failings, that Pouncy's concerns with appointed counsel only became clear to him on the morning of trial.

Pouncy also asserts that the second *Henness* factor—the adequacy of the trial court's inquiry into the matter—favors him.  It does not.  Contrary to Pouncy's claim, the trial court went to great lengths to let Pouncy express his concerns about defense counsel, giving him multiple opportunities to explain the attorney-client conflict as he saw it.  (R. 8-7, ID 459–72.)

As to the third *Henness* factor—whether the conflict between the attorney and client was so great that it resulted in a total lack of

communication preventing an adequate defense—weighs against Pouncy. Here, Pouncy claims that, at best, there was a dysfunctional relationship between he and his defense counsel. (R. 300, ID 12290.) Again, not so. As found by the Michigan Court of Appeals, Pouncy's "expression of dissatisfaction with how [defense counsel] was handling the case did not adequately demonstrate a breakdown in the attorney-client relationship." *Pouncy*, 2008 WL 9869818, at *11.

Part of the problem is that Pouncy focuses his attention on his side to what is a story with *two* sides. Notably defense counsel didn't share Pouncy's view regarding their relationship. He visited Pouncy from around half a dozen times (per counsel) to up to a dozen times (per Pouncy)[8] and sent an investigator to visit him multiple times to coordinate a defense. (R. 8-7, ID 462-63, 466-68.) As such, Pouncy's assertion that he and counsel never "meaningfully consulted" is just unhelpful hyperbole.

---

[8] According to the Sixth Circuit, "Pouncy later estimated it as a 'dozen.'" *Pouncy v. Palmer*, 846 F.3d 144, 162 (6th Cir. 2017).

Finally, the fourth *Henness* factor—a balancing of the accused's right and the public's interest in the prompt and efficient administration of justice—weighs against Pouncy. Pouncy refers to a statement by the trial court several months before trial indicating that it was open to conducting the trial in mid-March, about a month and a half later than trial in fact began. He says this is evidence that adjourning the trial at the last minute in this case would not have interfered with the public's interest in the prompt and efficient administration of justice. (R. 300, ID 12291.) This fact does not help Pouncy because it simply highlights the significance of the last-minute nature of Pouncy's request to hire or retain new counsel to the state trial court's decision not to postpone the trial. In other words, the state trial court saw it for it was—a delaying tactic. While the state trial court may have originally been willing to begin trial in mid-March, that does not mean that it was giving Pouncy the freedom to unnecessarily delay the trial once it was scheduled, especially at the very last possible moment. A long list of witnesses, including the two victims, had already been subpoenaed and had likely made special arrangements in their work and personal lives to accommodate what they believed would

22

be the dates that trial in this matter would be held.  Moreover, the prosecutor would have devoted significant time and effort to preparing for a trial he thought certain to proceed at the expense of preparing for other trials and matters also on his docket.

The state trial court could properly find, as it did, that Pouncy's last-minute request to retain new counsel was nothing more than a blatant attempt to "hijack" the criminal justice process.  And it could balance that finding with the public's interest in seeing efficient and swift justice in cases involving violent felonies.  While Pouncy brushes off the impact of delaying the trial at the very last moment on all those involved in this case, such an impact cannot be ignored.

Sixth Circuit precedent is clear:  The right to retain counsel of choice "must be balanced against the court's authority to control its own docket, and a court must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court." *United States v. Krzyske,* 836 F.2d 1013, 1017 (6th Cir. 1988).  Moreover, "every person has a constitutional right to retain at his own expense his own counsel *so long as* that right does not unreasonably interfere with the

normal progress of a criminal case." *Linton v. Perini*, 656 F.2d 207, 211 (6th Cir. 1981) (emphasis added).

Pouncy's reliance on the Seventh Circuit's decision in *Carlson v. Jess*, 526 F.3d 1018 (7th Cir. 2008), is misplaced. First, the prisoner in that case (Carlson) filed a written motion seeking new counsel a week before the trial date which, by no fault of his own, ended up not being heard until the day before trial. *Id.* at 1026. Contrast that with this case where Pouncy not only made his request to hire or retain his own attorney on the day of trial itself, but also did so *after* the trial had already begun. Moreover, at the time that Carlson made his request, and even on the day the motion was heard, "the witnesses and jurors had not yet assembled." *Id.* Contrast that with this case where Pouncy's very late request would have inconvenienced both witnesses (at least those scheduled to testify on the first day and possibly other witnesses told to clear their schedules for the week) and jurors, all of whom had assembled by the point that Pouncy made his request. And Carlson's trial was relatively non-complex, predicted to take a little over a day, with only three witnesses to be called by State, making it fairly simple to reschedule. *Id.* at 1025-26. Contrast that with this case

24

which took five to six days to try and had a long list of witnesses to be called to the stand.  Finally, as Pouncy concedes, at the time that Carlson made his request for a continuance, he had already retained a new attorney.  Again, contrast that with this case where Pouncy clearly had no idea *who* he would attempt to hire or retain when he said he wanted to do so.  Not only would a new attorney have to get up to speed on Pouncy's case, but he or she *still had to be found*, a process that could take weeks or months.[9]  The kind of trial court rigidity that the *Carlson* court called "arbitrary," *id* at 1026, and thus constitutionally unacceptable is not present in this case.

---

[9] Pouncy argues that "[t]here is no shortage of affordable criminal defense lawyers in Genesee County who would have been qualified and willing to take Pouncy's case."  (R. 300, ID 12293.)  This statement is puzzling since Pouncy apparently was deemed indigent such that he required the appointment of defense counsel at the outset of his criminal case and again claimed indigency when pursuing his appeal of right, thereby obtaining an appointed appellate attorney.  In other words, if Pouncy was indigent prior to trial and afterwards during his direct appeal, how was it that he was going to hire or retain new counsel?

### 4.   Conclusion

Under AEDPA review, Pouncy loses.  But he has not shown that he would prevail even if AEDPA did not apply and this Court were to review his claim de novo.  Habeas relief should be denied.

## II.   The state appellate court's conclusion that Pouncy properly waived his right to counsel was not an unreasonable application of the *Faretta* standard

Pouncy next argues that, (1) the Michigan Court of Appeals unreasonably found that Pouncy's waiver of his right to counsel was knowing, intelligent, and voluntary, and (2) the Michigan Court of Appeals unreasonably found that the state trial court's *Faretta* warnings were adequate.  (R. 300, ID 12295, 12297.)  The state appellate court's adjudication of these two related claims was not contrary to, or an unreasonable application of, Supreme Court precedent.

### A.   The Michigan Court of Appeals' decision

After accurately summarizing some of the applicable law and the trial court record, the state appellate court ruled on the merits that the trial court did not err in either accepting Pouncy's waiver or in how it

26

advised Pouncy concerning his request to represent himself. *Pouncy*, 2008 WL 9869818, at *8–9.

### B.  Clearly established federal law on waiving the right to counsel

In *Faretta v. California*, the Supreme Court held that "in order to represent himself, the accused must 'knowingly and intelligently' " waive his right to counsel.  422 U.S. 806, 835 (1975) (*citing Johnson v. Zerbst*, 304 U.S. 458, 464–65 (1938).  To do that, the Court held, "[the accused] should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " *Id*.  Beyond this short passage, "the Supreme Court has not elaborated on the procedural requirements, if any, that a trial court must implement when applying the *Zerbst* standard in a self-representation setting." *Swiger v. Brown*, 86 F. App'x 877, 880 (6th Cir. 2004).

To be sure, lower courts (including the Sixth Circuit) have added meat to the bare-boned *Faretta* standard using their supervisory powers.  *See e.g.*, *United States v. McDowell*, 814 F.2d 245, 251 (6th Cir. 1987) (using its supervisory authority to establish a preferred checklist

27

of waiver-colloquy inquires).  But lower court decisions not "the benchmark for ascertaining the clearly-established federal law that a state court must follow" for purposes of AEDPA.  *Swiger*, 86 F. App'x at 880–81.  Thus, the question here is not whether the trial court complied with Sixth Circuit precedent.

In fact, the question is not even whether the state trial court's inquiry satisfied the *Faretta* standard; it's whether the state court of appeals' decision affirming the wavier was an unreasonable application of *Faretta*.  In answering that question, this Court must consider the kind of federal law that is being applied.  The Supreme Court has further said that the propriety of a waiver inquiry "depend[s] on a range of case-specific factors," *Iowa v. Tovar*, 541 U.S. 77, 88 (2004), and that the inquiry need only be "as long and as thorough[ ] as the circumstances of the case before him demand," *Von Moltke v. Gillies,* 332 U.S. 708, 723–24 (1948).  In other words, the *Faretta* standard is a general one, which affords state courts "*even more* latitude to reasonably determine that a defendant has not satisfied [its] standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (emphasis added); *see also Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004) ("The

more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

## C.    Analysis

Pouncy argues that his waiver of counsel was invalid because it was presumed from a "silent record" *and* because the trial court did not adequately inform him of the range of allowable punishments and the dangers of self-representation.  (R. 300, ID 12295.)  Before getting into the law, it's important to know what exactly was said at trial.

### 1.    The facts

At the start of the first day of trial, the trial court instructed the prosecution to inform Pouncy of the charges against him, which it did. After the prosecutor said that he was charging Pouncy as a third habitual offender, the trial court informed Pouncy of the maximum sentences and any mandatory minimums:

> THE COURT: All right so now if he were also convicted of habitual offender third, the carjacking carries life, in fact all of the carjacking offenses carry life, armed robbery carries life of course, felony firearm is two years consecutive and preceding any time done on the underlying felonies and then he's got carjacking which again is a life offense and then a felon in possession which, if he were convicted of habitual offender third, would make that offense not a five-year max

29

but a ten-year max is that correct? It would double the maximum is that correct?

MR. LAROBARDIERE: Yes Judge.

(R. 8-7, ID 474.)

A short time later, during a discussion with the court that occurred after jury selection and just before initial instructions and opening statements, Pouncy raised the prospect of representing himself: "Would I, don't I have the right to represent myself though? I'm just askin', I'm just askin'." (*Id*. at ID 647.) The Court cautioned Pouncy: "[I]f you decide that you want to represent yourself," it said, "then you're gonna represent yourself in total. The only thing [defense counsel] will be doin' is sitting there okay?" (*Id*.) The court added, "And I can tell you right now that if you represent yourself you really are a fool okay and the reason is because you don't have a clue as to what you're doin'." (*Id*. at ID 648.)

Later, just after the prosecutor's opening statement, Pouncy again indicated his desire to proceed without counsel. In response, the trial court cautioned Pouncy on what that would entail:

> [I]f you make the opening statement, you'll have to represent yourself through this trial. Now I'm not gonna have him doin' half the trial and you doin' half.

30

(*Id.* at ID 669.)  The trial court also informed Pouncy about the limited

role his attorney would play if he proceeded *pro se*:

> Now if you decide to represent yourself, then he's gonna be
> sittin' back just as an advisor and that'll be it and you'll be
> able to get advice from him but you'll be callin' the shots
> through the entire trial.

(*Id.*)  And the trial court emphasized that he would hold Pouncy to the

same standard as an attorney:

> That includes objections and everything else. And if you
> don't know when and how to make 'em then I guess, you
> know, that's, that's on you.

(*Id.*)  The trial court discouraged Pouncy from representing himself,

using an analogy to drive the point home:

> I would caution you to be very careful as to how you proceed
> right now.
>
> * * *
>
> [I]f I needed to have my transmission rebuilt that I would
> pull my car into a place to have it rebuilt and say to them
> look you guys step to the side I'm gonna rebuild this
> transmission because I don't know anything about buildin'
> transmissions. I've never built one.

(*Id.* at ID 669–670.)  The trial court ended its discussion by asking

Pouncy if he understood the potential dangers:

> THE COURT: . . . Are you hearin' what I'm sayin'?
>
> MR. POUNCY: Yes Your Honor-

31

(*Id.*)

Pouncy later asked the trial judge what he would do if he were in Pouncy's position, prompting the trial court to again admonish Pouncy not to proceed without counsel:  "Sir I would let [your defense counsel] represent me in a heartbeat before I would represent myself with the knowledge that you have."  (*Id.* at ID 672–73.)

Pouncy opted to let his attorney deliver the opening statement, but not long after that, Pouncy slid a note to his counsel that said, "I'm gonna represent myself from now on so you can tell the Judge."  (*Id.* at ID 688.)

Upon learning of Pouncy's decision, the trial court asked Pouncy whether he understood that he had a right to an attorney and that if he couldn't afford one, one would be appointed for him.  (*Id.* at ID 688.) Pouncy answered, "[Y]es I do understand."  (*Id.*)

The trial court again informed Pouncy about the potential dangers and disadvantages of proceeding without counsel:

> You understand that if you represent yourself that I will have to treat you like any other lawyer and if you don't comply with the Court rules I'm gonna have to call you on it you understand that?"

(*Id.* at ID 689.)  Pouncy answered, "Yes sir."  (*Id.*)  The trial court continued, again emphasizing the limited role his stand-by counsel would play and the irreversible nature of his decision:

> And you understand that [defense counsel] will be here just simply to advise you from this trial forth and if you stand up and start representing yourself you're not gonna be able to change horses in the middle of the stream.  You're gonna be representing yourself from beginning to end sir. Is that what you really want to do?"

(*Id.*)  Pouncy twice answered in the affirmative: "Yes. Yes."  (*Id.*)

Finally, echoing its earlier statements, the trial court again cautioned Pouncy against representing himself:

> Mr. Pouncy I'm gonna tell you that in my opinion you have no business representing yourself, none whatsoever.

(*Id.*)  When Pouncy began to reply by referring to some of the evidence, the court stopped Pouncy and said, "Sir I just, sir I just want you to understand that . . . ."  (*Id.*)  Pouncy told the court: "All right I'm ready to go then."  (*Id.*)

**2.   The Michigan Court of Appeals reasonably concluded that Pouncy had knowingly, intelligently, and voluntarily waived his right to counsel and that the state trial court adequately informed Pouncy of the dangers of self-representation**

First, the Michigan Court of Appeals found that the trial court did not just allow Pouncy to represent himself at the very first hint that Pouncy raised the subject, but rather, "after each exchange the trial court erred on the side of ruling against waiver." *Pouncy*, 2008 WL 9869818, at *8.  The state appellate court found that it was not until the last exchange that Pouncy "confirmed that he understood the risks associated with self-representation and ultimately indicated that he was ready to proceed.  Only then did the trial court permit defendant to represent himself." *Id.*

Pouncy claims that this is an unreasonable finding as it presumes a waiver from a "silent record." (R. 300, ID 12295.)  It is true that the Supreme Court has held that the waiver itself must be on the record— courts cannot presume a *waiver* from a silent record.  *Johnson v. Zerbst*, 304 U.S. at 464–65.  But the record in this case *is not* silent.  And Pouncy has pointed to no Supreme Court precedent which requires a trial court to utter the specific phrase, "I find the waiver is knowing,

34

intelligent, and voluntary" before allowing a defendant to waive his right to counsel and to represent himself.  While Pouncy has accurately quoted *Johnson v. Zerbst*, 304 U.S. at 464, it does not specify the words that a trial court must utter after a colloquy with a defendant seeking to waive his right to counsel.  Rather the quoted language, in context, clearly refers to the colloquy with the defendant itself.  Moreover, the Sixth Circuit cases he cites cannot be used to find the Michigan Court of Appeals' decision unreasonable.  As the Supreme Court has repeatedly pointed out, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.' "  *Kernan v. Cuero*, 138 S. Ct. 4, 8 (2017) (per curiam) (quoting *Glebe v. Frost*, 574 U.S. 21, 23 (2014)) (per curiam).  And federal court of appeals precedent cannot "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 63 (2013) (per curiam) (citation omitted); *see also Lopez v. Smith*, 574 U.S. 1, 6 (2014) (providing that absent a decision by the Supreme Court addressing "the specific question presented by [a] case" a federal court cannot reject a state court's assessment of claim).

35

Next, the Michigan Court of Appeals' decision as detailed above is not an unreasonable application of the *Faretta*'s requirement that an accused "be made aware of the dangers and disadvantages of self-representation." 422 U.S. at 835. In *Faretta*, the Supreme Court identified a set of warnings that it considered sufficient to validate a waiver and entitle a defendant to proceed *pro se*. Those warnings were: "that . . . it was a mistake not to accept the assistance of counsel, and that [the defendant] would be required to follow all the 'ground rules' of trial procedure." *Id.* at 835–36.

Taking those warnings as the pitch pipe for measuring the state court's decision, the warnings here were right on key. The trial court told Pouncy multiple times he had "no business" representing himself. (R. 8-7, ID 648; *see also id.* at ID 669–70, 689.) The trial court also warned Pouncy multiple times about the danger of proceeding pro se and being treated like any other attorney. (*Id.* at ID 669, 680.) Using *Faretta* as the benchmark, the state court's decision in this case was well within the substantial leeway afforded to state courts applying general federal law standards.

The Supreme Court has held that the waiver itself must be on the record—courts cannot presume a *waiver* from a silent record. *Zerbst*, 304 U.S. at 464–65. There must also be sufficient evidence (apparent on the record) to satisfy the trial court that the waiver is a knowing and voluntary one. *Von Moltke,* 332 U.S. at 723–24 (stating that the inquiry need only be "as long and as thorough[ ] as the circumstances of the case before him demand").

But aside from that, the Supreme Court requires no talismanic hymn of voluntariness, as Pouncy assumes. The Supreme Court has endorsed a more itemized approach in other contexts, *see United States v. Broce,* 488 U.S. 563, 570 (1989) (explaining the necessity of detailed warning requirements prior to the acceptance of a plea bargain), but not for *Faretta*, *see Swiger*, 86 F. App'x at 880 ("[T]he Supreme Court has not elaborated on the procedural requirements, if any, that a trial court must implement when applying the *Zerbst* standard in a self-representation setting[.]"). As the Supreme Court said in *Tovar*, "We have not . . . prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel." 541 U.S. at 88. Even the Sixth Circuit has recognized that "the requirement of an

37

express finding is not a magic word test." *United States v. Bankston*, 820 F.3d 215, 226 (6th Cir. 2016). If district courts in this Circuit need not use "magic word[s]," surely a state court can safely do the same without unreasonably running afoul of *Faretta*.

The fact-specific nature of the inquiry also explains why the cases Pouncy relies on are not helpful here.

*Fowler v. Collins*, 253 F.3d 244 (6th Cir. 2001), involved a purported waiver of counsel at the petitioner's arraignment, where the state court magistrate failed to inform the petitioner of the charges against him or explain the pertinent constitutional rights. *Id*. at 250. There was *zero* discussion of the dangers of proceeding without counsel. *Id*. Later, on the first day of trial, the trial court referenced the petitioner's earlier (deficient) waiver of counsel, but again failed "to communicate to [the petitioner] the significance of waiving counsel." *Id*.

Compare that to the record in this case and the distinctions jump off the page. The trial court engaged in an extended back and forth with Pouncy, advising him of his constitutional rights, cautioning him against proceeding pro se, and warning him that he would be treated

38

like an attorney.  (*See* R. 8-7, ID 647–48, 669–73, 688–89.)  This is simply not *Fowler*.

In *James v. Brigano*, "[t]he trial judge did not inquire into [the petitioner's] reasons for wanting to fire [his attorney], nor did the trial judge explain the risks and dangers of self-representation."  470 F.3d 636, 639 (6th Cir. 2006).  In fact, the trial court never "addressed the question of waiver" at all.  *Id*. at 644.  The Sixth Circuit noted these shortcomings, but even that wasn't enough for the petitioner to succeed.

Rather, it was an unreasonable finding of fact motivating the state court's decision that earned the petitioner relief under AEDPA.  As *Brigano* explained, the state court rejected his claim based on its finding that his request was meant to delay trial and hamper the administration of the justice.  *Id*. at 643.  That finding, *Brigano* said, was refuted by the record.  *Id*. at 644.

Here, there was no similar unreasonable determination of fact motivating the state court's decision.  And, unlike in *Brigano*, the trial court here *did* inquire into the reasons for wanting to proceed *pro se*, and it *did* explain the consequences doing so.  (*See* R. 8-7, ID 459–72, 647–48, 669–73, 688–89.)

39

But Pouncy is not yet finished.  In his next attack on the validity of his waiver, Pouncy argues that he was not informed of "the range of allowable punishments" because he was not correctly told what his sentencing guidelines range would be following conviction.  (R. 300, ID 12301-02.)  This argument has a couple of answers.

First, no Supreme Court precedent requires the trial court to inform a defendant of "the range of allowable punishments" in the self-representation setting.  The Supreme Court *has* said as much in the guilty-plea context, *see Von Moltke*, 332 U.S. at 724, but the validity of a wavier is context specific, *see Swiger*, 86 F. App'x at 880 ("[D]ifferent procedural requirements have been applied to ensure that a waiver is knowing and intelligent in different constitutional settings.").  Because the Supreme Court has not established the "specific legal rule" in the *Faretta* context, the state court's decision rejecting his claim is necessarily "not an unreasonable application of clearly established Federal law."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  Only by framing the issue at the highest level of generality—the right to waive counsel—can Pouncy smuggle in waiver-colloquy requirements from one waiver context into another.  The Supreme Court has said that AEDPA

40

cases are not the occasion for such experimentation. *Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (warning habeas courts not to "fram[e] [Supreme Court] precedents at [too] high [a] level of generality," lest it transform an "imaginative extension of existing case law into 'clearly established Federal law, as determined by the Supreme Court.' ").

But let's assume *Von Moltke* governs. It held that an accused who wishes to waive his right to counsel must apprehend "the statutory offenses [and] . . . the range of allowable punishments thereunder." *Von Moltke*, 332 U.S. at 724. What the Supreme Court has *not* said, and what Pouncy needs it to have said, is that the phrase "the range of allowable punishments" means "sentencing guidelines range." No Supreme Court decision has even hinted at that, in any waiver context. That's enough to reject this aspect of Pouncy's claim.

For what it's worth, lower courts are nearly universal in rejecting claims that a defendant must be informed of his sentencing guidelines range before waiving the right to counsel in the guilty plea context. *See United States v. Salva*, 902 F.2d 483, 487 (7th Cir. 1990) ("Due process, however, does not oblige the government or the court to predict the

defendant's sentence" as part of right-to-counsel waiver); *United States v. Ufie*, 5 F. App'x 357, 359 (6th Cir. 2001) ("[T]here is no constitutional requirement that a defendant be informed by the court during the plea colloquy of his estimated guidelines sentencing range."); *see also United States v. Casallas*, 59 F.3d 1173, 1180 (11th Cir. 1995) ("The law is clear that the district court was not required to ascertain and communicate to appellant an estimate of the guideline range."). *United States v. Thomas*, 894 F.2d 996, 997 (8th Cir. 1990) ("The District Court is not required to inform the defendant of the applicable guideline range or the actual sentence he will receive."); *United States v. Rhodes*, 913 F.2d 839, 843 (10th Cir. 1990) ("The court was not required to inform Rhodes of the applicable Sentencing Guideline range prior to accepting Rhodes' plea of guilty."); *United States v. Fernandez*, 877 F.2d 1138, 1143 (2d Cir. 1989) (district court "not required to calculate and explain the Guidelines sentence").

Not even an *erroneous* estimate of the sentence will suffice to render the waiver involuntary. *United States v. Quiroga*, 554 F.3d 1150, 1155 (8th Cir. 2009) (noting "abundant circuit precedent holding that inaccurate advice of counsel about the sentencing guidelines or

42

likely punishment does not render involuntary a defendant's decision to plead guilty"); *United States v. Orr*, 165 F. App'x 623, 625 (10th Cir. 2006) ("[A] defendant's erroneous expectation, based on his attorney's erroneous estimate, likewise does not render a plea involuntary."); *United States v. Rhodes*, 913 F.2d 839, 843 (10th Cir. 1990); *see also United States v. Ford,* 15 F. App'x. 303, 308 (6th Cir. 2001) (stating "[u]nfulfilled subjective expectations of counsel and a defendant regarding the possible length of sentence do not render an otherwise valid plea involuntary" (citations omitted)).

What the defendant must be told is what the trial court told Pouncy in this case:  the statutory maximum punishment and any mandatory minimums.  (*See* R. 8-7, ID 474.)  Pouncy tries to minimize this occurrence by stating that, "[t]he record does not reflect whether Pouncy was listening to the Court's colloquy with the prosecutor, let alone understand the import of the conversation."  (R. 300, ID 12301.) But if this was the standard for determining a proper waiver, any defendant at any later time could falsely claim that he was not "listening" when key information was imparted to him and thereby try to undo the results of a trial that did not go so well for him.

43

Two final points on the *Faretta* claim.  Pouncy claims that because the Michigan Court of Appeals decision on the claim either unreasonably applied Supreme Court precedent and/or ruled on the claim based on an unreasonable determination of the facts, do novo review of the claim should follow.  (R. 300, ID 12303.)  But that's assuming this Court reaches that point, which it cannot.  The state appellate court's decision was both legally and factually reasonable.

Second, Pouncy claims that such de novo review would open the decision of the Sixth Circuit concerning the "Hobson's Choice" portion of his *Faretta* claim to reconsideration.  (R. 300, ID 12304.)  Let's be clear. No matter what this Court does with the discrete thus-far unadjudicated *Faretta* claim still at issue, the Sixth Circuit's prior ruling concerning the "Hobson's Choice" portion of the claim remains law of the case in this matter.  In other words, the Sixth Circuit's finding that the "Hobson's choice" portion of the *Faretta* claim was adjudicated reasonably on the merits by the Michigan Court of Appeals is law of the case and cannot be

undermined irrespective of what this Court does with Pouncy's remaining claims for relief.[10]

This Court should deny relief on Pouncy's remaining unadjudicated *Faretta* claim.

---

[10] The doctrine of the law of the case provides that "a decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation." *United States v. Todd,* 920 F.2d 399, 403 (6th Cir. 1990). The purpose of the law of the case doctrine is twofold: "(1) to prevent the continued litigation of settled issues; and (2) to assure compliance by inferior courts with the decisions of superior courts." *Id., citing* Moore's Federal Practice ¶ 0.404[1] at 118 (1988). While the law of the case doctrine does not divest a court of the power to revisit prior decisions of its own or of a coordinate court, "when a superior court determines the law of the case, an inferior court lacks the power to depart from it." *Id.,* n. 1. "[W]hen a case has been remanded by an appellate court, the trial court is bound to proceed in accordance with the mandate and law of the case as established by the appellate court." *Hanover Insurance Co. v. American Engineering Co.,* 105 F.3d 306, 312 (6th Cir. 1997) (internal quotation marks omitted). *See also Goldberg v. Maloney,* 692 F.3d 534, 538 (6th Cir. 2012) ("Once an appellate court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (internal quotation marks omitted). The law-of-the-case doctrine has been applied to habeas cases in various contexts. *See Crick v. Smith*, 729 F.2d 1038, 1039 (6th Cir. 1984).

## III.   Pouncy is not entitled to habeas relief pursuant to the Supreme Court's decision in *Lafler v. Cooper*

Next, Pouncy argues that he was denied the effective assistance of counsel in connection with a plea offer made before trial.  He claims that his counsel unreasonably estimated sentencing guidelines range, which led him to reject the plea.  He now says that he would have accepted the plea had he received competent advice.  (R. 300, ID 12305.)

To start, the State agrees that AEDPA deference does not apply to this claim.  But that isn't to say the analysis is deference-free.  The governing legal standard—*Strickland*'s two-part performance-prejudice test—is "a most deferential one" that is "never an easy task" to meet. *Harrington v. Richter*, 562 U.S. at 105.

* * *

Before applying that framework, three important clarifications are in order.  The most important clarification is this: *the prosecution's plea offer did not include an agreement on a specific sentencing guidelines range*.  This was *the prosecution's* plea offer:

> Judge the offer is plea to those eleven counts and no HO for sentencing.

(R. 8-7, ID 476.)  The prosecution did not include in the offer an agreement on a sentencing guidelines range or a specific sentence.

46

Nonetheless, Pouncy's defense counsel estimated Pouncy's sentencing guidelines range based on the information *available to him at the time*. He did so in conjunction with the prosecutor. Together, they estimated that Pouncy's guidelines range would be 135 to 225 months *without the habitual offender enhancement*. But counsel's estimate was just that: an estimate. It was *not* a term of the plea offer. The final guidelines range was (and always is) subject to change based on the probation department's recommendations and the trial court's ultimate scoring decisions. *See generally Wright v. Lafler*, 247 F. App'x. 701 (6th Cir. 2007).

The second clarification relates to the habitual sentencing enhancement. In Michigan, when a defendant is convicted as a habitual offender, it enhances the top end of the guidelines range by a percentage depending on the number of prior felony convictions. Mich. Comp. Laws 777.21(3). To use Pouncy's case as an example, a third habitual offender's top end is increased by 50%. *See* Mich. Comp. Laws 777.21(3)(b). One thing the habitual enhancement does not change is the bottom end of the guidelines range. Thus, by offering to drop the

47

habitual enhancement, the prosecution was effectively offering to lower the top of his guidelines, but the not bottom end.

To briefly summarize:  Pouncy wasn't promised a sentencing range; he was only *advised* by his counsel on what that range would likely be.  The only difference between the plea and trial sentencing exposures was the dropping of the habitual enhancement.  And, as a result, counsel's estimate of the sentencing range had limited relevance to the plea offer, since the only thing altered by the plea was the lowering of the top end of the guidelines by a certain percentage.

*  *  *

Under the two-part *Strickland* standard, Pouncy must first show deficient performance.  *Strickland*, 466 U.S. at 687.  To do that, he must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *id.*, as "measured against an 'objective standard of reasonableness under prevailing professional norms,' " *Rompilla v. Beard*, 545 U.S. 374, 380 (2005).

48

Second, Pouncy must prove that counsel's deficient performance prejudiced the defense.  To prove prejudice in this context, Pouncy must show that but for the bad advice there is a reasonable probability that:

1. He would have accepted the plea

2. The prosecution would not have withdrawn it in light of intervening circumstances

3. The court would have accepted its terms, and

4. The conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler v. Cooper*, 566 U.S. 156, 164 (2012).  A "reasonable probability," the Court has held, "is a probability sufficient to undermine confidence in the outcome," which "requires a substantial . . . likelihood of a different result," "not just [a] conceivable" one.  *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (internal quotation marks and citations removed).

### A.    Counsel's guidelines range estimation was not objectively unreasonable

Pouncy claims that defense counsel made a "staggering miscalculation" of his sentencing exposure because of the way that the sentencing guidelines were scored prior to trial.  (R. 300, ID 12307.) But he makes no effort at explaining why counsel's estimate was

49

objectively unreasonable or, in other words, deficient performance under *Strickland*.

An inaccurate prediction of a sentence alone is not enough to meet the *Strickland* standard. *United States v. Arvanitis,* 902 F.2d 489, 494 (7th Cir. 1990). Rather, "[t]he salient question is whether counsel undertook a good-faith effort to determine the applicable facts and estimate the sentence." *Bethel v. United States*, 458 F.3d 711, 717 (7th Cir. 2006). Here, we know enough of the facts surrounding the calculation of Pouncy's sentencing guidelines to reverse-engineer counsel's calculations and see that counsel's predictions were not deficient or unreasonable.

Start with what we know for sure. We know that following Pouncy's conviction, the probation department put his offense variable (OV) score at 145 and his prior record variable score at 60, placing him in the E-VI cell of the sentencing grid. PSIR, at 24-25;[11] R. 8-16, ID 1935; *see also* Class A Sentencing Grid, 2005 Michigan Sentencing Guidelines, p. 88, available at

---

[11] With the authorization of this Court, the State has filed a bates-stamped copy of Pouncy's PSIR under seal.

https://mjieducation.mi.gov/documents/felony-sentencing-resources/67-2005-sgm/file.) (last visited June 11, 2020). No one raised any issues regarding the Prior Record Variables (PRVs). (R. 8-16, ID 1913.)

We also know that counsel's pretrial prediction was 135 to 337 months. (R. 8-7, ID 475.) That guidelines range appears four times in the Class A sentencing grid, each time in a different PRV column. Given that neither Pouncy nor his counsel objected to the probation department's PRV score, it's fair to assume that counsel's pretrial prediction was based on the same PRV score as the probation department's. That means that counsel's prediction of 135 to 337 months was a prediction that Pouncy would end up in the E-IV cell, which corresponds to an OV score range of 60 to 79 points. That, of course, was lower than the probation department's calculation of 145 OV points.

Based on defense counsel's objections at sentencing, we can see where the difference comes from. Defense counsel objected to the probation department's scoring of the following OVs: OV 1 at 25 points; OV 4 at 10 points; OV 8 at 15 points; OV 17 at 10 points; and OV 19 at 10 points. (R. 8-16, 1913–31.) In total, defense counsel objected to 70

51

OV points.[12]  Had defense counsel succeeded in each of these objections, and thus obtained what he considered was the proper guidelines scoring, Pouncy's OV score would have been 75, placing him in the E-IV cell—*just like counsel predicted before trial.*

The reasonableness of counsel's prediction, then, turns on the strength of his arguments for why the challenged OVs should be scored at zero.

Starting with the two easiest ones, OVs 17 and 19, Pouncy won those objections and the trial court scored them at zero.  (R. 8-16, ID 1926–31.)  Thus, counsel's guidelines prediction based on a scoring of those OVs at zero was eminently reasonable.

The same goes for OV 1.  The probation department scored the variable at 25 points but following defense counsel's argument that it should be scored at zero, the trial court concluded that an intermediate score of 15 was proper.  (R. 8-16, ID 1913–19.)

---

[12] Pouncy also personally objected to the scoring of OV 13 at 25 points, but that objection does not shed light on what *defense counsel* considered the proper OV point total for purposes of his pre-trial prediction.

For the final two OVs, defense counsel's challenges were overruled, but that is not to say that his positions didn't have merit. The trial court upheld the 10-point score for OV 4 (psychological injury to a victim) based on the trial testimony of one the victims.  (R. 8-16, ID 1919.)  Counsel can hardly be faulted for not predicting the details of a victim's testimony about a collateral issue like lingering psychological effects of the crime.  *See United States v. Moore*, 416 F. App'x 454, 460 (5th Cir. 2011) (counsel not ineffective for failing to predict later developed facts).

As for OV 8, the probation department scored it at 15 points for asportation of a victim to a place of great danger or for holding a victim captive beyond the time necessary to commit the crime.  *See* Mich. Comp. Laws § 777.38(1)(a).  Defense counsel mounted a substantial challenge to the scoring, arguing that there was no asportation because the victims drove themselves to the scene voluntarily.  (R. 8-16, ID 1920.)  The trial court agreed with that argument.  (*Id.* at ID 1921 (agreeing with Pouncy, "I'm not so sure I think that the asportation applies").)  Although Pouncy ultimately lost the challenge on another

53

ground, it was a close call. (*Id.* at ID 1921–22 (trial court ruling that victims were "held captive" by being ordered into the woods).)

Although this Court has previously described counsel's estimation as a "gross miscalculation" that "suggest[ed] a lack of familiarity with the relevant sentencing facts," *Pouncy v. Palmer*, 165 F. Supp. 3d 615, 628 (E.D. Mich. 2016), the foregoing analysis demonstrates that counsel was familiar with the sentencing facts, made good faith estimations about close-call scorings, and was even right about some of them. It is well settled that total success is not the measure of reasonableness under *Strickland*. Nowhere is this truer than in the sentencing guidelines estimation context. *See, e.g.*, *United States v. Gordon*, 4 F.3d 1567, 1570–71 (10th Cir. 1993) ("A miscalculation or erroneous sentence estimation by defense counsel is not a constitutionally deficient performance rising to the level of ineffective assistance of counsel."); *Thomas v. United States*, 27 F.3d 321, 326 (8th Cir. 1994) (collecting cases); *see also Doganiere v. United States*, 914 F.2d 165 (9th Cir. 1990); *United States v. Arvinitis*, 902 F.2d 489, 494 (7th Cir. 1990); *Mix v. Robinson*, 64 F. App'x 952, 956–57 (6th Cir. 2003).

**B.    Pouncy cannot establish that he was prejudiced as a result of counsel's guidelines prediction**

Again, to prove prejudice in the forgone-plea context, the

defendant must show that:

1. He would have accepted the plea

2. The prosecution would not have withdrawn it in light of intervening circumstances

3. The court would have accepted its terms, and

4. The conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler*, 566 U.S. at 164.  Together, these inquiries are directed at one

overarching question: *if counsel had correctly advised the defendant*,

would things have been different.

The "if" clause is important.  If counsel had correctly advised

Pouncy, he would have known that his plea-based sentencing guidelines

range was 225 to 375 months.  This point cannot be overstated.

Contrary to Pouncy's assertion, his plea-based range would not have

been 135 to 225 months.  Counsel's prediction of the plea-based range

was just that: a prediction.  It was not a term of the plea offer.  It was

liable to change based on how the probation department and trial court

55

scored the variables, just as his estimate of the trial-based range was liable to change.

In fact, as explained above, the only sentencing difference contemplated by the plea offer was a reduction of the top end of the sentencing guidelines. The bottom end stayed the same. Thus, an erroneous guidelines estimation by counsel is equally erroneous for both the plea and the trial scenarios.[13]

### 1. Pouncy has not shown that he would have accepted the plea but for counsel's guidelines prediction

Given the confusion on this point, there's a question whether Pouncy's briefing has established that he would have accepted the plea. His prejudice argument compares the final guidelines range calculated after his conviction (225 to 562 months) with the plea-based guidelines range initially estimated by his counsel (135 to 225 months). (R. 300, ID 12312.) That argument is internally inconsistent. On one hand, he

---

[13] For this reason, cases involving stark differences between a definite plea-deal sentence and the ultimate sentence are irrelevant. *Cf. Sawaf v. United States*, 570 F. App'x 544, 546 (6th Cir. 2014) (defendant rejected plea deal for 41-month sentence after counsel failed to inform him *at all* about the sentencing guidelines, which were later calculated at 235 to 293). What happened in *Sawaf* didn't happen in this case.

says he if had known the true guidelines range after trial would be 225 to 562, he would have accepted the plea.  But in support of that assertion, he points to the fact that he would have received a guidelines range of 135 to 225 if he had pleaded guilty.  That second assertion ignores the premise of *Strickland* prejudice analysis, which is: "had counsel provided competent advice . . . ."  In other words, it does not consider the fact that the plea-based estimated range would change just as much as the trial-based estimated range (and be 225 to 375).

The issue here is not the difference between 135-to-225 and 225-to-562.  The operative question is whether the difference between 225-to-375 and 225-to-562, in conjunction with all other relevant considerations, supports the conclusion that there is a reasonable probability that Pouncy would have accepted the plea.  Pouncy has not answered that question.

This is a critical point because, although it is true that a defendant need not "support his own assertion that he would have accepted the offer with additional objective evidence," *Smith v. United States,* 348 F.3d 545, 551 (6th Cir. 2003), it is also true that a defendant's bald assertion isn't *necessarily* enough to establish a

57

reasonable probability that he would have accepted the plea. Otherwise, this element would be meaningless.[14]

Here, it's critical that Pouncy be able to point to *something* to show that he would have accepted the plea because the record is littered with statements that are completely irreconcilable with pleading guilty.

For example, at trial, in response to the plea offer, Pouncy stated on the record, "I will never take the plea to nothin' I did 'cause I didn't do it." (R. 8-7, ID 478.) Thus, Pouncy did not reject the plea because it wasn't favorable enough, or because he was misadvised; he rejected it because he claimed he was innocent.

Pouncy counters that his statement was essentially litigation posturing. Perhaps. *See Griffin v. United States*, 330 F.3d 733, 738

---

[14] The State concedes that the Sixth Circuit's opinion in *Sawaf*, which relies on its earlier opinion in *United States v Morris*, 470 F.3d 596 (6th Cir. 2006), holds that *Strickland*'s prejudice prong is *presumptively* satisfied when a defense counsel fails to inform a defendant about a "substantial disparity" between the length of a sentence offered by the government in a plea bargain and the otherwise applicable sentencing guidelines range. *Sawaf*, 570 F. App'x at 546. However, the key word is "presumptive" meaning it is not the final word on prejudice. In other words, the State can attempt to rebut such a presumption and it believes it has done so here. It is important to remember that this presumption is not the same as the situation where courts find that no demonstration of prejudice of any kind is required (e.g. structural errors).

(6th Cir. 2003) ("Defendants must claim innocence right up to the point of accepting a guilty plea, or they would lose their ability to make any deal with the government."). But that argument only makes sense if the innocence protestations happen *before* you are convicted. *See id.* ("[A] defendant must be entitled to maintain his innocence throughout trial under the Fifth Amendment.").

Here, Pouncy has *continued* to adamantly insist that he is actually innocent, wrongfully convicted for a crime he didn't commit. (*See, e.g.*, PSIR, at 23; R. 3; R. 158; R. 173; R. 197; R. 211.) If there is one constant in this case, it is Pouncy's adamant assertions of his innocence not only in pre-trial proceedings, but through state direct appeal, state collateral proceedings, and now on habeas review for the past almost seven years. These adamant assertions led this Court to conduct an evidentiary hearing on actual innocence in 2019. Taken in that context, Pouncy's statements at trial weren't simple litigation posturing; they were his truth. Given that, Pouncy cannot show "a substantial . . . likelihood" that he could have accepted the plea, *Cullen*, 563 U.S. at 189, especially if when you consider that that the "correct" sentencing ranges, like predicted ones, would have substantially overlapped. *See,*

59

*e.g.*, *Osley v. United States*, 751 F.3d 1214, 1225 (11th Cir. 2014) (stating that the petitioner's "insistence on . . . innocence, both before and after trial, makes it more difficult to accept his claim").

### 2.   Pouncy has not shown that his sentence under the plea would be lower than the sentence he received

Pouncy also has not shown that the sanction under the plea will be less severe than the one he received following trial.  True, the top end of the guidelines range would be lower (375 months, down from 562).  But that matters much less now that Michigan's guidelines are advisory.  See *People v. Lockridge*, 870 N.W.2d 502 (Mich. 2015). Pouncy's argument would have greater force if, say, the trial court would be restricted to the guidelines range.  But, under the new advisory guidelines regime, trial courts are free to impose an outside-the-guidelines sentence if it concludes that it is reasonable under the circumstances.

Here, the trial court has already determined that, among the options of sentences between 225 and 562 months, 562 months was the appropriate sentence for Pouncy.  There is no reason to think, given the absence of any new mitigating sentencing facts and the newfound

60

freedom to impose any sentence regardless of the recommended guidelines range, that the trial court would impose a different sentence, especially considering Pouncy's continued criminal behavior.  *See, e.g.*, *People v. Triplett*, 287 N.W.2d 165, 167 (Mich. 1980) ("An updated presentence report which includes prison conduct . . . would be a valuable tool in resentencing."); *People v. Phillips*, 575 N.W.2d 784, 790 (Mich. Ct. App., 1997) (affirming as proportionate a sentence previously held disproportionate based on subsequent pattern of misconduct in prison).

### 3.    The remedy problem

In the end Pouncy argues that this Court "should *also* conclude that court-appointed counsel's lack of trial preparations prejudiced Pouncy's ability to negotiate a more favorable plea deal than the one the prosecution offered."  (R. 300, ID 12313.)  In support of this argument, Pouncy cites the Sixth Circuit's recent opinion in *Byrd v. Skipper*, 940 F.3d 248 (6th Cir. 2019), cert. denied ___ U.S. ___ (May 26, 2020).  There are two reasons that this Court should decline to apply *Byrd* to this case.

61

The first is factual.  In the evidentiary hearing held in the *Byrd* case in the district court, "the prosecutor testified unequivocally about the state's willingness to extend a plea offer to Byrd."  *Id.* at 258.  This finding was critical to the majority's finding of prejudice.  But there is a larger problem looming for Pouncy.   Contrast that with this case where there is absolutely no evidence—on the record or otherwise—indicating that the prosecutor in this case was willing to offer Pouncy anything other than the agreement discussed on the record (dismissing the habitual offender notice).  Moreover, in *Byrd*, the prisoner testified at the evidentiary hearing that he "would have accepted any plea for less than life without the possibility of parole."  *Id.* at 238.  After noting the district court's hesitation to credit that testimony, the panel majority in *Byrd* went on to say that "when considering a defendant's *post hoc* assertions, we should look to contemporaneous evidence to substantiate a defendant's expressed preferences."  *Id.* at 258-59.  The panel majority said that Byrd's evidentiary hearing "testimony is supported by the fact that he specifically asked [defense counsel] about the possibility of pleading … [and defense counsel] convinced him to stay the course" promising a defense that would result in an acquittal.

*Id.* at 259.  Here, not only is there nothing contemporaneous supporting Pouncy's post-hoc claim, but the state court record unequivocally indicates that Pouncy would *never* take a plea.

The second is legal.  What remedy would this Court order for Pouncy if it were to apply *Byrd* to this Court?  *Lafler* recognizes that the right to effective plea negotiations raises some remedial issues.  We may not know, years later, whether a defendant would have accepted the plea offer, whether the prosecutor would have rescinded the offer, and whether the trial court would have approved it (assuming it were accepted and not rescinded).  *See Lafler*, 566 U.S. at 172.  But at least in *Lafler*, there was an actual plea offer that could form the basis for those questions.

The remedial problems become insurmountable where no plea deal was offered in the first place. Does the prosecutor speculate as to what plea deal the prosecutor's office theoretically might have offered years earlier?  And how can we know whether the trial court would have accepted a plea deal when one was never on the table?

Pouncy claims that this Court should do what he says the Sixth Circuit did in *Byrd* and order the vacation of his trial conviction as a

63

*Lafler* remedy. That is not what the majority in *Byrd* appears to have done. Rather, all the majority said was that it was doing was remanding the case to the district court "with instructions to issue a writ of habeas corpus in this matter unless state court proceedings consistent with this opinion are reopened within 180 days of the issuance of this court's mandate." *Byrd*, 940 F.3d at 260–261. Perhaps the majority in *Byrd* recognized that it had expanded *Lafler* in a way that left a puzzling question; what is the remedy? Not surprisingly then, most circuits have refused to extend *Lafler* beyond formal plea offers in the way that the panel majority in the *Byrd* case did.

Pouncy's other offered remedy—with respect to the plea offer that *was* made—is similarly misguided. It flows in this way: If Pouncy had accepted the prosecutor's plea offer, he could have received a sentence under which he would have been parole eligible after "a little over 11 years in prison" and since he has already spent "over 13 years in prison" this Court should order his "immediate release." (R. 300, ID 12315.) There are a lot of "ifs" here. *If* Pouncy had accepted the plea agreement, *if* the judge had accepted it, and *if* a judge would have sentenced him to a minimum term of 11 years. There is an even bigger "if." That is,

64

Pouncy would only be released on parole *if* the Michigan Parole Board deemed him parole-worthy when reaching the minimum term of his sentence.  In that regard, calling Pouncy's post-sentencing behavior over the years exceedingly poor is an understatement.  A detailed discussion of his post-conviction conduct is not necessary.  As such, Pouncy being deemed parole-worthy by the Michigan Parole Board immediately upon reaching his minimum term manifests fanciful thinking in the extreme.  The remedy set forth in *Lafler* is what Pouncy would be entitled to if this Court were to agree with the *Strickland/Lafler* claim and nothing more.

Pouncy's reliance on *Lewandowski v. Makel*, 949 F.2d 884 (6th Cir. 1991), is misplaced.  In *Lewandowski*, a prisoner was convicted and sentenced to 15 to 25 years' imprisonment for second-degree murder pursuant to a plea offer but was convinced by a new attorney to appeal and seek withdrawal of his plea.  The prisoner won his appeal, which resulted in plea withdrawal, and the prosecutor's reinstatement of the original first-degree murder charge.  Following trial, the prisoner was convicted as charged and sentenced to life without parole.  The Sixth Circuit found ineffective assistance of counsel for appellate counsel's

65

failure to warn the prisoner of the ramifications of winning the appeal,

ordered specific performance of the original plea agreement which led to

a 15 to 25-year term of imprisonment and ordered the release of the

prisoner as, by the time of the habeas proceedings, the prisoner would

have already been eligible by parole.  Interestingly, during the litigation

in the *Lafler* case, both the federal district court and the Sixth Circuit

cited *Lewandowski* not for the proposition that the prisoner should be

immediately released, but for specific performance of the plea

agreement.  And the Supreme Court clearly did not like that remedy, as

it reworked the remedy when issuing its opinion in *Lafler*:

> As a remedy, the District Court ordered specific performance of the original plea agreement. The correct remedy in these circumstances, however, is to order the State to reoffer the plea agreement. Presuming respondent accepts the offer, the state trial court can then exercise its discretion in determining whether to vacate the convictions and resentence respondent pursuant to the plea agreement, to vacate only some of the convictions and resentence respondent accordingly, or to leave the convictions and sentence from trial undisturbed. See Mich. Ct. Rule 6.302(C)(3) (2011) ("If there is a plea agreement and its terms provide for the defendant's plea to be made in exchange for a specific sentence disposition or a prosecutorial sentence recommendation, the court may ... reject the agreement"). Today's decision leaves open to the trial court how best to exercise that discretion in all the circumstances of the case.

*Lafler v. Cooper*, 566 U.S. at 174–75.  In short, it can be inferred from the *Lafler* Court's rejection of the lower courts' remedy for the constitutional violation it found (which was based on a reference to *Lewandowski*) that the *Lewandowski* case was overruled by the Supreme Court *sub silentio*.

In short, Pouncy is not entitled to habeas relief on his *Lafler* claim.

## IV.   Pouncy is not entitled to habeas relief on any of three parts of his *Brady/Giglio/Napue* claim

Pouncy's next claim is a three-part prosecutorial misconduct claim involving allegations that the prosecution suppressed evidence and knowingly allowed false testimony.  (R. 300, ID 12316.)  The first part involves cell phone records that, according to Pouncy, are associated with Quillie Strong and a person who Strong said was "Jacob Joe Woods" but was actually Jaakawa McGruder and which demonstrate that the officer-in-charge of this case (Detective Gagliardi) lied when he said he couldn't determine who the phone belonged to.  This claim is bogus as evidence now proves that McGruder could not have used the phone as Pouncy claims and because, as Pouncy's own presentence

67

investigation report (PSIR) reveals, that the number in question belongs to him. The second part, which relates to records regarding Wayne Grimes' arrest history, is governed by AEDPA, and the state court's rejection of the claim passes muster under that standard. The third part involves a person named Willie Joyce, who lived near the location where one of the carjackings occurred, identified someone other than Pouncy as the person who knocked on his door on the day of the nearby carjacking, information that Pouncy also claims was suppressed. This third part of the claim is barred by the habeas statute of limitations, but even if were it not, it is without merit and cannot be the basis for habeas relief.

* * *

There are two lines of related Supreme Court precedent relevant here. The first deals with false testimony. The Supreme Court has held that "a conviction obtained through use of false evidence, *known to be such by representatives of the State*, must fall under the Fourteenth Amendment." *Napue v. Illinois,* 360 U.S. 264, 269 (1959) (emphasis added). "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any

reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103 (1976) (footnotes omitted); *see also Giglio v. United States*, 405 U.S. 150 (1972).

A defendant alleging a claim under *Napue*, *Agurs*, and *Giglio* must show (1) that false testimony was given, *Napue*, 360 U.S. at 269; (2) that the prosecutor or someone associated with the case knew that the testimony was false (and failed to correct it), *Napue*, 360 U.S. at 269; *Giglio*, 405 U.S. at 154; and (3) that there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury," *Agurs,* 427 U.S. at 103.

The second line of cases involves evidence withheld from the defendant.  In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87 (1963).  The Supreme Court has since said that evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *Strickler v. Greene*, 527 U.S.

69

263, 280-81 (1999), that "the duty to disclose such evidence is applicable even though there has been no request by the accused," *id.* at 280, and that the duty encompasses "impeachment evidence as well as exculpatory evidence," *id.* (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)), and evidence "known only to police investigators and not to the prosecutor," *id.* at 280-81.  The petitioner bears the burden of establishing each of these three elements. *Carter v. Bell,* 218 F.3d 581, 601 (6th Cir. 2000).

### A.   Pouncy's claim based on the cell phone records fails because the State didn't suppress any records, the records don't prove that the officer-in-charge lied and, most important, *the number in question belongs to Pouncy*

First, Pouncy claims that the prosecutor suppressed exculpatory phone records and alleges that a police officer knowingly provided false testimony concerning the traceability of a phone number that the perpetrator of the carjackings used to contact the victims.  The state trial court rejected this claim which was first raised in Pouncy's collateral motion for relief from judgment and is the last state court to issue a reasoned decision on the claim.

70

As an initial matter, Pouncy resists AEDPA review.  Pouncy argues that on collateral review the state trial court applied the wrong legal standard to the claim.  Rather than apply the *Brady* standard to the claim, it applied the standard for determining whether to grant a new trial based on newly discovered evidence found in *People v. Cress*, 664 N.W.2d 174 (Mich. 2003).  Pouncy says that, because that case puts more of a burden on the defendant (in two different ways) than does the more lenient *Brady* standard, the state trial court's use of *Cress* strips its decision on the claim of any deference.  (R. 300, ID 12321-23.)  Not so.

First, Pouncy argues that, while the *Brady* standard for materiality only requires the defendant to show that there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different where "reasonable probability" is defined not as more likely than not, but rather great enough to undermine confidence in the outcome of the trial.  He points out that the state *Cress* standard is tougher for a defendant to meet as it requires a defendant to show that the new evidence makes a different result probable on retrial.  Admittedly, the standards may not be

71

identical, but when read in its entirety, one can infer from the state trial court's decision on this claim that, under any standard or definition of materiality, Pouncy would not have prevailed. It's reference to one of the victims noting that Pouncy called himself "Jacob Joe Woods" is proof positive that the state trial court was impliedly finding that the phone records did not in any way undermine his confidence in the verdict. And that is sufficient to afford the state trial court's decision with the protection of AEDPA.

Pouncy's second point is that contrary to Supreme Court precedent on *Brady* claims, *Cress* imposes a due diligence requirement. Assuming that post-*Brady* decisions from the Supreme Court have clearly established that there is no due diligence requirement of any kind in a *Brady* analysis,[15] the state trial court did not rely on that

---

[15] In *Banks v. Dretke*, 540 U.S. 668 (2004), the Supreme Court rejected a diligence requirement where the "prosecution represent[ed] that all [*Brady*] material ha[d] been disclosed" to the defendant. *Id.* at 695. But the *Banks* Court did not clearly explain whether courts must apply a diligence requirement in a situation where, as here, there is no evidence that the prosecutor made such a representation. Though the Sixth Circuit has read *Banks* broadly to repudiate a "diligence" requirement in all *Brady* cases that it considers de novo, *see United States v. Tavera*, 719 F.3d 705, 711–12 (6th Cir. 2013), the Sixth Circuit has never decided that *Banks* "clearly established" such a rule. *Cf. Ross v. Petro*, 515 F.3d 653, 662 (6th Cir. 2008) (explaining that only those

72

aspect of *Cress* to deny Pouncy relief on his *Brady-Napue* claim.  It said

nothing about due diligence or any failure of Pouncy to exercise due

diligence when denying the claim.

Moreover, it is important to remember that it is the state court's

decision, not its reasoning, to which AEDPA deference applies.  *See*

*Holland v. Rivard*, 800 F.3d 224, 235-36 (6th Cir. 2015).  So, as long as

the decision itself is reasonable in the sense that there exist any

reasonable reasons for the state court to have denied the prisoner relief

on a claim, even if the precise reasoning by the state court is not valid,

the decision can be upheld.  *But see Wilson v. Sellers*, 138 S.Ct. 1188

(2018).

---

parts of a Supreme Court decision that are "integral to the holding"
constitute "clearly established" Supreme Court law for purposes of 28
U.S.C. § 2254(d)). Indeed, given the unique circumstances before the
*Banks* Court, other circuits continue to apply a diligence requirement to
*Brady* claims that do not involve a prosecutor's misleading
representations. *See United States v. Brown*, 650 F.3d 581, 588 (5th
Cir. 2011); *Maynard v. Government of Virgin Islands*, 392 F. App'x. 105,
112 (3rd Cir. 2010).  In short, even if the state court did rely on a failure
of Pouncy to exercise due diligence to reject his *Brady* claim, this was
not necessarily inconsistent with "clearly established" Supreme Court
law.

In any event, whether under AEDPA review or de novo review, Pouncy's *Brady* claim regarding supposedly suppressed cell phone records does not warrant habeas relief.   This is because the factual underpinnings of the claim fall apart upon close examination.

Pouncy's claim concerning the cell phone records at issue flows roughly as follows.  First, the prosecution suppressed phone records in its possession from Verizon concerning calls made to victim Haynes in the separately tried third carjacking case; records which showed that the perpetrator called Haynes from a phone number identified as (810) 836-5074.  Pouncy has conceded that he had those records, but not until *after* the Brady/Sandstrom carjacking trial and prior to the start of the Haynes carjacking trial. (*See* R. 9-2, ID 5071–73.)  Second, this led Pouncy's appellate attorney to subpoena phone records for victims Brady and Sandstrom (from Sprint), which revealed that any calls placed to them from the perpetrator came from a phone number also identified as (810) 836-5074.  Third, Pouncy's post-conviction investigation concerning the phone number (810) 836-5074 led him to Quillie Strong.  Fourth, Strong provided two affidavits which together indicated that Strong got the phone for a person named "Jacob Joe

74

Woods" who was too young (under 18) to get the phone on his own (*see* R. 9-3, ID 5139–43). Sixth, Pouncy says that, since he is not Jacob Joe Woods, he could not have been the person who called all three victims. Seventh, this not just makes the initial Verizon phone records favorable and material under *Brady*, but indicate that Detective Gagliardi lied/perjured himself when he testified at the Brady/Sandstrom carjacking trial that his investigation revealed the calls to the victims in that case originated from unidentifiable calling cards.

In other words, Pouncy argues that, together, these records and the Strong affidavit show that the State either suppressed favorable evidence and/or relied on false testimony when Detective Gagliardi testified that he couldn't associate anyone with the perpetrator's phone number. Without context, this claim appears attractive. But it completely falls apart on close examination of the facts and record of this case.

Starting with the phone records, any allegation that authorities suppressed cell phone records relating to the Brady/Sandstrom carjackings or the later tried Haynes carjacking is without factual basis. There is no indication—from Detective Gagliardi's testimony or

otherwise—that authorities subpoenaed cell phone records directly from either Verizon or Sprint prior to—or during—the Brady/Sandstrom carjacking trial.  Law enforcement agents have other means of identifying cell phone users that stop short of requesting records directly from the carrier.  It is possible, if not likely, that law enforcement reverse-lookup services in 2005 yielded the results that Detective Gagliardi testified to.  This testimony is thus not incompatible with Pouncy's later-requested records directly from the carrier identifying Quillie Strong as the account holder.

Because there is no evidence that the State had records in its possession at the time of the Brady/Sandstrom trial linking the phone number used to call all three victims to a specific subscriber, Pouncy cannot show that the State suppressed evidence.  And because Gagliardi's testimony that he unsuccessfully investigated the number using some unspecified means is not refuted by records from the carrier itself, Pouncy cannot show that the prosecution relied on false

testimony.[16]  Proof of suppression, which is his burden to demonstrate, simply does not exist.

But where things really go south for Pouncy are with an analysis of the materiality and favorability prongs and the Quillie Strong affidavit.  According to Pouncy, the Haynes phone records (from Verizon) are favorable and material because they show that phone calls from the perpetrator to the victim in the Haynes carjacking did not come from anonymous or untraceable calling cards, but rather a specific phone number—(810) 836-5074.  And Pouncy's post-conviction investigation of that phone number led him to a specific subscriber— Quillie Strong—who then told Pouncy's appellate attorney that he did not use the phone associated with that number, but rather got it for a person named "Jacob Joe Woods."

---

[16] Even if Pouncy had proven Gagliardi's testimony false (he didn't), he would have to also show that the prosecution *knew* the testimony was false and failed to correct it in order to make out a *Napue/Giglio* claim. *See Briscoe v. LaHue*, 460 U.S. 325, 327 (1983) (the Supreme Court "has not held that the false testimony of a police officer in itself violates constitutional rights.")  He doesn't convincingly argue that the prosecution knew or should have known that Gagliardi's testimony was false.

Though Pouncy does not appear to mention it in his latest brief, in one of his affidavits, Strong identifies (by photograph) the person who he believed was Jacob Joe Woods.  The photograph, as it turns out, is of Jaakawa McGruder.  (R. 9-2, ID 5072-73).

What Pouncy didn't know when he subpoenaed the cell phone records, enlisted Strong to sign his affidavit, and argued that McGruder was the one who called the victims:  McGruder was in jail between October 9 and 12, 2005.  (R. 203, ID 9989-91.)  All the phone calls made from (810) 836-5074 on October 10 and 11th to the Sandstroms—*calls that Pouncy has agreed were placed by the perpetrator* (*see* R. 9-2, ID 5073)—McGruder couldn't possibly have made those.  He was behind bars.[17]

So the connection to McGruder is a bust.  Pouncy still insists that he did not make any of the phone calls from (810) 836-5074.  Presumably he will argue that, even if Jacob Joe Woods is not McGruder, it is certainly not Pouncy.  Wrong again.  At trial, the very first witness to take the stand was Joseph Davis, the owner of "Mr.

---

[17] While the jail records discovered by the State may not be useful to the materiality inquiry, *see Apanovitch v. Bobby*, 648 F.3d 434, 437 (6th Cir. 2011), they *are* relevant to whether the evidence itself is favorable.

78

Davis Racing," who was assisting victim Earl Brady with selling his car in October of 2005.  (R. 8-7, ID 678-680.)  Davis identified Pouncy as someone who came by his establishment expressing interest in Brady's car.  (*Id.* at 681-83.)  And when asked what name Pouncy went by at that time, Davis responded, "Jacob Woods." (*Id.* at 684, 692.)  Oops.

Of course, Pouncy has argued that Davis, just like the victims, misidentified him as Jacob Joe Woods (*see* R. 9-2, ID 5073).  He will thus likely continue to claim that there is no connection between him and the cell phone with the number (810) 836-5074 used by the perpetrator of the carjackings.  The problem with such an argument is that it would be contradicted by the phone number, (810) 836-5074, listed for him in his own Presentence Investigation Report.  (PSIR, at 17.)  Oops again.  The fact that Pouncy's very own paperwork ties him to the supposedly suppressed cell phone number neuters this entire claim.  Pouncy cannot possibly prove favorableness or materiality because the records are not exculpatory.  Instead, they result in a neat well-lit inculpatory trail right back to him.[18]

---

[18] This evidence does not implicate the holding in *Apanovitch*, 648 F.3d 434, because this information was known at the time of trial.

**B.    The state trial court's adjudication of Pouncy's claim relating to Wayne Grimes' arrest history was not objectively unreasonable**

The second part of Pouncy's *Brady-Giglio-Napue* claim involves documents he obtained from the City of Clio Police Department showing that Wayne Grimes was previously arrested for carrying a concealed weapon.  (R. 300, ID 12326.)

Because the state trial court adjudicated this claim on the merits[19] (*see* R. 8-37, ID 3157), this Court's review is "significantly constrained by AEDPA."  *Dekeyzer v. Harry*, 603 F. App'x 399, 404 (6th Cir. 2015). In other words, this Court cannot grant relief unless it finds that the decision involved an unreasonable application of Supreme Court precedent.  Even assuming this evidence establishes the first requirement of both claims (false testimony and favorable impeachment evidence), Pouncy cannot establish the remaining elements of the *Brady* and *Napue/Giglio* frameworks.

---

[19] In its response to Pouncy's recent notice concerning non-procedurally defaulted claims, the State inadvertently indicated that this was a new claim not previously pled in Pouncy's habeas petition.  (*See* R. 290, ID 1222-21.)  The State withdraws that argument.

*Actual Knowledge.*  There is no evidence that the prosecutor or police officers in Pouncy's case knew about or possessed Grimes' prior arrest record from Clio PD.  That arrest was conducted by a different law enforcement agency than those involved in the investigation of the carjackings in this case.  There is no clearly established federal law as determined by the Supreme Court in the *Napue-Giglio* context stating that knowledge by a prosecutor or law enforcement agents who have no connection to a given case is attributable to the prosecutor in that case.  So, too, in the *Brady* context.  The Supreme Court has held that the "prosecutor has a duty to learn of any favorable evidence known to the others *acting on the government's behalf in the case*, including the police," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (emphasis added), but it has not extended that rule outside of people involved in the prosecutor's case.  A judge in this district agrees:  "Prosecutors have 'a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.' "  This duty, however, does not extend indefinitely beyond the scope of the case." *Puertas v. Overton*, 342 F.Supp.2d 649, 659 (E.D. Mich. 2004) (Gadola, J.) *quoting Kyles v. Whitley*, 514 U.S. at 437.

81

Several courts considering similar cutting-edge *Napue* arguments have concluded that AEDPA cases (like this one) are not the occasion to break new ground. *See, e.g.*, *Sargent v. Sec'y, Fla. Dep't of Corr.*, 480 F. App'x 523, 529 (11th Cir. 2012) ("If we were writing on a clean slate, we might be persuaded to conclude that the state toxicologist is a member of the prosecution team. But this case does not present us with that option."). Because Supreme Court precedent does not compel the conclusion that a prosecutor ought to know the evidence in every other case prosecuted by other members of his office, the state court's decision was not an unreasonable application of clearly established law. *Richter*, 562 U.S. at 101 ("It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.").[20]

---

[20] For what it is worth, lower courts have hewed closely to the case-specific rationale of *Giglio* and *Napue*. *See United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006) ("[The inquiry] does not turn on the *status* of the person with actual knowledge, such as a law enforcement officer, prosecutor or other government official. In other words, the relevant inquiry is what the person *did,* not who the person *is*."); *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999) ("It is unrealistic to expect federal prosecutors to know all information possessed by state officials affecting a federal case, especially when the information results from an unrelated state investigation."); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) ("[T]he imposition of

Pouncy tries to get around this problem by stating that "[i]t strains credulity that both the prosecutor and Detective Gagliardi … were unaware that Grimes' testimony was false." (R. 300, ID 12328.) He further notes that Gagliardi had run Grimes' name through the LEIN system during the investigation which would have revealed that Clio PD arrest. He adds that Grimes' presentence-investigation report for his sentencing for his role in the carjackings "would have included his prior arrests." (*Id.*) He also states that the prosecutor "presumably read Grimes' PSIR prior to the conclusion of Pouncy's trial" and that "checking the criminal history of a star cooperating witness is basic preparation that any prosecutor worth his salt undertakes before putting his witness on the stand." (*Id.*) All of this is pure speculation. Moreover, there is no support, either in clearly established federal law as determined by Supreme Court precedent or in lower court decisions, for imputing knowledge under these circumstances.

---

an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.' "). Pouncy's argument is contrary to his substantial body of *Napue-Giglio* law.

The Grimes' PSIR—irrespective of what it actually says—does not help Pouncy meet his burden of actual knowledge. Grimes was sentenced on February 2, 2006, several days after his testimony in Pouncy's case on January 26, 2006 (which continued into January 27, 2006). Let's assume that Grimes' PSIR for his sentencing had already been prepared at the time of Grimes' testimony in Pouncy's case. Let's also assume that it references Grimes' arrest. Pouncy has nonetheless failed to demonstrate that the prosecutor had the PSIR at the time of Grimes' testimony in Pouncy's trial, saw the reference to Grimes' prior arrest, and realized that it contradicted Grimes' testimony at trial. It is very likely that the prosecutor did not see the PSIR until the day of Grimes' sentencing, a day which probably included sentencings for a long list of defendants. Even then, there is no evidence that the prosecutor saw any such reference and made the connection that it contradicted Grimes' trial testimony in Pouncy's case (assuming that the prosecutor even recalled this one statement by Grimes in what ended up being a lengthy trial). In short, Pouncy has failed to demonstrate actual knowledge on the part of law enforcement officers or the prosecution on the Pouncy team.

*Materiality.*  Even if Pouncy could impute knowledge of Grimes'
prior arrest to the prosecutor or the Pouncy law enforcement officers, he
cannot show that the state trial court's materiality conclusion was
unreasonable.

His argument in support of materiality under both the *Napue-
Giglio* and *Brady* frameworks overstates the importance of Grimes'
testimony and the allegedly withheld evidence.  The importance of
Pouncy's impeachment was *that* Grimes was inconsistent, not why.
Let's assume that Pouncy had the arrest records and that the jury was
told Grimes had been arrested before.  The jury would have learned
that the arrest was for a relatively minor felony, unlike the serious
felonies Grimes was facing when he gave his statements.  (R. 9-4, ID
5309.)  It would have also known that the gist of Grimes' testimony was
still intact:  he initially clammed up because he was nervous, but
decided to talk once he learned how much trouble he was in.  (R. 8-11,
ID 1151–52.)  The fact that he had been arrested for a relatively low-
level felony during a traffic stop does not refute the gist of his statement
or even render it implausible.  The jury would have known that Grimes

was wrong on a factual detail, but it still would have had a viable explanation for his inconsistencies.

This case is unlike those where the false testimony or suppressed evidence involves a promise of leniency or agreement with the government. *See Napue*, 360 U.S. at 270 (1959). In those scenarios, the jury would have had one *more* reason to *dis*believe the witness; here, at best, the jury would have had one *less* reason *to* believe the witness.

Pouncy also argues that Grimes' statement that he had not been previously arrested is material because it was the explanation given for the discrepancies between his two statements (or in Pouncy's words, "expressly invoked" as the reason for the discrepancies between his two statements, *see* R. 300, ID 12331.) But Pouncy's bases for impeachment were ancillary, at best.

Pouncy's primary basis for impeachment related to a purported inconsistency between what Grimes said at the beginning of the first interview (that he wasn't involved in the carjackings) and what he later said in the same interview (that he was involved). (R. 8-11, ID 1141, 1144–45; *see also* R. 9-4, ID 5272.) But to what end? To show that his initial statement was true and that everything he said afterwards was a

86

lie?  That makes no sense under Pouncy's theory of the case, which is that Grimes was present for all three carjackings.  This avenue of impeachment that Pouncy says was hampered by Grimes' false statements was already a dead end.

Pouncy's other points of impeachment had zero bearing on the central issues of the case.  (*See* R. 8-11, ID 1140–62.)  Even if Grimes was mistaken about collateral issues like where people were before the crime or who said what afterwards, those points do not detract in any meaningful way Grimes' testimony about Pouncy's involvement in the actual carjackings themselves.

Because Pouncy's impeachment focused on the minutia, neglecting the more important issues like the facts of each crime, its potential impact on the jury's decision was limited.  As a consequence, the materiality of the evidence that he says would have enhanced his impeachment is likewise limited.  As one court put it, "[e]xposure of the false testimony would not have added impeachment value sufficient to change the outcome of the trial." *United States v. Stewart*, 433 F.3d 273, 300–01 (2d Cir. 2006).  That's especially true when you consider that Pouncy had already effectively impeached Grimes by eliciting

concessions from him that his initial statement "wasn't the truth." (R. 8-10, ID 1120; *see also* R. 8-11, ID 1178 ("At that time, I wasn't truthful.").)

Even if this Court disagrees, that is not enough to justify habeas relief. Rather, because the state court adjudicated the merits of this claim, this Court has to find that the state court's decision represents an objectively unreasonable application of the *Giglio* materiality standard. It has to find that the decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 131. On these facts, given the ancillary nature of the topics of impeachment Pouncy was trying to pursue, and the limited effect the (allegedly) suppressed evidence would have had in refuting Grimes' testimony, it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016) (per curiam).

Finally, even if Pouncy could establish error, it was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Multiple witnesses who spent considerable time with Pouncy identified him, by sight and

88

by voice.  *See United States v. Ferguson*, 385 F. App'x 518, 524 (6th Cir. 2010) (holding that because other evidence "easily support[ed] the jury's verdict[,]" "it cannot be said that there was 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.' "). Moreover, the effect on the verdict is diminished by the fact that Pouncy was able to elicit concessions from Grimes about the truthfulness of his first statement.

### C.     Pouncy is not entitled to any relief pursuant to *Brady/Giglio/Napue* for the purported suppression of information concerning witness Willie Joyce

The third part of Pouncy's claim is that evidence that a witness who had a "face-to-face confrontation with the perpetrator of the October 11, 2005 carjacking moments before the crime occurred," was shown a photo array, and identified someone else as the person with whom he had this face-to-face encounter, was suppressed from the defense.  (R. 300, ID 12332.)  There are three problems with this part of Pouncy's claim.  It is not in Pouncy's habeas petition nor has this Court granted Pouncy leave to amend his petition to add the claim.  Because the claim does not relate back to any of Pouncy's other claims in his petition, the AEDPA statute of limitations on the claim has long since

passed.  Alternatively, the claim is unexhausted.  And finally, it is meritless irrespective of the statute of limitations and exhaustion.

### 1.    This part of Pouncy's *Brady* claim is barred by AEDPA's statute of limitations

There is no dispute that the "Joyce" portion of the claim was not raised in Pouncy's petition or that this Court has not granted Pouncy leave to amend his petition to add the claim.  Pursuant to 28 U.S.C. § 2242, a habeas petition may be amended "as provided in the rules of procedure applicable to civil actions."  The civil rules provide that an amendment relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the "conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).

The Supreme Court applied this language to habeas corpus petitions in *Mayle v. Felix*, 545 U.S. 644 (2005).  The Supreme Court rejected the argument that the "conduct, transaction, or occurrence" at issue in a section 2254 action should be defined so broadly as to include any pretrial, trial, or post-trial error that could provide a basis for challenging the conviction.  Rather, relation back is permitted "only

when the claims added by amendment arise from the same core facts as the timely filed claims, and not when the new claims depend upon events separate in 'both time and type' from the originally raised episodes." *Mayle*, 545 U.S. at 657.  After noting that AEDPA provides a one-year statute of limitations for filing habeas petitions, the Supreme Court observed that "[i]f claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance." *Mayle*, 545 U.S. at 662.  The Supreme Court held that "[a]n amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle*, 545 U.S. at 650.

The portion of Pouncy's *Brady* claim relating to Joyce does not relate back to any of the claims filed in his original petition, including his two other *Brady/Giglio/Napue* claims.  This new addition is thus unrelated and therefore unquestionably untimely.[21]

---

[21] This habeas matter has been pending in the federal courts since 2013. AEDPA's statute of limitations should be addressed claim-by-claim.  *Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005); *Bachman v.*

91

Though *Mayle* dealt with two separately designated claims—a Fifth Amendment violation versus a Sixth Amendment violation—its reasoning equally applies to claims with the same designation—here, a *Brady* claim based on a witness who did not identify the person he saw at the time of the carjacking as Pouncy—that do not rely on the same common core of operative facts, or that target separate episodes as his other *Brady* claims.

The Supreme Court in *Mayle* gave an example of the type of *Brady* claim that might relate back to an existing *Brady* claim.  Mayle, 545 U.S. at 664 n. 7.  But here the new *Brady* claim has nothing to do with the other two *Brady* claims presented – one regarding purportedly suppressed phone records regarding the subscriber of the cell phone that the perpetrator used to call the victims and the other concerning information purportedly in the possession of the prosecution team about

_____

*Bagley*, 487 F.3d 979, 983, 984-85 (6th Cir. 2007). Moreover, the AEDPA statute of limitations is not tolled by the filing of a federal habeas corpus petition.  *Duncan v. Walker,* 533 U.S. 167 (2001).  As such, even giving Pouncy every benefit of the doubt with respect to statutory tolling and diligence, where the statute of limitations clock on this claim would not have begun to run until 2018 (a point the State does not concede), Pouncy is still too late if he were now to try to amend his petition to include this claim.

92

the arrest record Wayne Grimes, who testified at trial for the prosecution.  This is not a situation where the later claim amplifies or supplements or further explains an existing *Brady* claim.  In other words, there is no "common core of operative facts."  The new *Brady* claim or subpart involves purported suppressed evidence (Willie Joyce's identification of someone other than Pouncy as the person he saw on the day of one of the carjackings) that is completely unrelated to the other two *Brady* claims as described above.  There is no commonality other than the fact that they are *Brady*-type claims.  That's it.  As such, the claim does not relate back.  *See and compare Hill v. Mitchell*, 842 F.3d 910 (6th Cir. 2016); *Watkins v. Deangelo-Kipp*, 854 F.3d 846 (6th Cir. 2017); *Cowan v. Stovall*, 645 F.3d 815 (6th Cir. 2011).

Pouncy nonetheless argues that the law cannot be so "unfair" so as to require him to seek to amend his petition, particularly when, as he says, the State has been on notice of this *Brady* violation since at least March of 2018.  (R. 300, ID 12335.)  Such equitable concerns have no place in determining whether this Court should require Pouncy to amend his petition to add this claim or whether it should otherwise

93

excuse what is obvious—the new claim does not relate back to any prior claims raised in his petition. *Hill v. Mitchell*, 842 F.3d at 925.[22]

In short, as Pouncy's new *Brady* claim concerning suppression of Joyce's identification of someone other than Pouncy does not relate back to any of his previously raised timely claims. As such, it is clearly barred by AEDPA's statute of limitations and thus should not be considered by this Court.

But it gets worse for Pouncy, as discussed below.

### 2.    This part of Pouncy's *Brady* claim is unexhausted

Even if this Court were to allow Pouncy to amend his petition to allow the claim or otherwise determines that the claim should be litigated, another problem looms large for Pouncy. The claim is unexhausted as it appears to have never been raised in state court.

Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). To

---

[22] This is not to say that Pouncy cannot attempt to assert equitable tolling so as to excuse the statute of limitations violation itself. But he cites no case where equitable tolling has been applied in a circumstance like this. Nor should it be applied in such a circumstance.

94

fulfill the exhaustion requirement, the prisoner must have fairly presented the federal claims to all levels of the state appellate system. *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.").[23]

However, this Court may *deny* a claim on the merits without considering exhaustion when it is more efficient to do so.  28 U.S.C. § 2254(b)(2) (stating that a habeas petition may be denied on the merits despite the failure to exhaust state court remedies); *see also Hudson v. Jones,* 351 F.3d 212, 215–16 (6th Cir. 2003).  And the reason for doing so is outlined below.

---

[23] Although Pouncy has already filed one motion for relief from judgment in the state courts, Michigan court rules allows a second one to proceed where, as relevant to this case, the defendant is able to demonstrate that he is "presenting a claim of new evidence that was not discovered before the first such motion."  Mich. Ct. R. 6.508(G)(2).

### 3.     This part of Pouncy's *Brady* claim is without merit

Even if this Court considers the claim regarding the Willie Joyce lineup, Pouncy cannot show that the prosecution suppressed favorable evidence, or that it was material to his case.  For starters, he cannot prove that anything was suppressed because the only evidence of suppression comes from Joyce himself.  And for the reasons stated below, this Court should be skeptical of entertaining a claim based on Joyce's statements.

Here's why.  Willie Joyce, a witness who lived in a home near where one of the carjackings occurred, signed an affidavit describing in detail the events of October 11, 2005.  (*See* 10/29/10 Joyce Affidavit, R. 9-3, ID 5166.)  He recalled the time of day, the appearance and attire of the man who came to his door, and the subject of their brief conversation.  (*Id*. at ¶ 2.)  Years later, Joyce executed another affidavit positively identifying *Jaakawa McGruder* as the man who visited him, and he further stated that he identified McGruder out of a line-up days after the incident.  (R. 182, ID 9278–79, ¶¶ 4–7.)

Of course, we now know that everything in Joyce's second affidavit is wrong because McGruder was in the Genesee County Jail on the day

that Joyce says he saw and spoke to McGruder.  But setting that aside, there is a stark difference between what Pouncy provided this Court in Joyce's affidavit and what Joyce was able to testify to on the stand during the evidentiary hearing on Pouncy's actual innocence claim.

Joyce's affidavit was filled with specifics, down to the 15-minute window of time he supposedly met McGruder.  But on the stand, the best Joyce could recall was that in "fall of 2005" "[a] young man came up to – best of my ability, come up to ask me if I wanted my lawn mowed." (R. 190, ID 9824.)  Beyond that, he couldn't give details.  To the contrary, Joyce expressly disclaimed knowledge of many of the details stated in his affidavit: he didn't know the date he viewed the photo line-up, the name of the officer who showed him it, the location of McGruder's photo in the line-up, or the date he went to the courthouse or who he spoke to there.  (*Id*. at ID 9833–35.)  And the details that Joyce didn't disclaim he merely affirmed after Pouncy's counsel recited the words of his affidavit and asked him the answer-begging question, "is that correct?"  (*Id*. at ID 9832–35.)

The disparity was not lost on the Court.  (*Id*. at ID 9840–41.)  And in response to this Court's inquiries, Joyce admitted to signing the

97

affidavit despite being unable to personally attest to the specific details in it. (*Id.* at ID 9841.) For that reason, and the fact that it is impossible for Joyce to have seen McGruder on October 11th, this Court should disregard his affidavits entirely. And without Joyce, there is no *Brady* claim.

In sum, the part of Pouncy's *Brady* claim that involves Willie Joyce was not raised in his petition and it is too late to do so now under AEDPA's statute of limitations given that it does not relate back to any of Pouncy's other claims in his petition. In any event, the claim is unexhausted, meaning this Court *cannot* grant Pouncy relief on it. And finally, even if this Court were to bypass all these procedural issues, the claim is simply without merit.

This Court should deny Pouncy habeas relief on all three parts of his *Brady/Giglio/Napue* claim.

## V. Pouncy's claim that he is entitled to habeas relief for his *Cronic* claim is unexhausted and thus procedurally defaulted. In any event, the claim does not merit habeas relief

Pouncy argues that he was constructively denied his right to counsel because, by failing to interview certain witnesses, consult with

98

him, or file certain motions, his defense counsel failed to subject the

prosecution's case to meaningful adversarial testing. *See United States*

*v. Cronic*, 466 U.S. 648, 659–60 (1984). (R. 300, ID 12336.) But while

Pouncy has previously cast large portions of this claim as "garden-

variety" ineffective assistance of trial counsel claims, the *Cronic*-based

claim that trial counsel's ineffectiveness was so prominent that it

constructively denied him his right to counsel has not been fully

exhausted in the state courts. And the inability to now exhaust that

claim renders it procedurally defaulted.[24] In any event, the claim lacks

merit because what Pouncy in fact alleges is not a *Cronic* violation, it's

garden-variety *Strickland* error, a claim which appears to have been

largely adjudicated on the merits in the context of other claims, if not

fully adjudicated on the merits.

---

[24] There has been much confusion about whether the *Cronic* aspect of
the claim was raised and addressed in the state courts. Both Pouncy
and the State have at various times treated the claim differently and
have taken differing positions on this question. In any event, in its very
first filing in this case (its first answer), the State asserted that the
claim was procedurally defaulted (R. 7, ID 43, 46) which is all that is
required to preserve the defense.

### A.   Pouncy procedurally defaulted his *Cronic* claim by failing to present it to the state trial court and the Michigan Court of Appeals on collateral review

Pouncy concedes that he did not present the *Cronic* claim on direct appeal nor in the state trial court in his collateral motion for relief from judgment.  And as shown below, he did not properly raise it in the Michigan Court of Appeals either.  While he did raise a *Cronic* claim in his later application for leave to appeal filed in the Michigan Supreme Court, this is insufficient to fully exhaust the claim.  And because Michigan law does not allow him to return to state court to exhaust the claim (the two exceptions in Mich. Ct. R. 6.508(G)(2) do not apply), the claim is unexhausted, but inexhaustible, and thus procedurally defaulted.  But even if Pouncy could excuse or bypass that default, thereby permitting this Court review the claim, it is without merit so there is no basis for habeas relief.

### 1.   The evolution of Pouncy's *Cronic* claim in state court collateral proceedings

A brief review of the evolution of Pouncy's claims in the collateral proceedings is important.  In his counseled motion for relief from judgment, Pouncy's 13th claim challenged counsel's failure to interview and produce Willie Joyce, his roommate Charles Smith, and several

alibi witnesses.  (R. 8-20, ID 2025.)  In his *pro se* supplement to the motion for relief from judgment, Pouncy echoed those same arguments, arguing that counsel was ineffective for failing to interview "witnesses who the prosecution had endorsed."  (R. 8-22, ID 2123, 2287-95.)  On appeal, Pouncy's counsel again challenged counsel's failure to interview and produce Joyce and Smith, the alibi witnesses.  (R. 8-48, ID 4254-55.)

Then, in his application to the Michigan Supreme Court, Pouncy raised an ineffective assistance of counsel claim that criticized counsel in general terms for not interviewing witnesses.  (R. 8-49, ID 4444, 4492.)  Comparing that claim with those in the trial court filings and counsel's court of appeals brief, the State gave Pouncy the benefit of doubt and interpreted his claim as a continuation of the claims raised and addressed in the lower courts in several of its pleadings filed after its initial answer to the petition.

It was with that understanding of the procedural history that the State interpreted Pouncy's federal habeas claim regarding counsel's failure to interview witnesses as raising the same claim that he raised in the Michigan Supreme Court (which it had read as a continuation of

the claims he raised in the trial court).  Pouncy confirmed that reading

when he stated that he raised this claim in the state trial court.  (R.

156, ID 8265–66.)

But following the state trial court's denial of Pouncy's motion for

relief from judgment, Pouncy started formulating the claim differently,

for the first time calling counsel's ineffectiveness so bad that it

constructively denied him his right to counsel under *Cronic*.  But this

reformulated claim does not appear in appellate counsel's application

for leave to appeal filed in the Michigan Court of Appeals from the state

trial court's denial of relief.  Rather, from what Pouncy has recently

produced, it was referenced in a pro se supplemental application that he

tried to file in the Michigan Court of Appeals.  *But*, the Michigan Court

of Appeals rejected that pleading and sent it back to Pouncy without

filing it correctly noting that, under Michigan appellate law, a pro se

supplemental (standard 4) brief (if timely) only properly supports an

*appellant's* brief, not an application for leave to appeal.  The

formulation of the claim in the rejected filing makes clear that it was a

drastic departure—and entirely new legal theory—than what had been

alleged in the trial court.  (R. 233-4, ID 10769–75.)  In light of that

document, it's clear that the claim ultimately only raised in the Michigan Supreme Court wasn't an evolution of the claims he raised in the trial court, but an echo of the new claim he tried—but failed—to raise in the Michigan Court of Appeals and did not even attempt to do so in the trial court.

So what does this mean?  The answer is straightforward.

### 2.   Pouncy's *Cronic* claim is unexhausted, inexhaustible, and thus procedurally defaulted

Before seeking a federal writ of habeas corpus, a state prisoner must exhaust all available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam) (quotation omitted). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim to all levels of the state appellate system and alert those courts to the federal nature of the claim.  *Id.* at 365–66; *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

Presenting a claim "for the first and only time in a procedural context in which its merits will not be considered unless there are

special and important reasons" to do so does not satisfy the "fair presentation" requirement. *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (quotation marks omitted). Thus, claims raised in a brief or pleading that has been stricken by a state court are not "fairly presented" because the state court was not given a "fair opportunity" to rule on the claim. *See Provenzano v. Singletary,* 3 F. Supp. 2d 1353, 1387 (M.D. Fla. 1997); *Rinehart v. Birkett*, No. 2:11-cv-12794, 2014 WL 1344469, at *8 (E.D. Mich. Apr. 4, 2014) (Battani, J.) (same); *Whaley v. Scutt*, No. 2:11-cv-10289, 2013 WL 5499921, at *10 (E.D. Mich. Oct. 3, 2013) (Duggan, J.); *Moon v. Trombley*, No. 2:07-cv-13754, 2010 WL 2376168, at *3 (E.D. Mich. June 9, 2010) (Battani, J.); *see also Wagner v. Smith*, 581 F.3d 410, 414–15 (6th Cir. 2009) ("Fair presentation requires that the state courts be given the opportunity to *see* both the factual and legal basis for each claim." (emphasis added)).

Here, the state courts would never have known Pouncy was presenting a separate and distinct *Cronic* claim. Pouncy didn't present it in the state trial court on collateral review, and his counsel didn't present in his application for leave to appeal to the Michigan Court of Appeals. Nor would the Michigan Court of Appeals have known about

104

the claim based on Pouncy's *pro se* filing. That filing was returned to Pouncy as improperly filed, and it was never docketed. Thus, worse than *Baldwin*, where the appellate court could have discovered the claim in question by reviewing the lower court record, the Michigan Court of Appeals had no possible way to know that Pouncy was alleging a *Cronic* claim based on a failure to interview witnesses. To hold that Pouncy fairly presented his *Cronic* claim would effectively require the Michigan Court of Appeals to alter its practice of rejecting procedurally improper filings—precisely what *Baldwin* rejected.

Because Pouncy's *pro se* filing was rejected, the first time he raised his *Cronic* claim was in the Michigan Supreme Court. That is not enough to comprise fair presentation.[25] Applying *Castille,* the Sixth Circuit has repeatedly held that a habeas petitioner does not comply with the exhaustion requirement when he fails to raise a claim in the state court of appeals, but raises it for the first time on discretionary

---

[25] The same goes for the Michigan Court of Appeals when it is exercising discretionary review authority. Thus, even if this court finds that Pouncy's *pro se* filing was enough to meet the fair presentation requirement for the Michigan Court of Appeals, presenting it for the first time to a court of discretionary review (like the Michigan Court of Appeals on collateral review) is not enough to properly exhaust.

appeal to the state's highest court. *See Hickey v. Hoffner*, 701 F. App'x 422, 425 (6th Cir. 2017); *Skinner v. McLemore,* 425 F. App'x 491, 494 (6th Cir. 2011); *Warlick v. Romanowski,* 367 F. App'x 634, 643 (6th Cir. 2010).  That is precisely what happened here.

Pouncy's claim is therefore unexhausted.  If an unexhausted claim would be procedurally barred under state law, the claim is procedurally defaulted for purposes of federal habeas review.  *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002).  Because Pouncy has already pursued collateral relief under Mich. Ct. R. 6.500 *et. seq.*, he no longer has an available remedy in state court.  This claim is therefore procedurally defaulted.  The only excuse that Pouncy has alleged to excuse his procedural defaults is actual innocence, and for the reasons detailed in prior filings by the State, Pouncy is not actually innocent.

### B.   Even ignoring Pouncy's exhaustion problem, he is not entitled to *Cronic* relief because he doesn't state a *Cronic* claim

Before proceeding too far into the merits, it is important to point out that the claim that Pouncy argues in his latest merits brief is not the same claim he raised in his petition.  Pouncy's claim, as stated in his petition, alleged that "[w]here the prosecution's case relied solely on

the testimonies of the witnesses, counsel's complete failure to conduct pretrial preparatory investigative interviews of any of the prosecution's witnesses constructively deprived petitioner of his Sixth Amendment right to counsel[.]"  (R. 3, ID 27–28.)  Properly understood, Pouncy's *Cronic* claim is limited to counsel's alleged failure to interview witnesses.

But failure-to-interview claims, like their more generic failure-to-investigate counterparts, are governed by the two-part *Strickland* test, regardless of how egregious counsel's purported deficiency is.  *See Woodard v. Collins*, 898 F.2d 1027, 1029 (5th Cir. 1990) (holding that "[p]recedent precludes the appellee from succeeding on th[e] argument" that *Cronic* covers failure to investigate claims); *see also Green v. Lynaugh,* 868 F.2d 176, 177–78 (5th Cir. 1989) (decision to conduct "almost no investigation" governed by *Strickland*); *Mann v. Adams,* 855 F.2d 639, 636–37 (9th Cir. 1988) (same); *Kratz v. United States*, 79 F. App'x 932, 934 (7th Cir. 2003) (same); *Gaedtke v. Sec'y, Dep't of Corr.*, 369 F. App'x 12, 18 (11th Cir. 2010); *United States v. Rith*, 171 F. App'x 228, 231 (10th Cir. 2006) (same).

Perhaps recognizing this and realizing that cases from this Circuit applying the *Cronic* prejudice presumption involve far more than simple failures to interview witnesses, Pouncy has added new components to his *Cronic* claim that he has never argued before in federal court. He now argues that counsel failed to investigate the facts, failed to meaningfully consult with Pouncy, and failed to contest the State's case prior to trial.

This Court should disregard these arguments and limit its review to the claim as initially alleged and argued in Pouncy's petition and supporting memorandum of law. (R. 3, ID 27–28; R. 9-1, ID 5034–35; R. 9-2, ID 5036–39.) But even if this Court considers the other components of Pouncy's argument, the tripartite claim—failure to investigate the facts, failure to consult, and failure to contest the State's case prior to trial—does not rise to the level of a *Cronic* violation.

### 1.     Pouncy fails to state a *Cronic* claim

*Cronic* is concerned with two rare kinds of Sixth Amendment deprivations: actual deprivation of counsel and constructive deprivation of counsel. *United States v. Cronic*, 466 U.S. 648, 659–60 (1984).

Actual-deprivation claims are exactly what they sound like: actual deprivation of counsel "entirely or during a critical stage of the proceeding." *Mickens v. Taylor*, 535 U.S. 162, 166 (2002); *see also Strickland v. Washington*, 466 U.S. 668, 692 (1984) (stating that "various kinds of state interference with counsel's assistance" are "presumed to result in prejudice" (*citing Cronic*, 466 U.S. at 658–59)).

The second kind of *Cronic* claim involves the constructive denial of counsel. The Supreme Court has identified two kinds of constructive denials claims. The first is when counsel is appointed under circumstances that make it exceedingly unlikely "that any lawyer, even a fully competent one, could provide effective assistance." *Cronic*, 466 U.S. at 659–60.

The second kind, which is the kind Pouncy relies on here, arises when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing[.]" *Id*. at 659. This kind of *Cronic* claim differs from its actual-denial counterpart in an important way. Unlike an actual-deprivation claim, which can be premised on counsel's absence during a critical stage in the proceeding, the claim that counsel failed to subject the prosecution's case to adversarial testing requires

109

the criminal defendant to show that his counsel's "failure to test the prosecutor's case" persisted "*throughout the . . . proceeding as a whole.*" *Bell v. Cone*, 535 U.S. 685, 696–97 (2002) (emphasis added).  In other words, Pouncy must show not that he had a bad lawyer at discrete points, but that he had *no lawyer* at all.  That's a rarity.  *See Florida v. Nixon*, 543 U.S. 175, 190 (2004).

The record shows that Pouncy was not effectively without a lawyer.  Start with the findings by the state appellate court regarding defense counsel's pretrial activities:

> [T]he record shows that [defense counsel] hired an investigator for the specific purpose of tracking down and interviewing potential alibi witnesses. The investigator met with defendant to collect the names of potential witnesses. Defendant conceded that he only gave the investigator the name and number for one potential witness.  The investigation apparently revealed no legitimate potential for an alibi defense.

*Pouncy*, 2008 WL 9869818, at *19.  These findings by the state court are presumed correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  As such, this Court must assume that (1) counsel hired an investigator, who (2) consulted with Pouncy to collect witness names; (3) that Pouncy gave the investigator only one witness to track down; and (4) that the investigator's subsequent actions "apparently

revealed no legitimate potential for an alibi defense." *Pouncy*, 2008 WL 9869818, at *19.  That's not nothing.

Even beyond that, the trial court record provides additional detail about counsel and his investigator's pretrial preparation.  For starters, defense counsel obtained public funds and hired Leonard Accardo, who was a "licensed private investigator," a "certified legal investigator," and a former police officer in the same department that was investigating Pouncy's alleged crimes.  (R. 8-11, ID 1221.)

Defense counsel provided the investigator with his entire file, including police interview reports, Grimes' proffer statement, transcripts, and photos of evidence.  (*Id*.)  Counsel and Accardo met with Pouncy to go over investigation strategy, including a possible motive for Grimes to falsely implicate Pouncy, the evidentiary value of Pouncy's tether status, and his potential alibi.  (*Id*. at ID 1222.)

Accardo met with Pouncy "at least two times" after that.  Counsel also consulted with Pouncy at least a half a dozen times prior to trial and possibly as many as a dozen.[26]  During his meetings with Accardo,

---

[26] According to the Sixth Circuit, "Pouncy later estimated it as a 'dozen.'" *Pouncy v. Palmer*, 846 F.3d at 162.

111

Pouncy provided his mother's phone number.  (*Id.*)[27]  Pouncy also gave him the name and address of his employer, but Accardo could not find that person or his business where Pouncy said he could find him, or through other means like the phone book.  (*Id.* at ID 1223.)

Accardo also examined the footprint documented at the scene of one of the carjackings and compared the print to those of Grimes and Pouncy (neither of which matched).  (*Id.* at ID 1225.)  And when Pouncy gave him information about a potential witness and her "basic location," he canvassed the area for her (to no avail).  (*Id.* at ID 1224.)  All in all, Accardo spent as much as twenty hours investigating Pouncy's case.  And he did so at counsel's behest.  Again, that's not nothing.

The fact that counsel had no alibi defense to present at trial was not for lack of investigation.  When asked whether he "[found] any witnesses that were helpful for the Defense," Accardo mentioned only Pouncy's mother.  (*Id.* at ID 1225.)  Counsel confirmed that when he

---

[27] Accardo said that he wasn't able to connect with Pouncy's mother before trial because the number Pouncy gave Accardo was wrong.  (*Id.* at ID 1223.)

told the court that he would have filed a witness list but that his investigator "basically struck out."  (*Id*. at ID 1133.)

Aside from the investigative aspect of the case, counsel's performance at trial shows that he: (1) was well versed in the facts of the case, (2) had selected a defense strategy, (3) conducted vigorous voir dire, (4) gave an opening statement, and (5) was ready to cross-examine witnesses before Pouncy decided to represent himself.  That's far more than what the Supreme Court has said is enough to apply *Strickland* instead of *Cronic*.

In the end, the question under *Cronic* is not whether counsel's performance was adequate, but whether there was any performance at all.  Based on the foregoing, it cannot be said that counsel did *nothing* during the pretrial stage and throughout the proceedings.  *See Benge v. Johnson*, 474 F.3d 236, 247 (6th Cir. 2007) ("[T]he Supreme Court has clarified that the *Cronic* presumption applies only where defense counsel *completely* or *entirely* fails to oppose the prosecution throughout the guilt or penalty phase *as a whole*.").  Pouncy's argument to the contrary amounts to a claim that his counsel "failed to [oppose the

113

prosecution] at specific points," *Bell,* 535 U.S. at 697, which sounds in *Strickland*, not *Cronic*.

The fact is, defense counsel *did* consult Pouncy; he *did* initiate investigations; and he *did* consider filing pre-trial motions and objecting to certain evidence.  Pouncy may think that this level of preparation and performance was inadequate (and for the reasons stated below, it's not), but *inadequate* does not mean *non-existent*.  And even if counsel would provide better representation if he interviewed more witnesses, spoke with his client more often, and filed more motions (a point the State does not concede), that does not mean the failure to do that in a given case is a total deprivation of counsel under *Cronic*.

The Supreme Court said as much in *Wright v. Van Patten*, where the accused argued that he was entitled to the *Cronic* presumption because his attorney attended his plea hearing by phone.  552 U.S. 120, 120 (2008).  The Supreme Court rejected the argument, stating that, even if it was true that "a lawyer physically present will tend to perform better than one on the phone, it does not necessarily follow that mere telephone contact amounted to total absence or 'prevented [counsel] from assisting the accused,' so as to entail application of *Cronic*."  *Id.* at

114

125.  "The question," the Court said, "is *not* whether counsel in those circumstances will perform less well than he otherwise would, but whether the circumstances are likely to result in such poor performance that an inquiry into its effects would not be worth the time." *Id.* (emphasis added).

As *Wright* teaches, the whole point of the *Cronic* presumption is to presume ineffectiveness *without* inquiring on a case-by-case, error-by-error basis into the wisdom of counsel's actual performance (and any resulting prejudice) under *Strickland. Bell v. Quintero*, 125 S. Ct. 2240, 2243 (2005) (opinion Thomas J., joined by Roberts, C.J., respecting denial of certiorari).  But the decision not to file certain motions, the decision how to conduct pretrial investigations, and the decision how much to consult with the accused are not the kind of decisions that are "so likely" to result in prejudice "that case-by-case inquiry into prejudice is not worth the cost." *Strickland*, 466 U.S. at 692.  Courts routinely—if not universally—inquire into the prejudicial effect of these kinds of purported performance deficiencies.

Take the allegation made at one point in time during the course of this habeas case that counsel was ineffective for failing to sever the

charges.  We know this allegation is amenable to a prejudice inquiry. The state court conducted it *in this very case* and said that Pouncy failed to establish prejudice.  *Pouncy*, 2008 WL 9869818, at *16.

Pouncy's oft-repeated claim that counsel was ineffective for not challenging the admission of a recorded call of someone threatening one of the victims is also amenable to prejudice analysis: if the recording was admissible, Pouncy was not prejudiced by his counsel's failure to object to its admission.  And, here, the state court of appeals decided as a matter of state law that the recording was properly admitted.  *Id.* at *25 (quoting *People v. Berkey,* 467 N.W.2d 6 (Mich. 1991)).  The same goes for counsel's alleged failure to investigate the facts and adequately consult with Pouncy.  All of it is amenable to prejudice analysis.

In short, because Pouncy's claim is simply an aggregation of three discrete claims of garden-variety *Strickland* claims, *Cronic*'s presumption of prejudice does not apply.  Pouncy's claim should be judged under the usual two-part performance-prejudice test—a test that he surely fails because he has not argued he was prejudiced by counsel's performance.

The case that Pouncy most heavily relies upon does not counsel a different result. *Mitchell v. Mason*, 325 F.3d 732 (6th Cir. 2003), is frequently cited but rarely applicable. *See, e.g.*, *Willis v. Lafler*, No. 05-cv-74885, 2007 WL 3121542, at *29 (E.D. Mich. Oct. 24, 2007) ("[*Mitchell*'s] holding is cabined by those unique facts."). And it has been described by two Supreme Court justices as a "dubious application[ ] of [the Supreme] Court's precedents," *Bell v. Quintero*, 125 S. Ct. 2240, 2243 (2005) (opinion Thomas J., joined by Roberts, C.J., respecting denial of certiorari) (citing *Mitchell,* 325 F.3d, at 748–49 (Carr, J., dissenting)).

Suffice it to say *Mitchell* is factually distinguishable here. Counsel in that case met with the petitioner for only six minutes immediately prior to trial and had been suspended from the practice of law for an entire month right before trial and therefore did not appear at motion hearings or do *any* other work on the case. *See Mitchell*, 325 F.3d at 742–44. The same cannot be said of Pouncy's defense attorney, who met with him before trial at least six times[28] (R. 8-7, ID 670),

---

[28] Again, according to the Sixth Circuit, "Pouncy later estimated it as a 'dozen' [times]" *Pouncy v. Palmer*, 846 F.3d at 162.

obtained an adjournment to conduct additional investigation (R. 8-6, ID

452), hired a professional investigator to do that investigation (R. 8-7,

ID 1221), and effectively represented him at trial until he was displaced

by Pouncy.  (*Id*. at ID 458–690).

### 2.   Pouncy's claims do not pass muster under *Strickland*

Taken as discrete claims of error, each of Pouncy's claims fails,

especially under AEDPA review, which would apply to many

components of Pouncy's claim if this Court decides that *Strickland*, not

*Cronic*, applies.

Between his direct appeal and his collateral motion for relief from

judgment, Pouncy raised approximately 15 distinct claims of ineffective

assistance of trial counsel.  It appears that either the Michigan Court of

Appeals (on direct appeal) and the state trial court (on collateral review)

adjudicated a large number of these on the merits.

A claim of ineffective assistance of counsel is governed by the

familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668

(1984).  "Surmounting *Strickland's* high bar is never an easy task."

*Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  "Even under de novo

118

review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105.  But this is not de novo review.

On habeas review, review is even further limited because this Court must give deference to both the defense counsel and the state appellate court reviewing their performance.  The Supreme Court has stressed that the "standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted).  Thus, a state prisoner seeking a federal writ of habeas corpus on the ground that he was denied effective assistance of counsel "must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance." *Bell v. Cone*, 535 U.S. 685, 698–99 (2002); *Durr v. Mitchell*, 487 F.3d 423, 435 (6th Cir. 2007).  On habeas review, the question "is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)) (internal quotation

119

marks omitted). "And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Mirzayance*, 556 U.S. at 123.

A sampling of the reasonable resolution of some of these claims reveals that neither the Michigan Court of Appeals nor the state trial court unreasonably adjudicated any of the myriad of ineffective assistance of trial counsel claims before them. Because Pouncy has focused largely on defense counsel's pre-trial actions and preparation, the State will choose a few of the claims specifically addressing that area.

For example, Pouncy has alleged that defense counsel "failed" to sever the Brady and Sandstrom carjackings charges into two separate trials. The state appellate court adjudicated this claim on the merits and found that counsel was not ineffective. *Pouncy*, 2008 WL 9869818, at *16. That decision was not unreasonable. Counsel's decision not to sever was deliberate (*see* R. 8-6, ID 452) and reasonable. At the time, Pouncy insisted he had an alibi for all three carjackings. If even one of those alibis worked out, it would have pierced the prosecution's theory

120

that one person—Pouncy—was responsible for all three.  A jury tasked with judging that theory that hears that the accused couldn't have committed one of the carjackings is more likely to believe that he didn't commit the other ones, too.  At the very least, it was reasonable for counsel to think so, and certainly reasonable for the state court of appeals to so conclude.

Pouncy has also faulted his counsel for not suppressing a tape recording of a harassing phone call left on one of the victim's voicemail. The state court held that the recording was admissible as a matter of state law—a ruling this Court must accept for purposes of habeas review.  *Pouncy*, 2008 WL 9869818, at *25.  That ruling scuttles any claim that defense counsel was ineffective for not objecting to the recorded call.

The same goes for Pouncy's criticism of counsel's decision not to challenge the Rule 404(b) evidence.  The state court held that that evidence was admissible as a matter of state law, *id.* at *22–23, meaning that any objection by counsel would have been futile, see *Lafler v. Cooper*, 566 U.S. at 167 ("Because the objection upon which

his ineffective-assistance-of-counsel claim was premised was meritless, [the defendant] could not demonstrate an error entitling him to relief.").

Finally, Pouncy's claims regarding the failure to interview witnesses, failure to prepare for trial generally, and consult with him fail because Pouncy cannot establish prejudice.  To this day, Pouncy has not explained what information he wanted to give his counsel that he didn't already share with him in his previous meetings.  The investigator met with Pouncy several times, and Pouncy was only able to give him information regarding one witness: his mother.  And the individuals that Pouncy claims his counsel should have interviewed— the prosecution's witnesses—all testified at trial.  There is zero evidence that a pretrial interview with the victims or witnesses would have produced any additional information that was not already available to Pouncy at trial on cross.  Pouncy hasn't even demonstrated that any of the witnesses would have spoken to defense counsel.  Moreover, Pouncy had the opportunity to cross-examine them and impeach them with any prior inconsistent statements.

One final point.  To the extent that the Sixth Circuit collaterally addressed some of these claims of ineffective assistance of trial counsel

122

in addressing the *Faretta* "Hobson's Choice" argument at issue before that court on the State's appeal, the court's findings and holdings concerning's defense counsel's performance are law of the case in this matter (see discussion, *supra*).

In sum, in the event this Court does not find Pouncy's *Cronic* claim unexhausted and thus procedurally defaulted, it fails on the merits because it sounds in *Strickland*, not *Cronic*. Analyzed under *Strickland*, it fails entirely.

**CONCLUSION AND RELIEF REQUESTED**

This Court should deny Pouncy's petition for habeas relief in its entirety as well as deny him a Certificate of Appealability (CIA) on any of the claims.

Respectfully submitted,

Dana Nessel
Attorney General

/s/ John S. Pallas
Assistant Attorney General
Attorney for Respondent
Criminal Trials and Appeals
Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-7650
pallasj@michigan.gov
P42512

Dated:  June 11, 2020

124

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2020, I electronically filed the

above document with the Clerk of the Court using the ECF System,

which will provide electronic copies to counsel of record.

JUDGE MATTHEW F. LEITMAN
AARON KATZ, ATTORNEY FOR PETITIONER
DAVID MOFFITT, ATTORNEY FOR PETITIONER

/s/ John S. Pallas
Assistant Attorney General
Attorney for Respondent
Criminal Trials and Appeals
Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-7650
pallasj@michigan.gov
P42512

125