# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN

# SOUTHERN DIVISION

|  |  |
|---|---|
| OMAR RASHAD POUNCY, | ) |
| Petitioner, | ) Case No. 2:13-cv-14695 |
| v. | ) Hon. Matthew F. Leitman |
| CARMEN D. PALMER, | ) |
| Respondent | ) |

## PETITIONER OMAR POUNCY'S REPLY BRIEF IN FURTHER SUPPORT OF HIS REMAINING UNRESOLVED HABEAS CLAIMS

Aaron M. Katz
David Khrakovsky
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
Telephone:  (617) 951-7000
Fax:  (617) 951-7050
Aaron.Katz@ropesgray.com

David L. Moffitt (P30716)
30800 Telegraph Rd., Ste. 1705
Bingham Farms, MI 48025
Telephone: (248) 644-0880
dlmoffittassoc@ameritech.net

84996944_2

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ............................................................................. 1

**ARGUMENT** ..................................................................................... 1

I.     Pouncy Is Entitled to Relief on His *Gonzalez-Lopez* Claim..................... 1

II.    Pouncy Is Entitled to Relief on His *Faretta* Claim. ...............................12

III.   Pouncy Is Entitled to Relief on His *Lafler* Claim. .................................16

IV.   Pouncy Is Entitled to Relief on His *Brady*/*Giglio*/*Napue* Claim. ............23

     A.    The State Suppressed Favorable Phone Records. .............................23

     B.    The Prosecution Unconstitutionally Failed to Correct Grimes's False Testimony, or at Least Suppressed *Giglio* Evidence Demonstrating Grimes's False Testimony................................................................29

     C.    The Court Can Consider the Joyce Photo Array Suppression. ...........33

V.    Pouncy Is Entitled to Relief on His *Cronic* Claim.................................36

**CONCLUSION** ................................................................................40

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alleyne v. United States*,
    570 U.S. 99 (2013)....................................................................................13

*Akins v. Easterling*,
    648 F.3d 380 (6th Cir. 2011)..............................................................13, 15

*Banks v. Dretke*,
    540 U.S. 668 (2004)................................................................................24

*Boyd v. French*,
    147 F.3d 319 (4th Cir. 1998).................................................................27

*Bradley v. Henry*,
    510 F.3d 1093 (9th Cir. 2007) (*en banc*) .............................................8

*Cobb v. Warden*,
    466 F. App'x 456 (6th Cir 2012)........................................................7, 12

*Coleman v. Thompson*,
    501 U.S. 722 (1991)................................................................................34

*Cottenham v. Jamrog*,
    248 F. App'x 625 (6th Cir. 2007).........................................................6

*Getsy v. Mitchell*,
    495 F.3d 295 (6th Cir. 2007)..............................................................36

*Giglio v. United States*,
    405 U.S. 150 (1972)...........................................................................*passim*

*Harrington v. Richter*,
    562 U.S. 86 (2011)................................................................................25

*Hart v. Mannina*,
    798 F.3d 578 (7th Cir. 2015)..............................................................36

*Holland v. Florida*,
    560 U.S. 631 (2010)..............................................................................34

*Holland v. Rivard*,
    800 F.3d 224 (6th Cir. 2015)............................................................................25

*Kyles v. Whitley*,
    514 U.S. 419 (1995).............................................................................24, 34

*Lalani v. United States*,
    315 Fed. App'x 858 (11th Cir. 2009) ................................................................21

*Luis v. United States*,
    136 S. Ct. 1083 (2016)................................................................................10

*Magana v. Hofbauer*,
    263 F.3d 542 (6th Cir. 2001)........................................................................20

*Martinez v. Illinois*,
    572 U.S. 833 (2014)..................................................................................5

*Mitchell v. Mason*,
    325 F.3d 732 (6th Cir. 2003).....................................................................37, 39

*Moldowan v. City of Warren*,
    578 F.3d 351 (6th Cir. 2009)........................................................................27

*Morris v. Slappy*,
    461 U.S. 1 (1983)..................................................................................3, 4

*People v. Cress*,
    664 N.W.2d 174 (Mich. 2003) ...................................................................23, 24

*People v. Lockridge*,
    498 Mich 358 (2015) ................................................................................15

*Phillips v. White*,
    851 F.3d 567 (6th Cir. 2017)......................................................................39, 40

*Pouncy v. Palmer*,
    165 F. Supp. 3d 615 (E.D. Mich., Jan. 11, 2016) ........................................11, 38

*Pouncy v Palmer*,
    168 F. Supp. 3d 954 (E.D. Mich 2016) ......................................................18, 39

84996944_2

*Powell v. Alabama*,
    287 U.S. 45 (1932)...................................................................................37

*Sawaf v. United State*s,
    570 Fed. App'x 544 (6th Cir. 2014) ...............................................21

*Smith v. Toledo Corr. Inst.*,
    No. 1:12-cv-425, 2020 U.S. Dist. LEXIS 62540 (S.D. Ohio April
    9, 2020)..................................................................................................25

*Smith v. United States*,
    348 F.3d 545 (6th Cir. 2003)............................................................19

*Strickler v. Green*,
    527 U.S. 263 (1999).............................................................................27

*United States v. Adelzo-Gonzalez*,
    268 F.3d 772 (9th Cir. 2001)..............................................................9

*United States v. Arvanitis*,
    902 F.2d 489 (7th Cir. 1990)............................................................18

*United States v. Gonzalez-Lopez*,
    548 U.S. 140 (2006)....................................................................1, 2, 3

*United States v. Gordon*,
    156 F.3d 376 (2d Cir. 1998)............................................................20

*United States v. Morris*,
    470 F.3d 596 (6th Cir. 2006)............................................................18

*Wheat v. United States*,
    486 U.S. 153 (1988).............................................................................4

*Wright v. Van Patten*,
    552 U.S. 120 (2008)...........................................................................40

**Statutes**

28 U.S.C. § 2254(d)(1) ..........................................................................2, 16

AEDPA.....................................................................................*passim*

**Other Authorities**

Sixth Amendment .............................................................................*passim*

*Barbara Menear*, Michigan Supreme Court (2019) ................................9

84996944_2

## INTRODUCTION

The State's response brief does not provide any satisfactory explanations for the fundamental defects and unfairness of Omar Pouncy's criminal proceeding. Instead, the State's response brief merely knocks down a series of strawmen that misapprehend the arguments that we made in our opening brief, mischaracterize the record, assert supposed "facts" that are not supported by any admissible (let alone persuasive) evidence, misread or ignore clearly established Supreme Court precedent and applicable Sixth Circuit case law, and seek to walk back admissions it previously has made.

For the reasons explained below, the Court should reject the State's efforts to defend Pouncy's unconstitutional conviction and grant Pouncy an unconditional writ of habeas corpus.

## ARGUMENT

## I. Pouncy Is Entitled to Relief on His *Gonzalez-Lopez* Claim.

The State argues that the Supreme Court's decision in "*Gonzalez-Lopez* has nothing to do with determining whether the state trial court *violated* Pouncy's Sixth Amendment right to retain his counsel of choice." State Resp. Br., ECF No. 321, Page.ID.12542. According to the State, by relying on *Gonzalez-Lopez*, Pouncy "has things backwards" and is "putting the proverbial cart before the horse." *Id.* at PageID.12543. The State misunderstands our argument.

Under AEDPA, the threshold question for the Court is whether the decision of the Michigan Court of Appeals affirming the trial court's refusal of Pouncy's request to obtain new counsel either (i) unreasonably applied clearly established Supreme Court precedent, or (ii) was contrary to clearly established Supreme Court precedent.  *See* 28 U.S.C. § 2254(d)(1).  With respect to that threshold question, *Gonzalez-Lopez* provides an unambiguous answer.  *Gonzalez-Lopez*'s core holding is that the Sixth Amendment right to counsel of choice is distinct from the right to be represented by counsel who is effective; demonstrating a violation of the former does not depend upon demonstrating a violation of the latter.  As the Supreme Court held in *Gonzalez-Lopez*, "[d]eprivation of the right [to counsel of choice] is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006).  Despite this, the Michigan Court of Appeals held that "the trial court did not abuse its discretion in denying [Pouncy's] request [for a continuance to retain new counsel]" because "[Pouncy] failed to demonstrate that his appointed counsel was not providing him with effective assistance . . . ."  ECF No. 8-44, Page.ID.3281.  A defendant's purported failure to demonstrate that his court-appointed counsel was ineffective is not, however, a permissible basis for an appellate court to affirm a trial court's denial of a defendant's request to retain new counsel.  Were it otherwise, it would

necessarily mean that the right to counsel of choice is entirely co-extensive with the right to effective counsel, which would render *Gonzalez-Lopez*'s core holding a dead letter. Thus, even *assuming* that Pouncy's court-appointed counsel was prepared to effectively represent Pouncy at trial (which he was not), the Michigan Court of Appeals did precisely what *Gonzalez-Lopez* forbids: it "confuse[d] the right to counsel of choice . . . with the right to effective counsel . . . ." *Gonzalez-Lopez*, 548 U.S. at 148. The Michigan Court of Appeals's decision is thus contrary to *Gonzalez-Lopez* and, for that reason alone, not entitled to AEDPA deference.

The State argues that the Supreme Court's decision in *Morris v. Slappy*, 461 U.S. 1 (1983), permits a reviewing court to consider counsel's effectiveness in determining whether the trial court abused its discretion in denying the defendant's last-minute request for a continuance to retain new counsel. The State is wrong. Unlike here, *Morris* did not involve a defendant's request to retain new counsel to replace the counsel that the court had appointed him.[1] Rather, *Morris* involved a

---

[1] The trial record does not allow for a conclusion that Pouncy, during his pre-trial colloquy with the court, was merely requesting new *appointed* counsel and was unable or unwilling to retain new counsel with his own funds. Indeed, when Pouncy later that day reiterated his request for a continuance to obtain new counsel, he made clear that he was willing to retain a lawyer with his own funds if necessary. *See* ECF No. 8-7, PageID.672. The trial court responded by excoriating Pouncy that "[i]f you were gonna hire somebody you should have did it a long time ago." *Id.* This resolves any doubt about the scope of the trial court's denial earlier that morning of Pouncy's request to replace Mr. Breczinski with a new lawyer. In its brief, the State expresses disbelief that, having been deemed an indigent defendant, Pouncy could have afforded to hire a lawyer. As the State is no doubt aware, Pouncy had a mother who

defendant's request for a continuance so that a particular *public defender*, who was recovering from emergency surgery, could represent him at trial.  *See id.* at 5–6. Because a defendant does not have a Sixth Amendment right to choose his *court-appointed* counsel, the Supreme Court did not even address, let alone decide, whether the trial court's refusal to grant the defendant's continuance motion violated his Sixth Amendment right to be represented by counsel of choice.  Instead, the Supreme Court addressed whether the trial court's refusal to grant a continuance violated the defendant's "right to the *assistance* of counsel." *Id.* at 11–12 (emphasis added).  Not surprisingly, the Supreme Court pointed to all of the facts showing that the public defender assigned to represent the defendant at trial was adequately prepared for trial, including his "unequivocal and uncontradicted statement . . . that he was fully prepared and 'ready' for trial . . . ."[2] *Id.* at 12.  Because *Morris* did not even involve the Sixth Amendment right at issue here, it is completely inapposite.[3]

---

was fully capable of paying for an attorney for her son, if that is what was necessary to ensure he received a fair trial represented by a lawyer whom he could trust.

[2] Mr. Breczinski, of course, told the trial court that it was "problematic" to say whether he was prepared for trial.  ECF No. 8-7, PageID.459.

[3] Also inapposite is *Wheat v. United States*, 486 U.S. 153, 159 (1988), where the "question raised . . . [was] the extent to which a criminal defendant's right under the Sixth Amendment to his chosen attorney is qualified by the fact that the attorney has represented other defendants charged in the same criminal conspiracy."  *Wheat* has nothing to do with whether a trial court, for no reason other than its own desire to proceed to trial without any further delay, may deny a defendant's request for a continuance so that he may retain counsel to replace his court-appointed counsel.

4

84996944_2

The other reeds upon which the Michigan Court of Appeals rested its decision affirming the trial court are equally narrow and brittle. First, the Michigan Court of Appeals concluded that Pouncy "did not make a formal motion for a continuance." ECF No. 8-44, PageID.3281. Second, the Michigan Court of Appeals concluded that Pouncy's request to retain new counsel "did not come until trial was already underway . . . ." *Id.* Neither conclusion can reasonably be squared with the trial record.

"The right to choice of counsel is implicated whenever a defendant informs the court . . . that he [or she] is unhappy with his [or her] counsel." *Cottenham v. Jamrog*, 248 F. App'x 625, 636 (6th Cir. 2007). To say that Pouncy was "unhappy" with Mr. Breczinski is a severe understatement. Prior to the venire even being called up to the courtroom for jury selection—which is indisputably prior to trial, *cf. Martinez v. Illinois*, 572 U.S. 833, 840 (2014) ("A jury trial begins . . . when the jury is sworn.")—Pouncy implored the trial court in stark terms that he was not even *comfortable* proceeding to trial with Mr. Breczinski:

> **POUNCY**: I really don't think . . . we ready to go on because um, well . . . me and my attorney not, we really not, really not on the same page to be honest. . . . I wrote . . . the Defender Administrator and asked for um further, a, a different counsel because I don't really feel satisfied with the one I have . . . . I'm not getting' proper representation um honestly. . . . I really don't feel comfortable with, with the representation that I have now.

ECF No. 8-7, PageID.460-462, 465.

5

Notably, the trial court, which had the benefit of personally observing Pouncy's demeanor, clearly understood that Pouncy was, at that moment, requesting an opportunity to obtain new counsel. The trial court, however, rejected the request out of hand, purely as a matter of expedience:

> THE COURT: You're not in a position to judge whether counsel knows how to do his job or not. **So at this point I'm not really in a position to grant your request to have new counsel because we're here on the day of trial, we got a jury downstairs that's ready to go and we're gonna try this case today Mr. Pouncy.**

*Id.* at PageID.465 (bolding added). This is when the relevant violation of Pouncy's Sixth Amendment right to counsel of choice occurred. That Pouncy later reiterated his desire for new counsel after the prosecutor's opening statement, *see* ECF No. 8-7, PageID.672, simply underscores how desperate Pouncy was to replace Mr. Breczinski with new counsel of his choosing.

With the Michigan Court of Appeals's decision disentitled to AEDPA deference, this Court reviews *de novo* whether the trial court acted arbitrarily when it denied Pouncy's request for new counsel. The trial court acted arbitrarily in the extreme. The trial court gave a single reason why it would not continue the trial so that Pouncy could obtain new counsel—because a venire was "downstairs." That amounted to no reason at all. An equally qualified venire would be "downstairs" and "ready to go" the following week, and the week after that, and the week after that.

6

The State acknowledges that "an 'unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay'" violates the defendant's Sixth Amendment right to counsel of choice.  State Resp Br., ECF No. 321, PageID.12545 (quoting *Morris*, 461 U.S. at 11–12).  The trial court's conduct cannot be described in any other way.  As the Sixth Circuit held *Cobb v. Warden*, because "[a]ny substitution of counsel will 'almost certainly necessitate a last-minute continuance,' . . . more than simply a delay must be shown to justify denying a motion to substitute counsel."  466 F. App'x 456, 463 (6th Cir 2012) (quoting *United States v. Whitfield*, 259 F. App'x 830, 834 (6th Cir. 2008)).  Here, however, the trial court did not even insinuate that a continuance of trial would somehow impair the court's ability to administrate justice.  Instead, the trial record from the morning of January 24, 2006 makes clear that the trial court was simply outraged that Pouncy was questioning the competence of Mr. Breczinski and, for that reason, hell bent on proceeding to trial without any further delay.[4]  The trial court did not treat Pouncy as an adult with his future hanging in the balance.  Rather, it treated Pouncy like an uppity teenager who needed to be put in his place.

---

[4] In failing to countenance Pouncy's concerns about Mr. Breczinski's pre-trial investigation (or, more accurately, lack thereof), the trial court appears to have assumed Pouncy's guilt of the charged offenses.  In other words, the trial court leapt to the conclusion that, insofar as Mr. Breczinski had failed to discover meaningfully exculpatory or exonerating information, it was because Pouncy was guilty rather than because Mr. Breczinski's trial preparations were lacking.

7

Because a venire being "downstairs" is a patently arbitrary reason to force a defendant to proceed to trial on serious felony charges roughly ten weeks after arraignment with an attorney that he does not trust and does not want, the State is forced to rely on a series of *non sequiturs*, red herrings, and speculation to defend the trial court's conduct.

First, the State argues that Pouncy's pre-trial colloquy with the trial court amounted only to a request for new *appointed counsel*. *See* State Resp. Br., ECF No. 321, PageID.12556. Nothing in the record supports this argument. During his pre-trial colloquy with the trial court, Pouncy never said anything to suggest that, if given the choice of retaining new counsel with his own funds or proceeding to trial with Mr. Breczinski, he would choose the latter. The trial court did not inquire whether Pouncy had the desire and ability to retain counsel with his own funds, and it could not silently "assume" that Pouncy "had no way of paying for counsel."[5] *Bradley v. Henry*, 510 F.3d 1093, 1098 (9th Cir. 2007) (*en banc*). Moreover, the trial court's ruling that it would not provide Pouncy a continuance was categorical; the trial court did not indicate that it would grant a continuance if Mr. Pouncy desired to retain counsel with his own funds.

---

[5] Indeed, any such assumption would have been factually incorrect. With the assistance of his mother, Pouncy absolutely had the resources to retain counsel, as he later made clear to the trial court. *See* ECF No. 8-7, PageID.672.

Second, the State argues that a trial court is granted "'a great deal of latitude'" when deciding a last-minute request to retain new counsel. State Resp. Br., ECF No. 321, PageID.12544 (quoting *Morris*, 461 U.S. at 11). That may be true, but it simply begs the question that this Court must answer, which is whether the trial court acted arbitrarily in denying Pouncy's request to retain new counsel. Neither the Supreme Court nor the Sixth Circuit has ever suggested that the last minute nature of a defendant's request is, on its own, a sufficient reason to deny the defendant an opportunity to retain new counsel. *Cf. United States v. Adelzo-Gonzalez*, 268 F.3d 772, 780 (9th Cir. 2001) (holding that a trial "court may not deny motion to substitute counsel solely because it was late"). Furthermore, Pouncy's request for an opportunity to obtain new counsel was not as "last minute" as the State suggests. Pouncy made clear to the trial court that he had written previously had written to the Defender Administrator, who is an officer of the Genessee County Court.[6] Because Pouncy was detained without bond, his opportunities to express his concerns to the trial court prior to the morning of January 24, 2006 were limited. The only prior opportunity for Pouncy to express his concerns to the trial court in person was at the January 9, 2006 pre-trial conference; but, at that point in time, Mr. Breczinski was continuing to give Pouncy (and the trial court) the impression that robust pre-trial

---

[6] *Barbara Menear*, Michigan Supreme Court (2019), https://courts.michigan.gov/Administration/SCAO/Documents/Barbara%20Menear.pdf.

investigation was being conducted behind the scenes, and so Pouncy's concerns with Mr. Breczinski had not yet crystallized.

Third, the State argues that Pouncy's "displeasure" with his court-appointed counsel was not a "compelling reason" for a last-minute continuance. State Resp. Br., ECF No. 321, PageID.12545. The record makes clear, however, that Pouncy was not merely displeased with Mr. Breczinski's representation to that point; rather, the felt completely uncomfortable proceeding to trial with him as his lawyer. ECF No. 8-7, PageID.460, 462. What more compelling reason for wanting new counsel could Pouncy have provided?[7] If a defendant does not feel comfortable with his counsel, forcing him to proceed to trial with that counsel is tantamount to forcing him to proceed to trial with no counsel at all. *See, e.g.*, *Luis v. United States*, 136 S. Ct. 1083, 1089 (2016) (recognizing "the necessarily close working relationship between lawyer and client, the need for confidence, and the critical importance of trust"). Indeed, this Court already has found that Mr. Breczinski's pre-trial communications with Pouncy were appalling lacking. *See, e.g.*, *Pouncy v. Palmer*,

---

[7] To be sure, Pouncy also expressed concern regarding Mr. Breczinski's lack of motion practice and failure to investigate Pouncy's alibi and mistaken identity defenses. The State asserts that Mr. Breczinski's failure to prepare a strong defense for Pouncy was "not for lack of effort." State Resp. Br., ECF No. 321, PageID.12545. The State, however, fails to cite any evidence demonstrating Mr. Breczinski's pre-trial "efforts."

10

165 F. Supp. 3d 615, 629 ("Breczinski had not meaningfully communicated with Pouncy prior to the start of trial.").

Fourth, the State argues that Pouncy's request for a continuance was simply an attempt to "hijack" the criminal justice system and that the trial court denied Pouncy's request for a continuance because it "saw it for what it was—a delaying tactic." State Resp. Br., ECF No. 321, PageID.12559. This is not a serious argument. Neither the trial court nor the prosecutor ever indicated any belief whatsoever that Pouncy was making his request for the purpose of delay or some other improper strategic reason. Because Pouncy was in pre-trial detention, he had no incentive to delay trial for the sake of delay, and the trial record leaves no doubt about the genuineness of Pouncy's concerns with Mr. Breczinski. *See Pouncy*, 165 F. Supp. 3d at 627 (recognizing Pouncy's reasonable concerns with Mr. Breczinski).

Fifth, the State argues that granting a continuance may have caused inconvenience to a "long list of witnesses, including two victims, [who] had already been subpoenaed and had likely made special arrangements in their work and personal lives to accommodate what they believed would be the dates that trial in this matter would be held," as well as to "the prosecutor" who "would have devoted significant time and effort to preparing for a trial he thought certain to proceed at the expense of preparing for other trials and matters also on his docket." State Resp. Br., ECF No. 321, PageID.12559–12560. Neither the trial court nor the prosecutor,

however, mentioned any of these considerations as concerns, let alone reasons for denying Pouncy an opportunity to retain new counsel. There is no evidence in the trial record to support the State's *post hoc* speculation that a continuance would have so impaired witnesses' and the prosecutor's schedule. Furthermore, the State's argument that the convenience of witnesses and the prosecutors could ever trump Pouncy's right to retain new counsel under the specific circumstances is contrary to the Sixth Circuit's decision in *Cobb*, 466 F. App'x at 463–464.

## II. Pouncy Is Entitled to Relief on His *Faretta* Claim.

The State's response to Pouncy's *Faretta* argument is essentially four-fold. First, the State argues that the trial court in fact warned Pouncy of the "dangers" of proceeding to trial without counsel. Second, the State argues that no Supreme Court decision requires that a trial court, before accepting a waiver of counsel, advise the defendant of the range of allowable punishments if convicted. Third, the State argues that the trial court actually did advise Pouncy of the range of allowable punishments for the charged offenses. Fourth, the State argues that the Court is barred from granting relief on Pouncy's *Faretta* claim based on the "Hobson's choice" theory. None of these arguments withstands scrutiny.

Telling a defendant that he is a "fool" to represent himself, and advising him that he will be subject to the same courtroom rules as any other lawyer would be, does not warn the defendant of all of the dangers of self-representation. The

12

principle danger of self-representation is that it exponentially increases the risk of conviction, oftentimes for reasons the defendant may not instinctively understand, after which the defendant may be imprisoned for an enormous length of time. The trial court's patronizing *Faretta* colloquy did not warn Pouncy of any of this. Most critically, the trial court did not warn Pouncy that a conviction at trial would automatically mean a *minimum* of 225 months in prison, and potentially multiple times that, before being parole eligible. The trial record makes clear that the trial court, prior to accepting Pouncy's waiver of counsel, neither told Pouncy that the charged offenses carried a mandatory minimum (let alone a mandatory minimum of 225 months) nor asked Pouncy if he understood this fact.

The Sixth Circuit already has held, in a habeas corpus case where AEDPA applied, that "[b]efore waiving the right to counsel, the defendant must understand 'the range of allowable punishments.'" *Akins v. Easterling*, 648 F.3d 380, 399 (6th Cir. 2011) (quoting *Von Moltke v. Gillies*, 332 U.S. 708, 724 (1948)). The State makes no mention of *Akins* in its response brief, presumably because it knows that it has no answer to it. Indeed, the State previously acknowledged that the Supreme Court's waiver-of-counsel case law requires that the defendant "be told . . . the statutory maximum punishment and any mandatory minimums." ECF No. 239, at 53, PageID.11374, which are what define the range of allowable punishments for a charged offense. *Cf. Alleyne v. United States*, 570 U.S. 99, 112 (2013). The reason

13

the State is now seeking to retract its prior concession is because it knows that the trial court did not satisfy that requirement in Pouncy's case.

In Pouncy's case, the trial court *never* told Pouncy that his charged offenses were subject to *any* mandatory minimum prison sentence, let alone a mandatory minimum prison sentence of at least 225 months' imprisonment.[8] Nor did the trial court, prior to accepting Pouncy's waiver of counsel, ask Pouncy whether he understood that the charged offenses were subject to a mandatory minimum prison sentence of at least 225 months. The State suggests that a pre-trial colloquy between the trial court *and the prosecutor* regarding the prosecution's *plea offer* was sufficient to warn Pouncy of the applicable statutory maximum and mandatory minimum for the charged offenses. *See* State Resp. Br., ECF No. 321, PageID.12580 (citing ECF No. 8-7, PageID.474.) The State is wrong. The colloquy was not directed to Pouncy, and the trial court never asked Pouncy to affirm whether he understood the relevance, meaning, or importance what was being discussed within his earshot. Even if Pouncy had been intently listening to the colloquy—which, of course, cannot be assumed from a silent record—at no point during the colloquy did the trial court or the prosecutor say anything that would have informed Pouncy that

---

[8] As we noted in our opening brief, at the point at which the trial court accepted Pouncy's waiver of counsel, the trial court had *never* asked Pouncy whether he understood the statutory maximum associated with the charged offenses. The State's response brief does not context this.

his "guidelines" represented the *absolute minimum amount of prison time* he would serve if convicted at trial. *Cf. People v. Lockridge*, 498 Mich 358, 388 (2015) ("Michigan's sentencing guidelines produce 'mandatory minimum' sentence[.]"). Simply put, there is nothing in the record that indicates in any way whatsoever, that when Pouncy chose to proceed *pro se* and the trial court accepted his waiver, Pouncy either had been informed or understood that, if convicted at trial, he would spend no less than 225 months in prison. The Court cannot assume from a silent record that Pouncy understood the essential information, merely because Pouncy was present in court during while the trial court, the prosecutor, and Mr. Breczinski discussed Pouncy's "guidelines."[9] *See Akins*, 648 F.3d at 398 ("[T]he appropriate inquiry is what the defendant understood—not what the court said or understood." (internal quotations omitted)).

The trial court's failure to advise Pouncy of the mandatory minimum associated with his charged offense and to ensure that Pouncy *understood* this information is, on its own, sufficient to warrant relief on Pouncy's *Faretta* claim.

---

[9] The State expresses concern that a "defendant at any later time could falsely claim he was not 'listening' when key information was imparted to him and thereby try to undo the result of a trial that did not go so well for him." State Resp. Br., ECF No. 321, PageID.12580. There is a very simple answer to this: the trial court must ask the defendant to affirm, on the record, that he has heard and understands the information that the court has conveyed to him. That is the procedure that trial courts follow whenever the defendant is contemplating waiving a constitutional right.

84996944_2

But, as we noted in our opening brief, the Court also is entitled to grant Pouncy relief on the "Hobson's choice" theory. The State disagrees, arguing that the Sixth Circuit already has concluded that the Michigan Court of Appeals's adjudication of the Hobson's choice theory was not unreasonable. The State misunderstands our position on this issue. Pouncy's *Faretta* claim is a single, unitary claim. If Pouncy satisfies § 2254(d) with respect to *any* aspect of his *Faretta* claim, this then logically entitles the Court to address the entire claim *de novo*, including the Hobson's choice theory. Though the Sixth Circuit held that the state court's rejection of the Hobson's choice theory was not unreasonable, this obviously does not foreclose Pouncy from prevailing on the theory under a more favorable *de novo* standard.

## III.    Pouncy Is Entitled to Relief on His *Lafler* Claim.

As its initial response to Pouncy's *Faretta* claim, the State suggests that the prosecutor was simply incorrect when he told the trial court that, if Pouncy accepted the prosecution's plea offer, his "guidelines" would be 135–225 months' imprisonment. The State argues that, in fact, Pouncy's "guidelines" range if he accepted the plea would have been exactly the same as the "guidelines" range that the trial court ultimately calculated after Pouncy's conviction at trial (225–562 months' imprisonment). According to the State, the "only thing altered by the plea [offer] was the lowering of the top end of the guidelines by a certain percentage." State Resp. Br., ECF No. 321, PageID.12585. The State's argument blinks reality.

16

In the real world, sentencing hearings after a defendant accepts a plea offer are *very different* than sentencing hearings after a trial. In the latter circumstances, prosecutors pull no punches, typically arguing in favor of every single plausible sentencing enhancement based on the evidence adduced at trial. This is part of what constitutes what is colloquially referred to as the "trial penalty." That is exactly what happened in Pouncy's case.

At Pouncy's sentencing hearing, the prosecutor vigorously argued in favor of multiple "offense variables" that, under Michigan law, had the effect of raising Pouncy's "guidelines" range, such as "serious psychological injury to the victims." ECF No. 8-16, PageID.1919. In support of those arguments, the prosecutor relied on victim testimony that the prosecution had introduced at trial. *See, e.g.*, *id.* ("You remember the testimony of Ms. Sandstrom; . . . this crime shook her to her core."). There is no reason to believe that the prosecutor, if Pouncy had accepted the plea offer, would have argued for those offense variables at sentencing, let alone called the carjacking victims to testify at a sentencing hearing in support of those offense variables. Much more likely, if not certain, the prosecutor would have done what prosecutors ordinarily do when the defendant pleads guilty prior to trial pursuant to a plea agreement—namely, honor the guidelines calculation arrived at during their plea discussions (here, 135–225 months' imprisonment) and refrain from arguing for additional, contestable enhancements at the defendant's sentencing hearing.

Indeed, this Court already found that this was the nature of the prosecution's plea offer. *See Pouncy v. Palmer*, 168 F. Supp. 3d 954, 968 (E.D. Mich 2016) ("[T]he State offered to permit [Pouncy] to plead guilty under a sentence agreement that called for a sentencing guidelines range of 135–225 months (11.5–18.75 years).")

The State next argues that Mr. Breczinski's calculation of Pouncy's guidelines range if convicted at trial, though wrong, was not "objectively unreasonable" and so does not constitute "deficient performance under *Strickland*." State Resp. Br., ECF No. 321, PageID.12587. As support for this argument, the State cites to the Seventh Circuit's holding in *United States v. Arvanitis* that "a 'mere inaccurate prediction [of the defendant's sentence], standing alone, [does] not constitute ineffective assistance." 902 F.2d 489, 494 (7th Cir. 1990) (quoting *Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir. 1986)). As an initial matter, the Court already has rejected this argument once, and it should do so again. *See Pouncy*, 168 F. Supp. 3d at 963 (holding that counsel's "staggering" miscalculation of Pouncy's guidelines "surely evidences a lack of preparation"). The Sixth Circuit has found calculation errors similar to the one made by Mr. Breczinski's to constitute deficient performance. *See United States v. Morris*, 470 F.3d 596, 603 (6th Cir. 2006) (finding deficient performance where counsel miscalculated his client's sentencing range if convicted at trial by 3 years and 7 months). Furthermore, the State's argument fundamentally mischaracterizes the nature of Mr. Breczinski's deficient performance. The Sixth

18

Circuit has held that "[a] criminal defendant has a right to expect at least that his attorney will . . . explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available." *Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003). It is clear that Mr. Breczinski did not do that here. Mr. Breczinski did not tell Pouncy that his guidelines calculation of 135–337 months' imprisonment if Pouncy were convicted at trial was an uncertain prediction based on an assumption that the prosecution either would not argue for, or would not prevail on, various offense variables at a contested sentencing hearing. Instead, Mr. Breczinski allowed Pouncy to believe that the guidelines calculation of 135–337 months' imprisonment was mathematically certain, and he did not interject when the trial court stated without exception or caveats that "there's really not much difference in the guidelines here at all [between the plea offer and trial]." ECF No. 8-7, PageID.477.

With respect to the prejudice prong of the *Strickland* test, the State presents two arguments. First, the State recycles its argument that Pouncy's guidelines range if he had pled guilty would have started at 225 months, just as it did after his trial conviction. We have already shown above that this argument is incorrect. Second, it argues that Pouncy's protestations of innocence undermine any claim that he would have accepted the prosecution's plea offer had Mr. Breczinski competently counseled him.

As an initial matter, the State misstates Pouncy's burden with respect to the prejudice prong.  Pouncy does not need to show "that he would have accepted the plea" had he received competent advice from Breczinski.  State Resp. Br., ECF No. 321, Page.ID 12593.  Pouncy needs only to show "a reasonable probability" that he would have done so.  *Griffin*, 330 F.3d at 73.  The "substantial disparity" between the guidelines that would have applied had Pouncy been sentenced on a guilty plea and the guidelines that Pouncy was facing if he proceeded to trial is, under *Griffin*, "sufficient to establish a reasonable probability that . . . [he] would have accepted the prosecution's offer." *Griffin*, 330 F.3d at 73; *see also Magana v. Hofbauer*, 263 F.3d 542, 545 (6th Cir. 2001) (holding that the 10-year disparity between the sentencing exposure at trial and the sentencing exposure under the plea offer was an "objective factor" demonstrating "reasonable probability that [petitioner] would have accepted the plea offer had he known his true sentencing exposure"); *United States v. Gordon*, 156 F.3d 376, 377–81 (2d Cir. 1998) (holding that 7.5-year disparity was "sufficient objective evidence . . . to support a finding of prejudice under Strickland").

Furthermore, the Sixth Circuit's decision in *Griffin* squarely forecloses the State's argument that Pouncy cannot show prejudice where he has maintained his innocence of the charged offenses.  *Griffin*, 330 F.3d at 734 (6th Cir. 2003) (holding that "repeated declarations of innocence do not prove, as the government claims, that

20

he would not have accepted a guilty plea"); *see also Lalani v. United States*, 315 Fed. App'x 858, 861 (11th Cir. 2009) (agreeing with *Griffin* that a defendant's maintaining of innocence post-conviction did not prevent them from showing prejudice). That Pouncy continues to maintain his innocence to this day does not change things. *See Sawaf v. United State*s, 570 Fed. App'x 544, 545–46 (6th Cir. 2014) (holding that "the prejudice prong is presumptively satisfied if the difference between the length of the sentence proposed in the Government's plea offer and the sentence imposed after trial conviction was substantial," and reversing the district court's finding that the petitioner's post-conviction protestations of innocence rebutted the presumption).

The State also has no convincing response to the fact that Mr. Breczinski completely failed to attempt to negotiate an even better plea deal than the one the prosecution offered. In *Byrd*, the Sixth Circuit held that, where "counsel's deficient performance deprives a defendant of a fair opportunity in plea negotiations," the petitioner is entitled to show that "absent counsel's errors, [he] would have bargained for a better plea." 940 F.3d at 256. The State argues that *Byrd* is inapplicable here because, unlike in *Byrd*, there is no evidence that the prosecution was willing to offer Pouncy anything other than the agreement discussed on the record. ECF No. 321 at 62, PageID.12599. Contrary to the State's argument, there *is* such evidence. Specifically, the same prosecutors offered Pouncy's co-

conspirators much more favorable plea terms, surely as a result of their attorneys actively participating in plea negotiations.

For the reasons above, Pouncy is entitled to relief on his *Lafler* claim, either (i) because Mr. Breczinski provided Pouncy incompetent advice with respect to the plea agreement that the prosecution put on the record, or (i) because Mr. Breczinski could have obtained in an even more favorable plea offer had he bothered to engage in actual plea negotiations. With respect to the former basis for relief, the State agrees that the minimum remedy would be for the Court to order that Pouncy be re-sentenced in state court pursuant to that plea agreement. The Court is not limited to that relief, however. Under the Sixth Circuit's decision in *Lewandowski*, the Court does have the power to order that Pouncy be immediately released. The State essentially acknowledges that *Lewandowski* allows for that relief, but it argues that the Supreme Court in *Lafler* implicitly overruled *Lewandowski*. *See* State Resp. Br., ECF No. 321, Page.ID 12604. That is an argument that the State should take up with the Sixth Circuit, not this Court. This Court should continue to treat *Lewandowski* as binding precedent unless and until the Sixth Circuit says otherwise.

With respect to the latter basis for relief, the State contests that the Sixth Circuit in *Byrd* held that the proper remedy is to vacate the petitioner's trial conviction so that plea negotiations can begin at square one. *See* State Resp. Br., ECF No. 321, PageID.12600–12601 ("Pouncy claims that this Court should do what

he says the Circuit did in *Byrd* and order the vacation of his trial conviction as a *Lafler* remedy. That is not what the majority in *Byrd* appears to have done."). The State is just flat out wrong. That is *exactly* the relief the majority in *Byrd* ordered. As Judge Griffin wrote in the very first paragraph of his dissenting opinion, "today [the majority] grant[s] habeas relief, vacate[s] a . . . jury verdict, and reset petitioner Curtis Byrd's state criminal case back to the pretrial state . . . because they conclude Byrd's counsel 'would have negotiated a more favorable outcome' during plea negotiations that never occurred." *Byrd*, 940 F.3d at (Griffin, J., dissenting). The State may find that relief "puzzling," State Resp. Br., ECF No. 321, PageID.12601, but the role of this Court is to follow Sixth Circuit precedent, not to question it.

## IV. Pouncy Is Entitled to Relief on His *Brady/Giglio/Napue* Claim.

The State's response to Pouncy's multi-faceted *Brady/Giglio/Napue* claim is replete with misstatements of law and fact. The Court should reject all of them.

### A. The State Suppressed Favorable Phone Records.

The State acknowledges that the trial court, on post-conviction appeal, adjudicated Pouncy's claim regarding the prosecution's suppression of (and Detective Gagliardi's false testimony regarding) the phone records through the lens of *People v. Cress*, 664 N.W.2d 174 (Mich. 2003). The State also acknowledges, albeit grudgingly, that *Cress* sets forth the standard for receiving a new trial on the grounds of newly discovered evidence, which both imposes a higher materiality

burden as compared to a claim under *Brady*, *Giglio*, or *Napue* and includes a diligence requirement.[10]   The State, however, argues that, even if the trial court applied the wrong legal standard to Pouncy's claim, the trial court's decision remains entitled to AEDPA deference.   According to the State, this is because "one can infer from the trial court's decision on this claim that, under any standard or definition of materiality, Pouncy would not have prevailed."   State Resp. Br., ECF No. 321, PageID.12609.   The State's conclusory characterizations aside, this is not how AEDPA works.   A federal habeas court does not ask whether the state court might have, could have, or would have denied the petitioner's claim had it actually applied the correct legal rule.   Rather, the federal habeas court looks at whether the state

---

[10] In a footnote, the State suggests that perhaps the Supreme Court's *Brady* progeny does not clearly establish the absence of a diligence requirement.   The State says that *Banks v. Dretke*, 540 U.S. 668, 695 (2004), holds that no diligence requirement applies "where the 'prosecution represent[ed] that all [*Brady*] material ha[d] been disclosed," which by implication may mean that a diligence requirement applies where the prosecution played coy about whether it had satisfied its *Brady* obligations.   State Resp. Br., ECF No. 321, PageID.12609 (quoting *Banks*).   This is a completely unserious argument.   The passage from *Banks* that the State quotes is from the portion of the opinion addressing whether a petitioner asserting a *Brady* claim that he did not timely present in state court must demonstrate diligence in order to satisfy the "cause and prejudice" exception to AEDPA's procedural default rule; it had nothing to do with the substantive elements of a *Brady* claim.   The Supreme Court has made clear time and again that a prosecutor has an affirmative constitutional obligation to learn or and disclose exculpatory evidence in the possession of the prosecution team.   *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police. . . . [T]he prosecutor's responsibility for failing to disclose known, favorable evidence rising to a material level of important is inescapable.").

court *in fact* applied the correct legal rule.  If it did not, the state court's decision is not entitled to AEDPA deference.  *See, e.g.*, *Smith v. Toledo Corr. Inst.*, No. 1:12-cv-425, 2020 U.S. Dist. LEXIS 62540, at \*23 (S.D. Ohio Apr. 9, 2020) ("By analyzing Petitioner's *Brady* claim under a subjective rather than an objective standard, the state trial judge misapplied federal law on Petitioner's post-conviction *Brady* claim.  This finding alone warrants relief.").

The State resists this point of black letter law, pointing to the Sixth Circuit's musings in *Holland v. Rivard*, 800 F.3d 224, 235–36 (6th Cir. 2015), regarding the meaning of the Supreme Court's decision in *Harrington v. Richter*, 562 U.S. 86 (2011).  The Supreme Court, however, subsequently clarified in *Wilson v. Sellers*—a decision that the State acknowledges with a "*but see*" cite—that where the state court adjudicated the petitioner's claim in a reasoned decision, the federal habeas court must "train its attention on the particular reasons . . . why [the] state court[ ] rejected [the] state prisoner's federal claim[.]"  138 S. Ct. 1188, 1191–92 (2018) (internal quotation marks omitted); *see also id.* at 1195 ("Had we intended *Richter*'s 'could have supported' framework to apply even where there is a reasoned decision by a lower state court, our opinion in *Premo* would have looked very different.").

With respect to the merits of Pouncy's claim, the State's responses are equally unconvincing.  The State first argues that "[t]here is no indication . . . that authorities subpoenaed cell phone records directly from either Verizon or Sprint prior to—or

84996944_2

during—the Brady/Sandstrom carjacking trial."  State Resp. Br., ECF No. 321, PageID.12612–12613.  The record evidence clearly shows otherwise.  The habeas record includes law enforcement's October 10, 2005 subpoena to Verizon and Verizon's October 17, 2005 subpoena response.  *See* ECF No. 8-5, PageID.357–361. The prosecution also put a "Verizon Wireless rep" on its January 6, 2006 witness list, ECF No. 211-3, PageID.10294, making it even more preposterous for the State now to claim that the prosecution did not have the Verizon records in its possession at the time of trial.  Indeed, earlier in this habeas proceeding the State seemed to acknowledge that the prosecution possessed the Verizon phone records at the time of Pouncy's trial and failed to disclose them.  *See* ECF No. 73, PageID.6788–6789 (Mr. Pallas stating, "I don't know that I could really serious[ly] dispute [the suppression prong of Pouncy's *Brady* claim]").

To the extent the State is claiming the prosecution team was subjectively unaware of the *import* of the Verizon records, this is irrelevant for *Brady* purposes. The Supreme Court has made clear that a *Brady* violation occurs even if the prosecution team's failure to disclose favorable information was entirely "inadvertent."[11]  *Strickler v. Green*, 527 U.S. 263, 288 (1999) (holding that "an

---

[11] Furthermore, insofar as the State argues that to establish a *Napue* violation Pouncy is required to show the Mr. Larobardiere knew that Detective Gagliardi's testimony was false, the State is incorrect.  If Detective Gagliardi knowingly perjured himself, that is sufficient to satisfy *Napue*, even if Mr. Larabardiere was entirely unaware that Detective Gagliardi was not testifying honestly.  *See, e.g., Boyd v. French*, 147 F.3d

inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment"); *see also Moldowan v. City of Warren*, 578 F.3d 351, 384 (6th Cir. 2009) (holding that *Brady* turns on "the nature of the evidence, not the state of mind of the state actor").

The State next argues that the phone records are neither favorable nor material. On this point, the State does not even try to defend the trial court's illogical assertion that whether someone other than Pouncy perpetrated the Haynes carjacking was not relevant to whether Pouncy perpetrated the Brady/Sandstrom carjackings. Instead, the State takes a completely different tack. While implicitly acknowledging that Quillie Strong was the account holder for the phone number at issue, the State contends that "Pouncy's very own paperwork ties him to the supposedly suppressed cell phone number (810) 836-5074 . . . ." State Resp. Br., ECF No. 321, PageID.12616. This, the State argues, makes the phone records not favorable to Pouncy's mistaken identity defense. The State is wrong.

The paperwork to which the State cites is a Pre-Sentence Investigation Report (the "PSIR") that Agent Jeffrey Lowe of the Genesee County Probation Department prepared on March 16, 2006, more than a month after the conclusion of Pouncy's trial. The State does not provide any of the necessary foundation to admit this

---

319, 329–30 (4th Cir. 1998) ("[K]nowingly false or misleading testimony by a law enforcement witness is imputed to the prosecutor.").

paperwork into the habeas proceeding's evidentiary record.[12]  The Court should therefore refuse to consider the PSIR for any purpose.  The prosecution did not claim during trial that it had independent, admissible evidence linking Pouncy to the (810) 836-5074 number, nor did the State make such an argument during the state court post-conviction proceedings.  Notably, contemporaneous police reports that the State has submitted in this habeas proceeding list a different phone number for Pouncy.  *See* ECF No. 203-6, PageID.10053 (listing (810) 618-0871 as Pouncy's phone number).

In any event, the State's reliance on the PSIR completely elides the actual argument that we made in our opening brief, which is that the phone records are exculpatory because they could have been used to connect the perpetrator's phone calls *to somebody other than Pouncy*.  To satisfy the materiality standards under either *Brady* (suppression of the records) or *Napue* (perjured testimony by Detective Gagliardi regarding the traceability of the phone calls), Pouncy does not need to disprove any and all possible connections between him and the phone number at issue.  Nor does he need to prove conclusively that someone other than him used the

---

[12] The PSIR presents a classic double hearsay problem.  By way of example, if the PSIR stated that Pouncy is seven feet tall, the State could not submit the PSIR, without any additional foundation, as evidence that Pouncy in fact is seven feet tall.  This is essentially what the State is seeking to accomplish with respect to the PSIR's listing of Pouncy's supposed "last known" telephone number.

phone to place the calls to the victims. Nor does he need to demonstrate that some particular person perpetrated the carjackings at issue. Nor does he need to convince this Court that a reasonable jury apprised of the phone records information definitely would have acquitted him. Pouncy needs only to show a reasonable probability (which is less than a preponderance standard) that, if the jury had learned that the phone used by the perpetrator of the Haynes carjacking could be connected to a man named Quillie Strong, the jury would not have convicted him.

Pouncy clears that bar with ease. Had the jury learned that the Mr. Strong was the account holder for the phone that the perpetrator used in the Haynes carjacking, the prosecution would have been constrained to argue that (1) Mr. Strong was not the perpetrator, *and* (2) Mr. Strong at some point had loaned the phone to Pouncy, *and* (3) Mr. Strong had not also loaned the phone to somebody else during the relevant time period who might be the perpetrator. In short, the phone records evidence would have put the prosecution in a box with only messy escape routes. That is the stuff of which acquittals are made.

### B. The Prosecution Unconstitutionally Failed to Correct Grimes's False Testimony, or at Least Suppressed *Giglio* Evidence Demonstrating Grimes's False Testimony.

The State acknowledges that Wayne Grimes lied to the jury when he said that his arrest for the October carjackings was the first time he had been arrested. In addition, the record is now clear that Grimes's prior arrest history was expressly

documented in a PSIR that the probation department prepared prior to the conclusion of Grimes's trial testimony.

The State, however, says that "Pouncy has nonetheless failed to demonstrate that the prosecutor had the PSIR at the time of Grimes's testimony in Pouncy's trial, saw the reference to Grimes's prior arrest, and realized that it contradicted Grimes's testimony at trial." State Resp. Br., ECF No. 321, PageID.12621. The State ignores, among other things, that the trial court specifically *instructed* the prosecutor on January 27, 2006 to turn over any prior arrest information for Grimes. *See* ECF No. 8-11, PageID.1289–1290. But even more importantly, Pouncy does not need to show the prosecutor's actual knowledge or appreciation of the PSIR's content to establish a *Giglio* violation. To establish a *Giglio* violation, it is sufficient for Pouncy to establish that the PSIR was in the possession of the Mr. Larobardiere's office at the time of Grimes's testimony. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) (holding that the "prosecutor's office is an entity" for *Giglio* purposes, and that "[t]o the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it"). The State cannot avoid *Giglio* by claiming that Mr. Larobardiere, though able to review the PSIR if he wished, was subjectively unaware or subjectively did not appreciate that the information in Grimes's PSIR was impeaching of Grimes's

trial testimony. *See, e.g.*, *Giglio*, 405 U.S. at 154 (holding that "whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor"). Because of its potential to contain *Brady* and *Giglio* information, a star cooperating witness's PSIR is precisely the type of thing that any prosecutor ought to seek out and review before putting the witness on the stand. Not doing so is a reckless disregard for the prosecutor's constitutional obligations under *Giglio* and *Brady*. If the prosecutor chooses not to review or turn over the PSIR, the prosecutor is playing with fire and assumes the risk that the witness's PSIR contains *Giglio* or *Brady* information to which the defendant was constitutionally entitled. If a prosecutor could avoid his *Giglio* and *Brady* obligations simply by choosing not to review a file that he knows exists, is available to him, and may contain exculpatory or impeachment information, *Giglio* and *Brady* would provide completely hollow protections.

The State's argument on the issue of materiality is a complete strawman. The reason that Grimes's City of Clio arrest was material impeachment evidence is not because the underlying criminal conduct was serious. It is because the City of Clio arrest reveals that Grimes, when confronted with the inconsistent statements that he had made to the police, was willing to tell a boldfaced lie to the jury under oath. The State argues that Grimes just got a minor detail wrong, which is another way of saying that Grimes simply told a white lie that he did not really need to tell. But a

31

lie is a lie is a lie. Honest witnesses do not lie on the stand—about *anything*. Indeed, a witness who is willing to lie under oath about a small thing is precisely the type of witness who is willing to lie about a big thing too. This is particularly true where, as here, the witness is a cooperator who is seeking to curry favor with the prosecutors in order to obtain a reduced sentence. A reasonable juror, knowing that Grimes had just lied on the stand—in order to explain away a lie he previously told to police, no less—could thus decide to disregard *everything* Grimes said on the witness stand, completely nullifying Grimes as a witness.

The State says that the victim witnesses' identifications of Pouncy as the perpetrator render any *Giglio* violation harmless. The State's argument simply ignores the various reasons why, without Grimes's testimony as a backstop, there is a reasonable probability that a jury might have found reasonable doubt notwithstanding the testimony of the victim witnesses. The victim witnesses' identifications were all cross racial, and they were all potentially influenced by Detective Gagliardi's use of highly suggestive photo arrays. Moreover, two of the victim witnesses picked someone *other than Pouncy* when shown photo arrays in court, *see Pouncy*, 846 F. 3d at 154; another failed to identify anybody from the photo array he was shown, *see* ECF No. 8-8, PageID.801; and another had told the police that it was "hard" for him to "tell black people apart from one another," ECF No. 8-11, PageID.1308. The reasons to be skeptical of the victim witnesses'

identifications is, of course, the very reason the prosecution felt compelled to call Grimes as a witness at all.  And it is the reason why the prosecutor repeatedly emphasized Grimes's testimony and vouched for Grimes's credibility and honestly during his closing and rebuttal arguments.

### C.  The Court Can Consider the Joyce Photo Array Suppression.

With respect to the suppression of Willie Joyce's exculpatory identification of someone other than Pouncy as the perpetrator, the State fails to respond to Pouncy's argument that, even *assuming* that he is required to add the Joyce suppression to his habeas petition in order to be granted relief for that constitutional violation, the statute of limitations may be equitably tolled beginning from the date that Pouncy put the State on notice of the suppression, which was only a few months after Pouncy learned of the suppression.  Instead, the State simply argues that the Joyce suppression is not pled in Pouncy's current petition and does not relate back to the *Brady* violations contained in that petition.

As stated in our opening brief, Pouncy learned of the Joyce suppression in February 2018 and brought the issue to the attention of the Court and the State through a formal court filing approximately a month later.  *See* ECF No. 182.  Less than two months after that, the Court ordered that an evidentiary hearing take place. *See* ECF No. 188.  The evidentiary hearing took place three weeks later.  *See* ECF No. 190.  Pouncy presented Mr. Joyce as a witness at that evidentiary hearing, and

the State clearly was aware that Pouncy was seeking to establish that the prosecution violated *Brady* by suppressing the fact that police had presented Mr. Joyce with a photo array and he had picked someone other than Pouncy as the perpetrator.  That was clearly sufficient to put the State on notice that Pouncy was alleging and seeking habeas relief based on this newly discovered *Brady* violation.  To the extent the Court believes, however, that Pouncy also needed to go through the formality of amending his habeas petition to add the Joyce suppression claim, Pouncy cannot be held responsible for his counsel's understandable oversight.  The Court may therefore apply the principle of equitable tolling and allow Pouncy to file a formal amendment now.  *See Holland v. Florida*, 560 U.S. 631, 650–52 (2010) (holding that equitable tolling in the habeas context is not subject to "rigid rules" and that district courts may "exercise judgment . . . with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case").

The State argues in the alternative that the Joyce suppression claim is unexhausted, suggesting that the Court should not grant relief on the Joyce suppression claim without first providing the state courts the opportunity to adjudicate the claim on the merits.  The State does not explain, however, how Pouncy could possibly bring the Joyce suppression claim now in state court, given Michigan's rules regarding successive post-conviction petitions.  *See, e.g., Coleman*

34

*v. Thompson*, 501 U.S. 722, 732 (1991) (holding that a petitioner has satisfied the exhaustion requirement where, although he did not bring the claim in state court, there are no longer any state court remedies available to him). Moreover, although the Supreme Court's decision in *Kyles* dictates that the suppression of the Joyce photo array information must be considered collectively with the prosecution's suppression of the Verizon phone records and Grimes's arrest record information, the state courts already concluded (wrongly) that neither the Verizon phone records nor Grimes's arrest history are favorable information. It would be nonsensical for this Court to force Pouncy back to state court to litigate the Joyce suppression as a singular *Brady* violation, only to then return to this Court to have the prosecution's multiple Fifth Amendment violations considered collectively as *Kyles* requires.

With respect to the merits of the Joyce suppression claim, the State's argument is simply that the Court should disbelieve *everything* that Mr. Joyce swore to in his affidavit and testified to on the witness stand—including even that police showed him a photo array at all. But to disbelieve all of Joyce's sworn statements would require the Court to believe either that (1) the police never showed Mr. Joyce a photo array at all, even though the police showed a photo array to every other eyewitness; or (2) Mr. Joyce was shown a photo array and he picked Pouncy, and yet the police's files lack any evidence that this occurred and the prosecution decided not to call Mr. Joyce as a witness. These alternatives seem far too incredible to be true. Tellingly,

despite having every opportunity to do so, the State fails to submit an affidavit from Detective Gagliardi attesting under penalty of perjury to either of these alternatives.

The State also insinuates that, to the extent Mr. Joyce recalls picking Jakawa McGruder from the photo array, Mr. Joyce's testimony is not favorable to Pouncy because McGruder could not possibly have committed the offense. This argument misses the point entirely. To be acquitted at trial, Pouncy did not have to prove that McGruder was the perpetrator; Pouncy nearly needed to convince the jury that there was reasonable doubt that *Pouncy was the perpetrator*. So long as Mr. Joyce picked *someone other than Pouncy* from the photo array (which he did), this is exculpatory. For all that matters, Mr. Joyce could have identified Oscar-winning actor Denzel Washington as the perpetrator and this would have been core *Brady* information. *See, e.g.*, *Hart v. Mannina*, 798 F.3d 578, 588 n.1 (7th cir. 2015) (holding that "any time a witness is presented with a photo array . . . and then fails to identify [the defendant], . . . [the defendant] will be entitled under *Brady* . . . to know about the non-identification").

## V.   Pouncy Is Entitled to Relief on His *Cronic* Claim.

The State argues that Pouncy's *Cronic* claim is procedurally defaulted as a result of Pouncy failure to exhaust all state court remedies. This State, however, long ago waived this affirmative defense. The State waived its failure to exhaust argument in its initial response to Pouncy's habeas petition by stating "[t]he State is

not arguing that any of Pouncy's habeas claims are barred by failure to exhaust a claim for which a state court remedy exists." ECF No.7 at 9, PageID.46. In a more recent filing—Respondent's Response to Petitioner Omar Pouncy's Notice (ECF No. 287) and Supplemental Notice (ECF No. 289)—the State conceded "that the claims set forth in Pouncy's original Notice, which included the *Cronic* claim, are not subject to the affirmative defense of procedural default." ECF No. 290 at 2, PageID.12218. The State cannot now suddenly assert a procedural default defense. *See, e.g.*, *Getsy v. Mitchell,* 495 F.3d 295, 317 (6th Cir. 2007) (finding that procedural default is waived by failing to assert it).

The Supreme Court has described the pretrial period as "perhaps the most critical period of the proceedings . . . that is to say, from the time of [a defendant's] arraignment until the beginning of their trial . . . consultation, thorough-going investigation and preparation [are] vitally important." *Powell v. Alabama*, 287 U.S. 45, 57 (1932). The Sixth Circuit has also characterized the pretrial period as a "critical period because it encompasses counsel's constitutionally imposed duty to investigate the case." *Mitchell v. Mason*, 325 F.3d 732, 743 (6th Cir. 2003) (*internal quotation marks omitted*). Court-appointed counsel's failure in the pretrial period was complete—and the *Cronic* presumption of prejudice applies—because Court-appointed counsel entirely failed to subject the prosecution's case to meaningful adversarial testing throughout the critical, pretrial stage. Mr. Breczinski admitted to

37

the trial court, and then swore in an affidavit submitted to this Court, that he did not pre-trial investigatory work of his own. Whatever work Mr. Breczinski's private investigator might have done, the investigator's work product (which itself was patently inadequate, for the reasons discussed in our opening brief) simply vanished into a black hole. Mr. Breczinski admitted that he had "no details to say whether I'm ready for trial" because he did not yet have any report from his investigator and had not conducted any investigation himself. ECF No. 8-7 at 4, PageID.459:6–7. Where a lawyer delegates to an investigator all of the work at a critical stage of the proceeding and then does not even receive the investigator's work product, the lawyer has done exactly *nothing* to represent his client at the critical pre-trial stage. As the saying goes, if a tree falls in a forest and nobody is there to hear it, it does not really make any sound.

This Court previously concluded that Court-appointed counsel failed in his duty to conduct pretrial investigation, finding that "there can be no serious dispute on this record that [Court-appointed counsel] was entirely unprepared for trial." *Pouncy*, 165 F. Supp. 3d at 628. The Court has pointed to "defense counsel's objective admissions that he (1) did not have the time or resources to conduct his own investigation into Petitioner's primary defenses (of alibi and mistaken identity); (2) hired an investigator to conduct the investigation into the defenses; and (3) did not have the investigator's final report on the day of trial. No competent attorney

could have been prepared under these circumstances—and defense counsel plainly was not." *Pouncy*, 168 F. Supp. 3d at 961. The Court should reject out of hand the State's continued efforts to applaud Mr. Breczinski's pre-trial preparations and readiness for trial. As this Court has previously stated, "nothing about [Court-appointed counsel's] performance suggested in any way . . . that he was ready to go." ECF No. 73, PageID.6721:12–14.

As noted in our opening brief, the Sixth Circuit has applied the *Cronic* presumption of prejudice in cases similar to Pouncy's, where defense counsel failed to investigate their client's defense. *See Mitchell,* 325 F.3d at 749 (Sixth Circuit granting *Cronic* presumption in AEDPA case where Petitioner's counsel's failed to consult with Petitioner and perform pretrial investigation); *id.* at 744 (finding that *Cronic* "guarantees more than a pro forma encounter between the accused and his counsel"). For example, in *Phillips v. White*, 851 F.3d 567 (6th Cir. 2017), the Sixth Circuit granted the petitioner's *Cronic* claim where defense counsel "neglected to conduct any mitigation investigation [or] . . . to mount any defense . . . [,] made no opening statement, called no witnesses, and presented no evidence—mitigating or otherwise," *Id.* at 578–79. The Court held that the *Cronic* presumption applied because counsel's "performance amounted to nonperformance." *Id.* at 581.

As in *Phillips*, Mr. Breczinski's pre-trial performance amounted to non-performance. Court-appointed counsel failed to investigate any witnesses, failed to

84996944_2

file or oppose any motions and pleadings, and failed to meaningfully consult with Pouncy prior to trial.  His failure continued throughout the pre-trial period, without any point of redemption.  Court-appointed counsel was simply absent in his representation of Pouncy prior to trial.

The State relies on *Wright v. Van Patten,* 552 U.S. 120, 125 (2008), but *Wright* is inapposite.  In *Wright*, the question was whether the Supreme Court's precedents clearly establish "that counsel's participation [in a hearing] by speakerphone should be treated as a complete denial of counsel, on par with total absence." *Id.* (internal quotation marks omitted).  That does not remotely resemble the question that Pouncy's *Cronic* claim raises.  In Pouncy's case, the question presented to this Court is whether, on *de novo* review, trial counsel constructively abandoned Pouncy during the pre-trial phase where counsel delegated all pre-trial factual investigation to a private investigator but then failed to direct, monitor, or follow up with the investigator prior to trial, such that counsel had no knowledge of what leads the investigator pursued or did not pursue or what the investigator found or did not find.

## CONCLUSION

For the foregoing reasons, and the reasons stated in our opening brief, Pouncy's habeas petition should be granted, and the Court should order the state to release Pouncy from custody immediately.

84996944_2

Respectfully submitted,

/s/ Aaron M. Katz

Aaron M. Katz
David Khrakovsky
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
Telephone:  (617) 951-7000
Fax:  (617) 951-7050
Aaron.Katz@ropesgray.com

David L. Moffitt (P30716)
30800 Telegraph Rd., Ste. 1705
Bingham Farms, MI 48025
Telephone: (248) 644-0880
dlmoffittassoc@ameritech.net

July 20, 2020

84996944_2

## CERTIFICATE OF SERVICE

I, Aaron M. Katz, hereby certify that on July 20, 2020, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Linus Banghart-Linn
Assistant Attorney General
Attorney for Respondent
Criminal Appellate Division
P.O. Box 30217
Lansing, MI 48909

Respectfully submitted,

/s/ Aaron M. Katz
Aaron M. Katz
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
Telephone:  (617) 951-7000
Fax:  (617) 951-7050
Aaron.Katz@ropesgray.com

84996944_2