# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**OMAR RASHAD POUNCY**,

     Petitioner,                             Case No. 2:13-cv-14695
                                               Hon. Matthew F. Leitman

v.

**CARMEN D. PALMER**,

     Respondent.

_____/

# PETITIONER
# OMAR RASHAD POUNCY'S
# POST-STATUS CONFERENCE BRIEF

## INTRODUCTION

On August 20, 2020, this Court convened a status conference that involved a discussion of several of Petitioner Omar Rashad Pouncy's ("Petitioner") substantive constitutional claims. Specifically, this Court raised questions regarding Petitioner's: (1) public-trial claim ("*Presley* claim"); (2) invalid waiver of counsel claim ("*Faretta* claim"); and (3) prosecutorial suppression of favorable evidence claim ("*Brady* claim"). This post-status conference brief is dedicated to answering this Court's questions regarding the aforementioned claims.

## SUMMARY OF ARGUMENT

The *Presley* claim must be reviewed *de novo* because the last reasoned decision, *i.e.,* the 2010 Motion for Relief from Judgement decision regarding the *Presley* claim resolved the claim on retroactivity grounds, which is a procedurally based decision, not a merits-based decision. This procedurally based decision is actually the *only* reasoned decision from state court that addressed the *Presley* claim. Therefore, the 2010 Motion for Relief from Judgment decision controls, rather than the unexplained (merit based) 2008 Direct Appeal decision. Since the last reasoned decision rule is a bright-line principle that has no exceptions, a lower court's decision—if it is the last reasoned decision—strips an earlier superior court's decision of its preclusive effect. Neither the Supreme Court or the Sixth Circuit have ever held that the last reasoned decision rule only applies when a

1

superior court reviews an inferior court's decision.  Also, counsel for Respondent has already agreed—in another habeas action before this Court—that even if a habeas petitioner raises a claim in the Michigan Court of Appeals on direct review and subsequently re-raises the same claim in the state trial court on collateral review: "In [*Barton v. Warden,* 786 F.3d 450 (6th Cir. 2015)], the Sixth Circuit held that it is the last reasoned decision—***and only the last reasoned decision on a federal claim***—that determines the appropriate standard of review on habeas." (*See Countryman v. Burton,* No. 2:17-cv-11047, ECF #32, Pg. ID 1414-15 (E.D. Mich. Apr. 10, 2020) (emphasis added).

Even if this Court refuses to strictly enforce the last reasoned decision rule and focus on the unexplained merit based 2008 Direct Appeal decision, counsel for Respondent's admission that *Cole v. Georgia,* 467 U.S. 39 (1984) constitutes a "ruling" from the Supreme Court, means that the 2008 Direct Appeal decision was contrary to *Cole* and the *Presley* claim still must be reviewed *de novo.*  To admit that *Cole* constitutes a "ruling" is to admit that *Cole* constitutes a "holding" and this Court is bound by Supreme Court "rulings."  Supreme Court rulings are what qualify as clearly established Supreme Court precedents.  If this Court is bound by Sixth Circuit rulings, *see In re Ford Motor Co. Speed Control Deactivation Switch Prods. Liab. Litig.*, 664 F.Supp.2d 752, 761 (E.D. Mich. 2009) (citations omitted) ("A District Court is bound by the ***rulings*** of the Circuit Court in which it sits.")

(emphasis added), then without question this Court is bound by Supreme Court rulings.  Since *Cole* is materially indistinguishable from the facts surrounding Petitioner's *Presley* claim—and counsel for Respondent concedes that *Cole* qualifies as a "ruling," *i.e.*, clearly established Supreme Court precedent—the 2008 Direct Appeal decision is contrary to Supreme Court precedent.

Regarding Petitioner's *Faretta* claim, while this Court may review the whole record, this Court is limited to the record that was developed in state court regarding this action (and only this action), ***before the initial waiver of counsel***. The arraignment proceeding from a completely separate prosecution is completely off-the-table in the case *sub judice*.  Simply because the state court consolidated transcripts from two separate prosecutions, and the State filed that consolidated transcript with its Rule 5 materials, does not make the transactions from the separate prosecution a part of the record in this action.  If what occurred during the separate prosecution affects the proceedings in this action, then the convictions here must be vacated as a result of being tainted by the *Cronic* violation that caused the convictions from the separate proceedings to have been vacated. *Cronic* violations are structural errors and structural errors render all related proceedings void.  Even more significant is the fact that the State has never attempted to rely on the proceeding from the separate prosecution in an effort to salvage the constitutionally defective *Faretta* waiver. Moreover, although

3

Petitioner indicated—in a separate prosecution—that he understood that he was facing five offenses, some of which carried only a 5 year maximum penalty, this cannot serve as a basis to infer from the **silent** record from the proceedings in the case *sub judice* where Petitioner understood that he was facing 11 offenses (more than twice as many) some of which carried a 10 year maximum penalty and a mandatory minimum prison sentence range of 225 months to 562 months.

Petitioner respectfully submits the *Brady* claim that the inquiry does not contemplate what the prosecution's possible counteractions would have been had the prosecution not suppressed the *Brady* material and Petitioner attempted to use the evidence at trial in his defense.  Nevertheless, Petitioner answers this Court's question.  If the prosecution fulfilled its *Brady* obligation and revealed that the phone records proved that the calls from the perpetrator to the victims were traced to a cell phone subscribed  to Quillie B. Strong (and not Petitioner) and Petitioner in turn introduced this evidence in his defense, the prosecution's potential counter to Petitioner's defense by calling Mr. Strong to establish that he activated the phone for Jacob Joe Woods (in an attempt to prove that Petitioner was Jacob Joe Woods), the prosecution would still meet a dead end.

The prosecution tactic would fail because while Mr. Strong declared in his affidavit that he activated the phone for Jacob Joe Woods, he expressly declared (after reviewing Petitioner's photograph) that Petitioner "is **not** the person known

to [him] as Jacob Joe Woods." (*See* 1st Affidavit of Quillie B. Strong, ECF #9-3, Pg. ID 5140) (emphasis added).  If anything, the prosecution would have avoided calling Mr. Strong (like they avoided calling Willie McKinley Joyce) because Mr. Joyce would have testified that Petitioner was ***not*** Jacob Joe Woods. Instead Mr. Strong would have identified the same person Mr. Joyce identified (in the suppressed lineup records) and the same person the prosecution's own witness— Joseph Davis—identified as Jacob Joe Woods, *see Pouncy v. Palmer,* 846 F.3d 144, 154 (6th Cir. 2017) ("When given a copy of a photographic lineup and asked which individual [he] had previously identified as the sham buyer, [] Joseph Davis . . . failed to pick out Pouncy's photo. . . . Joseph Davis pointed to a lineup photo of a man named Jaakawa McGruder.").

Mr. Strong also pointed to a photograph of McGruder as the individual whom he knew as Jacob Joe Woods.  (*See* 2nd Affidavit of Quillie B. Strong, ECF #9-3, Pg. ID 5143).  In other words, the prosecution would have wanted to avoid calling Mr. Strong because his testimony would have been ***doubly*** exculpatory for Petitioner.  Not only would Mr. Strong have declared that Petitioner was not the individual whom he had the phone activated for or who he knew as Jacob Joe Woods, but Mr. Strong's testimony would have reinforced Petitioner's mistaken identification defense and added credence to the prosecution's witness's—Joseph

Davis—in-court identification of McGruder as Jacob Joe Woods. The prosecution would have wanted to stay away from Mr. Strong.

## I.

## THE SUPREME COURT'S LAST REASONED DECISION RULE ESTABLISHES A BRIGHT-LINE PRINCIPLE THAT HAS NO EXCEPTIONS AND MUST BE STRICTLY ENFORCED ON HABEAS REVIEW

As the Sixth Circuit has made clear on habeas review, the "'last *explained* state-court judgment' governs." *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 462 (6th Cir 2015) (*per curiam*) (quoting *Ylst v. Nunnemaker,* 501 U.S. 797, 805 (1991)) (emphasis in original). Since the last-reasoned-decision rule was developed by the Supreme Court in *Ylst*, it is necessary to first discuss that decision.

In *Ylst,* the petitioner ("Nunnemaker") raised a *Miranda* claim in **both** his direct appeal and in his collateral review petition. *See, Ylst,* 501 U.S. at 799-800. When Nunnemaker presented his *Miranda* claim on direct appeal, the California Court of Appeals issued a reasoned opinion affirming Nunnemaker's conviction, based on "the state procedural rule that an objection based upon a *Miranda* violation cannot be raised for the first time on appeal" as "[t]he sole basis for its rejection of [Nunnemaker's] *Miranda* claim." *Id.* at 799. After direct appeal, Nunnemaker re-raised his *Miranda* claim on collateral review by returning to the state trial court, *i.e.*, the California Superior Court, but that court, the California

6

Court of Appeals, and the California Supreme Court all denied relief in unexplained decisions. *Id.* at 800.

Nunnemaker argued that his *Miranda* claim was no longer procedurally defaulted because when he re-raised the claim during his collateral review process, the unexplained decisions "lifted the procedural bar arising from the [California Court of Appeals'] decision on direct review," *ibid*. The Supreme Court disagreed. The Supreme Court instructed federal courts to identify the last-reasoned-decision and defer to the basis (or bases) in the "last reasoned state-court opinion" that addressed the claim. *Id.* at 804.

What the Supreme Court did ***not*** say is just as important as what the Supreme Court did say. Although Nunnemaker argued (like Petitioner in the instant case is arguing) that the subsequent trial court's decision, *i.e.*, the decision of the California Superior Court on collateral review, essentially overruled the California Court of Appeals' earlier direct appeal decision, the Supreme Court did *not* say that a subsequent decision from an inferior court on collateral review cannot overrule an earlier decision from a superior court on direct appeal.[1] Instead, the Supreme Court held that the focus must be on the "last *explained* state-court

---

[1] In fact, the Supreme Court in *Ylst v. Nunnemaker*, 501 U.S. 797 (1991) specifically considered the subsequent inferior court's decision in determining which court issued the last reasoned decision. *Id.* at 805, 806. This clearly shows that had the subsequent inferior court issued the last reasoned decision, the Supreme Court would have deemed that decision as controlling consistent with the rule that the last reasoned decision controls.

judgement" as it is the only governing decision for federal purposes. *Id.* at 805 (emphasis in original). If the Supreme Court wanted to hold that a subsequent decision from an inferior court on collateral review cannot overrule an earlier decision from a superior court on direct appeal, the Supreme Court could have easily said so. The fact that the Supreme Court did not say that a reasoned decision from a subsequent inferior court on collateral review could not overrule an earlier decision from a superior court on direct appeal speaks volumes.

The only reason why Nunnemaker did not succeed with his argument that the subsequent decision from the inferior court on collateral review overruled the earlier decision from the superior court on direct appeal, is because the subsequent decision from the inferior court on collateral review was an unexplained decision and therefore was ***not*** the "last reasoned state-court opinion" that addressed the *Miranda* claim. *Id.* at 804. The only reason why the Supreme Court held that the California Court of Appeals' decision from direct review controlled was because it was the ***only*** and therefore last reasoned decision regarding the *Miranda* claim. Assuming that the Supreme Court says what it means and means what it says— which Petitioner has faith that it does[2]—when it held that the focus must be only on the "last *explained* state-court judgment" *Ylst,* 501 U.S. 805 (emphasis in

---

[2] *See Mathis v. United States,* 136 S.Ct. 2243, 2254 (2016) ("[A] good rule of thumb for reading our decisions is that what they say and what they mean are one and the same. . . .")

original), had the California Superior Court on collateral review indeed been the last state court to issue a reasoned decision on Nunnemaker's *Miranda* claim, then the California Superior Court's collateral review decision would have overruled the prior California Court of Appeals' decision from direct appeal.

The Supreme Court did not say that the last-reasoned-decision rule only applied to higher courts' decisions on direct appeal. The last-reasoned-decision rule came with *no* exceptions. The last-reasoned-decision rule does not discriminate between which state court provided the "last *explained* state-court judgment." *Ibid* (emphasis in original). Neither does the last-reasoned-decision rule depend on whether a prior decision was substantively or procedurally based ***or*** substantively ***and*** procedurally based. The only focus is whether the "last *explained* state-court judgement" is procedurally or substantively based. The Supreme Court has "affirmed this approach time and again." *Wilson v. Sellers,* 138 S.Ct. 1188, 1192 (2018) ("We hold that the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide relevant rationale.").

A strict application of the last-reasoned-decision rule to Petitioner's *Presley* claim means that the 2010 Motion for Relief from Judgment decision is the only governing decision for federal habeas corpus purposes. Not only is it the "last *explained* state-court judgement" concerning the *Presley* claim, the 2010 Motion

for Relief from Judgment decision is the *only* reasoned decision regarding the *Presley* claim.  Although the 2008 Direct Appeal decision is certainly merit based, it was not an explained decision by any stretch of the imagination.  This means under the last-reasoned-decision rule, the unexplained 2008 Direct Appeal decision could not control over the explained 2010 Motion for Relief from Judgment decision in any event.

## A.

## THE 2008 DIRECT APPEAL DECISION IS AN *UNEXPLAINED* MERIT-BASED DECISION

In *Ylst,* the Supreme Court described an "unexplained" decision as one from which the court's rationale is "undiscoverable."  *Ylst,* 501 U.S. at 803; *see also id.* at 805 (holding that a state court decision was "unexplained" when, through "it was not utterly silent, neither was it informative with respect to the" reason for its conclusion).  In the case at bar, the 2008 Direct Appeal decision acknowledged that Petitioner was "argu[ing] that he was deprived of a fair trial . . ., by the trial court's deprivation of [his] right to have the public present during certain motion hearings and *voir dire*," (*see* 2008 Direct Appeal decision, ECF #9-4, Pg. ID 5376), and concluded that the claim did not "have merit."  (*See ibid*).  But there is no rationale explaining why Petitioner's public-trial claim supposedly lacked merit.  This exemplifies an unexplained decision.  Although it is an unexplained decision, it is still regarded as a merit-based decision for the purposes of AEDPA.  *See, e.g.,*

*Werth v. Bell,* 692 F.3d 486, 493 (6th Cir. 2012) (citing *Harrington v. Richter,* 131 S.Ct. 770, 785 (2011)) ("[W]e must presume that an unexplained summary order is an adjudication 'on the merits' for AEDPA purposes.").

In *Werth*—like in the instant case—the Michigan Court of Appeals indicated that the claims had no merit, *see id.* at 491 ("The Michigan Court of Appeals 'order[ed] that the delayed application for leave to appeal is DENIED for lack of merit in the grounds presented.'") (brackets in original), but provided no rationale as to why there was no merit to the claims presented.  The Sixth Circuit held that even unexplained decisions that state that a claim does not have merit qualify as decisions that receive AEDPA deference.  *Id.* at 493 ("We hold that AEDPA deference applies to Michigan orders like the orders in this case, absent some 'indication or [Michigan] procedural principle to the contrary.'") (quoting *Harrington,* 131 S.Ct. at 785).

Had the state-court litigation ended here and Petitioner then pursued habeas relief on his public-trial claim, then the ***unexplained*** 2008 Direct Appeals decision would have governed and ultimately would have been entitled to receive AEDPA deference.  But after the ***unexplained*** 2008 Direct Appeal decision was issued regarding Petitioner's public-trial claim, the Supreme Court issued *Presley v. Georgia,* 558 U.S. 209 (2010) which squarely addressed the Sixth Amendment right to a public trial during jury selection.  Since *Presley*: (1) undermined the

*unexplained* 2008 Direct Appeal decision; (2) Michigan allowed defendants to relitigate claims if there was a subsequent "retroactive change in the law [that] undermined the prior decision," Mich. Ct. R. 6.508(D)(2); and (3) *Presley* applied retroactively on collateral review (*see* Opinion & Order, ECF #58, Pg. ID 6404, n. 3) ("Because *Presley* did not announce a new rule, Pouncy may invoke that decision here."), Petitioner re-raised his public-trial claim on the basis that *Presley* applied retroactively.  The state court on collateral review entertained Petitioner's retroactivity argument.

## B.

## THE 2010 MOTION FOR RELIEF FROM JUDGEMENT DECISION IS THE *ONLY* (*FIRST* AND *LAST*) REASONED STATE-COURT DECISION REGARDING THE *PRESLEY* CLAIM

The state court on collateral review precisely specified the question it was entertaining: "**RETROACTIVE CHANGE IN LAW**[.]" (*See* 2010 Motion for Relief from Judgement Decision, ECF #8-37, Pg. ID 3164) (capitalization and bold in original).  The state court on collateral review acknowledged that Petitioner's argument that he was entitled to a new trial due to denial of his right to a public trial "was presented to the Michigan Court of Appeals (though admittedly before the Supreme Court's decision in *Presley*[.]") (*See ibid.*)  The state court on collateral review then acknowledged the collateral estoppel rule and the retroactive change in law exception of Mich. Ct. R. 6.508(D)(2). (*See ibid.*).  The state court

on collateral review then highlighted that Petitioner "contend[ed] that *Presley*, *supra*, established such a retroactive change in the law that undermined the prior decision." (*See ibid.*). Addressing Petitioner's retroactivity of *Presley* argument, the state court on collateral review concluded (albeit contrary to Supreme Court precedents) that Petitioner could not benefit from *Presley* because "[t]he highest Court gave no indication within *Presley* that it . . . was to be retroactive." (*See ibid.*).

Although the state court on collateral review rejected Petitioner's public-trial claim, like the state court on direct appeal, unlike the *unexplained* 2008 Direct Appeal decision, the 2010 Motion for Relief from Judgment decision offered an explanation for its decision to conclude that *Presley* did not apply retroactively. The 2010 Motion for Relief from Judgment decision, while correctly acknowledging that "*Presley* . . . relied heavily on [] prior precedent" (*see* 2010 Motion for Relief from Judgment Decision, ECF #8-37, Pg. ID 3169), it erroneously explained that Petitioner could not benefit from *Presley* retroactively because "[t]he [Supreme] Court gave no indication within *Presley* that it . . . was to be retroactive[.]" (*See ibid.*). This explanation for refusing to allow Petitioner to benefit from *Presley* on collateral review was plainly wrong. New decisions from the Supreme Court apply automatically retroactively on collateral review if they are dictated by prior precedent, without the Supreme Court ever having to declare

the decision retroactive. *See, e.g. Chaidez v. United States,* 568 U.S. 342, 347 (2013) ("Only when we apply a settled rule may a person avail herself of the decision on collateral review."); *Pelaez v. United States,* 27 F.3d 219, 220-21 (6th Cir. 1994) ("If prior opinions dictated the result, then the ruling was not new and could be applied retroactively."); *Johns v. Bowersox,* 203 F.3d 538, 544-45 (8th Cir. 2000) (citing *Yates v. Aiken*, 484 U.S. 211, 216-17 (1988) ("[S]tates must give retroactive effect to decisions that are not 'new law' but rather are dictated by precedent."); *Graham v. Hoke,* 946 F.2d 982, 991 (2d Cir. 1991) ("A Supreme Court decision that merely applies 'a well-established constitutional principle' to a new set of circumstances always is applied retroactively on collateral review.") (some internal quotation marks and citations omitted).  This is a point this Court emphasized at oral argument regarding this claim. (*See* Oral Argument Transcript, ECF #57, Pg. ID 6441-42).

The point is that while the 2010 Motion for Relief from Judgment decision rejected Petitioner's public-trial claim—unlike the *unexplained* 2008 Direct Appeal decision—an explanation (although erroneous) was provided.  To date, the 2010 Motion for Relief from Judgment decision is the ***first*** and ***last***-reasoned-decision regarding Petitioner's public-trial claim from any state court.  Ultimately, this means that the *unexplained* 2008 Direct Appeal decision that addressed the merits of the public-trial claim "***would have been stripped of any preclusive effect***

*under the last-reasoned-decision rule.*" *Barton,* 786 F.3d at 485 (emphasis added). This raises the question of whether an *explained* decision from a state trial court— if it is the last reasoned decision—controls over an *unexplained* state appellate court decision? A straightforward application of the last-reasoned-decision rule will result in an affirmative answer. If the state trial court issued the last-reasoned decision regarding a claim, then that decision governs for federal habeas corpus review purposes regardless of whether a state appellate court previously issued a decision regarding the claim. The last-reasoned-decision rule applies to *any* state-court decision which provides the "'last *explained* state-court judgment[,]'" *Barton,* 786 F.3d at 462 (quoting *Ylst,* 501 U.S. at 805) (emphasis in original), regarding a claim regardless of which state court issued the last-reasoned-decision.

The Sixth Circuit's decision in *Magnum Reign v. Gidley,* 929 F.3d 777 (6th Cir. 2019) also provides compelling reasons to conclude that the last-reasoned-decision issued by a state trial court controls for purposes of federal habeas corpus review exist when (like here) no state appellate court ever issues a reasoned decision regarding the particular claim. Before discussing *Magnum Reign,* it is necessary to expound further on *Barton*.

In *Barton,* the Sixth Circuit made clear that "[t]he last-reasoned-decision rule [] applies separately to each claim within a case." *Barton*, 786 F.3d at 463. The Sixth Circuit explained even if multiple state-courts addressed the claim, "we

must still defer to the last reasoned state-court *opinion*, rather than try to string together a series of state *opinions* piecemeal *for each claim*." *Ibid.* (emphasis in original and footnote omitted). This adds further instructions to only review the *explained* 2010 Motion for Relief from Judgment decision and not the *unexplained* 2008 Direct Appeals decision. As explained in *Barton*, "the Supreme Court made clear in *Ylst*, the core purpose of this rule is to improve 'administrability' and 'accuracy' amongst the lower federal courts." *Barton*, 786 F.3d at 463 (quoting *Ylst*, 501 U.S. at 803). If on federal habeas corpus review the court does not limit its review to the last-reasoned-decision from a state-court, the goal of improving "administrability" and "accuracy" is defeated. *See, ibid.* ("These objectives are contravened when a court attempts to combine various state-court decisions together for purposes of reviewing a single claim."). This is why the Sixth Circuit adopted the rule and made it clear that "'even when one state court adhered to federal law, if the last court to review the claim erred, the federal court should review the last decision in isolation and not in combination with decisions by other state courts.'" *Id.* at 464 (quoting *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir 2005)).

The holding that a state-court's last-reasoned-decision strips a prior decision addressing a claim of its preclusive effect is an *unqualified* rule, even if the last-reasoned-decision comes from a state trial court, rather than a state appellate court.

The last-reasoned-decision rule prohibits a court on federal habeas corpus review from bypassing a last-reasoned-decision from a state trial court to defer to an *unexplained* state appellate court's decision. Since the Supreme Court says what it means and means what it says, *see Mathis,* 136 S.Ct. at 2254, last-reasoned-decision means last-reasoned-decision notwithstanding which state court issued the last-reasoned-decision. It bears re-emphasizing that the Supreme Court and the Sixth Circuit have never held that the last-reasoned-decision rule only applies to state appellate courts' decisions and not state trial courts' decisions if a state appellate court ever addressed the claim. As explained, *infra*, the Sixth Circuit in *Magnum Reign* deemed the state trial court's last-reasoned-decision controlling notwithstanding the fact that the Michigan Court of Appeals also addressed the claim on the merits.

## C.

**THE SIXTH CIRCUIT'S DECISION IN *MAGNUM REIGN* ESTABLISHES THAT A LAST-REASONED-DECISION FROM A STATE TRIAL COURT CONTROLS OVER AN UNEXPLAINED MERIT BASED STATE APPEALLATE COURT DECISION**

In a *pre-Barton* and *pre-Magnum Reign* decision, this Court in *Davis v. Rapelje,* 33 F. Supp. 3d  849 (E.D. Mich., 2014), encountered the question of whether "the Michigan Court of Appeals' *unexplained* (but still 'on the merits')" decision controlled or whether "the Michigan trial court's *reasoned* (and also 'on the merits')" decision controlled.  *Id.* at 858 (emphasis in original).  The Court

opined that which decision governed "is less settled." *Ibid.* The Court ultimately avoided answering the question. *Ibid.* ("In this case, the Court need not, and does not, answer the question of which state-court opinion is entitled to AEDPA deference."). While Petitioner respectfully submits that *Ylst* clearly settled the question that only the "'last *explained* state-court judgment' govern[ed]." *Barton,* 786 F.3d at 462 (quoting *Ylst*, 501 U.S. at 805) (emphasis in original), even if it was "less settled" pre-*Barton*, the Sixth Circuit in *Barton* certainly settled which decision governed for federal habeas corpus review. The subsequent Sixth Circuit decision in *Magnum Reign* applied that settled rule when it deemed the last-reasoned-decision from the state trial court controlling over the unexplained merit-based state appellate court's decision.

In *Magnum Reign*, the petitioner "pled guilty to one count of armed robbery in Michigan state court." *Id.* at 779. At that time, the sentencing guidelines which controlled the minimum sentence were deemed to be mandatory. *Id.* at 780. ("It is true that, at an earlier point in the state proceedings, the sentencing court had imposed a minimum sentence based on state guidelines deemed mandatory.") Magnum Reign was sentenced based on a "minimum-sentence guidelines range [of] 108-180 months. This calculation was built in part upon judge-found facts, neither admitted by Magnum Reign nor found by a jury." *Id.* at 779. Magnum Reign received "a minimum sentence of 149 months, at the middle of the range."

18

*Ibid.* Reign moved to be resentenced and the state trial court "recalculated the guidelines ranges for his minimum sentence at 81-135 months, or roughly 6 ¾ to 11 ¼ years." Based on Magnum Reign's counsel's misstatement of the guidelines range "the court [resentenced] Magnum Reign [to] a minimum sentence of ten years, halfway between [the misstated guidelines range], instead of nine years, the actual middle of his range." *Ibid.*

After that resentencing, the Michigan Supreme Court decided *People v. Lockridge,* 498 Mich 358 (2015), which made Michigan's sentencing guidelines scheme "no longer binding on [] sentencing judge[s]." *Magnum Reign*, 929 F.3d at 779. In light of *Lockridge* and discovering that his counsel's misstatement of the guidelines range caused him not to receive a sentence in the middle of the guidelines range, Reign moved for a second resentencing. *Id.* at 779-80. The state trial court issued "a written order on March 2, 2016" "granting Magnum Reign's motion in part, based on the earlier misstatement by counsel, and lowering his sentence to nine years, [but] the sentencing court declined to resentence under *Lockridge*." In its decision, the state trial court *explained* "that it 'did not feel constrained by the then-mandatory nature of the guidelines. That is, the Court would have applied its same reasoning regardless of whether sentencing occurred before or after *Lockridge*. Accordingly, *Lockridge* does not require resentencing in this case.'" *Id.* at 780. ("Put differently, the sentencing court again decided on a

middle-of-the-guidelines sentence even though the guidelines were by then advisory but did so without another hearing.").

"Magnum Reign appealed his sentence to the Michigan Court of Appeals and the Michigan Supreme Court." *Ibid.* Unlike the trial court—that issued a reasoned decision addressing Reign's claim—the Michigan Court of Appeals and the Michigan Supreme Court "denied his appeal in summary orders." *Ibid.* As held in *Werth*, the Michigan Court of Appeals' *unexplained* order in *Magnum Reign*, while a summary order, it was indeed an on-the-merits decision for AEDPA purposes. *See Werth,* 692 F.3d at 493 ("[W]e must presume that an unexplained summary order is an adjudication 'on the merits' for AEDPA purposes.") (citing *Harrington,* 131 S.Ct. at 785). So at this point, while the Michigan Court of Appeals' decision constitutes an on-the-merits decision for the purposes of AEDPA, it was an *unexplained* on-the-merits decision—like the 2008 Direct Appeal decision in the case *sub judice*—and the state trial court's decision refusing to resentence Magnum Reign in light of *Lockridge* remains the first and last-reasoned decision—like the 2010 Motion for Relief from Judgment decision in this case—to address his claim.

With no success in state court, Reign turned to the federal judiciary where his case was eventually decided by the Sixth Circuit. Before addressing the merits, the Sixth Circuit observed that it first had to identify the governing state court

decision, which the Sixth Circuit correctly observed must be limited to the last reasoned state court decision. *See Magnum Reign,* 929 F.3d at 780 (citing *Ylst,* 501 U.S. at 803-805) ("In reviewing Magnum Reign's habeas appeal, we look to the last reasoned state court decision.").[3] Remaining faithful to the last-reasoned-decision rule, the Sixth Circuit disregarded the Michigan Court of Appeals' *unexplained* but merit-based decision and identified the state trial court's explained decision as the governing decision:

> "The last reasoned state court decision was the state sentencing court's order in which it imposed a minimum sentence within the guidelines range without holding another hearing."

*Id.* at 780.

The Sixth Circuit's decision in *Magnum Reign* in identifying the inferior state trial court's explained decision as the governing decision—under the last-reasoned-decision rule—rather than the superior state appellate court's *unexplained* merit based decision, proves that the 2010 Motion for Relief from Judgment decision controls in this case regarding Petitioner's *Presley* claim. *Magnum Reign* proves that last-reasoned-decision means last-reasoned-decision irrespective of whether the last-reasoned-decision was issued by a state trial court or state appellate court. The pertinent facts in the instant case are materially indistinguishable from the last-reasoned-decision related facts in *Magnum Reign.*

---

[3] This language was unqualified.

In the present case—like in *Magnum Reign*—the state trial court is the only (first and last) state-court to ever issue a reasoned decision on the constitutional claim in question. In the present case—like in *Magnum Reign*—the Michigan Court of Appeals issued a merit-based decision regarding the constitutional claim in question, but it was an *unexplained* decision. The only distinction between the present case and *Magnum Reign* is the fact that the last-reasoned-decision in *Magnum Reign* came *before* the *unexplained* merit based Michigan Court of Appeals' decision and the last-reasoned-decision in the case *sub judice* came after the unexplained merit based Michigan Court of Appeals' decision. However, this is a distinction without difference. Regardless of the sequence of the issuance of the last-reasoned-decision, the last-reasoned-decision always controls over an unexplained decision.

There are no principled reasons not to remain faithful to the last-reasoned-decision rule simply because the last-reasoned-decision was issued by a state trial court, rather than a state appellate court. In fact, *Ylst, Barton, Sellers,* and *Magnum Reign* all dictate that since the 2010 Motion for Relief from Judgement decision was the first and last-reasoned-decision to address Petitioner's public-trial claim it controls for federal habeas corpus purposes and "'[t]his decision stripped the [Michigan Court of Appeals] court's substantive determination of [Petitioner's public-trial] claim[] of preclusive effect.'" *Barton*, 786 F.3d at 463-64 (quoting

*Thomas v. Horn,* 570 F.3d 105, 115 (3rd Cir. 2009)).  And since the 2010 Motion for Relief from Judgment decision disposed of Petitioner's *Presley* claim on retroactivity grounds—which are procedurally based, *see Maslonka v. Hoffner,* 900 F.3d 269, 278 (6th Cir. 2018); *Burdine v. Johnson,* 262 F.3d 336, 377 n. 82 (5th Cir. 2001); *Jones v. Davis,* 806 F.3d 538, 544, 545   n. 1 (9th Cir. 2015) not substantively merit based—Petitioner's *Presley* claim must be reviewed de novo as it would be on direct appeal.  *See Stermer v. Warren,* 2020 U.S. App. LEXIS 15622, at *29-*30 (6th Cir. May 15, 2020) (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) (when "AEDPA deference no longer applies. . . . the petitioner's claim is reviewed *de novo* as it would be on direct appeal.").

Reviewed through "the more lenient *de novo* standard" *Sutton v. Carpenter,* 617 Fed. Appx. 439, 440 (6th Cir. 2015), this Court strongly indicated that Petitioner would have been granted habeas relief on his *Presley* claim.  (*See* Oral Argument Transcript, ECF #57, Pg. ID 6315-16).  That is to say, "the landscape has changed," as to the *Presley* claim "because AEDPA's deferential review no longer applies to this issue[.]"  *Ray v. Bauman,* 326 F. Supp. 3d  455, 459 (E.D. Mich. 2018).  To be more precise: "Absent the strictures of deferential review, [Petitioner's] claim for relief on this ground is undeniable."  *Id.* at 462.

## II.

**SINCE THE STATE CONFESSES THAT *COLE ET AL v. GEORGIA*—THE COMPANION CASE TO *WALLER v. GEORGIA*—CONSTITUTES A**

23

**"RULING" FROM THE SUPREME COURT, THE 2008 DIRECT APPEAL DECISION WAS "CONTRARY TO" *COLE* WHERE THE FACTS ARE MATERIALLY INDISTINGUISHABLE FROM THOSE HERE**

Even if the last-reasoned-decision rule is disregarded in this action and the Court instead focuses on the *unexplained* 2008 Direct Appeal decision which summarily disposed of Petitioner's public-trial claim on the merits, that decision decided Petitioner's "case differently than th[e Supreme] Court" decided *Cole*, which is a Supreme Court public trial "ruling" with a set of "materially indistinguishable facts[,]" *Williams v. Taylor,* 529 U.S. 362, 413 (2000), to the extent that the Supreme Court addressed and remedied an unobjected to public-trial claim. In *Waller v. Georgia*, 467 U.S. 39 (1984), the Supreme Court did ***not*** only address objected to public-trial claims. The Supreme Court also specifically addressed and ruled on an unobjected to public-trial claim because *Waller* was "[t]ogether with No. 83-322, *Cole et al v. Georgia,* also on certiorari to the same court." *Waller*, 467 U.S. at 39 (highlighting that the separate action of *Cole et al.* was being considered and decided). *Cole* was a separate action in the Supreme Court. *See Cole et al v. Georgia*, 464 U.S. 959 (1983) (*Cole et al v. Georgia,* was "consolidated" with *Waller v. Georgia*).

Due to the factual parallels between the case *sub judice* and *Cole,* at a prior oral argument, this Court asked counsel for Respondent "how can an objection be required in light of what the Supreme Court did in *Cole*'s companion case?" This

Court acknowledged that Cole "not only didn't object, he joined in the prosecution's motion to close the courtroom." This Court observed "if the rule is that an objection is required to affirmatively assert the right [to a public trial], as I question whether it is, then *Cole's (sic)* couldn't possibly have been entitled to remand, . . . Of course, *Cole's (sic)* loses because he didn't object." This Court then returned to its question posed to counsel for Respondent asking "[h]ow do you square what happened in *Cole's (sic)* with the idea that it is not clearly established that even absent an objection, a Court needs to make the findings before closing the courtroom[?]" (*See* Oral Argument Transcript, R. 57, Pg ID 6334-35). Counsel for Respondent proceeded to speak in generalities about Supreme Court "holdings" and "dicta." (*See id* at Pg ID 6335). The district court then asked counsel for Respondent "[i]sn't there a holding with respect to *Cole's* holding we vacate his conviction and we remand for further consideration? Isn't that a holding?" (*See ibid*). Counsel for Respondent quipped back saying that the Supreme Court's decision in *Cole et al* was a "***ruling***" but not a "***holding***." (*See ibid*.) ("MR. PALLAS: [Counsel for Respondent] No. I think that's a ruling, but I don't think it's a holding in terms of how you look at precedent.") (emphasis added). But the definition of a "***ruling***" (*see* Black's Law Dictionary (11th ed. 2019)) ("The outcome of a court's decision either on some point of law or on the case as a whole" (quoting Robert E. Keeton, Judging 67-68 (1990) ("'***a 'ruling' may have***

25

*force as precedent*, but ordinarily it has that force because the conclusion it expresses says (for example, 'objection sustained') depends upon and implicitly reiterates a 'rule'—a 'legal proposition of more general application . . .'")) (emphasis added) and a "***holding***" (*see* Black's Law Dictionary (11th ed. 2019)) ("A court's determination of a matter of law pivotal to its decision; a principal drawn from such a decision.")) is essentially the same. Despite counsel for Respondent's sophistry, he essentially conceded that the Supreme Court's decision in *Cole et al* is indeed precedent whether it is regarded as a "ruling" or a "holding."

*Cole et al*, is clearly established precedent. The United States Reporter, the official reporter for the Supreme Court, 28 U.S.C. § 411, treats *Cole et al* as an opinion of the Court. *Compare* 349 US LIII (1954) ("Cases reported before page 901 are those decided with opinions of the Court. Those reported on pages 901 *et seq.* are memorandum decisions and orders."), *with Waller/Cole et al*, 467 US at 39, 42 n. 2, 50 (addressing *Cole et al.*). Although during an exercise of semantic gymnastics, counsel for Respondent has nevertheless conceded that *Cole et al*, constitutes clearly established precedents when he admitted that *Cole et al* constitutes a "ruling." (*See* Oral Argument Transcript, R. 57, Pg ID 6335).

By the State's own admission, *Cole* is a "ruling" of the Supreme Court and this binding "ruling" proves that the 2008 Direct Appeal decision resulted in a decision contrary to *Cole.* While the Supreme Court addressed objections to public

trial claims regarding "petitioners Waller, Thompson, Eula Burke, and W.B. Burke," *Waller,* 467 U.S. at 42, n. 2, the Supreme Court also squarely addressed and remedied an unobjected to public trial claim in *Cole et al*. *Ibid.* In other words, the Supreme Court has indeed addressed the "specific question" *Lopez v Smith*, 135 SCt 1, 4 (2014) (emphasis added) of whether or not a trial court's closure of the courtroom to the public without making the *Waller* Inquiry and Required Findings is constitutionally offensive. Simply because the Supreme Court "consolidated" *Cole et al* with *Waller* does not make the Supreme Court's decision in *Cole et al* a "puzzle."

Here, the facts surrounding Petitioner's public trial claim are materially indistinguishable from the facts that were present in the Supreme Court decision of *Cole et al*, that resulted in reversal. Here, like in *Cole et al*, the trial court closed the courtroom to the public without any identified overriding interest likely to be prejudiced. Here, like in *Cole et al*, the trial court closed the courtroom to the public without ensuring that the closure was no broader than necessary. Here, like in *Cole et al*, the trial court closed the courtroom to the public without considering any reasonable alternatives to the closure. Here, like in *Cole et al*, the trial court closed the courtroom to the public without making any findings adequate to support the closure. Here, like in *Cole et al,* Petitioner did not object to the closure

of the courtroom. And here, like in *Cole et al*, the state court did not enforce a procedural default against the public–trial claim for failing to object.

Consequently, even if the 2010 State Collateral Post-Conviction decision, *i.e.*, the last reasoned decision to address the public–trial claim and to dispose of it on procedural grounds rather than on the merits, was overlooked and this court is "to 'train its attention on the particular reasons'" *Wilson v Sellars*, 138 SCt 1188, 1191-92 (2018) (quoting *Hittson v Chatman*, 192 LEd2d 887, 887 (2015) (Ginsburg, J., concurring in denial of certiorari)) set forth in the earlier 2008 Direct Appeal decision, that decision must be deemed contrary to clearly established Supreme Court precedent. *See Pouncy*, 846 F.3d at 158 (quoting *Metrish*, 133 SCt at 1786 n. 2, which quotes *Williams*, 529 US at 412-13)) ("A state-court decision is 'contrary to' clearly established federal law . . . if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'") (brackets in original). This ultimately means that *de novo* review applies to Petitioner's public–trial claim. *See Johnson v Williams*, 568 US at 303 ("AEDPA permits *de novo* review in those rare cases when a state court decides a federal claim in a way that is 'contrary to' clearly established Supreme Court precedent") (citing *Panetti v Quarterman*, 551 US 930, 953 (2007)).

The 2008 Direct Appeal decision was an unreasonable application of Supreme Court precedent to the extent that the Supreme Court granted relief on a

public trial violation in *In re Oliver*, 333 US at 272. A failure to object did not stop the Supreme Court in *Gannett*, 443 US at 375. And the lack of an objection did not impede the Supreme Court from granting relief on a public trial claim in *Richmond Newspapers*, 448 US at 560.

Petitioner is entitled to habeas relief on his public–trial claim.[4]

### III.

**THE *FARETTA* INQUIRY MUST BE LIMITED TO THE RECORD OF PROCEEDINGS INVOLVING THIS CASE; NOT FROM PROCEEDINGS INVOLVING AN UNRELATED PROSECUTION**

It is true that this Court is allowed "to look at the whole record, not just the colloquy immediately before the signing of the waiver, to determine if it was knowing and intelligently entered." *King v. Bobby,* 433 F.3d 483, 492 (6th Cir. 2006) (citing *Faretta v. California,* 422 U.S. 806 (1975) and *Von Moltke v. Gillies,* 332 U.S. 708 (1948) (plurality)). But the "whole record" does not (and cannot) include the record of proceedings developed during an unrelated prosecution. The "whole record" must only include proceedings that involved this case, ***before the initial waiver of counsel***. This case ***only*** involves the record that was developed in

---

This case is nothing like the *Johnson v. Sherry*, 586 F.3d 439 (6th Cir. 2009). *Johnson v. Sherry* is not a public trial case. It is an ineffective assistance of counsel case that deals with a lawyer's failure to object to the denial of a public trial. Any discussion of a right to a public trial in *Johnson v. Sherry* is mere *dicta* and this Court is not bound to follow *dicta* even from a published opinion. *See, e.g.*, *Mattox v. Edelman*, 851 F.3d 583, 593 (6th Cir. 2017) ("[O]ne panel of [the Sixth Circuit] is not bound by *dicta* in a previously published panel opinion") (citations omitted).

state court regarding Genesee County Circuit Court Case No. 05-17154-FC ("Brady/Sandstrom case"). While Petitioner also faced a separate prosecution regarding Genesee County Circuit Court Case No. 05-17448-FC ("Haynes case"), anything that occurred during the course of the Haynes case is *not* a part of the "whole record" in the Brady/Sandstrom case.

Even the Michigan Court of Appeals when considering the *Faretta* waiver in the Brady/Sandstrom case and the *Faretta* waiver in the Haynes case **rejected** the prosecution's attempt to rely on proceedings from the Brady/Sandstrom case to salvage the invalid waiver in the Haynes case. (*See* 2008 Direct Appeal decision, ECF #9-4, Pg. ID 5380) ("We disagree with the prosecution's assertion that the trial court's compliance with MCR 6.005(D) in the *Brady* trial was sufficient to constitute compliance with MCR 6.005(D) in the Haynes trial."). Despite "the overlapping nature of the proceedings," (*see ibid.*), in the Brady/Sandstrom case and the Haynes case, the Michigan Court of Appeals held what occurred during the proceedings "***in the Brady trial can have no effect on [Petitioner's] choice of representation in the Haynes trial***." (*See id.* at Pg. ID 5381) (emphasis added). In refusing to conflate the records from the Brady/Sandstrom case and the Haynes case the Michigan Court of Appeals explained:

> "***The fact that a trial court follows procedure with a certain defendant in one trial does not alleviate the trial court's obligation to adhere to proper procedure during a different and independent proceeding***. A

> defendant's repeated presence before the court does not
> make him any less worthy of the court's adherence to
> proper procedure and constitutional safeguards. . . ."

(*See ibid.*) (emphasis added).

Applying these principles here means that the colloquy from the arraignment regarding the Haynes case cannot be used to salvage the clearly constitutionally defective *Faretta* waiver regarding the Brady/Sandstrom case. It is true that Petitioner appeared before Judge Hayman on January 9, 2006, for the arraignment in the Haynes case and a typical pre-trial proceeding in the Brady/Sandstrom case and the state court consolidated the transcript from both of these proceedings from these separate cases. (*See* Transcript of Proceedings, ECF #8-6, Pg. ID 445) (listing the case number for both the Brady/Sandstrom case "05-17154-FC" and the Hayne case "05-174[4]8-FC"). But the fact that the state court transcriber combined the transcripts from these two separate and independent proceedings— apparently for administrative purposes—does not make the record of the arraignment in the Haynes case a part of the official record in the Brady/Sandstrom case. In fact, the sequence of the events set forth in the consolidated transcript shows that while Judge Hayman called both cases on January 9, 2006 (*see id.* at Pg. ID 447) ("THE COURT: People of the State of Michigan versus Omar Rashad Pouncy, 05-174[4]8-FC and 05-17155-FC. . . ."), he dealt with the arraignment in

the Haynes case first.  (*See ibid.*) ("THE COURT: Now do I need to arraign him on this charge here, Mr. -- the 17448-FC case?").

After going through the arraignment in the Haynes case (*see id.* at Pg. ID 447-52), Judge Hayman then and (only then) proceeded to address the Brady/Sandstrom case.  (*See id.* at Pg. ID 452) ("THE COURT: All right.  I'll continue the bond as it's presently set on ***that*** case." – "And then we have a matter ***another*** matter.  It is up for pretrial and motion cutoff today?") (emphasis added). Despite the consolidated transcript, the first part of the transcript (*see id.* at Pg. ID 447-52) was totally dedicated to the Haynes case and the record related to the Brady/Sandstrom case did not start until the end of the consolidated transcript. (*See id.* at Pg. ID 452-54).   So while the January 9, 2006 transcript can be considered in assessing the validity of the *Faretta* claim in this case, only a *limited portion* of the transcript, *i.e.*, the last three (3) pages, can be considered because the portion of the transcript that deals with the Haynes case is not a part of the "whole record" in this case, *i.e.,* the Brady/Sandstrom case.

The "whole record" in the case *sub judice* ostensibly neglects to reflect that Judge Hayman ever fulfilled his "'serious and weighty responsibility . . . of determining whether there [was] an intelligent and competent waiver by the accused.'"  *Carnley v. Cochran,* 369 U.S. 506, 514-15 (1962) (quoting *Johnson v. Zerbst,* 304 U.S. 450, 464-65 (1938)).  The Supreme Court has made clear that the

responsibility only "is satisfied when the trial court informs the accused of ***the nature of the charges against him***, . . . and of the range of allowable punishments[.]" *Iowa v. Tovar,* 541 U.S. 77, 81 (2004) (emphasis added). *See also Glass v. Pineda,* 635 Fed. Appx. 207, 214 (6th Cir. 2015) (quoting *Von Moltke,* 332 U.S. at 724) (emphasizing that "[i]t is clearly established" that the record in the case "need to establish that a defendant understands 'the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.'").

Looking at the "whole record" in the present case—before the initial waiver of counsel—would prove that at the arraignment in *this* case, Judge Hayman never informed Petitioner that he was charged with a total of eleven (11) offenses, which included "four counts of carjacking, four counts of armed robbery, two counts of felony firearm, and one count of felon in possession of a firearm." *Pouncy v. Palmer,* 165 F. Supp. 3d  615, 618 (E.D. Mich., 2016). In fact, the arraignment transcript from *this* case proves that Judge Hayman *never* told Petitioner "***of the nature of the charges against him***" or "***the range of allowable punishments[,]***" *Tovar,* 541 U.S. at 81 (emphasis added), associated with the charges. (*See* Arraignment Transcript, ECF #8-3, Pg. ID 279-83). And there is certainly nothing

33

in *this* case—before or after the initial waiver of counsel—that Petitioner declared that he understood that each of the four counts of carjacking and four counts of armed robbery carried a maximum penalty of life imprisonment with a minimum sentence ranging from between 225 months to 562 months. (*See* Sentence Transcript, ECF #8-16, Pg. ID 1936) (Judge Hayman explaining for the *first* time at sentencing that "the minimum is . . . two hundred twenty-five months to five hundred sixty-two months on the carjacking offense as well as the armed robbery offense."); *see also Pouncy,* 165 F. Supp. 3d at 620 (this Court holding that the 225 months to 562 months "range was not discovered until *after* Pouncy was convicted.") (emphasis added). Additionally, there is nothing in **this** record— before or after the initial waiver of counsel—that shows Petitioner acknowledged an understanding that he was facing a mandatory maximum penalty of 120 months (10 years) on the felon in possession of a firearm charge. (*See* Sentence Transcript, ECF #8-16, Pg. ID 1985) (Judge Hayman informing Petitioner for the *first* time in the process of sentencing that the felon in possession of a firearm charge in *this* case carried "a maximum of a hundred and twenty months").

Even if the colloquy from the arraignment in the Haynes case was a part of *this* record (which it is not), telling Petitioner—at the Haynes case arraignment— that he was facing five (5) charges: including **one** count each of armed robbery, carjacking, felon in possession of a firearm, carrying a concealed weapon, and

felony firearm, is no substitute for telling Petitioner and ensuring that he understood in *this* case that he was facing eleven (11) charges: including four counts of armed robbery, four counts of carjacking, two counts of felony firearm, and one count of felon in possession of a firearm.  Moreover, telling Petitioner—at the Haynes case arraignment—that he faced a maximum penalty of only five (5) years on the charge of felon in possession of a firearm is no substitute for telling Petitioner and ensuring that he understood in *this* case that the maximum penalty on this charge was double, ten (10) years.  In *United states v. Erskine,* 355 F.3d 1161 (9th Cir 2004), the *Faretta* waiver was invalidated where the trial court left the defendant to believe that he was only facing a maximum of one year when "the statutory maximum was actually five years, not one." *Id.* at 1165.

The record in *this* case demonstrates that on the morning of trial, Petitioner was begging for "*a better understanding[,]*" (*see* Trial Transcript, ECF #8-7, Pg. ID 462) (emphasis added), because as this Court previously held "Breczinski had not meaningfully communicated with Pouncy prior to the start of trial." *Pouncy,* 165 F. Supp. 3d at 629.  In other words, where the record reflects complete neglect by the trial court judge in *this* case and Petitioner's court appointed attorney never informed him of the vital information regarding the charges and associated penalties in *this* case due to the lack of meaningful communication, this is not a case where it can be assumed that Petitioner learned from his counsel of the

information the trial court judge never told him. *Cf. Akins v. Easterling,* 648 F.3d 380, 398 (6th Cir. 2011) ("Here, Akins had appointed counsel during pretrial proceeding.  Akins swore in his affidavit and testified in court at the motions hearing that he had discussed his case with appointed counsel on numerous occasions.").

There is nothing to salvage the constitutionally defective *Faretta* waiver in *this* case.  Petitioner maintains that at the time of the waiver in *this* case, he did not understand that he was facing a total of eleven (11) offenses.  He did not understand that eight of them carried a maximum penalty of life imprisonment.  He did not understand that he faced a mandatory minimum sentencing guidelines range of between 225 months and 562 months.  And he did not understand that he was facing a maximum penalty of 10 years on the felon in possession of a firearm charge.  Nothing from the colloquy in *this* case or the colloquy at the arraignment in the Haynes case conveyed to and ensured that Petitioner actually understood all of this.  As the Sixth Circuit held in *Ayers v. Hall,* 900 F.3d 829 (6th Cir. 2018):

> "At bottom, the record in *this* case simply does not allow the conclusion that [Petitioner] validly waived his right to counsel."

*Id.* at 837 (emphasis added.

If anything, the colloquy from the arraignment in the Haynes case demonstrates what Judge Hayman should have done—at a minimum—in this case

*before* allowing Petitioner to discharge his fundamental right to counsel and embark upon self-representation. Permitting Petitioner to engage in self-representation without all of this information was *truly* "'the same as intentionally opening a door to a lion's den and allowing, permitting a little lamb to walk straight into a den full of starving lions . . . knowing . . . that there is no way that the little lamb is capable of defending itself[.]'"   *Akins,* 648 F.3d at 396-97 (citation omitted).

## IV.

## THE *BRADY* INQUIRY DOES NOT INCLUDE HYPOTHESIZING HOW THE PROSECUTION WOULD HAVE RESPONDED TO THE SUPPRESSED EVIDENCE AT TRIAL HAD THE PROSECUTION NOT WITHHELD THE *BRADY* MATERIAL AND PETITIONER RELIED ON THE EVIDENCE AT TRIAL

The Sixth Circuit has repeatedly emphasized that there are *only* three components to the *Brady* inquiry:

> "There are three components of a *Brady* violation: '[T]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' *Strickler [v Greene]*, 527 U.S. [263, 281-82 (1999)]. The third component is sometimes referred to as the 'materiality' requirement."

*Bies v. Sheldon,* 775 F.3d 386, 397 (6th Cir. 2014).  Adding an additional inquiry of *any* kind to this three-part test would be 'contrary to" *Brady*.  *See, e.g., Dennis v. Sec'y, Pa. Dep't of Corr.,* 839 F.3d 263, 280-81 (3d Cir. 2016) (*en banc*) (citing

*Williams,* 529 U.S. at 393-94, 397) ("Interpreting Supreme Court precedent in a manner that adds an additional element to the legal standard for proving a constitutional violation is 'contrary to' clearly established federal law.") (reasoning that the Virginia Supreme Court's interpretation of *Strickland v. Washington,* 466 U.S. 668 (1984), which increased the burden on petitioners, was "contrary to" Supreme Court precedent).

In this case—like in *Bies,* 775 F.3d at 397 ("The first two components of Bies' *Brady* claim are not disputed.")—the State has already conceded that it possessed and suppressed the phone records and that the phone records are favorable to Petitioner.  (*See* Oral Argument Transcript, ECF #73, Pg. ID 6787-89).  The State's confession to the suppression and favorable prongs of the *Brady* inquiry was so clear that this Court informed counsel for Petitioner that "I think [counsel for Respondent is] not really quibbling on suppression.  I think he's not really quibbling on exculpatory." (*See id.* at Pg. ID 6789).  The State reaffirmed its admission that the first two components of *Brady* were not in dispute.  (*See* Answer to Petitioner Omar Pouncy's History of Remaining Habeas Claims and Brief in Support, ECF #170, Pg. ID 8489 n. 7) ("Counsel for Respondent did say at oral argument before this Court that it was arguable that the first two prongs of *Brady* had been established (particularly as the prosecutor appears to concede that the records were not turned over to Pouncy, but 'was available to defendant prior

to his own investigation' R. 8-27, People's Pro Per Supplemental Motion for Relief from Judgment, Pg. ID 2646)).").

Assuming that this Court is not permitting the State to betray its prior decision to not dispute and concede that Petitioner satisfies the first two components of *Brady* which should be binding,[5] Petitioner addresses this Court's question to the extent it is a part of this Court's materiality inquiry.

Petitioner understands this Court's question to be: Could the prosecution have used the phone records it suppressed to establish that Petitioner was Jacob Woods, by calling the subscriber of the cell phone in question (Quillie Strong) to identify Petitioner as Jacob Woods?  The answer to this question is a resounding no.

First and foremost, the evidence that tended to suggest that Petitioner is Jacob Woods is not as strong as the State would lead this Court to believe.  The State neglects to inform the Court that neither of the victims/witnesses from either the Haynes or Sandstrom carjacking testified that Petitioner identified himself as Jacob Woods!  Even the prosecution's star witness—Wayne Grimes—declared that Petitioner was ***not*** known to be Jacob Woods.  (*See* Trial Transcript, ECF #8-11, Pg. ID 1171).  And as the Sixth Circuit acknowledged—Joseph Davis—the

---

[5] *See, e.g., Barnes v. Owens-Corning Fiberglass Corp.,* 201 F.3d 815, 829 (6th Cir. 2000) (quoting *American Title Ins. Co. v. Lacelaw Corp.,* 861 F.2s 224, 226 (9th Cir. 1988)) ("'Under federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court.'")

prosecution's witness who claimed that Petitioner was Jacob Woods—actually identified Jaakawa McGruder as being Jacob Woods.  *See Pouncy*, 846 F.3d at 154.

Had the prosecution not suppressed the exculpatory phone records and Petitioner relied on the fact, at trial, that the phone records were not subscribed to him but were in fact subscribed to Quillie Strong, the prosecution could not have credibly countered this evidence by calling Mr. Strong to identify Petitioner as Jacob Woods.   In Mr. Strong's first affidavit he affirmatively declared that Petitioner was "not the person known to [him] as Jacob Joe Woods."  (*See* 1st Affidavit of Quillie B. Strong, ECF #9-3, Pg. ID 5140).   And just as the prosecution's own witness—Joseph Davis—identified Jaakawa McGruder as Jacob Woods, Mr. Strong likewise identified a photograph as McGruder as who he knew to be Jacob Woods.  (*See* 2nd Affidavit of Quillie B. Strong, ECF #9-3, Pg. ID 5141-43).  In other words, the prosecution would have further damaged its *own* case had they attempted to call the subscriber of the cell phone in question in an attempt to have Mr. Strong identify the individual whom he knew as Jacob Woods. Mr. Strong's testimony would have fortified Petitioner's defense of mistaken identification and could have significantly helped Petitioner prove that he was not Jacob Woods.

The prosecution's suppression of the exculpatory phone records is material. And as the Supreme Court has stressed, even if Petitioner's reliance on the suppressed *Brady* evidence would not have changed the verdict, Petitioner is entitled to relief because the prosecution's breach of its duty to turn this evidence over undermines confidence in the outcome of the trial.  *See Wearry v. Cain,* 136 S.Ct. 1002, 1006 (2016) ("Given this legal standard, [Petitioner] can prevail even if, . . . the undisclosed information may not have affected the jury's verdict.").

## **RELIEF REQUESTED**

WHEREFORE, for the foregoing reasons, Petitioner prays that this Honorable Court GRANT a writ of habeas corpus on his *Brady*, *Faretta*, and *Presley* claims (and other unresolved claims).

<div style="margin-left:40%">

Respectfully submitted,

LAW OFFICES OF DAVID L. MOFFITT & ASSOCIATES, PLLC

/s/David L. Moffitt
_____/
By: David L. Moffitt (P30716)
Co-Attorneys for Petitioner
Omar Rashad Pouncy
30800 Telegraph Road, Suite 1705
Bingham Farms, MI  48025
248-644-0880
dlmoffittassoc@ameritech.net

</div>

## CERTIFICATE OF SERVICE

I certify that on September 28, 2020, the foregoing instrument was served on all parties or their counsel of record through the CM/ECF system if they are registered users, or if they are not, by e-mail and/or by placing a true and correct copy in the United States mail, postage prepaid, to their respective addresses.

/s/David L. Moffitt

_____/

By: David L. Moffitt (P30716)