UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OMAR RASHAD POUNCY,

        Petitioner,                      Case No. 13-cv-14695
                                                Hon. Matthew F. Leitman

v.

MATT MACAULEY,[1]

        Respondent.
_____/

**OPINION AND ORDER (1) CONDITIONALLY GRANTING A WRIT OF HABEAS CORPUS ON CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL RELATED TO PLEA BARGAINING PROCESS; (2) DENYING HABEAS RELIEF ON ALL OTHER REMAINING CLAIMS; (3) GRANTING PETITIONER'S SEPARATE MOTION FOR A CERTIFICATE OF APPEALABILITY (ECF No. 400); AND (4) GRANTING A CERTIFICATE OF APPEALABILITY**

Petitioner Omar Rashad Pouncy is a state prisoner in the custody of the Michigan Department of Corrections. On November 12, 2013, Pouncy filed a petition for a writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254. (*See* Pet., ECF No. 1; Am. Pet., ECF No. 3; collectively the "Petition.") In the Petition,

---

[1] The proper respondent in a habeas action is a habeas petitioner's custodian, which in the case of an incarcerated habeas petitioner is the warden of the facility where he is incarcerated. *See* Rule 2(a), 28 U.S.C. § 2254; *Edwards v. Johns*, 450 F.Supp.2d 755, 757 (E.D. Mich. 2006). Pouncy is presently incarcerated at the Bellamy Creek Correctional Facility where Matt Macauley is Warden. *See* https://www.michigan.gov/corrections/0,4551,7-119-68854_1381_1388-5481--,00.html. The Court therefore **AMENDS** the case caption to reflect that the Respondent is Macauley.

Pouncy seeks relief from his state court convictions of four counts of armed robbery in violation of Mich. Comp. Laws § 750.529, four counts of carjacking in violation of Mich. Comp. Laws § 750.529a, and two counts of commission of a felony with a firearm in violation of Mich. Comp. Laws § 750.227b.

The Court previously granted the writ on one of Pouncy's claims in which he claimed that he did not voluntarily waive his right to counsel. *See Pouncy v. Palmer*, 165 F.Supp.3d 615 (E.D. Mich. 2016). Respondent appealed, and the United States Court of Appeals for the Sixth Circuit reversed this Court's ruling and remanded for further proceedings. *Pouncy v. Palmer*, 846 F.3d 144 (6th Cir. 2017).

Though the Petition originally raised fourteen claims with multiple sub-parts, only five claims remain before the Court. The Court has carefully considered those claims. For the reasons explained below, the Court **GRANTS** a conditional writ of habeas corpus on Pouncy's claim that he was denied the effective assistance of counsel in connection with the plea-bargaining process. As described in detail below, the conditional writ requires the State to release Pouncy unless, within the time frame set forth below in Section (V)(G)(1), (1) the State offers Pouncy the plea deal that would have been available to Pouncy but for his counsel's ineffective assistance and (2) if Pouncy timely accepts the plea deal in writing, the State moves the state trial court to vacate Pouncy's conviction, to accept the new plea deal, and to re-sentence Pouncy consistent with that plea deal. The Court **DENIES** relief on

all of Pouncy's other claims. In addition, the Court **GRANTS** Pouncy a certificate of appealability with respect to (1) the claims on which it denies relief herein and (2) the scope of relief it grants on his ineffective assistance of counsel claim arising out of the plea-bargaining process. (This certificate of appealability is in addition to the certificate that the Court previously granted on Pouncy's claim that the state trial court violated his Sixth Amendment right to a public trial.) Finally, the Court **GRANTS** Pouncy a certificate of appealability on its previous denial of his Motion for Reconsideration (ECF No. 377).

## I

## A

The Sixth Circuit summarized the facts underlying Pouncy's convictions as follows:

> In September 2005, Samuel Anderson agreed to display Ralph Haynes's Chevrolet Monte Carlo for sale on his front lawn. A young man, later identified as Omar Pouncy, visited Anderson and asked to have a look at the car. Pouncy left after asking about the price and returned a few days later to meet with Haynes and his brother Dan. Dan agreed to take Pouncy for a ride in the vehicle, but refused Pouncy's request to take the Monte Carlo to Pouncy's own mechanic. With Dan's permission, Pouncy brought his mechanic to Anderson's house instead. Pouncy then indicated that he would return to purchase the vehicle in a few days. On September 24, Pouncy returned to Anderson's house and asked to take Haynes's car for another test drive. Anderson agreed, but while the two were out in the car, Pouncy pulled a gun on Anderson, forced him to get out of the vehicle, and drove away.

At around that same time, Earl Brady's Chevrolet Camaro was on display at Joseph Davis's "racecar chassis fabrication shop." On September 24 or 25, three men entered Davis's shop and expressed interest in purchasing the Camaro. One of them, also later identified as Pouncy, eventually called Davis and let him know that he was "ready to make a deal." Davis called up Brady, who came to the shop to meet Pouncy, Pouncy's step-brother Wayne Grimes, and another man named Tiakawa Pierce. Pouncy asked if he could take the car to his mechanic's shop to have the vehicle inspected. Brady agreed and drove the Camaro to a house where Pouncy said they would meet the mechanic. While the men waited for the mechanic, Grimes pulled out a gun, demanded the keys to the Camaro, and fired a shot in the air. Brady complied and followed the men's instructions to leave the scene on foot.

A few days later, Thomas Sandstrom advertised his Cadillac for sale in a local paper. A man—again, later identified as Pouncy—called up Sandstrom on October 10 and arranged to inspect the car. The next day, Pouncy and Grimes arrived at Sandstrom's house and asked to take the car to Pouncy's mechanic. Sandstrom agreed and drove the Cadillac to the mechanic's house with Pouncy. Grimes followed in his own car, as did Sandstrom's wife Maria, who was driving her own Chevrolet Corvette. Pouncy directed Sandstrom to a house at the end of a dirt road and, after arriving, asked Sandstrom for the title to the Cadillac. Sandstrom walked over to Maria's car to retrieve the title, but promptly felt Pouncy stick a gun in his side. Pouncy ordered Maria out of her car, demanded Sandstrom's wallet, and instructed the couple to walk away. The Sandstroms eventually managed to flag down a police car, and Maria, who had seen the license plate on Grimes's car, gave the plate number to the police.

Detective James Gagliardi of the Mt. Morris Township Police Department ("MMTPD") took the lead on investigating the theft of Earl Brady's Camaro. After receiving reports of the Sandstrom carjacking, Gagliardi

used Maria's tip to track down Grimes. MMTPD officers soon arrested Grimes, who waived his Fifth Amendment rights and agreed to speak with police. Grimes confessed his involvement in the Brady and Sandstrom carjackings, identified Pouncy as the sham purchaser from both thefts, and told police that Tiakawa Pierce had assisted as well. At Gagliardi's request, officers put together photographic lineups with Pouncy and Pierce and showed them to the carjacking victims. Samuel Anderson, Dan Haynes, Earl Brady, Joseph Davis, and Thomas and Maria Sandstrom all identified Pouncy as the sham purchaser from the carjackings. Officers promptly found and arrested Pouncy.

*Pouncy*, 846 F.3d at 147-148.

Pouncy was charged in two separate cases. In one of the cases, he faced charges arising out of the Sandstrom and Brady carjackings. In the second case, he faced charges arising out of the Haynes carjacking. The habeas proceedings now before the Court relate to Pouncy's convictions in the case involving the Sandstrom and Brady carjackings.

The Sixth Circuit offered the following details about the trial in the Sandstrom and Brady case at issue here:

Pouncy, who was eighteen years old at the time … [waived his right to counsel and] represent[ed] himself [from the point of the trial immediately following the prosecution's direct examination of its first witness through the conclusion] of his trial.

The trial lasted six days, during which the State called Wayne Grimes, as well as several victims who made unequivocal in-court identifications of Pouncy as the perpetrator. Pouncy did, however, point out inconsistencies in two of the victims' photographic

identifications. When given a copy of a photographic lineup and asked which individual they had previously identified as the sham buyer, both Joseph Davis and Thomas Sandstrom failed to pick out Pouncy's photo. Despite having identified Pouncy as the perpetrator to police, Joseph Davis pointed to a lineup photo of a man named Jaakawa McGruder. Thomas Sandstrom pointed to a photo of Wayne Grimes. Pouncy subsequently took the stand in his defense and testified that he was alone at work at a home-remodeling job when the Brady and Sandstrom carjackings occurred. Pouncy called only one other witness, his mother, who testified that she saw Pouncy at work on the day of the Sandstrom carjacking.

Having heard numerous eyewitness identifications of Pouncy as the perpetrator, the jury convicted Pouncy as charged on four counts of carjacking, four counts of armed robbery, two counts of felony firearm possession, and one count of being a felon in possession of a firearm. The trial court sentenced Pouncy to a term of 586 to 824 months of imprisonment. Just over one month later, Pouncy represented himself in a bench trial on charges arising out of the Haynes carjacking. At the end of that trial, the trial judge convicted and sentenced Pouncy on one count each of carjacking, armed robbery, felony firearm possession, being a felon in possession of a firearm, and carrying a concealed weapon.

*Id.* at 154.

## B

Following Pouncy's convictions and sentence, he filed a direct appeal in the Michigan Court of Appeals. That court affirmed Pouncy's convictions in an unpublished opinion. *See People v. Pouncy*, 2008 WL 9869818 (Mich. Ct. App. Mar. 25, 2008). Pouncy then filed an application for leave to appeal in the Michigan

Supreme Court. That court denied Pouncy's application because it was not persuaded that the questions presented should be reviewed. *See People v. Pouncy*, 753 N.W.2d 187 (Mich. 2008) (Table).

Pouncy thereafter filed a motion for relief from judgment in the state trial court that raised several additional claims. That court denied relief in a written opinion and order. (*See* St. Ct. Op. and Order, ECF 8-37, PageID.3137-3165.) Pouncy then filed an application for leave to appeal in the Michigan Court of Appeals, and that court denied the application "for failure to establish entitlement to relief under Michigan Court Rule 6.508(D)." (Mich. Ct. App. Order, ECF No. 8-48, PageID.4227.) Pouncy next filed an application for leave to appeal in the Michigan Supreme Court, and that court denied the application because Pouncy "failed to meet the burden of establishing entitlement to relief under Michigan Court Rule 6.508(D)." (Mich. Sup. Ct. Order, ECF No. 8-49, PageID.4440).

## C

In 2013, Pouncy filed a petition for a writ of habeas corpus and an amended habeas petition in this Court. (*See* Pet., ECF No. 1; Am. Pet., ECF No. 3.) He raised 15 separate claims, and some of those claims included multiple sub-parts. (*See* Am. Pet., ECF No. 3, PageID.25-30.)

Respondent filed a response and supplemental filings in which he (1) asserted that some of Pouncy's claims were procedurally defaulted and (2) denied that Pouncy was entitled to any relief. (*See* Respondent's Brs., ECF Nos. 7, 30.)

## D

On March 6, 2015, Pouncy moved for summary judgment on his claim that the state trial court violated his right to a public trial. (*See* Mot. for Summ. J., ECF No. 33.) The Court held a hearing on the motion and received supplemental briefing from both parties. (*See* Supp. Brs., ECF Nos. 54, 55.) The Court thereafter issued an Opinion and Order denying the motion and denying habeas relief with respect to that claim. (*See* Op. and Order, ECF No. 58.) However, the Court did grant Pouncy a certificate of appealability on his public trial claim. (*See id.*, PageID.6414.)

## E

The Court next addressed Pouncy's claim that his waiver of counsel was not voluntary because he was forced to choose between proceeding with unprepared counsel or representing himself. The parties have referred to this as Pouncy's "Hobson's Choice" claim. In an Opinion and Order dated January 8, 2016, the Court granted habeas relief on that claim. *See Pouncy*, 165 F.Supp.3d at 631. The Court declined to address Pouncy's other claims at that time. *See id.*

Respondent appealed, and the Sixth Circuit reversed. *See Pouncy*, 846 F.3d at 163. The Sixth Circuit then remanded this action so that this Court could decide Pouncy's remaining claims. *See id*.

## F

### 1

After the conclusion of Pouncy's appeal, this Court held a status conference. During that conference, counsel for Pouncy contended that Pouncy was actually innocent of the crimes for which he was convicted. Counsel asserted Pouncy's actual innocence because it was relevant to the procedural default defense that Respondent had raised to several of Pouncy's remaining claims. If Pouncy could establish his actual innocence, then the Court could proceed to review even those remaining claims that would otherwise have been procedurally defaulted. *See Murray v. Carrier*, 477 U.S. 478, 496 (1986).

Pouncy's counsel explained that Pouncy had obtained two pieces of evidence in support of his actual innocence claim. First, a man named Jaakawa McGruder had signed an affidavit claiming responsibility for the crimes that Pouncy was convicted of committing. (*See* 2/23/2018 Status Conf. Tr., ECF No. 185, PageID.9483-9485.) Second, a witness named Willie Joyce had signed an affidavit stating, among other things, that when the police were first investigating the case, he identified McGruder as the potential perpetrator in a photo lineup. (*See id.*,

PageID.9489-9490.)  Because Pouncy's claim of actual innocence was set to play a potentially important role in the determination of which claims the Court would review on the merits, the Court decided to hold an evidentiary hearing on the actual innocence question before proceeding to the merits.  At the hearing, the Court planned to hear testimony from both McGruder and Joyce.

The Court held the evidentiary hearing on May 22, 2018.  McGruder testified first.  He said that he committed all three of the carjackings for which Pouncy was convicted and that Pouncy did not commit any of the carjackings. (*See* 5/22/2018 Evid. Hr'g Tr., ECF No. 190, PageID.9598-9818.)  He also explained in some detail how each carjacking was committed. (*See id.*, PageID.9610, 9615-9624.)

Joyce also testified at the hearing. (*See id.*, PageID.9821-9847.)  As explained further below (*see* Section (VI)(D)(1), *infra*), he said that he lived near the scene of one of the carjackings and that at the time of that carjacking, a man came to his front door and spoke briefly to him.  Joyce further testified that when he was interviewed by police around the time of the carjacking, he identified the man who came to his door as McGruder, not Pouncy.  Joyce's claimed interaction with the man at his door was potentially important because police believed that the person who came to Joyce's door was the actual carjacker.  Pouncy suggested that Joyce's testimony confirmed that McGruder, not Pouncy, was the perpetrator and thus that he (Pouncy) was actually innocent. (*See* Pouncy Br., ECF No. 197, PageID.9925.)

After the evidentiary hearing, Respondent discovered substantial evidence suggesting that Pouncy had conspired with McGruder to present perjured testimony during the evidentiary hearing.  Respondent summarized his position as follows:

> On May 22, 2018, Jaawkawa McGruder testified under oath that he committed the three carjackings for which Pouncy was convicted and that Pouncy was innocent. Months later, the State found evidence proving that McGruder couldn't possibly have committed one of the carjackings [because McGruder was in jail at the time]. Recognizing that this new evidence raised questions not just about McGruder's involvement in the other carjackings, but about the circumstances surrounding how and why he came to testify, we asked:1. How did McGruder learn all the details he provided under oath? 2. How does this new fact (that he didn't commit one of the crimes) square with McGruder's repeated denials of reviewing anything in preparation for the hearing? 3. And why did he lie about his involvement in the carjacking? (ECF No. 203, PageID.10021 n.7.) With enough to know that McGruder wasn't telling the truth about one of the carjackings, but not enough to prove how or why he lied, the State left those questions for another day. (*Id*.)

> Now that day has come.  Recently uncovered evidence shows that Pouncy orchestrated a scheme involving witness bribery and subornation of perjury from prison using a cell phone. Most damning of all are the text messages between Pouncy and McGruder in which the two agree that McGruder would falsely testify that he, not Pouncy, committed the three carjackings, and in return Pouncy would pay him $10,000. (*See* Ex. 1.) Pouncy's texts show that he did, in fact, pay McGruder. (*Id*.)

> Records also show that Pouncy had help from several people on the outside, including India Countryman, who

facilitated part of McGruder's payment; Rashad Shahid, who facilitated another part of the payment and who was involved in covering up the bribery after the hearing; and Tiakawa Pierce, Pouncy's co-defendant, who helped convince McGruder to commit perjury and whom Pouncy asked to provide more false evidence. (*See* Exs. 1-6.) There is only one phrase that captures what Pouncy has done: fraud on the court. And there is only one way to respond: dismissal with prejudice. A litigant who so flagrantly abuses the justice system shouldn't be allowed to call on that system to vindicate his claims. As numerous courts have done when confronted with this kind of conduct, this Court should dismiss the case.

(Mot. to Dismiss, ECF No. 238, PageID.11113-11114.)

Based upon this alleged misconduct by Pouncy, Respondent filed a motion to dismiss Pouncy's habeas petition and all of Pouncy's claims with prejudice. (*See id.*, PageID.11114.) Pouncy opposed the motion to dismiss. (*See* Pouncy Resp. to Mot. to Dismiss, ECF No. 272.) Meanwhile, the Court referred the matter to the United States Attorney for the Eastern District of Michigan so that that office could review the circumstances described in Respondent's motion, determine whether to launch an investigation, and decide whether to seek federal criminal charges against Pouncy and others.[2] (*See* Order, ECF No. 246, PageID.11451-11452.) The Court then stayed the case given the possibility that several of the lawyers representing Pouncy would

---

[2] The Court does not know what the United States Attorney has done in response to the Court's referral.

no longer be able to represent him and may have to testify against him. (*See id.*, PageID.11452-11453.)

**3**

The Court eventually lifted the stay and returned its attention to the motion to dismiss. In opposing that motion, Pouncy argued, among other things, that even if the Court concluded that he had committed the alleged misconduct, the Court could not and should not dismiss the entire petition as a sanction. The Court agreed in part. It concluded that it did have the authority to dismiss the entire petition if it found that Pouncy had orchestrated McGruder's perjury, as Respondent alleged. (*See* 2/5/2020 Status Conf. Tr., ECF 284, PageID.12193.) But the Court determined that it would not dismiss the entire petition in those circumstances because doing so would be too severe. (*See id.*) Instead, the Court concluded that the appropriate sanction – if the Court were to find that Pouncy did commit the alleged misconduct – would be to bar Pouncy from seeking to excuse any procedural default on any of his claims on any ground. This sanction struck the Court as appropriate and proportional because Pouncy's alleged misconduct – presenting false testimony in an effort to establish his actual innocence – was aimed at excusing his procedural defaults. (*See id.*, PageID.12194.)

The Court then made a proposal to Pouncy. It gave him the option of (1) contesting the allegations of misconduct against him – and, if successful, potentially

preserving his actual innocence claim and his effort to excuse his procedural defaults – or (2) avoiding a fight in this action over the allegations against him, abandoning his procedurally-defaulted claims, and proceeding to a determination of the merits of only his non-defaulted claims. (*See id.*, PageID.12195-12197.) Pouncy chose the second option. He wrote:

> Mr. Pouncy agrees to relinquish those constitutional claims contained in his petition for a writ of habeas corpus that are subject to a valid affirmative defense of procedural default. Mr. Pouncy understands that the Court will, after merits briefing on the remaining claims is completed, resolve the merits of those remaining claims.

(Notice, ECF No. 287, PageID.12207.)

Pouncy then identified the following five claims that, in his view, were not subject to a valid procedural default defense and that would be resolved by the Court on the merits:

- Sixth Amendment Waiver of Counsel Claim

    o Mr. Pouncy's waiver of trial counsel was not knowingly, intelligently, or voluntarily [made].

- Sixth Amendment Ineffective Assistance of Trial and Appellate Counsel Claims

    o Defense counsel's complete failure to conduct preparatory investigation of prosecution witnesses constructively deprived Mr. Pouncy of his Sixth Amendment right to effective assistance of counsel.

- o Counsel deficiently failed to object to the unwarranted closure of the courtroom during motion hearings and jury voir dire.

- o Appellate counsel unreasonably failed to comply with appellate filing requirements, thereby causing Mr. Pouncy to waive and/or forfeit multiple, obvious, significant, and meritorious direct appeal challenges to his conviction and sentence.

- Sixth Amendment Right to Counsel of Choice

  - o Mr. Pouncy was unconstitutionally deprived of his Sixth Amendment right to retain counsel of choice when the trial court refused to grant a continuance to allow him to retain new, adequately prepared counsel.

- *Brady* Claim

  - o The prosecution suppressed exculpatory evidence, specifically that the phone calls from the perpetrator were in fact traceable and could be traced to someone other than Mr. Pouncy.

- *Lafler* Claim

  - o Mr. Pouncy was misinformed by his trial counsel and the trial judge of the sentencing exposure he faced were he to be convicted at trial, causing him to reject a plea offer that he otherwise would have taken.

(*Id.,* PageID.12208.)   In a subsequent filing, Pouncy clarified that he was not abandoning his already denied public-trial claim. (*See* Notice, ECF No. 289, PageID.12213.)   He also noted in this second filing that he was contending in his *Brady* claim that the prosecution suppressed two additional pieces of evidence: (1)

Wayne Grimes' arrest history and (2) the fact that the "police had shown Willie Joyce a photo array and that Joyce had picked someone other than Mr. Pouncy as the perpetrator." (*Id.*, PageID.12214.)

Respondent filed a response in which he largely agreed that the list of claims Pouncy submitted were the ones not subject to procedural default. (*See* Notice, ECF No. 290, PageID.12218.)  But Respondent offered two caveats.  First, Respondent contended that the public-trial claim was not before the Court because it was not included in Pouncy's original petition, and Respondent contended that Pouncy should not be permitted to add that claim to the petition because it is barred by the statute of limitations. (*See id.*, PageID.12219.)  Second, Respondent asserted that the parts of Pouncy's *Brady* claim that related to Grimes' arrest record and Joyce's identification of someone other than Pouncy had not been raised in Pouncy's habeas petition and thus could not be asserted in this action unless the Court allowed Pouncy to amend the petition to add those parts of the claim. (*See id.*, PageID.12220-12221.) And Respondent reserved the right to present a procedural default defense to those new claims in the event that the Court permitted such an amendment. (*See id.*)

The parties then filed final merits briefs. (*See* Pouncy Br., ECF No. 300; Respondent Br., ECF No. 321; Pouncy Reply Br., ECF No. 335.)  The Court held a hearing on July 30, 2020.  The parties then filed supplemental briefs to address questions that arose at argument (*see* Supp. Brs., ECF Nos. 345, 347, and 349), and

the Court held a second, continued hearing on December 2, 2020, after which additional briefs were filed. (*See* Supp. Brs.*,* ECF Nos. 373, 378, and 380.) Finally, the Court then held an evidentiary hearing on January 8, 2021, on Pouncy's claim of ineffective assistance of counsel with respect to the plea-bargaining process, and the parties filed supplemental briefs after that hearing. (*See* Supp. Brs.*,* ECF Nos. 374, 381.) The matter is now ready for decision.

## II

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides, in part, that a federal court "shall not grant[]" a writ of habeas corpus on a claim that was adjudicated on the merits by a state court unless the state court's adjudication of the claim resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The "contrary to" and unreasonable application" prongs of AEDPA operate as follows:

> To prevail under the "contrary to" clause, a petitioner must show that the state court "arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or that it "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite" to that reached by the Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). To prevail under the "unreasonable application" clause, a petitioner must show that "the state court identifie[d] the correct governing legal principle from th[e] Court's decisions but unreasonably applie[d] that principle to the facts of the [petitioner's] case." *Id*. at

17

413. For purposes of AEDPA, "clearly established [f]ederal law" refers only "to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quotation marks and citation omitted).

*Taylor v. Simpson*, 972 F.3d 776, 783-784 (6th Cir. 2020). This standard applies only to claims adjudicated on the merits by the state court. *See Johnson v. Williams*, 568 U.S. 289, 302-03 (2013). Where Section 2254(d) does not apply, review is *de novo*. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007); *Williams v. Taylor*, 529 U.S. 362, 396-98 (2000).

Where a petitioner satisfies Section 2254(d)(1) – *i.e.*, where a petitioner shows that a state court decision was contrary to, or an unreasonable application of clearly established federal law – then a federal court "resolves" the underlying claim *de novo* "without the deference AEDPA otherwise requires." *Panetti*, 551 U.S. at 953. *See also Milton v. Miller*, 744 F.3d 660, 671 (10th Cir. 2014) (explaining that a habeas petitioner's "satisfaction of the § 2254(d)(1) standard …. requires [a federal court] to review *de novo*" the petitioner's underlying claim).

## III

### A

The Court will address the remaining claims in the order that the parties have presented them in the briefing. The Court begins with Pouncy's claim that the state trial court violated his Sixth Amendment right to counsel of choice when it declined

to permit him to replace his appointed counsel with retained counsel.[3] Poucy raised

this claim on direct review, and the Michigan Court of Appeals rejected it:

> Turning to defendant's ability to obtain retained counsel, the constitutional right to counsel encompasses the right of a defendant to choose his own retained counsel. *U.S. v. Gonzalez-Lopez*, 548 U.S. 144 (2006). However, the right is not absolute; a court must balance the defendant's right to choice of counsel against the public's interest in the prompt and efficient administration of justice. *People v. Akins*, 259 Mich. App. 545, 557 (2003).

> > "When reviewing a trial court's decision to deny a defense attorney's motion to withdraw and a defendant's motion for a continuance to obtain another attorney, we consider the following factors: (1) whether the defendant is asserting a constitutional right, (2) whether the defendant has a legitimate reason for asserting the right, such as a bona fide dispute with his attorney, (3) whether the defendant was negligent in asserting his right, (4) whether the defendant is merely attempting to delay trial, and (5) whether the defendant demonstrated prejudice resulting from the trial court's decision." [*Id.*, quoting *People v. Echavarria*, 233 Mich. App. 356, 369; 592 N.W.2d 737 (1999).]

> Although defendant did briefly express a desire to retain counsel, he did not make a formal motion for a continuance to do so. The trial court cannot be faulted for failing to grant a continuance that was never requested. Further, even if we were to conclude that this statement were a request for a continuance, we would conclude that the trial court did not abuse its discretion in denying the request. Defendant failed to demonstrate that his

---

[3] To be clear, Poucy does not argue in this claim that the state trial court erred when it failed to *appoint* substitute counsel; he only asserts here that the trial court violated his right to *retain* counsel. (*See* Poucy Br., ECF No. 300, PageID.12281-12294.)

appointed counsel was not providing him with effective assistance and the purported request did not come until trial was already underway and after he had already expressed a desire to represent himself.

The trial court did not err when it permitted the trial to proceed without a continuance.

*Pouncy*, 2008 WL 9869818, at *11.

## B

The Michigan Court of Appeals' decision is contrary to the United States Supreme Court decision in *United States v. Gonzalez-Lopez*, 548 U.S. 144 (2006). In violation of *Gonzalez-Lopez*, the state appellate court considered the purported effectiveness of Pouncy's appointed counsel as one factor that supported denying Pouncy's request to retain counsel. But *Gonzalez-Lopez* makes clear that the effectiveness of appointed counsel is immaterial to a defendant's right to retain counsel of his choice. As the Supreme Court explained, the Sixth Amendment "guarantees a defendant the right to be represented by [a] qualified attorney" of his choice "whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *Id.* at 144 (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25 (1989)). And "[d]eprivation of [that] right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, *regardless of the quality of the representation he received*." *Id.* (emphasis added). "To argue otherwise is to confuse the right to

counsel of choice—which is the right to a particular lawyer regardless of comparative effectiveness—with the right to effective counsel—which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed." *Id.* In direct contravention of this directive, the Michigan Court of Appeals confused Pouncy's right to counsel of choice with whether "his appointed counsel was … providing him with effective assistance…." *Pouncy*, 2008 WL 9869818, at *11. Thus, the Michigan Court of Appeals' ruling is contrary to clearly established federal law.

## C

Because the Michigan Court of Appeals' rejection of Pouncy's counsel of choice claim is contrary to *Gonzalez-Lopez,* the Court must review the claim *de novo*. *See Panetti*, 551 U.S. at 953. On *de novo* review, the Court concludes that the state trial court did not violate Pouncy's right to counsel of choice and that Pouncy is therefore not entitled to federal habeas relief on this claim.

## 1

While the right to retain counsel of choice is fundamental, it is "circumscribed in several important respects." *Gonzalez-Lopez*, 548 U.S. at 144. Most importantly, a trial court need not honor a request to retain counsel that would "unreasonably interfere with the normal progress of a criminal case." *Linton v. Parini*, 656 F.2d 207, 211 (6th Cir. 1981). Indeed, the Supreme Court has "recognized a trial court's

wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." *Gonzalez-Lopez,* 548 U.S. at 151-52 (citations omitted). Given this "wide latitude," a court reviewing the denial of a request for counsel of choice applies an abuse of discretion standard. *See United States v. Powell*, 847 F.3d 760, 778 (6th Cir. 2017). And "[w]hen a request for substitute counsel would 'almost certainly necessitate a last-minute continuance, the trial judge's actions are entitled to extraordinary deference.'" *Id*. at 779 (quoting *United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009)).

In assessing the denial of a motion for substitute counsel, a reviewing court considers: (1) the timeliness of the motion, (2) the adequacy of the trial court's inquiry into the matter, (3) the extent of the conflict between the attorney and client, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice. *See Henness v. Bagley*, 644 F.3d 308, 321 (6th Cir. 2011). When the Court balances these factors here, it concludes that the question of whether to grant Pouncy's request to retain counsel was a close one and that the state trial court did not abuse its broad discretion when it denied that request.

**2**

**a**

With respect to the first factor, the timing of Pouncy's request weighs against granting him relief. Pouncy did not ask to retain counsel until after the state trial

court had empaneled and sworn the jury and after both sides had given opening statements. At that point, Pouncy announced that he was "gonna hire a lawyer." (1/24/06 Trial Tr., ECF No. 8-7, PageID.672.) The trial court responded that it was too "late for that. It's trial today … If you were gonna hire somebody you should have did it a long time ago." (*Id*.) As the trial court seemed to recognize, granting Pouncy's request would have led either to (1) a substantial delay in the middle of the trial while Pouncy attempted to find new counsel and that attorney got up to speed or (2) a mistrial. The trial court reasonably sought to avoid both consequences. *See Hudson v. Rushen*, 686 F.2d 826, 831 (9th Cir. 1982) (affirming denial of request to retain counsel made after start of trial because, among other things, granting the request would have created risk of mistrial). Indeed, Pouncy has not cited a single case in which any reviewing court has found error in a trial court's refusal to grant a request to retain counsel that was made after trial commenced. Neither of the two primary cases that Pouncy relies upon – *Carlson v. Jess*, 526 F.3d 1018 (7th Cir. 2008) and *Couch v. Booker*, 650 F.Supp.3d 683 (E.D. Mich. 2009) – involved requests to retain counsel made after trial had begun.

Moreover, it was not at all clear that Pouncy had the ability to make good on his late request to retain counsel. He had previously qualified for appointed counsel by establishing his indigency, and he did not suggest to the trial court that he had recently acquired the means to hire a lawyer. Nor did he indicate that friends or

family were willing (or able) to pay for representation.[4]  And he did not tell the trial court that he had found a particular lawyer with whom he saw eye to eye and who was willing to take his case.  Thus, in addition to coming late in the process, Pouncy's request to retain counsel came surrounded by uncertainty.  This combination of uncertainty and tardiness supports the trial court's denial of the request.

**b**

Pouncy counters that he actually asked to retain counsel of his choice before jury selection began.  But the record does not support that contention.  While Pouncy did express his dissatisfaction with appointed counsel before jury selection commenced, he said *nothing* about *retaining* counsel during that discussion with the state trial court. (*See* 1/24/06 Trial Tr., ECF No. 8-7, PageID.459-472.)  On the contrary, his statements during that discussion suggested that he was still *unable* to afford to retain counsel and was seeking replacement *appointed* counsel.  Indeed, he told the trial court that he had written to "Barbara Menear, the Defender Administrator and asked for … different counsel because I don't really feel satisfied with the one I have." (*Id.*, PageID.460).  At no time prior to the commencement of

---

[4] Pouncy argues that his mother had the means to assist with the appointment of counsel. (*See* Pouncy Reply Br. at n.5, ECF No. 335, PageID.2796.)  But he never told the trial court that his mother was willing and/or able to provide that assistance.

trial did Pouncy sufficiently notify the trial court that he wished to retain counsel on his own or that he had the means to do so.

Pouncy next argues that once he complained about *appointed* counsel, the trial court was obligated to inquire as to whether Pouncy wished to *retain* counsel. (*See* Pouncy Reply Br., ECF No. 335, PageID.12793, citing *Cottenham v. Jamrog*, 248 F. App'x 625, 636 (6th Cir. 2007)). But Pouncy has not cited any case so holding. His primary authority, the Sixth Circuit's decision in *Cottenham*, involved a criminal defendant who expressly and repeatedly objected to being represented by retained counsel that his parents had hired. The court in *Cottenham* did not address how a trial court should respond where, as here, a criminal defendant complains about *appointed* counsel but does not expressly request to *retain* counsel of his choice. Nor does *Wilson v. Mintzes*, 761 F.2d 275 (6th Cir. 1985) – another case that Pouncy relies upon – address that question. In *Wilson*, a defendant who was represented by *retained* counsel complained about counsel's performance and suggested that his family may have the means to *retain* new counsel. *See id.* at 281 n.10 (setting forth colloquy between defendant and court, including defendant's statement that his family "[m]ay" have the funds to hire replacement counsel); *id.* at 290 (Engel, J., dissenting) (confirming that counsel was retained). The Sixth Circuit held that under those circumstances, the trial court should have construed an ambiguous request for relief as a request to attempt to retain a new lawyer. *See id.* at 281-82. But here,

Pouncy's statements to the trial court were not surrounded by the ambiguity present in *Wilson*. Moreover, unlike the defendant in *Wilson*, Pouncy never told the state trial court that he "may" have the funds to retain counsel.

Pouncy's reliance on *Bradley v. Henry*, 510 F.3d 1093, 1098 (9th Cir. 2007) (en banc) is likewise misplaced. In that case, during an *in camera* hearing held outside of the presence of the petitioner, the petitioner's originally-retained counsel moved to withdraw from representing the petitioner based upon "serious conflicts with [petitioner], including inadequate payment for defense services." *Id.* at 1095. When the proceedings moved into the courtroom, the originally-retained counsel renewed the motion to withdraw and informed the court that the petitioner had engaged another attorney to oppose originally-retained counsel's motion to withdraw. *See id.* The court refused to hear from petitioner's new attorney, granted the originally-retained attorney's motion to withdraw, and appointed new counsel for petitioner without ever asking her whether she could afford to retain counsel or whether she wished to do so. *See id.* at 1095 and 1097-98. The trial court apparently assumed that the petitioner could not afford to retain new counsel because she was young (under 21 years-old) and had had a "difficult" relationship with her father. *Id.* at 1097-98.

On appeal, the Ninth Circuit held that the trial court committed a serious error when it appointed counsel without hearing from the petitioner and from her newly

chosen lawyer. The Ninth Circuit stressed that "[d]ue process does not permit a judge to decide such a question without hearing the affected party." *Id.* at 1098. The contrasts between *Bradley* and Pouncy's case are obvious. Unlike the petitioner in *Bradley* (who had retained two separate attorneys at different phases of her case), Pouncy had taken affirmative steps highlighting his *inability* to retain counsel. He had demonstrated his indigence to qualify for appointed counsel and had informed the court that he sought replacement *appointed* counsel. Moreover, unlike in *Bradley*, the trial court in Pouncy's case did not make any decision concerning his representation without first hearing from Pouncy. *Bradley* therefore does not support Pouncy's contention that when he complained about appointed counsel, the trial court had an obligation to ask if he wished to retain counsel.

Next, Pouncy contends that the timing of his request to retain counsel did not weigh against granting it because he made the request as soon as he reasonably could have done so. He says that he could not have made the request any earlier because he was in custody. But he could have made a request to retain counsel when the trial court called the case and before jury selection and opening statements were completed. Moreover, Pouncy was able to send a written request for new appointed counsel to the Defender Administrator. It seems that he also could have sent a written pre-trial request to retain new counsel to the trial court. (This Court

frequently receives such requests to replace counsel from incarcerated defendants awaiting trial.)

Pouncy also argues that the trial court's own actions indicate that the timing of his request to retain counsel did not pose a problem. (*See* Pouncy Supp. Br., ECF 300, PageID.12291.) He notes that at a pre-trial hearing held two weeks before jury selection (on January 9, 2006), the trial court expressed its willingness to discuss adjourning the case until March. (*See* 1/9/06 Hr'g Tr., ECF No. 8-6, PageID.451-454.) From that willingness, he concludes that it would not have been a problem to grant his request to retain counsel (made on January 24, 2006) and to continue the trial until March. But this argument ignores that the trial court was willing to discuss continuing the trial *before it began* – before the lawyers had spent time completing their preparation, before jurors had been summoned and sworn, and before witnesses had been compelled to appear. That the trial court was willing to discuss adjourning the trial under materially different circumstances at an earlier point in the case does not suggest that there would have been no problem granting an adjournment in the middle of trial after Pouncy asked to retain counsel.[5]

---

[5] The state trial court never said that it was, in fact, willing to adjourn the trial until March. Instead, the trial court indicated that it was willing to consider moving the trial to March so that the case could be tried along with the Haynes case. (*See* 1/9/06 Hr'g Tr., ECF No. 8-6, PageID.451-454.) The court invited counsel to come to its chambers to discuss whether to move the trial to March. (*See id.*) It is not clear from the record whether counsel ever met with the trial court in chambers to discuss moving the trial date.

Finally, Pouncy cites several cases for the proposition that a trial court may not deny a request to retain counsel based solely upon the untimeliness of the request. (*See* Pouncy Reply Br., ECF No. 335, PageID.12795, 12797, citing *Cobb v. Warden*, 466 F.App'x 456, 463 (6th Cir. 2012) and *U.S. v. Adelzo-Gonzalez*, 268 F.3d 772, 780 (9th Cir. 2001)).  But none of the cases cited by Pouncy involved a request to retain counsel after trial had already begun and jeopardy had attached.  And those cases stand only for a proposition not applicable here – that a trial court may not deny a request to retain counsel where the sole consequence would be a modest continuance of a yet-to-have-begun trial.

**3**

The second factor – concerning the adequacy of the trial court's inquiry into the defendant's concerns with counsel – also weighs against Pouncy.  The Sixth Circuit's "decisions indicate that, to meet this [adequate inquiry] requirement, the [trial] court simply must allow a defendant the opportunity to explain the attorney-client conflict as he perceives it." *United States v. Marrero*, 651 F.3d 453, 465 (6th Cir. 2011).  By the time the trial court denied Pouncy's request to retain counsel, it had done just that.  More specifically, the trial court gave Pouncy an opportunity to express his dissatisfaction with his appointed counsel just before jury selection on the first morning of trial.  At that time, Pouncy complained to the trial court that "me and my attorney [are] really not on the same page." (1/24/06 Trial Tr., ECF No. 8-

7, PageID.460.)  Pouncy then listed a number of issues that he felt his appointed counsel had not adequately addressed with him. (*See id*., PageID.459-462.)  For instance, he told the trial court, among other things, that his appointed attorney did not file pre-trial motions, did not pay sufficient attention to alleged discrepancies in the police reports and transcripts that he (Pouncy) had pointed out, and failed to provide discovery. (*See id.*)  Pouncy added that he did not "feel comfortable" that court-appointed counsel was providing "proper representation." (*Id.*, PageID.459-462.)  Pouncy stressed that "I'm not getting' proper representation" and that "I really don't feel comfortable with the representation that I have now." (*Id.* PageID.462.)  After hearing from Pouncy, the court solicited a response from appointed counsel, expressed its disagreement with Pouncy's assessment of his counsel's performance, and decided to press ahead with the trial. (*See id*., PageID.462-463.)  Pouncy asked to retain counsel a few hours later that same day. (*See id.*, PageID.672.)  At that point, the trial court did not again ask Pouncy to identify his concerns with counsel's performance, but the court had no need to do so given Pouncy's statements earlier in the day.  Simply put, by the time the trial court denied Pouncy's request to retain counsel, the court had given Pouncy at least some opportunity "to explain" his conflict with appointed counsel. *Marrero*, 651 F.3d at 465.

As Pouncy reasonably notes, and as this Court has previously observed, the trial court's colloquy with Pouncy concerning his waiver of counsel was far from

ideal. (*See, e.g.*, 11/12/15 Hr'g Tr., ECF No. 73, PageID.6708.) The trial court seemed unnecessarily hostile to Pouncy and too dismissive of Pouncy's legitimate concerns. But despite the trial court's disrespectful and discourteous treatment of Pouncy, the court did allow Pouncy to voice his concerns about continuing to trial with his appointed lawyer. The court's exchange with Pouncy therefore minimally satisfied its obligation to inquire into the source of his dissatisfaction with appointed counsel. *See Marrero*, 651 F.3d at 465 (finding sufficient inquiry where district court gave defendant "the chance to fully describe his objections" to his lawyer's continued representation and "satisfied its obligation to determine the sources of his complaint.").

## 4

The third factor – the status of the relationship between Pouncy and his appointed counsel – weighs in favor of Pouncy's claim that he should have been permitted to retain counsel. That relationship had substantially deteriorated by the time Pouncy requested to retain counsel. As noted above, Pouncy felt, among other things, that his appointed lawyer made essentially no effort to meet with him and to attempt to understand the defense that Pouncy wished to present. Pouncy did not seem to trust his lawyer or his lawyer's judgment. Under those circumstances, it would have been challenging for Pouncy and his lawyer to have worked together to

mount an effective defense.[6]  The fractured relationship between Pouncy and his

counsel weighs in favor of Pouncy's request to retain new counsel.

**5**

The final factor – the balance of the above-described factors against the

public's interest in the prompt and efficient administration of justice – presents a

very close question.  On one hand, as noted above, granting Pouncy's late request to

retain counsel would have interfered with the efficient administration of justice by

causing a substantial delay and/or mistrial in the already-begun trial.  And, again,

Pouncy has not cited a single case in which any court has held that the balance of

these interests tips in favor of granting a request to retain counsel that is made *after*

trial has begun.  On the other hand, as also noted above, Pouncy had a substantial

interest in proceeding to trial (against a set of very serious charges) with counsel

with whom he enjoyed a healthy working relationship.

It is ultimately the closeness of the question that persuades the Court not to

disturb the state trial court's decision to deny Pouncy's request to retain counsel.

Precisely because the question is so close, the Court cannot say that the trial court

---

[6] As Respondent notes, Pouncy's lawyer did not seem to share Pouncy's view of
their relationship.  While counsel did have concerns about proceeding to trial, those
concerns related primarily to a lack of time to prepare and contact witnesses.
Counsel did not express an inability to work with Pouncy.  But a healthy attorney-
client relationship exists only where *both* attorney *and* client trust each other and
feel that they can communicate effectively with one another.

abused its substantial discretion when it chose to proceed with the already-underway trial rather than stopping the proceedings dead in their tracks so that Pouncy could try to find and retain a lawyer. Pouncy is therefore not entitled to federal habeas relief on this claim.

## IV

Shortly after the state trial court declined to allow Pouncy to retain new counsel, Pouncy chose to represent himself at trial. In his habeas petition, he seeks relief on the ground that he did not knowingly and voluntarily waive his right to counsel. The Court now turns to that claim.

Pouncy contends that his waiver of that right was invalid because: (1) the record was "silent" as to whether he, in fact, agreed to waive his right to counsel; (2) he was not adequately warned of the dangers and disadvantages of self-representation; (3) he was not warned of the range of allowable punishments; and (4) he was given the "Hobson's Choice" of proceeding with unprepared counsel or proceeding without an attorney at all. (Pouncy Br., ECF No. 300, PageID.12270, 12294-12304.) (The Court previously granted habeas relief based upon the fourth ground, and the Sixth Circuit reversed that grant. So only grounds one, two, and

three are now before the Court.[7])  The Court concludes that Pouncy is not entitled to relief on any of these theories.

## A

Pouncy presented his waiver-of-counsel claim to the Michigan Court of Appeals, and that court rejected the claim on the merits:

> The existence of a knowing and intelligent waiver of counsel depends on the particular facts and circumstances of a case. *People v. Riley*, 156 Mich. App. 396, 399 (1986), overruled in part on other grounds *People v. Lane*, 453 Mich. 132 (1996). An explanation of the risks of self-representation requires more than informing the defendant that he waives counsel at his own peril. *People v. Blunt*, 189 Mich. App. 643, 649-650 (1991). A defendant must be specifically and rigorously warned of the hazards ahead. *Russell*, supra at 193 n. 27, citing *Iowa v. Tovar*, 541 U.S. 77, 88-89 (2004). An explanation of the risks of self-representation should include, for example, a warning that exercising the right to self-representation is usually an unwise decision and the defendant may be acting to his own detriment, and a warning that the defendant will not be afforded any special treatment and will be held to abide by the special skills and training required of any professional attorney. *Blunt*, supra at 649-650.

---

[7] Pouncy argues that this Court has the authority to revisit the Hobson's Choice component of this claim and to review the claim *de novo* (as opposed to reviewing it under AEDPA as the Court did before). (*See* Pouncy Br., ECF No. 300, PageID.12303-12304.)  The Court disagrees.  The Sixth Circuit specifically determined that Pouncy's "Hobson's Choice" theory was subject to AEDPA review, not *de novo* review. *See* Pouncy, 846 F.3d at 160.  That ruling constitutes the law of the case and binds this Court. *See Hanover Insurance Co. v. American Engineering Co.*, 105 F.3d 306, 312 (6th Cir. 1997) ("[W]hen a case has been remanded by an appellate court, the trial court is bound to proceed in accordance with the mandate and law of the case as established by the appellate court.").

In the present case, the record demonstrates that the trial court properly advised defendant of the risks of self-representation. The trial court told defendant that he would be a "fool" to represent himself and warned him that the court would treat him "like any other lawyer." Indeed, the trial court explained that defendant would be bound to comply with the court rules, which included making "objections and everything else." After defendant effectively asserted his right to represent himself, the trial court was not required to repeatedly pressure defendant into relinquishing that right. *People v. Morton*, 175 Mich. App. 1, 7 (1989). Based on the totality of the exchanges, we conclude that the trial court properly apprised defendant of the risks associated with self-representation.[1]

Moreover, the record reflects that the trial court repeatedly advised defendant of the charges against him, including the minimum and maximum prison sentences associated with the various charges, both at the beginning of trial and at every subsequent proceeding. *See* MCR 6.005(D).[2] Additionally, the record reflects that throughout the entire proceeding, Breczinski was available to advise defendant as standby counsel and actively participated in the trial by performing voir dire and questioning witnesses. *See* MCR 6.005(D)(2).

———

[1] Contrary to defendant's assertion, the trial court was not required to advise him "of the manner in which to make objections or explain the manner of decorum to be followed in the courtroom." Regardless, the record demonstrates that the trial court repeatedly, as necessary, advised defendant with respect to proper procedure, including, for example, introducing evidence and making objections.

[2] We reject defendant's argument that the trial court's failure to specifically advise him of the charges against him at the February 1, 2006 hearing warrants reversal of his convictions. Notice of the charges against the defendant is only required during the initial waiver. MCR 6.005(D). MCR 6.005(E) does not require

that that the trial court re-advise the defendant of the charges against him at every subsequent proceeding. *See Lane, supra* at 137. Moreover, during his closing argument, the prosecutor advised the jury of all of the charges against defendant, and during jury instructions, the trial court advised the jury of all the charges against defendant. Defendant was present throughout both recitations of the charges against him. Therefore, defendant was clearly, albeit indirectly, re-advised of the charges against him during that proceeding.

*Pouncy*, 2008 WL 9869818, at ** 8-9.

## B

The Court first addresses the portion of Pouncy's claim in which he contends that the Michigan Court of Appeals wrongly "presumed in the face of a 'silent record' that [his] waiver [of the right to counsel] was knowing, intelligent, and voluntary." (Pouncy Br., ECF No. 300, PageID.12295.) Pouncy insists that the Court of Appeals was bound to find his waiver invalid because the trial court "did not make an express, on-the-record finding that [his] waiver was knowing, intelligent, and voluntary...." (*Id.*, PageID.12296.)

Pouncy is not entitled to relief on this aspect of his claim because no United States Supreme Court decision specifically requires a trial court to make an express finding, on the record, that a waiver of counsel is knowing, voluntary, and intelligent. Thus, the Michigan Court of Appeals did not contravene clearly established federal law when it upheld Pouncy's waiver despite the absence of a specific, on-the-record finding in support of the waiver.

Pouncy counters that the Supreme Court's decision in *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), holds that a waiver of counsel is valid only if it is supported by an express, on-the-record finding that it was knowing and voluntary. But that is not the (or even a) holding of *Zerbst*. The Supreme Court in that case said only that "it would be fitting and appropriate" for such a finding "to appear on the record." *Id.* at 465. That language does not clearly establish that a trial court must make an express finding of a valid waiver on the record.

Pouncy next cites three published Sixth Circuit decisions that, he says, confirm his reading of *Zerbst* as requiring an express waiver finding on the record: *Fowler v. Collins*, 253 F.3d 244, 249-50 (6th Cir. 2001); *James v. Brigano*, 470 F.3d 636 (6th Cir. 2006); and *Hill v. Curtin*, 792 F.3d 670, 678 (6th Cir. 2015) (en banc). The Court disagrees with Pouncy's reading of these cases and concludes that none of them hold that *Zerbst* clearly establishes the on-the-record waiver requirement.

First, while the Sixth Circuit in *Fowler* did say that "a trial court's determination as to the propriety of a waiver should appear on the record," *Fowler*, 253 F.3d at 249-50, the court's ruling did not turn on that point. Instead, the court held that the purported waiver was invalid because the trial court "failed to investigate whether the waiver was made knowingly and intelligently" and "also failed to apprise [the petitioner] of the dangers and disadvantages of self-representation." *Id.*

Second (and similarly), while the Sixth Circuit in *James* observed that "at no time did the state trial judge make an explicit finding that James's waiver was knowing and intelligent," *James*, 470 F.3d at 643, the Sixth Circuit's ruling did not rest on that observation. Rather, the Sixth Circuit found the waiver of counsel involuntary because the petitioner was forced to choose "between unprepared counsel and self-representation," and that was "no choice at all." *Id.* at 644.

Finally, in *Hill*, the Sixth Circuit described *Zerbst* in a parenthetical as "holding that a trial court's determination as to the propriety of a waiver of counsel should appear on the record," *Hill*, 792 F.3d at 678, but that parenthetical was part of a lengthy string citation in support of a proposition that was unrelated to whether a waiver had to appear on the record. Thus, *Hill* did not squarely hold that *Zerbst* clearly establishes that a trial court must make an express finding of waiver on the record. !

Because the Supreme Court has not held that a trial court must make an express finding on the record that a waiver of counsel is knowing, voluntary, and intelligent, Pouncy is not entitled to habeas relief on the ground that the trial court failed to make such a finding here.

## C

The Court next addresses Pouncy's contention that his waiver of counsel was invalid because the state trial court did not sufficiently warn him about the risks of

self-representation. The clearly established law governing this claim is found in the Supreme Court's decision in *Faretta v. California*, 422 U.S. 806 (1975). In *Faretta*, the Supreme Court held that a defendant's waiver of the right to counsel is valid under the Sixth Amendment only if the trial court has made him "aware of the dangers and disadvantages of the self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). But the Supreme Court in *Faretta* did not "prescribe[] any formula or script to be read to a defendant who states that he elects to proceed without counsel." *Iowa v. Tovar*, 541 U.S. 77, 88 (2004). Indeed, "the Supreme Court has not elaborated on the procedural requirements, if any, that a trial court must implement when applying the *Zerbst* [waiver] standard in a self-representation setting." *Swiger v. Brown*, 86 F. App'x 877, 880 (6th Cir. 2004). And "[g]iven the general standard articulated in *Faretta,* 'a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.'" *Hill,* 792 F.3d at 679 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

Under this forgiving standard of review, the Court cannot deem unreasonable the Michigan Court of Appeals' determination that Pouncy was sufficiently advised of, and understood, the dangers of self-representation before he waived his right to counsel. The record contains at least minimally-sufficient support for that ruling.

When Pouncy first broached the subject of self-representation, the state trial court warned him, "[i]f you decide that you want to represent yourself ... then you're gonna represent yourself in total. The only thing [defense counsel] will be doin' is sitting there okay?" (1/24/06 Trial Tr., ECF No. 8-7, PageID.647.) The court then added, "[a]nd I can tell you right now that if you represent yourself you really are a fool okay and the reason is because you don't have a clue as to what you're doin'." (*Id.*, PageID.648.) The court also warned Pouncy that he would be expected to handle the entire case himself, that his appointed attorney would only sit in an advisory role, and that he (Pouncy) would be held to the same standard as an attorney. (*See id.*) To further illustrate the danger and disadvantage of acting as his own attorney, the court later used the easy-to-understand analogy of a person who does not know anything about cars trying to repair his own vehicle. (*See id.*, PageID.669-670.) At that point, the court asked Pouncy if he was "hearin' what I'm sayin'?" (*Id.*, PageID.670.) Pouncy responded: "Yes Your Honor … but you're not hearin' me though." (*Id.*) Pouncy later asked what the court would do if their roles were reversed, and the court responded, "[s]ir I would let [defense counsel] represent me in a heartbeat before I would represent myself with the knowledge you have." (*Id.*, PageID.672-673.) The waiver of counsel did not occur at that point. Instead, the conversation turned to Pouncy's frustrations with his appointed attorney.

The actual waiver of counsel occurred after the prosecutor finished direct examination of the first witness. (*See id.*, PageID.688-690.) At that point, Pouncy's appointed counsel again informed the court that Pouncy was requesting to represent himself. Pouncy and the trial court then had the following colloquy:

> THE COURT: Okay Mr. Pouncy, would you stand sir? Is that your desire at this time? Please remain standing sir. Mr. Pouncy you understand you have the right to an attorney and you have the right to Court appointed counsel if you can't afford one, do you understand that?
>
> MR. POUNCY: I don't have an attorney right now.
>
> THE COURT: Sir I'm just asking you do you understand your rights sir?
>
> MR. POUNCY: Oh yes I do understand.
>
> THE COURT: You understand that if you represent yourself that I will have to treat you like any other lawyer and if you don't comply with the Court rules I'm gonna have to call you on it you understand that?
>
> MR. POUNCY: Yes sir.
>
> THE COURT: And you understand that Mr. Breczinski will be here just simply to advise you from this trial forth and if you stand up and start representing yourself you're not gonna be able to change horses in the middle of the stream. You're gonna be representing yourself from beginning to end sir. Is that what you really want to do?
>
> MR. POUNCY: Yes. Yes.
>
> THE COURT: Mr. Pouncy, I'm gonna tell you that in my opinion you have no business representing yourself, none whatsoever.

MR. POUNCY: The fact that they found the (inaudible) shoe –

THE COURT: Sir, I just, sir I just want you to understand that uh –

MR. POUNCY: All right I'm ready to go then.

(1/24/06 Trial Tr., ECF No. 8-7, PageID.688-689.) Trial thereafter proceeded with Pouncy representing himself and his appointed counsel acting in a stand-by capacity.

On this record, a fair-minded jurist could reasonably conclude, as the Michigan Court of Appeals did, that (1) the entirety of the trial court's exchanges with Pouncy sufficiently informed him that he faced serious risks and pitfalls if he chose to represent himself and (2) Pouncy understood the court's warnings and agreed to waive his right to counsel. While there is no single exchange on the record at which the trial court neatly gives a perfect *Faretta* warning to Pouncy and Pouncy then immediately expresses his full understanding of that warning, it was reasonable for the Court of Appeals to determine that the record as a whole included both a minimally sufficient warning by the trial court and comprehension and waiver by Pouncy. *See, e.g., King v. Bobby*, 433 F.3d 483, 492 (6th Cir. 2006) (holding that it is reasonable for a state court to review the "whole record, not just the colloquy immediately before the signing of the waiver, to determine if [a waiver of counsel] was knowing and intelligently entered."); *United States v. Krzyske*, 836 F.2d 1013, 1017-18 (6th Cir. 1988) (examining "all the circumstances" reflected in the record

as a whole to determine whether *Faretta* waiver was valid). For these reasons, the Court declines to grant habeas relief on this aspect of Pouncy's claim under *Faretta*. *See Pouncy*, 846 F.3d at 163 (explaining that habeas relief on a *Faretta* claim is not available where there is room for fair-minded disagreement concerning the state court's decision on the merits of the claim).

While the Court will not grant habeas relief on this component of Pouncy's claim, the Court's own view (as it previously indicated) is that the state trial court's *Faretta* waiver colloquy was problematic. The trial court's dialogue with Pouncy was truncated and reflected the court's frustration, exasperation, and annoyance by what it viewed as a mere interruption during the proceeding. Pouncy was making a vitally important decision, and the process should have involved a more deliberate and careful discussion than that allowed for by the court. But under AEDPA, Pouncy is nonetheless not entitled to relief on this claim.

## D

The Court next turns to Pouncy's claim that his waiver of his right to counsel was invalid because the trial court did not advise him about the range of allowable punishments that he faced if he were to be convicted as charged. The Court cannot grant habeas relief on this claim because the United States Supreme Court has not held that a criminal defendant must be informed about the range of allowable punishments before he may validly waive his right to counsel.

43

Pouncy counters that three Supreme Court decisions hold that a waiver of counsel is not valid unless a trial court advises a defendant, among other things, about the range of allowable punishments. The Court disagrees.

First, Pouncy cites *Faretta*, *supra*. But, as noted above, *Faretta* establishes only the general rule that a trial court must advise a defendant about the dangers of self-representation before accepting the defendant's waiver of his right to counsel. *Faretta* does not say or hold that a trial court must advise a defendant about the range of allowable punishments before the court may accept a waiver of counsel.

Second, Pouncy highlights the statement from *Von Moltke v. Gillies*, 332 U.S. 708, 724 (1948), that "[t]o be valid," a waiver of counsel "must be made with an apprehension of … the range of allowable punishments [for the charged offenses]." But this statement appeared in a plurality Opinion, not in an Opinion of the Court. *See id.* And the Justices who supplied the decisive votes in favor of the Supreme Court's judgment did not say that a trial court must advise a defendant about the range of allowable punishments before accepting a waiver of counsel. *See id.* at 727-31 (Frankfurter, J., concurring) (focusing on whether waiver was invalid on the ground that an FBI agent gave the petitioner faulty legal advice as to whether she was guilty). Pouncy has not explained how the statement in the plurality Opinion concerning the range of allowable punishments qualifies as clearly established

federal law under these circumstances.[8]  *See United States ex rel Walker v. Yurkovich*, 2010 WL 3937484, at *3 (N.D. Ill., Oct. 5, 2010) (concluding that statement in *Von Moltke* regarding range of allowable punishments did not constitute clearly established federal law).

Third, Pouncy cites *Tovar*, *supra*.  In *Tovar*, the Supreme Court said that the "constitutional requirement [for a valid waiver of counsel] is satisfied when the trial court informs the accused of the nature of the charges against him, of his right to be counseled regarding his plea, and of the range of allowable punishments attendant upon the entry of a guilty plea." *Tovar*, 541 U.S. at 81.  On first blush, this statement seems to provide strong support for Pouncy's claim.  But a careful review of *Tovar* reveals that this statement did not reflect the *holding* of the Supreme Court.

In *Tovar*, the Supreme Court granted certiorari to review a decision of the Iowa Supreme Court holding that before a defendant may waive his right to counsel, he must be advised, among other things, that (1) "waiving the assistance of counsel in deciding whether to plead guilty [entails] the risk that a viable defense will be overlooked"; and (2) "by waiving his right to an attorney he will lose the opportunity

---

[8] A plurality Opinion may constitute clearly established federal law when the Opinion represents the holding of the Supreme Court under the rule in *Marks v. United States*, 430 U.S. 188, 193 (1977). *See Panetti*, 551 U.S. at 949.  But Pouncy has not shown (or even attempted to show) how, under *Marks*, the plurality Opinion from *Von Moltke* represents the holding of the Supreme Court and, accordingly, may be considered clearly established federal law.

to obtain an independent opinion on whether, under the facts and applicable law, it is wise to plead guilty." *Id.* The Supreme Court noted that "the *sole* question before us is whether the Sixth Amendment compels the two admonitions here in controversy." *Id.* at 91-92 (emphasis added). And the Supreme Court "h[e]ld it does not." *Id.* at 92. Later in its Opinion, the Supreme Court highlighted the narrowness of its holding: "We hold *only* that the two admonitions the Iowa Supreme Court ordered are not required by the Federal Constitution." *Id.* at 94 (emphasis added). "Based upon all of the language in *Tovar*," this Court cannot accept Pouncy's argument that *Tovar* clearly establishes that a waiver of counsel is valid only where the trial court advises the defendant, among other things, of the range of allowable punishments. *People v. Bush*, 213 Cal. Rptr.3d 593, 604-06 (Cal. App. 2017). *But see Arrendondo v. Neven*, 763 F.3d 1122, 1131 (9th Cir. 2014) (holding that *Tovar* did clearly establish that a waiver of counsel is valid only where the trial court advises the defendant, among other things, of the range of allowable punishments).[9]

Pouncy also cites the Sixth Circuit's decision in *Akins v. Easterling*, 648 F.3d 380, 389 (6th Cir. 2011), for the proposition that a waiver of counsel is not valid

---

[9] In *Bush, supra*, the California Court of Appeals expressed its disagreement with *Arrendondo* and offered a lengthy explanation in support of its conclusion that *Tovar* does not clearly establish a waiver of counsel is valid only where the trial court advises the defendant, among other things, of the range of allowable punishments. *See Bush*, 213 Cal. Rptr.3d at 604-06. The Court believes that the California Court of Appeals' reading of *Tovar* is more faithful to *Tovar's* text than is the Ninth Circuit's reading of *Tovar*.

unless the trial court advises the defendant, among other things, of the range of allowable punishments. In *Akins*, the Sixth Circuit said:

> Before waiving the right to counsel, the defendant must understand 'the range of allowable punishments.' *Von Moltke,* 332 U.S. at 724, 68 S.Ct. 316. 'The constitutional requirement is satisfied when the trial court informs the accused of ... the range of allowable punishments.' *Tovar,* 541 U.S. at 81, 124 S.Ct. 1379."

*Id.* at 389.

While these statements in *Akins* lend support to Pouncy's argument that a trial court must advise a defendant about the range of allowable punishments before accepting a waiver of counsel, the statements do not represent "clearly established federal law" on which habeas relief may rest. As the Sixth Circuit has explained, "circuit precedent does not constitute clearly established Federal law, as determined by the Supreme Court, and it therefore cannot form the basis for habeas relief under AEDPA." *Hill v. Curtin*, 792 F.3d 670, 677 (6th Cir. 2015). Thus, to the extent that the statements in *Akins* represent legal rulings by the Sixth Circuit for which that court found some support in *Von Moltke* and *Tovar*, the statements do not constitute clearly established federal law.

Moreover, *Akins* does not fall within the narrow class of circuit precedent that may be consulted in determining whether a rule amounts to clearly established federal law. While this Court may look to Sixth Circuit decisions "to ascertain whether [that court] has already held that [a] particular point in issue is clearly

established by Supreme Court precedent," *Marshall v. Rodgers*, 569 U.S. 58, 64

(2013), *Akins* does not *hold* that *Von Moltke* and *Tovar* clearly establish that a trial

court must inform a defendant about the range of possible penalties before accepting

a waiver of counsel. The Sixth Circuit in *Akins* concluded that the trial court *did*

sufficiently inform the petitioner about the range of penalties before he waived his

right to counsel, *see Akins*, 648 F.3d at 399, and thus the Sixth Circuit did not have

to decide whether the petitioner's waiver of counsel would have been invalid absent

the penalty disclosure. Under these circumstances, *Akins* cannot be read as *holding*

that *Von Moltke* and *Tovar* clearly establish that a trial court must inform a defendant

about the range of possible penalties before accepting a waiver of counsel. *See Keahy*

*v. Marquis*, 978 F.3d 474, 480 (6th Cir. 2020) (declining to treat Sixth Circuit's prior

statement of legal rule in a habeas case as depicting clearly established federal law

because "the habeas claimant did not obtain relief in the case, making the language

unnecessary to the decision"); *Wright v. Spaulding*, 939 F.3d 695, 700-05 (6th Cir.

2019) (carefully describing how to determine the "holding" of a decision and

explaining that the holding is limited to the specific question actually presented by

the parties and considered by the court).[10]

---

[10] The opposite is true in cases in which the Sixth Circuit has (1) determined that the petitioner satisfied 28 U.S.C. § 2254(d)(1) and (2) affirmed a *grant* of habeas relief and/or directed that a district court *grant* habeas relief. As this Court previously explained in detail, in such cases the Sixth Circuit has necessarily *held* that the rule

Finally, Pouncy suggests that Respondent has conceded that clearly established federal law requires a trial court to advise a defendant about the range of allowable punishments before accepting a waiver of counsel, and Pouncy seems to imply that based upon this purported concession, the Court may treat this principle as clearly established federal law. (*See* Pouncy Br., ECF No. 300, PageID.12299.) In support, Pouncy cites Respondent's statement that a defendant who wishes to waive counsel "must be told" the "statutory maximum punishment and any mandatory minimums." (*Id.*) For two reasons, the Court disagrees.

First, Respondent did not admit that the rule cited by Pouncy is clearly established. On the contrary, Respondent first argued that "no Supreme Court precedent requires the trial court to inform a defendant of 'the range of allowable punishments' in the self-representation setting." (Respondent Br., ECF No. 239, PageID.11370.) Respondent then asserted, in the alternative, that if it is clearly established that a trial court must inform a defendant of the range of allowable punishments before accepting a waiver of counsel, the trial court complied with that requirement by informing Pouncy about the statutory maximum and applicable mandatory minimums. (*See id.*, PageID.11374.) Respondent's alternative argument was not an admission.

---

it has applied *does* constitute clearly established federal law. *See Pouncy*, 168 F.Supp.3d at 963-66.

Second (and in any event), this Court is obligated to make its own independent assessment of the legal questions presented in this action, and the Court does not consider itself bound by any party's position and/or concession concerning any question of law. For the reasons explained above, this Court has determined that Supreme Court precedent does not clearly establish that a trial court must inform a defendant about the range of allowable punishments before accepting the defendant's waiver of his right to counsel. Accordingly, Pouncy is not entitled to habeas relief based upon the trial court's alleged failure to so advise him.[11]

---

[11] Both Michigan law and Sixth Circuit precedent appear to require a court to advise a criminal defendant about the range of allowable punishments before accepting a waiver of the right to counsel. *See* Michigan Court Rule 6.005(D)(1) (providing that "[t]he court may not permit the defendant to make an initial waiver of the right to be represented by a lawyer without first (1) advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation"); *United States v. Ross*, 703 F.3d 856, 867 (6th Cir. 2012) (explaining that before a district court accepts a waiver of counsel, it "must ask the defendant a series of questions drawn from, or substantially similar to, the model inquiry set forth in the *Bench Book for United States District Judges*" – an inquiry which includes advice about the range of punishments). Thus, nothing in the Court's ruling should be taken to suggest that a waiver of counsel is valid in this Circuit or under Michigan law if the defendant is not told of the range of allowable punishments. The only question before the Court on the limited review permitted under AEDPA is whether the United States Supreme Court has held that a defendant must be informed of the range of punishments before waiving counsel. As described above, it has not.

**V**

The Court next turns to Pouncy's claim that his trial counsel provided ineffective assistance of counsel with respect to a possible plea bargain. Pouncy says that his attorney was ineffective vis-à-vis a possible plea in two related respects. First, Pouncy contends that his attorney gave him faulty advice about his sentencing exposure following a conviction at trial, and he argues that that mis-advice led him to reject a favorable plea offer. Second, he asserts that his attorney's deficient performance prevented him from securing a more favorable plea offer than that offered by the prosecutor.

The Court concludes that Pouncy is entitled to relief on his claim that his attorney was ineffective in connection with the plea-bargaining process. As described in detail below, counsel erroneously and unreasonably advised Pouncy about the possible minimum sentence that he (Pouncy) faced if convicted at trial. That deficient performance by counsel derailed the plea-bargaining process. It led Pouncy to reject a plea offer that the prosecution had made and, in addition, led Pouncy to eschew plea negotiations that would have resulted in a plea offer even more favorable than the one the prosecution had initially made. The Court is persuaded that both Pouncy and the trial court would have accepted the more favorable plea offer that the prosecution would have made. Under these circumstances, Pouncy has shown deficient performance by his attorney and

prejudice from that deficiency.  Accordingly, he is entitled to relief on his claim that he received ineffective assistance of counsel in connection with the plea-bargaining process.

## A

Pouncy presented his claim that he received ineffective assistance of counsel in connection with the plea-bargaining process to the state courts, and the state courts did not decide the claim on the merits.  Thus, as Respondent acknowledges, this Court may review the claim *de novo*. (*See* Respondent Br., ECF No. 321, PageID.12583.)

## B

In order to understand Pouncy's claim that counsel provided deficient advice in connection with the plea-bargaining process, one must first understand (1) how Michigan courts determine, impose, and express criminal sentences, (2) how the Michigan Sentencing Guidelines affect a sentence, and (3) how a habitual offender designation operates under Michigan law.

Unlike federal courts – which impose a sentence for a fixed period of time – "a sentence imposed in Michigan is [almost always] an indeterminate sentence" that includes both a minimum and maximum. *People v. Drohan*, 715 N.W.2d 778, 790 (Mich. 2006), overruled in part on other grounds, *People v. Lockridge*, 870 N.W.2d 502 (Mich. 2015).  Once a defendant serves his minimum sentence, he becomes

eligible for parole, and the Michigan Parole Board determines whether to release him prior to the expiration of his maximum term. *See* Mich. Comp. Laws § 791.234(1).

Next, Michigan's Sentencing Guidelines provide a range for determining a defendant's *minimum sentence. See People v. Babcock*, 666 N.W.2d 231, 256 n.7 (Mich. 2003). The guidelines play no role in determining a defendant's maximum sentence. *See id.* The maximum is set by statute. *See Drohan*, 715 N.W.2d at 790.[12] Furthermore, at the time of Pouncy's sentencing, Michigan's sentencing guidelines were "mandatory," meaning that trial courts were required to impose a minimum sentence within the guidelines range unless they found "substantial and compelling reasons" to depart from the guidelines. Mich. Comp. Laws § 769.343(3); *Babcock*, 666 N.W.2d at 236.

Finally, Michigan law provides that when a defendant is convicted as a habitual offender, the top end of his guidelines range increases by a percentage based upon the number of his prior felony convictions. *See* Mich. Comp. Laws § 777.21(3). But conviction as a habitual offender does not increase the bottom end of a defendant's guidelines range. Thus, by way of example, a third habitual offender

---

[12] For crimes such as carjacking and armed robbery, that carry a maximum sentence of "life or any term of years," Mich. Comp. Laws §§ 750.529 and 529(a), a trial court has discretion to set the maximum term of an indeterminate sentence to any number years, not exceeding the defendant's life expectancy. *See People v. Moore*, 417 N.W.2d 508 (Mich. App. 1987).

sees the top of his guidelines range increased by 50-percent, but the bottom end of his guidelines range remains the same. *See* Mich. Comp. Laws § 777.21(3)(b).

## C

With this rudimentary understanding of Michigan sentencing law and procedure, the Court now turns to how defense counsel's deficient representation manifested itself on the trial record in Pouncy's case.

On the morning that Pouncy's trial was set to begin, the state trial court convened proceedings on the record and asked the prosecutor to "tell us what is the charges [sic] and the maximum penalties." (1/24/06 Trial Tr. ECF No. 8-7, PageID.473.) The prosecutor then identified the eleven felony charges – including several counts of carjacking and armed robbery and two counts of felony firearm. (*See id.*) The prosecutor also told the court that Pouncy "does have two prior felonies" and that "there is a plea offer." (*Id.*) The court then asked whether Pouncy "has the potential of facing a habitual offender third," and the prosecutor answered that Pouncy did have that potential. (*Id.*, PageID.474.) The court then noted that the carjacking and armed robbery charges "carrie[d] life" maximum sentences and that the felony firearm charge "is two years consecutive."[13] (*Id.*)

---

[13] Under Michigan law, the mandatory sentence for a felony-firearm conviction is two years in prison, and the two years must "be served consecutively with and preceding any term of imprisonment imposed for the conviction of the [predicate] felony." Mich. Comp Laws § 750.227b(3).

The court then asked the prosecutor, "what are the guidelines on these offenses, assuming that [Pouncy] were convicted of [all] of the offenses that are in the information, what would the guidelines be?" (*Id.*) The prosecutor told the judge that Pouncy's counsel "has" the guidelines calculation. (*Id.*)

At that point, defense counsel told the court that Pouncy's guidelines range if Pouncy were to be convicted of all charges at trial – *i.e.*, the range in which Pouncy's minimum term would presumptively fall if he lost at trial – was "a hundred and thirty-five months to three hundred and thirty-seven." (*Id.*, PageID.475.) The court then observed that that range was "really somewhere in the neighborhood of 11.5 years to … about twenty-eight, twenty-nine years I think." (*Id.*) And the court added that if Pouncy were convicted on the felony-firearm charge, he would have to serve an additional two-year sentence "on top" of the sentence for the other offenses that would be imposed under the guidelines range. (*Id.*, PageID.477.)

The court then discussed the impact of the guidelines range with Pouncy. It told Pouncy that the range "means … that if you were convicted of all of the offenses and if you were a habitual offender third and you came in front of me for sentencing, the guidelines say I should give you a sentence somewhere between eleven and a half to twenty-eight years, eight years, do you understand that?" (*Id.*, PageID.476.) The court did not tell Pouncy that the guidelines range covered only the minimum

term of the sentence that would ultimately be imposed, and counsel likewise said nothing to that effect on the record.

The court then asked the prosecutor to identify any plea offer for the record. (*See id.*)  The prosecutor said that "the offer is plea to those eleven counts and no HO [habitual offender enhancement] for sentencing." (*Id*.)  The prosecutor did not identify any other terms of the offer. (*See id*.)

The court next asked "what would be the guidelines without the habitual offender third" – *i.e.*, the guidelines range under the plea offer? (*Id*.)  Defense counsel answered that "[t]he bottom range is still a hundred and thirty-five and the top is two twenty-five." (*Id*.)  The court responded that even with the prosecution's plea offer, Pouncy was "still lookin' at about eleven and a half to almost twenty, almost twenty years." (*Id.*)  Defense counsel confirmed that the court's observation was "[c]orrect." (*Id.*, PageID.477.)

The court then asked the prosecutor if the proposed plea deal also required Pouncy "to plea to the felony firearm" – the charge with the mandatory two-year sentence that had to be served consecutively to all other sentences. (*Id*.)  The prosecutor confirmed that it did. (*See id.*)

In response, the trial court said that it could "see why [Pouncy] might want to go to trial.  There's not much difference in terms of the guidelines between the offer and the original charges it sounds like to me." (*Id*.)  The court then repeated its

observation that "there's really not much difference in the guidelines here at all."
(*Id.*)  And the court asked Pouncy to discuss the plea offer with his attorney. (*See id.*)  Pouncy responded that he "will never take the plea to nothin' I did 'cause I didn't do it." (*Id.*, PageID.478.)

Pouncy then went to trial on all of the charges against him and was convicted of all charges.  He was also found to be a third habitual offender.  At sentencing, the trial court determined that his sentencing guidelines range called for a minimum sentence of 225-562 months. (*See* 3/9/06 Sent. Hr'g Tr., ECF No. 8-16, PageID.1936.)  That range far exceeded the range of 135-337 months that the parties had placed on the record before trial.

The court set Pouncy's minimum sentence at the top of the 225-562 months range. (*See id.*, PageID.1936, 1983-1984.)  It sentenced him to serve 562 months to life, plus two years consecutive for the felony firearm conviction. (*See id.*, PageID.1983-1984.)

Pouncy was understandably shocked by the severity of his sentence.  As noted above, the trial court had explained to Pouncy prior to trial (and when Pouncy rejected the plea offer) that the guidelines calculated by the parties "say [that if you are convicted of all charges and determined to be a third habitual offender] I should give you a sentence somewhere between eleven and a half to twenty-eight years, eight years." (1/24/06 Trial Tr., ECF No. 8-7, PageID.476.)

Pouncy's attorney was likewise surprised by Pouncy's post-trial sentencing exposure. He had not realized that following a trial, Pouncy's sentencing guidelines range could be determined to be higher than the parties had originally determined. And he never advised Pouncy that his post-trial sentencing exposure could potentially be substantially higher than the guidelines range that the parties placed on the record before trial. As counsel (who is now deceased) explained in an affidavit submitted in these proceedings:

> Prior to trial when Petitioner Pouncy was extended the favorable plea bargain with sentencing guidelines of 135 months (11 years, 3 months) to 225 months (18 years, 9 months), after discussing the matter with Assistant Prosecuting Attorney Christopher D. Larabardier [sic], I was under the impression that if Petitioner Pouncy rejected the plea bargain and proceeded to trial, he would only face a sentencing guideline range of 135 months (11 years, 3 months) to 337 months (28 years, 11 months) and this is what I impressed upon Petitioner Pouncy. (Trial Transcript, 1-24-06, 19-22, attached as Appendix C).

> Had I know[n] that the sentencing guideline range, after trial, would have left Petitioner Pouncy exposed to a sentencing guidelines range which permitted a minimum sentence of 46 years, 10 months, I would have factored this into my advice regarding the plea and based on the significant disparity between the possible minimum sentence after a plea versus after trial, I would have used this information to encourage Petitioner Pouncy to accept the plea offer which would have allowed for minimum sentence of between 11 years, 3 months to 18 years, 9 months. (Sentencing Transcript, 2-1-06, 81-83 attached as Appendix D).

(Michael Breczinski Aff. at ¶¶ 9-10, ECF No. 71, PageID.6650-6651.)

Pouncy now says that if counsel had properly advised him that his sentencing guidelines range following trial could end up being substantially higher than the guidelines range placed on the record before trial – and that he could thus face a substantially higher minimum sentence following trial – he would have instructed his attorney to engage in plea negotiations with the prosecutor, or, at a minimum, would have accepted the offer made the by the prosecution on the record on the first day of trial. (*See* Pouncy Br., ECF No. 374, PageID.13939-13942.)

**D**

Pouncy's claim that he was deprived of the effective assistance of counsel by his attorney's failure to properly advise him during the plea process is governed by the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Missouri v. Frye*, 566 U.S. 134, 140 (2012). "Under *Strickland*, a criminal defendant is not entitled to relief unless he proves both that counsel's performance was deficient, measured by reference to an 'objective standard of reasonableness,' and resulting prejudice, which exists where 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *United States v. Coleman*, 835 F.3d 606, 612 (6th Cir. 2016) (quoting *Strickland*, 466 U.S. at 688, 694).

In *Lafler v. Cooper*, 566 U.S. 156 (2012), the Supreme Court established the test for prejudice to be applied in a case in which a petitioner claims that counsel's

deficient performance led him to reject a favorable plea offer.  Under the test from *Lafler*, a petitioner "must show that but for the ineffective advice of counsel there is a reasonable probability that [1] the plea offer would have been presented to the court (*i.e.,* that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), [2] that the court would have accepted its terms, and [3] that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id*. at 164.

Pouncy has demonstrated both that his attorney provided objectively deficient representation in connection with the plea-bargaining process and that he (Pouncy) suffered prejudice as a result.

## E

The performance of Pouncy's counsel during the plea-bargaining process fell below an objective standard of reasonableness because he failed to provide competent "professional guidance to [Pouncy] regarding his sentence exposure." *Moss v. United States*, 323 F.3d 445, 474 (6th Cir. 2003).  Counsel's fundamental failure was not advising Pouncy that the pre-trial guidelines calculations stated by himself and by the trial court were *estimates* that (1) were based upon certain *assumptions* and (2) could change substantially depending upon the evidence presented at trial, the guidelines analysis offered by the probation department, and

post-trial findings made by the trial court. Simply put, counsel failed to advise Pouncy that his worst-case, post-trial guidelines calculation – and thus his worst-case, post-trial minimum sentence – was potentially much higher than the guidelines range stated on the record by counsel and by the trial court before the trial began. That failure was objectively unreasonable. *See, e.g., United States v. Knight*, 981 F.3d 1095, 1102 (D.C. Cir. 2020) ("Counsel's . . . failure to alert Knight to the worst-case scenario of rejecting the plea offer left Knight unable to make an intelligent decision about whether to accept the plea offer."); *Julian v. Bartley*, 495 F.3d 487 (7th Cir. 2007) (Counsel performed deficiently during plea bargaining by leading defendant to believe that by turning down plea offer "he was only risking seven additional years for a chance at acquittal," but "[i]n actuality, [he] was risking thirty-seven [additional] years for the chance at acquittal.").

Indeed, counsel should have been well aware that the post-trial guidelines range could have ended up much higher than he estimated. That is because counsel's pre-trial estimates rested upon a number of assumptions that were obviously open to serious question. For instance, counsel's pre-trial guidelines calculation scored zero points for an offense variable related to psychological injury to a victim. (*See* Respondent Br., ECF No. 321, PageID.12590.) But the charges here were multiple armed robberies during which the victims were confronted with a firearm. It should have been obvious to counsel before trial that there was at least some potential that

at least one victim could have suffered significant psychological trauma that could lead to scoring points on the psychological injury variable. And that is exactly what happened. Based upon the testimony of at least one of the victims at trial, the trial court scored 10 points for the psychological injury offense variable. A competent lawyer would have explained his analysis of the psychological injury variable to Pouncy and informed Pouncy that the variable could potentially be scored differently – and adversely to him – following trial.

Similarly, counsel's pre-trial guidelines calculation assumed that zero points would be scored for an offense variable related to whether a victim was threatened with a weapon. (*See id.*) It should have been obvious to any attorney who had done a basic investigation of the allegations and victim statements that it was at least possible that some points could be scored for this offense variable. And, again, that is exactly what happened. The trial court assessed 15 points for this variable based upon testimony that Pouncy and/or one of his accomplices fired a weapon in an attempt to threaten a victim into giving up his car. (*See* 3/9/06 Sent. Hr'g Tr., ECF No. 8-16, PageID1913-1919.) Pouncy's lawyer should have explained his analysis of the victim-threat variable to Pouncy before trial and explained how a different conclusion with respect to the variable would be possible after trial.

Respondent counters that Pouncy's defense lawyer did not perform deficiently because counsel's prediction of Pouncy's guidelines range was "reasonable."

(Respondent's Br., ECF No. 321 at PageID12587-12591.)  But that misses the point. Even if the prediction, itself, was reasonable, it was unreasonable for counsel to fail to explain to Pouncy that (1) the prediction that rested upon a number of assumptions and conclusions that the trial court may or may not draw following a trial, (2) the trial court's statement about what the guidelines would be following a conviction on all charges was likewise a prediction that was subject to substantial change, and (3) most fundamentally, there was at least some possibility that his highest possible minimum sentence following a conviction on all charges could be substantially higher than the top of the guidelines range stated on the record by counsel and the trial court.  Under these circumstances, the Court has no trouble concluding that counsel failed to provide effective assistance during the plea-bargaining process.[14]

---

[14] In an Opinion and Order issued much earlier in this case – and before the Court had the level of familiarity with the record and the legal issues that it now has – the Court said that the "magnitude of [defense counsel's] guidelines miscalculation was staggering." *Pouncy v. Palmer*, 168 F.Supp.3d 954, 963 (E.D. Mich. 2016).  At the time the Court made that statement, it did not have the benefit of Respondent's analysis of counsel's guidelines calculations.  Respondent has now offered a detailed analysis as to why the guidelines range stated by defense counsel was not an unreasonable pre-trial estimate of Pouncy's exposure under the guidelines even though it ended up falling far short of the range that the trial court ultimately calculated.  (*See* Respondent's Br., ECF No. 321, PageID.12586-12591.)  Respondent's analysis of this issue is serious and may have some merit.  However, the Court need not and does not reconsider whether defense counsel's pre-trial guidelines calculation was reasonable.  As explained above, even if the calculation was reasonable, counsel acted unreasonably in failing to advise Pouncy that (1) the calculation was an estimate that rested on some key and questionable assumptions and (2) Pouncy's guidelines range could ultimately be determined to be much higher than the estimate.

## F

The Court next turns to whether Pouncy has shown prejudice from counsel's deficient performance in connection with the plea offer.  As noted above, in order to show prejudice, Pouncy must demonstrate that a more favorable plea offer would have been presented to the trial court, that the trial court would have accepted the more favorable offer, and that the sentence under the offer would have been more favorable than the sentence that was imposed. *See Lafler*, 566 U.S. at 164.  Pouncy has done so.

## 1

The Court exercised its discretion to "conduct an evidentiary hearing" in order to develop a fuller record against which to assess Pouncy's claim of prejudice. *Id.* at 171.  Three witnesses testified at the hearing: (1) Pouncy, (2), Leonard Accardo, a private investigator employed by Pouncy's trial counsel to assist with pre-trial investigation, and (3) Christopher Larobardiere, the trial prosecutor.  In addition, each party submitted documentary exhibits for the Court's consideration.  The testimony and other evidence presented at the evidentiary hearing provided important additional information bearing on the question of prejudice that was not apparent from the trial record alone.  Indeed, the hearing testimony provided important context for statements made by counsel and by Pouncy on the record.

After carefully considering the hearing testimony, reviewing the hearing exhibits, and considering the other evidence in the record, the Court makes the following findings of fact related to the prejudice prong of Pouncy's ineffective assistance claim:

1. Before Pouncy went to trial in the case at issue here, he had been charged with several other criminal offenses in at least three different state-court criminal cases. (*See* 1/8/2021 Evid. Hr'g Tr., ECF No. 371, PageID.13642-13643.[15])

2. Pouncy resolved all of his prior criminal cases through plea negotiations that led to plea bargains. (*See id.*, PageID.13643.) In all of those cases, the prosecution made an opening plea offer, Pouncy's defense lawyers engaged in plea negotiations with the prosecution, and the final plea deal was more favorable than the prosecution's original offer. (*See id.*, PageID.13652, 13660-13661.) During the plea negotiations in one of the prior cases, Pouncy maintained and asserted his innocence, and he came to

---

[15] The Court does not mean to imply that the evidence cited in support of the factual findings above is the only evidence in the record that supports each finding. The findings are based upon the totality of the evidence presented at the hearing and in the record. For the convenience of the reader, the record citations simply highlight some of the evidence that supports each finding. Moreover, in some instances, the cited evidence, standing alone, does not directly prove the associated finding made by the Court. In those instances, the Court has drawn what it believes to be reasonable inferences from the cited evidence (and the other evidence in the record), and the Court concludes that its findings are supported by the reasonable inferences.

believe that his repeated assertions of innocence helped to induce the prosecution to negotiate down from its original plea offer. (*See id.*, PageID.13652-13653.)

3. In at least one of Pouncy's earlier criminal cases, he entered a plea – either guilty or no contest – even though he believed that he was innocent of the charges. (*See id.*, PageID.13645.) In that case, he entered the plea because his attorney advised him that the case against him was strong and that his best course of action was to enter a plea. (*See id.*, PageID.13645-13647.)

4. During preparation for the trial in this case, Accardo (the private investigator retained by Pouncy's attorney) came to visit Pouncy while Pouncy was in custody. (*See id.*, PageID.13667.) During their conversation, Accardo indicated to Pouncy that if Pouncy could provide information leading to the return of the vehicles that had been carjacked, that could be helpful to Pouncy in plea negotiations with the prosecution. (*See id.*, PageID.13512, 13527, 13668-13670.) Pouncy attempted to provide such information. (*See id.*, PageID.13512-13513.) He did so because he was willing to entertain the possibility of pleading guilty and willing to enter into plea negotiations with the prosecution. (*See id.*, PageID.13513, 13528, 13670.)

5. As the trial in this case approached, Pouncy wrote a letter to the prosecuting attorney expressing his innocence of the charges. (*See id*., PageID.13650-13651.) In the same letter, he also wrote that he was not seeking a plea offer because he was innocent. (*See id*.) At the time Pouncy wrote that letter, he believed, consistent with his perception of what had occurred in his earlier criminal cases, that his unequivocal assertions of his innocence and his denial of interest in a plea would help to induce the prosecution to re-examine and improve its plea offer. (*See id*., PageID.13650-13663, 13671-13672.)

6. At some other point prior to trial in this case, the prosecutor communicated to Pouncy's lawyer a plea offer under which Pouncy would plead guilty to all of the charges in exchange for dismissal of the habitual offender sentencing enhancement. (*See id*., PageID.13575.) (This is the same plea offer that was placed on the record just before the trial began.)

7. Around the time that the prosecution extended that offer, Pouncy's lawyer and the prosecutor undertook to calculate what Pouncy's range under the Michigan Sentencing Guidelines would be both (a) under the plea offer and (b) in the event Pouncy went to trial, was convicted on all charges, and was sentenced as an habitual offender. As described above, they determined that Pouncy's guidelines range under the plea agreement called

for a minimum sentence of 135-225 months and that his guidelines range if convicted as charged at trial called for a minimum sentence of 135-337 months.

8. Pouncy's lawyer did not inform Pouncy about the prosecution's plea offer and/or about the above-described guidelines calculations until the morning of trial (January 24, 2006). (*See id*., PageID.13653-13654, 13658.) Counsel informed Pouncy of these matters as Pouncy sat in the "bullpen" – a custodial holding area in which defendants await being called into court – and their discussion of these matters lasted only a few minutes. (*Id*., PageID.13656-13658.) During the discussion, counsel advised Pouncy – consistent with counsel's guidelines calculation described above – that Pouncy faced a possible minimum sentence of up to 337 months in prison if convicted on all charges at trial. (*See id*.) Counsel further told Pouncy that the trial was going to be adjourned, and therefore Pouncy did not have to make a decision that day about whether to accept or reject the plea offer. (*See id*.) Finally, counsel told Pouncy that he believed he could negotiate a better deal for Pouncy. (*See id*.)

9. Shortly after this conversation in the bullpen, the parties appeared before the state trial court. The plea offer and the guidelines calculation under the offer were placed on the record, and Pouncy rejected the plea deal. At that

time, Pouncy believed – based upon the statements by his counsel, the prosecutor, and the judge – that his sentencing guidelines range if convicted at trial would call for a minimum sentence of 135-337 months. (*See id.*, PageID.13656-13660, 13673.) That belief contributed to Pouncy's decision to reject the prosecution's offer. (*See id.*, PageID.13656-13660.)

10. Had Pouncy understood that his sentencing guidelines range upon conviction on all charges at trial would call for a minimum sentence of up to 562 months in prison, Pouncy would not have categorically refused to entertain a plea offer. (*See id.*, PageID.13662-13663, 13686-13688.) Instead, he would have been interested in commencing plea discussions and would have expressed to his attorney his willingness to participate in plea negotiations. (*See id.*)

11. If Pouncy had expressed to his attorney a willingness to engage in plea negotiations, his attorney would have participated in such negotiations with the prosecutor.  More specifically, counsel would have countered the prosecution's plea offer described above.  Indeed, counsel had previously declined to counter the prosecution's offer only because counsel, who had not meaningfully interacted with Pouncy, was under the mistaken

impression that Pouncy was absolutely unwilling to plead guilty. (*See id.*, PageID.13586.)[16]

12. If Pouncy's attorney had engaged in plea negotiations, he could have and would have secured for Pouncy a more favorable plea offer than the one originally made by the prosecution. In particular, as the trial prosecutor confirmed in his testimony at the evidentiary hearing, the prosecution would have agreed to modify its original offer to include a sentence agreement – pursuant to the decision of the Michigan Supreme Court in *People v. Killebrew*, 330 N.W.2d 834 (Mich. 1982)[17] – that Pouncy's minimum sentence fall within the guidelines range estimated by the parties. (*See id.*, PageID.13600-13601, 13619-13620.) Stated another

---

[16] Counsel's mistaken impression that Pouncy would not consider a plea may have stemmed from Pouncy's own statements to counsel. There is evidence that Pouncy told his attorney that he was not interested in a plea. (*See* 1/8/2021 Evid. Hr'g Tr., ECF No. 371, PageID.13576.) But if Pouncy made such statements to his attorney, he did so without having been advised by counsel of his possible range under the sentencing guidelines if convicted of all charges at trial. Thus, as explained below, Pouncy's statements to his attorney that he was not interested in a plea are not an accurate indicator of whether he would have been interested in a plea if he had been properly advised concerning his sentencing guidelines range. *See Byrd v. Skipper*, 940 F.3d 248, 259 (6th Cir. 2019).

[17] Under Michigan law, "a *Killebrew* sentence agreement" is a "binding agreement" between the prosecution and defense concerning the sentence to be imposed. *Leatherman v. Palmer*, 387 F. App'x 533, 534 (6th Cir. 2010) (citing *Killebrew*, 330 N.W.2d 834 (Mich. 1982)). But the trial court retains the discretion to reject the parties' *Killebrew* agreement. *See id.*

way, the prosecutor would have entered into a *Killebrew* sentence agreement calling for a minimum sentence of between 135-225 months (consecutive to the mandatory two-year sentence for the felony-firearm convictions).[18] The prosecution also would have agreed to permit Pouncy to plead no contest, rather than guilty, to all of the charges against him. (*See id*., PageID.13617-13618.)

13. Pouncy would have accepted this offer that the prosecution would have made if his lawyer had participated in plea negotiations. (*See id.*, PageID.13662-13663, 13686-13688.) In other words, Pouncy would have agreed to plead no contest to all charges in exchange for the dropping of the habitual offender enhancement and a *Killebrew* agreement calling for his minimum sentence to fall within a guidelines range of 135-225 months (plus two years consecutive for the felony-firearm convictions). (*See id*.)

---

[18] Pouncy has argued that his attorney could have secured an even more favorable plea deal (than the one described above including the *Killebrew* agreement) if the attorney had prepared more thoroughly, pressed the prosecution about the weaknesses of its case, and informed the prosecution that Pouncy had valuable information to offer about other crimes in the Flint, Michigan area that law enforcement officers were investigating. The Court disagrees. Pouncy has not presented persuasive evidence that the prosecution would have offered a more favorable deal than the one described above. In addition, Larobardiere's testimony at the evidentiary hearing concerning the prosecution's view of Pouncy and his crimes and concerning the prosecution's assessment of its case convinces the Court that the prosecution would not have made a better offer to Pouncy (than the one described above) if Pouncy's lawyer had done what Pouncy says he should have done.

14. The trial court would have accepted a plea agreement under which Pouncy agreed to plead no contest to all charges in exchange for (1) the dropping of the habitual offender enhancement and (2) a *Killebrew* sentencing agreement that his minimum sentence fall within a guidelines range of 135-225 months. (*See id.*, PageID.13619, 13621.) And the trial court would have imposed a sentence consistent with that plea deal. (*See infra* at Section (V)(F)(4).)

**2**

The evidence in the record and the Court's factual findings, taken together, compel the conclusion that Pouncy has shown prejudice under *Lafler*. First, he has shown that the prosecution would have made the more favorable plea offer including a *Killebrew* sentence agreement with a guidelines range that called for a minimum sentence of 135-225 months. (*See* Findings of Fact 12 and 13 above.[19]) Second, he

---

[19] As explained above, the Court has found as a matter of fact – based upon the testimony presented at the evidentiary hearing – that Pouncy would have accepted the plea offer that included a sentencing agreement that called for a minimum sentence of 135-225 months. The Court notes that there is additional support for that finding in the record. More specifically, the substantial "disparity between the plea offer" containing the sentencing agreement, on one hand, "and the potential sentence exposure" that Pouncy faced at trial, on the other hand, is "strong evidence of a reasonable probability that a properly advised [Pouncy] would have accepted [the] guilty plea offer [that included the sentence agreement], despite earlier protestations of innocence." *Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003). In fact, one panel of the Sixth Circuit has gone so far as to say – albeit in an unpublished decision – that the prejudice prong of an ineffective-assistance-in-plea-process claim is "presumptively satisfied if the difference between the length of the

has demonstrated that he would have accepted that offer. (*See id.*) Third, he has shown that the trial court would have accepted the agreement and imposed a sentence consistent with that agreement. (*See* Finding of Fact 14 above.) Finally, he has shown that a sentence under that agreement would have been substantially more favorable than the sentence he received at trial. Pouncy's showings amount to a demonstration of prejudice under *Lafler*.

### 3

Respondent counters that Pouncy's own words conclusively show that he would not have accepted any plea deal and, therefore, that he cannot show prejudice from counsel's mis-advice in connection with the plea-bargaining process. Respondent's reliance on Pouncy's statements is understandable. At all times – before his trial, after his trial, and during these very proceedings – Pouncy has adamantly maintained his innocence. Moreover, before trial, he told the judge that he would "never take the plea to nothin' I did 'cause I didn't do it," (1/24/06 Trial Tr. ECF No. 8-7, PageID.478), and he likewise told the prosecutor that he was "not trying to get no plea or nothing to [sic] like that." (Pouncy Ltr., ECF No. 387, PageID.14144.) Respondent insists that Pouncy's statements preclude a finding of prejudice here because they "are completely irreconcilable" with the notion that

---

sentence proposed in the plea offer and the sentence imposed after a trial and conviction was substantial." *Sawaf v. United States*, 570 F. App'x. 544, 547 (6th Cir. 2014).

Pouncy ever would have entered a plea. (Respondent's Br., ECF No. 321, PageID.12595.) Respondent adds that Pouncy's current claim that he would have accepted a plea is wholly unbelievable. (*See* Respondent's Supp. Br., ECF No. 381, PageID.14114-14120.) There is real merit to these arguments, but for the reasons explained below, they do not persuade the Court to find a lack of prejudice.

First, Pouncy's "repeated declarations of innocence do not prove, as [Respondent] claims, that [Pouncy] would not accepted a guilty plea." *United States v. Griffin*, 330 F.3d 733, 734 (6th Cir. 2003). And that fact that Pouncy continued to maintain his innocence after trial – and to this day – does not preclude a finding that he would have accepted a plea deal. *See Sawaf v. United States*, 570 F. App'x. 544, 545-46 (6th Cir. 2014) (holding that a federal inmate attacking conviction and sentence in a post-appeal motion under 28 U.S.C. § 2255 could establish that he would have accepted a plea deal even where he maintained his innocence through and during evidentiary hearing in Section 2255 proceedings).

Second, Pouncy's declarations of innocence do not suggest that he would have rejected a plea deal – like the one the prosecution would have offered absent counsel's deficient performance – that called for him plead *no contest*. Indeed, he could have entered such a plea without admitting guilt.

Third, as the Court found as a matter of fact, Pouncy's assertion in his pre-trial letter to the prosecutor that he was not interested in a plea deal did not reflect

his actual state of mind. Instead, Pouncy honestly believed that by asserting his lack of interest in a plea offer, he was setting himself up for – and strengthening his hand in – plea negotiations. This belief may seem illogical. But Pouncy was a misguided eighteen-year-old who did not know any better and whose experience seemed to suggest to him that playing hardball led to good plea offers.

Fourth, Pouncy's assertion to the trial court on the first day of trial that he would not accept a plea deal was, in large measure, "rooted in misinformation gleaned from [his] counsel's faulty advice" about his exposure at trial, and that makes Pouncy's stated resistance to a plea deal "an unreliable metric of reasonably probable outcomes." *Byrd v. Skipper*, 940 F.3d 248, 259 (6th Cir. 2019) (explaining why a defendant claiming ineffective assistance of counsel could show prejudice despite his assertions of innocence and statements that he would not plead guilty). Stated another way, because Pouncy "lacked the requisite information to weigh the options in front of him … whatever desire he exhibited before trial is not dispositive of what he would have done if he were properly educated about the charges against him." *Id*.

Finally, while Respondent has offered many reasonable bases for (1) questioning Pouncy's overall credibility and (2) disbelieving Pouncy's current testimony that he would have accepted a plea deal if properly advised by counsel, the Court found that particular testimony credible. The Court paid careful attention

to Pouncy's demeanor and tone when he offered that particular testimony, and the Court deemed Pouncy worthy of belief on this point. [20]

For all of these reasons, Respondent has not persuaded that Court that Pouncy would have rejected the plea deal that would have been offered even if his counsel had provided effective assistance in connection with the plea-bargaining process.

**4**

Respondent also argues that Pouncy cannot show prejudice because the state trial court (1) would not have accepted a plea deal that called for a minimum sentence within a guidelines range of 135-225 months, and (2) would have imposed the same sentence on Pouncy that Pouncy ultimately received even if the court had accepted the plea deal. The Court disagrees.

The record contains persuasive evidence that the state trial court would have accepted a plea deal pursuant to *Killebrew* calling for him to sentence Pouncy within a guidelines range that called for a minimum sentence of 135-225 months. First, the record indicates that the trial court accepted a substantial majority of the plea deals

---

[20] Respondent has also offered a reasonable critique of Accardo's testimony and reasonable arguments as to why the Court should not find that testimony reliable. (*See* Respondent's Supp. Br., ECF No. 381, PageID.14117-141119.) But as with Pouncy, the Court found Accardo's testimony to be credible and trustworthy. The Court relied on that testimony, in part, to support its finding that Pouncy was willing to consider entering a plea.

that included specific sentencing agreements. (*See* 1/8/2021 Evid. Hr'g Tr., ECF No. 371, PageID.13619-13621.)

Second (and more importantly), the trial court accepted plea deals with Pouncy's accomplices that contained *substantially* lower guidelines ranges than those called for under the offer to Pouncy, and the court imposed far lower sentences on the accomplices. For example, the plea deal for Tiakawa Pierce, one of Pouncy's accomplices, reduced the initial charge from carjacking to accessory-after-the-fact, and that charge reduction, in turn, decreased Pierce's maximum sentence from life or any term of years to only five years. (*See* 2/14/08 Pierce Plea Hr'g Tr., ECF No. 189-1, PageID.9573, 9575, 9587.) The trial court accepted that plea (*see id.*) and then sentenced Pierce to (1) 341 days in jail, (2) placement in a bootcamp upon Pierce's release from jail, and (3) one year of electronic tether monitoring following completion of the bootcamp. *See* Pierce St. Ct. Register of Action, http://www.co.genesee.mi.us/roaccsinq/ROACase.aspx?CASE=7021200&CASETYP=FC&FILENAME=C062410257&RtnForm=frmDefault.[21] Meanwhile, the plea agreement for the other accomplice, Wayne Grimes—who fired a shot into the air before threatening to shoot one victim in the chest— included a *Killebrew* agreement for a sentencing guidelines range that called for a minimum sentence of 51-85

---

[21] The Court may take judicial notice of the Register of Action from Piece's state court case. *See*, *e.g.*, *Chase v. Macauley*, 971 F.3d 582, 587 n.1 (6th Cir. 2020); *Granader v. Public Bank*, 417 F.2d 75, 82-83 (6th Cir. 1969).

months. (*See* 2/2/06 Grimes Plea and Sent. Hr'g Tr., ECF No. 8-5, PageID.376, 395 and 419; 1/8/2021 Evid. Hr'g Tr., ECF No. 371, PageID.13556-13564.) The trial court imposed a minimum sentence of 85 months on Grimes. (*See* 2/2/06 Grimes Plea and Sent. Hr'g Tr., ECF No. 8-5, PageID.419.) The trial court's treatment of the accomplices suggests that the court would have viewed the sentence in Pouncy's *Killebrew* sentencing agreement as sufficient punishment. While the accomplices were arguably less culpable, and while one cooperated with law enforcement, the minimum sentence available to the trial court under Pouncy's *Killebrew* plea agreement (225 months plus two years) would have been nearly 300% more than the highest sentence the trial court imposed on the other accomplices. The trial court likely would have deemed such a sentence sufficient to account for Pouncy's allegedly greater culpability and for the fact that, unlike his accomplices, he did not cooperate with law enforcement. Simply put, there is a reasonable probability that the trial court would have accepted a *Killebrew* sentencing agreement that included a guidelines range that called for a minimum sentence of 135-225 months because doing so would have been consistent with the manner in which the court sentenced Pouncy's accomplices. *See Byrd*, 940 F.3d at 258 ("Byrd also has demonstrated, by pointing to the bargain [his co-defendant] reached as a comparator, that an available plea would have provided favorable terms and would have been approved by the trial court."). *See also Rodriguez-Penton v. United States*, 905 F.3d 481, 488 (6th

Cir. 2018) (explaining that a defendant may demonstrate prejudice for failure to seek a better plea deal, among other ways, "by showing similar plea agreements that were reached by others charged with the same crime.").

The obvious question, though, is: how can this Court conclude that the state trial court would have agreed to sentence Pouncy within a guidelines range that called for a minimum sentence of 135-225 months when it ultimately concluded that a minimum sentence of 562 months was appropriate? The answer lies in the trial court's view of Pouncy's conduct *at trial*. As the trial court's comments at sentencing made clear, the court was seriously offended by the way Pouncy handled himself (while representing himself) during trial and by the way Pouncy treated the victims:

> "I've had a chance to watch his behavior in the courtroom; and I am absolutely shocked. I've never seen a young man like this before. It's the first time I've ever seen this. Someone that's so arrogant and so manipulative, and doesn't have a problem with humiliating people. He's humiliated his lawyer; he's made a mockery of this courtroom throughout the entire proceedings. He humiliated his step-brother . . . on the witness stand. . . .
>
> I also had to sit here and watch you terrorize Ms. Sandstrom even further I mean, after everything you had done to her and had done to her husband. . . . You sat there and you humiliated this woman on the stand and terrorized her further on the stand. You terrorized her husband. You sat here and manipulated this entire proceeding at every step of the way to try to create error in the record. I've never seen a young man who worked so hard to create

> error so that he could try to get a – get this case thrown out
> of court. I think it's just reprehensible. . . . .
>
> And then I look at your family . . . to bring your mother
> into the middle of this [to testify], in my opinion, was just
> absolutely reprehensible. . . .

(3/9/06 Sent. Hr'g Tr., ECF No. 8-16, PageID.1976-1978.) The trial court thought

that Pouncy's behavior evidenced "a mockery of the court system," which called for

a very stiff sentence. (*Id.*, PageID.1983.) This Court concludes that the trial court

would not have had the same view of Pouncy if he had entered a plea and had not

engaged in the trial conduct that so enraged that court.[22]

---

[22] At the evidentiary hearing before the Court, Christopher Larobardiere, the state-court prosecutor, surmised that the state trial court would have rejected a plea deal that included a *Killebrew* sentence agreement that called for a minimum sentence of 135-225 months. (1/8/2021 Evid. Hr'g Tr., ECF No. 371, PageID.13619-13622.) Larobardiere said that the trial court "was a very good reader of personality," would have "recognize[d]" the danger posed by Pouncy, and would have found a sentencing guidelines range of 135-225 months to be insufficient. (*Id.*) The Court acknowledges Larobardiere's familiarity with the trial court, and the Court found Larobardiere to be a credible witness. However, the Court respectfully disagrees with Larobardiere's prediction that that the trial court would have rejected the plea deal containing the *Killebrew* sentence agreement. The Court concludes that the sentences the trial court imposed upon Pouncy's co-defendants are a more accurate indicator of its view of the seriousness of the offense conduct and that the trial court would have been satisfied imposing a minimum sentence of up to 225 months on eighteen-year-old Pouncy.

# G

## 1

Given the Court's conclusion that Pouncy has shown both deficient performance by defense counsel and that he suffered prejudice as a result, the Court must now determine the appropriate remedy. To do so, the Court need look no further than *Lafler*. In that decision, the Supreme Court specified the remedy to be applied in these exact circumstances – *i.e.*, ineffective assistance of counsel by a defense attorney that (1) causes a criminal defendant in a Michigan state court criminal proceeding to reject a favorable plea deal and (2) results in the defendant receiving a harsher sentence at trial. The Supreme Court explained:

> As a remedy, the District Court ordered specific performance of the original plea agreement. The correct remedy in these circumstances, however, is to order the State to reoffer the plea agreement. Presuming respondent accepts the offer, the state trial court can then exercise its discretion in determining whether to vacate the convictions and resentence respondent pursuant to the plea agreement, to vacate only some of the convictions and resentence respondent accordingly, or to leave the convictions and sentence from trial undisturbed. *See* Mich. Ct. Rule 6.302(C)(3) (2011) ("If there is a plea agreement and its terms provide for the defendant's plea to be made in exchange for a specific sentence disposition or a prosecutorial sentence recommendation, the court may ... reject the agreement"). Today's decision leaves open to the trial court how best to exercise that discretion in all the circumstances of the case.

*Lafler*, 566 U.S. at 174-75.

The Court will issue a conditional writ of habeas corpus consistent with these directions from *Lafler*. The Court orders the State of Michigan (acting through either the Michigan Attorney General's Office or the Genesee County Prosecutor's Office) to offer Pouncy, within 60 days, the plea deal that it would have offered but for the deficient performance of Pouncy's counsel. That deal must (1) allow Pouncy to plead no contest to all of the charges against him without the habitual offender enhancement and (2) include a *Killebrew* sentence agreement calling for Pouncy to be sentenced pursuant to a guidelines range that calls for a minimum sentence of 135-225 months (to be served consecutively to the two-year sentence for the felony firearm convictions). If Pouncy accepts that offer in writing within 30 days, then within 60 days of Pouncy's written acceptance, the State shall petition the state trial court (1) to re-open the state court criminal case against Pouncy, (2) to vacate Pouncy's convictions, and (3) to accept the parties' plea agreement and to impose a sentence consistent with that agreement. The State shall release Pouncy from custody unless, as directed above, (1) it timely satisfies its obligations to offer Pouncy the plea deal in writing and (2) if Pouncy timely accepts that plea deal in writing, it petitions the state trial court as directed above.

If the State makes the offer as directed, Pouncy accepts, and the State petitions the trial court as directed, then at that point the state trial court "can [] exercise its

discretion in determining whether to vacate the convictions and resentence [Pouncy] pursuant to the plea agreement, to vacate only some of the convictions and resentence [Pouncy] accordingly, or to leave the convictions and sentence from trial undisturbed." *Lafler*, 566 U.S. at 174-75.[23]

## 2

Pouncy argues that the Court must impose a different remedy. He insists that the Court must order his "immediate release" under the Sixth Circuit's decision in *Lewandowski v. Makel*, 949 F.2d 884 (6th Cir. 1991). The Court disagrees.

As Pouncy accurately notes, in *Lewandowski*, the Sixth Circuit affirmed the decision of a district court granting "specific performance" of a plea agreement that the defendant rejected as a result of deficient performance by his attorney. *Id*. at 885-

---

[23] The Sixth Circuit has expressed "concern[] that the remedy in *Lafler* could become illusory if the state court chooses to merely reinstate" the "current sentence" of a habeas petitioner who has demonstrated that he received ineffective assistance in connection with the plea bargaining process. *Titlow v. Burt*, 680 F.3d 577, 592 (6th Cir. 2012). This Court shares that concern. The concern is mitigated, at least to some extent, by the requirement in *Lafler* that a state court "'consult' the initial plea agreement in crafting a new sentence for the defendant." *Id*. (quoting *Lafler*, 132 S.Ct. at 1389). Given that requirement, "the state court's discretion is not entirely unfettered." *Id*. (The Supreme Court reversed the Sixth Circuit's decision in *Titlow*, *see Burt v. Titlow*, 571 U.S. 12 (2013), but the Supreme Court did not address the Sixth Circuit's discussion of the remedy issue. Instead, the Supreme Court held that the petitioner's claim of ineffective assistance failed on the merits, and thus the Supreme Court did not reach the issue of an appropriate remedy. This Court recognizes that the Sixth Circuit's decision in *Titlow* is no longer a binding precedent, but the Court nonetheless believes that *Titlow* identifies important issues that may need to be addressed by a federal court if a state court imposes the same sentence upon a successful habeas petitioner.)

86. As "specific performance," the district court had ordered the immediate release of the defendant. *Id*. That relief was warranted because, by the time of the district court's decision, the defendant already would have been eligible for parole under the plea agreement that he had rejected. *See id*. Pouncy insists that, like the petitioner in *Lewandowski*, he should be immediately released because he would have been eligible for parole by now if the trial court had sentenced him under the deal that would have been available absent counsel's deficient performance.

The Court declines to order Pouncy's immediate release based upon *Lewandowski* for two reasons. First (and most importantly), *Lewandowski* plainly did not survive *Lafler*. While the Sixth Circuit in *Lewandowksi* affirmed an order of specific performance of a plea offer, the Supreme Court in *Lafler* held that specific performance was *not* "the correct remedy." *Lafler*, 566 U.S. at 174-75. Faced with the irreconcilable conflict between *Lewandowski* and *Lafler*, this Court must follow *Lafler*. Second (and in any event), Pouncy would not be entitled to immediate release even if this Court followed the approach in *Lewandowski*. Under the terms of the plea agreement that would have been available to Pouncy, the state trial court could have imposed a minimum sentence of 225 months (and that sentence would have run consecutive to the two years for Pouncy's felony-firearm conviction). Pouncy has not shown that he would be eligible for parole now if the trial court had

imposed such a sentence. Thus, even if *Lewandowski* applies here, it does not entitle Pouncy to immediate release.[24]

## VI

Pouncy next contends that the trial prosecutor violated his (Pouncy's) due process rights by failing to correct testimony that the prosecutor knew to be false and by withholding exculpatory evidence and/or impeachment evidence. This contention consists of three distinct (but conceptually related) claims, and the Court will address each claim separately below.

---

[24] Pouncy also seems to argue that under the Sixth Circuit's decision in *Byrd*, this Court should "unconditionally vacate[]" his sentence as a remedy. (Pouncy Br., ECF No. 300, PageID.12315.) Pouncy says that the Sixth Circuit in *Byrd* "vacat[ed the] petitioner's trial conviction as a *Lafler* remedy." (*Id.*) That is not accurate. The Sixth Circuit in *Byrd* "remand[ed] the case for entry of a writ of habeas corpus unless new state proceedings consistent with [its] opinion [were] reopened within 180 days of the issuance of the mandate in this matter." *Byrd*, 940 F.3d at 251 and 260-61. *Byrd* was an application of *Lafler*, *see id*. at 255 (citing *Lafler* as providing the prejudice framework), and, as noted above, the Supreme Court in *Lafler* said that once the federal district court ordered the State to re-offer a plea, the state trial court would have the discretion to "leave the convictions and sentence from trial undisturbed." *Lafler*. 566 U.S. at 174-75. Thus, it is not correct to say that the Sixth Circuit's order of remand in *Byrd* – under the *Lafler* framework – vacated the petitioner's convictions. On the contrary, pursuant to *Lafler*, the remand order in *Byrd* gave the state trial court the discretion whether to vacate the convictions.

## A

Before turning to the particulars of Pouncy's due process claims, it is helpful to begin with a brief review of the governing federal law. As both parties acknowledge, the claims are governed by three leading Supreme Court decisions.

First, in *Napue v. Illinois*, 360 U.S. 264 (1959), the Supreme Court held that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Id.* at 269. The Supreme Court emphasized that "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* To prevail on a claim under *Napue*, a habeas petitioner must show "(1) that the prosecution presented false testimony (2) that the prosecution knew was false, and (3) that was material." *Akrawi v. Booker*, 572 F.3d 252, 265 (6th Cir. 2009) (quoting *Abdus-Samad v. Bell,* 420 F.3d 614, 625-626 (6th Cir. 2005)). "The subject statement must be 'indisputably false' rather than 'merely misleading.'" *Id.* (quoting *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000)). !

Second, in *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution." *Id.* at 87. More recently, the Supreme Court clarified that the prosecution's duty to disclose exculpatory evidence "is applicable

even though there has been no request by the accused" and that the duty extends to evidence "known only to police investigators and not to the prosecutor." *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999). "In order to establish a violation of *Brady,* [a habeas petitioner] must show that the following three requirements are met: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011) (en banc) (quoting *Strickler*, 527 U.S. at 281-82). Evidence is "material" (*i.e.*, prejudicial) under *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280.

Third, in *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court held that "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility" will "justif[y] a new trial irrespective of the good faith or bad faith of the prosecution." *Id*. at 154 (quotation omitted). *Giglio* and its progeny make clear that the prosecution's duty to disclose under *Brady* extends to "impeachment evidence as well as exculpatory evidence." *United States v. Bagley*, 473 U.S. 667, 676 (1985).

**B**

Pouncy's first due process claim relates to the cellular telephone used by the perpetrators of the three carjackings. Pouncy argues that his due process rights under *Napue* and *Brady* were violated when (1) Detective James Gagliardi, the lead investigator, knowingly and falsely testified that that telephone had an untraceable phone number and (2) the prosecution failed to disclose certain Verizon billing records that would have led Pouncy to evidence that the subscriber of the cellular telephone used by the perpetrators was someone other than Pouncy.

**1**

The Court begins with a brief summary of the relevant factual background and procedural history related to this claim because that history is essential in order to fully understand the claim.

**a**

As explained above, the prosecution charged Pouncy with committing the Sandstrom and Brady carjackings in the case at issue here and charged him with committing the Haynes carjacking in a separate case. Even though the charges arising out of Haynes carjacking were the subject of a separate trial, the trial court allowed the prosecution to admit evidence related to that carjacking in the Sandstrom and Brady case at issue here on the theory that the carjackings all involved the same modus operandi. One key element of that modus operandi was that all three

carjackings began with the perpetrators placing a call to the victims in response to used-car advertisements that the victims had placed in newspapers. (*See* 1/24/06 Trial Tr., ECF No. 8-7, PageID.685 (testimony of Joseph Davis), PageID.732 (testimony of Earl Brady); 1/25/06 Trial Tr., ECF No. 8-8, PageID.836-837 (testimony of  Thomas Sandstrom), PageID.910-911 (testimony of Maria Sandstrom); 1/27/06 Trial Tr., ECF No. 8-11, PageID.1235-1236, 1241-1242 (testimony of Dan Haynes).)

During the investigation into the Haynes carjacking – and several months before the trials in both cases – law enforcement officers from the City of Burton Police Department (the department that took the lead on the Haynes carjacking) attempted to identify the subscriber of the cellular telephone used by the perpetrators to call the victims.[25]   To that end, the Burton City Attorney sent a subpoena to Verizon, the cellular service provider used by the victim in the Haynes carjacking. (*See* Exs. to Pouncy St. Ct. 6.500 Mot.[26], ECF No. 8-5, PageID.357.)  The subpoena directed Verizon to produce a "print out list of any and all numbers for incoming calls to the above-referenced number for the 24-hour period of Friday, September 23, 2005, and Saturday, September 24, 2005." (*Id.*)

---

[25] The Sandstrom and Brady carjackings were investigated by the Mt. Morris Police Department.

[26] This document is mislabeled in the record as "12-27-05 Transcript."

On or about October 18, 2005, Verizon produced a two-page report in response to the subpoena. (*See id.*, PageID.359-361.) The report consisted of several columns – three of which listed phone numbers. The columns were labeled "MDN," "Called #," and "CPN," respectively. (*Id.*) The "MDN" column listed the victim's phone number. But it was not clear what the numbers on the "Called #" and "CPN" columns were.

With respect to the calls that the victim received from the perpetrators, the "Called #" column listed two numbers: (313) 402-2922 and (313) 402-2933. (*See id.*) For those same calls, the "CPN" column listed a single number: (810) 836-5074. (*See id.*)

Two days later, Verizon produced a form that explained what the labels "MDN," "Called #," and "CPN" meant on its report concerning the victim's phone (the "Explanation Form"). (*See id.*, PageID.363.) The Explanation Form appeared to indicate that the numbers in the "Called #" column were routing numbers and that the number in the "CPN" column was the number of the phone that called the victim's phone. (*See id.*)

It appears that the investigators misunderstood the Explanation Form. Even though the form indicated that the number in the "CPN" column (*i.e.*, (810) 836-5074) was the phone number used to call the victim, the investigators appeared to conclude that the numbers in the "Called #" column (*i.e.*, (313) 402-2922 and (313)

402-2933) were the phone numbers used to call the victim. Based upon that error, on October 21, 2005, the Burton City Attorney sent a second subpoena to Verizon, mistakenly requesting production of subscriber information for (313) 402-2922 and (313) 402-2933. (*See id.*, PageID.365-366.)

Verizon responded to the second subpoena on October 28, 2015. (*See id.*, PageID.368.) That response consisted of a pre-printed form with several different boxes that could be checked off. (*See id.*) Verizon checked the boxes for "No Information Found" and "Routing Number(s)." (*Id.*) Despite this notification that the subpoena had requested information for routing numbers, there is no indication in the record that the Burton City Attorney or the Burton Police Department ever sent a follow-up subpoena to Verizon requesting subscriber information for the correct originating number, (810) 836-5074. Instead, investigators wrongly concluded that the calls from the perpetrators could not be traced.[27]

**b**

Prior to trial in the Sandstrom and Brady case (*i.e.*, this case), the state trial court and the parties addressed on the record whether investigators had been able to trace the calls from the perpetrators. The prosecutor told the court and Pouncy's attorney that the phone used by the perpetrators was not traceable. (*See* 1/24/06 Trial

---

[27] The record does not disclose how or when the information received by the Burton Police Department was transmitted to the Mt. Morris Police Department or the prosecutor.

Tr., ECF No. 8-7, PageID.489.)  Then, during the trial, the prosecutor elicited testimony to this same effect from Detective Gagliardi.  He testified that the calls from the perpetrators "went back to … a type of calling card that there's no information recorded to that." (1/27/06 Trial Tr., ECF No. 8-11, PageID.1355.)  The detective added that "there was no way to say that the phone calls came from this person or that person" or "to trace any of those calls … to any particular cell phone." (*Id.*, PageID.1355-1356.)

Pouncy says that he discovered after the trial that the prosecutor and Detective Gagliardi were wrong.  Pouncy reviewed the Explanation Form provided by Verizon and discovered that – as explained above – the records actually indicated that the perpetrators called from (810) 836-5074.  Pouncy then learned that (810) 836-5074 was "a standard issue Sprint phone number that was traceable to a specific subscriber, a man named Quillie Strong." (Pouncy Br., ECF No. 300, PageID.12319-12320.)

c

After losing his direct appeal, Pouncy filed a motion for relief from judgment in the state trial court in which he raised two claims related to the Verizon records.  First, Pouncy argued that the prosecution violated its duties under *Brady* when it affirmatively misled him into believing that the Verizon records could not be used to identify the subscriber of the phone used by the perpetrators. (*See* Pouncy St. Ct.

6.500 Mot., ECF 8-22, PageID.2180-2193.) In support of that claim, Pouncy attached to his motion an affidavit from Strong. (*See* Exs. to Pouncy St. Ct. 6.500 Mot., ECF No. 8-5, PageID.370.) In the affidavit, Strong identified himself as the subscriber of the Sprint cellular phone number used by the perpetrators. (*See id.*) Strong added that he did not use the phone himself and that, instead, he obtained the phone for a young man named Jacob Joe Woods. (*See id.*) Strong explained that he did so because Woods was under eighteen years of age and could not obtain his own account. (*See id.*) Pouncy argued that if the prosecution had not misled him into believing that the calls from the perpetrators were not traceable, he would have located Strong before trial and presented Strong's exculpatory testimony to the jury.

Second, Pouncy argued that Strong's affidavit was "newly discovered evidence" that entitled him to relief under the standard set forth by the Michigan Supreme Court in *People v. Cress*, 664 N.W.2d 174 (Mich. 2003). (Pouncy St. Ct. 6.500 Mot., ECF 8-22, PageID.2187-2188, 2193-2200.)

The state trial court denied relief on Pouncy's claims relating to the Verizon records and Strong's affidavit. (*See* St. Ct. Order, ECF No. 8-37, PageID.3150-3151, 3155.) But the court did not apply *Brady* to these claims. (*See id.*) Instead, the court first applied the state-law standard from *Cress* to Pouncy's claim that Strong's affidavit was "newly discovered evidence" warranting relief. (*Id.*, PageID.3150-3151.) The court then applied that same standard to Pouncy's claim that the

prosecution violated *Brady* when it told him that the Verizon records could not be used to determine the phone number from which the perpetrators calls. (*See id.*, PageID.3155.) The court held that Pouncy was not entitled to relief on either claim because he failed to satisfy the state-law standard for newly-discovered evidence. (*See id.*) The Michigan Court of Appeals and Michigan Supreme Court declined to review that ruling.

2

The state trial court acted contrary to clearly established federal law when it reviewed Pouncy's *Brady* claim related to the cellular phone records under the Michigan state-law standard for relief based upon newly-discovered evidence. The Michigan standard from *Cress* includes requirements that *Brady* does not. *Cress* requires the party offering the new evidence to show that he "could not, using reasonable diligence, have discovered and produced the evidence at trial," *Cress*, 664 N.W.2d at 182, but *Brady* contains no such reasonable diligence requirement. *See Banks v. Dretke*, 540 U.S. 668, 695 (2004). Because the state trial court adjudicated Pouncy's *Brady* claim under the wrong legal standard, its adjudication of that claim was contrary to clearly established Supreme Court law. This Court will therefore review this component of Pouncy's due process claim *de novo*. *See Panetti*, 551 U.S. at 953; *Williams*, 529 U.S. at 396-98; *Magana v. Hofbauer*, 263 F.3d 542, 541 (6th Cir. 2001).

**3**

As noted above, in the state courts, Pouncy presented his due process claim related to the Verizon records as arising under *Brady*. Here, he expands that claim. He contends that the prosecution's conduct related to the Verizon records violated both *Brady* and *Napue*. Applying *de novo* review, the Court concludes that Pouncy is not entitled to relief under either theory.

**a**

The Court begins with Pouncy's *Napue* claim. In that claim, he contends that the prosecution violated *Napue* when it knowingly presented Detective Gagliardi's false testimony that the phone used by the perpetrators could not be traced through a review of phone records. (*See* Pouncy Br., ECF No. 300, PageID.12318-12320.)

This claim fails because Pouncy has failed to demonstrate that anyone on the prosecution team or the investigative team knew that Detective Gagliardi's testimony was false. Pouncy offers no persuasive evidence to support that contention. Indeed, the most that he can say is that it "seems exceedingly unlikely that [Detective Gagliardi] simply made an honest mistake with respect to the traceability of the phone calls." (*Id*, PageID.12320.) But Pouncy's current confidence that Detective Gagliardi intentionally misled the jury conflicts with the position that he (Pouncy) advanced in state court. There, Pouncy said that the investigators "erroneously focused" on the wrong part of the records and

"erroneously concluded that the phone calls from the perpetrator were not capable of being traced." (Pouncy St. Ct. 6.500 Mot., ECF No. 8-22, PageID.2183; *see also id.*, PageID.2184.) He even explained how the investigators made their mistake. (*See id.*)

The Court is persuaded by the explanation that Pouncy presented to the state trial court. As explained above, it appears that the Burton Police Department wrongly interpreted the phone records to indicate that the calls were untraceable, and that erroneous conclusion was somehow transmitted to the Mt. Morris Police Department and then ultimately to the prosecution, the defense, and the trial court. On this record, the Court is not persuaded that Detective Gagliardi knowingly provided false testimony that the phone used by the perpetrators could not be traced based upon a review of phone records. Nor is the Court persuaded that the prosecutor knew that this testimony was inaccurate when he (the prosecutor) elicited it. The Court will therefore deny relief on Pouncy's *Napue* claim.

**b**

The Court next turns to Pouncy's claim that the prosecution violated *Brady* by misleading him into believing that the Verizon records lacked exculpatory value. The Court concludes that while Pouncy has satisfied the suppression element of his *Brady* claim, he has not shown that he suffered prejudice from that suppression. The Court therefore denies relief on Pouncy's *Brady* claim related to the Verizon records.

**i**

The Court begins with the suppression element of Pouncy's *Brady* claim.  A habeas petitioner may satisfy that element by showing that the prosecution disclosed the existence of exculpatory evidence but simultaneously misled the petitioner into believing that the evidence actually lacked exculpatory value. *See, e.g.*, *United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) (holding that criminal defendant satisfied suppression prong of *Brady* by showing that while prosecution disclosed existence of certain tape recordings, it misled defense counsel into believing that the tapes lacked exculpatory value); *United States v. Pelullo*, 399 F.3d 197, 213 (3d Cir. 2005), *as amended* (Mar. 8, 2005) ("It is equally clear, however, that defense counsel's knowledge of, and access to, evidence may be effectively nullified when a prosecutor misleads the defense into believing the evidence will not be favorable to the defendant.").

Pouncy has made such a showing here.  He has presented evidence that although the prosecution disclosed the existence of the Verizon records, it "completely suppressed the[ir] exculpatory value" by "declar[ing]" that the records did not contain information that would permit the calls placed by the perpetrators to be traced. (Pouncy Mem. of Law, ECF No. 9-2, PageID.5067.)   The transcripts of the state court proceedings clearly indicate that the prosecution twice erroneously represented – once to the state trial court and Pouncy and once to the jury – that the

Verizon records could not be used to trace the calls placed by the perpetrators. And based upon those representations, Pouncy and his attorney made no effort to trace the calls. Had they made such an effort, they would have discovered that the calls could, indeed, be traced back to a phone subscribed to someone other than Pouncy. That discovery would have had at least some exculpatory value to Pouncy's defense. Thus, Pouncy has demonstrated that the prosecution suppressed exculpatory evidence.[28]

## ii

The Court next turns to the prejudice element of Pouncy's *Brady* claim. "Prejudice (or materiality) in the *Brady* context is a difficult test to meet...."

---

[28] In the most recent rounds of briefing, the parties vigorously dispute whether the prosecution actually provided Pouncy with the Verizon records. Pouncy insists that the prosecution disclosed the existence of the records but did not actually provide him with copies of the records before or during the Sandstrom and Brady trial. (*See* Pouncy Supp. Br., ECF No. 390, PageID.14159-14165.) Respondent counters that Pouncy has failed to demonstrate that the records were not timely provided to him. (*See* Respondent's Supp. Br., ECF No. 391, PageID.14182-14189.) The Court need not resolve the question of whether the prosecution actually provided Pouncy with the records. As explained above, a *Brady* violation may occur where the prosecution provides a defendant with access to evidence but simultaneously misleads the defendant into believing that the evidence has no exculpatory value. And the *Brady* claim presented in Pouncy's petition includes Pouncy's contention that the prosecution misled him into believing that the Verizon records had no exculpatory value. (*See* Pouncy Mem. of Law, ECF No. 9-2, PageID.5067.) Finally, as described below, the Court denies relief on Pouncy's *Brady* claim related to the phone records because Pouncy has not shown prejudice, and thus the Court's resolution of the claim would be the same even if, as Pouncy claims, the prosecution never provided him with the phone records.

*Montgomery*, 654 F.3d at 678 (quoting *Jamison v. Collins,* 291 F.3d 380, 388 (6th Cir.2002)). The *en banc* Sixth Circuit has characterized this "difficult test" as follows:

> In order to establish prejudice, "the nondisclosure [must be] so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler,* 527 U.S. at 281, 119 S.Ct. 1936. But, the *Brady* standard is not met if the petitioner shows merely a reasonable *possibility* that the suppressed evidence might have produced a different outcome; rather, a reasonable *probability* is required. *Id.*at 291, 119 S.Ct. 1936 (stating that "[t]he District Court was surely correct that there is a reasonable *possibility* that either a total, or just a substantial, discount of [the witness's] testimony might have produced a different result" but that "petitioner's burden is to establish a reasonable *probability* of a different result" (citing *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555)); *see also United States v. Agurs,* 427 U.S. 97, 109–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."). "A reasonable probability is a 'probability sufficient to undermine confidence in the outcome.'" *Wilson v. Parker,* 515 F.3d 682, 701–02 (6th Cir. 2008) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)); *see also Cone v. Bell,* 556 U.S. 449, 129 S.Ct. 1769, 1783, 173 L.Ed.2d 701 (2009).

*Id*. at 678-79 (internal footnote omitted; emphasis in original). Pouncy offers two theories of prejudice, but neither persuades the Court that there is a "reasonable probability" that the outcome of his trial would have been different absent the

prosecution's misleading claim that the calls from the perpetrators could not be traced.

**(A)**

Pouncy first argues that absent the prosecution's misleading statements, he would have discovered that the calls were traceable, and he would have then been able to impeach Detective Gagliardi when the detective testified that the calls were not traceable. That impeachment, says Pouncy, would have substantially diminished the jury's view of the detective's reliability and credibility as a witness. The problem with this theory of prejudice is that the prosecution's case did not rest to any meaningful degree on the detective's testimony. On the contrary, the pillars of the prosecution's case were (1) the repeated in-court identifications of Pouncy by the victims of his crimes and (2) the testimony of Pouncy's accomplice, Wayne Grimes. The prosecution focused on these pillars of its case in both its opening statement and closing arguments. (*See* Opening, ECF No. 8-7, PageID.660-662; Closing, ECF No. 8-15, PageID.1796, 1798-1809.) Even if Pouncy had raised some doubt about the detective's competence and candor, that would not have meaningfully undercut the core of the prosecution's case. Thus, it is not reasonably probable that the result of Pouncy's trial would have been different if he had been able to impeach the Detective Gagliardi with the fact that, contrary to the detective's testimony, the calls from the perpetrators were traceable.

**(B)**

Pouncy's second theory of prejudice is more substantial. He argues that absent the prosecution's misleading claim that the calls from the perpetrators could not be traced, he would have been able to discover and present evidence to the jury that the calls came from a phone registered to Strong, *not* to him. During a hearing before the Court, Pouncy's attorney offered his theory as to why such a showing would have had a substantial impact on the jury:

> And the jury is left with a question, who is Quillie Strong? Could he be the perpetrator? Could Quillie Strong have loaned the phone to someone else? I mean, is the government saying that Quillie loaned it to Mr. Pouncy? If that's what they are saying, where is Mr. Strong? Why isn't he a prosecution witness? This is what acquittals are made of.

(7/30/2020 Hr'g Tr., ECF No. 372, PageID.13800.)

At first blush, this seems like a strong prejudice argument. Indeed, because the primary disputed issue at trial was the identity of the perpetrators, it would seem reasonable to assume that evidence connecting a key implement of the perpetrators' criminal scheme – the phone used to arrange all of the carjackings – to someone *other* than Pouncy could tend to raise doubt about Pouncy's guilt. But this theory of prejudice does not withstand scrutiny for two reasons.

101

**(1)**

First, the evidence identifying Pouncy as one of the perpetrators of the carjackings was overwhelming, and a showing that the phone used by the perpetrators happened to be subscribed to someone other than Pouncy would not have cast any meaningful doubt on Pouncy's obvious guilt. Pouncy was identified as the lead perpetrator by *seven different witnesses* who had many different interactions with him over the course of *three separate carjackings*. Moreover, these were not typical carjackings in which an assailant startles the victim and steals the victim's car in an instant. Instead, the lead perpetrator of these carjackings – Pouncy – spoke to some of the victims and witnesses at length and spent considerable time with some of them. The victims and witnesses thus had an opportunity to become familiar with both his voice and his appearance, and they were able to confidently identify him as the lead perpetrator during their direct examination testimony. And Pouncy's cross-examination (which he conducted after he began representing himself) of these victims and witnesses included a number of truly remarkable exchanges in which they repeatedly corrected him to his face when he tried to suggest that someone else was the assailant.

The following is a summary of the key eyewitness identification testimony against Pouncy:

- <u>Joseph Davis</u>: Davis owned the hot rod shop that was hosting the car offered for sale by victim Earl Brady. On direct examination, Davis identified Pouncy as the perpetrator of the Brady carjacking. (*See* 1/24/06 Trial Tr., ECF No. 8-7, PageID.682.) He explained that he was able to identify Pouncy because Pouncy and two other men visited his shop on three occasions to look at Brady's car, Pouncy called and spoke with him (Davis) over the phone, and he (Davis) saw Brady negotiating with Pouncy and another man. (*See id.*, PageID.678-685.) On cross-examination, Pouncy repeatedly tried to correct Davis when Davis referred to him (Pouncy) as the perpetrator. Pouncy suggested that Davis should identify him (Pouncy) as "someone who looked like" the perpetrator. Davis was having none of it. Davis responded: "I know who I'm speaking with right now." (*Id.*, PageID.693.) And Davis testified: "I spoke to you on three occasions, you spoke to me on the phone, we had a repertoire (sic), we actually talked to each other on three occasions." (*Id*, PageID.708.) According to Davis, there was "no question" that Pouncy was the same person he spoke with at his store. (*Id.*, PageID.725.)

- <u>Earl Brady</u>: Brady was the victim of one of the carjackings, and he identified Pouncy as the assailant. He testified on direct examination that he spent about five to ten minutes at Davis' hot rod shop with Pouncy before loading the hot rod on his trailer to ostensibly take it to Pouncy's mechanic. (*See id.*, PageID.729-733.) When they arrived at the scene of the crime, Brady spent additional time with Pouncy showing him how the race car operated. (*See id.*, PageID.734-735.) On cross-examination, Pouncy repeated his tactic of suggesting that the perpetrator was someone who merely looked like him. Brady held firm. He testified: "No that was you, not someone like you." (*Id.*, PageID.751.) The cross-examination

itself also confirmed Brady's identification. He testified: "Standing here this close to you and so on like that, yes my memory shows it's you." (*Id.*, PageID.764.)

- Patrick Wendell: Wendell accompanied Brady to Davis' shop where he (Wendell) observed the perpetrator, and he identified Pouncy as that perpetrator. (*See* 1/25/06 Trial Tr., ECF No. 8-8, PageID.779.)  He was able to identify Pouncy because he stood close by as Brady and Pouncy spoke about the car. (*See id.*, PageID.781.)  When the cars stopped at a gas station on the way to Pouncy's "mechanic," Wendell had an opportunity to observe Pouncy interact with Brady again. (*Id.*, PageID.784.)  Wendell was also only a few feet away when Brady showed Pouncy the features of the car at the scene of the carjacking. (*See id.*, PageID.786-789.)  Wendell had "no question" of Pouncy's identity as the perpetrator. (*Id.*, PageID.834.)   As before, Pouncy's cross-examination only served to solidify the witness' confidence. When Pouncy attempted to use the photo array to challenge Wendell, Wendell testified: "A picture isn't talking to me now. . . . The image that I saw that day is the image that's standing in front of me. . . . I believe in what I see in front of me." (*Id.*, PageID.821-822.)

- Thomas Sandstrom: Sandstrom was the victim of the second carjacking, and he identified Pouncy as the lead assailant.  He was able to identify Pouncy because he spoke to Pouncy twice on the phone, interacted with Pouncy at his (Sandstrom's) house when Pouncy came to see the car that Sandstrom had offered for sale, and, most importantly, spent forty-five minutes riding in the car and speaking with Pouncy as they drove to

Pouncy's "mechanic." (*Id.*, PageID.834-842, 853-854, 883-884.) A tape from Sandstrom's answering machine was also played for the jury that contained a threatening message warning against pressing charges. Sandstrom identified Pouncy's voice as the voice on the tape. (*See id.*, PageID.854-862.) Sandstrom rejected Pouncy's repeated suggestion on cross-examination that the perpetrator was someone who merely looked like him. He testified: "No. The person who was you was there. . . . I recognize you." (*Id.*, PageID.865.) Sandstrom then explained: "[A]n individual person that you sat three feet away from for approximately an hour, I can – I would remember that face. . . . it is your face." (*Id.*, PageID.886-887.) Sandstrom believed with his "whole heart" that Pouncy was the man who robbed him. (*Id.*, PageID.887.)

- <u>Maria Sandstrom</u>: Mrs. Sandstrom is the wife of victim Thomas Sandstrom, and she identified Pouncy as the lead perpetrator. She was able to identify Pouncy because she spoke to him for a few minutes outside her house, interacted with Pouncy at a gas station, and then interacted with him again when Pouncy stole the car. (*See id.*, PageID.911-914; *see also* 1/26/06 Trial Tr. ECF No. 8-10, PageID.989-995.) On cross-examination, Mrs. Sandstrom expressed her certainty that Pouncy was the perpetrator. She testified: "I believe with all my heart that it's you." (1/26/06 Trial Tr., ECF No. 8-10, PageID.1038.) She further testified that she and her husband immediately identified Pouncy in the photo array shown to them at the police station. (*See id.*, PageID.1054-1056.) She was absolutely sure that she was not making a mistake. (*See id.*, PageID.1074.)

- <u>Dan Haynes</u>: Haynes is the brother of victim Ralph Haynes, and he identified Pouncy as the perpetrator. He was able to identify Pouncy because he personally spoke with Pouncy twice about the car that his brother had offered for sale. (*See* 1/27/06 Trial Tr., ECF No. 8-11, PageID.1234-1256.) He had "no doubt" that Pouncy was the man he met about his brother's car. (*Id.*, PageID.1245.) Haynes did not budge on cross-examination. He testified: "You were there in that car that day, sir. You know you were." (*id.*, PageID.1245); "There's no doubt in my mind that it was you." (*id.*, PageID.1246); "I don't mean the person that looks like you. You." (*id.*, PageID.1248); "I know it was you, Omar. I know." (*id.*, PageID.1252); "Omar, we went through this before. It's you. There's no doubt in my mind it was you." (*id.*, PageID.1256); "I'm looking right at you." (*id.*, PageID.1262); and "I know you done it. I got eyes. … Your face, facial features, I remember all that. . . . I remember you." (*id.*, PageID.1263).

- <u>Samuel Anderson</u>: Anderson owned the house at which Ralph Haynes stored his car as he was attempting to sell it, and he identified Pouncy as the perpetrator. He was able to identify Pouncy because he spoke with Pouncy in person several times and took Pouncy on the test drive during which Pouncy stole the car. (*See id.*, PageID.1298-1304.) Anderson did not waiver on his identification testimony during cross-examination. He testified that it was "not someone who looks like you. I drove it with you." (*id.*, PageID.1307.) "It was you," Anderson recalled, "[t]here's no doubt in my mind." (*Id.*, PageID.1324.)

Pouncy counters that the eyewitness identification testimony was not strong. He says that on cross-examination, at least one of the witnesses identified someone other than him as the assailant when shown a photo array of possible suspects. But the purported misidentifications were not nearly as significant as Pouncy contends.

Consider the testimony of witness Joseph Scott Davis. On cross-examination, Pouncy showed Davis an array containing black and white photos of possible suspects. (*See* 1/24/06 Trial Tr., ECF No. 8-7, PageID.693-695.) Pouncy told Davis that the police report indicated that he had picked out subject #3 from the array, and he asked Davis whether he had made such an identification. (*See id.*) Davis initially said that he did not recall making an identification from that array, but "it seems that it was the top right corner (subject #3) but I'm not a hundred percent sure." (*Id.*) In fact, the top-right person on the array was someone named Jamarcus Omar Guise, a complete stranger to the case. (*See* Photo Array, ECF No. 9, PageID.4972, 5191-5192.)

Davis then looked at the photo and testified, "it wasn't the right corner obviously," but then he added it was subject #4. (1/24/06 Trial Tr., ECF No. 8-7, PageID.695.) That happened to be a photo of Jaakwaa McGruder. (*See id.*, PageID.698; *see also* Photo Array, ECF No. 9, PageID.5191-5192.)

But the prosecutor cleared up Davis's apparent confusion on re-direct examination. He presented Davis with color copies of the photo arrays, and Davis

quickly corrected his mistake. (*See* 1/24/06 Trial Tr., ECF No. 8-7, PageID.699-770.) Looking at the color copy, Davis conceded that subject #4 (McGruder) looked like Pouncy, but he said subject #4 was not Pouncy. (*See id.*, PageID.701-705.) Davis testified, "without a shadow of a doubt, as soon as I saw these pictures in color, you were not one of the people on that page … I'm positively sure beyond a shadow of a doubt … that it's you." (*Id.*, PageID.705-707.) Davis explained that the poor quality of the black-and-white copy caused him to make the mistake. (*See id.*, PageID.723.)

Pouncy also challenges the strength of the identifying eyewitness testimony on the basis that it involved cross-racial identification. That argument might have force if the crimes involved the sort of brief and frantic encounters more typically associated with carjackings, but they did not. As explained in detail above, each of the witnesses had repeated – and sometimes extended – interactions with Pouncy, and they identified him based upon both his appearance and his voice. This case thus presents a substantially lower risk that the cross-racial identifications were unreliable.

Moreover, the eyewitness testimony from the seven victims/witnesses did not stand alone. The prosecution also presented testimony from Pouncy's accomplice, Wayne Grimes. At trial, Grimes testified to committing the crimes with Pouncy and Pierce, and his testimony largely tracked the testimony of the eyewitnesses. (*See id.*,

PageID.1085-1094 (discussing the Brady carjacking), PageID.1096-1104 (discussing the Sandstrom carjacking).) Pouncy countered that Grimes falsely implicated him because of a dispute over a woman that resulted in Grimes pulling a gun on him. (*See* 1/26/06 Trial Tr., ECF No. 8-10, PageID.1104-1105; *see also* 1/31/06 Trial Tr., ECF 8-14, PageID.1681-1683.) But for the jury to accept such a defense, it would have had to believe that Grimes was either crafty enough (or lucky enough) to have committed the crimes with Pouncy's doppelganger – one who was so similar to Pouncy in appearance, voice, and manner that it led to his misidentification by the seven separate eyewitnesses who interacted with him for substantial periods of time.

In short, this was not a closely contested trial. The evidence overwhelmingly proved Pouncy's guilt. There is thus no reasonable probability that the outcome of the trial would have been different if (1) the prosecution had fully and fairly disclosed the Verizon phone records and (2) Pouncy had then been able to establish that the phone used by the perpetrators was subscribed in Strong's name.

**(2)**

Second, Pouncy's theory of prejudice fails to account for how the prosecution could have and would have responded to Pouncy's effort to connect the phone to Strong. That is an important shortcoming because "[i]n evaluating th[e] question [of prejudice], it is necessary to consider *all* the relevant evidence that the jury would

109

have had before it if [the defense] had pursued [a] different path —not just the [exculpatory] evidence [the defense] could have presented, but also the [other] evidence that almost certainly would have come in with it." *Montgomery*, 654 F.3d at 679 (quoting *Wong v. Belmontes*, 130 S.Ct. 383, 386 (2009)). More to the point, when assessing prejudice under *Brady*, a court properly considers evidence that the prosecution "quite likely could have successfully obtained" and presented if it had disclosed the exculpatory information in the first place and if the defense had made use of that evidence. *Id.* at 683.

The question thus becomes: how would the prosecution have responded to Pouncy's effort to link the perpetrators' phone to Strong, and would that response have meaningfully negated the doubt that may have been created by that link? As an initial matter, we can confidently conclude that if Pouncy had revealed that the phone used by the perpetrators was traceable, the prosecution team would have conducted its own investigation into the ownership and control of the phone. We know that because the investigators initially attempted to conduct just such an investigation. They subpoenaed the Verizon billing records for the victims' phones and then followed up with Verizon to obtain subscriber information for routing numbers that they erroneously believed to be the phone number used by the perpetrators. It was only when the investigators mistakenly concluded that the calls could not be traced that they stopped trying to find the origin of the calls. Thus,

there is every reason to believe that when Pouncy revealed that the calls could be traced, the investigators would promptly have revived their own efforts to trace the calls and to identify the person in control of the phone at the time of the carjackings. Moreover, it would defy common sense to conclude if Pouncy had revealed the traceability of the perpetrators' calls during trial, the prosecution would have done *nothing* in response. Simply put, upon learning that the calls could be traced, a reasonable prosecution team surely would have conducted its own tracing efforts.

And those tracing efforts would have confirmed what we now know to be true – that the phone used by the perpetrators belonged to Pouncy. How do we now know that? Because he effectively admitted that the phone was his at his sentencing hearing in this case. Prior to sentencing, the probation department prepared a presentence investigation report concerning Pouncy and the crimes for which he had been convicted (the "PSIR"). (*See* PSIR, ECF No. 320, PageID.12490-12514.) The PSIR listed a phone number for Pouncy. What number? The same number of the phone used by the perpetrators: (810) 836-5074. (*See id.*, PageID.12506.) At sentencing, Pouncy's counsel then confirmed that he and Pouncy had been given a sufficient opportunity to review the report. (*See* 3/9/06 Sent. Hr'g Tr., ECF No. 8-16, PageID.1905-1906.) The state trial court then gave Pouncy's attorney an opportunity to raise any objections or clarifications that he had with respect to the information in the report. He said nothing about the phone number being inaccurate.

Much more importantly, the trial court then gave Pouncy, himself, four separate opportunities to make "any additions or corrections" with respect to "anything" in the report. (*Id.*, PageID.1936-1944.)  The trial court stressed to Pouncy that it was giving him an opportunity to propose "*any* correction to *any of the information*" in the report." (*Id.*, PageID.1943-1944; emphasis added.)  Pouncy did not say that the phone number listed for him was wrong.  His failure to object under these circumstances amounted to an admission that the number was correct. *See*, *e.g., United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc) ("By failing to object to the presentence report, Vonner accepted all of the factual allegations contained in it…."); *United States v. Stafford*, 258 F.3d 465, 476 (6th Cir. 2001) (holding that a failure to object to a presentence report is an "express admission" of drug type and quantity listed in report); *United States v. Cadieux*, 500 F.3d 37, 47 (1st Cir. 2007) (treating failure to object to facts in a presentence report as an "adoptive admission").  Admittedly, the prosecution team and the investigators would not have had this post-trial admission by Pouncy during the trial, and thus they could not have used this admission to link him to the phone used by the perpetrators.  But they would have found other substantial links between Pouncy and the phone.

For example, the investigators likely would have found another presentence report for Pouncy connecting Pouncy to the perpetrators' phone.  This other

presentence report was in existence at the time of Pouncy's trial in this case. It had been prepared months earlier for use in connection with a different criminal case against Pouncy. And it listed Pouncy's phone number as (810) 836-5074 – the very same number used by the perpetrators. (*See* ECF No. 88-1, PageID.7202.) It is reasonable to conclude that once investigators learned the number of the phone used by the perpetrators, they would have searched for records containing phone numbers associated with Pouncy, would have discovered this other presentence investigative report for Pouncy, and would have presented it to the jury.[29]

It is further likely that the prosecution team would have linked Pouncy to the perpetrators' phone by pairing testimony from Strong with testimony from the victims and others who were with the victims at the time of the carjackings. That would have happened as follows. Once Pouncy identified Strong as the subscriber of the phone used by the perpetrators, the prosecution team surely would have

---

[29] During the hearing before the Court, counsel for Pouncy suggested that statements in the second presentence report concerning Pouncy's phone number would be inadmissible double hearsay. The Court concludes that the prosecution would have been able to present the statements in the report to the jury in at least two ways. First, for the same reasons explained above with respect to Pouncy's PSIR in this case, the prosecution likely could have been able to show that the statement amounted to an admission by Pouncy. Second, the prosecution could have called the probation agent who prepared the report to confirm that the phone number came from, or was confirmed by, Pouncy. The Court is confident that the prosecution could have found a way to inform the jury that the phone number from which Pouncy was trying to distance himself had been recently associated with him.

interviewed Strong. And they would have learned – as Strong later confirmed in an affidavit – that Strong obtained the phone for a teenager named Jacob Joe Woods. (*See* Strong Affidavit, ECF No. 8-5, PageID.370.) According to at least two of the prosecution's witnesses – Joseph Davis and Earl Brady – that is the same name that Pouncy used when arranging the carjackings. (*See*, *e.g.*, 1/24/06 Trial Tr., ECF No. 8-7, PageID.684, 692-693; 703, 705, 707, 714, 744, 750.) Thus, the prosecution would have used Pouncy's reliance on Strong to tie the perpetrators' phone right back to Pouncy. Simply put, Pouncy's focus on Strong would have backfired on him.[30]

### (3)

For all of these reasons, Pouncy has failed to show that there is a reasonable probability that the result of his trial would have been different if the prosecution had informed Pouncy that the calls from the perpetrators to the victims could be traced. Therefore, Pouncy is not entitled to relief on his claim under *Brady* that the prosecution misled him into believing that the Verizon records lacked exculpatory value.

---

[30] Had Strong been called as a witness and identified McGruder as being the "Jacob Joe Woods" to whom he gave the phone, it is likely such testimony would have been undermined with the presentation of evidence that McGruder was in jail at the time of the Sandstrom carjacking. (*See* Respondent's Post-Hearing Br., ECF No. 203, PageID.9989-9991, 10032-10048.)

## C

The Court next turns to Pouncy's second due process claim. This claim relates to the prosecution's failure to correct false testimony offered by Wayne Grimes, Pouncy's co-defendant and alleged accomplice.

## 1

The background of the claim related to Grimes' testimony is as follows. Prior to trial, Grimes gave several statements to police. The first denied involvement in the carjackings, the second admitted participation and named Pouncy as an accomplice, and the third contained detailed allegations regarding Pouncy's role. Grimes initially told Detective Gagliardi on October 12, 2005, that "he had nothing to do with this and that he wasn't involved." (Police Rpt., ECF No. 203-6, PageID.10061.) After Grimes was confronted with the fact that police had obtained his license plate number from a witness, he immediately made another statement implicating Pouncy and Pierce. (*See id.*, PageID.10061-10065). Then on January 10, 2006, about two weeks before Pouncy's trial, Grimes gave a third tape-recorded statement containing even more incriminating details regarding Pouncy's involvement in the crimes. (*See* Interview Tr., ECF No. 9-4, PageID.5273-5295.)

On cross-examination, Grimes explained that his first statements to the police were incomplete because he made them shortly after he had been arrested for the first time in his life, and he was scared. (*See* 1/27/06 Trial Tr., ECF No. 8-11,

PageID.1151.) In fact, Grimes had been arrested once before. That earlier arrest occurred in the City of Clio, Michigan on May 14, 2005, for carrying a concealed weapon in a motor vehicle. (*See* ECF No. 8-37, PageID.3157.)

Pouncy asserts that the police and prosecutor (1) must have known about Grimes' prior arrest before Grimes testified or must have learned about the arrest before trial concluded but (2) failed to correct Grimes' false testimony that his arrest in this case was his first and/or failed to provide Grimes' arrest record to the defense. Pouncy argues that this misconduct by the prosecution violated *Napue* and/or *Giglio*.

## 2

The Court declines to grant relief on this claim because Pouncy has not presented any evidence that the prosecution or the police investigators knew prior to the end of Pouncy's trial that Grimes had previously been arrested in Clio. Instead of presenting evidence, Pouncy contends that "it strains credulity that both the prosecutor [and Detective Gagliardi] were unaware" of the prior arrest. (Pouncy Br., ECF No. 300, PageID.12328.) Pouncy contends that the prosecutor must have known about Grimes' prior arrest because it was mentioned in a presentence investigation report concerning Grimes (the "Grimes PSIR"). Pouncy further insists that the investigator must have known about the arrest because he ran a Law Enforcement Information Network ("LEIN") inquiry concerning Grimes prior to Pouncy's trial. But Pouncy offers no proof that the prosecutor saw or had access to

the Grimes PSIR before Pouncy's trial ended. Indeed, Pouncy has not offered any evidence that the Grimes PSIR had arrived in the prosecutor's office before the end of Pouncy's trial. Likewise, Pouncy has not offered any evidence that the investigator actually ran a LEIN inquiry about Grimes before Pouncy's trial came to a close. In short, Pouncy's claim that the prosecutor and police knew (or had reason to know) that Grimes had been arrested in Clio is based upon pure speculation.

For all of these reasons, Pouncy is not entitled to habeas relief on this claim.

## D

The Court now turns to Pouncy's third and final due process claim. This claim relates to the prosecution's alleged suppression of evidence that witness Willie Joyce identified someone other than Pouncy as the perpetrator during an interview with police prior to trial. Pouncy has failed to persuade the Court that this claim is exhausted, and the Court will permit Pouncy to withdraw it (as Pouncy has asked the Court to do in the event that the Court found it to be unexhausted).

## 1

The factual and procedural background of this claim is as follows. As explained above, the carjacking scheme here involved targeting vehicles that had been listed for sale in certain publications. The carjackers would go the victims' homes or other locations where the vehicles were being stored, would induce the victims to drive the vehicles to an off-site location for an inspection by a mechanic

(who did not actually exist), and would then take the vehicles at gunpoint once they reached the site of the imaginary inspection.

During the trial, victim Thomas Sandstrom testified that as part of the carjacking scheme, Pouncy had him (Sandstrom) drive his car to the home of a purported auto mechanic for an inspection. (*See* 1/25/06 Trial Tr., ECF No. 8-8, PageID.839.) Sandstrom said that Pouncy directed Sandstrom to a house that sat at the end of a dead-end street in Mt. Morris Township. (*See id.*, PageID.843.) Sandstrom then explained that when they arrived at the house, Pouncy went to the door of the home, briefly spoke to someone, and then returned to the car. (*See id.*, PageID.843-844.) Sandstrom said that shortly thereafter (and without any inspection taking place), Pouncy and his accomplices ordered Sandstrom out of the car at gunpoint and stole the car. (*See id.*, PageID.844-845.) It turns out that the carjackers chose the house at the end of the dead-end street at random. They did not know the residents of the home, and it appears that they chose the home simply because of its remote location.

After the robbery, Sandstrom and his wife walked to a nearby road and flagged down a police car. (*See id.*, PageID.845-846.) They told the officers what occurred and gave them the license plate number of the perpetrators' car. (*See id.*) The officers then drove to the scene of the crime and identified Joyce as the man who answered the door at the house on the end of the dead-end street. (*See* Police Rpt.,

ECF No. 203-6, PageID.10057.) Joyce gave police a physical description of the man he spoke with and said that the man asked if Joyce wanted his lawn mowed. (*See id.*, PageID.10057-10058.) Joyce said that he did not want his lawn mowed, and the encounter ended. (*See id.*) The police report indicates that Detective Gagliardi subsequently returned to the house and tried to interview Joyce, but he was unsuccessful. (*See id.*, PageID.10068.) The prosecution listed Joyce as a potential witness for trial in connection with the Sandstrom carjacking, but the prosecution ultimately chose not to call him. (*See* Am. Felony Information, ECF No. 9-4, PageID.5325.)

In Pouncy's post-trial motion for relief from judgment in the state trial court, Pouncy raised a claim of ineffective assistance of counsel related to Joyce. Pouncy claimed that his attorney unreasonably failed to interview Joyce in order to determine whether the person who came to his door – *i.e.*, the person identified by Sandstrom as the carjacker – was Pouncy. (*See* St. Ct. Mot. for Relief from Judgment, ECF No. 8-20, PageID.2025-2026; St. Ct. Br. in Support, ECF No. 8-21, PageID.2116-2117; *Pro Se* Br. in Support, ECF No. 8-22, PageID.2287-2293.) But Pouncy did not raise a *Brady* claim related to Joyce.

Eight years later, Pouncy's new attorneys obtained a second affidavit from Joyce. (*See* 2018 Joyce Aff., ECF No. 182, PageID.9278-9279.) This affidavit contained substantial new information. Joyce stated that he had been interviewed

by police twice – once by the officers shortly after the carjacking and a second time by the Detective Gagliardi. (*See id*.) He said that during the second interview, he was shown a photographic line-up, and he identified someone other than Pouncy as the person who came to his door during the Sandstrom carjacking. (*See id*.) He then stated that he was subpoenaed to appear at court on January 24, 2006 (the first day of Pouncy's trial), but when he appeared, Detective Gagliardi (to whom he had identified someone other than Pouncy) told him that he was not needed and the judge was not allowing people in the courtroom. (*See id*.)

Pouncy filed Joyce's second affidavit with this Court on March 12, 2018. (S*ee id*.) He offered the affidavit as support for his claim that he was actually innocent and that the Court should thus excuse any alleged procedural defaults of his substantive claims. After reviewing the Joyce affidavit, the Court permitted Pouncy to call Joyce as a witness at the evidentiary hearing on Pouncy's actual innocence claim. (*See* 5/22/2018 Evid. Hr'g Tr., ECF No. 190, PageID.9821-9847.) As explained above, at that hearing, Joyce repeated his claim from his 2018 affidavit that he had identified someone other than Pouncy in a photographic lineup and that Detective Gagliardi told him that he was not needed as a trial witness. (*See id.*, PageID.9827-9829, 9834.)

Following the evidentiary hearing, the Court permitted the parties to file briefs on the issue of whether Pouncy had established his innocence. In Pouncy's post-

hearing brief, he argued that he had established his actual innocence through, among other things, Joyce's hearing testimony. But he attempted to make further use of Joyce's testimony. He attempted to raise – for the first time – a freestanding claim that the police and prosecution violated *Brady* by suppressing the fact that Joyce identified someone other than Pouncy as the person who came to his door during the Sandstrom carjacking. (*See* Pouncy Post-Hearing Br., ECF No. 197, PageID.9931-9936.) Pouncy continues to ask the Court to grant relief on this *Brady* claim related to Joyce. (*See* Pouncy Supp. Br., ECF No. 380, PageID.14043-14071.)

Respondent counters that the Court may not grant relief on Pouncy's *Brady* claim related to Joyce because Pouncy has not exhausted the claim in state court. (*See* Respondent's Supp. Br., ECF No. 321, PageID.12631-12632.)

**2**

A federal court "shall not" grant habeas relief on a particular claim "unless it appears" that the petitioner "has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1). The petitioner bears the burden of demonstrating that a claim is exhausted. *See Nali v. Phillips*, 681 F.3d 837, 852 (6th Cir. 2012). Pouncy has failed to persuade the Court that he has exhausted his state court remedies for his *Brady* claim related to Joyce or that he should be excused from trying to exhaust that claim.

**a**

Pouncy first argues that the Court should not compel him to return to state court to exhaust his *Brady* claim related to Joyce because he plainly has no remaining state court remedy for the claim. The Court disagrees.

As Respondent accurately notes, the Michigan Court Rules provide a mechanism through which Pouncy may attempt to present his *Brady* claim related to Joyce to a Michigan court. Rule 6.502 of the Michigan Court Rules permits a convicted defendant to file a motion for relief from his judgment of conviction. Such a motion may include *Brady* claims. *See, e.g., People v. Young*, 943 N.W.2d 99 (Mich. 2020) (allowing convicted defendant to present *Brady* claim in motion under Michigan Court Rule 6.502).

Moreover, the fact that Pouncy has already filed one motion for relief from judgment does not necessarily prevent him from presenting his *Brady* claim related to Joyce in a second such motion. Rule 6.502(G)(2) of the Michigan Court Rules permits a convicted defendant to file a second or subsequent motion for relief from judgment if the defendant demonstrates that he is "presenting a claim of new evidence that was not discovered before the first such motion." Pouncy says that he did not discover evidence that the police and prosecution suppressed evidence related to Joyce's identification until long after he filed his first motion for relief from judgment. (*See* Pouncy Reply Br., ECF No. 335, PageID.12821 – stating that

Pouncy discovered the factual basis for the claim in February 2018.) If that is true, then Pouncy may well have an opportunity under Rule 6.502(G)(2) to present his *Brady* claim related to Joyce in a second motion for relief from judgment in state court. *See, e.g., People v. Johnson*, 918 N.W.2d 676 (Mich. 2018) (holding that convicted defendant should have been permitted to present *Brady* claim based on newly-discovered evidence in a motion under Michigan Court Rule 6.502). Because that rule provides a possible remedy for Pouncy in state court, Pouncy has failed to show that he should be excused from presenting the claim to a state court.

Pouncy counters that he will not have an opportunity to file a second motion for relief from judgment under Rule 6.502(G)(2) raising the *Brady* claim related to Joyce because under Michigan law, his evidence supporting that claim will not be deemed newly-discovered evidence. (*See* Pouncy Br., ECF No. 345, PageID.13200.) In support of that contention, Pouncy directs the Court to the decision of the Michigan Court of Appeals in *People v. Swain*, 794 N.W.2d 92 (Mich. App. 2010). (*See id*.) In *Swain*, the Michigan Court of Appeals held that certain witness testimony offered by a convicted defendant in support of a motion for relief from judgment did not constitute newly-discovered evidence because the defendant discovered both the witnesses "*and their potential testimony* … before defendant filed her first motion for relief from judgment." *Id*. at 106 (emphasis added).

For at least two reasons, the Court is not persuaded that *Swain* will preclude Pouncy from proceeding on a theory that his evidence supporting his *Brady* claim related to Joyce is newly discovered. First, in sharp contrast to *Swain*, Pouncy says that he did not know of Joyce's *testimony* supporting that claim until 2018 – well after Pouncy filed his first motion for relief from judgment. *Swain* therefore likely poses no obstacle to a second motion for relief from judgment.[31] Second, the Michigan Supreme Court ultimately held that the defendant in *Swain* did present newly-discovered evidence that permitted her to proceed under Michigan Court Rule 6.502(G)(2), *see People v. Swain*, 878 N.W.2d 476 (Mich. 2016), and thus it is not clear that the Court of Appeals decision cited by Pouncy remains viable on the point for which Pouncy cited it.

Pouncy further contends that filing a motion for relief from judgment in state court is not an available remedy that must be exhausted for his *Brady* claim related to Joyce "because there is no 'right' to appeal available" from an order denying such a motion. (Pouncy Supp. Br., ECF No. 380, PageID.14051.) Pouncy does not cite any decision in which any court has so held, and he acknowledges that his lead attorney "disagreed" with his argument. (*Id.* at n.21, PageID.14048.)

---

[31] Notably, Pouncy's lead counsel did not disagree with this interpretation and application of *Swain*. (*See* 12/2/2020 Hr'g Tr., ECF No. 363, PageID.13443-13445.)

For all of these reasons, Pouncy has not persuaded the Court that a motion under Michigan Court Rule 6.502 is unavailable to him.

b

Pouncy offers three additional arguments as to why this Court may reach the merits of his *Brady* claim related to Joyce even though he did not present the claim to a state court. None persuade the Court that he is entitled to relief on this claim.

First, Pouncy contends that Respondent waived a lack of exhaustion defense when Respondent told the Court that Pouncy "***no longer has an available remedy in state court***." (Pouncy Br., ECF No. 345, PageID.13200, quoting Respondent's Supplemental Merits Br., ECF No. 239, PageID.11333; emphasis added by Pouncy.) This argument rests upon a mischaracterization of the record. At the page of Respondent's brief quoted by Pouncy, Respondent did not say that Pouncy lacks a state court remedy for any and all claims that Pouncy may wish to raise. Instead, Respondent made a much narrower point. He argued only that Pouncy had no available state court remedy for his claim of ineffective assistance of counsel under *United States v. Cronic*, 466 U.S. 648 (1984). (*See* Respondent's Br., ECF No. 239, PageID.11330-11334.) Respondent has never argued (or conceded) that Pouncy lacks a state court remedy for his *Brady* claim related to Joyce, nor has Respondent waived his exhaustion defense with respect to the claim. *See* 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be

estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.").

Second, Pouncy argues that a return to state court is not required because his *Brady* contentions related to Joyce do not amount to a new claim that must be exhausted. (*See* Pouncy Supp. Br., ECF No. 380, PageID.14051-14055.) Instead, Pouncy contends, he is merely offering new evidence – related to Joyce – to support his original (and exhausted) *Brady* claim (which focused on the alleged suppression of the Verizon records). (*See id.*) Pouncy has not cited any case in which the Sixth Circuit has held that a *Brady* claim based upon the alleged suppression of certain evidence may be considered part of a previously-exhausted *Brady* claim that was based upon the alleged suppression of *different* evidence. Under these circumstances, Pouncy has failed to persuade the Court that he may avoid exhausting his *Brady* claim related to Joyce on the ground that he previously presented to the state courts a *Brady* claim based on the suppression of *other* supposedly-exculpatory evidence.

Finally, Pouncy argues that the Sixth Circuit does not require a petitioner who discovers a *Brady* violation for the first time during federal habeas proceedings to return to state court to exhaust the *Brady* claim based upon the newly-discovered violation. (*See* Pouncy Supp. Br., ECF No. 380, Page ID.14056.) In support of that argument, he cites two Sixth Circuit decisions: *Hill v. Mitchell*, 842 F.3d 910 (6th

Cir. 2016) and *Jones v. Bagley*, 696 F.3d 475 (6th Cir. 2012). But neither of these cases holds that exhaustion is not required under these circumstances. In *Hill*, the Sixth Circuit said nothing about exhaustion. And in *Jones*, the Sixth Circuit denied the *Brady* claim on the merits without deciding whether exhaustion was required, as it was authorized to do under 28 U.S.C. § 2254(b)(2).[32] Pouncy has not persuaded the Court that the Sixth Circuit does not require exhaustion of *Brady* claims like the one related to Joyce.

**3**

In a recent filing, Pouncy stated that if the Court determined that his *Brady* claim related to Joyce was unexhausted, then he would withdraw the claim. (*See* Notice, ECF No. 395, PageID.14263-14265.) Because the Court has determined that

---

[32] At the district court level, the respondent in *Jones* raised lack of exhaustion as a defense to the petitioner's *Brady* claim that was based upon the suppression of evidence that was discovered for the first time during the federal habeas proceedings. (*See Jones v. Bagley*, U.S.D.C. S.D. Ohio, Civil Action No. 01-cv-00564, ECF No. 145, PageID.1818.) But the respondent also noted that the court could deny the claim on the merits even if the claim was not exhausted. (*See id*.) The district court, per the assigned Magistrate Judge, decided that it would address the exhaustion question only if it found "the claims to be potentially meritorious." (*Jones*, ECF No. 148, PageID.1858.) That court ultimately denied the claim on the merits without reaching the exhaustion question. *See Jones v. Bagley*, 2010 WL 654287, at ** 1, 39-52 (S.D. Ohio 2010) (noting respondent's argument that *Brady* claims based on suppression of evidence discovered during federal habeas proceedings "are unexhausted but without merit, so it is proper for this Court to deny them," and then denying the claims on the merits without reaching exhaustion question). The Sixth Circuit also denied the new *Brady* claims on the merits without addressing the question of exhaustion. *See Jones v. Bagley*, 696 F.3d 475, 486 (6th Cir. 2012).

the claim is unexhausted, it will permit Pouncy to withdraw the claim and now formally deems the claim withdrawn.

## VII

Finally, the Court addresses Pouncy's claim that he was constructively denied the right to the effective assistance of counsel during the pre-trial phase of this case. In the Petition and supporting brief, he claimed that the constructive denial occurred as a result of counsel's pre-trial failure to interview the prosecution's witnesses. (*See* Am. Pet., ECF No. 3, PageID.27-28; Pouncy Br., ECF No. 9, PageID.5034-5039.) Pouncy's most recent round of briefing offers a new and expanded version of this claim. He now contends that the constructive denial resulted from three alleged pre-trial failures by counsel: counsel's failure to investigate the facts, counsel's failure to meaningfully consult with Pouncy, and counsel's failure to contest the prosecution's case. (*See* Pouncy Br., ECF No. 300, PageID.12336.) Pouncy is not entitled to federal habeas relief on this claim.

## A

As an initial matter, the Court concludes that a substantial portion of this claim is not exhausted and thus not properly before the Court. As Pouncy concedes, he "did not assert [any portion of this] claim on direct appeal[, n]or did he present the claim to the trial court on post-conviction appeal." (Pouncy Br., ECF No. 300, PageID.12338.) Nonetheless, Pouncy insists that the claim is exhausted because he

asserted it "in a *pro per* 'Standard 4' brief that he submitted to the Michigan Court of Appeals," and his attorney then presented the claim to the Michigan Supreme Court." (*Id.*) There are two problems with this argument. First, the Michigan Court of Appeals rejected Pouncy's Standard 4 brief. (*See* Ltr., ECF No. 8-48, PageID.4397; Copy of Return Notification, ECF No. 233-4, PageID.10736.) Thus, the claims in that brief – including any claim related to the constructive denial of counsel in the pre-trial phase of this case – were not presented to the Michigan Court of Appeals and have not been exhausted. *See, e.g., Provenzano v. Singletary*, 3 F.Supp.2d 1353, 1387 (M.D. Fla. 1997) (holding that claims were not fairly presented to the state courts where they were contained in a pleading that was properly stricken by the state courts); *Rinehart v. Birkett*, 2014 WL 1344469, at *8 (E.D. Mich. Apr. 4, 2014) (same). Second (and in any event), in Pouncy's Standard 4 brief, he argued only that the constructive denial of counsel resulted from counsel's failure to interview the prosecution's witnesses. (*See* Standard 4 Brief, ECF No. 233-4, PageID.10737, 10769-10775.) Thus, even if that brief had been accepted for filing, it would not have exhausted any portion of Pouncy's constructive denial of counsel claim beyond the portion based upon counsel's alleged failure to interview the prosecution's witnesses.[33]

---

[33] Pouncy contends that the current version of his constructive denial of counsel claim – based upon counsel's (1) failure to interview witnesses, (2) failure to consult with Pouncy, and (3) failure to otherwise challenge the prosecution's case during the

Pouncy further argues that the Court should not deem any portion of this claim to be unexhausted because Respondent "long ago" waived its lack of exhaustion defense. (Pouncy Reply Br., ECF No. 335, PageID.12824.) Pouncy finds this waiver in two filings by Respondent: his response to Pouncy's initial petition (*see* Respondent's Br., ECF No. 7) and his more recent Notice concerning the status of Pouncy's remaining claims (*see* Respondent's Notice, ECF No. 290). But Respondent did not waive his exhaustion defense to the entirety of Pouncy's constructive denial of counsel claim in either of the filings identified by Pouncy.

The Court starts with Respondent's response to Pouncy's original petition. In that response, Respondent did say that the "State is not arguing that any of Pouncy's habeas claims are barred by failure to exhaust…." (Respondent's Br., ECF No. 7.

---

pre-trial stage of the case (*see* Pouncy Br., ECF No. 300, PageID.12336) – is essentially the same claim that he presented to the state courts in his Standard 4 brief and in his application for leave to appeal with the Michigan Supreme Court. (*See* Pouncy Br., ECF No. 345, PageID.13221-13225.) Relying on *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir., 2007), Pouncy says that his current claim merely clarifies and/or amplifies the claim that he presented to the state court. (*See id*.) The Court disagrees. As explained in detail above, as presented to the state courts, the constructive denial of counsel claim rested exclusively upon counsel's alleged failure to interview prosecution witnesses. The newly-added elements of the claim – failure to consult with Pouncy and otherwise challenge the prosecution's case – do not merely amplify the claim as presented to the state courts. Instead, the new elements of the claim are "based upon a different allegedly ineffective action than the claim presented to the state courts." *Richey*, 498 F.3d at 354. Thus, the new elements of the claim are not exhausted. *See id.*

PageID.46.)  However, as noted above, at that time, Pouncy's petition complained only about counsel's purported failure to interview prosecution witnesses and did not complain about his alleged failure to consult with Pouncy or otherwise contest the prosecution's case before trial.  Thus, at most, Respondent's initial pleading waived the failure to exhaust defense with respect to Pouncy's claim that his lawyer failed to interview prosecution witnesses.

The same is true with respect to Respondent's more recent Notice.  (*See* Respondent's Notice, ECF No. 290.)  In that Notice, Respondent said: "[T]he claims set forth in Pouncy's original Notice (R. 287) are not subject to the affirmative defense of procedural default." (*Id.*, PageID.12218.[34])  Notably, in Pouncy's "original Notice," he identified this claim as follows: "Defense counsel's complete failure to conduct preparatory investigation of prosecution witnesses constructively deprived Mr. Pouncy of his Sixth Amendment right to effective assistance of counsel." (Pouncy Notice, ECF No. 287, PageID.12208.)  Thus, at most, Respondent's statement in his more recent Notice applies only to the portion of

---

[34] In Pouncy's reply brief, he inaccurately quotes from Respondent's Notice.  Pouncy quotes Respondent as saying: "the claims set forth in Pouncy's original Notice, which included the *Cronic* claim, are not subject to the affirmative defense of procedural default." (Pouncy Reply Br., ECF No. 335, PageID.12825.)  As noted above, Respondent did not say that.  The Court does not mean to suggest that Pouncy's counsel intentionally mis-stated the record, but it is important to clarify what Respondent actually said.

Pouncy's constructive denial of counsel claim that rests upon his attorney's alleged failure to interview prosecution witnesses.

On this record, the Court concludes that (1) Pouncy failed to exhaust any portion of his constructive denial of counsel claim because he did not properly present any portion of that claim to the state courts, but (2) Respondent waived the failure to exhaust defense with respect to the portion of the claim based upon defense counsel's alleged failure to interview and/or investigate prosecution witnesses. Thus, the Court will limit its review of this claim to the portion of the claim that rests on that alleged failure. The Court will apply the *do novo* standard of review to that claim.

### B

As noted above, the "general rule" is that "claims of ineffective assistance of counsel are governed by the familiar two-part framework set forth in *Strickland*" that requires a defendant to demonstrate deficient performance by counsel and prejudice. *Coleman,* 835 F.3d at 612. "But in limited cases," a federal court "may dispense with *Strickland*'s prejudice inquiry where the circumstances arising in a criminal prosecution are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'" *Id.* at 612 (quotation omitted). "In particular, in *United States v. Cronic*, 466 U.S. 648 (1984), the Supreme Court identified three scenarios in which a defendant is entitled to a presumption of

prejudice: First, courts must presume prejudice where there has been a 'complete denial of counsel' at a 'critical stage' of the criminal proceedings. Second, [a federal court] also presume[s] prejudice 'if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.' Third, even if counsel is present and available to assist the accused, a prejudice inquiry is unnecessary where 'the likelihood that any lawyer, even a fully competent one, could provide effective assistance' is minimal." *Id.* at 612 (quoting *Cronic*, 466 U.S. at 659-60). The Supreme Court has stressed that "*Cronic* recognized [only] a narrow exception to *Strickland's* holding that a defendant who asserts ineffective assistance of counsel must demonstrate … that the deficiency prejudiced the defense" and that circumstances justifying application of this exception will arise "infrequently." *Florida v. Nixon*, 543 U.S. 175, 190 (2004).

## C

Pouncy brings his constructive denial of counsel claim under *Cronic's* second scenario. He contends that because counsel failed to interview and/or investigate any of the prosecution's witnesses, counsel "'entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing' during the "critical [pre-trial] stage" of the case. (Pouncy Br., ECF No. 300, PageID.12338-39, quoting *Cronic*, 466 U.S. at 659.) He thus claims that he is entitled to a presumption of prejudice and relief on this claim. (*See id*.) The Court disagrees.

Under *Cronic's* second scenario, a presumption of prejudice based upon "an attorney's failure to test the prosecutor's case" is appropriate only where "the attorney's failure" is "complete." *Bell v. Cone*, 535 U.S. 685, 697 (2002). And a failure to interview witnesses and/or to investigate their version of events, as Pouncy alleges here, is not a "complete" failure to test the prosecution's case. Such an alleged failure thus does not give rise to a presumption of prejudice under *Cronic*. *See, e.g., Altman v. Winn*, 644 F. App'x 637, 641-62 (6th Cir. 2016) (refusing to apply *Cronic* presumption of prejudice to claim that defense counsel "failed to conduct any meaningful investigation" and failed to interview "crucial witnesses"); *Howard v. Warren*, 2020 WL 3036328, at *9 (E.D. Mich. June 5, 2020) (refusing to apply *Cronic* presumption to claim that defense counsel failed to interview the only two prosecution witnesses who identified him as the shooter).[35]

Pouncy has not cited any case in which a court has held that an attorney's failure to interview witnesses, standing alone, amounts to a complete failure to test

---

[35] *See also Freeman v. Graves*, 317 F.3d 898, 900 (8th Cir. 2003) (holding that *Cronic* presumption of prejudice did not apply to claim that attorney failed to claim that "attorney's failure to interview any of the alibi witnesses named by [the defendant] caused the adversarial process to lose its character as a confrontation between opponents."); *Bartee v. Quarterman*, 574 F.Supp.2d 624, 645 (W.D. Tex. 2008) (holding that a habeas petitioner's "allegations his trial counsel inadequately investigated the case against petitioner, failed to interview potential witnesses, failed to discover and develop exculpatory and mitigating evidence, and inadequately examined venire members during voir dire do not fall within the narrow scope of the presumed prejudice rule announced in *Cronic*.").

the prosecution's case and thus warrants a presumption of prejudice under the second *Cronic* scenario. The primary decision relied upon by Pouncy – the Sixth Circuit's decision in *Mitchell v. Mason*, 325 F.3d 732 (6th Cir. 2003) – did not even involve the failure-to-test-the-government's-case prong of *Cronic* on which Pouncy relies here. The petitioner in *Mitchell* argued that he was entitled to a presumption of prejudice under *Cronic* because his defense attorney – who had been suspended from the practice of law for the 30-day period immediately preceding the trial – met with him before trial for a total of "six minutes … spread over three meetings." *Mitchell*, 325 F.3d at 744. The Sixth Circuit agreed. *See id.* But it did not presume prejudice on the theory that counsel failed to test the prosecution's case. Instead, "the court in *Mitchell* presumed that counsel's performance was prejudicial because [the defendant] was denied the *presence* of counsel during the critical pre-trial stage." *Ivory v. Jackson*, 509 F.3d 284, 295 (6th Cir. 2007) (emphasis in original) (explaining why *Mitchell* was inapplicable to petitioner's claim that his attorney failed to subject the prosecution's case to adversarial testing). Thus, *Mitchell* does not support Pouncy's argument that the Court should presume prejudice under *Cronic*.

In a post-hearing brief, Pouncy contends that a number of other Sixth Circuit "precedents allow prejudice to be presumed" based upon a "wholesale failure to investigate and interview witnesses." (Pouncy Br., ECF No. 345, PageID.13225-

13229.)  But the cases cited by Pouncy do not support that contention.  For instance, contrary to Pouncy's suggestion, the Sixth Circuit in *Rickman v. Bell*, 131 F.3d 1150 (6th Cir. 1997), did not presume prejudice based upon a failure to investigate and interview witnesses.  Instead, the court presumed prejudice where defense counsel "combined a total failure to actively advocate his client's cause with repeated expressions of contempt for his client for his alleged actions" and where "[t]he effect of all this was to provide Rickman not with a defense counsel, but with a second prosecutor." *Id.* at 1157.  Likewise, in *Phillips v. White*, 851 F.3d 567 (6th Cir. 2017), the court presumed prejudice where, at a capital sentencing proceeding, counsel "neglect[ed] to make an opening statement; fail[ed] to investigate or present evidence, mitigating or otherwise; and offer[ed] a potentially off-putting and self-deprecating remark." *Id.* at 581.  The net effect was that the "sentencing was a presentation by one party, not a contest between adversaries." *Id.*  Finally, in both *Carter v. Bell*, 218 F.3d 581 (6th Cir. 2000) and *Groseclose v. Bell*, 130 F.3d 1161 (6th Cir. 1997), the court found actual prejudice from counsel's deficient performance and did not presume prejudice based upon a failure to investigate or interview witnesses. *See Carter*, 218 F.3d at 600 (finding prejudice based upon quantity of mitigation evidence that counsel failed to present at capital sentencing); *Groseclose*, 130 F.3d at 1170 (declining to decide whether to presume prejudice because evidence supported a finding of actual prejudice).  Pouncy simply has not

shown that a presumption of prejudice is warranted based upon counsel's failure to investigate and/or interview witnesses.

For all of these reasons, Pouncy is not entitled to federal habeas relief on his claim that he was constructively denied the effective assistance of counsel when his appointed trial counsel failed to interview the prosecution's witnesses and/or investigate their accounts.

## D

Even if this Court considered Pouncy's constructive denial of counsel claim as presented in his final briefing – *i.e.,* as based upon counsel's alleged failure to interview witnesses *plus* his alleged failure to consult with Pouncy and otherwise investigate the case – the Court would still deny the claim. The record does not support Pouncy's contention that his attorney *entirely* failed to contest the prosecution's case during the pre-trial phase of the case.

Counsel contested the prosecution's case before trial in at least a few ways. First, he opposed the prosecution's case at the preliminary examination. He appeared at that hearing, cross-examined the prosecution's witnesses, objected to the prosecution's motion to amend the charges to add counts, and objected to the case being bound over for trial. (*See* 11/2/05 Prelim. Exam. Tr., ECF No. 8-2.) In addition, as the Sixth Circuit observed, counsel's "on-the-record statements impl[ied] that he had read all of the materials in Pouncy's file" prior to trial. *Pouncy,*

846 F.3d at 162. And counsel visited Pouncy in custody somewhere between "six" and one "dozen" times, and during those visits, they discussed "filing an alibi notice." *Id.* Based upon those discussions, counsel hired a private investigator who provided an initial oral report that he was unable to support the potential alibi defense. (*See* 1/24/06 Trial Tr., ECF No. 8-7 at PageID.461-462.)

In sum, while this Court continues to believe that defense counsel was not sufficiently prepared to try Pouncy's case, *see Pouncy*, 165 F.Supp.3d at 628-29, it seems clear that counsel did not *entirely* fail to subject the prosecution's case to adversarial testing during the pre-trial phase of the case. Accordingly, the *Cronic* presumption of prejudice does not apply here, and Pouncy is not entitled to relief on his ineffective assistance claim under *Cronic*.

## VIII

For all of the reasons explained above, IT **IS HEREBY ORDERED** as follows:

1. The Court **GRANTS** a conditional writ of habeas corpus on Pouncy's claim that he was denied the effective assistance of counsel in connection with the plea-bargaining process. The Court orders the State of Michigan (acting through either the Michigan Attorney General's Office or the Genesee County Prosecutor's Office) to offer Pouncy, within 60 days, a plea deal that (1) permits Pouncy to plead no contest to all of the charges against him without the habitual offender enhancement and (2) includes a *Killebrew* sentence agreement calling for Pouncy to be sentenced pursuant to a guidelines range that calls for a minimum sentence of 135-225 months (to be served consecutively to the two-year sentence for the felony firearm convictions). If Pouncy accepts that offer in writing within 30 days, then within 60 days of Pouncy's written acceptance, the State shall petition the

state trial court (1) to re-open the state court criminal case against Pouncy, (2) to vacate Pouncy's convictions, and (3) to accept the parties' plea agreement and to impose a sentence consistent with that agreement. The State shall release Pouncy from custody unless, as directed above, (1) it timely satisfies its obligations to offer Pouncy the plea deal in writing and (2) if Pouncy timely accepts that plea deal in writing, it petitions the state trial court as directed above.

2. In all other respects Pouncy's petition for a writ of habeas corpus is **DENIED**.

## IX

In order to appeal the Court's decision, a habeas petitioner must obtain a certificate of appealability. To obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *See Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *See Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002).

Here, all of Pouncy's claims on which the Court denied relief in this Opinion and Order are subject to debate by reasonable jurists. Reasonable jurists could also debate whether the Court ordered the proper remedy herein with respect to Pouncy's ineffective assistance of counsel claim arising out of the plea-bargaining process.

Accordingly, the Court **GRANTS** Pouncy a certificate of appealability on all of the claims on which it denied relief in this Opinion and Order and on the scope of relief it granted herein on his ineffective assistance of counsel claim.[36]

In addition, the Court's prior ruling in which it denied Pouncy's motion for reconsideration (ECF No. 377) is subject to debate by reasonable jurists. For that reason, the Court **GRANTS** Pouncy's motion for a certificate of appealability (*see* Mot., ECF No. 400) and **GRANTS** him a certificate of appealability on that claim as well.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated:  June 28, 2021                UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 28, 2021, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764

---

[36] The certificate of appealability does not cover the claims that Pouncy agreed not to pursue in connection with the resolution of Respondent's motion to dismiss, nor does it include Pouncy's *Brady* claim related to Willie Joyce.